**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

---

In the Matter of the Arbitration Between )
)
CORPORACIÓN MEXICANA )
DE MANTENIMIENTO INTEGRAL, )
S. DE R.L. DE C.V., )
a Mexican corporation, )
)     Case No. 08-CV-00469-RWR
         Petitioner, )
)
v. )
)
PEMEX EXPLORACIÓN Y PRODUCCIÓN, )
Gerencia Jurídica de Exploración y Producción )
Marina Nacional 329 Edificio A, Octavo Piso )
Colonia Huasteca, Delegación Miguel Delgado )
Mexico City, Federal District )
Mexico C.P. 11311, )
)
         Respondent. )

---

**PEMEX EXPLORACIÓN Y PRODUCCIÓN'S**
**MOTION TO DISMISS PETITION TO CONFIRM ARBITRATION AWARD**
**AND MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT THEREOF**

Robert B. Duncan (D.C. Bar No. 416283)
René E. Browne (D.C. Bar No. 463989)
HOGAN & HARTSON L.L.P.
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004-1109
Tel. (202) 637-5600
Fax. (202) 637-5910
E-mail: rbduncan@hhlaw.com
E-mail: rbrowne@hhlaw.com
*Attorneys for Respondent Pemex Exploración y*
*Producción*

Richard C. Lorenzo (Florida Bar No. 071412)
(Motion for *pro hac vice* admission pending)
Maria Eugenia Ramirez (Florida Bar No.
349320) (Motion for *pro hac vice* admission
pending)
HOGAN & HARTSON L.L.P.
1111 Brickell Avenue, Suite 1900
Miami, Florida 33131
Tel. (305) 459-6500
Fax. (305) 459-6550
Email: rlorenzo@hhlaw.com
Email: meramirez@hhlaw.com
*Attorneys for Respondent Pemex Exploración*
*Producción*

## <u>TABLE OF CONTENTS</u>

<u>Page</u>

TABLE OF AUTHORITIES ........................................................................................iii

I.  BACKGROUND ..........................................................................................1

II. MEMORANDUM OF POINTS AND AUTHORITIES ...........................................4

    A.  The Court Lacks Personal Jurisdiction Over PEP. ......................................4

    B.  COMMISA's Process and Service of Process of the Enforcement
        Petition Upon PEP are Insufficient. ...........................................................7

        1. Insufficient Process...............................................................................8

        2. Insufficient Service of Process ..............................................................9

    C.  COMMISA's Enforcement Petition Fails to State a Claim Upon
        Which Relief May be Granted.................................................................10

III. CONCLUSION ..........................................................................................14

## TABLE OF AUTHORITIES

**Page**

**CASES**:

*Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd.*, 191 F.3d 194 (2d Cir. 1999)............................13

*Berdakin v. Consulado de la República de El Salvador*, 912 F. Supp. 458
    (C.D. Ca. 1995)...............................................................................................................9

*Black & Veatch Pritchard, Inc. v. PDVSA Petróleo, S.A.*, Case No. 04-23190-
    CIV-UNGARO-BENAGES/BROWN (2004) ..................................................................8

*BPA Int'l., Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73 (D. D.C. 2003)............................5,6,7

*Europcar Italia, S.p.A. v. Maiellano Tours, Inc.*, 156 F.3d 310 (2d Cir. 1998) ............................14

*Evans v. Petróleos Mexicanos and Pemex Exploración y Producción*,
    No. 05-20434, 2006 WL 952265 (5th Cir. April 13, 2006) ................................................4

*Fertilizer Corp. of India v. IDI Mgmt.*, 517 F. Supp. 948 (S.D. Ohio 1981) ...............................14

*Frontera Resources Azerbaijan v. State Oil Co. of Azerbaijan*, 479 F. Supp. 2d
    376 (S.D.N.Y. 2007).........................................................................................................5

*Higgins v. SPX Corp.*, No. 1:05-CV-846, 2006 WL 1008677
    (W.D. Mich. April 18, 2006) ...........................................................................................14

*Kalasho v. Republic of Iraq*, No. 06-11030, 2007 WL 2683553
    (E.D. Mich. Sept. 7, 2007)...............................................................................................8

*Magness v. Russian Federation*, 247 F.3d 609 (5th Cir. 2001).......................................................9

*Nedagro B.V. v. Zao Konversbank*, No. 02-Civ-3946(HB), 2003 WL 151997
    (S.D.N.Y. Jan. 21, 2003) ................................................................................................14

*Pradhan v. Al-Sabah*, 299 F. Supp. 2d 493 (D. Md. 2004) .............................................................8

*Price v. Socialist People's Lybian Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002) .....................5

*Spier v. Calzaturificio Tecnica*, 663 F. Supp. 871 (S.D.N.Y. 1987) .........................................13,14

*Telcordia Techs., Inc. v. Telkom SA, Limited*, 95 Fed. Appx. 361
    (D.C. Cir. 2004).............................................................................................................14

*Unidyne Corp. v. Aerolineas Argentinas*, 590 F. Supp. 398 (E.D. Va. 1984)...........................9,10

**RULES:**

Fed. R. Civ. P. 4(j)(1) ........................................................................................... 7

Fed. R. Civ. P. 12(b)(2) .......................................................................................... 1

Fed. R. Civ. P. 12(b)(4) .......................................................................................... 1

Fed. R. Civ. P. 12(b)(5) .......................................................................................... 1

Fed. R. Civ. P. 12(b)(6) .......................................................................................... 1

**STATUTES:**

9 U.S.C. § 203 ......................................................................................................... 4

9 U.S.C. § 302 .................................................................................................. 4,11,13

9 U.S.C. §§ 207 .................................................................................................. 11,13

9 U.S.C.A. § 305 ................................................................................................... 11

28 U.S.C. § 1330(a) ................................................................................................ 4

28 U.S.C. § 1330(b) ................................................................................................ 4

28 U.S.C. §1603(a) ................................................................................................. 4

28 U.S.C. §1603(b) ................................................................................................. 4

28 U.S.C. §1605 ..................................................................................................... 4

28 U.S.C. § 1605(6)(B) ........................................................................................... 4

28 U.S.C. §1607 ..................................................................................................... 4

28 U.S.C. § 1608 ........................................................................................... 4,7,8,9,10

28 U.S.C. § 1608(b) ......................................................................................... 7,8,9,10

28 U.S.C. § 1608(b)(1) ............................................................................................ 7

28 U.S.C. §1608(b)(2) .......................................................................................... 7,10

28 U.S.C. §1608(b)(3) ............................................................................................. 7

**OTHER AUTHORITIES**

Albert Jan van den Berg, *The New York Arbitration Convention of 1958:*
    *Towards a Uniform Judicial Interpretation* 355 (1981) ....................................... 13

5 Inter-American Convention ..................................................................................................... 11

5(1)(b), Inter-American Convention ...................................................................................... 12,13

5(1)(c), Inter-American Convention ....................................................................................... 12,13

5(1)(e), Inter-American Convention ....................................................................................... 12,13

5(1)(d), Inter-American Convention ....................................................................................... 12,13

(5)(2)(b), Inter-American Convention .................................................................................... 12,13

6 Inter-American Convention ..................................................................................................... 13

D.C. Code Ann. §13-422 (2008) ................................................................................................. 5

D.C. Code Ann. §13-423 (2008) ................................................................................................. 6

Respondent, Pemex Exploración y Producción ("PEP"), hereby makes a special and limited entry of appearance in order to move this court to dismiss Petitioner, Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V.'s ("COMMISA"), Petition to Confirm Foreign Arbitral Award (the "Enforcement Petition"), for (i) lack of personal jurisdiction; (ii) insufficient process; (iii) insufficient service of process; and (iv) failure to state a claim upon which relief can be granted (the "Motion to Dismiss"). *See* Fed. R. Civ. P. 12(b)(2), (4), (5), (6). By making this special and limited entry of appearance to contest the Court's jurisdiction over it, Respondent does not submit itself in any way to this Court's jurisdiction nor does it consent to jurisdiction, and Respondent reserves all other defenses that it may have with respect to this matter. In support of its Motion to Dismiss, PEP states as follows:

## I.    **BACKGROUND**

As this Court is already aware, this matter involves a non-confirmed arbitral decision issued in Mexico (the "Arbitral Decision") related to a certain Engineering, Procurement, and Construction Contract (the "Contract") entered into between PEP and COMMISA (collectively referred to herein as the "Parties") concerning, among other things, the design, procurement, manufacture, and installation of a pipeline in Mexico. The arbitration between the Parties that led to the non-confirmed Arbitral Decision began in Mexico City, Mexico, on February 22, 2005, when COMMISA filed its Request for Arbitration against PEP before the International Court of Arbitration of the International Chamber of Commerce ("ICC") alleging, among other things, that PEP breached its obligations under the Contract.

In accordance with the Parties' agreement concerning arbitration, the applicable substantive law to the Contract was Mexican law and the arbitration was conducted entirely in Spanish, in Mexico City, Mexico. PEP actively participated in the arbitration through its

completion, filing a counterclaim against COMMISA and arguing, among other things, that certain disputes and issues submitted to arbitration could not be submitted to arbitration pursuant to the Contract's provisions.

On January 15, 2008 (but received by PEP on February 11, 2008), a non-unanimous Arbitral Tribunal issued its 183-page Arbitral Decision in favor of COMMISA and against PEP. Arbitrator Darío Ulises Oscós Coria issued a dissenting opinion (the "Dissenting Opinion") with regard to various aspects of the Arbitral Decision, holding, among other things, (i) that the parties' arbitration agreement was breached because although the Arbitral Tribunal had to rule based on Mexican law, in some instances, it ruled based on equity; (ii) that the Arbitral Tribunal went beyond the scope of the arbitration agreement; and (iii) that certain conditions stipulated in the Contract were breached in violation of Mexican law. *See* Dissenting Opinion, in Spanish with English translation, Exhibit 3 to Affidavit of Christopher M. Paparella, attached to COMMISA's Enforcement Petition.

As a result of these and other irregularities that transpired during the arbitration, on May 7, 2008, PEP, in accordance with Mexican law, filed before the Eighth Judicial District on Civil Matters of the First Circuit, in Mexico City, Mexico, a 309-page Complaint to Nullify the Arbitral Award (the "Complaint to Nullify"), the same Arbitral Decision that COMMISA prematurely now seeks to enforce before this District Court. *See* PEP's Complaint to Nullify in its original Spanish language,[1] attached hereto as **Exhibit A;**[2] Declaration of Sergio Aceves

---

[1]     The Complaint to Nullify is being filed in Spanish to bring it to the Court's attention at the earliest possible time. A certified English translation is currently being prepared and will be filed with the Court as soon as it is completed. Additionally, due to its size, the Complaint to Nullify is being filed without exhibits. Notwithstanding, the Complaint to Nullify's exhibits will be made available to the Court upon the Court's request.

[2]     PEP's Complaint to Nullify was admitted for consideration by the Mexican courts on May 12, 2008. *See* Borbolla Dec. at ¶ 16. In addition, the Complaint to Nullify was formally served upon COMMISA by the Mexican court on May 14, 2008. *See id.* On the eve of filing this Motion to Dismiss, that is, on Tuesday, March 20,

Borbolla at ¶ 14, dated May 20, 2008 (the "Borbolla Dec."), attached hereto as **Exhibit B**.[3] In its

Complaint to Nullify, PEP alleges that (i) PEP was unable to present its complete defense during

the arbitration proceedings; (ii) the Arbitral Decision is contrary to Mexico's public policy

because, among other things, it is contradictory and lacks legal foundation; (iii) the Arbitral

Decision contains decisions and rulings that go beyond the scope of the Parties' Contract and

arbitration agreement; and (iv) the Arbitral Decision concerns controversies that were not

intended by the Parties to be submitted to and resolved by arbitration. *See generally*, Complaint

to Nullify; Borbolla Dec. at ¶ 15.

As will be further explained below, given PEP's Complaint to Nullify, and given that (i)

the Court lacks personal jurisdiction over PEP; (ii) COMMISA's process upon PEP was

insufficient; (iii) COMMISA failed to properly serve its Enforcement Petition (D.E. 1) upon

PEP; and (iv) the Enforcement Petition fails to state a claim upon which relief may be granted

pursuant to the Federal Arbitration Act ("FAA"), the Inter-American Convention on

International Commercial Arbitration (the "Inter-American Convention"), and the doctrine of

comity, COMMISA's Enforcement Petition must be dismissed in its entirety.  In the alternative,

if the Court deems that the Enforcement Petition should not be dismissed, then PEP respectfully

requests that the Court stay these enforcement proceedings pending a final decision from the

Mexican courts on PEP's Complaint to Nullify.

---

2008, PEP was notified that COMMISA had filed a response to PEP's Complaint to Nullify in Mexico.  A copy of COMMISA's response to PEP's Complaint to Nullify will be provided to this Court upon receipt from the Mexican court.

[3]      An electronic copy of the Borbolla Dec. is being attached to the Motion to Dismiss.  The original, executed version of the Borbolla Dec. is available for review upon request pursuant to Local Civil Rule 5.4(b)(5).

## II.    MEMORANDUM OF POINTS AND AUTHORITIES

### A.    The Court Lacks Personal Jurisdiction Over PEP.

District courts have original jurisdiction, without regard to amount in controversy, of any "nonjury civil action against a foreign state[4] as defined in section 1603(a) of this title as to any claim for relief in personam with respect to which the foreign state is not entitled to immunity either under sections 1605-1607 of this title or under any applicable international agreement." 28 U.S.C. § 1330(a).  The Foreign Sovereign Immunities Act ("FSIA") then provides, under Section 1605(a), that a foreign state shall not be immune from the jurisdiction of courts of the United States in any case "in which the action is brought … to confirm an award made pursuant to such an agreement to arbitrate if … (B) the agreement or award is or may be governed by a treaty or other international agreement in force for the United States calling for the recognition and enforcement of arbitral awards" such as the Inter-American Convention.  28 U.S.C. § 1605(6)(B).  *See also* 9 U.S.C. § 203, 302.

Although based on the above PEP does not question this Court's subject matter jurisdiction over these proceedings, this Court, however, lacks personal jurisdiction over PEP. "Personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have jurisdiction under subsection (a) *where service has been made under section 1608 of this title*."  28 U.S.C. § 1330(b) (emphasis provided).  Given that service in this case did not comply with section 1608, as will be further explained below, the statutory requirements to acquire personal jurisdiction over PEP have not been met, and therefore this Court lacks personal

---

[4]    PEP is a decentralized government agency of the Federal Government of Mexico and a subsidiary of Petróleos Mexicanos ("PEMEX"), an agency of the Mexican government.  *See Evans v. Petróleos Mexicanos and Pemex Exploración y Producción*, No. 05-20434, 2006 WL 952265, at *1 (5th Cir. April 13, 2006) (affirming district court's finding that PEMEX and PEP were agencies of the Mexican government within the meaning of the Foreign Sovereign Immunities Act).  PEP therefore does not dispute that it is a "foreign state" within the meaning of the Foreign Sovereign Immunities Act, and more specifically, it does not dispute that it is "an agency or instrumentality of a foreign state."  *See id.*; 28 U.S.C. §1603(a) and (b).

jurisdiction over PEP. *See* Discussion on Insufficient Service and Service of Process in Section B, below.

Moreover, had the statutory requirements for personal jurisdiction over PEP been met, which they were not, COMMISA failed to satisfy the constitutional due process requirement that non-resident defendants have "certain minimum contacts with [the jurisdiction] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Frontera Resources Azerbaijan v. State Oil Co. of Azerbaijan*, 479 F. Supp. 2d 376, 380 (S.D.N.Y. 2007) (internal citations omitted); *BPA Intl., Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73, 82 (D. D.C. 2003) ("there must be some connection between a plaintiff's claims and the United States for a U.S. court to assert [personal] jurisdiction over a foreign government or its instrumentality").[5]

Here, PEP is not amenable to either general or specific personal jurisdiction due to its lack of forum-related contacts. The Court has no general personal jurisdiction over PEP as PEP has no minimum contacts with the District of Columbia nor with any other state in the United States. PEP is not "domiciled in, organized under the laws of, [n]or [does it] maintain ... its principal place of business" in the District of Columbia nor in any other state in the United States. D.C. Code Ann. §13-422 (2008); Borbolla Dec. at ¶ 3. PEP also does not have a

---

[5]        Although the District of Columbia Circuit has previously held in *Price v. Socialist People's Lybian Arab Jamahiriya*, 294 F.3d 82, 96 (D.C. Cir. 2002), that foreign states are not "persons" for purposes of the Due Process clause protected by the Fifth Amendment, and consequently no "minimum contacts" are needed once the statutory personal jurisdiction is established under the FSIA, *Price* is inapplicable here. First, as previously mentioned, COMMISA failed to meet the FSIA statutory requirements for this Court to acquire personal jurisdiction over PEP. *See* Discussion on Insufficient Service and Service of Process in Section B, above. Second, the court's personal jurisdiction analysis and holding in *Price* was limited to the application of the 1996 amendments to the FSIA, which were enacted as part of the Antiterrorism and Effective Death Penalty Act dealing with claims against foreign states for torture, hostage taking, and extrajudicial killing. *See id.* at 90. Finally, the *Price* court limited its holding to "actual foreign governments" as the court refused to comment on whether other entities that fall within the FSIA's definition of "foreign state, "such as corporations in which a foreign state owns a majority interest," could be considered "persons" under the Due Process clause. *See id.* at 100. *See also BPA Intl., Inc.*, 281 F. Supp. 2d at 82 ("Neither the [1996 FSIA] amendments nor the discussion in *Price* changed the pre-existing requirements that there must be some connection between a plaintiff's claims and the United States for a U.S. court to assert [personal] jurisdiction over a foreign government or its instrumentality").

continuing corporate presence in the District of Columbia nor in any other state in the United

States directed at advancing its objectives. *See BPA Intl., Inc.*, 281 F. Supp. 2d at 83; Borbolla

Dec. at ¶ 3. Additionally, PEP does not transact any business in the District of Columbia; does

not contract to supply services in the District of Columbia; has not caused tortious injury in the

District of Columbia by a local act or omission; has not caused tortious injury in the District of

Columbia by an act or omission outside the District of Columbia; has no real property in the

District of Columbia; does not possess or hold a mortgage or other lien on any real property

within the District of Columbia or any state of the United States; did not contract to insure

something in the District of Columbia; and does not have a marital or parent-child relationship in

the District of Columbia. *See* D.C. Code Ann. §13-423 (2008); Borbolla Dec. at ¶¶ 4-7. PEP

also does not have, and has never had, any employees, registered or other agents, offices, or

telephone or fax numbers, in any state of the United States; has never filed corporate income tax

returns, or paid taxes, to any agency of the United States or to any state or municipal government

in the United States; and does not have, and has never had, any motor vehicles or vessels in any

state of the United States. *See* Borbolla Dec. at ¶¶ 8-9. In short, PEP is a Mexican "foreign

state" within the meaning of the FSIA, and no harm occurred in the District of Columbia nor

anywhere else in the United States pertaining to the Contract or the Parties' dispute. There is

therefore no general jurisdiction over PEP. *See, e.g., BPA Intl., Inc.* 281 F. Supp. 2d at 83

(finding no general jurisdiction over defendant).

"A court has specific jurisdiction when the cause of action arises out of or has a

substantial connection with the defendant's activity in the court's district." *Id.* Here, all actions

pertaining to the Contract and the arbitration took place outside of the United States, specifically

in Mexico. *See* Borbolla Dec. at ¶ 13. Since neither the Petitioner nor the Respondent reside in

the District of Columbia, no action was taken in the District of Columbia to harm COMMISA, and no consequence of the alleged actions has been shown to have an impact in the District of Columbia, specific jurisdiction is also inapplicable here. *See BPA Intl., Inc.* 281 F. Supp. 2d at 83 (finding no specific jurisdiction over defendant).

Accordingly, PEP has no adequate minimum contacts with the United States and therefore, COMMISA's Enforcement Petition should be dismissed in its entirety for lack of personal jurisdiction over PEP.

**B.    COMMISA's Process and Service of Process of the Enforcement Petition Upon PEP are Insufficient.**

"A foreign state or its political subdivision, agency, or instrumentality must be served in accordance with 28 U.S.C. § 1608 [the FSIA]." Fed. R. Civ. P. 4(j)(1).  Section 1608 of the FSIA then provides that service in the United States courts of an agency or instrumentality of a foreign state, such as PEP, shall take place in the following manner:

> (1) by *delivery of a copy of the summons and complaint* in accordance with any special arrangement for service between the plaintiff and the agency or instrumentality; or (2) if no special arrangement exists, *by delivery of a copy of the summons and complaint* either to an officer, a managing or general agent, or to any other agent authorized by appointment or by law to receive service of process in the United States; or in accordance with an applicable international convention on service of judicial documents; or (3) if service cannot be made under paragraphs (1) or (2), and if reasonably calculated to give actual notice, by delivery of a copy of the summons and complaint, together with a translation of each into the official language of the foreign state – (A) as directed by an authority of the foreign state or political subdivision in response to a letter rogatory or request, or (B) by any form of mail requiring a signed receipt, to be addressed and dispatched by the clerk of the court to the agency or instrumentality to be served, or (C) as directed by order of the court consistent with the law of the place where service is to be made. (emphasis provided).

28 U.S.C. § 1608(b)(1)-(3).

Here, the process and the service of process upon PEP were insufficient, and the Enforcement Petition should therefore be dismissed in its entirety on these grounds alone.

## 1.    <u>Insufficient Process</u>

In accordance with the mandates of the FSIA, an agency of a foreign state must be served with *both* a copy of the summons and the complaint. *See* 28 U.S.C. § 1608(b) (service in United States courts of an agency or instrumentality of a foreign state shall take place "(1) by delivery of a copy of the <u>summons</u> and <u>complaint</u>") (emphasis provided). *See also* Civil Action Summons for PDVSA Petróleo, S.A. in *Black & Veatch Pritchard, Inc. v. PDVSA Petróleo, S.A.*, Case No. 04-23190-CIV-UNGARO-BENAGES/BROWN, United States District Court for the Southern District of Florida (filed 2004) (issuing summons for foreign state Respondent PDVSA Petróleo, S.A. as part of service of process of petition for confirmation of foreign arbitral award), attached hereto as **Exhibit C**; *Kalasho v. Republic of Iraq*, No. 06-11030, 2007 WL 2683553, at 9 (E.D. Mich. Sept. 7, 2007) (holding that FSIA "Section [1608] (b)(2) … requires service by delivery of a copy of the summons and complaint); *Pradhan v. Al-Sabah*, 299 F. Supp. 2d 493, 500 (D. Md. 2004) (ordering plaintiffs to properly serve defendants by serving a copy of both the court summons and complaint upon defendants).

Here, COMMISA only allegedly served a copy of the Enforcement Petition upon PEP, but completely failed to serve a Court-issued summons upon PEP who never received one, through any means, in this case. *See* Borbolla Dec. at ¶ 10. Indeed, even the Court docket reveals that no summons was ever issued in this enforcement action or that any return of service was ever filed in this case. *See, e.g.,* Court Docket, Case No. 08-CV-00469-RWR. Accordingly, COMMISA has failed to serve sufficient process upon PEP, and thus COMMISA's Enforcement Petition must be dismissed.

2.      **Insufficient Service of Process**

In addition to the above requirement, the FSIA establishes the exclusive means of service

of an agency or instrumentality of a foreign state.  Subsections one though three of Section

1608(b) of the FSIA "establish a hierarchy requiring a plaintiff first to serve process in

accordance with any special arrangement, and if none, then according to any applicable []

convention on service of judicial documents, and if none, then as provided in subsection three

…." *Unidyne Corp. v. Aerolineas Argentinas*, 590 F. Supp. 398, 401 (E.D. Va. 1984).  *See also*

*Magness v. Russian Federation,* 247 F.3d 609, 613 (5th Cir. 2001) ("The provisions for service

under [FSIA] section 1608 are hierarchical, such that a plaintiff must attempt the methods of

service in the order they are laid out in the statute.").

Here, COMMISA attempted to serve the Enforcement Petition upon PEP via Registered

Mail, Express Mail and Federal Express.  *See* Certificate of Service in Enforcement Petition

(D.E. 1); Notice of Amended Certificate of Service (D.E. 3).  These service methods are

insufficient to properly give notice to PEP and to serve the Enforcement Petition upon PEP.

First, no special arrangement exists between COMMISA and PEP for the service of enforcement

petitions of arbitral awards.  *See generally* Contract; Borbolla Dec. at ¶¶ 11-12.  Thus, attempted

service of the Enforcement Petition via Registered Mail, Express Mail and Federal Express is

insufficient and improper.  *See Berdakin v. Consulado de la República de El Salvador*, 912 F.

Supp. 458, 466 (C.D. Ca. 1995)  (holding that recital in lease provision did not mention service

of process and therefore the lease provision did not constitute a special arrangement for service

of process").

Given that there is no special arrangement for the service of arbitral award enforcement

petitions between the Parties, service of the Enforcement Petition must therefore take place in

accordance with subsection two of Section 1608(b) of the FSIA, that is, by delivering a copy of the summons and complaint to a PEP officer, managing or general agent authorized to receive service of process in the United States on behalf of PEP or in accordance to any applicable international convention on service of judicial documents, such as the Convention on the Service Abroad of Judicial and Extrajudicial Documents in Civil or Commercial Matters (the "Hague Service Convention").[6]  Given that PEP has no officers or managing or general agents in the United States authorized to receive process on its behalf, then service must be made in accordance with, for instance, the Hague Service Convention, which provides for service pursuant to letters rogatory.  *See* 28 U.S.C. §1608(b)(2); *see generally* Hague Service Convention.[7]  Since COMMISA failed to serve PEP in accordance with an international convention on the service of judicial documents, service upon PEP was insufficient.

Accordingly, COMMISA's Enforcement Petition should be dismissed in its entirety for insufficient service of process (as well as for lack of personal jurisdiction as further discussed in Section A, above).  *See Unidyne Corp.*, 590 F. Supp. at 402 (holding that service of process of foreign state was not obtained in accordance with Section 1608 of the FSIA and therefore no personal jurisdiction over the defendant was obtained).

**C.    COMMISA's Enforcement Petition Fails to State a Claim Upon Which Relief May be Granted.**

In accordance with the FAA, the Inter-American Convention and the doctrine of comity, the Enforcement Petition also fails to state a claim upon which relief can be granted.

---

[6]    Both Mexico and the United States are signatories to the Hague Service Convention. *See* List of Signatories, Hague Service Convention.

[7]    Given the service hierarchy order established by Section 1608(b) of the FSIA, COMMISA cannot serve the Enforcement Petition under subsection three of Section 1608(b) until it has attempted service under subsection two of Section 1608(b). *See Unidyne Corp.,* 590 F. Supp. at 401.

More specifically, under the plain language of the FAA, arbitral awards should be confirmed *unless* the federal court where enforcement is sought "finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said [Inter-American] Convention."[8] 9 U.S.C. §§ 207, 302.

As enumerated in the Inter-American Convention, there are seven grounds under which a court may refuse to confirm and enforce an arbitral award: (i) the parties are under some incapacity with respect to the applicable arbitration agreement, or the agreement is otherwise invalid; (ii) the party against whom the award is invoked was not given proper notice of the arbitration or appointment of an arbitrator or was otherwise unable to present its case and defense; (iii) the award exceeds the scope of the terms of the submission to arbitration; (iv) the composition of the arbitral authority or the arbitral procedure was not in accordance with the parties' agreement; (v) the award has not yet become binding on the parties; (vi) the subject matter of the award is not capable of settlement by arbitration under the law of the court where confirmation and enforcement are sought; or (vii) the confirmation or enforcement of the award would be contrary to public policy. *See* Art. 5, Inter-American Convention.

Here, the arbitration concerned a dispute between two Mexican entities, the Arbitral Decision was issued in Mexico, the arbitration took place in Mexico, and the Arbitral Tribunal was required to apply Mexican substantive law. Thus, the courts in Mexico are the "competent

---

[8]        Section 305 of the FAA provides that when the requirements for application of both the Inter-American Convention and the Convention on the Recognition and Enforcement of Foreign Arbitral Awards (the "New York Convention") are met, determination as to which Convention applies shall be made as follows: (1) if a majority of the parties to the arbitration agreement are citizens of a State which has ratified the Inter-American Convention *and* are member States of the Organization of American States ("OEA"), then the Inter-American Convention shall apply; (2) in all other cases the New York Convention shall apply. *See* 9 U.S.C.A. § 305. Here, since both COMMISA and PEP are Mexican citizens, and Mexico is both a signatory to the Inter-American Convention and a member of the OEA, the Inter-American Convention applies when seeking enforcement of the Arbitral Decision.

authority" that can annul the Arbitral Decision in accordance to Article 5(1)(e) of the Inter-American Convention. *See* Art. 5(1)(e), Inter-American Convention ("The recognition and execution of [an arbitral award] <u>may be refused</u> … [if the party against whom it was made] is able to prove to the competent authority of the State in which recognition and execution are requested [e.g. the United States] … (e) that <u>the decision is not yet binding on the parties</u> or has been annulled or suspended <u>by a competent authority of the State in which, or according to the law of which, the decision has been made [e.g. Mexico].</u>") (emphasis provided).

Given that the courts in Mexico are the "competent authority" that can annul the Arbitral Decision, on May 7, 2008, PEP timely filed before the Mexican courts, and the Mexican courts admitted, the Complaint to Nullify seeking the annulment of the Arbitral Decision under the following grounds provided in the Inter-American Convention:  (i) PEP was unable to present its complete defense during the arbitration proceedings; (ii) the Arbitral Decision concerns controversies that were not intended by the Parties to be submitted to and resolved by arbitration; (iii) the Arbitral Decision exceeds the scope of the Parties' Contract and arbitration agreement; and (iv) confirmation or enforcement of the Arbitral Decision would be contrary to public policy. *See* Arts. 5(1)(b), 5(1)(c), 5(1)(d), (5)(2)(b), Inter-American Convention; *see generally*, Complaint to Nullify.  Given the pending Complaint to Nullify filed in Mexico, the Arbitral Decision is therefore "not yet binding on the [P]arties." Art. 5(1)(e), Inter-American Convention. *See also* Borbolla Dec. at ¶ 16.

Accordingly, pursuant to the FAA and the Inter-American Convention, this Court may exercise its discretion and refuse to enforce the Arbitral Decision given that multiple grounds for refusal of recognition or enforcement of the Arbitral Decision - as specified in the Inter-American Convention - are present and have been raised by PEP in its pending Complaint to

Nullify in Mexico. *See* 9 U.S.C. §§ 207, 302; Arts. 5(1)(b), 5(1)(c), 5(1)(d), 5(1)(e), (5)(2)(b),

Inter-American Convention. *See also, e.g.*, *Spier v. Calzaturificio Tecnica,* 663 F. Supp. 871,

874 (S.D.N.Y. 1987) (holding that adjournment of an arbitral award enforcement petition is

"[c]learly [a] remedy [that] is discretionary with the district court."). The reasoning behind the

existence of the court discretion in arbitral award enforcement proceedings is that "mechanical

application of domestic arbitral law to foreign awards under the [Inter-American] Convention

would seriously undermine finality and regularly produce conflicting judgments. If a party

whose arbitration award has been vacated [or could be vacated] at the site of the award can

automatically obtain enforcement of the award under the domestic laws of other nations, a losing

party will have every reason to pursue its adversary 'with enforcement actions from country to

country until a court is found, if any, which grants the enforcement.'" *Baker Marine (Nig.) Ltd.*

*v. Chevron (Nig.) Ltd.*, 191 F.3d 194, 197, n.2 (2d Cir. 1999), *citing* Albert Jan van den Berg,

*The New York Arbitration Convention of 1958: Towards a Uniform Judicial Interpretation* 355

(1981).

   In short, this matter is a peculiarly Mexican affair, concerning a dispute involving

Mexican parties to a contract to perform services in Mexico, that led to an arbitration decision

where the Arbitral Tribunal was required to apply Mexican law, and is now in litigation in

Mexico to annul the Arbitral Decision. Based on all of the above, and in accordance with the

FAA, the Inter-American Convention, and the doctrine of comity, this Court should exercise its

discretion and dismiss, or in the alternative stay, COMMISA's Enforcement Petition given the

Mexican court's pending determination on the merits of PEP's Complaint to Nullify. *See* Art.

5(1)(e), Inter-American Convention; Article 6, Inter-American Convention ("If the competent

authority mentioned in Article 5.1.e [*e.g.* Mexico] has been requested to annul or suspend the

13

arbitral decision, the authority before which such decision is invoked [e.g. United States] may, if it deems appropriate, postpone a decision on the execution of the arbitral decision …."); *Telcordia Tech., Inc. v. Telkom SA, Ltd.,* 95 Fed. Appx. 361 (D.C. Cir. 2004) (affirming district court's dismissal of arbitral award enforcement petition in light of defendant's pending challenge of award before South Africa courts). *See also Europcar Italia, S.p.A. v. Maiellano Tours, Inc.,* 156 F.3d 310, 317 (2d Cir. 1998) ("[W]here a parallel proceeding is ongoing in the originating country and there is a possibility that the award will be set aside, a district court may be acting improvidently by enforcing the award prior to the completion of the foreign proceedings."); *Higgins v. SPX Corp.,* No. 1:05-CV-846, 2006 WL 1008677, at *4 (W.D. Mich. April 18, 2006) (holding that "comity and efficient use of judicial resources does strongly favor staying this action to await the decision of the Brazilian courts as to the nullification action."); *Nedagro B.V. v. Zao Konversbank,* No. 02-Civ-3946(HB), 2003 WL 151997, at *7 (S.D.N.Y. Jan. 21, 2003) (holding that deferment of the arbitral award enforcement petition was appropriate in light of the pendency of annulment proceedings in Russia); *Spier,* 663 F. Supp. at 871 (holding that stay of petition to enforce arbitral award was proper in light of respondent's challenge of award in Italy); *Fertilizer Corp. of India v. IDI Mgmt.,* 517 F. Supp. 948 (S.D. Ohio 1981) (holding that stay of petition to enforce arbitral award was proper in light of respondent's challenge of award in India).

## III.  CONCLUSION

Based on the allegations set forth above, Respondent, PEP, respectfully requests that:

1.    This Court grant, in its entirety, PEP's Motion to Dismiss COMMISA's Enforcement Petition (D.E. No. 1).

2.    Alternatively, PEP respectfully requests that the Court stay these proceedings pending a decision from the local Mexican courts on PEP's Complaint to Nullify.

Dated: May 21, 2008

Respectfully Submitted:

s/ René E. Browne
Robert B. Duncan (D.C. Bar No. 416283)
René E. Browne (D.C. Bar No. 463989)
HOGAN & HARTSON L.L.P.
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004-1109
Tel. (202) 637-5600
Fax. (202) 637-5910
E-mail: rbduncan@hhlaw.com
E-mail: rbrowne@hhlaw.com
*Attorneys for Respondent Pemex Exploración y Producción*

Richard C. Lorenzo (Florida Bar No. 071412)
(Motion for *pro hac vice* admission pending)
Maria Eugenia Ramirez (Florida Bar No. 349320)
(Motion for *pro hac vice* admission pending)
HOGAN & HARTSON L.L.P.
1111 Brickell Avenue, Suite 1900
Miami, Florida 33131
Tel. (305) 459-6500
Fax. (305) 459-6550
Email: rlorenzo@hhlaw.com
Email: meramirez@hhlaw.com
*Attorneys for Respondent Pemex Exploración y Producción*

### CERTIFICATE OF SERVICE

I hereby certify that on May 21, 2008, I electronically filed the foregoing Motion to Dismiss Petition to Confirm Arbitration Award, and the exhibits thereto, with the Clerk of the Court using CM/ECF. I also certify that the foregoing motion and exhibits are being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF, or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/ René E. Browne
René E. Browne

16

**SERVICE LIST**
**COMMISA V. PEP**
**CASE NO. 08-CV-00469**
**UNITED STATES DISTRICT COURT, DISTRICT OF COLUMBIA**

| | |
|---|---|
| **Robert M. Kennedy, Jr.** | **Christopher M. Paparella** |
| Hughes Hubbard & Reed LLP | Hughes Hubbard & Reed LLP |
| 1775 I Street, N.W. | One Battery Park Plaza |
| Washington, D.C. 20006-2401 | New York, New York 10004-1482 |
| Telephone:  (202) 721-4600 | Tel (212) 837-6644 |
| Facsimile:  (202) 721-4646 | Fax (212) 422-4726 |
| kennedyr@hugheshubbard.com | paparella@hugheshubbard.com |
| Attorney for Petitioner | Attorney for Petitioner |
| | |
| Via Transmission of Notices of Electronic Filing Generated by CM/ECF | Via First Class Mail, postage pre-paid |

17

<u>Exhibit A</u>

Part 1 of  7

PEMEX EXPLORACIÓN Y PRODUCCION

VS.

CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V.

**INCIDENTE DE NULIDAD DE LAUDO ARBITRAL**

**DEMANDA INCIDENTAL**

## C. JUEZ DE DISTRITO EN MATERIA CIVIL EN TURNO EN EL DISTRITO FEDERAL.

**JOSÉ NÉSTOR GARCÍA REZA**, en mi carácter de apoderado de PEMEX EXPLORACIÓN Y PRODUCCIÓN (de aquí en adelante y por economía procesal denominada **"PEP"**) como lo acredito con la copia certificada de la escritura pública No. 13,250 pasada ante el Notario Público No. 229 del Distrito Federal, LIC. MARCO ANTONIO RUIZ AGUIRRE, misma que acompaño al presente escrito, y señalando con domicilio para oír y recibir toda clase de notificaciones y documentos el ubicado en AVENIDA PASEO DE LA REFORMA Nº 265 PISO 2, LOCAL 3, C.P. 06500, DELEGACION CUAUHTEMOC, en esta Ciudad de México, DISTRITO FEDERAL, y autorizando para oír y recibir todo tipo de notificaciones y documentos e imponerse de los autos a los Licenciados JORGE HERNANDEZ ROMO, MIGUEL ANGEL HERNANDEZ ROMO, MIGUEL ANGEL HERNANDEZ-ROMO VALENCIA, JORGE ENRIQUE HERNANDEZ MARIN JAIME DUARTE AISPURO, HECTOR OMAR LOPEZ REYNOSO, MARIO ENRIQUE AGUILAR ARAUJO y CLAUDIO ERIC DEVEZE MONTOYA,

1

indistintamente, así como a los Señores JULIO SERGIO CORONEL ESPEJEL y GERARDO BAROJAS LECHUGA, indistintamente, ante usted expongo respetuosamente:

Con fundamento en lo dispuesto por los artículos 1457, 1458, 1460 y demás relativos del Código de Comercio, así como con fundamento en el artículo 360 del Código Federal de Procedimientos Civiles, en nombre y representación de PEP demando en la vía incidental de CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V. (de aquí en adelante y por economía procesal denominada "**COMMISA**") con domicilio en HOMERO No. 534-7° PISO, COLONIA CHAPULTEPEC MORALES, MÉXICO 11570, D. F., la nulidad del Laudo Arbitral pronunciado por los árbitros JUAN FERNÁNDEZ-ARMESTO, JOSÉ W. FERNÁNDEZ y DARÍO ULISES OSCÓS CORIA, en el juicio Arbitral seguido por **COMMISA** en contra de **PEP** en el procedimiento de arbitraje 13716/CCO/JRF, administrado por la Corte Internacional de Arbitraje de la Cámara Internacional de Comercio, y que debía ser resuelto conforme a Derecho Mexicano Federal en cuanto al fondo del negocio y conforme a las reglas de arbitraje de la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional, en cuanto al procedimiento, **mismo que fue notificado a mi representada PEP el día 11 de Febrero de 2008**. La razón por la cual se demanda la NULIDAD DEL LAUDO obedece a que dicho Laudo Arbitral es (a) contrario al orden público por ser contradictorio e infundado,

2

(b) contiene decisiones que exceden los términos del acuerdo arbitral y (c) se refiere a controversias no previstas en el acuerdo de arbitraje, y se solicita se condene a la parte demandada incidental a las siguientes

## P R E S T A C I O N E S

a) Que se decrete la nulidad del laudo arbitral mencionado, por ser contrario al orden público, por resolver controversias no planteadas por las partes en el arbitraje y por haber sido dictado en exceso de las facultades de los árbitros,

b) Que se condene a la demandada incidental al pago de los gastos y costas ocasionados por la tramitación del presente juicio incidental.

## OPORTUNIDAD DE LA DEMANDA DE NULIDAD

Como se señaló anteriormente, el laudo arbitral le fue notificado a mi representada el 11 de Febrero de 2008, por lo que mi representada presenta esta demanda dentro de los 3 meses que le concede el Código de Comercio, en su artículo 1458.

Fundo esta demanda INCIDENTAL DE NULIDAD DE LAUDO ARBITRAL, en los siguientes ANTECEDENTES, HECHOS y CONSIDERACIONES DE DERECHO.

3

## A N T E C E D E N T E S

I.- Con fecha 4 de septiembre de 1998, PEP y COMMISA celebraron Contrato de Obra Pública a Precios Unitarios y Tiempo Determinado número PEP-O-IT-136/98 (o IPC-28), cuyo objeto consistió en: diseño, procura, fabricación, tendido de tubería, revestimiento anticorrosivo, lastrado, protección catódica, ductos ascendentes, instalación y prueba de válvulas, contratados originalmente a un plazo de 528 días naturales y por un monto original de $155'975,313.77 pesos de los Estados Unidos Mexicanos y $171'851,364.10 dólares de los Estados Unidos de América.

El Contrato de Obra Pública descrito es un contrato administrativo ya que se encuentra regulado por la Ley de Adquisiciones y Obras Públicas (de aquí en adelante y por economía procesal denominada LAOP) y el Reglamento de la Ley de Obras Públicas, entre otras disposiciones administrativas, cuyo objeto persigue un interés colectivo consistente en una obra pública, siendo por tanto su cumplimiento y el de su regulación de orden público e interés social, tal como se desprende del artículo 134 de la Constitución, y del artículo 1 de la LAOP.

II. PEP y COMMISA suscribieron 16 convenios modificatorios, siendo éstos los que a continuación se mencionan:

4

| No. | Fecha | Motivo |
|---|---|---|
| 1 | 04/02/2000 | Prórroga por mal tiempo. |
| 2 | 31/05/2000 | Prórroga al plazo de la ejecución de los |
| 3 | 20/07/2000 | trabajos. |
| 4 | 29/08/2000 | Prórroga por mal tiempo. |
| 5 | 03/11/2000 | Prórroga por mal tiempo. |
| 6 | 21/11/2000 | Incremento al monto del contrato. |
| 7 | 26/12/2000 | Desagregación de precios. |
| 8 | 16/05/2001 | Único de plazo (modificación al plazo de ejecución de los trabajos) |
| 9 | 13/06/2001 | Modificación al monto del contrato. |
| 10 | 19/09/2001 | Modificación al monto por trabajos extraordinarios |
| 11 | 29/11/2001 | Modificación al monto del contrato. |
| 12 | 22/12/2001 | Modificación al monto del contrato. |
| 13 | 01/02/2002 | Modificación al monto del contrato. |
| 14 | 22/02/2002 | Prórroga Fecha de terminación del |
| 15 | 16/03/2002 | contrato. |
| 16 | 31/05/2002 | Prórroga de terminación de los trabajos. |
|  |  | Prórroga de terminación de los trabajos. |
|  |  | Prórroga de terminación de los trabajos. |

III. En la cláusula 23.3 del Contrato, PEP y COMMISA se comprometieron en árbitros para dirimir cualquier controversia, reclamación o disputa que sobrevenga o se

5

relacione o esté vinculada con el contrato o su incumplimiento, mismo que sería conducido en idioma español de conformidad con el Reglamento de Arbitraje de la Cámara de Comercio Internacional (CCI), y su sede o lugar de arbitraje sería el Distrito Federal, México. Pactándose adicionalmente que, **no obstante lo anterior** (es decir, no obstante que se trate de una controversia, reclamación o disputa que sobrevenga o se relacione o esté vinculada con el contrato o su incumplimiento), cualquier controversia técnica tendría que **someterse previamente** al procedimiento previsto en la cláusula 23.2 del mismo Contrato.

IV. Los trabajos ejecutados dentro del marco contractual fueron concluidos el 8 de abril del 2002, y fueron recibidos formalmente por PEP, mediante "*Acta de Recepción Física Total de los Trabajos*", de fecha 30 de Agosto de 2002.

V. Al terminar los trabajos objeto del Contrato de Obra Pública, COMMISA estimó que PEP le debía una cantidad que calculó en 147 millones de dólares en concepto de: i).- Adeudos bajo el contrato IPC-28 como resultado de los atrasos causados por PEP para el inicio de los trabajos de construcción de COMMISA; ii).- Adeudos por las interrupciones causadas por PEP en los trabajos de COMMISA después de haber iniciado sus actividades y por los trabajos adicionales que PEP solicitó y aún no ha pagado; y, iii).-



Adeudos por los trabajos realizados dentro del alcance original del contrato IPC-28.

VI. Basado en tales razones, y ante la imposibilidad de conciliar las diferencias con PEP, con fecha 14 de febrero de 2005, COMMISA solicitó el Arbitraje de la Cámara de Comercio Internacional.

VII. COMMISA inició arbitraje en contra de PEP. La demanda promovida por COMMISA le fue notificada a PEP el 22 de febrero de 2005 (Referencia: Caso 13716/CCO/JRF), por conducto de la Secretaría de la Corte Internacional de Arbitraje de la Cámara Internacional de Comercio.

VIII. De conformidad con el artículo 1.2 del Reglamento de Arbitraje de la CCI, la Corte de Arbitraje no resuelve por sí misma las controversias, sino que administra el arbitraje y se encarga de vigilar la aplicación del Reglamento. La controversia o demanda es resuelta por uno o más árbitros, a los que en conjunto se les denomina "Tribunal Arbitral".

IX. El Tribunal Arbitral estuvo conformado por tres Árbitros, a saber: Don Juan Fernández-Armesto, Presidente del Panel Arbitral designado por la Corte Internacional de Arbitraje; José W. Fernández, Árbitro designado por la parte demandante; y Darío Ulises Oscós Coria, Árbitro designado por PEP. Estos árbitros indicaron que sus domicilios, para los

7

efectos del Juicio Arbitral, respectivamente serían los siguientes:

a) Armesto & Asociados, General Pardiñas 102, 28006 Madrid, España; fax 00 34 91 515 9145; y correo electrónico jfa@jfarmesto.com.

b) Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022, Fax 001 212 326 2061, y su correo electrónico es jose.fernandez@lw.com.

c) Darío Oscos, S. C., Joaquín Gallo No. 53, Colonia Chimalistac, Delegación Coyoacán, México, Distrito Federal, Código Postal 04340, Fax 55 50 12 73, y su correo electrónico es doscos@oscosabogados.com.mx

X. Es importante subrayar que los Tribunales Arbitrales no son Tribunales permanentes sino que se constituyen para resolver cada uno de los asuntos que se le encomiendan y que son administrados por la Corte Internacional de Arbitraje dependencia de la Cámara Internacional de Comercio, con sede en París, Francia, desapareciendo una vez que se ha emitido el Laudo o se ha agotado el recurso de solicitud de interpretación, aclaración o corrección de laudo.

Además, los Tribunales Arbitrales carecen de una ubicación específica para todos los casos, por lo que las comunicaciones y escritos de las partes se envían mediante correo electrónico o mediante fax o mediante servicio de



mensajería, de conformidad con el artículo 3.2 del Reglamento de Arbitraje de la CCI, y a la Orden Procesal No. 1 ter emitida por el Tribunal Arbitral, a los domicilios de los señores árbitros.

La Corte Internacional de Arbitraje de la CCI tiene como domicilio el de: 38 Cours Albert 1er, 75008, París, Francia, fax 0033149532933 y correo electrónico arb@iccwbo.org. Para efectos del arbitraje en cuestión las comunicaciones eran dirigidas a D. José Ricardo Feris, consejero encargado del expediente, con correo electrónico jfs@iccwbo.org.

Lo anterior es también causa de que las partes no tengan recibos formales de las comunicaciones al Tribunal Arbitral, dado que el medio más usual de comunicación es a través de medios electrónicos.

XI. Tanto los árbitros que constituyeron el Tribunal Arbitral, así como la Corte de internacional de Arbitraje de la CCI, carecen de interés en el laudo que se pronuncie, porque no tienen interés en los términos en los cuales se emita, y por tanto, tampoco en los términos en los cuales se emita la sentencia del presente incidente.

XII. El artículo 34 del Reglamento de Arbitraje, al cual ambas partes se sometieron como procedimiento para resolver sus diferencias, establece que ni los árbitros, ni la

9

Corte, ni la CCI o sus empleados, ni los Comités Nacionales de la CCI, serían responsables frente a persona alguna, de hechos, actos u omisiones relacionados con el arbitraje.

XIII. El artículo 1 del Código Federal de Procedimientos Civiles, supletorio del de Comercio, establece que:

> "Sólo puede iniciar un procedimiento judicial o intervenir en él, quién tenga interés en que la autoridad judicial declare o constituya un derecho o imponga una condena, y quién tenga el interés contrario".

En ese sentido, al no tener interés en el laudo emitido, y no afectarse el patrimonio o cualquier otro derecho de los árbitros, de la Corte o de la CCI, estas personas carecen de igual manera de interés para intervenir en el juicio que se promueve con este escrito. Sirve por analogía, la aplicación de la siguiente:

> "ÁRBITROS. CARECEN DE INTERÉS JURÍDICO PARA RECLAMAR EN EL JUICIO DE AMPARO LA RESOLUCIÓN QUE DECLARA LA NULIDAD DEL LAUDO ARBITRAL POR NO CAUSAR DIRECTAMENTE PERJUICIO ALGUNO EN SU PATRIMONIO O PERSONA[1]. Para que proceda la acción de amparo es indispensable que quien la promueva acredite fehacientemente ante el juzgador federal que la actuación de la autoridad responsable le causa directamente perjuicios en su persona, derechos, bienes o posesiones, para que ipso facto se analice la posible violación de garantías, situación que no acontece cuando los quejosos son los

---

[1] No. Registro: 181,790. Tesis aislada. Materia(s): Común. Novena Época. Instancia: Tribunales Colegiados de Circuito. Fuente: Semanario Judicial de la Federación y su Gaceta. XIX, Abril de 2004. Tesis: I.10o.C.7 K. Página: 1388.

integrantes de un tribunal arbitral porque si lo que se reclama es el laudo emitido por éstos <u>y se declara su nulidad los efectos del acto reclamado, en sí mismos, no producen afectación a algún derecho real o material en contra de los integrantes del tribunal arbitral,</u> susceptible de apreciarse en forma objetiva para que se pueda constituir un perjuicio que les agravie de manera directa y personal, como sí sería que en la propia resolución reclamada el Juez responsable, al declarar la nulidad del laudo que emitieron, les haya impuesto una sanción pecuniaria o hubiese determinado que no tenían derecho al cobro de honorarios. En otras palabras, si de la resolución que constituye el acto reclamado, no se advierte que los árbitros quejosos resienten directamente un perjuicio en su patrimonio o persona, teniendo en cuenta que éste debe acreditarse en forma fehaciente y no inferirse a base de presunciones, no se actualiza la existencia de una afectación a su interés jurídico que haga procedente el juicio de amparo; de ahí surge la actualización de la causa de improcedencia prevista en la fracción V del artículo 73 de la Ley de Amparo.
DÉCIMO TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.
Amparo en revisión 390/2003. José Sáenz Viesca y otros. 17 de febrero de 2004. Unanimidad de votos. Ponente: Víctor Hugo Díaz Arellano. Secretaria: Elizabeth Estrada Mier."

XIV. Una vez designado el Tribunal Arbitral, el 6 de septiembre de 2005, fue firmada el Acta de Misión tanto por las partes como por el Tribunal Arbitral, en audiencia celebrada en la Ciudad de México, acta en la cual se fijaron los puntos litigiosos a resolverse por el Tribunal Arbitral.

XV. Consta en el punto II del Laudo Arbitral (página 7 del mismo) que en el convenio arbitral, tanto los árbitros como las

partes en el arbitraje determinaron en el punto 11 (once) lo siguiente:

> "Los árbitros carecen de poderes de amigable componedor o para decidir en equidad"

XVI. El 6 de Septiembre de 2005 las partes y el Tribunal Arbitral acordaron en el Acta de Misión, párrafo (H) **que el ordenamiento jurídico aplicable al fondo del asunto lo constituyen las Leyes Federales de los Estados Unidos Mexicanos. En consecuencia, las partes pactaron que el arbitraje se llevaría a cabo en estricto derecho y no conforme a la equidad o en conciencia.**

XVII. El proceso se desarrolló de la manera siguiente:

- El 16 de enero de 2006, COMMISA presentó ante el Tribunal Arbitral escrito detallado de su demanda, conforme a lo señalado en la Orden Procesal 1 ter, comunicación de 12 de diciembre de 2005.
- PEP, con fecha 2 de marzo de 2006, presentó su contestación a la demanda detallada de COMMISA, planteando a su vez demanda reconvencional.
- El 5 de abril de 2006, COMMISA presentó su escrito de Réplica y Contestación a la Reconvención, de acuerdo a la comunicación de 31 de marzo de 2006
- PEP presentó su escrito de Dúplica el 9 de mayo de 2006.
- Los días del 5 al 9 de junio de 2006, en la Ciudad de México, se celebró audiencia procesal en la que las

12

partes expusieron su caso, se desahogaron testimoniales y se debatió sobre cada una de las controversias.

- Las partes emitieron sus conclusiones el día 11 de agosto del 2006.

- El 13 de diciembre del 2006 el Tribunal Arbitral emitió la Orden de Procedimiento Número 6 mediante la cual ordena la realización de Diligencias para Mejor Proveer, elaborando al efecto un cuestionario que fue respondido por ambas partes, y permitiéndose ofrecer nueva prueba al respecto.

- El 12 de marzo del 2007 PEP y COMMISA dieron respuesta a las Diligencias para Mejor Proveer ordenadas por el Tribunal Arbitral.

- El 20 de agosto de 2007, las partes rinden al Tribunal Arbitral nueva información requerida para Mejor Proveer, específicamente con relación a las Controversias Técnicas 34 y 35, que adelante se detallarán.

- Con fecha 10 de octubre de 2007, el Tribunal Arbitral notificó a las partes el cierre de la instrucción.

XVIII. Se hace notar a Su Señoría, que la litis del juicio de Arbitraje es compleja. COMMISA determinó sus pretensiones en 39 partes que indebidamente denominó "Controversias Técnicas" (de la 1 a la 39), cada una con un soporte de hechos y de derecho distintos, teniendo como causa común la ejecución del Contrato de Obra Pública a Precios Unitarios

y Tiempo Determinado número PEP-O-IT-136/98 (IPC-28), cuyo objeto consistió, como se señalo anteriormente, en: diseño, procura, fabricación, tendido de tubería, revestimiento anticorrosivo, lastrado, protección catódica, ductos ascendentes, instalación y prueba de válvulas.

En ese tenor, tanto la demanda y réplica, como la contestación y la dúplica, se elaboraron, abordando individualmente cada una de estas llamadas "Controversias Técnicas", aunque no se ajuste su denominación al termino pactado en el Contrato de Obra Pública. Es muy importante hacer esta distinción, ya que de conformidad con el contrato, las controversias técnicas debían de haber sido resueltas previamente, y una vez que las mismas fueran resueltas, entonces y sólo hasta ese momento las mismas podían haber sido reclamadas ante el tribunal arbitral.

En efecto, las partes pactaron lo siguiente en el Contrato de Obra Publica:

> "23.2 **_Controversias Técnicas._** _El Contratista no tendrá derecho a efectuar ningún reclamo y PEP no será responsable por daños legales (incluyendo negligencia) o contractuales ante el Contratista, sus proveedores secundarios o subcontratistas, excepto en los casos específicamente previstos en este Contrato._
>
> _Para efectos de esta Cláusula se entenderá por Controversia Técnica toda diferencia que surja por cualquier reclamo o sea atribuible a la interpretación o ejecución de este Contrato, entre el Supervisor y el Contratista, en relación con los Anexos Técnicos del Contrato (A, B, B-1,_

14

*B-2, B-3, CEV, DT, DT-1, DT-2.1, DT-2.2, DT-3, DT-4, E-2, F-1 Y F-2)*

*Si por cualquier motivo el Supervisor y el Contratista no coinciden en la apreciación para resolver un reclamo de ajuste derivado de una Controversia Técnica, <u>el Contratista deberá hacer formal dicha Controversia Técnica por escrito al Supervisor y solicitarle la determinación correspondiente. Este tipo de solicitud del Contratista deberá ser claramente identificado indicando que se trata de una Controversia Técnica sujeta a resolución al amparo de esta Cláusula 23, debiendo contener un resumen de los hechos en controversia y la propuesta del Contratista para resolverlos.</u>*

*.................................................................*
*................................"*

*"23.3  **Arbitraje.**  Cualquier controversia, reclamación, diferencia o disputa que sobrevenga o se relacione o esté vinculada con este Contrato o el incumplimiento del mismo será dirimida finalmente mediante arbitraje conducido en el Distrito Federal, México, de acuerdo con las Reglas de Conciliación y Arbitraje de la Cámara Internacional de Comercio que estén en vigor en ese momento. El número de árbitros será de tres y el idioma para conducir el arbitraje será el español. No obstante lo anterior, cualquier controversia técnica deberá ser sometida previamente al procedimiento previsto en la Cláusula 23.2 y sólo en caso de que mediante dicho procedimiento no se logré un acuerdo entre las partes, éstas quedarán facultadas para acudir al recurso previsto en la Cláusula 23.3".*

XIX. El 11 de febrero de 2008 PEP recibió el Laudo Final emitido por el Tribunal Arbitral en la ciudad de México, Distrito Federal, fechado 15 de enero de 2008, el cual básicamente:

15

a) Condenó a PEP a pagar MXP $10,928,728.00 y USD 75,075,635.00 a COMMISA, cantidad que resulta, una vez hecha la compensación de la condena comprendida en la reconvención. La cantidad denominada en USD se pagaría en pesos mexicanos al tipo de cambio publicado en el Diario Oficial de la Federación el día hábil inmediato anterior al 29 de septiembre de 2002.

b) La deducción a la cantidad anteriormente mencionada, de los derechos de la Secretaría de la Función Pública (de aquí en adelante y por economía procesal denominada "SEFUPU"), equivalente al 5 al millar de la cantidad comprendida en la condena del Laudo Final.

c) Condenó a PEP al pago de gastos financieros a favor de COMMISA, a partir del 29 de septiembre de 2002 hasta la fecha en que se verifique el pago, a la tasa en cada momento establecida en la Ley de Ingresos de la Federación para el caso de prórroga de créditos fiscales: el cómputo se hará por días tomando como base la cantidad que resulte de multiplicar la condena en pesos señalada en el inciso a) por 0.995, debiéndose realizar su pago conjuntamente con el principal.

d) Condenó a PEP al pago del impuesto al valor agregado, y

e) Condenó a PEP a pagar a COMMISA USD $200,000.00 por gastos incurridos en el arbitraje.

16

XX. El detalle de la decisión del Tribunal Arbitral se refleja en los cuadros siguientes:

**Prestaciones reclamadas por COMMISA:**

## Cuadro Comparativo Caso 13716/CCO/JRF (IPC-28)

| Controversias Técnicas | Concepto | Posición COMMISA | | Posición PEP | | Laudo Final |
|---|---|---|---|---|---|---|
| | | MXP | USD | MXP | USD | |
| 1-18, y 22 | Controversias Conciliadas | $2,462,064.00 | $13,249,376.00 | (-) $2,386,203.92 | $13,336,334.49 | (-)$2386,203 MXP $13,336,334 USD |
| 19 | Obstrucciones | $2,049,594.48 | $4,851,169.60 | $975,044.16 | $2,270,800.94 | $1,225,734 MXP $2,831,053 USD |
| 20 | Colocación Sacos Arena Cemento | $21,568.50 | $710,993.00 | $100,390.59 | $52,909.93 | $27,064 MXP $61,062 USD |
| 21 | Colocación Sacos Arena Cemento | $21,568.50 | $710,993.00 | $39,525.93 | $40,984.98 | $18,225 MXP $78,695 USD |
| 23 | Trabajos Adicionales de Ingeniería Convenio 12 | 0.00 | $1,091,045.39 | 0.00 | $178,033.03 | $ 0.00 MXP $1,091,045 USD |
| 24 | Inspección Previa | 0.00 | $521,865.35 | 0.00 | 0.00 | Rechazada |
| 25 | Deducible de Seguro | 0.00 | $250,000.00 | 0.00 | 0.00 | $ 0.00 MXP $250,000 USD |
| 26 | Ajuste de los Costos Cotizados en Dólares | 0.00 | $3,285,222.05 | 0.00 | 0.00 | Rechazada |
| 27 | Diferencial por Trabajos en Plataformas | $63,468.69 | $1,948,210.00 | 0.00 | $104,408.08 | $ 62,502 MXP $1,947,288 USD |
| 28 | Almacenaje, Transporte y Carga y Descarga de Tubería | 0.00 | $414,470.08 | 0.00 | $412,441.22 | $ 0.00 MXP $412,440 USD |
| 29 | Tiempos de espera y Tránsitos Adicionales C10 | $2,877,082.80 | $4,177,552.00 | 0.00 | 0.00 | $1,222,395 MXP $1,356,793 USD |
| 30 | Tiempos de espera y Tránsitos Adicionales BP | $4,880,945.41 | $3,873,876.00 | 0.00 | 0.00 | $2,722,538 MXP $2,163,068 USD |
| 31 | Acondicionamiento | $1,498,175.00 | $3,107,462.00 | 0.00 | 0.00 | Rechazada |

17

| | | MXP | USD | MXP | USD |
|---|---|---|---|---|---|
| | Barcaza C10 | | | | |
| 32 | Tránsitos Adicionales C10 y 8P | $239,458.00 | $739,330.00 | $39,643.55 | $67,568.13 | $180,915 MXP $667,291 USD |
| 33 | Alargamiento Programa de Ingeniería | 0.00 | $9,895,687.50 | 0.00 | 0.00 | Rechazada |
| 34 | Tiempos de Espera Bar Protector, iniciales | $30,309,308.00 | $28,885,344.00 | 0.00 | 0.00 | $ 0.00 MXP $9,031,536 USD |
| 35 | Tiempos de Espera Castoro 10, iniciales | 0.00 | $18,494,205.33 | 0.00 | 0.00 | $ 0.00 MXP $4,891,478 USD |
| 36 | Malos Tiempos | $33,308,347.00 | $26,415,850.00 | 0.00 | 0.00 | $ 0.00 MXP $22,038,954 USD |
| 37 | Cruces IPC-28 | $6,877,278.00 | $11,632,024.00 | $3,261,832.08 | (-) $304,761.14 | $ 6,877,278 MXP $11,632,024 USD |
| 38 | Modificación de Fecha Crítica | 0.00 | $725,000.00 | 0.00 | 0.00 | $ 0.00 $396,765 USD |
| 39 | Cruces IPC-27 | $1,000,991.00 | $2,924,951.00 | $599,538.72 | $975,712.72 | $ 1,000,991 MXP $2,924,951 USD |
| | **Total** | $85,609,849.00 | $137,904,626.30 | $2,629,771.11 | $17,134,432.30 | $10,951,438 MXP $75,110,777 USD |

## Prestaciones reclamadas reconvencionalmente por PEP:

## Reconvención de PEP

| Reconvención | Reclamado | | Concedido | |
|---|---|---|---|---|
| | MXP | USD | MXP | USD |
| Pago de pena por retraso en entrega de documentación final | 0.00 | $1,135,000 | Rechazada | |
| Pago de pena por atraso en terminación de gasoducto | 0.00 | $135,000 | 0.00 | $17,280 |
| Pago de apoyo prestado por servicio de grúas | $1,261 | $153 | $1,261 | $153 |
| Ajustes en el precio de las partidas 2 y 10 de la línea 28-04 | $430,457 | $705,789 | Rechazada | |
| Ajustes en el precio de la partida 10 de | $21,449 | $17,709 | $21,449 | $17,709 |

18

| la línea 28-02 | | | | |
|---|---|---|---|---|
| **Total** | **$453,167** | **$1,858,651** | **$22,710** | **$35,142** |

XXI. El co-árbitro, licenciado Darío Oscós Coria, emitió voto particular para disentir de la opinión de la mayoría con relación a la decisión tomada por el Tribunal Arbitral respecto a las Controversias 36 (malos tiempos) 34 y 35 (retrasos en el inicio de los trabajos con embarcaciones) por considerar que i) se infringió el pacto de las partes en el sentido que el tribunal arbitral únicamente podía decidir el asunto de conformidad con las leyes federales de México, sin embargo, haciendo caso omiso de ello, en algunos aspectos el tribunal arbitral resolvió en equidad; ii) el Tribunal Arbitral excedió el acuerdo de arbitraje; y, iii) por que se violentaron las condiciones contractuales en contravención al artículo 70 de la LAOP, y al artículo 14 de la Constitución Política Mexicana.

Por otro lado, el árbitro disidente, Licenciado Darío Oscós Coria, disintió sobre la condena al pago de gastos financieros, por no haberse acreditado los requisitos legales y contractuales para su causación; e igualmente de la condena al pago de los gastos incurridos en el arbitraje, por la improcedencia de las reclamaciones mencionadas.

XXII. PEP considera que el Laudo Final emitido está afectado de nulidad por encontrarnos frente a diversas causales contenidas en el artículo 1457 del Código de

Comercio, mismas que serán expresadas en el capítulo de hechos de la presente demanda.

## H E C H O S

**I. Causas de Nulidad del Laudo Final con relación a la decisión de la Controversia Técnica 36: Malos tiempos en trabajos de la Castoro 10 y del Bar Protector.**

1.-COMMISA reclamo de PEP una compensación por los retrasos supuestamente sufridos por COMMISA como consecuencia, de la prórroga del plazo de vigencia del Contrato relativo al Proyecto IPC-28. En el contrato original se prevea un plazo original 528 días, mismo que fue prorrogado a 1322 días. COMMISA alegó que esta prórroga la obligó a trabajar bajo condiciones climáticas mucho menos favorables que aquéllas que tomó en consideración para efectos de su propuesta para la integración de los precios unitarios en el proceso de licitación del Contrato IPC-28.

2.- PEP contestó que esta reclamación era improcedente, así como que tal reclamación no podía ser materia de arbitraje. No obstante la objeción de PEP, la decisión del Tribunal Arbitral fue estudiar la misma y condenar parcialmente a PEP por este concepto, y derivado delo anterior, afectando con ello de nulidad el Laudo Arbitral, por las siguientes razones:

20

## P R I M E R A

3.- La decisión del Tribunal Arbitral, declarando procedente la pretensión de COMMISA contenida en la llamada Controversia Técnica 36, denominada *"Malos tiempos que afectaron a los trabajos de la Castoro 10 y del Bar Protector"* (la Castoro 10 y el Bar Protector son dos embarcaciones con las que COMMISA realizó los trabajos), y condenando a PEP a pagar a COMMISA la cantidad de USD $22,038,954.00, (como consta en el capítulo VII.2, páginas 51 a 60 del Laudo Final) es nula por ser contraria a disposiciones del orden público mexicano, específicamente las contenidas en los artículos 126 y 134 de la Constitución Política Federal; artículo 70 de la LAOP; artículo 44 fracción III del Reglamento de la Ley Federal de Presupuesto, Contabilidad y Gasto Público Federal, y artículo 66, fracción III del Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria.

4.- El artículo 126 de la Constitución Política Federal establece

*"No podrá hacerse pago alguno que no esté comprendido en el presupuesto o determinado por ley posterior".*

5.- Por su parte, el artículo 134 de la Constitución Política Federal establece en su penúltimo párrafo que

*"El manejo de los recursos económicos federales se sujetará a las bases de este artículo"*

21

6.- De conformidad con lo establecido en los artículos anteriormente transcritos, es claro que el manejo de los recursos económicos federales, y el pago de obligaciones con cargo a dichos recursos económicos federales, es una cuestión constitucional y por tanto, de orden público mexicano.

7.- Estos principios básicos son reflejados en diversos ordenamientos legales que están relacionados con la presupuestación y ejecución del gasto público federal, entre ellos, la LAOP, que en su artículo 1 establece:

> "Artículo 1.- La presente Ley es de orden público e interés social y tiene por objeto regular las acciones relativas a la planeación, programación, **presupuestación, gasto, ejecución,** conservación, mantenimiento y control de las adquisiciones y arrendamientos de bienes muebles; la prestación de servicios de cualquier naturaleza; así como **de la obra pública** y los servicios relacionados con la misma, **que contraten:**
> I. .......
> V. **Los organismos descentralizados,** y
> VI. .......".

8.- Por otro lado, el artículo 39 del Reglamento de la Ley de Presupuesto, Contabilidad y Gasto Público Federal, aplicable a la relación jurídica constituida por el Contrato de Obra Pública, establece:

22

> "***Artículo 39***.- El ejercicio del gasto público federal comprenderá el manejo y aplicación que de los recursos realicen las entidades, para dar cumplimiento a los objetivos y metas de los programas contenidos en sus presupuestos aprobados".

9.- El artículo 2 de la Ley de Presupuesto, Contabilidad y Gasto Público Federal, en su fracción VI, define como entidad a los organismos públicos descentralizados, como lo es PEP.

10.- De lo anterior se puede concluir que todo gasto y ejecución de una obra pública, realizado por organismos descentralizados como lo es PEP, es de orden público mexicano por referirse al manejo de recursos federales, y al pago de obligaciones con relación a los recursos federales presupuestados.

11.- En consecuencia, las obligaciones a cargo del presupuesto federal deben ser explícitas, sobre todo aquéllas que deriven de contratos de obra pública, **no pudiéndose generar obligaciones en un contrato eminentemente administrativo, por analogía o mayoría de razón, o realizando interpretaciones de derecho civil**. De la misma manera, todas las modificaciones a los contratos de obra pública que generen nuevas obligaciones a ejecutarse contra recursos federales, deben ser explícitas, tal como se desprende del artículo 70 de la LAOP, que establece:

*"Artículo 70.- Las dependencias y entidades podrán, dentro del programa de inversiones aprobado, bajo su responsabilidad y por razones fundadas y explícitas, modificar los contratos de obra pública mediante convenios, siempre y cuando éstos, considerados conjunta o separadamente, no rebasen el veinticinco por ciento del monto o del plazo pactados en el contrato, ni impliquen variaciones sustanciales al proyecto original.*

*Si las modificaciones exceden el porcentaje indicado o varían sustancialmente el proyecto, se deberá celebrar, por una sola vez, un convenio adicional entre las partes respecto de las nuevas condiciones, en los términos del artículo 29. Este convenio adicional deberá ser autorizado bajo la responsabilidad del titular de la dependencia o entidad o por el oficial mayor o su equivalente en entidades. Dichas modificaciones no podrán, en modo alguno, afectar las condiciones que se refieran a la naturaleza y características esenciales de la obra objeto del contrato original, ni convenirse para eludir en cualquier forma el cumplimiento de la Ley o de los Tratado...".*

12.- Una violación a lo dispuesto por el artículo 70 de la LAOP, es tan grave, que el artículo 15 de la misma ley sanciona cualquier omisión al texto de la Ley, con la nulidad absoluta del acto, privando al mismo de surtir efecto alguno o de ser convalidado o confirmado por voluntad de las partes. En efecto, el mencionado artículo 15 de la LAOP establece:

*"Artículo 15.- .......*

*Los actos, contratos y convenios que las dependencias y entidades realicen en contravención a lo dispuesto por esta Ley, serán nulos de pleno derecho".*

24

13.- Siguiendo con estos mismos lineamientos que son de ORDEN PUBLICO, los artículos 44 fracción III del Reglamento de la Ley Federal de Presupuesto, Contabilidad y Gasto Público Federal, y 66 fracción III del Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria, respectivamente disponen lo siguiente:

> *"Artículo 44.- Las entidades deberán cuidar bajo su responsabilidad, que los pagos que se efectúen con cargo a sus presupuestos aprobados se realicen con sujeción a los siguientes requisitos:*
> *I. .......*
> *III. Que se encuentren debidamente justificados y comprobados con los documentos originales respectivos, entendiéndose por justificantes las disposiciones y documentos legales que determinen la obligación de hacer un pago y, por comprobantes, los documentos que demuestren la entrega de las sumas de dinero correspondientes".*

> *"Artículo 66. Los pagos con cargo al Presupuesto de Egresos se realizarán por las dependencias a través de la Tesorería. Los pagos que realicen las entidades se efectuarán por conducto de sus propias tesorerías, llevando los registros presupuestarios correspondientes en sus respectivos flujos de efectivo.*
>
> *Las dependencias, en el ejercicio de sus erogaciones, adicionalmente deberán:*
> *I. .......*
> *III. Que se encuentren debidamente justificados y comprobados con los documentos originales respectivos, entendiéndose por justificantes las disposiciones y documentos legales que determinen la obligación de hacer un pago y, por comprobantes, los documentos que demuestren la entrega de las sumas de dinero correspondientes....".*

De estos dos último artículos citados se desprende que todo pago con cargo al erario federal debe estar contemplado en:

i)      Una disposición legal; o

ii)     Un documento legal.

Además, dicha obligación deber ser explícita o clara, no implícita o deducida por analogía, mayoría de razón, o supuestamente determinada por la "*equidad*", como se desprende de toda la exposición legal precedente.

14.- La lógica de lo anterior se reduce a que la formalización de las obligaciones permite su presupuestación, administración y control, y permite cumplir con el mandato del artículo 126 constitucional que permite hacer pagos con cargo a recursos federales, sólo cuando estén presupuestados.

15.- En el presente caso, el Tribunal Arbitral ha condenado a PEP a pagar a COMMISA, con cargo a recursos federales como corresponde a toda obra pública, la cantidad de USD $22,038,954.00, derivada de suspensiones a la ejecución de los trabajos objeto del contrato de obra pública referido, a causa de condiciones climáticas adversas o malos tiempos, considerados contractual y legalmente como eventos de caso fortuito o fuerza mayor, sin que dicha condena tenga una justificación legal (plasmada en una ley) o contractual.



16.- Es un principio de derecho civil que nadie está obligado al caso fortuito o a la fuerza mayor, a menos que se haya convenido expresamente. El Código Civil Federal establece:

> *"Artículo 1847. No podrá hacerse efectiva la pena cuando el obligado a ella no haya podido cumplir el contrato por hecho del acreedor, caso fortuito o fuerza insuperable".*

17.- En el Contrato de Obra Pública a Precios Unitarios y Tiempo Determinado número PEP-O-IT-136/98 (IPC-28), las partes pactaron que el caso fortuito traería como consecuencia una prórroga del tiempo para terminar los trabajos, en la misma medida en que dichos trabajos hubieran sido suspendidos por caso fortuito, **sin que se hubiere pactado compensación económica alguna, es decir, pagos con cargo al erario federal por las suspensiones a la ejecución de los trabajos causadas por condiciones climáticas adversas o malos tiempos, considerados como eventos de caso fortuito o fuerza mayor**. En efecto, PEP y COMMISA pactamos en la clausula 12.1 del Contrato:

> *"12.1 **Alcance del Caso Fortuito o Fuerza Mayor.**
> ....... Tratándose de trabajos costa afuera, las tormentas únicamente serán consideradas como caso fortuito o fuerza mayor cuando así lo determinen en forma conjunta el supervisor de PEP y el representante autorizado del Contratista, asentando en bitácora que las*

27

*actividades se suspenden por caso fortuito o
fuerza mayor; en caso de controversia, se estará
a lo dispuesto por la Capitanía del Puerto más
cercano al Sitio de los Trabajos, que hubiere
declarado oficialmente el cierre de tal puerto".*

*"12.4 **Efectos del Caso Fortuito o de Fuerza
Mayor.** A menos que el Caso Fortuito o Fuerza
Mayor impida total y definitivamente o en forma
considerable el cumplimiento de este Contrato,
en cuyo caso se estará a lo establecido en la
Cláusula 10.2.4, el Caso Fortuito o Fuerza Mayor
sólo actuará para diferir el cumplimiento de las
obligaciones pactadas en este Contrato y no
para excusar el incumplimiento".*

18.- Por otro lado, y en el mismo sentido, PEP y
COMMISA, pactamos expresamente en la cláusula 23.2 del
Contrato de Obra Pública, que PEP no sería responsable de
ningún daño contractual o legal, excepto en los casos
específicamente previstos en este Contrato. Dicha disposición
contractual señala:

*"23.2 **Controversias Técnicas.** El Contratista no
tendrá derecho a efectuar ningún reclamo y
PEP no será responsable por daños legales
(incluyendo negligencia) o contractuales ante
el Contratista, sus proveedores secundarios o
subcontratistas, excepto en los casos
específicamente previstos en este Contrato....".*

En ese sentido, tenemos una Cláusula expresa en el
Contrato que específica que en caso de suspensiones a los
trabajos por Caso Fortuito o Fuerza Mayor (tormentas), PEP
sólo tendrá obligación de diferir la fecha de terminación de
los trabajos. Por otro lado, la Cláusula 23.2 del Contrato de
Obra Pública celebrado entre COMMISA y PEP, arriba citada,

28

excluye cualquier obligación implícita de pago por caso fortuito o fuerza mayor, reafirmándose que todas las obligaciones de pago deben haberse acordado expresamente, en concordancia con las leyes presupuestarias antes citadas.

Esta cláusula tiene un doble efecto: por un lado constituye para PEP una excluyente de responsabilidad, es decir, PEP no responde económicamente por malos tiempos porque no está pactada esa responsabilidad en el contrato; y por otro lado se encuentra fuera del ámbito del arbitraje cualquier disputa relacionada con este tema, puesto que al no haber sido una prestación económica pactada contractualmente, su pago o cualquier disputa, reclamo o controversia que pretenda su pago, no puede ser materia del arbitraje, toda vez que la responsabilidad a cargo de PEP está excluida.

19.- Por otro lado, en los 16 Convenios Modificatorios celebrados entre las partes, las partes jamás modificamos los derechos y las obligaciones, así como las liberaciones de responsabilidad contenidas en la Cláusula 12 del Contrato, relativa a Caso Fortuito o Fuerza Mayor. Al contrario, en cada uno de los Convenios Modificatorios las partes expresamente reiteramos, que cada una de las cláusulas del contrato original, subsistían sin variación alguna, en cuanto no hubieren sido modificadas expresamente. Esto es, en razón de que en

29

cada extensión del contrato, COMMISA se obligó a trabajar bajo la cláusula que exime de pago a PEP por suspensiones causadas por malos tiempos, es evidente que dicha exención opera durante el plazo original y las prórrogas que en dichos convenios se acordaron.

20.- A pesar de lo expuesto en hechos anteriores, el Tribunal Arbitral, *"llega a la conclusión de que los precios unitarios pactados en el Contrato se refieren a la realización del trabajo en los meses previstos en el programa original de trabajo; dichos precios no cubren la realización de trabajos en otras fechas, en las que el riesgo de malos tiempos sea significativamente superior o inferior"* (párrafo 220, página 54 y párrafo 228, página 55 del Laudo Final).

21.- El Tribunal Arbitral consideró, sin fundamentación legal, que todos aquéllos trabajos no incluidos en el programa, es decir, aquellos trabajos realizados en una época diferente a la prevista originalmente, *constituye un trabajo extraordinario, que tiene que ser satisfecho como tal de acuerdo con la Cláusula 6.1 del Contrato"* (párrafos 222 y 223, página 54 del Laudo Final).

22.- La anterior consideración es falsa, la cláusula 1 del Contrato de Obra Pública define lo que es proyecto y lo que es programa. Cuando en el Contrato se utiliza la palabra **Proyecto** se refiere a la modernización y optimización del

30

Campo Cantarell, mismo que se encuentra ubicado en la Bahía de Campeche, México. El *Programa de Trabajo* se refiere al diagrama de red de procedencia que deberá ser elaborada por el Contratista (COMMISA) de conformidad con el numeral 3 *Programa de Trabajo* del Anexo B-2[2]. Por trabajo se entiende toda actividad explícita e implícita que el Contratista debe realizar bajo el Contrato para cumplir con la ejecución de la obra.

Derivado de lo anterior, es claro que un trabajo realizado fuera de la época originalmente pactada no es un trabajo extraordinario porque el programa de trabajo no es un calendario de actividades, sino el ordenamiento lógico y secuencial de los trabajos o red de actividades: es decir, qué actividades comprende la obra, y cuáles se realizarán primero y cuales después, atendiendo a su dependencia. En otras palabras, si el trabajo se encuentra listado en la red de procedencia de actividades, aunque se realice en época distinta a la pactada originalmente sigue siendo un trabajo original, y es improcedente modificar los precios en los términos de la cláusula 6.1 del Contrato, porque ésta sólo se refiere a trabajos extraordinarios.

Es pertinente mencionar que los malos tiempos no son actividades explícitas ni implícitas de la obra, y sobre todo

---

[2] Según el numeral 3 del Anexo B-2, el programa de trabajo deberá consistir en un diagrama de red de procedencia que utilice el método de camino crítico para mostrar cada actividad esencial e individual, en forma secuencial y lógica, y en el cual se debería indicar la duración y secuencia lógica de actividades, en número de días, así como la dependencia entre las mismas, incluyendo actividades fuera del sitio de los trabajos.

porque COMMISA de ninguna manera puede programar los malos tiempos. Por eso, cuando suceden, y si afectan la terminación del trabajo, se prorroga la fecha de terminación de los mismos[3].

23.- El Tribunal Arbitral dicta su laudo arbitral en violación a principios de orden público, como lo es, la soberanía constitucional, toda vez que no funda ni motiva su resolución, altera la regulación legal de orden público para el manejo de recursos públicos, y el pago de obligaciones con cargo al erario federal, por las razones siguientes: i) no cita una disposición legal mexicana que fundamente su decisión; ii) no cita una cláusula contractual expresa de los convenios que diga que PEP responde económicamente por los malos tiempos, a partir del vencimiento del plazo original del contrato.

Es claro que el Tribunal Arbitral omite justificar o fundar debidamente la obligación de pago a cargo de PEP, ignorando una cláusula expresa en contrario pactada por las partes, lo que es ilegal tratándose de pagos con cargo al erario público. En el párrafo 228, página 55, del Laudo Final, el Tribunal Arbitral pretende fundar su resolución, pero en realidad no cita disposición contractual alguna en la cual exista la obligación por parte de PEP de obligarse al caso

---

[3] Esto también indica la falta de sentido común de Tribunal Arbitral, aún dentro de las condiciones originales del contrato, era posible que COMMISA realizará trabajos fuera del término original, porque debido a los malos tiempos era posible la prórroga a la fecha de terminación de los Trabajos.

fortuito, ni durante la vigencia original del contrato ni una vez que se haya cumplido el plazo originalmente contratado.

En efecto, el tribunal arbitral expresa:

> 228. En resumen, en la Orden de Cambio núm. 56 y en el Convenio Modificatorio núm. 12, PEP ha reconocido:
>
> - que los precios unitarios ofertados por Commisa e incluidos en el Contrato incluía implícitamente una previsión de que, por cada 100 días trabajados, la Castoro 10 sufriría 8,45 días de malos tiempos y el Bar Protector 5,02;
> - que si se encargaban trabajos a realizar en períodos con mayores probabilidades de malos tiempos que las previstas en el programa original, el impacto de los malos tiempos se dividía: el Contratista asumía los días incluidos en sus precios unitarios, y el resto de los días se asumían por PEP, que los determinaba mediante observación directa y pagaba por ellos la tarifa de espera correspondiente.

Es preciso decir también, que no basta un acuerdo expreso para generar una obligación de pago con cargo al presupuesto, que se insiste, en este caso no la hay, sino que dicho acuerdo debe estar documentado y revestir las formalidades expresas exigidas por la ley.

24.- El Reglamento de la Ley de Presupuesto, Contabilidad y Gasto Público Federal define lo que es un documento justificante de pago. Este Reglamento estuvo vigente durante la vigencia del contrato de obra pública y su ejecución, por lo que claramente es el referente para determinar si existe o no obligación de pago con cargo al

33

presupuesto federal. Los artículos 69 y 70 del Reglamento de la Ley de Presupuesto, Contabilidad y Gasto Publico Federal establecen:

"***Artículo 69.-*** *Para el ejercicio del gasto público federal por concepto de adquisiciones, servicios generales y obras, las entidades formalizarán los compromisos correspondientes mediante la adjudicación, expedición y autorización de contratos de obras públicas, pedidos para la adquisición de bienes y servicios, y convenios y presupuestos en general, así como la revalidación de éstos, los que deberán reunir los mismos requisitos que los pedidos y contratos para que tengan el carácter de justificante.*

*En el caso de adquisiciones y obras públicas las entidades deberán contar con los programas y presupuestos de adquisiciones y obras respectivos, de conformidad con las disposiciones legales y reglamentarias aplicables".*

*"Artículo 70.- Para los pedidos y contratos a que se refiere el artículo anterior tengan carácter de documentos justificantes, deberán sujetarse a lo siguiente:*
*I. En ningún caso se aceptará la estipulación de penas convencionales ni intereses moratorios a cargo de las entidades:*
*Tratándose de cargas fiscales, no deberá autorizarse el pago de ninguna de ellas a excepción de los impuestos de importación y de aquellos que por disposición legal sean causantes o acepten su traslación;*
*II. Todo contrato que deba cubrirse con recursos de crédito interno o externo requerirá la autorización previa y por escrito de la Secretaría. La tramitación del financiamiento de dichos créditos se hará por conducto o con la autorización de la Secretaría de Hacienda y Crédito Público;*
*III. Deberán señalar con precisión su vigencia, importe total, el plazo de terminación o entrega*

34

*de los servicios o bienes contratados, así como la fecha y condiciones para su pago. En los casos que por la naturaleza del contrato no se pueda señalar un importe determinado, se deberán estipular las bases para fijarlos.*
*IV. En los casos procedentes, que exista la garantía correspondiente, y*
*V. Observar lo dispuesto en el artículo 42 de este reglamento".*

25.- La condena realizada por el Tribunal arbitral no está debidamente fundada, puesto que no señala ley o disposición contractual alguna en la cual se pueda apreciar que PEP se haya obligado a pagar por malos tiempos, afectando de esta manera el interés público. La necesidad de presupuestar, administrar y controlar la obra pública, y las obligaciones de pago que de ella deriven, son materia del orden público, toda vez que tienen su fundamento en la Constitución Política de los Estados Unidos Mexicanos. Por tal razón la decisión del Tribunal violenta los artículos 126 y 134 de la Constitución Mexicana, infringe en consecuencia el sistema jurídico mexicano, y el orden público que éste impone, acarreando la nulidad del laudo.

En consecuencia, el análisis arbitral sobre la cuantificación de esta controversia, también es ilegal y contraría el orden público.

26.- Nuestros tribunales federales confirman la posición de PEP al establecer lo siguiente:

No. Registro: 179,575
Tesis aislada

35

Materia(s): Administrativa
Novena Época
Instancia: Segunda Sala
Fuente: Semanario Judicial de la Federación y
su Gaceta
XXI, Enero de 2005
Tesis: 2a. IX/2005
Página: 605

**GASTO PÚBLICO.**
Del artículo 31, fracción IV, de la Constitución
Política de los Estados Unidos Mexicanos, que
establece la obligación de los mexicanos de
"contribuir para los gastos públicos, así de la
Federación, como del Distrito Federal o del
Estado y Municipio en que residan, de la
manera proporcional y equitativa que
dispongan las leyes", en relación con los
artículos 25 y 28 de la propia Constitución, así
como de las opiniones doctrinarias, se infiere
que el concepto de "gasto público", tiene un
sentido social y un alcance de interés colectivo,
por cuanto el importe de las contribuciones
recaudadas se destina a la satisfacción de las
necesidades colectivas o sociales, o a los
servicios públicos; así, el concepto material de
"gasto público" estriba en el destino de la
recaudación que el Estado debe garantizar en
beneficio de la colectividad.
Amparo en revisión 1305/2004. Jorge Ernesto
Calderón Durán. 19 de noviembre de 2004.
Cinco votos. Ponente: Juan Díaz Romero.
Secretario: César de Jesús Molina Suárez.

No. Registro: 336,366
Tesis aislada
Materia(s): Administrativa
Quinta Época
Instancia: Segunda Sala
Fuente: Semanario Judicial de la Federación
XL
Tesis:
Página: 677

**CONTRATOS ADMINISTRATIVOS.**
Cualesquiera que sean las estipulaciones que
hagan dos contratantes, éstas no pueden

subsistir cuando son contrarias a una ley de orden público y mucho menos cuando están en pugna con los preceptos terminantes de la Constitución General y como el artículo 28 de la misma dice que : "en los Estados Unidos Mexicanos, no habrá monopolios ni estancos de ninguna clase; ni exención de impuestos.....", si en un contrato administrativo se estipuló la exención de impuestos, para determinada industria, la cláusula relativa pudo subsistir hasta antes de que fuera promulgada la Constitución de 1917; pero a raíz de esa promulgación, su existencia es imposible y las autoridades contratantes no cometen violación alguna al desconocer la validez de la cláusula, pues la Suprema Corte de Justicia ha establecido que tratándose de actos nulos de pleno derecho, la autoridad administrativa puede revocarlos por sí y ante sí, sin necesidad de acudir a los tribunales.

Amparo administrativo en revisión 433/25. Compañía Hidroeléctrica e Irrigadora del Chapala, S.A. 23 de enero de 1934. Mayoría de tres votos. Disidentes: Daniel V. Valencia y y Luis M. Calderón. La publicación no menciona el nombre del ponente.


No. Registro: 331,037
Tesis aislada
Materia(s): Administrativa
Quinta Época
Instancia: Segunda Sala
Fuente: Semanario Judicial de la Federación
LVII
Tesis:
Página: 220


**CONTRATOS ADMINISTRATIVOS, APLICABILIDAD DEL CODIGO CIVIL, EN LOS.**
No siempre son de aplicación forzosa los preceptos del Código Civil, tratándose cuestiones administrativas, cuando de preferencia a toda legislación debe acatarse un precepto de la Constitución.
Amparo administrativo en revisión 3977/36. Gavito Hermanos y Compañía. 8 de julio de

1938. Unanimidad de cinco votos. Relator: José María Truchuelo.

No. Registro: 189,995
Tesis aislada
Materia(s): Administrativa, Civil
Novena Época
Instancia: Pleno
Fuente: Semanario Judicial de la Federación y su Gaceta
XIII, Abril de 2001
Tesis: P. IX/2001
Página: 324

**CONTRATOS ADMINISTRATIVOS. SE DISTINGUEN POR SU FINALIDAD DE ORDEN PÚBLICO Y POR EL RÉGIMEN EXORBITANTE DEL DERECHO CIVIL A QUE ESTÁN SUJETOS.**
La naturaleza administrativa de un contrato celebrado entre un órgano estatal y un particular puede válidamente deducirse de la finalidad de orden público que persigue, identificada también como utilidad pública o utilidad social, así como del régimen exorbitante del derecho civil a que está sujeto. De ello se infiere que los contratos celebrados por un órgano estatal con los particulares están regidos por el derecho privado cuando su objeto no esté vinculado estrecha y necesariamente con el cumplimiento de las atribuciones públicas del Estado y, por lo mismo, la satisfacción de las necesidades colectivas no se perjudique porque en aquellos actos el Estado no haga uso de los medios que le autoriza su régimen especial. Por el contrario, cuando el objeto o la finalidad del contrato estén íntimamente vinculados al cumplimiento de las atribuciones estatales, de tal manera que la satisfacción de las necesidades colectivas no sea indiferente a la forma de ejecución de las obligaciones contractuales, entonces se estará en presencia de un contrato administrativo, siendo válido estipular cláusulas exorbitantes que, desde la óptica del derecho privado, pudieran resultar nulas, pero que en el campo administrativo no lo son, en atención a la necesidad de asegurar el funcionamiento regular y continuo del



servicio público.
Juicio ordinario civil federal 1/2000. Jesús
Guillermo Puente Cutiño. 20 de febrero de 2001.
Unanimidad de diez votos. Ausente: Genaro
David Góngora Pimentel. Ponente: Juan Díaz
Romero. Secretario: Silverio Rodríguez Carrillo.
El Tribunal Pleno, en su sesión privada celebrada
hoy veintinueve de marzo en curso, aprobó,
con el número IX/2001, la tesis aislada que
antecede; y determinó que la votación es
idónea para integrar tesis jurisprudencial.
México, Distrito Federal, a veintinueve de marzo
de dos mil uno.

## SEGUNDA

27.- La decisión del Tribunal Arbitral, declarando procedente la pretensión de COMMISA contenida en la "Controversia Técnica" 36, denominada "Malos tiempos que afectaron a los trabajos de la Castoro 10 y del Bar Protector", y condenando a PEP a pagar a COMMISA la cantidad de USD $22,038,954.00, (capítulo VII.2, páginas 51 a 60 del Laudo Final) encuadra dentro de los supuestos de nulidad contemplados en el artículo 1457, fracción I, inciso c), y fracción II, del Código de Comercio, que dispone la nulidad del Laudo cuando el mismo contiene decisiones que exceden los términos del acuerdo de arbitraje o es contrario al orden público.

28.- Como ya se explicó anteriormente, el Arbitraje entre PEP y COMMISA es un arbitraje que debe de ser resuelto en estricto derecho, es decir con base en la ley y no en principios de equidad o justicia, lo que no sucedió en nuestro caso. Además, las partes y el tribunal arbitral están obligadas a



observar el principio de *pacta sunt servanda*, previsto en el artículo 1796 del Código Civil Federal, que dispone:

> "**Artículo 1796.-** Los contratos se perfeccionan por el mero consentimiento; excepto en aquellos que deben revestir una forma establecida por la Ley. Desde que se perfeccionan, obligan a los contratantes no sólo al cumplimiento de lo expresamente pactado, sino también a las consecuencias que, según su naturaleza, son conformes a la buena fe, al uso o a la ley".

Por ello, el Tribunal Arbitral carece de facultades para moderar o alterar las estipulaciones contractuales celebradas entre PEP y COMMISA, en equidad o como amigable componedor. En ese sentido, el texto expreso del Contrato Original debe ser respetado, independientemente del cambio climático acaecido durante la vida del contrato.

29.- Nuestros tribunales federales han confirmado la postura de PEP al establecer:

> No. Registro: 186,972
> **Jurisprudencia**
> Materia(s): Civil
> Novena Época
> Instancia: Tribunales Colegiados de Circuito
> Fuente: Semanario Judicial de la Federación y su Gaceta
> XV, Mayo de 2002
> Tesis: I.8o.C. J/14
> Página: 951
>
> **CONTRATOS. LOS LEGALMENTE CELEBRADOS DEBEN SER FIELMENTE CUMPLIDOS, NO OBSTANTE QUE SOBREVENGAN ACONTECIMIENTOS FUTUROS**

40

IMPREVISIBLES QUE PUDIERAN ALTERAR EL CUMPLIMIENTO DE LA OBLIGACIÓN, DE ACUERDO A LAS CONDICIONES QUE PRIVABAN AL CONCERTARSE AQUÉLLA.

De acuerdo al contenido de los artículos 1796 y 1797 del Código Civil para el Distrito Federal, que vienen a complementar el sistema de eficacia de los contratos a partir de su perfeccionamiento no adoptan la teoría de la imprevisión o cláusula rebus sic stantibus derivada de los acontecimientos imprevistos que pudieran modificar las condiciones originales en que se estableció un contrato sino, en todo caso, el sistema seguido en el Código Civil referido adopta en forma genérica la tesis pacta sunt servanda, lo que significa que debe estarse a lo pactado entre las partes, es decir, que los contratos legalmente celebrados deben ser fielmente cumplidos, no obstante que sobrevengan acontecimientos futuros imprevisibles que pudieran alterar el cumplimiento de la obligación de acuerdo a las condiciones que privaban al concertarse aquélla, sin que corresponda al juzgador modificar las condiciones de los contratos.

OCTAVO TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.

Amparo directo 246/98. Martha Irene Bustos González. 12 de noviembre de 1998. Unanimidad de votos. Ponente: Carlos Arellano Hobelsberger. Secretario: José David Cisneros Alcaraz .

Amparo directo 1284/98. Industrias Cormen, S.A. de C.V. 11 de diciembre de 1998. Unanimidad de votos. Ponente: Carlos Arellano Hobelsberger. Secretario: José David Cisneros Alcaraz.

Amparo directo 29/2001. Gustavo Parrilla Corzas. 22 de junio de 2001. Unanimidad de votos. Ponente: Patricio González-Loyola Pérez. Secretario: Enrique Villanueva Chávez.

Amparo directo 427/2001. Dachi, S.A. de C.V. 22 de junio de 2001. Unanimidad de votos. Ponente: Carlos Arellano Hobelsberger. Secretario: Dante Adrián Camarillo Palafox.

Amparo directo 2/2002. Restaurante Villa Reforma, S.A. de C.V. y otros. 25 de marzo de

41

2002. Unanimidad de votos. Ponente: Patricio González-Loyola Pérez. Secretario: Enrique Villanueva Chávez.

30.- En el presente caso, el tribunal arbitral sin fundamento jurídico alguno concede a COMMISA el derecho a recibir pagos por las suspensiones a los trabajos causados por malos tiempos, en contravención a lo pactado por las partes en el Contrato de Obra Pública, cuya Cláusula 12.4 señala:

> "12.4 **_Efectos del Caso Fortuito o de Fuerza Mayor._** A menos que el Caso Fortuito o Fuerza Mayor impida total y definitivamente o en forma considerable el cumplimiento de este Contrato, en cuyo caso se estará a lo establecido en la Cláusula 10.2.4, el Caso Fortuito o Fuerza Mayor sólo actuará para diferir el cumplimiento de las obligaciones pactadas en este Contrato y no para excusar el incumplimiento".

(pero de ninguna manera el caso fortuito influye para incrementar los precios pactados, como lo pretende el tribunal arbitral)

31.- El laudo arbitral cuya nulidad se demanda, viola además lo dispuesto por el artículo 70 de la LAOP, que establece:

> "**Artículo 70.-** Las dependencias y entidades podrán, dentro del programa de inversiones aprobado, bajo su responsabilidad y por razones fundadas y explícitas, modificar los contratos de obra pública mediante convenios, siempre y cuando éstos, considerados conjunta

42

*o separadamente, no rebasen el veinticinco por ciento del monto o del plazo pactados en el contrato, ni impliquen variaciones sustanciales al proyecto original.*

*Si las modificaciones exceden el porcentaje indicado o varían sustancialmente el proyecto, se deberá celebrar, por una sola vez, un convenio adicional entre las partes respecto de las nuevas condiciones, en los términos del artículo 29. Este convenio adicional deberá ser autorizado bajo la responsabilidad del titular de la dependencia o entidad o por el oficial mayor o su equivalente en entidades. Dichas modificaciones no podrán, en modo alguno, afectar las condiciones que se refieran a la naturaleza y características esenciales de la obra objeto del contrato original, ni convenirse para eludir en cualquier forma el cumplimiento de la Ley o de los Tratado....".*

32.- Toda vez que las partes jamás celebraron convenio modificatorio alguno para incrementar el precio del contrato por malos tiempos, o para documentar la obligación de pagar malos tiempos por la extensión del programa de trabajo, por tal razón, el Tribunal Arbitral carece de facultad legal para condenar a PEP al pago de los malos tiempos en trabajos de las embarcaciones Castoro 10 y Bar Protector.

33.- El Tribunal Arbitral al condenar a PEP al pago por malos tiempos viola lo pactado y excede el límite legal del 25% previsto en el artículo 70 invocado, pretendiendo modificar el contrato de obra y por ello resulta nulo el laudo arbitral.

43

34.- En efecto, el Tribunal Arbitral excede la materia de la controversia, pues en el arbitraje no se reclama la formalización de un convenio que fijara nuevas condiciones de trabajo, que diera pauta al pago de los malos tiempos. Por el contrario, la demandante reclama sólo su pago. Al reclamar COMMISA sólo su pago, el Tribunal Arbitral debió determinar su procedencia o improcedencia atendiendo a las condiciones del proyecto, fijadas por el contrato y a los 16 convenios modificatorios, que determinan únicamente en caso de malos tiempos, la prórroga a la fecha de terminación de los trabajos; y no alterar o modificar primero las condiciones contractuales y luego declarar procedente el pago, porque con ello excedió el acuerdo de arbitraje, al no resolver en estricto derecho.

35.- El Tribunal Arbitral no puede de propia autoridad modificar los derechos y las obligaciones pactadas por las partes. El Tribunal Arbitral carece de facultades para modificar las condiciones contractuales.

36.- Vale decir también que la capacidad de PEP para modificar los contratos se encuentra reducida, de acuerdo a lo dispuesto por el artículo 70 de la LAOP, citado en párrafos precedentes, y atendiendo a lo dispuesto en el artículo 29 del mismo ordenamiento, que se transcribe a continuación:

> *"**Artículo 29.-** Las dependencias y entidades podrán convocar, adjudicar o llevar a cabo*

44

*adquisiciones, arrendamientos y servicios, así como obra pública, solamente cuando se cuente con saldo disponible, dentro de su presupuesto aprobado, en la partida correspondiente. En casos excepcionales y previa autorización de la Secretaría las dependencias y entidades podrán convocar sin contar con saldo disponible en su presupuesto.*

*Tratándose de obra pública, además se requerirá contar con los estudios y proyectos, las normas y especificaciones de construcción, el programa de ejecución y, en su caso, el programa de suministro.*

*Los servidores públicos que autoricen actos en contravención a lo dispuesto en este artículo, se harán acreedores a las sanciones que resulten aplicables".*

En otras palabras, por disposición legal es imposible jurídicamente que la conducta de PEP o de sus funcionarios, al ejecutar un contrato, puedan generar obligaciones distintas a las pactadas, para ello se tiene que manifestar esa voluntad de manera expresa, y previo cumplimiento del procedimiento de modificación contractual previsto en la ley.

37.- En el presente caso, la decisión del Tribunal Arbitral viola también disposiciones de planeación, presupuestación y ejercicio de gasto público federal, que son cuestiones de orden público, al estar dispuestas por los artículos 126 y 134 de la Constitución Política Federal, acarreando por esa razón a nulidad del laudo arbitral.

45

Exhibit A

Part 2 of  7

En consecuencia, el análisis realizado por el tribunal arbitral sobre la cuantificación de esta controversia, también es ilegal y contraría el orden público y por ello resulta nulo el laudo arbitral.

### TERCERA

38.- El laudo emitido por el tribunal arbitral, declarando procedente la pretensión de COMMISA contenida en la Controversia Técnica 36, denominada *"Malos tiempos que afectaron a los trabajos de la Castoro 10 y del Bar Protector"*, y condenando a PEP a pagar a COMMISA la cantidad de USD $22,038,954.00 (capítulo VII.2, páginas 51 a 60 del Laudo Final), encuadra dentro de los supuestos de nulidad contemplados en el artículo 1457, fracción I, inciso c), del Código de Comercio, que dispone la nulidad del Laudo cuando el mismo *"... se refiera a una controversia no prevista en el acuerdo de arbitraje o contiene decisiones que exceden los términos del acuerdo de arbitraje"*.

39.- En el acuerdo de arbitraje celebrado entre PEP y COMMISA plasmado en el contrato PEP-O-IT-136/98, se pactó que sólo serían materia de arbitraje aquéllas disputas o reclamaciones que fueran formalizadas como Controversias Técnicas, como se demuestra a continuación:

> *"23.2 **Controversias Técnicas**. El Contratista no tendrá derecho a efectuar ningún reclamo y*

46

PEP no será responsable por daños legales (incluyendo negligencia) o contractuales ante el Contratista, sus proveedores secundarios o subcontratistas, excepto en los casos específicamente previstos en este Contrato.

Para efectos de esta Cláusula se entenderá por Controversia Técnica toda diferencia que surja por cualquier reclamo o sea atribuible a la interpretación o ejecución de este Contrato, entre el Supervisor y el Contratista, en relación con los Anexos Técnicos del Contrato (A, B, B-1, B-2, B-3, CEV, DT, DT-1, DT-2.1, DT-2.2, DT-3, DT-4, E-2, F-1 Y F-2)

Si por cualquier motivo el Supervisor y el Contratista no coinciden en la apreciación para resolver un reclamo de ajuste derivado de una Controversia Técnica, <u>el Contratista deberá hacer formal dicha Controversia Técnica por escrito al Supervisor y solicitarle la determinación correspondiente. Este tipo de solicitud del Contratista deberá ser claramente identificado indicando que se trata de una Controversia Técnica sujeta a resolución al amparo de esta Cláusula 23, debiendo contener un resumen de los hechos en controversia y la propuesta del Contratista para resolverlos.</u>

...

"23.3     **Arbitraje.**     Cualquier controversia, reclamación, diferencia o disputa que sobrevenga o se relacione o esté vinculada con este Contrato o el incumplimiento del mismo será dirimida finalmente mediante arbitraje conducido en el Distrito Federal, México, de acuerdo con las Reglas de Conciliación y Arbitraje de la Cámara Internacional de Comercio que estén en vigor en ese momento. El número de árbitros será de tres y el idioma para conducir el arbitraje será el español. **No obstante lo anterior, cualquier controversia técnica deberá ser sometida previamente al procedimiento previsto en la Cláusula 23.2 y sólo en caso de que mediante dicho procedimiento no se logré un acuerdo entre las**

*partes, éstas quedarán facultadas para acudir
al recurso previsto en la Cláusula 23.3".*

De conformidad con las Cláusulas contractuales
indicadas, las controversias tenían una naturaleza
estrictamente formal, pues en primer término si el Supervisor y
el Contratista no coincidían en la apreciación para resolver
un reclamo de ajuste derivado de una Controversia Técnica,
entonces el contratista tenía que plantearla por escrito,
**especificando en el documento que se trataba de una
controversia técnica,** proporcionando un resumen de los
hechos que motivaban la reclamación y presentar una
propuesta de solución.

40.- A pesar de lo pactado por las partes y a pesar de
que COMMISA incumplió con las obligaciones contractuales
relativas a las controversias técnicas, el tribunal arbitral,
determinó en los párrafos 233 y 234 del laudo lo siguiente:

> *"232. PEP también alega que Commisa no
> manifestó esta situación durante la vida del
> Contrato. En opinión del Tribunal Arbitral, la
> prueba practicada demuestra que la anterior
> aseveración no se ajusta a la realidad.*
>
> *233. Desde el inicio de la reprogramación,
> Commisa dejó constancia de los posibles costos
> adicionales por el incrmento de los malos
> tiempos. En efecto, el 5 de marzo de 1999 PEP le
> había pedido al Contratista los costos estimados
> de una posible reprogramación. Commisa
> contestó mediante carta de 15 de marzo de
> 1999, en la que dio unas cifras de 49M USD (ó de
> 28M USD, según las circunstancias). Commisa
> añadió: "Esto no incluye ningún tiempo*

48

*adicional de espera por condiciones climatológicas, debido a la extensión del programa de trabajo."*

*234. La mencionada carta prueba que, al menos desde marzo de 1999, Commisa esperaba ser remunerada por los malos tiempos adicionales que generara la extensión del programa de trabajo. Es cierto que durante el desarrollo del Contrato PEP únicamente reconoció el derecho a la remuneración en la Orden de Cambio núm. 56 y en el Convenio Modificatorio núm.12. Pero no existe indicio alguno de que Commisa renunciara a su reclamación, y cejara en su empeño de exigir lo que le correspondía cobrar. Buena prueba de ello es que cuando se firmó el Acta de Recepción Física Total de la obra, se hace referencia expresa a que existen aún reclamos pendientes de Commisa, y entre ellos se encuentran precisamente las "afectaciones por condiciones climatológicas (Castoro 10 y Bar Protector)".*

Las consideraciones del tribunal arbitral carecen de fundamentación y de motivación, al estimar la existencia de una formulación de una controversia técnica por parte de COMMISA, cuando es evidente que dicha mención no constituye una controversia técnica. Es más, en ese momento al que se refiere el tribunal arbitral, todavía no había disputa alguna al respecto.

De igual manera, el tribunal arbitral pretende justificar la condena que hizo en contra de PEP por concepto de malos tiempos, con consideraciones ilegales.

49

41.- Toda vez que COMMISA incumplió con el procedimiento de reclamación contractual establecido por las partes en el contrato, entonces era claro que el tribunal arbitral carecía de facultades para entrar al estudio de dicha reclamación, sin embargo el tribunal arbitral para subsanar dicha omisión de la contratista, recurre a la invocación de una carta de COMMISA del 15 marzo de 1999, cuando era claro que a esa fecha las embarcaciones Castoro 10 y Bar Protector todavía ni siquiera comenzaban a trabajar. Derivado de lo anterior, es lógico que no exista un reclamo de COMMISA derivado de malos tiempos, y por lo tanto dicha carta, anterior al inicio de los trabajos, no puede suplir la formalidad de un reclamo en los términos en que fue pactado en el Contrato. Además, un reclamo en términos del contrato celebrado entre PEP y COMMISA, solamente podía surgir con motivo de la ejecución de los trabajos y no antes, como lo pretende ejemplificar e infundadamente justificar el tribunal arbitral.

42.- También el tribunal arbitral en su propósito de enmendar las omisiones de COMMISA respecto de la falta de observancia del procedimiento de reclamación (formulación de una controversia técnica), vuelve a incurrir en consideraciones infundadas e interpretaciones meramente subjetivas cuando manifiesta que: "...*cuando se firmó el Acta de Recepción Física Total de la obra, se hace referencia expresa a que existen aún reclamos pendientes de Commisa,*



50

*y entre ellos se encuentran precisamente las "afectaciones por condiciones climatológicas (Castoro 10 y Bar Protector).* Lo manifestado por COMMISA en el Acta de Recepción Física Total, de ninguna forma puede considerarse como la observancia del procedimiento de reclamación establecido en la cláusula 23.2 del contrato celebrado entre PEP y COMMISA, pues COMMISA jamás manifestó haber presentado un reclamo ante el Supervisor de PEP, porque apenas se encontraba en elaboración, y mucho menos haber cumplido con todas las formalidades que el caso exigía. Con la finalidad de ser muy claros en la exposición de este punto es importante transcribir literalmente lo asentado por dicha contratista en la página 17 de la citada Acta de Recepción Física Total:

> *"RECLAMOS EN ELABORACIÓN POR COMMISA*
> *...*
>
> *PAQUETE 7 Afectación por condiciones climatológicas (Castoro 10 y Bar Protector). PENDIENTE PENDIENTE"*

Con la anterior transcripción se acredita fehaciente y plenamente que a la fecha en que se suscribió el Acta de Recepción Física Total, no existía ningún tipo de reclamo o controversia técnica formulada por COMMISA respecto de malos tiempos que hayan afectado los trabajos de las embarcaciones Castoro 10 y Bar Protector. Aún así y en un claro exceso y defecto interpretativo del contrato y de los derechos y obligaciones que de él emanan, el tribunal arbitral

51

en el párrafo 234 del laudo asentó que: "*es cierto que durante el desarrollo del contrato PEP únicamente reconoció el derecho a la remuneración en la orden de cambio núm. 56 y en el convenio número 12, pero que no existe indicio alguno de que COMMISA renunciara a su reclamación y cejara en su empeño de exigir lo que le correspondía cobrar*".

El Tribunal Arbitral jamás resolvió la cuestión objeto de la controversia y que básicamente consistía en el hecho de que COMMISA había cumplido con las formas o requisitos para sus reclamaciones, mas no que COMMISA hubiera usado o no sus derecho de reclamo.

En esta última consideración el tribunal arbitral deja sin fundamentación el laudo arbitral, toda vez que hace mención de que no existe indicio alguno de que COMMISA hubiera renunciado a su reclamación, como si esa fuera la condición para tener por no presentada el reclamo de malos tiempos, cuando que en este tipo de reclamos era condición indispensable que COMMISA cumpliera una obligación de hacer, consistente en que si en primer término, el Supervisor y el Contratista no coincidían en la apreciación para resolver un reclamo de ajuste derivado de una Controversia Técnica, entonces el contratista tenía que plantearla por escrito, especificando en el documento que se trataba de una controversia técnica, proporcionando un resumen de los hechos que motivaban la reclamación y presentar una

propuesta de solución, obligación que por supuesto COMMISA no cumplió.

43.- Ahora bien, toda vez que el tribunal arbitral no resolvió el reclamo de COMMISA de malos tiempos, ajustándose al procedimiento de reclamación estipulado en el contrato, resulta claro que con la consideración del tribunal dictada sin observar lo dispuesto en el contrato, el tribunal arbitral se excedió en el mandato que le fue conferido por PEP y COMMISA, de resolver conforme a estricto a estricto derecho las cuestiones que le fueron planteadas por las partes. En virtud de ello, la resolución emitida por el tribunal arbitral se encuentra afectada de nulidad, al actualizarse el supuesto contemplado en el artículo 1457, fracción I, inciso c), disposición que para pronta referencia se transcribe a continuación:

> "ARTÍCULO 1457. Los laudos arbitrales sólo podrán ser anulados por el juez competente cuando:
>
> I.    La parte que intente la acción pruebe que:
>
> c) El laudo se refiere a una controversia no prevista en el acuerdo de arbitraje o contiene decisiones que exceden los términos del acuerdo de arbitraje..." (Énfasis añadido).

Esto es de suma importancia jurídica, porque la formalización de la Controversia Técnica, y únicamente esta actuación, origina el procedimiento para obtener un

documento justificativo de pago, en los términos del artículo 44 fracción III del Reglamento de la Ley Federal de Presupuesto, Contabilidad y Gasto Público Federal, y artículo 66, fracción III, del Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria. En otras palabras, no puede constituirse una obligación de pago a cargo del erario público federal mientras no exista un documento justificativo de dicho pago.

Así, la parte final del cuarto párrafo, y la inicial del quinto siguiente, de la Cláusula 23.2 del Contrato señalan lo siguiente:

> *"Lo anterior en la inteligencia de que cualquier determinación de modificación técnico-contractual que implique o necesariamente deriven en una ampliación del monto del Contrato o del plazo de ejecución establecidos en las Cláusulas 3.1 y 4.1, respectivamente, deberá contar con la previa aprobación por escrito del representante del Proyecto ....... Una vez recibida la aceptación escrita por parte del Contratista de la determinación efectuada por el supervisor, se modificará el Contrato en lo conducente y se implementará la determinación".*

La Cláusula 5 del Contrato *"Modificaciones al Contrato"* establece lo siguiente:

> *"Las partes convienen en que por razones fundadas y explícitas **y a través de la suscripción de un convenio**, PEP podrá modificar el Contrato, en términos de lo establecido en el artículo 70 de la Ley de Adquisiciones y Obras Públicas".*

54

45.- En el presente caso COMMISA, presentó y formalizó extemporáneamente esta controversia, en un momento en que por disposición contractual, ya no podía ser atendida, por lo que la misma no podía ser materia del arbitraje ni ser válidamente considerada.

46.- Del Acta de Recepción Física Total de los trabajos de 30 de agosto de 2002, es claro que, la demandante no había planteado formalmente una controversia técnica por malos tiempos en los términos y condiciones contractuales, en la que hubiere planteado por escrito los motivos de su reclamo. Así consta en el párrafo 234, página 56 del Laudo Final y Voto Particular de D. Darío Oscós, párrafos 2 y 3, página 2, que es parte integrante del Laudo Final. El párrafo 234 establece lo siguiente:

> 234. La mencionada carta prueba que, al menos desde marzo de 1999, Commisa esperaba ser remunerada por los malos tiempos adicionales que generara la extensión del programa de trabajo. Es cierto que durante el desarrollo del Cambio núm. 56 y en el Convenio Modificatorio núm. 12. Pero no existe indicio alguno de que Commisa renunciara a su reclamación, y cejara en su empeño de exigir lo que le correspondía cobrar. Buena prueba de ello es que cuando se firmó el Acta de recepción física Total de la obra, se hace referencia expresa a que existen aún reclamos pendientes de Commisa, y entre ellos se encuentran precisamente las "afectaciones por condiciones climatológicas (Castoro 10 y Bar Protector)".

47.- Asimismo, en los párrafos 233 y 234, página 56 del Laudo Final, el Tribunal Arbitral manifiesta que COMMISA supuestamente alegó su derecho a una remuneración por malos tiempos debido a la reprogramación de los trabajos, esto con base en una carta referente a otro tema, que de ninguna manera puede ser considerada la formalización de una controversia técnica. El párrafo en cuestión dice "*Esto no incluye ningún tiempo adicional de espera por condiciones climatológicas. Debido a la extensión del programa de trabajo*". Es decir, durante la vigencia del contrato COMMISA nunca le solicitó a PEP formalmente, que tomara una determinación con relación a su esperanza de ser remunerado de los tiempos de espera por condiciones climatológicas, atribuidos a la extensión del programa de trabajo.

48.- Como ya se señaló anteriormente, fue hasta la terminación del contrato, y en la recepción física de los trabajos, de fecha 30 de agosto de 2002, en la cual, COMMISA anuncia su intención de formalizar su controversia técnica por malos tiempos, como consta en el Acta correspondiente, en el párrafo 234, página 56 del Laudo Final y en el Voto Particular de D. Darío Oscós, párrafos 3, 4 y 5, páginas 2 y 3, que es parte integrante del Laudo Final. Por otro lado, no fue sino hasta el 8 de abril de 2003 (Documento COM/EP2800/2003-5556), siete meses después de terminada



la obra, cuando COMMISA presenta su controversia, siendo rechazada por PEP por ser extemporánea.

49.- El Contrato, en su Anexo B-2 "Generalidades" Sección 5 "Modificaciones", establece que *"toda demora del contratista para dar aviso o presentar la propuesta a que se refiere el párrafo anterior, será motivo suficiente para rechazar la reclamación si el retraso perjudica a PEP y en la medida que lo haya perjudicado. **En ningún caso se considerará una reclamación del Contratista si se hace después de la Recepción Parcial o Total ...**".*

El tribunal arbitral dejó de aplicar este pacto y por ello omitió fundar debidamente el laudo arbitral.

50.- Es de suma importancia subrayar que el Supervisor de la Obra no cesa en sus funciones una vez terminada la obra, sino hasta que se extingan todos los derechos y obligaciones que resulten de la misma. Por lo que no puede deducir el Tribunal Arbitral que COMMISA haya tenido imposibilidad jurídica y/o fáctica y/o de actuar conforme al Contrato.

51.- Con fecha 8 de abril de 2003, siete meses después de terminada la obra, pero de manera extemporánea y sin posibilidad de surtir efectos, COMMISA le solicita al supervisor del Contrato, Ingeniero Alfredo Gómez Rangel que

57

formalizara la Controversia Técnica relativa a malos tiempos (COM/EP2800/2003-5556). Este documento era conocido por el Tribunal Arbitral, el cual, contra las garantías del debido proceso omitió tomarlo en cuenta en el laudo, tal como se acredita con la cita que hace del mismo el árbitro Darío Oscós Coria en su Voto Particular (página 4, párrafo 8)

52.- Por otro lado, este mismo documento acredita, tomando en cuenta la conducta de las partes, que era necesaria la formalización de la controversia técnica para ser atendido el reclamo de COMMISA; que COMMISA aún no había formalizado Controversia Técnica alguna en esta materia, al terminar el Contrato, y que su reclamación fue extemporánea, cuando no había posibilidad jurídica que PEP tomara en cuenta el fondo del asunto.

53.- En tal virtud, es ilegal la actitud del Tribunal Arbitral al considerar que se formalizó la controversia técnica, aún en contra de la expresa manifestación de COMMISA. Es más, esto demuestra la parcialidad del tribunal arbitral en violación del artículo 17 Constitucional, porque supuestamente resuelve tomando en cuenta la conducta de PEP (párrafo 118 del Laudo Final), pero no examina la conducta de COMMISA.

Cabe también constatar que esto refuerza la posición de PEP del "Acta de Recepción Física Total" de los Trabajos, en el sentido de que tampoco COMMISA formalizó su

58

controversia técnica con respecto a las controversias técnicas 19, 27, 34 y 35, y el tribunal arbitral actuando en violación del contrato de obra, se aboca a juzgar indebidamente sobre tales temas.

54.- Con base en el contrato de obra, antes de haber presentado la controversia a un arbitraje, COMMISA tenía que haber formalizado previa y oportunamente su Controversia Técnica, tal como lo exige el acuerdo de arbitraje contenido en la Cláusula 23.3 del Contrato de Obra Pública. Si no fue así, dicha Controversia Técnica no podía ser materia de arbitraje, por lo que las consideraciones del Tribunal Arbitral se refieren a una controversia no prevista en el acuerdo de arbitraje, ya que sólo controversias técnicas formales pueden ser materia de arbitraje, toda vez que el Tribunal Arbitral sólo podía resolver en definitiva, controversias técnicas. Al no dar cumplimiento con lo anterior, la resolución del tribunal arbitral se encuentra afectada de nulidad en razón de que se actualiza la causal de nulidad establecida en el artículo 1457, fracción I, inciso c) del Código de Comercio, cuyo texto es el siguiente:

> "c) *El laudo* se refiere a una controversia no prevista en el acuerdo de arbitraje..."

En consecuencia, cualquier análisis sobre la procedencia y la cuantificación de esta controversia, también es ilegal y contraría el orden público.

## CUARTA

55.- La decisión del Tribunal Arbitral, declarando procedente la pretensión de COMMISA contenida en la denominada Controversia Técnica 36, denominada "*Malos tiempos que afectaron a los trabajos de la Castoro 10 y del Bar Protector*", y condenando a PEP a pagar a COMMISA la cantidad de USD $22,038,954.00, (capítulo VII.2, páginas 51 a 60 del Laudo Final) encuadra dentro de los supuestos de nulidad contemplados en el artículo 1457, fracción I, inciso c), del Código de Comercio, que dispone la nulidad del Laudo cuando el mismo contiene decisiones que exceden los términos del acuerdo de arbitraje.

56.- No existe justificación para que el Tribunal Arbitral haya violado las estipulaciones contractuales relativas a Controversias Técnicas y Arbitraje que se expresaron en las Cláusulas 23.2 y 23.3 del Contrato, para permitir que un simple reclamo, fuera materia del arbitraje. La inconformidad de COMMISA con las condiciones contractuales no hace arbitrable su reclamación; para ello era necesario que le solicitara formalmente a PEP que decidiera sobre la materia, durante la vigencia del Contrato, lo cual nunca hizo, y así ha quedado demostrado en el arbitraje, como consta en el párrafo 234, página 56 del Laudo Final; y en el Voto Particular

60

de D. Darío Oscós, párrafos 3, 4 y 5, páginas 2 y 3, que es parte integrante del Laudo Final.

57.- El Arbitraje entre PEP y COMMISA es de estricto derecho, por lo que los derechos y facultades de las partes se determinan con base en disposiciones legales o contractuales, situacion que el tribunal arbitral no observó. Además, tanto el tribunal arbitral como las partes están obligadas a observar el principio de *pacta sunt servanda*, previsto en el artículo 1796 del Código Civil Federal, que dispone:

> "*Artículo 1796.*- Los contratos se perfeccionan por el mero consentimiento; excepto en aquellos que deben revestir una forma establecida por la Ley. Desde que se perfeccionan, obligan a los contratantes no sólo al cumplimiento de lo expresamente pactado, sino también a las consecuencias que, según su naturaleza, son conformes a la buena fe, al uso o a la ley".

58.- Formalizar la controversia, contractualmente no es lo mismo que insinuar o presumir un supuesto derecho, como lo hizo COMMISA. La decisión del Tribunal Arbitral fue dictada sin tener una base legal, una base jurídica, toda vez que dejo el cumplimiento del contrato al arbitrio de COMMISA, lo que expresamente prohíbe el artículo 1797 del Código Civil Federal, que establece:

61

> *"**Artículo 1797**. La validez y el cumplimiento de los contratos no puede dejarse al arbitrio de uno de los contratantes".*

Este principio tiene una trascendencia esencial en los contratos de obra pública, regulados por el derecho administrativo, en los cuales por su propia naturaleza, las partes tienen restringida su voluntad en la contratación, y porque en los mismos se reproducen disposiciones de orden público, que emanan directamente del artículo 126 y 134 Constitucionales, relativas a obra pública y gasto público.

59.- Derivado de lo anterior, es claro que no existe ninguna facultad para el Tribunal Arbitral para violar las estipulaciones contractuales celebradas entre PEP y COMMISA, ni puede el tribunal arbitral decidir en equidad o como amigable componedor. Además dicha estipulación sería nula de pleno derecho porque implicaría darle facultades al Tribunal Arbitral para regular cuestiones de orden público mexicano, que ya están contempladas en normas que son de orden público mexicano. Por eso el laudo arbitral solamente debió versar sobre prestaciones incluidas en el Contrato de Obra Pública, y su procedencia de conformidad a los supuestos también establecidos contractualmente, y observándose las Leyes Mexicanas (estricto derecho).

60.- En tal sentido, era obligación del Tribunal Arbitral aplicar correctamente las Cláusulas 23.2 y 23.3 del Contrato

conforme a su texto. Es decir, el Tribunal Arbitral realizó una aplicación indebida de las cláusulas 23.2 y 23.3 del Contrato, excediendo el pacto comisorio. El tribunal arbitral dictó un laudo sin la debida fundamentación y motivación al dictar la condena por malos tiempos en contra de PEP, invocando una carta de COMMISA del 15 marzo de 1999 (que ya fue previamente transcrita), así como el Acta de Recepción Física Total del 30 de agosto de 2002, con lo cual consideró que en su momento COMMISA dejó constancia de los posibles costos adicionales por el incremento de malos tiempos y de que no existía indicio alguno de que COMMISA renunciara a su reclamación, cuando la única realidad es que al mes de marzo de 1999, las embarcaciones Castoro 10 y Bar Protector aún no comenzaban a trabajar en las obras del IPC-28, por lo que resulta carente de toda lógica jurídica y sin fundamentación ni motivación alguna considerar que a esa fecha COMMISA ya estuviera en condiciones de formular algún reclamo relacionados con dichas embarcaciones.

61.- Resulta ilegal que el Tribunal Arbitral haya considerado en el laudo que la formalización de una controversia técnica se haya llevado a cabo simplemente porque COMMISA manifestó en un escrito de 15 de marzo de 1999, referente a las controversias 34 y 35 que: *"Esto no incluye ningún tiempo adicional de espera por condiciones climatológicas. Debido a la extensión del programa de trabajo"*.

63

62.- Por otro lado, y como ya quedó señalado en apartados anteriores, en el Acta de Recepción Física Total de ninguna forma COMMISA formuló ningún tipo de reclamo derivado de malos tiempos que hayan afectado los trabajos de las citadas embarcaciones (porque aún estaba en elaboración como se indica en la referida acta) y mucho menos cumplió, como era su obligación hacerlo, con las formalidades establecidas en el contrato en la cláusula 23.2, para estar en condiciones de acceder y formular sus reclamos en un juicio de arbitraje, en términos de la cláusula 23.3 del mismo Contrato. A pesar de ello, el tribunal arbitral consideró que la conducta de COMMISA cumplía con el contrato y era su fundamento para la condena contra PEP.

63.- El tribunal arbitral, al violar y desdeñar en su resolución el contenido de las cláusulas 23.2 y 23.3 del contrato, y en su lugar fundar y justificar su resolución en documentos que no cumplen con las formalidades exigidas en el contrato para tener por válidas e interpuestas en tiempo las reclamaciones de COMMISA, es claro que el tribunal arbitral se excedió del acuerdo de arbitraje, pues su obligación consistía en resolver las cuestiones que le fueran planteadas conforme a estricto derecho, lo cual como ya quedó demostrado, no cumplió, razón por la cual el laudo arbitral se encuentra afectado de nulidad en términos de lo

establecido en el artículo 1452, fracción I, inciso c) del Código de Comercio.

64.- Por otro lado, la aplicación de la ley en materia civil es una cuestión también de orden público por mandato del artículo 14 de la Constitución Política Federal, que en su último párrafo establece la garantía constitucional de la legalidad, cuyo mantenimiento es una cuestión de orden público mexicano.

El artículo 14 constitucional expresa:

> "**Artículo 14.-** ....... *En los juicios del orden civil, la sentencia definitiva deberá ser conforme a la letra o a la interpretación jurídica de la ley, y a falta de ésta se fundará en los principios generales del derecho".*

En consecuencia, cualquier análisis sobre procedencia y la cuantificación de esta controversia en la forma como lo hace el tribunal arbitral, también es ilegal y contraría el orden público.

65.- Esta argumentación está relacionada de igual manera con la decisión del Tribunal Arbitral, contenida en el Capítulo VI del Laudo Final, para declararse competente para conocer de todas las controversias y reclamaciones propuestas por COMMISA, alegando que todas las materias se relacionan o están vinculadas al Contrato relativo al

Proyecto IPC-28, incluyendo las Controversias Técnicas en los términos del Contrato, según los párrafos 105 y 129 del Laudo Final, cuando éstas debieron haber sido resueltas conforme al contrato de obra, mediante un procedimiento distinto y previo al arbitraje. Por tal razón, para mayor detalle sobre las violaciones a la garantía de legalidad cometidas por el Tribunal Arbitral sobre este punto, le solicitamos a ese juzgador, que en obvio de repeticiones, se remita al capítulo correspondiente de este escrito (hechos 472 a 508), en el cual se refuta la decisión del Tribunal Arbitral para considerarse competente en el asunto, mismo que solicitamos se tenga aquí insertado como si se hiciese al pie de la letra.

**II. Causas de Nulidad del Laudo Final con relación a la decisión de las Controversias 34 y 35: Tiempos de espera por retrasos en el inicio de los Trabajos de la Castoro 10 y del Bar Protector.**

66.- En las denominadas "Controversias Técnicas 34 y 35" COMMISA alega que el Contrato de Obra Pública lo obligaba a mantener sus embarcaciones disponibles desde el inicio del Contrato, pero que no obstante ello, las plataformas necesarias para comenzar los trabajos con embarcaciones no se terminaron conforme se habían programado. Aduce entonces que PEP retrasó el acceso al sitio de trabajo y el inicio de los trabajos con embarcaciones y que por ello

ocasiono a COMMISA tiempos de espera considerables para las embarcaciones Bar Protector y la Castoro 10.

67.- PEP contestó que esta reclamación era improcedente, porque las embarcaciones no se encontraban operando, y además que esta reclamación no podía ser materia de arbitraje.

68.- No obstante lo alegado por PEP, la decisión del Tribunal Arbitral fue la de conceder parcialmente esta prestación condenando a PEP a diversos pagos, afectando con ello de nulidad el Laudo Final dictado, atendiendo a las consideraciones siguientes.

### P R I M E R A

69.- Es nulo el laudo del Tribunal Arbitral, que declara parcialmente procedente la pretensión de COMMISA contenida en las llamadas "Controversias Técnicas" 34 y 35, denominada *Tiempos de espera por retrasos en el inicio de los trabajos de la Castoro 10 y del Bar Protector*", y que condena a PEP a pagarle a COMMISA la cantidad de USD $13,923,014.00, ya que las consideraciones vertidas por el Tribunal Arbitral, visibles en el Capítulo VII.1 del Laudo, de la página 36 a la 50, evidencian que la decisión encuadra dentro de los supuestos de nulidad contemplados en el

67

artículo 1457, fracciones I y II del Código de Comercio, que dispone la nulidad del Laudo cuando en el mismo se haya infringido el acuerdo de arbitraje, o gravemente se haya violentado el procedimiento de arbitraje, o que la decisión del laudo sea contrario al orden público.

70.- En el capítulo I precedente (consideración primera de la presente demanda), ya quedó demostrado que el manejo de recursos federales, y el régimen de pago de obligaciones con cargo a dichos recursos federales, es un régimen constitucional derivado de los artículos 126 y 134 de nuestra Carta Magna, y por tanto, cualquier infracción a los mismos atentaría precisamente contra el sistema jurídico en materia presupuestaria y de gasto público, que precisamente consagra la Constitución. Solicitamos que dichas disposiciones se tengan por reproducidos en este apartado, en obvio de repeticiones.

71.- También ha quedado acreditado, de la lectura de los artículos 1 y 15 de la Ley de Adquisiciones y Obras Públicas (LAOP), que la misma es de orden público e interés social ya que tiene por objeto regular las acciones relativas a la planeación, programación, presupuestación, gasto, ejecución y control de la obra pública y los servicios relacionados con la misma, que contraten los organismos descentralizados, en perfecta concordancia con el sistema constitucional al que nos referimos. De igual manera, y para

68

evitar repeticiones, solicitamos que dichos argumentos se tengan por reproducidos como si se hiciera al pie de la letra, por economía procesal.

72.- **El Contrato fue restringido sobre algunos temas derivados de penalidades, o con relación al caso fortuito o fuerza mayor, que no podía el Tribunal resolver sobre ellos, porque estaría resolviendo en conciencia y no en estricto derecho, principio conforme al cual debió emitirse el laudo.**

73.- En ese tenor, las condiciones y requisitos de pago de obligaciones · contraídas en virtud o relacionadas con contratos de obras públicas, al ser con cargo a recursos federales, están sujetos a disposiciones jurídicas de orden público pertenecientes al derecho público constitucional y administrativo, y no al mercantil.

74.- Así, podemos citar en esa misma idea, los artículos 44 fracción I del Reglamento de la Ley Federal de Presupuesto, Contabilidad y Gasto Público Federal, y 66, fracción I, del Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria, que establecen lo siguiente:

> *"Artículo 44.- Las entidades deberán cuidar bajo su responsabilidad, que los pagos que se efectúen con cargo a sus presupuestos aprobados se realicen con sujeción a los siguientes requisitos:*
> *I.* ***Que correspondan a compromisos efectivamente devengados****, con excepción de*

69

*los anticipos previstos en los ordenamientos legales y los mencionados ; ....... ".*

*"Artículo 66. Los pagos con cargo al Presupuesto de Egresos se realizarán por las dependencias a través de la Tesorería. Los pagos que realicen las entidades se efectuarán por conducto de sus propias tesorerías, llevando los registros presupuestarios correspondientes en sus respectivos flujos de efectivo.*
*Las dependencias, en el ejercicio de sus erogaciones, adicionalmente deberán:*
*I. Que correspondan a compromisos efectivamente devengados, con excepción de los anticipos previstos en las disposiciones aplicable; .... ".*

75.- **Es el caso que el pago determinado por el Tribunal Arbitral no fue efectivamente devengado por COMMISA, por lo que el laudo que condena a PEP al pago de las cantidades de dinero referidas, carece de fundamentación y motivación y por ello resulta nulo al violar las normas de orden público consagradas en la Constitución.**

76.- Como quedó expresado en hechos anteriores, COMMISA reclamaba tiempos de espera causados por retrasos en los inicios de los trabajos. En el Contrato, los tiempos de espera son un concepto de trabajo pagable, contenido en el último párrafo de la cláusula 10.1.2. En el Laudo Arbitral, el Tribunal Arbitral consideró, en los párrafos 165 a 167, visibles en la página 44, que dichos tiempos de espera eran inaplicables al presente caso, dado que esas tarifas o cuotas sólo pueden pagarse por suspensiones, una

70

vez que hayan iniciado los trabajos con embarcaciones. En efecto, el tribunal arbitral estableció:

> "165. En el presente arbitraje, el Demandante pretende que a los días de retraso imputables a PEP se les aplique la tarifa de tiempo de espera convenidas en el Contrato para esperas acaecidas después de la movilización.
>
> "166. El Tribunal Arbitral no está de acuerdo. En su opinión, las tarifas de tiempo de espera únicamente resultan aplicables si se producen interrupciones en el funcionamiento de las embarcaciones, una vez que éstas han sido movilizadas y admitidas al sitio de los trabajos. **Las tarifas de espera, por el contrario, no son aplicables si lo que se producen son retrasos en la puesta en servicio de las embarcaciones antes de la movilización.** En estos casos lo convenido es que PEP pague a Commisa los costos razonables y comprobados que el retraso le haya causado.
>
> *La anterior conclusión del Tribunal se fundamenta en la literalidad del propio Contrato (i), en el comportamiento pre y post contractual de las partes (ii) y en la lógica económica del negocio (iii).*

77.- Basado en esta lógica, el Tribunal Arbitral continuó con el análisis del caso, e indebidamente condenó a PEP a su pago. Como se desprende de la transcripción de las pretensiones de la Demandante, visible en el párrafo 80, página 23 del Laudo Final, existía una diversa pretensión de COMMISA con relación a estos hechos, misma que era la siguiente:

71

"*Commisa demanda una compensación de aproximadamente US$81 millones de dólares. Dicha suma se calcula de acuerdo con el Contrato EPC-28. En caso de que por alguna razón el Tribunal Arbitral determinará que las cuotas o tarifas por tiempos de espera o de reserva que se establecen en el Contrato EPC-28 no son aplicables para el cálculo de la compensación correspondiente a estos retrasos, Commisa atentamente solicita que se dicte laudo conforme al cual se decrete el pago de una indemnización a cargo de PEP que resulta suficiente para compensar a Commisa por los daños y perjuicios sufridos como consecuencia de los retrasos antes sufridos. Para tales efectos, Commisa estima que dichos daños y perjuicios ascienden aproximadamente a US$81 millones de dólares...*"

78.- Es decir, COMMISA pretendía el pago de tarifas de espera pactadas para el trabajo con embarcaciones, o en su defecto, el pago de una indemnización por daños y perjuicios, por lo que al haberse resuelto desfavorablemente a COMMISA su primera pretensión, procedía examinar la segunda.

79.- Relacionando la pretensión de COMMISA y la posición del Tribunal Arbitral plasmada en el Laudo Final, con la exigencia de orden público de que los pagos correspondan a trabajos efectivamente devengados, tenemos lo siguiente:

a) El concepto de trabajo "*retrasos en la puesta en servicio de las embarcaciones antes de la movilización*" (párrafo 166, página 44 del Laudo Final) no existe en el Contrato, y mucho

menos como un concepto de trabajo pagable, por ello no hay obligación contractual de pagar este evento.

b) La frase *"retrasos en la puesta en servicio de las embarcaciones antes de la movilización"*, denota claramente el carácter vacío de los hechos de la reclamación del Contratista, es decir, se está reclamando un pago por no acreditar las condiciones de operación de las embarcaciones, por no trabajar, o por prorrogar la fecha en que empezarían a trabajar.

Por otro lado, que los compromisos cuyo pago se solicita hayan sido efectivamente devengados, como lo exigen los artículos 44 fracción I y 66 fracción I del Reglamento de la Ley de Prepuesto, Contabilidad y Gasto Público y del Reglamento de la Ley de Presupuesto y Responsabilidad Hacendaria, respectivamente, puede interpretarse con relación a los conceptos de trabajo pactados en el contrato o a los daños y perjuicios solicitados por COMMISA, como que estos se hayan efectivamente terminado conforme al proyecto y a la calidad y especificaciones pactadas[4], e incluyendo las operaciones y materiales contemplados en el concepto de trabajo pactado[5], o que se hayan realmente causado.

---

[4] Reglamento de la Ley de Obras Públicas. Artículo 42. " *Para los efectos del artículo 39 de la Ley se entenderá por: I. Precio unitario, el importe de la remuneración o pago total que debe cubrirse al contratista por unidad de concepto de trabajo terminado; ejecutado conforme al proyecto, especificaciones de construcción y normas de calidad ...*"

[5] Reglas Generales para la Ejecución y Contratación de la Obra Pública: "*5.2.3 CONCEPTO DE TRABAJO. Conjunto de operaciones y materiales que de acuerdo con las formas y especificaciones respectivas, integran cada una de las partes en que se dividen convencionalmente los estudios y proyectos, la ejecución y equipamiento de las obras, la puesta en servicio, su conservación o mantenimiento y la supervisión de estos trabajos con fines de medición y pago*".

73

80.- De conformidad con el derecho civil mexicano el pago de daños y perjuicios no operan automáticamente como consecuencia directa e inmediata de un incumplimiento contractual; al contrario, ese nexo tiene que probarse, independientemente del monto del daño. Lo anterior tiene fundamento en el artículo 2110 del Código Civil Federal, que establece:

> *"Artículo 2110. Los daños y perjuicios deben ser consecuencia inmediata y directa de la falta de cumplimiento de la obligación, ya sea que se hayan causado o que necesariamente deban causarse".*

81.- Nuestras más altas autoridades han reiterado en jurisprudencia firme lo establecido en el artículo 2110 del Código Civil Federal, en los siguientes términos:

> **DAÑOS Y PERJUICIOS. EL DERECHO A ELLOS DEBE DEMOSTRARSE EN FORMA AUTÓNOMA AL INCUMPLIMIENTO DE LA OBLIGACIÓN EN QUE SE FUNDEN, EN TANTO ESTA ÚLTIMA NO IMPLICA QUE NECESARIA E INDEFECTIBLEMENTE SE CAUSEN**[6]. Si bien conforme a lo dispuesto por el artículo 2110 del Código Civil Federal, tales renglones deben ser el resultado del incumplimiento de una obligación, no puede sostenerse que ante tal supuesto el afectado forzosa y necesariamente sufra pérdida o menoscabo en su patrimonio o se vea privado de cualquier ganancia lícita de acuerdo con los artículos 2108 y 2109 del propio

---

[6] No. Registro: 184,165. **Jurisprudência. Materia(s): Civil.** Novena Época. Instancia: Tribunales Colegiados de Circuito. Fuente: Semanario Judicial de la Federación y su Gaceta. XVII, Junio de 2003. Tesis: I.7o.C. J/9. Página: 727.

ordenamiento, pues casos habrá en que aun ante el deber incumplido ninguna afectación de aquella índole traiga consigo. **De lo anterior se sigue que no basta con demostrar el extremo aludido para sostener que se materializaron los daños y perjuicios, que por lo mismo deben probarse en forma independiente, ya que sostener lo contrario conduciría a decretar una condena en forma automática aun en aquellos casos en que no se resintió ninguna de las afectaciones a que se hizo mérito.** Tal es el sentido de la jurisprudencia que puede verse en el Apéndice al Semanario Judicial de la Federación 1917-1985, Cuarta Parte, página 357, que dice: "DAÑOS Y PERJUICIOS. CONDENA GENÉRICA.-Los artículos 85, 515 y 516 del Código de Procedimientos Civiles para el Distrito Federal, y los códigos procesales de los Estados de la República que tienen iguales disposiciones, permiten concluir que si el actor en un juicio que tiene por objeto principal el pago de daños y perjuicios, probó su existencia y su derecho a ser indemnizado, pero no rindió pruebas que permitan precisar su importe, ni establecer las bases con arreglo a las cuales debe hacerse la liquidación, la condena al pago genérico de los mismos es procedente, reservándose la determinación de su cuantía para el procedimiento de ejecución de sentencia.". Desde el momento en que el criterio exige las pruebas del derecho a ser indemnizado, éste no puede ser otro que la presencia de la pérdida, menoscabo o privación que ya quedaron mencionados y, por tanto, si no quedan acreditadas no habrá lugar a la condena por daños y perjuicios, aunque prevalezca la relacionada con que la obligación debe cumplirse.

SÉPTIMO TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.

Amparo directo 1177/93. Autos Tlaxcala, S.A. de C.V. y Hermanos Rivera, S.A. de C.V. 6 de abril de 1993. Unanimidad de votos. Ponente: Carlos Gerardo Ramos Córdova. Secretaria: Irma Rodríguez Franco.

Amparo directo 3123/2001. Petróleos Mexicanos. 29 de noviembre de 2001.

Unanimidad de votos. Ponente: Anastacio Martínez García. Secretario: Carlos Arturo Rivero Verano.

Amparo directo 466/2002. Aseguradora Hidalgo, S.A. 11 de julio de 2002. Unanimidad de votos. Ponente: Sara Judith Montalvo Trejo. Secretaria: Teresa Bonilla Pizano.

Queja 90/2002. 16 de enero de 2003. Unanimidad de votos. Ponente: Anastacio Martínez García. Secretario: Carlos Arturo Rivero Verano.

Amparo directo 154/2003. Promociones Russek, S.A. de C.V. 10 de abril de 2003. Unanimidad de votos. Ponente: Anastacio Martínez García. Secretario: José Ybraín Hernández Lima.

**DAÑOS Y PERJUICIOS DERIVADOS DE ACTOS DE COMERCIO. EL SOLO INCUMPLIMIENTO NO HACE QUE SE GENEREN EN FORMA AUTOMÁTICA[7].** De conformidad con el artículo 376 del Código de Comercio, en las compraventas mercantiles, una vez perfeccionado el contrato, el contratante que cumpliere tendrá derecho a exigir, del que no cumpliere, la rescisión o cumplimiento del contrato y la indemnización, además de los daños y perjuicios. Sin embargo, de ello no se sigue que al demostrarse el incumplimiento de una parte que celebró un contrato mercantil, se tengan por actualizados los daños y perjuicios que se le ocasionaron, igual a su monto, pues del dispositivo legal indicado sólo se colige que el contratante cumplido tiene derecho a exigir del que no lo hizo, la rescisión o el cumplimiento forzoso del contrato, y las demás consecuencias legales como son la indemnización de los daños y perjuicios. De tal manera que, con independencia de que los actos comerciales sean lucrativos, para la procedencia de dicha indemnización, es necesario probar en juicio que se pudieron haber obtenido ganancias, y que éstas no ingresaron a su patrimonio merced al incumplimiento del demandado, pues de otra manera, implicaría considerar que aquéllos

---

[7] No. Registro: 178,481. Tesis aislada. Materia(s): Civil. Novena Época. Instancia: Tribunales Colegiados de Circuito. Fuente: Semanario . Judicial de la Federación y su Gaceta. XXI, Mayo de 2005. Tesis: III.2o.C.94 C. Página: 1448.

se generan en forma automática, lo cual no
está previsto por la ley.
SEGUNDO TRIBUNAL COLEGIADO EN MATERIA
CIVIL DEL TERCER CIRCUITO.
Amparo directo 549/2004. Pablo Álvarez
Magaña. 26 de noviembre de 2004.
Unanimidad de votos. Ponente: José
Guadalupe Hernández Torres. Secretario: José
Guadalupe Bustamante Guerrero.

82.- Es de suma importancia el establecer claramente
cuáles daños reclamó COMMISA. Y la respuesta es que
COMMISA únicamente reclamó como daños el pago de las
tarifas de espera plasmadas en el contrato (párrafo 80,
página 23 del Laudo Final, transcrito supra), las cuales fueron
declaradas improcedentes y no aplicables por el Tribunal
Arbitral (párrafos 165 a 167, visibles en la página 64 del Laudo
Final).

83.- Es decir, COMMISA reclamaba la misma cantidad
bajo dos causas distintas: (a) por concepto de tarifas de
espera, o (b) por concepto de daños y perjuicios, lo cual es
totalmente improcedente. Al respecto, cabe señalar que el
código civil federal, aplicado supletoriamente dispone en su
artículo 1840 lo siguiente:

> "Art. 1840.- Pueden los contratantes estipular
> cierta prestación como pena para el caso de
> que la obligación no se cumpla o no se cumpla
> de la manera convenida. Si tal estipulación se
> hace, no podrán reclamarse, además, daños y
> perjuicios."

77

84.- La simple aplicación del artículo 1840 del Código Civil Federal le debería haber bastado al Tribunal Arbitral para declarar improcedente el reclamo de COMMISA por daños, precepto legal que era conocido del Tribunal ya que esta situación fue reconocida por la propia COMMISA en su comunicado C 44 (párrafo 26, página 9), relativo a las Diligencias para Mejor Proveer, mismo que se exhibe como prueba, añadiendo que, como lo único que estaba solicitando era el pago de tarifas de espera, no tenía obligación de probar ningún daño (o lo que es lo mismo, que durante el procedimiento no había acreditado ningún daño).

Esto hubiera sido suficiente para declarar improcedente la reclamación por daños y perjuicios planteada por COMMISA, porque nunca demostró en su demanda daño alguno, por el contrario, toda la actuación de COMMISA consistió en argumentar que se encontraba dentro del supuesto del pago de tarifas de espera. No obstante esto, el Tribunal Arbitral, de manera incongruente, nunca se propuso establecer la procedencia o improcedencia de la acción por daños y perjuicios, que por supuesto resultaba clara y notoriamente improcedente.

85.- La decisión del tribunal arbitral agravio a PEP, toda vez que sin mediar solicitud de parte de COMMISA, el tribunal arbitral de manera oficiosa, infringiendo el principio de estricto derecho y equilibrio que deben tener las partes

dentro del proceso, así como el principio de imparcialidad que deben regir su actuación, se excedió en el mandato que le fue conferido y pasando por encima de disposiciones de orden público, resolvió sobre la procedencia de una prestación completamente distinta a la reclamada por COMMISA, es decir, el tribunal arbitral resolvió sobre una cuestión diferente a la que le fue planteada.

86.- Esta actuación del tribunal arbitral es suficiente para anular el laudo arbitral.

87.- El Tribunal Arbitral se encontró con que la Cláusula 10.1.2 del Contrato en sus dos primeros párrafos regula el pago de "Gastos no Recuperables", que se definen como aquellos gastos en que hubiere incurrido el Contratista en caso de suspensión a los trabajos en los términos de la Cláusula 10.1 del Contrato, y **solamente a solicitud del propio Contratista.** Dichos gastos deben ser razonables, **estar debidamente comprobados** y relacionarse directamente con el Contrato.

88.- Cabe señalar que estos gastos no recuperables regulan un supuesto distinto al de la suspensión a los trabajos con embarcaciones  que generan el pago de tarifas de espera (como lo admite en principio el Tribunal), tarifas que están reguladas en la misma Cláusula 10.1.2, párrafo tercero, prestación que el Tribunal Arbitral declaró previamente

79

improcedente; y de igual manera, los gastos no recuperables es una prestación distinta a una indemnización por daños y perjuicios, que ni siquiera estudió.

89.- Por otro lado, el Tribunal Arbitral también se encontró que conforme a la Orden de Cambio Núm. 1 Rev 2, PEP se comprometió a satisfacer a COMMISA los "costos justos, razonables y debidamente comprobados" que se hubieran devengado. Como bien lo reconoció el Tribunal Arbitral (véanse párrafos 174[8] y 175[9], página 45 del Laudo Final), esta definición es semejante a la de "Gastos No Recuperables" contenida en la Cláusula 10.1.2, primer y segundo párrafo. Siendo así las cosas, es evidente que PEP de conformidad a la Orden de Cambio Núm. 1, Rev. 2, se comprometió a resarcir a COMMISA, los Gastos No Recuperables que COMMISA acreditara debidamente, pero de ninguna manera se comprometió a pagar las Cuotas de Espera o de Tiempos de Espera, definida en la misma Cláusula 10.1.2, tercer párrafo, establecidas para esperas con embarcaciones, ni ninguna otra prestación.

---

[8] "En las contestaciones a las dudas planteadas por los licitantes en la Junta de Aclaraciones la Demandada dejó claro que, en caso de que hiciere uso de su derecho de reprogramación de fechas, PEP indemnizaría al Contratista aplicando las disposiciones contractuales y que la tarifa de espera se aplicaría durante la suspensión de operaciones".

[9] "Aún más significativo que estas aclaraciones precontractuales, es el comportamiento de las partes en la ejecución del Contrato. En la Orden de Cambio núm. 1 Rev 2, firmada por ambas partes, se convino la extensión del plazo para la incorporación de las embarcaciones, y PEP se obligó a satisfacer al Contratista los <los costos justos, razonables y debidamente comprobados> que se le hubieren irogado. Es de resaltar que los términos empleados en esta Orden de Cambio son idénticos a los empleados en el párrafo primero de la cláusula 10.1.2 del Contrato. No queda pues, duda alguna que las partes entendieron que lo pactado en el Contrato, para el caso de retraso en la incorporación de embarcaciones, era que PEP resarciera los costos reales incurridos por el Contratista, y no que se devengara la tarifa de espera".

80

90. Es decir, en la Orden de Cambio 1 Rev 2, PEP no se comprometió a pagar los tiempos de espera del barco que reclamaba COMMISA. No obstante ello, el Tribunal Arbitral consideró indebidamente su aplicación al caso (lo que será materia de la causa de nulidad que se expondrá en apartado subsecuente).

91.- El punto en este apartado es que bajo ningún concepto o causa de reclamación COMMISA ha demostrado que se hayan devengado las cantidades que reclama.

92.- Toda vez que COMMISA no demostró que efectivamente hubiese devengado las cantidades que reclama, entonces, el Tribunal Arbitral, al condenar a PEP a pagar a COMMISA al pago de ciertas cantidades no demostradas que se hubieren erogado, le esta ordenando a PEP que realice una conducta que las leyes mexicanas le impiden realizar. Es decir, se demostrará que no hay justificación contractual y legal para su pago (véase también el apartado Cuarto de este capítulo).

93.- El Reglamento de la Ley de Presupuesto, Contabilidad y Gasto Público Federal, disposición de orden público, el artículo 2110 del Código Civil Federal, y la jurisprudencia en materia civil, así como el Contrato de Obra y acuerdos posteriores, establecen para que se puedan pagar los compromisos, daños o gastos, estos deben de

81

haber sido efectivamente devengados, causados o comprobados, situación que no ocurrió en el presente caso. El Tribunal Arbitral supuestamente tuvo por acreditado un incumplimiento contractual (lo cual se niega porque el derecho de PEP a suspender trabajos está claramente estipulado en las cláusulas 4.4 y 10.1 del Contrato, y al estar previsto, es claro que se realiza legítimamente), y luego, sin hacer ninguna consideración de la causación del daño (falta de motivación y fundamentación), dicho tribunal arbitral se encausó directamente a determinar la compensación correspondiente, lo que constituye una violación grave en el laudo, al debido proceso y a las formalidades esenciales del procedimiento.

94.- Es importante señalar que para la ejecución de los trabajos objeto del contrato de obra pública, la contratista (COMMISA) debía contar con embarcaciones capaces de desarrollar trabajos costa afuera, ya sea en el tendido de ductos submarinos, o en su conexión a plataformas. COMMISA carecía de embarcaciones propias y subcontrató las embarcaciones Castoro 10 y Bar Protector a la empresa EMC.

95.- La fecha de inicio de los trabajos se difirió porque ciertas plataformas petroleras costa afuera, relacionadas con el objeto del contrato de obra del proyecto IPC-28, no estuvieron terminadas oportunamente. COMMISA alegó al

Tribunal Arbitral que el Contrato de Obra Pública lo obligaba a mantener sus embarcaciones disponibles, aduciendo luego que el retraso de PEP en proporcionar acceso al sitio de trabajo causó tiempos de espera considerables para las embarcaciones Bar Protector y la Castoro 10, mismos que debían de ser compensados.

96.- De la reclamación hecha por COMMISA, es claro que el costo o daño a compensar (si COMMISA tuviera base contractual o legal para ello, por la razón que se explicara en el apartado Tercero de este Capítulo) serían las cantidades efectivamente pagadas por COMMISA al dueño de las embarcaciones por el retraso en la puesta en servicio de las embarcaciones, en caso de que las embarcaciones hubieren estado disponibles. O de acuerdo con la postura del Tribunal Arbitral, COMMISA debía acreditar que había incurrido en gastos no recuperables (es importante subrayar desde este momento que COMMISA no acreditó lo primero, ni tampoco lo segundo).

97.- A pesar de ello, el tribunal arbitral sin fundamento ni motivación condenó a PEP al pago mencionado.

98.- Con lo hasta aquí narrado, podemos establecer qué tipo de eventos debía probar COMMISA para la procedencia de su reclamación; y también se demuestra que la tarifa establecida por el Tribunal arbitral como condena, (párrafo

83

183 del Laudo Final) no se apega a la normatividad de orden público del caso, por estar su fundamentación fuera del contexto fáctico y normativo del procedimiento, y del marco jurídico a aplicarse, debido a que el costo que la integra: **i)** no fue efectivamente incurrido; y, **ii)** No está debidamente probado, requisitos a los cuales expresó el Tribunal sujetaría su determinación conforme al acta de misión.

Este no es un caso de indebida aplicación de la ley, sino de la trasgresión a normas que afectan materialmente el gasto público, materia de soberanía constitucional.

99.- **Para que exista un costo debidamente incurrido**, es necesario que las partes estén en aptitud de cumplir con las obligaciones asumidas en el contrato. Así las cosas, para que un costo tenga esas características se hace necesario; **1)** La existencia de un atraso imputable a PEP; y, **2)** Que sea un costo pactado en el contrato o que sea pagable por haberse actualizado los supuestos contractuales de su pago.

100.- Suponiendo sin conceder, que existiera un retraso imputable a PEP (que no lo hay, porque era un derecho de PEP), la falta de la segunda condición sería suficiente para desestimar la acción, y sobre todo, relacionándola con el texto del artículo 65 de la Ley de Adquisiciones y Obras Públicas, y diversas normas de orden público mexicano.

101. No obstante lo anterior, queremos dejar en claro ciertos cuestionamientos de fondo, para que se entienda mejor la actuación ilegal del Tribunal Arbitral. Por un lado, la culpa en el retraso de los inicio de los trabajos, por la falta de plataformas, era un evento independiente de las condiciones para el pago de tarifas de espera para embarcaciones. En otras palabras, si COMMISA no acreditó de ninguna manera que sus embarcaciones estuvieran en condiciones de operar y en el sitio de los trabajos, no tenía derecho a pago alguno, por tanto es ilegal la imputación de responsabilidad a PEP que realiza el Tribunal Arbitral en el párrafo 153 del Laudo Final[10].

102.- Siendo así las cosas, es claro que el laudo es incongruente, toda vez que el Tribunal Arbitral no analizó en sus términos la defensa de PEP, y tampoco la acción de COMMISA. La principal excepción de PEP era que las embarcaciones estuvieran disponibles y en condiciones de operar para generar el pago de tarifas de espera, según consta en el párrafo 131 del laudo final[11] y en lo cual, en apariencia, el Tribunal estuvo de acuerdo, de conformidad con lo asentado en el párrafo 166 del Laudo Final. Sin

---

[10] Por el contrario, si hubiere cumplido con las condiciones contractuales para la operación de embarcaciones, sólo en ese evento se pudiere hablar de retrasos imputables a PEP, si no le proporcionaba acceso al sitio de los trabajos. En otro sentido, el cumplimiento de las operaciones para la puesta en servicio era responsabilidad de COMMISA, y mientras ella no cumpliera con su obligación, no le podía exigir a PEP el cumplimiento de la suya.

[11] La excepción de contrato no cumplido non adimpleti contractus tiene por efecto diferir la ejecución. No ataca al contrato: ambas partes quedan obligadas y bastará cumplir a la que se rehusaba hacerlo para que la otra no pueda ya invocar la excepción; la que se rehusaba podría demandar la ejecución. Una situación de espera es creada: hay negativa provisional de ejecución En ese sentido, no hay pago si no hay embarcaciones, en condiciones de operar de acuerdo al Contrato.

embargo, el Tribunal Arbitral, excediéndose en sus facultades, introdujo nuevas demandas al pleito, y alteró la litis, en beneficio de COMMISA, como se expondrá en el apartado segundo de este capítulo.

103.- Todavía es más evidente la parcialidad del Tribunal Arbitral, cuando afirma en el párrafo 159 del Laudo Final, que PEP se opuso en dos ocasiones a la movilización de las embarcaciones, cuando solamente le exigía a COMMISA el cumplimiento de sus obligaciones contractuales. Al calificar estos documentos, de acuerdo a su texto, como una oposición de PEP a la llegada de los barcos, el tribunal arbitral omite fundar y motivar debidamente el laudo arbitral.

104.- Esta falta de fundamentación por parte del tribunal arbitral, se refleja en la propia cita de documentos realizada por el tribunal arbitral al emitir su consideración en comento, pues invoca en el pie de página 88 (página 42 del laudo) los documentos CV 37 y CV 40, que no tienen relación alguna con el punto a estudio.

105.- Mediante correo electrónico del 29 de junio de 2006, la Secretaria del Tribunal Arbitral, Deva Villanúa, adjuntó una relación de los documentos aportados por las partes durante la audiencia arbitral, en la que se lee en lo referente al documento CV 37:

86

*"Ref. Inf. Diario actividades. Movilización barco "DSV". (2 pág.) COM-PEP 020700-703".*

*Con relación al documento denominado CV 40, se describe con los siguientes datos:*

*"Ref: Anexo B 1, cláusula 3.5.1. Re: Programa de Movilización."*

Ahora bien, de la revisión exhaustiva de ambas documentales, de ninguna de sus partes se desprende que PEP se haya opuesto a la movilización de las embarcaciones, como equivocada e infundadamente lo afirma el tribunal arbitral en el punto 159 del laudo, pues cabe agregar que la documental señalada en primer término se refiere a un informe de actividades de la propia embarcación bajo el control de la propia COMMISA, y con relación a la segunda documental, la misma consiste en un anexo del contrato en la que consta el programa de actividades y que no contiene la oposición de una de las partes a la movilización de embarcaciones.

106.- Es importante mencionar también, como ejemplo del tipo de documentación que tuvo que examinar el Tribunal Arbitral para decidir el punto, el Documento EP2800/COM/99-1696 de fecha 11 de junio de 1999 así como el Documento EP2800/COM/99 1604 de 21 mayo de 1999, exhibido como prueba en el arbitraje, y en los cuales se le exigía el cumplimiento a COMMISA de las condiciones contractuales para el arribo de las embarcaciones, exigencia que de

87

ninguna manera puede ser una oposición a la llegada de las embarcaciones.

Por ello resulta infundado el laudo arbitral.

107.- En el párrafo 166 del Laudo Final, el Tribunal Arbitral reconoce que las embarcaciones no habían sido puestas en servicio, es decir, no habían sido movilizadas al sitio de los trabajos, ni admitidas al sitio de los mismos[12], al señalar:

> "166. El Tribunal Arbitral no está de acuerdo. En su opinión, las tarifas de tiempo de espera únicamente resultan aplicables si se producen interrupciones en el funcionamiento de las embarcaciones, una vez que éstas han sido movilizadas y admitidas al sitio de los trabajos. Las tarifas de espera, por el contrario, no son aplicables si lo que se producen son retrasos en la puesta en servicio de las embarcaciones antes de la movilización. En estos casos lo convenido es que PEP pague a Commisa los costos razonables y comprobados que el retraso le haya causado".

Véase también el párrafo 169 del Laudo Final.

108.- Esto es, los trabajos no habían iniciado todavía, sin embargo, el Tribunal Arbitral estableció en el párrafo 168 del Laudo Final que dicha reclamación encuadraba dentro de la hipótesis normativa de la cláusula 10 y cláusula 10.1.2 del

---

[12] La Cláusula 16.1.1 del Contrato establece claramente que mientras las embarcaciones no se sometan y aprueben el Check List o inspección para verificar sus condiciones y capacidad para el trabajo, así como para acreditar que cuenta con todos los permisos y registros necesarios para navegar en aguas mexicanas, no pueden ser puestas en servicio. Si las embarcaciones no aprueban la inspección, no es posible considerarlas como disponibles.

88

Contrato, relativa a suspensiones a los trabajos ordenadas por PEP y el pago de gastos no recuperables, de conformidad con los párrafos 174[13] y 175[14] del laudo, lo cual es completamente infundado.

109.- Los retrasos en la puesta en servicio de las embarcaciones antes de la movilización, no es un concepto pagable conforme al contrato, porque sería ilegal y penado por las leyes, que una entidad pública o un servidor público, estableciera un pago, o pagara, por algo que no puede ser considerado un trabajo, ni suspensión a un trabajo.

110.- El artículo 65[15] de la LAOP es buena prueba de ello, puesto que dispone únicamente como sanción al retraso en el inicio de los trabajos por falta de acceso al sitio de los trabajos, la prórroga a la fecha de terminación de los trabajos.

---

[13] "En las contestaciones a las dudas planteadas por los licitantes en la Junta de Aclaraciones la Demandada dejó claro que, en caso de que hiciere uso de su derecho de reprogramación de fechas, PEP indemnizaría al Contratista aplicando las disposiciones contractuales y que la tarifa de espera se aplicaría durante la suspensión de operaciones".

[14] "Aún más significativo que estas aclaraciones precontractuales, es el comportamiento de las partes en la ejecución del Contrato. En la Orden de Cambio núm. 1 Rev 2, firmada por ambas partes, se convino la extensión del plazo para la incorporación de las embarcaciones, y PEP se obligó a satisfacer al Contratista los <los costos justos, razonables y debidamente comprobados> que se le hubieren irogado. Es de resaltar que los términos empleados en esta Orden de Cambio son idénticos a los empleados en el párrafo primero de la cláusula 10.1.2 del Contrato. No queda pues, duda alguna que las partes entendieron que lo pactado en el Contrato, para el caso de retraso en la incorporación de embarcaciones, era que PEP resarciera los costos reales incurridos por el Contratista, y no que se devengara la tarifa de espera".

[15] Artículo 65.- La ejecución de la obra contratada deberá iniciarse en la fecha señalada, y para ese efecto, la dependencia o entidad contratante oportunamente pondrá a disposición del contratista el o los inmuebles en que deba llevarse a cabo. El incumplimiento de la dependencia o entidad, prorrogará en igual plazo la fecha originalmente pactada de terminación de los trabajos.

89

111.- Asimismo, como esta disposición regula el supuesto de la falta de acceso al sitio de los trabajos, y los artículos 71[16] y 72 fracción I [17] de la LAOP, el supuesto de la suspensión a los trabajos, es claro que dichas distinciones legales echan por tierra las presunciones del Tribunal Arbitral para aplicar los efectos jurídicos de la cláusula 10 del Contrato, que contempla el supuesto de suspensiones a los trabajos, al supuesto de retrasos en el inicio de los trabajos. La analogía no opera en materia de gasto público, y menos cuando ambos supuestos se encuentran regulados.

112.- En otro sentido, estas disposiciones permiten entender que la cláusula 10 del Contrato resume las disposiciones del artículo 71 y 72 fracción I de la LAOP, y también que la cláusula 10 del contrato **no** resume el artículo 65 de la LAOP, y que en general el Contrato no contempla el supuesto para el pago de retrasos en el inicio de los trabajos. Todavía más allá, permite establecer que si no se pactó una prestación contractual por este concepto, y el artículo 65 de la LAOP, no contempla para ese evento ninguna prestación económica, se denota claro que la condena carece de justificación contractual o legal.

---

[16] Artículo 71.- Las dependencias y entidades podrán suspender temporalmente en todo o en parte la obra contratada, por cualquier causa justificada. Los titulares de las dependencias y los órganos de gobierno de las entidades designarán a los servidores públicos que podrán ordenar la suspensión..

[17] Artículo 72.- En la suspensión, rescisión administrativa o terminación anticipada de los contratos de obra pública, deberá observarse lo siguiente: I. Cuando se determine la suspensión de la obra o se rescinda el contrato por causas imputables a la dependencia o entidad, ésta pagará los trabajos ejecutados, así como los gastos no recuperables, siempre que éstos sean razonables, estén debidamente comprobados y se relacionen directamente con el contrato de que se trate;

<u>Exhibit A</u>

Part 3 of  7

113.- PEP se comprometió desde la licitación a satisfacer los tiempos de espera en los términos del Contrato, y los términos del Contrato son claros: las suspensiones a los trabajos con embarcaciones causarían tarifas de espera siempre y cuando ya estuvieren operativas. Si las embarcaciones no se encontraban operando, es claro que no hay obligación de ningún pago, porque el retraso de su puesta en servicio solamente genera prórroga a la fecha de terminación de los trabajos.

114.- **No ésta debidamente probado el costo,** debido a que la documental conforme a la cual el Tribunal Arbitral fija el costo, es una propuesta de COMMISA para minimizar daños (véase párrafos 180, 181, 182 y 183, páginas 46 y 47 del Laudo Final). Es decir, es una propuesta de COMMISA de fecha 15 de marzo de 1999, proponiendo una tarifa por el tiempo de espera de las embarcaciones por el retraso en los inicios de los trabajos, misma que se anexa como prueba.

115.- En consecuencia, es claro que una tarifa no es un costo incurrido (cantidades realmente pagadas), sino una propuesta de un precio por pagar mientras durara el retraso. La misma fecha del documento es clara prueba de que no es costo incurrido, pues fue realizada antes de que concluyera el retraso inicial. El documento es de 15 de marzo de 1999, y el inicio de los trabajos con la Castoro 10 fue el 1º de agosto de 1999, cinco meses después, y el inicio de los trabajos con la



91

Bar Protector fue el 3 de marzo de 2000, casi un año después, según consta en el párrafo 152 del laudo final. Además COMMISA describe su propuesta, en el documento al que nos referimos, de la manera siguiente:

> 1. Costos Probables de Reserva si se movilizan las embarcaciones de construcción ....
> 2. Orden de Magnitud de Costos Estimados para reprogramar el trabajo costa-afuera para el día 05 de agosto de 1999.

Esto es, de la simple lectura del documento de 15 de marzo de 1999, se evidencia que eran costos probables o costos estimados (no costos incurridos). Además que esos costos se generarían si las embarcaciones se movilizaran en esa fecha, lo que no ocurrió (veáse párrafo 166 del Laudo Final). Luego entonces, el costo es a condición de la movilización, no por tenerlas inmovilizadas.

116.- COMMISA nunca exhibió facturas o cualquier otro documento idóneo que acreditara los pagos efectivamente realizados por renta de barcos o movilización o desmovilización entre otros, dichas facturas serían la prueba que COMMISA tenía que haber exhibido para demostrar el gasto en que realmente incurrió. Por el contrario, en el procedimiento arbitral quedó acreditado que COMMISA no hizo pago alguno por renta de embarcaciones a favor de EMC, subcontratista dueña de las embarcaciones (véase



párrafo 180[18]. páginas 46 y 47 del Laudo Final), por lo que el contrato de subarrendamiento tampoco es prueba idónea. Valga decir, ni siquiera exhibió el convenio de transacción al cual hace referencia, ni el Tribunal se lo solicitó, como sí solicitó la exhibición para mejor proveer de otros documentos e información, que no le sirvieron para decidir el negocio.

117.- Ahora bien, centrándonos en los gastos no recuperables, estos no se generaron, y para afirmar esto, primero se tiene que entender que es un gasto no recuperable. Esta consideración jamás fue hecha por el Tribunal Arbitral: El Tribunal Arbitral condenó a pagar gastos no recuperables cuando no sabe que son los gastos no recuperables.

118.- La definición de gastos no recuperables, contenida en la Cláusula 10.1.2 del Contrato, es general y no limitativa, por lo que en su momento se prestó a abusos por parte de los Contratista. Sin embargo, el criterio normativo OP-5 de la Secretaría de Contraloría y Desarrollo Administrativo (SECODAM) hoy Secretaría de la Función Pública (SFP)[19], detalló en ejercicio de la facultad que le confiere el artículo 8 de la LAOP, cuáles eran estos gastos en caso de suspensión a los trabajos:

---

[18] " ... La Demandante ha reconocido que esta cantidad no fue satisfecha directamente a EMC, sino que se saldó como consecuencia de un Contrato de Transacción celebrado el 30 de septiembre de 2004 entre COMMISA, EMC y sus respectivas matrices (las compañías Halliburton Brown & Root Limited y European Marine Investments Limited).
[19] Localizable en la dirección electrónica siguiente: http://200.34.175.29:8080/wb3/wb/SFP/op_deroga06.

93

*1.* Las rentas de equipo inactivo o, si resulta más barato, los fletes del retiro y regreso del mismo a la obra;

*2.* La plantilla de veladores y personal de conservación y vigilancia de las instalaciones y obras, asignados durante la suspensión;

*3.* Costos de administración de obra en cuanto a honorarios, sueldos y prestaciones del personal técnico y administrativo estrictamente necesario y que tenga una función específica durante la suspensión;

*4.* Costo del mantenimiento y renta, si es el caso, de oficinas y demás instalaciones de campo.

119.- Este criterio estuvo vigente durante la ejecución de los Trabajos, y con relación a la vigencia de la Ley de Adquisiciones y Obras Públicas, aplicable al Contrato. Posteriormente, el Reglamento de la Ley de Obras Públicas y Servicios Relacionados con las Mismas, en su artículo 116, recogió la experiencia en cuanto a gastos no recuperables, definiendo éstos en los términos siguientes:

> **"Artículo 116.-** Tratándose de suspensión de trabajos el pago de gastos no recuperables se limitará a lo siguiente:
>
> I. Las rentas de equipo o, si resulta más barato, los fletes del retiro y regreso del mismo a la obra;
>
> II. Hasta un dos por ciento de los costos directos para los conceptos de trabajo programados y que no fueron ejecutados durante el periodo de la suspensión. En ningún caso, el monto aplicado podrá ser mayor al determinado por el contratista para los indirectos de las oficinas centrales en su proposición;

III. *La plantilla de veladores y personal de conservación y vigilancia de las instalaciones y obras, asignados durante la suspensión;*

IV. *Costos de administración de obra en cuanto a honorarios, sueldos y prestaciones del personal técnico y administrativo estrictamente necesario y que tenga una función específica durante la suspensión;*

V. *La mano de obra que sea estrictamente necesaria y que tenga una función específica durante la suspensión y que no haya sido trasladada a otro frente de trabajo;*

VI. *Costo del mantenimiento y renta, si es el caso, de oficinas y demás instalaciones de campo, y*

VII. *En su caso, el costo que represente la extensión de las garantías.*
*Para la determinación de estos gastos se deberán considerar como base para su cálculo, los programas y costos originalmente propuestos por el contratista, debiéndose ajustar con el último porcentaje de ajuste autorizado antes de la suspensión".*

120.- Examinando esta noción de gastos no recuperables se puede apreciar que PEP no tenía obligación de pagar la renta de las embarcaciones, si le eran más económicas otras soluciones, como regresar las embarcaciones a su lugar de origen, o dejarlas donde estaban, **que fue lo que ocurrió.**

121.- El documento de 15 de marzo de 1999, citado por el Tribunal Arbitral, como base de la cuantificación del inexistente daño, no integra el costo siguiendo esta disposición normativa, así que COMMISA no reclamaba Gastos no Recuperables, o en su caso, claramente se encuentra alegando fuera de la descripción de lo que podía reclamar como gastos no recuperables.

95

122.- En conclusión, el compromiso de pago nunca fue efectivamente devengado por COMMISA, y mucho menos fue probado el monto del gasto incurrido, como lo exige el Reglamento de la Ley de Presupuesto, Contabilidad y Gasto Público Federal, norma aplicable al caso por estar vigente durante la vida del Contrato de Obra Público, y determinar los derechos y obligaciones asumidos por las partes. El pago no importa un interés particular, sino público, por consistir en una erogación de recursos federales o ejecución de gasto público, regidos por principios emanados directamente de la Constitución Mexicana, por lo que la determinación de la procedencia del pago **NO** debe tomarse con base en principios del derecho civil, como la analogía o la mayoría de razón, porque se trataría de pagos no justificados o no presupuestados (artículo 126 de la Constitución). El interés a satisfacer es el público derivado de la obra, no el interés particular de COMMISA.

Sirve de apoyo a lo anterior la siguiente tesis judicial:

> **CONTRATOS ADMINISTRATIVOS. SE DISTINGUEN POR SU FINALIDAD DE ORDEN PÚBLICO Y POR EL RÉGIMEN EXORBITANTE DEL DERECHO CIVIL A QUE ESTÁN SUJETOS**[20]. La naturaleza administrativa de un contrato celebrado entre un órgano estatal y un particular puede

---

[20] No. Registro: 189,995. Tesis aislada. Materia(s): Administrativa, Civil. Novena Época. Instancia: Pleno. Fuente: Semanario Judicial de la Federación y su Gaceta. XIII, Abril de 2001. Tesis: P. IX/2001. Página: 324.

válidamente deducirse de la finalidad de orden público que persigue, identificada también como utilidad pública o utilidad social, así como del régimen exorbitante del derecho civil a que está sujeto. De ello se infiere que los contratos celebrados por un órgano estatal con los particulares están regidos por el derecho privado cuando su objeto no esté vinculado estrecha y necesariamente con el cumplimiento de las atribuciones públicas del Estado y, por lo mismo, la satisfacción de las necesidades colectivas no se perjudique porque en aquellos actos el Estado no haga uso de los medios que le autoriza su régimen especial. Por el contrario, cuando el objeto o la finalidad del contrato estén íntimamente vinculados al cumplimiento de las atribuciones estatales, de tal manera que la satisfacción de las necesidades colectivas no sea indiferente a la forma de ejecución de las obligaciones contractuales, entonces se estará en presencia de un contrato administrativo, siendo válido estipular cláusulas exorbitantes que, desde la óptica del derecho privado, pudieran resultar nulas, pero que en el campo administrativo no lo son, en atención a la necesidad de asegurar el funcionamiento regular y continuo del servicio público.

Juicio ordinario civil federal 1/2000. Jesús Guillermo Puente Cutiño. 20 de febrero de 2001. Unanimidad de diez votos. Ausente: Genaro David Góngora Pimentel. Ponente: Juan Díaz Romero. Secretario: Silverio Rodríguez Carrillo.

El Tribunal Pleno, en su sesión privada celebrada hoy veintinueve de marzo en curso, aprobó, con el número IX/2001, la tesis aislada que antecede; y determinó que la votación es idónea para integrar tesis jurisprudencial. México, Distrito Federal, a veintinueve de marzo de dos mil uno.

123.- En consecuencia, el análisis sobre la cuantificación de esta controversia así como la condena a PEP, también es ilegal y contraría el orden público y por esa razón procede que se decrete la nulidad del laudo arbitral.

## S E G U N D A

124.- La decisión del Tribunal Arbitral, declarando procedente la pretensión de COMMISA contenida en las llamadas "Controversias Técnicas" 34 y 35, denominada *"Tiempos de espera por retrasos en el inicio de los trabajos de la Castoro 10 y del Bar Protector"*, y condenando a PEP a pagar a COMMISA la cantidad de USD $13,923,014.00, es nula porque se refiere a una controversia no prevista en el acuerdo de arbitraje o contiene decisiones que exceden los términos del acuerdo de arbitraje, supuestos de nulidad contemplados en el artículo 1457, fracción I, inciso c), del Código de Comercio.

124.- En el procedimiento arbitral y en el Laudo Final se manejaron por el Tribunal Arbitral y las partes, tres conceptos o causas de pedir, perfectamente identificables, como se explicó en el capítulo precedente: i) las cuotas o tarifas de espera (cuotas de reserva; ii) los gastos no recuperables; y iii) los daños y perjuicios.

125.- Las cuotas o tarifas de espera (cuotas de reserva) se contemplan en el último párrafo de la Cláusula 10.1.2 y se definen de la manera siguiente:

> *"En caso de suspensión de los Trabajos por causas imputables a PEP durante el período en que se encuentren operando la(s) embarcación(es), PEP únicamente pagará al*

98

*Contratista la(s) Cuota(s) de Espera (Reserva-Códigos Nos. 10-01, 10-02, 10-03, 10-04 y 10-5) que corresponda(n), según lo estipulado en el Anexo "C" de este Contrato. Lo anterior en la inteligencia de que en este supuesto no aplica el pago de gastos no recuperables".*

126.- Los gastos no recuperables se definen en el primero y segundo párrafo de la Cláusula 10.1.2 del Contrato, de la manera siguiente:

*"En el caso de suspensión de los Trabajos en términos de lo estipulado en la Cláusula 10.1, PEP pagará al Contratista, **a solicitud de éste**, los trabajos ejecutados así como los gastos no recuperables en que hubiere incurrido, siempre que, a juicio de PEP, éstos sean razonables, estén debidamente comprobados y se relacionen directamente con el presente Contrato".*

Esta definición está tomada del artículo 72 fracción I de LAOP que establece:

*"**Artículo 72.-** En la suspensión, rescisión administrativa o terminación anticipada de los contratos de obra pública, deberá observarse lo siguiente:*

*I. Cuando se determine la suspensión de la obra o se rescinda el contrato por causas imputables a la dependencia o entidad, ésta pagará los trabajos ejecutados, así como los gastos no recuperables, siempre que éstos sean razonables, estén debidamente comprobados y*



99

> *se relacionen directamente con el contrato de*
> *que se trate; ........".*

La definición de gastos no recuperables contenida en la LAOP, se expresaba de manera general, y no limitativa, por lo que se prestaba a reclamaciones absurdas de los Contratistas. Por tal razón, la SECODAM realizó una interpretación administrativa de la disposición en comento, de conformidad con el artículo 8 de la LAOP[21].

El criterio normativo OP-5 de la Secretaría de Contraloría y Desarrollo Administrativo (SECODAM) hoy Secretaría de la Función Pública (SFP)[22], con relación al artículo 72 de la LAOP, detalla cuáles son estos gastos en caso de suspensión a los trabajos:

> *1. Las rentas de equipo inactivo o, si resulta más barato, los fletes del retiro y regreso del mismo a la obra;*
> *2. La plantilla de veladores y personal de conservación y vigilancia de las instalaciones y obras, asignados durante la suspensión;*
> *3. Costos de administración de obra en cuanto a honorarios, sueldos y prestaciones del personal técnico y*

---

[21] Artículo 8.- **La Secretaría, la Contraloría** y **la Secretaría de Comercio y Fomento Industrial**, en el ámbito de sus respectivas competencias, estarán facultadas para interpretar esta Ley a efectos administrativos. La Secretaría y la Contraloría dictarán las disposiciones administrativas que sean estrictamente necesarias para el adecuado cumplimiento de esta Ley, tomando en cuenta la opinión de la otra secretaría, así como, cuando corresponda, de la Secretaría de Comercio y Fomento Industrial. Tales disposiciones se publicarán en el Diario Oficial de la Federación.

[22] Localizable en la dirección electrónica siguiente: http://200.34.175.29:8080/wb3/wb/SFP/op_deroga06.

100

administrativo estrictamente necesario y que tenga una función específica durante la suspensión;

**4.** Costo del mantenimiento y renta, si es el caso, de oficinas y demás instalaciones de campo.

Posteriormente, la Ley de Obras Públicas y Servicios Relacionados con las Mismas, que sustituyó a la LAOP, a través del artículo 116 de su Reglamento, define lo que son los gastos no recuperables en caso de suspensión temporal de los trabajos.

> **"Artículo 116.-** Tratándose de suspensión de trabajos el pago de gastos no recuperables se limitará a lo siguiente:
>
> I. Las rentas de equipo o, si resulta más barato, los fletes del retiro y regreso del mismo a la obra;
>
> II. Hasta un dos por ciento de los costos directos para los conceptos de trabajo programados y que no fueron ejecutados durante el periodo de la suspensión. En ningún caso, el monto aplicado podrá ser mayor al determinado por el contratista para los indirectos de las oficinas centrales en su proposición;
>
> III. La plantilla de veladores y personal de conservación y vigilancia de las instalaciones y obras, asignados durante la suspensión;
>
> IV. Costos de administración de obra en cuanto a honorarios, sueldos y prestaciones del personal técnico y administrativo estrictamente necesario y que tenga una función específica durante la suspensión;
>
> V. La mano de obra que sea estrictamente necesaria y que tenga una función específica durante la suspensión y que no haya sido trasladada a otro frente de trabajo;
>
> VI. Costo del mantenimiento y renta, si es el caso, de oficinas y demás instalaciones de campo, y



101

VII. *En su caso, el costo que represente la extensión de las garantías.*
*Para la determinación de estos gastos se deberán considerar como base para su cálculo, los programas y costos originalmente propuestos por el contratista, debiéndose ajustar con el último porcentaje de ajuste autorizado antes de la suspensión".*

127.- Es importante señalar que el Tribunal Arbitral ha considerado infundada y equivocadamente que los gastos no recuperables se causan cuando se retrasa el inicio o la continuación de los trabajos, (párrafo 168, página 44 del Laudo Final), lo cual es falso, tal como se demostró en el apartado primero anterior a este capítulo, cuando se explicó que el retraso en el inicio de los trabajos se compensa únicamente con prórroga en la fecha de terminación de los trabajos, y además se corrobora lo anterior con la simple lectura a la primera oración del primer párrafo de la cláusula 10.1.2 del Contrato que establece: *"En el caso de suspensión a los **trabajos** ... ".*

128.- La indemnización por daños y perjuicios, es una exigencia genérica que tiene como objeto compensar económicamente a una persona por toda afectación a su patrimonio, o la privación de una ganancia lícita.

129.- La acción indemnizatoria es una acción fundada en la legislación civil y no en el Contrato o en la LAOP, de conformidad con los artículos 1910, 1915 y 1934 del Código Civil Federal.

130.- Derivado de lo anterior, son claramente distinguibles contractualmente y por ley los conceptos de "tarifa de espera", "gasto no recuperable" e "indemnización".

131.- En el presente caso, la pretensión de COMMISA, transcrita en el párrafo 80, página 23 del Laudo Final, con relación a las Controversias 34 y 35, era la siguiente:

> "Con base en las reclamaciones antes señaladas, Commisa demanda una compensación de aproximadamente US$81 millones de dólares. Dicha suma se calcula de acuerdo con el Contrato EPC-28. En caso de que por alguna razón el Tribunal Arbitral determinará que las cuotas o tarifas por tiempos de espera o de reserva que se establecen en el Contrato EPC-28 no son aplicables para el cálculo de la compensación correspondiente a estos retrasos, Commisa atentamente solicita que se dicte laudo conforme al cual se decrete **el pago de una indemnización a cargo de PEP que resulta suficiente a para compensar a Commisa por los daños y perjuicios sufridos como consecuencia de los retrasos antes sufridos.** Para tales efectos, Commisa estima que dichos daños y perjuicios ascienden aproximadamente a US$81 millones de dólares".

Es decir, en el arbitraje, COMMISA reclamaba lo siguiente:

i)    El pago de las Cuotas o Tarifas por Tiempos de Espera o Cuotas de Reserva que se establecen en el Contrato relativo al Proyecto IPC-28, y para el caso de que dichas cuotas no fueren aplicables,

103

ii)    El pago de una indemnización por daños y perjuicios.

132.- El Tribunal Arbitral declaró improcedente la reclamación por el pago de cuotas o tarifas de reserva o de espera, según se desprende de los apartados 165, 166 y 1667, página 44 del Laudo Final. Luego entonces, el Tribunal Arbitral sólo tenía pendiente abocarse a examinar la procedencia de la acción indemnizatoria.

133.- Sin embargo, el Tribunal Arbitral nunca consideró en el Laudo Final la acción indemnizatoria, pero en cambio resolvió, sobre la base de pago de gastos no recuperables, tal como se desprende de los párrafos 168 a 183, páginas 44 a 47, del Laudo Final, cuestión que no era materia del arbitraje.

En efecto, **COMMISA jamás solicitó ser resarcida con base en el pago de gastos no recuperables, requisito indispensable para su concesión, en los términos del primer párrafo de la Cláusula 10.1.2 del Contra**to, y en los términos del artículo 19 del Reglamento de Arbitraje de la CCI.

134.- El Tribunal Arbitral, al resolver demandas o cuestiones que no eran materia del arbitraje, ha excedido sus funciones e infringido gravemente el procedimiento de arbitraje acordado por las partes, y por ello el laudo arbitral es nulo con base en lo dispuesto por el artículo 1457, fracción I, inciso d), del Código de Comercio.

104

135.- En la cláusula 23.2 del Contrato, que es el acuerdo de arbitraje celebrado entre las partes, se pactó que el arbitraje se llevaría a cabo de conformidad con las Reglas de Arbitraje expedidas por la CCI. El artículo 19 de las reglas de arbitraje de la CCI establece que:

> *"Una vez firmada el Acta de Misión, o aprobada por la Corte, ninguna de las partes podrá formular nuevas demandas principales o reconvencionales, que estén fuera de los límites fijados en ella, salvo autorización del Tribunal Arbitral el cual, al decidir al respecto, deberá tener en cuenta la naturaleza de las nuevas demandas, la etapa en que se encuentra el proceso arbitral y las demás circunstancias que sean pertinentes"*

136.- El Tribunal Arbitral introdujo oficiosamente al pleito nuevas demandas, sin solicitud de las partes, sin una indicación expresa de que se trataba de nuevas demandas, de mala fe, y en beneficio de COMMISA. Por esta razón, también resulta nulo el laudo arbitral.

137.- Por otro lado, en la Orden Procesal No. 6 (comunicación A 39 de fecha 13 de diciembre de 2006) expedida por el Tribunal Arbitral, éste decretó diligencias para mejor proveer en los términos del artículo 20.5 del Reglamento de Arbitraje de la CCI. Con relación a las Controversias 34 y 35, apartado 2, el Tribunal Arbitral solicitó a ambas partes responder a las preguntas siguientes:

105

> *"¿Cuáles son los costos directos causados a la
> Demandante por el retraso en la incorporación
> al trabajo de las embarcaciones Bar Protector y
> Castoro 10?*
>
> *En especial, ¿cuáles son los importes satisfechos
> a EMC[23] como indemnización por los retrasos?*
>
> *¿Se han generado otros costos directamente
> por esta causa?".*

138.- En un principio PEP no dudó de la buena fe del Tribunal Arbitral, porque aparentemente estos cuestionamientos tenían relación con la pretensión de COMMISA por una indemnización por daños y perjuicios. Además, COMMISA, al desahogar las diligencias mediante la comunicación C 44, que se acompaña como prueba, expresamente manifestó que los únicos costos que reclamaba eran las tarifas de espera pactadas en el tercer párrafo del artículo 10.1.2 del Contrato (no los costos directos, no los importes pagados a EMC, y no los costos indirectos), prestación que el Tribunal Arbitral consideró a la postre improcedente (párrafos 166 y 172 del Laudo Final).

139.- No obstante el desahogo de las partes al requerimiento del Tribunal Arbitral, el Tribunal Arbitral, mediante comunicación A 49 de fecha 31 de julio de 2007, solicitó de nueva cuenta, a las partes, prueba adicional sobre lo siguiente:

---

[23] EMC es la subcontratista dueña de las embarcaciones.

*2. El Tribunal Arbitral se encuentra actualmente ante la necesidad de requerir más información sobre un aspecto concreto de las Controversias Técnicas 34 y 35, para poder así dar por concluida la redacción del laudo. Se trata de determinar, dentro de los costos de arrendamiento de las embarcaciones Castoro 10 y Bar Protector:*

*(i)    cuál es la **tarifa justa y razonable** a la que se debe remunerar la posposición en el inicio de los trabajos y*

*(ii)   cuál ha sido la efectivamente satisfecha por Commisa a EMC ....*

*4. El Tribunal Arbitral solicita a COMMISA que, antes del 10 de agosto de 2007, presente alegaciones y aporte toda la prueba que estime necesaria para demostrar:*

*(i)    · que las tarifas indicadas constituyen, en el marco del arrendamiento, **un costo justo y razonable** por posposición en la iniciación del programa de trabajo, y*

*(ii)   que las tarifas indicadas fueron efectivamente incurridas y pagadas por Commisa.*

140.- De constancias de autos y de la narrativa hecha por mi representada, se puede apreciar que COMMISA nunca reclamó el pago de costos o tarifas justas y razonables, y así lo reconoció al contestar la diligencia de prueba adicional. En este momento, PEP todavía desconocía la intención del Tribunal.

141.- Para ser más claro en la postura que guardaba COMMISA sobre el punto en estudio y lo cual no deja lugar a dudas sobre la naturaleza de su reclamo, a continuación se

transcribe la respuesta de COMMISA formulada a la comunicación A 49 del tribunal arbitral:

> "...Commisa se encuentra sorprendida y preocupada por la solicitud por parte del Tribunal Arbitral posterior a la audiencia de esta información, la cual nunca fue discutida por PEP en sus escritos y no es relevante para las cuestiones planteadas por las Controversias Técnicas 34 y 35. Commisa respetuosamente solicita que el Tribunal Arbitral clarifique por que solicita dicha información con respecto a los importes pagados por Commisa a EMC para las embarcaciones por el tiempo de espera reclamado en las Controversias Técnicas 34 y 35. Commisa pide dicha clarificación porque fue enteramente revelado en los escritos y en la audiencia en esta causa (y no existe disputa verdadera), que, de conformidad con el contrato EPC-28, los importes pagados por Commisa a EMC no tienen relevancia alguna para las reclamaciones de Commisa por tiempo de espera en las Controversias Técnicas 34 y 35.
>
> El contrato PC-28, el cual fue preparado por PEP, contiene tarifas unitarias especificadas y denominadas "tarifas por tiempo de espera" por el Castoro 10 y el Bar Protector.
>
> El contrato EPC-28 estipula que dichas tarifas se le pagarían a Commisa por PEP por concepto de un tipo de trabajo adicional definido como "tiempo de espera". Entre otras cosas, el anexo C del contrato EPC-28 estipula que PEP le pagará a Commisa las tarifas por tiempo de espera por cualquier periodo durante el cual las embarcaciones de Commisa permanecían en espera por falta de acceso al trabajo durante el periodo del contrato EPC-28. Los pagados por Commisa a EMC son irrelevantes para la determinación sobre si PEP le debe a Commisa las tarifas por tiempo de espera por el tiempo de espera reclamado en las Controversias Técnicas 34 y 35. En efecto, durante el transcurso del contrato EPC-28, PEP aceptó y

108

*pagó otros periodos de espera a las tarifas por tiempo de espera conforme al contrato EPC-28 y nunca afirmó que los tiempos de espera pagados por Commisa a EMC tenían relevancia alguna para dicha obligación. Como ya se ha notado, las Controversias Técnicas 34 y 35 solamente buscan cobrar las tarifas por tiempo de espera pactadas en el contrato EPC-28 (reducidas para tomar en cuenta los esfuerzos de mitigación por parte de Commisa) por el tiempo de espera experimentado por Commisa al principio del proyecto EPC-28. Las Controversias Técnicas 34 y 35 no están fundamentadas en los importes pagados por Commisa de conformidad con su subcontrato con EM.*

*En vista de lo anterior, Commisa respetuosamente solicita que el Tribunal Arbitral le clarifique a las partes el fundamento de su solicitud que Commisa proporciones información con respecto a los importes pagados por Commisa a EMC por el tiempo de espera reclamado en alas Controversias Técnicas 34 y 35."*

142.- Hasta que se dictó el laudo, PEP entendió qué es lo que buscaba el Tribunal Arbitral en su comunicado A 49 (párrafos 168,169 y 170) y a que el Tribunal se refería con el concepto de gastos no recuperables mencionados en el segundo párrafo de la cláusula 10.1.2 del contrato, y en la Orden de Cambio no. 1 Rev. 2 (prestación que no fue reclamada por COMMISA). El Tribunal Arbitral nunca le hizo notar a las partes que se trataba de una nueva demanda, ni que las partes discutieran su procedencia, sino solamente solicitó a COMMISA que acreditara su monto y a PEP que desmintiera el monto propuesto por COMMISA, actuando reticentemente, y por tanto de mala fe.

109

143.- Así, de manera oficiosa, y sin consentimiento de las partes, sobre todo de PEP, el Tribunal Arbitral introdujo nuevas demandas, con la fundamentación falsa de que se trataba de prueba adicional, en contravención al Reglamento de Arbitraje de la CCI (19), al contrato (cláusula 10.1.2 párrafo segundo), y a la imparcialidad del juzgador, por considerar el interés de COMMISA sobre cualquier otra cuestión.

144.- Tanto PEP como COMMISA objetamos el comunicado A 49 del Tribunal en el cual ordena la rendición de prueba adicional en los términos que ya quedaron precisados con anterioridad.

145.- El Tribunal Arbitral respondió mediante comunicación A 50 de fecha 6 de agosto de 2007, en el sentido de que se traba de información relevante para la preparación de las deliberaciones que conducirían a la redacción final del laudo.

146.- Por su parte, PEP, en su comunicado R 39 de 7 de agosto de 2007, se opuso a las pruebas adicionales ordenadas en el comunicado A 49 del 31 de julio de 2007, fundándose en que el Tribunal Arbitral excedía los límites del artículo 20.5 del Reglamento de Arbitraje de la CCI, relativas a las pruebas para mejor proveer, y que infringía las reglas de un procedimiento de estricto derecho (capítulo I incisos 1 y 8),



y además de que violaba el principio de igualdad de las partes y dejaba en indefensión a PEP. De igual manera, PEP objetó en el capítulo III del comunicado R 39, el documento de 15 de marzo de 1999, referido en el apartado Primero de este capítulo.

147.- En su comunicado A 51 el Tribunal Arbitral remite al laudo, para la respuesta a estas objeciones de PEP, lo que efectivamente hizo en los párrafos 184 a 189 del Laudo Final, aduciendo que no ha excedido su mandato y que tampoco había infringido el artículo 1432 del Código de Comercio Mexicano, porque se trataba de una pretensión de COMMISA, comprendida en el apartado C (c) relativa a las *Pretensiones y peticiones de la Parte Demandante* del Acta de Misión, y de igual manera se encontraba listada en el capítulo de *Puntos litigiosos por resolver*, contenido en el apartado D del mismo documento.

148.- Sin embargo, en ninguno de estos apartados se menciona el concepto de costos justos o razonables o gastos no recuperables. De la lectura del Acta de Misión, que se ofrece como prueba, únicamente se desprende que COMMISA solicita el pago de tarifas de espera pactadas en el contrato para el evento de suspensión a los trabajos con embarcaciones, o el pago de las mismas tarifas de espera a título de indemnización por daños y perjuicios. Así, de la



111

simple lectura del Acta de Misión se demuestra la falta de fundamentación y motivación del laudo.

149.- No cabe duda que el laudo atenta contra el sentido común, puesto que la propia COMMISA reconoció que no estaba solicitando el pago de costos justos y razonables o gastos no recuperables. Si en contra del texto claro de la solicitud de COMMISA, y de su propia explicación sobre los términos de la solicitud, el Tribunal decide que COMMISA pretendía otra cosa, es evidente que se trata de una resolución incongruente y absurda, carente de fundamentación y motivación, violando el estricto derecho para resolver en conciencia y de manera arbitraria.

Por esta razón también procede declarar nulo el laudo arbitral.

150.- Por otro lado, el Tribunal Arbitral consideró que no violó el principio de igualdad de las partes en los párrafos 192 a 194 del Laudo Final, solamente porque le concedió derecho a PEP a replicar y ofrecer prueba sobre el punto. Este es un argumento ilegal del Tribunal Arbitral, toda vez que, por un lado, es indudable que el Tribunal en el caso suplió la deficiencia de la queja o mejoró la demanda de COMMISA, sin estar autorizado por el Reglamento de Arbitraje, ni por las partes, ni por el sano juicio, atendiendo a la igualdad de las partes en el procedimiento, al ser COMMISA una empresa



112

mexicana, subsidiaria de Halliburton, una de las mayores empresas de construcción en el mundo; y, por otro lado, nunca le reveló a PEP que se trataba de una nueva demanda o una mejora en la demanda de COMMISA.

151.- En los párrafos 195 a 198 del Laudo Final, el Tribunal Arbitral consideró que su conducta no había dejado en indefensión a PEP, porque tuvo la oportunidad de alegar y probar en contra de la acción de COMMISA por daños. Ésta consideración del Tribunal Arbitral, carece de sustento legal alguno, toda vez que si la litis planteada desde el Acta de Misión era determinar el pago de las tarifas de espera o el pago de una indemnización por daños y PEP se excepcionó de las pretensiones de COMMISA en los términos planteados, entonces, si el Tribunal Arbitral resolvió sobre una cuestión distinta a la planteada, nos encontramos frente a un exceso del mandato que las partes le confirieron al Tribunal Arbitral y ante una incongruencia del laudo, puesto que es claro que el Tribunal Arbitral actuó oficiosamente y a espaldas de PEP.

152.- No puede alegar el Tribunal Arbitral que las diligencias para mejor proveer fueron suficientes para salvaguardar el interés de PEP, porque **lo que en realidad lo que salvaguarda el interés de PEP es un proceso debidamente observado tratándose de nuevas demandas, y no un mero trámite para mejor proveer.**

113

153.- La observancia del debido proceso está previsto como causal de nulidad contemplada en el artículo 1457 fracción I inciso b) del Código de Comercio, al señalar como causal de nulidad cualquier evento que impida a una de las partes, como en el caso, "hacer valer sus derechos"; pero además es un imperativo de orden público contenido en el artículo 14 de la Constitución que precisamente protege el derecho de audiencia y las formalidades esenciales del procedimiento.

154.- Por otro lado, la incongruencia del laudo al resolver en el mismo demandas no planteadas por las partes, infringe el acuerdo de las partes sobre el procedimiento arbitral, por no ajustarse al artículo 19 del Reglamento de Arbitraje de la CCI, incurriendo en la causal de nulidad contemplada en el inciso d) de la fracción I del artículo 1457 del Código de Comercio.

155.- En consecuencia, el análisis y la resolución del tribunal arbitral sobre la cuantificación de esta controversia, también es ilegal y contraría el orden público, por lo que resulta nulo el laudo arbitral.

## **T E R C E R A**

156.- El laudo del Tribunal Arbitral, que declara procedente la pretensión de COMMISA contenida en las

114

denominadas "Controversias Técnicas" 34 y 35, denominada *"Tiempos de espera por retrasos en el inicio de los trabajos de la Castoro 10 y del Bar Protector"*, y condenando a pagar a PEP la cantidad de USD $13,923,014.00, es nulo, como se verá en la relatoría de los siguientes hechos.

157.- Las consideraciones vertidas por el Tribunal Arbitral, visibles en el Capítulo VII.1 del Laudo, de la página 36 a la 50, evidencian que la decisión encuadra dentro de los supuestos de nulidad contemplados en el artículo 1457, fracción I, inciso c), del Código de Comercio, que dispone la nulidad del Laudo cuando el mismo *"... se refiera a una controversia no prevista en el acuerdo de arbitraje o contiene decisiones que exceden los términos del acuerdo de arbitraje"*.

158.- La Cláusula 23.2 del Contrato pactado por las partes establece que COMMISA no tiene derecho a reclamar y que PEP no es responsable por daños legales o contractuales, ante el contratista o subcontratista, que no estuvieran específicamente previstas en el Contrato. Es decir, contractualmente se limitaba la responsabilidad de PEP a lo pactado en el contrato, excluyendo por tanto, el pago de cualquier indemnización prevista en leyes.

159.- En el ámbito del acuerdo de arbitraje, dicha estipulación contractual determinaba que todo reclamo, controversia o disputa por daños, que no estuviera

115

específicamente prevista en el contrato, no era susceptible de ser considerada Controversia Técnica, es decir, una disputa relacionada o vinculada al contrato.

160.- Además, también se pactó que antes de que se solicitara la solución de la disputa en el marco de un arbitraje, debería de haber existido un procedimiento previo, mediante el cual se resolvieran las controversias. En otras palabras, toda reclamación por daños no prevista en el contrato, de ninguna manera puede referirse a una controversia o disputa relacionada con la aplicación o ejecución del contrato, o su incumplimiento.

161.- La cláusula 23.3 del Contrato, en su parte final, estableció que solamente si no se llegaba a algún acuerdo mediante la formalización de la Controversia Técnica, entonces se podría acudir para ello al arbitraje. Es decir, no podía ser materia de arbitraje cualquier prestación no pactada en el contrato, que primeramente no hubiese sido reclamada o convertida en controversia técnica.

162.- En resumen, la cláusula 23.2 del Contrato establece en qué casos y bajo qué circunstancias procede el arbitraje: es decir, si la reclamación no es una prestación contractual no solamente es improcedente su pago, sino que tampoco puede ser materia de arbitraje.

116

163.- Toda vez que la compensación económica otorgada por el Tribunal Arbitral, por retrasos en el inicio de los Trabajos de la Castoro 10 y del Bar Protector, en las mal llamadas "Controversias Técnicas 34 y 35" no estaban contempladas en el Contrato, estas compensaciones o pagos no pueden ser materia alguna de disputa o reclamación, ni tampoco pueden ser materia de arbitraje, y al resolver favorablemente a COMMISA las mismas, el Tribunal Arbitral infringe el acuerdo de arbitraje contenido en la Cláusula 23.3 del Contrato que señala que una disputa o controversia sólo puede ser sometida a arbitraje si previamente fue sometida formalmente al procedimiento de Controversia Técnica prevista en la Cláusula 23.2, o mejor dicho, si la prestación no estaba pactada en el contrato, no tiene derecho el contratista a realizar reclamación alguna, y el Tribunal Arbitral ni siquiera puede examinar si la Contratista tiene derecho a su pago ni a otorgársela en el laudo.

164.- Este es una cuestión de fondo, relacionada claramente con disposiciones contractuales establecidas para evitar reclamaciones infundadas de COMMISA, no pactadas en el Contrato. También es importante hacer notar a Su Señoría, que es infundado que el Tribunal Arbitral señale que las reclamaciones hechas por COMMISA se encuentran relacionadas al contrato porque se funda en hechos del contrato, según lo establece en los párrafos 103, 104 y 105 del Laudo Final, cuando dichos hechos no tienen ninguna

117

sanción pactada en el contrato, porque lo que al final demanda COMMISA es el pago en dinero de una obligación.

165.- En los dos apartados precedentes (primera y segunda) de este capítulo, se ha demostrado que no existía ninguna prestación económica pactada en el contrato para el evento de retraso en el inicio de los trabajos por falta de acceso a las plataformas, o por el retraso en la puesta en servicio de las embarcaciones, y además en este capítulo se ha demostrado que COMMISA no tenía derecho a reclamar daños legales, y es por ello, que es claro que el Tribunal Arbitral ha infringido el acuerdo de arbitraje, y ha resuelto materias no pactadas por las partes para ser resueltas en arbitraje, por lo que el laudo ha sido emitido en infracción al inciso c) de la fracción I del artículo 1457 del Código de Comercio.

166.- En consecuencia, cualquier análisis y la resolución del tribunal arbitral sobre la procedencia y cuantificación de esta controversia, también es ilegal y contraría el orden público, por lo que resulta nulo el laudo arbitral.

## C U A R T A

167.- La decisión del Tribunal Arbitral, declarando procedente la pretensión de COMMISA contenida en las denominadas "Controversias Técnicas" 34 y 35, denominada

118

*"Tiempos de espera por retrasos en el inicio de los trabajos de la Castoro 10 y del Bar Protector"*, y condenando a PEP a pagar a COMMISA la cantidad de USD $13,923,014.00, está afectada de la nulidad contemplada en el artículo 1457, fracción I, inciso c), del Código de Comercio, que dispone la nulidad del Laudo cuando el mismo *"... se refiera a una controversia no prevista en el acuerdo de arbitraje o contiene decisiones que exceden los términos del acuerdo de arbitraje"*.

168.- El Tribunal Arbitral ha infringido requisitos de procedibilidad, que impiden considerar a esta controversia como materia de arbitraje. Por otro lado, la conducta de COMMISA durante el arbitraje ha impedido que se pueda justificar cualquier pago en su favor, como lo exigen normas de orden público mexicano.

169.- En el Contrato celebrado entre PEP y COMMISA se pactó que sólo serían materia de arbitraje aquéllas disputas o reclamaciones que fueran formalizadas previamente como Controversias Técnicas. En efecto, en las cláusulas 23.2 y 23.3 del Contrato, las partes pactamos lo siguiente:

> *"23.2 **Controversias Técnicas.** El Contratista no tendrá derecho a efectuar ningún reclamo y PEP no será responsable por daños legales (incluyendo negligencia) o contractuales ante el Contratista, sus proveedores secundarios o subcontratistas, excepto en los casos específicamente previstos en este Contrato.*

119

Para efectos de esta Cláusula se entenderá por Controversia Técnica toda diferencia que surja por cualquier reclamo o sea atribuible a la interpretación o ejecución de este Contrato, entre el Supervisor y el Contratista, en relación con los Anexos Técnicos del Contrato (A, B, B-1, B-2, B-3, CEV, DT, DT-1, DT-2.1, DT-2.2, DT-3, DT-4, E-2, F-1 Y F-2)

Si por cualquier motivo el Supervisor y el Contratista no coinciden en la apreciación para resolver un reclamo de ajuste derivado de una Controversia Técnica, *el Contratista deberá hacer formal dicha Controversia Técnica por escrito al Supervisor y solicitarle la determinación correspondiente. Este tipo de solicitud del Contratista deberá ser claramente identificado indicando que se trata de una Controversia Técnica sujeta a resolución al amparo de esta Cláusula 23, debiendo contener un resumen de los hechos en controversia y la propuesta del Contratista para resolverlos.*

..................................................................
..................................."

"23.3    **Arbitraje.**    Cualquier controversia, reclamación, diferencia o disputa que sobrevenga o se relacione o esté vinculada con este Contrato o el incumplimiento del mismo será dirimida finalmente mediante arbitraje conducido en el Distrito Federal, México, de acuerdo con las Reglas de Conciliación y Arbitraje de la Cámara Internacional de Comercio que estén en vigor en ese momento. El número de árbitros será de tres y el idioma para conducir el arbitraje será el español. **No obstante lo anterior, cualquier controversia técnica deberá ser sometida previamente al procedimiento previsto en la Cláusula 23.2 y sólo en caso de que mediante dicho procedimiento no se logre un acuerdo entre las partes, éstas quedarán facultadas para acudir al recurso previsto en la Cláusula 23.3".**

120

170.- De conformidad con las Cláusulas contractuales anteriormente transcritas, por una parte, pueden haber simples controversias, disputas o reclamos, y por otra parte, controversias técnicas formales que deben plantearse por escrito, de manera solemne, especificando en el documento que se trata de una controversia técnica, proporcionando los hechos que motivan la reclamación y una propuesta de solución.

171.- Estos pactos contractuales son de suma importancia, toda vez que la formalización del reclamo en Controversia Técnica, convierte a la disputa o reclamación en materia de arbitraje, de conformidad al acuerdo suscrito entre las partes.

172.- De igual manera, únicamente esta actuación, la formalización del reclamo en Controversia Técnica, origina el procedimiento para obtener un documento justificativo de pago, en los términos del artículo 44 fracción III del Reglamento de la Ley Federal de Presupuesto, Contabilidad y Gasto Público Federal, y artículo 66, fracción III, del Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria, ya transcritos en el apartado primero de este capítulo. En otras palabras, no puede constituirse una obligación de pago a cargo del erario público federal mientras no exista un documento justificativo de dicho pago.

121

173.- En esos términos, la parte final del cuarto párrafo, y la inicial del quinto siguiente, de la Cláusula 23.2 del Contrato señalan lo siguiente:

> "Lo anterior en la inteligencia de que cualquier determinación de modificación técnico-contractual que implique o necesariamente deriven en una ampliación del monto del Contrato o del plazo de ejecución establecidos en las Cláusulas 3.1 y 4.1, respectivamente, deberá contar con la previa aprobación por escrito del representante del Proyecto....Una vez recibida la aceptación escrita por parte del Contratista de la determinación efectuada por el supervisor, se modificará el Contrato en lo conducente y se implementará la determinación".

174.- La Cláusula 5 del Contrato "Modificaciones al Contrato" establece que "Las partes convienen en que por razones fundadas y explícitas **y a través de la suscripción de un convenio,** PEP podrá modificar el Contrato, en términos de lo establecido en el artículo 70 de la Ley de Adquisiciones y Obras Públicas".

175.- El tribunal arbitral, que se obligó a llevar el arbitraje y dictar el laudo conforme a las Leyes Federales Mexicanas, conocía o debía conocer tales normas y resolver conforme a dichas normas y no lo hizo.

176.- En efecto, como quedó demostrado en el juicio de Arbitraje, la demandante COMMISA, presentó y formalizó

122

extemporáneamente esta controversia, en un momento en que por disposición contractual, ya no podía ser atendida, por lo que la misma no podía ser materia del arbitraje ni ser válidamente considerada.

177.- Del Acta de Recepción Física Total de los trabajos de 30 de agosto de 2002, que se anexa como prueba a la presente solicitud, se evidencia que en esa fecha, COMMISA no había planteado formalmente una controversia técnica por obstrucciones (C.T. 19), pago de diferencias por tiempos de espera por trabajos de la Castoro 10 en plataformas (C. T. 27), por retrasos en el inicio de los trabajos con embarcaciones en los términos y condiciones contractuales (C. T. 34 y 35), o por retrasos por malos tiempos. (C. T. 36) Véase también el Voto Particular del árbitro D. Darío U. Oscós que es parte integrante del Laudo Final.

178.- En el Acta de Recepción Física Total del Contrato PEP-O-IT-136/98 de 30 de agosto de 2007, en la página 17 (folio 1158), se establece un capítulo titulado "RECLAMOS EN ELABORACIÓN POR COMMISA". Estos reclamos pendientes de elaboración se dividen en varios paquetes de reclamaciones, que son los siguientes:

Los paquetes 1 a 5 se refieren a diversos extraordinarios relativos a trabajos de construcción relativos al retiro de



obstrucciones, que en laudo se decidieron como Controversia Técnica 19.

El Paquete 7 se refiere a "Afectaciones por condiciones climatológicas (Castoro 10 y Bar Protector), que en laudo se decidieron como Controversia Técnica 36.

**En el paquete 13 se comprende la reclamación por "Retraso en el inicio de la construcción por falta de disponibilidad de las plataformas" (Notificación de Cambio 23), que en laudo se decidieron como Controversias Técnicas 34 y 35; la reclamación por "Variación de costos de trabajos en tuberías partes superiores (top sides), que en laudo se decidieron como Controversia Técnica 27.**

179.- Es de suma importancia señalar que el Acta de Recepción Física Total de los Trabajos fue firmada tanto por los representantes de COMMISA, Ingenieros Juan Manuel Herrera y Nicolás Martínez Bocanegra, así como por los representantes de PEP. Es preciso hacer notar, de igual manera, que el listado de Reclamos o Controversias Técnicas en proceso de elaboración, fue una manifestación de COMMISA, tal como se desprende del párrafo puesto al pie del listado y que a la letra dice:

> "LA CONTRATISTA MANIFIESTA QUE FALTA INCLUIR EN ESTE CUADRO EL MONTO DE ALGUNOS PRECIOS (como en la reclamación referente a malos tiempos, es decir, en esta

124

fecha ni siquiera tenía COMMISA una cantidad líquida) EN LO REFERENTE A OBRA EXTRAORDINARIA EJECUTADA ASÍ COMO DIVERSOS RECLAMOS QUE HASTA EL MOMENTOSE ENCUENTRAN EN PROCESO DE ELABORACIÓN".

180.- La preclusión del derecho de COMMISA para ventilar sus reclamos mediante el arbitraje, va aparejada de la preclusión de su derecho a reclamar de PEP el pago de cualquier cantidad de dinero por estos reclamos, de conformidad con las consideraciones siguientes:

El Anexo B Sección 5, del Contrato, denominado "Modificaciones" establece que *"toda demora del contratista para dar aviso o presentar la propuesta a que se refiere el párrafo anterior, será motivo suficiente para rechazar la reclamación si el retraso perjudica a PEP y en la medida que lo haya perjudicado. **En ningún caso se considerará una reclamación del Contratista si se hace después de la Recepción Parcial o Total ...**"*.

Lo cierto es que para efectos del arbitraje, COMMISA tenía que haber formalizado previa y oportunamente su Controversia Técnica, como cumplimiento de una condición *sine qua non*, tal como lo exige el acuerdo de arbitraje contenido en la Cláusula 23.3 del Contrato de Obra Pública. Si no fue así, dicha Controversia Técnica no podía ser materia de arbitraje, por lo que las consideraciones del Tribunal Arbitral se refieren a una controversia no prevista en el

125

acuerdo de arbitraje, ya que sólo controversias técnicas formales pueden ser materia de arbitraje, o contiene decisiones que exceden los términos del acuerdo de arbitraje, ya que el Tribunal Arbitral sólo puede resolver en definitiva, controversias técnicas.

181.- Siendo así las cosas, y toda vez que el Tribunal Arbitral resolvió las Controversias Técnicas 34 y 35, es claro que ha infringido el acuerdo de arbitraje al haber dejado de observar los requisitos de procedibilidad, o condiciones para convertir la controversia técnica en materia del arbitraje, según el párrafo 199 del Laudo Final.

Por ello el laudo dictado por el tribunal arbitral resulta nulo.

182.- No existe justificación para que el Tribunal Arbitral haya violado las estipulaciones contractuales relativas a Controversias Técnicas y Arbitraje que se expresaron en las Cláusulas 23.2 y 23.3 del Contrato, para impedir que un simple reclamo, fuera materia del arbitraje. La inconformidad de COMMISA con las condiciones contractuales no hace arbitrable su reclamación; para ello era necesario que le solicitara formalmente a PEP que decidiera sobre la materia, durante la vigencia del Contrato, lo cual nunca hizo, y así quedó demostrado en el arbitraje. En ese sentido debe verse el Voto Particular de D. Darío Oscós, párrafos 34 a 38, páginas



12 y 13, que es parte integrante del Laudo Final, del cual se desprende que el Acta de Recepción Física de los trabajos, era conocida por los señores árbitros.

183.- El Arbitraje entre PEP y COMMISA es de estricto derecho, por lo que los derechos y facultades de las partes se determinan con base en disposiciones legales o contractuales, lo que no observó el tribunal arbitral en el presente caso. Además, el tribunal arbitral y las partes están obligadas a observar el principio de *pacta sunt servanda*, previsto en el artículo 1796 del Código Civil Federal, que dispone:

> "***Artículo 1796.-*** *Los contratos se perfeccionan por el mero consentimiento; excepto en aquellos que deben revestir una forma establecida por la Ley. Desde que se perfeccionan, obligan a los contratantes no sólo al cumplimiento de lo expresamente pactado, sino también a las consecuencias que, según su naturaleza, son conformes a la buena fe, al uso o a la ley".*

184.- Formalizar la controversia contractualmente no es lo mismo que insinuar o presumir un supuesto derecho, como lo hizo COMMISA. La decisión del Tribunal Arbitral aprobó la conducta de COMMISA, en contradicción al pacto arbitral. En otras palabras, el tribunal arbitral permitió que la ejecución del contrato, con relación al cumplimiento de los supuestos del arbitraje, estuviera sujeta al arbitrio de COMMISA, lo que



127

expresamente prohíbe el artículo 1797 del Código Civil Federal.

> *"**Artículo 1797**. La validez y el cumplimiento de los contratos no puede dejarse al arbitrio de uno de los contratantes".*

El principio consagrado en el artículo 1797 anteriormente transcrito, todavía es más importante en los contratos de obra pública, regulados por el derecho administrativo, en los cuales por su propia naturaleza, las partes tienen restringida su voluntad en la contratación, y porque en los mismos se reproducen disposiciones de orden público, que emanan directamente del artículo 126 y 134 Constitucionales, relativos a obra pública y gasto público.

185.- Además, no existe ninguna facultad para el Tribunal Arbitral para moderar o alterar las estipulaciones contractuales celebradas entre PEP y COMMISA, en equidad o como amigable componedor, toda vez que dicha estipulación sería nula de pleno derecho porque implicaría darle facultades al Tribunal Arbitral para regular cuestiones de orden público mexicano, que ya están contempladas en normas de orden público mexicano. Por eso el Arbitraje fue de estricto derecho. Es decir, no es materia de arbitraje determinar qué obligaciones derivan de un contrato de obra pública, puesto que esa facultad le corresponde a la ley y a la autoridad mexicana. En cambio el tribunal arbitral debía abocarse únicamente a determinar si la reclamación

128

correspondía a una prestación contractual y obrar en consecuencia.

186.- En tal sentido, era obligación del Tribunal Arbitral aplicar las Cláusulas 23.2 y 23.3 del Contrato conforme a su texto en primer lugar, lo cual no hizo. Es decir, realizó una aplicación indebida de las Cláusulas 23.2 y 23.3 del Contrato, excediendo el acuerdo de arbitraje.

187.- Por otro lado, la aplicación de la ley en materia civil es una cuestión también de orden público por devenir del mandato del artículo 14 de la Constitución Política Federal, que en su último párrafo establece el derecho constitucional a la garantía de legalidad, por lo que el mantenimiento de la legalidad es una cuestión de orden público mexicano.

> "*Artículo 14.-* ....... *En los juicios del orden civil, la sentencia definitiva deberá ser conforme a la letra o a la interpretación jurídica de la ley, y a falta de ésta se fundará en los principios generales del derecho*".

188.- Esta argumentación está relacionada de igual manera con la decisión del Tribunal Arbitral, contenida en el Capítulo VI del Laudo Final, para declararse competente para conocer de todas las controversias y reclamaciones propuestas por la Demandante, alegando que todas las materias se relacionan o están vinculadas al Contrato relativo

129

al Proyecto IPC-28, o constituyen Controversias Técnicas en los términos del Contrato, según los párrafos 105 y 129 del Laudo Final.

Para una mayor comprensión del presente argumento, solicitamos a Su Señoría que se refiera a los argumentos esgrimidos por PEP contra la decisión del tribunal arbitral para considerarse competente en el negocio arbitral y para resolver la presente materia, en obvio de repeticiones inútiles y por economía procesal.

189.- En conclusión, el Tribunal Arbitral incumplió con el procedimiento acordado por las partes, en el sentido de que el arbitraje fuera resuelto en estricto derecho. Esto es, en la cláusula 23.3 del Contrato se pactó que el arbitraje se tramitara de conformidad a las Reglas de Arbitraje de la CCI. El Reglamento de Arbitraje de la CCI establece en su artículo 17.3 que el arbitraje será de estricto derecho, a menos que las partes expresamente dispongan que el Tribunal asuma funciones de amigable componedor o resuelva ex *aequo et bono*.

Por tal razón el Tribunal Arbitral ha incurrido en la causal de nulidad contemplada en el inciso c de la fracción I del artículo 1457 del Código de Comercio, porque infringió gravemente el procedimiento de arbitraje en los términos expuestos. En consecuencia, cualquier análisis sobre la

procedencia y la cuantificación de esta controversia, también es ilegal y contraría el orden público.

## III. Causas de Nulidad con relación a la decisión sobre las Controversias 37 y 39 relativa a Cruces.

190.- El laudo arbitral que condena a PEP a pagar a favor de COMMISA, la totalidad de las prestaciones reclamadas por ésta, con relación a las controversias de cruces (37 y 39) contraviene disposiciones de orden público mexicano, afectando de nulidad al Laudo Final emitido de conformidad con el artículo 1457 fracción II del Código de Comercio.

191.- En el Contrato de Obra Pública origen de la Controversia, se pactaron trabajos o conceptos de trabajo denominados cruces, cuya terminación a satisfacción de PEP en cuanto a especificaciones y calidad proyectada, daba causa para pagar los precios unitarios pactados, consignados en el Anexo "C" del Contrato. Sin embargo, apartándose de la relación jurídica descrita, el Tribunal Arbitral condenó a PEP a su pago sin acreditarse la realización y terminación del trabajo de conformidad al concepto de trabajo propuesto.

Todas las consideraciones y decisiones del Tribunal Arbitral, en relación con este punto, son visibles en el Capítulo VII. 3, páginas de la 60 a la 70, del Laudo Final.

131

192.- Ya se ha establecido, en el presente escrito, en múltiples ocasiones, que el pago de trabajos relativo a obras públicas, realizado por PEP, constituye la aplicación y el manejo de recursos catalogados dentro del gasto público basados en el artículo 1 de la Ley de Adquisiciones y Obras Públicas, artículos 1 y 2 de la Ley de Presupuesto, Contabilidad y Gasto Público Federal, y artículo 39 de su Reglamento, por lo que es una cuestión de orden público de conformidad con los artículos 126 y 134 de la Constitución Política Federal.

En consecuencia, las condiciones y requisitos de pago de obligaciones contraídas en virtud o relacionadas con contratos de obras públicas, al ser con cargo a recursos federales, están sujetos a disposiciones jurídicas de orden público pertenecientes al derecho público, y no al mercantil, por lo que el estudio de las mismas trasciende la esfera privada, para interpretarse de manera más rigurosa.

193.- Así, podemos citar entre éstas, los artículos 44 fracción I del Reglamento de la Ley Federal de Presupuesto, Contabilidad y Gasto Público Federal, y 66, fracción I, del Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria, respectivamente disponen lo siguiente:

132

"*Artículo 44.- Las entidades deberán cuidar bajo su responsabilidad, que los pagos que se efectúen con cargo a sus presupuestos aprobados se realicen con sujeción a los siguientes requisitos:*

*I.   **Que correspondan a compromisos efectivamente devengados**, con excepción de los anticipos previstos en los ordenamientos legales y los mencionados ; ....... ".*

"*Artículo 66. Los pagos con cargo al Presupuesto de Egresos se realizarán por las dependencias a través de la Tesorería. Los pagos que realicen las entidades se efectuarán por conducto de sus propias tesorerías, llevando los registros presupuestarios correspondientes en sus respectivos flujos de efectivo.*

*Las dependencias, en el ejercicio de sus erogaciones, adicionalmente deberán:*

*I. . **Que correspondan a compromisos efectivamente devengados**, con excepción de los anticipos previstos en las disposiciones aplicable; ....... ".*

194.- **Como ya lo expresamos, en el caso, el "compromiso" que da causa para el pago no fue efectivamente devengado, es decir, no se realizó el concepto de trabajo contratado.**

El hecho de que no se realizó el trabajo como fue originalmente conceptualizado y contratado, es un hecho probado en el juicio de arbitraje tal como se desprende de los hechos narrados en el propio Laudo Arbitral. Es decir, COMMISA solicitó realizar los cruces con una especificación distinta a la original, lo que implicaba menos recursos a los trabajos a realizar. PEP aceptó la realización de esos trabajos al ser técnicamente aceptables. Véase el Capítulo VII. 3,

133

páginas de la 60 a la 70, del Laudo Final. Sin embargo, al Tribunal Arbitral, no tomó en consideración estas nuevas condiciones contractuales que son indispensables para generar el pago de conformidad con el derecho mexicano sobre gasto público y que son de orden público, como se explicará a continuación.

195.- El Contrato de Obra Pública objeto del Arbitraje es un contrato de Obra a precios unitarios de conformidad con el artículo 57 de la Ley de Adquisiciones y Obras Públicas, el cual muy claramente señala que **la remuneración o pago total que deba cubrirse al contratista se hará por unidad de concepto de trabajo terminado.** En efecto, dicho artículo establece en su parte conducente:

> "*Artículo 57.- Para los efectos de esta Ley, los contratos de obra pública podrán ser de dos tipos:*
> *I. Sobre la base de precios unitarios, en cuyo caso el importe de **la remuneración o pago total que deba cubrirse al contratista se hará por unidad de concepto de trabajo terminado,** o ......".*

196.- Las Reglas Generales para la Contratación y Ejecución de la Obra Pública, aplicables a la relación jurídica creada por el Contrato de Obra Pública, en su Sección 5 relativa a los lineamientos para la integración de los precios unitarios, define lo que es un precio unitario, y que es del tenor siguiente:

134

> *"5.2.5 PRECIO UNITARIO. Importe total por unidad de medida de cada concepto de trabajo".*

197.- En la cláusula 3.3. del Contrato, fue ratificada esta disposición legal, en el sentido de que el pago sólo procedería contra la conclusión del concepto de trabajo pactado, de la siguiente forma:

> *"**3.3 Precios Unitarios.** Los trabajos objeto de este Contrato se pagarán a base de precios unitarios conforme a lo consignado en el Anexo "C" del presente Contrato. Dichos trabajos incluyen la remuneración o pago total que deba cubrirse al Contratista por los trabajos, bajo los conceptos de costo directo, costo indirecto, financiamiento y utilidad, así como el costo de las obligaciones adicionales estipuladas en el presente Contrato a favor del Contratista. Dichos precios unitarios son fijos y sólo podrán ajustarse los costos directos que integran los mismos, en los casos y bajo las condiciones previstas en la Cláusula 3.7 del presente Contrato".*

198.- El problema o el litigio nunca fue entendido por el Tribunal Arbitral y por ello el tribunal arbitral no lo resolvió conforme al Derecho Federal Mexicano, a pesar de que fue planteado correctamente por PEP. Es decir, la cuestión no era determinar que los cruces fueron hechos por COMMISA, o si fueron aceptados por PEP, sino que los cruces, tal como fueron realizados por COMMISA, no se ajustan al concepto de trabajo originalmente contratado y conforme al cual se fijó el precio unitario pactado por la terminación de cada uno de ellos.

# Exhibit A

## Part 4 of 7

Esta correspondencia entre precio unitario y concepto de trabajo está establecida legalmente. Así lo establece la Regla General para la Contratación y Ejecución de la Obra Pública 5.1.2, y la Cláusula 3.3 del Contrato antes citado.

199.- De igual manera, el Reglamento de la Ley de Obras Públicas, aplicable a la presente controversia, establece esta relación.

> *"ARTICULO 31.- La proposición que el concursante deberá entregar en el acto de presentación y apertura, contendrá según las características de la obra:*
>
> I.   *Garantía de seriedad y carta de compromiso de la proposición;*
> II.  *Manifestación escrita de conocer el sitio de los trabajos;*
> III. ***Catálogo de conceptos, unidades de medición, cantidades de trabajo, precios unitarios propuestos e importes parciales y el total de la proposición;***
> IV.  *Datos básicos de costos de materiales puestos en el sitio de los trabajos, de la mano de obra y del uso de la maquinaria de construcción;*
> V.   ***Análisis de precios unitarios de los conceptos solicitados, estructurados con costos directos, costos indirectos, costos de financiamiento de los trabajos y cargo por utilidad. El procedimiento de análisis de los precios unitarios, podrá ser por asignación de recursos calendarizados o por el rendimiento por hora o turno.***
>
> *Los costos directos incluirán los cargos por concepto de materiales, mano de obra, herramientas, maquinaria y equipo de construcción.*

136

*Los costos indirectos estarán representados como un porcentaje del costo directo, dichos costos se desglosarán en los correspondientes a la administración de oficinas centrales, de la obra y seguros y fianzas.*

*El costo de financiamiento de los trabajos, estará representado por un porcentaje de la suma de los costos directos e indirectos; para la determinación de este costo deberán considerarse los gastos que realizará el contratista en la ejecución de los trabajos, los pagos por anticipos y estimaciones que recibirá y la tasa de interés que aplicará, debiendo adjuntarse el análisis correspondiente.*

*. El cargo por utilidad, será fijado por el contratista mediante un porcentaje sobre la suma de los costos directos, indirectos y de financiamiento;*

VI.    *.Programas de ejecución de los trabajos, utilización de la maquinaria y equipo de construcción, adquisición de materiales y equipos de instalación permanente, así como utilización del personal técnico, administrativo y de servicios encargado de la dirección, supervisión y administración de los trabajos, en la forma y términos solicitados, y*

VII.    *Relación de maquinaria y equipo de construcción indicando si es de su propiedad, y su ubicación física.*

*Tratándose de propuestas que presenten concursantes extranjeros, estos deberán acreditar que la integración de las mismas, partió de iguales condiciones en cuanto a precio, costo, financiamiento, oportunidad y demás que resulten pertinentes, de las que hubieren servido a los nacionales para integrar las suyas".*

137

200.- Esto es así, porque un concepto de trabajo, conforme a las Reglas Generales para la Contratación y Ejecución de Obra Pública, es definido de la manera siguiente:

> "5.2.3 CONCEPTO DE TRABAJO. **Conjunto de operaciones y materiales** que de acuerdo con las formas y especificaciones respectivas, integran cada una de las partes en que se dividen convencionalmente los estudios y proyectos, la ejecución y equipamiento de las obras, la puesta en servicio, su conservación o mantenimiento y la supervisión de estos trabajos con fines de medición y pago".

201.- Toda vez que el concepto de trabajo es esencialmente un conjunto de operaciones y materiales, es evidente que el precio unitario que se pacte responde a esos costos.

Así, el Tribunal Arbitral sin fundamentación y sin motivación, considera que no existe base legal para alterar los precios unitarios. En otras palabras, si el conjunto de operaciones y materiales realmente aplicados al trabajo de cruces, correspondían a lo conceptualizado originalmente, corresponde entonces aplicar los precios unitarios del Contrato. Si dichas operaciones y materiales no corresponden a los originalmente pactados, estamos ante un concepto de trabajo distinto, y no procede la aplicación de los precios originales, sino integrar precios unitarios extraordinarios.

138

202.- El Tribunal Arbitral no estudió el asunto como correspondía, puesto que un cruce no era cruzar un tubo con otro, sino el conjunto de operaciones y materiales que se emplearían en ese trabajo.

203.- Así, PEP y COMMISA debían integrar y conciliar precios unitarios extraordinarios para cubrir los nuevos trabajos de COMMISA. Entonces, los pagos ya realizados por PEP se constituyen en pagos en exceso o indebidos, a cuya retribución está obligada COMMISA de conformidad con la LAOP y el contrato. El artículo 69 de la LAOP establece:

> *"Artículo 69.- .......*
>
> *Tratándose de pagos en exceso que haya recibido el contratista, éste deberá reintegrar las cantidades pagadas en exceso, más los intereses correspondientes, conforme a una tasa que será igual a la establecida por la Ley de Ingresos de la Federación en los casos de prórroga para el pago de créditos fiscales. Los cargos se calcularán sobre las cantidades pagadas en exceso en cada caso y se computarán por días calendario desde la fecha del pago hasta la fecha en que se pongan efectivamente las cantidades a disposición de la dependencia o entidad".*

De igual manera es aplicable la Cláusula 3.8.7 del Contrato relativa a pagos en exceso.

El pago ofrecido por PEP correspondía al resultado de la compensación de ambas deudas o créditos.

Estos razonamientos son aplicables a los trabajos de cruces reclamados ante el tribunal arbitral como Controversia Técnica 37, y también a los reclamados como Controversia Técnica 39, en su totalidad.

204.- Nada mejor muestra la violación cometida por el tribunal arbitral a las normas de orden público citadas, que la consideración vertida por el Tribunal Arbitral en el párrafo 302, visible en la hoja 70, del Laudo Final, relativo a los cruces 1, 4 y 6 del IPC-27, en el cual decide que era legítima la expectativa de COMMISA de obtener el pago contemplado en el contrato, simplemente porque PEP le encargo trabajos adicionales de cruces, cuando por la misma razón, **era expectativa de PEP, de que COMMISA realizara el trabajo adicional de cruces, conforme a como este trabajo fue conceptualizado originalmente, es decir, que dicho trabajo incluyera las operaciones y materiales originalmente convenidos, incluyendo por supuesto las especificaciones técnicas previstas desde el principio.**

**Esto demuestra la parcialidad del Tribunal Arbitral, porque no pondera el derecho de PEP contra el derecho de COMMISA, sino que examina únicamente el derecho de COMMISA.**

205.- Otro hecho que revela y deja en evidencia la falta de imparcialidad con la que se condujo el tribunal arbitral al

140

resolver el tema de cruces, lo constituye las siguientes consideraciones contenidas en los párrafos 295 y 296 del laudo, que a la letra dicen:

> "295. En febrero de 2000 durante la ejecución de los trabajos, las partes convinieron que en ciertos cruces se podía reducir la separación hasta 0,5 m., y que el impacto en costes de esa reducción (en los cruces afectados, no en los restantes) se debería tener en cuenta.
>
> El problema radica en determinar cuál habría de ser el impacto en precio de la reducción de la separación. En su comunicación A39, el Tribunal solicitó a las partes que cuantificaran "aproximadamente el ahorro de costos en el dragado, en el número de sacos de arena y otros insumos y en la ocupación de hombres y máquinas que conlleve la reducción de la separación de ductos de un metro a 0,5 metros". En su contestación, COMMISA argumentó que la reducción de separación no supuso una disminución de costes, sino al contrario un incremento de tiempo y materiales. PEP por su parte presentó una tabla en la que detallaba para cada uno de los 19 cruces que, según su alegación, tenían una distancia inferior a un metro, un precio unitario extraordinario. Estos precios extraordinarios difieren significativamente de los precios unitarios convenidos en el Anexo C del Contrato: en general, la parte del precio extraordinario cifrada en PME es mayor que la del precio unitario, mientras que en la porción en USD ocurre exactamente lo contrario.
>
> 296. _En conclusión,_ ante las posturas encontradas de las partes, el Tribunal Arbitral ha decidido en base a un dato adicional según consta en autos: es un hecho incontrovertido que, durante la ejecución del Contrato, PEP pagó el 100% del precio de los cruces en los que la separación era inferior a un metro. Este hecho parece indicar que, durante la fase de



141

> cumplimiento, las partes estimaron que los cruces con menos de un metro de separación costaban y valían lo mismo que los cruces con separación superior. Así las cosas, el Tribunal Arbitral no encuentra razón convincente para no extender la misma regla a los restantes cruces con separación reducida, y decide que todos los cruces, sea cual sea su separación, deben ser satisfechos a los precios unitarios pactados en el Contrato."

206.- La consideración del Tribunal Arbitral es ilegal, porque un pago de lo indebido genera la obligación del contratista de restituir las cantidades en exceso, y no como lo indica el Tribunal Arbitral, de constituir una obligación a cargo de PEP de pagar lo indebido.

207.- También es preciso destacar en el apartado en cita, que el Tribunal Arbitral jamás entendió la litis y por ello no la resolvió conforme a derecho mexicano, ya que no se trataba de reducirle a COMMISA los ahorros que obtuvo en la ejecución de los trabajos, sino en la de generar nuevos precios por los cruces, atendiendo a que COMMISA los ejecutó con una especificación y calidad distintas a las pactadas originalmente (párrafo 258 del Laudo Final).

208.- Sobre el mismo tema de incongruencia, el apartado transcrito no refleja la actuación del Tribunal Arbitral durante el procedimiento, ni sus propias determinaciones. Así, el Tribunal Arbitral mediante su comunicación A 39, a la que anexó la Orden Procesal No. 6, solicitó a PEP y a COMMISA, que calcularan el ahorro de costos en el dragado, en el

142

número de sacos de arena y otros insumos y en la ocupación de hombres y máquinas que conlleve la reducción de la separación de ductos de un metro a 0,5 metros, toda vez que el tribunal arbitral adujo en los considerandos 1 y 3 de la orden procesal No. 6 lo siguiente:

> *"1. El Tribunal Arbitral ha tenido oportunidad de revisar en profundidad los miles de documentos que componen los anexos y apéndices a los escritos de las partes".*
>
> *"Finalizada la revisión de la documentación, el Tribunal Arbitral estima que ha aflorado toda una serie de cuestiones cuya clarificación es imprescindible para instruir correctamente la causa. Estas cuestiones no han sido tratadas con suficiente profundidad por las partes en sus escritos o la prueba aportada resulta deficitaria. Por ello el Tribunal Arbitral ha decidido promulgar las presentes Diligencias para mejor proveer, con la finalidad de recabar nuevas alegaciones y pruebas de las partes."*

209.- Es decir, en primer término el tribunal arbitral manifiesta que ha tenido la oportunidad de revisar en profundidad *"los miles de documentos que componen los anexos y apéndices a los escritos de las partes"*, para después argüir que finalizada la revisión de la documentación, ha aflorado toda una serie de cuestiones cuya clarificación es imprescindible para instruir correctamente la causa, pues esas cuestiones no han sido tratadas con suficiente profundidad por las partes en sus escritos o la prueba aportada resulta deficitaria y que en virtud de ello, el tribunal decidió promulgar esas diligencias

143

para mejor proveer con el propósito de recabar nuevas alegaciones y pruebas de las partes.

210.- La conducta del tribunal constituye un expreso reconocimiento por parte del tribunal arbitral, que a la fecha en que fueron emitidos el comunicado A 39 y la Orden Procesal No. 6, ambos del 13 de diciembre de 2006, el tribunal arbitral no contaba con los elementos suficientes tanto en argumentos como en medios probatorios para emitir una resolución sobre el reclamo de COMMISA denominado como "controversia técnica 37".

211.- Contraria a la propia conducta y solicitudes del Tribunal Arbitral, dicho Tribunal Arbitral en el punto 295 del laudo señaló que COMMISA, en su contestación, manifestó que la reducción de separación no supuso una disminución de costes, sino al contrario un incremento de tiempo y materiales, en tanto que PEP presentó una tabla en la que detallaba para cada uno de las 19 cruces que tenían una distancia menor a un metro, un precio unitario extraordinario, a lo que el tribunal arbitral agregó que esos precios extraordinarios difieren significativamente de los precios unitarios convenidos en el anexo C del contrato.

212.- Siguiendo ese orden de ideas, en el punto 296 del mismo laudo, el tribunal determinó que ante las posturas encontradas de las partes, decidió con base en un dato

144

adicional que consta en autos, que toda vez que es un hecho incontrovertido que durante la ejecución del contrato, PEP pagó el 100% del precio de cinco cruces en los que separación era inferior a un metro, no encontrando a su juicio, razón convincente para no extender la misma regla a los restantes cruces con separación reducida y decide que todos los cruces, sea cual sea su separación, deben ser satisfechos a los precios unitarios pactados en el contrato. Esta última consideración es ilegal, porque un pago de lo indebido genera la obligación del contratista de restituir las cantidades en exceso, y no como lo indica el Tribunal Arbitral, de constituir una obligación a cargo de PEP de pagar lo indebido.

213.- La propia conducta del tribunal es contraria a la resolución tomada en el Laudo Arbitral, puesto que en un momento determinado el Tribunal Arbitral reconoció de manera clara y precisa que no contaba con los elementos suficientes para emitir su determinación y para ello ordenó unas diligencias para mejor proveer (mismas que con posterioridad decidió no tomarlas en cuenta en virtud de las posiciones encontradas de las partes) y posteriormente dictó una resolución en un dato o información que ya constaba en autos desde antes de que ordenara el desahogo de las referidas diligencias para mejor proveer, entonces es claro que el tribunal arbitral emitió una determinación basada en criterios parciales y subjetivos, de justicia, apartándose de la

145

legislación federal mexicana que se obligó a observar en el arbitraje, sin contar con elementos válidos y objetivos. Es decir, el tribunal arbitral dictó el laudo arbitral en un estado de ignorancia similar al que tenía antes de elaborar el comunicado A 39 y Orden Procesal No. 6. En otras palabras: si su resolución no se basó en las pruebas adicionales aportadas por las partes, quiere decir que su resolución se basó en pruebas insuficientes según su propio dicho. De ahí resulta que el tribunal arbitral dicta un laudo incongruente y por ello resulta nulo.

214.- Entonces, con la resolución emitida por el tribunal arbitral, se actualiza la causal de nulidad del laudo arbitral, establecida en el artículo 1457, fracción I, inciso c), toda vez que incurrió en un exceso del mandato conferido por las partes al no resolver las cuestiones planteadas por las partes en estricto derecho, como era su obligación. Por el contrario, decidió resolver con criterios de carácter subjetivos y de acuerdo a argumentos que no contaban con los elementos necesarios para resolver válidamente, pues baste recordar lo manifestado por el propio tribunal arbitral en el considerando 3 de la orden procesal No. 6, en el sentido de que: *"El Tribunal Arbitral estima que ha aflorado toda una serie de cuestiones cuya clarificación es imprescindible para instruir correctamente la causa"*.



146

A contrario sensu, al no haber tomado en cuenta los argumentos y pruebas aportados por las partes, en particular las de PEP, con motivo del desahogo de las diligencias para mejor proveer, NO SE INSTRUYÓ CORRECTAMENTE LA CAUSA.

**215.- Así las cosas, el Tribunal Arbitral pretende que PEP haga pagos por un trabajo no devengado por COMMISA, en franca violación a las normas constitucionales y de orden público que regulan el ejercicio del gasto público en los contratos de obra y por ello el laudo resulta nulo.**

## III. O T R A S   C O N T R O V E R S I A S

**1.    Controversia    Técnica    19:    Reclamaciones    por Obstrucciones.**

216.- El laudo asimismo es nulo, toda vez que en relación con la Controversia Técnica 19, relativa a las reclamaciones por obstrucciones contenida en el Laudo Final, visible de la hoja 127 a 132 (párrafos 500 a 526), el mismo se refiere a una controversia no prevista en el acuerdo de arbitraje y por lo tanto se trata de una decisión que excede los términos del acuerdo de arbitraje, de conformidad con el artículo 1457, fracción I, inciso c), del Código de Comercio.

217.- Durante la ejecución del contrato relativo al IPC-28, cuyo objeto era  el tendido en el lecho marino de ductos submarinos, ductos ascendentes, y su interconexión con

147

plataformas costa afuera, surgieron problemas de carácter técnico, no previstos en el contrato, y que las partes denominamos obstrucciones.

218.- Dichas obstrucciones constituían impedimentos físicos que impedían el tendido de ductos y su interconexión a las plataformas, tales como basura depositada en el fondo marino, maleza, o elementos constructivos no contemplados en los planos, entre otros. Estas obstrucciones son consideradas trabajos extraordinarios.

219.- COMMISA reclamó a PEP el pago de 80 obstrucciones, de las cuales PEP sólo reconoció la procedencia de pagar 29 de ellas, y que no fueron liquidadas debido a la posición de COMMISA de apostar al "todo o nada".

220.- El Tribunal Arbitral consideró procedente el pago de 74 de ellas atendiendo a las siguientes razones:

i)      Veinte de estos eventos no fueron reconocidos por PEP como obstrucciones, porque los consideraba ya previstos en el contrato, o inexistentes. Sin embargo, el Tribunal Arbitral, sin ninguna motivación (párrafo 521 del Laudo Arbitral), considera procedentes 14 de ellas, absolviendo a PEP del pago de 6 de ellas,



debido al reconocimiento expreso de COMMISA, que tales eventos no eran obstrucciones.

ii)   De los 60 eventos restantes, PEP argumentó que técnicamente todos ellos podían calificarse como obstrucciones, sin embargo, PEP sólo reconocía como procedente el pago en 29 de estos casos, porque en los 31 restantes le había precluido el derecho a COMMISA para reclamar cualquier compensación.

221.- Con relación al primer grupo de obstrucciones, es decir, las veinte no reconocidas por PEP, el Tribunal Arbitral excede su mandato al resolver cuestiones no previstas en el acuerdo de arbitraje, afectando de nulidad el Laudo emitido.

En efecto, existía en el caso una diferencia técnica entre PEP y COMMISA, sobre la calificación o no de obstrucciones, de estos catorce eventos. Independientemente de esto, vale mencionar la falta de legalidad del Tribunal Arbitral de resolver una cuestión técnica, sin ningún apoyo pericial, y sin motivación fáctica o jurídica alguna (párrafo 521 del Laudo Arbitral).

222.- Si COMMISA no hubiese estado de acuerdo con la decisión de PEP, de conformidad con los términos del contrato, COMMISA tenía la obligación de formalizar sus reclamaciones como Controversias Técnicas, lo cual no hizo.



149

Como ya se ha señalado en múltiples ocasiones, en el contrato celebrado entre PEP y COMMISA se pactó que sólo serían materia de arbitraje aquéllas disputas o reclamaciones que fueran formalizadas como Controversias Técnicas, como se demuestra a continuación, tal y como se establece en el punto 23.2 que señala:

> "23.2 **Controversias Técnicas.** *El Contratista no tendrá derecho a efectuar ningún reclamo y PEP no será responsable por daños legales (incluyendo negligencia) o contractuales ante el Contratista, sus proveedores secundarios o subcontratistas, excepto en los casos específicamente previstos en este Contrato.*
>
> *Para efectos de esta Cláusula se entenderá por Controversia Técnica toda diferencia que surja por cualquier reclamo o sea atribuible a la interpretación o ejecución de este Contrato, entre el Supervisor y el Contratista, en relación con los Anexos Técnicos del Contrato (A, B, B-1, B-2, B-3, CEV, DT, DT-1, DT-2.1, DT-2.2, DT-3, DT-4, E-2, F-1 Y F-2)*
>
> *Si por cualquier motivo el Supervisor y el Contratista no coinciden en la apreciación para resolver un reclamo de ajuste derivado de una Controversia Técnica, <u>el Contratista deberá hacer formal dicha Controversia Técnica por escrito al Supervisor y solicitarle la determinación correspondiente. Este tipo de solicitud del Contratista deberá ser claramente identificado indicando que se trata de una Controversia Técnica sujeta a resolución al amparo de esta Cláusula 23, debiendo contener un resumen de los hechos en controversia y la propuesta del Contratista para resolverlos.</u>*
>
> ........................................................
> .................................."



150

"23.3    *__Arbitraje.__*    *Cualquier    controversia,   reclamación,    diferencia    o    disputa    que   sobrevenga o se relacione o esté vinculada con   este Contrato o el incumplimiento del mismo   será    dirimida    finalmente    mediante    arbitraje   conducido en el Distrito Federal, México, de   acuerdo  con  las  Reglas  de  Conciliación  y   Arbitraje  de  la  Cámara  Internacional  de   Comercio que estén en vigor en ese momento.   El número de árbitros será de tres y el idioma   para conducir el arbitraje será el español.* __No   obstante  lo  anterior,  cualquier  controversia   técnica deberá ser sometida previamente al   procedimiento previsto en la Cláusula 23.2 y   sólo    en    caso    de    que    mediante    dicho   procedimiento no se logré un acuerdo entre las   partes, éstas quedarán facultadas para acudir   al recurso previsto en la Cláusula 23.3".__*

223.- Tenemos entonces, de conformidad a las Cláusulas contractuales indicadas, que puede haber controversias, disputas o reclamos, informales, por llamarlos de alguna manera (aunque es obvio que deben ser por escrito) y formales. Las controversias formales deben plantearse por escrito, de manera formal, especificar en el documento que se trata de una controversia técnica, proporcionando los hechos que motivan la reclamación y una propuesta de solución.

224.- Esto tiene una importancia jurídica esencial, porque la formalización de la Controversia Técnica, y únicamente esta actuación, origina el procedimiento para obtener un documento justificativo de pago, en los términos del artículo 44 fracción III del Reglamento de la Ley Federal de Presupuesto, Contabilidad y Gasto Público Federal, y artículo

66, fracción III, del Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria. En otras palabras, no puede constituirse una obligación de pago a cargo del erario público federal mientras no exista un documento justificativo de dicho pago.

225.- Así, la parte final del cuarto párrafo, y la inicial del quinto siguiente, de la Cláusula 23.2 del Contrato señalan lo siguiente:

> *"Lo anterior en la inteligencia de que cualquier determinación de modificación técnico-contractual que implique o necesariamente deriven en una ampliación del monto del Contrato o del plazo de ejecución establecidos en las Cláusulas 3.1 y 4.1, respectivamente, deberá contar con la previa aprobación por escrito del representante del Proyecto ....... Una vez recibida la aceptación escrita por parte del Contratista de la determinación efectuada por el supervisor, se modificará el Contrato en lo conducente y se implementará la determinación".*

226.- La Cláusula 5 del Contrato *"Modificaciones al Contrato"* establece que *"Las partes convienen en que por razones fundadas y explícitas **y a través de la suscripción de un convenio,** PEP podrá modificar el Contrato, en términos de lo establecido en el artículo 70 de la Ley de Adquisiciones y Obras Públicas"*.

227.- Formalizar la controversia, contractualmente no es lo mismo que insinuar o presumir un supuesto derecho, como



152

lo hizo COMMISA. La decisión del Tribunal Arbitral aprobó la conducta de COMMISA, en contradicción al pacto contractual. En otras palabras, el tribunal arbitral consideró que la ejecución del contrato, con relación al cumplimiento de los supuestos del arbitraje, estuviera sujeta al arbitrio de COMMISA, lo que expresamente prohíbe el artículo 1797 del Código Civil Federal, que señala:

> **"Artículo 1797.** *La validez y el cumplimiento de los contratos no puede dejarse al arbitrio de uno de los contratantes".*

228.- El principio establecido en el artículo 1797 anteriormente transcrito cobra suma importancia en los contratos de obra pública, regulados por el derecho administrativo, en los cuales por su propia naturaleza, las partes tienen restringida su voluntad en la contratación, y porque en los mismos se reproducen disposiciones de orden público, que emanan directamente del artículo 126 y 134 Constitucionales, relativos a obra pública y gasto público.

La falta de formalización de los eventos de obstrucciones como controversias técnicas se demuestra con la multicitada Acta de Recepción Física de los trabajos de fecha 30 de agosto de 2002, en la cual se manifiesta en la página 17 que estos reclamos estaban en elaboración apenas.

153

229.- Lo cierto es que para efectos del arbitraje, COMMISA tenía que haber formalizado previa y oportunamente su Controversia Técnica, tal como lo exige el acuerdo de arbitraje contenido en la Cláusula 23.3 del Contrato de Obra Pública y toda vez que COMMISA no lo hizo, dicha Controversia Técnica no podía ser materia de arbitraje, por lo que las consideraciones del Tribunal Arbitral se refieren a una controversia no prevista en el acuerdo de arbitraje, ya que sólo controversias técnicas formales pueden ser materia de arbitraje, o contiene decisiones que exceden los términos del acuerdo de arbitraje, ya que el Tribunal Arbitral sólo puede resolver en definitiva, controversias técnicas.

230.- En el segundo grupo, no existe justificación legal para que el tribunal arbitral condene a PEP al pago de los 31 eventos de obstrucciones, toda vez que el derecho de COMMISA para reclamarlos ya había precluido. Esto es, no existe una orden de PEP que los considere trabajos extraordinarios, o una ley que los catalogue como trabajos pagables. Por el contrario, su reconocimiento fuera de las normas contractuales y el marco jurídico aplicable infringe diversas normas de orden público mexicano.

231.- Es claro que todos los trabajos deben estar justificados, ya sea en un contrato, un convenio, o una orden o notificación de cambio, de conformidad con los artículos 44

154

fracción III del Reglamento de la Ley Federal de Presupuesto, Contabilidad y Gasto Público, y 66 fracción III del Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria, citados precedentemente, disposiciones que regulan el ejercicio del gasto público, como los pagos a cuenta de obra pública, y por ende, disposiciones de orden público mexicano.

232.- En este tenor, podemos citar también el artículo 70 de la LAOP, que prevé las condiciones para modificar en cuanto a tiempo y monto los contratos de obra pública. El artículo 70 de la LAOP dispone como regla general que los contratos de obra pública no pueden ser modificados, salvo casos excepcionales. En ese caso, los trabajos extraordinarios y adicionales deben calificarse de manera estricta, al ser eventos excepcionales, debiendo revestir la misma formalidad que los trabajos originales. Es decir, la Contratista no puede hacer trabajos extraordinarios sin una orden expresa de PEP, por lo que ante la ausencia de una orden expresa, dicho trabajo no solamente no es pagable sino que incluso a la Contratista se le imputa responsabilidad.

233.- Ahora bien, con base en estas disposiciones, la Contratista no puede determinar unilateralmente la existencia de trabajos extraordinarios, y proceder a su ejecución sin una orden expresa de PEP. En el caso de los contratos de obra pública, no se privilegia el interés de la Contratista, sino el

155

interés de la hacienda pública, por ello el principio de utilidad no opera en beneficio de COMMISA para ser resarcida por PEP, sino al contrario, en el caso obra el interés público para impedir el pago de trabajos ejecutados unilateralmente por COMMISA, y adicionalmente responder por los daños y perjuicios.

234.- El Anexo B-2 del Contrato, denominado "Generalidades", en su Sección 5, denominado "Modificaciones" establece lo siguiente:

> "Cualquier modificación que implique cambios en las estipulaciones originalmente pactadas en el Contrato o bien, estipulaciones adicionales deberán formalizarse mediante convenio escrito entre las partes, en términos de lo señalado en la Cláusula 5 del Contrato.

> "Si en algún momento el Contratista considera que hay acciones u omisiones de PEP que constituyen un cambio al trabajo no cubierto por una notificación de cambio, el Contratista deberá presentar dentro de diez (10) días naturales después de la acción u omisión, una Solicitud de Notificación de Cambio, explicando detalladamente la razón de la solicitud. El Supervisor emitirá una notificación de Cambio o bien negará la petición por escrito.

> ------------------------------------------------------------
> --------------------------------

> "Si el Contratista considera que con la Notificación de Cambio se afecta el costo o tiempo requerido para la ejecución de cualquier parte del Trabajo, deberá enviar notificación escrita a PEP, dentro de los diez (10) días naturales siguientes a la fecha en que se

156

*hubiere recibido la Notificación de Cambio, y deberá presentar a PEP, dentro de los siguientes veinte (20) días naturales siguientes, una propuesta escrita que indique la naturaleza, efecto sobre el programa y el alcance monetario de dicha demanda con suficiente detalle para permitir un análisis exhaustivo y negociación.*

*"Toda demora del contratista para dar aviso o presentar la propuesta a que se refiere el párrafo anterior, será motivo suficiente para rechazar la reclamación si el retraso perjudica a PEP y en la medida que lo haya perjudicado.* En ningún caso se considerará una reclamación del Contratista si se hace después de la Recepción Parcial o Total ...".

235.- La disposición anteriormente transcrita es muy clara: el Contratista tenía un término de diez días para notificar a PEP sobre cualquier cambio en las condiciones contractuales que pudiere causar un aumento en el tiempo o monto del Contrato. De igual manera debía proponer a PEP una propuesta de solución económica dentro de los veinte días siguientes.

236.- Por otro lado, el derecho de PEP para ordenar la realización de trabajos extraordinarios o rechazar la realización de trabajos extraordinarios también se encuentra regulado. Esto es así porque PEP podría realizar dichos trabajos, en caso de no serle convenientes las condiciones propuestas por la contratista, ya sea con medios propios mediante administración directa o encargárselos a terceras personas (Regla 3.3.4. de las Reglas Generales para la Contratación y Ejecución de la Obra Pública), para de esta

157

manera asegurar las mejores condiciones para el Estado, en cuanto a calidad y precio.

237.- Por tales razones, un aviso oportuno formal de la Contratista de todos aquellos eventos que causaren trabajos extraordinarios era esencial, puesto que detonaba la orden de trabajo y la posibilidad de que COMMISA pudiera ejecutarla, sin contravenir la LAOP. Ante estos incumplimientos, PEP está facultado para rechazar su pago, en cuanto hayan causado un daño al erario público como en el caso sucedió. En efecto, la cláusula 8.1.9 del Contrato, establece

> *"8.1.9. Trabajos Excedentes. Si el Contratista, sin la autorización previa y por escrito de PEP, realiza trabajos por mayor valor del convenido en este Contrato, independientemente de la responsabilidad en que incurra por los Trabajos Excedentes, no tendrá derecho a reclamar pago alguno por ello".*

238.- Es decir, la realización de trabajos extraordinarios sin el debido consentimiento de PEP ocasiona daños al erario público, no es un beneficio, puesto que afectan recursos no contemplados en el presupuesto, y destinados a otros propósitos, y además que resultan de una actuación unilateral de la Contratista, que no garantiza las mejores condiciones económicas y técnicas para el Estado.



158

239.- Estos principios legales anteriormente transcritos, fueron pactados por las partes en la Cláusula 6 del Contrato, relativa a Trabajos Extraordinarios, en la siguiente forma:

> "El Contratista se obliga a realizar los trabajos extraordinarios que eventualmente pudieran resultar durante la ejecución del Contrato, entendiéndose por éstos los que no están comprendidos en el proyecto y en el programa. En todos los casos, PEP dará por escrito al Contratista, previamente a la ejecución de los trabajos extraordinarios, la orden de trabajo correspondiente, en la inteligencia, los conceptos, las especificaciones y los precios unitarios respectivos quedarán incorporados al Contrato para todos sus efectos, en los términos del convenio que se suscriba".

240.- En consecuencia, no basta que COMMISA tuviera informado a PEP sobre los eventos de obstrucciones, como lo considera el Tribunal Arbitral, sino que debió solicitar una notificación de cambio y proponer un precio por ese trabajo extraordinario, y luego esperar la decisión de PEP. En efecto, cualquier notificación de cambio hecho por COMMISA, en forma de informe extemporáneo, necesariamente tenía que esperar la respuesta de PEP.

241.- De ningún modo puede imputársele responsabilidad a PEP, como lo hace el Tribunal Arbitral, por no emitirse la Notificación de Cambio, por dos razones: (a) es un derecho de PEP rechazar la solicitud de COMMISA, y (b) COMMISA necesariamente debía esperar la orden expresa de PEP para iniciar los trabajos.

242. En el presente caso no se trata de la falta de formalización de los trabajos, sino de la inexistencia de una causa que obligue a PEP, como entidad pública a pagar. El Tribunal Arbitral, avala la conducta de COMMISA para imponerle precios y trabajos adicionales y extraordinarios a PEP, fuera de las restricciones contractuales. Es decir, el tribunal arbitral consideró válida la conducta de COMMISA para realizar, sin autorización previa de PEP, trabajos extraordinarios, y sin cuidado de las disposiciones de orden público que regulan el ejercicio presupuestal.

243.- Esta decisión del Tribunal Arbitral infringe el orden público mexicano y vicia de nulidad el Laudo Final por dos razones:

a. El artículo 70 de la LAOP, como ya explicamos, privilegia la inmovilidad de las condiciones contractuales y restringe las condiciones a las modificaciones contractuales. Esta disposición preserva diversos principios de orden público a saber: la obtención de mejores condiciones económicas para el Estado, y la eficiencia en el gasto público. Se propone evitar que a través de modificaciones del contrato se asignen trabajos que deberían ser materia de una licitación pública, o que se alteren injustificadamente los precios ofrecidos por el Contratista.

Así las cosas, y sin estar facultado para ello en la cláusula 23.3 del contrato ni en el Acta de Misión, el tribunal arbitral altera las condiciones contractuales, para determinar el pago de trabajos extraordinarios, y lo que es peor, infringe disposiciones de orden público mexicano para determinar la procedencia y pago de trabajos extraordinarios. Por estar así las cosas, esta controversia es nula al infringirse el artículo 1457 del Código de Comercio, en sus fracciones I inciso c) y II.

b. Los pagos que se hagan con cargo al erario público deben estar justificados, ya sea en un documento, o en una ley. Sin esa orden se consideran trabajos excedentes y un daño al erario público. Por tal razón, el principio de utilidad no opera en el caso, y COMMISA no tiene derecho a retribución alguna, precisamente porque su derecho deriva de un acto ilícito, y los actos ilícitos no genera consecuencia alguna.

Por estas razones es evidente que el tribunal arbitral dictó su laudo en violación de las normas de derecho mexicano de orden público y por ello resulta nulo el laudo.

**2. Controversia Técnica 27: costos por el diferencial de tarifas de tiempo de espera de la Castoro 10 en Trabajos de plataformas.**

161

244.- En el desarrollo de los trabajos pactados bajo el contrato de obra relativo al proyecto IPC-28, se presentaron interrupciones o suspensiones a los trabajos, que fueron previstas en el Contrato. De acuerdo con el Contrato, la interrupción o suspensión a los trabajos que emplearan embarcaciones daría causa para el pago de tarifas de espera o cuota de reserva

245.- Para la ejecución de los trabajos, COMMISA contrató dos embarcaciones: la Castoro 10 y la Bar Protector. Por sus características y capacidades, la primera era apta para el trabajo de tendido de ductos y la segunda para el trabajo en plataformas.

246.- Atendiendo a la diferenciación clara entre el trabajo de tendido de ductos y el trabajo en plataformas, y atendiendo al tipo de embarcación que originalmente se iba a emplear en cada uno de ellos, se pactaron en el Anexo C del Contrato tarifas de espera distintas para el Castoro 10 y el Bar Protector, puesto que cada uno de dichos buques realizaba trabajos distintos, es decir, había tarifas de espera para las suspensiones a los trabajos de tendido de ductos y tarifas de espera distintas para el trabajo en plataforma; siendo en mayor monto los pactados para suspensiones en el tendido de ductos.

162

247.- Por falta de disponibilidad de la embarcación Bar Protector, se hizo necesario que la embarcación Castoro 10 realizara trabajos en plataformas, lo cual ya estaba previsto desde la firma del Contrato (Anexo B-2 Plan de Trabajo). Durante los trabajos, sucedieron eventos que suspendieron los trabajos de la embarcación Castoro 10, y causaron que se actualizara el supuesto para el pago de tarifas de espera o cuotas de reserva.

248.- La disputa entre las partes fue determinar las tarifas de espera aplicables, bien la pactada para el tendido de ductos reclamada por COMMISA, o bien la pactada para el trabajo en plataformas, sostenida por PEP, posición que después cambió para proponer el pago de precios unitarios extraordinarios.

249.- COMMISA sostenía que debían pagarse las tarifas de espera para el trabajo de ductos, porque dicha tarifa reflejaba el uso de la Castoro 10. Mientras que PEP sostenía, en principio el pago de tarifas de espera para trabajos en plataformas, porque dichas tarifas se habían pactado en atención a los trabajos pactados. PEP pagó y COMMISA recibió el pago de las tarifas de espera de conformidad a la tarifa estipulada para el trabajo de plataformas, reclamando luego el pago de las diferencia entre esta tarifa y aquélla pactada para el tendido de ductos.

163

250.- Tomando en cuenta que los trabajos realmente ejecutados emplearon recursos distintos, a los que fueron tomados en consideración para integrar o pactar las tarifas de espera para los eventos de suspensión, tanto para uno u otro trabajo, PEP propuso a COMMISA, y así lo sostuvo ante el Tribunal Arbitral, que lo procedente era integrar precios unitarios extraordinarios, ante trabajos que realmente no se correspondían con los originalmente pactados, y en su caso, compensar las diferencias.

251.- El Tribunal resolvió que lo procedente era pagarle a COMMISA las tarifas de espera por trabajos de tendido de ductos, y que entonces PEP debía dicha diferencia. El tribunal arbitral, pare emitir su laudo se basó en que COMMISA propuso para los trabajos extraordinarios aludidos, dichas tarifas y PEP no se opuso a ella (valga aclarar que tampoco lo consintió).

Los hechos y consideraciones de esta controversia son visibles en el Capítulo VII.10 del Laudo Final, de la página 127 a 132, párrafo 500 a 526, de dicho documento.

252.- Los fundamentos del Tribunal Arbitral son incorrectos y violentan diversas disposiciones de orden público mexicano, relativas al empleo de recursos federales, lo cual hace procedente que se declare la nulidad del laudo arbitral.



164

253. En primer lugar es importante subrayar que no hay un acuerdo de voluntades entre las partes. En efecto, PEP nunca aceptó pagar las cuotas de espera por trabajos de tendido, a las suspensiones ocurridas en los trabajos de plataforma. Por el contrario, de su conducta se desprende que PEP ofreció y pago una tarifa distinta a la solicitada por COMMISA (solamente se reclaman "diferencias").

254.- En segundo lugar, el Tribunal Arbitral no atendió a la conducta de las partes para tomar su determinación, conductas que determinaban cuál era el procedimiento correcto para determinar el pago al cual COMMISA tenía derecho. Esta conducta se evidenciaba de la Controversia Técnica 17 en la cual COMMISA aceptó el pago de precios unitarios extraordinarios por trabajos en plataformas en los cuales se empleo a la Castoro 10 y no a la Bar Protector. Por lo que la actuación del Tribunal Arbitral es incongruente, y hace de lado la misión que le fue encomendada por las partes.

255.- La decisión no fue hecha con base en estricto derecho. El artículo 1805 del Código Civil Federal, aplicable al presente caso, establece que la falta de respuesta inmediata de una proposición contractual sin plazo de contestación, provoca que la propuesta de contrato se entienda rechazada. Entonces, la falta de respuesta de PEP a la propuesta de COMMISA, presume su rechazo, y no su

aceptación como incorrectamente lo ha considerado el Tribunal Arbitral. El silencio de PEP no implica consentimiento y no es fuente de obligaciones.

256.- En el caso, el consentimiento debe ser expreso, en los términos del artículo 1803, fracción II, última parte, del Código Civil Federal; Regla 3.3.4. General para la Contratación y Ejecución de la Obra Pública; y Cláusulas 6 y 6.1 del Contrato, por lo que la ejecución de los trabajos no provoca el consentimiento del precio unilateralmente propuesto por COMMISA. No hay entonces una obligación pagable con recursos públicos.

257.- Todas estas infracciones legales claramente provocaron que el Tribunal Arbitral ordenara el pago de trabajos que no se ejecutaron en la realidad. Es decir, que ordenara el pago de precios que no fueron integrados para compensar el trabajo extraordinario ejecutado sino otro distinto, que contenía operaciones y recursos empleados distintos al que se paga. En materia de aplicación y ejecución de gasto para el pago de obras públicas, no hay una justificación para el pago porque no hay un costo efectivamente incurrido, es decir, el concepto de trabajo originalmente pactado no se cumplió. La problemática aquí expuesta es similar a la planteada en el Capítulo correspondiente a la materia de cruces, por lo que aplican los mismos principios legales y fácticos.

258.- El hecho de que no se realizó el trabajo como fue originalmente conceptualizado y contratado, es un hecho plenamente demostrado en el procedimiento arbitral, tal y como se desprende de los hechos narrados en el propio Laudo Arbitral. Es decir, COMMISA solicitó realizar trabajos en plataforma con la Castoro 10, en lugar de con la Bar Protector, es decir, con recursos distintos a los originalmente pactados. PEP aceptó la realización de esos trabajos al ser técnicamente aceptables. Sin embargo, al Tribunal Arbitral, no tomó en consideración estas nuevas condiciones contractuales que son indispensables para generar el pago de conformidad con el derecho mexicano sobre gasto público y que son de orden público.

259.- El Contrato de Obra Pública objeto del Arbitraje es un contrato de Obra a precios unitarios de conformidad con el artículo 57 de la Ley de Adquisiciones y Obras Públicas, el cual muy claramente señala que **la remuneración o pago total que deba cubrirse al contratista se hará por unidad de concepto de trabajo terminado.** Dicha disposición legal establece:

> *"Artículo 57.- Para los efectos de esta Ley, los contratos de obra pública podrán ser de dos tipos:*
> *I. Sobre la base de precios unitarios, en cuyo caso el importe de **la remuneración o pago total que deba cubrirse al contratista se hará***



167

*por unidad de concepto de trabajo terminado,
o ......".*

260.- Por su parte, las Reglas Generales para la Contratación y Ejecución de la Obra Pública, aplicables a la relación jurídica creada por el Contrato de Obra Pública, en su Sección 5, relativa a los lineamientos para la integración de los precios unitarios, define lo que es un precio unitario, al establecer:

> *"5.2.5 PRECIO UNITARIO. Importe total por unidad de medida de cada concepto de trabajo".*

261.- En el Contrato fue adoptada esta disposición legal, en el sentido de que el pago sólo procedería contra la conclusión del concepto de trabajo pactado. En efecto, en la cláusula 3.3 del contrato, las partes pactamos:

> *"3.3 Precios Unitarios. Los trabajos objeto de este Contrato se pagarán a base de precios unitarios conforme a lo consignado en el Anexo "C" del presente Contrato. Dichos trabajos incluyen la remuneración o pago total que deba cubrirse al Contratista por los trabajos, bajo los conceptos de costo directo, costo indirecto, financiamiento y utilidad, así como el costo de las obligaciones adicionales estipuladas en el presente Contrato a favor del Contratista. Dichos precios unitarios son fijos y sólo podrán ajustarse los costos directos que integran los mismos, en los casos y bajo las condiciones previstas en la Cláusula 3.7 del presente Contrato".*

262.- Esta correspondencia entre precio unitario y concepto de trabajo está establecida legalmente. Así lo establece la Regla General para la Contratación y Ejecución de la Obra Pública 5.1.2, y la Cláusula 3.3 del Contrato antes citado. De igual manera, el Reglamento de la Ley de Obras Públicas, aplicable a la presente controversia, establece esta relación:

> **"ARTICULO 31.-** La proposición que el concursante deberá entregar en el acto de presentación y apertura, contendrá según las características de la obra:
>
> I.    Garantía de seriedad y carta de compromiso de la proposición;
>
> II.   Manifestación escrita de conocer el sitio de los trabajos;
>
> III.  **Catálogo de conceptos, unidades de medición, cantidades de trabajo, precios unitarios propuestos e importes parciales y el total de la proposición;**
>
> IV.   Datos básicos de costos de materiales puestos en el sitio de los trabajos, de la mano de obra y del uso de la maquinaria de construcción;
>
> V.    **Análisis de precios unitarios de los conceptos solicitados, estructurados con costos directos, costos indirectos, costos de financiamiento de los trabajos y cargo por utilidad. El procedimiento de análisis de los precios unitarios, podrá ser por asignación de recursos calendarizados o por el rendimiento por hora o turno.**
>
> Los costos directos incluirán los cargos por concepto de materiales, mano de obra, herramientas, maquinaria y equipo de construcción.
>
> Los costos indirectos estarán representados como un porcentaje del

169

*costo directo, dichos costos se desglosarán en los correspondientes a la administración de oficinas centrales, de la obra y seguros y fianzas.*

*El costo de financiamiento de los trabajos, estará representado por un porcentaje de la suma de los costos directos e indirectos; para la determinación de este costo deberán considerarse los gastos que realizará el contratista en la ejecución de los trabajos, los pagos por anticipos y estimaciones que recibirá y la tasa de interés que aplicará, debiendo adjuntarse el análisis correspondiente.*

*El cargo por utilidad, será fijado por el contratista mediante un porcentaje sobre la suma de los costos directos, indirectos y de financiamiento;*

VI.    *.Programas de ejecución de los trabajos, utilización de la maquinaria y equipo de construcción, adquisición de materiales y equipos de instalación permanente, así como utilización del personal técnico, administrativo y de servicios encargado de la dirección, supervisión y administración de los trabajos, en la forma y términos solicitados, y*

VII.    *Relación de maquinaria y equipo de construcción indicando si es de su propiedad, y su ubicación física.*

*Tratándose de propuestas que presenten concursantes extranjeros, estos deberán acreditar que la integración de las mismas, partió de iguales condiciones en cuanto a precio, costo, financiamiento, oportunidad y demás que resulten pertinentes, de las que hubieren servido a los nacionales para integrar las suyas".*

263.- Esto es así porque un concepto de trabajo, conforme a las Reglas Generales para la Contratación y

170

Ejecución de la Obra Pública, es definido de la manera siguiente:

> "5.2.3 CONCEPTO DE TRABAJO. **Conjunto de operaciones y materiales** que de acuerdo con las formas y especificaciones respectivas, integran cada una de las partes en que se dividen convencionalmente los estudios y proyectos, la ejecución y equipamiento de las obras, la puesta en servicio, su conservación o mantenimiento y la supervisión de estos trabajos con fines de medición y pago".

264.- Toda vez que el concepto de trabajo es esencialmente un conjunto de operaciones y materiales, es evidente que el precio unitario que se pacte responde a esos costos. Así el Tribunal Arbitral dicta el laudo sin fundamentación al considerar que no existe base legal para alterar los precios unitarios. En otras palabras, si el conjunto de operaciones y materiales realmente aplicados al trabajo de tendido de tubería, correspondían a lo conceptualizado originalmente, corresponde entonces aplicar los precios unitarios del Contrato. Si dichas operaciones y materiales no corresponden a los originalmente pactados, estamos ante un concepto de trabajo distinto, y no procede la aplicación de los precios originales, sino integrar precios unitarios extraordinarios.

265.- Ya se ha establecido que el pago de trabajos relativo a obras públicas, realizado por PEP, constituye la aplicación y el manejo de recursos catalogados dentro del

171

gasto público basados en el artículo 1 de la Ley de Adquisiciones y Obras Públicas, artículos 1 y 2 de la Ley de Presupuesto, Contabilidad y Gasto Público Federal, y artículo 39 de su Reglamento, por lo que es una cuestión de orden público de conformidad con los artículos 126 y 134 de la Constitución Política Federal.

266.- En consecuencia, las condiciones y requisitos de pago de obligaciones contraídas en virtud o relacionadas con contratos de obras públicas, al ser con cargo a recursos federales, están sujetos a disposiciones jurídicas de orden público pertenecientes al derecho público, y no al mercantil.

267.- Así, podemos citar entre las disposiciones jurídicas de orden público, los artículos 44 fracción I del Reglamento de la Ley Federal de Presupuesto, Contabilidad y Gasto Público Federal, y 66, fracción I, del Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria, que respectivamente disponen lo siguiente:

> "*Artículo 44.- Las entidades deberán cuidar bajo su responsabilidad, que los pagos que se efectúen con cargo a sus presupuestos aprobados se realicen con sujeción a los siguientes requisitos:*
> *I. **Que correspondan a compromisos efectivamente devengados**, con excepción de los anticipos previstos en los ordenamientos legales y los mencionados ; ....... ".*

> "*Artículo 66. Los pagos con cargo al Presupuesto de Egresos se realizarán por las*

172

*dependencias a través de la Tesorería. Los pagos que realicen las entidades se efectuarán por conducto de sus propias tesorerías, llevando los registros presupuestarios correspondientes en sus respectivos flujos de efectivo.*
*Las dependencias, en el ejercicio de sus erogaciones, adicionalmente deberán:*
*I.    **Que corresponda a compromisos efectivamente devengados**, con excepción de los anticipos previstos en las disposiciones aplicable; ........ ".*

Como ya lo expresamos anteriormente, en el presente caso, el "compromiso" que da causa para el pago no fue efectivamente devengado, es decir, no se realizó el concepto de trabajo contratado, por lo que su pago es nulo y la orden de pago infringe disposiciones de derecho mexicano de orden público.

268.- De igual manera podemos señalar que COMMISA no formalizó esta reclamación como controversia técnica, y al igual que lo hemos explicado anteriormente, la falta de formalización de los eventos de obstrucciones como controversias técnicas se demuestra con la multicitada Acta de Recepción Física de los trabajos de fecha 30 de agosto de 2002, en la cual se manifiesta  en la página 17 que estos reclamos estaban en elaboración apenas.

## V. Gastos Financieros.

**Primero**

173

269.- El Tribunal Arbitral no fundamentó los supuestos y requisitos legales necesarios para condenar a PEP al pago de gastos financieros, mismos que son de orden público mexicano. Por otro lado, COMMISA no acreditó en el procedimiento arbitral que hubiere dado cumplimiento al procedimiento pactado para el pago establecido en el contrato. Como dijimos, dicho procedimiento de pago es de orden público, al tratarse de recursos presupuestados por el gobierno federal. Es decir, al tratarse de recursos cuya erogación o gasto o ejercicio o aplicación están regulados por normas constitucionales y tienen como propósito la consecución del interés público y no el interés particular.

Es decir, si COMMISA no estimó los trabajos oportunamente, no tiene derecho a reclamar gastos financieros porque incumplió normas de orden público que hacían imposible ejercer tal facultad. Este pacto contractual, que reproduce disposición de ley, es de interpretación estricta, puesto que no puede disponerse de recursos pertenecientes al gasto público por analogía, mayoría de razón, o por un simple principio de derecho comercial como el invocado por el Tribunal arbitral

270.- El Tribunal Arbitral consideró (párrafos 734[24] y 735[25] del Laudo Final) que de la interpretación conjunta de las

---

[24] "734. En cuanto a los intereses devengados por las cantidades adeudadas, esta cuestión está regulada en la cláusula 3.8.6 del Contrato, que ordena que "en caso de retraso en el pago de estimaciones y de ajustes de costos PEP, a solicitud del Contratista, pagará gastos financieros conforme a una tasa que será igual a la establecida en la Ley de Ingresos de la Federación en los casos de prórroga para el pago

174

Cláusulas 3.8.6 y 3.8.8 del Contrato, era procedente el pago del gasto financiero conforme a los requisitos siguientes:

i)   El pago de gastos financieros procede por retraso en el pago de estimaciones.

ii)  Existe retraso en el pago de estimaciones cuando no se paga en 30 días siguientes a la presentación de la estimación al supervisor.

iii) Dicho pago procede a solicitud del Contratista

iv)  Que no exista una legítima causa para que PEP pueda rehusar el pago.

**Uno.**

271.- Dentro del primer punto, podemos señalar que el Tribunal Arbitral fue completamente incongruente en sus consideraciones, si tomamos en cuenta que la estimación es el acto mediante el cual se determina el volumen o cantidad de los trabajos realmente ejecutados, y se valoran los mismos, aplicando los precios unitarios pactados por unidad de medida, a dichas cantidades de trabajo. La estimación también es el documento donde consta dicha valoración, Así las cosas, la estimación de una obra es un acto formal.

---

de créditos fiscales", añadiendo la cláusula 3.8.8 que, por excepción, no se generan gastos financieros cuando PEP legítimamente suspenda el pago de estimaciones".

[25] "735. Del juego de las cláusulas 3.8.6 y 3.8.8 del Contrato, resultan las siguientes conclusiones:
-- el primer requisito para que se devenguen gastos financieros es que se haya producido un retraso en **el pago de estimaciones y de ajustes de costos**. Retraso implica que las cantidades debidas no hayan sido pagadas en plazo. Y el plazo de pago viene determinado en la cláusula 3.8.2: 30 días después de la presentación de la estimación correspondiente.
-- en cuanto al comienzo del devengo, la cláusula 3.8.6 se limita a señalar que la tasa LFI se devengará en caso de "retraso", es decir, "desde que se venció el plazo" para pagarlas. Y el plazo para el pago es de 30 días, a contar desde la fecha de la estimación correspondiente (cláusula 3.8.2). Los gastos financieros dejarán de devengarse en la fecha en que se produzca el pago en efectivo."

175

272.- La estimación se define en la Regla 5.2.6 de las Reglas Generales para la Contratación y Ejecución de Obra Pública, aplicable al caso que nos ocupa, como la *"Valuación de los trabajos ejecutados en determinado período aplicando los precios unitarios de los conceptos de trabajo pactados durante dicho período o el porcentaje de precio alzado pactado correspondiente al avance de cada unidad de obra o de la obra. Por extensión el documento en el que se consignan las valuaciones antes mencionadas, para efectos de pago"*.

273.- En cambio, el efecto jurídico del "Acta de Recepción Física Total de los Trabajos" es la de: i) verificar por parte de la dependencia o entidad (PEP), que los trabajos estén debidamente concluidos dentro del plazo pactado en el contrato; ii) una vez constatado lo anterior, proceder a su recepción; iii) determinar la fecha a partir de cuándo la contratista responde por vicios ocultos o cualquier defecto de la obra. Lo anterior en términos de los artículos 74, 75 de la Ley de Adquisiciones y Obras Públicas, y 49 del Reglamento de la Ley de Obras Públicas, y la cláusula 9.2.6 del contrato.

274.- Sin embargo, el Tribunal Arbitral, a pesar de que se obligó a aplicar normas federales mexicanas al caso, no consideró estas disposiciones normativas al decidir la cuestión, porque no atendió la primera premisa establecida



por él mismo, lo que es notoriamente incongruente, y origina que el laudo se encuentre en contradicción consigo mismo. Esto es, lo primero que el Tribunal debió establecer es la definición de estimación y si ésta fue elaborada y presentada al supervisor, lo cual nunca hizo el Tribunal Arbitral. Además, el Tribunal Arbitral consideró el tema de una manera muy distinta a la originalmente establecida por el mismo:

275.- En el párrafo 743[26] del laudo arbitral, el Tribunal Arbitral consideró que en el Contrato se había pactado que el pago sería procedente una vez que se concluyera cada parte de la obra, conforme fue seccionada convencionalmente, concluyendo con base en esa argumentación, que una vez concluida la obra y entregada procedería el pago de todos los trabajos de la obra. De esa manera determina indebidamente que PEP está en mora a partir de la terminación de los trabajos, y la recepción de la obra por parte de PEP, soslayando que las cláusulas contractuales sobre el pago, exigen la estimación del trabajo previamente a su pago; y soslayando la propia premisa inicial plasmada por el Tribunal que había considerado el plazo de pago contado a partir de la presentación de la estimación, y no de la terminación de los trabajos.

---

[26] "El Contrato está basado sobre el principio de que el Contratista debía ir cumpliendo con la obra encomendada, y que sería remunerada por PEP en un plazo de 30 días desde la finalización del trabajo – así se desprende de su cláusula 3.8. …".

177

276.- Estas cláusulas contractuales en juego (3.8.6 y 3.8.8) reproducen lo dispuesto por el primer párrafo del artículo 69 de la LAOP, que claramente exige el requisito de una estimación no pagada para la procedencia del pago de gastos financieros, y no el supuesto de la entrega de la obra y su recepción, al señalar:

> *"Artículo 69.- En caso de incumplimiento en los pagos de estimaciones y de ajustes de costos, la dependencia o entidad, a solicitud del contratista, deberá pagar gastos financieros conforme a una tasa que será igual a la establecida por la Ley de Ingresos de la Federación en los casos de prórroga para el pago de créditos fiscales. Dichos gastos se calcularán sobre las cantidades no pagadas y se computarán por días calendario desde que se venció el plazo, hasta la fecha en que se pongan efectivamente las cantidades a disposición del contratista ... ".*

277.- Por otro lado, los principios de la mora, desde el punto de vista mercantil (utilidad, reciprocidad), no son aplicables a los contratos de obra pública, por lo que en consecuencia la realización y presentación de la estimación es un requisito indispensable para la condenación al pago de gastos financieros, por lo que al no existir dichas estimaciones, es improcedente pagar las obras, y pagar los gastos financieros correspondientes, con mayor razón.

278.- En su artículo 70 fracción I, el Reglamento de la Ley de Presupuesto, Contabilidad y Gasto Público Federal, vigente durante la vigencia del contrato de obra pública y su

ejecución, establece que en los contratos de obra pública no pueden pactarse penas convencionales ni intereses moratorios a cargo de los organismos públicos, y establece:

> "*Artículo 70.- Para los pedidos y contratos a que se refiere el artículo anterior tengan carácter de documentos justificantes, deberán sujetarse a lo siguiente:*
> *I. **En ningún caso se aceptará la estipulación de penas convencionales ni intereses moratorios a cargo de las entidades: ...**"*

Con esto queda demostrado que dicho laudo es incongruente e infundado, porque no define ni considera los supuestos de la norma, sino manifiestamente supuestos distintos, a pesar de que ostensiblemente ha citado las cláusulas contractuales del caso.

Por esta razón es procedente declarar la nulidad del laudo. -

**Dos.**

279.- En cuanto a la segunda premisa establecida por el juzgador para el pago de gastos financieros, es decir, la fecha a partir de cuándo comenzarían a correr los gastos financieros, dicha fecha la establece el Tribunal al día siguiente del 29 de septiembre del 2002.

280.- El juzgador considera que el pago debe hacerse 30 días después de la recepción física total de los trabajos

(párrafo 743[27] del laudo final), porque considera que a partir de ese momento PEP se enriquece, al recibir y utilizar los bienes u obras contratados, sin haberlos pagado, y que COMMISA se empobrece al no recibir el precio (párrafo 743 del laudo final, ya transcrito). En consecuencia, el Tribunal determina (párrafo 743 del laudo final) que si la recepción física total de los trabajos se produjo el 30 de agosto de 2002, a partir de esa fecha se cuentan 30 días que tenía PEP para pagar dichos trabajos, venciéndose el 29 de septiembre de 2002[28]. En consecuencia, a partir del día siguiente se calculan los intereses, de acuerdo con el Tribunal Arbitral.

281.- Vale la pena subrayar que las consideraciones del juzgador son infundadas, porque la obligación de pago no nace a partir de la recepción de la obra sino a partir de la estimación, porque el contrato es a precios unitarios y NO a precio alzado. Es decir, en los contratos de obra a precio alzado[29], la cantidad a pagar se determina aplicando los precios unitarios pactados a las cantidades de trabajo

___

[27] " ...Constituye un hecho probado que el 30 de agosto de 2002 la Contratista entregó a PEP la totalidad de la obra, otorgando ambas partes el Acta de Recepción Física Total. De una interpretación conjunta de las cláusulas 3.8.2 y 9.2.6 del Contrato resulta, en opinión del Tribunal, que PEP tenía la obligación de pagarle a Commisa todas las cantidades debidas por la construcción de la obra, a más tardar 30 días después de su entrega, es decir, el 29 de septiembre de 2002. Esta es una interpretación resulta de un análisis sistemático del Contrato, y además satisface de forma equitativa los intereses en juego" ... "Hasta el Acta de Recepción Física, PEP no había recibido la obra a su entera satisfacción y, por lo tanto, no podía haber surgido la obligación recíproca de satisfacer íntegramente el precio. A partir del otorgamiento del Acta de Recepción Física Total, se rompe el sinalagma entre las partes: el patrimonio de la Demandada se enriquece, pues disfruta a su entera satisfacción de la obra sin haberla pagado en su integridad, mientras que el Contratista sufre un empobrecimiento, pues ha entregado su prestación, sin haber recibido el precio. **Para restablecer el sinalagma, las cantidades impagadas por PEP, se deben incrementar con el devengo, a partir del 29 de septiembre de 2002, de un interés moratorio, calculado al tipo convenido en el propio Contrato.**"
[28] Una violación al fondo del asunto es que el Tribunal Arbitral empieza a contar el término desde el mismo día de la fecha del Acta de Recepción Física Total" de los trabajos, y no a partir del día siguiente.
[29] En los contratos de obra a precio alzado el pago está determinado por el resultado: terminada la obra, el Contratista recibe el pago.

<u>Exhibit A</u>

Part 5 of  7

realmente ejecutados, de conformidad con el artículo 57 fracción I de la LAOP, y cláusulas 3.3, 3.4, y 3.8 del Contrato.. "... *en este caso el precio no se fija por la totalidad de la obra, sino por cada parte, tomándose como parámetro una unidad o medida*" (Humberto Podetti. Contrato de Construcción. Editorial Astrea. Página 244).

282.- Esta argumentación tiene relación con las definiciones normativas de "Concepto de Trabajo", "Unidad de Medida", y "Precio Unitario", relacionadas en el capítulo correspondiente a "Otras Controversias", apartado 2, respecto a la reclamación por las diferencias de tarifas de espera por trabajos en plataformas, mismas que solicitamos se tengan aquí por reproducidas, como si se hiciesen al pie de la letra, por economía procesal.

383.- Por otro lado, no es el Supervisor o el Residente de Obra el que va a pagar la estimación. Estas figuras contractuales únicamente reciben la estimación, y la aprueban en caso de estar debidamente justificado el volumen de trabajo y las cantidades que en el mismo se consignan. En este punto se equivoca el Tribunal Arbitral, porque la función del Supervisor no es pagar estimaciones, y no puede disponer del presupuesto de PEP, y si hipotética y materialmente pudiere hacerlo, estaría incumpliendo con sus deberes impuestos por el artículo 8, fracciones I y IV, de la Ley de Responsabilidades Administrativas de los Servidores

Públicos, y se haría acreedor a las sanciones del caso. En otro sentido, sería un acto ilícito; hay una imposibilidad jurídica de que el Supervisor pague reclamaciones. El Tribunal no alcanzó a comprender el momento oportuno para el pago de estimaciones.

384.- Los pagos de PEP no pueden realizarse por ninguna otra dependencia que no sea la ventanilla única de pagos de PEP (artículo 11 de la Ley Federal de las Entidades Paraestatales), de la misma manera, que los pagos de la administración pública federal, únicamente pueden realizarse a través de la Tesorería de la Federación, de conformidad con el artículo 39 del Servicio Público de la Tesorería de la Federación.

385.- En el párrafo 746[30] del Laudo Final, el Tribunal Arbitral consideró que la presentación de la estimación y su factura en la ventanilla única de pagos de PEP, como causa que detona el plazo para el pago de trabajos, sólo es una cláusula operativa durante la vigencia del contrato, y no es aplicable una vez que el contrato ha terminado; alegando adicionalmente que para condenar al pago de gastos

---

[30] "746. El primer argumento esgrimido por PEP consiste en que Commisa debería haber presentado la factura y la documentación soporte en la ventanilla única de PEP, sita en Ciudad del Carmen, Campeche, tal como prevé la cláusula 3.8.3 del Contrato. El argumento no convence". El procedimiento de pago a través de la ventanilla única está previsto para los pagos durante la ejecución de la obra, no a los pagos exigidos a través de un arbitraje, años después de haberse finalizado la obra. Pero es más: de acuerdo con la cláusula 3.8.6, reguladora del incumplimiento en el pago, los intereses moratorios deben ser pagados "en caso de retraso en los pagos de estimaciones y ajustes de costos de PEP, a solicitud del Contratista". La cláusula únicamente exige que se haya producido "un retraso en los pagos" y que Commisa haya solicitado el pago de intereses moratorios, pero no que Commisa haya presentado algún tipo de documentación en la ventanilla única de Ciudad del Carmen. Dado que los dos requisitos exigidos por la cláusula 3.8.6 se han cumplido, el Tribunal Arbitral no alberga duda alguna de que han de devengarse gastos financieros".

financieros basta acreditar el retraso en el pago y la solicitud del contratista, y no que se haya presentado documentación alguna a la ventanilla única.

386.- Es infundada esta argumentación del Tribunal Arbitral. PEP jamás ha dicho que para la procedencia del pago de gastos financieros COMMISA tenía que haber solicitado su pago por escrito a la ventanilla única. Lo que PEP ha alegado desde el inicio, es que PEP no ha incumplido con ninguna obligación de pago, porque para ello COMMISA tenía que constituir dicha obligación de pago de dinero, en los términos del Contrato y la LAOP.

387.- En este caso, el Tribunal Arbitral infringe el sistema del control del gasto público contenido en el presupuesto de egresos de la federación, que concentra en una sola dependencia dichos pagos con cargo a recursos federales. Si el pago se concentra en una sola dependencia, lo que en el caso de PEP es la ventanilla única, cuando se habla de retrasos en el pago se tiene que entender como retrasos de la ventanilla única, El sistema de asignación de funciones y responsabilidades de la administración pública, impide resolver la  situación de una manera eminentemente de derecho privado.

388.- En ese sentido, la disposición contractual relativa al procedimiento de pago, contenida en las cláusulas 3.8.1,

primer párrafo, parte final, y 3.8.4, es obligatoria para las partes (además de que en el contrato no hay ninguna limitación al respecto) durante la vigencia y después de la vigencia del contrato, por una norma imperativa relativa a la erogación de recursos federales. Esto es, el Contratista (él personalmente) debe presentar su estimación a la ventanilla única, y si ésta no paga en 30 días, entonces, y sólo en ese evento, se causará gasto financiero.

389.- Esto es, COMMISA tenía que conseguir la autorización de las estimaciones, es decir, la conformidad del Supervisor del Contrato, con la valuación hecha por el Contrista de los trabajos ejecutados. Para eso, primero tenía que elaborar sus estimaciones. Esto nos lleva a otro punto de nulidad de la decisión, que es la parcialidad del juzgador para presumir que las reclamaciones de COMMISA tenían sustento, y que PEP tenía que pagarlas antes que cualquier otra consideración, véase el párrafo 749[31] del laudo final, en la cual el Tribunal considera que "le bastaría a PEP manifestar su inconformidad con la liquidación para no pagar gastos financieros". Es decir, presume la buena fe del contratista y la mala fe de PEP, sin justificación, lo que es claro signo de parcialidad a favor de COMMISA y en contra de PEP.

---

[31] " ... Entender lo contrario sería lo mismo que dejar el pago de los gastos financieros al libre arbitrio de PEP, que con solo discrepar de las cuantías reclamadas, podrá evadir su obligación de pagar intereses moratorios. Una interpretación del Contrato en erste sentido no podría nunca ser acogida, por violar el principio imperativo impuesto por el artículo 1797 C. c. : *"La validez y el cumplimiento de los contratos no puede dejarse al arbitrio de uno de los contratantes"*.

184

390.- Este criterio del Tribunal Arbitral infringe también las disposiciones presupuestarias que indican que la administración pública no puede hacer pagos con cargo al erario federal, sin antes cerciorarse que efectivamente sea un costo incurrido (artículo 44 del Reglamento de la Ley de Presupuesto, Contabilidad y Gasto Público Federal, y artículo 66 del Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria), y en el caso eso no sucede sino hasta la presentación de la estimación. Por tal razón, no puede correr ningún plazo para el pago, ni actualizarse la obligación de gastos financieros en beneficio de COMMISA.

391.- Vale la pena referirnos a la disgregación argumentativa del Tribunal Arbitral, contenida en el párrafo 744[32] y 748[33] del Laudo Arbitral, que señala que el "Acta de Recepción Física Total de los Trabajos", hace las veces de interpelación para el cobro, lo cual también es inconsistente con las disposiciones y alegaciones antes expuestas. El "Acta de Recepción Física Total de los Trabajos", no es un documento que se pueda considerar como una interpelación de pago, no solamente por los efectos jurídicos que tiene su

---

[32] "744. La anterior conclusión se ve reforzada por el tenor del artículo 2080 C.c., según el cual "si no se ha fijado el tiempo en que deba hacerse el pago y se trata de obligaciones de dar, no podrá el acreedor exigirlo sino después de los treinta días siguientes a la interpelación que se haga, ya judicialmente, ya en la extrajudicial, ante un notario o ante dos testigos. Es decir: aun si se interpretara que el Contrato no tiene un tiempo fijado para que PEP hiciera el pago final, de acuerdo con el C .c. éste debería haberse hecho en un plazo de 30 días desde la interpelación extrajudicial. Interpelación que se produjo a través a través del Acta de Recepción Física Total, en la que Commisa planteó sus reclamaciones y de la que PEP, al recibir y firmar el documento, se dio por enterada."

[33] "748. En cuanto al primero de estos argumentos, el tenor literal de la cláusula 3.8.6 del Contrato no existe ningún tipo de interpelación o intimación para que comience el devengo de intereses, sino simplemente que el Contratista los solicite, como ha ocurrido en el presente arbitraje. Pero es más: aún si se exigiera, al amparo del artículo 2050 C.c., que Commisa hubiera planteado una interpelación a PEP, para que los intereses comenzaran a devengarse, esto habría ocurrido a través del Acta de Recepción Física Total, en la que la Demandante planteó sus reclamaciones, dándose el deudor por enterado de su existencia".

expedición, como ya se expuso supra, sino principalmente porque COMMISA tiene que presentar posteriormente a dicha acta (y acto), su estimación final en los términos de la regla 5.2.7[34] de las Reglas Generales para la Contratación y Ejecución de la Obra Pública.

392.- Sin liquidación de los trabajos (cantidad líquida) no puede surtir efectos una interpelación. La interpelación al cobro se produce, una vez que COMMISA presente su estimación debidamente autorizada, junto con su factura, a la ventanilla única de PEP, y si no se ha producido el cobro, no puede correr el plazo para pagar en contra de PEP, y si no existe retraso, no hay causación de gasto financiero.

**Tres.**

393.- En cuanto a que dicho pago procede a solicitud del Contratista, esto es cierto, siempre y cuando PEP se haya negado a autorizar injustificadamente una estimación, o la ventanilla única de pagos no haya hecho el pago correspondiente en treinta días. El hecho de que COMMISA haya solicitado el pago de gastos financieros, sólo porque terminó y entrego sus trabajos, y transcurrieron treinta días, no se ajusta a la normatividad de orden público, antes citada.

---

[34] "5.2.7 Liquidación. Estimación final en la cual se ajusta el pago total de los trabajos ejecutados en los términos del contrato".

186

394.- El procedimiento de pago estipulado en el contrato era a grandes rasgos que el contratista debía elaborar sus estimaciones; luego presentar las estimaciones (con toda la documentación que soporte la valuación) al supervisor de obra para que las aprobara; una vez aprobada, si la cantidad correspondía a los trabajos realmente ejecutados con la calidad y en la cantidad exigida por el contrato, el Contratista debía presentarla, junto con su factura, a la ventanilla única de PEP. Ni COMMISA probó haber cumplido este procedimiento, ni el tribunal arbitral se lo exigió.

395.- Para pronta referencia y a efecto de facilitar la tarea de Su Señoría, transcribimos a continuación el contenido de las citadas cláusulas 3.8.1, 3.8.2, 3.8.6 y 3.8.8 del Contrato No. PEP-O-IT-136/98.

> *"3.8 Forma de Pago. Los trabajos objeto del presente Contrato se pagarán mediante la formulación de estimaciones que abarcarán periodos de un mes calendario; estas estimaciones serán presentadas por el Contratista al Supervisor, acompañadas de la documentación que acredite la procedencia de su pago dentro de los 4 (cuatro) días hábiles siguientes a la fecha de corte, la que será el día último de cada mes; si las estimaciones no son presentadas en el término antes señalado, los conceptos correspondientes se incorporarán en la siguiente estimación.*
>
> *3.8.1 Revisión, Aprobación y Autorización de Estimaciones. El supervisor, dentro de los 8 (ocho) días naturales siguientes a la fecha en que hubiere recibido las estimaciones, revisará*

187

*y, en su caso emitirá recomendación de pago de las estimaciones, turnándolas al representante autorizado de la Dirección del Proyecto Cantarell, quien, dentro de un plazo de 2 (dos) días naturales, autorizará el pago correspondiente, al Contratista para que éste las presente, junto con la factura correspondiente, en la Ventanilla Única de PEP, y éste inicie su trámite de pago.*

*En el supuesto de que durante la revisión de las estimaciones surjan diferencias técnicas o numéricas, el Supervisor lo notificará de inmediato al Contratista para que, de ser posible, dichas diferencias queden conciliadas y, en su caso, aprobada la estimación correspondiente por el Supervisor, dentro de los 8 (ocho) días señalados para la revisión de las estimaciones.*

*De no ser posible conciliar todas las diferencias de modo que la estimación sea aprobada dentro del plazo indicado, las pendientes deberán resolverse e incorporarse en la siguiente estimación.*

*Las estimaciones y la liquidación aunque hayan sido pagadas no se considerarán como aceptación de los Trabajos, ya que PEP se reserva expresamente el derecho de reclamar por trabajos faltantes o mal ejecutados o por pago de lo indebido.*

*En el evento que el Contratista sea declarado en quiebra o haga una asignación general a beneficio de acreedores, o si un síndico o un interventor es nombrado a cuenta de la insolvencia del Contratista, o si se rescinde este Contrato parcial o totalmente, salvo que las leyes aplicables indiquen lo contrario, la propiedad de todo el equipo y los materiales que el Contratista hubiere traspasado a PEP en concordancia con la Cláusula 16.4, no serán parte del patrimonio del Contratista.*

*Si el Contratista estuviese inconforme con las estimaciones o con la liquidación de dichas*

188

estimaciones, tendrá un plazo de 30 (treinta) días naturales, a partir de la fecha en que se haya autorizado la estimación o su liquidación, según sea el caso, para hacer por escrito la reclamación. Si transcurrido este plazo el Contratista no efectúa la reclamación, se considerará que la estimación o liquidación quedó definitivamente aceptada por él y sin derecho a posterior reclamación.

3.8.2 Plazo para el Pago de Estimaciones. El pago correspondiente se efectuará a los 30 (treinta) días naturales siguientes a la fecha en que el Contratista presente al Supervisor de PEP las estimaciones correspondientes.

A solicitud del Contratista, el pago de los ajustes de costos que resulten de la aplicación de la Cláusula 3.7, se realizará a los 30 (treinta) días naturales siguientes a la fecha en que PEP resuelva por escrito el aumento o reducción, mediante las estimaciones mencionadas en esta Cláusula, que contendrán, en su caso, tanto los pagos por Trabajos ejecutados como su correspondiente ajuste y en caso de no incluirse en la misma estimación, se contemplará en la subsecuente con la aclaración respectiva.

Cuando la fecha de vencimiento de acuerdo con las condiciones de pago sea día inhábil bancario en la plaza de pago, se aplicará el siguiente criterio:

| Vencimiento día inhábil | | Pago |
|---|---|---|
| Domingo (lunes) | Día | posterior |
| Sábado (viernes) | Día | anterior |
| Lunes a jueves posterior | Día | |
| Viernes (jueves) | Día | anterior |

3.8.6 Incumplimiento en el Plazo de Pago de Estimaciones. En caso de retraso en los pagos

189

*de estimaciones y de ajustes de costos de PEP, a solicitud del Contratista, pagará gastos financieros conforme a una tasa que será igual a la establecida en la Ley de Ingresos de la Federación en los casos de prórroga para el pago de créditos fiscales. Dichos gastos se calcularán sobre las cantidades no pagadas y se computarán por días calendario desde que se venció el plazo, hasta la fecha en que se pongan efectivamente las cantidades a disposición de PEP.*

*3.8.8 Facultad de Suspensión de Pagos. Queda expresamente pactado por las partes que PEP podrá suspender el pago de estimaciones por Trabajos ejecutados que hayan sido presentadas o que se presenten para su cobro, reteniendo los montos correspondientes, sin que dicha suspensión genere el pago de gastos financieros y siendo bajo la responsabilidad y costo del Contratista cualquier situación de la que PEP pudiera resultar responsable si permanece sin pagar (ejem., retención no pagada e impuestos atrasados), en caso de que se presente alguno de los siguientes supuestos:*

I. *El incumplimiento por parte del Contratista en la presentación de la póliza de fianza de cumplimiento o de los endosos correspondientes, en los términos y dentro de los plazos señalados al efecto en las Cláusulas 7.1 y 7.1.3.*

II. *El incumplimiento por parte del Contratista en la presentación de las copias certificadas de las pólizas y/o certificados a que se refiere la cláusula 7.3.2, en los términos y dentro de los plazos estipulados en las Cláusulas 7.3.2 y 7.3.3.*

III. *Existan reclamaciones pendientes de resolver de PEP contra el Contratista;*

IV. *El Contratista esté en mora substancial en el cumplimiento de cualquiera de sus obligaciones contractuales, incluyendo, pero no limitadas a, el programa, la*



190

     *garantía de calidad y los requisitos de salud y seguridad;*

V.    *El Contratista no ha presentado el Programa de Trabajo en los términos y condiciones estipuladas en el numeral 3 (Programa de Trabajo) del Anexo "B-2".*

VI.    *Existan cantidades pendientes de pago por parte del Contratista y a favor de PEP, por concepto de pagos en exceso; o*

VII.    *Se determinen compensaciones a favor de PEP resultantes de otras transacciones."*

396.- La transcripción anteriormente hecha, determina el criterio infundado, erróneo e incorrecto del tribunal, formado a partir de una interpretación equivocada y parcial del contenido de las cláusulas del contrato celebrado entre PEP y COMMISA, pues sólo tomó en consideración para arribar a su determinación las cláusulas 3.8 (forma de pago), 3.8.2 (plazo para el pago de estimaciones) y la 9.2.6 (Acta de Recepción Total), ignorando y desdeñando por completo el contenido de la cláusula 3.8.1, referida a la Revisión, Aprobación y Autorización de Estimaciones, misma que establece en su primer párrafo, el que una vez autorizado el pago de las estimaciones correspondientes, estas se devolverían al contratista para que esta las presente, junto con la factura correspondiente, en la ventanilla única de PEP, y éste inicie el trámite de pago.

397.- De todas las argumentaciones expuestas anteriormente, y de las citas contractuales realizadas, se desprende claramente que la resolución del Tribunal Arbitral

no respetó el pacto contractual celebrado entre las partes, infringiendo el pacto de las partes en el sentido de que el arbitraje fuera resuelto con apego a estricto derecho[35], e infringiendo el artículo 17(2) del Reglamento de Arbitraje de la CCI, conforme al cual se desarrolló el arbitraje, que ordena claramente que al dictarse el laudo el Tribunal Arbitral deberá tomar en cuenta lo estipulado contractualmente.

### Cuatro.

398.- En cuanto a que no exista causa legítima para la suspensión del pago, el Tribunal Arbitral no desarrolla este requisito para la procedencia del gasto financiero. Es decir, en ninguna parte de la decisión argumenta, motiva o funda, que no existe ninguna causa de suspensión, no obstante mencionar, en el párrafo 735[36] del laudo final, que ha considerado relevantes de discernir las fracciones III y IV de la Cláusula 3.8.8 del Contrato. Esto por sí mismo vicia el laudo arbitral al ser una infracción notoria al debido proceso (por ausencia de motivación y congruencia), protegido en nuestro sistema jurídico por el artículo 16 de la Constitución, actuación que deja en indefensión a PEP. Esta decisión del Tribunal Arbitral, de igual manera, infringe el Reglamento de Arbitraje de la CCI, ordenamiento conforme al cual se

---

[35] El procedimiento de arbitraje es por naturaleza de estricto derecho, a menos que las partes acuerden expresamente que el tribunal arbitral actuará como amigable componedor o *ex aequo et bono*, según el artículo 17(3) del Reglamento de Arbitraje de la CCI.
[36] " ... el tercer requisito consiste en que PEP no tenga legítima causa para suspender el pago; la cláusula 3.8.8 enuncia siete causas de este tipo, siendo las dos únicas potencialmente relevantes para resolver la presente litis las (III) Y (IV) ; de acuerdo con la primera, PEP puede suspender el pago, sin devengarse intereses , si existen *reclamaciones pendientes de resolver de PEP contra el Contratista*"; la segunda amplía el ámbito de la suspensión a supuestos en los que "*el Contratista esté en mora substancial en el cumplimiento de las obligaciones contractuales*". .

desarrolló el proceso en el procedimiento arbitral, y que en su Artículo 25(2) ordena que el laudo deberá ser motivado, y el artículo 27, que indica que debe ser congruente, por lo que el laudo no se emitió conforme a las reglas pactadas por las partes para el arbitraje. Esta infracción al procedimiento, es de tal manera grave que por sí misma acarrea la nulidad del laudo.

399.- Sin embargo, se insiste que la principal causa para suspender el pago, es la falta de estimaciones (Regla 5.2.7 de las Reglas Generales para la Contratación y Ejecución de la Obra Pública, la cual contempla la estimación final del contrato). Esto es, para liquidar el contrato hace falta la elaboración de la estimación final, no la simple recepción de los trabajos. La Regla 5.2.7 establece:

> "5.2.7 Liquidación. Estimación final en la cual se ajusta el pago total de los trabajos ejecutados en los términos del contrato".

400.- Así las cosas, la excepción opuesta por PEP ante el tribunal arbitral, en el sentido de que las reclamaciones de COMMISA no estaban liquidadas era procedente, por lo que es ilegal e incorrecta la afirmación del Tribunal Arbitral manifestada en el párrafo 749[37] del Laudo Final de que la

---

[37] "749. Y en cuanto al argumento de la falta de liquidez, tampoco puede prosperar, pues la cláusula 3.8.6 del Contrato no exige que las cantidades sean líquidas para que, con respecto a ellas, se devenguen intereses moratorios. Basta con que la cuantía de las cantidades debidas se determine, tal como ocurre en este Laudo, para que devenguen intereses desde la fecha en que contractualmente debieron ser pagadas. Entender lo contrario sería lo mismo que dejar el pago de los gastos financieros al libre arbitrio de PEP, que con solo discrepar de las cuantías reclamadas, podría evadir su obligación de pagar intereses moratorios. Una interpretación del Contrato en este sentido no podría nunca ser acogida, por

Cláusula 3.8.6 del Contrato no exige que las cantidades sean líquidas para proceder al pago de gastos financieros. Además, el tribunal arbitral claramente sigue ignorando la definición de estimación, la cual evidentemente determina cantidades líquidas, al valuar los trabajos y es fundamental para dictar el laudo en relación a los gastos financieros.

401.- Es importante subrayar que el Supervisor de la Obra no cesa en sus funciones una vez terminada la obra, sino hasta que se extingan todos los derechos y obligaciones que resulten de la misma, es decir, hasta que se liquide el contrato mediante la estimación final.

402.- En efecto, con fecha 8 de abril de 2003, siete meses después de terminada la obra, por supuesto, de manera extemporánea y sin posibilidad de surtir efectos, COMMISA le solicitó al supervisor del Contrato, Ingeniero Alfredo Gómez Rangel que formalizara la Controversia Técnica relativa a malos tiempos (Documento COM/EP2800/2003-5556). Este documento era conocido por el Tribunal Arbitral, y negligentemente no fue tomado en cuenta en la decisión, tal como se acredita con la cita que hace del mismo el árbitro disidente Licenciado Darío Oscós Coria en su Voto Particular (página 4, párrafo 8), que corre agregado como parte del laudo arbitral.

---

violar el principio imperativo impuesto por el artículo 1797 C. c.: "La validez y el cumplimiento de los contratos no puede dejarse al arbitrio de uno de los contratantes".

403.- Por otro lado, ese mismo documento acredita, tomando en cuenta la conducta de las partes, que COMMISA aún no había formalizado Controversia Técnica alguna en esta materia al terminar el Contrato, y que su reclamación fue extemporánea, cuando no había posibilidad jurídica que PEP tomara en cuenta el fondo del asunto. Es decir, no había posibilidad de causar obligación alguna.

404.- En tal virtud, es infundada y constituye un contrasentido la actitud del Tribunal Arbitral al considerar que se formalizó la controversia técnica, aún en contra de la expresa manifestación de COMMISA, es decir, que en el Acta de Recepción había cantidades que se debían por ciertas controversias, cuando apenas el reclamo se encontraba en elaboración, y en algunos casos, como malos tiempos, ni siquiera había cuantificación. Es más, esto demuestra su parcialidad, porque supuestamente resuelve tomando en cuenta la conducta de PEP (Párrafo 118 del Laudo Final), pero no examina la conducta de COMMISA.

405.- Asimismo, esto refuerza la interpretación de PEP del "Acta de Recepción Física Total" de los Trabajos, en el sentido de que tampoco COMMISA formalizó su controversia técnica con respecto a las llamadas "controversias técnicas" 19, 27, 34 y 35.

195

406.- La elaboración de la estimación era requisito indispensable del Contrato, y las partes ajustaron su conducta a dicho requisito. Durante la vigencia del contrato celebrado con PEP, de acuerdo al "Acta de Recepción Física Total" del 30 de agosto de 2002 suscrita por PEP y COMMISA, ésta **presentó 52 estimaciones que fueron aprobadas y pagadas** por PEP, generando un total acumulado por obra ejecutada de $251'188,059.62 M.N. y 215'903,797.64 dólares de los Estados Unidos de América, y por concepto de ajustes de costos **presentó 4 estimaciones** por un total de $90'562,422.65 M.N., lo cual quedó asentado expresamente en la citada Acta en las páginas 14 y 15.

407.- Además, en la propia Acta de Recepción Física de los Trabajos, página 23, bajo el rubro de CONCEPTOS PENDIENTES DE PAGO, se estableció que la Contratista presentaría estimación para autorizar su pago previa conciliación. En consecuencia, la conducta de las partes ratifica la obligatoriedad del procedimiento de pago y de las estimaciones autorizadas y presentadas en ventanilla de pagos, aún después de terminado el contrato, por lo que el Tribunal Arbitral infringe nuevamente el Reglamento de Arbitraje de la CCI (artículo 17 (2)).

408.- De todo lo anteriormente expuesto, es claro que la acción por el pago de gastos financieros, no fue acreditada por COMMISA, ni desde el punto de vista del derecho público

196

ni desde el punto de vista del derecho privado, sin embargo y a pesar de ello, el tribunal arbitral dictó el laudo que atenta contra normas de orden público, por lo cual resulta nulo el laudo arbitral.

**Nulidad**

409.- Queda claro que los elementos determinados por el propio Tribunal Arbitral para declarar procedente el pago de gastos financieros no se han cumplido. Queda también de manifiesto que las conclusiones infundadas y equivocadas del Tribunal Arbitral obedecen al pretender resolver una controversia de naturaleza administrativa y de disposición de recursos públicos, a la luz de los principios y preceptos del derecho mercantil.

410.- Como se expuso en el capítulo correspondiente, el Tribunal Arbitral no aplicó las disposiciones pertinentes del caso. En ninguna parte hace referencia el Tribunal Arbitral a las disposiciones de orden público que regulan los pagos con cargo al presupuesto de las entidades de la administración pública.

411.- Por otro lado, el Tribunal Arbitral, que se obligó a dictar el laudo no en equidad, sino en estricto derecho, aplicando las leyes federales mexicanas, señala expresamente en su resolución que la misma **"además satisface de forma equitativa los intereses en juego"** (párrafo

743 del Laudo Final, ya transcrito), sin entender que los intereses en juego no son ambos privados, sino que hay una disputa entre un interés público y un interés privado, en el cual, la justicia conmutativa no es idónea para decidir el pleito (véanse los párrafos 739[38] y 740[39] del Laudo Final). También es evidente la parcialidad del Tribunal Arbitral en los supuestos señalados anteriormente: es decir, el Tribunal pondera como mejor derecho el beneficio del Contratista que el respeto irrestricto al contrato. **Es decir, el Tribunal permite que COMMISA se aproveche de su propio dolo, porque evidentemente no cumplió con el procedimiento de pago establecido contractualmente, lo cual constituye una violación al orden público internacional, porque ningún país permite que el cumplimiento de un contrato quede al arbitrio de uno de los contratantes. Aunque fuere cierta la consideración del Tribunal Arbitral (que no lo es), eximir a CQMMISA de cumplir con el contrato sólo porque ha sufrido un perjuicio, es completamente injustificado, y violenta el estricto derecho.**

---

[38] "739. Constituyen hechos probados que el 30 de agosto de 2002 ambas partes firmaron y otorgaron el Acta de Recepción Física Total, prevista en la cláusula 9.2.6 del Contrato, en la que se dejó constancia de la entrega de la obra al Propietario, y también de que el Contratista le reclamaba el pago de determinadas partidas. Desde entonces PEP viene utilizando a su satisfacción los sistemas de ductos que conforman el objeto del Contrato".

[39] "740.-El Tribunal Arbitral deja constancia de que PEP no ha alegado que la obra adolezca de ningún vicio, ni ha presentado reclamación alguna frente a Commisa basada en un incumplimiento de sus obligaciones dimanantes del Contrato. Desde el 30 de agosto de 2002 PEP viene disfrutando del uso y disfrute, pacífico y satisfactorio de la obra que Commisa le construyó y entregó. Sin embargo, el Contratista no ha cobrado una parte sustancial del precio debido, a pesar de haber transcurrido más de cinco años desde su entrega".

198

412.- En caso de diferencias técnicas, el Contrato establecía en su cláusula 23.2 la posibilidad de elevar la disputa a Controversia Técnica (dispute board), establecido además, como un requisito procedimental *sine qua non* para acudir al arbitraje.

413.- De conformidad con el Acta de Misión (Capítulo C, apartado (d), inciso 2 d), PEP expresamente solicitó la aplicación del artículo 126 de la Constitución Política Mexicana, de la Ley de Presupuesto, Contabilidad y Gasto Público Federal, del Reglamento de la Ley de Presupuesto, Contabilidad y Gasto Público Federal; de la Ley Federal de Responsabilidades de los Servidores Públicos; la Ley General de Bienes Nacionales; y de la Ley de Adquisiciones y Obras Públicas, entre otras, **ninguna de las cuales aplicó el tribunal arbitral**.

414.- Las leyes aplicables al fondo de la controversia, o leyes sustantivas de aplicación, lo eran las leyes federales mexicanas, de conformidad con el Capítulo H del Acta de Misión. Especialmente eran aplicables las leyes administrativas porque el contrato base de la acción es un contrato administrativo.

415.- El Contrato de Obra Pública es un Contrato Administrativo y no Civil. Así se refleja por estar celebrado por un organismo público descentralizado, como PEP; por estar

celebrado y regulado por la Ley de Adquisiciones y Obras Públicas, y por haber sido celebrado en interés público de conformidad con el segundo párrafo del artículo 134 de la Constitución.

416.- Los Contratos Administrativos no responden a las mismas reglas que los Contratos Civiles, por lo que no pueden interpretarse de la misma manera. Por ejemplo, ya ha quedado asentado en tesis de los tribunales federales, que los contratos administrativos establecen un régimen exorbitado de derechos, es decir, son en beneficio del Estado. De igual manera, la capacidad de contratación y el consentimiento del Estado para contratar, está regulado por un sinnúmero de disposiciones como la LAOP, la Ley Federal de Responsabilidad Administrativa para los Servidores Públicos, la Ley Federal de Presupuesto y Responsabilidad Hacendaria; la Ley Federal de Entidades Paraestatales; la ley del servicio de tesorería; entre otras, así como sus reglamentos, reglas administrativas, lineamientos, oficios y circulares expedidos por la administración pública. Así las cosas, pocas materias de un contrato de obra pública pueden ser negociadas por las partes, ni dispuesta por ellas.

417.- De igual manera, el Tribunal Arbitral no puede disponer de normas de orden público mexicano, es decir, no puede determinar de ninguna manera el tribunal arbitral que los pagos con cargo al erario federal se hagan por

200

dependencias distintas a las señaladas en la ley, como medida de control presupuestal, y tampoco alterar los procedimientos de pago de recursos federales, también establecidos en aras de una administración eficiente y honrada de los recursos federales, y menos con base en principios mercantilistas.

418.- Por otro lado, el interés privado de COMMISA, como el derecho a obtener una contraprestación por su trabajo, de ninguna manera puede prevalecer sobre el interés público de un manejo eficiente, eficaz y honrado, de los recursos públicos, principios rectores contenidos en el artículo 134 de la Constitución. Así, al tener su causa en un acto claramente ineficaz y carente de validez por parte del Tribunal Arbitral, la condena al pago de gastos financieros también rompe el sistema jurídico-constitucional de administración de los recursos federales.

419.- En ese entendido, la naturaleza mercantil del procedimiento de arbitraje, no le cambia al contrato base de la acción su naturaleza administrativa. Así las cosas, la interpretación y aplicación del contrato administrativo de obra pública bajo las reglas del derecho privado resulta inconsistente con la naturaleza del mismo y su objetivo. Por lo que, al no establecer correctamente el marco regulatorio del contrato de obra pública, el Tribunal Arbitral cometió el error

manifiesto de aplicar los principios del derecho mercantil a relaciones jurídicas de carácter administrativo.

**Segundo**

420.- El Laudo Final dictado asimismo es nulo en lo relativo a la condena realizada para el pago de gastos financieros (o intereses, tal cual los considera el Tribunal Arbitral) por contravenir normas de orden público mexicano, de conformidad con el artículo 1457 fracción II del Código de Comercio.

421.- En efecto, en el derecho mexicano se prohíbe la capitalización de intereses aún no devengados, bajo pena de nulidad, y de igual manera se prohíbe capitalizar los gastos financieros. En el caso de los intereses o gastos financieros devengados, para ello hace falta de manera indispensable el consenso de las partes, y sobre todo de la persona que los va a pagar. En este caso, la ley no suple ni puede suplir la voluntad de las partes, ni puede imponerse sobre ésta, y tampoco lo puede hacer el Tribunal, porque no fue un derecho puesto a su disposición, y que además es indisponible mientras no haya acuerdo. La autonomía de la voluntad es ilimitada en la materia.

422.- Los artículos que soportan estos argumentos son el artículo 2397 del Código Civil Federal y 363 del Código de Comercio, los que respectivamente indican lo siguiente:

202

> *"Artículo 2397. Las partes no pueden, bajo pena de nulidad, convenir de antemano que los intereses se capitalicen y que produzcan intereses".*

> *"ARTÍCULO 363. Los intereses vencidos y no pagados, no devengarán intereses. Los contratantes podrán, sin embargo, capitalizarlos".*

423.- Contrariamente a lo dispuesto por las disposiciones legales anteriormente transcritas, el Tribunal Arbitral resolvió que:

> *"Los gastos financieros se computarán **por días calendario y serán satisfechos en PME conjuntamente con el principal ...**"*

Esto se puede apreciar en los párrafos 750 y 780, páginas 174 y 180 del Laudo Arbitral, que señalan:

> *"750. En relación a este punto litigioso, el Tribunal Arbitral decide que:*
> *- --------------------------------------*
> *- los gastos financieros se computarán por días calendario y serán*
> *satisfechos conjuntamente con el principal de las cantidades adeudadas por PEP".*

> *"780. …….. . Los gastos financieros se computarán por días calendario y serán satisfechos conjuntamente con el principal de las cantidades adeudadas por PEP".*

424.- Así las cosas, el derecho de capitalizar los intereses, es una disputa fuera del acuerdo de Arbitraje, porque no existe ni puede haber una cláusula en ese sentido, porque las

disposiciones aplicables prohíben la acumulación del interés generado al capital, como base del cálculo de los intereses. Así el juzgador incurre también en la causal de nulidad contemplada en el artículo 1457 fracción I inciso c) del Código de Comercio, por exceder su mandato.

425.- Por otro lado, la pretensión del Tribunal Arbitral en el sentido de que los gastos financieros o intereses se computen de manera diaria, implica la capitalización diaria de las sumas generadas, lo que es un negocio prohibido por el derecho mexicano, y su establecimiento es contrario al orden público por contrariar precisamente una ley prohibitiva, cuya sanción es la nulidad del acto.

## VI. Examen de las Causales de Nulidad del Laudo.

426.- La solicitud de nulidad de laudo comercial arbitral está regida por la Convención sobre el Reconocimiento y Ejecución de las Sentencias Arbitrales Extranjeras del 10 de junio de 1958 (Convención de Nueva York), la Convención Interamericana sobre Arbitraje Comercial Internacional (Convención de Panamá), y el Código de Comercio en su Título Cuarto, Capítulo VII, que comprende los artículos 1457, 1458, 1459 y 1460; de conformidad con el artículo 133 de la Constitución Política Federal.

427.- La Convención sobre el Reconocimiento y Ejecución de las Sentencias Arbitrales Extranjeras del 10 de junio de 1958, ratificada por el Senado Mexicano en el año de 1971, conocida comúnmente como Convención de Nueva York, en su artículo primero dispone que dicha Convención se aplicará al reconocimiento y la ejecución de las sentencias arbitrales dictadas en el territorio de un estado distinto de aquel en el que se pide el reconocimiento y la ejecución de dichas sentencias, y que tengan su origen en diferencias entre personas naturales o jurídicas.

428.- La Convención de Nueva York, establece en su Artículo V, una serie de causas o motivos eficientes, para que un tribunal jurisdiccional nacional, le niegue a un laudo comercial arbitral su reconocimiento, y/o rehúse su ejecución. Estas causas o motivos eficientes, sirven también para, que en vía de acción, la parte afectada solicite la anulación del laudo arbitral comercial. Dichas causales son las siguientes:

> "Artículo V
> 1. Sólo se podrá denegar el reconocimiento y la ejecución de la sentencia, a instancia de la parte contra la cual es invocada, si esta prueba ante la autoridad competente del país en que se pide el reconocimiento y la ejecución:
> a) Que las partes en el acuerdo que se refiere el art. II estaban sujetas a alguna incapacidad en virtud de la ley que les es aplicable o que dicho acuerdo no es válido en virtud de la ley a que las partes se han sometido, o si nada hubiere indicado a este respecto, en virtud de la

205

*ley del Estado en que se haya dictado la sentencia; o*

*b) Que la parte contra la cual se invoca la sentencia arbitral no ha sido debidamente notificada de la designación del árbitro o del procedimiento de arbitraje o no haya podido por cualquier otra razón, hacer valer sus medios de defensa; o*

*c) Que la sentencia se refiera a una diferencia no prevista en el compromiso o no comprendida en las disposiciones de la cláusulas compromisoria, o contiene disposiciones que exceden los términos del compromiso o de la cláusula compromisoria; no obstante, si las disposiciones de la sentencia que se refieren a las cuestiones sometidas al arbitraje pueden separarse de las que no hayan sido sometidas al arbitraje, se podrá dar reconocimiento y ejecución a las primeras; o*

*d) Que la constitución del tribunal arbitral o el procedimiento arbitral no se han ajustado al acuerdo celebrado entre las partes o, en defecto de tal acuerdo, que la constitución del tribunal arbitral o el procedimiento arbitral no se han ajustado a la ley del Estado donde se haya efectuado el arbitraje; o*

*e) Que la sentencia no sea aún obligatoria para las partes o haya sido anulada o suspendida por una autoridad competente del Estado en que, conforme a cuya ley, haya sido dictada esa sentencia.*

*2. También se podrán denegar el reconocimiento y la ejecución de una sentencia arbitral si la autoridad competente del Estado en que se pide el reconocimiento y la ejecución comprueba:*

*a) Que, según la ley de este Estado, el objeto de la diferencia no es susceptible de solución por vía de arbitraje; o*

*b) Que el reconocimiento o la ejecución de la sentencia sean contrarios al orden público del mismo Estado".*

429.- La Convención Interamericana sobre Arbitraje Comercial Internacional (Convención de Panamá), contiene una disposición similar a la de la Convención de Nueva York, que contiene las causas o motivos suficientes para rehusar la ejecución de un laudo arbitral comercial, o solicitar su anulación, mismo que se transcribe a continuación:

> "Artículo 5
> 1. Sólo se podrá denegar el reconocimiento y la ejecución de la sentencia, a solicitud de la parte contra la cual es invocada, si ésta prueba ante la autoridad competente del Estado en que se pide el reconocimiento y la ejecución:
> a) Que las partes en el acuerdo estaban sujetas a alguna incapacidad en virtud de la ley que les es aplicable o que dicho acuerdo no es válido en virtud de la ley a que las partes se han sometido, o si nada hubiere indicado a este respecto, en virtud de la ley del Estado en que se haya dictado la sentencia; o
> b) Que la parte contra la cual se invoca la sentencia arbitral no haya sido debidamente notificada de la designación del árbitro o del procedimiento de arbitraje o no haya podido por cualquier otra razón, hacer valer sus medios de defensa; o
> c) Que la sentencia se refiera a una diferencia no prevista en el acuerdo de las partes de sometimiento al procedimiento arbitral; no obstante, si las disposiciones de la sentencia que se refieren a las cuestiones sometidas al arbitraje pueden separarse de las que no hayan sido sometidas al arbitraje, se podrá dar reconocimiento y ejecución a las primeras; o
> d) Que la constitución del tribunal arbitral o el procedimiento arbitral no se hayan ajustado al acuerdo celebrado entre las partes o, en defecto de tal acuerdo, que la constitución del tribunal arbitral o el procedimiento arbitral no se

207

*hayan ajustado a la ley del Estado donde se haya efectuado el arbitraje; o*

*e)  Que la sentencia no sea aún obligatoria para las partes o haya sido anulada o suspendida por una autoridad competente del Estado en que, conforme a cuya ley, haya sido dictada esa sentencia.*

2. *También se podrá denegar el reconocimiento y la ejecución de una sentencia arbitral si la autoridad competente del Estado en que se pide el reconocimiento y la ejecución comprueba:*

*a) Que, según la ley de este Estado, el objeto de la diferencia no es susceptible de solución por vía de arbitraje; o*

*b) Que el reconocimiento o la ejecución de la sentencia sean contrarios al orden público del mismo Estado".*

430.- El Artículo 1457 del Código de Comercio determina las causales por las cuales, las partes en el arbitraje, pueden solicitar la anulación de laudo arbitral comercial, las cuales son las siguientes:

*"ARTÍCULO 1457. Los laudos arbitrales sólo podrán ser anulados por el juez competente cuando.*

*I. La parte que intente la acción pruebe que:*

*a) Una de las partes en el acuerdo de arbitraje estaba afectada por alguna incapacidad, o que dicho acuerdo no es válido en virtud de la ley a que las partes lo han sometido, o si nada se hubiese indicado a ese respecto, en virtud de la legislación mexicana;*

*b) No fue debidamente notificada de la designación de un árbitro o de las actuaciones arbitrales, o no hubiere podido, por cualquier otra razón, hacer valer sus derechos;*

*c) El laudo se refiere a una controversia no prevista en el acuerdo de arbitraje o contiene decisiones que exceden los términos del acuerdo de arbitraje. No obstante, si las disposiciones del laudo que se refieren a las*

208

*cuestiones sometidas al arbitraje pueden separarse de las que no lo están, sólo se podrán anular estas últimas; o*

*d) La composición del tribunal arbitral o el procedimiento arbitral no se ajustaron en el acuerdo celebrado entre las partes, salvo que dicho acuerdo estuviera en conflicto con una disposición del presente título de la que las partes no pudieran apartarse o, a falta de dicho acuerdo, que no se ajustaron al presente título; o*

*II. El juez compruebe que, según la legislación mexicana, el objeto de la controversia no es susceptible de arbitraje, o que el laudo es contrario al orden público".*

431.- Como puede observarse, todos estos ordenamientos, son coincidentes en señalar las causas que impiden el reconocimiento o la ejecución del laudo arbitral comercial. Algunas de estas causas han sido invocadas por PEP para solicitar la nulidad del laudo, por lo que a continuación se hará el listado de las mismas, y su desarrollo dogmático, para demostrar claramente que los hechos y derecho invocado en el capítulo correspondiente, encuadran dentro de las mencionadas causales de nulidad, que son las siguientes.

432.- La imposibilidad de PEP de hacer valer sus derechos o medios de defensa en el Arbitraje (Falta de debido proceso), sancionado en el artículo V fracción 1 inciso b), de la Convención de Nueva York; artículo 5 fracción 1 inciso b), de la Convención de Panamá; y artículo 1457 fracción I inciso b) del Código de Comercio.

433.- Cuando la decisión no está prevista en el acuerdo de arbitraje excede los términos del arbitraje (plus petitio o extra petita) sancionado en el artículo V fracción 1 inciso c), de la Convención de Nueva York; artículo 5 fracción 1 inciso c), de la Convención de Panamá; y artículo 1457 fracción I inciso c) del Código de Comercio.

434.- Cuando el procedimiento es contrario al acuerdo arbitral (indebido procedimiento arbitral), sancionado en el artículo V fracción 1 inciso d), de la Convención de Nueva York; artículo 5 fracción 1 inciso d), de la Convención de Panamá; y artículo 1457 fracción I inciso d) del Código de Comercio.

Todas estas causales se invocan y proceden a petición de parte.

435. Cuando el laudo es contrario al orden público mexicano, sancionado en el artículo V fracción 2 inciso b), de la Convención de Nueva York; artículo 5 fracción 2 inciso b), de la Convención de Panamá; y artículo 1457 fracción II del Código de Comercio.

**Esta causal de nulidad exige que proceda de Oficio el examen por parte del tribunal jurisdiccional, y además permite el estudio por parte del Tribunal Arbitral del fondo del**

<u>asunto, del procedimiento y de las pruebas aportadas y</u> <u>desahogadas, si esto es necesario para demostrar la</u> <u>violación al orden público mexicano.</u>

436.- Lo señalado en el párrafo anterior es claro en el derecho internacional privado. La resolución 3 (c) adoptada por la Internacional Law Association en su Septuagésima Conferencia Verificada en Nueva Delhi, India del 2 al 6 de abril de 2002, en la cual se aprobaron una serie de recomendaciones a los tribunales de los Estados, elaboradas por su Comité de Arbitraje Internacional, tendientes a establecer Bases Generales, Principios Fundamentales, Reglas Generales sobre el **Concepto de Orden Público** y de lo que constituyen en este contexto las Obligaciones Internacionales (Dr. José Luis Siqueiros, *EL ORDEN PÚBLICO COMO MOTIVO PARA DENEGAR EL RECONOCIMIENTO Y LA EJECUCIÓN DE LAUDOS ARBITRALES INTERNACIONALES*, en la Revista Pauta No. 40, Página 21).

"*Recomendación 3 (c) Cuando la violación del orden público del foro se alegue por una de las partes y tal violación no pueda establecerse de una simple revisión del laudo y sólo pueda determinarse a través de un escrutinio de los antecedentes fácticos del caso, el tribunal podrá llevar a cabo un nuevo examen de los hechos*"

437.- Esta idea sobre el concepto de orden público fue

retomada en el Informe Final del Comité de Arbitraje Internacional de la Internacional Law Association, que fue presentado en la Conferencia de dicha Asociación, celebrada en Londres Inglaterra, en julio de 2002, donde se le dio su respaldo definitivo (Alvaro López de Argumedo Piñeiro y Marcos de Benito Llopis-Llombart, EL ORDEN PÚBLICO COMO CAUSA DE DENEGACIÓN DEL RECONOCIMIENTO DE UN LAUDO ARBITRAL EXTRANJERO: CRITERIOS PARA SU APLICACIÓN PRÁCTICA, en la Revista Actualidad Jurídica Uría y Menéndez, de noviembre de 2005, Página 120).

*"Recomendación 3 (c).- Cuando la supuesta infracción de una norma de orden público no resulte evidente de la mera lectura del fallo del laudo, el Tribunal del exequatur podrá entrar a examinar los hechos fundamentales fácticos y jurídicos del asunto"*.

438.- Otros estudiosos del arbitraje también toman esta idea, por ejemplo Francisco González de Cossío, que acepta la posibilidad de que el juez revise los hechos del caso de manera excepcional, si es necesario para determinar la violación al orden público (Francisco González de Cossío, EJECUCIÓN DE LAUDOS ARBITRABLES, en Manual de Arbitraje Comercial, Editorial Porrúa, Página 19).

**Uno.**

439.- El objetivo de declarar la nulidad cuando no se

212

permita a una persona hacer valer sus derechos o medios de defensa, es que las partes gocen de un mínimo de justicia e igualdad. El debido proceso es lo que en el ámbito del derecho constitucional mexicano se conoce como garantía de audiencia; garantía cuyo cumplimiento le da credibilidad a cualquier tipo de procedimiento y hace confianza en su resultado. Es innecesario decir que el debido proceso responde a un principio universal de justicia.

440.- En este caso se trata de establecer que PEP estuvo imposibilitado para hacer valer sus derechos; y esta imposibilidad resultó en una sentencia adversa a sus intereses. Esta causal se invocó a propósito de nuestros argumentos en contra de la decisión de la Controversia 34 y 35 (segunda), en la cual el Tribunal Arbitral concedió a COMMISA prestaciones que no eran reclamadas por esta. Recuérdese que se acreditó que el Tribunal Arbitral trajo de propia autoridad al pleito una cuestión ajena a la litis planteada y condenó a PEP a pagar una cantidad de dinero como compensación a COMMISA de los gastos no recuperables en los cuales supuestamente incurrió, cuando COMMISA solamente reclamó o el pago de tarifas de espera por suspensión a los trabajos o en su defecto, una indemnización por daños y perjuicios, justificando el Tribunal Arbitral su actuación mediante el ordenamiento de Diligencias para Mejor Proveer, que no le dieron a PEP la oportunidad de hacer valer sus derechos como ya se expuso.

Al respecto, nuestras más altas autoridades han establecido lo siguiente:

> **ÁRBITRO. SUS RESOLUCIONES SON ACTOS DE AUTORIDAD, Y SU EJECUCIÓN LE CORRESPONDE AL JUEZ DESIGNADO POR LAS PARTES**[40]. Para la ejecución de un laudo arbitral es preciso la mediación de un acto realizado por un órgano jurisdiccional que, sin quitarle la naturaleza privada, asume su contenido, de modo que el laudo es ejecutable por virtud del acto jurisdiccional, que sólo es el complemento necesario para ejecutar lo resuelto por el árbitro, ya que el laudo es una resolución dictada por el árbitro que dirime la controversia suscitada entre las partes, con calidad de cosa juzgada y constituye título que motiva ejecución, ante el Juez competente que debe prestar los medios procesales necesarios para que se concrete lo resuelto en el laudo. Por lo tanto, el laudo es una resolución que tiene los atributos de inimpugnabilidad, inmutabilidad y coercibilidad, sólo que la eficacia y realización concreta de lo condenado quedan siempre al Juez competente designado por las partes o el del lugar del juicio. El árbitro carece de la facultad de hacer cumplir, ante sí, el laudo que emitió, porque no tiene la potestad o imperium, que es uno de los atributos de la jurisdicción y que es inherente a los órganos jurisdiccionales del Estado. Ello implica que el árbitro carece de la fuerza del Estado para hacer efectiva la condena, pero el laudo en sí mismo no está despojado de los atributos de la cosa juzgada, puesto que la facultad de decidir la controversia es una delegación hecha por el Estado a través de la norma jurídica, y sólo se reserva la facultad de ejecutar. El Juez ante quien se pide la ejecución de un laudo dictado por un árbitro, para decretar el requerimiento

---

[40] No. Registro: 189,345. Tesis aislada. Materia(s): Civil. Novena Época. Instancia: Tribunales Colegiados de Circuito. Fuente: Semanario Judicial de la Federación y su Gaceta. XIV, Julio de 2001. Tesis: I.3o.C.231 C. Página: 1107.

214

de pago, únicamente debe y puede constatar la existencia del laudo, como una resolución que ha establecido una conducta concreta, inimpugnable e inmutable y que, por ende, **debe provenir de un procedimiento en el que se hayan respetado las formalidades esenciales del procedimiento,** y que no sea contrario a una materia de orden público.

TERCER TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.

Amparo directo 1303/2001. Constructora Aboumrad Amodio Berho, S.A. de C.V. 8 de marzo de 2001. Unanimidad de votos. Ponente: Neófito López Ramos. Secretaria: Lina Sharai González Juárez.

**Dos.**

441.- Cuando la decisión no está prevista en el acuerdo de arbitraje o excede los términos del acuerdo de arbitraje (plus petitio o extra petita), causa la nulidad del laudo, porque la controversia se refiera a controversias no incluidas en el acuerdo de arbitraje, es decir, cuando los temas de la litis del arbitraje, no son parte del acuerdo de arbitraje, para ser materia precisamente del Juicio de Arbitraje.

442.- De conformidad con la Cláusula 23.2 del Contrato, no podían ser materia del arbitraje aquellas disputas, reclamaciones o controversias que no hubieren sido formalizadas como controversias técnicas, y de igual manera aquellas compensaciones por daños legales que no estuvieran expresamente pactadas en el contrato.

443.- En ese tenor, quedó demostrado que en relación a las controversias técnicas 34 y 35 (cuarta), sobre retrasos

215

iniciales en trabajos con embarcaciones, controversia técnica 36 (tercera y cuarta), sobre compensación por malos tiempos, parcialmente con relación a la controversia técnica 19, relativa a obstrucciones, y a la controversia técnica 27, relativa a pago de diferencias, que éstas no fueron formalizadas precisamente como controversias técnicas, por lo que no podían ser materia del arbitraje. De igual manera, con relación a la controversia técnica 36 (primera), sobre compensación por malos tiempos, se demostró que el pago de malos tiempos no fue una prestación que PEP se comprometió a pagar por virtud del contrato, y por el contrario, se demostró que PEP no estaba obligada a ninguna compensación de eventos considerados como de caso fortuito o fuerza mayor, como las condiciones climáticas adversas.

**Tres.**

444.- Cuando el procedimiento es contrario al acuerdo arbitral (indebido procedimiento arbitral). En este tenor, hemos alegado y dado prueba de que el tribunal arbitral no decidió la controversia en estricto derecho, además de que el laudo es incongruente y contradictorio consigo mismo.

445.- El Tribunal Arbitral no respetó el estricto derecho. El procedimiento de arbitraje pactado por las partes, de conformidad con la cláusula 23.3 del contrato fueron las Reglas de Arbitraje de la Cámara Internacional de Comercio



216

que estuvieren en vigor al momento del arbitraje. De acuerdo con el artículo 17(3)  del Reglamento de Arbitraje de la CCI, el procedimiento de arbitraje es por naturaleza de estricto derecho, a menos que las partes acuerden expresamente que el tribunal arbitral actuara como amigable componedor o *ex aequo et bono*. En ninguna parte del acuerdo de arbitraje a que nos referimos o en el Acta de Misión se expresó que el Tribunal Arbitral actuaría como amigable componedor o que el mismo se resolvería en "equidad".

Además, en cuanto al fondo del asunto, éste debía resolverse de conformidad con las leyes federales mexicanas, de conformidad con el Capítulo H del Acta de Misión.

446.- Lo que se puede desprender de la lectura del laudo arbitral es que el Tribunal Arbitral privilegió un supuesto derecho o interés de COMMISA a ser compensado  por sus trabajos, sobre cualquier consideración contractual o de orden público. Al ser el laudo arbitral divisible, las cuestiones de nulidad se abordan controversia por controversia. Sin embargo, podemos claramente identificar un patrón de violación al principio de estricto derecho, que afecta todo el laudo.

447.- Existen múltiples ejemplos de violaciones al principio de estricto derecho en el laudo arbitral.



217

448.- En las cuestiones competenciales, al no observar la cláusula 23.3 del Contrato, que establece como requisito de arbitrabilidad de una disputa, el que se formalicen como controversia técnica.

449.- En las controversias técnicas 34 y 35 (primera, segunda, tercera y cuarta), sobre retrasos iniciales en trabajos con embarcaciones; controversia técnica 36 (primera, segunda, tercera y cuarta), sobre compensación por malos tiempos; controversias técnicas 37 y 39, relativas a cruces; controversia técnica 19, relativa a obstrucciones; controversia técnica 27, relativa a pagos de diferencias; y en la decisión sobre el pago de gastos financieros, se observan violaciones al estricto derecho.

450.- En todas estas controversias el Tribunal Arbitral dejó de aplicar cláusulas contractuales pertinentes en el caso; dejó de observar leyes pertinentes al caso, cuya aplicación fue solicitada expresamente por PEP, sobre todo leyes administrativas. Por ejemplo, en la controversia 36 hizo a un lado el hecho de que PEP no estaba obligada, de conformidad al contrato, a pagar malos tiempos; en las controversias 34 y 35 no tomó en cuenta que COMMISA no acreditó ningún extremo contractual o legal para ser indemnizada por el retraso en el inicio de los trabajos con embarcaciones. Con relación a la controversia 19, no obedeció reglas contractuales para determinar la preclusión

218

de los derechos de la Demandante, y en las controversias 27, 37 y 39, ordenó el pago pactado por trabajos que no correspondían a los realmente ejecutados por COMMISA. En la decisión sobre gastos financieros, evidentemente el Tribunal Arbitral, para solucionar la controversia, no hizo ningún caso del derecho aplicable a gastos financieros, ni a cláusulas esenciales del contrato.

451.- El laudo además es incongruente y notoriamente contradictorio consigo mismo. Por ejemplo, en las controversias técnicas 34 y 35 (segundo), el Tribunal Arbitral condena a pagar una prestación no solicitada por COMMISA; en las controversias técnicas 37 y 39 (sobre cruces), condena a pagar cantidades pactadas como compensación para un tipo distinto de trabajo; y por si lo anterior no fuera suficiente, en la controversia de gastos financieros, el Tribunal Arbitral establece correctamente los supuestos de la norma, y después considera unos supuestos totalmente distintos a los primeros, y con base en ellos condena a PEP a su pago.

452.- Todas estas circunstancias vician el laudo arbitral, tal como ya lo han determinado los tribunales jurisdiccionales, conforme a las siguientes tesis:

**LAUDO ARBITRAL. CUÁNDO EL JUEZ PUEDE**



219

NEGARSE A EJECUTARLO[41]. Los laudos nacionales no requieren de la aprobación judicial u homologación para que puedan ser ejecutados; los Jueces sólo pueden negarse a ejecutar un laudo cuando por no respetar formalidades esenciales, se vicia el laudo arbitral, como, entre otros supuestos, cuando: 1. El árbitro no se haya apegado al compromiso arbitral (artículo 616 del Código de Procedimientos Civiles para el Distrito Federal); 2. Se trate de asuntos no comprometibles arbitralmente; 3. La designación del árbitro se hubiera hecho por quien no esté en pleno ejercicio de sus derechos o no se haya realizado en la forma y con los requisitos que establece la ley (artículos 612 a 614 del Código de Procedimientos Civiles para el Distrito Federal); 4. El árbitro designado sea incapaz, y en caso de que hayan ocurrido el fallecimiento, la recusación o la excusa de la persona prevista para el cargo, o de su designación como funcionario judicial, si además no existía, ni por convenio de las partes, ni por disposición legal, la posibilidad de nombrar un sustituto (artículos 222, 612, 613 y 622 del Código de Procedimientos Civiles para el Distrito Federal); 5. Antes de pronunciarse el laudo, los árbitros hayan sido revocados por consentimiento expreso y unánime de las partes (artículo 618 del Código de Procedimientos Civiles para el Distrito Federal); 6. El laudo se haya dictado una vez vencidos tanto los plazos y prórrogas concedidos por los comprometientes, como los plazos que establece la ley (artículos 617, 622, 624 y 627 del Código de Procedimientos Civiles para el Distrito Federal); 7. Se violen los derechos fundamentales de acción y de defensa; 8. **Se declare la nulidad del convenio, ya sea por vicios formales, o porque siendo de derecho y no de amigable composición, no se cumpla con la garantía de audiencia.**
CUARTO TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.
Amparo en revisión 364/2002. Koblenz Eléctrica,

[41] No. Registro: 186,920. Tesis aislada. Materia(s): Civil. Novena Época. Instancia: Tribunales Colegiados de Circuito. Fuente: Semanario Judicial de la Federación y su Gaceta. XV, Mayo de 2002. Tesis: I.4o.C.53 C. Página: 1241.

S.A. de C.V. 22 de febrero de 2002. Unanimidad de votos. Ponente: Marco A. Rodríguez Barajas. Secretaria: Ana Paola Surdez López.

**LAUDO, LOS JUECES PUEDEN REHUSAR LA EJECUCION DEL, CUANDO ADVIERTAN QUE EL ARBITRO NO CUMPLIO LAS FORMALIDADES PROCESALES PACTADAS POR LOS INTERESADOS, PUES TAL CUESTION ES DE ORDEN PUBLICO[42].** Aunque los Jueces del orden común carecen de facultades para revisar la legalidad del laudo arbitral, en cuanto al fondo, lo que es propio de la apelación en el supuesto de que tal recurso no haya sido renunciado por las partes, sí pueden, en cambio, rehusar la ejecución del laudo, <u>cuando adviertan que el árbitro se ha apartado ostensiblemente de los requisitos procesales estipulados en el respectivo compromiso o cláusula compromisoria</u>, con evidente violación a las normas esenciales de todo juicio, que son de orden público.
SEGUNDO TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.
Amparo en revisión 286/77. Etla, S.A. 23 de septiembre de 1977. Unanimidad de votos. Ponente: Martín Antonio Ríos.

453.- La violación al acuerdo de arbitraje, en el sentido de que el procedimiento sería de estricto derecho, es de suma importancia, toda vez que la voluntad de PEP de someterse al arbitraje, reiterado en el Acta de Misión, se pactó con el requisito de que se tratara de un procedimiento de derecho, resuelto conforme a las leyes federales mexicanas. Para demostrar la existencia de esta violación al procedimiento pactado por las partes, se debe estudiar la decisión del Tribunal Arbitral.

---

[42] No. Registro: 252,781. Tesis aislada. Materia(s): Civil. Séptima Época. Instancia: Tribunales Colegiados de Circuito. Fuente: Semanario Judicial de la Federación. 103-108 Sexta Parte. Tesis: Página: 129. Genealogía: Informe 1977, Tercera Parte, Tribunales Colegiados de Circuito, tesis 9, página 264.

454.- Por otro lado, en el caso, no puede existir lesión entre las partes que induzcan al juzgador a proceder de diversa manera a la pactada por las partes. Cualquier prestación contractual, y sus alcances, son plenamente conocidos por la Contratista, y en esos términos fue la contratación.

455.- El estricto derecho, es más importante aún en el derecho administrativo, toda vez que, como ya explicamos a lo largo del presente escrito, el contrato de obra pública es un contrato administrativo, que resume ineludiblemente una serie de normas relativas al control y ejecución de la obra pública, así como al control y aplicación de recursos federales, que se enmarcan en un sistema de control presupuestal establecido en los artículos 126 y 134 de la Constitución Política Federal, por lo que su violación indudablemente anula el laudo dictado.

### Cuatro

456. La principal argumentación de PEP se centra en el hecho de que las decisiones relativas a las Controversias 34, 35, 36 y sobre gastos financieros son violatorias del orden público mexicano. Por supuesto, un laudo es anulable cuando el mismo es contrario al orden público mexicano (artículo 1457 fracción II del Código de Comercio).

457.- Existe una discusión dogmática en el arbitraje, y en la doctrina de derecho internacional privado, sobre el significado de orden público, que trataremos de explicar, no para llegar a una conclusión definitiva, que no es el caso, sino para que ese juzgador tenga bases para establecer la procedencia de la solicitud de PEP.

458.- Existen nociones de orden público dadas por la dogmática jurídica. Así, por orden público se entienden las nociones más básicas de moralidad y de justicia de un sistema jurídico (Francisco González de Cossío, EJECUCIÓN DE LAUDOS ARBITRABLES, en Manual de Arbitraje Comercial, Editorial Porrúa, Página 191).

459.- Por otro lado, diversos autores señalan lo siguiente en relación al orden público *"El orden público hace referencia a las normas fundamentales de convivencia de un determinado país, que coinciden con las normas básicas de la Constitución*[43]*"*, o *"en el orden público se engloban todas las disposiciones imperativas, es decir, todas aquéllas que las partes no podrán derogar en sus convenios particulares"*[44] o el orden público es el *"sistema que mantendrá los principios de justicia en un Estado para la correcta interpretación de su ley y asegurar la debida administración de justicia y evitar dentro*

---

[43] Eloy Ruibola Santana, citado por Francisco Gorjón Gómez en ARBITRAJE COMERCIAL Y EJECUCIÓN DE LAUDOS, Mc Graw Hill, Página 271.
[44] Ibrahim Fadlallah citado por Francisco Gorjón Gómez en ARBITRAJE COMERCIAL Y EJECUCIÓN DE LAUDOS, Mc Graw Hill, Página 272.

223

*del procedimiento arbitral la arbitrariedad en la que pueden caer los mismos árbitros"*[45].

460.- Es indiscutible que el orden público se constituye por: i) los principios fundamentales relativos a justicia y moralidad que el Estado desea proteger aún cuando no esté directamente involucrado; ii) las reglas designadas para servir a los intereses políticos, sociales y económicos de dicho Estado, conocidos como leyes de policía o reglas de orden público; y iii) el deber del Estado de respetar sus obligaciones ante otros Estados u organismos internacionales (Francisco González de Cossío, Obra Citada, Página 191).

461.- Eso es, existirá una violación del orden público si sucede que: i) el laudo arbitral infringe los principios de justicia y moralidad que un Estado desea proteger; ii) que el laudo arbitral contradiga disposiciones de orden público que le sirven al Estado para satisfacer sus intereses políticos, sociales o económicos; o iii) implique una violación del Estado a sus compromisos internacionales.

462.- Los principios de justicia y moralidad de orden público pueden ser procesales o sustantivos, y afectarse de acuerdo a la manera irregular en la cual se condujo el arbitraje, y la infracción grave a las garantías (constitucionales o fundamentales) del proceso, de acuerdo

---

[45] F. A. Mann citado por Francisco Gorjón Gómez en ARBITRAJE COMERCIAL Y EJECUCIÓN DE LAUDOS, Mc Graw Hill, Página 272.

224

con el orden jurídico mexicano, o porque el laudo infringe una norma imperativa (Francisco Gorjón Gómez, ARBITRAJE COMERCIAL Y EJECUCIÓN DE LAUDOS, Mc Graw Hill, Página 274); e igualmente, dentro de las reglas de orden público encontramos también todas las disposiciones básicas que regulan la economía pública.

Todas las nociones apuntadas, encuadran dentro del "orden público" cuya infracción en el Laudo reclama PEP.

463.- El sistema jurídico constitucional establecido en los artículos 126 y 134 de la Constitución, sobre la realización de obras públicas y el ejercicio y control del presupuesto o gasto público federal, es por supuesto de orden público, porque responde a las necesidades políticas, económicas y sociales del Estado Mexicano.

Estas disposiciones además, son principios básicos constitucionales de algunos Estados. Por ejemplo la Constitución Española en su artículo 133 (4) dispone que las administraciones públicas solamente podrán contraer obligaciones financieras y realizar gastos de acuerdo a las leyes. También la Constitución de Colombia, en su Título XII, regula el régimen económico y de la hacienda pública, pudiéndose resaltar que su artículo 345 es similar al artículo 126 de la Constitución Mexicana. Con estas citas podemos afirmar que las normas presupuestarias y de gasto público,

<u>Exhibit A</u>

Part 6 of  7

son principios económicos básicos del Estado Mexicano, y para un gran número de miembros de la comunidad internacional, y no meras concepciones de orden público de derecho interno.

464.- Sobre todo, con relación a la impugnación de la decisión de las controversias técnicas 34, 35, 36 y de gastos financieros, se ha esgrimido una serie de violaciones a disposiciones de orden público, tales como el mandato de pagar obligaciones no contraídas contractualmente ni que derivan de la ley; pagos por trabajos no realizados o costos no incurridos; mandamientos de pagos en contravención a los procedimientos de orden público de pago con cargo a recursos federales, e infracciones a la responsabilidad del Estado por intereses moratorios, y en general, al régimen de derecho administrativo que constituye el marco de regulación del contrato de obra pública, que establece un régimen exorbitante de derecho a favor del Estado, tendiente a lograr el bien común.

465.- El Tribunal Arbitral dejó de aplicar en su resolución disposiciones administrativas de orden público. Esta inobservancia del derecho mexicano o de normas aplicables, no puede catalogarse simplemente como un error de derecho, por dos razones: la primera ya fue explicada: esta conducta del Tribunal constituye una violación al acuerdo de arbitraje, de cuyos términos se deduce que el procedimiento

de arbitraje sería de estricto derecho. La segunda razón es que dichas disposiciones no pueden ser renunciadas por los particulares, cuya observancia es obligatoria, por lo que obligatoriamente tenía que tomarlas en cuenta el Tribunal. La falta de aplicación de normas, se reitera, en el caso, no es una cuestión de fondo o casacionista, sino de orden público acorde con la naturaleza de las normas que se han dejado de aplicar.

En este tenor, nuestras más altas autoridades han establecido lo siguiente:

> **CONTRATOS ADMINISTRATIVOS, APLICABILIDAD DEL CODIGO CIVIL, EN LOS**[46]. No siempre son de aplicación forzosa los preceptos del Código Civil, tratándose cuestiones administrativas, cuando de preferencia a toda legislación debe acatarse un precepto de la Constitución. Amparo administrativo en revisión 3977/36. Gavito Hermanos y Compañía. 8 de julio de 1938. Unanimidad de cinco votos. Relator: José María Truchuelo.

> **ORDEN PÚBLICO. ES UN CONCEPTO JURÍDICO INDETERMINADO QUE SE ACTUALIZA EN CADA CASO CONCRETO, ATENDIENDO A LAS REGLAS MÍNIMAS DE CONVIVENCIA SOCIAL**[47]. El orden público no constituye una noción que pueda configurarse a partir de la declaración formal contenida en una ley. Por el contrario, ha sido criterio constante de la Suprema Corte de Justicia de la Nación que corresponde al juzgador examinar su presencia en cada caso concreto, de tal suerte que se perfila como un

---

[46] No. Registro: 331,037. Tesis aislada. Materia(s): Administrativa. Quinta Época. Instancia: Segunda Sala. Fuente: Semanario Judicial de la Federación. LVII. Tesis: Página: 220.

[47] No. Registro: 177,560. Tesis aislada. Materia(s): Común. Novena Época. Instancia: Tribunales Colegiados de Circuito. Fuente: Semanario Judicial de la Federación y su Gaceta. XXII, Agosto de 2005. Tesis: I.4o.A.63 K. Página: 1956.

concepto jurídico indeterminado de imposible definición **cuyo contenido sólo puede ser delineado por las circunstancias de modo, tiempo y lugar que prevalezcan en el momento en que se realice la valoración. En todo caso, para darle significado, el juzgador debe tener presentes las condiciones esenciales para el desarrollo armónico de la comunidad, es decir, las reglas mínimas de convivencia social**; en la inteligencia de que la decisión que se tome en el caso específico no puede descansar en meras apreciaciones subjetivas, sino en elementos objetivos que traduzcan las preocupaciones fundamentales de la sociedad, siempre buscando no obstaculizar la eficacia de los derechos de tercero.

CUARTO TRIBUNAL COLEGIADO EN MATERIA ADMINISTRATIVA DEL PRIMER CIRCUITO.

Amparo directo 312/2004. Alberto Salmerón Pineda. 12 de enero de 2005. Unanimidad de votos. Ponente: Jesús Antonio Nazar Sevilla. Secretario: Ernesto González González.

Amparo directo 453/2004. Hospital Ángeles del Pedregal, S.A. de C.V. 23 de febrero de 2005. Unanimidad de votos. Ponente: Jesús Antonio Nazar Sevilla. Secretaria: Indira Martínez Fernández.

**ORDEN PUBLICO, LEYES DE**[48]. El orden público que tiene en cuenta la ley y la jurisprudencia, para establecer una norma sobre las nulidades radicales, no puede estar constituido por una suma de intereses meramente privados; para que el orden público esté interesado, **es preciso que los intereses de que se trate, sean de tal manera importantes, que, no obstante el ningún perjuicio y aun la aquiescencia del interesado, el acto prohibido pueda causar un daño a la colectividad, al Estado o a la nación**.

Amparo civil directo 2785/31. Díaz Rubín Pedro y coagraviados. 30 de marzo de 1933. Unanimidad de cuatro votos. Ausente: Manuel Padilla. La publicación no menciona el nombre del ponente.

---

[48] No. Registro: 362,355. Tesis aislada. Materia(s): Común. Quinta Época. Instancia: Tercera Sala. Fuente: Semanario Judicial de la Federación. XXXVII. Tesis: Página: 1835. Genealogía: Apéndice 1917-1985, Octava Parte, Común, tesis relacionada con la jurisprudencia 193, página 315.

LEYES DE ORDEN PUBLICO, RENUNCIA DE LAS (LEGISLACION DEL DISTRITO FEDERAL)[49].
En los artículos 6o., 15 y 1309 del Código Civil de 1884, se encuentra, respectivamente, la ineficacia de la renuncia de las leyes de interés público, la prohibición de ser alteradas por convenio entre particulares y el tenerse por no hecha la misma renuncia.
Amparo civil en revisión 8398/39. Formoso Padín Joaquín. 20 de octubre de 1941. Unanimidad de cuatro votos. Ausente: Eduardo Vasconcelos.
Relator: Roque Estrada.

## VII. Costos Incurridos en el Arbitraje.

466.- En los párrafos 764 a 771, páginas 177 a 179, y el Capítulo XII inciso 6. subinciso (ii), del Laudo Arbitral, el Tribunal Arbitral condena a PEP a pagar a COMMISA los costos incurridos en el Arbitraje por plantear la excepción de incompetencia en un monto de USD 200 mil dólares.

El Tribunal Arbitral considera en el párrafo 770, atendiendo al criterio del vencimiento[50], lo siguiente:

*"En cuanto a las pretensiones de falta de competencia del Tribunal Arbitral y de falta de requisitos de procedibilidad planteada por la Demandada, el Tribunal Arbitral las ha rechazado íntegramente, indicando que <todas las pretensiones y peticiones formuladas por la Demandante en su acción y por la Demandada en su reconvención quedan sujetas a la cláusula 23.3 del Contrato, y que el*

---

[49] No. Registro: 308,917. Tesis aislada. Materia(s): Civil. Quinta Época. Instancia: Cuarta Sala. Fuente: Semanario Judicial de la Federación. LXX. Tesis: Página: 1195.
[50] Párrafo 767 del Laudo Final.- "Ni las partes, ni el Reglamento de la CCI han fijado el criterio que el Tribunal Arbitral debe seguir en la asignación de gastos y costas entre las partes. Ante este silencio el Tribunal Arbitral acude al artículo 1455 C.com. dedicado a las costas, que establece el criterio del vencimiento, si bien permitiendo al Tribunal Arbitral prorratear los elementos de estas costas entre las partes, si lo estima razonable, <teniendo en cuenta las circunstancias del caso>".

> *Tribunal Arbitral tiene competencia para resolverlas>.* **Habiendo sido vencida la Demandada completamente en sus objeciones jurisdiccionales,** *le corresponde asumir la proporción de los gastos razonables en que ha incurrido la Demandante para contestar dichas pretensiones. El Tribunal Arbitral, a la vista de las circunstancias del caso, decide que estos gastos ascienden a 200.000 USD y que deben ser satisfechos por la Demandada"*

467.- El criterio del vencimiento no es aplicable en el caso de la resolución de excepciones procesales, porque la misma no decide ningún punto del litigio planteado por las partes, sino solamente, como en el caso ha ocurrido, se ha decidido en principio (y no de manera inmutable) [51] quién es el Tribunal Competente. Por tanto, el pago de esta cantidad es completamente injustificado. Sirve de apoyo la siguiente jurisprudencia, aplicada por analogía a la interpretación del artículo 1455 del Código de Comercio:

> **COSTAS EN EL JUICIO EJECUTIVO MERCANTIL. NO PROCEDE LA CONDENA A SU PAGO CUANDO POR SENTENCIA INTERLOCUTORIA SE DECLARA PROCEDENTE LA EXCEPCIÓN DE INCOMPETENCIA POR DECLINATORIA (INTERPRETACIÓN DEL ARTÍCULO 1084, FRACCIÓN III, DEL CÓDIGO DE COMERCIO)[52].** Conforme a dicha disposición, siempre será condenado a pagar costas el que intente un juicio ejecutivo y no obtenga sentencia favorable, de donde se advierte que la fracción III del artículo 1084 del Código de Comercio adopta la teoría del vencimiento

---

[51] Se reitera que de conformidad con el artículo 1432 del Código de Comercio, la resolución definitiva sobre la competencia de un Tribunal Arbitral corresponde a los órganos jurisdiccionales, por lo que no es una resolución definitiva ni irrecurrible.

[52] No. Registro: 175,979. Jurisprudencia. Materia(s): Civil. Novena Época. Instancia: Primera Sala. Fuente: Semanario Judicial de la Federación y su Gaceta. XXIII, Febrero de 2006. Tesis: 1a./J. 185/2005. Página: 175.

conforme a la cual la condena se determina siempre por el resultado del proceso, lo que da al actor la calidad de vencido cuando no acredite la procedencia de su acción. En ese sentido, se concluye que en los juicios ejecutivos en los que se emita sentencia interlocutoria que declare procedente la excepción de incompetencia hecha valer por la vía declinatoria y se remitan los autos a un Juez diverso, no se surte el supuesto contenido en la fracción aludida y, por tanto, no procede la condena al pago de costas, pues esa resolución no resuelve el litigio planteado **y, por ende, no puede conceptuarse al actor como parte vencida, dado que el resultado del proceso objetivamente no le ha sido adverso, ya que la incompetencia por declinatoria sólo implica que un diverso juzgador se avocará al conocimiento de la contienda para resolver lo que legalmente corresponda.** Sin que obste a lo anterior el hecho de que la condena en costas también pueda decretarse a través de sentencias interlocutorias, pero solamente será por aquellas que impidan el pronunciamiento de fondo que resuelva la cuestión principal planteada.

**Contradicción de tesis 128/2005-PS.** Entre las sustentadas por los Tribunales Colegiados Primero y Tercero, ambos en Materia Civil del Cuarto Circuito. 23 de noviembre de 2005. Cinco votos. Ponente: José de Jesús Gudiño Pelayo. Secretario: Rogelio Alberto Montoya Rodríguez.

**Tesis de jurisprudencia 185/2005. Aprobada por esta Primera Sala de este Alto Tribunal, en sesión de fecha treinta de noviembre de dos mil cinco.**

468.- Por otro lado, el Tribunal Arbitral decidió en la Orden Procesal No. 2 resolver la cuestión de competencia conjuntamente con el fondo del asunto, tal y como lo hizo. No hubo audiencias o diligencias adicionales con relación a las cuestiones competenciales, sino que se litigó conjuntamente con el fondo del asunto, por lo que ningún

231

retraso o costo adicional pudo haberse generado. En su caso, fue el propio Tribunal Arbitral el que retrasó el procedimiento para suplir la deficiencia de la queja y de la prueba de COMMISA, con relación a las controversias 34 y 35, como se expone en los antecedentes del proceso de arbitraje, por lo que no solamente es injustificada la condena al pago de costos incurridos en el arbitraje, sino completamente injusta.

469.- Ahora, el punto principal en el caso, es que las Controversias Técnicas 34, 35 y 36, relativas a retrasos en el inicio de los trabajos con embarcaciones y malos tiempos, son improcedentes por no ser materia de arbitraje ni constituir controversias técnicas en los términos de la cláusula 23.2 del Contrato, o por no ser daños legales compensable conforme al Contrato y pactarse una excusa de responsabilidad a favor de PEP; como ya quedó expuesto en las consideraciones tres y cuatro, y cuatro, de los capítulos correspondientes a las causas de nulidad de la decisión de las mismas.

470.- En ese sentido, y por razones de congruencia de la resolución, la nulidad del Laudo Arbitral respecto a las controversias indicadas; o, la resolución definitiva de la incompetencia del Tribunal Arbitral, tiene como consecuencia necesaria la anulación de esta condena por costos incurridos en el arbitraje.

471.- En otras palabras, si la materia de las controversias técnicas 34, 35 y 36 no son un daño legal o contractual que PEP deba compensar; o no son materias arbitrables por disposición contractual; o si el Tribunal Arbitral es incompetente para resolver sobre las controversias planteadas por COMMISA -como ese Juzgador deberá resolver-, es evidente que su resolución deberá modificar de igual manera y por la misma razón esta condena por supuestos costos incurridos.

## VIII. Competencia del Tribunal Arbitral.

472.- El tercer párrafo del artículo 1432 del Código de Comercio, establece que el Tribunal Arbitral será el competente para resolver sobre su propia competencia, dándole potestad a los Tribunales Nacionales, una vez resuelta la competencia en primera instancia por el Tribunal Arbitral, para que resuelva definitivamente la competencia de dicho Tribunal Arbitral, sobre la base del acuerdo de arbitraje.

473.- El Tribunal Arbitral decidió resolver la cuestión de competencia planteada por PEP conjuntamente con el fondo del asunto, de conformidad con la Orden Procesal No. 2, lo que efectivamente sucedió, tal como se observa en el Capítulo VI del Laudo Final, al resolver los puntos litigiosos 1(a) y 2 (a), (b) y (c), por lo que el momento procesal oportuno para solicitarle a Usted Juez, que resuelva definitivamente la

233

competencia del Tribunal Arbitral, es conjuntamente con la solicitud de nulidad del laudo, al tener ambas como causa precisamente el laudo emitido y resolvió materias no previstas en el acuerdo de arbitraje, conforme al artículo 1457 fracción I inciso c) del mismo ordenamiento.

474.- El punto litigioso 1 (a) se refería a lo siguiente:

"¿Constituyen todas las pretensiones y peticiones formuladas por la Demandante en su demanda y por la Demandada en su reconvención <Controversia, reclamación, diferencia o disputa que sobrevenga o se relacione o esté vinculada con el Contrato o el incumplimiento del mismo, (como exige la cláusula 23.3 del mismo), y es el Tribunal Arbitral competente para resolverlas?".

El Tribunal Arbitral se declaró competente para conocer de todas las controversias y reclamaciones propuestas por la Demandante, alegando que todas las materias se relacionan o están vinculadas al Contrato relativo al Proyecto IPC-28, y quedan sujetas a la cláusula 23.3 del Contrato, según los párrafos 103[53] y 105[54] del Laudo Arbitral, haciendo caso omiso del texto de las Cláusulas 23.2 y 23.3 del Contrato, entre otras.

475.- Es importante subrayar que de conformidad con la cláusula 23.3 del Contrato, para que una disputa,

---

[53] "Analizando las pretensiones de la Demandante se advierte que se trata de peticiones <que están vinculadas con el Contrato>, y más específicamente, con su cumplimiento o con su incumplimiento (tal como lo exige la Cláusula 23.3 del Contrato). El Tribunal no alberga duda alguna que la voluntad de las partes al otorgar el Contrato fue precisamente que pretensiones del tipo de las hoy formuladas por COMMISA fueran resueltas a través del arbitraje".

[54] "En resumen, el Tribunal Arbitral llega a la conclusión de que todas las peticiones y pretensiones formuladas por la Demandante en su acción y por la Demandada en su reconvención quedan sujetas a la cláusula 23.3 del Contrato, y que el Tribunal Arbitral tiene competencia para resolverlas".

234

reclamación o controversia técnica, sea materia del arbitraje deben acreditarse dos supuestos: a) que estén relacionadas o vinculadas con el contrato o con el incumplimiento del mismo; y b) que se hayan formalizado como controversias técnicas. El Tribunal Arbitral solamente aborda en este punto la primera de las condiciones, aún y cuando las parte, claramente habían pactado en la cláusula 23.3 del Contrato lo siguiente:

> "23.3 **_Arbitraje._** Cualquier controversia, reclamación, diferencia o disputa que sobrevenga o se relacione o esté vinculada con este Contrato o el incumplimiento del mismo será dirimida finalmente mediante arbitraje conducido en el Distrito Federal, México, de acuerdo con las Reglas de Conciliación y Arbitraje de la Cámara Internacional de Comercio que estén en vigor en ese momento. El número de árbitros será de tres y el idioma para conducir el arbitraje será el español. **_No obstante lo anterior, cualquier controversia técnica deberá ser sometida previamente al procedimiento previsto en la Cláusula 23.2 y sólo en caso de que mediante dicho procedimiento no se logré un acuerdo entre las partes, éstas quedarán facultadas para acudir al recurso previsto en la Cláusula 23.3"._**

476.- Esta división de los requisitos contenidos en el acuerdo de arbitraje es incongruente y constituye un estudio indebido del caso, porque la competencia se determina también por el cumplimiento de procedimientos previos; porque se deja de examinar en su integridad en el acuerdo de arbitraje; y porque el acuerdo de arbitraje no se entiende,

235

si no se le relaciona con las cláusulas 23.1 y 23.2[55] del mismo Contrato.

477.- El Tribunal Arbitral, en su consideración 104, únicamente declara de manera dogmática que todas las controversias están vinculadas al contrato, o a su cumplimiento o incumplimiento, pero de ninguna manera hace un análisis caso por caso, si efectivamente las controversias están relacionadas con el contrato.

478.- El Tribunal Arbitral, simple y llanamente, indica que si la controversia surgió durante la vigencia del contrato, y tomando como pretexto la ejecución del Contrato, son materias arbitrables, sin atender a que el sistema de responsabilidad derivado del Contrato, acordado con COMMISA en beneficio de PEP, sólo le permite a COMMISA realizar reclamaciones por prestaciones pactadas expresamente en el Contrato, excluyéndose a PEP por cualquier daño legal no previsto en el Contrato. La cláusula 23.2 del Contrato, en su primera parte, literalmente dispone lo siguiente:

> "23.2 Controversias Técnicas. El Contratista no tendrá derecho a efectuar ningún reclamo y PEP no será responsable por daños legales (incluyendo negligencia) o contractuales ante el Contratista, sus proveedores secundarios o subcontratistas, excepto en los casos específicamente previstos en este Contrato ... ".

---

[55] En otras palabras, la Cláusula 23 se subdivide en la 23.1, la 23.2 y la 23.3.

Esto es, dicha Cláusula asume el contenido del artículo 2117 del Código Civil que permite a los contratantes regular su responsabilidad, y excluir las normas generales sobre responsabilidad. Es decir, la responsabilidad de PEP está limitada por el propio contrato, y COMMISA renunció a cualquier otro tipo de reclamación.

Esta excepción específicamente se referían a dos reclamaciones: la controversia 36 relativa a malos tiempos, y a las controversias 34 y 35 relativas a embarcaciones.

479.- En el Contrato de Obra Pública a Precios Unitarios y Tiempo Determinado número PEP-O-IT-136/98 (IPC-28), se pactó expresamente por las partes que no habría compensación económica, es decir, pagos con cargo al erario federal por las suspensiones a la ejecución de los trabajos causadas por condiciones climáticas adversas o malos tiempos, considerados como eventos de caso fortuito o fuerza mayor. En efecto, en las cláusulas 12.1 y 12.4 del contrato se pactó lo siguiente:

"12.1 *Alcance del Caso Fortuito o Fuerza Mayor.* ....... Tratándose de trabajos costa afuera, las tormentas únicamente serán consideradas como caso fortuito o fuerza mayor cuando así lo determinen en forma conjunta el supervisor de PEP y el representante autorizado del Contratista, asentando en bitácora que las actividades se suspenden por caso fortuito o fuerza mayor; en caso de controversia, se estará

237

*a lo dispuesto por la Capitanía del Puerto más cercano al Sitio de los Trabajos, que hubiere declarado oficialmente el cierre de tal puerto".*

*"12.4 **Efectos del Caso Fortuito o de Fuerza Mayor.** A menos que el Caso Fortuito o Fuerza Mayor impida total y definitivamente o en forma considerable el cumplimiento de este Contrato, en cuyo caso se estará a lo establecido en la Cláusula 10.2.4, el Caso Fortuito o Fuerza Mayor sólo actuará para diferir el cumplimiento de las obligaciones pactadas en este Contrato y no para excusar el incumplimiento".*

480.- De igual manera, en la cláusula 23.2 del Contrato se pactó que PEP no sería responsable de ningún daño contractual o legal, excepto en los casos específicamente previstos en este Contrato, en la siguiente forma:

*"23.2 **Controversias Técnicas.** El Contratista no tendrá derecho a efectuar ningún reclamo y PEP no será responsable por daños legales (incluyendo negligencia) o contractuales ante el Contratista, sus proveedores secundarios o subcontratistas, excepto en los casos específicamente previstos en este Contrato....".*

En ese sentido, tenemos una Cláusula expresa en el Contrato que específica que en caso de suspensiones a los trabajos por Caso Fortuito o Fuerza Mayor (tormentas), PEP sólo tendrá obligación de diferir la fecha de terminación de los trabajos.

Por otro lado, la cláusula 23.2 del Contrato, tiene un doble efecto: el primero de fondo ya que constituye para PEP una excusa de responsabilidad, es decir, PEP no responde

238

responsabilidad en el contrato (solo diferir la fecha de terminación); y una segunda formal, es decir, si no es una prestación económica del contrato, su pago o cualquier disputa, reclamo o controversia que pretenda su pago, no puede ser materia del arbitraje, porque no puede constituirse como controversia técnica relacionada con la ejecución de los trabajos.

Siguiendo con este lineamiento, en los 16 Convenios Modificatorios celebrados entre las partes, no se modificó o alteró la Cláusula 12 del Contrato, relativa a Caso Fortuito o Fuerza Mayor. Al contrario, en cada uno de ellos se pactó expresamente, que cada una de las cláusulas del contrato original, subsistían sin variación alguna, en cuanto no hubieren sido modificadas expresamente.

481.- En conclusión, la Controversia Técnica 36 no es materia de arbitraje por acuerdo de las partes, y el Tribunal Arbitral no tiene competencia para resolverlas, al no ser una prestación pactada en el contrato a cargo de PEP y a favor de COMMISSA.

482.- Con relación a las controversias 34 y 35, relativa a retrasos en el inicio de los trabajos por falta de plataformas, la pretensión de COMMISA, visible en el párrafo 80, página 23

239

del Laudo Final, y página 8 del Acta de Misión, apartado **(c)** 3 (c), fue la siguiente:

> "Con base en las reclamaciones antes señaladas, Commisa demanda una compensación de aproximadamente US$81 millones de dólares. Dicha suma se calcula de acuerdo con el Contrato EPC-28. En caso de que por alguna razón el Tribunal Arbitral determinará que las cuotas o tarifas por tiempos de espera o de reserva que se establecen en el Contrato EPC-28 no son aplicables para el cálculo de la compensación correspondiente a estos retrasos, Commisa atentamente solicita que se dicte laudo conforme al cual se decrete el pago de una indemnización a cargo de PEP que resulta suficiente a para compensar a Commisa por los daños y perjuicios sufridos como consecuencia de los retrasos antes sufridos. Para tales efectos, Commisa estima que dichos daños y perjuicios ascienden aproximadamente a US$81 millones de dólares".

Esto es, COMMISA reclamaba, en caso de que no fuera procedente el pago de las tarifas de espera pactadas en el contrato (y el tribunal resolvió que no lo eran)[56], y el pago de una indemnización de daños y perjuicios.

483.- Esta reclamación por daños y perjuicios está fuera del arbitraje o no es materia del arbitraje porque no se trata de una prestación pactada en el contrato a favor de COMMISA, o en otro sentido, de conformidad con el primer párrafo de la cláusula 23.2 del Contrato, PEP está excluido de pago de cualquier prestación no contemplada en el

---

[56] Párrafos 165, 166 y 167 del Laudo Final.

240

Contrato. En consecuencia, ante la imposibilidad de cualquier disputa técnica respecto a esta materia, el Tribunal Arbitral carece de competencia para resolverla.

484.- En esa tesitura, el Tribunal Arbitral infringió la competencia impuesta en el acuerdo de arbitraje, y el acuerdo mismo de arbitraje, por lo que se ese Juzgador debe resolver definitivamente que el Tribunal Arbitral carece de competencia para resolver las controversias referidas.

485.- Esta clara exposición sobre la incompetencia del Tribunal Arbitral, en el laudo se combate mediante dos consideraciones insuficientes:

En los párrafos 100 y 101, el Tribunal Arbitral considera, respectivamente, lo siguiente:

> " ... *Compárese esta cláusula (la 23.3) con el texto estándar de la cláusula de arbitraje propuesto por la propia CCI: <todas las desavenencias que deriven de este contrato o guarden relación con éste>. Del análisis comparativo puede inducirse que la voluntad de las partes al celebrar el Contrato EPC-28 no fue la de restringir el ámbito de sumisión al arbitraje, sino al contrario, convenir que todo tipo de disputas derivadas del Contrato, o simplemente vinculadas al mismo, fueran resueltas mediante arbitraje".*

> "Como dice el artículo 1851 Código Civil Federal (<C.c.>), <si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas>. Y en el presente caso, los

241

> *términos de la Cláusula 23.3 son absolutamente claros, y no dejan lugar a duda alguna, que las partes convinieron en que todas las controversias derivadas del cumplimiento o incumplimiento del Contrato, sin exclusión alguna, fueran resueltas mediante arbitraje".*

Estas consideraciones del Tribunal Arbitral carecen de fundamentación. En el primer argumento el Tribunal Arbitral deja de observar que la cláusula de arbitraje modelo de la CCI no es similar a la cláusula 23.3 del contrato, que establece el acuerdo arbitral, porque ésta última establece limitaciones al arbitraje al señalar:

> *"23.3 __Arbitraje.__ Cualquier controversia, reclamación, diferencia o disputa que sobrevenga o se relacione o esté vinculada con este Contrato o el incumplimiento del mismo será dirimida finalmente mediante arbitraje conducido en el Distrito Federal, México, de acuerdo con las Reglas de Conciliación y Arbitraje de la Cámara Internacional de Comercio que estén en vigor en ese momento. El número de árbitros será de tres y el idioma para conducir el arbitraje será el español. **No obstante lo anterior, cualquier controversia técnica deberá ser sometida previamente al procedimiento previsto en la Cláusula 23.2 y sólo en caso de que mediante dicho procedimiento no se logré un acuerdo entre las partes, éstas quedarán facultadas para acudir al recurso previsto en la Cláusula 23.3".***

Siendo así las cosas, es claro que no fue la voluntad de las partes que cualquier disputa o controversia fueran materia del arbitraje, sino tan solo aquéllas que hubieren sido formalizadas como controversias técnicas. Por la misma razón, la segunda consideración del tribunal arbitral es infundada e inexacta, toda vez que evidentemente no atiende al tenor

242

literal de la cláusula 23.3 ni tampoco atiende el contenido de la cláusula 23.2 relativa a controversias técnicas. Ante esta falta de aplicación de disposiciones pertinentes, es evidente que la decisión es infundada.

486.- Ahora bien, en el párrafo 104 del Laudo Arbitral se expresa, con relación al mismo tema, lo siguiente:

> "La postura de PEP es especialmente incongruente, pues ha planteado una serie de pretensiones en la vía reconvencional; en ellas pide que se condene al Contratista al pago de una cláusula penal prevista en el Contrato y al pago del coste de determinados apoyos prestados a Commisa durante la ejecución de la obra. Con respecto a estas pretensiones reconvencionales, PEP sí defiende que el Tribunal Arbitral tiene competencia y que la litis está correctamente entablada. El Tribunal Arbitral no alcanza a comprender cómo se puede argumentar que las pretensiones del actor escapan de la cláusula 23.3 del Contrato, mientras que las reconvencionales de la Demandada se hallan incluidas dentro de su ámbito".

487.- El pago de penas convencionales por atraso reclamadas por PEP en vía reconvencional, están pactadas en las Cláusulas 11 y 11.1 del Contrato, por lo que de ninguna manera puede ser contradictoria la conducta de PEP. Por otro lado, la Cláusula 23.2 se ha establecido a favor de PEP y no de la Contratista. Esto es, COMMISA sí está obligada para con PEP a resarcirla de cualquier pérdida o daño que resulte de la ejecución de los trabajos o del cumplimiento o incumplimiento de los trabajos, porque PEP no la excusó de

responsabilidad en esos casos; COMMISA sí excuso a PEP del pago de daños no pactados expresamente.

488.- Los puntos litigiosos 2 (a), (b) y (c), consisten en lo siguiente:

> *"(a)¿Constituye alguna de las pretensiones o peticiones formuladas por la Demandante una controversia técnica, tal como se define este concepto en el Contrato EPC-28?; (b) De ser la respuesta a la anterior pregunta 2. (a) afirmativa, ¿se han sometido dicha o dichas controversias técnicas al procedimiento previsto en la cláusula 23.2 del Contrato?; (c) De ser negativa la respuesta a la anterior pregunta 2. (a) ¿cuál sería la consecuencia a los efectos del presente arbitraje?".*

Sobre este tema, el Tribunal Arbitral resuelve infundada y equivocadamente en el párrafo 121 del Laudo Arbitral lo siguiente:

> *" ... la petición principal del Demandante consiste en 39 Controversias Técnicas, que fueron sometidas correctamente sometidas al procedimiento previsto en la cláusula 23.2 del Contrato, quedando expedita la vía arbitral para su reclamación; ... y que en consecuencia , no existe impedimento alguno para entrar a conocer el fondo de las reclamaciones".*

Es importante señalar también en este párrafo la infundada consideración del Tribunal Arbitral de considerar que las pretensiones reconvencionales de PEP y la solicitud de prórroga no requieren ser formalizadas como controversias

244

técnicas, al haberse planteado una vez terminada la obra y cesado el Supervisor.

489.- Para poder entender claramente este punto, es importante entender que es una Controversia Técnica. Las partes pactamos en la cláusula 23.2 del Contrato lo siguiente:

> "23.2 *Controversias Técnicas.* El Contratista no tendrá derecho a efectuar ningún reclamo y PEP no será responsable por daños legales (incluyendo negligencia) o contractuales ante el Contratista, sus proveedores secundarios o subcontratistas, excepto en los casos específicamente previstos en este Contrato.
>
> Para efectos de esta Cláusula se entenderá por Controversia Técnica toda diferencia que surja por cualquier reclamo o sea atribuible a la interpretación o ejecución de este Contrato, entre el Supervisor y el Contratista, en relación con los Anexos Técnicos del Contrato (A, B, B-1, B-2, B-3, CEV, DT, DT-1, DT-2.1, DT-2.2, DT-3, DT-4, E-2, F-1 Y F-2)
>
> Si por cualquier motivo el Supervisor y ·el Contratista no coinciden en la apreciación para resolver un reclamo de ajuste derivado de una Controversia Técnica, <u>el Contratista deberá hacer formal dicha Controversia Técnica por escrito al Supervisor y solicitarle la determinación correspondiente. Este tipo de solicitud del Contratista deberá ser claramente identificado indicando que se trata de una Controversia Técnica sujeta a resolución al amparo de esta Cláusula 23, debiendo contener un resumen de los hechos en controversia y la propuesta del Contratista para resolverlos ... "</u>.

490.- De conformidad con la cláusula anteriormente transcrita, tenemos que puede haber controversias, disputas o reclamos, informales, por llamarlos de alguna manera

245

(aunque es obvio que deben ser por escrito), y formales. Las controversias formales deben plantearse por escrito, de manera formal, **especificar en el documento que se trata de una controversia técnica**, proporcionando los hechos que motivan la reclamación y una propuesta de solución.

491.- En el presente caso tenemos, como ha quedado probado en el juicio de Arbitraje, que la demandante COMMISA, presentó y formalizó extemporáneamente las controversias técnicas 19, 34, 35 y 36, en un momento en que por disposición contractual, ya no podían ser atendidas, por lo que las mismas no podían ser materia del arbitraje ni ser válidamente consideradas.

492.- Del Acta de Recepción Física Total de los trabajos de 30 de agosto de 2002, que se anexa como prueba a la presente solicitud, se evidencia que en esa fecha la demandante no había planteado formalmente una controversia técnica  por obstrucciones (C.T. 19), pago de diferencias por tiempos de espera por trabajos de la Castoro 10 en plataformas (C. T. 27), por retrasos en el inicio de los trabajos con embarcaciones en los términos y condiciones contractuales (C. T. 34 y 35), o por retrasos por malos tiempos, en la que hubiere planteado por escrito los motivos de su reclamo (C. T. 36) Véase también el Voto Particular del árbitro D. Darío Oscós Coria que es parte integrante del Laudo Final.



246

493.- En el Acta de Recepción Física Total del Contrato PEP-O-IT-136/98 de 30 de agosto de 2007, en la página 17 (folio 1158), se establece un capítulo titulado "RECLAMOS EN ELABORACIÓN POR COMMISA". Estos reclamos pendientes de elaboración se dividen en varios paquetes de reclamaciones, que son los siguientes:

Los paquetes 1 a 5 se refieren a diversos extraordinarios relativos a trabajos de construcción relativos al retiro de obstrucciones, que en laudo se decidieron como Controversia Técnica 19.

El Paquete 7 se refiere a "Afectaciones por condiciones climatólogicas (Castoro 10 y Bar Protector), que en laudo se decidieron como Controversia Técnica 36.

En el paquete 13 se comprende la reclamación por "Retraso en el inicio de la construcción por falta de disponibilidad de las plataformas" (Notificación de Cambio 23), que en laudo se decidieron como Controversias Técnicas 34 y 35; la reclamación por "Variación de costos de trabajos en tuberías partes superiores (top sides), que en laudo se decidieron como Controversia Técnica 27.

494.- Es muy importante señalar que el Acta de Recepción Física Total de los Trabajos fue firmada tanto por los representantes de COMMISA, Ingenieros Juan Manuel

247

Herrera y Nicolás Martínez Bocanegra, al igual que por los representantes de PEP. Es preciso hacer notar de igual manera que el listado de Reclamos o Controversias Técnicas en proceso de elaboración, fue una manifestación de COMMISA, tal como se desprende del párrafo puesto al pie del listado y que a la letra dice:

> "LA CONTRATISTA MANIFIESTA QUE FALTA INCLUIR EN ESTE CUADRO EL MONTO DE ALGUNOS PRECIOS (como en la reclamación referente a malos tiempos, es decir, en esta fecha ni siquiera tenía COMMISA una cantidad líquida) EN LO REFERENTE A OBRA EXTRAORDINARIA EJECUTADA ASÍ COMO DIVERSOS RECLAMOS QUE HASTA EL MOMENTOSE ENCUENTRAN EN PROCESO DE ELABORACIÓN".

495.- La preclusión del derecho de COMMISA para ventilar sus reclamos mediante el arbitraje, va aparejada de la preclusión de su derecho a reclamar de PEP el pago de cualquier cantidad de dinero por estos reclamos, toda vez que el Anexo B Sección 5, del Contrato, denominado "Modificaciones" establece que *"toda demora del contratista para dar aviso o presentar la propuesta a que se refiere el párrafo anterior, será motivo suficiente para rechazar la reclamación si el retraso perjudica a PEP y en la medida que lo haya perjudicado. **En ningún caso se considerará una reclamación del Contratista si se hace después de la Recepción Parcial o Total ...".***

Así las cosas, podemos afirmar que las consideraciones del Tribunal Arbitral son infundadas, y a veces atentan contra el buen sentido, como se expondrá a continuación.

496.- En el capítulo correspondiente a otras controversias, se estableció claramente que solamente en 29 eventos de adecuación de trabajos y remoción de obstrucciones COMMISA cumplió con el procedimiento de modificación contractual previstos en el contrato. Las otras 51 reclamaciones de obstrucciones no cumplieron con este requisito, y así se demuestra con el Acta de Recepción Física Total, cuya parte conducente transcribimos en párrafos anteriores.

Por tal razón es infundado y falso lo asentado por el Tribunal Arbitral en la parte final del párrafo 112 del Laudo Arbitral, porque a la controversia técnica 19 nunca se le dio ese carácter. Es más, es ininteligible la consideración del Tribunal Arbitral en el contexto del Contrato, porque no estaríamos hablando de una controversia técnica sino de cuando menos cinco controversias técnicas relativas a obstrucciones, sino es que más, de acuerdo también con el Acta de Recepción Física de los Trabajos ya transcrita supra.

En el párrafo 115 el Tribunal Arbitral señala que:

> "Constituyen hechos probados que el 30 de agosto de 2002 las partes otorgaron el <Acta de

249

*Recepción Física Tota> prevista en la cláusula 9.2.6 del Contrato. En el Acta ambas partes reconocieron que existían aproximadamente 30 reclamaciones relativas a Controversias Técnicas en marcha, y Commisa advirtió que faltaba por incluir el monto de alguna obra extraordinaria y diversos reclamos adicionales, lo que implica que la reclamación existía, a los efectos del Anexo B2 del Contrato, aunque estuviera pendiente su cuantificación ...".*

En esta afirmación, una vez más se vuelve a equivocar el tribunal arbitral. Las reclamaciones que se listaron en el "Acta de Recepción Física Total" de los Trabajos estaban en proceso de elaboración. Es decir, fueron presentadas posteriormente al Acta mencionada, cuando por disposición de la parte final de la Sección 5 del Anexo B-2 del Contrato, ni siquiera podían ser ya atendidas[57], y mucho menos formalizadas como controversias técnicas. Vale precisar también que en el Contrato se distingue entre reclamo y Controversia Técnica, por lo que su utilización como sinónimo por parte del Tribunal Arbitral es infundada.

497.- El Tribunal Arbitral hace una afirmación infundada en el párrafo 115 del Laudo Arbitral, cuando señala que PEP admitió expresamente en su Escrito de Concusiones (documento R 29, página 21, que con este escrito se acompaña como prueba) que las 39 reclamaciones de COMMISA se substanciaron como Controversia Técnica en los

---

[57] *"...toda demora del contratista para dar aviso o presentar la propuesta a que se refiere el párrafo anterior, será motivo suficiente para rechazar la reclamación si el retraso perjudica a PEP y en la medida que lo haya perjudicado. En ningún caso se considerará una reclamación del Contratista si se hace después de la Recepción Parcial o Total ..."*

250

términos de la Cláusula 23.2 del Contrato. En efecto, el tribunal arbitral señala:

> "Aún cuando en el contrato IPC-28, COMMISA y PEP establecieron un procedimiento para dirimir todas aquéllas divergencias que surgieran con motivo de la interpretación o ejecución del contrato <cláusula 23.2 Controversias Técnicas> <de hecho algunos reclamos fueron resueltos en los términos de dicho procedimiento>, las partes establecieron mesas de trabajo"

Con esto no tiene razón en afirmar el Tribunal Arbitral que PEP reconoció a los 39 reclamos como controversias técnicas, sino solamente a algunos. La frase tampoco le permite identificar a cuáles de los 39 reclamos se les dio el carácter de controversias técnicas, y lo que es más importante, tampoco puede el Tribunal Arbitral afirmar con sustento que se refieren a las reclamaciones presentadas después del "Acta de Recepción Física Total" de los Trabajos.

498.- En el párrafo 117 el Tribunal Arbitral afirma que a COMMISA no le ha precluído su derecho por haber abandonado las mesas de trabajo, por lo siguiente: "... *De acuerdo con el tenor literal de la cláusula 23.2 del Contrato, transcurridos 30 días naturales desde el inicio de las negociaciones, ambas partes tienen expedito el acceso al arbitraje ...*".

499.- Después del Acta de Recepción Física de los Trabajos, no eran admisibles ni reclamos, ni controversias

251

técnicas, por disposición del último párrafo de la Sección 5 del Anexo B-2 del Contrato. Las negociaciones a que se refiere el último párrafo del artículo 23.2 del Contrato, son para resolver en definitiva una Controversia Técnica, resuelta previamente por el Supervisor del Contrato. En el caso esto era imposible jurídicamente hablando, porque ni siquiera se había elaborado un reclamo, ni había resolución del supervisor.

Las negociaciones se llevaron a cabo, como es usual en toda operación que no termina satisfactoriamente para las partes, para tratar de evitar un pleito judicial o una disputa arbitral, según el caso.

500.- Las indicadas negociaciones fueron sacadas de su contexto por el Tribunal Arbitral, para determinar a conveniencia, que se había cumplido con el procedimiento contractual, y no es así. El Tribunal mismo se contradice en este hecho, porque el mismo Tribunal reconoce que una vez que se recibe y acepta la obra, y cesa en sus funciones el Supervisor, no hay posibilidad de desarrollar el procedimiento descrito en la cláusula 23.2 del Contrato (párrafo 118 del Laudo Final). En efecto, el tribunal arbitral señala:

> "118. La alegación de PEP es , además, incongruente con su propia actitud en este arbitraje: PEP ha planteado reclamaciones en vía reconvencional, sin haber alegado ni probado con respecto a ellas el cumplimiento

252

*del procedimiento de Controversia Técnica diseñado en la Cláusula 23.2 ..."*

501.- Para ser cierta la consideración anteriormente transcrita, primero tiene que demostrase que PEP está sujeto a la Cláusula 23.2 del Contrato para plantear sus reclamaciones. Esto no es así, porque como se desprende del párrafo tercero del indicado numeral, el obligado a plantear formalmente es COMMISA: ya que *"si por cualquier motivo el Supervisor y el Contratista no coinciden en la apreciación para resolver un reclamo de ajuste derivado de una Controversia Técnica, **el Contratista**, deberá hacer formal dicha controversia ..."*.

502.- Se vuelve a insistir, COMMISA responde a PEP por cualquier daño que le cause, contractual o legal, sin limitación y sin requisitos previos. Así está pactado el Contrato, y una vez más vuelve el Tribunal Arbitral a ignorar, que se trata de un contrato administrativo y no mercantil, sujeto a distintos principios.

503.- Por la misma razón es infundada y falsa la consideración del Tribunal Arbitral contenida en el mismo párrafo 118 del Tribunal Arbitral que dice:

> *"El comportamiento de PEP muestra cual debe ser la recta interpretación de la cláusula 23 del Contrato: las Controversias Técnicas únicamente pueden plantearse durante la fase en que se están ejecutando los trabajos.*

253

> *Terminados éstos, otorgada el Acta de Recepción Total de la obra, cesa el Supervisor en sus funciones y, por lo tanto, no hay posibilidad de desarrollar el procedimiento descrito en la cláusula 232 del Contrato. Es por esta razón que el demandado ha podido válidamente plantear sus pretensiones reconvencionales, sin tener que pasar por el procedimiento de las Controversias Técnicas".*

De la conducta de PEP, no puede deducirse más que, al no estar obligado a formalizar sus reclamaciones en Controversia Técnica, éstas pueden realizarse durante la ejecución de los trabajos o una vez recibida la obra, y ser materia de arbitraje por estar relacionada con el contrato. Existen en el contrato diversas cláusulas en ese sentido para exigir responsabilidad al contratista por trabajos mal ejecutados, faltantes. vicios ocultos y garantías. En cambio, no es posible para el Contratista formalizar sus controversias una vez terminado el contrato, por disposición del último párrafo de la Sección 5 del Anexo B-2 del Contrato, y mucho menos formalizarlas en Controversia Técnica. En su caso, COMMISA tendría que ejercer sus derechos ante los Tribunales Nacionales, sin opción de acudir al arbitraje, al no cumplir con el segundo supuesto para que una disputa, reclamación o controversia sea arbitrable.

La interpretación de esta cláusula por parte del Tribunal Arbitral es insuficiente. No puede seriamente afirmar que el Contratista puede plantear sus reclamaciones como le venga en gana, una vez terminado el Contrato, ya que    atenta

contra el principio contractual que impide que el cumplimiento de un contrato quede al arbitrio de una de las partes, que es un principio toral del derecho internacional privado, que el Tribunal Arbitral violentó. Más bien, el contratista ya no puede plantear sus reclamaciones de ninguna manera, en el arbitraje.

504.- Es importante subrayar que el Supervisor de la Obra no cesa en sus funciones terminada la obra, sino hasta que se extingan todos los derechos y obligaciones que resulten de la misma, es decir, hasta que se liquide el contrato mediante la estimación final, a la que ya nos referimos en el capítulo correspondiente a Gastos Financieros. Tan es así, que con fecha 8 de abril de 2003, siete meses después de terminada la obra, por supuesto, de manera extemporánea y sin posibilidad de surtir efectos, COMMISA le solicita al supervisor del Contrato, Ingeniero Alfredo Gómez Rangel que formalizara la Controversia Técnica relativa a malos tiempos (Documento COM/EP2800/2003-5556). Este documento era conocido por el Tribunal Arbitral, y negligentemente no fue tomado en cuenta en la decisión, tal como se acredita con la cita que hace del mismo el árbitro disidente Licenciado Darío Oscós Coria en su Voto Particular (página 4, párrafo 8).

505.- Por otro lado, este mismo documento acredita, tomando en cuenta la conducta de las partes, que COMMISA aún no había formalizado Controversia Técnica

255

alguna en esta materia, al terminar el Contrato, y que su reclamación fue extemporánea, cuando no había posibilidad jurídica que PEP tomara en cuenta el fondo del asunto (por ejemplo, de manera similar a un recurso extemporáneo que es ineficaz para acreditar la definitividad en el amparo). En tal virtud, es un contrasentido la actitud del Tribunal Arbitral en demostrar que se formalizó la controversia técnica, aún en contra de la expresa manifestación de COMMISA y por ello también procede que se declare nulo el laudo arbitral.

Se subraya que, esto refuerza la interpretación de PEP del "Acta de Recepción Física Total" de los Trabajos, en el sentido de que tampoco COMMISA formalizó su controversia técnica con respecto a las controversias técnicas 19, 27, 34 y 35.

506.- En estas consideraciones, el Tribunal Arbitral trata de justificar en forma infundada que COMMISA no tenía obligación de sujetarse a la cláusula 23.2 del contrato, y además, se contradice en el momento de decidir el fondo de las controversias, por lo que el laudo es completamente incongruente, y por ende, carece de fundamentación y motivación, atentando contra la soberanía constitucional que es de orden público y por ello el laudo resulta nulo.

Por ejemplo, en la controversia 36 el Tribunal Arbitral trata de justificar que la Contratista sí presentó una

256

controversia técnica. Véanse los párrafos 233 y 234, página 56, del Laudo Final, en la cual el Tribunal Arbitral manifiesta que COMMISA supuestamente alegó su derecho a una remuneración por malos tiempos debido a la reprogramación de los trabajos, que de ninguna manera puede ser considerada la formalización de una controversia técnica. El párrafo en cuestión dice *"Esto no incluye ningún tiempo adicional de espera por condiciones climatológicas debido a la extensión del programa de trabajo"*.

507.- Formalizar la controversia, contractualmente no es lo mismo que insinuar o presumir un supuesto derecho, como lo hizo COMMISA. La decisión del Tribunal Arbitral aprobó la conducta de COMMISA, en plena contradicción con el pacto contractual. Lo cierto es que para efectos del arbitraje, COMMISA tenía que haber formalizado previa y oportunamente, como Controversia Técnica, todos sus reclamos tal como lo exige el acuerdo de arbitraje contenido en la Cláusula 23.3 del Contrato de Obra Pública. Si no fue así, dicha Controversia Técnica no podía ser materia de arbitraje, por lo que las consideraciones del Tribunal Arbitral se refieren a controversias no previstas en el acuerdo de arbitraje, ya que sólo controversias técnicas formales pueden ser materia de arbitraje; o en su caso, el Laudo Arbitral contiene decisiones que exceden los términos del acuerdo de arbitraje, ya que el Tribunal Arbitral sólo puede resolver en definitiva, controversias técnicas.

508.- De todo lo expuesto, resulta evidente que el laudo arbitral se refiere a controversias no previstas en el acuerdo arbitral, que el laudo arbitral excede los términos del acuerdo arbitral, que el laudo arbitral es contrario al orden público y por ello es procedente que se declare la nulidad del laudo arbitral.

## M E D I D A S   S O L I C I T A D A S

De conformidad con lo dispuesto por el artículo 384 del Código Federal de Procedimientos Civiles, solicito que Su Señoría decrete las medidas necesarias para mantener la situación de hecho existente.

Esto es, mi representada solicita a Su Señoría que ordene a COMMISA que se abstenga de ejecutar y/o llevar cualquier acto tendiente a solicitar el reconocimiento o ejecución del laudo arbitral cuya nulidad se solicita, o cualquier acto realizado en o para ejecutar el laudo arbitral.

Es claro que en el presente caso, la orden de mantener las cosas en el estado que guardan, no ocasiona daño ni perjuicio alguno a la demandada COMMISA, puesto que mi representada es solvente y se encuentra ejerciendo su derecho a solicitar la nulidad del laudo arbitral, que es un derecho legítimo, toda vez que, como se ha demostrado a lo largo del presente escrito, el procedimiento arbitral no se ajustó al acuerdo celebrado entre las partes, el laudo es contrario al orden público, el laudo contiene decisiones que

258

exceden los términos del acuerdo de arbitraje, y el tribunal arbitral dictó un laudo conforme a equidad y no conforme a estricto derecho, tal y como lo pactaron las partes.

Por otra parte, mi representada está exenta de prestar la garantía exigida por el artículo 387 del Código Federal de Procedimientos Civiles, de conformidad con lo dispuesto por el artículo 4 del mismo ordenamiento, que establece:

> "Artículo 4.- Las instituciones, servicios y dependencias de la Administración Pública de la Federación y de las entidades federativas tendrán, dentro del procedimiento judicial, en cualquier forma en que intervengan, la misma situación que otra parte cualquiera; pero nunca podrá dictarse, en su contra, mandamiento de ejecución ni providencia de embargo, **y estarán exentos de prestar las garantías que este Código exija de las partes**".

## P R U E B A S:

Con fundamento en los artículos 360 y demás relativos del Código Federal de Procedimientos Civiles, se ofrecen las pruebas siguientes:

## I. DOCUMENTALES.

**1. Décimo séptimo testimonio del Instrumento Público Número 13,250** del Libro 288, pasada ante la fe del Notario Público 229 del Distrito Federal, Licenciado Marco Antonio Ruiz Aguirre, misma que se ofrece para demostrar la personalidad y representación de PEP que ostenta el Lic. José

Néstor García Reza, y expresada en el preámbulo de este ocurso.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

Esta prueba es idónea para demostrar la personalidad con que se actúa porque evidencia su otorgamiento en escritura pública de conformidad con la fracción I del artículo 2555 del Código Civil Federal, y porque hace prueba plena en los términos del artículo 1292 del Código de Comercio.

**2. Laudo Final** emitido con fecha 15 de enero de 2008 en el Juicio de Arbitraje, referencia: Caso 13716/CCO/JRF, promovido por Corporación Mexicana de Mantenimiento Integral, S. de R. L. de C. V., en contra de PEMEX Exploración y Producción.

Esta probanza se ofrece con relación a los Capítulos de hechos y de derecho, numerados del II al XI del presente escrito, para demostrar el objeto y la causa o causas de la presente solicitud de nulidad. Este documento es el idóneo para demostrar el objeto y la causa o causas de nulidad, en los términos del artículo 1461 del Código de Comercio, aplicado por mayoría de razón, que exige como documento base de la acción el laudo original o su copia certificada.

260

Este documento contiene las consideraciones y decisiones del Tribunal Arbitral, que PEP acusa de ser anulables por infringir el artículo 1457 del Código de Comercio. Este es el principal documento con el cual PEP demostrará los vicios de que adolecen las decisiones del Tribunal Arbitral sobre las Controversias: 19, relativa a obstrucciones; 27, relativa a diferencias por tiempos de espera por trabajos en plataformas; 34 y 35, relativas a retraso de trabajos con embarcaciones por falta de acceso; 36, relativa a pagos por suspensiones a los trabajos por malos tiempos; 37 y 39 por trabajos de cruces; la decisión sobre el pago de gastos financieros; la decisión por la cual se declara competente para conocer de todas las controversias; y la decisión de condenar a pagar a PEP por los costos incurridos en el arbitraje; ya sea porque el Tribunal Arbitral dejó en indefensión a PEP, impidiéndole que hiciera valer sus derechos; o se refirió en el laudo a una controversia no prevista en el acuerdo de arbitraje o que excedía los términos del arbitraje; o porque el procedimiento arbitral no se ajustó al acuerdo de las partes plasmado en el compromiso arbitral, o porque el laudo contiene decisiones contrarias al orden público mexicano.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**3. Comunicación de la Corte Internacional de Arbitraje** de la Cámara Internacional de Comercio de fecha 7 de febrero de 2008, firmada por D. José Ricardo Feris, Consejero de la Secretaría de la Corte Internacional de Arbitraje de la Cámara Internacional de Arbitraje, enviada por mensajería y recibida por la Oficina del Abogado General de Petróleos Mexicanos con fecha 11 de febrero de 2008, la cual se ofrece para demostrar la oportunidad de la presente solicitud.

Este documento es idóneo para demostrar la notificación del laudo en atención a que se realizó por la Secretaría de la Corte Internacional de Arbitraje, en los términos de los artículos 3.2 y 28.1 del Reglamento de Arbitraje de la CCI, ordenamiento procesal conforme al cual se desarrolló el procedimiento de arbitraje, atendiendo al compromiso arbitral contenido en la cláusula 23.3 del Contrato de Obra Pública.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**4. Contrato No. PEP-O-IT-136/98 (IPC-28)** celebrado entre la empresa Corporación Mexicana de Mantenimiento Integral, S. de R. L. de C. V. (COMMISA) y Pemex Exploración y Producción (PEP) de fecha 4 de septiembre de 1998,

documental que se ofrece con relación a los capítulos de hechos y de derecho I, IV, V, VI, VII, VIII, IX, X y XI de la presente solicitud. Los hechos que se pretende probar con el mismo son los siguientes:

a) El acuerdo de arbitraje: la cláusula 23.3 Contrato contiene el compromiso en árbitros signado por PEP y COMMISA, mediante el cual se comprometieron a resolver sus controversias técnicas mediante arbitraje, de conformidad con el Reglamento de Arbitraje de la Cámara de Comercio Internacional, así como que el arbitraje tendría como sede la ciudad de México, Distrito Federal, y se desarrollaría en idioma español.

b) El método de resolver controversias entre las partes de conformidad con la cláusula 23 del Contrato, la cual establece en su inciso 23.1, la aplicación de las leyes federales mexicanos para la regulación del Contrato; en su inciso 23.2, el procedimiento de controversia técnica como requisito previo al arbitraje; y el inciso 23.3 que establece el compromiso en árbitros, y la estipulación de que solamente controversias técnicas pueden ser materia de arbitraje.

c) La cláusula 23.2 del Contrato, en su primer párrafo determina la falta de responsabilidad de PEP por daños legales (por negligencia o contractuales),

que no estuvieran expresamente pactados en el Contrato.

d) El objeto del Contrato, y la obligación de COMMISA a terminar los trabajos acatando lo establecido en los diversos ordenamientos y en los anexos técnicos del Contrato, contenida en la cláusula 1.

e) La remuneración términos de pagos del contrato, de conformidad con la cláusula 3 del Contrato: se demuestra con esta cláusula que se trata de un contrato de obra a precios unitarios; que se estableció un procedimiento de pago formal, que ni el Tribunal Arbitral ni COMMISA, obedecieron; las funciones del supervisor en el procedimiento de pago; la necesidad de elaborar estimación para la obtención del pago, su autorización y presentación en ventanilla única por parte de COMMISA.

f) Los extremos conforme a los cuáles se genera el pago de gastos financieros.

g) Los efectos de las suspensiones a los trabajos por caso fortuito, de conformidad con la cláusula 4.4 y 12.1 y 12.2, que sólo generarían prórrogas y no pagos.

h) La naturaleza formal de las modificaciones contractuales (cláusula 5).

i) Con la cláusula 6 se prueba la obligación del Contratista de realizar trabajos extraordinarios; la definición de éstos; y su remuneración.

j) La naturaleza del Acta de Recepción Física de los Trabajos en los términos de la cláusula 9.2.6 del Contrato;

k) Las condiciones de remuneración por suspensiones a los trabajos, y la definición de gastos no recuperables (cláusula 10.1.2.

l) La ausencia de responsabilidad por caso fortuito, y la consideración que se hace de caso fortuito a las condiciones climáticas adversas, de conformidad con la cláusula 16.

m)    Las obligaciones del contratista relativas a embarcaciones (cláusula 16), y

n) Cualquier otra referencia a acuerdos contenidos en el Contrato de Obra Pública.

Este documento es el idóneo para demostrar el acuerdo entre las partes, para la ejecución de la obra pública solicitada, de conformidad con el artículo 214 del Código Federal del Código Federal de Procedimientos Civiles, por encima de testigos o presunciones.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**5. Anexo B 2 "Generalidades" del Contrato** No. PEP-O-IT-136/98 (IPC-28) celebrado entre la empresa Corporación Mexicana de Mantenimiento Integral, S. de R. L. de C. V. (COMMISA) y Pemex Exploración y Producción (PEP), que forma parte integrante del Contrato de Obra, y que se ofrece con relación a los capítulos de hechos y de derecho IV, secciones tercera y cuarta, V, sección cuarta, VII, secciones 1 y 2, y XI, de la presente demanda, para demostrar lo que se entiende por "Programa de Trabajo" (numeral 3), así como el incumplimiento de COMMISA al procedimiento de modificación contractual y la preclusión de su derecho para realizar cualquier reclamación (numeral 5). Este documento es idóneo para demostrar estos hechos o derecho, porque constituye un anexo técnico que desarrolla estos temas con relación al Contrato.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**6. Anexo B 2 "Plan para la Ejecución del Trabajo" del Contrato** No. PEP-O-IT-136/98 (IPC-28) celebrado entre la empresa Corporación Mexicana de Mantenimiento Integral, S. de R. L. de C. V. (COMMISA) y Pemex Exploración y Producción (PEP), que se ofrece con relación al Capítulo V, sección primera de esta solicitud, para demostrar las

266

condiciones de arribo de las embarcaciones con relación al pago de tarifas de espera. Este documento es idóneo para ese efecto por ser parte integrante del Contrato.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**7. Convenio Número Uno al Contrato** No. PEP-O-IT-136/98 (IPC-28) de fecha 4 de febrero de 2000; este documento se ofrece con relación a los Capítulos IV y XI, relativo a malos tiempos e incompetencia del Tribunal Arbitral, y se ofrece para demostrar que: i) toda modificación se debe formalizar en convenio; ii) que toda cláusula no modificada expresamente continúa imponiéndose a las partes; iii) que la cláusula 12 sobre caso fortuito no fue modificada; y, iii) que la cláusula 23.2 sobre daños legales jamás fue modificada. Este documento es idóneo por ser parte integrante del Contrato.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**8. Convenio Número Dos al Contrato** No. PEP-O-IT-136/98 (IPC-28) de fecha 31 de mayo de de 2000; este documento se ofrece con relación a los Capítulos IV y XI, relativo a malos tiempos e incompetencia del Tribunal Arbitral, y se ofrece

para demostrar que: i) toda modificación se debe formalizar en convenio; ii) que toda cláusula no modificada expresamente continúa imponiéndose a las partes; iii) que la cláusula 12 sobre caso fortuito no fue modificada; y, iii) que la cláusula 23.2 sobre daños legales jamás fue modificada. Este documento es idóneo por ser parte integrante del Contrato.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**9. Convenio Número Tres al Contrato** No. PEP-O-IT-136/98 (IPC-28) de fecha 20 de julio de 2000; este documento se ofrece con relación a los Capítulos IV y XI, relativo a malos tiempos e incompetencia del Tribunal Arbitral, y se ofrece para demostrar que: i) toda modificación se debe formalizar en convenio; ii) que toda cláusula no modificada expresamente continúa imponiéndose a las partes; iii) que la cláusula 12 sobre caso fortuito no fue modificada; y, iii) que la cláusula 23.2 sobre daños legales jamás fue modificada. Este documento es idóneo por ser parte integrante del Contrato.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**10. Convenio Número Cuatro al Contrato** No. PEP-O-IT-136/98 (IPC-28) de fecha 29 de agosto de 2000; este documento se ofrece con relación a los Capítulos IV y XI, relativo a malos tiempos e incompetencia del Tribunal Arbitral, y se ofrece para demostrar que: i) toda modificación se debe formalizar en convenio; ii) que toda cláusula no modificada expresamente continúa imponiéndose a las partes; iii) que la cláusula 12 sobre caso fortuito no fue modificada; y, iii) que la cláusula 23.2 sobre daños legales jamás fue modificada. Este documento es idóneo por ser parte integrante del Contrato.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**11. Convenio Número Cinco al Contrato** No. PEP-O-IT-136/98 (IPC-28) de fecha 3 de noviembre de 2000; ; este documento se ofrece con relación a los Capítulos IV y XI, relativo a malos tiempos e incompetencia del Tribunal Arbitral, y se ofrece para demostrar que: i) toda modificación se debe formalizar en convenio; ii) que toda cláusula no modificada expresamente continúa imponiéndose a las partes; iii) que la cláusula 12 sobre caso fortuito no fue modificada; y, iii) que la cláusula 23.2 sobre daños legales jamás fue modificada. Este documento es idóneo por ser parte integrante del Contrato.

269

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**12. Convenio Número Seis al Contrato** No. PEP-O-IT-136/98 (IPC-28)  de fecha 21 de noviembre de 2000; ; este documento se ofrece con relación a los Capítulos IV y XI, relativo a malos tiempos e incompetencia del Tribunal Arbitral, y se ofrece para demostrar que: i) toda modificación se debe formalizar en convenio; ii) que toda cláusula no modificada expresamente continúa imponiéndose a las partes; iii) que la cláusula 12 sobre caso fortuito no fue modificada; y, iii) que la cláusula 23.2 sobre daños legales jamás fue modificada. Este documento es idóneo por ser parte integrante del Contrato.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**13. Convenio Número Siete al Contrato** No. PEP-O-IT-136/98 (IPC-28)   de 26 de diciembre de 2000; ; este documento se ofrece con relación a los Capítulos IV y XI, relativo a malos tiempos e incompetencia del Tribunal Arbitral, y se ofrece para demostrar que: i) toda modificación se debe formalizar en convenio; ii) que toda cláusula no modificada expresamente continúa imponiéndose a las partes; iii) que la cláusula 12 sobre caso fortuito no fue modificada; y, iii) que la

cláusula 23.2 sobre daños legales jamás fue modificada. Este documento es idóneo por ser parte integrante del Contrato.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**14. Convenio Número Ocho al Contrato** No. PEP-O-IT-136/98 (IPC-28) de fecha 16 de mayo de 2001; este documento se ofrece con relación a los Capítulos IV y XI, relativo a malos tiempos e incompetencia del Tribunal Arbitral, y se ofrece para demostrar que: i) toda modificación se debe formalizar en convenio; ii) que toda cláusula no modificada expresamente continúa imponiéndose a las partes; iii) que la cláusula 12 sobre caso fortuito no fue modificada; y, iii) que la cláusula 23.2 sobre daños legales jamás fue modificada. Este documento es idóneo por se parte integrante del Contrato.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**15. Convenio Número Nueve al Contrato** No. PEP-O-IT-136/98 (IPC-28) de fecha 13 de junio de 2001; este documento se ofrece con relación a los Capítulos IV y XI, relativo a malos tiempos e incompetencia del Tribunal Arbitral, y se ofrece para demostrar que: i) toda modificación se debe

# Exhibit A

## Part 7 of 7

formalizar en convenio; ii) que toda cláusula no modificada expresamente continúa imponiéndose a las partes; iii) que la cláusula 12 sobre caso fortuito no fue modificada; y, iii) que la cláusula 23.2 sobre daños legales jamás fue modificada. Este documento es idóneo por ser parte integrante del Contrato.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**16. Convenio Número Diez al Contrato** No. PEP-O-IT-136/98 (IPC-28) de fecha 19 de septiembre de 2001; este documento se ofrece con relación a los Capítulos IV y XI, relativo a malos tiempos e incompetencia del Tribunal Arbitral, y se ofrece para demostrar que: i) toda modificación se debe formalizar en convenio; ii) que toda cláusula no modificada expresamente continúa imponiéndose a las partes; iii) que la cláusula 12 sobre caso fortuito no fue modificada; y, iii) que la cláusula 23.2 sobre daños legales jamás fue modificada. Este documento es idóneo por ser parte integrante del Contrato.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**17. Convenio Número Once al Contrato** No. PEP-O-IT-136/98 (IPC-28) de fecha 29 de noviembre de 2001; este

documento se ofrece con relación a los Capítulos IV y XI, relativo a malos tiempos e incompetencia del Tribunal Arbitral, y se ofrece para demostrar que: i) toda modificación se debe formalizar en convenio; ii) que toda cláusula no modificada expresamente continúa imponiéndose a las partes; iii) que la cláusula 12 sobre caso fortuito no fue modificada; y, iii) que la cláusula 23.2 sobre daños legales jamás fue modificada. Este documento es idóneo por ser parte integrante del Contrato.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**18. Convenio Número Doce al Contrato** No. PEP-O-IT-136/98 (IPC-28)  de fecha 22 de diciembre de 2001; este documento se ofrece con relación a los Capítulos IV y XI, relativo a malos tiempos e incompetencia del Tribunal Arbitral, y se ofrece para demostrar que: i) toda modificación se debe formalizar en convenio; ii) que toda cláusula no modificada expresamente continúa imponiéndose a las partes; iii) que la cláusula 12 sobre caso fortuito no fue modificada; y, iii) que la cláusula 23.2 sobre daños legales jamás fue modificada. Este documento es idóneo por ser parte integrante del Contrato.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

273

**19. Convenio Número Trece al Contrato** No. PEP-O-IT-136/98 (IPC-28)   de fecha 1 de febrero de 2002; este documento se ofrece con relación a los Capítulos IV y XI, relativo a malos tiempos e incompetencia del Tribunal Arbitral, y se ofrece para demostrar que: i) toda modificación se debe formalizar en convenio; ii) que toda cláusula no modificada expresamente continúa imponiéndose a las partes; iii) que la cláusula 12 sobre caso fortuito no fue modificada; y, iii) que la cláusula 23.2 sobre daños legales jamás fue modificada. Este documento es idóneo por ser parte integrante del Contrato.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**20. Convenio Número Catorce al Contrato** No. PEP-O-IT-136/98 (IPC-28)   de fecha 22 de febrero de 2002; este documento se ofrece con relación a los Capítulos IV y XI, relativo a malos tiempos e incompetencia del Tribunal Arbitral, y se ofrece para demostrar que: i) toda modificación se debe formalizar en convenio; ii) que toda cláusula no modificada expresamente continúa imponiéndose a las partes; iii) que la cláusula 12 sobre caso fortuito no fue modificada; y, iii) que la cláusula 23.2 sobre daños legales jamás fue modificada. Este documento es idóneo por ser parte integrante del Contrato.

274

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**21. Convenio Número Quince al Contrato** No. PEP-O-IT-136/98 (IPC-28)   de fecha 16 de marzo de 2002; este documento se ofrece con relación a los Capítulos IV y XI, relativo a malos tiempos e incompetencia del Tribunal Arbitral, y se ofrece para demostrar que: i) toda modificación se debe formalizar en convenio; ii) que toda cláusula no modificada expresamente continúa imponiéndose a las partes; iii) que la cláusula 12 sobre caso fortuito no fue modificada; y, iii) que la cláusula 23.2 sobre daños legales jamás fue modificada. Este documento es idóneo por ser parte integrante del Contrato.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**22. Convenio Número Dieciséis al Contrato** No. PEP-O-IT-136/98 (IPC-28)   de fecha 31 de mayo de 2002; ; este documento se ofrece con relación a los Capítulos IV y XI, relativo a malos tiempos e incompetencia del Tribunal Arbitral, y se ofrece para demostrar que: i) toda modificación se debe formalizar en convenio; ii) que toda cláusula no modificada expresamente continúa imponiéndose a las partes; iii) que la cláusula 12 sobre caso fortuito no fue modificada; y, iii) que la



cláusula 23.2 sobre daños legales jamás fue modificada. Este documento es idóneo por ser parte integrante del Contrato.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**23. Reglamento de Arbitraje** de la Cámara de Comercio Internacional  vigente a partir del 1°. de enero de 1998. Este documento se ofrece para demostrar el derecho o normas procesales aplicadas al procedimiento de arbitraje; así como con relación a los capítulos de hecho y de derecho I, II, III, V (segunda y cuarta), VIII (tres y cuatro), y IX (tres), para demostrar el incumplimiento que del mismo hizo el Tribunal Arbitral. Este documento es idóneo porque conforme al mismo se debió desarrollar el procedimiento de Arbitraje. Por otro lado se está exhibiendo una edición oficial  o propia de la Cámara de Comercio Internacional.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**24. Acta de Misión**. Este documento emitido por las partes y el Tribunal Arbitral  durante el procedimiento de arbitraje, se ofrece con relación a los capítulos de hecho y de derecho II, V (primera, segunda, tercera y cuarta), VIII

(nulidad), IX (tres) y XI del presente escrito, y se ofrece para demostrar: i) la fecha del acta de misión, así como la fecha para interponer nuevas demandas; ii) los puntos litigiosos a resolver por el Tribunal Arbitral, y las pretensiones y demandas de las partes; iii) que nunca se le dieron a los árbitros facultades para resolver como amigable componedor o ex aequo et bono;  y, iv) la violación grave cometida por el Tribunal Arbitral en contra del procedimiento de arbitraje, al resolver cuestiones que no eran materia litigiosa ni pretensión de ninguna de las partes.

Este documento prueba los hechos listados ya que de conformidad con el artículo 18 del Reglamento de Arbitraje, el Tribunal Arbitral debe consignar en el mismo, una exposición sumaria de las pretensiones de las partes, y una lista de puntos litigiosos a resolver.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**25. Orden Procesal no. 1 ter.** Este documento constituye una actuación del Tribunal Arbitral y se ofrece con relación a los capítulos de hechos y de derecho II y III, para demostrar que en el procedimiento de arbitraje las comunicaciones se remitían por mensajería, fax o correo electrónico. Este documento es idóneo para ese efecto, en atención a que en

la página 11 del Acta de Misión se convino que todas las comunicaciones de las partes y del Tribunal se realizarían en la forma prevista en las órdenes procesales expedidas por el Tribunal Arbitral.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**26. Orden Procesal no. 2** y Comunicación A 24 del Tribunal Arbitral. Estos documentos son actuaciones del Tribunal Arbitral, y se ofrecen con relación a los capítulos de hecho y de derecho X y XI, para demostrar que el Tribunal Arbitral decidió resolver las cuestiones de competencia en el Laudo Final, y que por tanto las cuestiones de competencia y jurisdicción planteadas por PEP no dilataron el procedimiento ni le causaron a la contraparte costos adicionales en el arbitraje. Este documento es idóneo para ese efecto puesto que el Tribunal Arbitral dispuso del procedimiento de arbitraje mediante órdenes procesales.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**27. Orden Procesal 6** y Comunicación A 39 del Tribunal Arbitral. Estos documentos son actuaciones del Tribunal

278

Arbitral, y se ofrecen con relación a los capítulos de hecho y de derecho V (segunda) para demostrar la orden y el contenido de las diligencias para mejor proveer ordenadas por el Tribunal Arbitral, así como la violación grave del procedimiento arbitral por parte del Tribunal Arbitral.; de igual manera se ofrecen con relación al capítulo VI, para demostrar que el Tribunal Arbitral no entendió las argumentaciones y excepciones de PEP, y que resolvió la controversia de cruces con pruebas deficientes. Este documento es idóneo para ese efecto puesto que el Tribunal Arbitral dispuso del procedimiento de arbitraje mediante órdenes procesales.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**28. Comunicación C 44 de COMMISA** de fecha 12 de marzo de 2007. Esta comunicación se ofrece con relación al capítulo V (segunda) de este ocurso, y se ofrece para demostrar cuál era la pretensión de COMMISA con relación a las controversias técnicas 34 y 35, así como la violación grave del procedimiento arbitral por parte del Tribunal Arbitral. Este documento es idóneo para ese efecto puesto que proviene directamente de la contraparte, COMMISA.



279

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**29. Comunicación A 49 del Tribunal Arbitral** de fecha 31 de julio de 2007. Esta actuación del Tribunal Arbitral se ofrece con relación al capítulo V (segunda) del presente escrito, para demostrar que el Tribunal introdujo nuevas demandas al pleito con el pretexto de solicitar prueba adicional a las partes; que dejó en indefensión a PEP, y que violó gravemente el procedimiento de arbitraje. Este documento es idóneo para ese fin porque proviene directamente del Tribunal Arbitral, y se encuentra relacionado en las consideraciones del Tribunal.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**30. Comunicación C 47 de COMMISA** de fecha 3 de agosto de 2007. Esta actuación de COMMISA se ofrece con relación al capítulo V (segunda) del presente escrito, para demostrar que el Tribunal introdujo nuevas demandas al pleito con el pretexto de solicitar prueba adicional a las partes; que dejó en indefensión a PEP, y que violó gravemente el procedimiento de arbitraje. Este documento es idóneo para

ese fin porque proviene directamente de la demandante en el arbitraje COMMISA.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**31. Comunicación A 50 del Tribunal Arbitral** de 6 de agosto de 2007. Esta comunicación del Tribunal Arbitral se ofrece con relación al capítulo V (segunda) del presente escrito, para demostrar que el Tribunal introdujo nuevas demandas al pleito con el pretexto de solicitar prueba adicional a las partes; que dejó en indefensión a PEP, y que violó gravemente el procedimiento de arbitraje. Este documento es idóneo para ese fin porque proviene directamente del Tribunal Arbitral.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**32. Comunicación R 39 de PEP** de fecha 7 de agosto de 2007. Este comunicado de PEP se ofrece con relación al capítulo V (segunda) del presente escrito, para demostrar que PEP se opuso en su debida oportunidad a la actuación del Tribunal Arbitral tendiente a violentar gravemente el procedimiento de Arbitraje. Este es documento es idóneo

para ese fin porque demuestra que PEP no renunció a su derecho a objetar de nulidad la decisión de las controversias 34 y 35, en los términos del artículo 33 del Reglamento de Arbitraje.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**33. Comunicación A 51 del Tribunal Arbitral** de 10 de agosto de 2007. Esta comunicación del Tribunal Arbitral se ofrece con relación al capítulo V (segunda) del presente escrito, para demostrar que el Tribunal Arbitral decidió posponer la objeción planteada por PEP en su comunicado R 39, hasta el dictado del Laudo Final. Este documento es idóneo para demostrar el hecho por ser su autor el Tribunal Arbitral.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**34. Comunicación C 49 de COMMISA** de fecha 21 de agosto de 2007. Esta actuación de COMMISA se ofrece con relación al capítulo V (segunda) del presente escrito, para demostrar que el Tribunal introdujo nuevas demandas al pleito con el pretexto de solicitar prueba adicional a las partes; que

282

dejó en indefensión a PEP, y que violó gravemente el procedimiento de arbitraje. Este documento es idóneo para ese fin porque proviene directamente de la demandante COMMISA.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**35. Documento COM/EP2800/2003-5556 de fecha 8 de abril de 2003**, y recibido por PEP con esa misma fecha. Este documento se ofrece con relación a los capítulos de hecho y de derecho IV (tercera), VIII y XI, para demostrar que la Controversia Técnica 36 relativa a malos tiempos, fue presentada extemporáneamente, después de la terminación de los trabajos; que era necesaria la formalización de la controversia técnica como requisito previo al arbitraje; que el Supervisor del Contrato se encontraba todavía en funciones en esa fecha. Este documento es idóneo para ese efecto porque fue citado en el voto particular del Lic. Darío Oscós Coria, coárbitro designado, como prueba de su voto disidente.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**36. Escrito de Alegatos de PEP.** Esta actuación de PEP dentro del procedimiento de arbitraje, se ofrece con relación al capítulo XI para demostrar que no todas las reclamaciones de COMMISA fueron formalizadas como controversias técnicas, y para desmentir al Tribunal Arbitral sobre el punto, y de igual manera evidenciar su descuido en cuanto a la valoración de las pruebas.

Este documento es idóneo para el efecto porque el Tribunal Arbitral cita este documento expresamente, para tener por acreditados los hechos que se pretende desmentir.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**37. Comunicación de 29 de junio de 2006,** remitida por la Licenciada Deva Villanúa Gómez, exhibiendo la relación de documentos presentados en las audiencias del caso. Este documento se ofrece como prueba con relación al capítulo V (segundo) para demostrar que el Tribunal Arbitral no motivo ni fundamento el Laudo, dado que su texto contradice puntualmente las consideraciones del Tribunal. Este documento es idóneo puesto que la suscrita es Secretaria Administrativa del Tribunal Arbitral de conformidad con el apartado E del Acta de Misión.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**38. Orden de Cambio No. 1 Rev. 2 del Contrato** PEP-O-IT-136/98. Este documento se ofrece con relación al capítulo V (primera y segunda) para demostrar que PEP no se comprometió a pagar tarifas de espera por los retrasos iniciales de las embarcaciones; que el Tribunal Arbitral de manera oficiosa introdujo nuevas demandas al pleito; que en las diligencias para mejor proveer el Tribunal Arbitral actuó de mala fe; y en general, la violación grave al procedimiento arbitral por parte del Tribunal Arbitral.

Este documento es idóneo para producir el efecto probatorio señalado, porque el Tribunal Arbitral fundo su decisión precisamente en este documento.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**39. Documento COM/EP2800/99-0302** de fecha 15 de marzo de 1999. Este documento se ofrece con relación a los capítulos VIV, V y XI del presente escrito, para demostrar con relación a la controversia sobre malos tiempos e incompetencia, que no hubo formalización de controversia

285

técnica como requisito previo al arbitraje; y con relación a la controversia por retrasos iniciales, para demostrar que COMMISA no demostró la causación de daño alguno, y que el Tribunal Arbitral condenó a pagar prestaciones que no se devengaron.  Este documento es idóneo para ese efecto, porque el Tribunal Arbitral se refiere expresamente a este documento para justificar que COMMISA formalizó controversia técnica con relación a los malos tiempos, y para determinar las tarifas que PEP debía pagar por los retrasos en los trabajos con embarcaciones.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**40. Acta No. DEPC-RPEP-IPC-28-001-2002** de fecha 30 de agosto de 2002  que consigna la Recepción Física Total de los Trabajos del Contrato No. PEP-O-IT-136/98, celebrado entre Pemex Exploración Y Producción y la compañía Corporación Mexicana de Mantenimiento Integral, S. de R. L. de C. V.  Este documento se ofrece con relación a los capítulos de hechos y de derecho I, IV, V, VII, VIII y X, para demostrar la fecha de terminación de los trabajos; que en la fecha de elaboración del acta de misión COMMISA no había formalizado sus controversias técnicas relativas a malos tiempos, retrasos iniciales, obstrucciones, pagos de diferencias por trabajos en plataformas; que el derecho de COMMISA para reclamar

286

sobre estas materias había precluido; que en estas materias COMMISA no cumplió con los requisitos previos del Contrato para someterse al arbitraje; y, que el Tribunal Arbitral excedió su mandato y resolvió controversias no contempladas en el acuerdo de arbitraje. Este documento es idóneo para ese efecto puesto que es referido en el Voto Particular del Lic. Darío Oscós Coria, coárbitro disidente.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**41. Documento EP2800/COM/99-1696** de fecha 11 de junio de 1999. Este documento se ofrece como prueba con relación al capítulo V (segundo) para demostrar que el Tribunal Arbitral no motivó ni fundamentó el Laudo, dado que su texto contradice puntualmente las consideraciones del Tribunal.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**42. Documento EP2800/COM/99 1604** de 21 mayo de 1999. Este documento se ofrece como prueba con relación al capítulo V (segundo) para demostrar que el Tribunal Arbitral

no motivó ni fundamentó el Laudo, dado que su texto contradice puntualmente las consideraciones del Tribunal.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**43. Documento.** Consistente en el voto particular emitido por el árbitro integrante del Tribunal Darío Ulises Oscós Coria, en el laudo arbitral correspondiente al procedimiento de arbitraje 13716/CCO/JRF administrado por la Corte Internacional de Arbitraje de la Cámara Internacional de Comercio, y que forma parte del Laudo arbitral que se impugna, que se ofrece para demostrar todos los hechos al mismo imputados.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**44. Documento.-** Consistente en todo lo actuado en el procedimiento arbitral 13716/CCO/JRF administrado por la Corte Internacional de Arbitraje de la Cámara Internacional de Comercio, siendo actora COMMISA y demandado PEP, misma que exhibiré en el momento procesal oportuno y una vez que se me expida por el Tribunal Arbitral por conducto del Presidente de la Secretaría de la Corte Internacional de

288

Arbitraje de la CCI, a quien ya se le solicitó como se acredita con la copia de dicha solicitud que para tal fin se exhibe, sin embargo, de juzgarlo pertinente  Su Señoría, solicito de requiera éste para que remita el expediente correspondiente a tal procedimiento arbitral por tratarse de actuaciones totalmente concluidas.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**45. Artículo de Revista:** El orden público como motivo para denegar el reconocimiento y la ejecución de laudos arbitrales internacionales, suscrito por el Dr. José Luis Sequeiros, que se ofrece con relación al capítulo IX de este ocurso para demostrar el derecho internacional privado citado, y la violación al orden público cometido en el laudo.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

**46. Artículo de Revista:** El orden público como causa de denegación del reconocimiento de un laudo arbitral extranjero: criterios para su aplicación práctica, signado por Alvaro López de Argumedo Piñeiro y Marcos De Benito Llopis-Llombart, que se ofrece con relación al capítulo IX de este

ocurso para demostrar el derecho internacional privado citado, y la violación al orden público cometido en el laudo.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

## II. PRESUNCIONAL.

Consistente en aquéllas presuncionales que la Ley o ese Juzgador deriven de lo actuado y por actuar y que me favorezcan.

Relaciono esta prueba con todos y cada uno de los antecedentes de esta demanda, así como en todos y cada uno de los hechos de la demanda.

## D E R E C H O

I. En cuando al procedimiento son aplicables los artículos 1457, 1458, 1459, 1460 y demás relativos del Código de Comercio. Asimismo son aplicables los artículos 360 siguientes y demás relativos del Código Federal de Procedimientos Civiles.

II. En cuanto al fondo, son aplicables los artículos 126 y 134 de la Constitución Política de los Estados Unidos Mexicanos, así

como las normas federales y tesis jurisprudenciales citadas en el desarrollo de la presente demanda.

## RELACION DE DOCUMENTOS QUE SE ACOMPAÑAN A LA DEMANDA.

1.- Testimonio del Instrumento Público No. 13250 de fecha 7 de Abril de 2003, pasada ante el Notario Público No. 229 del Distrito Federal, LIC. MARCO ANTONIO RUIZ AGUIRRE, que contiene poder que otorga PEMEX EXPROPIACIÓN Y PRODUCCIÓN al LIC. JOSÉ NÉSTOR GARCÍA REZA.

2.- Copia notarialmente certificada por el LIC. EDUARDO FRANCISCO GARCÍA VILLEGAS SÁNCHEZ CORDERO, titular de la Notaría No. 248 del Distrito federal, que contiene el LAUDO en el Arbitraje 13716/CCO/JRF de la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional de fecha 15 de enero de 2008, habiéndose llevado el arbitraje en CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., (México) como demandante y PEMEX EXPLORACIÓN Y PRODUCCIÓN (México como Demandada.

3.- Copia notarialmente certificada por el LIC. EDUARDO FRANCISCO GARCÍA VILLEGAS SÁNCHEZ CORDERO, titular de la Notaría No. 248 del Distrito federal, que contiene el VOTO PARTICULAR LAUDO FINAL pronunciado por el Co- Árbitro LIC. DARÍO ULISES OSCÓS CORIA de fecha 15 de enero de 2008,

en el Arbitraje 13716/CCO de la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional entre CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V. (México) como demandante y PEMEX EXPLORACIÓN Y PRODUCCIÓN (México) como demandada.

4.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en la Ciudad de Villahermosa, Tabasco, que contiene el Contrato de Obra Pública a precios unitarios y tiempo determinado que celebran por una parte PEMEX-EXPLORACION Y PRODUCCIÓN el 4 de septiembre de 1998 y por la otra parte CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V.

5.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en la Ciudad de Villahermosa, Tabasco, que contiene la LICITACIÓN PUBLICA INTERNATIONAL No. 18575003-016-98, que es el ANEXO "B-2" de PEMEX EXPLORACION Y PRODUCCIÓN, certificación de fecha 8 de Abril del 2008.

6.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del

Estado y del patrimonio inmueble Federal con adscripción y residencia en la Ciudad de Villahermosa, Tabasco, de fecha 3 de abril del 2008, que contiene una descripción narrativa del plan para la ejecución del trabajo presentada por CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V.

7.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, que contiene el Convenio No. UNO al Contrato PEP-O-136/98, que celebran PEMEX-EXPLORACION Y PRODUCCIÓN con la empresa CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., certificación de fecha 3 de Abril del 2008.

8.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, que contiene el Convenio No. DOS al Contrato PEP-O-136/98, que celebran PEMEX-EXPLORACION Y PRODUCCIÓN con la empresa CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., certificación de fecha 3 de abril del 2008.

9.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, que contiene el Convenio No. TRES al Contrato PEP-O-136/98, que celebran PEMEX-EXPLORACION Y PRODUCCIÓN con la empresa CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., certificación de fecha 3 de Abril del 2008.

10.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, que contiene el Convenio No. CUATRO al Contrato PEP-O-136/98, que celebran PEMEX-EXPLORACION Y PRODUCCIÓN con la empresa CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., certificación de fecha 3 de abril del 2008.

11.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, que contiene el Convenio No. CINCO al Contrato PEP-O-136/98, que celebran PEMEX-EXPLORACION Y PRODUCCIÓN con la empresa CORPORACIÓN MEXICANA DE MANTENIMIENTO

INTEGRAL, S. DE R. L. DE C. V., certificación de fecha 3 de abril del 2008.

12.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, que contiene el Convenio No. SEIS al Contrato PEP-O-136/98, que celebran PEMEX-EXPLORACION Y PRODUCCIÓN con la empresa CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., certificación de fecha 3 de abril del 2008.

13.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, que contiene el Convenio No. SIETE Adicional en Plazo al Contrato PEP-O-136/98, que celebran PEMEX-EXPLORACION Y PRODUCCIÓN con la empresa CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., certificación de fecha 3 de abril del 2008.

14.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, que

contiene el Convenio No. OCHO al Contrato PEP-O-136/98, que celebran PEMEX-EXPLORACION Y PRODUCCIÓN con la empresa CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., certificación de fecha 3 de abril de 2008.

15.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, que contiene el Convenio No. NUEVE al Contrato PEP-O-136/98, que celebran PEMEX-EXPLORACION Y PRODUCCIÓN con la empresa CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., certificación de fecha 3 de abril de 2008.

16.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, que contiene el Convenio No. DIEZ al Contrato PEP-O-136/98, que celebran PEMEX-EXPLORACION Y PRODUCCIÓN con la empresa CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., certificación de fecha 3 de abril del 2008.



296

17.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, que contiene el Convenio No. ONCE al Contrato PEP-O-136/98, que celebran PEMEX-EXPLORACION Y PRODUCCIÓN con la empresa CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., certificación de fecha 22 de Abril del 2008.

18.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, que contiene el Convenio No. DOCE Adicional en Monto al Contrato PEP-O-136/98, que celebran PEMEX-EXPLORACION Y PRODUCCIÓN con la empresa CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., certificación de fecha 3 de abril del 2008.

19.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, que contiene el Convenio No. TRECE al Contrato PEP-O-136/98, que celebran PEMEX-EXPLORACION Y PRODUCCIÓN con la empresa CORPORACIÓN MEXICANA DE MANTENIMIENTO

297

INTEGRAL, S. DE R. L. DE C. V., certificación de fecha 3 de abril del 2008.

20.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, que contiene el Convenio No. CATORCE al Contrato PEP-O-136/98, que celebran PEMEX-EXPLORACION Y PRODUCCIÓN con la empresa CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., certificación de fecha 3 de abril del 2008.

21.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, que contiene el Convenio No. QUINCE al Contrato PEP-O-136/98, que celebran PEMEX-EXPLORACION Y PRODUCCIÓN con la empresa CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., certificación de fecha 3 de abril del 2008.

22.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, que

contiene el Convenio No. DIECISÉIS al Contrato PEP-O-136/98, que celebran PEMEX-EXPLORACION Y PRODUCCIÓN con la empresa CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., certificación de fecha 3 de abril del 2008.

23.- Solicitud del abogado General de PEMEX-EXPLORACION Y PRODUCCIÓN a la Secretaría de la Corte Internacional de Arbitraje, D. JOSE RICARDO FERIS, Corte Internacional de Arbitraje de la Cámara de Comercio Internacional de fecha 24 de abril de 2008 en la cual solicita se expida copia certificada o autenticada de las actuaciones del expediente relativo al procedimiento de arbitraje CCI, referencia 13716/CCO/JRF promovido por CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., (México) contra PEMEX-EXPLORACION Y PRODUCCIÓN (México), consistente en el Acta de Emisión, las Ordenes Procesales emitidas, y las comunicaciones del Tribunal Arbitral, incluyendo las de la secretaría Administrativa, y aquéllas comunicaciones provenientes de COMMISA y PEP.

24.- Correo Electrónico enviado el 30 de abril de 2008 a las 11:06 a.m., por CLAUDIO ERIC DEVEZE MONTOYA, a JOSE RICARDO FERIS de la Corte Internacional de Arbitraje de la Cámara de Comercio en que le solicita copia del expediente de referencia que es CASO 13716/CCO/JRF, CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V.,

(México) con PEMEX-EXPLORACION Y PRODUCCIÓN (México), así como copia del DIARIO DE TRANSMISIÓN, Número 921 0034915159145 con hora de inicio 01-15 07:05 PM 00´36" MCE, página 001 con el resultado (correcto) y el Número 922 0033149532933, con hora de inicio 01-15 07:06 PM 00´18" MCE pagina 001 con resultado (correcto).

25.- Correo Electrónico enviado el 30 de abril de 2008 a las 11:10 a.m. por  CLAUDIO ERIC DEVEZE MONTOYA a los integrantes del Tribunal Arbitral, D. JUAN FERNÁNDEZ-ARMETO, D. JOSE W. FERNÁNDEZ y D. DARIO OSCOS CORIA del CASO 13716/CCO/JRF CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., (México) con PEMEX-EXPLORACION Y PRODUCCIÓN (México).

26.- Original del ACTA DE MISIÓN en el Arbitraje ante la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional entre CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V. (México), con PEMEX-EXPLORACION Y PRODUCCIÓN (México), en el CASO CCI No. 13716/CCO.

27.- Copia de la orden Procesal No. 1 ter en el Arbitraje ante la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional entre CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., (México) con

PEMEX-EXPLORACION Y PRODUCCIÓN (México) en el CASO CCI No. 13716/CCO.

28.- Copia de la Orden Procesal No. 2 Escrito A 24 en el Arbitraje ante la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional entre CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V. (México) con PEMEX-EXPLORACION Y PRODUCCIÓN (México) en el CASO CCI No. 13716/CCO.

29.- Carta de fecha 13 de diciembre de 2006, dirigida por el Presidente del Tribunal Arbitral Juan Fernández-Armesto, a los abogados de las partes en el Arbitraje tanto de la actora como de la demandada a la que anexa la ORDEN PROCESAL No. 6 en el Arbitraje ante la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional entre CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V. (México) con PEMEX-EXPLORACION Y PRODUCCIÓN (México) en el CASO CCI No. 13716/CCO.

30.- Corre electrónico del Secretario de la Corte Internacional de Arbitraje de JOSE RICARDO FERIS para DEVEZE MONTOYA en que acusa recibo de su comunicación de 30 de abril de 2008 en el CASO 13716/CCO/JRF CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., (México) con PEMEX-EXPLORACION Y PRODUCCIÓN (México).

31.- Copia de la comunicación C-44 RESPUESTAS ADICIONALES A LAS PREGUNTAS DEL TRIBUNAL INCLUIDAS EN LA ORDEN PROCESAL No. 6, que envían los abogados de la actora en el arbitraje CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., a la Cámara de Comercio Internacional Corte Internacional de Arbitraje.

32.- Carta de fecha 31 de Julio de 2007, que envía JUAN FERNÁNDEZ-ARMESTO, Presidente del Tribunal Arbitral en CASO CCI No. 13716/CCO a los abogados de la parte actora y demandada.

33.- Correo electrónico de fecha 3 de agosto de 2007 que envía CHRIS PAPARELLA abogado de la parte actora en el Arbitraje, a los Árbitros en el caso CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V. contra PEMEX EXPLORACIÓN Y PRODUCCIÓN, CASO CCI No. 13716/CCO Comunicación C.47.

34.- Carta de fecha 6 de Agosto de 2007, enviada por Juan Fernández-Armesto, Presidente del Tribunal Arbitral en el CASO CCI 13716/CCO CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., (México) con PEMEX-EXPLORACION Y PRODUCCIÓN (México), a los abogados de las partes actora y demandada en el arbitraje.

302

35.- Carta de fecha 7 de Agosto de 2007, dirigida por el LIC. JAIME DUARTE AISPURO, en representación de PEMEX-EXPLORACION Y PRODUCCIÓN, a los integrantes del Tribunal Arbitral en la cual expresa que objeta el comunicado A-49 y A 50 remitido por el Tribunal Arbitral y opone la excepción de que el Tribunal Arbitral ha excedido su mandato.

36.- Carta de fecha 10 de Agosto de 2007 que dirige Juan Fernández-Armesto, Presidente del Tribunal Arbitral en el CASO CCI No. 13716/CCO a los abogados de la parte actora y demandada en el arbitraje.

37.- Correo Electrónico de 21 de agosto 2007, que dirige el Señor CHRIS PAPARELLA a los árbitros y al Señor José Ricardo Feris de la Corte Internacional de Arbitrajes de la CCI en el CASO CCI No. 13716/CCO CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., contra PEMEX-EXPLORACION Y PRODUCCIÓN, Comunicación C.49.

38.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, que dirige el ING. JAIME VÁZQUEZ TOBÍAS, Representante Legal de CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. D R. L. DE C. V., y PEMEX-EXPLORACION Y PRODUCCIÓN en

303

relación al Contrato de Obra Pública a Precios Unitarios y Tiempo Determinado No. PEP-O-IT-136/98.

39.- Correo electrónico de fecha 29 de junio de 2006 enviado por DEVA VILLANÚA GÓMEZ a los abogados de la parte actora y demandada y a los Árbitros en el CASO CCI No. 13716/CCO a la que anexa TABLA con documentos entregados durante la audiencia.

40.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, de la Orden de Cambio del Contrato proyecto Cantarell de PEMEX que contiene descripciones de cambio tanto en plazo de ejecución como fecha de inicio y terminación de fechas críticas.

41.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, de fecha 15 de marzo de 1999   dirigida por la empresa CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V., a PEMEX-EXPLORACION Y PRODUCCIÓN, para el asunto RESERVA Y REPROGRAMACIÓN DE COSTOS.

42.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, de fecha 11 de junio de 1999, dirigida por el Supervisor del Contrato PEP-O-IT-136/98 (EPC-28), ING. MARWAN F. ABBASSI al ING. NICOLAS MARTINEZ, Gerente de Proyecto del EPC-28 de CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. A. DE C. V., en relación al contrato PEP-O-IT-136/98 (EPC-28), ANEXO B1, CLÁUSULA 3.5.1, Documento COM/EP2800/99-558, 31 de mayo de 1999, Documento EP2800/COM/99-1604, 21 mayo de 1999.

43.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, que contiene el Contrato No. PEP-O-IT-186/98 Acta de Recepción Física Total, firmada por las dos partes que celebraron el Contrato PEP-O-IT-136/98.

44.- Copia notarialmente certificada por el LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notario Público No. 18 del Estado y del patrimonio inmueble Federal con adscripción y residencia en esta Ciudad de Villahermosa, Tabasco, de la carta de fecha 21 de mayo de 1999, dirigida por el ING. Marwan F. Abbassi, Supervisor de Contrato 1999, al ING.

Nicolás Martínez, Gerente de Proyecto del EPC-28, CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. A. DE C. V.

45.- Copia del Artículo escrito por el Dr. José Luis Siqueiros, intitulado EL ORDEN PUBLICO COMO MOTIVO PARA DENEGAR EL RECONOCIMIENTO Y LA EJECUCIÓN DE LAUDOS ARBITRALES INTERNACIONALES.

46.- Copia del artículo escrito por ALVARO LOPEZ DE ARGUMEDO PIÑEIRO y MARCOS DE VENITO LLOPIS-LLOMBART, intitulado INTERNACIONAL. EL ORDEN PUBLICO COMO CAUSA DE DENEGACIÓN DEL RECONOCIMIENTO DE UN LAUDO ARBITRAL EXTRANJERO: CRITERIOS PARA SU APLICACON PRÁCTICA.

47.- Copia del escrito presentado al Tribunal Arbitral por PEMEX-EXPLORACION Y PRODUCCIÓN y firmado por su abogado General JOSÉ NÉSTOR GARCÍA REZA que contiene el RESUMEN DEL ESCRITO DE ALEGATOS.

48.- Edición del Reglamento de Arbitraje vigente a partir del 1° de enero de 1998 de la Corte Internacional de Arbitraje.

49.- Copia certificada de Comunicación de la Corte Internacional de Arbitraje de la Cámara Internacional de Comercio de fecha 7 de febrero de 2008, firmada por D. José

Ricardo Feris, Consejero de la Secretaría de la Corte Internacional de Arbitraje de la Cámara Internacional de Arbitraje, enviada por mensajería y recibida por la Oficina del Abogado General de Petróleos Mexicanos con fecha 11 de febrero de 2008, mediante la cual se anexa el laudo emitido y una copia para información de la opinión disidente del señor Darío Oscós Coria.

## P U N T O S   P E T I T O R I O S:

En ese tenor, por todo lo expuesto y fundado, PEP le solicita a ese juzgador lo siguiente:

**PRIMERO.-** Se tenga al suscrito, con el carácter de apoderado de Pemex Exploración y Producción, que se ostenta y acredita con el testimonio que se anexa, reconocerme la personalidad con la que me ostento y tener por autorizados a los profesionistas en los términos señalados en este escrito.

**SEGUNDO.-** Se tenga a Pemex Exploración y Producción solicitando en la VÍA INCIDENTAL, la NULIDAD TOTAL de Laudo Arbitral emitido en el Juicio de Arbitraje 13716/CCO/JRF, en los términos del artículo 360 del Código

Federal de Procedimientos Civiles, y de los artículos 1457 y 1458 del Código de Comercio.

**TERCERO.-** Se tenga a PEP por ofrecidas y exhibidas las pruebas documentales relacionadas, mismas que se encuentran desahogadas por su propia naturaleza, de la parte que representamos para acreditar los extremos de la acción intentada.

**CUARTO.-** Conceder la medida solicitada.

**QUINTO.-** Ordenar que con las copias simples exhibidas que para tal fin se exhibe, se corra traslado y emplace, para que dentro del término legal conteste la demanda de mérito, a CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. A. DE C. V. (COMMISA), en el domicilio que para tal fin se señaló en el inicio de este escrito inicial y que corresponde al que ellos designaron para oír y recibir notificaciones en su demanda.

**SEXTO.-** En su oportunidad abrir el incidente a prueba.

**SEPTIMO.-** Concluida la secuela procesal, declare procedente la presente solicitud, y en su oportunidad declare la nulidad del Laudo Final emitido en el Juicio de Arbitraje 13716/CCO/JRF.

**OCTAVO.-** Previa certificación y cotejo de las copias simples de los documentos ofrecidos en éste escrito como prueba, así como de los Testimonios con los cuales acreditamos personalidad, ordenar la devolución de los originales por conducto de cualquiera de las personas autorizadas para recibir notificaciones, e indicadas en el preámbulo de este ocurso.

México, Distrito Federal, a 6 de mayo de 2008

Atentamente,

**LIC. JOSÉ NÉSTOR GARCÍA REZA**
OAG/0482/2008
**Apoderado de PEP**

309

<u>Exhibit B</u>

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In the Matter of the Arbitration Between )
)
CORPORACIÓN MEXICANA )
DE MANTENIMIENTO INTEGRAL, )
S. DE R.L. DE C.V., )
a Mexican corporation, )
)                    Case No. 08-CV-00469-RWR
Petitioner, )
)
v. )
)
PEMEX EXPLORACIÓN Y PRODUCCIÓN, )
Gerencia Jurídica de Exploración y Producción )
Marina Nacional 329 Edificio A, Octavo Piso )
Colonia Huasteca, Delegación Miguel Delgado )
Mexico City, Federal District )
Mexico C.P. 11311, )
)
Respondent. )
)

## DECLARATION OF SERGIO ACEVES BORBOLLA

I, Sergio Aceves Borbolla, declare under penalty of perjury under the laws of the United

States of America, pursuant to 28 U.S.C. § 1746, that to the best of my knowledge, the following

is true and correct:

1.      I am the Sub-director of Engineering and Development of Strategic Works at

Pemex Exploración y Producción ("PEP"). PEP is a subsidiary of Petróleos Mexicanos

("PEMEX"), a decentralized government agency of the Federal Government of Mexico created

in 1938 by Special Decree of the Mexican Congress. I submit this declaration in support of

PEP's Motion to Dismiss Corporación Mexicana de Mantenimiento Integral, S. de R.L. de

C.V.'s ("COMMISA") Petition to Confirm Foreign Arbitral Award (the "Enforcement Petition").



2.      As the Sub-director of Engineering and Development of Strategic Works at PEP, I have personal knowledge concerning the business organization of PEP and of the matters set forth in this declaration.

3.      PEP is a decentralized government agency of the Federal Government of Mexico. Its headquarters are located at Marina Nacional 329 Edificio A, Octavo Piso, Colonia Huasteca, Delegacion Miguel Hidalgo, Mexico City, Federal District, Mexico, C.P. 11311. PEP is not domiciled in the District of Columbia or in any other state of the United States of America ("United States"), is not organized under the laws of the District of Columbia or of any other state of the United States, nor does it maintain its principal place of business in the District of Columbia or in any other state of the United States. PEP also does not have a corporate presence in the District of Columbia nor anywhere else in the United States.

4.      PEP does not transact any business in the District of Columbia nor anywhere else in the United States nor does it contract to supply services in the District of Columbia or anywhere else in the United States.

5.      PEP has no real property in the District of Columbia nor anywhere else in the United States. PEP also does not possess or hold a mortgage or other lien on any real property within any state of the United States.

6.      PEP also has not caused tortious injury in the District of Columbia by a local act or omission nor has it caused tortious injury in the District of Columbia by an act or omission outside the District of Columbia.

7.      PEP has never contracted to insure something in the District of Columbia, and does not have a marital or parent-child relationship in the District of Columbia.

\\\MI - 087358/000003 - 126613 v1                    2

8.     PEP does not have, and has never had, any employees, registered or other agents, offices, or telephone or fax numbers, in any state of the United States.  PEP also has never filed corporate income tax returns, or paid taxes, to any agency of the United States or to any state or municipal government in the United States.

9.     PEP does not have, and has never had, any motor vehicles or vessels in any state of the United States.

10.     With respect to COMMISA's purported service of the Enforcement Petition upon PEP, I can confirm that PEP never received, through any means, any court-issued summons concerning the Enforcement Petition.

11.     PEP did receive, however, by express or registered mail, certain documents from COMMISA that appear to relate to the Enforcement Petition.  I have reviewed and am familiar with these documents.  Notwithstanding, PEP never agreed to be formally served with judicial documents by express mail or any other informal manner of service of process.

12.     Additionally, PEP has never entered into any agreement with COMMISA to effectuate service by any informal means of the Enforcement Petition or any other arbitral award enforcement or judicial action.

13.     All actions concerning the arbitral decision relating to COMMISA and PEP which is now the subject of the arbitral award enforcement proceedings recently commenced by COMMISA in the District of Columbia, United States of America (the "Arbitral Decision"), took place in Mexico as the underlying dispute involved Mexican parties (COMMISA and PEP) to a contract to perform services in Mexico, which led to an arbitration in which the arbitral tribunal was required to apply Mexican substantive law.

14.    As a result of certain irregularities that took place throughout the arbitration and errors contained in the Arbitral Decision, on May 7, 2008, PEP filed, before the Eighth Judicial District on Civil Matters of the First Circuit in Mexico (the "Mexican court"), a Complaint to Nullify the Arbitral Award (the "Complaint to Nullify") that had been issued by the arbitral tribunal in the international arbitration between COMMISA and PEP, a copy of which I have reviewed.

15.    Specifically, in its Complaint to Nullify, PEP argues the following: (i) PEP was unable to present its defense during the arbitration proceedings; (ii) the Arbitral Decision is contrary to Mexico's public policy because, among other things, it is contradictory and lacks legal foundation; (iii) the Arbitral Decision contains decisions and rulings that go beyond the scope of the Parties' Contract and arbitration agreement; and (iv) the Arbitral Decision concerns controversies that were not intended by the Parties to be submitted to and resolved by arbitration. A true and correct copy of the Complaint to Nullify is attached as **Exhibit A** to the Motion to Dismiss.

16.    The Complaint to Nullify was admitted for consideration by the Mexican court on May 12, 2008.  In addition, the Mexican court formally served the Complaint to Nullify upon COMMISA on May 14, 2008.   The Arbitral Decision, therefore, is not yet binding on COMMISA and PEP given the Complaint to Nullify, which is pending before the Mexican court.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in ___Mexico, DF___ , Mexico, on May 20 , 2008.

_____
SERGIO ACEVES BORBOLLA

Exhibit C

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 04-23190-CIV-UNGARO-BENAGES/Brown

BLACK & VEATCH PRITCHARD, INC.,
a Delaware corporation,

     Petitioner,

vs.

PDVSA Petroleo, S.A.,
a Venezuelan corporation,

     Respondent.
_____/

## CIVIL ACTION SUMMONS

TO:   **PDVSA Petróleo, S.A.**
      **By Serving it's Registered Agent:**
      **Juan José Nuñez Calderon**
      Judicial Representative
      Nro. De Cedula: 3000000029412
      Edificio PDVSA
      Avenida Libertador
      Organización La Campiña
      Torre Este – Piso 10
      Caracas, VENEZUELA

     **YOU ARE HEREBY SUMMONED** and required to serve upon **PETITIONER'S ATTORNEYS**, Edward H. Davis and Heidi A. Schulz, ASTIGARRAGA DAVIS, 701 Brickell Avenue, 16th Floor, Miami, Florida 33131, an answer to the Petition which is herewith served upon you, within twenty (20) days after service of this summons upon you, exclusive of the day of service. If you fail to do so, judgment by default will be taken against you for the relief demanded in the Petition. You must also file your answer with the Clerk of this Court within a reasonable period of time after service.



JAN 1 4 2005

Clarence Maddox

CLERK

_____
DATE

_____
(BY) DEPUTY CLERK

1

## RETURN OF SERVICE

| Service of the Summons and Complaint was made by me[1] | DATE |
|---|---|
| NAME OF SERVER (Print) | TITLE |

*Check one box below to indicate appropriate method of service*

9    Served personally upon the defendant.  Place where served:  _____

_____

9    Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.
     Name of person with whom the summons and complaint were left: _____

9    Returned unexecuted: _____

_____

_____

9    Other (specify): _____

_____

_____

### STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|
|  |  |  |

### DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
                    *Date*                           *Signature of Server*


                                    _____
                                              *Address of Server*

F:\WDOX\CLIENTS\10081\6001\00042696.DOC

---

[1] As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

2

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In the Matter of the Arbitration Between | ) |
| | ) |
| CORPORACIÓN MEXICANA | ) |
| DE MANTENIMIENTO INTEGRAL, | ) |
| S. DE R.L. DE C.V., | ) |
| a Mexican corporation, | ) |
| | ) |
| | )     Case No. 08-CV-00469-RWR |
| Petitioner, | ) |
| | ) |
| v. | ) |
| | ) |
| PEMEX EXPLORACIÓN Y PRODUCCIÓN, | ) |
| Gerencia Jurídica de Exploración y Producción | ) |
| Marina Nacional 329 Edificio A, Octavo Piso | ) |
| Colonia Huasteca, Delegación Miguel Delgado | ) |
| Mexico City, Federal District | ) |
| Mexico C.P. 11311, | ) |
| | ) |
| Respondent. | ) |
| | ) |

## [PROPOSED] ORDER

Upon consideration of Respondent Pemex Exploración y Producción's ("PEP") Motion to Dismiss Petition to Confirm Arbitration Award filed pursuant to Federal Rules of Civil Procedure 12(b)(2), 12(b)(4), 12(b)(5), and 12(b)(6) (the "Motion to Dismiss"), the Memorandum of Points and Authorities in support of the Motion to Dismiss, and any opposition and reply thereto, it is hereby:

ORDERED that the Motion to Dismiss be and hereby is GRANTED; and it is further

ORDERED that the Petition to Confirm Arbitration Award be and hereby is Dismissed with Prejudice.

**IT IS SO ORDERED.**

Dated: _____, 2008

_____
Hon. Richard W. Roberts
United States District Judge

Pursuant to Local Civil Rule 7, subdivision (k), the names and address of all attorneys entitled to be notified of this order are:

**Counsel for the Claimant:**

Robert M. Kennedy, Jr.
Hughes Hubbard & Reed LLP
D.C. Bar No. 459966
1775 I Street, N.W.
Washington, D.C. 20006-2401
Tel. (202) 721-4600
Fax (202) 721-4646
E-mail: kennedyr@hugheshubbard.com

**Co-counsel for the Claimant:**

Christopher M. Paparella
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Tel. (212) 837-6644
Fax (212) 422-4726
E-mail: paparella@hugheshubbard.com

**Counsel for the Respondent:**

Robert B. Duncan, Esq.
DC Bar Number: 416283
HOGAN & HARTSON LLP
555 13th Street, NW
Washington, DC 200004
Tel. (202) 637-5758
Fax (202) 637-5910
E-mail: RBDuncan@hhlaw.com

René E. Browne, Esq.
DC Bar Number: 463989
HOGAN & HARTSON LLP
555 13th Street, NW
Washington, DC 200004
Tel. (202) 637-6965
Fax (202) 637-5910
E-mail: rbrowne@hhlaw.com


**Co-counsel for the Respondent:**

Richard C. Lorenzo, Esq.
(Motion for *pro hac vice* admission pending)
HOGAN & HARTSON LLP
1111 Brickell Avenue, Suite 1900
Miami, Florida 33131
Tel. (305) 459-6652
Fax (305) 459-6550
E-mail: Rlorenzo@hhlaw.com

Maria Eugenia Ramirez, Esq.
(Motion for *pro hac vice* admission pending)
HOGAN & HARTSON LLP
1111 Brickell Avenue, Suite 1900
Miami, Florida 33131
Tel. (305) 459-6542
Fax (305) 459-6550
E-mail: MERamirez@hhlaw.com