# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
In the Matter of the Arbitration Between )
)
CORPORACIÓN MEXICANA )
DE MANTENIMIENTO INTEGRAL, )
S. DE R.L. DE C.V., )
a Mexican corporation, )
)
    Petitioner, )  Case No. 08-CV-00469-RWR
)
v. )
)
PEMEX EXPLORACIÓN Y PRODUCCIÓN, )
Gerencia Jurídica de Exploración y Producción )
Marina Nacional 329 Edificio A, Octavo Piso )
Colonia Huasteca, Delegación Miguel Delgado )
Mexico City, Federal District )
Mexico C.P. 11311, )
)
    Respondent. )
_____)

## PEMEX EXPLORACIÓN Y PRODUCCIÓN'S
## NOTICE OF FILING PETITIONER'S RESPONSE TO
## COMPLAINT TO NULLIFY ARBITRAL AWARD FILED IN MEXICO

  Respondent, Pemex Exploración y Producción ("PEP"), hereby provides notice that

Petitioner Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. ("COMMISA"),

filed a Response to PEP's Complaint to Nullify the Arbitral Award (the "Complaint to Nullify")

before the Eighth Judicial District on Civil Matters of the First Circuit, in Mexico City, Mexico,

dated May 19, 2008.  A true and correct copy of COMMISA's Response to PEP's Complaint to

Nullify, dated May 19, 2008, in its original Spanish language, is attached hereto as **Exhibit A.**[1]

---

[1]  COMMISA's Response to PEP's Complaint to Nullify is being filed in its original language in
Spanish to bring it to the Court's attention at the earliest possible time.  A certified English translation is currently
being prepared and will be filed with the Court as soon as it is completed.  Additionally, due to their size,
COMMISA's Response to PEP's Complaint to Nullify is being filed without exhibits.  Notwithstanding, these
exhibits will be made available to the Court upon the Court's request.

Dated:      May 28, 2008

Respectfully Submitted:


<u>s/ René E. Browne</u>
Robert B. Duncan (D.C. Bar No. 416283)
René E. Browne (D.C. Bar No. 463989)
HOGAN & HARTSON L.L.P.
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004-1109
Tel. (202) 637-5600
Fax. (202) 637-5910
E-mail: <u>rbduncan@hhlaw.com</u>
E-mail: <u>rbrowne@hhlaw.com</u>
*Attorneys for Respondent Pemex Exploración y*
*Producción*


Richard C. Lorenzo (Florida Bar No. 071412)
(Motion for *pro hac vice* admission pending)
Maria Eugenia Ramirez (Florida Bar No. 349320)
(Motion for *pro hac vice* admission pending)
HOGAN & HARTSON L.L.P.
1111 Brickell Avenue, Suite 1900
Miami, Florida 33131
Tel. (305) 459-6500
Fax. (305) 459-6550
Email: <u>rlorenzo@hhlaw.com</u>
Email: <u>meramirez@hhlaw.com</u>
*Attorneys for Respondent Pemex Exploración y*
*Producción*

**CERTIFICATE OF SERVICE**

I hereby certify that on May 28, 2008, I electronically filed the foregoing Notice and Exhibit A thereto with the Clerk of the Court using CM/ECF. I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF, or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

<div align="center" style="margin-left:auto; margin-right:auto;"></div>

s/ René E. Browne
René E. Browne

**SERVICE LIST**
**COMMISA V. PEP**
**CASE NO. 08-CV-00469**
**UNITED STATES DISTRICT COURT, DISTRICT OF COLUMBIA**


**Robert M. Kennedy, Jr.**
Hughes Hubbard & Reed LLP
1775 I Street, N.W.
Washington, D.C. 20006-2401
Telephone:  (202) 721-4600
Facsimile:  (202) 721-4646
kennedyr@hugheshubbard.com
Attorney for Petitioner

Via Transmission of Notices of Electronic Filing
Generated by CM/ECF

**Christopher M. Paparella**
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Tel (212) 837-6644
Fax (212) 422-4726
paparella@hugheshubbard.com
Attorney for Petitioner

Via First Class Mail, postage pre-paid

# EXHIBIT A
# Part 1 of 4

PEMEX EXPLORACIÓN Y PRODUCCIÓN

VS.

COROPRACIÓN MEXICANA DE MANTENIMIENTO

INTEGRAL, S. DE R.L. DE C.V.

Expediente número 158/2008-II

Asunto: Se da contestación al incidente de nulidad

*Notificación*
*Personal*
*22/V/08*

C. JUEZ OCTAVO DE DISTRITO EN MATERIA
CIVIL EN EL DISTRITO FEDERAL

MARCO TULIO VENEGAS CRUZ, en representación de la empresa denominada
**CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE
C.V. (en adelante "COMMISA")** personalidad que acredito en este acto mediante
la exhibición del segundo testimonio de la escritura pública número 58,042 pasada
ante la fe del Notario Público No. 1 del Distrito Federal, Licenciado Roberto Nuñez
y Bandera, en la cual consta el poder que otorga COMMISA al suscrito,
documento que se acompaña como **ANEXO UNO** del presente ocurso y que
solicito me sea devuelto previa compulsa y cotejo que se realice con la copia
simple que de éste se acompaña, señalando como domicilio para oír y recibir
notificaciones el ubicado en Guillermo González Camarena número 1100, 7°
piso, Colonia Santa Fe, Centro de Ciudad, Delegación Álvaro Obregón,
Código Postal 01210 y autorizando en los amplios términos del tercer párrafo del
artículo 1069 del Código de Comercio a los Licenciados en Derecho, **Fernando
Moreno Gómez de Parada (con cédula profesional número 1516258), Edmond
Frederic Grieger Escudero (con cédula profesional 4204176), Montserrat
Manzano Escalón (con cédula profesional número 4214290), Alberto Muerza
Sierra (con cédula profesional número 2948545), Adrián Magallanes Pérez
(con cédula profesional número 5295822) y Diego Ignacio Sierra Laris (con
carta de pasante para la práctica de la abogacía número 68851); y**
autorizando, en términos del antepenúltimo párrafo del mismo artículo, para oír y
recibir notificaciones, documentos y valores, así como para imponerse de los
autos, a los pasantes en derecho **Robert Edward Dolan Isunza, Elisa de Anda
Madrazo, Raymundo Soberanis Cortés, Ricardo Rabasa Cossu, Alejandra
Cárdenas Ducker, Mariana García Martinez Parente y Pablo Usobiaga
Hegewisch,** con el debido respeto comparezco ante usted y expongo:

Que con fecha catorce de mayo del presente año se corrió traslado a mi
representada del incidente de nulidad de laudo arbitral promovido por PEMEX
EXPLORACIÓN Y PRODUCCIÓN (en adelante "PEP"), al habérsele notificado el
auto de nueve de mayo de dos mil ocho, por medio del cual se tuvo por

1

presentado y admitido el incidente de referencia y se concedió un término de tres días a mi representada para que manifieste lo que a su interés convenga.

Atento a lo anterior, encontrándome dentro del término de tres días que para este fin fue concedido por el Juzgador, y con fundamento en lo ordenado por el artículo 1460 del Código de Comercio, así como por el artículo 360 del Código Federal de Procedimientos Civiles, ocurro ante usted a dar contestación a la demanda incidental promovida por PEP de la siguiente manera:

## I.    PRESTACIONES RECLAMADAS

Son improcedentes todas y cada una de las prestaciones reclamadas a mi poderdante por la parte actora, en virtud de lo siguiente:

a) Se rechaza la procedencia de la solicitud de que se decrete la nulidad del laudo arbitral dictado en el procedimiento de arbitraje 13716/CCO/JRF, toda vez que éste: i) no es contrario al orden público; ii) resolvió las controversias sometidas por las partes al arbitraje; y iii) fue dictado en ejercicio de las facultades otorgadas por las partes a los árbitros.

b) Resulta igualmente improcedente la condena que solicita PEP respecto de que se condene a mi representada al pago de los gastos y costas ocasionados por la tramitación del presente incidente.

## II.    CONSIDERACIONES PRELIMINARES

En primer lugar y como una cuestión preliminar de orden, llamamos la atención de su Señoría sobre la forma desordenada y poco clara en que la demanda de nulidad se encuentra planteada.

La actora básicamente plantea en los ocho apartados (numerales I al VII romanos) de su capítulo de "HECHOS" en forma desordenada y repetitiva y confusa, sus argumentos jurídicos sobre las razones por las cuales estima que el laudo debe ser declarado nulo.

Asimismo, en el apartado VIII de su capítulo de "HECHOS" pretende en forma por demás extemporánea, impugnar la decisión que tomaron los árbitros sobre su propia competencia.

2

El planteamiento de la demanda en los términos antes señalados resulta totalmente falto de técnica jurídica en la medida en que se plantean argumentos de Derecho como cuestiones fácticas.

Por si lo anterior no fuera poco y quizás con el ánimo de confundir a su Señoría los planteamientos jurídicos en los referidos apartados se extienden por más de 200 páginas en forma repetitiva y confusa, impugnando cuestiones relativas al fondo del laudo arbitral pronunciado por el Tribunal Arbitral, tal cual y si se tratara de una "apelación" o de un "juicio de amparo" en contra del mismo y olvidando que de acuerdo con el artículo 1457 del Código de Comercio las causas por las cuales se puede anular un laudo son excepcionales y taxativas y ninguna de ellas permite la revisión, modificación o anulación de los razonamientos y decisiones de fondo adoptadas en el laudo arbitral.

En atención a lo anterior, considerando la forma desordenada, confusa y con falta de técnica jurídica en que la demanda de nulidad de laudo promovida por PEP se encuentra planteada y con el objeto de contestar cada una de sus alegaciones y argumentos de manera precisa y ordenada, a continuación su Señoría encontrará un pequeño índice de la estructura de la presente Contestación:

III.    CONTESTACIÓN A LOS ANTECEDENTES ...........................................................6

IV.    CONTESTACIÓN A LOS HECHOS ...................................................................10

V.    IMPROCEDENCIA DE LA IMPUGNACIÓN A LA DECISION SOBRE LA COMPETENCIA DEL TRIBUNAL ARBITRAL PARA DICTAR EL LAUDO........................12

A)    EXCEPCIÓN DERIVADA DE LA INAPLICABILIDAD DEL ARTÍCULO 1432 DEL CÓDIGO DE COMERCIO PARA SOLICITAR AL JUEZ QUE SE PRONUNCIE SOBRE LA VALIDEZ DE LA COMPETENCIA ASUMIDA POR EL TRIBUNAL ARBITRAL...................................................12

B) EXCEPCIÓN DERIVADA DE LA INAPLICABILIDAD DEL ARTÍCULO 1457 DEL CÓDIGO DE COMERCIO PARA SOSTENER LA SUPUESTA INCOMPETENCIA DEL TRIBUNAL ARBITRAL COMO CAUSA DE NULIDAD DEL LAUDO. ....................................................................14

C) EXCEPCIÓN DERIVADA DE QUE EL TRIBUNAL ARBITRAL TIENE COMPETENCIA PARA RESOLVER TODAS LAS CONTROVERSIAS SURGIDAS DEL CONTRATO, DE ACUERDO CON LA CLÁUSULA ARBITRAL. ..................................................................................16

D) EXCEPCIÓN DERIVADA DE QUE LA PROCEDENCIA DE LOS RECLAMOS DE COMMISA FUE PARTE DE LA MISIÓN DADA POR LAS PARTES A LOS ÁRBITROS Y PEP NO OBJETÓ TALES DETERMINACIONES. POR LO TANTO, CONFORME A LO ORDENADO POR EL ARTÍCULO 33 DEL REGLAMENTO DE LA CORTE INTERNACIONAL DE ARBITRAJE PEP CONSINTIÓ LA COMPETENCIA DEL TRIBUNAL ARBITRAL Y LA PROCEDENCIA DEL ANÁLISIS DE LAS CONTROVERSIAS TÉCNICAS Y PERDIÓ SU DERECHO PARA RECLAMAR LA NULIDAD DE LAUDO.

.................................................................................................................

VI.    CONTESTACION A LAS CAUSALES DE NULIDAD Y OTROS ARGUMENTOS
INVOCADOS POR LA ACTORA. ..............................................................29

    A)    INAPLICABILIDAD DE LA CONVENCIÓN DE NUEVA YORK Y DE LA CONVENCIÓN DE
    PANAMÁ AL PROCEDIMIENTO DE NULIDAD INICIADO POR LA PARTE ACTORA. .....................29

    B)    CONTRADICCIONES EVIDENTES E INTRÍNSECAS EXISTENTES EN LA DEMANDA DE
    NULIDAD. ..........................................................................................31

    C)    IMPOSIBILIDAD JURÍDICA DE QUE EN EL PROCEDIMIENTO DE NULIDAD SE ENTRE AL
    ESTUDIO DEL FONDO DEL ASUNTO ALEGANDO VIOLACIONES AL ORDEN PÚBLICO U OTRAS
    CAUSALES DE NULIDAD...........................................................................34

    D)    EL LAUDO NO ES CONTRARIO AL ORDEN PÚBLICO. ...............................45
        1.- La compensación determinada por el Tribunal Arbitral a favor de COMMISA
        cuenta con justificación legal y contractual. .........................................45
        2.- El Contrato no es un contrato de naturaleza administrativa y en consecuencia, no
        se puede alegar un sometimiento del interés de PEP sobre el de COMMISA. ..........51
        3.- El Laudo Arbitral no viola disposición alguna de naturaleza presupuestal............57
        4.- El Laudo Arbitral no modifica al Contrato y, por lo tanto, no viola al Artículo 70 de
        la Ley de Adquisiciones y Obra Pública aplicable. ...................................70
        5.- Las condenas contenidas en el Laudo Arbitral si tienen fundamento contractual y
        no se refieren a pagos no previstos en el Contrato. ..................................73
        6.- El laudo aplica correctamente las disposiciones contractuales y legales de
        naturaleza civil e independientemente de ello, sus determinaciones al respecto no
        pueden ser consideradas como violaciones al orden público...................................75
        7.- Las determinaciones contenidas en el laudo arbitral no son incongruentes........84

    E)    EN EL LAUDO ARBITRAL NO SE INFRINGIÓ EL ACUERDO DE ARBITRAJE PORQUE LAS
    DISPUTAS QUE RESUELVE SI SE ENCUENTRAN CONTEMPLADAS EN EL MISMO Y NO EXCEDEN
    SU ALCANCE. ..........................................................................................87
        1.- PEP consintió y ratificó su consentimiento para que el Tribunal Arbitral conociera
        y resolviera los reclamos de COMMISA y, en consecuencia, esta causal de nulidad
        resulta inatendible.....................................................................................87
        2.- Conforme a las cláusulas 23.2 y 23.3 del Contrato, el hecho de no  plantear la
        controversia técnica formalmente conforme al procedimiento no implica que las
        disputas que hayan subsistido en relación con dichos temas no sean arbitrables. ...88
        3.- Las reclamaciones relacionadas con las "controversias técnicas" 34, 35, 36, 37 y
        39 no son verdaderas controversias técnicas conforme a la cláusula 23.2 del
        Contrato..................................................................................................93
        4.-    En todo caso, el alcance que la parte actora pretende dar al segundo párrafo
        de la cláusula arbitral del Contrato es contrario al artículo 1797 del Código Civil
        Federal y excusaría la necesidad de acudir al procedimiento de controversia técnica.
        97

5.- La condena al pago de gastos financieros contenida en el laudo arbitral es válida ya que se sustenta en el retraso en el pago de las indemnizaciones determinadas por el Tribunal Arbitral, así como en los términos del Contrato. ..........99

F) DURANTE EL ARBITRAJE Y EN EL LAUDO FINAL NO SE VIOLENTARON LAS REGLAS DEL PROCEDIMIENTO ARBITRAL. ............................................................................100
1.- Los conceptos de fundamentación y motivación legal previstos en el artículo 16 Constitucional no son aplicables a un laudo arbitral, ni en la tramitación de un procedimiento de naturaleza arbitral. ..................................................................100
2.- Las decisiones contenidas en el laudo no son parciales. ....................................104
3.- La decisión contenida en el laudo sobre gastos financieros no se funda en la Equidad, sino en disposiciones contractuales y legales específicas. ......................108

G) CONTESTACIÓN A OTRAS CONSIDERACIONES Y ARGUMENTOS QUE PRETENDEN SUSTENTAR LA NULIDAD DE LA DECISIÓN SOBRE LA CONTROVERSIA TÉCNICA NÚMERO 36. ................................................................................................................................108
H) CONTESTACIÓN A OTRAS CONSIDERACIONES Y ARGUMENTOS QUE PRETENDEN SUSTENTAR LA NULIDAD DE LA DECISIÓN SOBRE LAS CONTROVERSIAS TÉCNICAS NÚMEROS 34 Y 35. ................................................................................................................................112
1.- El Tribunal Arbitral tiene facultades para resolver las cuestiones de fondo como mejor le parezca, independientemente de los planteamientos de las partes y esto no implica una violación al acuerdo de arbitraje con respecto a las condenas relacionadas con los reclamos de las controversias números 34 y 35. ...................112
2.- La Valoración de las Pruebas por el Tribunal Arbitral No Puede Ser Revisada Judicialmente. La Valoración de las Pruebas es Cuestión de Fondo. ......................117
3.- El hecho de que COMMISA hubiera planteado las controversias técnicas número 34 y 35 una vez concluidos los trabajos no es capaz de provocar que el reclamo haya dejado de ser materia del arbitraje. ..................................................118

I) CONTESTACIÓN A OTRAS CONSIDERACIONES Y ARGUMENTOS QUE PRETENDEN SUSTENTAR LA NULIDAD DE LA DECISIÓN SOBRE LAS CONTROVERSIA TÉCNICAS NÚMERO 19. ................................................................................................................................121

J) VALIDEZ DE LA CONDENA A PAGAR GASTOS Y COSTAS DEL ARBITRAJE. ....................123

Como se puede apreciar del índice antes transcrito, en primer lugar, se contestan única y exclusivamente los hechos contenidos en el capítulo de ANTECEDENTES, así como las pocas referencias fácticas contenidas en el capítulo de HECHOS de la demanda.

Posteriormente, y por tratarse de una cuestión de naturaleza procesal, se demuestra la improcedencia de la reclamación que se plantea ante su Señoría sobre las decisiones contenidas en el Laudo a través de las cuales el Tribunal Arbitral resolvió sobre su propia competencia.

Finalmente, se presentan las excepciones, defensas y argumentos a través de los cuales se da contestación a los argumentos que en forma confusa y poco técnica hizo valer la parte actora en su capítulo de "HECHOS" para sustentar las supuestas causales de nulidad del laudo arbitral que alega.

En este contexto y a efecto de permitir y facilitar a su Señoría un análisis adecuado del presente litigio, en nuestra contestación a los argumentos de nulidad de la actora, primeramente nos enfocamos en las líneas generales de los temas que se repiten reiteradamente en su demanda y, posteriormente, nos enfocamos en la contestación particular de sus razonamientos. **Cabe también desde este momento precisar que a lo largo de la presente contestación a la demanda y únicamente con el objeto de facilitar el seguimiento de los argumentos de las partes, COMMISA se refiere a sus reclamos y demandas que fueron resueltas en el laudo arbitral, como "Controversias Técnicas", sin que ello implique que COMMISA los consideró o pretenda que los mismos se adecúen a la definición que de "Controversia Técnica" se contiene en la cláusula 23.2 del Contrato, puesto que se trata de reclamos o demandas de muy diversa naturaleza y características.**

Por cuanto hace a los antecedentes planteados por la actora incidental, a continuación me refiero a cada uno de ellos en el orden en que fueron expuestos:

III.    CONTESTACIÓN A LOS ANTECEDENTES

I.-    El antecedente correlativo de la demanda incidental que se contesta, contiene la descripción de diversos hechos, por lo que nos referiremos a cada uno de ellos en particular:

I.1.- Es cierto el contenido del primer párrafo del Antecedente I relativo a los datos del contrato PEP-O-IT-136/98 (o IPC-28) (en lo sucesivo denominado como el "Contrato").

I.2.- El contenido del segundo párrafo del Antecedente I es falso y se niega para todos los efectos legales y respecto del mismo se realizan las siguientes precisiones:

a)   Respecto de la afirmación de la parte actora incidental que a la letra dice que *"el Contrato de Obra Pública descrito es un contrato administrativo ya que se encuentra regulado por la Ley de Adquisiciones y Obras Públicas (de aquí en adelante y por economía procesal denominada LAOP) y el*

6

*Reglamento de la Ley de Obras Públicas, entre otras disposiciones administrativas*", mi representada manifiesta que lo narrado es falso atendiendo a que el contrato PEP-O-IT-136/98 (o IPC-28), como se demostrará más adelante, **no es un contrato administrativo.**

El Contrato fue celebrado por PEP en su carácter de ente privado que responde a los intereses particulares de dicha entidad y que se encuentra sujeto al régimen de Derecho Civil, tal y como se reconoce amplia y reiteradamente por PEP en su demanda de nulidad de laudo.

b) Respecto de la afirmación de la parte actora incidental que a la letra dice en relación al Contrato, que su *"objeto persigue un interés colectivo consistente en una obra pública, siendo por tanto su cumplimiento y el de su regulación de orden público e interés social, tal como se desprende del artículo 134 de la Constitución, y del artículo 1 de la LAOP"*, mi representada manifiesta que es falso, como se demostrará más adelante, que: i) el objeto del contrato persigue un interés colectivo; y ii) su cumplimiento y el de su regulación son de orden público e interés social.

II.- El antecedente correlativo de la demanda incidental que se contesta, relativo a la firma de dieciséis convenios modificatorios entre PEP y COMMISA, es cierto.

III.- El antecedente correlativo de la demanda incidental que se contesta, **se niega** por los términos en que se encuentra redactado y mi representada manifiesta que la verdad sobre este hecho se encuentra contenida en todo caso, en la cláusula arbitral pactada en el Contrato y se remite a su texto literal para todos los efectos legales a que haya lugar.

IV.- El antecedente correlativo de la demanda incidental que se contesta, **se niega** por los términos en que se encuentra redactado y mi representada manifiesta que la verdad sobre este hecho se encuentra contenida en el laudo arbitral y se remite a su texto literal para todos los efectos legales a que haya lugar.

V.- El antecedente correlativo de la demanda incidental que se contesta, **se niega** por los términos en que se encuentra redactado y mi representada manifiesta que la verdad sobre este hecho se encuentra contenida en todo caso, en las pretensiones que COMMISA hizo valer ante el Tribunal Arbitral y que fueron transcritas en el laudo arbitral en el capítulo V denominado "Pretensiones de las Partes" – párrafo 80 en adelante –.

7

VI.- El antecedente correlativo de la demanda incidental que se contesta, se niega por los términos en que se encuentra redactado y mi representada manifiesta que la verdad sobre este hecho se encuentra contenida en todo caso, en el laudo arbitral – párrafos 12 y 79 – y se remite a su texto literal para todos los efectos legales a que haya lugar.

VII.- El antecedente correlativo de la demanda incidental que se contesta, se niega por los términos en que se encuentra redactado y mi representada manifiesta que la verdad sobre este hecho se encuentra contenida en el laudo arbitral y se remite a su texto literal para todos los efectos legales a que haya lugar.

VIII.- El antecedente correlativo de la demanda incidental que se contesta, se niega por los términos en que se encuentra redactado y mi representada manifiesta que la verdad sobre este hecho se encuentra contenida en el Reglamento de Arbitraje de la Cámara de Comercio Internacional y se remite a su texto literal para todos los efectos legales a que haya lugar.

IX.- El antecedente correlativo de la demanda incidental que se contesta, es cierto.

X.- El antecedente correlativo de la demanda incidental que se contesta, se niega por los términos en que se encuentra redactado y mi representada manifiesta que la verdad sobre este hecho se encuentra contenida en el Reglamento de Arbitraje de la Cámara de Comercio Internacional.

En relación al nombre del consejero encargado del expediente en la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional, es correcto que éste era el D. José Ricardo Feris.

XI.- El antecedente correlativo de la demanda incidental que se contesta, es cierto.

XII.- El antecedente correlativo de la demanda incidental que se contesta, es cierto.

XIII.- El antecedente correlativo de la demanda incidental que se contesta, se niega por los términos en que se encuentra redactado.

XIV.- El antecedente correlativo de la demanda incidental que se contesta, **es** verdadero.

XV.- El antecedente correlativo de la demanda incidental que se contesta, **se niega** por los términos en que se encuentra redactado y mi representada manifiesta que la verdad sobre este hecho se encuentra contenida en el convenio arbitral celebrado entre PEP y COMMISA y se remite a su texto literal para todos los efectos legales a que haya lugar.

XVI.- El antecedente correlativo de la demanda incidental que se contesta, **se niega** por los términos en que se encuentra redactado y mi representada manifiesta que la verdad sobre este hecho se encuentra contenida en el convenio arbitral celebrado entre PEP y COMMISA y en el Acta de Misión y se remite a sus textos literales para todos los efectos legales a que haya lugar.

XVII.- El antecedente correlativo de la demanda incidental que se contesta, **se niega** por los términos en que se encuentra redactado y mi representada manifiesta que la verdad sobre este hecho se encuentra contenida en la narración que del procedimiento se realizó en el laudo arbitral y se remite a su texto literal para todos los efectos legales a que haya lugar.

XVIII.- El antecedente correlativo de la demanda incidental que se contesta, **se niega** por los términos en que se encuentra redactado. No obstante lo anterior, y por considerarlo esencial para la litis planteada, se realizan las siguientes precisiones:

a) La cláusula 23.3 del Contrato establece literalmente lo siguiente:

> "23.3 **Arbitraje. Cualquier controversia**, reclamación, diferencia o disputa que sobrevenga o se relacione o esté vinculada con este contrato o el incumplimiento del mismo será dirimida **finalmente** mediante arbitraje conducido en el Distrito Federal, México, de acuerdo con las Reglas de Conciliación y Arbitraje de la Cámara Internacional de Comercio que estén en vigor en ese momento. El número de árbitros será de tres y el idioma para conducir el arbitraje será el español. No obstante lo anterior, cualquier controversia técnica **deberá ser sometida previamente al procedimiento previsto en la Cláusula 23.2 y sólo en caso de que mediante dicho procedimiento no se logre una acuerdo entre las partes**, éstas quedarán facultadas para acudir al recurso previsto en la Cláusula 23.3".

Según se desprende de la cláusula transcrita, **cualquier controversia** relacionada con el contrato debe ser resuelta finalmente mediante arbitraje. En este contexto,

9

resulta evidente que el alcance de la cláusula es amplio y no restringido como ahora asevera de manera infundada PEP.

De esta manera, de la redacción de la cláusula de referencia no se desprende, como lo pretende la parte actora, que aquellas controversias que no se hubieran sometido al procedimiento de la cláusula 23.2 no sean de la competencia del Tribunal Arbitral.

Por el contrario, la cláusula arbitral determina que **todas** las controversias derivadas del contrato deberán ser resueltas mediante arbitraje ya que la cláusula no establece limitación alguna respecto de cuáles son las controversias de las que el Tribunal Arbitral podrá conocer.

XIX.- El antecedente correlativo de la demanda incidental que se contesta, es cierto.

XX.- El antecedente correlativo de la demanda incidental que se contesta, se niega por los términos en que se encuentra redactado y mi representada manifiesta que la verdad sobre dicho antecedente se muestra en el laudo arbitral – páginas 163 y 164 – y se remite a su texto literal para todos los efectos legales a que haya lugar.

XXI.- El antecedente correlativo de la demanda incidental que se contesta, se niega por los términos en que se encuentra redactado y mi representada manifiesta que la verdad sobre dicho antecedente se muestra en el laudo arbitral y en el voto disidente emitido por el co-árbitro, licenciado Darío Oscós Coria.

Sin embargo, al respecto se precisa que su Señoría no tiene facultades para analizar los argumentos que esgrime el co-árbitro en su voto disidente relativos a porque que éste disiente sobre la condena de pago de gastos financieros y de gastos incurridos en el arbitraje. Lo anterior con fundamento en el artículo 1457 del Código de Comercio, que al establecer taxativa y excepcionalmente las causas de nulidad del laudo, impide al Juez que conoce de la nulidad analizar los aspectos de fondo y sustancia del laudo.

XXII.- El antecedente correlativo de la demanda incidental que se contesta, se niega toda vez que como se demostrará en el presente escrito, el laudo arbitral no está afectado de nulidad.

## IV.    CONTESTACIÓN A LOS HECHOS

10

Por cuanto hace a los hechos, a continuación me refiero a cada uno de ellos, en el orden en que fueron expuestos y refiriendo de manera clara la denominación que la parte actora incidental les atribuyó.

Lo anterior es importante, toda vez que los hechos fueron expuestos a manera de capítulos o temas y sin seguir un orden numérico lógico:

I.- Todas y cada uno de las aseveraciones fácticas contenidas en el hecho I denominado por la actora incidental *"Causas de Nulidad del Laudo Final con relación a la decisión de la Controversia Técnica 36: Malos tiempos en trabajos de la Castoro 10 y del Bar Protector"*, se niegan. En específico es falso, como se demostrará en el presente escrito, que el laudo arbitral esté afectado de nulidad.

II.- Todas y cada uno de las aseveraciones fácticas contenidas en el hecho II denominado por la actora incidental *"Causas de Nulidad del Laudo Final con relación a la decisión de las Controversias 34 y 35: Tiempos de espera por retraso en el inicio de los Trabajos de la Castoro 10 y del Bar Protector"*, se niegan. En específico es falso, como se demostrará en el presente escrito, que el laudo arbitral esté afectado de nulidad.

III.- Todas y cada uno de las aseveraciones fácticas contenidas en el hecho III denominado por la actora incidental *"Causas de Nulidad del Laudo Final con relación a la decisión de las Controversias 37 y 39 relativa a Cruces"*, se niega. En específico es falso, como se demostrará en el presente escrito, que el laudo arbitral esté afectado de nulidad.

IV.- Todas y cada uno de las aseveraciones fácticas contenidas en el hecho que se contesta y que es parte del Capítulo confusa y erróneamente denominado: *"III. OTRAS CONTROVERSIAS"* y que fue denominado por la parte actora incidental *"1. Controversia Técnica 19: Reclamaciones por Obstrucciones"*, se niegan. En específico es falso, como se demostrará en el presente escrito, que el laudo arbitral esté afectado de nulidad.

V.- Todas y cada uno de las aseveraciones fácticas contenidas en el hecho que se contesta y que es parte del Capítulo confusa y erróneamente denominado *"III. OTRAS CONTROVERSIAS"* y que fue denominado por la parte actora incidental *"2. Controversia Técnica 27: costos por el diferencial de tarifas de tiempo de espera de la Castoro 10 en Trabajos en plataformas"*, se niega. En específico es falso, como se demostrará en el presente escrito, que el laudo arbitral esté afectado de nulidad.

11

VI.- Todas y cada uno de las aseveraciones fácticas contenidas en el hecho que se contesta y que fue denominado por la parte actora "V. *Gastos Financieros*, se niegan. En específico es falso, como se demostrará en el presente escrito, que el laudo arbitral esté afectado de nulidad.

VII.- Todas y cada uno de las aseveraciones fácticas contenidas en el hecho que se contesta y que fue denominado por la parte actora "VI. *Examen de las Causales de Nulidad del Laudo*" se niegan. En este hecho, PEP realiza un resumen de las causales de nulidad que considera que presenta el laudo final, en relación a ello mi representada más adelante realiza un estudio sucinto de las razones por la cuales el laudo arbitral no está afectado de nulidad.

VIII.- Todas y cada uno de las aseveraciones fácticas contenidas en el hecho que se contesta y que fue denominado por la parte actora "VII. *Costos Incurridos en el Arbitraje*", se niegan. En este hecho, PEP argumenta que la determinación que hizo el Tribunal Arbitral de condenar a PEP a pagar a COMMISA los costos incurridos en el Arbitraje no fue apegada a derecho. Al respecto, mi representada manifiesta que su Señoría no es competente para analizar esta cuestión toda vez que se trata de una decisión de fondo y además, la parte actora incidental no argumenta una causal de nulidad en este hecho, por lo que su Señoría carece de competencia para estudiar el hecho al que nos referimos.

IX.- Todas y cada uno de las aseveraciones fácticas contenidas en el hecho que se contesta y que fue denominado por la parte actora "VIII. *Competencia del Tribunal Arbitral*", son falsas y se niegan.

## V.    IMPROCEDENCIA DE LA IMPUGNACIÓN A LA DECISIÓN SOBRE LA COMPETENCIA DEL TRIBUNAL ARBITRAL PARA DICTAR EL LAUDO.

**A)**    EXCEPCIÓN DERIVADA DE LA INAPLICABILIDAD DEL ARTÍCULO 1432 DEL CÓDIGO DE COMERCIO PARA SOLICITAR AL JUEZ QUE SE PRONUNCIE SOBRE LA VALIDEZ DE LA COMPETENCIA ASUMIDA POR EL TRIBUNAL ARBITRAL.

El artículo 1432 en el que la parte actora sustenta su pretensión de que su Señoría revise y se pronuncie sobre la decisión adoptada en el laudo final por el Tribunal Arbitral con respecto a su propia competencia, no es aplicable al caso concreto.

Según se desprende de la demanda, en particular de los apartados VI y VIII en los que la actora combate la competencia del Tribunal Arbitral, la accionante hace depender la procedencia de su acción de lo ordenado por el artículo 1432 del Código de Comercio.

12

La actora argumenta concretamente con base en el citado artículo que está facultada para impugnar la resolución del Tribunal Arbitral sobre su propia competencia. Esta aseveración es incorrecta.

El citado artículo 1432 del Código de Comercio a la letra establece lo siguiente:

> "**Artículo 1432.**- El Tribunal Arbitral estará facultado para decidir sobre su propia competencia, incluso sobre las excepciones relativas a la existencia o validez del acuerdo de arbitraje. A ese efecto, la cláusula compromisoria que forme parte de un contrato se considerará como un acuerdo independiente de las demás estipulaciones del contrato. La decisión de un Tribunal Arbitral declarando nulo un contrato, no entrañará por ese solo hecho la nulidad de la cláusula compromisoria.
>
> La excepción de incompetencia del Tribunal Arbitral deberá oponerse a más tardar en el momento de presentar la contestación. Las partes no se verán impedidas de oponer la excepción por el hecho de que hayan designado a un árbitro o participado en su designación. La excepción basada en que el Tribunal Arbitral ha excedido su mandato, deberá oponerse tan pronto como se plantee durante las actuaciones arbitrales la materia que supuestamente exceda su mandato. El Tribunal Arbitral podrá, en cualquiera de los casos, estimar una excepción presentada con posterioridad si considera justificada la demora.
>
> El Tribunal Arbitral podrá decidir las excepciones a que se hace referencia en el párrafo anterior, desde luego o en el laudo sobre el fondo del asunto. <u>Si antes de emitir laudo sobre el fondo, el Tribunal Arbitral se declara competente, cualquiera de las partes dentro de los treinta días siguientes a aquél en que se le notifique esta decisión, podrá solicitar al juez resuelva en definitiva</u>; resolución que será inapelable. Mientras esté pendiente dicha solicitud, el Tribunal Arbitral podrá proseguir sus actuaciones y dictar laudo."

     (Énfasis añadido)

Como se advierte de la transcripción anterior, el Código de Comercio da la oportunidad a las partes de impugnar ante un tribunal estatal la decisión dictada con respecto a la competencia del Tribunal Arbitral, única y exclusivamente en <u>aquellos casos en que el Tribunal Arbitral decide sobre su propia competencia antes de decidir sobre el fondo del asunto y con un plazo limitado de treinta días</u>.

En este contexto, la petición de la parte actora resulta infundada.

En efecto, conforme a lo ordenado por el artículo 1432 del Código de Comercio, PEP sólo podía impugnar la decisión sobre la competencia del Tribunal Arbitral si

la misma se hubiera adoptado en un laudo preliminar previo a la emisión del laudo definitivo sobre el fondo del asunto. Además, PEP tenía un mes para inconformarse contado a partir de que el Tribunal Arbitral decidiera sobre su competencia.

De esta manera, si la parte actora tuvo la pretensión de impugnar la competencia del Tribunal Arbitral ante un tribunal estatal en todo caso hubiera debido hacerlo dentro del mes siguiente a que el Tribunal Arbitral se pronunció por primera vez sobre su competencia, lo cual ocurrió al emitirse el acta de Misión el veinticinco de octubre de dos mil dos.

Evidentemente, PEP no impugnó la competencia asumida en el acta de Misión por el Tribunal Arbitral dentro del mes siguiente al veinticinco de octubre de dos mil dos, por lo que es claro que consintió la competencia ahí precisada, tal y como se advierte del texto del acta de Misión que se transcribe en el inciso B) del presente apartado (página 26 de la presente Contestación).

En efecto, el acta de Misión es un documento firmado por las partes y sobre todo por el Tribunal Arbitral en el que todos los participantes consienten en los puntos de hecho y de derecho que serán materia del arbitraje. En este contexto, este documento hace las veces de decisión consensuada sobre el alcance de la competencia y jurisdicción del Tribunal Arbitral. De ahí que si se pretende ahora impugnar la competencia del Tribunal Arbitral resulta notoriamente extemporánea esta pretensión.

**En consecuencia, considerando que la decisión del Tribunal Arbitral sobre su propia competencia se encuentra contenida en un laudo definitivo que resuelve el fondo del asunto y, considerando además, que en todo caso PEP no impugnó la decisión sobre la competencia del Tribunal Arbitral dentro del plazo de un mes previsto por el artículo 1432 del Código de Comercio, es evidente que la petición de la actora fundada en dicho precepto resulta infundada.**

**B) EXCEPCIÓN DERIVADA DE LA INAPLICABILIDAD DEL ARTÍCULO 1457 DEL CÓDIGO DE COMERCIO PARA SOSTENER LA SUPUESTA INCOMPETENCIA DEL TRIBUNAL ARBITRAL COMO CAUSA DE NULIDAD DEL LAUDO.**

El artículo 1457 del Código de Comercio no prevé como supuesto de nulidad la incompetencia del Tribunal Arbitral.

La pretensión de la actora carece de sustento legal en virtud de que según se desprende de su demanda, su acción va encaminada a obtener la nulidad del laudo arbitral con base en que el Tribunal Arbitral careció de competencia para estudiar y resolver todo lo relacionado con aquellas controversias técnicas que no fueron sometidas por la contratista al procedimiento previsto en la cláusula 23.2 del contrato.

Tal sustento de la pretensión de la actora es ilegal en virtud de que los únicos supuestos de nulidad del laudo arbitral son aquellos previstos en el artículo 1457 del Código de Comercio y la **incompetencia del Tribunal Arbitral no se encuentra prevista dentro de ellos.**

El citado artículo que a la letra establece lo siguiente:

> **"Artículo 1457.-** Los laudos arbitrales sólo podrán ser anulados por el juez competente cuando.
>
> I.- La parte que intente la acción pruebe que:
>
> a) Una de las partes en el acuerdo de arbitraje estaba afectada por alguna incapacidad, o que dicho acuerdo no es válido en virtud de la ley a que las partes lo han sometido, o si nada se hubiese indicado a ese respecto en virtud de la legislación mexicana;
>
> b) No fue debidamente notificada de la designación de un árbitro o de las actuaciones arbitrales, o no hubiere podido, por cualquier otra razón, hacer valer sus derechos;
>
> c) El laudo se refiere a una controversia no prevista en el acuerdo de arbitraje o contiene decisiones que exceden los términos del acuerdo de arbitraje. No obstante, si las disposiciones del laudo que se refieren a las cuestiones sometidas al arbitraje pueden separarse de las que no lo están, sólo se podrán anular estas últimas; o
>
> d) La composición del Tribunal Arbitral o el procedimiento arbitral no se ajustaron en el acuerdo celebrado entre las partes, salvo que dicho acuerdo estuviera en conflicto con una disposición del presente título de la que las partes no pudieran apartarse o, a falta de dicho acuerdo, que no se ajustaron al presente título; o
>
> II.- El juez compruebe que según la legislación mexicana, el objeto de la controversia no es susceptible de arbitraje, o que el laudo es contrario al orden público."

El argumento de la parte actora en cuanto a la competencia, no encuadra en los supuestos anteriormente transcritos del artículo 1457 del Código de Comercio; por lo tanto, no puede considerarse que el tema de la competencia pueda provocar la nulidad del laudo.

15

De la simple lectura de las fracciones del artículo en cita se desprende que el laudo arbitral puede ser anulado por diversas causas. La mayoría de ellas tienen que ver con el hecho de que las partes hayan tenido una oportunidad de defensa, que el acuerdo de arbitraje sea válido, que la controversia sea susceptible de ser arbitrable o bien que el laudo sea contrario al orden público.

Sin embargo, ninguna de ellas prevé como causa de nulidad que el Tribunal Arbitral sea incompetente, por lo que la pretensión de nulidad de la parte actora fundada en esta supuesta incompetencia carece de sustento legal y, en ese sentido, debe ser declarada improcedente.

C) Excepción derivada de que el Tribunal Arbitral tiene competencia para resolver todas las controversias surgidas del Contrato, de acuerdo con la cláusula arbitral.

La parte actora argumenta que el Tribunal Arbitral carece de competencia para conocer de reclamos relacionados con controversias técnicas que no fueron planteadas debidamente, así como a controversias que, en su opinión, no pueden ser sometidas a la competencia del Tribunal Arbitral en virtud de que contractualmente no se encuentran previstas como gastos indemnizables.

Tales argumentos son incorrectos en virtud de que confunden los conceptos de competencia con procedencia.

La competencia del Tribunal Arbitral es la facultad que tiene el órgano para decidir sobre una disputa.   Sobre este particular resulta pertinente hacer énfasis en que la facultad del Tribunal Arbitral para decidir sobre su propia competencia se enmarca dentro del principio de autonomía de la cláusula arbitral.

De acuerdo con este principio, independientemente de la validez o existencia del contrato original, así como de los reclamos derivados del mismo, el acuerdo arbitral subsiste como un acuerdo independiente y válido *per se*.

Este principio de autonomía de la cláusula arbitral se encuentra reconocido por el primer párrafo del propio artículo 1432 del Código de Comercio que dispone lo siguiente:

> "**Artículo 1432.-** El Tribunal Arbitral estará facultado para decidir sobre su propia competencia, incluso sobre las excepciones relativas a la existencia o validez del acuerdo de arbitraje. A ese efecto, la cláusula compromisoria que forme parte de un contrato se considerará como un acuerdo independiente de las demás estipulaciones del

16

**contrato.** La decisión de un Tribunal Arbitral declarando nulo un contrato, no entrañará por ese solo hecho la nulidad de la cláusula compromisoria."

(Énfasis añadido)

Como consecuencia del principio de autonomía de la cláusula arbitral es evidente que el Tribunal Arbitral constituido con base en ella cuenta con la facultad para determinar su propia competencia para conocer y resolver las controversias que se le presenten y que se encuentren dentro del alcance y objeto de la citada cláusula, con independencia de que las pretensiones de cada parte que integran a las controversias en particular resulten o no fundadas.

**En este contexto, es necesario distinguir claramente la competencia del tribunal arbitral para resolver sobre una determinada pretensión o reclamo, de la procedencia de dicha reclamación.**

La procedencia de una reclamación se refiere a la existencia de presupuestos necesarios que verificados permiten al tribunal estudiar los méritos en los que se basa la reclamación.

Según la parte actora, conforme a la cláusula 23.3 del Contrato, el Tribunal Arbitral carece de competencia para conocer de controversias que no hayan seguido el procedimiento previsto en la cláusula 23.2.

Tal afirmación de la actora es infundada según se desprende de la interpretación de la propia cláusula arbitral establecida en la cláusula 23.3 del Contrato que se transcribe a continuación.

> "23.3 Arbitraje. **Cualquier controversia,** reclamación, diferencia o disputa que sobrevenga o se relacione o esté vinculada con este contrato o el incumplimiento del mismo será dirimida **finalmente** mediante arbitraje conducido en el Distrito Federal, México, de acuerdo con las Reglas de Conciliación y Arbitraje de la Cámara Internacional de Comercio que estén en vigor en ese momento. El número de árbitros será de tres y el idioma para conducir el arbitraje será el español. No obstante lo anterior, cualquier controversia técnica **deberá ser sometida previamente** al procedimiento previsto en la **Cláusula 23.2** y **sólo en caso de que mediante dicho procedimiento no se logre una acuerdo entre las partes**, éstas quedarán facultadas para acudir al recurso previsto en la Cláusula 23.3".

Según se desprende de la cláusula transcrita, cualquier controversia relacionada con el contrato debe ser resuelta finalmente mediante arbitraje. Sin embargo, en algunos casos, como aquellos en los que se vean involucradas controversias técnicas, previo al arbitraje las partes deben acudir previamente al procedimiento

17

previsto en la cláusula 23.2 del Contrato. Si las partes no llegan a un acuerdo según el procedimiento referido entonces pueden acudir al arbitraje.

De la redacción de la cláusula de referencia no se desprende, como lo pretende la parte actora, que aquellas controversias que no se hubieran sometido al procedimiento de la cláusula 23.2 no sean de la competencia del Tribunal Arbitral.

Por el contrario, la cláusula arbitral determina que **todas** las controversias derivadas del contrato deberán ser resueltas mediante arbitraje. La cláusula no establece limitación alguna respecto de cuáles son las controversias de las que el Tribunal Arbitral podrá conocer.

La única condicionante que pudiera establecer la cláusula arbitral se refiere a la necesidad de las partes de acudir a un procedimiento de controversia técnica **durante la ejecución de la obra**, en lugar de acudir a un arbitraje. Sin embargo, esto no implica que las controversias entre las partes que pudieran derivar en una controversia técnica no puedan ser resueltas en arbitraje, incluso, la circunstancia particular consistente en la verificación sobre si la contratista acudió o no al procedimiento para resolver una controversia técnica previsto en la cláusula 23.2 del contrato.

Esto implica que el Tribunal Arbitral tiene igualmente competencia para decidir si la contratista siguió válidamente el procedimiento de controversia técnica o no. Contrariamente a lo que argumenta la parte actora, el hecho de que la contratista no hubiera agotado el procedimiento de controversia técnica previsto en la cláusula 23.2 no genera la incompetencia del Tribunal Arbitral.

Como se ha indicado, la competencia del tribunal es la facultad que tiene para decidir finalmente sobre las disputas, en este caso, **todas las disputas** surgidas entre las partes. La conducta procedimental de las partes durante la ejecución de la obra no puede ser un motivo para limitar la competencia del Tribunal Arbitral. En este sentido, el primer párrafo de la cláusula arbitral es muy claro al establecer que las partes pactaron que todas las disputas derivadas del Contrato serían sometidas al Tribunal Arbitral.

Sobre el particular, es pertinente tener en consideración las reglas de interpretación contractual establecidas por los artículos 1851, 1852, 1853, 1854, 1855 y 1857 del Código Civil Federal.

Conforme a dichas reglas existen básicamente dos formas de interpretar los contratos, uno de ellos sigue el método subjetivo, es decir, determinar, cuál fue la

verdadera intención de las partes atendiendo, en principio, al sentido literal de las cláusulas, a la intención evidente de los contratantes.

Dicho método igualmente determina que cualquiera que sea la generalidad de los términos de un contrato, no deberán entenderse comprendidos en él cosas distintas y casos diferentes de aquéllos sobre los que los interesados se propusieron contratar y que las cláusulas deben interpretarse las unas por las otras, atribuyendo a las dudosas el sentido que resulte del conjunto de todas.

Además, de los preceptos invocados se desprende que la conducta observada por las partes antes, durante y en la fase de ejecución del contrato, posee un valor relevante como medio de su interpretación, en razón del principio de coherencia y continuidad del contrato. Para acudir a dicho medio, es necesario que los actos de las partes tengan relevancia en relación con la voluntad contractual que de ellas ha de deducirse y con el sentido del contrato.

Es menester, además, que esos actos sean comunes, o que, si se ejecutan por una sola parte, exista la aceptación expresa o tácita de la otra. Este "comportamiento interpretativo" arroja luz sobre la verdadera intención de los contratantes respecto a los alcances que quisieron dar al compromiso a cuyo cumplimiento quedaron sujetos.

El otro método de interpretación sigue un criterio objetivo, el cual pasa por alto la conducta de las partes y deja al intérprete un lineamiento acotado para la determinación del significado de los términos del contrato.

En este sentido, el artículo 1857 del ordenamiento citado sigue esta metodología y determina que cuando absolutamente fuere imposible resolver las dudas por las reglas establecidas en los artículos precedentes, si aquéllas recaen sobre circunstancias accidentales del contrato, y éste fuere gratuito, se resolverán en favor de la menor transmisión de derechos e intereses; si fuere oneroso se resolverá la duda en favor de la mayor reciprocidad de intereses.

El mismo precepto establece que si las dudas de cuya resolución se trata en dicho artículo recayesen sobre el objeto principal del contrato, de suerte que no pueda venirse en conocimiento de cuál fue la intención o la voluntad de los contratantes, el contrato será nulo.

En este sentido, debe entenderse que cuando no existe duda sobre la claridad de los términos de los contratos, sus cláusulas deben ser interpretadas en un

19

sentido **amplio** de tal forma que su contenido obligacional surta sus efectos plenamente.

**"Registro No. 174760**
Localización:
Novena Época
Instancia: Tribunales Colegiados de Circuito
Fuente: Semanario Judicial de la Federación y su Gaceta
XXIV, Julio de 2006
Página: 1177
Tesis: I.6o.C.402 C
Tesis Aislada
Materia(s): Civil

**CONTRATOS. TEORÍA DE LA PREEMINENCIA DE LA VOLUNTAD DE LAS PARTES EN AQUÉLLOS.** De la interpretación del artículo 1851 del Código Civil para el Distrito Federal, se desprenden dos hipótesis que deben aplicarse a los contratos para determinar su alcance jurídico, como son la literalidad de sus cláusulas y la **intención** de los contratantes. Sin embargo, del segundo párrafo se advierte el contenido de la denominada teoría de la preeminencia de la voluntad de los contratantes, que se ubica sobre la expresión material y que atiende a factores objetivos con independencia de la **intención** de los interesados, la cual, se deduce de la conducta desplegada por las **partes** contratantes antes, durante y en la fase de ejecución del **contrato.** En consecuencia, del caudal probatorio ofrecido por las **partes,** deben considerarse los elementos extrínsecos al **contrato** para desentrañar la verdadera **intención** de las **partes,** la que es preeminente al contenido literal                de                aquél.

SEXTO TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.

Amparo directo 5106/2005. Eduardo Yedid Cohen. 18 de agosto de 2005. Unanimidad de votos. Ponente: Gustavo R. Parrao Rodríguez. Secretario: Abraham Mejía Arroyo."

Sirve de apoyo a lo anterior, los siguientes criterios de los tribunales federales:

**"No. Registro: 385,432**
Tesis aislada
Materia(s): Civil
Quinta Época
Instancia: Sala Auxiliar
Fuente: Semanario Judicial de la Federación
CXVI
Tesis:
Página: 325

**CONTRATOS, INTERPRETACION DE LOS.** La voluntad de las partes es la suprema ley en los contratos, salvo los casos en que medie el interés público; y de acuerdo con las normas interpretativas de los mismos, si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, se estará al sentido literal de sus cláusulas.

Amparo civil directo 10059/49. Garza Félix S. 2 de junio de 1953. Unanimidad de cinco votos. La publicación no menciona el nombre del ponente."

20

No. Registro: 214,023
Tesis aislada
Materia(s): Civil
Octava Época
Instancia: Tribunales Colegiados de Circuito
Fuente: Semanario Judicial de la Federación
XII, Diciembre de 1993
Tesis:
Página: 847

"CONTRATOS. INTERPRETACION DE LOS. Para la correcta interpretación de los contratos, debe atenderse a la voluntad de las partes sobre su expresión material. Pues conforme al artículo 1680 del Código Civil vigente en el Estado México, si los términos de un contrato son claros y no dejan duda sobre la intención de los contratantes, debe estarse al sentido literal de sus cláusulas, pero si las palabras parecieran contrarias a la intención evidente de las partes, prevalecerá ésta sobre aquéllas. En cuyo caso, la naturaleza de los contratos no depende de su designación, sino de los hechos y actos asentados por aquéllas, en relación a las disposiciones legales aplicables."

PRIMER TRIBUNAL COLEGIADO DEL SEGUNDO CIRCUITO.

Amparo directo 325/93. Consuelo Pérez Vda. de Vergara. 25 de mayo de 1993. Unanimidad de votos. Ponente: Raúl Díaz Infante Aranda. Secretario: Rigoberto F. González Torres.

Esta tesis reitera el criterio sustentado en la Jurisprudencia 108, visible a fojas 302 y 303, Cuarta Parte, Tercera Sala del Apéndice de Jurisprudencia 1917-1985."

En el caso concreto, según se advierte de la cláusula 23.3 del Contrato, las partes pactaron que **todas las controversias** surgidas del contrato fueran **resueltas finalmente** mediante arbitraje.

La redacción de la cláusula es muy clara por cuanto a la intención de las partes de que todas y cada una de las controversias fueran resueltas en arbitraje. Esto debe entenderse igualmente en un sentido amplio.

Las prácticas comerciales comunes que se concretan en obligaciones contractuales por lo general plasman la intención de los contratantes que conlleva una **visión práctica de negocios**.

Siendo congruentes con la referida visión práctica de negocios, es común que las partes contratantes deciden someter **la totalidad de sus controversias a su posible solución mediante un acuerdo arbitral.**

Esto es congruente en virtud de que todas las posibles controversias derivadas de un contrato provienen de una misma causa normativa como lo es el contrato principal. De manera que es lógico, congruente, práctico y lo menos costos posible que sea un solo tribunal arbitral el que decida un posible cúmulo de controversias mediante un procedimiento arbitral.

21

En el caso concreto, como se desprende de la lectura de la cláusula 23.3 del contrato, su literalidad indica que **todas** las controversias derivadas del contrato deben ser resueltas en arbitraje.

Asimismo, más allá de la literalidad, la práctica común de las partes, así como **su intención y la lógica** indica que verdaderamente fue la intención de las partes someter todas y cada una de sus controversias a un tribunal arbitral.

No obsta a lo anterior, como lo pretende argumentar la parte actora, el hecho de que el segundo párrafo del artículo citado prevea un mecanismo de conciliación previo al arbitraje.

Esto se debe que no existe, dentro de la misma cláusula, ni en otro contenido obligacional pactado entre las partes alguna disposición que ni expresa ni por medio de una interpretación válida permita concluir que la falta del agotamiento del procedimiento de conciliación implique que cualquier reclamo relacionado salga de la extensión del acuerdo arbitral.

En la cláusula en comento, las partes **no pactaron expresamente** que la falta de sometimiento al procedimiento de controversia técnica **implicara su inarbitrabilidad**. No existe en la cláusula un elemento literal que permita generar duda sobre la contundencia de su primer párrafo en el que se indica que **todas** las controversias deben ser resueltas **finalmente** mediante arbitraje.

Tampoco, existe una interpretación válida que permita concluir que la intención de las partes fue la de dividir en un momento dado las controversias y excluir algunas de la cláusula arbitral por el solo hecho de no agotar el procedimiento de controversia técnica.

Suponer esto implicaría aceptar que las partes pactaron bifurcar la solución de sus controversias y someter algunas a arbitraje y otras a los tribunales nacionales competentes. No existe otra posibilidad, o bien la disputa se heterocompone a través de arbitraje o bien a través de un juicio ante un tribunal nacional.

Si este fuera el caso, hubiera sido coherente con la voluntad de las partes de incluir una cláusula que indicara **cuáles serían los tribunales competentes** en caso de que alguna disputa quedara fuera de la cláusula arbitral. Sin embargo, no existe dentro del contrato disposición alguna que prevea tal circunstancia.

22

Además, como se ha dicho, esto sería contrario al sentido literal de la cláusula que usa palabras categóricas como **"todas"** y **"finalmente"**. Esto sería incongruente igualmente con el sentido práctico y eficiente del arbitraje por el cual las partes comúnmente optan por someter sus controversias a un procedimiento arbitral.

Como se ha dicho, es lógico que las partes a un contrato de esta naturaleza opten por una solución integral a sus controversias y no las bifurquen con la posibilidad incluso, de llegar a tener **interpretaciones contradictorias** de un mismo contrato y de las mismas obligaciones.

De aceptarse la posibilidad de que tanto un tribunal arbitral como un tribunal nacional conocieran de la interpretación de un mismo contrato abre la alternativa a decisiones contradictorias, no sobre la misma disputa obviamente pero sí sobre cuestiones generales del contrato que en un momento dado pudiera generar la inoperancia de la cláusula y del método de solución de controversias elegido originalmente por las partes.

Así las cosas, deberá considerar este tribunal que las pretensiones de la actora se hacen depender de circunstancias e interpretaciones inverosímiles de la cláusula arbitral.

Asimismo y como colofón lógico de lo expuesto debe considerarse que de una recta interpretación de la cláusula arbitral, también es competencia del Tribunal Arbitral determinar si las partes se sometieron correctamente al procedimiento de controversia técnica previsto en la cláusula 23.2 del Contrato. Asimismo, es competencia del Tribunal Arbitral determinar cuál es exactamente el alcance del segundo párrafo de la cláusula arbitral. Corresponde también al Tribunal Arbitral determinar cuál es el alcance jurídico de la posible omisión de la contratista en relación con someter una disputa una controversia técnica.

En el caso concreto, el Tribunal Arbitral se pronunció correctamente sobre estas cuestiones y en el ejercicio legal de su competencia determinó que los reclamos de COMMISA sí eran procedentes.

Además, la interpretación de la parte actora es incorrecta al pretender darle un alcance semejante a la cláusula arbitral, en virtud de que no existe una disposición dentro de la propia cláusula arbitral que indique que el Tribunal Arbitral pierde su competencia sobre la disputa por el sólo hecho de que la contratista no siguió el procedimiento previsto en la cláusula 23.2 del Contrato. Aceptar esta interpretación nos llevaría al absurdo de que el Tribunal Arbitral resuelva que una determinada pretensión no es procedente por no haber cumplido con la cláusula

23

23.2 del Contrato, a pesar de que precisamente por no haber cumplido con dicha cláusula el Contrato no podía resolver sobre ella. Es decir, el Tribunal Arbitral se estaría pronunciado sobre la improcedencia 'de un reclamo y al mismo tiempo dicha improcedencia lo haría incompetente volviendo nula su determinación al respecto.

Por otra parte, la parte actora pretende dar a las cláusulas 23.3 y 23.2 un alcance que no tienen puesto que la naturaleza de la cláusula 23.2 es distinta de lo que argumenta la actora.

La naturaleza de la cláusula 23.2 tiene la finalidad de fomentar un arreglo entre las partes **durante la ejecución de la obra** con el objeto de que las partes lleguen a un acuerdo pronto que les permita continuar con los trabajos e impida el establecimiento formal de un litigio que pudiera implicar mayores retrasos en la obra o incluso su suspensión total.

La cláusula 23.2 del contrato ordena lo siguiente:

> "23.2 Controversias Técnicas. El contratista no tendrá derecho a efectuar ningún reclamo y PEP no será responsable por daños legales (incluyendo negligencia) o contractuales ante el Contratista, sus proveedores secundarios o subcontratistas, excepto en los casos específicamente previstos en este Contrato.
>
> Para efectos de esta cláusula se entenderá por Controversia Técnica toda diferencia que surja por cualquier reclamo o sea atribuible a la interpretación o ejecución de este contrato, con los Anexos Técnicos del Contrato (A, B, B-1, B-2, B-3, CEV, DT, DT-1, DT-2.1, DT-3, DT-4, E-2, F-1 y F-2)
>
> Si por cualquier motivo el Supervisor y el contratista no coinciden en la apreciación para resolver un reclamo de ajuste derivado de una Controversia Técnica, el Contratista deberá hacer formal dicha Controversia Técnica por escrito al Supervisor y solicitarle la determinación correspondiente. Este tipo de solicitud del contratista deberá ser claramente identificada indicando que se trata de una Controversia Técnica sujeta a resolución al amparo de esta Cláusula 23, debiendo contener un resumen de los hechos en controversia y la propuesta del Contratista para resolverlos ..."

Como se desprende de la cláusula transcrita, el procedimiento de la cláusula 23.2 conlleva la finalidad de que las partes resuelvan ciertas disputas técnicas amigablemente durante la ejecución de los trabajos. Sin embargo, ni de su redacción, ni de la redacción de la cláusula arbitral prevista en la cláusula 23.3 se desprende que la omisión de la contratista de presentar la solicitud formal de

24

controversia técnica, impida posteriormente la presentación del reclamo en arbitraje.

En este sentido, el único efecto de la cláusula 23.3 en relación con la cláusula 23.2 es la limitación consistente en que previamente a la reclamación de alguna prestación relacionada con una controversia técnica, las partes deben intentar llegar a un acuerdo mediante el procedimiento formal de la controversia técnica.

Como se ha indicado, la razón de ser del método de solución de disputas mediante un acuerdo sometido de la controversia técnica es fomentar que las partes lleguen a un acuerdo, durante la ejecución de la obra. Sin embargo, esto no implica que cualquier indemnización que la contratista tuviera derecho a reclamar ya no pudiera ser reclamada en arbitraje una vez terminada la obra, si es que no se siguió oportunamente la controversia técnica.

Como se desprende de las cláusulas analizadas, la intención de las partes no fue prever un mecanismo para excluir la competencia del Tribunal Arbitral, sino en todo caso, su única intención fue prever un mecanismo previo al arbitraje para que las partes intentaran resolver sus disputas relacionadas con controversias técnicas, de mutuo acuerdo, antes de acudir al arbitraje.

**Por lo tanto, deberá considerarse que todas las causas de nulidad en que la parte actora fundamenta la incompetencia del Tribunal Arbitral son infundadas y en este sentido deberá pronunciarse su Señoría, declarando la improcedencia de las reclamaciones de PEP.**

D) EXCEPCIÓN DERIVADA DE QUE LA PROCEDENCIA DE LOS RECLAMOS DE **COMMISA** FUE PARTE DE LA MISIÓN DADA POR LAS PARTES A LOS ÁRBITROS Y PEP NO OBJETÓ TALES DETERMINACIONES. POR LO TANTO, CONFORME A LO ORDENADO POR EL ARTÍCULO 33 DEL REGLAMENTO DE LA CORTE INTERNACIONAL DE ARBITRAJE PEP CONSINTIÓ LA COMPETENCIA DEL TRIBUNAL ARBITRAL Y LA PROCEDENCIA DEL ANÁLISIS DE LAS CONTROVERSIAS TÉCNICAS Y PERDIÓ SU DERECHO PARA RECLAMAR LA NULIDAD DE LAUDO.

Como se desprende de la demanda de arbitraje presentada por COMMISA, así como de la contestación a la demanda presentada por PEP un punto sometido a controversia en el arbitraje fue el relativo a si COMMISA siguió el procedimiento previsto para reclamos relativos a controversias técnicas.

25

Tales puntos fueron debatidos por las partes en el procedimiento arbitral en virtud de que PEP **planteó** tal cuestión como una **excepción** de procedencia, mas no como una excepción o defensa de competencia.

En el acta de misión, el Tribunal Arbitral determinó ser necesario resolver tales cuestiones como elementos de procedencia. Esto implica que PEP **consintió** que las cuestiones relativas al procedimiento de controversias técnicas son requisitos de procedencia de los reclamos pero no cuestiones relativas a la competencia del Tribunal Arbitral ni tampoco cuestiones que puedan considerarse como externas o extrañas al acuerdo de arbitraje.

**Al final del acta de misión, las partes firmaron estar conformes con los términos de dicho documento.**

En este sentido, debe estimarse que la parte actora estuvo de acuerdo y consintió en que el Tribunal Arbitral tiene competencia para conocer y resolver sobre la naturaleza e interpretación del cumplimiento de las partes sobre las controversias técnicas.

Según se desprende del acta de misión, el Tribunal Arbitral determinó lo siguiente:

(b) **Puntos litigiosos relacionados con la competencia del Tribunal arbitral y requisitos de procedibilidad:**

1.    (a)   ¿Constituyen todas las pretensiones y peticiones formuladas por la Demandante en su demanda y por la Demandada en su reconvención *"Controversia, reclamación, diferencia o disputa que sobrevenga o se relacione o esté vinculada con [el] Contrato o el incumplimiento del mismo"*. (como exige la cláusula 23.3. del mismo), y es el Tribunal Arbitral competente para resolverlas?

     (b)   ¿Es competente el Tribunal Arbitral para decretar la compensación de los derechos reclamados en este arbitraje derivados del Contrato EPC-28, con obligaciones dimanantes de otros contratos celebrados entre Demandante y Demandada?

2.    (a)   ¿Constituye alguna de las pretensiones o peticiones formuladas por la Demandante una controversia técnica, tal como se define este concepto en el Contrato EPC-28?

     (b)   De ser la respuesta a la anterior pregunta 2. (a) afirmativa, ¿se han sometido dicha o dichas controversias técnicas al procedimiento previsto en la cláusula 23.2. del Contrato?

     (c)   De ser negativa la respuesta a la anterior pregunta 2. (a) ¿cuál sería la consecuencia a los efectos del presente arbitraje?

Al final del acta de misión, las partes firmaron de conformidad como a continuación se muestra:

**I)** **Declaraciones de las partes**

Ambas partes declaran que:

(i) Las personas que firman esta Acta de Misión en nombre de las partes, están debidamente autorizadas en virtud de los poderes descritos debajo de cada firma y vinculan a sus poderdantes.

(ii) El otorgamiento del Acta de Misión no requiere ninguna autorización de naturaleza administrativa.

Como expresión de su consentimiento, lo firman en seis ejemplares, uno para la Demandante, uno para la Demandada, tres para el Tribunal y uno para la Secretaría de la CCI, en la Ciudad de México, D.F., a 6 de septiembre de 2005. La Demandada hace constar que el otorgamiento de esta Acta de Misión no implica renuncia a las alegaciones sobre falta de jurisdicción y competencia del Tribunal Arbitral por ella planteadas, y a las que se hace referencia en el apartado D) (b) de este documento, y que serán resueltas por el propio Tribunal.

**PARTES**
**CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V.**

Por Poder

Nombre del representante: Christopher Rondla

Fecha y descripción de los poderes: 2 Sept 05 Public Deed 53 727

**PEMEX-EXPLORACIÓN Y PRODUCCIÓN**
Por Poder

Nombre del representante: Jorge Duarte Aispuro

Fecha y descripción de los poderes: Escritura Publica 8710 Fecha 25 octubre - 2002

En el laudo arbitral, el Tribunal resolvió en congruencia con la misión encomendada por las partes de la siguiente manera:

> "El Tribunal llega a la conclusión de que:
>
> a petición principal del Demandante consiste en 39 Controversias Técnicas, que fueron correctamente sometidas al procedimiento previsto en la cláusula 23.2 del Contrato, quedando expedita la vía arbitral para su reclamación;
>
> as reclamaciones planteadas por la Demandada en vía reconvencional y la reclamación de prórroga de plazo planteada por Commisa en su Escrito de Conclusiones, no requieren ser sometidas al procedimiento previsto en la cláusula 23.2 del Contrato, al haberse planteado una vez terminada la obra y cesado el Supervisor;

27

> *as reclamaciones accesorias siguen la suerte de las principales de las que traen causa;*
>
> *y que, en consecuencia, no existe impedimento alguno para entrar a conocer el fondo de las reclamaciones."*

Conforme a la transcripción anterior, resulta ser evidente que la parte actora consintió en que el Tribunal Arbitral si tenía competencia para resolver acerca de la procedencia de las controversias técnicas y que estas cuestiones sí estaban comprendidas dentro del acuerdo arbitral.

Si la parte actora estuvo de acuerdo con tales cuestiones y consintió acerca de la competencia del Tribunal Arbitral y del alcance del acuerdo de arbitraje, entonces no puede estimarse ahora válido que pretenda anular el laudo, justamente con dichos argumentos.

El artículo 33 del Reglamento de Arbitraje de la Cámara de Comercio aplicable al caso concreto prevé precisamente esta consecuencia. El referido artículo ordena lo siguiente:

> **"Artículo 33**
> **Renuncia**
>
> Se presumirá que una parte que proceda con el arbitraje sin oponer reparo al incumplimiento de cualquiera de las disposiciones del Reglamento, de cualesquiera otras normas aplicables al procedimiento, de cualquier instrucción del Tribunal Arbitral o de cualquier estipulación contenida en el acuerdo de arbitraje relacionadas con la constitución del Tribunal Arbitral o con el desarrollo del proceso, ha desistido de su derecho a objetar."

De conformidad con el artículo 33 citado, resulta que el Reglamento de Arbitraje de la Cámara Internacional de Comercio contiene una salvaguarda procesal para asegurar que las partes están de acuerdo con los términos del procedimiento arbitral, con las disposiciones del mismo reglamento, con las órdenes del Tribunal Arbitral, así como con las estipulaciones contenidas en el acuerdo de arbitraje.

Ahora bien, el mismo artículo prevé que si las partes no oponen **reparo durante el procedimiento arbitral**, por cuanto a las órdenes procesales y demás cuestiones, incluida entre ellas el alcance del acuerdo arbitral se entiende que han desistido de su derecho a objetarlas con posterioridad.

Como se ha indicado con anterioridad, en el acuerdo arbitral, las partes convinieron en considerar aplicable para la solución de sus disputas el

Reglamento de Arbitraje de la Cámara Internacional de Comercio. Por lo tanto, les resulta obligatoriamente aplicable lo determinado en el artículo 33 referido.

De manera que, como se ha indicado, si en el acta de misión PEP aceptó que las cuestiones relativas a la procedencia de los reclamos relacionados con las controversias técnicas fuera resuelto por el Tribunal Arbitral, entonces **consintió** tal determinación en términos del artículo 33 y **perdió su derecho a objetarlo.**

Consecuentemente, si la parte actora consintió la **competencia** del Tribunal Arbitral, con la posibilidad del que el tribunal **estudiara la procedencia** de los reclamos relacionados con las controversias técnicas, y con los **términos del acuerdo de arbitraje** en tales sentidos, entonces no puede ahora válidamente intentar la nulidad del laudo arbitral justamente con los argumentos referidos.

Finalmente cabe señalar que estas determinaciones del Tribunal Arbitral no pueden en forma alguna vulnerar la garantía de legalidad prevista por el artículo 16 constitucional, por la simple y sencilla razón de que un laudo arbitral no puede ser violatorio de garantías.   En este sentido, el alegar como lo hace PEP que las determinaciones de hecho y derecho del Tribunal Arbitral son incorrectas no es un argumento válido para pretender anular un laudo arbitral, puesto que tal y como se explica a lo largo de la presente contestación, el fondo del laudo no puede ser sujeto a revisión por parte de un Tribunal estatal.

Por lo tanto, deberá considerarse fundada esta excepción y declararse improcedente e infundada la acción.

VI.    <u>CONTESTACION A LAS CAUSALES DE NULIDAD Y OTROS ARGUMENTOS INVOCADOS POR LA ACTORA.</u>

A) Inaplicabilidad de La Convención de Nueva York y de la Convención de Panamá al Procedimiento de Nulidad iniciado por la parte Actora.

Primeramente y dada la inexactitud de algunos fundamentos legales invocados por la actora para sostener su demanda, demostramos a su Señoría que varios de los ordenamientos mencionados en la demanda de nulidad son incorrectos.

Así, la actora invoca la Convención sobre el Reconocimiento y Ejecución de las Sentencias Arbitrajes Extranjeras adoptada en Nueva York, Estados Unidos de América en el año de 1958, para tratar de sostener y fundar sus causales de nulidad.  Sin embargo, este ordenamiento no es aplicable al caso concreto

En efecto, de acuerdo con el artículo 1° de dicha Convención, la misma es aplicable sólo con respecto al:

i)   Reconocimiento y ejecución de sentencias arbitrales (laudos); y

ii)  Sólo en relación con sentencias arbitrales consideradas como extranjeras por haberse dictado en un Estado distinto de aquél en que se pide el reconocimiento y ejecución.

Expresamente dicho artículo señala lo siguiente:

> "Artículo 1
>
> 1. La presente Convención **se aplicará al reconocimiento y la ejecución de las sentencias arbitrales dictadas en el territorio de un Estado distinto de aquel en que se pide el reconocimiento y la ejecución de dichas sentencias,** y que tengan su origen en diferencias entre personas naturales o jurídicas. Se aplicara también a las sentencias arbitrales que no sean consideradas como sentencias nacionales en el Estado en el que se pide su reconocimiento y ejecución."
>
> (Énfasis añadido).

En consecuencia, considerando que la acción planteada por la actora es una acción de nulidad y no de reconocimiento y ejecución y considerando, además que de acuerdo con la cláusula 23.3 del Contrato (cláusula arbitral) el laudo se dictó en México, Distrito Federal por tener ahí su sede el arbitraje, es evidente que no se está en presencia de un laudo que pueda ser materia de la citada Convención.

En el mismo sentido, tampoco resulta aplicable la Convención Interamericana Sobre Arbitraje Comercial Internacional adoptada en el año de 1975 en Panamá, por lo que el hecho de invocarla denota de nueva cuenta la ignorancia de la parte actora en la materia.

En efecto, en la citada Convención Interamericana no existe artículo alguno que establezca o prevea una acción de nulidad de laudo, por lo que es evidente que la acción promovida por la actora no puede sustentarse en dicho instrumento internacional.

Lo anterior, sin embargo, no implica que **únicamente para efectos de interpretación** pueda atenderse a los comentarios y análisis realizados por los tratadistas y Tribunales sobre las causales para denegar el reconocimiento y ejecución de laudos que se encuentran en ambas Convenciones, pero sólo en la

medida que dichas causales son sustancialmente idénticas a las causales de nulidad previstas por el artículo 1457 del Código de Comercio.

B) CONTRADICCIONES EVIDENTES E INTRÍNSECAS EXISTENTES EN LA DEMANDA DE NULIDAD.

Con independencia de que se aborden a detalle las razones por las cuales los argumentos específicos de la parte actora para sostener la nulidad resultan o inatendibles, o improcedentes o infundados, a continuación se destacan contradicciones evidentes en que se incurre en la demanda:

1.- PEP alega en forma reiterada que el Contrato es un Contrato de Naturaleza Administrativa (sin definir en forma clara el origen y las consecuencias de esta afirmación) y que, por lo tanto, el Tribunal Arbitral al resolver las disputas entre las partes no debió haber aplicado ninguna de las reglas del Derecho Civil. (Este argumento, es más adelante desvirtuado en la presente contestación.)

No obstante lo anterior, PEP también alega en forma reiterada y constante que el Tribunal Arbitral violó el orden público porque no aplicó correctamente diversos preceptos relativos a controversias de Derecho Civil (argumento que también se desvirtúa más adelante en esta contestación). Específicamente, en este sentido, PEP alegó que en el laudo arbitral se violan, entre otras, las siguientes disposiciones de Derecho Civil:

i. Los artículos 1796 y 1797 del Código Civil Federal porque supuestamente el Tribunal Arbitral asumió competencia sobre los reclamos de COMMISA sin que se cumplieran las formalidades para ser consideradas controversias técnicas en términos del Contrato.

ii. El artículo 14 Constitucional (relativo a la forma de resolución de controversias civiles por tribunales estatales) al alegar la nulidad de la resolución dictada por el tribunal en relación con la controversia técnica número 36.

iii. Los artículos 16 Constitucional y a la normatividad civil en materia de daños (artículos 1910, 1915, 1934 y 2110 del Código Civil Federal) por cuanto supuestamente no se fundó ni motiva la causación de daños y perjuicios, al resolver sobre las controversias técnicas números 34 y 35.

31

iv. El artículo 1805 del Código Civil Federal al no resolver en estricto derecho Civil la controversia técnica número 27.

v. El principio de derecho civil que impide que una parte se beneficie de su propio dolo (ya que supuestamente se alega que COMMISA no cumplió con el procedimiento contractual de estimaciones previas), al resolver el reclamo de gastos financieros.

vi. Los artículos 2397 del Código Civil Federal y 363 del Código de Comercio al resolver sobre el reclamo de gastos financieros supuestamente en contra de la prohibición para capitalizar intereses.

Así, aunque la parte actora constante y reiteradamente se duele de una supuesta incongruencia del laudo arbitral, resulta que es ella quien incurre en verdaderas incongruencias al sostener primero la inaplicabilidad del Derecho Civil y, posteriormente alegar la violación al orden público porque supuestamente el Derecho Civil no se aplicó en el laudo. Esta contradicción, en sí misma torna la acción de nulidad notoriamente improcedente.

2.- Aún peor resulta la confusión, incongruencia y contradicción en que incurre la parte actora al aludir al Tribunal Arbitral como una autoridad estatal y quererle imponer obligaciones como tal. En este sentido, resultan totalmente infundados los argumentos de que en el laudo arbitral se violó la garantía de exacta aplicación de la Ley (en controversias civiles) y de debida fundamentación y motivación legal, puesto que ni el Tribunal Arbitral es una autoridad, ni mucho menos el laudo arbitral constituye un acto de molestia al que se le exija que deba estar debidamente fundado y motivado. Sirven de apoyo a lo anterior, las siguientes tesis aisladas:

"No. Registro: 179,667
Tesis aislada
Materia(s): Constitucional, Civil
Novena Época
Instancia: Primera Sala
Fuente: Semanario Judicial de la Federación y su Gaceta
XXI, Enero de 2005
Tesis: 1a. CLXXVI/2004
Página: 411

ARBITRAJE COMERCIAL. LOS ARTÍCULOS 1415 A 1463 DEL CÓDIGO DE COMERCIO, NO VIOLAN EL ARTÍCULO 13 DE LA CONSTITUCIÓN FEDERAL. Si se parte de la base que el juicio arbitral es aquel que se tramita ante personas o instituciones que no son Jueces del Estado, o que siéndolo, no actúan como tales, sino como personas de derecho privado, es inexacto que los

preceptos reclamados, al establecer la posibilidad de que los particulares sujeten sus controversias al arbitraje comercial, otorguen a los tribunales arbitrales la calidad de tribunales especiales, pues quienes emiten dichos laudos son personas o instituciones designadas para resolver controversias entre particulares, ya sea como amigables componedores o en conciencia, sólo si las partes las han autorizado expresamente para hacerlo en términos del artículo 1445, párrafo tercero, del citado código. Estos laudos deben ser reconocidos u homologados por los órganos jurisdiccionales correspondientes, a fin de que adquieran la fuerza jurídica necesaria para su completa obligatoriedad, y a efectos de su ejecución de conformidad con los artículos 1461 a 1463 del ordenamiento mencionado. De ahí que el arbitraje comercial regulado en el Código de Comercio no contraviene el artículo 13 de la Constitución, que como garantía de igualdad, en el aspecto jurisdiccional, prohíbe los tribunales especiales.

Amparo en revisión 237/2004. Emilio Francisco Casares Loret de Mola y otros. 28 de abril de 2004. Unanimidad de cuatro votos. Ausente: Humberto Román Palacios. Ponente: Juan N. Silva Meza. Secretario: Jaime Flores Cruz."

(Énfasis añadido)

"No. Registro: 175,553
Tesis aislada
Materia(s): Civil
Novena Época
Instancia: Tribunales Colegiados de Circuito
Fuente: Semanario Judicial de la Federación y su Gaceta
XXIII, Marzo de 2006
Tesis: II.4o.C.25 C
Página: 2038

**LITISPENDENCIA. NO PUEDE HACERSE VALER DICHA EXCEPCIÓN SI EXISTE, POR UNA PARTE, LA TRAMITACIÓN DE UN JUICIO EJECUTIVO MERCANTIL Y, POR LA OTRA, UN PROCEDIMIENTO ARBITRAL.** De la interpretación del artículo 1123 del Código de Comercio, se advierte que es claro al señalar que dicha excepción únicamente procede cuando un Juez ya conoce de un juicio, en donde existe igualdad entre partes, acciones deducidas y cosas reclamadas, supuesto normativo que no se actualiza cuando la controversia surge entre un Juez y un árbitro. Se afirma lo anterior, porque <u>un árbitro no es funcionario del Estado, puesto que sus facultades derivan de la voluntad de las partes, expresada de acuerdo con la ley</u> y, aunque la sentencia o laudo arbitral no puede revocarse por la voluntad de uno de los interesados, no es por sí misma ejecutiva, ya que sólo adquiere ese carácter por la mediación de un acto realizado por un órgano jurisdiccional que, sin quitarle su naturaleza privada, asume su contenido; consecuentemente, las resoluciones de un árbitro carecen de imperio, dado que sus laudos son actos privados al provenir de particulares, y son ejecutivos sólo cuando los órganos del Estado han añadido, a la materia lógica del laudo la materia jurisdiccional de una sentencia, de ahí que resulte manifiesto que la función jurisdiccional compete al Estado y sólo puede ser conferida a los órganos de éste; en tales condiciones, si, por una parte existe la tramitación de un juicio ejecutivo mercantil y, por la otra, un procedimiento arbitral, no puede hacerse valer en el juicio ejecutivo la excepción de

33

litispendencia, dado que ésta procede sólo cuando un Juez conoce ya del mismo negocio, supuesto que no se actualiza en la especie, porque el árbitro no, es Juez ni autoridad judicial pues, como se ha dejado anotado, no es funcionario del Estado, y las facultades que ejerce derivan de la voluntad de las partes.

CUARTO TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL SEGUNDO CIRCUITO.

Amparo en revisión 255/2005 Duroplast Ramos Arizpe, S.A. de C.V. 17 de enero de 2006. Unanimidad de votos. Ponente: José Martínez Guzmán. Secretario: Francisco Peñaloza Heras.

(Énfasis añadido)

Igualmente, resulta aplicable por analogía la siguiente tesis aislada:

"Registro No. 366995
Localización:
Quinta Época
Instancia: Cuarta Sala
Fuente: Semanario Judicial de la Federación CXXIII
Página: 115
Tesis Aislada
Materia(s): laboral

**ARBITROS PRIVADOS, SUS RESOLUCIONES NO SON ACTOS DE AUTORIDAD.** Aunque el nombramiento de árbitro, por voluntad de las partes, recayera en la Junta Central de Conciliación y Arbitraje en pleno, ésta no actuó como órgano jurisdiccional, **si no como cualquier árbitro privado, que no es autoridad y que carece de imperio para hacer cumplir sus determinaciones.**

Amparo directo en materia de trabajo 3937/52. Sindicato de Cargadores de Camiones, Casas Comerciales y Conexos de la Región de Jalapa, Ver. 7 de enero de 1955. Unanimidad de cuatro votos. Ausente: Luis Díaz Infante. La publicación no menciona el nombre del ponente.

(Énfasis añadido)

C) IMPOSIBILIDAD JURÍDICA DE QUE EN EL PROCEDIMIENTO DE NULIDAD SE ENTRE AL ESTUDIO DEL FONDO DEL ASUNTO ALEGANDO VIOLACIONES AL ORDEN PÚBLICO U OTRAS CAUSALES DE NULIDAD.

De la manera en que se encuentra planteada la demanda de nulidad, resulta evidente el objetivo de la parte actora de provocar a como dé lugar que su Señoría entre al análisis del fondo del asunto resuelto en el laudo arbitral.

Así y siempre bajo el pretexto de supuestas violaciones al orden público, a las reglas del procedimiento y al pacto arbitral, se reiteran cuestiones de fondo que ya fueron definidas y resueltas por el Tribunal Arbitral.

34

Bastará una lectura de su Señoría a la demanda de nulidad para percatarse de que, más que demostrar supuestas causales de nulidad de laudo, la parte actora prácticamente está presentando una apelación en contra de aquellas decisiones que le fueron desfavorables en el laudo arbitral, reiterando al efecto todos sus argumentos de fondo.

De esta manera, si una decisión contenida en el laudo arbitral no le fue favorable a la parte actora, ésta alega o que dicha decisión no está fundada contractual o legalmente, o que es parcial, o que viola el orden público o que se excede del alcance de la competencia del Tribunal Arbitral. La invocación de las causas de nulidad, en este contexto, se vuelve un mero pretexto para tratar de provocar que todo el fondo del asunto sea re-examinado en esta instancia lo cual resulta notoriamente improcedente como se explica a continuación.

La Autoridad Judicial debe omitir entrar al estudio del fondo del asunto resuelto por el laudo arbitral cuyo reconocimiento y ejecución se solicite. Es absoluto e indiscutible, que el laudo final cuya ejecución se reconviene posteriormente, tiene la calidad de *cosa juzgada*. Resulta aplicable en lo conducente la siguiente tesis aislada:

> °No. Registro: 186,229
> Tesis aislada
> Materia(s): Civil
> Novena Época
> Instancia: Tribunales Colegiados de Circuito
> Fuente: Semanario Judicial de la Federación y su Gaceta
> XVI, Agosto de 2002
> Tesis: XV.1o.50 C
> Página: 1317
>
> **LAUDO ARBITRAL. SU HOMOLOGACIÓN POR AUTORIDAD JUDICIAL ORDINARIA Y EL ANÁLISIS DE ÉSTA, EN AMPARO, NO PERMITE EL ESTUDIO DE SU SENTIDO EN CUANTO AL FONDO.** Un laudo arbitral es la decisión de un órgano no estatal, así convenida por las partes, para resolver una contienda, ya sea presente o futura; así, para efectos de la instancia ordinaria queda a la exclusiva potestad de la decisión del tribunal de arbitraje y pasa a ser una extensión de esa voluntad, que por ser un acto de particulares, en cuanto a su sentido, no se encuentra sujeto a revisión constitucional; sin embargo, tal revisión constitucional sí se puede dar respecto a la resolución de homologación emitida por un órgano judicial estatal, la que, desde luego, se limitará al resultado del análisis de la debida composición del tribunal de arbitraje, del debido procedimiento, de la manifestación de voluntad de las partes de someterse al arbitraje, de la materia del mismo y de los demás **supuestos contemplados en el artículo 1462 del Código de Comercio, supuestos que, como se advierte, contemplan únicamente cuestiones de *forma* y no de *fondo*,** y, una vez dada la homologación, de los actos de ejecución con que el Juez auxilia al cumplimiento del laudo; por lo que en la vía de amparo únicamente se podrán alegar

35

esas cuestiones y no las relativas al fondo y sentido del laudo. Lo anterior se robustece con el criterio sostenido por la Tercera Sala de la anterior integración de la Suprema Corte de Justicia de la Nación, en la tesis aislada, publicada en el Semanario Judicial de la Federación, Quinta Época, Tomo XXXVIII, página 801, de rubro: "ARBITRAJE.", en la que considera que el arbitraje es una convención que la ley reconoce, lo que constituye una renuncia de los particulares para que la autoridad judicial conozca de una controversia, por lo que tiene una importancia procesal negativa, en cuanto que las partes confían la decisión de sus conflictos a uno o más particulares, llamados árbitros; sin embargo, éstos no son funcionarios del Estado ni tienen jurisdicción propia o delegada, y sus facultades derivan únicamente de la voluntad de las partes, expresada de acuerdo a la ley, y si bien el laudo arbitral no puede revocarse a voluntad de uno de los interesados, no es ejecutivo en sí mismo, ya que sólo puede considerársele como una obra de la lógica jurídica que es acogida por el Estado, por lo que sólo puede ejecutarse a través de un acto realizado por un órgano jurisdiccional que, sin quitarle su naturaleza privada, asume su contenido, y es entonces que se equipara a un acto jurisdiccional. Sin embargo, los Jueces no están autorizados para revisar los laudos de manera integral, ya que de lo contrario podrían nulificarlos, aun por cuestiones de fondo, para lo que sería necesario que previamente las partes comparecieran ante el Juez a plantearle el debate, y el sistema generalmente adoptado consiste en que si la violación contenida en el laudo transgrede el orden público, el Juez no debe ordenar su ejecución, pero si solamente perjudica intereses privados debe ordenarla; y una vez decretado judicialmente su cumplimiento se eleva a la categoría de acto jurisdiccional y es entonces que el agraviado puede ocurrir ante los tribunales de la Federación en demanda de amparo, que deberá tramitarse en la vía biinstancial, como así se advierte de la jurisprudencia número 32/93 de la Tercera Sala de la anterior integración de la Suprema Corte de Justicia de la Nación, publicada en la Gaceta del Semanario Judicial de la Federación, tomo 72, diciembre de 1993, página 41, de rubro: "LAUDO ARBITRAL, ACUERDOS DE HOMOLOGACIÓN Y EJECUCIÓN DEL. PROCEDE EN SU CONTRA EL JUICIO DE AMPARO INDIRECTO, EN TÉRMINOS DEL ARTÍCULO 114, FRACCIÓN III, DE LA LEY DE AMPARO, Y NO EL DIRECTO A QUE ALUDE EL 158 DEL MISMO ORDENAMIENTO.".

PRIMER TRIBUNAL COLEGIADO DEL DÉCIMO QUINTO CIRCUITO.

Amparo en revisión 138/2002. Macalux, México, S.A. de C.V. 28 de mayo de 2002. Unanimidad de votos. Ponente: Pedro Fernando Reyes Colín. Secretario: Ángel Rodríguez Rico."

(Énfasis añadido)

No obstante lo anterior, como ya se señaló, PEP pretende que se entre al estudio del fondo de lo resuelto por el laudo arbitral alegando supuestas violaciones al orden público fundadas en la fracción II del artículo 1457 del Código de Comercio, que establece:

36

"Articulo 1457. Los laudos arbitrales _sólo podrán_ ser anulados por el juez competente cuando.

.....

II. El juez compruebe que según la legislación mexicana, el objeto de la controversia no es susceptible de arbitraje, o que el laudo es contrario al orden público."

Esta disposición encuentra su antecedente directo en la Ley Modelo sobre Arbitraje Comercial Internacional de la CNUDMI de la Organización de Naciones Unidas, que en el año de 1993 fue adoptada por el legislador federal dentro del Código Comercio, a fin armonizar la regulación mexicana del arbitraje con los principios reconocidos como válidos universalmente en la materia, procurando con ello uniformar su marco jurídico con el de los otros países del orbe. Este propósito se hace evidente de la simple lectura de la exposición de motivos que de la reforma al Código de Comercio fue presentada por el Ejecutivo Federal, en los siguientes términos:

"De lo expuesto, puede concluirse que, en el comercio internacional es muy conveniente una legislación moderna sobre el arbitraje comercial, _conocida universalmente, y de amplia aceptación en los medios comerciales internacionales_; estas razones motivan la presente iniciativa de decreto que reforma y adiciona diversas disposiciones del Código de Comercio y del Código Federal de Procedimientos Civiles.

De merecer la aprobación de ese honorable Congreso de la Unión, se incorporarían las disposiciones de la Ley Modelo sobre Arbitraje Comercial Internacional de la Comisión de las Naciones Unidas para el Derecho Mercantil Internacional (CNUDMI), que es el resultado de una negociación universal realizada en el seno de las Naciones Unidas. La Asamblea General de este organismo recomendó a todos los países que examinaran debidamente la mencionada Ley Modelo y tomaran en cuenta la conveniencia de _uniformar_ el derecho procesal arbitral y las necesidades específicas de la práctica del arbitraje comercial internacional.

Como lo hace notar la Secretaría de la CNUDMI, la Ley Modelo constituye una base sólida y alentadora para la armonización y el perfeccionamiento deseados de las leyes nacionales. Regula todas las etapas del proceso arbitral, desde el acuerdo de arbitraje, hasta el reconocimiento y la ejecución del laudo arbitral, _y refleja el consenso mundial sobre los principios y aspectos más importantes de la práctica del arbitraje internacional. Resulta aceptable para los países de todas las regiones y para los ordenamientos jurídicos o sistemas económicos del mundo._

.....

Nuestro país participó activamente en la elaboración de la Ley Modelo, de modo que las necesidades y peculiaridades de nuestras leyes y tradiciones fueron tomadas en cuenta en el momento de su elaboración."

37

Considerando lo anterior, la causal de nulidad alegada por PEP fue adoptada del artículo 34 de esta Ley Modelo, que prevé la nulidad de un laudo arbitral que sea violatorio del orden público, en los siguientes términos:

> **"Artículo 34.** La petición de nulidad como único recurso contra un laudo arbitral
>
> 1) Contra un laudo arbitral sólo podrá recurrirse ante un tribunal mediante una petición de nulidad conforme a los párrafos 2) y 3) del presente artículo.
>
> 2) El laudo arbitral sólo podrá ser anulado por el tribunal indicado en el artículo 6 cuando:
>
> .....
>
> b) el tribunal compruebe:
>
> i) que, según la ley de este Estado, el objeto de la controversia no es susceptible de arbitraje; o
>
> ii) **que el laudo es contrario al orden público de este Estado."**

Como se puede observar, el supuesto normativo de la Ley Modelo y del Código de Comercio en relación a la causal de nulidad alegada es idéntico y solo difiere en cuanto a su forma.

El concepto de orden público en relación con la nulidad y/o ejecución de un laudo arbitral es un tema que ha sido ampliamente desarrollado en la doctrina y jurisprudencia internacional alrededor de esta Ley Modelo, lo que sin lugar a dudas nos permite esclarecer el sentido y alcance de lo dispuesto por la fracción II del artículo 1457. De hecho, la jurisprudencia mexicana ha dispuesto que para interpretar las disposiciones del Código de Comercio desde un punto de vista teleológico e histórico, es <u>necesario</u> acudir a los comentarios existentes en relación a esta Ley Modelo, tal y como se desprende del siguiente criterio jurisprudencial:

"No. Registro: 176,581
Tesis aislada
Materia(s): Civil
Novena Época
Instancia: Tribunales Colegiados de Circuito
Fuente: Semanario Judicial de la Federación y su Gaceta
XXII, Diciembre de 2005
Tesis: I.3o.C.502 C
Página: 2650

**COMPROMISO ARBITRAL, NULIDAD DEL. COMPETENCIA DEL ÁRBITRO Y NO DEL JUEZ ORDINARIO PARA CONOCER DE LA ACCIÓN DE NULIDAD RESPECTIVA, PORQUE LOS ARTÍCULOS 1424 Y 1432 DEL CÓDIGO DE COMERCIO TIENEN COMO PROPÓSITO DAR EFICACIA A LOS ACUERDOS DE ARBITRAJE Y FACILITAR LA**

**REALIZACIÓN DE LOS PROCEDIMIENTOS ARBITRALES.**
Para interpretar los preceptos que regulan el arbitraje en el Código de Comercio, desde el punto de vista teleológico e histórico, es necesario tener en cuenta que el antecedente de los mismos se encuentra en la Ley Modelo Sobre Arbitraje Comercial Internacional de la Comisión de las Naciones Unidas para el Derecho Mercantil Internacional (CNUDMI), cuyas disposiciones fueron incorporadas a la legislación mercantil nacional a fin de ajustarla a los aspectos favorables para el arbitraje que se advirtieron en esa propuesta normativa, como se desprende de la exposición de motivos del decreto de reforma y adiciones publicado en el Diario Oficial de la Federación el veintidós de julio de mil novecientos noventa y tres, así como de los correspondientes dictámenes emitidos por las respectivas Cámaras de Origen y Revisora, a saber, de Diputados y de Senadores, de tal suerte que resulta conveniente acudir al texto de la mencionada ley modelo, en los preceptos que guardan similitud o identidad de contenido, y a la explicación que de dichos dispositivos hace la secretaría de la mencionada comisión internacional. Esa semejanza en contenido normativo se advierte entre los artículos 1424 y 1432 del Código de Comercio, y 8 y 16 de la ley modelo, cuyo propósito es facilitar y dar eficacia al reconocimiento de los acuerdos de arbitraje, así como evitar la práctica de tácticas dilatorias, aunque se trate del ejercicio de las facultades de supervisión o de control que se reconocen como necesarias por parte de los tribunales judiciales. La anterior finalidad de la regulación de la remisión al arbitraje y de la facultad de determinar la competencia por parte del tribunal arbitral, basada en el principio arbitral de origen alemán denominado "Kompetenz-Kompetenz", o competencia-competencia, que implícitamente se encuentra en el texto de los artículos 1424 y 1432 del Código de Comercio, dado el origen que tienen y la semejanza con las normas que los inspiraron, revela que el legislador mexicano buscó dar cabal eficacia al compromiso arbitral y facilitar la realización de los arbitrajes, en caso de existir un acuerdo sobre esa forma de resolución de controversias, impidiendo el empleo de dilaciones en la sustanciación de esos procedimientos, aun cuando se ejerciera el necesario control judicial sobre la validez del pacto arbitral, el que, en términos del artículo 1432 del Código de Comercio, puede hacerse antes de que se dicte el laudo arbitral, o con posterioridad a éste, es decir, puede ser previo o ex post. Por tanto, cuando existe pacto arbitral sobre la competencia del árbitro para conocer de la nulidad del acuerdo de arbitraje, queda excluida la competencia del Juez ordinario del Estado, para respetar cabalmente la voluntad de las partes al convenir la resolución de las controversias, incluyendo la nulidad del pacto arbitral, a través del procedimiento arbitral.

TERCER TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.

Amparo en revisión 14/2005. Servicios Administrativos de Emergencia, S.A. de C.V. 19 de mayo de 2005. Unanimidad de votos, con voto aclaratorio del Magistrado Anastacio Martínez García. Ponente: Neófito López Ramos. Secretario: Raúl Alfaro Telpalo."

(Énfasis añadido)

La violación al orden público como causal de nulidad de un laudo arbitral es una figura ampliamente discutida en el foro internacional, debido a que a través de la misma las partes para quienes no resulta favorable un laudo han buscado aprovecharse de la supuesta ambigüedad del concepto y bajo cualquier pretexto o razonamiento artificial han demandado que el juez revoque la resolución dictada por los árbitros, como si se tratara de una apelación que se pronuncia sobre la legalidad de los razonamientos de fondo del tribunal arbitral.

Estos abusos han sido reportados ampliamente por el representante designado por el gobierno mexicano en la CNUDMI, el Dr. José María Abascal Zamora. Sin embargo, en su artículo *"La interpretación uniforme de la Convención de Nueva York y del Título IV del Libro Quinto del Código de Comercio"*, el Dr. Abascal Zamora sostiene que estos abusos derivados de la supuesta ambigüedad del concepto "orden público" no han encontrado respuesta por parte de los tribunales judiciales domésticos, sosteniendo lo siguiente:

> **"6. Sobre el concepto de orden público y su interpretación estricta.**
>
> Es humano que el perdedor, que estuvo de acuerdo en el arbitraje cuando tenía interés en celebrar el contrato, no quiera cumplir cuando se enfrenta a un laudo desfavorable. La parte que pierde trata de ignorar su obligación y busca su nulidad y que se deniegue la ejecución. La vía que se considera más fácil para convencer a un tribunal para que analice el fondo de la cuestión resuelta por los árbitros, es la alegación de que el laudo viola el orden público.
>
> Desde que se creo la disposición del párrafo 2 del artículo V de la CNY, que permite a un juez denegar la ejecución si estima que esta viola el orden público, se tuvo el temor de que se hubiera abierto un potencial agujero que, a través de la revisión judicial del fondo del negocio, diera al traste con la intención de las partes de convenir en el arbitraje. Sin embargo, la jurisprudencia internacional ha demostrado que estos temores eran falsos; no obstante que la defensa del orden público es la que se hace valer con mayor frecuencia, ha sido sistemáticamente desestimada por los jueces [...].
>
> .....
>
> Hay dos sentencias que han sido sistemáticamente observadas en la jurisprudencia internacional.
>
> La primera fue una decisión que interpretó el inciso (b) del párrafo 2 del artículo V de la CNY, según la cual, la Corte rehusó la reclamación de que el abandono de una compañía americana de un proyecto de construcción en Egipto, con motivo de la Guerra de los seis días, podría excusarse por el rompimiento de las relaciones bilaterales de los Estados Unidos de América y Egipto. Afirmando que una construcción expansiva de esta defensa podría viciar el esfuerzo básico de la CNY de remover obstáculos preexistentes a la ejecución, **la Corte dijo que: la ejecución de laudos arbitrales sólo**

puede denegarse sobre las bases de que la ejecución violaría las nociones básicas de moralidad y justicia... al igualar la "política nacional" de los Estados Unidos con el "orden público", la parte apelante equivoca el concepto, ya que leer la defensa de orden público como un medio parroquial de protección de los intereses de la política nacional, debilitaría seriamente la utilidad de la convención. La disposición no significa encapsular las vicisitudes de la política nacional dentro del rubro del "orden público" [...].

En el mismo STEWART (nota en pág. 94), cita la segunda, una resolución alemana (...) que rechaza la defensa del orden público afirmando que tal contravención sólo existe bajo la ley alemana si el laudo arbitral viola una regla los principios básicos de la economía pública o de plano contradice en una forma intolerable los principios alemanes de justicia."

(Énfasis añadido)

En congruencia con el sentido restrictivo que estas dos resoluciones de los tribunales domésticos de los Estados Unidos y de Alemania han hecho sobre el orden público y sus implicaciones en la nulidad o ejecución de un laudo arbitral, Alan Redfern, Martin Hunter, Nigel Blackaby y C. Partasides[1], han expuesto a su vez que la mayor parte de los países desarrollados en materia de arbitraje han coincidido en la formulación común de un concepto acotado de "orden público" y mencionan lo siguiente:

"9-32 Finalmente, la **Ley Modelo** establece que un laudo arbitral puede nulificarse si un tribunal nacional del lugar del arbitraje encuentra que el laudo esté en conflicto con el orden público de su propio país.

La mayor parte de las jurisdicciones arbitrales desarrolladas tienen concepciones similares de orden público. De acuerdo con la Corte Federal Suprema de Suiza, **orden público denota principios legales fundamentales, cuya falta de observancia sería incompatible con el sistema Suizo legal y económico.** (101). De igual manera, **los tribunales alemanes han sostenido que un laudo violaría el orden público si entra en conflicto con nociones fundamentales de justicia; buena fe o se conflictúa con principios que son valores nacionales o económicos fundamentales.**(102) De nuevo, en términos similares, la Corte Superior de Justicia de Ontario negó la nulidad de un laudo dictado por un tribunal NAFTA, sosteniendo que para que un laudo viole el orden público:

"**éste debe fundamentalmente ser contrario a los principios más básicos y explícitos de justicia y equidad en Ontario,** o denotar una ignorancia intolerable o corrupción en la parte del tribunal arbitral" (...)[2]"

---

[1] REDFERN, Alan; HUNTER, Martin; BLACKABY, Nigel; and PARTASIDES, C. *Law and Practice of International Commercial Arbitration,* Kluwer Law International, 2004, pp. 1-50.
[2] Lastly, the **Model Law** states that an arbitral award may be set aside if a national court of the place of arbitration finds that the award is in conflict with the public policy of its own country.

41

(Énfasis añadido)

Bajo esta misma línea restringida del concepto de orden público, el Reporte de la CNUDMI sobre la Ley Modelo complementa esta noción que se tiene de él, para explicitar un poco más su alcance y señalar a la corrupción, al cohecho y al fraude como causales de nulidad de un laudo. Al respecto, en el reporte de la Comisión se sostiene lo siguiente:[3]

> "Se entendía que el término "orden público", que fue utilizado en la Convención de Nueva York de 1958 y en otros muchos tratados, comprendía principios fundamentales de derecho y justicia en ámbitos sustantivos y adjetivos. Consecuentemente, instancias como la corrupción, el cohecho, el fraude y casos similares serios constituirían bases para nulificar. (...)"[4]

Ahora bien, para interpretar lo dispuesto por la fracción II del artículo 1457 del Código de Comercio, este concepto estricto de orden público entendido *como una serie de principios fundamentales de derecho y justicia cuya violación es gravemente incompatible con los valores o el sistema económico o jurídico de un país"* debe analizarse a la luz de los principios que rigen al arbitraje y a la tarea del Juez al resolver el incidente de nulidad.

De acuerdo con el maestro Jorge Alberto Silva, la revisión que el Juez hace sobre el laudo es limitada y específica, quedando acotada a la revisión de cuestiones de forma y no de fondo. En su obra de Arbitraje comercial internacional en México, el maestro Silva señala textualmente[5]:

> "Queda prohibido revisar el fondo del asunto resuelto, es el principio sobre el que gira la revisión del laudo.
>
> Gómez Lara sigue las ideas que se le plantearon en una tesis recepcional y afirma que de las violaciones alegadas, el tribunal judicial podrá examinar las de procedimiento, no las de fondo.

---

*Traducción del siguiente texto:* Most developed arbitral jurisdictions have similar conceptions of public policy. According to the Swiss Federal Supreme Court, **public policy denotes fundamental legal principles, a departure from which would be incompatible with the Swiss legal and economic system.**(101) Similarly, German courts have held that an award will violate public policy **if it conflicts with fundamental notions of justice, *bonos mores* or conflicts with principles which are fundamental national or economic values.**(102) Again in similar terms, the Superior Court of Justice of Ontario refused to set aside an award rendered by a NAFTA tribunal, holding that for an award to offend public policy:

[it]'must fundamentally offend the most basic and explicit principles of justice and fairness in Ontario, or evidence intolerable ignorance or corruption on the part of the arbitral Tribunal'... The Applicant must establish that the awards are contrary to the essential morality of Ontario.(103)

[3] BROCHES, Aron. *Commentary on the Uncitral Model Law*, International Council for Commercial Arbitration, Kluwer Law, Vol. IV, 2004.

[4] "It was understood that the term 'public policy', which was used in the 1958 New York Convention and many other treaties, covered **fundamental principles of law and justice in substantive as well as procedural respects. Thus, instances such as corruption, bribery and fraud and similar serious cases would constitute a ground for setting aside.** (...)."

[5] SILVA, Jorge Alberto. *Arbitraje comercial internacional en México*, segunda edición, Oxford, México, 2001, p. 252.

El tribunal de exequátur no examinará los argumentos fácticos planteados en juicio ni los lógicos que utilizó el árbitro cuando pronuncia el laudo".

En relación a este mismo alcance de la misión del Juez, en el *Informe del Secretario General de Naciones Unidas respecto a una compilación analítica de las observaciones por gobiernos y organizaciones internacionales acerca del proyecto de una ley modelo sobre arbitraje comercial internacional*, el gobierno de Qatar manifestó su interés en dejar en claro cuál era la tarea del Juez al analizar la acción de nulidad del laudo por violación al orden público, y concluyó lo siguiente:[8]

> "**Cuando los derechos de las partes se determinen en forma pecuniaria, mediante el reconocimiento de un título o en otro modo que pos sí mismo no afecte el orden público del país del reconocimiento o la ejecución, la causa del orden público no debe aplicarse para denegar el reconocimiento o la ejecución. De otra manera, ello significaría reabrir el examen del litigio respecto al cual ya se ha adoptado una decisión y, como consecuencia de esa medida, perderían utilidad las actuaciones arbitrales y se menoscabaría la confianza necesaria en las operaciones en general y en las operaciones internacionales en particular. En apoyo de esa opinión, Qatar señala que muchos Estados, entre ellos los Estados Unidos de América, tienen leyes y determinada jurisprudencia que prevé esa interpretación estricta del orden público. En consecuencia, sugiere que se incorpore al final del apartado ii) del inciso b) del párrafo 1), el texto siguiente:**
>
> *"Al decidirse si el laudo sería contrario al orden público del Estado, <u>no se volverá a examinar el objeto del litigio con respecto al que se hubiese adoptado una decisión mediante ese laudo, y la decisión se relacionará sólo con las actuaciones o medidas necesarias para el reconocimiento o la ejecución"</u>.*

(Énfasis añadido)

Como se puede observar, el análisis de un tribunal judicial de la noción de orden público como causal de nulidad de un laudo está claramente delimitada por la función que tiene el Juez de no entrar al estudio del fondo del litigio, limitándose a resolver las cuestiones formales limitativamente señaladas por el propio artículo 1457 del Código de Comercio.

En el caso que nos ocupa, por así convenir a sus pretensiones, PEP ha intentado desvirtuar el concepto de orden público antes expuesto y su delimitación que en la materia arbitral tiene respecto al papel del Juez en la revisión del laudo. De forma

---

[8]    (A/CN.9/263    y    Add.1-3),    p.    85.    *Visible    en:*
http://daccessdds.un.org/doc/UNDOC/GEN/NL8/500/50/PDF/NLB50050.pdf?OpenElement

43

ilógica y temeraria PEP ha sostenido que "algunos autores" afirman que en el incidente de nulidad el juez puede entrar al análisis del fondo del laudo, pero el único nombre que de estos "algunos autores" da para sostener su postura, es el del Dr. Francisco González de Cossio, citando la página 19 de su obra Manual de Arbitraje Comercial.

A este respecto, la página 19 de la obra Manual de Arbitraje Comercial del Dr. Francisco González de Cossio citado por PEP nada menciona respecto al tema de nulidad del laudo por violaciones al orden público y mucho menos respecto a la revisión del fondo del caso. Por el contrario, al revisar la obra citada por PEP se advierte que el propio autor citado por ella sostiene precisamente la posición que es contraria a sus ilegítimos intereses, pero congruente con lo que hasta ahora se ha expuesto en el presente escrito.

En efecto, el Dr. González de Cossio deja muy en claro en su obra Manual de Arbitraje Comercial como el Juez no puede entrar a la revisión del fondo del asunto, y al distinguir las diferencias entre el recurso de apelación y el recurso de nulidad, señala lo siguiente[7]:

> "Existe una diferencia conceptual entre, por un lado, la apelación y, por el otro, los recursos existentes en relación con los laudos. Su diferente naturaleza obedece a que un recurso de apelación examina el fondo del laudo (es decir, tanto los hechos como el derecho) y el tribunal que realice dicha revisión tiene la facultad de confirmar, revocar o modificar el mismo.
>
> En los recursos de nulidad, reconocimiento y ejecución, el órgano competente tiene una jurisdicción limitada. Su nivel de análisis se limita a la determinación de la presencia de una de las causales de nulidad o no ejecución. El órgano que realiza esta revisión no establece la correcta determinación de los hechos ni la correcta aplicación del derecho. Únicamente decide si se ha presentado un vicio en la emisión del laudo que justifique la invalidación."

Bajo esta misma línea, dentro de los principios rectores del arbitraje el Dr. González de Cossio señala los siguientes:

> "Los laudos: a) Tienen que ser ejecutados, b) Sin que por ser extranjeros se pueda requerir condiciones más rigorosas que los laudos locales, c) Teniendo los jueces mexicanos la discreción, más no la obligación, de anularlos o no ejecutarlos únicamente en los expresamente contemplados, d) Siempre y cuando se venza la presunción de validez de los mismos, y **e) Siempre que no analicen el fondo del laudo.**"

(Énfasis añadido)

---

[7] GONZÁLEZ DE COSSÍO, Francisco. *Ejecución de Laudos Arbitrales* en *Manual de Arbitraje Comercial*, México, Porrúa 2004, p. 168 a 170.

Así las cosas, es claro que PEP busca aprovecharse del supuesto concepto ambiguo de "orden público" para que este juzgador entre al análisis del fondo del asunto al analizar las causales de nulidad planteadas. Sin embargo, como se ha expuesto en páginas precedentes, el concepto de orden público es un concepto de carácter restringido que únicamente puede ser entendido en la materia arbitral en atención al papel que el Juez debe seguir en la tramitación del incidente de nulidad.

**D)    EL LAUDO NO ES CONTRARIO AL ORDEN PÚBLICO.**

PEP alega reiteradamente que el laudo es contrario y violó el orden público, por lo que en términos del artículo 1457, fracción II debe ser declarado nulo. Para ello, PEP esgrime diversas razones y argumentos cuya improcedencia se demuestra a continuación detalladamente.

> **1.- La compensación determinada por el Tribunal Arbitral a favor de COMMISA cuenta con justificación legal y contractual.**

PEP alega prácticamente en relación con todas las decisiones tomadas por el Tribunal Arbitral en relación con las controversias técnicas número 19, 27, 34, 35, 37, 39, Gastos Financieros y de Pago de Gastos y Costas del Arbitraje que el laudo es contrario al orden público porque dichas decisiones no cuentan con justificación legal y contractual y en esa medida carecen de debida fundamentación y motivación legal.

Sobre las mismas bases y en forma confusa, PEP alega también que en la decisión adoptada en relación con la controversia técnica número 36 se incurrió en dicho defecto, pero con respecto a ella no alega la violación al orden público, sino que afirma que el Tribunal Arbitral se excedió en su misión al resolver sin fundamento legal o contractual la disputa.

Este argumento y causal de supuesta nulidad es un ejemplo claro del intento de PEP para que se analice el fondo del laudo arbitral, so pretexto de violación al orden público. No obstante, el mismo resulta improcedente por las siguientes razones.

En primer lugar, tal y como se explicó en el apartado C) del presente capítulo VI, cualquier argumento tendiente a que en un procedimiento de nulidad de fondo se entre al análisis de las decisiones de fondo del procedimiento resulta inatendible.

45

# EXHIBIT A
# Part 2 of 4

No es óbice a lo anterior, el que se alegue que las decisiones de fondo cuestionadas, supuestamente vulneran el orden público ya que la demostración de dicha excepción resulta de aplicación estricta y tiene además que ser clara e indubitable, lo cual no sucede en ninguno de los argumentos esgrimidos por PEP con respecto a las decisiones adoptadas por el Tribunal Arbitral en su laudo, al resolver las controversias técnicas número 19, 27, 34, 35, 37, 39, Gastos Financieros y de Pago de Gastos y Costas del Arbitraje

Contrariamente a lo que sostiene PEP, el Tribunal Arbitral si razonó y justificó legal y contractualmente las decisiones contenidas en su laudo, tal y como se explica a detalle a continuación:

a) Decisión con respecto a Controversia Técnica número 19.

Al resolver el reclamo identificado en el laudo como "Controversia Técnica" número 19, el Tribunal determinó que al ejecutar el trabajo encomendado, COMMISA se encontró con una serie de elementos no previstos en los planos constructivos proporcionados por PEP y que constituían obstrucciones para la colocación de los ductos en la forma acordada. Se trata, por lo tanto, de un problema de ejecución contractual atribuible a omisiones de PEP que ésta última reconoció como parte de su responsabilidad.

Sobre este punto, el Tribunal Arbitral determinó que existió un acuerdo entre las partes de que estas obstrucciones daban lugar a trabajos extraordinarios, con fundamento en el Convenio Modificatorio número 12. Asimismo, el Tribunal estableció que COMMISA presentó en su debida oportunidad los reclamos derivados de estas obstrucciones y que su aceptación o no por parte de PEP era un hecho ajeno a COMMISA al cual no se podía supeditar la procedencia de sus reclamos.

Finalmente, el Tribunal Arbitral con base en el análisis de las características de estos reclamos y los acuerdos expresos o tácitos llegados por las partes con respecto a ellos, determinó condenar a PEP al pago de las condenas fijadas en el laudo.

b) Decisión con respecto a Controversia Técnica número 27.

En la Controversia Técnica 27, COMMISA reclama el pago de $63.469 pesos y US$1.948.210 dólares por el diferencial de las tarifas de espera de la Castoro 10, lo anterior en razón de que PEP ordenó un cambio en el programa de trabajo por el que se utilizó el Castoro 10 en lugar de el Bar Protector. Por su parte, PEP

46

sostiene que los precios se pactaron por actividades y no por embarcaciones y que en todo caso, sólo tendría derecho a reclamar la cantidad de US$ 316.985 dólares menos $1.888.065 pesos a favor de PEP.

El Tribunal Arbitral estudió las pruebas ofrecidas y determinó que toda vez que la Supervisión solicitó a COMMISA la cotización de la barcaza para este tipo de trabajo y que COMMISA indicó que su tarifa sería la misma, se entiende que PEP aceptó la oferta de COMMISA al ordenar que se realizara el trabajo en plataformas con el Castoro 10.

En consecuencia, el Tribunal Arbitral aceptó parcialmente la pretensión de COMMISA y condenó a PEP a satisfacer a COMMISA la cantidad de $62.502 pesos más US$1.947.288 dólares.

c) Decisión con respecto a Controversia Técnica número 34 y 35.

**En la Controversia Técnica 34** COMMISA reclamó el pago de 30.309.308 PME más 28.885.334 USD por el adeudo por retraso en el inicio de los trabajos del Bar Protector; y **en la Controversia Técnica 35**, el pago de 18.494.205 USD por el retraso en el inicio de los trabajos de la Castoro 10. Por su parte PEP consideró improcedentes los reclamos y argumentó que los pagos por tiempos de espera únicamente comenzarían a devengarse una vez que las embarcaciones pasaran el check list y se pusieran a su disposición.

El Tribunal consideró que desde el veinte de agosto de mil novecientos noventa y ocho existen diversas evidencias de que COMMISA advirtió y comunicó a PEP respecto de los costos que podría ocasionar la reprogramación de los trabajos, por lo que el cinco de marzo de mil novecientos noventa y nueve el Supervisor requirió a mi representada para que presentara unas estimaciones de los costos que habría de indemnizar – solicitud que se cumplió el quince de marzo del mismo año –.[8] Un factor fundamental en el análisis del Tribunal Arbitral fue el proceso formal de revisión del contrato que tuvo lugar entre las partes y durante el cual se aceptó y se firmó por ambos, la Orden de Cambio número 1, Rev. 2, en la cual PEP consintió en satisfacer a COMMISA los "costos justos, razonables y debidamente comprobados" que se hubieren irrogado, asimismo, se aceptó la extensión del plazo solicitada por COMMISA de 117 días.

Una vez analizadas las pruebas ofrecidas, el tribunal determinó en base a la **literalidad del contrato** – párrafo 168 en adelante del laudo – y **al estricto**

---

[8] Cabe señalar que los precios ofrecidos a PEP eran inferiores a los que a su vez COMMISA pactó con EMC.

derecho – párrafos 179 en adelante –, que el pago de la tarifa de espera que solicitaba COMMISA no era aplicable si la espera se producía antes de que la embarcación fuera movilizada, por lo que la condena sólo podía cuantificarse en base a los "costos justos, razonables y comprobados", lo que daba como resultado una condena al pago de 13.923.014 USD.

Por último, y en relación a la Controversia Técnica que se describe merece la pena resaltar dos cosas: (i) el Tribunal estudió si las Controversias Técnicas 34 y 35 eran compatibles con el Acta de Misión y determinó que si lo eran – párrafo 187 en adelante –; y (ii) el Tribunal aclaró en el laudo que, contrario a lo que sostiene PEP, el requerimiento para ofrecer pruebas adicionales fue realizados a ambas partes por medio de la comunicación A 49 y no solo a COMMISA.

    d)  Decisión con respecto a Controversia Técnica número 37 y 39.

En la Controversia Técnica 37, COMMISA reclamó el pago de 6.877.277 PME más 11.632.024 USD por el adeudo por los trabajos de cruces en el contrato EPC-28; y en la Controversia Técnica 39, el pago de 1.000.991 PME más 2.924.951 USD, por cruces en el alcance del contrato EPC-027 que fue incorporado al EPC-28.

En relación a la Controversia Técnica 37, toda vez que la separación entre los ductos fue menor a un metro, PEP argumentó que mi representada no había aprobado ni cuantificado los conceptos reclamados y que en todo caso, una distancia menor entre tuberías implicaba un ahorro de costes.

Al respecto, el Tribunal concluyó que en base a un documento de solicitud de especificaciones técnicas, firmado por ambas partes, se convino que determinadas cruces podrían tener una separación de 0,5 m, en vez de un metro y que el impacto de costes de esta reducción de separación se evaluaría al hacer las estimaciones. Aunado a lo anterior, el hecho de que COMMISA obtuviera la certificación de ABS[9] y que el Supervisor hubiera aprobado en nombre de PEP las especificaciones técnicas de los cruces que mi representada sometió a su consideración, llevó al Tribunal a aceptar en su integridad la pretensión de COMMISA y a condenar a PEP a pagar 6.877.277 PME más 11.632.024 USD.

En relación a la Controversia Técnica 39, COMMISA alegó que PEP le encargó ocho cruces correspondientes a la línea 27 y que ahora se niega a pagar el precio unitario correspondiente. Por su parte PEP argumenta que con respecto a las cruces 2, 3, 5, 7 y 8, que éstas tienen una separación de ductos menor a un metro;

---

[9] Agencia de certificación designada por PEP.

y por lo que hace a las cruces 1,4 y 6, menciona que están situadas en una curva de expansión que tiene su precio unitario propio.

El Tribunal Arbitral arribó a las mismas conclusiones que en la Controversia Técnica 37 por lo que hace a las cruces 2, 3, 5, 7 y 8. Por lo que hace al resto de la cruces, el Tribunal determinó que toda vez que PEP encargó a mi representada las cruces, creó una legítima expectativa de que iban a ser remunerados dichos trabajos de acuerdo con lo convenido en los precios unitarios pactados. En consecuencia, el Tribunal aceptó en su integridad la pretensión de COMMISA y condenó a PEP a pagar la suma de 1.000.991 PME más 2.924.951 USD.

     e)  Decisión con respecto a Gastos Financieros.

Además de alegar una supuesta ausencia de fundamento legal y contractual con respecto a esta condena, PEP argumenta la supuesta violación al artículo 16 Constitucional, así como una supuesta indefensión derivada de la supuesta omisión en analizar los argumentos de PEP en relación con los gastos financieros.

Efectivamente, en primer lugar, formalmente la garantía de legalidad no puede ser vulnerada por un laudo arbitral, por no tratarse de un acto de autoridad. Por lo tanto, cualquier argumento en este sentido de PEP resulta inatendible.

Independientemente del aspecto formal antes anotado, aun considerando la cuestión desde un punto de vista estrictamente material, la valoración y condena de gastos financieros hecha en contra de PEP en el laudo arbitral, no la dejó en estado de indefensión

La obligación de pagar intereses (Gastos Financieros) deriva del Contrato y el Tribunal Arbitral se limitó a aplicarlo.

En este contexto, cada uno de los argumentos vertidos por PEP fueron analizados y desechados por el Tribunal Arbitral, en base a su interpretación de lo pactado en el Contrato.  No se dejó, por lo tanto, en estado de indefensión a PEP ni mucho menos se resolvió esta disputa sin fundamento legal o contractual como erróneamente alega dicha parte.

Concretamente, de la lectura del laudo se advierte que el Tribunal Arbitral determinó que la disposición contractual aplicable a esta disputa era la cláusula 3.8.6 del Contrato, que establece que: *"en caso de retraso en los pagos de estimaciones y de ajustes de costos PEP, a solicitud del Contratista, pagará gastos financieros conforme a una tasa que será igual a la establecida en la*

*Ley de Ingresos de la Federación en los casos de prórroga para el pago de los créditos fiscales...",* en relación con la cláusula 3.8.8 que libera a PEP de pagar gastos financieros cuando PEP legítimamente suspenda el pago de las estimaciones.

Interpretando las disposiciones contractuales en base a la prueba y argumentación presentada por las partes, el Tribunal Arbitral determinó que los requisitos para que se actualizara la obligación de pago de intereses fueron: (i) que exista un retraso en el pago de estimaciones y ajuste de costos; esto es, que no hayan sido pagadas dentro de los 30 días siguientes a la presentación de la estimación correspondiente, conforme a lo dispuesto en la cláusula 3.8.2 del Contrato; (ii) que el Contratista solicite su pago y (iii) que PEP no tenga una causa legítima para suspender el pago, de las siete señaladas en la cláusula 3.8.8 del Contrato.

En cuanto al primer requisito, el Tribunal Arbitral interpretó sistemáticamente el Contrato y determinó que, considerando que *"el Contrato está basado sobre el principio de que el Contratista debía ir cumpliendo con la obra encomendada y que sería remunerado por PEP en un plazo de 30 días desde la finalización del trabajo",* PEP debió pagar a COMMISA todas las cantidades debidas *"a más tardar 30 días después de su entrega, es decir el 29 de septiembre de 2002."*[10]  El Tribunal Arbitral complementó su argumento señalando que es a partir de la fecha de entrega final de las obras cuando se "rompe el sinalagma contractual", pues a partir de dicha fecha PEP obtuvo el uso y goce de la obra (sin que PEP haya alegado la existencia de vicios, defectos y otros incumplimientos) y en cambio COMMISA sufre un empobrecimiento por no haber recibido el precio.

Resolvió también el Tribunal Arbitral, que la presentación de factura y documentación de soporte en la ventanilla única de PEP, conforme a lo previsto en la cláusula 3.8.3, era aplicable al procedimiento normal de pago de estimación durante el desarrollo de los trabajos, no al cobro de cantidades reclamadas por medio de un procedimiento arbitral.

En cuanto a la supuesta falta de interpelación, el Tribunal Arbitral aplicó literalmente la cláusula 3.8.6 del Contrato, que no exige ninguna interpelación judicial o extrajudicial, sino una mera "solicitud" de pago y señaló el Tribunal que la demanda arbitral hacía las veces de dicha solicitud.  Si la interpelación fuera necesaria bajo el artículo 2080 del Código Civil Federal, estableció el Tribunal Arbitral, el Acta de Recepción Física Total haría sus veces, ya que COMMISA

---

[10] Laudo arbitral ¶743.  El Tribunal contó los 30 días a partir del 30 de agosto de 2002, fecha de firma del Acta de Recepción Física Total.

planteó sus reclamaciones en dicho documento y PEP tuvo conocimiento de su existencia.[11]

Finalmente, el Tribunal Arbitral sostuvo que la cláusula 3.8.6 no impone como requisito el que las cantidades sean líquidas para que, respecto de ellas, *se devenguen intereses moratorios.*[12]

Como puede apreciarse, el Tribunal Arbitral hizo una serie de determinaciones acerca del contenido y alcance de las cláusulas del Contrato aplicables al pago de gastos financieros. En el Laudo Arbitral, el Tribunal Arbitral interpretó el Contrato en forma sistemática, para establecer la fecha en que venció el plazo de 30 días que PEP tenía para pagar, así como los requisitos que debían cumplirse para que se generara la obligación de pagar gastos financieros. Finalmente, el Tribunal Arbitral determinó que dichos requisitos habían sido cumplidos.

Estas determinaciones son de fondo, tienen el efecto de cosa juzgada y no deben ser revisadas de nuevo por la autoridad judicial ya que tienen un claro sustento legal y contractual, por lo que no pueden ser ahora cuestionadas alegando que supuestamente el laudo condenó a prestaciones sin fundamento contractual y legal y, por ende, supuestamente violó el orden público.

> 2.- El Contrato no es un contrato de naturaleza administrativa y en consecuencia, no se puede alegar un sometimiento del interés de PEP sobre el de COMMISA.

El punto toral en el que se funda PEP para sostener la nulidad del laudo arbitral estriba en que según ella, el Contrato es un acuerdo de naturaleza administrativa firmado por una entidad paraestatal a la que se aplican una serie de disposiciones de naturaleza presupuestal que se encuentran en la Constitución y la legislación secundaria, que convierten al Contrato en un documento que según PEP no puede ser interpretado y, en última instancia, respecto del cual resulta imposible desprender legalmente condenas indemnizatorias por supuestamente no estar previstas expresamente en el presupuesto de PEP, ni estar expresamente contenidas en el Contrato.

Así, según PEP las determinaciones del Tribunal Arbitral contenidas en el laudo violan el orden público ya que según PEP sólo la interpretación contractual y legal hecha por ella es la correcta y si no se adopta la misma, entonces se vulneran disposiciones presupuestales de orden público. Con esto PEP pretende que

---

[11] Laudo Arbitral ¶748.

[12] Laudo Arbitral ¶749.

fundada en la observancia disposiciones de disciplina presupuestal que la rigen internamente se le exima de la responsabilidad por la violación a sus compromisos contractuales libremente asumidos.

La posición de PEP es incorrecta y claramente se funda en una serie de sofismas y falacias que no resisten un análisis serio.

**En primer lugar, cabe señalar que la normatividad citada por PEP se refiere a disposiciones de disciplina presupuestal interna que obligan a PEP, más no a COMMISA ni mucho menos pueden ni deben ser consideradas y aplicadas por el Tribunal Arbitral al emitir su laudo.**

En este contexto, la controversia planteada y resuelta a través del laudo arbitral fue una disputa de naturaleza contractual a la cual se le aplicaron las reglas de Derecho Civil correspondientes, en términos del artículo 13 de la Ley de Adquisiciones y Obras Públicas que le es aplicable y que literalmente disponía:

> **"Artículo 13.-** En lo no previsto por esta Ley, serán aplicables el Código Civil para el Distrito Federal en Materia Común y para toda la República en Materia Federal; y, el Código Federal de Procedimientos Civiles."

Asimismo, es pertinente destacar que de acuerdo con el artículo 14 de la Ley Orgánica de Petróleos Mexicanos y Organismos Subordinados, PEP está facultada, tal y como sucedió en el caso que nos ocupa, para someter a la decisión de un Tribunal Arbitral las controversias derivadas de los contratos que celebre, por lo que el alegar ahora como lo pretende que prácticamente el Tribunal Arbitral no puede resolver las disputas que se le plantearon debido a disposiciones de naturaleza y disciplina interna presupuestal de PEP es incorrecto. Dicho artículo establece literalmente lo siguiente:

> **"Artículo 14.-** Los actos jurídicos que celebren Petróleos Mexicanos o cualquiera de sus Organismos Subsidiarios se regirán por las Leyes Federales aplicables y las controversias nacionales en que sea parte, cualquiera que sea su naturaleza, serán de la competencia de los tribunales de la Federación, salvo acuerdo arbitral, quedando exceptuados de otorgar las garantías que los ordenamientos legales exijan a las partes, aun en los casos de controversias judiciales.
>
> Tratándose de actos jurídicos de carácter internacional, Petróleos Mexicanos o sus Organismos Subsidiarios podrán convenir la aplicación de derecho extranjero, la jurisdicción de tribunales extranjeros en asuntos mercantiles y celebrar acuerdos arbitrales cuando así convenga al mejor cumplimiento de su objeto."

Por otro lado, y centrándonos específicamente en las disposiciones invocadas por la actora, cabe precisar que el artículo 134 de la Constitución de los Estados Unidos Mexicanos dispone, en su parte conducente, lo siguiente:

> "Artículo 134. Los recursos económicos de que dispongan el Gobierno Federal y el Gobierno del Distrito Federal, así como sus respectivas administraciones públicas paraestatales, se administrarán con eficiencia, eficacia y honradez para satisfacer los objetivos a los que estén destinados.
>
> Las adquisiciones, arrendamientos y enajenaciones de todo tipo de bienes, prestación de servicios de cualquier naturaleza y la contratación de obra que realicen, se adjudicarán o llevarán a cabo a través de licitaciones públicas mediante convocatoria pública para que libremente se presenten proposiciones solventes en sobre cerrado, que será abierto públicamente, a fin de asegurar al Estado las mejores condiciones disponibles en cuanto a precio, calidad, financiamiento, oportunidad y demás circunstancias pertinentes..."

Del artículo en cita se desprende que nuestra Constitución establece que **todas las contrataciones en las que el Estado, sea parte** deberán sujetarse al procedimiento de licitación pública[13].

En este sentido, cualquier contratación de obra pública que realice el Estado deberá sujetarse a la Ley de Obras Públicas y Servicios Relacionados con las Mismas[14], la cual, regula las acciones relativas a la planeación, programación, presupuestación, contratación[15], gasto, ejecución y control de las obras públicas, así como los servicios relacionados con las mismas.

Como conclusión a lo hasta aquí expuesto tenemos que, toda contratación que realice el Estado en relación con obras públicas habrá de ser regulada por la Ley de Obras Públicas y Servicios Relacionados con las Mismas.

Sin embargo, es preciso aclarar que no todo contrato celebrado por el Estado o sus entidades paraestatales es un contrato de carácter administrativo. En efecto, el carácter administrativo de un contrato no obedece a que el Estado sea parte del mismo o a que esté celebrado y regulado por una Ley Federal, como lo sería la Ley de Obras Públicas y Servicios Relacionados con las Mismas, sino a dos factores concretos:

a) Que el órgano administrativo lo celebre para satisfacer intereses públicos.

---

[13] Salvo cuando la licitación no sea idónea para asegurar las mejores condiciones para el Estado – tercer párrafo del artículo 134 constitucional –.
[14] Publicada en el Diario Oficial de la Federación el cuatro de enero de dos mil y la cual derogó a Ley de Adquisiciones y Obras Públicas.
[15] En el Título Tercero de la Ley.

b) Que haya una relación de subordinación entre la autoridad y el gobernado.

A continuación se explicará con mayor detalle cada uno de ellos y se analizará si el contrato cumple o no con dichos requisitos.

**a) Que el órgano administrativo lo celebre para satisfacer intereses públicos.**

El órgano administrativo que celebró el contrato fue PEP y el objeto del contrato, según se estableció en la cláusula segunda del instrumento, fue *"la ejecución de una obra consistente en diseño, procura, fabricación, tendido de tubería, revestimiento anticorrosivo, lastrado, protección catódica, ductos ascendentes, instalación y prueba de válvulas"*. Como puede observarse, PEP contrató a COMMISA con la finalidad de realizar obras en su sistema de tuberías y ductos, lo cual no implica una satisfacción del interés público, sino en todo caso, un mantenimiento a sus instalaciones.

Los tribunales de nuestro país han señalado que para que un contrato tenga por objeto el interés público, es necesario que su finalidad esté íntimamente vinculada a satisfacer necesidades colectivas y que la satisfacción de esas necesidades no sea indiferente a la forma de ejecución de las obligaciones contractuales. A continuación se transcribe una tesis jurisprudencial emitida por el Pleno de la H. Suprema Corte de Justicia de la Nación, en la cual puede observarse el criterio que se describe:

> **"CONTRATOS ADMINISTRATIVOS. SE DISTINGUEN POR SU FINALIDAD DE ORDEN PÚBLICO Y POR EL RÉGIMEN EXORBITANTE DEL DERECHO CIVIL A QUE ESTÁN SUJETOS.** La naturaleza administrativa de un contrato celebrado entre un órgano estatal y un particular puede válidamente deducirse de la finalidad de orden público que persigue, identificada también como utilidad pública o utilidad social, así como del régimen exorbitante del derecho civil a que está sujeto. De ello se infiere que <u>los contratos celebrados por un órgano estatal con los particulares están regidos por el derecho privado cuando su objeto no esté vinculado estrecha y necesariamente con el cumplimiento de las atribuciones públicas del Estado y, por lo mismo, la satisfacción de las necesidades colectivas no se perjudique porque en aquellos actos el Estado no haga uso de los medios que le autoriza su régimen especial.</u> Por el contrario, cuando el objeto o la finalidad del contrato estén íntimamente vinculados al cumplimiento de las atribuciones estatales, de tal manera que la satisfacción de las necesidades colectivas no sea indiferente a la forma de ejecución de las obligaciones contractuales, entonces se estará en presencia de un contrato administrativo, siendo válido estipular cláusulas

54

exorbitantes que, desde la óptica del derecho privado, pudieran resultar nulas, pero que en el campo administrativo no lo son, en atención a la necesidad de asegurar el funcionamiento regular y continuo del servicio público.

Juicio ordinario civil federal 1/2000. Jesús Guillermo Puente Cutiño. 20 de febrero de 2001. Unanimidad de diez votos. Ausente: Genaro David Góngora Pimentel. Ponente: Juan Díaz Romero. Secretario: Silverio Rodríguez                                                                     Carrillo.

El Tribunal Pleno, en su sesión privada celebrada hoy veintinueve de marzo en curso, aprobó, con el número IX/2001, la tesis aislada que antecede; y determinó que la votación es idónea para integrar tesis jurisprudencial. México, Distrito Federal, a veintinueve de marzo de dos mil uno.

Registro No. 189995, Novena Época, Instancia: Pleno, Abril de 2001, Materia(s): Administrativa, Civil"

(Énfasis añadido)

Por su parte, la doctrina ha señalado – en palabras de Marienhoff – que el servicio público es *"la actividad que tiende a la satisfacción inmediata de las necesidades del grupo social y de los individuos que la integran"*, y que uno de los rasgos más resaltantes de los servicios públicos es que éstos no deben perseguir principalmente fines de lucro.

En el caso concreto, tenemos que en el contrato, PEP no se encontraba persiguiendo la satisfacción de las necesidades colectivas, es decir, no estaba desarrollando tareas propias del Estado.

**b) Que haya una relación de subordinación entre la autoridad y el gobernado**

Las relaciones entre las partes de un contrato en el que interviene el Estado pueden ser de tres tipos:

(i)     de coordinación: son las que se establecen entre los particulares o entre órganos del poder público – en su carácter de particular – y los gobernados;

(ii)    de *supra* ordinación: se dan entre los diversos órganos del poder público en su carácter de autoridades

(iii)   de *supra* subordinación: son las que se entablan entre los órganos del poder público en su **carácter de autoridades** y los gobernados.

En el caso del contrato que nos ocupa, las partes constituyeron una relación de coordinación voluntaria entre PEP y COMMISA, y no así una relación de supra a subordinación entre autoridad y gobernado.

55

Se trató en consecuencia, de un contrato de carácter privado, en el cual ambas partes adquirieron derechos y obligaciones y fijaron los términos de la relación, incluyendo al arbitraje como el medio a través del cual resolverían los conflictos futuros que pudieran surgir en la vida del contrato.

Como conclusión a lo expuesto tenemos que el hecho de que el Contrato se encuentre regulado por la Ley de Adquisiciones y Obras Públicas[16] no le da el carácter de ser un **contrato administrativo**, sino que hay que atender a su finalidad que es de carácter eminentemente privada.

Así las cosas, y al convergir en el Contrato intereses evidentemente privados, se está en presencia de un Contrato Privado. En consecuencia, es falsa la afirmación que realiza la actora incidental relativa a que en el contrato se contraponen el interés privado de COMMISA y el interés público de PEP.

La anterior aclaración es de suma importancia toda vez que PEP pretende argumentar que al ser su interés de carácter público, éste debe prevalecer sobre el interés privado de COMMISA. Lo cual es claramente falso por que el contrato se firmó entre dos particulares y no existe un interés superior al otro, simplemente existen cláusulas que determinan las obligaciones y derechos de las partes con relación al contrato y el Tribunal Arbitral ha decidido conforme a lo pactado por las partes.

Pensar de otra manera, es decir, considerar que en un contrato en el que interviene el Estado siempre va a ser de interés público y que por lo mismo los intereses del Estado deberán prevalecer respecto de los del gobernado, nos llevaría a la absurda conclusión de sostener que todo contrato en el que participe el Estado carece de seguridad jurídica y que lo que prevalece son las decisiones arbitrarias que el Estado pueda adoptar, frente a las cuales el particular no tendría campo de acción por ser considerado su interés de un nivel inferior.

Por el contrario, el régimen jurídico del país prevé que cuando una autoridad actúa en violación de las disposiciones contractuales afectando con ello al gobernado, éste tienen la opción de acudir a alguno de los medios de defensa para hacer valer los derechos que el contrato, y que la Constitución y las leyes les han otorgado, logrando con ello el que la violación contractual se declare ilegal y que por lo tanto se restituya de manera directa los daños y perjuicios que sufrió el gobernado con el ilegal proceder de la autoridad.

---

[16] Esta Ley empezó a regir al contrato a partir de su entrada en vigor en el año dos mil, antes se encontraba vigente la Ley de Adquisiciones y Obras Públicas.

Eso fue exactamente lo que realizó COMMISA cuando acudió al arbitraje – en los términos que habían sido pactados en el contrato – a fin de buscar que los actos de PEP que violaron las disposiciones contractuales fueran sancionados, resarciendo así el daño que le fue causado.

Finalmente, cabe señalar que de aceptarse la postura de PEP de que el Contrato es de naturaleza administrativa y no civil, entonces se llegaría al absurdo de que su Señoría no estaría facultada ni sería competente (en razón de materia) para conocer del presente incidente de nulidad del laudo.

### 3.- El Laudo Arbitral no viola disposición alguna de naturaleza presupuestal.

En un primer momento, es necesario aclarar que las legislaciones y artículos que cita PEP en su incidente de nulidad de laudo arbitral, y con base en los cuales desarrolla una seria de argumentos para concluir – erróneamente – que se ha violado el orden público, son mañosamente interpretados de manera aislada y en muchas ocasiones se trata de preceptos que no aplican al caso concreto o que han sido derogados por otras legislaciones. En consecuencia, a continuación se ofrece un marco legal de los ordenamientos aplicables al laudo arbitral y se explica el porqué éste está apegado a Derecho.

PEP considera que el laudo arbitral es contrario a disposiciones de orden público mexicano, y específicamente con relación a la Constitución Política Federal, refiere que el laudo viola lo dispuesto en los artículos 126 y 134.

El artículo 126 constitucional a la letra dispone lo siguiente:

> "Artículo 126. No podrá hacerse pago alguno que no esté comprendido en el Presupuesto o determinado por ley posterior."

PEP sostiene que el laudo arbitral viola este precepto al momento en que le impone una condena que obliga al pago de una cantidad que no está prevista en el presupuesto. Esta conclusión es equivocada atendiendo a que el laudo arbitral en ningún momento ordena a PEP el que pague la condena con dinero que no esté comprendido en el presupuesto.

Si uno estudia la Constitución en su conjunto, y no sólo el artículo 126 de manera aislada, se percatará que nuestra Carta Magna contempla en su artículo 113 **que**

57

el Estado es responsable por los daños que con motivo de su actividad irregular cause a los particulares.

En efecto, el artículo 113 en su parte conducente dispone a la letra lo siguiente:

> "Artículo 113. ...
>
> La responsabilidad del Estado por los daños que, con motivo de su actividad administrativa irregular, cause en los bienes o derechos de los particulares, será objetiva y directa. Los particulares tendrán derecho a una indemnización conforme a las bases, límites y procedimientos que establezcan las leyes."

Si tomamos como premisa, el que la propia Constitución establece que el Estado puede incurrir en responsabilidad y que en caso de hacerlo deberá de indemnizar al particular, luego entonces tenemos que concluir que el pago de dicha indemnización es procedente constitucionalmente hablando y que – de acuerdo con el artículo 126 citado – deberá realizarse con cargo al presupuesto. Lo anterior es procedente conforme a la legislación aplicable, y más adelante se detallará la forma en que dicho pago debe realizarse con cargo al presupuesto.

Así las cosas, podemos concluir que el laudo arbitral es apegado a derecho y que el hecho de que condene a PEP al pago de una indemnización por la responsabilidad en la que incurrió al violar el contrato firmado con COMMISA no es contrario al orden público.

Por otro lado, PEP estima que el laudo arbitral contraviene el penúltimo párrafo del artículo 134 constitucional que dispone que *"el manejo de los recursos económicos federales se sujetará a las bases de este artículo".*

La estimación de PEP es infundada y para demostrarlo es necesario entender el contexto del artículo y no sólo el párrafo que cita, por lo que a continuación se transcribe en su totalidad:

> "Artículo 134. Los recursos económicos de que dispongan el Gobierno Federal y el Gobierno del Distrito Federal, así como sus respectivas administraciones públicas paraestatales, se administrarán con eficiencia, eficacia y honradez para satisfacer los objetivos a los que estén destinados.
>
> Las adquisiciones, arrendamientos y enajenaciones de todo tipo de bienes, prestación de servicios de cualquier naturaleza y la contratación de obra que realicen, se adjudicarán o llevarán a cabo a través de licitaciones públicas mediante convocatoria pública para que libremente se presenten proposiciones solventes en sobre cerrado, que será abierto públicamente, a fin de asegurar al Estado las mejores condiciones disponibles en cuanto a precio, calidad,

58

> financiamiento, oportunidad y demás circunstancias pertinentes.
>
> Cuando las licitaciones a que hace referencia el párrafo anterior no sean idóneas para asegurar dichas condiciones, las leyes establecerán las bases, procedimientos, reglas, requisitos y demás elementos para acreditar la economía, eficacia, eficiencia, imparcialidad y honradez que aseguren las mejores condiciones para el Estado.
>
> **El manejo de recursos económicos federales se sujetará a las bases de este artículo.**
>
> Los servidores públicos serán responsables del cumplimiento de estas bases en los términos del Título Cuarto de esta Constitución."

(Énfasis añadido)

Como puede observarse, el artículo 134 dispone los principios y las bases que deberán de seguirse cuando el Estado contrate la prestación de servicios, la construcción de obras o adquiera, arriende o enajene todo tipo de bienes. En este sentido, debemos tener claro que dicho precepto en nada contraviene el hecho de que el Estado sea responsable por los daños que cause a los particulares. Por lo anterior, es infundado el argumento que esgrime PEP en el sentido de que el laudo arbitral es contrario a lo dispuesto en el artículo 134 constitucional.

Por otro lado, PEP sostiene que todas las modificaciones a los contratos de obra pública que generen nuevas obligaciones a ejecutarse contra recursos federales deben ser explícitas, y lo anterior lo fundamenta en el artículo 70 de la Ley de Adquisiciones y Obras Públicas que a la letra dice lo siguiente:

> "Artículo 70.-Las dependencias y entidades podrán, dentro del programa de inversiones aprobado, bajo su responsabilidad y por razones fundadas y explícitas, **modificar los contratos de obra pública mediante convenios, siempre y cuando éstos, considerados conjunta o separadamente, no rebasen el veinticinco por ciento del monto o del plazo pactados en el contrato, ni impliquen variaciones sustanciales al proyecto original.**
>
> Si las modificaciones exceden el porcentaje indicado o varían sustancialmente el proyecto, se deberá celebrar, por una sola vez, un convenio adicional entre las partes respecto de las nuevas condiciones, en los términos del artículo 29. Este convenio adicional deberá ser autorizado bajo la responsabilidad del titular de la dependencia o entidad o por el oficial mayor o su equivalente en entidades. Dichas modificaciones no podrán, en modo alguno, afectar las condiciones que se refieran a la naturaleza y características esenciales de la obra objeto del contrato original, ni convenirse para eludir en cualquier forma el cumplimiento de la Ley o de los Tratados.

De las autorizaciones a que se refiere el párrafo anterior, el titular de la dependencia o entidad, de manera indelegable, informará a la Secretaria, a la Contraloría y, en su caso, al órgano de gobierno. Al efecto, a más tardar el último día hábil de cada mes, deberá presentarse un informe que se referirá a las autorizaciones otorgadas en el mes calendario inmediato anterior.

No serán aplicables los límites que se establecen en este artículo cuando se trate de contratos cuyos trabajos se refieran a la conservación, mantenimiento o restauración de los inmuebles a que se refiere el artículo 5o. de la Ley Federal sobre Monumentos y Zonas Arqueológicos, Artísticos e Históricos, en los que no sea posible determinar el catálogo de conceptos, las cantidades de trabajo, las especificaciones correspondientes o el programa de ejecución."

(Énfasis añadido)

Pues bien, mi representada considera que a PEP le asiste la razón en el sentido de que las **modificaciones** a los contratos de obra pública que generen nuevas obligaciones contra recursos federales habrán de ser explícitas y cumplir con el procedimiento y las condiciones contempladas en el artículo 70 citado.

Sin embargo, PEP pretende aplicar dicha regla – **que se refiere únicamente a las modificaciones contractuales** – a las obligaciones que surgieron a su cargo con motivo de un incumplimiento contractual que ha sido analizado y determinado por el Tribunal Arbitral.

En conclusión, el laudo arbitral no contraviene el artículo 70 de la Ley de Adquisiciones y Obras Públicas porque no se trata de una modificación contractual sino de la condena a una indemnización por incumplimiento contractual, por lo que el origen de las obligaciones a cargo de PEP no debe seguir lo dispuesto en dicho precepto.

Por lo que se refiere a la violación de los preceptos del Reglamento de la Ley Federal de Presupuesto, Contabilidad y Gasto Público Federal – hoy Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria, la misma también resulta infundada.

Antes de entrar al estudio de los artículos que PEP estima que han sido violados a nivel reglamento, es preciso realizar la siguiente aclaración.

El Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria fue publicado en el Diario Oficial de la Federación el día veintiocho de junio de dos mil seis y entró en vigor  - en términos de su artículo transitorio primero – al día siguiente al de su publicación, derogando – en términos de su artículo transitorio

60

segundo – al Reglamento de la Ley Federal de Presupuesto, Contabilidad y Gasto Público Federal.

Así las cosas, es incongruente que PEP fundamente sus pretensiones en dos reglamentos que por definición, no pueden regular al mismo tiempo las erogaciones de PEP toda vez que uno ha abrogado al otro.

En este sentido, COMMISA considera que al caso concreto es aplicable el Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria toda vez que es este el ordenamiento jurídico que se encontraba vigente al momento en que el Tribunal Arbitral dictó el laudo arbitral, pero sobre todo porque será éste el que rija la forma y el mecanismo con base en el cual PEP habrá de cubrir la indemnización a la que ha sido condenado.

No obstante lo anterior, a continuación se analizan los artículos que considera PEP que han sido violados de ambos ordenamientos:

- Artículo 44 fracción III del Reglamento de la Ley Federal de Presupuesto, Contabilidad y Gasto Público Federal:

PEP estima que el artículo 44 fracción III del Reglamento de la Ley Federal de Presupuesto, Contabilidad y Gasto Público Federal ha sido violado porque el pago al que se le está obligando no se encuentra debidamente justificado y comprobado en las disposiciones y documentos legales que determinan la obligación de hacer el pago.

El artículo de referencia a la letra dispone lo siguiente:

> "Artículo 44.- Las entidades deberán cuidar bajo su responsabilidad, que los pagos que se efectúen con cargo a sus presupuestos aprobados se realicen con sujeción a los siguientes requisitos:
>
> I. Que correspondan a compromisos efectivamente devengados, con excepción de los anticipos previstos en otros ordenamientos legales y los mencionados en el artículo 64 del presente Reglamento.
> II. Que se efectúen dentro de los límites de los calendarios financieros autorizados, y
>
> **III. Que se encuentren debidamente justificados y comprobados con los documentos originales respectivos, entendiéndose por justificantes las disposiciones y documentos legales que determinen la obligación de hacer un pago y, por comprobantes, los documentos que demuestren la entrega de las sumas de dinero correspondientes."**

61

Al respecto, COMMISA considera que el laudo arbitral, y en su momento, la resolución del juez competente ordenando su ejecución, **son documentos legales que determinan la obligación de hacer el pago.**

Es ilógico pensar que una resolución dictada por autoridad competente no constituya un documento legal fuente de obligaciones para el Estado. Pensar de esta manera, necesariamente nos haría concluir que no hay forma de que el Estado sea condenado vía un procedimiento arbitral o jurisdiccional porque la resoluciones no bastará para justificar el pago al que sea condenado.

Por su parte, los artículos 69 y 70 del mismo ordenamiento que cita PEP, no son aplicables al caso en concreto toda vez que éstos se refieren, a las formalidades y requisitos que deben tener los pedidos y los contratos para que tengan el carácter de justificante de gasto público. En consecuencia, los mismos no son aplicables al laudo arbitral.

- <u>Artículo 66 fracción III del Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria:</u>

PEP considera que el laudo arbitral es contrario al artículo 66 fracción III del Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria, que a la letra dispone lo siguiente:

> "Artículo 66. Las dependencias y entidades serán responsables de que los pagos efectuados con cargo a sus presupuestos se realicen con sujeción a los siguientes requisitos:
>
> I. Que correspondan a compromisos efectivamente devengados, con excepción de los anticipos previstos en las disposiciones aplicables;
>
> II. Que se efectúen dentro de los límites de los calendarios de presupuesto autorizados, y
>
> III. **Que se encuentren debidamente justificados y comprobados con los documentos originales respectivos, entendiéndose por justificantes las disposiciones y documentos legales que determinen la obligación de hacer un pago** y, por comprobantes, los documentos que demuestren la entrega de las sumas de dinero correspondientes.
>
> Los registros de las erogaciones que no constituyan pagos se ajustarán en lo que resulte compatible con lo dispuesto en esta Sección, conforme lo determine la Secretaría."

(Énfasis añadido)

62

Al igual que fue expuesto en el apartado anterior – con relación al artículo 44 del Reglamento de la Ley de Presupuesto, Contabiliad y Gasto Público Federal –, mi representada considera que el laudo arbitral, y en su momento, la resolución del juez competente ordenando su ejecución,' **son documentos legales que determinan la obligación de hacer el pago.**

La mejor forma de comprobar lo aquí expuesto es realizando una análisis integral tanto de la Ley Federal de Presupuesto y Responsabilidad Hacendaria como de su Reglamento, del cual se desprende que ambos ordenamientos contemplan la posibilidad y el procedimiento que debe de seguirse para pagar obligaciones a los particulares que tengan como origen la responsabilidad del Estado.

El artículo 2º de la Ley Federal de Presupuesto y Responsabilidad Hacendaria nos ofrece una serie de definiciones, dentro de las cuales encontramos la del presupuesto devengado.

> "**Artículo 2.-** Para efectos de esta Ley, se entenderá por:
>
> ...
>
> XXXVI. Presupuesto devengado: **el reconocimiento de las obligaciones de pago** por parte de los ejecutores de gasto a favor de terceros, por los compromisos o requisitos cumplidos por éstos conforme a las disposiciones aplicables, **así como de las obligaciones de pago que se derivan por** mandato de tratados, leyes o decretos, así como **resoluciones y sentencias definitivas**, y las erogaciones a que se refiere el artículo 49 de esta Ley;..."
>
> (Énfasis añadido)

Como puede observase, la ley en cita prevé de manera expresa que los ejecutores de gasto deben reconocer las obligaciones de pago que tengan con terceros que derivan de resoluciones o sentencias definitivas.

En este sentido, es claro que el laudo arbitral es una resolución definitiva y en consecuencia el pago de las obligaciones a las que se le condena a PEP deben ser reconocidas y formar parte del presupuesto devengado.

Al respecto, no se deja de señalar que la ley en comento es el ordenamiento que regula los artículos 126, 127 y 134 constitucionales, los cuales fueron precisamente invocados por PEP como fundamento de su argumento de que no se pueden pagar obligaciones que derivan de una resolución. Lo anterior acredita nuevamente que la razón no le asiste a PEP y que las obligaciones a las cuales fue condenado en el laudo arbitral son procedentes conforme a derecho y en consecuencia no son contrarias al orden público.

63

En este mismo sentido, el artículo 4° del mismo ordenamiento dispone a la letra:

> "Artículo 4.- El gasto público federal comprende las erogaciones por concepto de gasto corriente, incluyendo los pagos de pasivo de la deuda pública; inversión física; inversión financiera; **así como responsabilidad patrimonial;** que realizan los siguientes ejecutores de gasto:
>
> I. El Poder Legislativo;
> II. El Poder Judicial;
> III. Los entes autónomos;
> IV. Los tribunales administrativos;
> V. La Procuraduría General de la República;
> VI. La Presidencia de la República;
> VII. Las dependencias, y
> **VIII. Las entidades."**

Del artículo en cita se desprende de manera clara que son erogaciones del gasto público federal aquellas que tengan como origen la responsabilidad patrimonial de los ejecutores del gasto público, incluyendo a las entidades.

De lo aquí señalado se concluye que la propia Ley está contemplando que el Estado puede incurrir en responsabilidad patrimonial y que en consecuencia, pueden existir erogaciones que se realicen para resarcir dicha responsabilidad.

Por su parte, el artículo 47 de la ley en cita dispone el procedimiento que debe de seguir el ejecutor del gasto — en el caso concreto PEP — a efecto de cubrir las obligaciones de cualquier índole que se deriven de resoluciones definitivas emitidas por autoridad competente. A continuación se transcribe el precepto:

> **"Artículo 47.- Los ejecutores de gasto, con cargo a sus respectivos presupuestos y de conformidad con las disposiciones generales aplicables, deberán cubrir las contribuciones federales, estatales y municipales correspondientes, así como las obligaciones de cualquier índole que se deriven de <u>resoluciones definitivas</u> emitidas por autoridad competente.**
>
> **Las adecuaciones presupuestarias que, en su caso, sean necesarias para el pago de las obligaciones a que se refiere la parte final del párrafo anterior, no podrán afectar el cumplimiento de los objetivos y las metas de los programas prioritarios aprobados en el Presupuesto de Egresos.**
>
> **Las dependencias y entidades que no puedan cubrir la totalidad de las obligaciones conforme a lo previsto en el párrafo anterior, presentarán ante la autoridad competente un programa de cumplimiento de pago que deberá ser considerado para todos los efectos legales en vía de ejecución respecto de la resolución que se hubiese emitido, con la finalidad de cubrir las obligaciones hasta por un monto que no afecte los objetivos y metas de**

los programas prioritarios, sin perjuicio de que el resto de la obligación deberá pagarse en los ejercicios fiscales subsecuentes conforme a dicho programa.

Los Poderes Legislativo y Judicial y los entes autónomos, en caso de ser necesario, establecerán una propuesta de cumplimiento de obligaciones, observando en lo conducente lo dispuesto en los párrafos segundo y tercero de este artículo."

(Énfasis añadido)

El precepto en cita demuestra de manera fehaciente que el régimen jurídico aplicable al gasto público de PEP le obliga a cubrir las obligaciones que deriven de resoluciones definitivas emitidas por autoridad competente con cargo a su presupuesto, e inclusive prevé la forma en que deberá pagarse la obligación si es que no alcanza a cubrir el monto adeudado, para lo cual se le autoriza al Estado a presentar ante la autoridad competente un programa de cumplimiento de pago que deberá ser considerado para todos los efectos legales en la vía de ejecución respecto de la resolución que se hubiese emitido.

Por otro lado, con lo que respecta al Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria, éste contempla en su artículo 57 que en términos del artículo 41, fracción II, inciso f) de la Ley, se entenderá **como gasto obligatorio** las erogaciones para cubrir indemnizaciones y obligaciones que se deriven de resoluciones definitivas emitidas por autoridad competente hasta por el monto que corresponda ejercer en dicho año.

Se citan a continuación ambos preceptos a efecto de ofrecer mayor claridad:

"Artículo 41 de la Ley.- El proyecto de Presupuesto de Egresos contendrá:

...

II. El proyecto de Decreto, los anexos y tomos, los cuales incluirán:

...

f) **Un capítulo específico que incorpore las previsiones de gasto que correspondan a gastos obligatorios;...**"
(Énfasis añadido)

"Artículo 57 del Reglamento.- Para efectos del artículo 41, fracción II, inciso f) de la Ley, se entenderán por gastos obligatorios los siguientes:

...

VII. Erogaciones para cubrir indemnizaciones y obligaciones que se deriven de resoluciones definitivas emitidas por autoridad competente hasta por el monto que corresponda ejercer en dicho año, que se determine conforme al artículo 47 de la Ley;"

65

El contenido de ambos preceptos nos lleva necesariamente a la conclusión de que las erogaciones para cubrir indemnizaciones y obligaciones que deriven de resoluciones definitivas por autoridad competente deben ser incorporadas necesariamente en las previsiones de gastos obligatorios que componen el presupuesto de egresos.

Con lo anteriormente expuesto, se demuestra una vez más que no existe violación al orden público al condenar a PEP al pago de obligaciones, y además se acredita que el pago de éstas es necesariamente incorporado al presupuesto de egresos por lo que su pago es conforme a derecho y sobre todo acorde a los principios constitucionales.

Centrándonos en cada una de las impugnaciones vertidas por PEP con respecto a los reclamos específicos, tenemos que contrariamente a lo sostenido por ella, no existen las violaciones indicadas tal y como a continuación se detalla:

a) Al resolver la Controversia Técnica 36 no se violaron los preceptos que menciona PEP.

Los artículos 126 y 134 de la Constitución no han sido violados atendiendo a que de una lectura integral de Nuestra Carta Magna se desprende que ésta contempla la existencia de la responsabilidad del Estado. Así mismo, la ley reglamentaria de dichos artículos, Ley de Federal de Presupuesto y Responsabilidad Hacendaria, contempla la procedencia y las condiciones en que se debe dar el pago de las obligaciones a cargo del Estado decretadas en sentencias y resoluciones definitivas.

Por su parte, el artículo 70 de la Ley de Adquisiciones y Obras Públicas no ha sido violado toda vez que éste se refiere únicamente a los requisitos y condiciones que deben de cumplir las **modificaciones** a los contratos de obra pública que generen nuevas obligaciones contra recursos federales.  Sin embargo, dichas reglas no son aplicables a las obligaciones a las que se condenó a PEP con motivo de un incumplimiento contractual que ha sido analizado y determinado por el Tribunal Arbitral.

Asimismo, el artículo 44 fracción III del Reglamento de la Ley Federal de Presupuesto, Contabilidad y Gasto Público Federal, no ha sido violado atendiendo, en primer término, a que no es aplicable al laudo arbitral toda vez que fue derogado con anticipación a que éste fuera dictado y además no va a regir el pago de las obligaciones a que se ha condenado a PEP. Ahora bien, suponiendo sin conceder que el artículo fuera aplicable al caso que nos ocupa, el mismo no ha

66

sido violado en razón de que el laudo arbitral y la sentencia que en su momento ordene su ejecución, constituyen documentos legales que permiten determinar la obligación de hacer un pago conforme a la fracción III del precepto en cita.

El artículo 66 fracción III del Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria, tampoco ha sido violado atendiendo a que el laudo arbitral, y en su momento, la resolución de juez competente ordenando su ejecución, son documentos legales que determinan la obligación de hacer el pago de las obligaciones a las que ha sido condenada PEP. Lo anterior se comprueba de la lectura integral de dicho reglamento, el cual dispone la forma en que tales obligaciones deben de ser cumplidas con cargo al presupuesto.

Por su parte, los artículos 69 y 70 del Reglamento de la Ley Federal de Presupuesto, Contabilidad y Gasto Público Federal, no han sido violados atendiendo, en primer término, a que no son aplicables al laudo arbitral toda vez que fueron derogados con anticipación a que éste fuera dictado y además no van a regir el pago de las obligaciones a que se ha condenado a PEP. Ahora bien, suponiendo sin conceder los artículos regularán al caso que nos ocupa, éstos se refieren a las formalidades y requisitos que deben tener los pedidos y los contratos para que tengan el carácter de justificante de gasto público. En consecuencia, los mismos no son aplicables al laudo arbitral.

Finalmente, el artículo 29 de la Ley de Adquisiciones y Obras Públicas no ha sido violado toda vez que éste se refiere únicamente a las condiciones y requisitos que deben de cumplirse para que el Estado contrate adquisiciones, arrendamientos, servicios u obra pública, por lo que dichas reglas no son aplicables a las obligaciones a las que se condenó a PEP con motivo de un incumplimiento contractual que ha sido analizado y determinado por el Tribunal Arbitral.

b)    Al resolver las Controversias Técnicas 34 y 35 no se violaron los preceptos que menciona PEP.

En primer lugar, el artículo 44 fracción III del Reglamento de la Ley Federal de Presupuesto, Contabilidad y Gasto Público Federal, no ha sido violado atendiendo, en primer término, a que no es aplicable al laudo arbitral toda vez que fue derogado con anticipación a que éste fuera dictado y además no va a regir el pago de las obligaciones a que se ha condenado a PEP. Ahora bien, suponiendo sin conceder que el artículo fuera aplicable al caso que nos ocupa, el mismo no ha sido violado en razón de que el laudo arbitral y la sentencia que en su momento ordene su ejecución, constituyen documentos legales que permiten determinar la obligación de hacer un pago conforme a la fracción III del precepto en cita.

67

Por lo que se refiere al artículo 66 fracción I del Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria, el mismo tampoco fue violado en el laudo arbitral toda vez que éste se refiere a las reglas que rigen los pagos de las obligaciones contractuales, por lo que su regulación no es aplicable a la condena que se ha impuesto a PEP en el laudo arbitral, la cual es resultado de un incumplimiento contractual y su cumplimiento se rige por otra serie de artículos que ya han sido enumerados y analizados en el apartado "c) Reglamento de la Ley Federal de Presupuesto, Contabilidad y Gasto Público Federal – hoy Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria –".

Finalmente, tampoco se violó al artículo 65 de la Ley de Adquisiciones y Obras Públicas, puesto que contrariamente a lo que sostiene PEP, sí se encuentra contractualmente obligada a indemnizar a COMMISA por estos reclamos ya que PEP incurrió en omisiones y retrasos que le son exclusivamente imputables y respecto de las cuales asumió su responsabilidad.

Esta determinación además, no puede ser revisada en esta instancia alegando una supuesta responsabilidad restringida por el artículo 65 de la citada Ley de Adquisiciones y Obras Públicas ya que es un hecho que PEP puede extender dicha responsabilidad contractualmente, así como que dicho artículo se refiere a un supuesto de retraso en el cual la otra parte no haya estado a su vez obligada a hacer erogaciones para cumplir con sus obligaciones en la fecha originalmente pactada, tal y como sucedió en el caso que nos ocupa.

c) Al resolver las Controversias Técnicas 37 y 39 no se violaron los preceptos que menciona PEP.

Los artículos 126 y 134 de la Constitución no han sido violados atendiendo a que de una lectura integral de Nuestra Carta Magna se desprende que ésta contempla la existencia de la responsabilidad del Estado. Así mismo, la ley reglamentaria de dichos artículos, Ley de Federal de Presupuesto y Responsabilidad Hacendaria, contempla la procedencia y las condiciones en que se debe dar el pago de las obligaciones decretadas en sentencias y resoluciones definitivas.

El artículo 44 fracción III del Reglamento de la Ley Federal de Presupuesto, Contabilidad y Gasto Público Federal, no ha sido violado atendiendo, en primer término, a que no es aplicable al laudo arbitral toda vez que fue derogado con anticipación a que éste fuera dictado y además no va a regir el pago de las obligaciones a que se ha condenado a PEP. Ahora bien, suponiendo sin conceder que el artículo fuera aplicable al caso que nos ocupa, el mismo no ha sido violado

68

en razón de que el laudo arbitral y la sentencia que en su momento ordene su ejecución, constituyen documentos legales que permiten determinar la obligación de hacer un pago conforme a la fracción III del precepto en cita.

Por su parte, artículo 66 fracción III del Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria, no ha sido violado atendiendo a que el laudo arbitral, y en su momento, la resolución de juez competente ordenando su ejecución, son documentos legales que determinan la obligación de hacer el pago de las obligaciones a las que ha sido condenada PEP. Lo anterior se comprueba de la lectura integral de dicho reglamento, el cual dispone la forma en que tales obligaciones deben de ser cumplidas con cargo al presupuesto.

Finalmente, el artículo 57 de la Ley de Adquisiciones y Obras Públicas no ha sido violado toda vez que éste se refiere a los tipos de contratos que existen en materia de obra pública, y ello no es relevante para efectos del laudo. Es importante recordar que las causales de nulidad sólo pueden referirse a aquellas que se cometan al momento de dictar el laudo y no a cuestiones sustantivas de fondo.

A mayor abundamiento, el artículo 57 se refiere al concepto de precio unitario, mismo que fue respetado por el Tribunal Arbitral en su laudo en la medida en que con base en el mismo determinó la compensación a que tenía derecho COMMISA con respecto al trabajo realizado e interpretando las características de dicho trabajo con relación a los precios unitarios acordados por las partes.

Luego entonces, resulta evidente que no existe violación alguna en el laudo arbitral al citado precepto.

d) Al resolver la Controversia Técnica 19 no se violaron los preceptos que menciona PEP.

El artículo 70 de la Ley de Adquisiciones y Obras Públicas no ha sido violado toda vez que este ser refiere únicamente a los requisitos y condiciones que deben de cumplir las modificaciones a los contratos de obra pública que generen nuevas obligaciones contra recursos federales.  Sin embargo, dichas reglas no son aplicables a las obligaciones a las que se condenó a PEP con motivo de un incumplimiento contractual que ha sido analizado y determinado por el Tribunal Arbitral.

e) Al resolver la Controversia Técnica 27 no se violaron los preceptos que menciona PEP.

69

El artículo 57 de la Ley de Adquisiciones y Obras Públicas no ha sido violado toda vez que éste se refiere a los tipos de contratos que existen en materia de obra pública, y ello no es relevante para efectos del laudo. Es importante recordar que las causales de nulidad sólo pueden referirse a aquellas que se cometan al momento de dictar el laudo y no a cuestiones sustantivas de fondo.

Finalmente, PEP argumenta en su escrito de incidente de nulidad de laudo arbitral el que el ordenamiento jurídico prohíbe que en los contratos y en los pedidos, se estipulen penas convencionales e intereses moratorios a cargo de las entidades. Al respecto, cabe señalar que la condena que determinó el Tribunal Arbitral a favor de COMMISA no fue resultado de una pena convencional o de intereses moratorios pactados, sino por concepto de indemnización del incumplimiento de obligaciones contractuales, por lo que tampoco existe violación legal alguna que pueda justificar la nulidad del laudo demandada.

### 4.- El Laudo Arbitral no modifica al Contrato y, por lo tanto, no viola al Artículo 70 de la Ley de Adquisiciones y Obra Pública aplicable.

PEP cuestiona las decisiones tomadas con respecto a las Controversias Técnicas números 19 y 36 alegando que en ellas la interpretación del Tribunal Arbitral modifica el Contrato violando el artículo 70 de la Ley de Adquisiciones y Obras Públicas al no cumplir las formalidades previstas en él.

**En relación con este punto, el planteamiento de PEP es claramente incorrecto y tendencioso. El Tribunal Arbitral No Modificó el Contrato, simplemente se limitó a aplicar y hacer efectivo el acuerdo adoptado por las partes.**

En efecto, el Tribunal Arbitral se fundó en el propio acuerdo de PEP para compensar a COMMISA por cualesquiera modificaciones al Programa de trabajos.

Como puede apreciarse de la lectura del laudo arbitral (págs. 51 a 60 con respecto a la controversia técnica número 36; y págs. 127 a 133, con relación a la controversia técnica número 19) el Tribunal Arbitral determinó, luego de valorar las pruebas y argumentos de COMMISA y PEP, que PEP asumió la obligación de compensar a COMMISA por los costos adicionales en que ésta pudiera incurrir derivado del ejercicio por parte de PEP de su derecho a reprogramar los trabajos.

En ningún momento pretendió el Tribunal Arbitral modificar las obligaciones contraídas libremente por las partes, ni sustituirse en la voluntad de las partes y establecer términos y condiciones distintos a los convenidos. El Tribunal se limitó

a aplicar las disposiciones contractuales pactadas por PEP y COMMISA que el Tribunal Arbitral determinó aplicables al caso concreto. En específico, el Tribunal Arbitral determinó que "*toda modificación del programa constituye un trabajo extraordinario, que tiene que ser satisfecho como tal de acuerdo con la cláusula 6.1 del contrato.*"

Al argumentar que el Tribunal Arbitral "modificó" el Contrato de Obra Pública, PEP asume tácita pero necesariamente que el Tribunal Arbitral erró en su valoración de las pruebas y/o interpretación del Contrato. Esto es, PEP supone que no estaba obligada a compensar a COMMISA por los costos adicionales derivados de la reprogramación de los trabajos, y que el Tribunal Arbitral falló erróneamente al resolver lo contrario. En pocas palabras, se está impugnando la determinación de los hechos y del derecho realizada por el Tribunal Arbitral, bajo el pretexto de una violación al orden público.

Como lo han definido en repetidas ocasiones los tribunales mexicanos, la autoridad judicial que conoce de la ejecución del laudo y/o de la demanda de su anulación no puede revisar el fondo del laudo arbitral, sino exclusivamente la forma. Al demandar la nulidad en base a este argumento, PEP está solicitando a su Señoría que resuelva, expresa o tácitamente, que el Tribunal Arbitral valoró erróneamente la prueba ofrecida y que su determinación de los hechos debe ser revisada judicialmente. Como señalamos, esto es contrario a las disposiciones del Código de Comercio en la materia (que sólo permiten la anulación del laudo arbitral en los casos limitativamente señalados en el art. 1457 del Código de Comercio) y la jurisprudencia de los tribunales mexicanos, que expresamente reconocen que lo resuelto de fondo por el Tribunal Arbitral no puede ser controvertido judicialmente: en este sentido, lo resuelto por el Tribunal Arbitral tiene la naturaleza de *cosa juzgada (tal y como ya se mencionó al citar la tesis aislada)* ÁRBITRO. SUS RESOLUCIONES SON ACTOS DE AUTORIDAD, Y SU EJECUCIÓN LE CORRESPONDE AL JUEZ DESIGNADO POR LAS PARTES" en el apartado C) del presente capítulo VI.

En este mismo sentido, debe señalarse que los tribunales mexicanos han establecido claramente el principio que la autoridad judicial no puede revisar el *fondo* del laudo arbitral, esto es, la determinación que haga el tribunal de los hechos controvertidos en base a las pruebas y argumentos ofrecidos por las partes:

> "Registro No. 186229
> Localización:
> Novena Época
> Instancia: Tribunales Colegiados de Circuito
> Fuente: Semanario Judicial de la Federación y su Gaceta
> XVI, Agosto de 2002
> Página: 1317

Tesis: XV.1o.50 C
Tesis Aislada
Materia(s): Civil

**LAUDO ARBITRAL. SU HOMOLOGACIÓN POR AUTORIDAD JUDICIAL ORDINARIA Y EL ANÁLISIS DE ÉSTA, EN AMPARO, NO PERMITE EL ESTUDIO DE SU SENTIDO EN CUANTO AL FONDO.** Un laudo arbitral es la decisión de un órgano no estatal, así convenida por las partes, para resolver una contienda, ya sea presente o futura; así, para efectos de la instancia ordinaria queda a la exclusiva potestad de la decisión del tribunal de arbitraje y pasa a ser una extensión de esa voluntad, que por ser un acto de particulares, en cuanto a su sentido, no se encuentra sujeto a revisión constitucional; sin embargo, tal revisión constitucional sí se puede dar respecto a la resolución de homologación emitida por un órgano judicial estatal, la que, desde luego, se limitará al resultado del análisis de la debida composición del tribunal de arbitraje, del debido procedimiento, de la manifestación de voluntad de las partes de someterse al arbitraje, de la materia del mismo y de los demás supuestos contemplados en el artículo 1462 del Código de Comercio, supuestos que, como se advierte, contemplan únicamente cuestiones de forma y no de fondo, y, una vez dada la homologación, de los actos de ejecución con que el Juez auxilia al cumplimiento del laudo; por lo que en la vía de amparo únicamente se podrán alegar esas cuestiones y no las relativas al fondo y sentido del laudo. Lo anterior se robustece con el criterio sostenido por la Tercera Sala de la anterior integración de la Suprema Corte de Justicia de la Nación, en la tesis aislada, publicada en el Semanario Judicial de la Federación, Quinta Época, Tomo XXXVIII, página 801, de rubro: "ARBITRAJE.", en la que considera que el arbitraje es una convención que la ley reconoce, lo que constituye una *renuncia* de los particulares para que la autoridad judicial conozca de una controversia, por lo que tiene una importancia procesal negativa, en cuanto que las partes confían la decisión de sus conflictos a uno o más particulares, llamados árbitros; sin embargo, éstos no son funcionarios del Estado ni tienen jurisdicción propia o delegada, y sus facultades derivan únicamente de la voluntad de las partes, expresada de acuerdo a la ley, y si bien el laudo arbitral no puede revocarse a voluntad de uno de los interesados, no es ejecutivo en sí mismo, ya que sólo puede considerársele como una obra de la lógica jurídica que es acogida por el Estado, por lo que sólo puede ejecutarse a través de un acto realizado por un órgano jurisdiccional que, sin quitarle su naturaleza privada, asume su contenido, y es entonces que se equipara a un acto jurisdiccional. Sin embargo, los Jueces no están autorizados para revisar los laudos de manera integral, ya que de lo contrario podrían nulificarlos, aun por cuestiones de fondo, para lo que sería necesario que previamente las partes comparecieran ante el Juez a plantearle el debate, y el sistema generalmente adoptado consiste en que si la violación contenida en el laudo transgrede el orden público, el Juez no debe ordenar su ejecución, pero si solamente perjudica intereses privados debe ordenarla; y una vez decretado judicialmente su cumplimiento se eleva a la categoría de acto jurisdiccional y es entonces que el agraviado puede ocurrir ante los tribunales de la Federación

72

en demanda de amparo, que deberá tramitarse en la vía biinstancial, como así se advierte de la jurisprudencia número 32/93 de la Tercera Sala de la anterior Integración de la Suprema Corte de Justicia de la 'Nación, publicada en la Gaceta del Semanario Judicial de la Federación, tomo 72, diciembre de 1993, página 41, de rubro: "LAUDO ARBITRAL, ACUERDOS DE HOMOLOGACIÓN Y EJECUCIÓN DEL. PROCEDE EN SU CONTRA EL JUICIO DE AMPARO INDIRECTO, EN TÉRMINOS DEL ARTÍCULO 114, FRACCIÓN III, DE LA LEY DE AMPARO, Y NO EL DIRECTO A QUE ALUDE EL 158 DEL MISMO ORDENAMIENTO.".

PRIMER TRIBUNAL COLEGIADO DEL DÉCIMO QUINTO CIRCUITO. Amparo en revisión 138/2002. Mecalux, México, S.A. de C.V. 28 de mayo de 2002. Unanimidad de votos. Ponente: Pedro Fernando Reyes Colin. Secretario: Ángel Rodríguez Rico."

Este mismo precedente establece claramente que el laudo debe ser ejecutado cuando perjudica exclusivamente intereses privados y que, a *contrario sensu*, se considera que el laudo es contrario al orden público cuando lesiona intereses públicos. En este sentido, cabe el argumento que PEP es una entidad paraestatal o de la administración pública centralizada, con personalidad y patrimonio propio y que actúa en el comercio.

Un laudo arbitral que ordena a PEP a compensar por los costos adicionales derivados de una decisión libremente adoptada por PEP en el contexto de una relación comercial (la derivada del Contrato de Obra), de un contrato celebrado por PEP en su carácter de ente privado mercantil (esto es, sin ejercitar una función o facultad propia del estado) no puede ser considerada como contraria al orden público. De conformidad con este principio, es evidente que el laudo arbitral cuya nulidad solicita PEP no lesiona el orden público ya que afecta los intereses meramente patrimoniales de PEP, derivado de su actuación como ente de derecho privado en el desarrollo de actividades empresariales, tal y como se expuso abundantemente en el numeral inmediato anterior.

### 5.- Las condenas contenidas en el Laudo Arbitral si tienen fundamento contractual y no se refieren a pagos no previstos en el Contrato.

La parte actora basa su pretensión de nulidad del laudo arbitral en el hecho de que las cantidades a las que fue condenada respecto de los reclamos relacionados con las controversias técnicas 27, 37 y 39 no estaban previstas en el contrato como tal y que por lo tanto no tenían un sustento presupuestal, lo cual contraviene el orden público.

Tales afirmaciones de la parte actora carecen de sustento y por lo tanto son incapaces de provocar la nulidad parcial del laudo.

73

Como se ha sostenido a lo largo de esta contestación de demanda, el laudo arbitral sólo es anulable conforme a las causas previstas en las diferentes fracciones del artículo 1457 del Código de Comercio.

El referido artículo no prevé como una causa de nulidad la indebida interpretación o aplicación de las disposiciones contractuales o bien legales por parte del tribunal arbitral. El sistema de impugnación laudos comerciales conforme al derecho mexicano no prevé como causa de nulidad el error o la mala apreciación del derecho.

La actora alega propiamente esto al determinar que el tribunal arbitral condenó a PEP a pagar indemnizaciones no previstas en el contrato. Por lo tanto, no es posible considerar válida dicha afirmación como una causa de nulidad del laudo.

Pero además, independientemente de lo anterior, suponiendo que dicha cuestión fuese analizable como causa de nulidad del laudo, se estima que no le asiste la razón a la parte actora en virtud de que las prestaciones referidas a las que fue condenada en el laudo son indemnizaciones por incumplimientos contractuales.

Del análisis de tales reclamos y la determinación de su procedencia en el laudo arbitral es claro que el sustento de los reclamos de indemnización por parte de COMMISA en contra de PEP sí tienen sustentos contractuales.

En el caso de la reclamaciones 37 y 39, conforme a las bases de licitación se advierte que las mismas versan sobre incumplimientos contractuales por parte de PEP en relación a ductos y cruces.

Las bases de licitación, que forman parte integrante del contrato, preveían que PEP se encontraba obligada a proporcionar información correcta respecto de las condiciones del lecho marino en donde COMMISA debería instalar los referidos ductos.

PEP proporcionó información incorrecta respecto del lecho marino, lo cual obligó a que COMMISA llevara a cabo trabajos adicionales. El hecho de proporcionar información incorrecta causó un daño a COMMISA.

Lo mismo sucede respecto de la reclamación relacionada con la controversia técnica número 27 la cual consistió en una indemnización por tiempos de espera de la embarcación denominada "Castoro 10" mientras realizaba trabajos en las plataformas y los ductos ascendentes.

74

Como se desprende del laudo, PEP incumplió el contrato en virtud de que en medio de la ejecución de la obra ordenó a COMMISA que llevara a cabo trabajos adicionales con dicha embarcación en las plataformas y los ductos ascendentes a pesar de que el contrato original no preveía esto como una tarea a ser realizada por dicho barco. Esto generó que COMMISA incurriera en costos adicionales con motivo del cambio de planes de PEP. PEP jamás reconoció tales gastos a favor de COMMISA.

Conforme al derecho mexicano, todo aquél que causa un daño a otro con motivo del incumplimiento de una obligación está obligado a la reparación de dicho daño.

Aun y cuando fuera cierto que las partes no previeron una indemnización específica para tal daño en el contrato, esto no implica que el tribunal arbitral se excediera en sus facultades por las dos razones apuntadas.

La primera de ellas consiste en que sí existía la obligación contractual de PEP de de proporcionar los datos correctos sobre el lecho marino.

Además, en todo caso, la ley, el Código Civil Federal, aplicable como ley sustantiva prevé como una cláusula natural de todos los contratos la obligación de la indemnización como motivo de un daño.

Finalmente, según se desprende del anexo C del contrato, las partes pactaron la posibilidad y su obligación de pagar trabajos adicionales.

Por lo tanto, debe considerarse que tales afirmaciones de la parte actora carecen igualmente de sustento para la anulación del laudo.

> 6.- <u>El laudo aplica correctamente las disposiciones contractuales y legales de naturaleza civil e independientemente de ello, sus determinaciones al respecto no pueden ser consideradas como violaciones al orden público.</u>

Como ya se precisó en el apartado B) del presente capítulo, a pesar de que PEP alega en un primer momento que el Contrato no puede ser interpretado aplicando las disposiciones de Derecho Civil, posteriormente en forma contradictoria alega que el laudo arbitral es contrario al orden público, precisamente por no aplicar dichas disposiciones.

Así la posición de PEP al respecto consiste en aseverar que en todos aquellos casos en que la determinación del Tribunal Arbitral resultó en una condena contraria a sus intereses, la misma aplicó en forma incorrecta las disposiciones y

principios de Derecho Civil aplicables y que, por esa razón, se violó el orden público.

Evidentemente, esta posición de PEP es incorrecta puesto que el simple desacuerdo sobre las interpretaciones que en materia sustantiva se encuentran en el laudo, no puede bajo ninguna excusa (como las que invoca PEP) servir para sustentar una revisión sobre el fondo del asunto. Se reitera que las causas de nulidad son taxativas y sobre todo que los argumentos tendientes a sostener la violación al orden público no pueden ser utilizados como excusa para revisar las interpretaciones jurídicas y valoraciones probatorias contenidas en el laudo arbitral.

En este orden de ideas, PEP pretende soportar su dolosa pretensión de que el Juez entre al estudio del fondo del asunto apoyándose en una referencia bibliográfica supuestamente existente en un artículo titulado "*El orden público como motivo para negar el reconocimiento y ejecución de laudos arbitrales internacionales*" del maestro José Luis Siqueiros[17]. Sin embargo, de la simple lectura de este artículo no se desprende opinión alguna que sea conforme con su pretensión y, por el contrario, el maestro Siqueiros adopta una visión mucho más restringida del concepto del análisis del "orden público", sosteniendo que solamente puede considerarse como causa de nulidad de un laudo en circunstancias excepcionales y bajo un análisis que de él se haga sobre una perspectiva internacional y no local, existiendo en el mundo una tendencia a favorecer la eficiencia del arbitraje y la ejecución del laudo correspondiente. Al respecto, el autor en cita sostiene lo siguiente:

> "Aceptando que los precedentes jurisprudenciales a nivel nacional y universal, no han sido unánimes en esta materia, **puede afirmarse que la tendencia actual favorece la ejecución de la sentencia arbitral**. La Corte Europea de Justicia en una sentencia reciente (1999) decidió:
>
> "... **es en el interés de la eficiencia del procedimiento arbitral el que la impugnación de los laudos arbitrales se limite en su alcance y que *su nulidad o la denegación para reconocerlos sólo sea posible en circunstancias excepcionales*".**
>
> .....
>
> Como se indicó anteriormente, la autoridad judicial del Estado requerido para reconocer y ejecutar el laudo extranjero, deberá aplicar los principios de ***orden público internacional***, tal y como se concibe en tal Estado. **En tal virtud debe ignorar aquellos principios que se estiman**

---

[17] SIQUEIROS, José Luis. *El orden público como motivo para negar el reconocimiento y ejecución de laudos arbitrales internacionales*, Jurídica, No. 32, abril 2003, México, pp. 45-58.

como fundamentales en el contexto de la ley que regula
el contrato, o de la ley aplicable en el lugar de su
cumplimiento; tampoco debe considerar la ley vigente en la
sede del arbitraje. Estas tres alternativas estuvieron
disponibles para el tribunal arbitral que dictó el laudo, pero no
son acequibles para el juez que analiza su ejecución.[18]"

(Énfasis añadido)

En relación a lo indicado en este último párrafo, es importante ver como en opinión
del maestro Siqueiros el juez que conoce de la acción de nulidad de un laudo debe
considerar únicamente los principios del <u>orden público internacional</u> para dictar su
sentencia, ignorando aquellos principios fundamentales derivados de la ley que
resulta aplicable al contrato o a la del lugar de su cumplimiento.

Esta postura internacionalista del maestro Siqueiros es compartida unánimemente
por la doctrina nacional y extranjera, por lo que resulta contradictorio y paradójico
que PEP intente fundar su dolosa pretensión en esta opinión, lo que únicamente
refleja el carácter temerario de su demanda.

Por otro lado, al referenciar las recomendaciones de la Comisión de Arbitraje
Comercial Internacional de la "International Law Association" (Asociación
Internacional de Derecho) respecto a lo que debe considerarse orden público a la
luz de una acción de nulidad de un laudo, el mismo José Luis Siqueiros refiere
como aplicables, entre otras, las siguientes reglas:

2(c) Cuando una de las partes pudiera haberse opuesto al
pronunciamiento de un laudo con base en un principio
fundamental pero no lo hubiese hecho, no tendrá derecho a
invocarlo después como un motivo para que se rehúse el
reconocimiento y ejecución del laudo ya dictado.
.....

3(a) <u>La violación por un lado de una mera "norma imperativa"</u>
(i.e. una norma que es imperativa, pero que no forma parte
del orden público internacional de un Estado, en la medida
de que no sea obligatoria su aplicación al concreto), <u>no
deberá constituir un obstáculo para el reconocimiento y
ejecución del laudo, aún cuando tal norma sea parte
integrante de: la ley del foro, del derecho que rige el contrato,
del derecho vigente</u> en el sitio de cumplimiento del contrato o
del derecho que rija en la sede del arbitraje.
......

[...] El "derecho público", noción también muy similar al orden
público, tampoco es un concepto sinónimo del segundo. Este
último se refiere a principios fundamentales.[19]

---

[18] *Ibidem,* p. 46 y 47

[19] *Ibidem,* p. 49 y 50.

77

Como se puede observar, el concepto de orden público está estrechamente acotado en función del papel restrictivo que tiene el juez que conoce de la acción de nulidad de un lado. De hecho, incluso se sostiene que si el recurrente tuvo oportunidad de alegar esta supuesta violación al orden público en el procedimiento arbitral, lo que en este caso claramente pudo haber realizado oponiendo una excepción que evitara el pago del adeudo a su cargo, no tiene derecho a alegar que con base en dicha defensa no se ejecute o reconozca el laudo ya dictado.

En este contexto, e independientemente de que no pueden ser sujetas a revisión en esta instancia, a continuación se demuestra específicamente que las supuestas violaciones de Derecho Civil alegadas por PEP resultan infundadas:

    a)    No se violó el artículo 14 Constitucional al resolver la Controversia Técnica número 36.

El artículo 14 Constitucional no resulta aplicable a los laudos arbitrales por tratarse de un precepto que únicamente obliga a los Tribunales estatales. Las reglas conforme a las cuales se debe dictar un laudo arbitral en el caso que nos ocupa son aquellas contempladas por el Reglamento de Arbitraje de la CCI, por lo que no resultan atendibles los argumentos de la parte actora en el sentido de que supuestas inexactitudes en la aplicación de la legislación civil dentro del laudo arbitral son contrarias al orden público.

A mayor abundamiento y con independencia de lo anterior, cabe señalar que de la simple lectura del laudo final, a páginas 51 a 60 se advierte que el Tribunal Arbitral sí llevó a cabo un razonamiento jurídico válido para sustentar sus conclusiones y determinaciones, por lo que a este respecto no se actualiza causal de nulidad alguna.

    b)    Al resolverse las Controversias Técnicas números 34 y 35, el Tribunal Arbitral aplicó correctamente las disposiciones relativas a la causación de daños y perjuicios para condenar a PEP.

De nueva cuenta, en relación con este reclamo alega PEP que el Tribunal Arbitral violó el orden público por no haber fundado y motivado debidamente su condena de daños y perjuicios.

Ante este argumento, reiteramos que el laudo arbitral no es un acto de autoridad al que le sean aplicables o exigibles los requisitos de debida fundamentación y

motivación legal establecidos por el artículo 16 Constitucional. Como se expone posteriormente, en el apartado F) del presente capítulo VI, los requisitos que tiene que cumplir el laudo se derivan del Reglamento de Arbitraje de la Cámara de Comercio Internacional que básicamente exige que las determinaciones contenidas en el laudo se encuentren razonadas.

De nueva cuenta de la lectura del laudo a fojas 36 a 51 se advierte que el Tribunal Arbitral razonó su determinación tal y como lo exige el Reglamento de Arbitraje de la Cámara de Comercio Internacional.

Por lo tanto, resulta inatendible el argumento de PEP de que la decisión sobre los daños y perjuicios relacionados con las Controversias Técnicas 34 y 35 no están debidamente fundadas y motivadas en los artículos correspondientes del Código Civil, puesto que dicho argumento no se configura como una causal de nulidad de laudo, ya que implicaría revisar el fondo de la decisión sin que exista o se acredite la violación de algún verdadero principio de orden público.

Con independencia de lo anterior y aún dentro del incorrecto enfoque que PEP pretende dar a la obligación de razonar el laudo, cabe señalar que la misma se cumple con precisar en forma clara los motivos que el Tribunal Arbitral tuvo para resolver en determinado sentido, sin que sea exigible como lo pretende PEP que se haga un análisis exhaustivo y una cita interminable y ociosa de preceptos jurídicos. Basta en este sentido que se explique, razone y justifique la decisión para que el laudo sea valido (sin importar inclusive si dichas razones son o no correctas para un tercero o inclusive para el Tribunal Estatal).

En este contexto y aún y cuando el estándar de debida fundamentación y motivación legal exigido por la Constitución Mexicana no es exigible a un laudo arbitral, cabe mencionar que aún dicho estándar es interpretado por nuestros más altos tribunales como un requisito flexible que atiende más a su finalidad (de permitir la adecuada defensa de las partes) que a formalismos o citas de preceptos. Es aplicable en lo conducente la siguiente jurisprudencia obligatoria:

"No. Registro: 175,082
Jurisprudencia
Materia(s): Común
Novena Época
Instancia: Tribunales Colegiados de Circuito
Fuente: Semanario Judicial de la Federación y su Gaceta
XXIII, Mayo de 2006
Tesis: I.4o.A. J/43
Página: 1531

**FUNDAMENTACIÓN Y MOTIVACIÓN. EL ASPECTO FORMAL DE LA GARANTÍA Y SU FINALIDAD SE TRADUCEN EN EXPLICAR, JUSTIFICAR, POSIBILITAR LA DEFENSA Y COMUNICAR LA DECISIÓN.** El contenido

formal de la garantía de legalidad prevista en el artículo 16 constitucional relativa a la fundamentación y motivación tiene como propósito primordial y ratio que el justiciable conozca el "para qué" de la conducta de la autoridad, lo que se traduce en darle a conocer en detalle y de manera completa la esencia de todas las circunstancias y condiciones que determinaron el acto de voluntad, de manera que sea evidente y muy claro para el afectado poder cuestionar y controvertir el mérito de la decisión, permitiéndole una real y auténtica defensa. Por tanto, no basta que el acto de autoridad apenas observe una motivación pro forma pero de una manera incongruente, insuficiente o imprecisa, que impida la finalidad del conocimiento, comprobación y defensa pertinente, **ni es válido exigirle una amplitud o abundancia superflua, pues es suficiente la expresión de lo estrictamente necesario para explicar, justificar y posibilitar la defensa, así como para comunicar la decisión a efecto de que se considere debidamente fundado y motivado,** exponiendo los hechos relevantes para decidir, citando la norma habilitante y un argumento mínimo pero suficiente para acreditar el razonamiento del que se deduzca la relación de pertenencia lógica de los hechos al derecho invocado, que es la subsunción.

CUARTO TRIBUNAL COLEGIADO EN MATERIA ADMINISTRATIVA DEL PRIMER CIRCUITO.

Amparo directo 447/2005. Bruno López Castro. 1o. de febrero de 2006. Unanimidad de votos. Ponente: Jean Claude Tron Petit. Secretaria: Claudia Patricia Peraza Espinoza.
Amparo en revisión 631/2005. Jesús Guillermo Mosqueda Martínez. 1o. de febrero de 2006. Unanimidad de votos. Ponente: Jean Claude Tron Petit. Secretaria: Alma Margarita Flores Rodríguez.
Amparo directo 400/2005. Pemex Exploración y Producción. 9 de febrero de 2006. Unanimidad de votos. Ponente: Jesús Antonio Nazar Sevilla. Secretaria: Ángela Alvarado Morales.
Amparo directo 27/2006. Arturo Alarcón Carrillo. 15 de febrero de 2006. Unanimidad de votos. Ponente: Hilario Bárcenas Chávez. Secretaria: Karla Mariana Márquez Velasco.
Amparo en revisión 78/2006. Juan Alcántara Gutiérrez. 1o. de marzo de 2006. Unanimidad de votos. Ponente: Hilario Bárcenas Chávez. Secretaria: Mariza Arellano Pompa.

c)    Al resolverse las Controversias Técnicas números 37 y 39, el Tribunal Arbitral aplicó correctamente las disposiciones relativas a la compensación adecuada para PEP.

Alega PEP en la misma tesitura que los puntos anteriores que el Tribunal Arbitral está aplicando incorrectamente las disposiciones contractuales y legales del caso, al no reconocer que los pagos efectuados por PEP a favor de COMMISA con motivo de las Controversias Técnicas 37 y 39 constituían un pago indebido que no podía servir para justificar el importe de la compensación adeudada a COMMISA.

Este argumento resulta de nueva cuenta inatendible porque se refiere a decisiones y cuestiones de fondo del Tribunal Arbitral que en forma alguna pueden ser catalogadas como una violación al orden público Mexicano

d)      Al resolver la Controversia Técnica números 27, el Tribunal Arbitral aplicó correctamente las disposiciones relativas al consentimiento manifestado por PEP sobre el tratamiento que había que dar a las diferencias entre las tarifas aplicables y reclamadas por COMMISA.

Otra vez, PEP menciona que el Tribunal Arbitral resolvió sin aplicar correctamente el artículo 1805 del Código Civil relativo al consentimiento dado por dicha entidad a ciertos pagos por diferencias en tarifas y, que por ello, se violó a la garantía de exacta aplicación de la Ley consagrada por el artículo 14 Constitucional.

Como hemos señalado anteriormente al no ser aplicable el artículo 14 Constitucional al arbitraje por no tratarse de un procedimiento judicial que culmine con un acto de autoridad, cualquier argumento en el que PEP alegue la inexacta aplicación de disposiciones de naturaleza civil resulta inatendible, por no estar prevista como una causal de nulidad la inexacta o incorrecta interpretación de la legislación civil.

Reiteramos de nueva cuenta que el fondo del laudo no puede ser revisado al momento de solicitar la nulidad del laudo, alegando como pretexto que las decisiones o razonamientos contenidos en él son contrarios al orden público, **porque a juicio de una de las partes fueron erróneos**. Es necesario, en este sentido, que se pruebe la existencia de una violación concreta al orden público, la alegación de un análisis legal correcta es incapaz de ser considerada en sí misma, como una violación al orden público como pretende la parte actora.

En esta virtud, este argumento de parte de PEP debe ser desestimado.

e)      Al resolverse la condena sobre Gastos Financieros, el Tribunal Arbitral aplicó correctamente las disposiciones contractuales y legales.

PEP alega que si COMMISA no estimó los trabajos (que dan lugar a los gastos financieros) oportunamente no tiene derecho a reclamar gastos financieros y, por lo tanto, la condena viola orden público porque no se aplica en forma correcta y estricta el Derecho Civil al no interpretarse adecuadamente el Contrato y además, condenarse a la capitalización de intereses.

Por lo que se refiere al primer argumento de PEP en el sentido de que en el laudo se contraría el orden público internacional porque se permite a COMMISA que se aproveche de su propio dolo ya que obtiene una condena a su favor de gastos financieros, a pesar de que según PEP no cumplió con el procedimiento de

81

estimaciones previas de sus reclamos; el mismo resulta otra vez inatendible por constituir una resolución de fondo del Tribunal Arbitral que no puede ser revisada en esta instancia.

A mayor abundamiento, el "pretexto de orden público" empleado en esta ocasión de que supuestamente en el laudo se está favoreciendo y premiando un supuesto actuar doloso de COMMISA resulta infundado.

En efecto, el concepto de dolo que aporta el Código Civil Federal de aplicación supletoria a la materia mercantil objeto del contrato que generó la controversia resuelta por el laudo final y que se contiene en el artículo 1815 establece lo siguiente:

> "**Artículo 1815.-** Se entiende por dolo en los contratos, cualquiera sugestión o artificio que se emplee para inducir a error o mantener en él a alguno de los contratantes; y por mala fe, la disimulación del error de uno de los contratantes, una vez conocido."

Conforme al concepto antes citado, cabe hacer notar a su Señoría, que PEP en ningún momento acreditó que COMMISA hubiera realizado cualquier acto para inducir al error a PEP, ni para mantenerla en el error, ni mucho menos para inducir o mantener en el error al Tribunal Arbitral.

Asimismo, según lo dispuesto por el Código Civil Federal, aplicable al caso concreto, el dolo como actuar de cualquier persona es un elemento que no puede presumirse como ligera y presuntuosamente sostiene PEP, sino que debe quedar acreditado plenamente al grado de que no exista duda de que existió una intención real de causar un daño a alguien más, misma que se insiste, PEP, jamás acreditó. Esto se confirma en el precedente judicial que se cita a continuación:

> "No. Registro: 185,014
> Tesis aislada
> Materia(s): Civil
> Novena Época
> Instancia: Tribunales Colegiados de Circuito
> Fuente: Semanario Judicial de la Federación y su Gaceta
> XVII, Febrero de 2003
> Tesis: V.1o.25 C
> Página: 967
>
> **ACCIÓN DE INDEMNIZACIÓN POR EL EJERCICIO ABUSIVO DE UN DERECHO. SUS ELEMENTOS.** El artículo 1912 del Código Civil Federal, que preceptúa: "Cuando al ejercitar un derecho se causa daño a otro, hay obligación de indemnizarlo si se demuestra que el derecho sólo se ejerció a fin de causar el daño, sin utilidad para el titular del derecho.", acepta en sus términos la tesis doctrinal del abuso de los derechos de Julien Bonnecase, que sostiene que la verdadera noción del abuso del derecho se reduce a su

forma psicológica, como el ejercicio de un derecho sin utilidad para su titular y con un fin exclusivamente nocivo y se compone de cuatro elementos: El primer elemento consiste en el poder de acción, representado por un derecho, que recibe del legislador una organización, en cierta forma material, respecto de la cual su titular puede estrictamente limitarse con la intención secreta de servirse únicamente para dañar a otra persona. El segundo refiere a la ausencia de toda utilidad derivada del ejercicio del derecho, entendido ello como la ausencia de todo "interés serio y legítimo", en donde los tribunales no deben admitir fácilmente, con motivo de su ejercicio, la ausencia de toda utilidad por su titular, esto es, no deberán limitarse a registrar la falta de interés actual, sino prever el futuro y examinar si el acto, desprovisto momentáneamente de utilidad, es susceptible de producirla en lo porvenir. El tercer elemento se trata de la intención nociva en su sentido psicológico, es decir, tal y como la comprendemos, la cual constituye la característica esencial de la noción de abuso de derecho; la <u>intención nociva debe estar absolutamente caracterizada y absorberse a la noción de dolo del derecho común, es decir, a la intención de dañar, cuya materialización no tenga un significado dudoso y revele la intención con que se ha realizado.</u> Y por último, el perjuicio ocasionado a otra persona, elemento absolutamente necesario que en el orden del procedimiento es el primero en aparecer y que conduce a verificar la existencia de los otros elementos en donde agota su papel para no reaparecer sino hasta el momento de valorar el monto de la reparación debida (Tratado Elemental de Derecho Civil. Volumen I. Bonnecase, Julien. Editorial Harla, México, Distrito Federal, 1997, páginas 824 a la 827). En consecuencia, habrá lugar a la indemnización por el abuso de un derecho, siempre y cuando se actualicen los señalados elementos, a saber, el ejercicio de un derecho, la intención dañina en el ejercicio del derecho, la ausencia de utilidad para el titular de ese derecho y el perjuicio ocasionado a otra persona; ya que no puede considerarse que hubo ejercicio abusivo de un derecho cuando no obstante la intención nociva del titular en dañar a otro, su ejercicio conlleve un beneficio a su favor, o bien, cuando sin haber ese beneficio para su titular, no exista intención de provocar el daño causado.

PRIMER TRIBUNAL COLEGIADO DEL QUINTO CIRCUITO.

Amparo directo 6/2002. Pesquera Mare, S.A. de C.V. 14 de octubre de 2002. Unanimidad de votos. Ponente: Mario Pedroza Carbajal. Secretaria: Laura Catalina Maldonado Arce."

(Énfasis añadido)

En términos de lo antes expuesto, podemos concluir que PEP en ningún momento acreditó en qué consistió el dolo que imputa a COMMISA en el tema de los gastos financieros a los que condenó finalmente el Tribunal Arbitral en el laudo objeto del presente procedimiento incidental. Esta carencia probatoria resulta suficiente para que su Señoría declare improcedente el argumento planteado por PEP como supuesta causal de nulidad del laudo.

Ahora bien, el hecho de que el Tribunal Arbitral haya determinado en su laudo final, emitir una condena por gastos financieros en contra de PEP, con independencia de que COMMISA haya o no cumplido, estrictamente el procedimiento de integración de las estimaciones previas, es un tema de fondo y de interpretación del Contrato, que escapa al análisis al que Usted Juez deberá sujetarse respecto de la presente controversia incidental.

Por otra parte, en relación con la supuesta violación a la prohibición contenida en los artículos 2397 del Código Civil Federal y 363 del Código de Comercio, porque supuestamente en el laudo se está condenando a PEP a capitalizar intereses, cabe señalar que la misma no se sostiene ni siquiera en los propios argumentos de la actora.

De la lectura de la demanda de nulidad se advierte que PEP no explica su teoría de porqué el laudo arbitral condena a capitalizar intereses. Por el contrario, del laudo arbitral (fojas 169 174) se desprende que el Tribunal Arbitral determinó que la disposición contractual aplicable era la cláusula 3.8.6 del Contrato, que establece que "en caso de retraso en los pagos de estimaciones y de ajustes de costos PEP, a solicitud del Contratista, pagará gastos financieros conforme a una tasa que será igual a la establecida en la Ley de Ingresos de la Federación en los casos de prórroga para el pago de los créditos fiscales...", en relación con la cláusula 3.8.8 que libera a PEP de pagar gastos financieros cuando PEP legítimamente suspenda el pago de las estimaciones.

De esos preceptos así como de los puntos resolutivos del laudo no se advierte que se tengan que capitalizar intereses como erróneamente y sin fundamento alega PEP.

En este orden de ideas, el hecho de que los intereses se deban pagar al mismo tiempo que el principal y de que se causen diariamente hasta que se verifique dicho pago, en forma alguna implica una supuesta capitalización de intereses como pretende sostener PEP.

En consecuencia, estos argumentos de supuesta nulidad del laudo resultan también infundados e inatendibles.

7.- Las determinaciones contenidas en el laudo arbitral no son incongruentes.

Resultan improcedentes los argumentos que esgrime PEP al referir que el laudo es contrario al orden público por carecer de fundamentación – como lo hace en la

página 32 de su escrito de incidente de nulidad –, toda vez que de acuerdo con el artículo 25 del Reglamento de Arbitraje de la Corte Internacional de Arbitraje de la Cámara de Internacional de Comercio, el Tribunal solamente está obligado a razonar sus laudos, pero no a cumplir con la garantía constitucional de de debida fundamentación y motivación legal por no tratarse de un acto de autoridad al que le sea exigible dicho requisito.

Ahora bien, en relación a la motivación ésta debe entenderse como las circunstancias, razones o causas de hecho que llevaron al Tribunal a decidir en cierto sentido con adecuación a la ley aplicable.

En el caso concreto, su Señoría podrá observar que el laudo, en cada Controversia Técnica que analiza, toma en cuenta, examina y estudia: (i) las posturas y argumentos de las partes; (ii) los hechos probados; y (iii) realiza un análisis general de los autos.

Una vez hecho lo anterior y cumpliendo con los requisitos de justicia e imparcialidad establecidos en el artículo 15 del Reglamento de Arbitraje de la Corte Internacional de Arbitraje de la Cámara de Internacional de Comercio, el Tribunal llega a una conclusión que claramente se encuentra razonada y motivada.

El hecho de que el laudo exponga de manera clara y sucinta los motivos, pasos y razonamientos que llevaron al Tribunal a tomar determinada resolución, evidencia la **congruencia** con la que se ha dictado el laudo.

En efecto, el laudo es congruente y fue dictado conforme a la lógica-jurídica.

Los Tribunales de nuestro país han determinado lo que debe entenderse por el principio de congruencia – el cual debe estar presente en toda resolución –, a continuación se citan dos tesis jurisprudenciales:

> "**CONGRUENCIA. PRINCIPIO DE, EN LA SENTENCIA. La** congruencia significa ilación o aceptación ante los motivos de inconformidad o reclamo y la concesión que hace el juzgador a ello, o sea, conformidad en cuanto a extensión, concepto y alcance entre lo resuelto por el órgano jurisdiccional y las demandas, contestaciones y demás pretensiones deducidas oportunamente por las partes.
>
> TERCER TRIBUNAL COLEGIADO DEL SEGUNDO CIRCUITO.
>
> Amparo directo 313/89. Guillermo Toledo Castillo. 31 de Mayo de 1989. Unanimidad de votos. Ponente: María del

85

Carmen Sánchez Hidalgo. Secretaria: María Concepción Alonso Flores.

No. Registro: 228,210, Tesis aislada, Octava Época, Enero a Junio de 1989"
(Énfasis añadido)

"PRINCIPIO DE CONGRUENCIA. QUE DEBE PREVALECER EN TODA RESOLUCION JUDICIAL. En todo procedimiento judicial debe cuidarse que se cumpla con el principio de congruencia al resolver la controversia planteada, que en esencia está referido a que la sentencia sea congruente no sólo consigo misma sino también con la litis, lo cual estriba en que al resolverse dicha controversia se haga atendiendo a lo planteado por las partes, sin omitir nada, ni añadir cuestiones no hechas valer, ni contener consideraciones contrarias entre sí o con los puntos resolutivos.

PRIMER TRIBUNAL COLEGIADO EN MATERIA ADMINISTRATIVA DEL PRIMER CIRCUITO.

Amparo en revisión 731/90. Hidroequipos y Motores, S. A. 25 de abril de 1990. Unanimidad de votos. Ponente: Samuel Hernández Viazcán. Secretario: Aristeo Martínez Cruz.

Nota: Este criterio ha integrado la jurisprudencia I.1o.A. J/9, publicada en el Semanario Judicial de la Federación y su Gaceta, Novena Época, Tomo VIII, agosto de 1998, página 764, de rubro: "PRINCIPIO DE CONGRUENCIA. QUE DEBE PREVALECER EN TODA RESOLUCIÓN JUDICIAL.

No. Registro: 224,049, Octava Época, Instancia: Tribunales Colegiados de Circuito, Enero de 1991"

De ambos criterios se desprende que para que una resolución sea congruente, ésta debe ser:

(i)    Congruente en sí misma y también con la litis.

(ii)   Dictada en atención a lo expuesto por las partes.

(iii)  Exhaustiva en el sentido de incluir todas las cuestiones expuestas por las partes.

(iv)   Dictada con base a una ilación o aceptación entre las pretensiones y las determinaciones que hace el juzgador.

En este sentido, podemos observar que **el laudo arbitral es congruente** toda vez que cumple con los requisitos del principio de congruencia.

En este sentido, su Señoría podrá percatarse que dichas garantías fueron respetadas a las partes en todo momento durante el procedimiento arbitral, como se desprende del laudo arbitral en el que consta: (i) un debido emplazamiento a PEP; (ii) un periodo de pruebas otorgado a las partes para su ofrecimiento; (iii) un

período de alegatos, y en general un respeto al derecho de igualdad que tienen las partes para probar sus pretensiones y defensas en el proceso.

En consecuencia a lo expuesto, debe concluírse que el laudo está apegado a derecho, y en consecuencia no es contrario al orden público, en cuanto a que fue: (i) debidamente motivado; (i) congruente; y (iii) dictado respetando el principio de debido proceso.

E)    EN EL LAUDO ARBITRAL NO SE INFRINGIÓ EL ACUERDO DE ARBITRAJE PORQUE LAS DISPUTAS QUE RESUELVE SI SE ENCUENTRAN CONTEMPLADAS EN EL MISMO Y NO EXCEDEN SU ALCANCE.

El otro argumento toral en que PEP funda su demanda de nulidad se centra en alegar que la resolución de las controversias técnicas números 36, 34, 35, 19 y 27 se encuentra fuera del alcance de la cláusula arbitral ya que no cumplieron con los requisitos formales establecidos por la cláusula 23.2 del Contrato y, por ende, el Tribunal Arbitral se excedió al resolver sobre las mismas, razón por la cual según PEP se actualiza el inciso c) fracción I del artículo 1457 del Código de Comercio.

En forma poca clara e incongruente, el mismo argumento es repetido en relación con la supuesta nulidad de la condena de los gastos financieros, para alegar una supuesta violación a las reglas del procedimiento arbitral porque según PEP se está resolviendo un reclamo que no está comprendido dentro del alcance de la cláusula arbitral.

Además, de nueva cuenta justificándose en esta supuesta causal de nulidad PEP aprovecha para volver a plantear sus argumentos de fondo con respecto a la improcedencia de los reclamos de las citadas controversias técnicas demandadas por COMMISA en el arbitraje, con la clara e improcedente intención de que su Señoría los vuelva a analizar como si se tratara de una apelación en contra del laudo.

A continuación se demuestra a detalle cómo los argumentos de PEP sobre esta cuestión son improcedentes, inatendibles e infundados:

1.- PEP consintió y ratificó su consentimiento para que el Tribunal Arbitral conociera y resolviera los reclamos de COMMISA y, en consecuencia, esta causal de nulidad resulta inatendible.

87

Como se expuso claramente en el Capítulo III de la presente Contestación (relativo a la decisión del Tribunal Arbitral sobre su propia competencia), PEP consintió tácitamente la competencia del Tribunal Arbitral para conocer y resolver sobre todas las disputas que COMMISA le planteó, ya que no impugnó en debidos tiempo y forma (dentro del plazo de un mes previsto por el artículo 1432 del Código de Comercio), la decisión adoptada por el Tribunal Arbitral al respecto.

En este orden de ideas, resulta importante señalar que como se señaló en el inciso d) del citado capítulo III, PEP consintió durante el arbitraje que COMMISA sometiera al Tribunal Arbitral la resolución de las controversias técnicas identificadas bajo los números 36, 34, 35, 37, 39, 19 y 27.

Además, no sólo PEP consintió lo anterior durante el procedimiento arbitral sino que también ratificó dicho consentimiento al no haber impugnado la decisión contenida en el acta de misión sobre la competencia del Tribunal Arbitral dentro del plazo legal de un mes con que contaba para ello.

Bajo este contexto resulta claramente inatendible ahora el argumento de PEP en el sentido de que la decisión sobre las demandas de COMMISA planteadas en el arbitraje se encuentra fuera del alcance de la cláusula arbitral, por lo que la causal de nulidad invocada debe ser desestimada por su Señoría.

> 2.- <u>Conforme a las cláusulas 23.2 y 23.3 del Contrato, el hecho de no plantear la controversia técnica formalmente conforme al procedimiento no implica que las disputas que hayan subsistido en relación con dichos temas no sean arbitrables.</u>

PEP alega que las demandas planteadas por COMMISA durante el arbitraje no cumplieron con los requisitos formales para ser consideradas como Controversias Técnicas y, en consecuencia, según ella no existía fundamento contractual para que el Tribunal Arbitral se pronunciara sobre ellas.

El acuerdo de voluntades de las partes en un contrato de someter todas sus disputas a los métodos alternativos de solución de controversias es sumamente común en el mundo moderno de los negocios.

Igualmente es muy común que las partes acuerden en sus contratos, métodos de solución de conflictos que les permitan llegar a un acuerdo previo a tener que someter la controversia a un procedimiento de heterocomposición como lo es el arbitraje.

Sin embargo, no hay que perder de vista que ambos tipos de procedimientos, el arbitraje y aquellos procedimientos conocidos como la mediación o la conciliación son distintos y sus consecuencias y alcances no se encuentran procesalmente contrapuestos.

En los procedimientos conocidos como mediación o bien la conciliación, las partes pactan comprometerse a someterse a un procedimiento específico en los que puede intervenir un tercero con facultades simplemente de avenencia y conciliación para tratar de que los contratantes resuelvan de iniciativa propia sus disputas y finalmente lleguen a un acuerdo.

Este tipo de procedimientos suelen pactarse en contratos sumamente complejos en los que existen una gran cantidad de obligaciones bilaterales pactadas, normalmente a ser desarrolladas a lo largo del tiempo y generalmente el cumplimiento de unas depende del cumplimiento previo de otras, todas ellas encaminadas al cumplimiento de una meta específica, como lo puede ser la prestación de un servicio, la ejecución de una obra, etcétera.

Dada la complejidad de los contratos y de las obligaciones a ser cumplidas por las partes, a menudo se requiere de un mecanismo que permita resolver controversias de común acuerdo y de una manera sencilla y rápida de tal forma que el método permita resolver los problemas y continuar con la ejecución de las obligaciones del contrato.

Generalmente, este tipo de procedimientos se refiere a problemas técnicos que puedan presentarse durante el desarrollo y ejecución de las obligaciones contractuales y que requieran de una respuesta técnica adecuada y pronta para las partes que los lleve directamente a un acuerdo acerca de la forma y términos de afrontar la cuestión técnica, sin demorar la ejecución del contrato.

Este tipo de procedimientos suelen preverse en las cláusulas de jurisdicción y competencia de los contratos como medios alternativos de solución de controversias previos al arbitraje.

Sin embargo, el hecho de que sean medios de solución de controversias calificados como "previos al arbitraje" simplemente implica que se trata de métodos de avenimiento entre las partes que deben intentarse antes del arbitraje como una condicionante en el tiempo, mas no como una condicionante de procedencia para el procedimiento arbitral.

89

El planteamiento consistente en agotar los medios de solución de controversias previas al arbitraje simplemente es un presupuesto temporal, no procedimental.

La intención de las partes al pactar este tipo de cláusulas tiene un efecto meramente práctico en torno al cumplimiento del contrato. Como se ha dicho, el efecto es meramente agilizar su ejecución. Por eso tienen el alcance de condicionar el sometimiento de las disputas a este tipo de procedimientos de manera previa en el tiempo al arbitraje.

Sin embargo, la condicionante del sometimiento de este tipo de procedimientos previos al arbitraje no implica que la omisión de las partes en agotarlos limite su arbitrabilidad posterior.

Esto se debe al hecho de que la mediación y la conciliación o bien un procedimiento de controversia técnica, como lo es en el presente caso, son métodos de solución de controversias distintos al arbitraje.

En este tipo de métodos de solución de controversias no existe la posibilidad de llegar a un resultado de manera necesaria, en virtud de que se basan en la autocomposición. Por su parte, en el arbitraje si existe la posibilidad de que las partes lleguen necesariamente a un resultado respecto de su controversia en virtud de que la solución de la disputa se encomienda a un tercero.

El hecho de someter la controversia a un procedimiento de conciliación o bien como es el caso, a un procedimiento de controversia técnica no asegura un resultado. Esto se debe a que la solución de la controversia depende únicamente de su voluntad. Si las partes no desean cooperar, entonces no existe la posibilidad de llegar a un resultado. La solución de la disputa en una controversia técnica depende únicamente de las partes.

Ahora bien, si las partes no llegan a un acuerdo, o simplemente no son capaces de entablar condiciones para una negociación, ni siquiera la cláusula que prevea este método de solución de controversias es capaz de impedirles acudir al arbitraje si consideran que tienen derecho a una contraprestación o indemnización derivada del contrato.

Sin embargo, a pesar de todas las posibles situaciones derivadas de cláusulas que prevén medios alternativos de solución de controversias, ninguna de las razones por las cuales las partes pactan de esta manera permite concluir que

90

# EXHIBIT A
# Part 3 of 4

las controversias que no hayan sido sometidas a una controversia técnica posteriormente no son susceptibles de ser resueltas en arbitraje.

En este contexto, la cláusula 23.3 del contrato que prevé el sometimiento de las partes al arbitraje establece lo siguiente:

> "23.3 **Arbitraje.** Cualquier controversia reclamación, diferencia o disputa que sobrevenga o se relacione o esté vinculada con este Contrato o el incumplimiento del mismo será dirimida finalmente mediante arbitraje conducido en el Distrito Federal, México, de acuerdo con las Reglas de Conciliación y Arbitraje de la Cámara Internacional de Comercio que estén en vigor en ese momento. El número de árbitros será de tres y el idioma para conducir el arbitraje será el español. No obstante lo anterior, cualquier controversia técnica deberá ser sometida previamente al procedimiento previsto en la Cláusula 23.2 y sólo en caso de que mediante dicho procedimiento no se logre un acuerdo entre las partes, éstas quedarán facultadas para acudir al recurso previsto en esta cláusula 23.3."

De la lectura de la cláusula de arbitraje se pueden sacar las siguientes conclusiones:

1) La cláusula es amplia por cuanto al alcance de las controversias que comprende.

2) La cláusula de arbitraje determina que es arbitrable **cualquier controversia** reclamación, diferencia o disputa que sobrevenga o se relacione o esté vinculada con el contrato o su incumplimiento.

3) La arbitrabilidad de la cláusula se refiere a cuáles son las disputas que las partes pretenden someter al análisis del Tribunal Arbitral. En este caso, de la simple redacción de la cláusula no existe duda de que las partes quisieron someter **cualquier** controversia derivada del cumplimiento o interpretación del contrato al Tribunal Arbitral.

Cualquier controversia implica verdaderamente cualquiera de las posibles disputas surgidas tanto de la interpretación como del cumplimiento del Contrato. En el presente caso, la parte actora considera que mi mandante no agotó los procedimientos previstos en la cláusula 23.2 para las controversias técnicas y consecuentemente *ipso jure* entonces cualquier reclamación derivada de una controversia técnica no es arbitrable.

91

Sin embargo, la cláusula en estudio es muy clara por cuanto a que todas las controversias e incluso interpretaciones acerca de las disposiciones del Contrato deben ser sometidas a arbitraje.

En el presente caso, debe considerarse que las cuestiones relativas a cuáles son las controversias técnicas y si COMMISA siguió correctamente el procedimiento previsto en el artículo 23.2 constituyen precisamente problemas que derivan de una controversia reclamación, diferencia o disputa que sobrevenga o se relacione o esté vinculada con el contrato o su incumplimiento.

Por lo tanto, la posible disputa entre las partes sobre si COMMISA se sometió o no correctamente al procedimiento previsto para las controversias técnicas **debe ser resuelta mediante arbitraje y por lo tanto se trata de una controversia materia del acuerdo arbitral.**

Interpretar lo contrario, como lo pretende la parte actora sería un error. Como se desprende de su escrito de demanda, pretende demostrar que COMMISA no se ajustó al procedimiento previsto en la cláusula 23.2 del contrato correspondiente a las controversias técnicas.

El planteamiento de la actora es sumamente confuso y equivocado además de superficial puesto que no conduce a un resultado congruente con la voluntad de las partes.

Si fuese cierto lo que pretende la actora y la falta de agotamiento del procedimiento previsto en la cláusula 23.2 condujera a la arbitrabilidad de la cláusula entonces se correría el riesgo de hacer **inoperante** la cláusula arbitral.

Según la actora la omisión de seguir el procedimiento de la cláusula 23.2 impide al Tribunal Arbitral de conocer de dicha disputa. Sin embargo, el primer párrafo de la cláusula arbitral indica que **todas** las disputas derivadas del contrato deben ser resueltas **finalmente** mediante arbitraje.

Si esto fuera cierto, el primer párrafo de la cláusula no indicaría que todas las disputas deberían ser resueltas mediante arbitraje y haría una excepción expresa respecto de las controversias técnicas.

Siguiendo con la "lógica" de la actora, suponiendo que esto fuera cierto, si la controversia técnica dejara de ser arbitrable entonces tendría que ser sometida a un tribunal estatal, lo cual sería contrario al primer párrafo de la cláusula arbitral ya referida.

92

Por el contrario, debe entenderse que a lo que se refiere la cláusula arbitral en análisis es a un requisito de agotamiento de una **conciliación** de los reclamos derivados de controversias técnicas que por ningún motivo es capaz de **implicar la imposibilidad de que la controversia deje de ser arbitrable.**

Por lo tanto, deberá considerarse que los argumentos en los que basa su reclamación de la parte actora carecen de sustento.

> 3.- Las reclamaciones relacionadas con las "controversias técnicas" 34, 35, 36, 37 y 39 no son verdaderas controversias técnicas conforme a la cláusula 23.2 del Contrato.

Mi mandante no acepta la pretensión de la actora por cuanto a que las referidas reclamaciones se encuentran fuera del alcance de la cláusula arbitral. Sin embargo, aún y cuando esto fuera cierto sus razones para la anulación del laudo son infundadas en virtud de que las controversias referidas no entran dentro de la definición de controversia técnica según la cláusula 23.2 del Contrato.

Como se advierte de la demanda de nulidad de la parte actora, sus pretensiones se basan en el supuesto de que COMMISA no se sujetó a los procedimientos previstos en la cláusula 23.2 del Contrato que prevé la posibilidad de una conciliación entre las partes para arribar a un acuerdo respecto de controversias técnicas.

Sin embargo, de la demanda no se desprenden hechos o argumentación de algún tipo que indique las razones por las cuales las reclamaciones relacionadas con las "controversias técnicas" 34, 35, 36, 37 y 39 fueran controversias técnicas que tuvieran que someterse a los procedimientos previstos en la cláusula 23.2.

En lo conducente, en la cláusula 23.2 del Contrato las partes pactaron lo siguiente:

> "23.2 **Controversias Técnicas** El Contratista no tendrá derecho a efectuar ningún reclamo y PEP no será responsable por daños legales (incluyendo negligencia) o contractuales ante el Contratista, sus proveedores secundarios o subcontratistas, excepto en los casos específicamente previstos en este Contrato.
>
> Para efectos de esta Cláusula, se entenderá por Controversia Técnica toda diferencia que surja por cualquier reclamo o sea atribuible a la interpretación o ejecución de este Contrato, entre el Supervisor y el Contratista, en relación con los anexos técnicos del Contrato ("A", "B", "B-1", "B-2", "B-3", "CEV", "DT", "DT-1", "DT-2-1", "DT-2.2", "DT-3", "DT-4", "E-2", "F-1" y "F-2"), ..."

93

De la anterior transcripción se desprende que la cláusula 23.2 define lo que es controversia técnica, básicamente como aquella surgida en relación con los anexos técnicos "A", "B", "B-1", "B-2", "B-3", "CEV", "DT", "DT-1", "DT-2.1", "DT-2.2", "DT-3", "DT-4", "E-2", "F-1" y "F-2".

Esto implica que la clasificación e identificación de una controversia técnica depende que surja en relación con alguno de los anexos técnicos mencionados. Cualquier otra controversia surgida con motivo de alguna cuestión que no se encuentre relacionada con los anexos técnicos de referencia no puede ser considerada como una controversia técnica.

Por su parte, la cláusula 22 del contrato contiene una lista y descripción de los anexos técnicos del contrato. Dicha cláusula ordena lo siguiente:

"Cláusula 22

ANEXOS DEL CONTRATO

Las partes convienen en considerar como anexos al presente Contrato los que se indican a continuación, los cuales, debidamente firmados por las partes forman parte integrante del presente instrumento.

Descripción

| | Descripción |
|---|---|
| ANEXO "A" | Relación de planos |
| ANEXO "B" | Requerimientos Generales |
| ANEXO "B-1" | Alcance del Trabajo y especificaciones |
| ANEXO "B-2" | Generalidades Administrativas |
| ANEXO "B-3" | Requerimientos generales de datos |
| ANEXO "C" | Catálogo de conceptos, cantidades de trabajo y precios unitarios propuestos. |
| ANEXO "CE" | Detalle del precio unitario por tipo de costo, comprende "CE-2, CE-4, CE-6, CE-7, CE-8, CE-9, CE-10, CE-11, CE-12, CE-13, Ce-14, CE-15, CE-16, CE-17 (A y B), CE-18 y CE-19" |
| ANEXO "CEV" | Criterios de evaluación comprende "CEV-1, CEV-3, CEV-4, CEV-5, CEV-6, CEV-7, CEV-8, CEV-9, CEV-10, CEV-11, CEV-12, CEV-13y CEV-14". |
| ANEXO "DT" | Programa calendarizado de método de ruta crítica. |
| ANEXO "DT-1" | Programa de maquinaria y equipo de |

94

| | construcción. |
|---|---|
| ANEXO "DT-2.1" | Programa calendarizado de procura de materiales de construcción. |
| ANEXO "DT-2.2" | Programa calendarizado de adquisición de equipo de instalación permanente. |
| ANEXO "DT-3" | Programa de Mano de Obra para Trabajos Manuales. |
| ANEXO "DT-4" | Programa de personal de diseño, administración y servicios. |
| ANEXO "E-2" | Equipo de instalación permanente que proporcionará el Contratista. |
| ANEXO "F-1" | Materiales y repuestos que proporcionará el contratista. |
| ANEXO "F-2" | Equipo de construcción que proporcionará el contratista. |

La parte actora no esclarece en su demanda las razones por las cuales consideró que los reclamos derivados de las llamadas controversias técnicas 34, 35, 36, 37 y 39 cuyas condenas pretende anular del laudo arbitral son controversias técnicas en sentido estricto, según lo ordenado por la cláusula 23.2 relacionadas con los anexos técnicos referidos en ella.

La parte actora pasó por alto esta circunstancia, la cual es un elemento de su acción. De manera que al no hacerlo así, además de ser su demanda deficiente técnicamente, también resulta ser obscura.

Ahora bien, considera mi mandante que las reclamaciones surgidas de las controversias referidas no entran dentro del alcance de los anexos técnicos referidos en la cláusula 23.2.

Los reclamos relacionados con las controversias técnicas 34, 35, 36, 37 y 39 son los siguientes:

**a) Controversias Técnicas 34 y 35:**

Como se desprende de la demanda de arbitraje (páginas 88 a 102), estas controversias derivan del hecho de que el Contrato obligaba a COMMISA a mantener sus embarcaciones denominadas "BAR PROTECTOR" y "CASTORO 10" disponibles para trabajar. Por su parte PEP se comprometió a proporcionar en tiempo y forma el acceso al sitio de trabajo, lo cual dependía de terminar las plataformas. El retraso de PEP causó serios **tiempos de espera para ambas** embarcaciones, las cuales fueron la causa de estos reclamos.

**b) Controversia Técnica 36:**

Como se desprende de la demanda de arbitraje (páginas 103 a 111) esta reclamación **deriva de los retrasos** sufridos por COMMISA a causa del mal tiempo. Como consecuencia de la prórroga del plazo de vigencia del Contrato de un plazo original de 528 días a un plazo total de 1322 días, esto obligó a COMMISA a trabajar bajo condiciones climáticas mucho menos favorables que aquellas que tomó en consideración para efectos de su propuesta en el proceso de licitación.

**c) Controversias Técnicas 37 y 39:**

Como se desprende de la demanda de arbitraje (páginas 111 a 123) esta reclamación derivó de los adeudos de PEP a COMMISA por los trabajos de cruces enterrados y colocados sobre el lecho marino.

Como se advierte de las reclamaciones éstas tuvieron sus orígenes en los siguientes conceptos:

**d) Retrasos y tiempos de espera, así como cruces.**

Según se desprende de la cláusula 23.2 del Contrato que contiene una lista de los anexos técnicos respecto de los cuales habría que promover una controversia técnica antes de acudir al arbitraje, ninguno de ellos prevé el anexo técnico que regula lo relativo a cruces y tiempos de espera.

Expuesto lo anterior, resulta necesario atender a lo dispuesto por el anexo C, que es el que prevé lo relativo a cruces y tiempos de espera. Dicho anexo C no se encuentra dentro de la relación de anexos técnicos que prevé la cláusula 23.2. En este anexo que regula lo relativo a los precios unitarios se define lo siguiente:

> "Página 30:
>
> "Cruces (unidad = cada uno) Este elemento de pago se establece para compensar a **contratista por todo trabajo adicional asociado a cruces.** Se establecerá un precio unitario por entierro y un precio unitario por cruces expuestos. Se pagará en forma adicional al precio del ducto indicado anteriormente."
>
> Página 31:
>
> Tiempo a la espera de órdenes (unidad=días) El tiempo transcurrido, medido en minutos, entre la recepción de las instrucciones de PEP/Supervisor de detener el trabajo(o

**cuando se niega el acceso a instalaciones de Pemex)** y la recepción de de instrucciones de reanudar el trabajo (o cuando se otorga acceso a instalaciones de Pemex). Los días serán prorrateados al minuto más cercano (1.440 minutos por día)."

Como se desprende de las transcripciones, los sustentos técnicos de las reclamaciones referidas se encuentran previstos en el **anexo C**. Dicho anexo no se encuentra dentro de la lista de los anexos técnicos de la cláusula 23.2 del Contrato.

Por lo tanto, mi mandante no se encontraba obligada a seguir el procedimiento de controversia técnica respecto de estas reclamaciones antes de acudir al arbitraje y, consecuentemente, no existe siquiera la posibilidad de analizar la pretensión de la actora. De manera que también por estas razones deberá declararse improcedente la acción.

> 4.- En todo caso, el alcance que la parte actora pretende dar al segundo párrafo de la cláusula arbitral del Contrato es contrario al artículo 1797 del Código Civil Federal y excusaría la necesidad de acudir al procedimiento de controversia técnica.

Como se ha indicado con anterioridad, la pretensión de la parte actora es anular el laudo por cuanto a que según PEP comprendió controversias que no estaban previstas dentro del acuerdo de arbitraje y consecuentemente, según su "lógica" esto generó la incompetencia y un exceso de facultades del Tribunal Arbitral.

La parte actora considera que dado que mi mandante no presentó formalmente los procedimientos de controversias técnicas específicamente relacionadas con los reclamos de las controversias técnicas números 34, 35, 36, 37 y 39, entonces tales reclamos quedaron fuera del acuerdo de arbitraje.

Tal interpretación no es lógica ni plausible en virtud de que la misma que podría generar:

i)      el extremo de condicionar el cumplimiento de la cláusula al arbitrio de uno de los contratantes (PEP), y

ii)     limitaría el acceso a la justicia de la contratista.

Tales afirmaciones encuentran sustento en lo ordenado por los artículos 1797 y 2225 del Código Civil Federal en relación con el artículo 14 de la Constitución

97

Política de los Estados Unidos Mexicanos, mismos que paradójicamente son reiteradamente citados por la parte actora.

Expresamente dichos artículos señalan lo siguiente:

> "**Artículo 1797.-** La validez y el cumplimiento de los contratos no puede dejarse al arbitrio de uno de los contratantes.
>
> **Artículo 2225.-** La ilicitud en el objeto, en el fin o en la condición del acto produce su nulidad, ya absoluta, ya relativa, según lo disponga la ley."

De la interpretación de lo anterior se desprende que no es válido interpretar que una cláusula de un Contrato en el sentido de dejar su cumplimiento y, por lo tanto, su efectividad a la voluntad de alguno de los contratantes.

De esta manera, la interpretación propuesta por PEP de sujetar al contratista a agotar un procedimiento de conciliación con PEP resulta inaceptable por ser contraria al texto de los citados artículos.

A mayor abundamiento, de obligarse a COMMISA a conciliar con PEP, se le sometería a seguir un procedimiento de manera escalonada que no necesariamente puede llevar a las partes a un acuerdo. De este modo, si PEP no tiene la voluntad de negociar conforme al procedimiento previsto en la cláusula 23.2 entonces esto impide al contratista someter formalmente su pretensión o reclamo derivado de una controversia técnica.

En efecto, si PEP se niega a negociar o bien si simplemente se niega a recibir la documentación de la contratista, entonces **sería imposible para la contratista formalizar la controversia técnica** conforme lo ordena la cláusula 23.2 del contrato. Si esto sucede, entonces cualquier reclamo que quisiera hacer valer en el arbitraje podría ser considerado posteriormente por PEP como un reclamo **que excede a la cláusula arbitral**.

Esto implica que la cláusula permite que **el cumplimiento de la obligación de** someter formalmente la controversia técnica **quede al arbitrio de PEP.**

Además, lo anterior por sí sólo demuestra las consecuencias de la errónea interpretación de PEP en relación con el alcance y objeto de la cláusula arbitral. Por lo tanto, debe considerarse que de aceptarse la pretensión de la parte actora, esto acarrearía la **nulidad de dicha obligación** (de previa conciliación) eventualmente imposible de realizar para la contratista.

98

Por lo tanto si la obligación es nula, no puede válidamente hacerse depender la pretensión arbitral de la actora de este supuesto incumplimiento contractual de la demandada.

Pero además, debe considerarse nula dicha interpretación de PEP en virtud de que constituye **un obstáculo para la obtención de justicia** cuyo derecho tienen todas las personas y se encuentra consagrado en el artículo 17 de la Constitución Política de los Estados Unidos Mexicanos.

Según la parte actora, la omisión de plantear formalmente una controversia técnica impide que la controversia se arbitrable. Pero si la controversia no es arbitrable *ipso jure* entonces la contratista pierde **su derecho a la obtención de** justicia, lo cual es contrario a la Constitución puesto que sometió **todas sus controversias** al arbitraje en virtud de la misma cláusula.

Por lo tanto, considera mi mandante que los razonamientos de la parte actora son improcedentes para provocar la nulidad del laudo por cuanto a estas reclamaciones se refiere.

> 5.-    La condena al pago de gastos financieros contenida en el laudo arbitral es válida ya que se sustenta en el retraso en el pago de las indemnizaciones determinadas por el Tribunal Arbitral, así como en los términos del Contrato.

PEP alega que toda vez que las ccontroversias que dan origen a las condenas en que se fundan los gastos financieros nunca se formalizaron como controversias técnicas, el laudo se emitió en exceso del alcance y objeto de la cláusula arbitral.

Es decir, PEP hace depender la nulidad de la condena a gastos financieros de la nulidad de las condenas que configuran el importe principal sobre el que se calculan dichos gastos y que se refieren a la arbitrabilidad de los reclamos de COMMISA.

En este contexto y toda vez que ya se ha demostrado clara y contundentemente que las condenas contenidas en el laudo con respecto a las demandas identificadas por COMMISA como controversias técnicas números 36, 34, 35, 37, 39, 19 y 27 son válidas por referirse a cuestiones o disputas que válidamente podían ser y fueron resueltas por el Tribunal Arbitral dentro del alcance de la competencia que le dio la cláusula arbitral del Contrato; resulta evidente que también la condena a pagar gastos financieros sobre dicha cantidad es válida.

**F)   DURANTE EL ARBITRAJE Y EN EL LAUDO FINAL NO SE VIOLENTARON LAS REGLAS DEL PROCEDIMIENTO ARBITRAL.**

1.-   Los conceptos de fundamentación y motivación legal previstos en el artículo 16 Constitucional no son aplicables a un laudo arbitral, ni en la tramitación de un procedimiento de naturaleza arbitral.

PEP alega como una violación a las reglas de procedimiento a las que las partes se sometieron el que, según ella, en las decisiones contenidas en el laudo con respecto a las controversias técnicas números 34, 35, 36 y gastos financieros no se haya fundado y motivado el laudo en artículos legales o cláusulas del Contrato, en violación al artículo 16 Constitucional.

Este argumento de PEP resulta inatendible atento a las siguientes consideraciones:

Los principios imperativos para el sustento argumentativo de las sentencias emitidas por la Judicatura Mexicana, ordenados por la Constitución, relativos a la *fundamentación* y *motivación*, no son aplicables a la estructura que debe guardar un laudo en cuanto a los razonamientos que construyan la conclusión a la que finalmente arribe cualquier Tribunal Arbitral al emitir un laudo final. En este sentido todos los supuestos agravios con apariencia de apelación o conceptos de violación de que se duele la promovente de la nulidad del laudo que ahora se contesta, en el sentido de alegar que se le violó la garantía de audiencia como si el procedimiento arbitral se tratara de un juicio seguido conforme a las reglas procesales de un procedimiento judicial, resultan por completo improcedentes.

El Reglamento de Arbitraje de la Cámara de Comercio Internacional, en su artículo 25, exclusivamente obliga al Tribunal Arbitral, a emitir un laudo *motivado*. Esta expresión ha sido entendida en la doctrina del arbitraje internacional como que el Tribunal Arbitral debe dar exclusivamente *sus* razones respecto de las determinaciones que finalmente emita en el laudo final, inclusive considerando un laudo como *motivado* a pesar de que dentro del propio razonamiento del Tribunal Arbitral, se encuentren contradicciones. Es de especial trascendencia, que su Señoría tome en cuenta que la doctrina sostiene expresamente que los Juzgadores omitirán entrar al fondo de las cuestiones sustantivas resueltas por el Tribunal Arbitral. Lo anterior se confirma en la cita que a continuación nos permitimos efectuar del manual de arbitraje denominado *"Fouchard, Gaillard, Goldman on International Commercial Arbitration"*, editado por Emmanuel Gaillard y John Savage:

"Donde las bases para un laudo deben ser expresadas, eso no significa que aquellas deban ser bien fundadas en hechos o ley. Una corte revisando el laudo para asegurarse que se han dado razones no revisará por supuesto los hallazgos sustantivos del laudo. Consecuentemente, aún las bases que son claramente equivocadas satisfarán los requisitos de que los árbitros establezcan las razones para su laudo."[20]

En un sentido similar al anterior, Yves Derains y Erick A. Schwartz en su obra *El Nuevo Reglamento de Arbitraje de la Cámara de Comercio Internacional*, se han pronunciado respecto a la obligación de motivar, prevista en el artículo 25(2) del mencionado Reglamento, en el siguiente sentido:

"... la motivación expresada en el laudo debe demostrar que el Tribunal Arbitral <u>ha tenido en cuenta las posiciones de las partes</u>."[21]

*(Énfasis añadido)*

Es irrefutable, la única obligación que existe para que el Tribunal Arbitral emita su laudo, es que haya tomado en cuanto a la motivación, es que se demuestre del mismo, que haya tomado en cuenta las posiciones de las partes, cuestión que se cumple sobradamente en el laudo final objeto del presente procedimiento incidental de nulidad.

El hecho de que el laudo final de quince de enero de dos mil ocho, constituye *cosa juzgada*, y que su Señoría, exclusivamente deberá avocarse al análisis cuestiones meramente formales respecto del mismo, se confirma en los siguientes criterios judiciales:

"Registro No. 189345
Localización:
Novena Época
Instancia: Tribunales Colegiados de Circuito
Fuente: Semanario Judicial de la Federación y su Gaceta
XIV, Julio de 2001
Página: 1107
Tesis: I.3o.C.231 C
Tesis Aislada
Materia(s): Civil

**ÁRBITRO. SUS RESOLUCIONES SON ACTOS DE AUTORIDAD, Y SU EJECUCIÓN LE CORRESPONDE AL JUEZ DESIGNADO POR LAS PARTES.** Para la ejecución de un laudo arbitral es preciso la mediación de un acto

[20] GAILLARD, Emmanuel y SAVAGE, John, *Fouchard Gaillard Goldman on International Commercial Arbitration*, The Hague/Boston/ London, Kluwer Law International, 1999, p. 763. La cita es una traducción libre del siguiente texto: "Where the grounds for the award must be stated, that does not mean that they must be well-founded in fact or law. A court reviewing the award to ensure that reasons have been given will not of course review the substantive findings of the award. Thus, even grounds that are clearly wrong will satisfy the requirement that the arbitrators state the reasons for their award."
[21] DERAINS, Yves y SCHWARTZ, Erick A., *El Nuevo Reglamento de Arbitraje de la Cámara de Comercio Internacional*, México, D.F., Oxford, 2001, p. 349.

101

realizado por un órgano jurisdiccional que, sin quitarle la naturaleza privada, asume su contenido, de modo que el laudo es ejecutable por virtud del acto jurisdiccional, que sólo es el complemento necesario para ejecutar lo resuelto por el árbitro, ya que el laudo es una resolución dictada por el árbitro que dirime la controversia suscitada entre las partes, con calidad de cosa juzgada y constituye título que motiva ejecución, ante el Juez competente que debe prestar los medios procesales necesarios para que se concrete lo resuelto en el laudo. Por lo tanto, *el laudo es una resolución que tiene los atributos de inimpugnabilidad, inmutabilidad y coercibilidad*, sólo que la eficacia y realización concreta de lo condenado quedan siempre al Juez competente designado por las partes o el del lugar del juicio. El árbitro carece de la facultad de hacer cumplir, ante sí, el laudo que emitió, porque no tiene la potestad o imperium, que es uno de los atributos de la jurisdicción y que es inherente a los órganos jurisdiccionales del Estado. Ello implica que el árbitro carece de la fuerza del Estado para hacer efectiva la condena, pero *el laudo en sí mismo no está despojado de los atributos de la* cosa juzgada, puesto que la facultad de decidir la controversia es una delegación hecha por el Estado a través de la norma jurídica, y sólo se reserva la facultad de ejecutar. El Juez ante quien se pide la ejecución de un laudo dictado por un árbitro, para decretar el requerimiento de pago, únicamente debe y puede constatar la existencia del laudo, como una resolución que ha establecido una conducta concreta, inimpugnable e inmutable y que, por ende, debe provenir de un procedimiento en el que se hayan respetado las formalidades esenciales del procedimiento, y que no sea contrario a una materia de orden público.

TERCER TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.

Amparo directo 1303/2001. Constructora Aboumrad Amodio Berho, S.A. de C.V. 8 de marzo de 2001. Unanimidad de votos. Ponente: Neófito López Ramos. Secretaria: Lina Sharai González Juárez.

Nota: Por ejecutoria de fecha 26 de octubre de 2001, la Segunda Sala declaró inexistente la contradicción de tesis 14/2001-PL en que participó el presente criterio."

Aunado a lo anterior, suponiendo sin conceder, que resultaran procedentes los argumentos de PEP respecto a una supuesta obligación del Tribunal Arbitral para fundar y motivar el laudo final, su Señoría deberá tomar en consideración que aquella se duele de que el laudo incurrió en una *falta de fundamentación y motivación*, situación que en todo caso sería absolutamente falsa, y lo único que podría en todo caso, imputársele sería una *indebida fundamentación y motivación*. La distinción entre "falta de" e "indebida" fundamentación y motivación ha sido claramente definida por la Jurisprudencia de los tribunales nacionales tal como se percibe del siguiente criterio obligatorio:

"Registro No. 170307
Localización:
Novena Época
Instancia: Tribunales Colegiados de Circuito

Fuente: Semanario Judicial de la Federación y su Gaceta
XXVII, Febrero de 2008
Página: 1954
Tesis: I.3o.C. J/47
**Jurisprudencia**
Materia(s): Común

**FUNDAMENTACIÓN Y MOTIVACIÓN. LA DIFERENCIA ENTRE LA FALTA Y LA INDEBIDA SATISFACCIÓN DE AMBOS REQUISITOS CONSTITUCIONALES TRASCIENDE AL ORDEN EN QUE DEBEN ESTUDIARSE LOS CONCEPTOS DE VIOLACIÓN Y A LOS EFECTOS DEL FALLO PROTECTOR.** La falta de fundamentación y motivación es una violación formal diversa a la indebida o incorrecta fundamentación y motivación, que es una violación material o de fondo, siendo distintos los efectos que genera la existencia de una u otra, por lo que el estudio de aquella omisión debe hacerse de manera previa. En efecto, el artículo 16 constitucional establece, en su primer párrafo, el imperativo para las autoridades de fundar y motivar sus actos que incidan en la esfera de los gobernados, pero la contravención al mandato constitucional que exige la expresión de ambas en los actos de autoridad puede revestir dos formas distintas, a saber: la derivada de su falta, y la correspondiente a su incorrección. Se produce la falta de fundamentación y motivación, cuando se omite expresar el dispositivo legal aplicable al asunto y las razones que se hayan considerado para estimar que el caso puede subsumirse en la hipótesis prevista en esa norma jurídica. En cambio, hay una indebida fundamentación cuando en el acto de autoridad sí se invoca el precepto legal, sin embargo, resulta inaplicable al asunto por las características específicas de éste que impiden su adecuación o encuadre en la hipótesis normativa; y una incorrecta motivación, en el supuesto en que sí se indican las razones que tiene en consideración la autoridad para emitir el acto, pero aquéllas están en disonancia con el contenido de la norma legal que se aplica en el caso. De manera que la falta de fundamentación y motivación significa la carencia o ausencia de tales requisitos, mientras que la indebida o incorrecta fundamentación y motivación entraña la presencia de ambos requisitos constitucionales, pero con un desajuste entre la aplicación de normas y los razonamientos formulados por la autoridad con el caso concreto. La diferencia apuntada permite advertir que en el primer supuesto se trata de una violación formal dado que el acto de autoridad carece de elementos ínsitos, connaturales, al mismo por virtud de un imperativo constitucional, por lo que, advertida su ausencia mediante la simple lectura del acto reclamado, procederá conceder el amparo solicitado; y en el segundo caso consiste en una violación material o de fondo porque se ha cumplido con la forma mediante la expresión de fundamentos y motivos, pero unos y otros son incorrectos, lo cual, por regla general, también dará lugar a un fallo protector, sin embargo, será menester un previo análisis del contenido del asunto para llegar a concluir la mencionada incorrección. Por virtud de esa nota distintiva, los efectos de la concesión del amparo, tratándose de una resolución jurisdiccional, son igualmente diversos en uno y otro caso, pues aunque existe un elemento común, o sea, que la autoridad deje insubsistente el acto inconstitucional, en el primer supuesto será para que subsane la irregularidad expresando la fundamentación y motivación antes ausente, y en el segundo

103

para que aporte fundamentos y motivos diferentes a los que formuló previamente. La apuntada diferencia trasciende, igualmente, al orden en que se deberán estudiar los argumentos que hagan valer los quejosos, ya que si en un caso se advierte la carencia de los requisitos constitucionales de que se trata, es decir, una violación formal, se concederá el amparo para los efectos indicados, con exclusión del análisis de los motivos de disenso que, concurriendo con los atinentes al defecto, versen sobre la incorrección de ambos elementos inherentes al acto de autoridad; empero, si han sido satisfechos aquéllos, será factible el estudio de la indebida fundamentación y motivación, esto es, de la violación material o de fondo.

TERCER TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.

Amparo directo 551/2005. Jorge Luis Almaral Mendívil. 20 de octubre de 2005. Unanimidad de votos. Ponente: Neófito López Ramos. Secretario: Raúl Alfaro Telpalo.
Amparo directo 66/2007. Juan Ramón Jaime Alcántara. 15 de febrero de 2007. Unanimidad de votos. Ponente: Neófito López Ramos. Secretario: Raúl Alfaro Telpalo.
Amparo directo 364/2007. Guadalupe Rodríguez Daniel. 6 de julio de 2007. Unanimidad de votos. Ponente: Neófito López Ramos. Secretaria: Greta Lozada Amezcua.
Amparo directo 513/2007. Autofinanciamiento México, S.A. de C.V. 4 de octubre de 2007. Unanimidad de votos. Ponente: Neófito López Ramos. Secretario: Raúl Alfaro Telpalo.
Amparo directo 562/2007. Arenas y Gravas Xaltepec, S.A. 11 de octubre de 2007. Unanimidad de votos. Ponente: Neófito López Ramos. Secretario: Raúl Alfaro Telpalo."

(Énfasis añadido)

Ahora bien, en el laudo arbitral se verifica la existencia de distintos fundamentos legales, así como de los motivos y razonamientos de aplicación de los mismos que desarrolló el Tribunal Arbitral, resolviendo el *fondo* del asunto y acatando las disposiciones procesales del multicitado Reglamento de Arbitraje de la Cámara de Comercio Internacional. Así las cosas, al seguir existiendo una motivación, se cumpliría plenamente con lo único a que estaba obligado el Tribunal Arbitral conforme al artículo 25(2) del Reglamento de Arbitraje de la Cámara de Comercio Internacional, que era motivar el laudo. Con esto, su Señoría, se encuentra impedido de entrar al estudio de los razonamientos por los que el Tribunal Arbitral emitió su decisión y en ese sentido el multicitado laudo final, tiene la calidad de cosa juzgada, por lo que deberá declararse improcedente cualquier argumento de PEP en relación con un supuesta nulidad derivada de una supuesta falta de fundamentación y motivación legal.

### 2.- Las decisiones contenidas en el laudo no son parciales.

PEP demanda la nulidad del laudo argumentando que el tribunal arbitral actuó de manera parcial, en su perjuicio, en todas aquellas decisiones que le sean desfavorables.

104

Con independencia de que esta aseveración es falsa, la parcialidad de los árbitros no es una de las causales de nulidad limitativamente señaladas por el artículo 1427 del Código de Comercio y toda objeción a este respecto debió haberse realizado durante el procedimiento arbitral, tal y como lo disponen el artículo 1429 del Código de Comercio y el artículo 11 del Reglamento de Arbitraje de la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional, al que las partes voluntariamente se acogieron. Estos dos artículos establecen respectivamente lo siguiente:

> "**Artículo 1429.** Las partes podrán acordar libremente el procedimiento de recusación de los árbitros.
>
> A falta de acuerdo, la parte que desee recusar a un árbitro enviará al tribunal arbitral, dentro de los quince días siguientes a aquél en que tenga conocimiento de su constitución o de circunstancias que den lugar a dudas justificadas respecto de la imparcialidad del árbitro o su independencia, o si no posee las cualidades convenidas, un escrito en el que exponga los motivos para la recusación. A menos que el árbitro recusado renuncie a su cargo o que la otra parte acepte la recusación, corresponderá al tribunal arbitral decidir sobre ésta.
>
> Si no prosperase la recusación incoada en los términos del párrafo anterior, la parte recusante podrá pedir al juez, dentro de los treinta días siguientes de notificada la decisión por la que se rechaza la recusación, resuelva sobre su procedencia, decisión que será inapelable. Mientras esa petición esté pendiente, el tribunal arbitral, incluso el árbitro recusado, podrán proseguir las actuaciones arbitrales y dictar un laudo.
>
> **Artículo 11**
> **Recusación de los árbitros**
>
> 1
>
> La demanda de recusación de un árbitro, fundada en una alegación de falta de independencia o en cualquier otro motivo, deberá presentarse ante la Secretaría mediante un escrito en donde se precisen los hechos y las circunstancias en que se funda dicha demanda.
>
> 2
>
> Para que sea admisible, la demanda de recusación deberá ser presentada por la parte interesada dentro de los 30 días siguientes a la recepción por ésta de la notificación del nombramiento o confirmación del árbitro, o dentro de los 30 días siguientes a la fecha en que dicha parte fue informada de los hechos y las circunstancias en que funda su demanda, si dicha fecha es posterior a la recepción de la mencionada notificación.
>
> 3
>
> La Corte debe pronunciarse sobre la admisibilidad y, al mismo tiempo y si hubiere lugar a ello, sobre el fondo de la demanda

de recusación, después que la Secretaría haya otorgado al árbitro en cuestión, la(s) otra(s) parte(s) y, si es el caso, a los demás miembros del tribunal arbitral la oportunidad de presentar sus comentarios por escrito dentro de un plazo adecuado. Dichos comentarios deberán ser comunicados a las partes y a los árbitros.

No existe en el Código de Comercio disposición alguna en la que se pueda fundamentar la nulidad de un laudo alegando la falta de imparcialidad de los árbitros en el procedimiento, pues precisamente este ordenamiento establece un momento procesal distinto en el que las objeciones de esta naturaleza pueden hacerse valer y que "casualmente" no fueron planteadas por PEP en su oportunidad, pero de las que ahora pretende valerse para evitar pagar la condena establecida en el laudo.

Ahora bien, suponiendo sin conceder que lo que PEP alegara como causal de nulidad es una violación al orden público derivada de una supuesta parcialidad del tribunal arbitral al emitir el sentido del fallo contenido en el laudo (lo que no ha hecho y por ende el tribunal no puede analizar para no suplir la deficiencia de su queja), en este escenario es claro lo que la actora estaría planteando es la revisión por parte de este H. Juez de los motivos y razonamientos en los que se basó el tribunal arbitral para dictar el laudo, lo que como se ha venido insistiendo, excede por mucho el tarea de revisión que la ley le encomienda, que en palabras del Dr. Francisco González de Cossio citado por el propio recurrente, consiste en lo siguiente:

> El juez tiene competencia únicamente para determinar si existe una de las causales de nulidad o no ejecución. **No puede analizar ni reevaluar el fondo del laudo. Es decir, no puede** hacer una revisión acerca de los hechos o la aplicación del derecho que motiva el sentido de la resolución contenida en el laudo.[22]

Por otro lado, aún en el caso de que excediendo su función este H. Juez decidiera entrar al análisis del fondo del litigio para determinar si el tribunal arbitral tuvo una actuación parcial al emitir el sentido del fallo (lo que haría a su sentencia ilegal), para que se llegara a declarar la nulidad del laudo objeto de este incidente se debería en todo caso demostrar objetivamente que los árbitros se alejaron de sus convicciones jurídicas sobre el caso para resolver en un sentido opuesto, debiendo a su vez demostrar la ausencia de toda lógica o congruencia en los razonamientos esgrimidos por los árbitros y que el sentido de dicho laudo se dictó con el único fin

---

[22] GONZALEZ DE COSSIO, Francisco. *Arbitraje*, editorial Porrúa, primera edición, México, 2004, p. 406.

de perjudicar a una de las partes y de beneficiar a la otra. De otra forma la parcialidad del tribunal arbitral sería una cuestión no probada, pues los árbitros tienen la facultad para resolver en forma definitiva una disputa mediante la aplicación e interpretación que ellos mismos hacen del derecho aplicable a los hechos planteados y probados por las partes en el procedimiento.

La carga de la prueba que tiene el recurrente para demostrar la parcialidad de los árbitros al momento de dictar el laudo es sumamente elevada y únicamente podría arribarse a ella mediante la coexistencia de elementos objetivos que generen convicción en los motivos por los que se adoptó el sentido del laudo, tales como sobornos, cohechos o prebendas dados por la parte vencedora a los miembros del tribunal. Sin embargo, estos actos no han tenido lugar y por ende el recurrente nunca podrá probarlos. Si bien la existencia de actos de corrupción supondría una clara violación al orden público, insistimos que el laudo se ha dictado con plena libertad por el tribunal arbitral y ninguno de sus miembros estaba a afectado por alguna causa que pudiera significarle un obstáculo o incentivo para resolver en un sentido determinado.

Adicionalmente, la carga de la prueba que el recurrente no ha satisfecho se complementa con la aplicación del principio de presunción de validez del laudo, que ha sido conceptuado por la doctrina nacional en los siguientes términos:

> A los laudos arbitrales les aplica la *presumptio in favorem validatis sententiae* por lo que se presumen válidos y ejecutables. Es por ello que se establece un régimen de excepción y discreción en la posible determinación de su nulidad. Dada esta presunción, la carga de la prueba para su nulidad y ejecución corresponde a la parte que busca anular o resistir la ejecución de los mismos.[23]

En el caso que nos ocupa la recurrente no ha aportado elemento objetivo alguno que desvirtúe la aplicación de este principio y demuestre la parcialidad en su perjuicio del tribunal arbitral. Mucho menos, el recurrente ha aportado algún elemento de que dicha supuesta parcialidad se ha traducido en la emisión de un laudo cuya ejecución suponga una violación al orden público, entendido éste como una serie de principios fundamentales de derecho y justicia cuya violación es gravemente incompatible con los valores o el sistema económico o jurídico mexicano.

En realidad, PEP alega la imparcialidad del tribunal arbitral simple y sencillamente porque no le pareció adecuado el sentido de la resolución. PEP perdió el arbitraje y está alegando cualquier medio a su alcance para evitar pagar a mi representada

---

[23] *Ibidem*, p. 405.

las cantidades a que tiene derecho. No obstante esto, el Código de Comercio y la interpretación que de sus disposiciones emite la doctrina nos permiten concluir con meridiana claridad que la recurrente no demuestra los extremos de su acción, al no aportar elemento de convicción alguno que dé manera objetiva demuestre que el tribunal arbitral actuó de manera parcial al emitir el emitir el fallo y que esta conducta además se tradujo en la emisión de un laudo violatorio de los principios fundamentales de justicia y derecho que rigen el sistema económico y jurídico mexicano.

En consecuencia, este argumento de la parte actora resulta infundado.

> 3.- <u>La decisión contenida en el laudo sobre gastos financieros no se funda en la Equidad, sino en disposiciones contractuales y legales específicas.</u>

PEP plantea falsa y tendenciosamente que la decisión adoptada con respecto a los gastos financieros se encuentra fundada en equidad, sólo porque no se le dio la razón a sus argumentos. Este argumento se puede fácilmente desvirtuar con tan sólo analizar el contenido de las páginas 168 a 174 en dónde el Tribunal Arbitral, tal y como ya se ha expuesto en puntos anteriores, determinó fundado en diversas disposiciones legales y contractuales el importe y forma de causación y cálculo de los gastos financieros que tienen que ser  reembolsados a mi representada.

G) CONTESTACIÓN A OTRAS CONSIDERACIONES Y ARGUMENTOS QUE PRETENDEN SUSTENTAR LA NULIDAD DE LA DECISIÓN SOBRE LA CONTROVERSIA TÉCNICA NÚMERO 36.

Alega PEP que la disputa se presentó por COMMISA en un momento en que ya no era permitida contractualmente por lo que no podía ser materia del arbitraje.

No obstante, el hecho de que COMMISA hubiera planteado la controversia técnica número 36 una vez concluidos los trabajos no es capaz de provocar que el reclamo haya dejado de ser materia del arbitraje.

Como se ha expuesto con anterioridad, mi mandante sostiene que el eventual incumplimiento del segundo párrafo de la cláusula arbitral no genera que la posible controversia salga del alcance de la cláusula arbitral.

Con independencia de esto, considera mi mandante que la pretensión de la parte actora es incapaz de generar la nulidad del laudo en virtud de que se basa en una lectura e interpretación equivocada del segundo párrafo de la cláusula arbitral.

108

Según se desprende de lo ordenado por la cláusula arbitral número 23.3 del contrato, el único requisito que impone para la tramitación de las controversias técnicas es que éstas se presenten con anterioridad al arbitraje. La cláusula de referencia no impone la obligación a la contratista de que la controversia técnica tuviera que presentarse antes de ser concluidos los trabajos o el momento de la entrega final.

**La condición que impone la cláusula en comento consiste en que la controversia técnica debería ser planteada previamente al arbitraje.**

**De manera que basta con que mi mandante hubiera planteado su controversia previamente a la presentación del arbitraje para que se tuviera por cumplida.**

Así sucedió en la realidad según se desprende de los propios hechos de la demanda de nulidad de la parte actora, como del laudo arbitral, como de la demanda de arbitraje. De tales documentos se desprende lo siguiente:

PEP aceptó que la Controversia Técnica 36 fuera planteada luego de la Terminación y Entrega de la Obra.

Al momento de firmar el Acta de Entrega, PEP reconoció y aceptó que, a la fecha de su firma, existían ciertas controversias técnicas pendientes de ser planteadas por PEP, entre ellas la Controversia 36, por virtud de la cual COMMISA reclamó el pago de una compensación por retrasos sufridos a causa del mal tiempo.

Posteriormente, PEP acordó integrar una serie de mesas de trabajo para atender las controversias que se plantearon con posterioridad al Acta de Entrega, incluyendo específicamente, la Controversia 36.[24] PEP recibió, analizó y resolvió la Controversia 36, planteada por PEP.

La conducta de PEP prueba indubitablemente que la recta interpretación del Contrato es que controversias como la identificada con el numero 36 son plenamente aceptables dentro del marco de la cláusula arbitral, aún y cuando ésta haya sido planteada después de la firma del Acta de Entrega Recepción.

Conforme a la doctrina judicial mexicana, esta manifestación de voluntad de PEP es válida, incluso si no se hizo por escrito:

---

[24] Laudo arbitral ¶235.

109

"Registro No. 172234
Localización:
Novena Época
Instancia: Tribunales Colegiados de Circuito
Fuente: Semanario Judicial de la Federación y su Gaceta
XXV, Junio de 2007
Página: 1048
Tesis: XIX.2o.A.C.46 C
Tesis Aislada
Materia(s): Civil

**CONTRATOS. PUEDEN MODIFICARSE EXPRESA O TÁCITAMENTE EN ATENCIÓN A LA "AUTONOMÍA DE LA VOLUNTAD", SIEMPRE QUE NO SE AFECTE EL ORDEN PÚBLICO, LA MORAL O LAS BUENAS COSTUMBRES, INCLUSIVE AUNQUE SE HAYA CONVENIDO EN CLÁUSULA ESPECÍFICA LA FORMALIDAD ESCRITA PARA ELLO (LEGISLACIÓN DEL ESTADO DE TAMAULIPAS).** En términos de los artículos 1255, 1256 y 1300 del Código Civil para el Estado de Tamaulipas, un contrato es el acuerdo de dos o más personas para crear, transferir, modificar, conservar o extinguir obligaciones, por eso, la voluntad de las partes es la suprema ley que se traduce en una libertad contractual, que suele darse en dos aspectos, el externo y el interno, también denominado este último por la doctrina como "autonomía de la voluntad", en donde el primero es la facultad de decidir si se celebra o no el contrato y, el segundo, es la posibilidad de establecer el contenido del acuerdo de voluntades, esto es, el derecho y las obligaciones de cada una de las partes. Tal libertad no es un derecho ilimitado del que gocen los contratantes, ya que se encuentra acotado por el orden público, la moral o las buenas costumbres, lo que significa que las partes en uso de esa máxima autoridad que impera en los contratos, como es la voluntad de elegir, siempre que no contravengan tales principios, pueden expresa o tácitamente crear, transferir, modificar, conservar o extinguir lo inicialmente pactado, aunque hayan convenido en cláusula específica que esto únicamente podría ser siempre y cuando se acordara por escrito, pues si bien ello constituye también la voluntad expresada por las partes en el contrato, tal formalidad acordada no puede estimarse inmutable, porque no protege algún derecho de orden público ni su modificación o cancelación es contraria a la moral o al derecho.

SEGUNDO TRIBUNAL COLEGIADO EN MATERIAS ADMINISTRATIVA Y CIVIL DEL DÉCIMO NOVENO CIRCUITO.
Amparo directo 126/2005. Inmobiliaria Ayusa, S. de R.L. de C.V. 28 de junio de 2005. Unanimidad de votos. Ponente: Jorge Sebastián Martínez García. Secretario: Jesús Garza Villarreal.

**A mayor abundamiento, el Principio de Buena Fe Impide a PEP Hacer Valer Cláusulas o Acuerdos Que la Misma PEP Acordó No Fueran Aplicables.**

El artículo 1796 del Código Civil Federal, que PEP reiteradamente invoca como fundamento para alegar que el Tribunal Arbitral no debió aceptar la Controversia Técnica 36, obliga a PEP y COMMISA a obrar de buena fe en el cumplimiento del Contrato. Una de las consecuencias que impone la buena fe a los contratantes es la de no abusar del ejercicio de sus derechos:

110

Registro No. 183878
Localización:
Novena Época
Instancia: Tribunales Colegiados de Circuito
Fuente: Semanario Judicial de la Federación y su Gaceta
XVIII, Julio de 2003
Página: 1061
Tesis: I.8o.C.251 C
Tesis Aislada
Materia(s): Civil

**CONTRATOS BILATERALES, BUENA FE EN EL CUMPLIMIENTO DE LOS.** No basta cualquier incumplimiento de las obligaciones asumidas por uno de los contratantes para que se justifique el de la otra parte, sino que es menester que aquél sea de tal importancia que deje o sea capaz de dejar insatisfecho el interés del acreedor, atendiendo a la interdependencia funcional de las prestaciones correlativas; así lo exige el principio de buena fe en el cumplimiento del contrato que establece el artículo 1796 del Código Civil para el Distrito Federal, pues si los contratos desde que se perfeccionan obligan no sólo al cumplimiento de lo expresamente pactado sino también a las consecuencias que, según su naturaleza, son conformes a la buena fe, esta misma regla conduce a estimar inadmisible la pretensión de que se exima del cumplimiento a una de las partes, cuando el incumplimiento del otro contratante no es de importancia, toda vez que ello implicaría un ejercicio abusivo de ese derecho por contrariar los fines que la ley tuvo en cuenta al reconocerlo -el de preservar el sinalagma contractual- y por exceder los límites impuestos por la buena fe.

OCTAVO TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.
Amparo directo 273/2003. Sistema de Transporte Colectivo. 18 de junio de 2003. Unanimidad de votos. Ponente: Abraham S. Marcos Valdés. Secretaria: María Teresa Lobo Sáenz.

Conforme al principio de buena fe, interpretado y aplicado por los tribunales mexicanos, PEP no puede invocar ahora un convenio o pacto (que las Controversias Técnicas sólo podrían plantearse antes de la terminación de los trabajos) que la misma PEP estuvo de acuerdo en que no era aplicable al caso concreto de este reclamo. Los tribunales mexicanos han determinado que una parte no puede invocar en su favor una cláusula que la misma parte convino, incluso tácitamente, en dejar inoperante:

"Registro No. 271663
Localización:
Sexta Época
Instancia: Tercera Sala
Fuente: Semanario Judicial de la Federación
Cuarta Parte, XXIX
Página: 43
Tesis Aislada
Materia(s): Civil

**ARRENDAMIENTO, RENUNCIAS, QUE NO PUEDEN INCLUIRSE EN LOS CONTRATOS DE.** Si bien es verdad que lo dispuesto en el artículo 2432 del Código Civil no es renunciable, según lo establece el artículo 2433 del mismo

111

ordenamiento, esta regla rige para evitar que se incluya en los contratos esa renuncia y para que en caso de ser incluida no se le de valor alguno; pero eso no implica que el titular de cada acción no pueda dejar de ejercitarla. Por lo que si durante cinco años estuvieron , conformes las partes contratantes en no dar efectividad a determinada cláusula del contrato, esa conformidad deja ver por la fuerza misma de los hechos, que no se reconocía por la arrendataria efectividad alguna a dicha estipulación. Por tanto, **no parece conforme a la buena fe que debe prevalecer en los contratos, venir a invocar después de cinco años una cláusula vuelta inoperante por el consentimiento de las partes que manifiestan por la forma de cumplir con las demás estipulaciones, su tácita voluntad sobre el particular.**"

En conclusión el actuar de PEP hace que su reclamo de nulidad deba ser declarado improcedente y adicionalmente esta es una cuestión de fondo e interpretación del Contrato por lo que su Señoría incluso está impedido para atender el mismo.

H) CONTESTACIÓN A OTRAS CONSIDERACIONES Y ARGUMENTOS QUE PRETENDEN SUSTENTAR LA NULIDAD DE LA DECISIÓN SOBRE LAS CONTROVERSIAS TÉCNICAS NÚMEROS 34 Y 35.

1.-    El Tribunal Arbitral tiene facultades para resolver las cuestiones de fondo como mejor le parezca, independientemente de los planteamientos de las partes y esto no implica una violación al acuerdo de arbitraje con respecto a las condenas relacionadas con los reclamos de las controversias números 34 y 35.

Según la parte actora, el tribunal arbitral violó el acuerdo de arbitraje en virtud de que resolvió una disputa no sometida a su consideración. Según la parte actora el tribunal arbitral no resolvió una acción indemnizatoria sino una acción de gastos no recuperables que no se demandó ni era materia del arbitraje y con ello violó el articulo 19 del Reglamento de Arbitraje de la Cámara Internacional de Comercio.

En primer lugar, debe estimarse que el tribunal arbitral se encuentra vinculado únicamente por los acuerdos establecidos por las partes. Dichos acuerdos pueden determinarse ya sea en el acuerdo arbitral, en el acta de misión o bien en cualquier otro acuerdo durante el procedimiento arbitral.

Según se desprende del acuerdo de arbitraje (cláusula 23.3 del contrato) las partes convinieron en conferir poderes al tribunal arbitral conforme al Reglamento de Arbitraje de la Cámara Internacional de Comercio.

112

El artículo 15 del Reglamento de Arbitraje de la Cámara Internacional de Comercio es un reflejo de este principio. Dicho artículo ordena lo siguiente:

> "**Artículo 15**
> **Normas aplicables al procedimiento**
> **1**
> El procedimiento ante el Tribunal Arbitral se regirá por el Reglamento y, en caso de silencio de éste, por las normas que las partes o, en su defecto, el Tribunal Arbitral determinen ya sea con referencia o no a un derecho procesal nacional aplicable al arbitraje.
> **2**
> En todos los casos, el Tribunal Arbitral deberá actuar justa e imparcialmente y asegurarse que cada parte tenga la oportunidad suficiente para exponer su caso."

Esto implica también que el tribunal arbitral tiene poderes para determinar cuál es el derecho aplicable, así como las consecuencias jurídicas aplicables según las pretensiones de las partes y los hechos en los que las sustenten.

En el caso concreto, según se desprende de la propia demanda de la parte actora en la que cita el reclamo arbitral relativo de mi mandante, así como de la propia demanda de mi mandante, ésta reclamó lo siguiente en relación a los tiempos de espera:

> "Commisa demanda una compensación de aproximadamente US$81 millones de dólares. Dicha suma se calcula de acuerdo con el Contrato EPC-28. En caso de que por alguna razón el Tribunal Arbitral determinara que las cuotas o tarifas por tiempos de espera o de reserva que se establecen en el Contrato EPC-28 no son aplicables para el cálculo de la compensación correspondiente a estos retrasos, Comisa atentamente solicita que se dicte laudo conforme al cual se decrete el pago de una indemnización a cargo de PEP que resulte suficiente para compensar a Commisa por los daños y perjuicios sufridos como consecuencia de los retrasos antes sufridos. Para tales efectos, Commisa estima que dichos daños y perjuicios ascienden aproximadamente a US$81 millones de dólares ..."

Tal pretensión de COMMISA no excedía el acuerdo arbitral ni implicaba alguna incitación para que el tribunal arbitral lo violara. Es muy claro que la pretensión de COMMISA era una indemnización por tener sus dos embarcaciones ociosas por causas imputables a PEP y solicitó libertad al tribunal arbitral para conceder una indemnización como mejor lo considerara pertinente.

En este sentido, en el acta de misión que fue firmada y aceptada por PEP el tribunal arbitral determinó lo siguiente:

**"C) Puntos litigiosos en relación con las pretensiones y peticiones formuladas por la demandante**

3. a) ¿Se han producido retrasos, imputables a la Demandada y sufridos por la Demandante, que han afectado al inicio de los trabajos de las dos principales embarcaciones, la Castoro 10 y el Bar Protector?

b) ¿Se han producido retrasos, imputables a la Demandada, porque debido a los retrasos de PEP la Demandante hubo de realizar los trabajos comprometidos en el Contrato EPC-28 en condiciones climáticas desfavorables derivadas del cambio de la temporada?

c) De ser las respuestas a las preguntas 3. a) y/o 3 b) afirmativas, ¿tiene derecho la Demandante a recibir de la Demandada una compensación y/o una indemnización por daños y perjuicios o debe rechazarse tal pretensión en caso de estimar alguna de las excepciones articuladas por la Demandada? De decretarse la procedencia de la compensación y/o indemnización ¿cuál sería su cuantía?"

Según se desprende del acta de misión encomendada por las partes al tribunal arbitral, le fue encomendado que determinara, evidentemente conforme a la litis planteada y conforme a las pruebas ofrecidas por las partes, si COMMISA tenía derecho a alguna indemnización por los tiempos de espera y a cuánto ascendería la misma.

Esto fue aceptado por PEP según se desprende del acta de misión. Esto implica que PEP estuvo de acuerdo en que el tribunal arbitral determinara esto conforme a la litis. Esto es congruente con lo pactado por las partes y conforme a lo ordenado por el Reglamento de Arbitraje de la Cámara Internacional de Comercio.

De manera que si PEP aceptó el acta de misión, no puede considerarse que el tribunal arbitral se hubiera excedido en sus facultades o bien violara el acuerdo arbitral.

Como se desprende del laudo impugnado, el tribunal arbitral decidió conforme al acta de misión, condenar a PEP a pagar una indemnización por los tiempos de espera, si dicha indemnización fue determinada como daños y perjuicios o bien como tarifas o de la forma que fuera tal circunstancia resulta irrelevante para efectos de la nulidad del laudo como es planteada por PEP en virtud de que, como se advierte de lo referido en líneas que anteceden el tribunal arbitral se apegó al acta de misión acordada por ambas partes.

Las partes facultaron al tribunal arbitral para que decidiera sobre la procedencia de la indemnización así como sobre la determinación de su cuantía.

114

En este sentido, también es infundada la afirmación de PEP en el sentido de que
se le dejó en **estado de indefensión** en virtud de que **conoció y aceptó los**
términos y condiciones del **acta de misión.**

PEP conoció con oportunidad las pretensiones de COMMISA. Asimismo, tuvo la
oportunidad de contestar la demanda y conoció con oportunidad los términos del
acta de misión, tuvo la oportunidad de ofrecer pruebas y hacer valer sus
alegaciones en relación con el caso. Según se desprende del procedimiento
arbitral tal circunstancia no fue desconocida por PEP.

De manera que no existe la posibilidad de afirmar válidamente que PEP fue
privada de su oportunidad de defensa ni por las pretensiones de COMMISA ni por
lo resuelto por el tribunal arbitral en relación a ellas.

**Por otra parte, también es infundado el argumento de PEP en el sentido de**
**que COMMISA reclamó la misma cantidad por dos causas distintas: a) tarifas**
**de espera y b) daños y perjuicios y que dicha circunstancia fuera capaz por**
**sí sola de anular el laudo.**

Este argumento expuesto por la parte actora como una causa de nulidad del laudo
nada tiene que ver con las causas de nulidad previstas en el artículo 1457 del
Código de Comercio. La circunstancia alegada por la parte actora es, en todo
caso, una circunstancia **propia del fondo de la controversia arbitral.**

Como se ha demostrado, las partes dieron facultades al tribunal arbitral para
resolver el fondo de la controversia en virtud tanto de la cláusula arbitral como del
acta de misión.

Todas las cuestiones manifestadas por el tribunal arbitral relativas a esto son
cuestiones de fondo para las cuales estuvo plenamente facultado para resolver. Si
la pretensión de COMMISA era improcedente o no, simplemente tiene que ver con
cuestiones que en nada escapan a los acuerdos de las partes y en nada se
encuentran relacionadas con las causales de nulidad.

**En el mismo sentido debe desestimarse el argumento de PEP en el sentido**
**de que según la cláusula 23.2 PEP no es responsable por daños legales o**
**contractuales no previstos en el contrato y por lo tanto cualquier reclamo**
**fundado en ellos no es arbitrable.**

115

Esta cuestión también correspondió exclusivamente al tribunal arbitral, en su caso, como objeto de análisis del fondo de la controversia. Como se ha indicado, las partes dieron poderes al tribunal arbitral para la interpretación del Contrato y la determinación de sus consecuencias legales. Por lo tanto, correspondió al tribunal arbitral analizar tal cuestión como propia de la litis el procedimiento arbitral.

Por ningún motivo puede considerarse que el estudio de tal cuestión pudiera ser motivo de la nulidad del laudo. Esto se debe a que la debida o indebida interpretación del Contrato del que se desprenden los derechos y obligaciones de las partes no es motivo de nulidad del laudo. Como se ha indicado a lo largo de toda la contestación de la demanda, las causales de nulidad son limitadas y expresas e impiden que su Señoría entre al estudio del fondo del asunto resuelto en el laudo.

**Misma consideración debe hacerse respecto de los costos justos razonables y debidamente comprobados que se hubieran devengado.**

La determinación de los costos justos, razonables y comprobados debidos a COMMISA por este concepto se contiene en los párrafos 178 a 183 del Laudo Arbitral.

En principio, el Tribunal Arbitral determinó que, pese a que el Contrato hacía referencia a "costos justos, razonables y comprobados", no tenía facultades de amigable componedor, sino que el monto de la indemnización habría de calcularse multiplicando el número de días de espera efectivamente probadas, por la tarifa que "efectivamente COMMISA tuvo que pagar a EMC en virtud del Subcontrato" de arrendamiento de las embarcaciones.

COMMISA argumentó que las cantidades a que tenía derecho debían calcularse en base a la tarifa por día de retraso pactada en el Subcontrato celebrado entre COMMISA y EMC.

Sin embargo, y a pesar de la objeción de COMMISA, el Tribunal Arbitral consideró que COMMISA no tenía derecho a tales cantidades, pese a haberlas pagado a EMC por virtud de cierto Contrato de Transacción celebrado el 30 de septiembre de 2004 entre COMMISA, EMC y sus respectivas sociedades controladoras (Halliburton Brown Root Limited ("HBR") y European Marine Investments Limited ("EMI").

Aquí es importante reiterar que el Tribunal Arbitral determinó que la prueba ofrecida era suficiente para acreditar que COMMISA había pagado efectivamente

116

dichas cantidades y que el pago realizado bajo el Contrato de Transacción (que en realidad consistió en una condonación de adeudo) era suficiente para acreditar que dichas cantidades fueron efectivamente pagadas por COMMISA.

En efecto, el Tribunal Arbitral utilizó ciertas tarifas contenidas en una cotización que COMMISA había ofrecido a PEP, y que eran menores a las efectivamente pagadas por COMMISA. El Tribunal Arbitral basó su decisión en la suposición de que COMMISA hubiera podido obtener tarifas menores a las establecidas en el Subcontrato y que estaba obligada a ello como parte de su deber de mitigar los daños. En pocas palabras, el Tribunal Arbitral condenó a PEP a indemnizar a COMMISA por los retrasos causados utilizando una tarifa menor a la que COMMISA efectivamente pagó, pues COMMISA "fue capaz (o podría haber sido capaz)" de obtener un descuento de EMC sobre dichas tarifas.

2.-    La Valoración de las Pruebas por el Tribunal Arbitral No Puede Ser Revisada Judicialmente. La Valoración de las Pruebas es Cuestión de Fondo.

Como lo ha señalado la jurisprudencia de los tribunales mexicanos, la determinación de los hechos en base a la prueba ofrecida y desahogada es cuestión de fondo que corresponde al Tribunal Arbitral. Y lo resuelto por el Tribunal Arbitral tiene efectos de cosa juzgada, que sólo puede ser revisada por la autoridad judicial cuando el laudo arbitral es contrario al orden público.

En este sentido, es necesario reiterar que la determinación de los hechos controvertidos que realiza el Tribunal Arbitral tiene efectos de cosa juzgada, como claramente lo indica la jurisprudencia citada.

Salvo que, en la determinación de los hechos controvertidos, el Tribunal Arbitral hubiere violado las formalidades esenciales del procedimiento o hubiere resuelto una controversia fuera del alcance del compromiso arbitral, lo resuelto por el Tribunal Arbitral en cuanto a los hechos controvertidos es inatacable. Los hechos, *per se*, no son ni pueden ser contrarios al orden público y por tanto no existe manera, en derecho mexicano, en que la resolución de los hechos controvertidos pueda ser anulada por este concepto.

Por lo tanto, también deberá considerarse que tales motivos de nulidad son plenamente infundados.

117

3.-    El hecho de que COMMISA hubiera planteado las controversias
técnicas número 34 y 35 una vez concluidos los trabajos no es capaz de
provocar que el reclamo haya dejado de ser materia del arbitraje.

Como se ha expuesto con anterioridad, mi mandante sostiene que el eventual
incumplimiento del segundo párrafo de la cláusula arbitral no genera que la posible
controversia salga del alcance de la cláusula arbitral.

No obstante esto, considera mi mandante que la pretensión de la parte actora es
incapaz de generar la nulidad del laudo en virtud de que se basa en una lectura e
interpretación equivocada del segundo párrafo de la cláusula arbitral.

Según se desprende de lo ordenado por la cláusula arbitral número 23.3 del
contrato, el único requisito que impone para la tramitación de las controversias
técnicas es que éstas se presenten con anterioridad al arbitraje. La cláusula de
referencia no impone la obligación a la contratista de que la controversia técnica
tuviera que presentarse antes de ser concluidos los trabajos o el momento de la
entrega final.

**La condición que impone la cláusula en comento consiste en que la
controversia técnica deber planteada previamente al arbitraje.**

**De manera que basta con que mi mandante hubiera planteado su
controversia previamente a la presentación del arbitraje para que se tuviera
por cumplida.**

Así sucedió en la realidad según se desprende de los propios hechos de la
demanda de nulidad de la parte actora, como del laudo arbitral, como de la
demanda de arbitraje. De tales documentos se desprende lo siguiente:

COMMISA preparó su propuesta de precios unitarios conforme al Anexo C del
contrato para intentar recuperar los tiempos de espera. En una reunión celebrada
el cinco de marzo de mil novecientos noventa y nueve, PEP solicitó a mi mandante
(COMMISA) que presentara dos estimaciones por costos por retrasos en la
construcción: un estimado en el cual COMMISA asumiera el desplazamiento
inmediato de las embarcaciones y un estimado en el cual COMMISA asumiera que
las embarcaciones se desplazarían al sitio de los trabajos hasta agosto de mil
novecientos noventa y nueve. COMMISA llevó a cabo tales estimaciones.

Durante una reunión del dieciocho de marzo de mil novecientos noventa y nueve
mi mandante solicitó a PEP le diera una respuesta a sus estimaciones de costos.

118

Sin embargo, PEP jamás le dio respuesta. PEP tampoco respondió a las estimaciones de costos que COMMISA le proporcionó.

Según se desprende de lo anterior, mi mandante sí llevó a cabo la iniciación de los procedimientos de controversias técnicas relacionadas con estos reclamos. Sin embargo, por causas imputables a PEP no pudo continuar con la formalización del reclamo.

Ahora bien, según se desprende de lo anterior, mi mandante sí cumplió con la condición de llevar a cabo el procedimiento para la controversia técnica antes de la iniciación del arbitraje. El tiempo en el que se haya hecho exactamente resulta ser irrelevante. La única condición que impone la cláusula es que haya sido hecho con anterioridad al arbitraje, lo cual sí fue cumplido.

Por lo tanto, si mi mandante cumplió con plantear la controversia antes de acudir al arbitraje, entonces debe considerarse que sí cumplió con la condición del segundo párrafo de la cláusula 23.3 del contrato.

4.    Al resolverse estos reclamo en el laudo no se violó el procedimiento arbitral ya que la Misión del Tribunal Arbitral se cumplió plenamente, no se violó el artículo 19 del Reglamento de la Cámara de Comercio Internacional, ni se dejó en estado de indefensión a PEP

También es infundado lo alegado por la parte actora en el sentido de que el tribunal arbitral violó lo ordenado por el acta de misión ya que los gastos relacionados con las reclamaciones derivadas de las controversias técnicas 34 y 35 no se devengaron ni se probaron.

Tales afirmaciones son carentes de sustento en virtud de que, como ya se ha explicado los temas de carga de prueba, prueba de hechos y demás temas que tienen que ver con el fondo de la controversia en el arbitraje no son alegaciones que válidamente puedan anular el laudo arbitral.

Como se ha explicado, PEP aceptó el acta de misión y en dicho documento se estableció claramente que uno de los puntos a resolver sería la indemnización por los tiempos de espera.

El acta de misión que fue firmada y aceptada por PEP en la que el tribunal arbitral determinó lo siguiente:

"C) Puntos litigiosos en relación con las pretensiones y peticiones formuladas por la demandante

119

> *5. a) ¿Se han producido retrasos, imputables a la Demandada y sufridos por la Demandante, que han afectado al inicio de los trabajos de las dos principales embarcaciones, la Castoro 10 y el Bar Protector?*
>
> *b) ¿Se han producido retrasos, imputables a la Demandada, porque debido a los retrasos de PEP la Demandante hubo de realizar los trabajos comprometidos en el Contrato EPC-28 en condiciones climáticas desfavorables derivadas del cambio de la temporada?*
>
> *c) De ser las respuestas a las preguntas 3. a) y/o 3 b) afirmativas, ¿tiene derecho la Demandante a recibir de la Demandada una compensación y/o una indemnización por daños y perjuicios o debe rechazarse tal pretensión en caso de estimar alguna de las excepciones articuladas por la Demandada? De decretarse la procedencia de la compensación y/o indemnización ¿cuál sería su cuantía?"*

Según se desprende del acta de misión encomendada por las partes al Tribunal Arbitral, le fue encomendado que determinara, evidentemente conforme a la litis planteada y conforme a las pruebas ofrecidas por las partes, si COMMISA tenía derecho a alguna indemnización por los tiempos de espera y a cuánto ascendería la misma.

Esto fue aceptado por PEP según se desprende del acta de misión. Esto implica que PEP estuvo de acuerdo en que el tribunal arbitral determinara esto conforme a la litis. Esto es congruente con lo pactado por las partes y conforme a lo ordenado por el Reglamento de Arbitraje de la Cámara Internacional de Comercio.

El artículo 19 del Reglamento de Arbitraje de la Cámara Internacional de Comercio ordena textualmente lo siguiente:

> **"Artículo 19**
> **Nuevas demandas**
> Una vez firmada el Acta de Misión, o aprobada por la Corte, ninguna de las partes podrá formular nuevas demandas, principales o reconvencionales, que estén fuera de los límites fijados en ella, salvo autorización del Tribunal Arbitral el cual, al decidir al respecto, deberá tener en cuenta la naturaleza de las nuevas demandas, la etapa en que se encuentre el proceso arbitral y las demás circunstancias que sean pertinentes."

Conforme a la lo probado en el arbitraje, quedó plenamente acreditado que las embarcaciones tuvieron tiempos de espera adicionales a lo pactado por las partes. También quedó demostrado que los tiempos de espera que COMMISA tuvo que soportar se debieron al incumplimiento de PEP de entregar el acceso al sitio a tiempo.

120

Ahora bien, el incumplimiento de PEP quedó probado sin lugar a dudas. Sin embargo, el planteamiento de la actora es infantil por cuanto se refiere a que no quedó probado el gasto. Independientemente de que esto es una cuestión de fondo del arbitraje. Evidentemente, hay que atender a la naturaleza del incumplimiento y sus consecuencias. Si COMMISA tuvo ociosas sus embarcaciones por causas imputables a PEP es lógico y congruente que tuviera derecho a cobrar una indemnización.

El argumento de PEP es muy superficial por cuanto a que COMMISA tendría que haber demostrado el gasto. Como se ha dicho, las embarcaciones se encontraban ociosas en altamar y a disposición de PEP, a espera de PEP. Esto evidentemente tiene un costo, simplemente el costo de no poder usar la embarcación en otro negocio. Por lo tanto, al condenar el tribunal arbitral al pago de la indemnización no violó el procedimiento arbitral por dos razones, una formal y una de fondo.

La formal radica en el hecho de que en el acta de misión se estableció la cuestión de la posibilidad de indemnizar a mi mandante simplemente por tiempos de espera.

La de fondo, radica en el hecho de que quedó probado que PEP incumplió sus obligaciones y obligó a mi mandante a mantener ociosas sus embarcaciones.

Esto no implica, por ninguna por ningún motivo, la violación al artículo 19 del Reglamento de Arbitraje de la Cámara de Comercio Internacional. Lo determinado por el tribunal arbitral no implicó la admisión de una nueva demanda, ninguna nueva prestación reclamada. PEP conoció, desde un principio, el alcance de la demanda y el alcance de la litis establecida en el acta de misión. No cabe duda de que PEP tuvo oportunidad de defensa y de la condena que se analiza no fue motivo de una demanda nueva.

Por lo tanto, deberá considerarse que estos argumentos también son infundados.

I) CONTESTACIÓN A OTRAS CONSIDERACIONES Y ARGUMENTOS QUE PRETENDEN SUSTENTAR LA NULIDAD DE LA DECISIÓN SOBRE LAS CONTROVERSIA TÉCNICAS NÚMERO 19.

PEP alega la violación al principio de legalidad porque al resolverse la controversia técnica número 19, el Tribunal Arbitral no se asistió de una prueba pericial.

Las alegaciones de PEP en relación con la controversia técnica 19 son infundadas en virtud de se trata de cuestiones de fondo del arbitraje que no son motivo de nulidad conforme al artículo 1457 del Código de Comercio, además de que el citado principio de legalidad se refiere a una garantía constitucional aplicable únicamente a las autoridades en relación con actos de molestia y no con laudos arbitrales.

En efecto, la violación al **principio de legalidad**, en virtud de que supuestamente el tribunal arbitral resolvió esta disputa **sin apoyo pericial**, así como que resolvió respecto de **problemas técnicos no previstos en el contrato** son todos problemas de fondo del laudo arbitral que por ninguna circunstancia pueden ser revisados a la luz del artículo 1457 del Código de Comercio ya que ninguno de ellos se ubica en sus hipótesis normativas.

En este mismo sentido son claramente infundados los argumentos de PEP expuestos en el inciso 230 de su demanda en el sentido de que los reclamos de COMMISA por treinta y un eventos de obstrucciones **ya habían precluido en** virtud de que no fueron formalizados por PEP como trabajos extraordinarios.

El hecho de que tales reclamos no hubieran sido formalizados por PEP como trabajos extraordinarios no genera la imposibilidad de su reclamo. Esto es así en virtud de que como la misma PEP lo argumenta en este reclamo y se ha expuesto como defensa por mi mandante a lo largo de esta demanda, conforme al artículo 1797 del Código Civil Federal, no es válido dejar el cumplimiento de las obligaciones a uno de los contratantes. **Sería absurdo hacer depender la procedencia de un reclamo de la clasificación que de éste hiciera PEP como un trabajo extraordinario.** Por lo tanto, no es válido que ahora PEP haga depender la validez del laudo de esta circunstancia.

En este sentido es absurda la postura de PEP por cuanto a que debió aprobar todos los trabajos extraordinarios realizados por COMMISA y si el tribunal arbitral lo condenó a pagarlos sin su consentimiento resulta en la nulidad de laudo. Como se ha indicado, el cumplimiento de las obligaciones no puede dejarse al arbitrio de una de las partes. **Además de que esto es propio de la controversia y litis arbitral que el tribunal arbitral se encuentra facultado para resolver.** Por lo tanto, no puede estimarse que la condena exceda la cláusula arbitral y esto de alguna forma viole el orden público.

Además, como se ha explicado, las cuestiones relacionadas con ductos según el anexo C del contrato no requerían una formalización como controversia técnica. Por lo tanto tal circunstancia es irrelevante para una posible preclusión de

derechos. **Lo mismo debe considerarse con respecto del argumento relacionado con el anexo B-2 que se basa en el mismo principio.**

En última instancia, como se ha venido sosteniendo a lo largo de esta contestación de demanda, el tema de la formalización de los reclamos como controversias técnicas no es un tema que implique la violación al acuerdo arbitral o bien un exceso de facultades de los árbitros y pueda conllevar la nulidad del laudo. Por el contrario, tales cuestiones son propias de la litis arbitral. **Suponer lo contrario llevaría al absurdo de aceptar que cualquier indebida interpretación del contrato implicaría la violación del acuerdo arbitral.**

Por último y en relación con el argumento de PEP de que la decisión sobre la controversia técnica número 19 se refiere a problemas técnicos no previstos en el Contrato y, por lo tanto, la decisión sobre la misma excede los términos del acuerdo arbitral también resulta incorrecta.

Como se ha indicado en la defensa en relación con las reclamaciones de las controversias técnicas 34, 35, 36, 37 y 39, especialmente la 37 y 39 relativas a **cruces de ductos establecidos en el lecho marino,** es evidente que tales cuestiones se encuentran reguladas en el anexo técnico C. El anexo técnico C no se encuentra comprendido en la cláusula 23.2 del contrato. **Las obstrucciones deben ser consideradas como trabajos extraordinarios relacionados con los ductos según el anexo C del Contrato.**

Por lo tanto como lo relativos a ductos no puede considerarse como una controversia técnica de las referidas en dicha cláusula, entonces no podría exigírsele a COMMISA agotar dicho procedimiento.

Por todas estas razones también debe considerarse que la nulidad propuesta por la parte actora es infundada.

### J) Validez De La Condena A Pagar Gastos Y Costas Del Arbitraje.

PEP prácticamente impugna la condena contenida en el laudo arbitral a pagar los gastos y costas del arbitraje sin invocar causal de nulidad alguna del laudo con respecto a dicho punto y concretándose básicamente a impugnar las consideraciones de fondo hechas por el Tribunal Arbitral con respecto a este punto.

La deficiencia en el planteamiento de PEP vicia su argumento y la hace inatendible *per se.*

Con independencia de lo anterior, y suponiendo sin conceder que esta "impugnación" de PEP fuera atendible, es claro que la condena a PEP contenida en el punto 6 de la decisión del Tribunal Arbitral en materia de costas, visible a hoja 182 y 183 del laudo final objeto de la presente demanda incidental es en sí misma valida ya que se emitió en cumplimiento de lo dispuesto por el artículo 31 del Reglamento de Arbitraje de la Cámara de Comercio Internacional que regula el procedimiento del que se deriva el laudo cuya nulidad reclama PEP, en el siguiente sentido:

> "6.    Condenar, en materia de gastos y costas, a:
>
> (i) Cada parte a asumir la mitad de los honorarios y los gastos de los árbitros, la mitad de los gastos administrativos de la Cámara de Comercio Internacional y sus propios gastos de defensa.
>
> (ii) Condenar a PEP a satisfacer a Commisa 200.000 USD como gastos incurridos por ésta para defenderse de las objeciones de falta de competencia del Tribunal Arbitral y de falta de requisitos de procedibilidad planteadas por aquélla."

En efecto, el Reglamento de Arbitraje en comento confiere al Tribunal Arbitral una facultad discrecional para fijar los costos del arbitraje que considere razonables, situación que se verifica en el texto del artículo 31, mismo que se cita a continuación para mayor claridad expositiva:

> "**Artículo 31**
> **Decisión sobre los costos del arbitraje.**
> 1
> Los **costos del arbitraje** incluirán los honorarios y los gastos de los árbitros, así como los gastos administrativos de la CCI determinados por la Corte de conformidad con el arancel vigente en la fecha de inicio del proceso arbitral, los honorarios y los gastos de los peritos nombrados por el Tribunal Arbitral y los **gastos razonables** incurridos por las partes para su defensa en el arbitraje.
>
> 2
> La Corte podrá fijar los honorarios de los árbitros en un monto superior o inferior al que resulte del arancel aplicable si así lo considera necesario en razón de las circunstancias excepcionales del caso. En cualquier momento del proceso, <u>el Tribunal Arbitral podrá tomar decisiones sobre costos distintos de aquéllos fijados por la Corte.</u>
>
> 3
> El Laudo final fijará los <u>costos del arbitraje</u> y decidirá <u>cuál de las partes debe pagarlos o en qué proporción deben repartirse entre ellas.</u>"

(Énfasis añadido)

124

Como se desprende del artículo trascrito del Reglamento de Arbitraje de la ICC, es el tribunal arbitral quien, por el acuerdo de las partes, está facultado para fijar las costas del arbitraje en el laudo final y decidir quién y en qué proporción deberá cubrirlas.

Tanto la doctrina internacional más autorizada respecto de la interpretación del Reglamento de Arbitraje de la CCI como la práctica arbitral, resaltan la discrecionalidad que gozan los árbitros para establecer la distribución en la cual serán cubiertos los costos del arbitraje.

Así, Yves Derains y Eric A. Schwartz[25] señalan que *"de acuerdo con el art. 31(3) [del Reglamento de Arbitraje de la CCI], los árbitros tienen total discrecionalidad para asignar los costos de la forma en que lo consideren apropiado."*[26] En este sentido se pronuncian también W. Lawrence Craig, William W. Park y Jan Paulsson, otras tres voces amplia e internacionalmente reconocidas en materia de arbitraje comercial internacional y, en particular, de la interpretación y aplicación del Reglamento de Arbitraje de la CCI.[27]

En lo relativo a la consideración del sentido del fallo de las prestaciones demandadas y de la conducta procesal de las partes, la jurisprudencia arbitral ilustra sobre la utilización de fórmulas sencillas para prorratear los costos del arbitraje: en un laudo dictado conforme al Reglamento de Arbitraje de la CCI[28], destacan los siguientes razonamientos: (i) *el tribunal arbitral goza de una amplia discreción* conforme a las reglas de la CCI; y (ii) constituye una solución equitativa el que se distribuya el beneficio de las costas en la misma proporción que la procedencia de las prestaciones reclamadas por las partes (principio útil para el caso de reclamaciones recíprocas).[29]

Por último en este apartado es importante señalar que es práctica habitual en el arbitraje comercial que si una parte gana todas sus prestaciones reclamadas se impongan a la parte vencida las costas del arbitraje, así como los demás gastos razonables de representación de la parte ganadora. Esta práctica tiene la doble función de reparación y disuasión.

---

[25] Ambos autores ex secretarios generales de la Corte Internacional de Arbitraje de la CCI.
[26] DERAINS, Yves y Eric A. SCHWARTS, El Nuevo Reglamento de Arbitraje de la Cámara de Comercio Internacional (Guía de arbitraje comercial internacional), Colección de Estudios Jurídicos, Edit. Oxford University Press, México, 2001; p. 414.
[27] CRAIG, W. Laurence, William W. PARK y Jan PAULSSON, *International Chamber of Commerce Arbitration*, 3a ed., Edit. Oceana Publications, Inc., Estados Unidos de América, 2000; pp. 394 y 395.
[28] Collection of ICC Arbitral Awards, 1986-1900, p. 52, caso No. 3267, del año de 1984.
[29] GRAHAM TAPIA, Luis Enrique, *El arbitraje comercial*, Colección de Obras Monográficas, reimpresión a la 1ª ed., Edit. Themis, México, 2007; p. 290.

Lo anterior implica que el tribunal arbitral debe tomar en cuenta todas las circunstancias del caso para distribuir los costos en forma justa y equitativa. Un criterio importante en ello es la conducta de las partes en el procedimiento. Cuando una reclamación es frívola o una parte provocó gastos o retrasos injustificables en el procedimiento mediante una conducta activa (tácticas dilatorias) u omisiva, por lo general el tribunal arbitral debe tomar en cuenta dichas circunstancias para repercutir en su contra los gastos que de ello se generen a cargo de la otra parte.[30]

En este orden de ideas, como podrá apreciar su Señoría, la fijación de costos que efectuó el Tribunal Arbitral para condenar a PEP, fue efectuada en cumplimiento y con fundamento en la facultad que así le confiere el artículo 31 antes transcrito, del Reglamento de Arbitraje de la Cámara de Comercio Internacional.

Este fue el razonamiento que utilizó el Tribunal Arbitral, para emitir la condena en costas antes transcrita.

Además, según se aprecia del párrafo 767, el Tribunal Arbitral también sustentó su decisión en el contenido del artículo 1455 del Código de Comercio, que sigue también el criterio de razonabilidad de las costas, según el caso concreto, según puede apreciarse en la siguiente cita:

> "Artículo 1455.- Salvo lo dispuesto en el párrafo siguiente, las costas del arbitraje serán a cargo de la parte vencida. Sin embargo, el Tribunal Arbitral podrá prorratear los elementos de estas costas entre las partes si decide que el prorrateo es razonable, teniendo en cuenta las circunstancias del caso.
>
> Respecto del costo de representación y de asistencia legal, el Tribunal Arbitral decidirá, teniendo en cuenta las circunstancias del caso, qué parte deberá pagar dicho costo o podrá prorratearlo entre las partes si decide que es lo razonable.
> ..."

De una interpretación lógica y sistemática del artículo transcrito, se deriva que nuestra legislación en materia de arbitraje comercial establece, entre otras, las siguientes reglas en materia de costas:

(i)   Solamente en el caso de que las partes fueran omisas respecto a las costas del arbitraje, se aplicarán las siguientes reglas del Código de Comercio:

---

[30] GONZÁLEZ DE COSSÍO, Francisco, *Arbitraje*, *Op. cit. Supra*, Nota 22; p. 306.

126

a. Es el tribunal arbitral quien fijará las costas del arbitraje en el laudo final.

b. Tanto los honorarios del tribunal arbitral como del costo de representación y de asistencia legal, serán determinados por el tribunal arbitral en un monto razonable teniendo en cuenta el monto de la disputa, la complejidad del tema, el tiempo dedicado por los árbitros y cualesquiera otras circunstancias pertinentes del caso.[31]

c. Las costas del arbitraje serán a cargo de la parte vencida. Sin embargo, *el tribunal arbitral podrá prorratear los elementos de estas costas entre las partes si decide que el prorrateo es razonable, teniendo en cuenta las circunstancias del caso.*

En este contexto y siguiendo al Prof. José Luis Siqueiros, reconocido jurista mexicano y experto en arbitraje comercial, en ausencia de un acuerdo de las partes, el tribunal arbitral está expresamente facultado por el Código de Comercio para establecer las costas del arbitraje en el Laudo final, proveyendo que sean razonables conforme a las circunstancias del caso. Aún cuando la regla general es que los costos correrán a cargo de la parte vencida, el tribunal arbitral está autorizado a prorratear[32] los elementos de los costos entre las partes.[33]

En el mismo sentido se pronuncia el Dr. Luis Enrique Graham Tapia al señalar que con "*la reserva de lo que hubieren pactado las partes, la tendencia dentro del arbitraje, es de confiar al tribunal arbitral un margen amplio de apreciación, en cuanto a la distribución de las costas entre las partes. Así, el árbitro puede tomar en consideración: i) la conducta procesal de las partes; ii) el fallo (a favor o en contra) en cuanto a las prestaciones reclamadas.*"[34] [Énfasis añadido]

En esta tesitura, y en cuanto al fondo del asunto, en el laudo final el Tribunal Arbitral resolvió que cada una de las partes debía pagar la mitad de los gastos administrativos y asumir sus propios gastos de defensa, toda vez que tanto COMMISA, como PEP, habían resultado vencedoras sólo en forma parcial.

---

[31] Una copia poco afortunada del Reglamento de Arbitraje de UNCITRAL faculta a una de las partes para solicitar a un juez que, a su entera discreción, participe en el proceso de determinación de las costas del arbitraje pudiendo éste solamente hacer las observaciones que considere apropiadas respecto de los honorarios de los árbitros, pero será el mismo tribunal arbitral quien en última instancia deberá fijar el monto correspondiente a sus honorarios.

[32] El verbo prorratear, según es empleado por el propio artículo 1455 del Código de Comercio, significa, conforme a la Real Academia de la Lengua, repartir una cantidad entre dos o más personas, según la parte que proporcionalmente toca a cada una.

[33] SIQUEIROS, José Luis y Alexander C. HOAGLAND. *International Handbook on Commercial Arbitration*, Vol. III, International Council for Commercial Arbitration (ICCA). Edit. Kluwer, La Haya / Londres / Nueva York, 1995.

[34] GRAHAM TAPIA, Luis Enrique. *El arbitraje comercial*, Op. cit. Supra, Nota 29; p. 290.

127

En cambio, el Tribunal Arbitral determinó que toda vez que COMMISA, resultó vencedora en todas y cada una de las objeciones planteadas por PEP en cuanto a la supuesta falta de competencia del Tribunal Arbitral y falta de requisitos de procedibilidad, PEP debía asumir los gastos razonables incluidos por COMMISA, en la defensa de estas objeciones, que el Tribunal fijó en USD $200,000 (doscientos mil dólares de los Estados Unidos de América 00/100).

Como puede apreciarse, no existe ninguna cuestión de orden público, violación a normas de procedimiento o cualesquiera otras causales de nulidad que sean aplicables a esta condena al pago de costas.

El argumento planteado por PEP en el sentido de que ésta no fue vencida respecto de las excepciones procesales de incompetencia que planteó en juicio, en este procedimiento incidental, resulta absolutamente improcedente e inatendible, pues el mismo se refiere a una apreciación de fondo, emitida por el Tribunal Arbitral en ejercicio de las facultades que para el efecto de distribuir las costas del arbitraje, le confiere el artículo 31 del Reglamento de Arbitraje de la Cámara de Comercio Internacional.

Definitivamente, nada tiene que ver con las causales limitadas de nulidad que el Código de Comercio prevé, que el Tribunal Arbitral haya decidido que era razonable que PEP tuviera que pagar la cantidad a que fue condenada, por haber sido vencida en un punto particular de la controversia resuelta en el laudo final.

No existe en el artículo 1457 ni en ninguna otra del Código de Comercio, autorización o causal alguna que faculte al juez competente a revisar lo resuelto por el tribunal arbitral en el laudo sobre la fijación y determinación del pago de las costas de un procedimiento arbitral.

Es el tribunal arbitral quien determina las cosas de un arbitraje. Un juez que conozca de la solicitud de nulidad (o reconocimiento y ejecución) de un laudo no está facultado para examinar dichas determinaciones ni modificarlas.[35]

Como se ha mencionado en diversas ocasiones en el presente ocurso, el artículo 1457 establece, en forma limitativa y de interpretación estricta, las causales conforme a las cuales el juez competente podrá anular un laudo arbitral.

En ninguna de las dos fracciones de dicho artículo 1457 (y de sus diversos sub-incisos), se establece la posibilidad que el juez competente pueda anular un laudo

---

[35] GONZÁLEZ DE COSSÍO, Francisco, *Arbitraje, Op. cit. Supra*, Nota 22; p. 300.

128

arbitral por lo que hace a la fijación y determinación en costas de un arbitraje. Asimismo y como ya quedó debidamente acreditado en apartados anteriores, el examen de las distintas causales de nulidad del artículo 1457 tampoco facultan al juez, por ninguna circunstancia, a revisar o analizar las decisiones de fondo adoptadas por el tribunal arbitral en el laudo.

Aún y cuando se pretendiese aplicar por analogía alguna de las causales de nulidad contempladas en el artículo 1457, es menester reiterar que el tribunal arbitral, en todo momento, actuó dentro de las facultades y con las atribuciones que la cláusula arbitral y el Código de Comercio le confirieron.

Respecto de las costas del arbitraje, ya quedó debidamente acreditado que el tribunal arbitral se ajustó en todo momento al acuerdo arbitral y que dicho acuerdo no está en conflicto con disposición alguna del Código de Comercio ni de ninguna otro precepto que por acuerdo de las partes o por mandato legal fuera aplicable al arbitraje.

En consecuencia, esta condena en costas deberá prevalecer y así ser declarada por su Señoría, porque en ese sentido fue determinado conforme al artículo 31 del Reglamento de Arbitraje aplicable a la controversia, por el Tribunal Arbitral.

<div align="center">

DERECHO

</div>

Niego la aplicación de los preceptos legales invocados por la actora tanto en su parte adjetiva como en la sustantiva.

Asimismo, por medio del presente escrito vengo a promover en contra de PEP,

<div align="center">

RECONVENCIÓN

</div>

Lo anterior se solicita en virtud de que mi representada participó como parte actora en el procedimiento arbitral número 13716/CCO/JRF seguido ante la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional y en el cual se emitió un laudo definitivo e inapelable que condenó a la demandada PEP al pago de diversas prestaciones a favor de mi representada.

En virtud de lo expuesto en el párrafo precedente, con el debido respeto solicito a su Señoría:

**1.-** Reconozca la validez del laudo final de fecha quince de enero de dos mil ocho, emitido en el procedimiento arbitral número 13716/CCO/JRF seguido ante la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional.

**2.-** En consecuencia, ordene a PEP pagar a mi representada las cantidades determinadas a su favor en el citado laudo, conforme a las especificaciones del laudo arbitral contenidas en el apartado denominado "XII. **DECISIÓN**", visibles en las páginas 182 y 183 del laudo en comento, mismas que se citan literalmente a continuación:

"...

3. ...la suma de "S" Pesos mexicanos ["PME"], calculada de acuerdo con la siguiente fórmula:

$$S = (A + B) \times 0,995$$

en la que

"S" es la suma en PME que PEP debe pagar a Commisa.
"A" es igual a 10.928.728 PME.
"B" es una suma en PME que resulta de convertir 75.075.835 Dólares de los Estados Unidos de América ["USD"] en PME al tipo de cambio de venta que el Banco de México haya determinado y publicado en el Diario Oficial de la Federación el día hábil inmediato anterior al 29 de septiembre de 2002.
"+" es el signo de adición.
"x" es el signo de multiplicación.
"=" es el signo de igualdad.
0,995 refleja la reducción del 5 al millar que Commisa está obligada a efectuar a favor de la Secretaría de Contraloría y Desarrollo Administrativo.

4. ... pagar a Commisa, en concepto de gastos financieros derivados del Contrato EPC-28, un interés calculado sobre la suma "S", definida en la Decisión precedente; los gastos financieros se devengarán desde el 29 de septiembre de 2002 hasta la fecha de pago efectivo, a la tasa en cada momento establecida en la Ley de Ingresos de la Federación para los casos de prórroga en el pago de créditos fiscales; el cómputo se hará por días y el pago de los gastos financieros se realizará conjuntamente con el de la suma "S" definida en la Decisión precedente.

6. Condenar, en materia de gastos y costas, a:

(ii) ... satisfacer a Commisa 200.000 USD como gastos incurridos por ésta para defenderse de las objeciones de falta de

130

competencia del Tribunal Arbitral y de falta de requisitos de
procedibilidad planteadas por aquélla."

3.- Se condene a PEP el pago de la cantidad que determine su Señoría por
concepto de los gastos y costas derivados del presente procedimiento.

**A.** *Emplazamiento.* Con el objeto de que la paraestatal PEP sea emplazada
a la presente reconvención, solicito a su Señoría ordene que la misma sea
**notificada personalmente** de la presente reconvención de conformidad con la
jurisprudencia obligatoria que se cita a continuación:

"No. Registro: 178,647
Jurisprudencia
Materia(s): Civil
Novena Época
Instancia: Primera Sala
Fuente: Semanario Judicial de la Federación y su Gaceta
XXI, Abril de 2005
Tesis: 1a./J. 134/2004
Página: 617

RECONVENCIÓN. EL AUTO QUE LA ADMITE DEBE
NOTIFICARSE PERSONALMENTE AL DEMANDADO
RECONVENIDO (LEGISLACIONES DE BAJA CALIFORNIA Y
EL DISTRITO FEDERAL). Los códigos procesales de Baja
California y del Distrito Federal no establecen la forma en que se
debe notificar una reconvención, sino que solamente se limitan a
decir que de la misma se dará traslado al actor para que la
conteste. La expresión "dar traslado" no se refiere a la forma en
que se debe notificar la reconvención, sino a la manera en que las
partes pueden tener acceso a los autos y a los documentos que
corran agregados, para que conozcan su contenido y se impongan
de ellos. Por lo tanto, al existir una laguna legal en cuanto a la
forma en que se debe notificar el auto que admite la reconvención,
se debe atender a la naturaleza de la demanda reconvencional, la
cual implica el ejercicio de acciones en contra del actor en el
principal, por lo que constituye también una demanda que, como
tal, debe recibir el mismo tratamiento que se le da a la demanda
principal. De esta manera, si ambos códigos establecen que una
vez que se admite la demanda **se debe correr traslado de ella
a la parte demandada y emplazarla para que la conteste**, en el
caso de la reconvención también se debe emplazar. Ello implica
que **se debe notificar personalmente el auto admisorio
correspondiente**, acompañando las copias de dicha demanda
reconvencional, tal y como ocurre cuando se hace el
emplazamiento de la demanda principal. Con lo anterior se busca
que se cumpla con la garantía de seguridad jurídica establecida en
el artículo 14 constitucional a favor de la parte reconvenida,
porque aunque ésta ya conoce la existencia del juicio y la
autoridad ante quien se tramita, desconoce las pretensiones de su
contraparte y las acciones que se ejercitan en su contra en vía de
reconvención, por lo cual, si no se le notifica personalmente el
auto que admite dicha demanda reconvencional, se limitaría su
garantía de defensa estando imposibilitada para dar respuesta a
las acciones de la reconvención y para desvirtuarlas a través de
las pruebas que considere pertinentes para ese fin.

Contradicción de tesis 99/2004-PS. Entre las sustentadas por el Tercer Tribunal

Colegiado en Materia Civil del Primer Circuito y el Tercer Tribunal Colegiado del Décimo Quinto Circuito. 17 de noviembre de 2004. Mayoría de tres votos. Disidentes: José Ramón Cossío Díaz y Olga Sánchez Cordero de García Villegas. Ponente: José Ramón Cossío Díaz. Secretario: Fernando A. Casasola Mendoza.

Tesis de jurisprudencia 134/2004. Aprobada por la Primera Sala de este Alto Tribunal, en sesión de fecha primero de diciembre de dos mil cuatro."

El domicilio para llevar a cabo el emplazamiento se encuentra ubicado en:

> **Gerencia Jurídica de Exploración y Producción**
>
> **Marina Nacional 329 Edificio A, Octavo Piso**
>
> **Colonia Huasteca, Delegación Miguel Hidalgo**
>
> **México, DistritoFederal, C.P. 11311**

B.    *Extremos de la Acción.* De conformidad con el artículo 1461 del Código de Comercio, un laudo arbitral será reconocido como vinculante por los Jueces mexicanos y, después de una presentación de una petición por escrito de la parte interesada, será ejecutado.

Para conceder la ejecución referida se requiere única y exclusivamente al solicitante, de conformidad con el segundo párrafo del artículo 1461 del Código de Comercio referido, que se acompañe copia debidamente autenticada del laudo o copia certificada del mismo, y el original del acuerdo de arbitraje o copia certificada del mismo, que sirvió de fundamento al procedimiento arbitral y, al laudo respectivo. Sobre el particular, es pertinente citar la siguiente tesis de jurisprudencia:

"Novena Epoca
Instancia: OCTAVO TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.
Fuente: Semanario Judicial de la Federación y su Gaceta
Tomo: VIII, Agosto de 1998
Tesis: I.8o.C.159 C
Página: 877

**LAUDO ARBITRAL EMITIDO EN TERRITORIO NACIONAL, FORMALIDADES QUE DEBE REVESTIR EL PROCEDIMIENTO DE HOMOLOGACIÓN.** De acuerdo con el artículo 1461 del Código de Comercio, el procedimiento de homologación de un laudo arbitral, debe revestir las formalidades establecidas en ese dispositivo, así como en el diverso 360 del Código Federal de Procedimientos Civiles, formalidades que son las siguientes: 1) Presentación de la solicitud correspondiente por escrito ante el Juez de primera instancia; 2) Presentación original del laudo autenticado o copia certificada del mismo; 3) Presentación original del acuerdo de arbitraje o copia certificada del mismo, y 4) Las establecidas por el referido artículo 360 del código adjetivo federal; que son: a) Una vez promovido el incidente, el Juez mandará dar traslado a las partes, por tres días. b) Transcurrido el término, si las partes no ofrecieron pruebas ni el tribunal las estimó necesarias, debe citarse a una audiencia de alegatos dentro de los tres días siguientes, la que se celebrará con o sin la concurrencia

132

de las partes. c) En caso de ofrecerse pruebas o el tribunal estime necesaria alguna, debe abrirse una dilación probatoria de diez días. d) Celebrada la audiencia de alegatos dentro de los cinco días siguientes debe dictarse la resolución correspondiente.

OCTAVO TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.

Amparo en revisión 65/97. Lydia Marina de Álvarez y otros. 31 de marzo de 1997. Unanimidad de votos. Ponente: Guillermo Antonio Muñoz Jiménez. Secretaria: Ana Luisa Mendoza Vázquez."

De acuerdo a lo exigido por el Código de Comercio y refrendado en el precedente anterior, se acompaña al presente escrito como **ANEXO DOS** copia certificada del laudo arbitral de fecha quince de marzo de dos mil ocho, cuyo reconocimiento y ejecución se solicita en este acto.

Por lo que se refiere al original del acuerdo de arbitraje, el mismo ya fue exhibido por mi contraria en el presente procedimiento bajo el número de Anexo 4 y además fue reconocido como válido y vinculante PEP.

En ese sentido, de conformidad con lo dispuesto por el artículo 210 del Código Federal de Procedimientos Civiles que establece que el documento que un litigante presente en juicio, prueba plenamente en su contra, ante el ofrecimiento del acuerdo de arbitraje en comento, por mi contraria y el reconocimiento del mismo, por mi representada, el requisito de exhibición del original de tal acuerdo, efectivamente se ha cumplido. Lo anterior, cobra mayor sustento en el criterio judicial que se cita a continuación:

"Registro No. 362651
Localización:
Quinta Época
Instancia: Tercera Sala
Fuente: Semanario Judicial de la Federación
XXXVI
Página: 2020
Tesis Aislada
Materia(s): Civil

**DOCUMENTOS, FUERZA PROBATORIA DE LOS.** El **documento presentado por una de las partes en un juicio, prueba plenamente en su contra**, en todas sus partes, aunque el colitigante no lo reconozca, de acuerdo con lo preceptuado en el artículo 1298 del Código de Comercio.

Recurso de súplica 165/26. Straffon Tomás. 2 de diciembre de 1932. Unanimidad de cuatro votos. Ausente: Manuel Padilla. La publicación no menciona el nombre del ponente.

(Énfasis añadido)"

El laudo arbitral antes referido fue redactado en idioma español por lo que no es necesario presentar una traducción del mismo.

133

Adicionalmente, es importante destacar que la Autoridad Judicial debe omitir entrar al estudio del fondo del asunto resuelto por el laudo arbitral cuyo reconocimiento y ejecución se solicite. Es absoluto e indiscutible, el laudo final cuya ejecución se solicita, tiene la calidad de *cosa juzgada*, situación que se verifica en los siguientes criterios judiciales:

"Registro No. 189345
Localización:
Novena Época
Instancia: Tribunales Colegiados de Circuito
Fuente: Semanario Judicial de la Federación y su Gaceta
XIV, Julio de 2001
Página. 1107
Tesis· I.3o.C.231 C
Tesis Aislada
Materia(s): Civil

**ÁRBITRO. SUS RESOLUCIONES SON ACTOS DE AUTORIDAD, Y SU EJECUCIÓN LE CORRESPONDE AL JUEZ DESIGNADO POR LAS PARTES.** Para la ejecución de un laudo arbitral es preciso la mediación de un acto realizado por un órgano jurisdiccional que, sin quitarle la naturaleza privada, asume su contenido, de modo que el laudo es ejecutable por virtud del acto jurisdiccional, que sólo es el complemento necesario para ejecutar lo resuelto por el árbitro, ya que el laudo es una resolución dictada por el árbitro que dirime la controversia suscitada entre las partes, con calidad de cosa juzgada y constituye título que motiva ejecución, ante el Juez competente que debe prestar los medios procesales necesarios para que se concrete lo resuelto en el laudo. Por lo tanto, *el laudo es una resolución que tiene los atributos de inimpugnabilidad, inmutabilidad y coercibilidad*, sólo que la eficacia y realización concreta de lo condenado quedan siempre al Juez competente designado por las partes o el del lugar del juicio. El árbitro carece de la facultad de hacer cumplir, ante sí, el laudo que emitió, porque no tiene la potestad o imperium, que es uno de los atributos de la jurisdicción y que es inherente a los órganos jurisdiccionales del Estado. Ello implica que el árbitro carece de la fuerza del Estado para hacer efectiva la condena, pero *el laudo en sí mismo no está despojado de los atributos de la <u>cosa juzgada</u>*, puesto que la facultad de decidir la controversia es una delegación hecha por el Estado a través de la norma jurídica, y sólo se reserva la facultad de ejecutar. El Juez ante quien se pide la ejecución de un laudo dictado por un árbitro, para decretar el requerimiento de pago, únicamente debe y puede constatar la existencia del laudo, como una resolución que ha establecido una conducta concreta, inimpugnable e inmutable y que, por ende, debe provenir de un procedimiento en el que se hayan respetado las formalidades esenciales del procedimiento, y que no sea contrario a una materia de orden público.

TERCER TRIBUNAL COLEGIADO EN MATERIA CIVIL DEL PRIMER CIRCUITO.

Amparo directo 1303/2001. Constructora Aboumrad Amodio Berho, S.A. de C.V. 8 de marzo de 2001. Unanimidad de votos. Ponente: Neófito López Ramos. Secretaria: Lina Sharai González Juárez.

Nota: Por ejecutoria de fecha 26 de octubre de 2001, la Segunda Sala declaró inexistente la contradicción de tesis 14/2001-PL en que participó el presente

134

criterio.

No. Registro: 186,229
Tesis aislada
Materia(s): Civil
Novena Época
Instancia: Tribunales Colegiados de Circuito
Fuente: Semanario Judicial de la Federación y su Gaceta
XVI, Agosto de 2002
Tesis: XV.1o.50 C
Página: 1317

**LAUDO ARBITRAL. SU HOMOLOGACIÓN POR AUTORIDAD JUDICIAL ORDINARIA Y EL ANÁLISIS DE ÉSTA, EN AMPARO, NO PERMITE EL ESTUDIO DE SU SENTIDO EN CUANTO AL FONDO.** Un laudo arbitral es la decisión de un órgano no estatal, así convenida por las partes, para resolver una contienda, ya sea presente o futura; así, para efectos de la instancia ordinaria queda a la exclusiva potestad de la decisión del tribunal de arbitraje y pasa a ser una extensión de esa voluntad, que por ser un acto de particulares, en cuanto a su sentido, no se encuentra sujeto a revisión constitucional; sin embargo, tal revisión constitucional sí se puede dar respecto a la resolución de homologación emitida por un órgano judicial estatal, la que, desde luego, se limitará al resultado del análisis de la debida composición del tribunal de arbitraje, del debido procedimiento, de la manifestación de voluntad de las partes de someterse al arbitraje, de la materia del mismo y de los demás **supuestos contemplados en el artículo 1462 del Código de Comercio, supuestos que, como se advierte, contemplan únicamente cuestiones de** *forma* y *no de fondo*, y, una vez dada la homologación, de los actos de ejecución con que el Juez auxilia al cumplimiento del laudo; por lo que en la vía de amparo únicamente se podrán alegar esas cuestiones y no las relativas al fondo y sentido del laudo. Lo anterior se robustece con el criterio sostenido por la Tercera Sala de la anterior integración de la Suprema Corte de Justicia de la Nación, en la tesis aislada, publicada en el Semanario Judicial de la Federación, Quinta Época, Tomo XXXVIII, página 801, de rubro: "ARBITRAJE.", en la que considera que el arbitraje es una **convención que la ley reconoce, lo que constituye una renuncia de los particulares para que la autoridad judicial conozca de una controversia**, por lo que tiene una importancia procesal negativa, en cuanto que las partes confían la decisión de sus conflictos a uno o más particulares, llamados árbitros; sin embargo, éstos no son funcionarios del Estado ni tienen jurisdicción propia o delegada, y sus facultades derivan únicamente de la voluntad de las partes, expresada de acuerdo a la ley, y si bien el laudo arbitral no puede revocarse a voluntad de uno de los interesados, no es ejecutivo en sí mismo, ya que sólo puede considerársele como una obra de la lógica jurídica que es acogida por el Estado, por lo que sólo puede ejecutarse a través de un acto realizado por un órgano jurisdiccional que, sin quitarle su naturaleza privada, asume su contenido, y es entonces que se equipara a un acto jurisdiccional. Sin embargo, los Jueces no están autorizados para revisar los laudos de manera integral, ya que de lo contrario podrían nulificarlos, aun por cuestiones de fondo, para lo que sería necesario que previamente las partes comparecieran ante el Juez a plantearle el debate, y el sistema generalmente adoptado consiste en que si la violación contenida en el laudo transgrede el orden público, el Juez no debe ordenar su ejecución, pero si solamente perjudica intereses privados debe ordenarla; y una vez decretado judicialmente su cumplimiento se eleva a la categoría

135

# EXHIBIT A
# Part 4 of 4

de acto jurisdiccional y es entonces que el agraviado puede ocurrir ante los tribunales de la Federación en demanda de amparo, que deberá tramitarse en la vía biinstancial, como así se advierte de la jurisprudencia número 32/93 de la Tercera Sala de la anterior integración de la Suprema Corte de Justicia de la Nación, publicada en la Gaceta del Semanario Judicial de la Federación, tomo 72, diciembre de 1993, página 41, de rubro: "LAUDO ARBITRAL, ACUERDOS DE HOMOLOGACIÓN Y EJECUCIÓN DEL. PROCEDE EN SU CONTRA EL JUICIO DE AMPARO INDIRECTO, EN TÉRMINOS DEL ARTÍCULO 114, FRACCIÓN III, DE LA LEY DE AMPARO, Y NO EL DIRECTO A QUE ALUDE EL 158 DEL MISMO ORDENAMIENTO.".

PRIMER TRIBUNAL COLEGIADO DEL DÉCIMO QUINTO CIRCUITO.

Amparo en revisión 138/2002. Mecalux, México, S.A. de C.V. 28 de mayo de 2002. Unanimidad de votos. Ponente: Pedro Fernando Reyes Colín. Secretario: Ángel Rodríguez Rico.*

(Énfasis añadido)

Cumplidos así todos los requisitos establecidos por el Código de Comercio y no ubicándonos en cualquiera de los supuestos previstos por el artículo 1462 de ese mismo ordenamiento, a efecto de proporcionar a su Señoría los antecedentes que llevaron a la presente solicitud de ejecución, a continuación expongo los siguientes:

## HECHOS

**PRIMERO.-** La demandante **COMMISA**, presentó su solicitud de arbitraje contra la demandada PEP, el once de febrero de dos mil cinco.

**SEGUNDO.-** La demandada PEP, presentó su contestación a dicha solicitud de arbitraje y una demanda reconvencional el tres de mayo de dos mil cinco.

**TERCERO.-** La demandante **COMMISA**, presentó su réplica a la demanda reconvencional el quince de junio de dos mil cinco.

**CUARTO.-** Se constituyó el Tribunal Arbitral y el dos de junio de dos mil cinco, los co-árbitros José W. Fernández y Darío Oscós Coria designaron a Juan Fernández-Armesto como Presidente del Tribunal Arbitral. Esta designación fue confirmada por el Secretario General de la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional, el diez del mismo mes y año.

**QUINTO.-** El Tribunal Arbitral elaboró un borrador de Acta de Misión y se firmó dentro del plazo prorrogado por la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional, en su sesión del doce de agosto, hasta el treinta y uno de octubre de dos mil cinco.

El veinte de septiembre de dos mil cinco, el Tribunal Arbitral emitió la Orden Procesal n° 1 que incluía el calendario procesal.

**SEXTO.-** La demandante **COMMISA**, presentó su escrito de demanda el dieciséis de enero de dos mil seis. La demandada PEP, contestó a dicho escrito a través de su escrito de contestación a la demanda y de reconvención el dos de marzo de dos mil seis.

**SÉPTIMO.-** El cinco de abril de dos mil seis, la demandante **COMMISA**, presentó su escrito de réplica y el nueve de mayo de dos mil seis, la demandada PEP presentó su escrito de dúplica.

**OCTAVO.-** Se llevaron a cabo las audiencias correspondientes los días cinco a nueve de junio de dos mil seis en el Hotel JW Marriott en México, Distrito Federal.

**NOVENO.-** Con fecha quince de enero de dos mil ocho, se emitió el laudo arbitral por el Tribunal Arbitral constituido por Juan Fernández Armesto como Árbitro Presidente y José W. Fernández y Darío Oscós Coria como co-árbitros resolviendo lo siguiente:

"1.  Declarar que es competente para resolver todas las pretensiones y peticiones formuladas por "Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V." ["Commisa"] en su demanda y por "PEMEX-Exploración y Producción" ["PEP"] en su reconvención.

2.  Declarar que no existe impedimento alguno para entrar a conocer de todas las pretensiones y peticiones formuladas por Commisa en su demanda y por PEP en su reconvención.

3.  Condenar a PEP a pagar a Commisa, en concepto de remuneración e indemnización debida al amparo del contrato EPC-28, la suma de "S" Pesos Mexicanos ["PME"], calculada de acuerdo con la siguiente fórmula

$$S = (A + B) \times 0,995$$

en la que

"S" es la suma en PME que PEP debe pagar a Commisa.
"A" es igual a 10.928.728 PME.
"B" es una suma en PME que resulta de convertir 75.075.635 Dólares de los Estados Unidos de América ["USD"] en PME al tipo de cambio de venta que el Banco de México haya determinado y publicado en el Diario Oficial de la Federación el día hábil inmediato anterior al 29 de septiembre de 2002.
"+" es el signo de adición.
"x" es el signo de multiplicación.

137

"=" es el signo de igualdad.

0,995 refleja la reducción del 5 al millar que Commisa está obligada a efectuar a favor de la Secretaría de Contraloría y Desarrollo Administrativo.

4.  Condenar a PEP a pagar a Commisa, en concepto de gastos financieros derivados del Contrato EPC-28, un interés calculado sobre la suma "S", definida en la Decisión precedente; los gastos financieros se devengarán desde el 29 de septiembre de 2002 hasta la fecha de pago efectivo, a la tasa en cada momento establecida en la Ley de Ingresos de la Federación para los casos de prórroga en el pago de créditos fiscales; el cómputo se hará por días y el pago de los gastos financieros se realizará conjuntamente con el de la suma "S" definida en la Decisión precedente.

5   Declarar que las cantidades a cuyo pago PEP ha resultado condenada en virtud del presente laudo no incluyen el Impuesto sobre el Valor Agregado mexicano.

6.  Condenar, en materia de gastos y costas, a:

(iii) Cada parte a asumir la mitad de los honorarios y los gastos de los árbitros, la mitad de los gastos administrativos de la Cámara de Comercio Internacional y sus propios gastos de defensa.

(iv) Condenar a PEP a satisfacer a Commisa 200.000 USD como gastos incurridos por ésta para defenderse de las objeciones de falta de competencia del Tribunal Arbitral y de falta de requisitos de procedibilidad planteadas por aquélla.

7.  Desestimar todas las demás pretensiones y peticiones de las partes.

La decisión del Tribunal Arbitral se adopta por unanimidad, con la salvedad de que el árbitro D. Oscós Coria disidente de la opinión de la mayoría en lo referente a las Controversias Técnicas 36 ("Malos tiempos que afectaron a los trabajos de la Castoro 10 y del Bar Protector"), 34 y 35 ("Tiempos de espera por retrasos en el inicio de los trabajos de la Castoro 10 y Bar Protector") y al cálculo de intereses y costas. Su opinión disidente en estos aspectos quedará recogida en un voto particular."

## CONSIDERACIONES DE DERECHO EN VIRTUD DE LAS CUALES SE DEBERÁ CONSIDERAR PROCEDENTE Y FUNDADA LA ACCIÓN QUE SE EJERCE MEDIANTE EL PRESENTE INCIDENTE

1.- Mi representada tiene derecho para reclamar la condena dictada en el laudo del procedimiento arbitral 13716/CCO/JRF en virtud de que participó como parte demandante, lo cual fue reconocido por el Tribunal Arbitral ante quien obtuvo laudo favorable.

Tal y como se desprende de lo actuado en el procedimiento arbitral de referencia, cuyo laudo definitivo obra como prueba y documento base de la acción en el expediente en el que se actúa, con fecha quince de enero de dos mil ocho, el Tribunal Arbitral compuesto por José W. Fernández, Juan Fernández Armesto y Darío Oscós Coria condenó a la demandada, según se aprecia a páginas 182 y 183 del laudo referido, a pagar las siguientes cantidades:

"...

3.    ...la suma de "S" Pesos mexicanos ["PME"], calculada de acuerdo con la siguiente fórmula:

S = (A + B) x 0,995

en la que

"S" es la suma en PME que PEP debe pagar a Commisa.

"A" es igual a 10.928.728 PME.

"B" es una suma en PME que resulta de convertir 75.075.635 Dólares de los Estados Unidos de América ["USD"] en PME al tipo de cambio de venta que el Banco de México haya determinado y publicado en el Diario Oficial de la Federación el día hábil inmediato anterior al 29 de septiembre de 2002.

"+" es el signo de adición.

"x" es el signo de multiplicación.

"=" es el signo de igualdad.

0,995 refleja la reducción del 5 al millar que Commisa está obligada a efectuar a favor de la Secretaría de Contraloría y Desarrollo Administrativo.

4.    ... pagar a Commisa, en concepto de gastos financieros derivados del Contrato EPC-28, un interés calculado sobre la suma "S", definida en la Decisión precedente; los gastos financieros se devengarán desde el 29 de septiembre de 2002 hasta la fecha de pago efectivo, a la tasa en cada momento establecida en la Ley de Ingresos de la Federación para los casos de prórroga en el pago de créditos fiscales; el cómputo se hará por días y el pago de los gastos financieros se realizará conjuntamente con el de la suma "S" definida en la Decisión precedente.

...

6.    Condenar, en materia de gastos y costas, a:

(ii)    ... satisfacer a Commisa 200.000 USD como gastos incurridos por ésta para defenderse de las objeciones de falta de competencia del Tribunal Arbitral y de falta de requisitos de procedibilidad planteadas por aquélla."

139

2.- La presente acción reconvencional es procedente sin preceder la necesidad de haber requerido previamente el pago a la demandada pues el propio emplazamiento relativo a senda acción, debe' hacer las veces de requerimiento judicial de pago.

3.- Las personas que fungieron como árbitros en el procedimiento arbitral nunca se encontraron impedidos para conocer y resolver la disputa sometida a su competencia.

En virtud de lo anterior, cabe abundar que el Tribunal Arbitral fue adecuado y correctamente constituido puesto que:

Mi representada cumplió por lo dispuesto en la cláusula arbitral y el Reglamento de Arbitraje de la Cámara de Comercio Internacional al momento de designar a su árbitro, tanto como lo hizo la propia PEP.

Derivado de lo anterior y como ya fue debidamente mencionado, se aclara que mi representada realizó el nombramiento del citado árbitro en atención a su reputación y prestigio como un árbitro imparcial, independiente y conocedor tanto de la materia arbitral como de la materia jurídico-comercial.

4.- Es procedente el presente procedimiento de reconocimiento y ejecución de laudo arbitral en virtud de que las partes se sometieron voluntaria y expresamente al procedimiento arbitral.

5.- Lo resuelto por el Tribunal Arbitral no versa sobre la declaración de una violación a un tema de derecho administrativo, sino sobre el incumplimiento de una obligación contractual.

El caso concreto tiene como supuesto la existencia previa de una obligación pactada por las partes y cuya consecuencia de incumplimiento es el pago de una indemnización por los daños causados por PEP a mi representada, situación jurídica que implica la procedencia del procedimiento arbitral.

6.- No se actualiza alguno de los supuestos previstos en el artículo 1462, fracción II del Código de Comercio.

Efectivamente, según se desprende de lo ordenado por dicho numeral, el juez puede negar el reconocimiento del laudo arbitral si el objeto de la controversia no

140

es susceptible de arbitraje o bien si el reconocimiento o la ejecución del laudo son contrarios al orden público.

En este tenor, jamás existieron violaciones que podrían ser catalogadas como violaciones procesales o formales y de fondo en el dictado del laudo. Tales cuestiones no son capaces de implicar una contravención al orden público.

El concepto de orden público al que se refiere el artículo 1462 del Código de Comercio, en cita no tiene nada que ver con las formalidades del procedimiento arbitral. Por el contrario, a lo que la ley se refiere con esto es que el laudo o su ejecución impliquen la contravención de leyes que por su importancia, contengan valores superiores del ordenamiento legal. Esto es, el texto de la ley no se refiere a normas procesales del arbitraje, sino a normas sustantivas que por su importancia se consideran elevadas a la categoría de orden público.

En este contexto, el laudo arbitral si se encuentra razonado en Derecho mexicano. Contiene la cita de los preceptos que los árbitros consideraron aplicables al caso concreto, e igualmente contiene las razones, circunstancias y consideraciones de hecho y de derecho por las cuales determinaron el sentido del fallo.

Cabe además señalar que de conformidad con el artículo 25 del Reglamento de Arbitraje de la Cámara de Comercio Internacional la única obligación que tienen los árbitros en relación con el contenido del laudo se refiere a que el mismo se encuentre motivado. Sin embargo, dicha motivación no debe ni puede ser interpretada en los términos de la obligación de las autoridades jurisdiccionales estatales mexicanas, toda vez que ésta deviene del principio de legalidad existente en materia constitucional, mientras que la obligación de motivar el laudo deviene de un pacto entre las partes.

En este sentido, el Reglamento de Arbitraje de la Cámara de Comercio Internacional no define los términos y alcance de lo que debe entenderse por un laudo motivado. Sin embargo, la interpretación que se ha dado en la práctica arbitral, sobre todo considerando las versiones que en otros idiomas existen el citado artículo 25 (como por ejemplo en idioma inglés "The Award shall state the reasons upon which it is based" cuya traducción libre sería "El Laudo establecerá las razones en las cuales se encuentra basado"), es que basta con que en el laudo se expresen las razones de la decisión para que el mismo sea válido.

7.- No hubo violaciones al procedimiento arbitral. Según se desprende de lo dispuesto por el artículo 15 del Reglamento de Arbitraje de la Cámara de Comercio Internacional el derecho procesal nacional sólo es aplicable si el

Reglamento es omiso y además, el Tribunal Arbitral considera conveniente hacer referencia a él.

Por su parte, el artículo 15 párrafo 2 del referido Reglamento de Arbitraje, dispone sobre la oportunidad de defensa. Al respecto, tal numeral determina que el Tribunal Arbitral debe conceder a las partes una oportunidad suficiente para exponer su caso.

Por esto debe entenderse que el procedimiento arbitral debe cumplir con las formalidades suficientes para poder integrar un medio de solución de controversias. Esto es, debe prever la posibilidad de que, tanto la parte demandante como la demandada sean capaces de exponer sus casos para poder integrar una litis.

Igualmente, se requiere que las partes sean capaces de ofrecer las pruebas que sustenten sus pretensiones, que se les permita alegar, si es el caso y que el Tribunal Arbitral dicte un laudo que se ocupe congruentemente de los puntos planteados.

La supuesta aplicación incongruente de normas administrativas y normas de materia mercantil o inclusive civil que alega en forma por demás inconsistente y carente de una secuencia lógica, PEP, respecto de la forma en que se llevó el procedimiento arbitral no son formalidades esenciales del procedimiento. Tampoco lo es, la forma en que el Tribunal Arbitral decidió interpretar el contenido obligacional del contrato, en especial el pacto de arbitraje contenido en la cláusula 23.3, del contrato base de la acción y los alcances que dicho pacto pudiera tener respecto de las distintas controversias que pudieran llegar a suscitarse con motivo de la ejecución de dicho contrato.

Tales elementos forman parte y se derivan específicamente de la jurisdicción que sobre el fondo del asunto tiene en forma exclusiva el Tribunal Arbitral. La manera de valorar las pruebas, así como las consideraciones en virtud de las cuales el Tribunal Arbitral toma sus decisiones no tienen nada que ver con las formalidades esenciales del procedimiento. Tales cuestiones no pueden ser sujetas a análisis por un tribunal estatal.

La autonomía del Tribunal Arbitral en la toma de sus decisiones y el correspondiente reconocimiento por parte de los tribunales estatales es justamente la razón de ser del arbitraje comercial. Dicha institución tiene como finalidad la existencia y el reconocimiento de un medio de solución de controversias basado en la voluntad contractual y cuyos límites deben ser mínimos

142

para cumplir su razón de ser, la cual es la celeridad y economía propia del derecho mercantil.

En este sentido, los argumentos de la demandada consistentes en que el laudo no debe ser reconocido por no observar las supuestas formalidades esenciales del procedimiento que ella consideran son el hecho de considerar el interés público involucrado en el contrato base de la acción, la supuesta falta de fundamentación y motivación en diversa legislación administrativa supuestamente aplicable al contrato base de la acción, el valor probatorio dado a los documentos ofrecidos como prueba, y el análisis de los razonamientos respecto de la arbitrabilidad de la controversia respecto de las distintas controversias técnicas sometidas a arbitraje, no son argumentos que, según lo explicado y según lo ordenado por el artículo 1462 del Código de Comercio, sean capaces de conllevar al desconocimiento del laudo.

8.- Asimismo, es importante tomar en cuenta lo dispuesto por el artículo 33 del Reglamento de Arbitraje de la Cámara de Comercio Internacional que establece que para el caso de que alguna de las partes omita objetar algún acto que estime violatorio de sus derechos a una adecuada defensa, en la primera oportunidad que tenga para hacerlo, se entenderá que ha perdido su derecho a objetar tal acto. Esta regla se confirmó en el inciso (vii) del punto G del Acta de Misión vinculante para las partes, en el siguiente sentido:

> "Si durante el desarrollo del procedimiento alguna de las partes advirtiera que se están violando su derecho a un proceso justo y equitativo o los principios de igualdad, audiencia y contradicción, deberá ponerlo en conocimiento del Tribunal Arbitral tan pronto como lo advierta, entendiéndose que, si no lo hace en la primera oportunidad, renuncia a su posterior alegación."

PEP, jamás puso en conocimiento del Tribunal Arbitral cualquier tipo de violación de esta especie. En consecuencia, su Señoría deberá considerar que ha renunciado a su derecho a alegar cualquier tipo de argumento en el sentido de que le fue violado el derecho de garantía de audiencia o debido proceso.

En este sentido, queda absolutamente excluida, la causal prevista por el inciso b), de la fracción I, del artículo 1462 del Código de Comercio, para que la parte condenada en el laudo final cuyo reconocimiento y ejecución se demanda, alegue una violación a sus derechos a una adecuada defensa.

Aporta todavía mayor contundencia al hecho de la pérdida de este derecho, lo establecido en el párrafo 41 del laudo final en comento, visible en la página 11 del mismo, en el que se reconoce que a PEP le fue preguntado "*si en algún momento*

*del procedimiento arbitral se habían infringido los principios de audiencia, contradicción e igualdad o si [había] sufrido algún tipo de indefensión procesal"* y que ésta declaró no haber sufrido indefensión procesal alguna y que el procedimiento arbitral se siguió conforme a los principios del debido proceso.

## DOCUMENTOS

En cumplimiento a lo ordenado por los artículos 1061 y 1378 del Código de Comercio procedo a hacer una relación de los documentos en los que mi representada funda sus peticiones.

**1.- LA DOCUMENTAL PÚBLICA,** consistente en la escritura pública número 58,042, de fecha catorce de marzo de dos mil ocho, otorgada ante la fe del Notario Público número 1 del Distrito Federal, Licenciado Roberto Nuñez Y Bandera en la cual consta el poder otorgado por COMMISA a favor del Licenciado Marco Tulio Venegas Cruz y otros.

Esta prueba acredita la personalidad con la que comparece COMMISA al presente procedimiento incidental de nulidad. Resulta idónea para acreditar este hecho en virtud de que el poder contenido en la referida escritura pública, se otorgó ante fedatario público cumpliendo con las formalidades exigidas por el Código Civil Federal para tal efecto.

La presente prueba se relaciona con todos y cada uno de los hechos de la presente contestación y reconvención, especialmente con la personalidad con la que comparece el suscrito Marco Tulio Venegas Cruz, en representación de COMMISA.

**2.- LA DOCUMENTAL PRIVADA,** consistente en la copia certificada de fecha veintiocho de febrero de dos mil ocho emitida por Jason A. Fry, Secretario General de la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional respecto del laudo final de fecha quince de enero de dos mil ocho emitido en el arbitraje 13716/CCO/JRF sostenido entre COMMISA y PEP.

Esta prueba se ofrece para dar cumplimiento a lo dispuesto por el artículo 1061 del Código de Comercio a efectos de que el laudo final sea reconocido y ejecutado por su Señoría.

Esta copia certificada es idónea para acreditar tal extremo en virtud de que la certificación que la misma contiene, fue emitida por funcionario por parte de la

Corte Internacional de Arbitraje de la Cámara de Comercio Internacional que fue precisamente la institución administradora del arbitraje que dio origen al laudo objeto del presente procedimiento.

Esta prueba se relaciona con todos y cada uno de los hechos de la presente contestación y especialmente con aquellos referidos en la reconvención.

3.- **LA DOCUMENTAL PRIVADA**, consistente en una certificación de fecha veintinueve de febrero de dos mil ocho emitida por Jason A. Fry, Secretario General de la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional en la cual se certifica lo siguiente:

1) que, CORPORACIÓN MEXICANA DE MANTENIMIENTO INTERGRAL, S. DE R.L. DE C.V. (antes denominada como CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S.A. DE C.V.) (México) ha sido Demandante en un arbitraje en contra de PEMEX-EXPLORACIÓN Y PRODUCCIÓN (México) (la "Demandada") (número de referencia 13716/CCO/JRF);

2) que la Demandada de arbitraje fue recibida por la Secretaría el 14 de febrero de 2005;

3) que, de acuerdo con el récord de la compañía de mensajería expresa DHL, la Demanda de Arbitraje fue recibida por la Demandada el 22 de febrero de 2005;

4) que la Contestación a la Demanda de Arbitraje fue presentada el 3 de mayo de 2005;

5) que, de acuerdo con el récord de la compañía de mensajería expresa DHL, el Laudo Final de fecha 15 de enero de 2008 fue recibido por la Demandada el 11 de febrero de 2008.

Esta prueba se ofrece para acreditar los hechos que se manifiestan en la certificación en relación con diversos acontecimientos procesales que se verificaron durante la tramitación del procedimiento arbitral 13716/CCO/JRF. Esta prueba resulta idónea para acreditar los extremos contenidos en la misma en virtud de que fue emitida por la Institución Administradora del arbitraje que concluyó en el laudo objeto del presente procedimiento.

Esta prueba se relaciona con todos y cada uno de los hechos del presente escrito, especialmente con el hecho de que se respetaron las formalidades esenciales del procedimiento previstas en el Reglamento de Arbitraje de la Cámara de Comercio Internacional.

145

**4.- LA DOCUMENTAL PRIVADA,** consistente en una copia certificada de fecha veintiocho de febrero de dos mil ocho suscrita por el Sr. Jason A. Fry, Secretario General de la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional respecto del Acta de Misión o "Terms of Reference" suscrita por los árbitros, los representantes de COMMISA y PEP.

La presente se ofrece para acreditar la manifestación expresa de voluntad y acuerdo que existió entre las partes del arbitraje respecto a los puntos sobre los cuales debía pronunciarse el Tribunal Arbitral, es decir la fijación de la litis que este último debía resolver. Esta prueba acredita que las partes se sometieron expresamente a la determinación que eventualmente emitió el Tribunal Arbitral, consistente en el laudo final que ahora PEP ha impugnado de nulo.

Esta prueba resulta idónea para acreditar el extremo referido en el párrafo anterior en virtud de que la misma corresponde fielmente al original que en su momento suscribieron las partes.

La presente prueba se relaciona con todos y cada uno de los hechos narrados en el presente escrito, particularmente con el hecho de que el Tribunal Arbitral resolvió en el laudo final, los puntos que las partes expresamente consintieron en que conformaran la litis del arbitraje.

**5.- LA DOCUMENTAL PÚBLICA,** consistente en el legajo de fecha diecinueve de mayo de dos mil ocho, emitido por el Lic. Miguel Soberón Mainero, Notario Público número 181, del Distrito Federal, respecto del documento consistente en el Anexo C del Contrato número PEP-O-IT 136/98.

Esta prueba se ofrece para acreditar que lo tratado en el aludido Anexo C era el material al que exclusiva y limitativamente se refería la cláusula 23.2 del Contrato y en ese sentido, sólo respecto del material tratado en dicho Anexo C, podrían haber surgido en su momento, cualesquiera controversias técnicas. En este sentido, las controversias técnicas a que se refería el Anexo C, no correspondían a aquellas por las que condenó el laudo arbitral.

Esta prueba es idónea para acreditar el hecho en comento en virtud de que la misma es prueba plena del contenido de dicho Anexo C y en este sentido, la misma hará indubitable que el texto de la cláusula 23.2 del Contrato sólo hacía referencia a controversias técnicas que pudieran suscitarse en razón de lo dispuesto en dicho Anexo C.

146

Esta prueba se relaciona con todos los hechos del presente escrito de contestación y reconvención, especialmente con el relativo a que las condenas emitidas en el laudo arbitral se refirieron a controversias técnicas distintas a aquellas que fueron materia de la cláusula 23.2. del Contrato.

6.- **LA DOCUMENTAL PÚBLICA** consistente en la traducción de fecha diecinueve de mayo de dos mil ocho, realizada por Alberto de la Santa Cruz Manzano Alba, Perito Traductor No. P.125-2004, respecto de dos citas: la primera de ellas consiste en el párrafo 9-32 del libro REDFERN, Alan; HUNTER, Martin; BLACKABY, Nigel; y PARTASIDES, C. *Ley y Práctica del Arbitraje Comercial Internacional*, Klewer Law Internacional, 2004, pp. 1-50; la segunda consiste en un párrafo de la página 180 del libro BROCHES, Aron. *Comentario del Modelo de Ley Uncitral, Consejo Internacional de Arbitraje Comercial*, Kluwer Law Internacional, Vol. IV, 2004.

La presente prueba se ofrece para acreditar el cumplimiento que COMMISA da respecto de lo dispuesto por el artículo 131 del Código de Procedimientos Civiles Federal en relación con las traducciones que se deben presentar al español respecto de documentos que se presenten en idioma extranjero. La misma resulta idónea para acreditar sendo cumplimiento toda vez que fue emitida por traductor autorizado para emitir traducciones como la de la especie.

Esta prueba se relaciona con todos y cada uno de los hechos del presente escrito de contestación y reconvención, especialmente con lo relativo a la doctrina de arbitraje internacional en cuanto al concepto más aceptado de "orden público", mismo que es por completo distante del engañosamente propuesto por PEP.

7.- **LA DOCUMENTAL PRIVADA**, consistente en el Contrato de Obra Pública a Precios unitarios y Tiempo Determinado número PEP-O-IT-136/98 de fecha cuatro de septiembre de mil novecientos noventa y ocho celebrado entre COMMISA y PEP, que fue objeto del arbitraje que dio origen al laudo final materia del presente procedimiento incidental.

Esta prueba se ofrece con fundamento en el artículo 210 del Código Federal de Procedimientos Civiles y hago propio el mismo documento ofrecido por PEP en su escrito inicial de incidente de nulidad, como punto 4, del apartado denominado "Relación de Documentos que se Acompañan a la Demanda" visible a foja 292 del mismo. Esta prueba acredita la existencia de la cláusula arbitral 23.3 y el fundamento de todos los reclamos que fueron motivo del laudo arbitral cuya objeto del presente procedimiento incidental y cuyo reconocimiento y ejecución solicita COMMISA.

147

Esta prueba se relaciona con todos los hechos del presente escrito, especialmente con el fundamento contractual de la disputa arbitral, de la competencia del Tribunal Arbitral para pronunciarse respecto de las controversias surgidas con relación a dicho Contrato y del mismo laudo final.

Por lo anteriormente expuesto y fundado,

A USTED C. JUEZ, atentamente pido se sirva:

**PRIMERO.-** Tenerme por presentado, en representación de **CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V.**, promoviendo el presente incidente de reconocimiento y ejecución de laudo arbitral, así como exhibiendo los documentos que se anexan al presente escrito.

**SEGUNDO.-** Ordenar se emplace PEMEX EXPLORACIÓN Y PRODUCCIÓN mediante notificación personal.

**TERCERO.-** En el momento procesal oportuno, dictar sentencia en la que se declare procedente el reconocimiento y ejecución del laudo que intenta mi representada y se ordene pagar a PEMEX EXPLORACIÓN Y PRODUCCIÓN las prestaciones a las que fue condenada en el laudo de quince de enero de dos mil cinco.

**PROTESTO LO NECESARIO**

México, Distrito Federal, a diecinueve de mayo de dos mil ocho.

_____
**MARCO TULIO VENEGAS CRUZ**
en representación de
**CORPORACIÓN MEXICANA DE MANTENIMIENTO
INTEGRAL, S. DE R. L. DE C.V.**

148