## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

CORPORACIÓN MEXICANA )
  DE MANTENIMIENTO INTEGRAL, )
  S. DE R.L. DE C.V., )
                             )     CASE NO.:  1:08-CV-00469 (RWR)
                             )
      Petitioner, )     **[ORAL HEARING REQUESTED]**
                             )
                             )
         v. )
                             )
PEMEX EXPLORACIÓN )
  Y PRODUCCIÓN, )
                             )
      Respondent. )

---

## CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V.'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO RESPONDENT'S MOTION TO DISMISS PETITION TO CONFIRM ARBITRATION AWARD

Christopher M. Paparella (D.D.C. No. NY0091)
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, N.Y. 10004-1482
Tel.:  (212) 637-6644
Fax:  (212) 422-4726
Email: paparella@hugheshubbard.com

Robert M. Kennedy (D.C. Bar No. 459966)
HUGHES HUBBARD & REED LLP
1775 I Street N.W.
Washington, DC 20006-2401
Tel.:  (202) 721-4600
Fax: (202) 721-4646
Email:  kennedyr@hugheshubbard.com

## <u>TABLE OF CONTENTS</u>

<div align="right">Page</div>

PRELIMINARY STATEMENT ..................................................................................................1

BACKGROUND ......................................................................................................................3

    The Parties ........................................................................................................................3

    The EPC-28 Contract and Arbitration ..............................................................................4

    The Present Proceedings ...................................................................................................6

ARGUMENT ...........................................................................................................................8

I.      SERVICE ON PEP WAS PROPER. ..................................................................................8

      A.    Commisa's Notice of Petition and Petition Are Sufficient Process Under the FSIA and the FAA. ..............................................................................8

            1.    Neither the Federal Arbitration Act Nor This Court Requires a Summons to Accompany a Petition to Confirm an Arbitral Award. ...........8

            2.    The Petition Should Not Be Dismissed Even If a Summons Was Required Because Commisa Substantially Complied With 28 U.S.C. § 1608(b) and PEP Has Suffered No Prejudice. ...........................10

      B.    Commisa Properly Served PEP Pursuant to the EPC-28 Contract's Special Arrangement for Service. .................................................................12

II.    THIS COURT HAS PERSONAL JURISDICTION OVER PEP. ...................................14

      A.    No Minimum Contacts Analysis Is Necessary Because PEP Is Not a "Person" Within the Meaning of the Due Process Clause. ..................................14

      B.    Even If a Minimum Contacts Analysis Were Necessary, PEP's Contacts with the United States As a Whole Are Sufficient to Confer Personal Jurisdiction over It. ..............................................................................................17

III.   PEP IS NOT ENTITLED TO A DISMISSAL OR STAY OF THE PETITION. .............18

      A.    Commisa Has Adequately Pled Its Right to Have this Court Confirm the Award. ................................................................................................................19

      B.    The Mexican Court Has Rejected PEP's Requests to Enjoin Commisa from Pursing this Proceeding; PEP Has Not Demonstrated Any Basis on Which this Court Should Decline to Confirm the Award. ....................................19

C.    PEP Is Not Entitled to a Stay of these Proceedings Pending the Resolution
of the Nullification Proceeding, Particularly Where the Mexican Court
Has Twice Rejected PEP's Request to Stay Commisa from Pursuing this
Proceeding...........................................................................................................23

1.    PEP's Complaint to Nullify Is Baseless and Is Not Entitled to this
Court's Deference. ...................................................................................23

2.    The Circumstances of this Case Warrant  Immediate Confirmation,
Not a Stay................................................................................................24

IV.    IN THE EVENT THE COURT DECIDES TO STAY THE ACTION, PEP
SHOULD BE REQUIRED TO POST SECURITY PURSUANT TO ARTICLE 6
OF THE INTER-AMERICAN CONVENTION. ..............................................28

CONCLUSION.............................................................................................................30

# TABLE OF AUTHORITIES

Page(s)

## CASES

*Abur v. Republic of Sudan*, 437 F. Supp. 2d 166 (D.D.C. 2006) ...................................12

*Altmann v. Republic of Austria*, 317 F.3d 954 (9th Cir. 2002) ....................................17

*In re Arbitration Between Interdigital Commc'ns Corp. & Samsung Elecs. Co.*,
    528 F. Supp. 2d 340 (S.D.N.Y. 2007) ...............................................................24, 25

*In re Arbitration Between Space Sys./Loral Inc. & Yuzhnoye Design Office*,
    164 F. Supp. 2d 397 (S.D.N.Y. 2001) .........................................................................13

*Baker Marine (Nig.) Ltd. v. Chevron (Nig.) Ltd.*, 191 F.3d 194 (2d Cir. 1999) ......................21, 22

* *Banco de Seguros del Estado v. Mut. Marine Offices, Inc.*, No. 02 Civ. 467 (SAS),
    2003 WL 21108318 (S.D.N.Y. May 14, 2003) ...............................................20, 21

*Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955 (2007) ......................................................19

*Berdakin v. Consulado de la República de El Salvador*,
    912 F. Supp. 458 (C.D. Cal. 1995) ...........................................................................14

*Booth v. Hume Publ'g, Inc.*, 902 F.2d 925 (11th Cir. 1990) ............................................8

*BPA Int'l, Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73 (D.D.C. 2003) ...........................16, 17

*Cassirer v. Kingdom of Spain*, 461 F. Supp. 2d 1157 (C.D. Cal. 2006) .........................15

*Compagnie des Bauxites de Guinée v. Hammermills,Inc.*, No. 90-0169 (JGP),
    1992 WL 122712 (D.D.C. May 29, 1992) ...................................................................20

* *Consorcio Rive S.A. de C.V. v. Briggs of Cancun, Inc.*, No. Civ.A. 99-2204,
    2000 WL 98127(E.D. La. Jan. 26, 2000) ...................................................................28

*Corporación Mexicana de Servicios Martimos, S.A. de C.V. v. M/T Respect*,
    89 F.3d 650 (9th Cir. 1996) .........................................................................................16

*Cruz v. United States*, 387 F. Supp. 2d 1057 (N.D. Cal. 2005) .......................................15

*Doe I v. State of Israel*, 400 F. Supp. 2d 86 (D.D.C. 2005) .....................................10, 12

*Europcar Italia, S.p.A. v. Maillano Tours, Inc.*, 156 F.3d 310 (2d Cir. 1998) ...............24, 25, 27

*Evans v. PEMEX*, C.A. No. H-04-1510 (S.D. Tex.) ........................................................4, 18

*Fertilizer Corp. of India v. IDI Mgmt.*, 517 F. Supp. 948 (S.D. Ohio 1981)...............................27

\* *Florasynth, Inc. v. Pickholz*, 750 F.2d 171, 176 (2d Cir. 1984) ...........................................20, 21

*Fronteras Res. Azerbaijan v. State Oil Co. of Azerbaijan*,
    479 F. Supp. 2d 376 (S.D.N.Y. 2007)......................................................................17

*Harris Corp. v. Nat'l Iranian Radio & Television*, 691 F.2d 1344 (11th Cir. 1982) ...................11

*Higgins v. SPX Corp.*, No. 1:05-CV-846, 2006 WL 1008677 (W.D. Mich. Apr. 18, 2006).........27

*IFC Interconsult, AG v. Safeguard Int'l Partners, LLC*, 438 F.3d 298 (3d Cir. 2006) ..................9

*In re Arbitration of Certain Controversies Between*
    *Telcordia Techs., Inc. & Telkom SA, Ltd.*, No. 02-1990 (JR),
    2003 U.S. Dist. LEXIS 23726 (D.D.C. July 20, 2003)............................................27

*Int'l Road Fed'n v. Embassy of Dem. Rep. Congo*, 131 F. Supp. 2d 248 (D.D.C. 2001)..............13

*Kalasho v. Republic of Iraq*, No. 06-11030, 2007 WL 2683553
    (E.D. Mich. Sept. 7, 2007)............................................................................11

*Kemp v. Metabolife Int'l, Inc.*, No. 00-3513, 2003 WL 1936381 (E.D. La. Apr. 23, 2003) .........10

\* *Koken v. LDG Re Corp.*, No. 06-mc-81, 2006 WL 3857489 (E.D Pa. Dec. 28, 2006)...............9

*Magness v. Russ. Fed'n*, 247 F.3d 609 (5th Cir. 2001) .................................................11

*Marlowe v. Argentine Naval Comm'n*, 604 F. Supp. 703 (D.D.C. 1985)....................................13

\* *MGM Prods. Group, Inc. v. Aeroflot Russ. Airlines*, No. 03 Civ. 0500,
    2003 WL 21108367 (S.D.N.Y., May 14, 2003) ...................................................21, 24, 25, 26

*Nattah v. Bush*, 541 F. Supp. 2d 223 (D.D.C. 2008) .....................................................19

*Nedagro B.V. v. Zao Konversbank*, No. 02 Civ. 3946 (HB),
    2003 U.S. Dist. LEXIS 787 (S.D.N.Y. Jan. 21, 2003)............................................27

*New England Mut. Life Ins. Co. v. Troy Ventures, Ltd.*, No. 94-3299,
    1994 WL 705411 (D.N.J. Dec. 14, 1994)..................................................................10

*O'Bryan v. Holy See*, No. 04-338-H, 2007 WL 114162 (W.D. Ky. Jan. 10, 2007) .....................15

*Pradhan v. Al-Sabah*, 299 F. Supp. 2d 493 (D. Md. 2004) ......................................................11, 12

\* *Price v. Socialist People's Libyan Arab Jamahiriya*, 294 F.3d 82 (D.C. Cir. 2002) .....14, 15, 17

*Republic of Argentina v. Weltover*, 504 U.S. 607 (1992) ........................................................17, 18

*Rux v. Republic of Sudan*, No. 04-428, 2005 WL 2086202 (Ed. Va. Aug. 26, 2005) ...................15

*Sherer v. Construcciones Aeronauticas*, 987 F.2d 1246 (6th Cir. 1993)................................10, 11

*Spier v. Calzaturificio Tecnica S.p.A*, 663 F. Supp. 871 (S.D.N.Y. 1987).................22, 27, 28, 29

\* *Spier v. Calzaturificio Tecnica, S.p.A.*, No. 86 Civ. 3447 (CSH),
    1988 U.S. Dist. LEXIS 9919 (S.D.N.Y. Sept. 7, 1988)........................................................29

*Straub v. A P Green, Inc.*, 38 F.3d 448 (9th Cir. 1994) ....................................................11

*Telcordia Techs., Inc. v. Telkom SA, Ltd.* ...........................................................27

\* *TMR Energy Ltd. v. State Prop. Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005)..........9, 15, 16

*Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148 (D.C. Cir. 1994)............................10

*Velidor v. L/P/G Benghazi*, 653 F.2d 812 (3d Cir. 1981) ........................................10

\* denotes cases principally relied upon

## STATUTES AND RULES

9 U.S.C. § 207 (2000) ...................................................................................................19

9 U.S.C. § 301 (2000) .....................................................................................................8

9 U.S.C. § 302 (2000) ...................................................................................................19

9 U.S.C. § 307 (2000) .....................................................................................................8

28 U.S.C. § 1330(b) (2000) ...........................................................................................14

28 U.S.C. § 1605(a)(2) (2000)........................................................................................16

28 U.S.C. § 1607(a)(7) (2000) .......................................................................................15

28 U.S.C. § 1608(a) (2000)..............................................................................10, 12, 13

28 U.S.C. § 1608(b) (2000) ...............................................................10, 11, 12, 14

D.D.C. Local Civ. R. 7..................................................................................................9

E.D. Pa. Local Civ. R. 7.1.............................................................................................9

Fed. R. Civ. P. 12(b)(2)...............................................................................................17

Fed. R. Civ. P. 12(b)(4)...............................................................................................10

Fed. R. Civ. P. 12(b)(6)..............................................................................................18, 19

## MISCELLANEOUS

Inter-American Convention on International Commercial Arbitration, Jan. 30, 1975,
O.A.S.T.S. No. 42 ....................................................................................... *passim*

Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Jun. 10,
1958, 21 U.S.T. 2517, 330 U.N.T.S. 3, art. VI ................................................22, 29


Charles Alan Wright & Arthur R. Miller, 5B *Federal Practice and Procedure* § 1353
(3d ed. 2004) ...........................................................................................................10

## PRELIMINARY STATEMENT

Petitioner Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V. ("Commisa") submits this memorandum of points and authorities in opposition to Respondent Pemex Exploración y Producción's ("PEP") Motion to Dismiss Commisa's Petition to Confirm Foreign Arbitral Award (the "Petition").

On or about February 11, 2008, Commisa and PEP received a final arbitral award (the "Award") from a duly constituted International Chamber of Commerce ("ICC") arbitral tribunal that resolved an arbitration that had been held pursuant to an arbitral agreement between Commisa and PEP. The Award requires, among other things, that PEP pay Commisa over $152.8 million, including interest, costs and Mexican value added tax. Interest on the award is running at approximately $1 million per month.

Commisa commenced this proceeding to confirm the Award on March 19, 2008. More than two months later – and days before the expiration of the time limit to do so under Mexican law – PEP filed a meritless action in Mexico seeking annulment of part of the Award and then filed the instant motion to dismiss or, in the alternative, stay this proceeding. PEP's motion is baseless. Indeed, the Mexican courts have already rejected two requests by PEP for an order barring Commisa from seeking enforcement of the Award.

Through its motion to dismiss, PEP seeks a third bite at the apple, arguing that: (i) Commisa did not serve PEP properly with the Petition and related papers because they were not accompanied by a summons and were delivered by Federal Express and Express mail; (ii) this Court lacks personal jurisdiction over PEP because PEP does not have sufficient minimum contacts with the District of Columbia; and (iii) the Petition fails to state a claim because PEP has requested a Mexican court to nullify the Award. In the alternative, PEP

requests a stay of this proceeding pending resolution of its later-filed Mexican proceeding.  None of the bases for PEP's motion are meritorious.

*There is no need for a summons*:  Under the Federal Arbitration Act ("FAA"), actions to confirm arbitral awards are summary procedures and are governed by Federal motion practice. As a result, a summons was not required to be served on PEP and the Clerk of this Court expressly refused to issue a summons.  Even if a summons had been required, its absence is not grounds for dismissal because PEP admits it received actual notice of this proceeding and, having hired U.S. counsel and timely filed this motion, plainly suffered no prejudice from its omission.

*PEP was properly served*:  Service on PEP by Federal Express and Express Mail was lawful (and indeed required) under the Foreign Sovereign Immunities Act ("FSIA") and Commisa's and PEP's contract.  Where, as here, the parties have agreed on the special arrangement for service, the FSIA requires service in accordance with such arrangement.  Here, the parties' contract provides that legal notices such as the Petition ("notices of a legal or administrative nature") be "delivered in person or sent by registered mail *or any other delivery service that can ensure receipt*" (emphasis added).  Courts have consistently endorsed service under the FSIA pursuant to nearly identical contract provisions.

*PEP is subject to the jurisdiction of this Court*:  PEP is an agency of a foreign state and therefore not a "person" within the meaning of the Constitution's Due Process Clause. Consequently, this Court may exercise personal jurisdiction over PEP without any analysis of PEP's contacts with the District of Columbia.  Even if minimum contacts were required, personal jurisdiction over PEP would be appropriate in light of PEP's contacts with the United States as a whole (which is the relevant inquiry).  Among other things, PEP has admitted in another Federal

action and in filings with the Securities & Exchange Commission that it does business in the United States.

**_The Award is final_**:  The Award is "final" and binding upon the parties.  PEP's later-filed meritless Mexican nullification action does not change the status of the Award; nor does it fall within the ambit of any of the exclusive grounds for declining to confirm an arbitral award that are enumerated in the Inter-American Convention.

**_There is no basis to stay enforcement of the Award_**:  PEP's request that this Court stay this proceeding pending the resolution of PEP's Mexican proceeding is also baseless.  PEP has twice made an identical request to the Mexican courts, which have twice refused to bar Commisa from pursuing this confirmation proceeding.  This Court should not grant PEP relief that it has already sought and been refused in Mexico.  Even if this Court determines that a stay is warranted (it is not), it should require PEP to post security in the then current amount of the Award, which would be an amount exceeding $152.8 million, and to increase such security thereafter by $1 million per month to account for accruing interest, as a condition of such stay.

## BACKGROUND

_The Parties_

Commisa is a corporation organized and existing under the laws of Mexico and is a subsidiary of KBR, Inc., a corporation organized and existing under the laws of the State of Delaware and with a headquarters in Houston, Texas.  (Petition ¶ 1.)

PEP is one of four subsidiaries of Petroleos Mexicanos ("PEMEX"), the Mexican state oil company, and is a "government agency of the Federal Government of Mexico" and an "'organ' of a foreign state."  (PEP Motion to Dismiss ("Motion") at 4 n.4; Declaration of Sergio

Aceves Borbolla ("Borbolla Decl."), attached as Ex. B to the Motion, ¶ 3.)[1]  PEP and the other

Pemex companies "fuel[] the [Mexican] nation's economy, accounting for some one-third of the

Mexican government's revenues and about 7% of its export earnings" and have been "[l]ong

recognized as the tangible expression of Mexican nationalism . . . ."  (Kennedy Decl. Ex. C.)

PEP regularly engages in commercial activity in the United States.  Andres Carvajal

Solano, a PEP officer, admitted in a declaration PEP filed in *Evans v. PEMEX, et al.,* C.A. No.

H-04-1510 (S.D. Tex.) that "PEP conducts some business in the United States . . . .".  (Kennedy

Decl. Ex. B ¶ 6.)  Among other things, PEP and PEMEX have issued millions of dollars of bonds

in the United States that are subject to U.S.-based trust and other arrangements and which are

used to fund PEP projects.  (Kennedy Decl. Ex. E.)  And PEP is currently engaged in a service

contract with the Houston-based Lewis Energy Group L.P. concerning the development of a

natural gas field along Mexico's border with Texas.  (Kennedy Decl. Ex. D.)

*The EPC-28 Contract and Arbitration*

Commisa and PEP entered into a contract in August 1998 under which Commisa agreed

to perform certain engineering, procurement and construction services for PEP and PEP agreed

to pay Commisa for same (the "EPC-28 Contract").

Section 23.3 of the EPC-28 Contract provides that "[a]ny dispute, claim, difference or

dispute [*sic*] that may arise out of, is related or connected to this Contract or breach thereof shall

be definitively resolved by means of arbitration in Mexico City, Federal District, in accordance

with the Rules of Conciliation and Arbitration of the International Chamber of Commerce in

effect at that time.  There shall be three arbitrators, and the arbitration shall be conducted in

Spanish."  (Exhibit 5 to the Affidavit of Christopher M. Paparella, executed March 12, 2008, and

---

1.   *See also* Motion to Dismiss filed by PEP and PEMEX in *Evans v. PEMEX*, *et al.*, C.A. No. H-04-1510 (S.D.
     Tex.) at 8.  A copy of this brief is attached as Exhibit A to the Declaration of Robert M. Kennedy ("Kennedy
     Decl.") filed concurrently with this Opposition.

filed with the Petition ("Paparella Aff.").)  On February 11, 2005, Commisa filed with the ICC a

request for arbitration of disputes that had arisen between it and PEP under the EPC-28 Contract.

A three-member arbitral tribunal was duly constituted.  Between June 5 and June 8, 2006,

after both sides presented extensive written submissions, the parties presented their arguments

and evidence at hearings before the arbitral tribunal.  PEP confirmed to the arbitral tribunal at the

close of the hearing in an exchange between the Chairman of the Arbitral Tribunal, Juan

Fernandez Armesto, and PEP's counsel Jaime Duarte Aispuro that PEP had been afforded due

process of law, had been treated with equality and had been given the opportunity to present all

of its defenses:

> Fernández Armesto:  Ok, then we go into the last two issues.
> Number one, I'd like to ask both of you if at this time, in the
> process, do you feel that you have been defenseless? Do you feel
> that we have not followed due process? Do you think that we have
> not followed the principles of due process and equality? If there is
> anything you want to say, say at this time, it will be included in the
> minutes and the tribunal, if you are right, will try to do something
> about it. If we cannot do anything about it there will be that in the
> record.
>
> [ . . .]
>
> Jaime Duarte: Definitely no. We are concerned about the risk of
> the translation. It is like musical chairs, but because of translation.
>
> Fernández Armesto: I don't understand about the musical chairs
> thing. It's got to be something very Mexican.
>
> Jaime Duarte: Well, in the sense that translators may understand
> one meaning and that is what we get in the translation. But none of
> the rights that you have listed have been violated. It's only one
> concern that we have.
>
> Fernández Armesto: So no. That is something that you can look at
> in the transcript. If there is a mistake we can clean it up.
>
> My concern is if you believe that any due process principle of
> equality has been breached. If you have been defenseless at any

time during the process.

Jaime Duarte: No.

Fernández Armesto: Ok, thank you very much.[2]

The arbitral tribunal issued the Award dated January 15, 2008, which was received by Commisa on February 8 and by PEP on February 11, 2008. The amount of the Award, including interest and costs, is approximately $152.8 million. The Award provides for interest thereon. Interest is accruing on the Award in the amount of approximately $1 million per month.

On March 12, 2008, Commisa issued a letter to PEP requesting payment of the amounts specified in the Award. (Kennedy Decl. Ex. M.) PEP ignored this request. On May 8, 2008, Commisa sent a second letter requesting prompt payment of the Award. (Kennedy Decl. Ex. N.) PEP finally responded on May 19, 2008, asserting that it did not have any obligation to comply with the Award until the resolution of the nullity proceeding it had commenced in Mexico. (Kennedy Decl. Ex. O.)

*The Present Proceedings*

On March 19, 2008, Commisa commenced this proceeding by serving and filing: (a) a Notice of Petition To Confirm Foreign Arbitral Award, (b) a Petition to Confirm Foreign Arbitral Award (with exhibit), (c) a Memorandum of Points and Authorities in Support of Petition to Confirm Foreign Arbitral Award, (d) the Paparella Affidavit (with exhibits), and (e) a [Proposed] Order and Judgment (collectively, the "Petition"). (Kennedy Decl. ¶¶ 8-14.)

Commisa's counsel sought issuance of a summons addressed to PEP by the Clerk's Office. However, the Clerk's Office refused to issue a summons, advising that, in this District,

---

2.  Excerpts from the relevant portion of the hearing transcript are attached as Exhibit L to the Kennedy Declaration.

an action to confirm an arbitral award is a summary procedure governed by the service and paper requirements applicable to motion practice.  (Kennedy Decl. ¶¶ 8-10.)

Section 21.1.1(b) of the EPC-28 Contract provides that "[n]otices of a legal or administrative nature shall be delivered in person, via certified mail or by any other courier service that will ensure receipt thereof . . . ."  (Kennedy Decl. H.)  Pursuant to that special arrangement for service, Commisa served the Petition on PEP by Federal Express and Express Mail on March 19, 2008.  PEP accepted delivery of the service packages on March 24 and 26, 2008.  (Kennedy Decl. ¶¶ 12-14.)

On May 7, 2008, PEP filed an action seeking nullification of part, but not all, of the Award before the Eighth Judicial District on Civil Matters of the First Circuit in Mexico City, Mexico (the "Nullification Proceeding").  (*See* Declaration of Claus von Wobeser ("Von Wobeser Decl."), executed on June 4, 2008 and filed concurrently herewith, ¶¶ 1, 3.)  The Nullification Proceeding seeks vacatur of part of the Award on a number of grounds, none of which has any merit, and none of which is before this Court.  Commisa has filed papers opposing PEP's proceeding in Mexican court.

In the Nullification Proceeding, PEP has twice asked the Mexican court to issue an order barring Commisa from seeking enforcement of the arbitral award until resolution of its challenge to the Award.  The Mexican court rejected both of PEP's requests.  (Von Wobeser Decl. ¶¶ 4-5.)

On May 21, 2008, PEP filed the instant motion to dismiss Commisa's Petition or, in the alternative, to stay this proceeding pending a decision in the Nullification Proceeding.

## ARGUMENT

## I.    SERVICE ON PEP WAS PROPER.

### A.    Commisa's Notice of Petition and Petition Are Sufficient Process Under the FSIA and the FAA.

PEP's motion to dismiss for insufficient process must fail for two reasons.  First, Commisa's service of the Petition on PEP was proper because a petition to confirm an arbitral award under Chapter 3 of the FAA is a motion, not a pleading, and therefore does not require a summons.  Second, even if a summons were required, its omission was a technical defect that does not invalidate service because PEP has not – and cannot – demonstrate that it suffered any prejudice whatsoever from the absence of a summons.

### 1.    Neither the Federal Arbitration Act Nor This Court Requires a Summons to Accompany a Petition to Confirm an Arbitral Award.

Commisa's Petition is governed by Chapters 1 and 3 of the FAA.  *See* 9 U.S.C. § 301 *et seq.* (2000).  Section 6 of the FAA provides that "[a]ny application to the court hereunder shall be made and heard in the manner provided by law for the making and hearing of motions, except as otherwise herein expressly provided."[3]  *Id.* § 6.  Consistent with the plain language of the FAA, courts have interpreted the FAA to require that a petition to confirm an arbitral award be treated as a motion, rather than as a pleading.  As the Eleventh Circuit explained in *Booth v. Hume Publ'g, Inc.*, 902 F.2d 925, 932 (11th Cir. 1990):

> A party initiates judicial review of an arbitration award not by filing a complaint in the district court, but rather by filing either a petition to confirm the award or a motion to vacate or modify the award . . . .  These rules further the [FAA's] policy of expedited judicial action because they prevent a party who has lost in the arbitration process from filing a new suit in federal court and

---

3.    Section 6 is applicable to actions arising under the Inter-American Convention on International Commercial Arbitration, Jan. 30, 1975, O.A.S.T.S. No. 42 ("Inter-American Convention").  9 U.S.C. § 307 ("Chapter 1 [of the FAA] applies to actions and proceedings brought under this chapter to the extent that chapter 1 is not in conflict with this chapter or the Inter-American Convention as ratified by the United States.").

> forcing relitigation of the issues . . . .  Moreover, the district court
> need not conduct a full hearing on a motion to vacate or confirm;
> such motions may be decided on the papers without oral testimony.

*See also IFC Interconsult, AG v. Safeguard Int'l Partners, LLC*, 438 F.3d 298, 308 (3d Cir.

2006) (application for confirmation of arbitral award "was a motion, not a pleading").  Thus, in

*Koken v. LDG Re Corp.*, No. 06-mc-81, 2006 WL 3857489 (E.D. Pa. Dec. 28, 2006), the court

flatly rejected the argument that service of a confirmation petition was defective because it was

not accompanied by a summons.  The court observed that  "a petition for confirmation of an

arbitration award is a motion, not a pleading" and that service was therefore proper because

"Local Rule 7.1 governing motion practice does not require the party filing a motion to include a

summons ."  *Id.* at *4.  *Compare* D.D.C. Local Civ. R. 7 (making no mention of summons) *with*

E.D. Pa. Local Civ. R. 7.1 (same).

     The Local Rules of this Court do not require that motions be accompanied by a summons

and, in fact, the Clerk's Office expressly refused to issue one in connection with Commisa's

confirmation action.  PEP's reliance on a summons issued by the Clerk of the Southern District

of Florida in connection with a petition to confirm an arbitral award in that court is misplaced.

Local procedures in the Southern District of Florida have no bearing on this case.  *This* Court

does not require a summons to be issued for a petition to confirm an arbitral award.  Indeed, the

Court of Appeals of this Circuit has upheld the confirmation of awards against foreign states

where no summons was served along with the petition.  (*See, e.g.*, Kennedy Decl. Ex. G,

annexing docket of *TMR Energy Limited v. State Property Fund of Ukraine*, C.A. No. 1:03-cv-

00034-TPJ (D.D.C.), *aff'd*, 411 F.3d 296 (D.C. Cir. 2005).)

    2.      **The Petition Should Not Be Dismissed Even If a Summons Was Required Because Commisa Substantially Complied With 28 U.S.C. § 1608(b) and PEP Has Suffered No Prejudice.**

Even assuming *arguendo* that a summons was required in this proceeding, its omission was a mere technical defect that did not prejudice PEP.  Such a minor, non-prejudicial defect does not invalidate service.

It is well-settled that a motion to dismiss for insufficient service should only be granted where the defendant demonstrates that it suffered prejudice from the defective process.  *New England Mut. Life Ins. Co. v. Troy Ventures, Ltd.*, No. 94-3299, 1994 WL 705411, at *4 (D.N.J. Dec. 14, 1994) ("Absent a showing of prejudice, defective service is not grounds for dismissal.").[4]  This rule is applicable to service under the Foreign Sovereign Immunities Act.  The courts in this Circuit and numerous others have held repeatedly that technically defective service on a foreign state's agency or instrumentality will be deemed legally sufficient so long as the respondent receives actual notice of the action and is not prejudiced by the defect.  *Transaero, Inc. v. La Fuerza Aerea Boliviana*, 30 F.3d 148, 153 (D.C. Cir. 1994) ("The authorities generally hold that [28 U.S.C.] section 1608(b) may be satisfied by technically faulty service that gives adequate notice to the foreign state."); *Doe I v. State of Israel*, 400 F. Supp. 2d 86, 102 (D.D.C. 2005) ("The service requirements of § 1608(b) are less stringent than those of § 1608(a), and can be satisfied by 'technically faulty service' as long as the defendants receive adequate notice of the suit and are not prejudiced.").[5]

---

4.  *See also* Charles Alan Wright & Arthur R. Miller, 5B *Federal Practice and Procedure* § 1353 at 342 (3d ed. 2004) ("In the case of an objection under Rule 12(b)(4) to the form of the process, the motion will be granted only when the defect is prejudicial to the defendant."); *cf. Kemp v. Metabolife Int'l , Inc.*, No. 00-3513, 2003 WL 1936381, at *1 (E.D. La. Apr. 23, 2003) ("Because there is no indication of prejudice to [the defendant], Plaintiffs are permitted to amend the process to correct the defect.").

5.  *See also Velidor v. L/P/G Benghazi*, 653 F.2d 812, 821 (3d Cir. 1981) (holding that, because instrumentality owned jointly by the Algerian and Libyan governments "immediately became aware of the suit" after service on the master of the instrumentality's ship, such service "fully achieved the [Congressional] objective of actual notice"); *Sherer v. Construcciones Aeronauticas*, 987 F.2d 1246, 1249 (6th Cir. 1993) (papers served without

*Pradhan v. Al-Sabah* – a case cited by PEP – is illustrative. 299 F. Supp. 2d 493 (D. Md. 2004). In *Pradhan*, the plaintiff commenced an action for damages to a rental property in Maryland state court, *id.* at 496, and served the defendant Kuwaiti ambassador by certified mail rather than pursuant to section 1608(b)(2),[6] but there was no record that the defendant ever actually received plaintiff's papers, *id.* at 499. The defendant nevertheless removed the action to federal court and moved to dismiss for lack of improper service, among other grounds. *Id.* at 496. The court observed that, while the Fourth Circuit had not spoken to the issue of technically defective service under 28 U.S.C. § 1608(b), numerous other circuits have adopted a substantial compliance standard for service on foreign agents and instrumentalities. *Id.* at 499. The court noted that, even though the defendants had never actually been served with a summons *or a complaint*, their participation in the litigation was clear evidence that they had received actual notice of the suit. *Id.* at 500. "Defendants have been fully informed of, and involved with, the issues and claims in this case such that no prejudice would result if an extension is granted to cure any defects in service." *Id.* The court therefore held that "any deficiency in service can be easily cured, without prejudice" and did not dismiss the action, but merely ordered plaintiff to serve a summons and complaint within thirty days. *Id.*[7]

---

translations into Spanish constituted adequate service against Spanish state agency under § 1608(b) where agency received actual notice and suffered no prejudice from lack of translation); *Harris Corp. v. Nat'l Iranian Radio & Television*, 691 F.2d 1344, 1352 (11th Cir. 1982) (service effective despite various technical defects where defendant had actual notice of suit); *cf. Magness v. Russian Fed'n*, 247 F.3d 609, 616, 618 (5th Cir. 2001) (adopting substantial compliance standard but holding service inadequate where defendant did not receive actual notice of suit); *Straub v. A P Green, Inc.*, 38 F.3d 448, 453-54 (9th Cir. 1994) (same).

6.    There is no indication that service pursuant to 28 U.S.C. § 1608(b)(1) was available or attempted in *Pradhan*.

7.    Nor does the other case PEP cites, *Kalasho v. Republic of Iraq*, No. 06-11030, 2007 WL 2683553 (E.D. Mich. Sept. 7, 2007), support its position. The court in that case noted that service under § 1608(b) requires only substantial compliance with the requirements of that statute, but held that service on individual defendants was insufficient because the defendants did not receive actual notice of the action, not because plaintiffs did not include a summons with their papers. *Id.* at *9.

Like the defendant in *Pradhan*, PEP received actual notice of this proceeding, appeared by counsel and filed a timely motion to dismiss the Petition. PEP has alleged no prejudice resulting from the lack of a summons and indeed has not suffered any. Accordingly, its motion to dismiss for insufficient process must be denied.

**B.     Commisa Properly Served PEP Pursuant to the EPC-28
Contract's Special Arrangement for Service.**

PEP does not dispute that it received notice of this action, but nevertheless contends that the action should be dismissed because of the manner in which it received that notice did not comply with the dictates of the FSIA. PEP is wrong.

PEP acknowledges (Motion at 9) that where the parties have agreed to a special arrangement for service, the FSIA requires that service on the foreign state must be attempted in the first instance in accordance with such special arrangement. 28 U.S.C. § 1608(a)(1) (2000). *Doe I*, 400 F. Supp. 2d at 101 ("[A] plaintiff may only attempt service through [section 1608(a)(2)] . . . if service through [section 1608(a)(1)] is unavailable or has proven unsuccessful.");[8] *Abur v. Republic of Sudan*, 437 F. Supp. 2d 166, 172 (D.D.C. 2006) (similar).

Clause 21.1.1(b) of the EPC-28 Contract is a special arrangement for the service of process agreed to by Commisa and PEP. It provides that "Notices of a legal or administrative nature shall be delivered in person, via certified mail or by any other courier service that will ensure receipt thereof," at the address provided. (Kennedy Decl. Ex. H.) There is no dispute that Commisa properly served PEP in accordance with this special arrangement. PEP acknowledges (at 9) that Commisa served PEP by Express Mail and Federal Express at both the address of the

---

8. Although the court in *Doe I* addressed service on a foreign government pursuant to 28 U.S.C. § 1608(a), as opposed to an agency or instrumentality of a foreign state pursuant to 28 U.S.C. § 1608(b), the language of 28 U.S.C. § 1608(a)(1) and § 1608(b)(1) is substantially identical.

PEP agent listed in Clause 21.1.1(b) and at the address of that agent's successor. PEP accepted

service by Federal Express on March 24 and 26, 2008. (Kennedy Decl. Ex. I.)

PEP makes no mention of Clause 21.1.1(b) in its motion to dismiss. It simply proclaims

that there "is no special arrangement for service of arbitral award enforcement petitions" – an

apparent allusion to the fact that Clause 21.1.1 does not specifically reference enforcement

petitions, or any of the other myriad examples of legal notices. (Motion at 9.)

This Court's case law flatly refutes PEP's hyper-technical argument. For instance, in

*International Road Federation v. Embassy of the Democratic Republic of the Congo*, 131 F.

Supp. 2d 248 (D.D.C. 2001), this Court held that service pursuant to the terms of a sublease

between the plaintiff and the defendant embassy was valid under Section 1608(a)(1). The notice

clause in that sublease did not specifically mention service of process. Rather, it provided that

"[a]ll notices, demands, or requests between Sublessor and Sublessee [would] be delivered in

person, by certified mail, return receipt requested, or by registered mail . . . ." *Id.* at 251. The

foreign state argued that the notice clause did not constitute a special arrangement for the service

of process because it did not refer specifically to legal process. In language directly on point

here, this Court rejected that argument: "[s]ervice of process certainly [fell] under the contractual

language of 'notices, requests, demands or other communications to or upon the respective

parties.'" *Id.* (quoting *Marlowe v. Argentine Naval Comm'n*, 604 F. Supp. 703, 708 (D.D.C.

1985)).

*In re Arbitration Between Space Systems/Loral Inc. & Yuzhnoye Design Office*, 164 F.

Supp. 2d 397, 402-03 (S.D.N.Y. 2001) is also on point. That case held that a petition to serve an

arbitral award could be served pursuant to Section 1608(a)(1) of the FSIA where the parties'

contract provided that "[a]ll notices and communications between the [p]arties shall be in writing

and shall be effective, if delivered in person to the authorized representative of the recipient party at the address listed below, or sent by express mail or Data fax."[9]

Clause 21.1.1(b) is plainly a special arrangement for service and Commisa properly served the Petition in accordance with it.  Again, even if Commisa's service under Clause 21.1.1(b) was somehow technically defective – which it was not – it was still valid service under the case law of courts in this circuit and many others holding that only substantial compliance with Section 1608(b) is required.  *See supra*, Section I.A.2.

## II.    THIS COURT HAS PERSONAL JURISDICTION OVER PEP.

### A.    No Minimum Contacts Analysis Is Necessary Because PEP Is Not a "Person" Within the Meaning of the Due Process Clause.

Section 1330(b) of the Judicial Code provides that "[p]ersonal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject matter jurisdiction] where service has been made under section 1608 of this title."  28 U.S.C. § 1330(b) (2000).  In other words, where service is made under Section 1608, personal jurisdiction is automatic in actions under the FSIA.

PEP argues that this Court lacks personal jurisdiction because PEP has insufficient contacts with the District of Columbia to satisfy due process.  Recent, controlling precedent holds the exact opposite.

The D.C. Circuit has held that minimum contacts are only required to confer personal jurisdiction over a "person" within the meaning of the Constitution's Due Process Clause, and that a foreign government does not fall within that definition.  *Price v. Socialist People's Libyan*

---

9.    The Central District of California's decision in *Berdakin v. Consulado de la República de El Salvador*, 912 F. Supp. 458 (C.D. Cal. 1995), which PEP cites in support of its assertion that Clause 21.1.1(b) does not constitute a special arrangement for service under 28 U.S.C. § 1608(b) (Motion at 9), is entirely distinguishable.  The notice provision in the lease at issue in that case clearly applied only to notices specifically identified in that agreement.  *Berdakin*, 912 F. Supp. at 466 (governing notices "[w]henever under this Lease a provision is made for any demand, notice or declaration of any kind . . . .").  Clause 21.1.1(b) is not so narrow.

*Arab Jamahiriya*, 294 F.3d 82, 95-96 (D.C. Cir. 2002).[10]  Three years later, the court expanded

the holding of *Price* to include agencies of foreign states like PEP in *TMR Energy Limited v.*

*State Property Fund of Ukraine*, 411 F.3d 296 (D.C. Cir. 2005) – a case conspicuously absent

from PEP's brief.

      *TMR Energy* is directly on point.  In that case, a Cypriot corporation had obtained an

arbitral award in its favor in Sweden against the State Property Fund of Ukraine (the "SPF"), an

agency of the Ukrainian state charged with implementing national privatization policies.  *Id.* at

298-99.  This Court confirmed the award over the SPF's contention that the action should be

dismissed for lack of personal jurisdiction because the SPF did not have minimum contacts with

the United States.  *Id.* at 298.  The D.C. Circuit rejected SPF's argument and affirmed this

Court's order confirming the award.  *Id.*

      The Court of Appeals held that "the SPF – like its principal, the State of Ukraine – is not

a 'person' for purposes of the due process clause and cannot invoke the minimum contacts test to

avoid the personal jurisdiction of the district court."  *Id.* at 302.  The court reasoned that "[i]f the

State of Ukraine exerted sufficient control over the SPF to make it an agent of the State, then

there is no reason to extend to the SPF a constitutional right that is denied to the sovereign

itself."  *Id.* at 301.

      Like SPF, PEP is an acknowledged "government agency of the Federal Government of

Mexico."  (Motion at 4 n.4; Borbolla Decl. ¶ 3.)  Indeed, PEP, together with its co-subsidiaries

---

10.  Although *Price* did limit its holding to foreign governments and their political subdivisions, nothing in that
     decision further limited its holding, as PEP incorrectly states (Motion at 5 n.5), to actions arising under the
     FSIA "torture exception," 28 U.S.C. § 1607(a)(7).  Since *Price*, nearly every court to consider the issue of
     whether a foreign state is a "person" for due process purposes has adopted and applied the holding in *Price* to
     actions involving provisions other than § 1607(a)(7).  *See Cassirer v. Kingdom of Spain*, 461 F. Supp. 2d 1157,
     1168 (C.D. Cal. 2006); *Rux v. Republic of Sudan*, No. 04-428, 2005 WL 2086202, *18 (Ed. Va. Aug. 26, 2005);
     *Cruz v. United States*, 387 F. Supp. 2d 1057, 1067 (N.D. Cal. 2005); *cf. O'Bryan v. Holy See*, No. 04-338-H,
     2007 WL 114162, *9 (W.D. Ky. Jan. 10, 2007) ("Defendant Holy See cannot simultaneously seek the
     protections of the FSIA and the United States Constitution.  Therefore, the First Amendment does not bar
     Plaintiffs' claims.").

and its direct parent PEMEX, "fuel[] the [Mexican] nation's economy, accounting for some one-third of the Mexican government's revenues and about 7% of its export earnings" and has been "[l]ong recognized as the tangible expression of Mexican nationalism . . . ." (Kennedy Decl. Ex. C.) As such, PEP is squarely within the holding of *TMR Energy. See also Corporación Mexicana de Servicios Marítimos, S.A. de C.V. v. M/T Respect*, 89 F.3d 650, 655 (9th Cir. 1996) (finding that PEP's sister company Pemex Refining is "a subdivision of the United Mexican States").

PEP makes no mention of the D.C. Circuit's controlling opinion in *TMR Energy*, and instead directs the Court to non-authoritative decisions that do not support its argument. To begin with, PEP mischaracterizes *BPA International, Inc. v. Kingdom of Sweden*, 281 F. Supp. 2d 73, 82 (D.D.C. 2003). The court stated, as part of its discussion of the FSIA's commercial activity exception, that "there must be some connection between a plaintiff's claims and the United States for a U.S. court to assert jurisdiction over a foreign government or its instrumentality *with respect to commercial claims under 28 U.S.C. § 1605(a)(2)*." *Id.* (emphasis added). The court's holding dealt with the requirements for *subject matter jurisdiction* in that case, which was based on the express language of a wholly inapplicable FSIA exception. PEP omits the final portion of the quoted sentence and inserts the word "personal" where it did not otherwise belong, thus rewriting the Court's decision to fit its argument. (Motion at 5.)

Indeed, while the court in *BPA* did find that it lacked personal jurisdiction over the defendant Swedish national telephone company, its personal jurisdiction analysis did not even discuss minimum contacts; instead, its holding was based on the fact that the foreign instrumentality only owned an unspecified indirect interest in the principal defendant and otherwise had no connection to the dispute or to the United States. *BPA*, 281 F. Supp. 2d at 82-

83.  That situation is entirely different from the one before this Court – in which an "agency of the Federal Government of Mexico" is a party to both this action to confirm an arbitral award and the award on which it is based.

The court in *Fronteras Resources Azerbaijan v. State Oil Co. of Azerbaijan*, 479 F. Supp. 2d 376 (S.D.N.Y. 2007) stated that it "largely agree[d] with the D.C. Circuit's analysis [in *Price*] that the text and structure of the Constitution, and principles of comity and international law, support the argument that the Due Process Clause is not an obstacle to the exercise of personal jurisdiction over a foreign state . . . ." *Id.* at 384.  The court held that it was nevertheless forced to engage in a due process analysis because of two factors not present here.  First, the Southern District felt constrained to follow contrary Second Circuit precedent.  Second, the parties' briefs did not adequately describe the relationship between the defendant and the Azerbaijani state. *Id.* at 384-85.

This Court is not so constrained.  The D.C. Circuit has held clearly that no minimum contact analysis is appropriate in this case.  The relationship between PEP and Mexico is adequately described in PEP's motion papers.  Accordingly, this Court has personal jurisdiction over PEP and should deny PEP's motion to dismiss pursuant to Rule 12(b)(2).

**B.    Even if a Minimum Contacts Analysis Were Necessary,
PEP's Contacts with the United States as a Whole
Are Sufficient to Confer Personal Jurisdiction over It.**

"Where service is made under FSIA section 1608, the relevant area in delineating contacts is the entire United States, not merely the forum state." *Altmann v. Republic of Austria*, 317 F.3d 954, 970 (9th Cir. 2002); *see also Republic of Argentina v. Weltover*, 504 U.S. 607, 619-20 (1992) ("Assuming, without deciding that a foreign state is a 'person' for purposes of the Due Process Clause . . . we find that Argentina possessed 'minimum contacts' that would satisfy the constitutional test . . . [where] Argentina purposefully avail[ed] itself of the privilege of

conducting activities within the [United States].") (internal citations and quotation marks omitted).

The evidence makes clear that PEP purposely avails itself of the privilege of conducting business in the United States. Because it was in their interest in that case, PEP and Pemex argued in *Evans v. PEMEX*, C.A. No. H-04-1510 (S.D. Tex.), that "[t]he Fifth Circuit has previously noted that it is without question that PEMEX conducts commercial operations that have substantial contact with the United States; it purchases and charters a large amount of its equipment from United States businesses, and maintains offices and bank accounts in the United States." (Kennedy Decl. Ex. A at 11 & n.4.) An officer of PEP, Andres Carvajal Solano, filed a declaration in *Evans* in which he acknowledged that "PEP conducts some business in the United States . . . ." (Kennedy Decl. Ex. B ¶ 6.) Furthermore, PEP obtains funding for its projects in part through some $1.5 billion in debt instruments issued by its parent PEMEX and administered by a Delaware trust. (Kennedy Decl. Ex. E.)

PEP has therefore "purposefully availed itself of the privilege of conducting activities with the United States," and, to the extent minimum contacts are necessary between PEP and the United States, "satisf[ied] the constitutional test." *Weltover*, 504 U.S. at 619-20.

## III.    PEP IS NOT ENTITLED TO A DISMISSAL OR STAY OF THE PETITION.

PEP contends that this proceeding should be dismissed pursuant to Rule 12(b)(6) because it has commenced a proceeding in Mexico seeking nullification of part of the Award. PEP fails to disclose that the Mexican court has already twice rejected PEP's request that Commisa be enjoined from pursuing confirmation of the Award. This Court should likewise reject PEP's motion to dismiss.

### A.    Commisa Has Adequately Pled Its Right to Have this Court Confirm the Award.

In order to survive a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a petitioner need only plead "enough facts to state a claim for relief that is plausible on its face . . . [and which] giv[es] the defendant fair notice of the claim and the grounds upon which it rests." *Nattah v. Bush*, 541 F. Supp. 2d 223, 232-33 (D.D.C. 2008), (quoting *Bell Atl. Corp. v. Twombly*, 127 S. Ct. 1955, 1964 (2007)).  The Petition meets this standard.

The Petition sets forth ample facts to support its claim for relief under the FSIA and the FAA.  Specifically, the Petition demonstrates proof of the existence of a binding arbitration agreement between Commisa and PEP and proof of a final arbitration award in favor of Commisa under that agreement.  (Paparella Aff. Exs. 1, 2 and 5).  This is all that is required by the Inter-American Convention and the FAA.  9 U.S.C. §§ 207, 302.

### B.    The Mexican Court Has Rejected PEP's Requests to Enjoin Commisa from Pursing this Proceeding; PEP Has Not Demonstrated Any Basis on Which this Court Should Decline to Confirm the Award.

The Mexican court in PEP's Nullification Proceeding has twice rejected PEP's request that it order Commisa to refrain from pursing this (and other) enforcement proceedings with respect to the arbitral award.  (Von Wobeser Decl. ¶¶ 4-5.)  There is no basis in U.S. law for this Court to reach a different result.

The FAA provides that upon a petition to confirm an arbitral award "[t]he court shall confirm the award ['as against any other party to the arbitration'] unless it finds one of the grounds for refusal or deferral of recognition or enforcement of the award specified in the said Convention."  9 U.S.C. §§ 207, 302.  The grounds for refusing to confirm an award are construed narrowly, and the burden of proving that one or more exists rests with the party challenging the

award – in this case, PEP. *Compagnie des Bauxites de Guinée v. Hammermills, Inc.*, No. 90-0169 (JGP), 1992 WL 122712, at *3 (D.D.C. May 29, 1992).

PEP has not established that any ground for refusing to confirm the Award exists, and no such ground does exist. The only basis upon which PEP suggests the Award should not be confirmed is that, because PEP filed the Nullification Proceeding after Commisa filed the Petition, the Award is "not yet binding on the parties" and is therefore not entitled to automatic confirmation pursuant to Article 5(1)(e) of the Inter-American Convention. PEP's argument is meritless.

It is black-letter law that an arbitral award is final and binding on the parties to the underlying arbitration from the moment it is issued, regardless of whether it has been confirmed. As the Second Circuit explained in *Florasynth, Inc. v. Pickholz*:

> [T]he confirmation of an arbitration award is a summary proceeding that merely makes what is already a final arbitration award a judgment of the court. The award need not actually be confirmed by a court to be valid. An unconfirmed award is a contract right that may be used as the basis for a cause of action. In fact, in the majority of cases the parties to an arbitration do not obtain court confirmation. A party, successful in arbitration, seeks confirmation by a court generally because he fears the losing party will not abide by the award. Armed with a court order the winning party has a variety of remedies available to enforce the judgment.

750 F.2d 171, 176 (2d Cir. 1984).

The fact that a party to the underlying arbitration later seeks to avoid its obligations under the award through a nullification proceeding does not render it "not yet binding" within the ambit of Article 5(1)(e). The Southern District of New York considered an argument virtually identical to PEP's in *Banco de Seguros del Estado v. Mutual Marine Offices, Inc.*, and rejected it as "miss[ing] the mark." No. 02 Civ. 467 (SAS), 2003 WL 21108318, at *2 (S.D.N.Y. May 14, 2003). In that case, the respondent had lost an arbitration and subsequent enforcement

proceeding and asked the court to reconsider its order confirming the award on the grounds that

an ongoing appeal of an interim order by the arbitration panel rendered the arbitration award not

final or binding under the terms of Article 5(1)(e) of the Inter-American Convention.  *Id.*  The

court held that "[n]o court approval was needed to make the arbitration binding" and denied the

respondent's motion.  *Id.*; *see also MGM Prods. Group, Inc. v. Aeroflot Russ. Airlines*, No. 03

Civ. 0500, 2003 WL 21108367, at *5 (S.D.N.Y., May 14, 2003) ("The mere fact that recourse

may somehow be had in another court of law does not prevent the Award from being

'binding.'").

PEP's argument likewise misses the mark.  The arbitration agreement contained in the

EPC-28 Contract expressly provides that "[a]ny dispute, claim, difference or dispute that may

arise out of, is related to or connected with this Contract or breach thereof *shall be definitively*

*resolved by means of arbitration* conducted in Mexico City, Federal District, in accordance with

the Rules of Conciliation and Arbitration of the International Chamber of Commerce in effect at

that time."  (Paparella Aff. Ex. 5 (emphasis added).)  The ICC Rules in turn provide that "[e]very

Award shall be binding on the parties," and that by submitting to arbitration under its rules,

parties agree to "carry out any Award without delay."  (Kennedy Decl. Ex. J)  Thus, by agreeing

that its disputes with Commisa would be governed by the ICC Rules, and by expressly waiving

the right to appeal any award, PEP agreed in the EPC-28 Contract that the Award would be

binding upon it from the moment it was made.  *Florasynth, Inc.*, 750 F.2d at 176; *Banco de*

*Seguros del Estado*, 2003 WL 21108318, at *2.

The cases PEP cites in support of its argument that this Court should dismiss the Petition

in favor of the Mexican proceeding are inapposite.  In *Baker Marine (Nig.) Ltd. v. Chevron*

*(Nig.) Ltd.,* the Second Circuit affirmed the dismissal of a petition to confirm an award brought

by a party "whose arbitration award ha[d] been vacated at the site of the award." 191 F.3d 194, 197 & n.2 (2d Cir. 1999). Rather than acknowledge the fundamental difference between an award, like the Award here, that is the subject of a vacatur proceeding pending in another jurisdiction and one, like the award in *Baker Marine*, that has already been set aside, PEP instead attempts to rewrite the Second Circuit's holding by expanding it to include awards that "could be" set aside by the competent authority. (Motion at 13.) In fact, the Second Circuit was not confronted with, and did not even discuss, a situation like the one before this Court, in which vacatur of the award was merely possible. PEP's attempt to persuade this Court otherwise is disingenuous and should not be countenanced.

Similarly, in *Spier v. Calzaturificio Tecnica S.p.A*, the court stayed, but did not dismiss, confirmation of an award pursuant to Article VI of the Convention on the Recognition and Enforcement of Foreign Arbitral Awards, Jun. 10, 1958, 21 U.S.T. 2517, 330 U.N.T.S. 3 ("New York Convention"),[11] on the grounds that the respondent had initiated proceedings to vacate the award in Italian court more than six months *before* the petitioner sought confirmation of the award in the United States. 663 F. Supp. 871, 872, 874-75 (S.D.N.Y. 1987). Here, Commisa commenced this proceeding nearly two months before PEP commenced its Mexican proceeding.

Thus, PEP can point to no authority compelling this Court to dismiss the Petition pursuant to Article 5(1)(e) on the basis of a later-filed, baseless proceeding to vacate the Award. The Court should therefore deny PEP's motion and grant the Petition.

---

11. Article VI of the New York Convention and Article 6 of the Inter-American Convention are substantially identical.

C.    **PEP Is Not Entitled to a Stay of these Proceedings Pending
the Resolution of the Nullification Proceeding, Particularly
Where the Mexican Court Has Twice Rejected PEP's Request
to Stay Commisa from Pursuing this Proceeding.**

Article 6 of the Inter-American Convention vests a court with discretion to "postpone" –

but not dismiss – a petition to confirm an award that is the subject of a proceeding to "annul or

suspend" the award.  Although a court may postpone its consideration of a petition to confirm an

arbitral award where a vacatur proceeding is pending in another jurisdiction, the great weight of

authority holds that this Court should not postpone its judgment on the Petition under the

circumstances of this case.  This is all the more the case here where the Mexican courts have

already considered and rejected PEP's request that Commisa be stayed from pursuing this

proceeding.

1.    **PEP's Complaint to Nullify Is Baseless and
Is Not Entitled to this Court's Deference.**

Whether to stay a confirmation proceeding in favor of a parallel vacatur proceeding is

entirely within the confirming court's discretion.  Inter-American Convention, art. 6.  PEP's

Mexican action is not entitled to any deference.  In that action, PEP argues, among other things,

that (i) PEP was unable to present a complete defense during the arbitration proceedings; (ii) that

the Arbitral Tribunal decided matters beyond the scope of the parties' arbitration agreement; and

(iii) the Award contravenes Mexican public policy.  (Motion at 12.)  Each of PEP's arguments is

a post-hoc fabrication aimed at stalling these proceedings.

PEP's claim that it was unable to present a complete defense is based on the fact that the

arbitral tribunal ruled in Commisa's favor with respect to many (but not all) of Commisa's

claims.  PEP never made any such claim in the arbitration.  To the contrary, PEP confirmed

specifically at the hearing in the arbitration that it had been given an opportunity to present all of

its defenses, had received due process of law and had been treated with equality. This claim has no merit under Mexican law. (Kennedy Dec., Ex. L; Von Wobeser Decl. ¶ 6 and Ex. 4 at 27.)

PEP's claim that the arbitral tribunal exceeded its authority by deciding matters beyond the scope of the EPC-28 Contract arbitration clause is flatly contradicted by the broad language of the EPC-28 Contract's arbitration clause. Moreover, Mexican law vests the arbitral tribunal with the discretion to determine the scope of its own authority. (Von Wobeser Decl. ¶ 6 and Ex. 4 at 11-12.)

PEP's argument that the Award violates Mexican public policy because, among other things, PEP cannot be made to satisfy obligations that are not expressly authorized by its government-regulated budget is equally meritless under Mexican law (as it would be under the law of the United States). (Von Wobeser Decl. ¶ 6 and Ex. 4 at 53-62.)

### 2.    The Circumstances of this Case Warrant Immediate Confirmation, Not a Stay.

Courts have held that "[a] stay of confirmation should not be lightly granted lest it encourage abusive tactics by the party that lost in arbitration." *MGM*, 2003 WL 21108367 at *5 (quoting *Europcar Italia, S.p.A. v. Maillano Tours, Inc*., 156 F.3d 310, 317 (2d Cir. 1998). Among the factors courts consider are:

> (1) the general objectives of arbitration –the expeditious resolution of disputes and the avoidance of protracted and expensive litigation; (2) the status of the foreign proceedings and the estimated time for those proceedings to be resolved; (3) whether the award sought to be enforced will receive greater scrutiny in the foreign proceedings under a less deferential standard of review; (4) the characteristics of the foreign proceedings, including . . . whether they were brought to . . . set the award aside (which would tend to weigh in favor of enforcement); . . . (5) the balance of possible hardships to each of the parties . . . ; and (6) any other circumstances that could tend to shift the balance in favor of or against adjournment.

*In re Arbitration Between Interdigital Commc'ns Corp. & Samsung Elecs. Co.*, 528 F. Supp. 2d 340, 360 (S.D.N.Y. 2007)(quoting *Europcar*, 156 F.3d at 317-18).

These factors weigh in favor of confirming the Award. Commisa commenced this confirmation proceeding six weeks before PEP moved to vacate part of the Award in Mexico. The Mexican proceedings have only just begun and are unlikely to be finally resolved before October 2009. PEP only seeks nullification of part of the Award. Moreover, the Mexican court in the Nullification Proceeding has already twice rejected PEP's requests that Commisa be stayed from pursuing this proceeding. (Von Wobeser Decl. ¶¶ 3-5 and Exs. 2-3.) Confirmation, rather than a stay, would therefore advance "the expeditious resolution of disputes" and avoid the "protracted and expensive litigation" PEP seeks to perpetuate.

Courts are disinclined to stay confirmation proceedings that were started before the respondent commences proceedings to vacate the award in another jurisdiction. *See, e.g.*, *Interdigital Commc'ns*, 528 F. Supp. 2d at 360-62 (enforcing rather than staying arbitration award where plaintiff brought enforcement action in United States court prior to defendant's action to set award aside). This is particularly true where, as here, the foreign jurisdiction has itself refused to stay enforcement of the award. In *MGM*, for example, the court refused to stay enforcement of a Swedish arbitration award where the plaintiff had brought its enforcement action in the United States before the Russian defendant brought a nullification action in the Swedish courts. 2003 WL 21108367 at *5-6. The court held: "[A] district court should not automatically stay enforcement proceedings on the ground that parallel proceedings are pending in the originating country. . . . Confirmation, not a stay, advances the general objective of 'expeditious resolution of disputes.'" *Id.* at *5.

Other factors that weighed in favor of confirming the award included "[t]he fact that the pending foreign appeal seeks to set aside, not enforce, the award"; that the parallel appeal in Sweden had "only just begun" two months before the court issued its decision; as well as considerations of fundamental fairness because the plaintiff, like Commisa, had "provided services without receiving payment" and therefore bore the greater hardship in continued delay of the award relative to the defendant which "received services without paying for them." *Id*. at *5-6.

The court's conclusion was further "strengthened" by the fact that the Swedish courts themselves had rejected the defendants' request to stay enforcement pending resolution of the appeal. *Id*. at *6. Here, the Mexican courts have twice declined to grant the relief PEP seeks in this action. And PEP has not identified any reason why this Court should grant a stay in favor of the Nullification Proceedings when the Mexican courts themselves have determined that a stay of enforcement of the award is unnecessary.

A stay of this proceeding would cause Commisa grave hardship. The gravamen of the Award is the Arbitral Tribunal's finding that PEP failed to honor its obligations to pay substantial amounts to Commisa for engineering, procurement and construction services Commisa performed for PEP under the EPC-28 Contract. Commisa performed these services for PEP at Commisa's expense many years ago, and PEP has enjoyed the benefit of such services without paying for them for years. The Award requires PEP to honor its EPC-28 Contract obligation to pay these amounts, plus interest and costs. To allow PEP to continue to avoid its contractual payment obligations by staying this proceeding would be a manifest injustice to Commisa.

Every case PEP points to in support of its request for a stay involved plaintiffs who, unlike Commisa, brought their United States enforcement actions only *after* bringing an enforcement action in the country of arbitration or after defendants had brought nullification actions in the country of arbitration. Thus, in *Nedagro B.V. v. Zao Konversbank*, the court's grant of a stay hinged on the plaintiff's having first brought an enforcement action in the foreign court before commencing the parallel United States action: "With respect to the . . . perhaps most important *Europcar* factor, it was petitioner who first sought to enforce its award in the originating country . . . thus raising 'concerns of international comity' vis-à-vis its petition to confirm the ICC award in this Court."[12] No. 02 Civ. 3946 (HB), 2003 U.S. Dist. LEXIS 787, at *22 (S.D.N.Y. Jan. 21, 2003). No such concerns are present here, where the Mexican court has already twice rejected substantially the same relief PEP seeks from this Court, holding each time that PEP was not entitled to an order enjoining Commisa from seeking to confirm the Award. (Von Wobeser Decl. ¶¶ 4-5.)

The Nullification Proceedings are no more than an attempt to prolong this dispute and forestall PEP's contractual and legal obligation to comply with the Award. This Court should not indulge PEP and should immediately confirm the Award.

---

12. In the unpublished D.C. Circuit decision that PEP points to, *Telcordia Techs., Inc. v. Telkom SA, Ltd.*, No. 03-7099, 2004 WL 784074, at *1 (D.C. Cir. Apr. 9, 2004), the plaintiff was seeking to enforce only a partial arbitration award, and one where the arbitrator had not yet fixed the amount of damages. *In re Arbitration of Certain Controversies Between Telcordia Techs., Inc. & Telkom SA, Ltd.*, No. 02-1990 (JR), 2003 U.S. Dist. LEXIS 23726, at *3-4 (D.D.C. July 20, 2003). Moreover, by the time the plaintiff commenced the United States proceedings, the defendant in *Telcordia* had already brought several actions to appeal or nullify the arbitration panel's rulings and award. *Id.* at *4; *accord Higgins v. SPX Corp.*, No. 1:05-CV-846, 2006 WL 1008677, at *4, (W.D. Mich. Apr. 18, 2006) (granting stay where plaintiff brought enforcement action only after defendant had moved to nullify arbitration award in place of arbitration); *Spier* 663 F. Supp. at 874-75 (same); *Fertilizer Corp. of India v. IDI Mgmt.*, 517 F. Supp. 948, 961-63 (S.D. Ohio 1981) (same).

IV.    **IN THE EVENT THE COURT DECIDES TO STAY THE ACTION, PEP SHOULD BE REQUIRED TO POST SECURITY PURSUANT TO ARTICLE 6 OF THE INTER-AMERICAN CONVENTION.**

Should the Court decide to stay Commisa's enforcement action pending the outcome of

the Mexican proceedings, Commisa requests that the court require PEP to post security in the

amount of the Award, plus interest and costs as provided therein, as a condition for such stay.

Article 6 of the Inter-American Convention provides that

> If the competent authority [in the place of arbitration] has been
> requested to annul or suspend the arbitral decision, the authority
> before which such decision is invoked may, if it deems it
> appropriate, postpone a decision on the execution of the arbitral
> decision and, *at the request of the party requesting execution, may
> also instruct the other party to provide appropriate guaranties*.

Inter-American Convention, art. 6 (emphasis added).

United States courts routinely condition a stay of petitions to confirm arbitral awards

upon the respondent's agreement to post security in the amount sought to be confirmed.  Thus, in

*Consorcio Rive S.A. de C.V. v. Briggs of Cancun, Inc.,* the Eastern District of Louisiana granted

defendant a stay of an action to enforce a Mexican arbitration award on the condition that

defendant post full security in the amount of the judgment.  No. Civ.A. 99-2204, 2000 WL

98127, at *4 (E.D. La. Jan. 26, 2000).  The court held:

> Defendants seek a stay of this matter because of the proceedings in
> Mexico which they initiated. The Court will require that they give
> suitable security to protect the interests of [plaintiff] should the
> stay be granted. Defendants may post a bond or other equally
> satisfactory security in the sum of $ 2,760,000, the amount of the
> arbitral award at issue. A stay will be imposed herein on the
> posting of that security.

*Id.*

Likewise, in *Spier,* the court said that it was inclined to require defendant to post full

security in "the full amount of [plaintiff's] award together with interest and allowable costs and

fees" and that the grant of a stay would be conditioned on the posting of such security.  663 F.

Supp. at 876.  The court granted the petitioner's request for a stay in a subsequent order and

explained what constitutes "suitable security" within the meaning of the New York Convention:

> [W]hen Article VI of the Convention refers to "suitable security"
> in the context of asking the enforcement tribunal to adjourn
> proceedings pending litigation in another country, the party
> seeking to enforce the award is entitled to security giving him a
> direct claim against either property or a guarantor resident in the
> country of enforcement.

*Spier v. Calzaturificio Tecnica, S.p.A.*, No. 86 Civ. 3447 (CSH), 1988 U.S. Dist. LEXIS 9919, at

*3-4 (S.D.N.Y. Sept. 7, 1988).  The court held that suitable security could take the form of a

bond posted pursuant to that court's local rules or of an irrevocable letter of credit issued by a

New York bank.  *Id.* at *4.  The court cautioned that, "[i]f timely and proper security is not

posted in conformity with this order, this Court will, if so requested by petitioners, proceed to

adjudicate the merits of the [enforcement action], without further regard to the proceedings now

pending in the Italian courts." *Id.*

In the event that the court stays this confirmation action pending the resolution of the

Nullification Proceedings, Commisa respectfully requests that, pursuant to Article 6 of the Inter-

American Convention, the court condition any such stay on PEP's posting of security in the full

amount of the Award, plus interest and costs as provided therein, in the form of a bond or letter

of a credit from a United States bank.

## CONCLUSION

For all the foregoing reasons, Petitioner Commisa respectfully submits that this Court grant the relief sought in Commisa's Petition and deny PEP's motion to dismiss or stay in its entirety. Commisa respectfully requests an oral hearing to address the issues raised in the Petition and PEP's motion to dismiss.

Washington, D.C.
June 4, 2008

                                    Respectfully submitted,

                                    HUGHES HUBBARD & REED LLP


                                    By:   s/ Robert M. Kennedy
                                         Robert M. Kennedy (D.C. Bar No. 459966)
                                         1775 I Street N.W.
                                         Washington, DC 20006-2401
                                         Tel.:  (202) 721-4600
                                         Fax: (202) 721-4646
                                         Email:  kennedyr@hugheshubbard.com

                                         Christopher Paparella  (D.D.C. No. NY0091)
                                         One Battery Park Plaza
                                         New York, N.Y. 10004-1482
                                         Tel.:  (212) 637-6644
                                         Fax:  (212) 422-4726
                                         Email:  paparella@hugheshubbard.com

                                         *Attorneys for Claimant Corporación Mexicana*
                                         *De Mantenimiento Integral, S. De R.L. De C.V.*

Of Counsel:

William J. Sanchez
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York, New York 10004-1482

60299722_1.DOC

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| CORPORACIÓN MEXICANA<br>DE MANTENIMIENTO INTEGRAL,<br>S. DE R.L. DE C.V.,<br><br>Petitioner,<br><br>v.<br><br>PEMEX EXPLORACIÓN<br>Y PRODUCCIÓN,<br><br>Respondent. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

CASE NO.: 1:08-CV-00469 (RWR)

## <u>DECLARATION OF ROBERT M. KENNEDY</u>

I, ROBERT M. KENNEDY, hereby declare as follows:

1.       I am a member of the Bar of this Court and a partner in the law firm of Hughes Hubbard & Reed LLP, attorneys for Petitioner Corporación Mexicana De Mantenimiento Integral, S. De R.L. De C.V. ("COMMISA") in the above-captioned litigation. This declaration is submitted in support of COMMISA's opposition to the motion to dismiss filed by Respondent Pemex Exploración y Producción ("PEP").

2.       I make this declaration based upon my own personal knowledge and if called as a witness could testify competently to the facts stated herein.

***PEP's Status As An Agency Of A Foreign State And Its Contacts With The United States***

3.       Attached hereto as **Exhibit A** is a true and correct copy of a brief submitted by PEP and its parent corporation, Petroleos Mexicanos ("PEMEX"), in support of their motion to dismiss the complaint in *Evans v. PEMEX*, C.A. No. H-04-1510 (S.D. Tex.), that was obtained from the docket in that case. In that brief (at 8), PEP describes itself as a "government agency of

the Federal Government of Mexico" and an "'organ' of a foreign state." PEP further states (at

11) that "it is not disputed that PEMEX and PEP engage in commercial activity to some extent

within the United States."

4.      Attached hereto as **Exhibit B** is a true and correct copy of a declaration (without

exhibits) from Andres Carvajal Solano submitted in support of PEP's motion to dismiss the

complaint in *Evans v. PEMEX*, C.A. No. H-04-1510 (S.D. Tex.), that was obtained from the

docket in that case. That declaration (at ¶ 6) states that "PEP conducts some business in the

United States . . . ."

5.      Attached hereto as **Exhibit C** is a true and correct copy of a Hoover's Inc.

company report regarding PEMEX. The report states (at 2) that the PEMEX group "fuels the

[Mexican] nation's economy, accounting for some one-third of the Mexican government's

revenues and about 7% of its export earnings," and has been "[l]ong recognized as the tangible

expression of Mexican nationalism . . . ."

6.      Attached hereto as **Exhibit D** are true and correct copies of (i) a February 2004

PEMEX press release that discusses a fifteen-year service contract with the Lewis Energy Group,

a Texas-based oil and natural gas contractor, to develop the natural gas reserve along the Texas-

Mexico border and (ii) a December 14, 2007 article from Foster Natural Gas Report, entitled

"FERC Clears Ensinal's Project Proposal to Link Production and Gathering Operations at the

Border Between Texas and Mexico," which discusses the Multiple Services Contract between

PEP and a subsidiary of the Lewis Energy Group LP.

7.      Attached hereto as **Exhibit E** is a true and correct copy of excerpts of a

prospectus for the PEMEX Project Funding Master Trust that was obtained from the SEC's

website. The prospectus states that the PEMEX Project Funding Master is a Delaware trust

established by PEMEX that administers some US$1.5 billion in financial resources earmarked

for long-term productive infrastructure projects carried out by PEP and its affiliates.

### COMMISA's Efforts To Secure A Summons

8.      On March 19, 2008, I went to the Clerk's Office for the United States District

Court for the District of Columbia in an effort to file COMMISA's Petition to Confirm Foreign

Arbitral Award and related papers.  Among those papers was an unsigned summons addressed to

PEP.  A copy of that summons is attached hereto as **Exhibit F**.

9.      I was advised by the Clerk's Office that, in this District, an action to confirm an

arbitral award is a summary procedure governed by the service requirements applicable to

motions practice.  Accordingly, the Clerk's Office refused to execute the summons and instead

instructed me to serve and file papers relating to COMMISA's confirmation action with a

certificate of service.

10.      Attached hereto as **Exhibit G** is the docket sheet for *TMR Energy Ltd. v. State

Property Fund of Ukraine*, C.A. No. 1:03-cv-00034 (TPJ) (D.D.C.), which I understand to be an

action to confirm an arbitration award against a foreign state or an agency or instrumentality

thereof.  The docket sheet does not reflect the issuance of a summons.

### Service Upon PEP

11.      Clause 21.1.1(b) of the EPC-28 Contract (as defined in COMMISA's

Memorandum of Points and Authorities in Opposition to Respondent's Motion to Dismiss to

Petition Confirm Arbitration Award) between COMMISA and PEP sets for the parties'

agreement as to the manner in which service of legal papers shall be accomplished.  Specifically,

Clause 21.1.1(b) provides that "[n]otices of a legal or administrative nature shall be delivered in

person, via certified mail or by any other courier service that will ensure receipt thereof . . . ." A certified translation of Clause 21.1.1(b) of that agreement is attached hereto as **Exhibit H**.

12.     Consistent with the Clerk's instructions and Clause 21.1.1(b) of the EPC-28 contract, I caused to be served COMMISA's Petition to Confirm Foreign Arbitral Award and related papers by Federal Express on March 19, 2008.  The Federal Express package contained the (a) Notice of Petition To Confirm Foreign Arbitral Award, (b) Petition To Confirm Foreign Arbitral Award (with exhibit), (c) Memorandum of Points and Authorities In Support of Petition To Confirm Foreign Arbitral Award, (d) Affidavit of Christopher M. Paparella In Support of Petition To Confirm Arbitration Award (with exhibits), and (e) [Proposed] Order and Judgment. (collectively, the "Motion Papers").  The package also contained Spanish translations of those documents (the "Translations").  The Motion Papers and Translations were also sent to PEP via Express Mail on March 19, 2008.

13.     The Federal Express and Express Mail shipments were sent to Guillermo Iturbide Ruiz at the address listed in Clause 21:

> Pemex – Exploración y Producción
> Gerencia de Recursos Materiales
> Boulevard Adolfo Ruiz Cortines No. 1202
> Edificio Pirámide, Piso 4
> Fracc, Oropeza
> Villahermosa, Tabasco c.p. 86030
> United Mexican States

The Motion Papers and Translations were also sent to Victor Manual Bahena Bustos at:

> Pemex-Exploración y Producción
> Gerencia de Contratos
> Torre Empresarial
> Paseo Tabasco # 1203
> Col. Col. Linda Vista
> Villahermosa, Tabasco c.p. 86050
> United Mexican States

14.    Both Express Mail and Federal Express are delivery services that can ensure receipt. Records obtained from Federal Express confirm that the packages were delivered on March 24 and March 26, 2008. True and correct copies of the tracking papers associated with these papers that were obtained from Federal Express' website are attached hereto as **Exhibit I**.

### *The Finality Of The Arbitration Award*

15.    Attached hereto as **Exhibit J** is a true and correct copy of Article 28 of the Rules of Arbitration of the International Chamber of Commerce. Subsection 6 of Article 28 provides that "[e]very Award shall be binding upon the parties. By submitting the dispute to arbitration under these Rules, the parties undertake to carry out any Award without delay and shall be deemed to have waived their right to any form of recourse insofar as such waiver can validly be made."

16.    Attached hereto as **Exhibit K** is a true and correct copy of Article 1461 of the Mexican Commerce Code, along with a translation thereof, which provides that "[r]egardless of the country where an arbitration award is entered, it shall be recognized as binding and upon petition in writing to a judge, it shall be enforced in accordance with the provisions of this Chapter."

### *PEP's Admission That It Had The Opportunity To Present All Of Its Defenses And Had Been Otherwise Afforded Due Process In The Arbitration Proceedings*

17.    Attached hereto as **Exhibit L** is a true and correct copy of excerpts of the Spanish and English versions of the June 8, 2006, hearing transcript in *Corporación Mexicana de Mantenimiento Integral, S. De R.L. De C.V. v. PEMEX Exploración Y Producción*, ICC Case No. 13716/CCO/JRF. The transcript reflects that PEP's counsel confirmed to the Tribunal that PEP had been afforded due process of law, had been treated with equality and had been given the opportunity to present all of its defenses in the arbitration proceedings.

*PEP's Refusal To Comply With The Award*

18.    Attached hereto as **Exhibit M** is a true and correct copy of a letter dated March 12, 2008 from COMMISA to PEP along with a translation of the same.  In the letter, COMMISA requested payment in accordance with the terms of the award issued in connection with the parties' arbitration.

19.    Attached hereto as **Exhibit N** is a true and correct copy of a letter dated May 8, 2008, from COMMISA to PEP along with a translation of the same.  In the letter, COMMISA again requested payment in accordance with the terms of the award issued in connection with the parties' arbitration.

20.    Attached hereto as **Exhibit O** is a true and correct copy of a letter dated May 19, 2008, from PEP to COMMISA along with a translation of the same.  In the letter, PEP advised that it will not pay the amounts due under the terms of the award pending "final resolution of the corresponding judicial organs in connection with the annulment proceedings" commenced in Mexico.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 4, 2008
Washington, D.C.

_____
Robert M. Kennedy

**KENNEDY DECLARATION**

**EXHIBIT A**

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| KEVIN L. EVANS,<br>　　　　Plaintiff | §<br>§<br>§ | |
| V. | §<br>§ | **C.A. NO. H-04-1510** |
| PEMEX, ET AL.<br>　　　　Defendants | §<br>§<br>§ | |

DEFENDANTS PEMEX AND PEMEX EXPLORACION Y
PRODUCCION'S MOTION TO DISMISS PURSUANT TO
RULE 12(b)(1) AND 12(b)(2)

TO THE HONORABLE JUDGE OF SAID COURT:

COME NOW Petroleos Mexicanos (PEMEX) and PEMEX Exploracion y Produccion ("PEP") and file this their Rule 12(b)(1) ("lack of jurisdiction over the subject matter") and 12(b)(2) ("lack of jurisdiction over the person") Motion To Dismiss Plaintiff Kevin L. Evans ("Evans") First Amended Original Complaint. In support thereof, PEMEX and PEP would respectfully show as follows:

## I.

## FACTUAL BACKGROUND

This is an action arising from an injury suffered by Evans while working on the AKAL "TJ," an oil platform situated 80 miles offshore of Ciudad Del Carmen, Mexico, in the Bay of Campeche, in the territorial waters of Mexico. The accident occurred in navigable waters of the Gulf of Mexico, but well outside the territorial waters of the United States or the State of Texas.

## A.    The Parties

At all times pertinent, Evans was a citizen of the United States whose permanent home is in Idaho. He claims to have been employed by Tesco Corporation in the capacity of top drive supervisor. (Plaintiff's Amended Original Complaint at p.1- 2).

PEMEX is a decentralized public entity of the Mexican Government with its headquarters in Mexico City, Federal District, Mexico, and is organized and existing under the laws of the Sovereign State of Mexico and was and is the national oil company of Mexico. PEMEX was created by a presidential decree dated June 7, 1938 effective July 20, 1938. PEMEX is neither a citizen of a State of the United States nor was it created under the laws of any third country. (Unsworn Declaration of Xavier Antonio de la Garza).

PEMEX Exploracion y Produccion ("PEP") is also a decentralized public entity of the Mexican Government with its headquarters in Mexico City, Federal District, and is organized and existing under the laws of the Sovereign State of Mexico and is a subsidiary of PEMEX. PEP, together with Pemex Refinacion, Pemex Gas y Petroquimica Basica, and Pemex Petroquimica, the other subsidiaries of PEMEX, and PEMEX, comprise Mexico's national oil and gas company. PEP is a decentralized public entity of the Mexican Government and is a legal entity empowered to own property and carry on business in its own name. PEP is neither a citizen of a State of the United States nor was it created under the laws of any third country. (Unsworn Declaration of Andres Carvajal Solano).

## B.    The AKAL "TJ" Platform

The AKAL "TJ" platform was and is at all times owned by Pemex Exploracion y Produccion. (Unsworn Declaration of Andres Carvajal Solano). The AKAL "TJ" is a fixed oil platform which

at all relevant times was operating in the Bay of Campeche, Mexico. It has never been present in U.S. ports or U.S. territorial waters. (Unsworn Declaration of Andres Carvajal Solano).

**C.     *Tesco Corporation***

PEP had entered into a contract with Cia. Tesco Corporation, for the well-servicing and refurbishing of several of PEP's oil platforms, including the AKAL "TJ." (Unsworn Declaration of Andres Carvajal Solano, see also, Contrato No. 50SNT00860, and Convenio "Tres," a supplement thereto, attached as Exhibits "1" and "2" to the Unsworn Declaration of Mr. Carvajal Solano). All work was to be performed in Mexico or in the territorial waters of Mexico. (Unsworn Declaration of Andres Carvajal Solano). Cia. Tesco Corporation is a Mexican corporation, with its headquarters in Mexico City, D.F. The contract and the supplement thereto were executed in Ciudad del Carmen, Campeche, Mexico. The contract between PEP and Cia. Tesco Corporation provides that Cia. Tesco Corporation is of Mexican citizenship. (See Contrato No. 50SNT00860, Declarations of Cia. Tesco Corporation.) The contract also provides that the parties thereto agreed to submit to the jurisdiction of the federal courts of Mexico with respect to matters arising under the interpretation and execution of the contract. (*Id.* at ¶ 29).

**D.     *The Accident***

On or about October 1, 2003, Plaintiff was injured while working on the AKAL "TJ," which was located in the Bay of Campeche, Mexico, 80 miles from the Ciudad del Carmen, Mexico, in the territorial waters of Mexico. (Unsworn Declaration of Andres Carvajal Solano; *see also*, Plaintiff's First Amended Original Complaint, Section III.)

## II.

## SUPPORTING DOCUMENTS

In support of their Motion, PEMEX and PEP submit the following documents:

1.    Unsworn Declaration of Xavier Antonio de la Garza (Exhibit "A"); and

2.    Unsworn Declaration of Andres Carvajal Solano (Exhibit "B").

## III.

## DISMISSAL IS REQUIRED UNDER
## RULE 12(b)(1) AND 12(b)(2)

### A.    *The FSIA Governs Questions Of Subject Matter And In Personam Jurisdiction When Sovereign Immunity Issues Are Presented*

The Foreign Sovereign Immunities Act ("FSIA") sets forth the sole and exclusive standards

to be used in resolving all sovereign immunity issues. *See* 28 U.S.C. § 1602 ("Claims of foreign

states to immunity should hence forth be decided by courts of the United States and of the States in

conformity with the principles set forth in this chapter"); *Kelly v. Syria Shell Petroleum Dev. B.V.*,

213 F.3d 841, 845 (5th Cir. 2000); *Arriba Ltd. v. Petroleos Mexicanos,* 962 F.2d 528, 532 (5th Cir.

1992).

Section 1604 of the FSIA provides:

**§ 1604.  Immunity of a foreign state from jurisdiction**

> Subject to existing international agreements to which the
> United States is a party at the time of enactment of this Act a foreign
> state shall be immune from the jurisdiction of the courts of the United
> States and of the States except as provided in sections 1605 to 1607
> of this chapter.

28 U.S.C § 1604.

Accordingly, Federal Courts have jurisdiction over civil actions against "a foreign state...as to any claim for relief in personam with respect to which the foreign state is *not* entitled to immunity under [§§ 1605-1607 of this Title] or under any applicable international agreement." 28 U.S.C. § 1330(a) (emphasis added). Furthermore, "personal jurisdiction over a foreign state shall exist as to every claim for relief over which the district courts have [subject matter] jurisdiction under [§ 1330](a) where service has been made under [28 U.S.C. § ] 1608." 28 U.S.C. § 1330(b). It therefore follows that "personal jurisdiction, like subject-matter jurisdiction, exists only when one of the exceptions to foreign sovereign immunity in §§ 1605-07 applies." *Argentine Republic v. Amerada Hess Shipping Corp.*, 488 U.S. 428, 434 n.3 (1989); *Verlinden B.V. v. Central Bank of Nigeria,* 461 U.S. 480, 485 n.5 (1983) ("Under the [FSIA],...both statutory subject-matter jurisdiction...and personal jurisdiction turn on application of the substantive provisions of the [FSIA]").

## B.   *PEMEX and PEP are Agencies or Instrumentalities of a Foreign State as defined in the FSIA*

Section 1604 of the FSIA directs that sovereign immunity shall be applied to a "foreign state." 28 U.S.C. §1604. A "foreign state" includes "a political subdivision of a foreign state or an agency or an instrumentality of a foreign state as defined in [§ 1603] (b)." 28 U.S.C. § 1603(a). An agency or instrumentality of a foreign state is defined as:

> any entity - (1) which is a separate legal person, corporate or otherwise, and (2) which is an organ of a foreign state or a political subdivision thereof, or a majority of whose shares or other ownership interest is owned by a foreign state or a political subdivision thereof, and (3) which is neither a citizen of a State of the United States ...nor created under the laws of any third country. 28 U.S.C. § 1603(b).

As is clearly established by the documents accompanying this Motion, PEMEX is a separate legal person, corporate or otherwise, which is a decentralized public entity of Mexico, and that country's national oil company, and is neither a citizen of a State of the United States nor created under the laws of any third country. (Unsworn Declaration of Xavier Antonio de la Garza, p. 1 at Para. 3). Accordingly, PEMEX is an "agency or instrumentality" within the meaning of FSIA. In fact, the Fifth Circuit has so concluded on many prior occasions. *See, e.g., United States v. Moats,* 961 F. 2d 1198, 1204, n. 7 (5th Cir. 1992)("It is undisputed that PEMEX, the nationalized petroleum company of Mexico, falls within the definition of foreign state for purposes of sovereign immunity."); *Stena Rederi AB v. Comision de Contratos del Comite Ejecutivo General,* 923 F. 2d 380, 382, n. 2 (5th Cir. 1991)("Petroleos Mexicanos is an agency of the United Mexican States charged with the obligation to preserve, explore and produce Mexico's hydrocarbon resources."); *Tubular Inspectors Inc. v. Petroleos Mexicanos,* 977 F. 2d 180 (5th Cir. 1992). (Court reverses district court's finding of jurisdiction over PEMEX).

Likewise, PEP is also an "agency or instrumentality" of a foreign sovereign within the meaning of FSIA. As is clearly established by documents attached hereto, PEP is a decentralized public entity of the Sovereign State of Mexico, and is neither a citizen of a State of the United States nor created under the laws of any third country. (Unsworn Declaration of Andres Carvajal Solano, p. 1, at Para. 3). Fifth Circuit law does not require that the corporation be directly owned by a foreign state; a company which is a subsidiary of an entity which is itself wholly owned by a foreign state is also considered an agency or instrumentality of a foreign state. In *Delgado, et al v. Shell Oil Company, et al,* 231 F. 3d 165 (5th Cir. 2000), the court found that a company known as "Dead Sea" was an instrumentality or agency of a foreign state when Dead Sea was 100% owned by Dead Sea

51679:#3007512v1<RRVW> -Pemex's Mtn to Dismiss Evan's Compl:012605

Works Limited, which itself was 88.2% owned by Israel Chemicals Limited, which in turn was 75.3% owned by a foreign sovereign, the State of Israel.

Moreover, if indirect or non-first tier ownership were an issue under Fifth Circuit law, which it is not, even in those circuits which require direct ownership by the foreign sovereign, such as the Ninth Circuit,[1] PEP would still be an agency or instrumentality of a foreign state because it would qualify under the first prong of Section 1603(b)(2), that is, it would be considered an "organ" of a foreign state. In *Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. The M/T Respect,* 1996 U.S. App. Lexis 22068 (9th Cir. 1996), the Ninth Circuit determined that PEMEX-Refinacion (PEMEX-Refining), another subsidiary of PEMEX, was an agency or instrumentality of a foreign state.  In concluding that PEMEX-Refinacion was an instrumentality or agency of a foreign sovereign, the court noted that from 1938 until 1992, all petroleum production, manufacturing, transportation, distribution, and commercialization in Mexico was performed by PEMEX, an instrumentality of the Mexican government.  In 1992, PEMEX was restructured by presidential degree with the approval of the Mexican Congress.  The restructuring created four subsidiaries of PEMEX, each responsible for a separate part of the Mexican petroleum business.  The court noted that each of the PEMEX subsidiaries was a legal entity empowered to own property and carry on business in its own name.  The court noted that all of PEMEX Refinacion's acquisitions and shares had to be approved by the government, and that its employees were subject to the rights and obligations of public servants.  In its dealings with government agencies, PEMEX-Refinacion was

---

[1] In contrast to the Ninth Circuit, both the Sixth and Seventh Circuits agree with the Fifth Circuit's position that ownership by a sovereign through a subsidiary meets the test under FSIA, and direct first-tier ownership is not required. *See, In re Aircrash Disaster Near Roselawn, Ind.,* 96 F. 3d 932 (7th Cir. 1996); *Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.,* 10 F. 3d 425, 426-27 (7th Cir. 1993).

not required to post the customary performance bond, in part because the government of Mexico guarantees PEMEX -Refinacion's performance.

While the court found under Ninth Circuit law that PEMEX-Refinacion could not meet the test for instrumentality on the basis that a majority of its shares were owned by the government, as it was a subsidiary of PEMEX and owned by PEMEX and not directly by the Mexican government,[2] the court found that PEMEX-Refinacion met the first prong of the test under 28 U.S.C. §1603(b)(2), as it qualified as an "organ" of a foreign state. In so concluding, the Ninth Circuit quoted from the district court's opinion as follows:

> [PEMEX-Refining] is an integral part of the United Mexican States. PEMEX[-Refining] was created by the Mexican Constitution, Federal Organic Law, and Presidential Proclamation; it is entirely owned by the Mexican Government; is controlled entirely by government appointees; employs only public servants; and is charged with the exclusive responsibility of refining and distributing Mexican government property. Thus PEMEX-[Refining] is a subdivision of the United Mexican States and therefore qualifies for foreign sovereign immunity under FSIA.

*Corporacion Mexicana de Servicios Maritimos, S.A. de C.V. v. M/T Respect*, 1996 U.S. App. LEXIS 22068 (9th Cir. 1996)

Similarly, PEP, a subsidiary of PEMEX and also engaged in the business of maintaining the petroleum assets and industry of the Mexican government, and also created by the Mexican Constitution, Federal Organic Law and Presidential Proclamation, is an "organ" of a foreign state, and entitled to immunity under the FSIA.

---

[2]  The Ninth Circuit has concluded that an entity wholly owned by "an agency or instrumentality of a foreign state" is not an entity owned by a "foreign state or a political subdivision thereof." *Gates v. Victor Fine Foods*, 54 F. 3d 1457, 1462 (9th Cir. 1995), *cert. denied*, 116 S. Ct. 187 (1995). This, of course, is in contrast to Fifth Circuit law, where first tier ownership by the sovereign is not required for sovereign immunity status. Under Fifth Circuit rulings, PEP qualifies as an entity owned by a foreign state, even if it is first directly owned by its parent company, and only through the state's ownership of the parent company, is also owned by the state.

Accordingly, PEP is an agency or instrumentality of a foreign state because it is both an organ of a foreign state, and it is owned by a foreign state, albeit through PEP's parent company, PEMEX.

**C.    *The FSIA's Commercial Activity Exception To Immunity Does Not Apply In This Context***

Under the FSIA, a court in the United States can exercise subject matter jurisdiction over a foreign sovereign <u>only</u> if an exception to sovereign immunity applies. *See* 28 U.S.C. § 1330(a). The FSIA recognizes sundry exceptions to the general rule of sovereign immunity. One of these is a "commercial activities" exception: Foreign states are not immune from judicial process in any case in which the action is based upon commercial activity as set forth in Section 1605(a)(2).

Section 1605(a)(2) identifies three types of acts which are sufficiently connected to the United States to satisfy the requirement of the commercial activities exception:

(1)    A commercial activity carried on in the United States;

(2)    An act performed in the United States in connection with a commercial activity carried on outside the United States; and

(3)    A commercial activity carried on outside the United States that has a direct effect in the United States.

*See* 28 U.S.C. § 1605(a)(2); *Stena Rederi A.B. v. Comision de Contratos Del Comite*, 923 F.2d 380, 386 (5th Cir. 1991); *Callejo v. Vancomer, S.A.*, 764 F.2d 1101, 1110 (5th Cir. 1985).

For any of the three types of acts identified in Section 1605(a)(2) to apply, the Court of Appeals for the Fifth Circuit has required a nexus between the underlying claim and the commercial activity in (or having a direct effect in) the United States. *See Tubular Inspectors, Inc. v. Petroleos Mexicanos*, 977 F.2d 180, 184 (5th Cir. 1992); *Stena Rederi*, 923 F.2d at 386-87; *Vencedora Oceanica Navigacion v. Compagnie Nationale Algerienne De Navigation*, 730 F.2d 195, 202-204

(5th Cir. 1984). Merely pleading that a foreign instrumentality is "doing business" in the U.S. is not enough to apply the commercial activities exception to immunity under 1605(a)(2); rather, a nexus between the instrumentality's commercial activity in the United States and the event giving rise to the underlying lawsuit is necessary for the district court to exercise subject matter jurisdiction. *See Vencedora*, 730 F.2d at 202.[3]

Therefore, under the "nexus test" analysis, commercial actions that are "isolated or unrelated" to the events giving rise to the lawsuit "do not authorize the [immunity] exception." *Tubular Inspectors, Inc. v. Petroleos Mexicanos*, 977 F.2d 180, 184 (5th Cir. 1992); *Arriba Ltd. v. Petroleos Mexicanos*, 962 F.2d 528, 533 (5th Cir. 1992). The Court of Appeals for the Fifth Circuit has required that "the jurisdictional nexus requirement of § 1605(a)(2) mandates not only that [the instrumentality's] commercial acts be tied to the United States, but that they form the basis of [the plaintiff's] causes of action." *Id*. (citing *Stena Rederi A.B. v. Comision de Contratos*, 923 F.2d 380, 386-88 (5th Cir.1991)). In sum, the commercial activity must "also be the activity on which the lawsuit is based," *Arriba*, 962 F.2d at 533 (citing *Stena*, 923 F.2d 380, 387), and "the connection between the cause of action and the sovereign's commercial acts in the United States must be material." *Stena Rederi*, 923 F.2d at 387 (emphasis in original). *See, e.g. Arriba*, 962 F.2d at 533.

In this case, Evans' claims are based on "commercial activity" that occurred <u>outside</u> the United States, that is wholly <u>unconnected</u> to any commercial activity of PEMEX or PEP within the United States, and that did <u>not</u> have a direct effect in the United States.

---

[3]    According to the Fifth Circuit, "the 'nexus test' has been adopted by other circuits." *Vencedora*, 730 F.2d at 202 (citing *Velidor v. LPG Benghazi*, 653 F.2d 812, 820 (3d Cir.1981); *Gould v. Pechiney Ugine Kuhlmann*, 853 F.2d 445, 452 (6th Cir.1988); *America West Airlines, Inc. v. GPA Group, Ltd.*, 877 F.2d 793, 796 (9th Cir.1989)).

While it is not disputed that PEMEX and PEP engage in commercial activity to some extent within the United States, [4] the only commercial activity connected to PEMEX in the instant case were the actions of PEP in entering into a contract in Mexico with another Mexican company, Cia. Tesco Corporation, to do certain repair related work on various oil platforms located in the Bay of Campeche in Mexican territorial waters. Unfortunately, while in the course of effecting such repair work under the contract between PEP and Cia. Tesco Corporation, the Plaintiff was injured. In effect, all commercial activity relating to the accident, took place *wholly* within the sovereign State of Mexico.

The fact that Evans is now in the United States and may continue to experience the effects of the accident he suffered in Mexico on board the oil platform is not sufficient to defeat PEMEX and PEP's claims of sovereign immunity. As the Fifth Circuit noted in *Zernicek v. Brown & Root, Inc.,* 826 F. 2d 415, 418 (5th Cir. 1987), "Every court that has considered a claim for personal injury sustained in foreign territory has held that subsequent physical suffering and consequential damages are insufficient to constitute a "direct effect in the United States" for purposes of abrogating sovereign immunity."

In a more recent opinion addressing direct effects under this exception to the FSIA, the Court of Appeals for the District of Columbia Circuit explained that if lingering effects of a personal injury suffered overseas are deemed sufficient to satisfy the direct-effect requirement of the FSIA, then the commercial activity exception would largely eviscerate the FSIA's provision of immunity for foreign

---

[4] The Fifth Circuit has previously noted that it is without question that PEMEX conducts commercial operations that have substantial contact with the United States; it purchases and charters a large amount of its equipment from United States businesses, and maintains offices and bank accounts in the United States. *See, Stena Rederi A.B. v. Comision de Contratos Del Comite,* 923 F. 2d 380, 387 (5th Cir. 1991).

states. *See, Princz v. Federal Republic of Germany*, 307 U.S. App. D.C. 102, 26 F.3d 1166, 1173 (D.C. Cir. 1994), *cert. denied*, 115 S. Ct. 923, 130 L. Ed. 2d 803 (1995). Other courts considering the matter have also concluded that by merely returning to the United States, a plaintiff injured while abroad is not therefore entitled to sue an otherwise immune foreign sovereign. *See, Martin v. Republic of South Africa*, 836 F.2d 91, 94-95 (2d Cir. 1987) (ruling in conformity with other courts rejecting continued physical suffering and consequential damages that persisted when the plaintiff returned to the United States as a direct effect in the United States); *Yugoexport, Inc. v. Thai Airways Int'l, Ltd.*, 749 F.2d 1373, 1375 (9th Cir. 1984), cert. denied, 471 U.S. 1101, 105 S. Ct. 2326, 85 L. Ed. 2d 844 (1985).

The Court of Appeals for the Fifth Circuit has made it clear that the plaintiff attempting to invoke jurisdiction must produce facts to show that the commercial activity exception to immunity applies. *Arriba*, 962 F.2d 528, 533. Under Section 1605(a)(2), Evans is required to plead "the jurisdictional nexus necessary to support subject matter jurisdiction in this country." *Id.* It is evident that, under this standard, the Plaintiff has not and cannot do so.[5] The Plaintiff has therefore failed to allege a single PEMEX or PEP activity in or directly affecting the United States that bears a material relationship to the offshore accident occurring in foreign waters giving rise to this action.

Thus, there is no nexus between PEMEX's or PEP's commercial activity in the United States and the injuries which Plaintiff incurred on board the AKAL "TJ." Consequently, PEMEX and PEP are immune under FSIA and this Court lacks subject-matter jurisdiction and, therefore, *in personam*

---

[5]  Evans' First Amended Complaint makes no attempt to connect his accident on board the AKAL "TJ" with any commercial activities of PEMEX or PEP in the United States. Paragraph I of the First Amended Complaint merely states that PEMEX and PEP "are both decentralized public entities of the Mexican Government and doing commercial activities of drilling, exploring and production of oil and gas substantial, systematic and continuous business in the State of Texas and the United States of America."

jurisdiction under the FSIA.  Accordingly, Plaintiff's suit must be dismissed.  *See* FED. R. CIV. P. 12(b)(1)- (2).

WHEREFORE, PREMISES CONSIDERED, Defendants PEMEX and PEP respectfully request that this Court grant its Rule 12(b)(1) and Rule 12(b)(2) Motion To Dismiss Plaintiff Evans" First Amended Original Complaint because of lack of subject-matter and *in personam* jurisdiction pursuant to the Foreign Sovereign Immunities Act.

Respectfully submitted,

By:_____

David R. Walker
State Bar No. 20696800
1001 McKinney Street, Suite 1100
Houston, Texas 77002
Telephone: (713) 224-8380
Facsimile:  (713) 225-9945

Attorneys for Petróleos Mexicanos (PEMEX) and PEMEX Exploracion y Produccion

OF COUNSEL:

ROYSTON, RAYZOR, VICKERY & WILLIAMS, L.L.P.

## CERTIFICATE OF SERVICE

I certify that on this 26 th day of January, 2005, the foregoing was served on all counsel of record by Certified Mail, Return Receipt Requested.

*CM-RRR - # 7003 3110 0005 7109 3916*
Mr. Newton B. Schwartz, Sr.
1911 Southwest Freeway
Houston, Texas 77098

*CM-RRR - # 7003 3110 0005 7109 3923*
Mr. Seth Cortigene
1200 State Highway 146 South, Suite 190
LaPorte, Texas 77571

*CM-RRR - # 7003 3110 0005 7109 3930*
Mr. James S. Walker
Walker & Hunter, P.C.
1924 Portsmouth Street
Houston, Texas 77098

Of Royston, Rayzor, Vickery & Williams, L.L.P.

**KENNEDY DECLARATION**

**EXHIBIT B**

**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

| | | |
|---|---|---|
| **KEVIN L. EVANS,** | § | |
| **Plaintiff** | § | |
| | § | |
| **V.** | § | |
| | § | **C.A. NO. H-04-1510** |
| **PEMEX, ET AL.** | § | |
| **Defendants** | § | |

**UNSWORN DECLARATION UNDER PENALTY
OF PERJURY OF ANDRES CARVAJAL SOLANO**

UNITED MEXICAN STATES

MEXICO CITY, D.F.

1.      My name is ANDRES CARVAJAL SOLANO. I am over 18 years of age and have personal knowledge of the facts stated herein.

2.      I am working of Pemex Exploracion y Produccion (PEP). I have worked in this position since 1994.

3.      PEP is a decentralized public entity, of the Mexican Government with its headquarters in Mexico City, D.F., and is organized and existing under the laws of the sovereign State of Mexico and is a subsidiary of PEMEX. PEP, together with Pemex Refinacion, Pemex Gas y Petroquimica Basica, and Pemex Petroquimica, the other subsidiaries of PEMEX, and PEMEX, comprise Mexico's state oil and gas company. PEP is a legal entity empowered to own property and carry on business in its own name. PEP is neither a citizen of a State of the United States nor was it created under the laws of any third country.

4.    PEP owns the AKAL "TJ" platform on which Plaintiff Kevin L. Evans was working at the time he was allegedly injured. The AKAL "TJ" is a fixed oil platform which at all relevant times was operating in the Bay of Campeche, Mexico. It has never been present in U.S. ports or U.S. territorial waters.

5.    PEP had entered into a contract with Cia. Tesco Corporation, a Mexican corporation, for the well-servicing and refurbishing of several of PEP's oil platforms, including the AKAL "TJ." A copy of said contract, Contrato No. 50SNT00860, and Convenio Tres, a supplement thereto, is attached to this Affidavit as Exhibits " 1 " and " 2 ." All work pursuant to said contract was to be performed in Mexico or in the territorial waters of Mexico. As Plaintiff Kevin L. Evans alleges in his complaint, his injury occurred while working on the AKAL "TJ" while said platform was located in the Bay of Campeche, Mexico, 80 miles from Ciudad del Carmen, Mexico, in the territorial waters of Mexico.

6.    While PEP conducts **some business** in the United States, the subject matter of the accident on which this suit is based is not related to any such business conducted by PEP in the United States.

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this _25_ day of January, 2005 in Mexico City, D.F.

**KENNEDY DECLARATION**

**EXHIBIT C**

FOCUS - 1 of 1 DOCUMENT

Copyright 2008 Hoover's Inc., All Rights Reserved



**A D&B COMPANY**

Hoover's Company Records - In-depth Records

May 20, 2008

Petróleos Mexicanos

Avenida Marina Nacional 329, Colonia Huasteca
México, D.F. 11311
Mexico

**\* \* \* \* \* \* \* \* \* COMMUNICATIONS \* \* \* \* \* \* \* \* \***
**TELEPHONE:** +52-55-1944-2500
**FAX:** +52-55-1944-9378
**URL:** http://www.pemex.com

**\* \* \* \* \* \* \* \* \* COMPANY IDENTIFIERS \* \* \* \* \* \* \* \* \* \***
**HOOVER ID:** 41359

**\* \* \* \* \* \* \* \* \* COMPANY INFORMATION \* \* \* \* \* \* \* \* \* \***
**LEGAL STATUS:** Government-owned

**EMPLOYEES:** 141,275
**ONE YEAR EMPLOYEE GROWTH:** 1.5%

**\* \* \* \* \* \* \* \* \* EXECUTIVES \* \* \* \* \* \* \* \* \***

| OFFICER | TITLE | AGE | SALARY | BONUS |
|---|---|---|---|---|
| Jesús Reyes Heroles | Director General | - | - | - |
| Esteban Levin Balcells | CFO | - | - | - |
| Rosendo Villarreal Dávila | Corporate Director Administration | - | - | - |
| Raúl A. Livas Elizondo | Corporate Director Operations | - | - | - |
| José F. Álvarez Enríquez | Corporate General Controller | - | - | - |
| Carlos A. Morales Gil | Director General, Pemex Exploration and Production | - | - | - |
| José A. Ceballos Soberanis | Director General, Pemex Refining | - | - | - |
| Roberto Ramírez Soberón | Director General, Pemex Gas and Basic Petrochemicals | - | - | - |
| Rafael Beverido Lomelin | Director General, Pemex Petrochemicals | - | - | - |

Hoover's Company Records - In-depth Records, 2008, Petróleos Mexicanos

| OFFICER | TITLE | AGE | SALARY | BONUS |
|---|---|---|---|---|
| Rosendo Zambrano Fernández | Director General, International Commerce | - | - | - |
| Heber Cinco Ley | Director General, Mexican Petroleum Institute | - | - | - |
| Alejandro Fleming Kauffman | Secretary | - | - | - |
| Georgina Kessel Martínez | Chairman | - | - | - |
| Francisco Fernández Lagos | Deputy Director, Pipeline Transport | - | - | - |
| Jorge Borja Navarrete | Corporate Director Engineering and Project Development | - | - | - |
| Felipe Luna Melo | Deputy Director Planning, Evaluation, and Control, Engineering and Project Development | - | - | - |
| Ernesto Ríos Montero | Deputy Director Engineering and Project Development | - | - | - |
| Ignacio López Rodríguez | Deputy Director Corporate Services, Corporate Division of Management | - | - | - |

| DIRECTOR | TITLE | AGE |
|---|---|---|
| Juan Rafael Elvira Quesada | Director | - |
| Agustin Carstens | Director | - |
| Eduardo Sojo Garza Aldape | Director | - |
| Luis Téllez Kuenzler | Director | - |
| Gerardo Ruiz Mateos | Director | - |
| Georgina Kessel Martínez | Chairman | - |

**\* \* \* \* \* \* \* \* \* DESCRIPTION \* \* \* \* \* \* \* \* \* \***

Petróleos Mexicanos (PEMEX) not only fuels Mexico's automobile engines, the state-owned oil company also fuels the nation's economy, accounting for some one-third of the Mexican government's revenues and about 7% of its export earnings. The integrated company's operations, spread throughout Mexico, range from exploration and production to refining and petrochemicals. PEMEX's P.M.I. Comercio Internacional subsidiary manages the company's trading operations outside the country. PEMEX has estimated proved reserves of 15.5 billion barrels of oil equivalent. In 2006 PEMEX produced about 3.3 million barrels of crude oil per day.

PEMEX's refining operations convert crude oil into gasoline, jet fuel, diesel, fuel oil, asphalts, and lubricants. PEMEX's Gas and Basic Petrochemicals unit processes natural gas and natural gas liquids, and ships and sells natural gas and liquefied petroleum gas throughout Mexico. It also produces several basic petrochemical feedstocks.

Long recognized as the tangible expression of Mexican nationalism, PEMEX has faced popular opposition in its bid to follow other Latin American state oil companies and privatize some operations. PEMEX is, however, working to become more responsive to market conditions and expand its international scope.

**HISTORY:**

Histories of pre-colonial Mexico recount the nation's first oil business: Natives along the Tampico coast gathered asphalt from naturally occurring deposits and traded with the Aztecs.

As the 20th century began, Americans Edward Doheny and Charles Canfield struck oil near Tampico. Their success was eclipsed in 1910 by a nearby well drilled by British engineer Weetman Pearson, leader of the firm that became Pearson PLC.

Hoover's Company Records - In-depth Records, 2008, Petróleos Mexicanos

President Porfirio Díaz had welcomed foreign ownership of Mexican resources, but revolution ousted Díaz, and the 1917 Constitution proclaimed that natural resources belonged to the nation. Without enforcing legislation, however, foreign oil companies continued business as usual until a 1925 act limited their concessions. During a bitter labor dispute in 1938, President Lázaro Cárdenas expropriated foreign oil holdings -- the first nationalization of oil holdings by a non-Communist state. Subsequent legislation created Petróleos Mexicanos (PEMEX).

Without foreign capital and expertise, the new state-owned company struggled, and Mexico had to import petroleum in the early 1970s. But for many Mexicans, PEMEX remained a symbol of national identity and economic independence. That faith was rewarded in 1972 when a major oil discovery made PEMEX one of the world's top oil producers again. Ample domestic oil supplies and high world prices during the Iranian upheaval in the late 1970s fueled a boom and a government borrowing spree in Mexico. Between 1982 and 1985 PEMEX contributed more than 50% of government revenues.

When oil prices collapsed in 1985, Mexico cut investment in exploration, and production dropped. To decrease its reliance on oil, Mexico began lowering trade barriers and encouraging manufacturing, even allowing some foreign ownership of petrochemical processing.

Elected in 1988, President Carlos Salinas de Gortari began to reform PEMEX. Labor's grip on the company was loosened in 1989 when a union leader was arrested and jailed after a gun battle. In 1992, after a PEMEX pipeline explosion killed more than 200 people in Guadalajara, four of its executives and several local officials were sent to prison, amid public cries for company reform.

President Ernesto Zedillo appointed Adrián Lajous Vargas head of PEMEX in 1994. Under the professorial Lajous, PEMEX began to adopt modern business practices (such as trimming its bloated payroll), look for more reserves, and improve its refining capability. Lajous tried to sell some petrochemical assets in 1995, but had to modify the scheme the next year after massive public protests by the country's nationalists. Still, PEMEX began selling off natural gas production, distribution, and storage networks to private companies.

Though oil prices were dropping, in 1998 Mexico finally upped PEMEX's investment budget and PEMEX dramatically increased exploration and production. In spite of 2000's looming national election (elections traditionally had caused bureaucrats to keep a low profile to protect their jobs), Lajous again fanned the flames of the opposition: In 1998 he signed a major deal to sell Mexican crude to Exxon's Texas refinery, and in 1999 a four-year-old PEMEX/Shell joint venture announced it would expand its US refinery.

In 1999 Lajous resigned and was replaced by Rogelio Montemayor, a former governor. The next year Vicente Fox was elected as Mexico's new president, the country's first non-Institutional Revolutionary Party (PRI) leader in seven decades. He announced plans to replace PEMEX's politician-staffed board with professionals -- Montemayor was among the casualties -- and modernize the company, but he ruled out privatizing PEMEX as politically unfeasible.

Fox appointed Raúl Muñoz, formerly with Dupont Mexico, in 2003 to lead PEMEX. Muñoz, however, was engulfed in a scandal involving the misuse of funds and forced to resign the following year. His replacement, Luis Ramírez, lasted until the next national election, when incoming President Felipe Calderón appointed Jesús Reyes.

**HOOVER INDUSTRIES:**

- Energy & Utilities
    - OIL & GAS REFINING, MARKETING & DISTRIBUTION
    - Oil & Gas Exploration & Production
    - Oil & Gas Transportation & Storage


- Retail
    - Convenience Stores & Truck Stops
    - Gasoline Retailers


* * * * * * * * * **MARKET AND INDUSTRY** * * * * * * * * * *
**NAICS CODES:**
21111 - Oil and Gas Extraction

Hoover's Company Records - In-depth Records, 2008, Petróleos Mexicanos

211111 - Crude Petroleum and Natural Gas Extraction
211112 - Natural Gas Liquid Extraction
213111 - Drilling Oil and Gas Wells
213112 - Support Activities for Oil and Gas Operations
221210 - Natural Gas Distribution
324110 - Petroleum Refineries
32419 - Other Petroleum and Coal Products Manufacturing
324191 - Petroleum Lubricating Oil and Grease Manufacturing
324199 - All Other Petroleum and Coal Products Manufacturing
333132 - Oil and Gas Field Machinery and Equipment Manufacturing
424710 - Petroleum Bulk Stations and Terminals
424720 - Petroleum and Petroleum Products Merchant Wholesalers (except Bulk Stations and Terminals)
445120 - Convenience Stores
447110 - Gasoline Stations with Convenience Stores
447190 - Other Gasoline Stations
45431 - Fuel Dealers
454311 - Heating Oil Dealers
454312 - Liquefied Petroleum Gas (Bottled Gas) Dealers
454319 - Other Fuel Dealers
486110 - Pipeline Transportation of Crude Oil
486210 - Pipeline Transportation of Natural Gas
486910 - Pipeline Transportation of Refined Petroleum Products
541360 - Geophysical Surveying and Mapping Services
**SIC CODES:**
1311 - Crude petroleum and natural gas
1321 - Natural gas liquids
1381 - Drilling oil and gas wells
1382 - Oil and gas exploration services
1389 - Oil and gas field services, nec
2911 - Petroleum refining
2992 - Lubricating oils and greases
2999 - Petroleum and coal products, nec
3533 - Oil and gas field machinery
4612 - Crude petroleum pipelines
4613 - Refined petroleum pipelines
4922 - Natural gas transmission
4923 - Gas transmission and distribution
4925 - Gas production and/or distribution
5171 - Petroleum bulk stations & terminals
5172 - Petroleum products, nec
5399 - Misc. general merchandise stores
5499 - Miscellaneous food stores
5541 - Gasoline service stations
5983 - Fuel oil dealers
5984 - Liquefied petroleum gas dealers
**MARKETS:**
      2006 Sales

|  | % of total |
|---|---|
| Mexico | 54 |
| Other countries | 45 |
| Other revenues | 1 |
|  |  |
| Total | 100 |

      2006 Sales

                              % of total

Hoover's Company Records - In-depth Records, 2008, Petróleos Mexicanos

```
Exploration & production          39
Refining                          20
Gas & basic petrochemicals        10
Petrochemicals                     1
Corporate & subsidiaries          30

Total                            100
```

- .
- . Selected Subsidiaries
- .
- . PEMEX Exploración y Producción (petroleum and natural gas exploration and production)
- . PEMEX Gas y Petroquímica Básica (natural gas, liquids from natural gas, and ethane processing)
- . PEMEX Petroquímica (petrochemical production)
- . PEMEX Refinación (refining and marketing)
- . P.M.I. Comercio Internacional (international trading)

## COMPETITORS:

- . Exxon
- . PDVSA
- . Royal Dutch Shell
- . Ashland
- . BHP Billiton
- . BP
- . Chevron
- . Devon Energy
- . Eni
- . Imperial Oil
- . Koch Industries, Inc.
- . Marathon Oil
- . Norsk Hydro ASA
- . Occidental Petroleum
- . PETROBRAS
- . Sunoco
- . TOTAL

## * * * * * * * * * FINANCIALS * * * * * * * * * *
**FISCAL YEAR DATE:** December, 2006

| (Millions U.S. Dollars) | 2006 | 2005 | 2004 |
|---|---|---|---|
| Revenue | $104,644.7 | $87,279.4 | $70,110.4 |
| Net Income | $4,182.3 | ($7,079.2) | ($2,277.8) |
| Net Profit | 4.0% | - | - |
| Employees | 141,275 | 139,171 | 137,722 |

- . One Year Sales Growth: 19.9%

## * * * * * * * * * SERVICE FIRMS * * * * * * * * * *
**AUDITOR:** PricewaterhouseCoopers, 2008

**LOAD-DATE:** May 20, 2008

**KENNEDY DECLARATION**

**EXHIBIT D**

[PEMEX LOGO]

## GERENCIA CORPORATIVA DE COMUNICACION SOCIAL

_____

## PRESS RELEASE No. 33/2004

_____

DATE: 02/09/2004

## PEMEX SIGNS FIFTH MULTIPLE SERVICE CONTRACT

Olmos Block will generate investments for the country of almost
U.S.$ 344 million in order to increase natural gas production

Petroleos Mexicanos signed today a Multiple Service Contract (MSC) with the
Texan company Lewis Energy Group for the performance of the infrastructure,
development and maintenance works of the non-associated gas fields of the Olmos
block, located at the Burgos Basin.

The signature of this contract will generate a total investment of U.S.
$ 343,573,500 million throughout the 15-year term of the contract and with this
investment Pemex expects to increase natural gas production by 40 million cubic
feet per day.

This is the fifth MSC signed by Pemex. The first MSC, corresponding to the
Reynosa-Monterrey block, was signed with the Spanish company Repsol,
representing the public works contract for the largest amount in Pemex's
records.

The Cuervito block contract was the second contract signed by Pemex. The
contractor was an international consortium integrated by the Brazilian company
Petrobras, the Japanese company Teikoku Oil Co. and the Mexican company D&S
Petroleum, a subsidiary of Diavaz Group.

The third contract corresponded to the Mision block and it was awarded to an
international Mexican-Argentinian consortium integrated by the Argentinian

companies Techint and its subsidiary Tecpetrol, and the Mexican company Industrial Perforadora de Campeche (IPC).

While the fourth contract corresponded to the Fronterizo block. It was signed with the same Brazilian-Japanese-Mexican consortium which will develop the Cuervito block.

With the first five MSCs, Petroleos Mexicanos guarantees an increase in natural gas production of almost 440 million cubic feet per day, thus reducing costly imports, and these contracts will allow new investments for the country in an amount of U.S. $ 4.4 billion. The contracts will also attract leading technology and expertise that will increase Pemex's capacity, while saving the company an estimated U.S. $ 800 million in production costs.

Lewis Energy Group is a vertically integrated exploration and development company, one of the most successful groups in the Southern Texas region, and a company with proven technology and capability to develop natural gas fields in the region. The MSCs will strengthen Petroleos Mexicanos' capacity to develop the Burgos Basin Integral Project, oriented to increase non-associated natural gas production in the Northern region of the country, reduce imports, and help meet the increasing demand for natural gas in Mexico.

****

**THIS PAGE INTENTIONALLY LEFT BLANK**

FOCUS - 1 of 12 DOCUMENTS

Copyright 2007 Foster Associates, Inc.
All Rights Reserved
Foster Natural Gas Report

December 14, 2007

**SECTION:** Report No. 2673; Pg. 13

**LENGTH:** 731 words

**HEADLINE:** FERC CLEARS ENSINAL'S PROJECT PROPOSAL TO LINK PRODUCTION AND GATHERING OPERATIONS AT THE BORDER BETWEEN TEXAS AND MEXICO

**BODY:**

On December 10, FERC acted on the 7/2/07 application of Encinal Gathering, Ltd. (CP07-418) requesting authorization under Section 3 of the Natural Gas Act (NGA) to site, construct, and operate natural gas pipeline and metering facilities at a point on the International Boundary between the United States and the Republic of Mexico in Webb County, Tex. and Coahuila, Mex. FERC conditionally approved the request and also issued a Presidential Permit authorizing Encinal to construct and connect these same Border Crossing Facilities to its existing gathering facilities in Webb County. This would enable Encinal to connect the stranded production from the Olmos Block in Mexico through the border facilities to its existing Big Reef Gathering System. These border facilities will import gas from Mexico to the U.S. and export gas in reverse from the U.S. to Mexico. Granting these authorizations are not inconsistent with the public interest, FERC concluded. (FNGR No. 2652, pp26-27)

Encinal is a Texas limited partnership engaged in the production and gathering of gas and is an indirect subsidiary of Lewis Energy Group, LP (LEG). Encinal conducts production and gathering operations in Webb, LaSalle, and Dimmit counties in Texas. The wells in this area produce sweet gas and sour gas. It also operates the Big Reef Gathering System, which connects Encinal's sour gas production to the Big Reef Treating Facility, a treatment facility.

Another LEG subsidiary, Lewis Energy Mexico, S, de R.L. de C.V. (LEM), engages in exploration and production activities in Mexico, across the International Boundary. LEM has executed a Multiple Services Contract with PEMEX Exploracion Produccion (PEMEX Exploracion) that entitles LEM to perform exploration and production in the Olmos Block. The gas produced there belongs to PEMEX Exploracion, which makes delivery of the gas to PEMEX Gas y Petroquimica Basica at the border. LEM and Encinal plan to drill as many as sixty more wells in this general vicinity, both in Mexico and the U.S., respectively, over the next few years. Currently, there is no pipeline infrastructure in Mexico for approximately sixty miles in any direction beyond the Olmos block, thus stranding all of the gas produced there.

Therefore, Encinal explained that LEM plans to construct gathering facilities in Mexico that would interconnect with the facilities Encinal proposes in this proceeding to provide an outlet for the stranded gas. New gas production in Mexico will be transported to Encinal's system for ultimate consumption in the San Antonio, Texas area. However, Encinal wishes to have the flexibility to reverse the flow in the future to enable gas produced and gathered via the Big Reef system to flow south into Mexico for processing and ultimate consumption there. For this reason, Encinal requested authorization to use the facilities at the border for both importation and exportation.

For its part, Encinal proposes to construct a 683-foot extension of its existing gathering system to interconnect at the border with new gathering facilities being constructed by LEM in Mexico. The proposed Border Crossing Facilities comprise two twelve-inch diameter gathering lines, one for sour gas and one for sweet gas. These pipeline sections would be horizontally directionally drilled under the Rio Grand River and would be a total of 1,435 feet long, 683 feet of which would be located in the U.S. From the center of the Rio Grande River, the Border Crossing Facilities would extend eastward to pigging facilities at Encinal's existing well site in Webb County, the westward terminus of Encinal's system. The design capacity of each segment of pipeline will be approximately 30 MMcf/d and each will cost approximately $250,000 to construct.

FERC CLEARS ENSINAL'S PROJECT PROPOSAL TO LINK PRODUCTION AND GATHERING OPERATIONS AT THE BORDER BETWEEN TEXAS AND MEXICO Foster Natural Gas Report December 14, 2007

The non-jurisdictional gathering facilities would consist of two parallel eight-inch diameter pipelines extending approximately 1.2 miles from the eastern terminus of the Border Crossing Facilities eastward to Encinal's existing system and fall under the jurisdiction of the Texas Railroad Commission.

Based on FERC's review of the record, and absence of any objection from the Secretaries of State and Defense, the Commission determined that Encinal's project would facilitate trade between the U.S. and Mexico, thereby promoting the objectives of the Energy Policy Act of 1992, and is not inconsistent with the public interest.

**LOAD-DATE:** December 17, 2007

**KENNEDY DECLARATION**

**EXHIBIT E**

*This is an EDGAR HTML document rendered as filed.  [ Alternative Formats ]*

<div style="border:1px solid">Form F-4</div>

Table of Contents

Registration No. 333-

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

# FORM F-4
# REGISTRATION STATEMENT
*UNDER*
*THE SECURITIES ACT OF 1933*

# PEMEX PROJECT FUNDING MASTER TRUST
### (Exact name of Issuer as specified in its charter)

## PETROLEOS MEXICANOS (MEXICAN PETROLEUM)
## PEMEX-EXPLORACION Y PRODUCCION (PEMEX-EXPLORATION AND PRODUCTION)
## PEMEX-REFINACION (PEMEX-REFINING)
## and
## PEMEX-GAS Y PETROQUIMICA BASICA (PEMEX-GAS AND BASIC PETROCHEMICALS)
### (Exact names of co-registrants as specified in their charters and translations of co-registrants' names into English)

| **Delaware** | **United Mexican States** | **1311** | **Not Applicable** |
|---|---|---|---|
| (State or other jurisdiction of incorporation or organization of Issuer) | (State or other jurisdiction of incorporation or organization of co-registrants) | (Primary Standard Industrial Classification Code Number) | (I.R.S. Employer Identification Number) |

c/o The Bank of New York
Global Structured Finance Unit
101 Barclay Street, 21 West
New York, NY 10286
(Address, including zip code, and telephone number, including area code, of issuer's principal executive offices)

Avenida Marina Nacional No. 329
Colonia Huasteca
México, D.F. 11311
México
Telephone: (52-55) 1944-2500
(Address, including zip code, and telephone number, including area code, of co-registrants' principal executive offices)

*Copies to:*

Ismael Hernández Amor
P.M.I. Holdings North America, Inc.
909 Fannin, Suite 3200
Houston, Texas 77010
Telephone: 713-567-0182

Wanda J. Olson
Cleary Gottlieb Steen & Hamilton LLP
One Liberty Plaza
New York, New York 10006
Facsimile: 212-225-3999

*(Name, address and telephone number of agent for service)*

**Approximate date of commencement of proposed sale to the public:**
From time to time after this registration statement becomes effective.

Case 1:08-cv-00489-RWR   Document 9-7   Filed 06/04/2008   Page 4 of 105

## CALCULATION OF REGISTRATION FEE

| Title of Each Class of Securities to be Registered | Amount to be Registered | Proposed Maximum Offering Price Per Unit[1] | Proposed Maximum Aggregate Offering Price[1] | Amount of Registration Fee |
|---|---|---|---|---|
| 5.75% Guaranteed Notes due 2015 | U.S. $759,254,000 | 100% | U.S. $759,254,000 | U.S. $81,240.18 |
| 6.625% Guaranteed Bonds due 2035 | U.S. $751,995,000 | 100% | U.S. $751,995,000 | U.S. $80,463.47 |
| Guaranties and subsidiary guaranties | U.S. $1,511,249,000 | —— | —— | None[2] |

(1) The securities being registered are offered (i) 5.75% Notes due 2015 and 6.625% Bonds due 2035 previously sold in transactions exempt from registration under the Securities Act of 1933 and (ii) upon certain resales of the securities by broker-dealers. The registration fee has been computed based on the face value of the securities solely for the purpose of calculating the amount of the registration fee, pursuant to Rule 457 under the Securities Act of 1933.

(2) Pursuant to Rule 457(n), no separate fee is payable with respect to the guaranties and the subsidiary guarantees.

**The Registrants hereby amend this registration statement on such date or dates as may be necessary to delay its effective date until the Registrants shall file a further amendment which specifically states that this registration statement shall thereafter become effective in accordance with Section 8(a) of the Securities Act, or until the registration statement shall become effective on such date as the Securities and Exchange Commission, acting pursuant to said Section 8(a), may determine.**

Table of Contents



**Prospectus**

# Pemex Project Funding Master Trust
# Exchange Offers

### for the following classes of securities:

### U.S. $759,254,000 5.75% Guaranteed Notes due 2015
### U.S. $751,995,000 6.625% Guaranteed Bonds due 2035

*unconditionally guaranteed by*

# Petróleos Mexicanos

*Terms of the Exchange Offers*

- We are offering to exchange securities that we sold in private offerings for an equal principal amount of new registered securities.

- The exchange offers commence on August    , 2006 and expire at Midnight, New York City time, on September    , 2006, unless we extend them.

- You may withdraw a tender of old securities at any time prior to the expiration of the exchange offers.

- All old securities that are validly tendered and not validly withdrawn will be exchanged.

- We believe that the exchange of securities will not be a taxable exchange for either U.S. or Mexican federal income tax purposes.

- We will not receive any proceeds from the exchange offers.

- The terms of the new securities to be issued are identical to the old securities, except for the transfer restrictions and registration rights relating to the old securities.

- The payment of principal and interest on the new securities will be unconditionally guaranteed by Petróleos Mexicanos, a decentralized public entity of the Federal Government of the United Mexican States, which we refer to as the guarantor.

- Three of the four subsidiary entities of Petróleos Mexicanos will guarantee its obligations as guarantor of the new securities. These subsidiary entities are Pemex-Exploration and Production, Pemex-Refining and Pemex-Gas and Basic Petrochemicals; we refer to them as the subsidiary guarantors.

- The new securities will contain provisions regarding acceleration and future modifications to their terms that differ from those applicable to certain of the Pemex Project Funding Master Trust's, which we refer to as the issuer, and the guarantor's other outstanding public external indebtedness issued prior to October 2004. Under these provisions, in certain circumstances, the issuer and the guarantor may amend the payment and certain other provisions of an issue of new securities with the consent of the holders of 75% of the aggregate principal amount of such new securities.

We are not making an offer to exchange securities in any jurisdiction where the offer is not permitted.

**Investing in the securities issued in the exchange offers involves certain risks. See " Risk Factors" beginning on page 12.**

Neither the U.S. Securities and Exchange Commission (SEC) nor any state securities commission in the United States has approved or disapproved the securities to be distributed in the exchange offers, nor have they determined that this prospectus is truthful and complete. Any representation to the contrary is a criminal offense.

August    , 2006

Table of Contents

# TABLE OF CONTENTS

|                                              | Page |
|----------------------------------------------|------|
| Available Information                        | 1    |
| Electronic Delivery of Documents             | 2    |
| Currency of Presentation                     | 2    |
| Presentation of Financial Information        | 3    |
| Prospectus Summary                           | 4    |
| Selected Financial Data                      | 10   |
| Risk Factors                                 | 12   |
| Forward-Looking Statements                   | 18   |
| Use of Proceeds                              | 18   |
| Ratio of Earnings to Fixed Charges           | 19   |
| Capitalization of PEMEX                       | 20   |
| Recent Developments                          | 21   |
| Pemex Project Funding Master Trust           | 28   |
| Subsidiary Guarantors                        | 30   |
| The Exchange Offers                          | 32   |
| Description of the New Securities            | 42   |
| Book Entry; Delivery and Form               | 59   |
| Taxation                                     | 62   |
| Plan of Distribution                         | 66   |
| Validity of Securities                       | 67   |
| Public Official Documents and Statements     | 67   |
| Experts                                      | 67   |
| Responsible Persons                          | 67   |
| General Information                          | 68   |

i

SEC Info - Pemex Project Funding Master Trust, et al. - F-4 - On 8/16/06 - Page 7 of 30
Case 1:08-cv-00489-RWR Document 9-7 Filed 06/04/2008 Page 7 of 30
Page 8 of 105

Table of Contents

Terms such as *"we," "us"* and *"our"* generally refer to Petróleos Mexicanos and its consolidated subsidiaries, unless the context otherwise requires.

We will apply, through our listing agent, to have the new securities admitted to trading on the Euro MTF, the alternative market of the Luxembourg Stock Exchange. All of the old securities are currently admitted to trading on the Euro MTF, the alternative market of the Luxembourg Stock Exchange.

Petróleos Mexicanos, as guarantor, has registered the new securities with the *Sección Especial* (the Special Section) of the *Registro Nacional de Valores* (the National Registry of Securities, or the *"Registry"*) maintained by the *Comisión Nacional Bancaria y de Valores* (National Banking and Securities Commission, or the *"CNBV"*) of the United Mexican States (*"Mexico"*), which is a requirement under the *Ley de Mercado de Valores* (the Securities Market Law) in connection with an offering outside of Mexico by a Mexican issuer. Registration of the new securities with the Special Section of the Registry does not imply any certification as to the investment quality of the new securities, the solvency of the issuer, the guarantor or the subsidiary guarantors or the accuracy or completeness of the information contained in this prospectus. Furthermore, the information included in this prospectus is the sole responsibility of the issuer, the guarantor and the subsidiary guarantors (and not our managing trustee) and has not been reviewed or authorized by the CNBV of Mexico. The new securities have not been registered with the *Sección de Valores* (the Securities Section) of the Registry and, consequently, may not be publicly offered or sold in Mexico. Any Mexican investor who acquires the new securities from time to time must rely on its own examination of the issuer, the guarantor and the subsidiary guarantors.

You should rely only on the information provided in this prospectus. We have authorized no one to provide you with different information. You should not assume that the information in this prospectus is accurate as of any date other than the date on the front of the document.

## AVAILABLE INFORMATION

Separate financial statements of the Pemex Project Funding Master Trust have not been included in this prospectus. Petróleos Mexicanos does not believe that these financial statements would be material to you because (1) Petróleos Mexicanos, an SEC reporting company, is the sole beneficiary of the issuer, (2) the issuer has no independent operations, and (3) Petróleos Mexicanos has fully and unconditionally guaranteed the issuer's obligations under the securities.

In its filings under the Securities Exchange Act of 1934, as amended, a footnote to Petróleos Mexicanos' annual financial statements states that the issuer is consolidated with Petróleos Mexicanos, and that the guarantee, when taken together with the indenture, the trust agreement of the issuer and Petróleos Mexicanos' obligations to pay all fees and expenses of the issuer, constitutes a full and unconditional guarantee by Petróleos Mexicanos of the issuer's obligations under the securities.

We have filed a registration statement with the SEC on Form F-4 covering the new securities. This prospectus does not contain all of the information included in the registration statement. Any statement made in this prospectus concerning the contents of any contract, agreement or other document is not necessarily complete. If we have filed any of those contracts, agreements or other documents as an exhibit to the registration statement, you should read the exhibit for a more complete understanding of the document or matter involved. Each statement regarding a contract, agreement or other document is qualified in its entirety by reference to the actual document.

Petróleos Mexicanos is required to file periodic reports and other information (File No. 0-99) with the SEC under the Securities Exchange Act of 1934, as amended. We will also furnish other reports as we may determine appropriate or as the law requires. You may read and copy the registration statement, including the attached

1

Table of Contents

exhibits, and any reports or other information we file, at the SEC's public reference room in Washington, D.C. You can request copies of these documents, upon payment of a duplicating fee, by writing to the SEC's Public Reference Section at Judiciary Plaza, 450 Fifth Street, N.W., Washington, D.C. Please call the SEC at 1-800-SEC-0330 for further information on the operation of the public reference rooms. In addition, any filings we make electronically with the SEC will be available to the public over the Internet at the SEC's website at http://www.sec.gov under the name *"Mexican Petroleum."*

You may also obtain copies of these documents at the offices of the Luxembourg listing agent, Kredietbank S.A. Luxembourgeoise.

The SEC allows Petróleos Mexicanos to *"incorporate by reference"* information it files with the SEC, which means that Petróleos Mexicanos can disclose important information to you by referring you to those documents. The information incorporated by reference is considered to be part of this prospectus, and later information filed with the SEC will update and supercede this information. We incorporate by reference the documents filed by Petróleos Mexicanos listed below:

- Petróleos Mexicanos' annual report on Form 20-F for the year ended December 31, 2005, which we refer to as the *"Form 20-F;"* and

- all of Petróleos Mexicanos' annual reports on Form 20-F, and all reports on Form 6-K that are designated in such reports as being incorporated into this prospectus, filed with the SEC pursuant to Section 13(a), 13(c), or 15(d) of the Securities Exchange Act of 1934 after the date of this prospectus and prior to the termination of the exchange offers.

You may request a copy of any document that is incorporated by reference in this prospectus and that has not been delivered with this prospectus, at no cost, by writing or telephoning Petróleos Mexicanos at: Gerencia Jurídica de Finanzas, Avenida Marina Nacional No. 329, Colonia Huasteca, México D.F. 11311, telephone (52-55) 1944-9325, or by contacting our managing trustee at the address indicated on the inside back cover of this prospectus or by contacting our Luxembourg listing agent at the address indicated on the inside back cover of this prospectus, as long as any of the new securities are admitted to trading on the Euro MTF, the alternative market of the Luxembourg Stock Exchange, and the rules of such stock exchange so require. **To ensure timely delivery, investors must request this information no later than five business days before the date they must make their investment decision.**

## ELECTRONIC DELIVERY OF DOCUMENTS

We are delivering copies of this prospectus in electronic form through the facilities of The Depository Trust Company (*"DTC"*). You may obtain paper copies of the prospectus by contacting the exchange agent or the Luxembourg listing agent at their respective addresses specified on the inside back cover of this prospectus. By participating in the exchange offers, you will (unless you have requested paper delivery of documents) be consenting to electronic delivery of these documents.

## CURRENCY OF PRESENTATION

References in this prospectus to *"U.S. dollars," "U.S. $," "dollars"* or *"$"* are to the lawful currency of the United States of America. References in this prospectus to *"pesos"* or *"Ps."* are to the lawful currency of Mexico. We use the term *"billion"* in this prospectus to mean one thousand million.

This prospectus contains translations of certain peso amounts into U.S. dollars at specified rates solely for your convenience. You should not construe these translations as representations that the peso amounts actually represent the actual U.S. dollar amounts or could be converted into U.S. dollars at the rate indicated. Unless we

2

Table of Contents

indicate otherwise, the U.S. dollar amounts have been translated from pesos at an exchange rate of Ps. 10.7777 to U.S. $1.00, which is the exchange rate that the *Secretaría de Hacienda y Crédito Público* (the Ministry of Finance and Public Credit) instructed us to use on December 31, 2005.

On August 14, 2006, the noon buying rate for cable transfers in New York reported by the Federal Reserve Bank of New York was Ps. 10.8005 = U.S. $1.00.

## PRESENTATION OF FINANCIAL INFORMATION

The audited consolidated financial statements of PEMEX as of December 31, 2004 and 2005 and for each of the three years ended December 31, 2003, 2004 and 2005 are included in Item 18 of the Form 20-F incorporated by reference in this prospectus and the registration statement covering the new securities. We refer to these financial statements as the 2005 financial statements. These consolidated financial statements were prepared in accordance with accounting principles generally accepted in Mexico, or *"Mexican GAAP,"* and are presented in constant pesos with purchasing power at December 31, 2005.

The 2005 financial statements were reconciled to United States generally accepted accounting principles, or *"U.S. GAAP."* Mexican GAAP differs in certain significant respects from U.S. GAAP; the differences that are material to the 2005 financial statements are described in Note 20 to the 2005 financial statements.

We also include summary consolidated interim financial information of PEMEX for the six months ended June 30, 2006, which is not audited and was prepared in accordance with Mexican GAAP.

3

Table of Contents

# PROSPECTUS SUMMARY

*The following summary highlights selected information from this prospectus and may not contain all of the information that is important to you. This prospectus includes specific terms of the new securities we are offering, as well as information regarding our business and detailed financial data. We encourage you to read this prospectus in its entirety.*

## The Issuer

The issuer, Pemex Project Funding Master Trust, is a Delaware statutory trust established by Petróleos Mexicanos pursuant to the terms of a trust agreement dated as of November 10, 1998 among The Bank of New York, as managing trustee, The Bank of New York (Delaware), as Delaware Trustee and Petróleos Mexicanos, as sole beneficiary, as amended. The issuer is a financing vehicle for the long-term productive infrastructure projects of Petróleos Mexicanos, which we refer to as PIDIREGAS. The Delaware office of the issuer is The Bank of New York (Delaware), 502 White Clay Center, Route 273, P. O. Box 6973, Newark, DE 19711, telephone: (302) 283-8648; the office of the managing trustee of the issuer is The Bank of New York, Corporate Trust, Global Structured Finance Unit, 101 Barclay Street, Floor 21 West, New York, NY 10286, telephone (212) 495-1784.

## PEMEX

Petróleos Mexicanos is a decentralized public entity of the federal government of the United Mexican States (*"Mexico"*). The Mexican Congress established Petróleos Mexicanos on June 7, 1938 in conjunction with the nationalization of the foreign oil companies then operating in Mexico. Its operations are carried out through four principal subsidiary entities, which are *Pemex-Exploración y Producción* (Pemex-Exploration and Production), *Pemex-Refinación* (Pemex-Refining), *Pemex-Gas y Petroquímica Básica* (Pemex-Gas and Basic Petrochemicals) and *Pemex-Petroquímica* (Pemex-Petrochemicals). Petróleos Mexicanos and each of the subsidiary entities are decentralized public entities of Mexico and legal entities empowered to own property and carry on business in their own names. In addition, a number of subsidiary companies, including Pemex Project Funding Master Trust, are incorporated into the consolidated financial statements. We refer to Petróleos Mexicanos, the subsidiary entities and the consolidated subsidiary companies as PEMEX, and together they comprise Mexico's state oil and gas company.

## The Exchange Offers

On June 8, 2005, we issued U.S. $1,000,000,000 of 5.75% Notes due 2015, U.S. $990,746,000 of which were exchanged for new registered notes in February 2006 pursuant to an exchange offer we commenced in January 2006. On February 2, 2006 we issued an additional U.S. $750,000,000 of 5.75% Notes due 2015. We refer to the U.S. $9,254,000 of 5.75% Notes due 2015 that were issued in June 2005 and not exchanged in our previous exchange offer, together with the additional U.S. $750,000,000 of 5.75% Notes due 2015 that we issued in February 2006, as the *"5.75% old notes."*

On June 8, 2005, we issued U.S. $500,000,000 of 6.625% Bonds due 2035, U.S. $498,005,000 of which were exchanged for new registered bonds in February 2006 pursuant to an exchange offer we commenced in January 2006. On February 2, 2006 we issued an additional U.S. $750,000,000 of 6.625% Bonds due 2035. We refer to the U.S. $1,995,000 of 6.625% Bonds due 2035 that were issued in June 2005 and not exchanged in our previous exchange offer, together with the additional U.S. $750,000,000 of 6.625% Bonds due 2035 that we issued in February 2006, as the *"6.625% old bonds."*

We are offering new, registered securities in exchange for the 5.75% old notes and the 6.625% old bonds, which were unregistered securities and which we issued and sold to certain initial purchasers. These initial purchasers sold the 5.75% old notes and the 6.625% old bonds in offshore transactions and to qualified institutional buyers in transactions that were exempt from the registration requirements of the Securities Act. In this prospectus, we refer to the unregistered securities that we have already issued as the old securities, and the securities that we are now offering as the new securities.

4

Table of Contents

The old securities and the new securities are guaranteed by Petróleos Mexicanos. Three of the subsidiary entities of Petróleos Mexicanos guarantee its obligations as guarantor of the securities. These subsidiary entities are Pemex-Exploration and Production, Pemex-Refining and Pemex-Gas and Basic Petrochemicals.

*Registration Rights Agreement*

Each time we issued the old securities, we also entered into a registration rights agreement with the initial purchasers of those old securities in which we agreed to do our best to complete exchange offers of the old securities on or prior to a particular date. We have already complied with our obligations under the registration rights agreement that we entered into in respect of the old securities issued in February 2006.

*The Exchange Offers*

Under the terms of the exchange offers, holders of each series of old securities are entitled to exchange old securities for an equal principal amount of new securities with substantially identical terms, except as described herein.

You should read the discussion under the heading *"Description of the New Securities"* for further information about the new securities and the discussion under the heading *"The Exchange Offers"* for more information about the exchange process. The 5.75% old notes and the 6.625% old bonds may be tendered only in a principal amount of U.S. $10,000 and integral multiples of U.S. $1,000 in excess thereof.

The series of new securities that we will issue in exchange for old securities will correspond to the series of old securities tendered as follows:

| New Securities Series | Corresponding Old Securities Series |
|---|---|
| 5.75% Guaranteed Notes due 2015, or *"5.75% new notes"* | 5.75% old notes due 2015 |
| 6.625% Guaranteed Bonds due 2035, or *"6.625% new bonds"* | 6.625% old bonds due 2035 |

As of the date of this prospectus, the following amounts of each series of old securities are outstanding:

- U.S. $759,254,000 aggregate principal amount of 5.75% old notes; and
- U.S. $751,995,000 aggregate principal amount of 6.625% old bonds.

*Resale of New Securities*

We believe that you may offer the new securities issued in the exchange offers for resale, resell them or otherwise transfer them without compliance with the registration and prospectus delivery provisions of the Securities Act, as long as:

- you are acquiring the new securities in the ordinary course of your business;
- you are not participating, do not intend to participate, and have no arrangement or understanding with any person to participate, in the distribution of the new securities; and
- you are not an *"affiliate"* of ours, as defined under Rule 405 of the Securities Act.

If any statement above is not true and you transfer any new security without delivering a prospectus meeting the requirements of the Securities Act or without an exemption from the registration requirements of the Securities Act, you may incur liability under the Securities Act. We do not assume responsibility for or indemnify you against this liability.

If you are a broker-dealer and receive new securities for your own account in exchange for old securities that you acquired as a result of market making or other trading activities, you must acknowledge that you will deliver a prospectus meeting the requirements of the Securities Act in connection with any resale of the new securities. We will make this prospectus available to broker-dealers for use in resales for 180 days after the expiration date of these exchange offers.

*Consequences of Failure to Exchange Old Securities*

If you do not exchange your old securities for new securities, you will continue to hold your old

Case 1:08-cv-00469-RWR          Document 9-7          Filed 06/04/2008          Page 12 of 30

5

Table of Contents

securities. You will no longer be able to require that we register the old securities under the Securities Act. In addition, you will not be able to offer or sell the old securities unless:

- they are registered under the Securities Act, or
- you offer or sell them under an exemption from the requirements of, or in a transaction not subject to, the Securities Act.

*Expiration Date*

The exchange offers will expire at Midnight, New York City time, on September    , 2006, unless we decide to extend the expiration date.

*Interest on the New Securities*

The 5.75% new notes will accrue interest at 5.75% per year, accruing from June 15, 2006, the last date on which we paid interest on the 5.75% old notes you exchange. We will pay interest on the 5.75% new notes on June 15 and December 15 of each year.

The 6.625% new bonds will accrue interest at 6.625% per year, accruing from June 15, 2006, the last date on which we paid interest on the 6.625% old bonds you exchange. We will pay interest on the 6.625% new bonds on June 15 and December 15 of each year.

*Conditions to the Exchange Offers*

We may terminate the exchange offers and refuse to accept any old securities for exchange if:

- there has been a change in applicable law or the SEC staff's interpretation of applicable law, and the exchange offers are not permitted under applicable law or applicable SEC staff interpretations of law; or
- there is a stop order in effect or threatened with respect to the exchange offers or the indenture governing the securities.

We have not made any of the exchange offers contingent on holders tendering any minimum principal amount of old securities for exchange.

*Certain Deemed Representations, Warranties and Undertakings*

If you participate in the exchange offers, you will be deemed to have made certain acknowledgments, representations, warranties and undertakings. See *"The Exchange Offers—Holders' Deemed Representations, Warranties and Undertakings."*

*Procedure for Tendering Old Securities*

If you wish to accept the exchange offers, you must deliver electronically your acceptance together with your old securities through DTC's Automated Tender Offer Program (*"ATOP"*) system.

If you are not a direct participant in DTC, you must, in accordance with the rules of the DTC participant who holds your securities, arrange for a direct participant in DTC to submit your acceptance to DTC electronically.

*Withdrawal Rights*

You may withdraw the tender of your old securities at any time prior to Midnight, New York City time, on the expiration date, unless we have already accepted your old securities. To withdraw, you must send a written notice of withdrawal to the exchange agent through the electronic submission of a message in accordance with the procedures of DTC's ATOP system by Midnight, New York City time, on the scheduled expiration date. We may extend the expiration date without extending withdrawal rights.

If you are not a direct participant in DTC, you must, in accordance with the rules of the DTC participant who holds your securities, arrange for a direct participant in DTC to submit your written notice of withdrawal to DTC electronically by Midnight, New York City time, on the expiration date.

*Acceptance of Old Securities and Delivery of New Securities*

    If all of the conditions to the exchange offers are satisfied or waived, we will accept any and all old securities that are properly tendered in the exchange

6

Table of Contents

offers prior to Midnight, New York City time, on the expiration date. We will deliver the new securities as promptly as practicable after the expiration date.

*Tax Considerations*

We believe that the exchange of old securities for new securities will not be a taxable exchange for U.S. federal and Mexican income tax purposes. You should consult your tax advisor about the tax consequences of the exchange offers as they apply to your individual circumstances.

*Fees and Expenses*

We will bear all expenses related to consummating the exchange offers and complying with the registration rights agreements. The initial purchasers have agreed to reimburse us for certain of these expenses.

*Exchange Agent*

Deutsche Bank Trust Company Americas is serving as the exchange agent for the exchange offers. Deutsche Bank Luxembourg S.A. is serving as the exchange agent in Luxembourg. The exchange agents' addresses, telephone numbers and facsimile numbers are included under the heading *"The Exchange Offers—The Exchange Agent; Luxembourg Listing Agent."*

**Description of the New Securities**

*Issuer*

Pemex Project Funding Master Trust.

*Guarantors*

Petróleos Mexicanos will unconditionally guarantee the payment of principal and interest on the new securities. We call this the guarantee.

Each of Pemex-Exploration and Production, Pemex-Refining and Pemex-Gas and Basic Petrochemicals will, jointly and severally, guarantee Petróleos Mexicanos' payment obligations under its guaranty of the new securities. We call these the subsidiary guaranties.

*New Securities Offered*

- U.S. $759,254,000 aggregate principal amount of 5.75% new notes due 2015, and
- U.S. $751,995,000 aggregate principal amount of 6.625% new bonds due 2035.

The form and terms of each series of new securities will be the same as the form and terms of the corresponding series of old securities, except that:

- the new securities will be registered under the Securities Act and therefore will not bear legends restricting their transfer,
- holders of the new securities will not be entitled to some of the benefits of the registration rights agreement, and
- we will not issue the new securities under our medium-term note program.

The new securities will evidence the same debt as the old securities.

*Maturity Dates*

- 5.75% new notes mature on December 15, 2015, and
- 6.625% new bonds mature on June 15, 2035.

*Interest Payment Dates*

- for the 5.75% new notes, June 15 and December 15 of each year, and

Case 1:08-cv-00469-RWR    Document 9-7    Filed 06/04/2008    Page 18 of 105

- for the 6.625% new bonds, June 15 and December 15 of each year.

*Consolidation with Other Securities*

The 5.75% new notes will be consolidated to form a single series with, and will be fully fungible with, the U.S. $990,746,000 principal amount of our outstanding 5.75% guaranteed notes due 2015 which we issued in February 2006 upon the consummation of the exchange offers that we commenced in January 2006.

The 6.625% new bonds will be consolidated to form a single series with, and be fully fungible with, the U.S. $498,005,000 principal amount of our outstanding 6.625% guaranteed bonds due 2035

7

Table of Contents

which we issued in February 2006 upon the consummation of the exchange offers that we commenced in January 2006.

*Further Issues*

We may, without your consent, increase the size of the issue of any of the series of new securities or create and issue additional securities with either the same terms and conditions or the same except for the issue price, the issue date and the amount of the first payment of interest; *provided* that such additional securities do not have, for the purpose of U.S. federal income taxation, a greater amount of original issue discount than the affected series of new securities have as of the date of the issue of the additional securities. These additional securities may be consolidated to form a single series with the corresponding new securities.

*Withholding Tax; Additional Amounts*

We will make all principal and interest payments on the new securities without any withholding or deduction for Mexican withholding taxes, unless we are required by law to do so. In some cases where we are obliged to withhold or deduct a portion of the payment, we will pay additional amounts so that you will receive the amount that you would have received had no tax been withheld or deducted. For a description of when you would be entitled to receive additional amounts, see *"Description of the New Securities—Additional Amounts."*

*Tax Redemption*

If, as a result of certain changes in Mexican law, the issuer or Petróleos Mexicanos is obligated to pay additional amounts on interest payments on any of the series of the new securities at a rate in excess of 10% per year, then we may choose to redeem those new securities. If we redeem any new securities, we will pay 100% of their outstanding principal amount, plus accrued and unpaid interest and any additional amounts payable up to the date of our redemption.

*Redemption of the New Securities at the Option of the Issuer*

The issuer may at its option redeem any of the 5.75% new notes or the 6.625% new bonds, in whole or in part, at any time or from time to time prior to their maturity, at a redemption price equal to the principal amount thereof, plus the Make-Whole Amount (as defined under *"Description of the New Securities—Redemption of the New Securities at the Option of the Issuer"*) plus accrued interest on the principal amount of the 5.75% new notes or the 6.625% new bonds, as the case may be, to the date of redemption.

*Ranking of the New Securities and the Guaranties*

The new securities:

- will be direct, unsecured and unsubordinated public external indebtedness of the issuer, and

- will rank equally in right of payment with each other and with all other existing and future unsecured and unsubordinated public external indebtedness of the issuer.

The guaranties of the new securities by Petróleos Mexicanos and the subsidiary guarantors will constitute direct, unsecured and unsubordinated public external indebtedness of Petróleos Mexicanos and each of the subsidiary guarantors, respectively, and will rank *pari passu* with each other and with all other present and future unsecured and unsubordinated public external indebtedness of Petróleos Mexicanos and each of the subsidiary guarantors.

Petróleos Mexicanos and the subsidiary guarantors are party to certain financial leases which will, with respect to the assets securing those financial leases, rank prior to the new securities and the guaranties.

*Negative Pledge*

None of the issuer, Petróleos Mexicanos or the subsidiary guarantors or their respective subsidiaries will create security interests in our crude oil and crude oil receivables to secure any public external indebtedness. However, we may enter into up to U.S. $4 billion of receivables financings and similar transactions in any year and up to U.S. $12 billion of receivables financings and similar transactions in the aggregate.

*We may pledge or grant security interests in any of our other assets or the assets of Petróleos Mexicanos or the subsidiary guarantors to secure*

Case 1:08-cv-00469-RWR    Document 9-7    Filed 06/04/2008    Page 18 of 30

8

Table of Contents

*our debts. In addition, we may pledge oil or oil receivables to secure debts payable in pesos or debts which are different than the new securities, such as commercial bank loans.*

*Indenture*

The new securities will be issued pursuant to an indenture dated as of December 30, 2004, among the issuer, Petróleos Mexicanos and the trustee.

*Trustee*

Deutsche Bank Trust Company Americas.

*Events of Default*

The new securities and the indenture under which the new securities will be issued contain certain events of default. If an event of default occurs and is continuing with respect to a series of securities, 20% of the holders of the outstanding securities of that series can require us to pay immediately the principal of and interest on all those securities. For a description of the events of default and their grace periods, you should read *"Description of the New Securities—Events of Default; Waiver and Notice."*

*Collective Action Clauses*

The new securities will contain provisions regarding acceleration and future modifications to their terms that differ from those applicable to certain of the issuer's and the guarantor's other outstanding public external indebtedness issued prior to October 2004. Under these provisions, in certain circumstances, the issuer and the guarantor may amend the payment and certain other provisions of a series of new securities with the consent of the holders of 75% of the aggregate principal amount of such new securities.

*Governing Law*

The new securities and the indenture will be governed by New York law, except that the laws of Mexico will govern the authorization and execution of these documents by Petróleos Mexicanos.

*Listing*

The issuer intends to apply, through its listing agent, to have the new securities admitted to trading on the Euro MTF, the alternative market of the Luxembourg Stock Exchange. All of the old securities are currently admitted to trading on the Euro MTF, the alternative market of the Luxembourg Stock Exchange.

## Use of Proceeds

We will not receive any cash proceeds from the issuance of the new securities.

## Principal Executive Offices

Our headquarters are located at:

Avenida Marina Nacional No. 329
Colonia Huasteca
México, D.F. 11311
Phone: (52-55) 1944-2500.

## Risk Factors

Holders of old securities that do not exchange their old securities for new securities will continue to be subject to the restrictions on transfer that are listed on the legends of those old securities. These restrictions will make the old securities less liquid. To the extent that old securities are tendered and accepted in the exchange offers, the trading market, if any, for the old securities would be reduced.

Case 1:08-cv-00469-RWR    Document 9-7    Filed 06/04/2008    Page 20 of 30

The issuer cannot promise that a market for the new securities will be liquid or will continue to exist. Prevailing interest rates and general market conditions could affect the price of the new securities. This could cause the new securities to trade at prices that may be lower than their principal amount or their initial offering price.

The new securities provide a number of exceptions to the obligations to gross-up for Mexican withholding taxes and do not include a gross-up provision for United States withholding taxes.

In addition to these risks, there are additional risk factors related to the operations of PEMEX, the Mexican Government's ownership and control of PEMEX and Mexico generally. These risks are described beginning on page 12.

9

**THIS PAGE INTENTIONALLY LEFT BLANK**

Table of Contents

## PEMEX PROJECT FUNDING MASTER TRUST

The Pemex Project Funding Master Trust was organized as a statutory trust under Delaware law pursuant to a Trust Agreement dated November 10, 1998, as amended (which we refer to as the Trust Agreement). The Bank of New York acts as managing trustee and The Bank of New York (Delaware) acts as Delaware trustee of the issuer. The Pemex Project Funding Master Trust's purpose is, as set forth in the Trust Agreement, to administer certain financial resources earmarked for PIDIREGAS, which are described below.

Petróleos Mexicanos is the sole beneficiary of the Pemex Project Funding Master Trust and controls the Pemex Project Funding Master Trust in all of its activities. As set forth below, the Pemex Project Funding Master Trust is dependent on payments by the guarantors and subsidiary guarantors in respect of indebtedness incurred by the Pemex Project Funding Master Trust.

## PIDIREGAS Projects

Under Mexico's General Law of Public Debt, a PIDIREGAS must be a long-term productive infrastructure project which is:

- related to an economic activity identified as a priority by the Mexican Government,

- expected to generate funds sufficient to repay the financing incurred for the project, and

- previously approved by the Mexican Government.

Petróleos Mexicanos or a subsidiary guarantor negotiates and enters into turn-key and other contracts for the construction of PIDIREGAS. PEMEX subsequently delegates to the Pemex Project Funding Master Trust the payment obligations under the related project contracts and transfers any funds obtained through related financing transactions. Accordingly, upon receipt by PEMEX of invoices under the project contracts, Petróleos Mexicanos instructs the Pemex Project Funding Master Trust to make payment to the appropriate contractors.

Financings for PIDIREGAS are either entered into by Petróleos Mexicanos and assigned to the Pemex Project Funding Master Trust or arranged by Petróleos Mexicanos and entered into directly by the Pemex Project Funding Master Trust, as is the case with the old securities and the new securities. In either case, funds obtained through these financings are transferred to The Bank of New York as managing trustee, whose decisions are, in turn, dictated by Petróleos Mexicanos. All payments under financings entered into by or assigned to the Pemex Project Funding Master Trust are unconditionally guaranteed by Petróleos Mexicanos. The subsidiary guarantors jointly and severally guarantee Petróleos Mexicanos' payment obligations under its guaranties of these financings.

The Pemex Project Funding Master Trust has been consolidated with PEMEX and its subsidiary companies in the 2005 financial statements and in the interim financial information set forth under *"Recent Developments"* in this prospectus.

## Assignment and Indemnity Agreement

Under an Assignment and Indemnity Agreement dated November 10, 1998, among Petróleos Mexicanos, The Bank of New York and the subsidiary guarantors, Petróleos Mexicanos and the subsidiary guarantors have assumed certain obligations of the Pemex Project Funding Master Trust with respect to the liabilities incurred or assumed by the Pemex Project Funding Master Trust in connection with PIDIREGAS. These obligations include:

- the obligation of Petróleos Mexicanos to guarantee the repayment of the debt obligations undertaken by the Pemex Project Funding Master Trust to finance PIDIREGAS;

- the obligation of Petróleos Mexicanos and the particular subsidiary guarantor that is sponsoring a PIDIREGAS to make payments to the issuer as may be necessary for the Pemex Project Funding Master Trust to fulfill its payment obligations in respect of any financing that the issuer has entered into in connection with the PIDIREGAS; and

28

Table of Contents

- the joint and several obligations of Petróleos Mexicanos and each of the subsidiary guarantors to indemnify the Pemex Project Funding Master Trust with respect to any liability incurred by the Pemex Project Funding Master Trust in connection with PIDIREGAS.

## Liquidity and Capital Resources

Petróleos Mexicanos makes decisions to draw-down funds under PIDIREGAS-related financings on the basis of the short-term obligations of the issuer under PIDIREGAS construction contracts. The issuer invests any excess liquidity in short-term investments, including interest-bearing deposits at Banco de México and other foreign banks.

At December 31, 2005, cash and cash equivalents of the issuer totaled U.S. $5.0 billion, its total assets were U.S. $36.9 billion, its long-term indebtedness totaled U.S. $33.2 billion, its short-term indebtedness (including interest payable of U.S. $0.5 billion) totaled U.S. $2.5 billion and its other liabilities totaled U.S. $1.3 billion (including accounts payable to contractors of U.S. $1.0 billion and derivative instruments in a notional amount of U.S. $0.1 billion), of which short-term liabilities totaled U.S. $0.1 billion.

At June 30, 2006, cash and cash equivalents of the issuer totaled U.S. $2.2 billion, its total assets were U.S. $38.0 billion, its long-term indebtedness totaled U.S. $34.6 billion, its short-term indebtedness (including interest payable of U.S. $0.6 billion) totaled U.S. $2.7 billion and its other liabilities totaled U.S. $0.7 billion (including accounts payable to contractors of U.S. $0.6 billion), of which short-term liabilities totaled U.S. $0.1 billion.

The assets of the issuer consist primarily of the funds it receives through various PIDIREGAS financings incurred directly or indirectly by the issuer, earnings from the short-term investment of its excess liquidity and its rights to receive payment from Petróleos Mexicanos and the subsidiary guarantors.

Future amortization of the issuer's outstanding indebtedness of U.S. $36.8 billion at June 30, 2006 is scheduled as follows:

### Pemex Project Funding Master Trust
### Indebtedness Amortization Schedule
### Maturities

| 2006 | 2007 | 2008 | 2009 | 2010 | Over 5 years |
|------|------|------|------|------|--------------|
| | | (in millions of U.S. dollars) | | | |
| U.S. $1,112.3 | U.S. $2,762.0 | U.S. $3,893.2 | U.S. $4,495.0 | U.S. $4,530.5 | U.S. $19,976.6 |

29

Table of Contents

## SUBSIDIARY GUARANTORS

The subsidiary guarantors—Pemex-Exploration and Production, Pemex-Refining and Pemex-Gas and Basic Petrochemicals—are decentralized public entities of Mexico, which were created by the Mexican Congress on July 17, 1992 out of operations that had previously been directly managed by Petróleos Mexicanos. Each of the subsidiary guarantors is a legal entity empowered to own property and carry on business in its own name. The executive offices of each of the subsidiary guarantors are located at Avenida Marina Nacional No. 329, Colonia Huasteca, México, D.F. 11311, México.

The Organic Law allocates the operating functions of Petróleos Mexicanos among the subsidiary guarantors, each of which is a 100% owned subsidiary of Petróleos Mexicanos. The principal objectives of the subsidiary guarantors, as noted in Article 3 of the Organic Law, are as follows:

- Pemex-Exploration and Production explores for and exploits crude oil and natural gas and transports, stores and markets these hydrocarbons;

- Pemex-Refining refines petroleum products and derivatives that may be used as basic industrial raw materials and stores, transports, distributes and markets these products and derivatives; and

- Pemex-Gas and Basic Petrochemicals processes natural gas, natural gas liquid and artificial gas derivatives and stores, transports, distributes and markets these hydrocarbons and derivatives that may be used as basic industrial raw materials.

For further information about the legal framework governing the subsidiary guarantors, see *"Item 4—Information on the Company—Organizational Laws"* in the Form 20-F. Copies of the Organic Law will be available at the specified offices of Deutsche Bank Trust Company Americas and the paying agent and transfer agent in Luxembourg.

The subsidiary guarantors have been consolidated with PEMEX in the 2005 financial statements included in the Form 20-F and in the interim financial information set forth under *"Recent Developments"* in this prospectus. See Note 21 to the 2005 financial statements for the condensed balanced sheets, statements of operations and changes in financial position for the subsidiary guarantors that are utilized to produce the consolidated financial statements of PEMEX. None of the subsidiary guarantors publish their own financial statements.

The following is a brief description of each Subsidiary Guarantor.

*Pemex-Exploration and Production*

Pemex-Exploration and Production explores for and produces crude oil and natural gas, primarily in the northeastern and southeastern regions of Mexico and offshore in the Gulf of Mexico. In nominal peso terms, our capital investment in exploration and production activities decreased by 0.4% in 2005, but we continued to finance an array of programs to expand production capacity and efficiency. As a result of our investments in previous years, our total hydrocarbon production reached a level of approximately 4,395 thousand barrels of oil equivalent per day in 2005. Pemex-Exploration and Production's crude oil production decreased by 1.5% from 2004 to 2005, averaging 3,333 thousand barrels per day in 2005. Pemex-Exploration and Production's natural gas production (excluding natural gas liquids) increased by 5.4% from 2004 to 2005, averaging 4,818 million cubic feet per day in 2005. Exploration drilling activity decreased by 28.2%, from 103 exploratory wells in 2004 to 74 exploratory wells in 2005, including Niquel-1, Antiguo-8 and Caravana-1 in Burgos, Huace-1 in Veracruz, Pit-1 and Ichalkil-1 in Campeche Oriente, and Xanab-1 in Crudo Ligero Marino. Development drilling activity rose 7.1%, from 624 development wells in 2004 to 668 development wells in 2005. In 2005, we completed the drilling of 742 wells, the highest number of wells completed in one year in the last 45 years. Our drilling activity in 2005 was directed at increasing the production of non-associated gas in the Burgos, Veracruz and Macuspana regions.

30

Table of Contents

Our offshore drilling efforts in 2005 led to significant discoveries of heavy, light and extra-light crude oil sources, particularly in the Marine region. Our current challenge with respect to these discoveries is the short-term development of these new resources.

*Pemex-Refining*

Pemex-Refining converts crude oil into gasoline, jet fuel, diesel, fuel oil, asphalts and lubricants. It also distributes and markets most of these products throughout Mexico, where it experiences a significant demand for its refined products. Pemex-Refining's atmospheric distillation refining capacity remained constant at approximately 1,540 thousand barrels per day during 2005. In 2005, Pemex-Refining produced 1,338 thousand barrels per day of refined products, as compared to 1,361 thousand barrels per day of refined products in 2004. For further information about Pemex-Refining, see *"Item 4—Information on the Company—Exploration and Production—Refining"* in the Form 20-F.

*Pemex-Gas and Basic Petrochemicals*

Pemex-Gas and Basic Petrochemicals processes wet natural gas in order to obtain dry natural gas, liquefied petroleum gas and other natural gas liquids. Furthermore, it transports, distributes and sells natural gas and liquefied petroleum gas throughout Mexico and produces and sells several basic petrochemical feedstocks, which are used by Pemex-Refining or Pemex-Petrochemicals. In 2005, Pemex-Gas and Basic Petrochemicals' total sour natural gas processing capacity remained constant at approximately 4,503 million cubic feet per day. Pemex-Gas and Basic Petrochemicals processed 3,153 million cubic feet per day of sour natural gas in 2005, a 5.9% decrease from the 3,349 million cubic feet per day of sour natural gas processed in 2004. It produced 436 thousand barrels per day of natural gas liquids in 2005, a 3.3% decrease from natural gas liquid production of 451 thousand barrels per day in 2004. It also produced 3,147 million cubic feet per day of dry gas in 2005, a 0.1% increase from the 3,144 million cubic feet per day produced in 2004. For further information about Pemex-Gas and Basic Petrochemicals, see *"Item 4—Information on the Company—Gas and Basic Petrochemicals"* in the Form 20-F.

For further information about the investment policies of the Subsidiary Guarantors, see *"Item 4—Information on the Company—Capital Expenditures and Investment"* in the Form 20-F.

31

**THIS PAGE INTENTIONALLY LEFT BLANK**

Table of Contents

## DESCRIPTION OF THE NEW SECURITIES

**General**

    This is a summary of the material terms of the new securities and the indenture dated December 30, 2004 among the Pemex Project Funding Master Trust, Petróleos Mexicanos and the trustee. Because this is a summary, it does not contain the complete terms of the new securities and the indenture, and may not contain all the information that you should consider before investing in the new securities. A copy of the indenture has been filed as an exhibit to the registration statement, which includes this prospectus. We urge you to closely examine and review the indenture itself. See *"Where You Can Find More Information"* for information on how to obtain a copy. You may also inspect a copy of the indenture at the corporate trust office of the trustee, which is currently located at:

<div align="center">

Deutsche Bank Trust Company Americas
c/o Deutsche Bank National Trust Company
25 DeForest Avenue
2nd Floor
Mail Stop: SUM01-0105
Summit, NJ 07901
Phone: (908) 608-3125
Fax: (732) 578-4635

</div>

and at the office of the Luxembourg paying and transfer agent and exchange agent in Luxembourg, which is located at:

<div align="center">

Deutsche Bank Luxembourg S.A.
2 Boulevard Konrad Adenauer
L-1115 Luxembourg
Ref: Coupon Paying Dept.
Phone: (352) 42122-641
Fax: (352) 42122-449

</div>

    We will issue the new securities under the indenture. The form and terms of the new securities of each series will be identical in all material respects to the form and terms of the old securities of the corresponding series, except that:

- we will register the new securities under the Securities Act and therefore they will not bear legends restricting their transfer;

- holders of the new securities will not receive some of the benefits of the registration rights agreement; and

- we will not issue the new securities our medium-term note program.

    The 5.75% new notes we are offering and the 5.75% old notes we previously sold will collectively be a single series for all purposes under the indenture. The 6.625% new bonds we are offering and the 6.625% old bonds we previously sold will collectively be a single series for all purposes under the indenture.

    We will issue the new securities only in fully registered form, without coupons and in denominations of U.S. $10,000 and integral multiples of U.S. $1,000 in excess thereof.

    The new securities will mature on:

- December 15, 2015, in the case of the 5.75% new notes; and

- June 15, 2035, in the case of the 6.625% new bonds.

<div align="center">42</div>

Table of Contents

The 5.75% new notes will accrue interest at 5.75% per year, accruing from June 15, 2006, the last date on which we paid interest on the 5.75% old notes you exchange. We will pay interest on the 5.75% new notes on June 15 and December 15 of each year.

The 6.625% new bonds will accrue interest at 6.625% per year, accruing from June 15, 2006, the last date on which we paid interest on the 6.625% old bonds you exchange. We will pay interest on the 6.625% new bonds on June 15 and December 15 of each year.

Interest on the new securities will accrue from the last date on which interest on the corresponding series of old securities was paid. We will compute the amount of each interest payment on the basis of a 360-day year consisting of twelve 30-day months.

## Consolidation with other Securities

The 5.75% new notes will be consolidated to form a single series with, and will be fully fungible with, the U.S. $990,746,000 principal amount of our outstanding 5.75% Guaranteed Notes due 2015, which we issued in February 2006 upon the consummation of the exchange offers that we commenced in January 2006.

The 6.625% new bonds will be consolidated to form a single series with, and be fully fungible with, U.S. $498,005,000 principal amount of our outstanding 6.625% Guaranteed Bonds due 2035, which we issued in February 2006 upon the consummation of the exchange offers that we commenced in January 2006.

## Principal and Interest Payments

We will make payments of principal of and interest on the new securities represented by a global security by wire transfer of U.S. dollars to DTC or to its nominee as the registered owner of the new securities, which will receive the funds for distribution to the holders. We expect that the holders will be paid in accordance with the procedures of DTC and its participants. Neither we nor the trustee or any paying agent shall have any responsibility or liability for any of the records of, or payments made by, DTC or its nominee.

If the new securities are represented by definitive securities, we will make interest and principal payments to you, as a holder, by wire transfer if:

- you own at least U.S. $10,000,000 aggregate principal amount of new securities; and
- not less than 15 days before the payment date, you notify the trustee of your election to receive payment by wire transfer and provide it with your bank account information and wire transfer instructions;

or if:

- we are making the payments at maturity; and
- you surrender the new securities at the corporate trust office of the trustee or at the offices of the other paying agents that we appoint pursuant to the indenture.

If we do not pay interest by wire transfer for any reason, we will, subject to applicable laws and regulations, mail a check to you on or before the due date for the payment at your address as it appears on the register maintained by the trustee on the applicable record date.

We will pay interest payable on the new securities, other than at maturity, to the registered holders at the close of business on the 15th day (whether or not a business day) (a *"regular record date"*) before the due date for the payment. Should we not make punctual interest payments, such payments will no longer be payable to the holders of the new securities on the regular record date. Under such circumstances, we may either:

43

Table of Contents

- pay interest to the persons in whose name the new securities are registered at the close of business on a special record date for the payment of defaulted interest. The trustee will fix the special record date and will provide notice of that date to the holders of the new securities not less than ten days before the special record date; or

- pay interest in any other lawful manner not inconsistent with the requirements of any securities exchange on which the new securities are then listed.

Interest payable at maturity will be payable to the person to whom principal of the new securities is payable.

If any money that the issuer, the guarantor or a subsidiary guarantor pays to the trustee for principal or interest is not claimed at the end of two years after the payment was due and payable, the trustee will repay that amount to the issuer upon its written request. After that repayment, the trustee will not have any further liability with respect to the payment. However, the issuer's obligation to pay the principal of and interest on the new securities, and the obligations of the guarantor and the subsidiary guarantors on their respective guaranties and subsidiary guaranties with respect to that payment, will not be affected by that repayment. Unless otherwise provided by applicable law, your right to receive payment of principal of any new security (whether at maturity or otherwise) or interest will become void at the end of five years after the due date for that payment.

If the due date for the payment of principal, interest or additional amounts with respect to any new security falls on a Saturday or Sunday or another day on which the banks in New York are authorized to be closed, then holders will have to wait until the next business day to receive payment. You will not be entitled to any extra interest or payment as a result of that delay.

## Paying and Transfer Agents

We will pay principal of the new securities, and holders of the new securities may present them for registration of transfer or exchange, at:

- the corporate trust office of the trustee,

- the office of the Luxembourg paying and transfer agent, or

- the office of any other paying agent or transfer agent that we appoint.

With certain limitations that are detailed in the indenture, we may, at any time, change or end the appointment of any paying agent or transfer agent with or without cause. We may also appoint another, or additional, paying agent or transfer agent, as well as approve any change in the specified offices through which those agents act. In any event, however:

- at all times we must maintain a paying agent, transfer agent and registrar in New York, New York, and

- if and for as long as the new securities are traded on the Euro MTF, the alternative market of the Luxembourg Stock Exchange, and if the rules of that stock exchange require, we must have a paying agent and a transfer agent in Luxembourg.

We have initially appointed the trustee at its corporate trust office as principal paying agent, transfer agent, authenticating agent and registrar for all of the new securities. The trustee will keep a register in which we will provide for the registration of transfers of the new securities.

We will give you notice of any of these terminations or appointments or changes in the offices of the agents in accordance with *"—Notices"* below.

## Guaranties

*Guaranty.* Pursuant to the indenture, Petróleos Mexicanos has unconditionally guaranteed the due and punctual payment of all amounts payable by the issuer in respect of the securities, as and when the same shall become due and payable, whether at maturity, by declaration of acceleration or otherwise.

44

Table of Contents

*Subsidiary Guaranties.* In a guaranty agreement dated <u>July 29, 1996</u>, which we refer to as the subsidiary guaranty agreement, among Petróleos Mexicanos and the subsidiary guarantors, each of the subsidiary guarantors will be jointly and severally liable with Petróleos Mexicanos for all payment obligations of Petróleos Mexicanos under international financing agreements entered into by Petróleos Mexicanos. This liability extends only to those payment obligations that Petróleos Mexicanos designates as being entitled to the benefit of the subsidiary guaranty agreement in a certificate of designation.

Petróleos Mexicanos has designated both the indenture and the new securities as benefiting from the guaranty agreement in certificates of designation, dated <u>February 11, 2005</u>, <u>June 8, 2005</u> and <u>February 2, 2006</u>. Accordingly, each of the subsidiary guarantors will be unconditionally liable for Petróleos Mexicanos' obligations under its guaranty of all amounts payable by the issuer in respect of the new securities as and when they become due and payable.

Under the terms of the subsidiary guaranty agreement, each of the subsidiary guarantors will be jointly and severally liable for the full amount of each payment under the guaranty by the guarantor. Although the issuer and the subsidiary guarantors may terminate the guaranty agreement in the future, the guaranties of the subsidiary guarantors on all obligations designated before termination will remain in effect until all amounts payable with respect to such obligations have been paid in full. These designated amounts will include the entire principal of and interest on the new securities.

Any amendment to the subsidiary guaranty agreement that would affect the rights of any party to, or beneficiary of, the indenture and the new securities will be valid only with the consent of the same parties, or percentage of holders, as is required to amend the indenture or the new securities.

**Ranking of New Securities and Guaranties**

The new securities will be direct, unsecured and unsubordinated public external indebtedness of the issuer. All of the new securities will be equal in the right of payment with each other.

The payment obligations of the Pemex Project Funding Master Trust under the new securities will rank equally with all of its other present and future unsecured and unsubordinated public external indebtedness for borrowed money. The guaranty of the new securities by Petróleos Mexicanos and the guaranties by the subsidiary guarantors of Petróleos Mexicanos' payment obligations under its guaranty will be direct, unsecured and unsubordinated public external indebtedness of the guarantor and the subsidiary guarantors and will rank equal in the right of payment with each other and with all other present and future unsecured and unsubordinated public external indebtedness for borrowed money of Petróleos Mexicanos and the subsidiary guarantors, respectively.

*The new securities are not obligations of, or guaranteed by, Mexico.*

**Additional Amounts**

When the issuer, the guarantor or the subsidiary guarantors make a payment on the new securities or its respective guaranty, we may be required to deduct or withhold present or future taxes, assessments or other governmental charges imposed by Mexico or a political subdivision or taxing authority of or in Mexico (we call these Mexican withholding taxes). If this happens, the issuer, the guarantor or the subsidiary guarantors will pay the holders of the new securities additional amounts as may be necessary to insure that every net payment made by the issuer, the guarantor or the subsidiary guarantors, after deduction or withholding for Mexican withholding taxes, will not be less than the amount actually due and payable on the new securities. However, this obligation to pay additional amounts will not apply to:

1.  any Mexican withholding taxes which would not have been imposed or levied on a holder of new securities were there not some past or present connection between the holder and Mexico or any of its political subdivisions, territories, possessions or areas subject to its jurisdiction, including, but not limited to, that holder:

    •   being or having been a citizen or resident of Mexico,

45

**KENNEDY DECLARATION**

**EXHIBIT F**

AO 440 (Rev. DC - September 2003) Summons in a Civil Action

# UNITED STATES DISTRICT COURT
## District of Columbia

CORPORACIÓN MEXICANA DE
MANTENIMIENTO INTEGRAL,
S. DE R.L. DE C.V

**SUMMONS IN A CIVIL CASE**

V.

PEMEX EXPLORACIÓN Y PRODUCCIÓN,

CASE NUMBER:

TO:
Pemex – Exploracion y Produccion
Gerencia de Recursos Materiales
Boulevard Adolfo Ruiz Cortines No. 1202
Edificio Piramide, Piso 4
Fracc, Oropeza
Villahermosa, Tabasco
United Mexican States
Attn: Ing. Guillermo Iturbide Ruiz

Pemex-Exploración y Producción
Gerencia de Contratos
Torre Empresarial
Paseo Tabasco # 1203
Col. Col. Linda Vista
Villahermosa, Tabasco c.p. 86050
United Mexican States
Attn: Ing. Victor Manuel Bahena Bustos

**YOU ARE HEREBY SUMMONED** and required to serve on PLAINTIFF'S ATTORNEY  (name and address)

Robert M. Kennedy
HUGHES HUBBARD & REED LLP
1775 I Street NW
Washington, DC 20006

an answer to the complaint which is served on you with this summons, within _____ days after service
of this summons on you, exclusive of the day of service.  If you fail to do so, judgment by default will be taken against you for
the relief demanded in the complaint.  Any answer that you serve on the parties to this action must be filed with the Clerk of this
Court within a reasonable period of time after service.

CLERK

DATE

(By) DEPUTY CLERK

AO 440 (Rev DC - September 2003) Summons in a Civil Action

## RETURN OF SERVICE

|  | DATE |
|---|---|
| Service of the Summons and complaint was made by me[1] | |
| NAME OF SERVER *(PRINT)* | TITLE |

*Check one box below to indicate appropriate method of service*

**G**  Served personally upon the defendant.  Place where served: _____

**G**  Left copies thereof at the defendant's dwelling house or usual place of abode with a person of suitable age and discretion then residing therein.

Name of person with whom the summons and complaint were left: _____

**G**  Returned unexecuted: _____

**G**  Other (specify): _____

## STATEMENT OF SERVICE FEES

| TRAVEL | SERVICES | TOTAL |
|---|---|---|

## DECLARATION OF SERVER

I declare under penalty of perjury under the laws of the United States of America that the foregoing information contained in the Return of Service and Statement of Service Fees is true and correct.

Executed on _____        _____
                     Date                          *Signature of Server*


                                              _____
                                              *Address of Server*

(1) As to who may serve a summons see Rule 4 of the Federal Rules of Civil Procedure.

**KENNEDY DECLARATION**

**EXHIBIT G**

TYPE-E

# U.S. District Court
## District of Columbia (Washington, DC)
## CIVIL DOCKET FOR CASE #: 1:03-cv-00034-TPJ

TMR ENERGY LIMITED v. THE STATE PROPERTY
FUND OF UKRAINE
Assigned to: Judge Thomas Penfield Jackson
Demand: $37,000,000
Case in other court: USCA, 03-07191
Cause: 28:1602 Foreign Sovereign Immunities Act

Date Filed: 01/10/2003
Date Terminated: 12/03/2003
Jury Demand: None
Nature of Suit: 890 Other Statutory
Actions
Jurisdiction: Federal Question

**Petitioner**

**TMR ENERGY LIMITED**

represented by **Samuel Rosenthal**
CURTIS, MALLET-PREVOST, COLT
& MOSLE
1200 New Hampshire Avenue, NW
Washington, DC 20036
(202) 452-7373
Fax: (917) 368-7340
Email: srosenthal@cm-p.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

V.

**Respondent**

**THE STATE PROPERTY FUND OF
UKRAINE**

represented by **Mark N. Bravin**
MORGAN, LEWIS & BROCKIUS
LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-5231
Fax: (202) 739-3001
Email: mbravin@morganlewis.com
*LEAD ATTORNEY*
*ATTORNEY TO BE NOTICED*

**Thomas Joseph O'Brien**
MORGAN, LEWIS & BOCKIUS LLP
1111 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 739-5186
Fax: (202) 739-3001
Email: to'brien@morganlewis.com

*ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|------------|---|-------------|
| 01/10/2003 | 1 | PETITION TO CONFIRM ARBITRATION AWARD against THE STATE PROPERTY FUND OF UKRAINE ( Filing fee $150 ), filed by TMR ENERGY LIMITED . (Attachments: # 1 Exhibit A# 2 Exhibit B# 3 Exhibit C# 4 Exhibit D# 5 Exhibit E)(rje, ) (Entered: 01/15/2003) |
| 01/10/2003 | 2 | LCvR 26.1 - CERTIFICATE OF DISCLOSURE of Corporate Affiliations and Financial Interests (rje, ) (Entered: 01/15/2003) |
| 01/10/2003 | 3 | NOTICE of Petition by TMR ENERGY LIMITED (rje, ) (Entered: 01/15/2003) |
| 02/25/2003 | 4 | NOTICE of filing of documents relating to service of papers pursuant to the Hague Convention by TMR ENERGY LIMITED (Attachments: # 1 Appendix) (rje, ) (Entered: 03/21/2003) |
| 04/07/2003 | 5 | ATTORNEY APPEARANCE by Mark Bravin on behalf of The State Property Fund of Ukraine. (Bravin, Mark) Modified on 4/9/2003 (rje, ). (Entered: 04/07/2003) |
| 04/07/2003 | 6 | First MOTION for Extension of Time to *Respond to Petition to Confirm Foreign Arbitral Award* by THE STATE PROPERTY FUND OF UKRAINE. (Attachments: # 1 Memorandum in Support of Respondent's Motion for Enlargement of Time# 2 Text of Proposed Order)(Bravin, Mark) (Entered: 04/07/2003) |
| 04/14/2003 | 7 | RESPONSE to Motion of respondent for an enlargement of time to respond to the petition to confirm arbitral award filed by TMR ENERGY LIMITED. (rje, ) (Entered: 04/16/2003) |
| 04/23/2003 | | ORDER granting 6 Motion for Extension of Time Until May 7, 2003, to Respond to Petition to Confirm Foreign Arbitral Award.Signed by Judge Thomas Penfield Jackson on 4/23/03. (LG, ) (Entered: 04/23/2003) |
| 05/07/2003 | 8 | ENTERED IN ERROR.....Second MOTION for Extension of Time to File Response/Reply *to Petition To Confirm Arbitral Award* by THE STATE PROPERTY FUND OF UKRAINE. (Attachments: # 1 Memorandum in Support of Motion of Respondent for Further Enlargement of Time To Respond to Petition To Confirm Arbitral Award# 2 Text of Proposed Order)(Bravin, Mark) Modified on 5/8/2003 (rje, ). (Entered: 05/07/2003) |
| 05/08/2003 | | NOTICE OF CORRECTED DOCKET ENTRY. Document No. 8 was entered in error and counsel was instructed to refile said pleading. (rje, ) (Entered: 05/08/2003) |
| 05/08/2003 | 9 | Second MOTION for Extension of Time to File Response/Reply as to 1 Petition to Confirm Arbitration Award by THE STATE PROPERTY FUND OF UKRAINE. (Attachments: # 1 Text of Proposed Order)(Bravin, Mark) (Entered: 05/08/2003) |
| 05/09/2003 | 10 | Memorandum in opposition to motion re 9 *a Further Enlargement of time to* |

|  |  | *Respond to Petition* filed by TMR ENERGY LIMITED. (Rosenthal, Samuel) (Entered: 05/09/2003) |
|---|---|---|
| 05/13/2003 | 11 | ORDER . Signed by Judge Thomas Penfield Jackson on May 13, 2003. (lctpj3, ) (Entered: 05/13/2003) |
| 05/19/2003 | 12 | REPLY in support of motion re 9 *Further Enlargement of Time to Respond to Petition* filed by THE STATE PROPERTY FUND OF UKRAINE. (O'Brien, Thomas) (Entered: 05/19/2003) |
| 06/12/2003 | 13 | MOTION to Withdraw as Attorney *for Respondent and Statement* by THE STATE PROPERTY FUND OF UKRAINE. (Attachments: # 1 Exhibit A (SPF Statement)# 2 Exhibit B (April 7, 2003 Letter)# 3 Text of Proposed Order) (O'Brien, Thomas) (Entered: 06/12/2003) |
| 06/16/2003 | 14 | NOTICE by TMR ENERGY LIMITED re 13 MOTION to Withdraw as Attorney *for Respondent and Statement TMR's Intention to File a Joint Memorandum* (Rosenthal, Samuel) (Entered: 06/16/2003) |
| 06/25/2003 | 15 | Memorandum in opposition to motion re 13 *the "Statement" of Respondent, the State Property Fund of Ukraine, and in Support of the Cross-Motion for an Order Confirming Arbitral Award* filed by TMR ENERGY LIMITED. (Rosenthal, Samuel) (Entered: 06/25/2003) |
| 06/25/2003 | 16 | CROSS-MOTION for an Order confirming arbitral award(Please refer to docket entry No. 15 for document). by TMR ENERGY LIMITED. (rje, ) Modified on 6/26/2003 (rje, ). (Entered: 06/26/2003) |
| 07/10/2003 | 17 | MOTION for Leave to Appear of Morgan Lewis as counsel for Respondent *and rescind pending motion of Morgan Lewis to withdraw appearance in accordance with request* by THE STATE PROPERTY FUND OF UKRAINE. (Attachments: # 1 Exhibit A (Statement from SPF)# 2 Text of Proposed Order) (O'Brien, Thomas) (Entered: 07/10/2003) |
| 07/10/2003 | 18 | MOTION for Extension of Time to *file, out of time, opposition to Petitioner's cross-motion, requested* by THE STATE PROPERTY FUND OF UKRAINE. (Attachments: # 1 Exhibit A (Statement from SPF)# 2 Text of Proposed Order) (O'Brien, Thomas) (Entered: 07/10/2003) |
| 07/15/2003 | 19 | Memorandum in opposition to motion re 18 *leave to file its opposition by August 11, 2003* filed by TMR ENERGY LIMITED. (Rosenthal, Samuel) (Entered: 07/15/2003) |
| 07/23/2003 |  | SetHearings: Initial Status Conference set for 9/10/2003 09:30 AM in Courtroom 2 before Thomas Penfield Jackson. (rew, ) (Entered: 07/23/2003) |
| 07/23/2003 | 20 | ORDER granting 17 Motion for Leave to Appear (lctpj1, ) (Entered: 07/23/2003) |
| 07/23/2003 | 21 | ORDER granting 18 Motion for Extension of Time for leave to file by August 11, 2003, with no further extentions allowed. (lctpj1, ) (Entered: 07/23/2003) |
| 08/11/2003 | 22 | Memorandum in opposition to motion re 16 *Confirmation of Petition and in Support of Respondent's Motion to Dismiss and For Additional Relief* filed by |

| | | |
|---|---|---|
| | | THE STATE PROPERTY FUND OF UKRAINE. (Attachments: # 1 Exhibit 1# 2 Exhibit 2# 3 Exhibit 3# 4 Exhibit 4 & 5# 5 Exhibit 6# 6 Exhibit 7# 7 Exhibit 8# 8 Exhibit 9# 9 Exhibit 10# 10 Exhibit 11# 11 Exhibit 12# 12 Exhibit 13# 13 Exhibit 14# 14 Exhibit 15)(O'Brien, Thomas) (Entered: 08/11/2003) |
| 08/11/2003 | 23 | MOTION to Dismiss *and for Additional relief* by THE STATE PROPERTY FUND OF UKRAINE. (Attachments: # 1 Text of Proposed Order)(O'Brien, Thomas) (Entered: 08/11/2003) |
| 08/20/2003 | 24 | STIPULATION *as to Briefing Schedule for Pending Motions* by TMR ENERGY LIMITED. (Rosenthal, Samuel) (Entered: 08/20/2003) |
| 09/08/2003 | | Calendar Entry, Set Deadlines/Hearings: Status Conference set for 10/23/2003 09:30 AM in Courtroom 2 before Thomas Penfield Jackson. (rew, ) (Entered: 09/08/2003) |
| 09/10/2003 | | ORDER re 24 Stipulation filed by TMR ENERGY LIMITED. Signed by Judge Thomas Penfield Jackson on 9/4/03. (lctpj3, ) (Entered: 09/10/2003) |
| 09/22/2003 | 25 | ENTERED IN ERROR..... MOTION for Extension of Time to File *Petitioner's Memorandum of Points and Authorities* by TMR ENERGY LIMITED. (Rosenthal, Samuel) Modified on 9/23/2003 (rje, ). (Entered: 09/22/2003) |
| 09/22/2003 | 26 | ENTERED IN ERROR.....MEMORANDUM from Petitioner, TMR Energy Ltd., in further Support of its Cross-Motion to Confirm Arbitral Award or, in the Alternative, Requiring Respondent to Post Security, and in Opposition to the Motion of Respondent to Dismiss the Petition and for Additional Relief. (Rosenthal, Samuel) Modified on 9/23/2003 (rje, ). (Entered: 09/22/2003) |
| 09/22/2003 | 27 | ENTERED IN ERROR.....AFFIDAVIT re 26 Memorandum, *of Lawrence M. Weiss* by TMR ENERGY LIMITED. (Rosenthal, Samuel) Modified on 9/23/2003 (rje, ). (Entered: 09/22/2003) |
| 09/22/2003 | 28 | ENTERED IN ERROR.....AFFIDAVIT re 26 Memorandum, *of Sarah Francois-Poncet* by TMR ENERGY LIMITED. (Rosenthal, Samuel) Modified on 9/23/2003 (rje, ). (Entered: 09/22/2003) |
| 09/23/2003 | | NOTICE OF CORRECTED DOCKET ENTRY. Document No. 25,26,27 & 28 were entered in error and counsel was instructed to refile said pleading. (rje, ) (Entered: 09/23/2003) |
| 09/23/2003 | 29 | MOTION for Extension of Time to File *Memorandum of Points and Authorities and Supporting Declarations* by TMR ENERGY LIMITED. (Attachments: # 1 # 2)(Rosenthal, Samuel) (Entered: 09/23/2003) |
| 09/30/2003 | | ORDER granting 29 Motion for Extension of Time to File . Signed by Judge Thomas Penfield Jackson on 9/30/03 n/p/t. (lctpj3, ) (Entered: 09/30/2003) |
| 10/03/2003 | 30 | MOTION for Order *of Admission of Michael Johnson Pro Hac Vice* by TMR ENERGY LIMITED. (Attachments: # 1 Affidavit of Michael Johnson in Support of Motion for Admission Pro Hac Vice# 2 Text of Proposed Order of Admission to Practice Pro Hac Vice)(Rosenthal, Samuel) (Entered: 10/03/2003) |
| | | |

| 10/03/2003 | 31 | MOTION for Order *for Admission of Shane Cargo Pro Hac Vice* by TMR ENERGY LIMITED. (Attachments: # 1 Affidavit of Shane Cargo in Support of Motion for Admission Pro Hac Vice# 2 Text of Proposed Order of Admission to Practice, Pro Hac Vice)(Rosenthal, Samuel) (Entered: 10/03/2003) |
|---|---|---|
| 10/07/2003 | | ORDER granting 30 Motion for Order of Admission to Practice, pro hac vice. Signed by Judge Thomas Penfield Jackson on 10/7/03. (lctpj3, ) (Entered: 10/07/2003) |
| 10/07/2003 | | ORDER granting 31 Motion for Order of Admission of Shane Cargo, Pro Hac Vice. Signed by Judge Thomas Penfield Jackson on 10/7/03. (lctpj3, ) (Entered: 10/07/2003) |
| 10/10/2003 | 32 | MOTION for Extension of Time to File Response/Reply as to 23 MOTION to Dismiss *and for Additional relief* by THE STATE PROPERTY FUND OF UKRAINE. (Attachments: # 1 Text of Proposed Order)(Bravin, Mark) (Entered: 10/10/2003) |
| 10/14/2003 | 33 | Memorandum in opposition to motion re 32 *of Respondent SPF's "Partial Consent Motion" for Enlargement of Time* filed by TMR ENERGY LIMITED. (Rosenthal, Samuel) (Entered: 10/14/2003) |
| 10/14/2003 | | ORDER granting 32 Motion for Extension of Time to File Response/Reply . Signed by Judge Thomas Penfield Jackson on 10/14/03. (lctpj3, ) (Entered: 10/14/2003) |
| 10/21/2003 | | Set/Reset Hearings: Status Conference set for 10-23-03 at 9:30 am is off and reset for 12/3/2003 09:30 AM in Courtroom 2 before Judge Thomas Penfield Jackson. (rew, ) (Entered: 10/21/2003) |
| 11/03/2003 | 34 | REPLY in support of motion re 23 filed by THE STATE PROPERTY FUND OF UKRAINE. (Attachments: # 1 Exhibit)(Bravin, Mark) (Entered: 11/03/2003) |
| 11/04/2003 | 35 | ERRATA *Title of memo was in error, Table of Contents reformatted* by THE STATE PROPERTY FUND OF UKRAINE. (Bravin, Mark) (Entered: 11/04/2003) |
| 12/03/2003 | 36 | JUDGMENT in favor of Petitioner, TMR Energy, Ltd. against Respondent, State Property Fund of Ukraine. Signed by Judge Thomas Penfield Jackson on 12/3/2003. (lctpj1, ) (Entered: 12/03/2003) |
| 12/03/2003 | | Minute Entry for proceedings held before Judge Thomas Penfield Jackson : Status Conference held on 12/3/2003. Petitioner's motion for summary enforcement heard and granted. Judgment is stayed pending filing of an appeal. (Court Reporter Kay Moomey (Miller).) (zrew, ) (Entered: 12/03/2003) |
| 12/08/2003 | 37 | NOTICE OF TRANSCRIPT of Motion Hearing Proceedings held on 12/3/03 before Judge Jackson. Court Reporter: Katherine K. Moomey (rje, ) (Entered: 12/11/2003) |
| 12/22/2003 | 38 | NOTICE OF APPEAL as to 36 Judgment by THE STATE PROPERTY FUND OF UKRAINE. Filing fee $ 255. (rje, ) (Entered: 12/23/2003) |
| | | |

| 12/23/2003 | | Transmission of Notice of Appeal and Docket Sheet to US Court of Appeals re 38 Notice of Appeal (rje, ) (Entered: 12/23/2003) |
| 12/31/2003 | | USCA Case Number 03-7191 for 38 Notice of Appeal filed by THE STATE PROPERTY FUND OF UKRAINE. (rje, ) (Entered: 01/05/2004) |
| 05/14/2004 | 39 | MOTION to Enforce Judgment *and for an Order Permitting TMR to Register Judgment in Other United States District Courts*, MOTION for an Order Permitting the Declaration of Lawrence M. Weiss to be filed Under Seal for In Camera Review by TMR ENERGY LIMITED. (Attachments: # 1 Memorandum of Law in Support of Motion to Permit Declaration of Lawrence Weiss to be Filed under Seal and for In Camera Review# 2 Memorandum of Law in Support of Motion to Enforce Judgment and to Register Judgment# 3 Affidavit Declaration of Sarah Francois-Poncet# 4 Exhibit Notice that Declaration filed in camera# 5 Text of Proposed Order Proposed Order to Enforce Judgment and Register Judgment# 6 Text of Proposed Order Proposed Order to Seal and for In Camera Review)(Rosenthal, Samuel) (Entered: 05/14/2004) |
| 05/28/2004 | 40 | Memorandum in opposition to motion re 39 *TMR's Motions for an Order Permitting It (A) to Enforce Judgment, (B) to Register Judgment in Other United States District Courts, and (C) to File Declaration of Lawrence M. Weiss Under Seal for In Camera Review by the Court* filed by THE STATE PROPERTY FUND OF UKRAINE. (Attachments: # 1 # 2)(Bravin, Mark) (Entered: 05/28/2004) |
| 06/01/2004 | 41 | ERRATA *Correcting typographical errors in SPF memorandum in opposition (#40) to TMR motions (#39) and providing Proposed Order* by THE STATE PROPERTY FUND OF UKRAINE. (Attachments: # 1 Exhibit A (Declaration of D. Parfenenko)# 2 Exhibit B (page from InforMARE website)# 3 Text of Proposed Order)(O'Brien, Thomas) (Entered: 06/01/2004) |
| 06/10/2004 | 42 | REPLY to opposition to motion re 39 filed by TMR ENERGY LIMITED. (Rosenthal, Samuel) (Entered: 06/10/2004) |
| 08/27/2004 | 43 | ORDER granting petitioner TMR Energy LTD's MOTION for an Order Permitting the Declaration of Lawrence M. Weiss to be filed Under Seal for In Camera Review and granting petitioner TMR Energy LTD's MOTION to Enforce Judgment and for an Order Permitting TMR to Register Judgment in Other United States District Courts. Signed by Judge Thomas Penfield Jackson on 8/26/2004. (lctpj1, ) (Entered: 08/27/2004) |
| 10/14/2004 | | ( ENTERED IN ERROR ) CLERK'S JUDGMENT in favor of TMR ENERGY, LTD. against STATE PROPERTY FUND OF UKRAINE in the amount of $41,412,987.20.. Signed by the Clerk on 10/14/2004. (rew, ) Modified on 10/14/2004 (rew, ). (Entered: 10/14/2004) |
| 10/14/2004 | | Remark : By the Clerk. Clerk's Judgment 10/14/2004 at 5:22 PM ENTERED IN ERROR. (rew, ) (Entered: 10/14/2004) |
| 10/14/2004 | 44 | CLERK'S JUDGMENT in favor of TMR ENERGY, LTD. against STATE PROPERTY FUND OF UKRAINE in the amount of $41,412,987.20.. Signed by the Clerk on 10/14/2004. (rew, ) (Entered: 10/14/2004) |

| 10/15/2004 | 45 | CLERK'S AMENDED JUDGMENT in favor of TMR ENERGY, LTD. and against STATE PROPERTY FUND OF UKRAINE in the amount of $41,412,987.20. Signed by the Clerk on 10/15/2004. (rew, ) (Entered: 10/15/2004) |
|---|---|---|
| 10/29/2004 | 46 | MOTION to Alter Judgment *and strike the Clerk's Judgment and Clerk's Amended Judgment* by THE STATE PROPERTY FUND OF UKRAINE. (Attachments: # 1 Supplement Memorandum in Support of Motion# 2 Exhibit A# 3 Exhibit B# 4 Text of Proposed Order)(O'Brien, Thomas) (Entered: 10/29/2004) |
| 11/11/2004 | 47 | RESPONSE to *Motion to Strike Clerk's Judgment and Clerk's Amended Judgment* filed by TMR ENERGY LIMITED. (Rosenthal, Samuel) (Entered: 11/11/2004) |
| 11/22/2004 | 48 | REPLY to opposition to motion re 46 to Strike Clerk's Judgment and Amended Judgment filed by THE STATE PROPERTY FUND OF UKRAINE. (O'Brien, Thomas) (Entered: 11/22/2004) |
| 11/25/2005 | 49 | USCA JUDGMENT (certified copy) as to 38 Notice of Appeal filed by THE STATE PROPERTY FUND OF UKRAINE; It is hereby ordered and adjudged that the judgment of the District Court appealed from in this cause is hereby affirmed in accordance with the opinion of the court; USCA#03-7191 (jsc) (Entered: 11/30/2005) |

| PACER Service Center | | |
|---|---|---|
| **Transaction Receipt** | | |
| 06/03/2008 09:48:57 | | |
| **PACER Login:** | hh0002 | **Client Code:** | 030456.0001 |
| **Description:** | Docket Report | **Search Criteria:** | 1:03-cv-00034-TPJ |
| **Billable Pages:** | 4 | **Cost:** | 0.32 |

**KENNEDY DECLARATION**

**EXHIBIT H**

# CLAUSE
# 21

## NOTICES AND LANGUAGE

**21.1**   **Notices.** The parties agree to carry out any communication that may be issued in relation to compliance with and performance of this Contract in writing, as follows:

### 21.1.1 Notices to PEP:

a)   Notices related to technical matters shall be delivered in person to the Supervisor or his representative at the Work Site, with the understanding that in both cases a copy of the notice in question shall be delivered to the Project Representative, in person, via certified mail or by any other courier service that will ensure receipt thereof at the domicile specified below:

Pemex-Exploración y Producción
Dirección del Proyecto Cantarell
Atención: (Name of Authorized Representative of the Cantarell Project Administration Office)
Boulevard Adolfo Ruiz Cortines No. 1202
Edificio Pirámide, Piso 7
Fracc. Oropeza
Villahermosa, Tab.

b)   Notices of a legal or administrative nature shall be delivered in person, via certified mail or by any other courier service that will ensure receipt thereof, to the authorized representative of PEP's Material Resources Administration, at the domicile specified below:

Pemex-Exploración y Producción
Gerencia de Recursos Materiales
Boulevard Adolfo Ruiz Cortines No. 1202
Edificio Pirámide, Piso 4
Fracc. Oropeza
Villahermosa, Tab.



## CERTIFICATE OF ACCURACY

I, the undersigned, being first duly sworn, declare:

- that I am the CEO of V&L International, LLC;
- that our translator is familiar with both the Spanish and English languages;
- that our translator is a member of the American Translators Association;
- that our translator is certified with the American Translators Association in the language pair **Spanish into English**;
- that our translator has made the translation of the document(s) identified below for William Sanchez, Esq. of Hughes Hubbard & Reed LLP:

**Contract Clause 21.1.1**, consisting of 1 page in Spanish and 1 page in English and attached hereto;

I further declare:
- that our editor is familiar with both the Spanish and English languages;
- that our editor has reviewed and proofread the translation provided by our translator;
- that said translation is to the best of my knowledge and belief a true and correct translation.

Executed in Los Angeles on this 3rd day of June, 2008.

_____
Lejla Hadzimuratovic
CEO

**KENNEDY DECLARATION**

**EXHIBIT I**

**FedEx Express** International Air Waybill
For FedEx services worldwide.

/0299/0500/0034237407/1

**Sender**

**From** Please print and press hard

Date 3.19.08

Sender's FedEx Account Number 0100-4477-4

Sender's Name N. Brown    Phone 212 837-6304

Company HUGHES HUBBARD & REED LLP

Address

Address 1 BATTERY PARK PLZ FL 12

City NEW YORK    State/Province NY

Country US    ZIP/Postal Code 10004

**To**

Recipient's Name Ing. Victor Manuel Bahena Bustos 52 55 1944 2500    Phone

Company Pemex - Exploracion y Produccion

Address Gerencia de Contratos, Torre Empresarial
Paseo Tabasco #1203    Dept./Floor

Address Col. Col. Linda Vista

City Villahermosa    State/Province Tabasco

Country Mexico    ZIP/Postal Code c.p. 86050

Recipient's Tax ID Number for Customs Purposes
e.g. GST/RFC/VAT/IMEX/ABN, or as locally required.

**Shipment Information**
Shipper's Load and Count/SLAC    For EU Only: Tick here if goods are not in free circulation and provide C.I.

Total Packages    Total Weight 12 lbs. kg    DIM / / in. cm

| Commodity Description DETAIL REQUIRED | Harmonized Code | Country of Manufacture | Value for Customs REQUIRED |
|---|---|---|---|
| *Document* | | | |

FeVeSED Leave Blank in AES? No EEVSED required, value $2,500 or less per Sch. B Number, no license required (NLR), not subject to ITAR.
No EEVSED required, enter exemption number:    If other than NLR, enter License Exception:
Yes - Enter AES proof of filing citation:

No EEVSED required. value for Carriage    Total Declared Value for Customs (Specify Currency)

**4  Express Package Service**    Packages up to 150 lbs. / 68 kg
For packages over 150 lbs. /68 kg, use the FedEx Expanded Service incl. Air Waybill

☑ FedEx Intl. Priority    ☐ FedEx Intl. First Available to select locations. Higher rates apply.

☐ FedEx Intl. Economy FedEx Envelope and FedEx Pak rate not available.

**5  Packaging**    *These unique brown boxes with special pricing are provided by FedEx for FedEx Intl. Priority only.

☐ FedEx Envelope    ☐ FedEx Pak    ☑ FedEx Box    ☐ FedEx Tube
☐ Other ___    ☐ FedEx 10kg Box*    ☐ FedEx 25kg Box*

**6  Special Handling**

☐ HOLD at FedEx Location    ☐ SATURDAY Delivery
Available to select locations for FedEx Intl. Priority only.

**7a  Payment** Bill transportation charges to:
Enter FedEx Acct. No. or Credit Card No. below.

☐ Sender Acct. no. in Section 1 will be billed.    ☐ Recipient    ☐ Third Party    ☐ Credit Card    ☐ Cash Check/Cheque

FedEx Acct. No.

Credit Card No.

Credit Card Exp. Date

**7b  Payment** Bill duties and taxes to:    ALL shipments may be subject to Customs charges.
WARNING: FedEx does not estimate prior to clearance.
Enter FedEx Acct. No. below.

☑ Sender Acct. no. in Section 1 will be billed.    ☐ Recipient    ☐ Third Party

FedEx Acct. No.

**8  Your Internal Billing Reference**    030456-0001

**9  Required Signature**
Use of this Air Waybill constitutes your agreement to the Conditions of Contract on the back of this Air Waybill, and you represent that this shipment does not require a U.S. State Department License or contain dangerous goods. Certain international treaties, including the Warsaw Convention, may apply to this shipment and limit our liability for damage, loss, or delay, as described in the Conditions of Contract. WARNING: These commodities, technology, or software were exported from the United States in accordance with Export Administration Regulations. Diversion contrary to law is prohibited.

Sender's Signature ___ 3/19/08

This is not authorization to deliver this shipment without a recipient signature.

For Completion Instructions, see back of fifth page.

FedEx Tracking Number 8591 1075 7315    Form ID No. 04

PART 1584
©1994-200 PRINTED I    52

The terms and conditions of service may vary from country to country. Consult our local office for specific information.
Non-Negotiable International Air Waybill • ©1994-2008 FedEx

**Questions? Go to our Web site at fedex.com.**
Or in the U.S., call 1.800.247.4747. Outside the U.S., call your local FedEx office.

Not all services are available to all destinations. Dangerous goods cannot be shipped using this Air Waybill.



FedEx Express
Customer Support Trace
3875 Airways Boulevard
Module H, 4th Floor
Memphis, TN 38116

U.S. Mail: PO Box 727
Memphis, TN 38194-4643

Telephone: 901-369-3600

May 21,2008

Dear Customer:

The following is the proof-of-delivery for tracking number **859110757315**.

## Delivery Information:

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivery location: | VILLAHERMOSA |
| Signed for by: | M.CAMPOS | Delivery date: | Mar 24, 2008 16:35 |
| Service type: | Priority Box | | |

NO SIGNATURE IS AVAILABLE
FedEx Express proof-of-delivery details appear below; however, no signature is currently available for this shipment. Please check again later for a signature.

## Shipping Information:

| | | | |
|---|---|---|---|
| Tracking number: | 859110757315 | Ship date: | Mar 19, 2008 |
| | | Weight: | 12.0 lbs. |

Recipient:
VILLAHERMOSA MX

Shipper:
NEW YORK, NY US

Reference                              030456-000

Thank you for choosing FedEx Express.

FedEx Worldwide Customer Service
1.800.GoFedEx 1.800.463.3339

Track Shipments/FedEx Kinko's Orders

## Detailed Results

 Quick Help

| | | | |
|---|---|---|---|
| **Tracking number** | 859110757315 | **Reference** | 030456-000 |
| **Signed for by** | M.CAMPOS | **Destination** | VILLAHERMOSA MX |
| **Ship date** | Mar 19, 2008 | **Service type** | Priority Box |
| **Delivery date** | Mar 24, 2008 4:35 PM | **Weight** | 12.0 lbs. |
| **Status** | Delivered | | |
| **Signature image available** | No | | |

| Date/Time | | Activity | Location | Details |
|---|---|---|---|---|
| **Mar 24, 2008** | 4:35 PM | **Delivered** | VILLAHERMOSA MX | |
| **Mar 22, 2008** | 8:32 AM | At local FedEx facility | MEXICO CITY MX | |
| **Mar 21, 2008** | 9:00 AM | Delivery exception | MEXICO CITY MX | Holiday - Business closed |
| **Mar 20, 2008** | 8:12 PM | Delivery exception | MEXICO CITY MX | Holiday - Business closed |
| | 8:11 PM | Delivery exception | MEXICO CITY MX | Package at station, arrived after courier dispatch |
| | 8:11 PM | At local FedEx facility | MEXICO CITY MX | |
| | 4:11 PM | Int'l shipment release | TOLUCA MX | |
| | 9:02 AM | At dest sort facility | TOLUCA MX | |
| | 9:02 AM | In transit | TOLUCA MX | Package available for clearance |
| | 5:43 AM | Departed FedEx location | MEMPHIS, TN | |
| | 12:36 AM | Arrived at FedEx location | MEMPHIS, TN | |
| | 1:04 AM | Departed FedEx location | NEWARK, NJ | |
| | 10:32 PM | Arrived at FedEx location | NEWARK, NJ | |
| **Mar 19, 2008** | 9:17 PM | Left origin | NEW YORK, NY | |
| | 8:28 PM | Picked up | NEW YORK, NY | |

[ Signature proof ]    [ E-mail results ]    [ Track more shipments/orders ]

Subscribe to tracking updates (optional)

**Your name:**                           **Your e-mail address:**

| E-mail address | Language | | Exception updates | Delivery updates |
|---|---|---|---|---|
| | English | | | ☐ |
| | English | | | ☐ |
| | English | | | ☐ |
| | English | | | ☐ |

**Select format:** ◉ HTML   ○ Text   ○ Wireless

**Add personal message:**

Not available for Wireless or
non-English characters.

☐ By selecting this check box and the Submit button, I agree to these Terms and Conditions

**THIS PAGE INTENTIONALLY LEFT BLANK**

RETAIN THIS COPY FOR YOUR RECORDS.

SRF

**FedEx** Express® **International Air Waybill**
For FedEx services worldwide

/0300/0500/0034237407/b

**Sender's Copy**

Not all services and options are available to all destinations. Dangerous goods cannot be shipped using this Air Waybill.

**1 From** Please print and press hard.

Date 3.19.08    Sender's FedEx Account Number 0100-4477-4

Sender's Name H. Brown    Phone 212 837-6304

Company HUGHES HUBBARD & REED LLP

Address 1 BATTERY PARK PLZ FL 12

City NEW YORK

Country US    State Province NY    ZIP Postal Code 10004

**2 To**

Recipient's Name Ing. G. Iturbide Ruiz    Phone 525519442500

Company Pemex - Exploration y Production

Address Boulevard Adolfo Ruiz Cortines No. 1202
Edificio Piramide Piso 4

Address Fracc, Oropeza

City Villahermosa    State Province Tabasco

Country Mexico    ZIP Postal Code 86030

Recipient's Tax ID Number for Customs Purposes
+4-GSTMFC/VAT/IN/EIN/SSN or as bulk required.

**3 Shipment Information**

Total Packages 1    Total Weight 12    kg    DIM ___ x ___ x ___    in/cm

Commodity Description DETAIL REQUIRED

[signature] Benneuf

Harmonized Code | Country of Manufacture | Total Declared Value for Customs | Value for Customs REQUIRED

Total Value for Customs    Total Value for Carriage (Specify Currency)

**4 Express Package Service**

☐ FedEx Int'l. Priority
☐ FedEx Int'l. First Where available
☐ FedEx Int'l. Economy FedEx Envelope and FedEx Pak are not available.

Packages up to 150 lbs./68 kg
For packages over 150 lbs./68 kg, use the FedEx Expanded Service list/Air Waybill.

*These services (shown here) with special pricing are provided by FedEx for FedEx Int'l. Priority only.

**5 Packaging**

☐ FedEx Envelope    ☐ FedEx Pak    ☐ FedEx Box*    ☐ FedEx Tube
☐ Other    ☐ FedEx Box*    ☐ FedEx 25kg Box*

**6 Special Handling**

☐ HOLD at FedEx Location    ☐ SATURDAY Delivery Available to select locations for FedEx Int'l. Priority only.

**7a Payment** Bill transportation charges to:
Enter FedEx Acct. No. or Credit Card No. below.

☐ Sender Acct. No. in Section 1 will be billed.    ☐ Recipient    ☐ Third Party    ☐ Credit Card    ☐ Cash/Check

FedEx Acct. No. ___    FedEx Use Only
Credit Card No. ___    Credit Card Exp. Date ___

**7b Payment** Bill duties and taxes to:
Enter FedEx Acct. No. below.

☐ Sender Acct. No. in Section 1 will be billed.    ☐ Recipient    ☐ Third Party

All shipments may be subject to Customs charges, which FedEx does not estimate prior to clearance.

**8 Your Internal Billing Reference**

First 24 characters will appear on invoice.    030456.0001

**9 Required Signature**

Use of this Air Waybill constitutes your agreement to the Conditions of Contract on the back of this Air Waybill, and you represent that this shipment does not require a U.S. State Department License or contain dangerous goods. Certain international treaties, including the Warsaw Convention, may apply to this shipment and limit our liability for damage, loss, or delay, as described in the Conditions of Contract.

WARNING: These commodities, technology, or software were exported from the United States in accordance with the Export Administration Regulations. Diversion contrary to U.S. law prohibited.

Sender's Signature [signature] 3/19/08
This is your authorization to deliver this shipment without a recipient signature.

For Completion Instructions, see back of fifth page.

FedEx Tracking Number 8591 1075 7326

Form ID No. ___

⊗ **Ship and track packages at fedex.com**

Questions? Go to our Web site at fedex.com.
Or in the U.S., call 1.800.247.4747. Outside the U.S., call your local FedEx office.

The terms and conditions of service may vary from country to country. Consult our local office for specific information.
Non-Negotiable International Air Waybill ©1994-2008 FedEx
PRINTED IN U.S.A.

PART 158099 Rev. Date 6/05
©1994-2008 FedEx    521

0402



FedEx Express
Customer Support Trace
3875 Airways Boulevard
Module H, 4th Floor
Memphis, TN 38116

U.S. Mail: PO Box 727
Memphis, TN 38194-4643

Telephone: 901-369-3600

May 21,2008

Dear Customer:

The following is the proof-of-delivery for tracking number **859110757326**.

**Delivery Information:**

| | | | |
|---|---|---|---|
| Status: | Delivered | Delivery location: | VILLAHERMOSA |
| Signed for by: | S.DIAZ | Delivery date: | Mar 26, 2008 17:24 |
| Service type: | Priority Box | | |

NO SIGNATURE IS AVAILABLE
FedEx Express proof-of-delivery details appear below; however, no signature is currently available for this shipment.
Please check again later for a signature.

**Shipping Information:**

| | | | |
|---|---|---|---|
| Tracking number: | 859110757326 | Ship date: | Mar 19, 2008 |
| | | Weight: | 12.0 lbs. |

| | |
|---|---|
| Recipient: | Shipper: |
| VILLAHERMOSA MX | NEW YORK, NY US |

| Reference | 03045600 |
|---|---|

Thank you for choosing FedEx Express.

FedEx Worldwide Customer Service
1.800.GoFedEx 1.800.463.3339

Track Shipments/FedEx Kinko's Orders

## Detailed Results

| | |
|---|---|
| **Tracking number** | 859110757326 |
| Signed for by | S.DIAZ |
| Ship date | Mar 19, 2008 |
| Delivery date | Mar 26, 2008 5:24 PM |
| **Status** | Delivered |
| **Signature image available** | No |

| | |
|---|---|
| **Reference** | 03045600 |
| Destination | VILLAHERMOSA MX |
| Service type | Priority Box |
| Weight | 12.0 lbs. |

| Date/Time | | Activity | Location | Details |
|---|---|---|---|---|
| **Mar 26, 2008** | 5:24 PM | Delivered | VILLAHERMOSA MX | |
| **Mar 25, 2008** | 7:12 PM | At local FedEx facility | MEXICO CITY MX | |
| **Mar 24, 2008** | 11:00 AM | Delivery exception | MEXICO CITY MX | Incorrect address |
| **Mar 22, 2008** | 8:32 AM | At local FedEx facility | MEXICO CITY MX | |
| **Mar 21, 2008** | 9:00 AM | Delivery exception | MEXICO CITY MX | Holiday - Business closed |
| **Mar 20, 2008** | 8:12 PM | Delivery exception | MEXICO CITY MX | Holiday - Business closed |
| | 8:11 PM | Delivery exception | MEXICO CITY MX | Package at station, arrived after courier dispatch |
| | 8:11 PM | At local FedEx facility | MEXICO CITY MX | |
| | 4:11 PM | Int'l shipment release | TOLUCA MX | |
| | 8:56 AM | At dest sort facility | TOLUCA MX | |
| | 8:56 AM | In transit | TOLUCA MX | Package available for clearance |
| | 5:43 AM | Departed FedEx location | MEMPHIS, TN | |
| | 12:36 AM | Arrived at FedEx location | MEMPHIS, TN | |
| | 1:04 AM | Departed FedEx location | NEWARK, NJ | |
| **Mar 19, 2008** | 10:32 PM | Arrived at FedEx location | NEWARK, NJ | |
| | 9:17 PM | Left origin | NEW YORK, NY | |
| | 8:28 PM | Picked up | NEW YORK, NY | |

[ Signature proof ]  [ E-mail results ]  [ Track more shipments/orders ]

Subscribe to tracking updates (optional)

**Your name:**                    **Your e-mail address:**

| E-mail address | Language | | Exception updates | Delivery updates |
|---|---|---|---|---|
| | English | | | ☐ |
| | English | | | ☐ |
| | English | | | ☐ |
| | English | | | ☐ |

**Select format:** ◉ HTML ○ Text ○ Wireless

**Add personal message:**

Not available for Wireless or non-English characters.

☐ By selecting this check box and the Submit button, I agree to these Terms and Conditions

**KENNEDY DECLARATION**

**EXHIBIT J**

**ICC**
**International Chamber of Commerce**
*The world business organization*

# Rules of Arbitration
in force as from 1 January 1998

**Cost scales effective as of 1 January 2008**

**International Chamber of Commerce**
**International Court of Arbitration**
38, Cours Albert 1er
75008 Paris
France
Tel. +33 1 49 53 29 05
Fax +33 1 49 53 29 33
E-mail arb@iccwbo.org
**www.iccarbitration.org**

## Article 26
## Award by Consent

If the parties reach a settlement after the file has been transmitted to the Arbitral Tribunal in accordance with Article 13, the settlement shall be recorded in the form of an Award made by consent of the parties if so requested by the parties and if the Arbitral Tribunal agrees to do so.

## Article 27
## Scrutiny of the Award by the Court

Before signing any Award, the Arbitral Tribunal shall submit it in draft form to the Court. The Court may lay down modifications as to the form of the Award and, without affecting the Arbitral Tribunal's liberty of decision, may also draw its attention to points of substance. No Award shall be rendered by the Arbitral Tribunal until it has been approved by the Court as to its form.

## Article 28
## Notification, Deposit and Enforceability of the Award

1

Once an Award has been made, the Secretariat shall notify to the parties the text signed by the Arbitral Tribunal, provided always that the costs of the arbitration have been fully paid to the ICC by the parties or by one of them.

2

Additional copies certified true by the Secretary General shall be made available on request and at any time to the parties, but to no one else.

3

By virtue of the notification made in accordance with Paragraph 1 of this Article, the parties waive any other form of notification or deposit on the part of the Arbitral Tribunal.

4

An original of each Award made in accordance with the present Rules shall be deposited with the Secretariat.

5

The Arbitral Tribunal and the Secretariat shall assist the parties in complying with whatever further formalities may be necessary.

6

Every Award shall be binding on the parties. By submitting the dispute to arbitration under these Rules, the parties undertake to carry out any Award without delay and shall be deemed to have waived their right to any form of recourse insofar as such waiver can validly be made.

## Article 29
## Correction and Interpretation of the Award

1

On its own initiative, the Arbitral Tribunal may correct a clerical, computational or typographical error, or any errors of similar nature contained in an Award, provided such correction is submitted for approval to the Court within 30 days of the date of such Award.

2

Any application of a party for the correction of an error of the kind referred to in Article 29(1), or for the interpretation of an Award, must be made to the Secretariat within 30 days of the receipt of the Award by such party, in a number of copies as stated in Article 3(1). After transmittal of the application to the Arbitral Tribunal, the latter shall grant the other party a short time limit, normally not exceeding 30 days, from the receipt of the application by that party, to submit any comments thereon. If the Arbitral Tribunal decides to

**KENNEDY DECLARATION**

**EXHIBIT K**

e) El laudo no sea aún obligatorio para las partes o hubiere sido anulado o suspendido por el juez del país en que, o conforme a cuyo derecho, hubiere sido dictado ese laudo; o

II. El juez compruebe que, según la legislación mexicana, el objeto de la controversia no es susceptible de arbitraje; o que, el reconocimiento o la ejecución del laudo son contrarios al orden público.

**Suspensión de la ejecución o el reconocimiento**

Si se solicitó a un juez del país en que, o conforme a su derecho, fue dictado el laudo, su nulidad o suspensión, el juez al que se solicita el reconocimiento o la ejecución del laudo podrá, si lo considera procedente, aplazar su decisión y a instancia de la parte que pida el reconocimiento o la ejecución del laudo, podrá también ordenar a la otra parte que otorgue garantías suficientes.

**1463**

**Incidente de reconocimiento y ejecución del laudo**

El procedimiento de reconocimiento o ejecución se sustanciará incidentalmente de conformidad con el Artículo 360 del Código Federal de Procedimientos Civiles. La resolución no será objeto de recurso alguno.

**ARTICULOS TRANSITORIOS**

**Iniciación de vigencia**

**1**

Este Código comenzará a regir el día 1o. de enero de 1890.

**Substanciación de negocios pendientes**

**2**

La substanciación de los negocios pendientes se sujetará a este Código en el estado que ella se encuentre el expresado día; pero si los términos que nuevamente se señalan para algún acto judicial fuesen menores que los que estuvieren ya concedidos, se observará lo dispuesto en la legislación anterior.

**Recursos ya interpuestos**

**3**

Los recursos que están ya legalmente interpuestos serán admitidos aunque no deban serlo conforme a este código; pero se substanciarán sujetándose a las leyes que él establece para los de su clase, o en su defecto, a las establecidas en el Código de Comercio de 20 de abril de 1884.

**Derogación de disposiciones**

**4**

Quedan derogados dicho Código de Comercio de 20 de abril de 1884 y las leyes mercantiles preexistentes y relativas a las materias que en este Código se tratan.

Por tanto, mando se imprima, publique, circule y se le dé el debido cumplimiento.

Palacio del Gobierno Nacional de México, a 15 de septiembre de 1889.—Porfirio Díaz.—Al C. Lic. Joaquín Baranda, Secretario de Estado y del Despacho de Justicia e Instrucción Pública.

Y lo comunico a usted para los fines consiguientes.

Libertad y Constitución, México, septiembre 15 de 1889.—J. Baranda.—Rúbrica.



**1459**

**Suspensión de las actuaciones de nulidad**

El juez, cuando se le solicite la anulación de un laudo, podrá suspender las actuaciones de nulidad, cuando corresponda y así lo solicite una de las partes, por el plazo que determine a fin de dar al tribunal arbitral la oportunidad de reanudar las actuaciones arbitrales o de adoptar cualquier otra medida que a juicio del tribunal arbitral elimine los motivos para la petición de la nulidad.

**1460**

**Substanciación del incidente de nulidad**

El procedimiento de nulidad se sustanciará incidentalmente, de conformidad con lo dispuesto por el artículo 360 del Código Federal de Procedimientos Civiles.

La resolución no será objeto de recurso alguno.

**CAPITULO IX**

**Reconocimiento y Ejecución de Laudos**

**1461**

**Ejecución del laudo**

Un laudo arbitral, cualquiera que sea el país en que haya sido dictado, será reconocido como vinculante y, después de la presentación de una petición por escrito al juez, será ejecutado de conformidad con las disposiciones de este capítulo.

La parte que invoque un laudo o pida su ejecución deberá presentar el original del laudo debidamente autenticado o copia certificada del mismo, y el original del acuerdo de arbitraje a que se refieren los artículos 1416 fracción I y 1423 o copia certificada del mismo. Si el laudo o el acuerdo no estuviera redactado en español, la parte que lo invoca deberá presentar una traducción a este idioma de dichos documentos, hecha por perito oficial.

**1462**

**Causales para denegar el reconocimiento o la ejecución**

Sólo se podrá denegar el reconocimiento o la ejecución de un laudo arbitral, cualquiera que sea el país en que se hubiere dictado, cuando:

I. La parte contra la cual se invoca el laudo, pruebe ante el juez competente del país en que se pide el reconocimiento o la ejecución que:

a) Una de las partes en el acuerdo de arbitraje estaba afectada por alguna incapacidad, o que dicho acuerdo no es válido en virtud de la ley a que las partes lo han sometido, o si nada se hubiere indicado a este respecto, en virtud de la ley del país en que se haya dictado el laudo;

b) No fue debidamente notificada de la designación de un árbitro o de las actuaciones arbitrales, o no hubiere podido, por cualquier otra razón, hacer valer sus derechos;

c) El laudo se refiere a una controversia no prevista en el acuerdo de arbitraje o contiene decisiones que exceden los términos del acuerdo de arbitraje. No obstante, si las disposiciones del laudo que se refieren a las cuestiones sometidas al arbitraje pueden separarse de las que no lo están se podrá dar el reconocimiento y ejecución a las primeras.

d) La composición del tribunal arbitral o el procedimiento arbitral no se ajustaron al acuerdo celebrado entre las partes o, en defecto de tal acuerdo, que no se ajustaron a la ley del país donde se efectuó el arbitraje; o

**THIS PAGE INTENTIONALLY LEFT BLANK**

[ENGLISH TRANSLATION]


**TITLE FOUR**
**COMMERCIAL ARBITRATION**


**Chapter IX-Entry and Execution of Awards**


**Article 1461**

Regardless of the country where an arbitration award is entered, it shall be recognized as binding and upon petition in writing to a judge, it shall be enforced in accordance with the provisions of this Chapter.

The party who asserts an award or petitions for its enforcement shall present the original of the award duly authenticated, or a certified copy and the original of the agreement or arbitration referred to by Articles 1416, subparagraph I and Article 1423, or a certified copy thereof. If the award or the agreement is not in Spanish, the party presenting them shall provide a translation into Spanish prepared by an official interpreter.


**Article 1462**

Full faith or enforcement of an award may only be denied, regardless of the country from which it originates, if:

I.   The party against whom the award is presented proves to the satisfaction of the judge of appropriate jurisdiction in the country in which full faith and execution is demanded that:

a) Once the parties to the arbitration agreement was affected by a legal disability, or that the agreement is invalid under the applicable law chosen by the parties, or if nothing is mentioned in that respect, by the laws of the country where the award is entered.

b) He was not duly notified of the designation of an arbiter or of the arbitration proceedings, or was unable by whatever reason to assert his rights.

**c)** The award refers to a controversy not foreseen in the arbitration agreement, or contains determinations that exceed the terms of the agreement. Nevertheless, if the determinations of the award refers to submitted issues that can be separated fro those that were not, the former may be validated and given execution.

**d)** The constitution of the arbitration tribunal or the arbitration procedure was not in accordance with the agreement between the parties, or in the absence of agreement, it did not comply with the law of the land where the arbitration was held; or,

**e)** The award is not compulsory upon the parties or has been annulled or suspended by the judge of the country where it was entered; or,

II.    The judge finds that according to Mexican law, the controversy is not subject to arbitration; or that full faith or enforcement of the award will be against public policy.

## Article 1463

If a petition to declare void or suspend an award is brought before a judge of the country pursuant to whose laws the arbitration was held, the judge before whom full faith or enforcement of the award is requested may withhold his decision if he so deems advisable, and at the request of the party petitioning enforcement of the award, he may require the posting of security from the other party.

Full faith or enforcement proceedings shall be brought on by special motion in accordance with Article 360 of the Federal Code of Civil Procedure. Its determination shall not be subject to review.

**KENNEDY DECLARATION**

**EXHIBIT L**

México, D.F., 8 de Junio de 2006.

**Versión estenográfica del Cuarto día de la Audiencia Procesal Kuri, Breña, Sánchez, Ugarte, Corchera y Aznar PEMEX Exploración y Producción, celebrada en el Salón Maximilian I y II del Hotel JW Marriott de esta ciudad.**

Sí, don Jaime, dígame.

**Sr. Jaime Duarte:** Una solicitud nada más, señor Presidente.

Sabemos, nos dicen los compañeros que hay una versión diaria que se edita por parte de la versión estenográfica, sería muy importante si ahorita nos dieran una copia a nosotros, otra a ustedes, el día de hoy, de las que se han editado. Y ya nosotros nos sentaríamos con el abogado a revisarla, no dudo que tengamos un consenso a la brevedad en se sentido, nada más si nos pudieran dar un copia de la del lunes, martes, miércoles.

**Sr. Juan Fernández:** Yo en todo el tema de lo que es el transcrip, les rogaría que con la Secretaria lo organicen. Y si hubiera algún tema irresoluble, el Tribunal lo decidiría, pero yo creo que esto es un tema que en el buen entendimiento de las partes se puede seguro que resolver.

**Sr. Chris Paparella:** OK, se los damos.

El 16 de agosto deben estar los escritos.

**Sr. Jaime Duarte:** Aquí la petición era si era lunes, martes, miércoles, que ya tienen la versión primaria, nos la pudieran dar ahorita para irla revisando y mañana nos reuníamos con ustedes.

**Sr. Juan Fernández:** Yo les propondría, ¿qué prefieren, un viernes o lunes para entregarlo? Viernes, para no destrozar el fin de semana.

¿Qué prefieren? ¿El viernes 11 de agosto?

Hemos tenido alguna vez dificultades por las diferencias horarias, porque una parte protesta porque envió antes su escrito y la otra entonces tuvo tiempo. Entonces en los escritos simultáneos es mejor que ambas partes los manden al tribunal y después el tribunal lo distribuye a todo mundo. Sí se garantiza que no hay, que el cruce es perfecto. Muy bien.

¿Algo más sobre esto?

Entonces ya tengo, entramos en los dos últimos puntos. Lo primero es que quiero preguntarle a los dos ¿si en este momento del proceso sienten ustedes algún elemento de indefensión de que no se ha seguido el debido proceso, de que no se ha cumplido con los principios de audiencia, contradicción e igualdad? Si lo sienten díganlo porque lo transcribimos al acta y el tribunal hará todo lo posible, si ve que tiene razón para resolverlo, y si no tiene razón, por lo menos quedará constancia.

Me dirijo en primer lugar a los demandantes y les pregunto si tienen algún punto que piensen que se ha violado el principio de audiencia, contradicción, igualdad, el principio de proceso debido o se ha producido alguna situación de indefensión.

**Sr. Chris Paparella:** Quisiera responder a la primera pregunta. Quiero decir que siempre tengo algo que decir. No, no pensamos que el principio de trato de igualdad o de debido proceso se ha violado.

¿Cuál fue la segunda? Eso es todo. Ok.

**Sr. Juan Fernández:** Pido ahora a los demandados y les hago exactamente la misma pregunta.

**Sr. Jaime Duarte:** No, definitivamente no. Tenemos la preocupación nosotros del riesgo de traducciones, lo que le llamamos aquí en México "teléfono descompuesto". Pero sentimos que el proceso no se ha violado. Hemos tenido todos los derechos iguales.

**Sr. Juan Fernández:** Perdóneme, no le he entendido. Lo del "teléfono descompuesto", eso tiene que ser algo muy mexicano.

**Sr. Jaime Duarte:** Muy mexicano en el sentido de que en algo de lo que se dice en inglés los traductores interpretan un significado, y nosotros es lo que recibimos. Pero no tiene nada qué ver con que se haya violentado el derecho, ninguno de estos derechos.

**Sr. Juan Fernández:** Contestación es no.

**Sr. Jaime Duarte:** Preocupación de nosotros por eso…

**Sr. Juan Fernández:** Pero eso lo vemos en el transcrip. Si en el transcrip hay cosas que están mal lo limpiamos.

Mi preocupación es si ustedes creen que algunos de los principios de proceso debido audiencia, contradicción, igualdad, si han tenido algún tipo de indefensión en este proceso.

**Sr. Jaime Duarte:** No.

**Sr. Juan Fernández:** Y si lo han tenido, por favor, díganlo.

**Sr. Jaime Duarte:** No, no.

**Sr. Juan Fernández:** Muchas gracias.

Pues entonces ya no me queda más que agradecer al equipo que ha hecho la transcripción.

Agradecer a los esforzados traductores, que han hecho un trabajo digno de mucha apreciación, porque tiene que ser tremendamente difícil traducir la rapidez y la velocidad con I que hablamos y nos interrumpimos, y temas tan técnicos y tan difíciles. O sea, que un millón de gracias a los traductores.

Y a todos ustedes muchas gracias por su colaboración, y por su ayuda al tribunal en intentar encontrar una solución justa a esta contienda.

Adiós a todos.

4

**Secretaria Deva Villanúa:** Que no se vayan los que firman actas.

**-0o0o0-**

**THIS PAGE INTENTIONALLY LEFT BLANK**

Mexico, D.F., June 8, 2006.

**Stenographic version of the Hearing attended by Kuri Breña, Sánchez Ugarte, Corcuera y Aznar and PEMEX Exploración y Producción, held in the Maximilian II Room of the Mexico City JW Marriott.**

So the tribunal wants the memoranda or statements to be ready by mid-August, otherwise we will not have enough time.

Please submit your statement by mid-August, and then the tribunal will try to have the award in the month of October -- month of October.

Since the tribunal, uh, has it and it is approved by CCI, it takes, like, one month, but we are going to make an effort so that by the end of the year the award will be communicated to the parties.

Okay? Yes, Don Jaime?

**Jaime Duarte:** One request, Mr. Chairman.

The colleagues are saying that there is a daily version of the transcript. Why don't we get today something and they can get something. Get the transcript, what they have so far, if they can give us a copy of what was transcribed Monday, Tuesday, Wednesday.

**Fernández Armesto:** As far as the transcript, get organized with the secretary if there is something that you cannot agree on, then the tribunal will decide. But I think that this is an issue on, uh, which the two parties can come to an agreement. Is that okay?

**Chris Paparella:** We have -- we'll give it to them.

So do you want to say that the briefs are due on the 16th of August?

**Jaime Duarte:** The request is, if they already have the first version of the transcript for Monday, Tuesday, and Wednesday, if we can get it now to start working on it and tomorrow we get together.

**Fernández Armesto:** What would you rather, uh, do? Uh, the brief, uh, is due on Friday, or on Monday so that you have a nice weekend.

What would you rather the due date be of this? Friday, August the 11th, August 11.

We have a problem because of the different time zones. One party complains because its brief was sent earlier, so it is better for both parties to send them to the tribunal and then the tribunal can, uh, make the distribution. Okay? Fine.

Anything else on?

Ok, then we go into the last two issues. Number one, I'd like to ask both of you if at this time, in the process, do you feel that you have been defenseless? Do you feel that we have not followed due process? Do you think that we have not followed the principles of due process and equality? If there is anything you want to say, say at this time, it will be included in the minutes and the tribunal, if you are right, will try to do something about it. If we cannot do anything about it there will be that in the record.

The claimant, do you have anything to say? Anything at all? Do you think that the principle of due process, equality, has been breached? The prince - Or if there has been any situation in which you have been defenseless?

**Chris Paparella:** We'll address the first question, whether I have anything to say and to say that I always have something to say. No, we do not feel that the principle of treatment of equality or due process has been breached. And it would, was that?

Did you have any other? That's it, right?

**Fernández Armesto:**  That's it.

**Chris Paparella:** No, we're ok.

**Fernández Armesto:** Now let me ask exactly the same question to the respondent.

**Jaime Duarte:** Definitely no. We are concerned about the risk of the translation. It is like musical chairs, but because of translation.

**Fernández Armesto:** I don't understand about the musical chairs thing. It's got to be something very Mexican.

**Jaime Duarte:** Well, in the sense that translators may understand one meaning and that is what we get in the translation. But none of the rights that you have listed have been violated. It's only one concern that we have.

**Fernández Armesto:** So no. That is something that you can look at in the transcript. If there is a mistake we can clean it up.

My concern is if you believe that any due process principle of equality has been breached. If you have been defenseless at any time during the process.

**Jaime Duarte:** No.

**Fernández Armesto:** Ok, thank you very much.

All that remains is for me to thank the transcription team. I'd like to thank the hard-working translators that have done a much-appreciated work. But it has to be very difficult to translate as fast as we speak and we interrupt ourselves and this is very technical, very difficult, so I'd like to thank the translators.

All of you, thank you for your help to the tribunal in trying to find a just solution to this.

Goodbye. Those that have to sign the minutes should not leave the room. Those that have to sign the minutes should stay and sign them...

*   *   *

**KENNEDY DECLARATION**

**EXHIBIT M**

# KURI BREÑA, SÁNCHEZ UGARTE Y AZNAR
## ABOGADOS

DANIEL KURI BREÑA ROMERO DE TERREROS
JESÚS SÁNCHEZ UGARTE
MANUEL AZNAR NICOLÍN
GERARDO LEMUS BURGUETE
GUILLERMO GARAY ESPINOSA
LUIS OCTAVIO NÚÑEZ ORELLANA
VÍCTOR MANUEL FRÍAS GARCÉS
BERNARDO LUNA GUTIÉRREZ
ANTONIO CASARES CARRILLO

CORPORATIVO PUNTA SANTA FE TORRE "B"
PROL. PASEO DE LA REFORMA Nº 1015, PISO 8
COL. DESARROLLO SANTA FE
01376 MÉXICO, D.F.
TELS: 5292-5930
FAX: 5292-5928 / 29

12 de marzo de 2008.

PEMEX Exploración y Producción
Av. Marina Nacional No. 329 Col. Huasteca
México, D.F. C.P. 11311

Atención: Lic. José Néstor García Reza
          Abogado General de PEMEX y
          Jaime Duarte Aispuro
          Gerente Jurídico, Exploración y Producción

Re: Arbitraje 13716/CCO/JRF
Contrato No. PEP-O-IT-136/98
EPC-28

Estimados Señores:

Hacemos referencia al laudo final (el "Laudo Final") de fecha 15 de enero de 2008, expedido en el procedimiento arbitral que se llevó a cabo ante la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional bajo el No. 3716/CCO/JRF entre Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. ("Commisa") como demandante y PEMEX Exploración y Producción ("PEP") como demandada, en relación al Contrato de Obra Publica a Precios Unitarios y Tiempo Determinado No. PEP-O-IT-136/98 (el "Contrato EPC-28") de fecha 4 de septiembre de 1998, de conformidad con el cual, Commisa prestó a PEP ciertos servicios, incluyendo la procura, fabricación y tendido de tubería para la construcción de ductos en el Campo Cantarell dentro del mar territorial de los Estados Unidos Mexicanos. En relación a este asunto, atentamente solicitamos lo siguiente:

1. El pago sin demora de la factura número 1102 por la cantidad total de; (i) $1,537,744,431.28 (mil quinientos treinta y siete millones, setecientos cuarenta y cuatro mil

2.

cuatrocientos treinta y uno Pesos 28/100 M.N.), la cual es el monto principal total en Pesos, Moneda Nacional, que PEP debe pagar a Commisa conforme al Laudo Final, más los gastos financieros computados conforme a lo establecido en el Laudo Final al 31 de marzo de 2008, y el impuesto al valor agregado correspondiente, y (ii) US $230,000.00 (doscientos treinta mil Dólares 00/100), para cubrir los gastos y costas que PEP debe pagar a Commisa de acuerdo con el Laudo Final, mas el impuesto al valor agregado correspondiente. Estamos adjuntando a esta carta el original de la referida factura 1102, la cual reúne todos los requisitos fiscales aplicables, y un documento en el cual se desglosan en detalle todas las cantidades que PEP fue condenado a pagar a Commisa de conformidad con el Laudo Final y las compensaciones y deductivas correspondientes.

2.  El pago de la factura adjunta deberá hacerse mediante depósito o transferencia electrónica de fondos en la cuenta No. 2546019, que Commisa tiene con Banco Nacional de México, S.A (CLABE:002180000025460190). Esta cuenta de Commisa se encuentra debidamente registrada con PEP.

3.  Finalmente, es importante mencionar que en la factura adjunta, los gastos financieros han sido calculados al 31 de marzo de 2008, asumiendo que el pago será recibido por Commisa en dicha fecha. En caso de que PEP efectúe el pago requerido antes o después del 31 de marzo de 2008, los gastos financieros deberán ser ajustados y Commisa entregará a PEP otra factura con el cómputo de gastos financieros que corresponda.

Atentamente,

Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V.
Por: Jesús Sánchez Ugarte
Representante Legal



**CORPORACION  MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V.**
Homero No. 534 Piso 7, Col.  Chapultepec Morales C.P. 11570
Delegación Miguel Hidalgo  Tel. / Fax (52) (55) 5605-4205
R.F.C. CMM-930722-NJ5

Nombre:   PEMEX EXPLORACION Y PRODUCCION

Direccion:  Av. Marina Nacional No. 329 Col. Huasteca

México, D.F. C.P. 11311

R.F.C.     PEP-920716-7XA

**1102**

México D.F.

11 de Marzo de 2008

PEP-O-IT-136/98 (IPC-28)

AGRADECEMOS SU PAGO EN MONEDA  NACIONAL:
BANCO:            **BANAMEX**
SUCURSAL No.:            0
NOMBRE:              Banco Nacional de México SA
PARA ABONO A:  CORPORACION MEXICANA DE
MANTENIMIENTO INTEGRAL,S. DE R.L. DE C.V.
CUENTA No.:          2546019

REF: Trabajos relacionados con el Contrato de Obra
Pública a Precios Unitarios Num. PEP-O-IT-136/98
(IPC-28) realizados del 26/08/98 al 30/08/02.

| | | |
|---|---|---|
| Importe neto concedido a COMMISA por el Tribunal Arbitral de la Corte Internacional de Arbitraje en el caso No 13716/CCO/JRF de acuerdo a laudo emitido el 15/01/08 y notificado el 8/02/08. | 774,200,186.35 | |
| (-) .005 Retencion a favor de la Secretaría de la funcion Pública. | (3,871,000.93) | |
| Gastos financieros del 29/09/02 al 31/03/08. | 566,839,885.26 | |
| Gastos y costas. | | 200,000.00 |
| Se adjunta un desglose de los conceptos amparados por la factura como anexo "A". | | |
| Mil quinientos treinta y siete millones setecientos cuarenta y cuatro mil | | |
| cuatrocientos treinta y un pesos 28/100 más doscientos treinta mil dolares 00/100 | | |
| SUB-TOTAL | 1,337,169,070.68 | 200,000.00 |
| I.V.A. | 200,575,360.60 | 30,000.00 |
| TOTAL | 1,537,744,431.28 | 230,000.00 |

E F E C T O S   F I S C A L E S   A L   P A G O
LA  REPRODUCCION  NO  AUTORIZADA  DE  ESTE
COMPROBANTE CONSTITUYE UN DELITO EN
LOS TERMINOS DE LAS DISPOSICIONES FISCALES
PAGO  EN  UNA  SOLA  EXHIBICION

IMPRESO EN MÉXICO POR ACCIÓN TIPOGRÁFICA, S.A. DE C.V. LISBOA No. 34  COL.
JUÁREZ  C.P. 06600 TEL/FAX  5566  2157  R. F. C. ATI-710818-789
AUTORIZACIÓN PUBLICADA EN PÁGINA DE INTERNET DEL SAT
DE 10 DE JUNIO DE 2002, COMERCIALIZADO POR:
JOSÉ ALFONSO HERNÁNDEZ OCHOA R.F.C. HEOA-870802-F68
MEZQUITE No. 14-LOCAL, COL. IGNACIO ALLENDE C.P. 02810
DELEGACIÓN  AZCAPOTZALCO  TEL.  5368.3411
NÚMERO DE APROBACIÓN ASIGNADO POR EL SISTEMA
INTEGRAL  DE  COMPROBANTES  13712470
FOLIO DEL 1,001 AL 1,100 IMPRESO EN MARZO DE 2008 VENCE EN FEBRERO DE 2010



CORPORACION MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V.
Homero 534 Piso 7, Col. Chapultepec Morales C.P. 11570
Tel. 55 - 5605 - 4205

CONTRATO No. PEP-O-IT-138/98

RESUMEN LAUDO ARBITRAL CASO NO. 13716/CCO/JRF DE 15 DE ENERO 2008

| | | |
|---|---|---|
| Laudo en Pesos (Monto a favor de Commisa por 39 controversias tecnicas) | | $10,951,435.00 |
| Laudo en Dolares (Monto a favor de Commisa por 39 controversias tecnicas) | | $75,110,777.00 |
| Laudo en Pesos (Monto a favor de PEP por reconvencion) | | ($22,710.00) |
| Laudo en Dolares (Monto a favor de PEP por reconvencion) | | ($35,142.00) |
| Laudo en Pesos (Monto neto a favor de Commisa) | | $10,928,728.00 |
| Laudo en Dolares (Monto neto a favor de Commisa) | | $75,075,635.00 |
| Equivalente en pesos al tipo de cambio del 27 de Septiembre del 2002 | 10.1667 | $763,271,458.35 |
| Subtotal en pesos | | $774,200,186.35 |
| Deductivo por SECODAM (0.5%) | | ($3,871,000.93) |
| Monto Base Para el Calculo de Intereses | | $770,329,185.42 |
| Intereses a Fecha de Pago: 31 DE MARZO 2008 (Ver detalle) | | $566,839,885.26 |
| Subtotal | | $1,337,169,070.68 |
| IVA | | $200,575,360.60 |
| TOTAL A PAGAR EN MONEDA NACIONAL | | $1,537,744,431.28 |

| | |
|---|---|
| Monto por gastos y costas (Dolares de EEUU) | $200,000.00 |
| IVA (Dolares de EEUU) | $30,000.00 |
| TOTAL A PAGAR EN DOLARES DE EEUU (PAGADEROS AL TIPO DE CAMBIO VIGENTE EL DIA ANTERIOR AL PAGO) | $230,000.00 |

MEXICO, D.F., March 12, 2008

Pagina: 1 / 1

Resumen Laudo EPC-28

CORPORACION MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V.

Homero 534 Piso 7, Col. Chapultepec Morales C.P. 11570

Tel. 55 - 5605 - 4205

**CONTRATO No. PEP-O-IT-136/98**

**CALCULO DE GASTOS FINANCIEROS**

### PERIODOS E IMPORTES DE RECARGOS POR PRORROGA

| PERIODO | 30Sep02 | 31Oct02 | 30Nov02 | 31Dic02 | 31Ene03 | 28Feb03 | 31Mar03 | 30Abr03 |
|---|---|---|---|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 1.07% | 0.92% | 0.76% | 0.95% | 1.34% | 1.43% | 1.29% | 1.36% |
| IMPORTE ANTERIOR | | 770,328,185.42 | 770,878,686.91 | 777,970,770.83 | 783,883,348.69 | 791,330,240.50 | 801,934,065.72 | 813,401,722.86 |
| IMPORTE DEL MES | | | | | | | | |
| IMPORTE ACUMULADO PARA CALCULO | 770,328,185.42 | 770,878,686.91 | 777,970,770.83 | 783,883,348.69 | 791,330,240.50 | 801,934,065.72 | 813,401,722.86 | 823,894,605.08 |
| RECARGOS | 549,501.49 | 7,092,083.92 | 5,912,577.86 | 7,446,891.81 | 10,603,825.22 | 11,467,657.14 | 10,492,882.22 | 11,369,745.55 |
| ACUMULADO | 770,878,686.91 | 777,970,770.83 | 783,883,348.69 | 791,330,240.50 | 801,934,065.72 | 813,401,722.86 | 823,894,605.08 | 835,264,350.63 |

### PERIODOS E IMPORTES DE RECARGOS POR PRORROGA

| PERIODO | 31May03 | 30Jun03 | 31Jul03 | 31Ago03 | 30Sep03 | 31Oct03 | 30Nov03 | 31Dic03 |
|---|---|---|---|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 1.41% | 1.31% | 1.17% | 1.07% | 1.03% | 1.01% | 1.01% | 0.99% |
| IMPORTE ANTERIOR | 835,264,350.63 | 847,041,577.97 | 858,137,822.84 | 868,178,035.16 | 877,467,540.14 | 886,505,455.80 | 895,459,160.90 | 904,503,298.43 |
| IMPORTE DEL MES | | | | | | | | |
| IMPORTE ACUMULADO PARA CALCULO | 835,264,350.63 | 847,041,577.97 | 858,137,822.84 | 868,178,035.16 | 877,467,540.14 | 886,505,455.80 | 895,459,160.90 | 904,503,298.43 |
| RECARGOS | 11,777,227.34 | 11,096,244.87 | 10,040,212.52 | 9,289,504.98 | 9,037,915.66 | 8,953,705.10 | 9,044,137.53 | 8,954,582.65 |
| ACUMULADO | 847,041,577.97 | 858,137,822.84 | 868,178,035.16 | 877,467,540.14 | 886,505,455.80 | 895,459,160.90 | 904,503,298.43 | 913,457,881.08 |

### PERIODOS E IMPORTES DE RECARGOS POR PRORROGA

| PERIODO | 31Ene04 | 28Feb04 | 31Mar04 | 30Abr04 | 31May04 | 30Jun04 | 31Jul04 | 31Ago04 |
|---|---|---|---|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.76% | 0.75% | 0.76% |
| IMPORTE ANTERIOR | 913,457,881.08 | 920,308,815.19 | 927,211,131.30 | 934,165,214.78 | 941,171,463.89 | 948,230,239.79 | 955,341,965.59 | 962,507,031.34 |
| IMPORTE DEL MES | | | | | | | | |
| IMPORTE ACUMULADO PARA CALCULO | 913,457,881.08 | 920,308,815.19 | 927,211,131.30 | 934,165,214.78 | 941,171,463.89 | 948,230,239.79 | 955,341,965.59 | 962,507,031.34 |
| RECARGOS | 6,850,834.11 | 6,902,316.11 | 6,954,083.48 | 7,006,239.11 | 7,058,775.90 | 7,111,725.80 | 7,165,064.75 | 7,218,802.74 |
| ACUMULADO | 920,308,815.19 | 927,211,131.30 | 934,165,214.78 | 941,171,463.89 | 948,230,239.79 | 955,341,965.59 | 962,507,031.34 | 969,725,834.08 |

### PERIODOS E IMPORTES DE RECARGOS POR PRORROGA

| PERIODO | 30Sep04 | 31Oct04 | 30Nov04 | 31Dic04 | 31Ene05 | 28Feb05 | 31Mar05 | 30Abr05 |
|---|---|---|---|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
| IMPORTE ANTERIOR | 969,725,834.08 | 976,996,777.84 | 984,326,268.67 | 991,708,715.69 | 999,146,531.06 | 1,006,640,130.04 | 1,014,189,931.02 | 1,021,796,355.50 |
| IMPORTE DEL MES | | | | | | | | |
| IMPORTE ACUMULADO PARA CALCULO | 969,725,834.08 | 976,996,777.84 | 984,326,268.67 | 991,708,715.69 | 999,146,531.06 | 1,006,640,130.04 | 1,014,189,931.02 | 1,021,796,355.50 |
| RECARGOS | 7,272,943.76 | 7,327,490.83 | 7,382,447.02 | 7,437,815.37 | 7,493,598.98 | 7,549,800.98 | 7,606,424.48 | 7,663,472.67 |
| ACUMULADO | 976,996,777.84 | 984,326,268.67 | 991,708,715.69 | 999,146,531.06 | 1,006,640,130.04 | 1,014,189,931.02 | 1,021,796,355.50 | 1,029,459,828.17 |

### PERIODOS E IMPORTES DE RECARGOS POR PRORROGA

| PERIODO | 31May05 | 30Jun05 | 31Jul05 | 31Ago05 | 30Sep05 | 31Oct05 | 30Nov05 | 31Dic05 |
|---|---|---|---|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
| IMPORTE ANTERIOR | 1,029,459,828.17 | 1,037,180,776.88 | 1,044,959,632.71 | 1,052,796,829.96 | 1,060,692,805.18 | 1,068,648,002.23 | 1,076,662,862.25 | 1,084,737,833.72 |
| IMPORTE DEL MES | | | | | | | | |
| IMPORTE ACUMULADO PARA CALCULO | 1,029,459,828.17 | 1,037,180,776.88 | 1,044,959,632.71 | 1,052,796,829.96 | 1,060,692,805.18 | 1,068,648,002.23 | 1,076,662,862.25 | 1,084,737,833.72 |
| RECARGOS | 7,720,948.71 | 7,778,855.83 | 7,837,197.25 | 7,895,976.22 | 7,955,199.00 | 8,014,860.02 | 8,074,971.47 | 8,135,533.75 |
| ACUMULADO | 1,037,180,776.88 | 1,044,959,632.71 | 1,052,796,829.96 | 1,060,692,805.18 | 1,068,648,002.23 | 1,076,662,862.25 | 1,084,737,833.72 | 1,092,873,367.47 |

Intereses

CORPORACION MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V.
Homero 534 Piso 7, Col. Chapultepec Morales C.P. 11570
Tel. 55 - 5605 - 4205

CONTRATO No. PEP-O-IT-136/98

CALCULO DE GASTOS FINANCIEROS

### PERIODOS E IMPORTES DE RECARGOS POR PRORROGA

| PERIODO | 31/Ene/06 | 28/Feb/06 | 31/Mar/06 | 30/Abr/06 | 31/May/06 | 30/Jun/06 | 31/Jul/06 | 31/Ago/06 |
|---|---|---|---|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
| IMPORTE ANTERIOR | | | | | | | | |
| IMPORTE DEL MES | | | | | | | | |
| IMPORTE ACUMULADO PARA CALCULO | $ 1,092,873,397.47 | $ 1,101,069,917.73 | $ 1,109,327,942.11 | $ 1,117,647,901.68 | $ 1,126,030,260.94 | $ 1,134,475,487.90 | $ 1,142,984,054.06 | $ 1,151,556,434.47 |
| RECARGOS | $ 8,196,550.26 | $ 8,258,024.38 | $ 8,319,959.57 | $ 8,382,359.28 | $ 8,445,226.96 | $ 8,508,566.16 | $ 8,572,380.41 | $ 8,636,673.26 |
| ACUMULADO | $ 1,101,069,917.73 | $ 1,109,327,942.11 | $ 1,117,647,901.68 | $ 1,126,030,260.94 | $ 1,134,475,487.90 | $ 1,142,984,054.06 | $ 1,151,556,434.47 | $ 1,160,193,107.73 |

### PERIODOS E IMPORTES DE RECARGOS POR PRORROGA

| PERIODO | 30/Sep/06 | 31/Oct/06 | 30/Nov/06 | 31/Dic/06 | 31/Mar/07 | 28/Feb/07 | 31/Mar/07 | 30/Abr/07 |
|---|---|---|---|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
| IMPORTE ANTERIOR | | | | | | | | |
| IMPORTE DEL MES | | | | | | | | |
| IMPORTE ACUMULADO PARA CALCULO | $ 1,160,193,107.73 | $ 1,168,894,556.04 | $ 1,177,661,265.21 | $ 1,186,493,724.70 | $ 1,195,392,427.64 | $ 1,204,357,870.85 | $ 1,213,390,554.88 | $ 1,222,490,984.04 |
| RECARGOS | $ 8,701,448.31 | $ 8,766,709.17 | $ 8,832,459.49 | $ 8,898,702.94 | $ 8,965,443.21 | $ 9,032,684.03 | $ 9,100,429.16 | $ 9,168,682.38 |
| ACUMULADO | $ 1,168,894,556.04 | $ 1,177,661,265.21 | $ 1,186,493,724.70 | $ 1,195,392,427.64 | $ 1,204,357,870.85 | $ 1,213,390,554.88 | $ 1,222,490,984.04 | $ 1,231,659,666.42 |

### PERIODOS E IMPORTES DE RECARGOS POR PRORROGA

| PERIODO | 31/May/07 | 30/Jun/07 | 31/Jul/07 | 31/Ago/07 | 30/Sep/07 | 31/Oct/07 | 30/Nov/07 | 31/Dic/07 |
|---|---|---|---|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
| IMPORTE ANTERIOR | $ 1,231,659,666.42 | $ 1,240,897,113.92 | $ 1,250,203,842.27 | $ 1,259,580,371.09 | $ 1,269,027,223.87 | $ 1,278,544,928.05 | $ 1,288,134,015.01 | $ 1,297,795,020.12 |
| IMPORTE DEL MES | | | | | | | | |
| IMPORTE ACUMULADO PARA CALCULO | $ 1,231,659,666.42 | $ 1,240,897,113.92 | $ 1,250,203,842.27 | $ 1,259,580,371.09 | $ 1,269,027,223.87 | $ 1,278,544,928.05 | $ 1,288,134,015.01 | $ 1,297,795,020.12 |
| RECARGOS | $ 9,237,447.50 | $ 9,306,728.35 | $ 9,376,528.82 | $ 9,446,852.78 | $ 9,517,704.18 | $ 9,589,086.96 | $ 9,661,005.11 | $ 9,733,462.65 |
| ACUMULADO | $ 1,240,897,113.92 | $ 1,250,203,842.27 | $ 1,259,580,371.09 | $ 1,269,027,223.87 | $ 1,278,544,928.05 | $ 1,288,134,015.01 | $ 1,297,795,020.12 | $ 1,307,528,482.77 |

### PERIODOS E IMPORTES DE RECARGOS POR PRORROGA

| PERIODO | 31/Ene/08 | 29/Feb/08 | 31/Mar/08 | 30/Abr/08 | 31/May/08 | 30/Jun/08 | 31/Jul/08 | 31/Ago/08 |
|---|---|---|---|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
| IMPORTE ANTERIOR | $ 1,307,528,482.77 | $ 1,317,334,946.39 | $ 1,327,214,958.49 | $ 1,337,169,070.68 | $ 1,347,197,838.71 | $ 1,357,301,822.50 | $ 1,367,481,586.17 | $ 1,377,737,698.07 |
| IMPORTE DEL MES | | | | | | | | |
| IMPORTE ACUMULADO PARA CALCULO | $ 1,307,528,482.77 | $ 1,317,334,946.39 | $ 1,327,214,958.49 | $ 1,337,169,070.68 | $ 1,347,197,838.71 | $ 1,357,301,822.50 | $ 1,367,481,586.17 | $ 1,377,737,698.07 |
| RECARGOS | $ 9,806,463.62 | $ 9,880,012.10 | $ 9,954,112.19 | $ 10,028,768.03 | $ 10,103,983.79 | $ 10,179,783.67 | $ 10,256,111.90 | $ 10,333,032.74 |
| ACUMULADO | $ 1,317,334,946.39 | $ 1,327,214,958.49 | $ 1,337,169,070.68 | $ 1,347,197,838.71 | $ 1,357,301,822.50 | $ 1,367,481,586.17 | $ 1,377,737,698.07 | $ 1,388,070,730.81 |
| IMPORTE TOTAL INTERESES PESOS | $ 547,905,760.97 | $ 558,885,773.07 | $ 566,839,885.26 | $ 576,966,663.29 | $ 586,872,637.08 | $ 597,152,400.76 | $ 607,408,512.65 | $ 617,741,545.39 |

IMPORTE GENERADO POR RECARGOS LAUDO ARBITRAL 15/ENERO/2008

MEXICO, D.F., March 12, 2008

THIS PAGE INTENTIONALLY LEFT BLANK

(English Translation)

March 12, 2008.

PEMEX Exploración y Producción
Av. Marina Nacional No. 329 Col. Huasteca
México, D.F. C.P. 11311

Attention: Lic. José Néstor García Reza
           General Counsel of PEMEX

                    Re: Arbitration 13683/CCO
                    Contrato No. PEP-O-IT-136/98
                    EPC-28

Ladies and Gentlemen:

Reference is made to the final award ("Final Award") issued on January 15, 2008 under the arbitration proceeding conducted before the International Chamber of Commerce under No. 13716/CCO/JRF between Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. ("Commisa) as plaintiff and PEMEX Exploración y Producción ("PEP") as defendant in connection with Public Works Unitary Prices Contract No. PEP-O-IT-136/98 (the "EPC-28 Contract") dated as of September 4, 1998, under which Commisa rendered certain services to PEP regarding the procurement, manufacturing and installation of certain oil and gas submarine pipeline in the Cantarell Oil Field in Mexican territorial waters. In this connection we hereby respectfully request the following:

#120137  v1

2.

1.  To promptly pay invoice number 1100, for the aggregate amount of; (i) Mex. $1,537,744,431.28 (one billion five hundred and thirty seven million seven hundred and forty four thousand four hundred and thirty one 28/100 Mexican Pesos), which is the total principal amount awarded to Commisa under the Final Award, except for the Dollar amount set out in paragraph (ii) below, plus, interest computed in the terms and conditions established in the Final Award through March 31, 2008, and the corresponding value added tax, and (ii) US $230,000.00 (two hundred and thirty thousand 00/100 Dollars), to pay the arbitration costs and expenses awarded to Commisa pursuant to the Final Award, plus the corresponding value added tax. We are enclosing herewith such original invoice.  We are also enclosing a detailed breakdown of all the amounts awarded pursuant to the Final Award.

2.  Payment of the attached invoice must be made through deposit or wire transfer to account No. 2546019, which Commisa has with Banco Nacional de México, S.A. It should be noted that such account is already registered with PEP.

3.  Finally, please note that interest under the attached invoice has been computed assuming that payment will be made on March 31, 2008.  If payment is made prior to or after the expiration of this term, the interests will have to be adjusted accordingly and Commisa will issue and deliver to PEP another invoice with the proper interest amount.


                    Sincerely,


_____
Corporación Mexican de Mantenimiento Integral, S. de R.L.
                    de C.V.
            By: Jesús Sánchez Ugarte
            Position; Attorney-in-fact


#120137  v1

**KENNEDY DECLARATION**

**EXHIBIT N**

**KURI BREÑA, SÁNCHEZ UGARTE Y AZNAR**

**ABOGADOS**

DANIEL KURI BREÑA ROMERO DE TERREROS
JESÚS SÁNCHEZ UGARTE
MANUEL AZNAR NICOLÍN
GERARDO LEMUS BURGUETE
GUILLERMO GARAY ESPINOSA
LUIS OCTAVIO NÚÑEZ ORELLANA
VÍCTOR MANUEL FRÍAS GARCÉS
BERNARDO LUNA GUTIÉRREZ
ANTONIO CASARES CARRILLO

CORPORATIVO PUNTA SANTA FE TORRE "B"
PROL. PASEO DE LA REFORMA Nº 1015, PISO 8
COL. DESARROLLO SANTA FE
01376 MÉXICO, D.F.
TELS: 5292-5930
FAX: 5292-5928 / 29

8 de mayo de 2008.

PEMEX Exploración y Producción
Av. Marina Nacional No. 329 Col. Huasteca
México, D.F. C.P. 11311 .

Atención: Lic. José Néstor García Reza
          Abogado General de PEMEX y
          Jaime Duarte Aispuro
          Gerente Jurídico, Exploración y Producción

                    Re: Arbitraje 13716/CCO/JRF
                    Contrato No. PEP-O-IT-136/98
                    EPC-28_____

Estimados Señores:

Hacemos referencia al laudo final (el "Laudo Final") de fecha 15 de enero de 2008, expedido en el procedimiento arbitral que se llevó a cabo ante la Corte Internacional de Arbitraje de la Cámara de Comercio Internacional bajo el No. 3716/CCO/JRF entre Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. ("Commisa") como demandante y PEMEX Exploración y Producción ("PEP") como demandada, en relación al Contrato de Obra Publica a Precios Unitarios y Tiempo Determinado No. PEP-O-IT-136/98 (el "Contrato EPC-28") de fecha 4 de septiembre de 1998.

También hacemos referencia a nuestra carta de 12 de marzo de 2008, por la cual Commisa solicitó a PEP el pago sin demora de la factura número 1102 por la suma total de; (i) $1,537,744,431.28 Pesos M.N., (la cual era la cantidad total en Pesos debida al 31 de marzo de 2008), y (ii) US $230,000.00 Dólares, más el impuesto al valor agregado correspondiente.

En seguimiento a nuestra carta del 12 de marzo, les informamos que al 31 de mayo de 2008, la cantidades totales adeudadas por PEP a Commisa bajo el Laudo Final son las siguientes; (i) $1,560,897,095.88 Pesos M.N., la cual es el monto principal total en Pesos, Moneda Nacional, que PEP debe a Commisa conforme al Laudo Final, más los gastos financieros computados en los términos establecidos en el Laudo Final al 31 de mayo de 2008, y el impuesto al valor agregado correspondiente, y (ii) US $230,000.00 Dólares, para cubrir los gastos y costas que PEP adeuda a Commisa de acuerdo con el Laudo Final, mas el impuesto al valor agregado correspondiente. Adjuntamos a esta carta un documento en el cual se desglosan en detalle todas las cantidades que PEP fue condenado a pagar a Commisa de conformidad con el Laudo Final y las compensaciones y deductivas correspondientes.

Es importante mencionar que en el reporte que PEMEX presentó a la Bolsa Mexicana de Valores con relación al primer trimestre de este año[1], PEMEX no informó sobre los gastos financieros que PEP adeuda bajo el Laudo Final. Al 31 de marzo de 2008, dichos gastos financieros sumaban la cantidad de $566,839,885.26 Pesos M.N. y al 31 de mayo de 2008, ascienden a la cantidad de $586,972,637.08 Pesos M.N. Es decir, los intereses representan más del 40% del monto total que PEP debe a Commisa de acuerdo con el Laudo Final.

Por medio de la presente reiteramos nuestra solicitud de que PEP pague a Commisa sin demora las cantidades antes referidas, las cuales PEP adeuda a Commisa conforme al Laudo Final, mediante depósito o transferencia electrónica de fondos en la cuenta No. 2546019, que Commisa tiene con Banco Nacional de México, S.A. (CLABE:002180000025460190).

Por supuesto, si PEP paga antes o después del 31 de mayo de 2008, los gastos financieros deberán ser ajustados según corresponda. Contra el pago total de dichas cantidades, Commisa entregará a PEP una factura que reúna todos los requisitos fiscales.

Atentamente,

_____
Corporación Mexicana de Mantenimiento Integral,
S de R.L. de C.V.
Por: Jesús Sánchez Ugarte
Representante Legal

_____
[1] Fuente: Notas Complementarias a la Información Financiera Trimestre: 01 Página 8/12

CORPORACION MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V.
Homero 534 Piso 7, Col. Chapultepec Morales C.P. 11570
Tel. 55 - 5603 - 4205

CONTRATO No. PEP-O-IT-136/98

RESUMEN LAUDO ARBITRAL CASO NO. 13716/CCO/JRF DE 15 DE ENERO 2008

| | | |
|---|---|---|
| Laudo en Pesos (Monto a favor de Commisa por 39 controversias tecnicas) | | $10,951,438.00 |
| Laudo en Dolares (Monto a favor de Commisa por 39 controversias tecnicas) | | $75,110,777.00 |
| Laudo en Pesos (Monto a favor de PEP por reconvencion) | | ($22,710.00) |
| Laudo en Dolares (Monto a favor de PEP por reconvencion) | | ($35,142.00) |
| Laudo en Pesos (Monto neto a favor de Commisa) | | $10,928,728.00 |
| Laudo en Dolares (Monto neto a favor de Commisa) | | $75,075,635.00 |
| Equivalente en pesos al tipo de cambio del 27 de Septiembre del 2002 | 10.1667 | $763,271,456.35 |
| Subtotal en pesos | | $774,200,186.35 |
| Deductiva por SECODAM (0.5%) | | ($3,871,000.93) |
| Monto Base Para el Calculo de Intereses | | $770,329,185.42 |
| Intereses a Fecha de Pago: 31 DE MAYO 2008 (Ver detalle) | | $ 586,972,637.08 |
| Subtotal | | $1,357,301,822.50 |
| IVA | | $203,595,273.38 |
| TOTAL A PAGAR EN MONEDA NACIONAL | | $1,560,897,095.88 |

| | |
|---|---|
| Monto por gastos y costas (Dolares de EEUU) | $200,000.00 |
| IVA (Dolares de EEUU) | $30,000.00 |
| TOTAL A PAGAR EN DOLARES DE EEUU (PAGADEROS AL TIPO DE CAMBIO VIGENTE EL DIA ANTERIOR AL PAGO) | $230,000.00 |

MEXICO, D.F.,    Mayo 8, 2008

**CORPORACION MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V.**

Homero 534 Piso 7, Col. Chapultepec Morales C.P. 11570
Tel. 55 - 5485 - 4205

**CONTRATO No. PEP-O-IT-139/08**

**CALCULO DE GASTOS FINANCIEROS CONFORME A LAUDO FINAL**





| PERIODO | 30/Sep02 | 31/Oct02 | 30/Nov02 | 31/Dic02 |
|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 1.07% | 0.92% | 0.65% | 1.34% |
| IMPORTE ANTERIOR | | 770,329,185.42 | 770,878,686.81 | 777,970,770.83 |
| IMPORTE DEL MES | 770,329,185.42 | 770,878,686.81 | 777,970,770.83 | 783,883,348.69 |
| IMPORTE ACUMULADO PARA CALCULO | 770,329,185.42 | 770,878,686.81 | 777,970,770.83 | 783,883,348.69 |
| RECARGOS | 549,501.49 | 7,092,083.92 | 5,912,577.86 | 7,446,891.81 |
| ACUMULADO | 770,878,686.81 | 777,970,770.83 | 783,883,348.69 | 791,330,240.50 |

**PERIODOS E IMPORTES DE RECARGOS POR PRORROGA**

| PERIODO | 31/Ene03 | 28/Feb03 | 31/Mar03 | 30/Abr03 |
|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 1.34% | 1.43% | 1.26% | 1.35% |
| IMPORTE ANTERIOR | 791,330,240.50 | 801,834,065.72 | 813,401,722.86 | 823,884,605.08 |
| IMPORTE DEL MES | 801,834,065.72 | 813,401,722.86 | 823,884,605.08 | 835,284,350.63 |
| IMPORTE ACUMULADO PARA CALCULO | 791,330,240.50 | 801,834,065.72 | 813,401,722.86 | 823,884,605.08 |
| RECARGOS | 10,503,825.22 | 11,467,657.14 | 10,482,882.22 | 11,399,745.55 |
| ACUMULADO | 801,834,065.72 | 813,401,722.86 | 823,884,605.08 | 835,284,350.63 |

**PERIODOS E IMPORTES DE RECARGOS POR PRORROGA**

| PERIODO | 30/May03 | 30/Jun03 | 31/Jul03 | 31/Ago03 |
|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 1.41% | 1.31% | 1.17% | 1.07% |
| IMPORTE ANTERIOR | 835,284,350.63 | 847,041,577.97 | 858,137,822.64 | 868,178,035.16 |
| IMPORTE DEL MES | 847,041,577.97 | 858,137,822.64 | 868,178,035.16 | 877,467,540.14 |
| IMPORTE ACUMULADO PARA CALCULO | 835,284,350.63 | 847,041,577.97 | 858,137,822.64 | 868,178,035.16 |
| RECARGOS | 11,777,227.34 | 11,096,244.67 | 10,040,212.52 | 9,289,504.98 |
| ACUMULADO | 847,041,577.97 | 858,137,822.64 | 868,178,035.16 | 877,467,540.14 |

**PERIODOS E IMPORTES DE RECARGOS POR PRORROGA**

| PERIODO | 30/Sep03 | 31/Oct03 | 30/Nov03 | 31/Dic03 |
|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 0.75% | 1.05% | 1.01% | 0.96% |
| IMPORTE ANTERIOR | 877,467,540.14 | 886,505,455.80 | 895,459,180.90 | 904,503,298.43 |
| IMPORTE DEL MES | 886,505,455.80 | 895,459,180.90 | 904,503,298.43 | 913,457,881.08 |
| IMPORTE ACUMULADO PARA CALCULO | 877,467,540.14 | 886,505,455.80 | 895,459,180.90 | 904,503,298.43 |
| RECARGOS | 9,037,915.66 | 8,953,725.10 | 9,044,117.53 | 8,954,582.65 |
| ACUMULADO | 886,505,455.80 | 895,459,180.90 | 904,503,298.43 | 913,457,881.08 |

**PERIODOS E IMPORTES DE RECARGOS POR PRORROGA**

| PERIODO | 31/Ene04 | 28/Feb04 | 31/Mar04 | 30/Abr04 |
|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 0.75% | 0.75% | 0.75% | 0.75% |
| IMPORTE ANTERIOR | 913,457,881.08 | 920,306,815.19 | 927,211,131.30 | 934,165,214.78 |
| IMPORTE DEL MES | 920,306,815.19 | 927,211,131.30 | 934,165,214.78 | 941,171,453.89 |
| IMPORTE ACUMULADO PARA CALCULO | 913,457,881.08 | 920,306,815.19 | 927,211,131.30 | 934,165,214.78 |
| RECARGOS | 6,850,934.11 | 6,902,316.11 | 6,954,083.49 | 7,006,239.11 |
| ACUMULADO | 920,306,815.19 | 927,211,131.30 | 934,165,214.78 | 941,171,453.89 |

**PERIODOS E IMPORTES DE RECARGOS POR PRORROGA**

| PERIODO | 30/May04 | 30/Jun04 | 31/Jul04 | 31/Ago04 |
|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 0.75% | 0.75% | 0.75% | 0.75% |
| IMPORTE ANTERIOR | 941,171,453.89 | 948,230,239.79 | 955,341,966.59 | 962,507,031.34 |
| IMPORTE DEL MES | 948,230,239.79 | 955,341,966.59 | 962,507,031.34 | 969,725,834.08 |
| IMPORTE ACUMULADO PARA CALCULO | 941,171,453.89 | 948,230,239.79 | 955,341,966.59 | 962,507,031.34 |
| RECARGOS | 7,058,785.90 | 7,111,726.80 | 7,165,064.75 | 7,218,802.74 |
| ACUMULADO | 948,230,239.79 | 955,341,966.59 | 962,507,031.34 | 969,725,834.08 |

**PERIODOS E IMPORTES DE RECARGOS POR PRORROGA**

| PERIODO | 30/Sep04 | 31/Oct04 | 30/Nov04 | 31/Dic04 |
|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 0.75% | 0.75% | 0.75% | 0.75% |
| IMPORTE ANTERIOR | 969,725,834.08 | 976,998,777.64 | 984,326,288.67 | 991,708,715.69 |
| IMPORTE DEL MES | 976,998,777.64 | 984,326,288.67 | 991,708,715.69 | 999,146,531.06 |
| IMPORTE ACUMULADO PARA CALCULO | 969,725,834.08 | 976,998,777.64 | 984,326,288.67 | 991,708,715.69 |
| RECARGOS | 7,272,943.76 | 7,327,490.83 | 7,382,447.02 | 7,437,815.37 |
| ACUMULADO | 976,998,777.64 | 984,326,288.67 | 991,708,715.69 | 999,146,531.06 |

**PERIODOS E IMPORTES DE RECARGOS POR PRORROGA**

| PERIODO | 31/Ene05 | 28/Feb05 | 30/Abr05 | 31/Mar05 |
|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 0.75% | 0.75% | 0.75% | 0.75% |
| IMPORTE ANTERIOR | 999,146,531.06 | 1,006,640,130.04 | 1,014,189,931.02 | 1,021,796,355.50 |
| IMPORTE DEL MES | 1,006,640,130.04 | 1,014,189,931.02 | 1,021,796,355.50 | 1,029,459,828.17 |
| IMPORTE ACUMULADO PARA CALCULO | 999,146,531.06 | 1,006,640,130.04 | 1,014,189,931.02 | 1,021,796,355.50 |
| RECARGOS | 7,493,598.98 | 7,549,800.99 | 7,606,424.48 | 7,663,472.67 |
| ACUMULADO | 1,006,640,130.04 | 1,014,189,931.02 | 1,021,796,355.50 | 1,029,459,828.17 |

**PERIODOS E IMPORTES DE RECARGOS POR PRORROGA**

| PERIODO | 30/May05 | 30/Jun05 | 31/Jul05 | 31/Ago05 |
|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 0.75% | 0.75% | 0.75% | 0.75% |
| IMPORTE ANTERIOR | 1,029,459,828.17 | 1,037,180,776.88 | 1,044,958,632.71 | 1,052,796,829.96 |
| IMPORTE DEL MES | 1,037,180,776.88 | 1,044,958,632.71 | 1,052,796,829.96 | 1,060,692,806.18 |
| IMPORTE ACUMULADO PARA CALCULO | 1,029,459,828.17 | 1,037,180,776.88 | 1,044,958,632.71 | 1,052,796,829.96 |
| RECARGOS | 7,720,948.71 | 7,778,855.83 | 7,837,197.25 | 7,895,976.22 |
| ACUMULADO | 1,037,180,776.88 | 1,044,958,632.71 | 1,052,796,829.96 | 1,060,692,806.18 |

**PERIODOS E IMPORTES DE RECARGOS POR PRORROGA**

| PERIODO | 30/Sep05 | 31/Oct05 | 30/Nov05 | 31/Dic05 |
|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 0.75% | 0.75% | 0.75% | 0.75% |
| IMPORTE ANTERIOR | 1,060,692,806.18 | 1,068,648,002.23 | 1,076,662,862.25 | 1,084,737,833.72 |
| IMPORTE DEL MES | 1,068,648,002.23 | 1,076,662,862.25 | 1,084,737,833.72 | 1,092,873,397.47 |
| IMPORTE ACUMULADO PARA CALCULO | 1,060,692,806.18 | 1,068,648,002.23 | 1,076,662,862.25 | 1,084,737,833.72 |
| RECARGOS | 7,955,196.05 | 8,014,860.02 | 8,074,971.47 | 8,135,533.75 |
| ACUMULADO | 1,068,648,002.23 | 1,076,662,862.25 | 1,084,737,833.72 | 1,092,873,397.47 |

**CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V.**

Homero 534 Piso 7, Col. Chapultepec Morales C.P. 11570

Tel. 55 - 5645 - 4205

**CONTRATO No. PEP-O-IT-138/98**

## CALCULO DE GASTOS FINANCIEROS CONFORME A LAUDO FINAL

### PERIODOS E IMPORTES DE RECARGOS POR PRORROGA

| PERIODO | 31/Ene/06 | 28/Feb/06 | 31/Mar/06 | 30/Abr/06 | 31/May/06 | 30/Jun/06 | 31/Jul/06 | 31/Ago/06 |
|---|---|---|---|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
| IMPORTE ANTERIOR | 1,092,873,367.47 | 1,101,069,917.73 | 1,109,327,842.11 | 1,117,647,901.68 | 1,126,030,260.94 | 1,134,475,487.90 | 1,142,984,054.06 | 1,151,556,434.47 |
| IMPORTE DEL MES | | | | | | | | |
| IMPORTE ACUMULADO PARA CALCULO | 1,092,873,367.47 | 1,101,069,917.73 | 1,109,327,842.11 | 1,117,647,901.68 | 1,126,030,260.94 | 1,134,475,487.90 | 1,142,984,054.06 | 1,151,556,434.47 |
| RECARGOS | 8,196,550.26 | 8,258,924.38 | 8,319,059.57 | 8,382,359.26 | 8,445,226.96 | 8,508,566.16 | 8,572,380.41 | 8,636,673.26 |
| ACUMULADO | 1,101,069,917.73 | 1,109,327,842.11 | 1,117,647,901.68 | 1,126,030,260.94 | 1,134,475,487.90 | 1,142,984,054.06 | 1,151,556,434.47 | 1,160,193,107.73 |

### PERIODOS E IMPORTES DE RECARGOS POR PRORROGA

| PERIODO | 30/Sep/06 | 31/Oct/06 | 30/Nov/06 | 31/Dic/06 | 31/Ene/07 | 28/Feb/07 | 31/Mar/07 | 30/Abr/07 |
|---|---|---|---|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
| IMPORTE ANTERIOR | 1,160,193,107.73 | 1,168,894,556.04 | 1,177,661,265.21 | 1,186,493,724.70 | 1,195,392,427.64 | 1,204,357,870.85 | 1,213,390,554.88 | 1,222,490,984.04 |
| IMPORTE DEL MES | | | | | | | | |
| IMPORTE ACUMULADO PARA CALCULO | 1,160,193,107.73 | 1,168,894,556.04 | 1,177,661,265.21 | 1,186,493,724.70 | 1,195,392,427.64 | 1,204,357,870.85 | 1,213,390,554.88 | 1,222,490,984.04 |
| RECARGOS | 8,701,448.31 | 8,766,709.17 | 8,832,459.49 | 8,898,702.94 | 8,965,443.21 | 9,032,684.03 | 9,100,429.16 | 9,168,682.38 |
| ACUMULADO | 1,168,894,556.04 | 1,177,661,265.21 | 1,186,493,724.70 | 1,195,392,427.64 | 1,204,357,870.85 | 1,213,390,554.88 | 1,222,490,984.04 | 1,231,659,666.42 |

### PERIODOS E IMPORTES DE RECARGOS POR PRORROGA

| PERIODO | 31/May/07 | 30/Jun/07 | 31/Jul/07 | 31/Ago/07 | 30/Sep/07 | 31/Oct/07 | 30/Nov/07 | 31/Dic/07 |
|---|---|---|---|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
| IMPORTE ANTERIOR | 1,231,659,666.42 | 1,240,897,113.92 | 1,250,203,842.27 | 1,259,580,371.09 | 1,269,027,223.87 | 1,278,544,928.05 | 1,288,134,015.01 | 1,297,795,020.12 |
| IMPORTE DEL MES | | | | | | | | |
| IMPORTE ACUMULADO PARA CALCULO | 1,231,659,666.42 | 1,240,897,113.92 | 1,250,203,842.27 | 1,259,580,371.09 | 1,269,027,223.87 | 1,278,544,928.05 | 1,288,134,015.01 | 1,297,795,020.12 |
| RECARGOS | 9,237,447.50 | 9,306,728.35 | 9,376,528.82 | 9,446,852.78 | 9,517,704.18 | 9,589,086.96 | 9,661,005.11 | 9,733,462.65 |
| ACUMULADO | 1,240,897,113.92 | 1,250,203,842.27 | 1,259,580,371.09 | 1,269,027,223.87 | 1,278,544,928.05 | 1,288,134,015.01 | 1,297,795,020.12 | 1,307,528,482.77 |

### PERIODOS E IMPORTES DE RECARGOS POR PRORROGA

| PERIODO | 31/Ene/08 | 29/Feb/08 | 31/Mar/08 | 30/Abr/08 | 31/May/08 | 30/Jun/08 | 31/Jul/08 | 31/Ago/08 |
|---|---|---|---|---|---|---|---|---|
| TASA DE RECARGOS PRORROGA | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% | 0.75% |
| IMPORTE ANTERIOR | 1,307,528,482.77 | 1,317,334,946.39 | 1,327,214,958.49 | 1,337,169,070.68 | 1,347,197,838.71 | 1,357,301,822.50 | 1,367,481,586.17 | 1,377,737,698.07 |
| IMPORTE DEL MES | | | | | | | | |
| IMPORTE ACUMULADO PARA CALCULO | 1,307,528,482.77 | 1,317,334,946.39 | 1,327,214,958.49 | 1,337,169,070.68 | 1,347,197,838.71 | 1,357,301,822.50 | 1,367,481,586.17 | 1,377,737,698.07 |
| RECARGOS | 9,806,463.62 | 9,880,012.10 | 9,954,112.19 | 10,028,768.03 | 10,103,983.79 | 10,179,763.67 | 10,256,111.90 | 10,333,032.74 |
| ACUMULADO | 1,317,334,946.39 | 1,327,214,958.49 | 1,337,169,070.68 | 1,347,197,838.71 | 1,357,301,822.50 | 1,367,481,586.17 | 1,377,737,698.07 | 1,388,070,730.81 |

| IMPORTE TOTAL INTERESES PESOS | 547,005,760.97 | 598,885,773.07 | 598,839,885.28 | 576,868,683.29 | 588,072,657.08 | 597,152,409.75 | 607,408,512.65 | 617,741,546.39 |
|---|---|---|---|---|---|---|---|---|

**IMPORTE GENERADO POR GASTOS FINANCIEROS LAUDO ARBITRAL 15/ENERO/2008**

MEXICO, D.F., Mayo 9, 2008

Commisa

**THIS PAGE INTENTIONALLY LEFT BLANK**

(English Translation)

May 8, 2008

PEMEX Exploración y Producción
Av. Marina Nacional No. 329 Col. Huasteca
México, D.F. C.P. 11311

Attention: Lic. José Néstor García Reza
           General Counsel of PEMEX and
           Lic. Jaime Duarte Legal Manager
           PEMEX Exploracion y Produccion

                        Re: Arbitration 13683/CCO
                        Contrato No. PEP-O-IT-136/98
                        EPC-28

Gentlemen:

Reference is made to the final award ("Final Award") issued on January 15, 2008 on arbitration proceeding conducted before the International Chamber of Commerce under No. 13716/CCO/JRF between Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. ("Commisa) as plaintiff and PEMEX Exploración y Producción ("PEP") as defendant in connection with Public Works Unitary Prices Contract No. PEP-O-IT-136/98 (the "EPC-28 Contract") dated as of September 4, 1998.

Reference is also made to our March 12, 2008 letter by which Commisa requested PEP promptly payment of invoice number 1102 for the aggregate amount of (i) $1,537,744,431.28 Mexican Pesos (which was the Mexican Peso amount owed through March 31, 2008), and (ii) US $230,000.00 Dollars, plus the corresponding value added tax.

As of May 31, 2008 the aggregate amount owed by PEP to Commisa in accordance with the Final Award is the following; (i) $1,560,897,095.88 Mexican Pesos, which is the total principal amount awarded to Commisa under the Final Award, except for the Dollar amount set out in paragraph (ii) below, plus, interest computed in the terms and conditions established in the Final Award through May 31, 2008, and the corresponding value added tax, and (ii) US $230,000.00 Dollars, to pay the arbitration costs and expenses awarded to Commisa pursuant to the Final Award, plus the corresponding value added tax. We are enclosing herewith a detailed breakdown of the abovementioned amounts.

It is important to note that in the report for the first quarter of 2008 that PEP filed with the Mexican Stock Exchange[1], PEP did not disclose the interest owed pursuant to the Final Award. Such interest was as of March 31, 2007 equal to $566.8 Million Mexican Pesos and as of May 31, 2008 is the amount of $586.9 Million Mexican Pesos. Interest represents more than 40% of the total sum owed by PEP to Commisa under the Final Award.

By this letter, we reiterate our request that PEP promptly pays Commisa all amounts owed under the Final Award through deposit or wire transfer to account No. 2546019, which Commisa has with Banco Nacional de México, S.A.

Of course, if PEP pays before or after May 31, 2008 the interest set forth in the enclosed document would have to be adjusted accordingly. Upon full payment by PEP of the abovementioned amounts, Commisa will deliver to PEP an invoice meeting all applicable tax requirements.

Sincerely,

---

Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V.
By: Jesús Sánchez Ugarte
Position; Attorney-in-fact

---

[1] *"Notas Complementarias a la Información Financiera Trimestre: 01 Página 8/12"*

#120137 v1

**KENNEDY DECLARATION**

**EXHIBIT O**



**PEMEX**
OFICINA DEL ABOGADO GENERAL
GERENCIA JURIDICA EXPLORACION Y PRODUCCION

*"2008, Año de la Educación Física y el Deporte"*

México, Distrito Federal, a 19 de mayo de 2008.

Corporación Mexicana de Mantenimiento
Integral, S. de R. L. de C. V.
Prolongación Paseo de la Reforma No. 1015, Piso 8
Colonia Desarrollo Santa Fe,
México, Distrito Federal,
Código Postal 01376.

Atención: Lic. Jesús Sánchez Ugarte
            Representante Legal
            de COMMISA

En atención a sus cartas de 12 de marzo y 8 de mayo, ambas del año en curso, mediante las cuales hace referencia al Laudo Final de 15 de enero de 2008, emitido dentro del Juicio Arbitral con número de referencia 13716/CCO/JRF, iniciado por Corporación Mexicana de Mantenimiento Integral, S. de R. L. de C. V. (COMMISA), en contra de Pemex Exploración y Producción (PEP), con el fin de que se le cubran a su representada diversos montos supuestamente derivados del laudo mencionado, al respecto le comento lo siguiente:

El Laudo Final al que nos referimos, le fue notificado a PEP el 11 de febrero de 2008. En virtud de ese hecho, PEP tenía tres meses para ejercer su derecho de acudir a las instancias judiciales que considerara idóneas con el propósito de impugnar la citada resolución arbitral. Como consecuencia de lo antes señalado, en la época de sus misivas PEP no tenía ninguna obligación de cubrir a su representada ningún concepto derivado del laudo arbitral, ni tampoco ahora, en atención a que la situación jurídica del laudo arbitral se encuentra sub júdice, como ya es de su conocimiento.

En ese tenor, PEP se atenderá al resultado final de las instancias judiciales correspondientes del incidente de nulidad del laudo arbitral planteado ante los Tribunales Federales del País, en contra del laudo cuyo pago indebidamente solicita su representada.

Atentamente

Lic. José Nestor García Reza
Abogado General de Petróleos Mexicanos

OAG/529/2008

70 1938
2008
A N I V E R S A R I O

Una empresa *fuerte* para el *futuro* de México

GERENCIA JURIDICA EXPLORACION Y PRODUCCION
Marina Nacional No. 329, Edificio "A", Piso 8°, Col. Huasteca
México, D.F., C.P. 11311
CONMUTADOR : 1944-2500 EXT. 12222 y 12223

**THIS PAGE INTENTIONALLY LEFT BLANK**

**(English translation)**

[Letterhead of the Office of PEP's Legal Counsel]


Mexico, Federal District, May 19, 2008.

Corporación Mexicana de Mantenimiento
Integral, S. de R.L. de C.V.
Prolongación Paseo de la Reforma No. 1015, Piso 8
Colonia Desarrollo Santa Fe,
Mexico, Federal District
01376

Attention: Mr. Jesús Sánchez Ugarte, Esq.
          COMMISA's Legal Representative


In connection with your letters of March 12, 2008, and May 8, 2008, in which you make reference to the Arbitration number 13716/CCO/JRF, filed by Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. (COMMISA), against Pemex Exploración y Producción (PEP), in order to claim payment of certain amounts allegedly derived from the abovementioned award, we hereby submit the following:

The Final Award to which we make reference, was notified to PEP on February 11, 2008. Given this fact, PEP had three months to exercise its right to appear before whatever judicial organs PEP considered ideal in order to object to such arbitral resolution. As a consequence of the foregoing, on the date of your letters, PEP did not have any obligation to pay any amounts derived from the award to COMMISA, and PEP does not have such obligation at this time given that the legal status of the award is sub judice, as you are aware.

In this light, PEP shall comply with the final resolution of the corresponding judicial organs in connection with the annulment proceedings against the arbitral award filed by PEP before Mexican Federal Tribunals.

Yours truly,

[SIGNATURE]

José Nestor García Reza, Esq.
Attorney General for Petróleos Mexicanos

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| CORPORACIÓN MEXICANA<br>DE MANTENIMIENTO INTEGRAL,<br>S. DE R.L. DE C.V.,<br><br>Petitioner,<br><br>v.<br><br>PEMEX EXPLORACIÓN<br>Y PRODUCCIÓN,<br><br>Respondent. | CASE: 1:08-CV-00469 (RWR) |

## DECLARATION OF CLAUS VON WOBESER

CLAUS VON WOBESER declares as follows:

1.      I am admitted to practice in Mexico by the Mexican General Direction of Professions pursuant to the license number 704601 dated December 1st, 1981 and I am the managing partner of the law firm Von Wobeser y Sierra, S.C., attorneys for petitioner Corporación Mexicana De Mantenimiento Integral ("Commisa") in an action commenced by Pemex Exploración y Producción ("PEP") in the Eighth Judicial District on Civil Matters of the First Circuit in Mexico City, Mexico entitled *Pemex Exploración y Producción v. Corporación Mexicana De Mantenimiento Integral*, Case No. 158/2008-II (the "Nullification Action").

2.      I currently serve as the President of the Arbitration Commission of the Mexican chapter of the International Chamber of Commerce (the "ICC"), and as Vice President of the ICC International Court of Arbitration.  From 2006 to 2007 I served as Co-Chair of the Arbitration Committee of the International Bar Association and from 2001 to 2003, I served as

President of the Mexican Bar Association. I have also acted as arbitrator in more than 20 domestic and international arbitrations administered under a variety of institution's rules, including those of the ICC.

3. PEP's Nullification Action seeks nullification of part of an arbitral award (the "arbitral award") dated January 15, 2008 that was issued by the arbitral tribunal in an arbitration held under the Rules of Arbitration of the ICC between Commisa and PEP entitled *Corporación Mexicana De Mantenimiento Integral, S. de R.L. de C.V. v. Pemex Exploración y Producción v.* Corporación *Mexicana De Mantenimiento Integral*. PEP argues in the Nullification Action, among other things, that (i) PEP was unable to present a complete defense during the arbitration proceedings because the arbitrators were unduly partial to Commisa, as evidenced by the fact that the arbitral tribunal interpreted the parties' contract in a manner favorable to Commisa; (ii) that the Arbitral Tribunal decided matters beyond the scope of the parties' arbitration agreement; and (iii) the Award contravenes Mexican public policy.

4. PEP requested in its complaint in the Nullification Action that the Mexican court issue a precautionary order against Commisa prohibiting it from pursuing any action to enforce the arbitral award until the Nullification Action was resolved. An English translation of the portion of PEP's complaint requesting this relief is Exhibit 1 hereto. The Mexican court refused to issue the requested order. An English translation of the Mexican court's decision denying PEP's request is Exhibit 2 hereto.

5. PEP then filed a second application with the Mexican court, repeating its request for a precautionary order against COMMISA prohibiting it from pursuing any action to enforce the arbitral award until the Nullification Action was resolved. PEP requested specifically that the Mexican court order Commisa to stop pursuing or suspend the above-captioned proceeding in

this Court to confirm the arbitral award. The Mexican court denied this second request by PEP. (An English translation of the Mexican court's order denying PEP's second request is Exhibit 3 hereto.)

6. I attach as Exhibit 4 hereto the English translation of the pleading that my law firm filed on Commisa's behalf opposing PEP's Nullification Action. Commisa argues in its pleading that PEP's arguments are not well-founded under Mexican law in general and under Mexican arbitration law in particular. Among other things, Commisa argues that: (i) Mexican law does not provide for a "lack of impartiality" as a grounds upon which an arbitral award may be vacated; (ii) the Mexican Federal Commercial Code gives the arbitrators the authority to determine their own jurisdiction; and (iii) the arbitral award does not violate Mexican public policy because it awards amounts against PEP that PEP may not have budgeted.

7. I have been involved with a number of Mexican nullification proceedings similar to the Nullification Action. Such proceedings and subsequent related constitutional challenges, can take one to two years, and sometimes longer, to complete.

I declare under penalty of perjury of the laws of the United States that the foregoing is true and correct.

Executed on June 4, 2008
Mexico City, Mexico

_____
Claus Von Wobeser

**VON WOBESER DECLARATION**

**EXHIBIT 1**

## **MEASURES REQUESTED**

In accordance with article 384 of the Federal Civil Procedures Code, I request that Your Honor declare the measures necessary to maintain the current situation.

My principal requests that Your Honor order COMMISA to abstain from enforcing and/or carrying out any act related to requesting the recognition or enforcement of the arbitral award whose setting aside is requested, or any act carried out in or for the enforcement of the arbitral award.

It is clear that in this case, the order to maintain things in their current state does not cause any damage or harm to the defendant COMMISA, since my principal is solvent and is exercising its right to request the setting aside of the arbitral award, which is a legitimate right, since as has been demonstrated throughout this writ, the arbitral proceeding did not comply with the agreement executed by the parties, the award is contrary to public policy, the award contains decisions that exceed the terms of the arbitration agreement, and the arbitral tribunal issued an award in equity and not according to law, as the parties had agreed.

Furthermore, my principal is exempt from granting the guarantee required by article 387 of the Federal Civil Procedures Code, in accordance with article 4 of that same Code, which establishes:

> "Article 4.- The institutions, services and agencies of the Federal Public Administration and of the states and the federal district have, within the judicial proceeding, in whatever form they may be involved, the same situation as any other party; but no writ of attachment or seizure order may be issued against them, **and they will be exempt from granting the guarantees that this Code requires from the parties."**

# VON WOBESER DECLARATION

# EXHIBIT 2

Place: Mexico City, Federal District, on May 14, 2008

Add to the case file the writ of Jaime Duarte Aspurio as legal representative of PEP which capacity is evidenced in terms of the notarial transcript number 25078 issued by notary number 237 of the Federal District and Federal Real Estate Asset Notary Lic. Alfredo Ayala Herrera requesting, based on article 384 of the Federal Civil Procedures Code, the declaration of the measures necessary in order to maintain the existing factual situation, which is to say that the defendant be ordered to abstain from executing or carrying out any act related to requesting the recognition and execution of the arbitral award whose setting aside is now requested. In response to his petition, tell the petitioner that the measures cannot be declared since the requirements for their issuance established in articles 384, 385, 386, 387 and 388 of the Federal Civil Procedures Code have not been met. In effect, precautionary measures is the name given to a series of court orders issued before or during a proceeding, by which it is attempted to prevent the changing of the factual situation existing at the time of initiating the court proceedings.

Therefore, what is pursued with the precautionary measures is that the holder of a subjective right timely ensure its exercise especially when what is requested are negative precautionary measures, which are those by which it is procured, above all, to prevent the change of the state of the evidence existing at the time of the request, in order to avoid the damage that could be caused by its change. The negative character arises from the fact that the execution of an act is not sought but rather that an act be detained.

Now, the general conditions for issuing a precautionary measure are: 1) the existence of a right, 2) the danger this right is in of not being satisfied.

This last condition constitutes the basis for the precautionary measures of avoiding or preventing the danger of further marginal damage that could result from the delay or slowness of an ordinary proceeding, and therefore the clear notion of "*periculum in mora*" is not born from a state of danger, nor has the purpose of preventing a feared harm, but rather it is necessary that in addition to the harm the order be urgent.

In this case, the principal action that is demanded consists of the declaration of the setting aside of the arbitral award issued in the arbitration between COMMISA and PEP in the arbitral proceeding 13716/CCO/JRS, administered by the International Court of Arbitration of the International Chamber of Commerce and the precautionary measure that is requested consists of that *"…COMMISA abstain from exercising and carrying out any act related to requesting the recognition or enforcement of the arbitral award whose setting aside is requested."*

From all of the above it is shown that it is not possible to declare the precautionary measure requested by the petitioner, since no evidence is shown with respect to the urgency of the precautionary measure, given that it is not proven that the arbitral claimant intends to enforce the arbitral award, or request its recognition, which would be indispensable for declaring the requested precautionary measure. This is because, as established in the cited articles, the measure will only be issued in order to prevent the causing of damage or harm from what is requested and that with this things are maintained in their current state, which was not demonstrated and, therefore, it is not feasible to declare the requested measure.

In addition to the above, once the mentioned procedures of recognition or enforcement are initiated at the request of the arbitral claimant, such procedures can be challenged by other legal means, which also shows that in this case the urgency required for the requested measure is not satisfied.

NOTIFY THE PARTIES.

**VON WOBESER DECLARATION**

**EXHIBIT 3**

Place: Mexico City, Federal District, on May 26, 2008.

Add to your files the writ of Jaime Duarte Aspurio, as legal representative of PEMEX EXPLORACIÓN Y PRODUCCIÓN, which capacity has been duly evidenced in the files, which restates the request that a precautionary measure be adopted and manifests that there is urgency in such request based on article 384 of the Federal Procedures Code, in order to declare the necessary measures and maintain the current situation, given that he asserts he has knowledge that an American judge has been asked to confirm, recognize and enforce the arbitral award whose setting aside is requested exhibiting documentation affecting its rights. In response to his petition, tell him that the ruling issued May 14th of this year is confirmed, since the urgency of the requested measure is not evidenced. As stated in such ruling it is not evidenced that the arbitral award is enforceable in Mexico, since it is not proven that the homologation or its enforcement has been processed and that it has been made firm, and therefore the urgency required for the adoption of the requested measure has not been satisfied, as was established in the mentioned ruling of last May 14th.

Place the documents exhibited with the writ in question in the safety box of the court.

Finally, having reviewed the writ of MARCO TULIO VENEGAS CRUZ as representative of the defendant, which capacity has been recognized in the files, by which he requests certified copies of several records, based on article 1067 of the Commercial Code in force, issue at his cost the copies of the records indicated with proof of payment received.- **Notify the parties.**

**VON WOBESER DECLARATION**

**EXHIBIT 4**

PEMEX EXPLORACIÓN Y PRODUCCIÓN

VS.

CORPORACIÓN MEXICANA DE MANTENIMIENTO

INTEGRAL, S. DE R.L. DE C.V.

File number 158/2008-II

Re: Answer to ancillary setting aside action

EIGHTH DISTRICT JUDGE IN CIVIL

MATTERS IN THE FEDERAL DISTRICT

I, **MARCO TULIO VENEGAS CRUZ**, in representation of the company **CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V. (hereinafter "COMMISA")** which legal capacity I evidence herein with the exhibition of the second notarial transcript of public instrument number 58,042 issued by Notary Public No. 1 of the Federal District, Mr. Roberto Nuñez y Bandera, in which the power granted by COMMISA to the undersigned is recorded, which document is attached as **EXHIBIT ONE** of this document and which I request be returned to me after the attached photocopy thereof is compared and certified, indicating as domicile to receive notifications **Guillermo González Camarena número 1100, 7° piso, Colonia Santa Fe, Centro de Ciudad, Delegación Álvaro Obregón, Código Postal 01210** and authorizing in the broadest terms of the third paragraph of article 1069 of the Commerce Code the attorneys**, Fernando Moreno Gómez de Parada (with professional license number 1516258), Edmond Frederic Grieger Escudero (with professional license number 4204176), Montserrat Manzano Escalón (with professional license number 4214290), Alberto Muerza Sierra (with professional license number 2948545), Adrián Magallanes Pérez (with professional license number 5295822) and Diego Ignacio Sierra Laris (with legal intern license 68851);** and authorizing, in terms of the third to last paragraph of the same article to receive notices, documents and securities, and to have access to the files, the legal interns **Robert Edward Dolan Isunza, Elisa de Anda Madrazo, Raymundo Soberanis Cortés, Ricardo Rabasa**

**Cossu, Alejandra Cárdenas Ducker, Mariana García Martínez Parente and Pablo Usobiaga Hegewisch,** with due respect appear before you and allege:

That on May 14th of this year my principal was served in the ancillary proceeding for setting aside the arbitral award filed by PEMEX EXPLORACIÓN Y PRODUCCIÓN (hereinafter "PEP"), the ruling of May 9, 2008 having been notified, by means of which the mentioned proceeding was considered presented and admitted and my principal being granted a term of three days to state its defense.

In light of the above, it being within the term of three days that was granted by the Judge for this purpose, and based on the rules of article 1460 of the Commerce Code, and article 360 of the Federal Code of Civil Procedures, I come before you to answer the ancillary claim filed by PEP in the following manner:

## I.    RELIEF CLAIMED

The relief claimed from my principal by the plaintiff is invalid in view of the following:

a) The validity of the request to declare the setting aside of the arbitral award issued in the arbitration proceeding 13716/CCO/JRF is rejected, given that it: i) is not contrary to public policy; ii) resolved the disputes submitted by the parties to arbitration; and iii) was issued in exercise of the powers granted by the parties to the arbitrators.

b) Also invalid is the request by PEP that my principal be ordered to pay the expenses and costs incurred for the processing of this ancillary proceeding.

## II.    PRELIMINARY STATEMENTS

First of all and as a preliminary question of order, we call the attention of Your Honor to the disordered and unclear form in which the setting aside claim is set forth.

2

The plaintiff basically sets forth in the eight sections (Roman numbers I to VII) of its "FACTS" chapter in a disordered, repetitive and confusing manner, its legal arguments as to why it considers that the award should be set aside.

Furthermore, in section VIII of its "FACTS" chapter it attempts to late to challenge the decision adopted by the arbitrators regarding their own competence.

The filing of the claim in the above indicated terms shows a total lack of legal methodology to the extent that arguments of Law are set forth as questions of fact.

If the above were not enough and perhaps in an effort to confuse Your Honor, the legal arguments in the mentioned sections go on for more than 200 pages in a repetitive and confusing manner, challenging questions of substance in the arbitral award issued by the Arbitral Tribunal, as if it were an "appeal" or an "amparo proceeding" against the award and forgetting that according to 1457 of the Commercial Code the causes for which an award can be set aside are exceptional and restrictive and none of them allows the review, modification or setting aside of the reasoning and decisions on the merits adopted in the arbitral award.

As a result of the above, considering the unorganized and confusing form in which PEP's claim is presented, lacking the appropriate legal methodology, and in order to answer each of its allegations and arguments in a precise and organized manner, below Your Honor will find a small table of contents with the structure of this Answer:

III.    ANSWER TO THE BACKGROUND POINTS .......................................................7

IV.    ANSWER TO THE FACTS ................................................................................12

V.   INVALIDITY OF THE CHALLENGE OF THE DECISION ON THE COMPETENCY OF THE ARBITRAL TRIBUNAL TO ISSUE THE AWARD. ...........................................14

3

A)    OBJECTION DERIVED FROM THE INAPPLICABILITY OF ARTICLE 1432 OF THE COMMERCIAL CODE TO REQUEST THE JUDGE TO ISSUE A RULING ON THE VALIDITY OF THE COMPETENCE ASSUMED BY THE ARBITRAL TRIBUNAL. ......................................................14

B) OBJECTION DERIVED FROM THE INAPPLICABILITY OF ARTICLE 1457 OF THE COMMERCIAL CODE TO SUPPORT THE PRESUMED INCOMPETENCE OF THE ARBITRAL TRIBUNAL AS A CAUSE FOR SETTING ASIDE THE AWARD. ......................................................................17

C) OBJECTION DERIVED FROM THE FACT THAT THE ARBITRAL TRIBUNAL IS COMPETENT TO RESOLVE ALL THE DISPUTES ARISING FROM THE CONTRACT, BASED ON THE ARBITRATION CLAUSE. ....................................................................................................19

D) OBJECTION ARISING FROM THE FACT THAT DETERMINING THE VALIDITY OF THE CLAIMS OF COMMISA WAS PART OF THE MISSION GIVEN BY THE PARTIES TO THE ARBITRATORS AND PEP DID NOT OBJECT TO SUCH DETERMINATIONS. THEREFORE, ACCORDING TO ARTICLE 33 OF THE RULES OF THE INTERNATIONAL COURT OF ARBITRATION PEP CONSENTED TO THE COMPETENCY OF THE ARBITRAL TRIBUNAL AND THE VALIDITY OF THE ANALYSIS OF THE TECHNICAL DISPUTES AND LOST ITS RIGHT TO CLAIM THE SETTING ASIDE OF THE AWARD. ....30

VI.    ANSWER TO THE CAUSES FOR SETTING ASIDE AND OTHER ARGUMENTS INVOKED BY THE PLAINTIFF. .....................................................................................35

A)    INAPPLICABILITY OF THE NEW YORK CONVENTION AND THE PANAMA CONVENTION TO THE SETTING ASIDE PROCEEDING INITIATED BY THE PLAINTIFF. ........................................35

B)    OBVIOUS AND INTRINSIC CONTRADICTIONS EXISTING IN THE SETTING ASIDE CLAIM.36

C)    LEGAL IMPOSSIBILITY OF IN THE SETTING ASIDE PROCEEDING ENTERING INTO THE STUDY OF THE MERITS OF THE CASE ALLEGING VIOLATIONS OF PUBLIC POLICY OR OTHER CAUSES FOR SETTING ASIDE. ........................................................................41

D)    THE AWARD IS NOT CONTRARY TO PUBLIC POLICY. .............................................53

1.- The compensation determined by the Arbitral Tribunal in favor of COMMISA is legally and contractually justified. ..........................................................................53

2.- The Contract is not an administrative contract and therefore a surrendering of COMMISA's interest to that of PEP cannot be alleged. ..........................................61

3.- The Arbitral Award did not violate any budgetary provision. ..............................68

4.- The Arbitral Award does not modify the Contract and, therefore, it does not violate Article 70 of the applicable Law of Acquisitions and Public Works. .............84

5.- The orders to pay contained in the Arbitral Award do have a contractual basis and do not refer to payments unforeseen in the Contract.......................................88

6.- The award correctly applies the contractual and civil law provisions and aside from that, its determinations in respect thereto cannot be considered to violate public policy. ...................................................................................................91

7.- The decisions contained in the arbitral award are not incongruent..................102

E)    IN THE ARBITRAL AWARD THE ARBITRATION AGREEMENT WAS NOT INFRINGED BECAUSE THE DISPUTES IT RESOLVES WERE CONTEMPLATED IN IT AND DO NOT EXCEED ITS SCOPE. ......................................................................................................................105

1.- PEP consented and ratified its consent for the Arbitral Tribunal to hear and resolve the claims of COMMISA and, therefore, this cause for setting aside cannot be addressed.................................................................................................106

2.- According to clauses 23.2 and 23.3 of the Contract, the fact that the technical dispute was not presented formally according to the procedure does not imply that the disputes that have survived in relation to such matters are not subject to arbitration.................................................................................................107

3.- The claims related to "technical disputes" 34, 35, 36, 37 and 39 are not true technical disputes under clause 23.2 of the Contract. ...........................................112

4.-    In any case, the scope that the plaintiff attempts to give to the second paragraph of the arbitration clause of the Contract is contrary to article 1797 of the Federal Civil Code and would excuse the necessity of making use of the technical dispute procedure................................................................................................117

5.-    The order to pay financial expenses contained in the arbitral award is valid since it is based on the delay in the payment of the indemnifications determined by the Arbitral Tribunal, as well as the terms of the Contract. ...................................119

F)  DURING THE ARBITRATION AND IN THE FINAL AWARD THE RULES OF ARBITRAL PROCEDURE WERE NOT VIOLATED.................................................................................120

1.-    The concepts of grounding in fact and law established in article 16 of the Constitution are not applicable to an arbitral award, nor to the processing of an arbitral procedure. ...............................................................................................120

2.- The decisions contained in the award are not partial. ......................................126

3.- The decision contained in the award on financial expenses was not based on Equity, but rather on contractual provisions and specific legal provisions. ...........130

G) ANSWER TO OTHER CONSIDERATIONS AND ARGUMENTS USED TO SUPPORT THE SETTING ASIDE OF THE DECISION ON TECHNICAL DISPUTE NUMBER 36........................................130

H) ANSWER TO OTHER CONSIDERATIONS AND ARGUMENTS USED TO SUPPORT THE SETTING ASIDE OF THE DECISION ON TECHNICAL DISPUTE NUMBERS 34 AND 35............................135

1.-     The Arbitral Tribunal has the authority to resolve the substantive questions as it considers best, independently of the arguments of the parties and this does not imply a violation of the arbitration agreement with respect to the rulings in relation to the claims of dispute numbers 34 and 35. ..........................................135

2.-     The Evaluation of the Evidence by the Arbitral Tribunal cannot be Reviewed by the Courts. The Evaluation of the Evidence is a Question of Substance. ........141

3.-     The fact that COMMISA had presented technical dispute numbers 34 and 35 once the works were finished cannot mean that the claim cannot be subject to arbitration...........................................................................................................141

I) ANSWER TO OTHER CONSIDERATIONS AND ARGUMENTS THAT ARE USED TO SUPPORT THE SETTING ASIDE OF THE DECISION ON TECHNICAL DISPUTE NUMBER 19. ........................146

J) VALIDITY OF THE ORDER TO PAY EXPENSES AND COSTS OF THE ARBITRATION. ...........148

As can be appreciated from the above transcribed table of contents, first of all only and exclusively the facts contained in the BACKGROUND chapter, and the few factual references contained in the FACTS chapter of the claim, are answered.

Subsequently, since it is a procedural question, the invalidity is shown of the claim filed before Your Honor on the decisions contained in the Award through which the Arbitral Tribunal resolved its own competence.

Finally, we present the objections, defenses and arguments through which the plaintiff's arguments, confusingly and without legal methodology asserted in its "FACTS" chapter

to support the supposed causes for setting aside the arbitral award that it alleges, are answered.

In this context and in order to allow and facilitate the analysis by Your Honor of this case, in our answer to the setting aside arguments of the plaintiff, we first focus on the general topics which are repeatedly referred to in its claim and thereafter we focus on answering the specific reasoning. **It should also be mentioned at this time that throughout this answer to the claim and only in order to facilitate the following of the arguments of the parties, COMMISA refers to its claims that were resolved in the arbitral award as "Technical Disputes", without this implying that COMMISA considers them or is attempting to fit them under the definition of "Technical Dispute" contained in clause 23.2 of the Contract, since they are claims of a very different nature and characteristics.**

With regard to the background set forth by the plaintiff, below I refer to each of them in the order in which they were presented:

## III.    ANSWER TO THE BACKGROUND POINTS

**I.-**    The background point corresponding to the ancillary claim being answered contains the description of various facts, which we refer to individually as follows:

I.1.- The contents of the first paragraph of Background point I regarding the identification of the contract PEP-O-IT-136/98 (or IPC-28) (hereinafter referred to as the "Contract") are true.

I.2.- The contents of the second paragraph of  Background point I is false and is denied for all legal purposes and with respect to which the following clarifications are made:

a)  With respect to the assertion of the ancillary claim plaintiff saying that *"the Public Works Contract described is an administrative contract since it is regulated by the Law of Acquisitions and Public Works (hereinafter referred to as LAOP) and the Regulation of the Public Works Law, among other administrative rules"*, my principal manifests that this is false because the PEP-O-IT-136/98 (or IPC-28) contract, as will be demonstrated further on, **is not an administrative contract.**

The Contract was executed by PEP as a private entity that responds to the private interests of such entity and that is subject to the Civil Law, as is fully and repeatedly recognized by PEP in its claim to set aside the award.

b)  With respect to the assertion of the plaintiff that states in relation to the Contract that its *"purpose is to pursue a collective interest consisting of a public work, and therefore its performance and its regulation must comply with public policy and the public interest, as can be seen from article 134 of the Constitution and article 1 of the LAOP"*, my principal manifests that it is false that, as will be demonstrated further on: i) the purpose of the contract is to pursue a collective interest; and ii) its performance and its regulation are governed by public policy and the public interest.

**II.-**     The corresponding background point of the ancillary claim being answered regarding the signature of sixteen amendments by PEP and COMMISA, is true.

**III.-**     The corresponding background point of the ancillary claim being answered, **is denied** due to the terms in which it is drafted and my principal manifests that the truth of this fact is contained in the arbitral clause agreed to in the Contract, the text of which is herein referred to for all applicable legal purposes.

**IV.-**     The corresponding background point of the ancillary claim that is answered, **is denied** due to the terms in which it is drafted and my principal manifests that the truth of

this fact is contained in the arbitral award, the text of which is herein referred to for all applicable legal purposes.

**V.-**    The corresponding background point of the ancillary claim being answered, **is denied** due to the terms in which it is drafted and my principal manifests that the truth of the fact is contained in the claims that COMMISA asserted before the Arbitral Tribunal and that were transcribed in the arbitral award in chapter V entitled "Claims of the Parties" – paragraph 80 and following –.

**VI.-**    The corresponding background point of the ancillary claim that is answered, **is denied** due to the terms in which it is drafted and my principal manifests that the truth of this fact is contained in the arbitral award – paragraphs 12 and 79 – the text of which is herein referred to for all applicable legal purposes.

**VII.-**    The corresponding background point of the ancillary claim in question **is denied** due to the terms in which it is drafted and my principal manifests that the truth of this fact is contained in the arbitral award and its text is herein referred to for all legal purposes.

**VIII.-**    The corresponding background point of the ancillary claim in question **is denied** due to the terms in which it is drafted and my principal manifests that the truth of this fact is contained in the Rules of Arbitration of the International Chamber of Commerce and its text is herein referred to for all legal purposes.

**IX.-**    The corresponding background point of the ancillary claim in question is true.

**X.-**    The background point of the ancillary claim in question **is denied** due to the terms in which it is drafted and my principal manifests that the truth of this fact is contained in the Rules of Arbitration of the International Chamber of Commerce.

9

In relation to the name of the advisor in charge of the file in the International Court of Arbitration of the International Chamber of Commerce, it is correct that it was D. José Ricardo Feris.

**XI.-**    The corresponding background point of the ancillary claim in question is true.

**XII.-**    The corresponding background point of the ancillary claim in question is true.

**XIII.-**    The background point of the ancillary claim in question **is denied** due to the terms in which it is drafted.

**XIV.-**    The corresponding background point of the ancillary claim in question **is true.**

**XV.-**    The background point of the ancillary claim in question **is denied** due to the terms in which it is drafted and my principal manifests that the truth of the fact is contained in the arbitration agreement executed by PEP and COMMISA and its text is herein referred to for all legal purposes.

**XVI.-**    The background point of the ancillary claim in question **is denied** due to the terms in which it is drafted and my principal manifests that the truth of the fact is contained in the arbitration agreement executed by PEP and COMMISA and in the Terms of Reference and the texts thereof are herein referred to for all legal purposes.

**XVII.-** The background point of the ancillary claim in question **is denied** due to the terms in which it is drafted and my principal manifests that the truth of the fact is contained in narration in the arbitral award of the proceeding and its text is herein referred to for all legal purposes.

**XVIII.-**The background point of the ancillary claim in question **is denied** due to the terms in which it is drafted. Nevertheless, and considering it essential for this dispute, the following clarifications are made:

10

a)  Clause 23.3 of the Contract establishes the following:

> "23.3 Arbitration. **Any controversy**, claim, difference or dispute that arises or is related to or linked with this contract or the breach thereof, will be **definitively** resolved by arbitration conducted in the Federal District, Mexico City, according to the Rules of Conciliation and Arbitration of the International Chamber of Commerce that are in force at that time. The number of arbitrators will be three and the arbitration will be conducted in Spanish. Notwithstanding the above, any technical dispute **shall be submitted previously to the procedure set forth in Clause 23.2 and only if the parties cannot reach an agreement by such procedure**, will they be authorized to make use of the recourse established in Clause 23.3".

As can be seen from the transcribed clause, **any controversy** related to the contract must be finally resolved by arbitration.  In this context, it is clear that the scope of the clause is broad and not restricted as PEP now asserts without basis.

Thus the drafting of this clause does not show, as argued by the plaintiff, that those controversies that were not submitted to the procedure of clause 23.2 are not under the jurisdiction of the Arbitral Tribunal.

On the contrary, the arbitral clause determines that **all** the controversies arising from the contract will be resolved by arbitration since the clause does not establish any limitation with respect to which controversies the Arbitral Tribunal can hear.

**XIX.-**  The corresponding background point of the ancillary claim in question **is true.**

**XX.-**  The background point of the ancillary claim in question **is denied** due to the terms in which it is drafted and my principal manifests that the truth of the fact is contained in the arbitral award – pages 163 and 164 – and its text is herein referred to for all legal purposes.

11

**XXI.-** The background point of the ancillary claim in question **is denied** due to the terms in which it is drafted and my principal manifests that the truth of the fact is contained in the arbitral award and in the dissenting vote issued by the co-arbitrator Mr. Darío Oscós Coria.

However, in this respect it is clarified that Your Honor does not have the authority to analyze the arguments that the co-arbitrator presents in his dissenting vote regarding why he dissents in relation to the order to pay financial expenses and the expenses incurred in the arbitration. This is based on article 1457 of the Commerce Code which, while establishing restrictively and as an exception the causes for setting aside an award, prevents the Judge hearing the setting aside proceeding from analyzing the legal and substantive aspects of the award.

**XXII.-** The corresponding background point of the ancillary claim in question **is denied** since as will be shown herein, the arbitral award is not null and void.

## IV.    ANSWER TO THE FACTS

With regard to the facts, below I refer to each of them in the order in which they were presented, referring clearly to the name that the plaintiff herein attributed to them.

The above is important given that the facts were presented in chapters or topics and without following any logical numeric order:

**I.-** Each and every one of the factual assertions contained in fact I called by the plaintiff *"Causes for Setting Aside the Final Award in relation to the decision of Technical Dispute 36: Bad weather in the works of the Castoro 10 and the Bar Protector"*, are denied. Specifically, it is false, as will be shown herein, that the arbitral award is null and void.

**II.-** Each and every one of the factual assertions contained in fact II called by the plaintiff herein *"Causes for Setting Aside the Final Award in relation to the decision on Disputes 34 and 35: Waiting times for the delay in the commencement of the Works of the Castoro 10 and the Bar Protector"*, are denied. Specifically, it is false, as will be shown herein, that the arbitral award is null and void.

**III.-** Each and every one of the factual assertions contained in fact III called by the plaintiff herein *"Causes for Setting Aside the Final Award in relation to the decision on Disputes 37 and 39 regarding Crossings"*, are denied. Specifically, it is false, as will be shown herein, that the arbitral award is null and void.

**IV.-** Each and every one of the factual assertions contained in the fact in question and that is part of the Chapter confusingly and erroneously called: "*III. OTHER DISPUTES"* and that was called by the plaintiff "*1. Technical Dispute 19: Claims for Obstructions"*, are denied. Specifically, it is false, as will be shown herein, that the arbitral award is null and void.

**V.-** Each and every one of the factual assertions contained in the fact in question and that is part of the Chapter confusingly and erroneously called: "*III. OTHER DISPUTES"* and that was called by the plaintiff "*2. Technical Dispute 27: costs for the difference in rates of waiting time of the Castoro 10 in platform Works"*, are denied. Specifically, it is false, as will be shown herein, that the arbitral award is null and void.

**VI.-** Each and every one of the factual assertions contained in the fact that is answered and that was called by the plaintiff "V. *Financial Expenses"*, are denied.  Specifically, it is false, as will be shown herein, that the arbitral award is null and void.

**VII.-** Each and every one of the factual assertions contained in the fact that is answered and that was called by the plaintiff "VI. *Examination of the Causes for Setting Aside the Award"* are denied.  In this fact, PEP summarizes the causes for setting aside that it

considers to be present in the final award, in relation to which my principal further on will analyze specifically why the arbitral award is not null and void.

**VIII.-** Each and every one of the factual assertions contained in the fact that is answered and that was called by the plaintiff "VII. *Costs Incurred in the Arbitration",* are denied.  In this fact, PEP argues that the determination by the Arbitral Tribunal to order PEP to pay COMMISA the costs incurred in the Arbitration was not issued according to law. In this respect, my principal manifests that Your Honor is not competent to analyze this question since it is a substantive decision and, in addition, the plaintiff does not present a cause for setting aside in this fact, and therefore Your Honor does not have jurisdiction to study the fact to which we refer.

**IX.-** Each and every one of the factual assertions contained in the fact that is answered and that was called by the plaintiff "VIII. *Jurisdiction of the Arbitral Tribunal",* are false and are denied.


**V.    INVALIDITY OF THE CHALLENGE OF THE DECISION ON THE COMPETENCY OF THE ARBITRAL TRIBUNAL TO ISSUE THE AWARD.**


**A)    OBJECTION DERIVED FROM THE INAPPLICABILITY OF ARTICLE 1432 OF THE COMMERCIAL CODE TO REQUEST THE JUDGE TO ISSUE A RULING ON THE VALIDITY OF THE COMPETENCE ASSUMED BY THE ARBITRAL TRIBUNAL.**

Article 1432 on which the plaintiff bases its argument that Your Honor review and rule on the decision adopted in the final award by the Arbitral Tribunal with respect to its own competence is not applicable to this specific case.

As can be seen from the claim, in particular from sections VI and VIII in which the plaintiff challenges the jurisdiction of the Arbitral Tribunal, the plaintiff bases the validity of its action on the provisions of article 1432 of the Commercial Code.

The plaintiff specifically argues based on such article that it has the authority to challenge the ruling of the Arbitral Tribunal on its own competence. This assertion is incorrect.

The cited article 1432 of the Commercial Code establishes the following:

> **Article 1432** An arbitral tribunal has the authority to determine its own jurisdiction and rule on any defenses regarding the existence or validity of an agreement for arbitration.  For such purpose the arbitration clause in a contract shall be deemed an agreement independent of all other stipulations in the contract.  A determination by an arbitration tribunal declaring a contract null and void shall not void the arbitration clause
>
> The defense of lack of jurisdiction of the arbitration tribunal must be raised before the filing of the answer.  The parties shall not be barred from asserting this defense by virtue of having appointed an arbiter or participated in his appointment.  The defense that the tribunal exceed its authority must be asserted as soon as it is raised or when it so appears during the arbitration proceeding.  The tribunal may, however, in either case consider a defense of proceeding.  The tribunal may, however, in either case consider a defense of this nature raised after the time for it has expired if it finds the delay justified.
>
> The arbitration tribunal may resolve the defenses referred to in the preceding paragraph a prior or in the final award on the merits.  **If prior to the issuance of its final award the tribunal declares itself competent, either party may petition a judge to review the foregoing within thirty (30) days after receiving notice of the declaration,** and his decision shall be non-appealable.  While such petition is pending, the arbitration tribunal may continue to act until an award is entered.
>
> (Emphasis added)

As shown from the above transcription, the Commercial Code gives the opportunity to the parties to challenge before a state court the decision issued with respect to the competence of the Arbitral Tribunal, only and exclusively in **those cases in which the**

15

**Arbitral Tribunal decides on its own competence before deciding on the merits of the case and within a limited term of thirty days**.

In this context the petition of the plaintiff is unfounded.

In effect, according to article 1432 of the Commercial Code, PEP could have only challenged the decision on the competence of the Arbitral Tribunal if such Tribunal had adopted a preliminary award prior to the issuance of the definitive award on the merits of the case. Furthermore, PEP had one month from when the Arbitral Tribunal decided on its competence to challenge it.

Thus, if the plaintiff intended to challenge the competence of the Arbitral Tribunal before a state court in any case it should have done so within the month following the date on which the Arbitral Tribunal first indicated its competence, which occurred upon the issuance of the Terms of Reference on October 25, 2002.

Obviously, PEP did not challenge the competence assumed in the Terms of Reference by the Arbitral Tribunal within the month following October 25, 2002, and therefore it is clear that it consented to the competence indicated therein, as is shown from the text of the Terms of Reference transcribed in subsection B) of this section (page 26 of this Answer).

In effect, the Terms of Reference is a document signed by the parties and above all by the Arbitral Tribunal in which all the participants consent on the points of fact and law that will be addressed in the arbitration. In this context, this document is equivalent to a consensual decision on the scope of the competence and jurisdiction of the Arbitral Tribunal. Thus if it is intended to challenge the competence of the Arbitral Tribunal now, such intention is clearly extemporaneous.

**Therefore, considering that the decision of the Arbitral Tribunal on its own competence is contained in a definitive award that rules on the merits of the case**

16

**and, also considering that in any case PEP did not challenge the decision on the competence of the Arbitral Tribunal within the term of one month set forth in article 1432 of the Commercial Code, it is clear that the petition of the plaintiff based on such provision is without grounds.**

**B) OBJECTION DERIVED FROM THE INAPPLICABILITY OF ARTICLE 1457 OF THE COMMERCIAL CODE TO SUPPORT THE PRESUMED INCOMPETENCE OF THE ARBITRAL TRIBUNAL AS A CAUSE FOR SETTING ASIDE THE AWARD.**

Article 1457 of the Commercial Code does not establish as a presumption for setting aside the incompetence of the Arbitral Tribunal.

The claim of the plaintiff has no legal basis in view of the fact that as shown from its claim, its action is intended to obtain the setting aside of the arbitral award based on the argument that the Arbitral Tribunal lacked competence to take up and resolve anything related to those technical disputes that were not submitted by the contractor to the procedure established in clause 23.2 of the contract.

Such support of the claim of the plaintiff is illegitimate in view of the fact that the only premises for setting aside an arbitral award are those set forth in article 1457 of the Commercial Code and **the incompetence of the Arbitral Tribunal is not among them**.

Such article establishes the following:

> **"Article 1457** Arbitration awards may only be voided by a judge of competent jurisdiction if:
>
> **I.-** The party requesting it proves that:
>
> a) One of the parties to the arbitration agreement was subject to a legal disability; the agreement is invalid pursuant the laws that were

17

designated;   or if no other laws were designated, is invalid under Mexican law;

b) He was not given proper notice of the designation of one of the arbiters or of the arbitration proceedings, or was impaired by any other reasons to assert his rights;

c) The award refers to a controversy which was not foreseen in the arbitration agreement, or contains determinations that exceed its scope. If the dispositions in the award that exceed the scope of the submitted issues can be separated from those that do not, only the former shall be void; or,

d) The panel of the arbitration procedures were not in accord with the agreement between the parties, unless such agreement is in conflict with provisions of this Title which the parties cannot waive; or, in the absence of such an agreement, the proceedings were not in conformity with this Title; or,

**II.-** The judge finds that in accordance to Mexican law, the object or the controversy is not subject to arbitration, or the award is contrary to public policy."

The argument of the plaintiff regarding competence does not fall under any of the above transcribed premises of article 1457 of the Commercial Code; therefore, it cannot be considered that the issue of competence can provoke the setting aside of the award.

From a simple reading of the cited article it can be seen that an arbitral award can be set aside for various reasons. The majority of them have to do with the parties having an opportunity to present their defense, that the agreement to arbitrate is valid, that the dispute is a matter that can be resolved by arbitration or that the award is not contrary to public policy.

However, none of them establish as a cause for setting aside that the Arbitral Tribunal is incompetent, and therefore the claim for setting aside of the plaintiff based on its

presumed lack of competence has no legal basis and, in that regard, must be declared invalid.

**C) OBJECTION DERIVED FROM THE FACT THAT THE ARBITRAL TRIBUNAL IS COMPETENT TO RESOLVE ALL THE DISPUTES ARISING FROM THE CONTRACT, BASED ON THE ARBITRATION CLAUSE.**

The plaintiff argues that the Arbitral Tribunal lacks competence to hear the claims related to technical disputes that were not duly presented, and disputes that, in its opinion, cannot be submitted to the competence of the Arbitral Tribunal because contractually they are not seen as indemnifiable expenses.

Such arguments are incorrect because they confuse the concept of competence with validity.

The competence of the Arbitral Tribunal is the authority such body has to decide a dispute. In this regard it is relevant to emphasize that the power of the Arbitral Tribunal to decide on its own competence is established in the principle of autonomy of the arbitration clause.

According to this principle, regardless of the validity or existence of the original contract, and of the claims derived from it, the arbitration agreement survives as an independent and valid agreement *per se*.

This principle of the autonomy of the arbitration clause is recognized by the first paragraph of article 1432 of the Commercial Code which provides the following:

> **"Article 1432** An arbitral tribunal has the authority to determine its own jurisdiction and rule on any defenses regarding the existence or validity of an agreement for arbitration.  **For such purpose the arbitration clause in a contract shall be deemed an agreement independent of all other stipulations in the contract.**  A

19

> determination by an arbitral tribunal declaring a contract null and void shall not void the arbitration clause."

> (Emphasis added)

As a consequence of the principle of autonomy of the arbitration clause it is clear that the Arbitral Tribunal constituted based on it has the authority to determine its own competence to hear and resolve the disputes that are presented to it and that are within the scope and purpose of such clause, independently of whether or not the particular claims of each party to the disputes are found to be valid.

**In this context it is necessary to clearly distinguish the competence of the arbitral tribunal to resolve a particular claim from the validity of such claim.**

The validity of a claim refers to the existence of necessary presumptions that verified allow the tribunal to study the merits on which the claim is based.

According to the plaintiff, based on clause 23.3 of the Contract, the Arbitral Tribunal lacks competence to hear the disputes for which the procedure established in clause 23.2 has not been followed.

Such assertion of the plaintiff is without basis as can be seen from the interpretation of the arbitration clause established in clause 23.3 of the Contract which is transcribed below.

> "23.3 Arbitration. **Any controversy**, claim, difference or dispute that arises or is related to or linked with this contract or the breach thereof, will be **definitively** resolved by arbitration conducted in the Federal District, Mexico City, according to the Rules of Conciliation and Arbitration of the International Chamber of Commerce that are in force at that time. The number of arbitrators will be three and the arbitration will be conducted in Spanish. Notwithstanding the above, any technical dispute **shall be submitted previously to the procedure set forth in Clause 23.2 and only if the parties cannot reach an agreement by such**

20

**procedure**, will they be authorized to make use of the recourse established in Clause 23.3".

As can be seen from the transcribed clause, any dispute related to the contract must be resolved definitively by arbitration. However, in some cases, such as those in which technical disputes are involved, prior to the arbitration the parties must first go through the procedure established in clause 23.2 of the Contract. If the parties do not reach an agreement under this procedure, then they may go to arbitration.

The drafting of this clause does not establish, as the plaintiff claims, that those disputes that have not been submitted to the clause 23.2 proceeding are not subject to the competence of the Arbitral Tribunal.

On the contrary, the arbitration clause determines that **all** the disputes arising from the contract shall be resolved by arbitration. The clause does not establish any limitation with respect to which disputes the Arbitral Tribunal can hear.

The only condition the arbitration clause may establish refers to the requirement that the parties make use of a technical dispute procedure **during the execution of the work**, instead of going to arbitration. However, this does not imply that the disputes between the parties that may arise from a technical dispute cannot be resolved in arbitration, including the particular circumstance consisting of the verification as to whether or not the contractor used the procedure to resolve a technical dispute established in clause 23.2 of the contract.

This implies that the Arbitral Tribunal is also competent to decide if the contractor correctly followed the technical dispute procedure or not. Contrary to what the plaintiff argues, the fact that the contractor may have not exhausted the technical dispute procedure established in clause 23.2 does not generate the lack of competence of the Arbitral Tribunal.

21

As has been indicated, the competence of the tribunal is the authority it has to definitively decide the disputes, in this case **all the disputes** arising between the parties. The procedural conduct of the parties during the execution of the work can not be a reason for limiting the competence of the Arbitral Tribunal. In this regard, the first paragraph of the arbitration clause is very clear in establishing that the parties agreed that all the disputes arising from the Contract would be submitted to the Arbitral Tribunal.

In this regard it is relevant to take into consideration the rules of contractual interpretation established by articles 1851, 1852, 1853, 1854, 1855 and 1857 of the Federal Civil Code.

According to such rules that are basically two forms of interpreting contracts, one of them following the subjective method, which is to say determining what was the true intention of the parties based in principle on the literal meaning of the contract clauses, the clear intention of the contracting parties.

Such method also determines that however general the terms of a contract, they should not be understood to include different things and different cases from those on which the interested parties intended to contract and that the clauses must be interpreted as a whole, attributing to unclear ones the meaning that makes sense in the context of the others.

Furthermore, from the principles invoked it can be seen that the conduct of the parties before, during and in the execution phase of the contract is relevant as a means of interpretation, by reason of the principle of the coherence and continuity of the contract. To use such interpretation, the acts of the parties must have relevance in relation to the contractual will that has been deduced from them and with the purpose of the contract.

It is also essential that these acts are common or that, if they are executed by just one party, there is an express or tacit acceptance of the other party. This "interpretive

22

behavior" sheds light on the true intention of the contracting parties with respect to the scope they wanted to give the agreement to which they agreed to be subject.

The other method of interpretation follows an objective criterion, which does not refer to the conduct of the parties and leaves to interpretation a line of thinking directed toward the determination of the meaning of the terms of the contract.

In this regard, article 1857 of the cited law follows this methodology and determines that when it is absolutely impossible to resolve the doubts by the rules established in the preceding articles, if such doubts have to do with incidental circumstances of the contract, and the contract is gratuitous, they will be resolved in favor of the lesser transfer of rights and interests; if the contract is onerous the doubt will be resolved in favor of the greater reciprocity of interests.

The same provision establishes that if the doubts whose resolution is in question in such article fall under the principal purpose of the contract, such that it cannot be determined what was the intention or the will of the contracting parties, the contract will be null and void.

In this respect, it must be understood that when there is no doubt about the clarity of the terms of a contract, its clauses must be interpreted **broadly** in order that its obligational content have full effect.

> **"Registry No.** 174760
> **Location:**
> Ninth Period
> Instance: Collegiate Circuit Courts
> Source: Judicial Weekly of the Federation and its Gazette
> XXIV, July 2006
> Page: 1177
> Decision: I.6o.C.402 C
> Isolated Decision
> Matter(s): Civil
>
> **CONTRACTS. THEORY OF THE PREEMINENCE OF THE WILL OF THE PARTIES IN CONTRACTS.**  From the interpretation of article 1851 of the Civil Code for the Federal District, two

23

hypotheses can be seen that should be applied to contracts in order to determine their legal scope, which are the literal meaning of its provisions and the **intention** of the contracting parties. However, from the second paragraph is gleaned the contents of the theory of the preeminence of the will of the contracting parties, which is placed above the material expression and which addresses objective factors independent from the **intention** of the interested parties, which is deduced from the conduct displayed by the contracting **parties** before, during and in the phase of execution of the **contract**. Therefore, from the evidence offered by the **parties**, the elements extrinsic to the **contract** must be considered in order to decipher the true **intention** of the **parties**, which is preeminent to its literal contents.

SIXTH COLLEGIATE COURT IN CIVIL MATTERS OF THE FIRST CIRCUIT.

Direct amparo 5106/2005. Eduardo Yedid Cohen. 18 August 2005. Unanimous vote. Drafting judge: Gustavo R. Parrao Rodríguez. Secretary: Abraham Mejía Arroyo."

The following analyses of the federal courts support the above:

"Registry No.: 385,432
Isolated decision
Material(s): Civil
Fifth Period
Instance: Auxiliary Chamber
Source: Judicial Weekly of the Federation
CXVI
Decision:
Page: 325

**CONTRACTS, THEIR INTERPRETATION.** The will of the parties is the supreme law in contracts, except in cases involving the public interest; and according to the interpretive rules applicable to them, if the terms of a contract are clear and there is no doubt regarding the intention of the contracting parties, the literal meaning of its clauses will govern.

Direct civil amparo 10059/49. Garza Félix S. 2 June 1953. Unanimous five votes. The publication does not mention the name of the drafting judge."

Registry No.: 214,023
Isolated decision
Material(s): Civil
Eighth Period
Instance: Collegiate Circuit Courts
Source: Judicial Weekly of the Federation

XII, December 1993
Decision:
Page: 847

"**CONTRACTS. THEIR INTERPRETATION**. For the correct interpretation of contracts, the will of the parties takes precedent over their material expression. Since according to article 1680 of the Civil Code in force in the State of Mexico, if the terms of a contract are clear and leave no doubt about the intention of the contracting parties, the literal meaning of its provisions should prevail, but if the words seem contrary to the clear intention of the parties, the intention will prevail over the words. In this case, the nature of a contract does not depend on its designation, but rather on the facts and acts included in it, in relation to the applicable legal provisions."

FIRST COLLEGIATE COURT OF THE SECOND CIRCUIT.

Direct amparo 325/93. Consuelo Pérez Vda. de Vergara. 25 May 1993. Unanimous vote. Drafting judge: Raúl Díaz Infante Aranda. Secretary: Rigoberto F. González Torres.

This decision restated the criteria upheld in the Court Precedent 108, visible at pages 302 and 303, Fourth Part, Third Chamber of the Court Precedent Appendix 1917-1985."

In the case in question, as established in clause 23.3 of the Contract, the parties agreed that **all the disputes** arising from the contract shall be **definitively resolved** by arbitration.

The drafting of the clause is very clear in regard to the intention of the parties that each and every one of the disputes be resolved in arbitration. This should also be understood broadly.

The commercial practices that become specific contractual obligations generally set forth the intention of the contracting parties including **a practical business view.**

Consistent with this practical business view, it is common for the contracting parties to decide to submit **all of their disputes to resolution by an arbitration agreement**.

25

This is consistent in view of the fact that all the possible disputes arising from a contract come from the same regulatory cause which is the principal contract. Thus it is logical, consistent, practical and the least costly that it be a single arbitral tribunal that decides a possible accumulation of disputes through an arbitral proceeding.

In this specific case, as can be seen from the reading of clause 23.3 of the contract, **it literally** indicates that **all** the disputes arising from the contract must be resolved in arbitration.

Furthermore, beyond the literal text, the common practice of the parties, as well as **their intention and reasoning** indicate that it was truly the intention of the parties to submit all of their disputes to an arbitral tribunal.

The above is not impeded, as the plaintiff attempts to argue, by the fact that the second paragraph of the cited article establishes a conciliation mechanism prior to arbitration.

This is due to the fact that neither in that clause nor in any other obligational content agreed to by the parties is there any provision that either expressly or by valid interpretation leads to the conclusion that the failure to exhaust the conciliation proceeding implies that any related claim is outside of the scope of the arbitration agreement.

In the clause in question, the parties **did not expressly agree** that the failure to submit to the technical dispute procedure **implies its inarbitrability**. There is no literal element in the clause that could generate doubt on the force of its first paragraph in which it is indicated that **all** disputes shall be **definitively** resolved by arbitration.

There is also no valid interpretation that would allow for the conclusion that the intention of the parties was to divide the disputes at a given time and exclude some from the arbitration clause simply because the technical dispute procedure was not exhausted.

26

To presume this would imply accepting that the parties agreed to bifurcate the resolution of their disputes and submit some to arbitration and others to the competent domestic courts. There is no other possibility, either the dispute is resolved through arbitration or through a trial before a domestic court.

If this were the case, it would have been consistent with the will of the parties to include a clause that indicated **which courts would be competent** in case any dispute was outside of the scope of the arbitration clause. However, there is no provision in the contract that provides for such a circumstance.

In addition, as has been said, this would be contrary to the literal meaning of the clause which uses categorical words such as **"all"** and **"definitively"**. This would also be inconsistent with the practical nature and efficiency of arbitration for which parties commonly choose to submit their disputes to an arbitral proceeding.

As has been said, it is logical that the parties to a contract of this nature would choose a holistic resolution of their disputes and not bifurcate them which would run the risk of having **contradictory interpretations** of the same contract and the same obligations.

Accepting the possibility that both an arbitral tribunal and a domestic court can be asked to interpret the same contract opens the door to the possibility of contradictory decisions, maybe not on the same dispute, but on general questions of the contract that at a given time could generate the inoperability of the clause and of the dispute resolution mechanism originally elected by the parties.

Thus, this court should consider that the claims of the plaintiff rely on improbable circumstances and interpretations of the arbitral clause.

Furthermore and as a logical conclusion of what has been explained it should be considered that from a strict interpretation of the arbitral clause, the Arbitral Tribunal is also competent to determine if the parties correctly submitted to the technical dispute

27

procedure established in clause 23.2 of the Contract. In addition, the Arbitral Tribunal is competent to determine the exact scope of the second paragraph of the arbitral clause. It also corresponds to the Arbitral Tribunal to determine the legal scope of the possible failure of the contractor in relation to submitting a dispute to the technical dispute procedure.

In this specific case, the Arbitral Tribunal correctly decided these questions and in the legal exercise of its competence determined that the claims of COMMISA were valid.

In addition, the interpretation of the plaintiff is incorrect in trying to give it a scope similar to the arbitration clause, given that there is no provision in the arbitration clause that indicates that the Arbitral Tribunal loses its competence over the dispute due to the sole fact that the contractor did not follow the procedure established in clause 23.2 of the Contract. To accept this interpretation would lead to the absurd result that the Arbitral Tribunal resolves that a particular claim is not valid because it does not comply with clause 23.2 of the Contract, in spite of the fact that precisely for not having complied with such clause of the Contract it could not resolve that claim.  In other words, the Arbitral Tribunal would be deciding on the invalidity of a claim and at the same time such invalidity would make it incompetent, thereby nullifying its determination in that respect.

Moreover, the plaintiff attempts to give clauses 23.3 and 23.2 a scope that they do not have given that the nature of 23.2 is different from what the plaintiff argues.

The nature of clause 23.2 has the purpose of promoting a settlement between the parties **during the execution of the work** so that the parties can reach an agreement quickly that allows them to continue with the works and prevents the formal establishment of a proceeding that could imply greater delays on the work or even its total suspension.

Clause 23.2 of the contract requires the following:

28

"23.2 Technical Disputes. The contractor will not have the right to make any claim and PEP will not be liable for legal (including negligence) or contractual damages before the Contractor, its secondary suppliers or subcontractors, except in the cases specifically set forth in this Contract.

For purposes of this clause a Technical Dispute shall be understood as any difference that arises for any claim or that is attributable to the interpretation or execution of this contract, with the Technical Exhibits of the Contract (A, B, B-1, B-2, B-3, CEV, DT, DT-1, DT-2.1, DT-3, DT-4, E-2, F-1 and F-2)

If for any reason the Supervisor and the contractor do not agree on the interpretation to resolve an adjustment claim arising from a Technical Dispute, the Contractor shall make such Technical Dispute formally in writing to the Supervisor and request the corresponding decisions from the latter. This type of request of the contractor shall be clearly identified indicating that it is a Technical Dispute subject to resolution under this Clause 23, containing a summary of the facts in dispute and the proposal of the Contractor to resolve them …"

As can be seen from the transcribed clause, the procedure of clause 23.2 is for the parties to resolve certain technical disputes in a friendly manner during the execution of the works. However, neither its drafting nor the drafting of the arbitration clause in clause 23.3 establishes that the failure of the contractor to present the formal technical dispute request subsequently prevents the presentation of the claim in arbitration.

In this regard, the only effect of clause 23.3 in relation to clause 23.2 is the limitation consisting of that prior to the filing of any claim related to a technical dispute, the parties must attempt to **reach an agreement** through the formal technical dispute procedure.

As has been indicated, the reason for the dispute resolution mechanism by an agreement submitted from the technical dispute is to encourage the parties to reach an agreement during the execution of the work. However, this does not mean that any indemnification that the contractor had a right to claim could no longer be claimed in arbitration once the work was finished, if the technical dispute was not timely followed.

29

As can be seen from the analyzed clauses, the intention of the parties was not to establish a mechanism to exclude the competence of the Arbitral Tribunal; rather in all cases its only intention was to establish a mechanism prior to arbitration so that the parties could attempt to resolve their disputes related to technical disputes, by agreement, before going to arbitration.

**Therefore, it must be considered that all the causes of nullity on which the plaintiff bases the incompetence of the Arbitral Tribunal are unfounded and in this regard Your Honor should declare the invalidity of the claims of PEP.**

**D) OBJECTION ARISING FROM THE FACT THAT DETERMINING THE VALIDITY OF THE CLAIMS OF COMMISA WAS PART OF THE MISSION GIVEN BY THE PARTIES TO THE ARBITRATORS AND PEP DID NOT OBJECT TO SUCH DETERMINATIONS. THEREFORE, ACCORDING TO ARTICLE 33 OF THE RULES OF THE INTERNATIONAL COURT OF ARBITRATION PEP CONSENTED TO THE COMPETENCY OF THE ARBITRAL TRIBUNAL AND THE VALIDITY OF THE ANALYSIS OF THE TECHNICAL DISPUTES AND LOST ITS RIGHT TO CLAIM THE SETTING ASIDE OF THE AWARD.**

As can be seen from the arbitration claim filed by COMMISA, as well as the answer to the claim filed by PEP a disputed point in the arbitration was regarding whether COMMISA followed the procedure established for claims regarding technical disputes.

Such points were debated by the parties in the arbitral proceeding because PEP **established such question as an exception** of validity, not as an exception or defense of competence.

In the terms of reference, the Arbitral Tribunal determined it was necessary to resolve such questions as elements of validity. This implies that PEP **consented** that the questions regarding the technical dispute procedure are requirements of validity of the

30

claim but not questions regarding the competence of the Arbitral Tribunal nor questions that can be considered external or unrelated to the arbitration agreement.

**At the end of the terms of reference the parties signed expressing agreement with the terms of such document.**

In this regard, it must be considered that the plaintiff was in agreement and consented that the Arbitral Tribunal has competence to hear and resolve on the nature and interpretation of compliance of the parties regarding technical disputes.

As can be seen from the terms of reference, the Arbitral Tribunal determined the following:

> (b)     **Points in dispute related to the competence of the Arbitral Tribunal and requirements of prosecutability:**
>
> 1.     (a) Are all the claims and petitions formulated by the Claimant in its claim and by the Respondent in its counterclaim a *"Controversy, claim, difference or dispute that arise from or are related or linked to the Contract or its breach"* (as required by clause 23.3 thereof), and is the Arbitral Tribunal competent to resolve them?
>
> (b) Is the Arbitral Tribunal competent to declare the compensation of the rights claimed in this arbitration arising from Contract EPC-28, with obligations originating from other contracts executed by Claimant and Respondent?
>
> 2.     (a) Is any of the claims or petitions formulated by the Claimant a technical dispute, as this concept is defined in the Contract EPC-28?
>
> (b) If the answer to the above question 2. (a) is yes, have such technical dispute(s) been submitted to the procedure established in clause 23.2 of the Contract?
>
> (c)     If the answer to the above question 2. (a) is no, what would be the consequence for purposes of this arbitration?

At the end of the terms of reference, the parties signed in agreement as is shown below:

> I)     **Declarations of the parties**
>
> Both parties declare that:
>
> (i)     The persons that sign these Terms of Reference on behalf of the parties are duly authorized by virtue of the powers of attorney described below each signature and bind their grantors.

31

(ii)    The signing of the Terms of Reference does not require any administrative authorization.

As an expression of their consent, they sign it in six copies, one for the Claimant, one for the Respondent, three for the Tribunal and one for the Secretariat of the ICC, in Mexico City, Federal District, on September 6, 2005. The Respondent states for the record that the signing of the Terms of Reference does not imply any waiver of the allegations on lack of jurisdiction and competence of the Arbitral Tribunal filed by it, and those referred to in section D (b) of this document, and that they will be resolved by the Tribunal itself.

**PARTES**

CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V.

Por Poder

Nombre del representante: _Christopher Boivella_

Fecha y descripción de los poderes: _2 Sept 05 Public Deed 53 727_

PEMEX-EXPLORACIÓN Y PRODUCCIÓN

Por Poder

Nombre del representante: _Jaime Duarte Aispuro._

Fecha y descripción de los poderes: _Escritura Pública 8710, Fecha 25-octubre-2002._

In the arbitral award, the Tribunal resolved consistently with the mission entrusted to it by the parties in the following manner:

*"The Tribunal arrives to the conclusion that:*

*-The principal petition of the Claimant consisting of 39 Technical Disputes, **which were correctly submitted to the procedure established in clause 23.2 of the Contract, arbitration remaining open for its claim**;*

*-The claims set forth by the Respondent in a counterclaim and the claim for extension of the term set forth by Commisa in its Conclusions Writ, do not need to be submitted to the procedure*

32

*established in clause 23.2 of the Contract, since they were presented after the work was finished and the Supervisor discharged;*

*-The accessory claims follow the fate of the principal claims from which they arise;*

*and that, therefore, there is no impediment to resolving on the merits of the claims."*

According to the text transcribed above, it is clear that the plaintiff consented that the Arbitral Tribunal had competence to resolve on the validity of the technical disputes and that these questions were contemplated in the arbitration agreement.

If the plaintiff agreed with such questions and consented to the competence of the Arbitral Tribunal and the scope of the arbitration agreement, then it cannot now be considered valid that it attempts to annul the award exactly with such arguments.

Article 33 of the Rules of Arbitration of the Chamber of Commerce applicable to this case specifically establishes this consequence. Such article states the following:

> **"Article 33**
> **Waiver**
> A party which proceeds with the arbitration without raising its objection to a failure to comply with any provision of these Rules, or of any other rules applicable to the proceedings, any direction given by the Arbitral Tribunal, or any requirement under the arbitration agreement relating to the constitution of the Arbitral Tribunal, or to the conduct of the proceedings, shall be deemed to have waived its right to object."

According to article 33, the Rules of Arbitration of the International Chamber of Commerce contain a procedural safeguard to ensure that the parties agree with the terms of the arbitral proceeding, with the provisions of the rules, with the orders of the Arbitral Tribunal and with the stipulations contained in the arbitration agreement.

The same article provides that if the parties do not **object during the arbitral proceeding,** with regard to the procedural orders and other questions, including among them the scope of the arbitration agreement, it is understood that they have abandoned their right to object to them later.

As has been indicated previously, in the arbitration agreement, the parties agreed to consider applicable for the resolution of their disputes the Rules of Arbitration of the International Chamber of Commerce. Therefore, what is determined in article 33 is binding on them.

Thus, as has been indicated, if in the terms of reference PEP accepted that the questions regarding the validity of the claims related to the technical disputes were resolved by the Arbitral Tribunal, then it **consented** to such determination in terms of article 33 and **lost its right to object to it**.

Therefore, if the claimant consented to the **competence** of the Arbitral Tribunal, with the possibility that the tribunal **study the validity** of the claims related to the technical disputes, and with the **terms of the arbitration agreement** in that regard, then it cannot now validly attempt to nullify the arbitral award based on the mentioned arguments.

Finally it should be indicated that these determinations of the Arbitral Tribunal cannot in any manner violate the guarantee of due process established in article 16 of the Constitution, for the simple reason that an arbitral award cannot violate due process rights.  In this regard, alleging as PEP does that the determinations of fact and law of the Arbitral Tribunal are incorrect is not a valid argument to attempt to annul an arbitral award, since as explained throughout this answer, the substance of the award cannot be reviewed by a state Court.

Therefore this objection should be considered grounded and the action should be declared invalid and ungrounded.

34

## VI.    ANSWER TO THE CAUSES FOR SETTING ASIDE AND OTHER ARGUMENTS INVOKED BY THE PLAINTIFF.

**A) INAPPLICABILITY OF THE NEW YORK CONVENTION AND THE PANAMA CONVENTION TO THE SETTING ASIDE PROCEEDING INITIATED BY THE PLAINTIFF.**

First of all and given the inaccuracy in some of the legal grounds invoked by the plaintiff to support its claim, we will demonstrate to Your Honor that several of the laws mentioned in the setting aside claim are incorrect.

In this regard, the plaintiff invokes the Convention on the Recognition and Enforcement of Foreign Arbitral Awards adopted in New York, United States of America in 1958, to try to support and establish grounds for its causes for setting aside. However, this convention is not applicable to this case.

In effect, according to article 1 of such Convention, it is applicable only with respect to:

i)    Recognition and enforcement of arbitral awards; and

ii)   Only in relation to arbitral awards considered foreign because they were issued in a State other than the one in which the recognition and enforcement is requested.

Such article expressly indicates the following:

> **"Article 1**
>
> 1. This Convention **shall apply to the recognition and enforcement of arbitral awards made in the territory of a State other than the State where the recognition and enforcement of such awards are sought**, and arising out of differences between persons, whether physical or legal. It shall also apply to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought."

(Emphasis added).

35

Therefore, considering that the action filed by the plaintiff is a setting aside action and not an action for recognition and enforcement and also considering that according to clause 23.3 of the Contract (arbitral clause) the award was issued in Mexico City, Federal District which was the place of arbitration, it is clear that this is not an award to which the cited Convention can apply.

Similarly, neither is the Inter-American Convention on International Commercial Arbitration adopted in 1975 in Panama applicable, and therefore the invocation of it again indicates the ignorance of the plaintiff in this area.

In this regard, the cited Inter-American Convention does not contain any article that establishes or provides for an action for the setting aside of an award, and therefore it is clear that the action filed by the plaintiff cannot be based on such international instrument.

The above, however, does not imply that **solely for purposes of interpretation** the comments and analyses of experts and Tribunals on the causes for denying the recognition and enforcement of awards found in both Conventions cannot be addressed, but only to the extent that such causes are substantially identically to the causes for setting aside established in article 1457 of the Commerce Code.

**B) OBVIOUS AND INTRINSIC CONTRADICTIONS EXISTING IN THE SETTING ASIDE CLAIM.**

Although the reasons the specific arguments of the plaintiff to support setting aside the award either cannot be addressed or are invalid or ungrounded will be addressed in detail, below the obvious contradictions existing in the claim are pointed out:

    **1.-** PEP alleges repeatedly that the Contract is an Administrative Contract by Nature (without clearly identifying the origin and the consequences of this assertion) and that, therefore, the Arbitral Tribunal when resolving the disputes between the

36

parties should not have applied any of the rules of Civil Law. (This argument is disproved further on in this answer.)

Notwithstanding the above, PEP also alleges repeatedly and constantly that the Arbitral Tribunal violated public policy because it did not correctly apply several provisions regarding Civil Law disputes (which argument is also disproved further on in this answer). Specifically, in this regard, PEP alleged that in the arbitral award the following Civil Law provisions are violated, among others:

    i. Articles 1796 and 1797 of the Federal Civil Code because presumably the Arbitral Tribunal assumed competence over the claims of COMMISA without complying with the formalities to be considered technical disputes in terms of the Contract.

    ii. Article 14 of the Constitution (regarding the form of resolving civil disputes by state courts) alleging the nullity of the resolution issued by the tribunal in relation to technical dispute number 36.

    iii. Article 16 of the Constitution and the civil law provisions regarding damages (articles 1910, 1915, 1934 and 2110 of the Federal Civil Code) according to which presumably the causation of damages and losses was not supported by fact and law when resolving the technical dispute numbers 34 and 35.

    iv. Article 1805 of the Federal Civil Code because technical dispute number 27 was not resolved according to strict civil law.

    v. The civil law principle that prevents a party from benefiting from its own fraud (since it is alleged that COMMISA did not comply with the contractual procedure of prior estimates), when resolving the claim for financial expenses.

37

vi. Article 2397 of the Federal Civil Code and article 363 of the Commercial Code when resolving on the claim for financial expenses presumably in violation of the prohibition on capitalizing interest.

Thus, although the plaintiff constantly and repeatedly complains of the supposed inconsistency of the arbitral award, it is the plaintiff that is truly inconsistent by maintaining first the inapplicability of Civil Law and, subsequently alleging the violation of public policy because supposedly Civil Law was not applied in the award. This contradiction in itself makes the setting aside action clearly invalid.

2.-    Even worse is the confusion, inconsistency and contradiction of the plaintiff in alluding to the Arbitral Tribunal as a state authority and attempting to impose obligations as such. In this regard the arguments that in the arbitral award the guarantee of strict application of the law (in civil disputes) of due legal and factual grounds, are totally unsubstantiated, since the Arbitral Tribunal is not an authority and much less does the arbitral award constitute a burden imposed by an authority that therefore must be duly grounded in law and fact. The following isolated decisions support the above:

"Registry No.: 179,667
Isolated decision
Material(s): Constitutional, Civil
Ninth Period
Instance: First Chamber
Source: Judicial Weekly of the Federation and its Gazette
XXI, January 2005
Decision: 1a. CLXXVI/2004
Page: 411

**COMMERCIAL ARBITRATION. ARTICLES 1415 TO 1463 OF THE COMMERCE CODE, <u>DO NOT VIOLATE ARTICLE 13 OF THE FEDERAL CONSTITUTION.   If it is assumed that an arbitral proceeding is a proceeding processed before persons or institutions that are not Judges of the State, or being so, do not act in such capacity, but rather as persons under private law,</u>** it is inaccurate that the claimed rules, by establishing the possibility of private parties submitting their disputes to

commercial arbitration, grant arbitral tribunals the quality of special courts, since those who issue such awards are persons or institutions designated to resolve disputes between private parties, whether as amicable compositors or in conscience, only if the parties have expressly authorized them to do so in terms of article 1445, third paragraph, of the cited code. These awards must be recognized or homologated by the corresponding judicial bodies, in order for them to acquire the necessary legal force to be completely binding, and effective their enforcement in accordance with articles 1461 to 1463 of the mentioned law. Thus the commercial arbitration regulated in the Commercial Code does not violate article 13 of the Constitution, which as a guarantee of equal treatment, in the judicial aspect, prohibits special courts.

Amparo in review 237/2004. Emilio Francisco Casares Loret de Mola and other. 28 April 2004. Unanimous four votes. Absent: Humberto Román Palacios. Drafting judge: Juan N. Silva Meza. Secretary: Jaime Flores Cruz."

(Emphasis added)

"Registry No.: 175,553
Isolated decision
Material(s): Civil
Ninth Period
Instance: Collegiate Circuit Court
Source: Judicial Weekly of the Federation and its Gazette
XXIII, March 2006
Decision: II.4o.C.25 C
Page: 2038

**LIS PENDENS. SUCH OBJECTION CANNOT BE ASSERTED IF THERE IS, ON ONE HAND, THE PROCESSING OF A COMMERCIAL EXECUTORY PROCEEDING AND, ON THE OTHER HAND, AN ARBITRAL PROCEEDING.** From the interpretation of article 1123 of the Commercial Code, it can be seen that it is clear in indicating that such objection is only valid when a Judge is already trying a matter, when there is identity of parties, actions and things claimed, which does not occur when the dispute arises between a Judge and an arbitrator. The above is asserted because **an arbitrator is not an officer of the State, since his powers are derived from the will of the parties, expressly in accordance with the law** and, although the decision or arbitral award cannot be revoked by the will of one of the interested parties, it is not executory since it only becomes so through the mediation of an act by a judicial body which, without removing its private nature, assumes its contents; therefore, the resolutions of an arbitrator lack enforcement power, given that his

39

awards are private acts coming from private parties, and they become executory only when the State bodies have added to the legal material of the award the judicial material of a judgment, and thus it is clear that the judicial function belongs to the State and can only be conferred to State bodies; in these conditions if, on the one hand there is an executory commercial proceeding and on the other an arbitral proceeding, the objection of lis pendens cannot be asserted in the executory proceeding, given that that is only valid when a Judge is already trying the same matter, which does not occur in this case, **because the arbitrator is not a Judge nor a judicial authority since, as has been noted, he is not an officer of the State, and the powers he exercises come from the will of the parties.**

FOURTH COLLEGIATE COURT IN CIVIL MATTERS OF THE SECOND CIRCUIT.

Amparo in review 255/2005. Duroplast Ramos Arizpe, S.A. de C.V. 17 January 2006. Unanimous vote. Drafting judge: José Martínez Guzmán. Secretary: Francisco Peñaloza Heras.

(Emphasis added)

The following isolated decision is applicable by analogy:

**"Registry No.** 366995
**Location:**
Fifth Period
Instance: Fourth Chamber
Source:      Judicial      Weekly      of      the      Federation      CXXIII
Page: 115
Isolated Decision
Material(s): labor

**PRIVATE ARBITRATORS, THEIR RESOLUTIONS ARE NOT ACTS OF AUTHORITY.** Although the appointment of an **arbitrator**, by the will of the parties, falls to the plenary Central Conciliation and Arbitration Board, the latter did not act as a judicial body, <u>but rather as any private arbitrator, which is not an authority and lacks the power of the state to enforce its determinations</u>.

Direct amparo in labor matters 3937/52. Sindicato de Cargadores de Camiones, Casas Comerciales y Conexos de la Región de Jalapa, Ver. 7 January 1955. Unanimous four votes. Absent: Luis Díaz Infante. The publication does not mention the name of the drafting judge.

(Emphasis added)

**C) LEGAL IMPOSSIBILITY OF IN THE SETTING ASIDE PROCEEDING ENTERING INTO THE STUDY OF THE MERITS OF THE CASE ALLEGING VIOLATIONS OF PUBLIC POLICY OR OTHER CAUSES FOR SETTING ASIDE.**

From the manner in which the setting aside claim is presented, it is clear that the objective of the plaintiff is to have Your Honor enter into an analysis of the merits of the case resolved in the arbitral award.

Thus and always under the pretext of a supposed violation of public policy, rules of procedure and the arbitration agreement, substantive issues already determined and resolved by the Arbitral Tribunal are restated.

A simple reading by Your Honor of the setting aside claim is sufficient to be aware that more than demonstrating supposed causes for setting aside the award, the plaintiff is basically presenting an appeal against the decisions that were unfavorable to it in the arbitral award, restating for such purposes all its arguments on the substance of the disputes.

In this manner, if a decision contained in the arbitral award was not favorable to the plaintiff, the latter alleges either that such decision is not contractually or legally grounded, or that it violates public policy or that it exceeds the scope of competence of the Arbitral Tribunal. The invocation of the causes for setting aside in this context becomes a mere pretext to try to cause the reexamination of the merits of the case in this proceeding which is clearly invalid as explained below.

The Judicial Authority must refuse to enter into a study of the substantive issued of the case resolved by the arbitral award whose recognition and enforcement is requested. It is absolute and unarguable that the final award whose enforcement is counterclaimed

41

subsequently is considered *res judicata*. The relevant part of following isolated decision is applicable hereto:

**"Registry No.** 186229
**Localization:**
Ninth Period
Instance: Collegiate Circuit Courts
Source: Judicial Weekly of the Federation and its Gazette
XVI, August 2002
Page: 1317
Decision: XV.1o.50 C
Isolated Decision
Material(s): Civil

**ARBITRAL AWARD. ITS HOMOLOGATION BY ORDINARY JUDICIAL AUTHORITY AND ITS ANALYSIS, IN AMPARO, DOES NOT PERMIT THE STUDY OF THE SUBSTANCE OF THE RULING.**

An arbitral award is the decision of a non-state body, agreed to by the parties, to resolve a dispute, either present or future; thus, for purposes of the ordinary court proceeding the latter remains under the exclusive authority of the decision of the arbitral tribunal and becomes an extension of that decision, which being an act of private parties, in regard to its ruling, is not subject to constitutional review; however, such constitutional review may be given with respect to the ruling of homologation issued by a state judicial body, which, of course, will be limited to the result of the analysis of the due formation of the arbitral tribunal, of due process, of the manifestation of the agreement of the parties to submit to arbitration, of the matters subject to arbitration and of **the other situations contemplated in article 1462 of the Commerce Code, situations that, as indicated, only contemplate questions of form and not of substance**, and, once the homologation is accomplished, of the acts of enforcement with which the Judge helps to fulfill the award; therefore in the amparo only those questions can be pleaded and not any regarding the substance and ruling of the award. This is supported with the interpretation upheld by the Third Chamber of the above formation of the Supreme Court of Justice of the Nation, in the isolated decision, published in the Judicial Weekly of the Federation, Fifth Period, Volume XXXVIII, page 801, with the heading: "ARBITRATION.", in which it is considered that **arbitration is a convention that the law recognizes, which constitutes a *renouncement* by the private parties of the right for the judicial authority to take up a dispute**, and therefore it has negative procedural significance, in that the parties entrust the resolution of their disputes to one or more private parties, called arbitrators; however, these are not officials of the State and nor do they have jurisdiction of their own or delegated, and their powers only arise from the agreement of the parties, expressed according to law, and while the arbitral award cannot be revoked unilaterally by one of the interested parties, it is not ready for execution in itself, since it can only be considered to be a work of the legal reasoning that is resorted to by the State, and therefore it can only be

enforced through an act carried out by a judicial body which, without removing its private nature, assumes its contents, and it is then that it becomes a judicial act. However, **the Judges are not authorized to review the awards as a whole, since otherwise they could nullify them, even for substantive questions, for which it would be necessary that first the parties appear before the Judge to set forth the debate, and the system generally adopted consists of if the violation contained in the award violates public policy, the Judge should not order its enforcement, but if it only harms private interests he should order it**; and once its enforcement is judicially declared it becomes a judicial act and it is then that the aggrieved party can go before the Federal courts to file an amparo, which must be processed in a double proceeding, as is indicated in court precedent number 32/93 of the Third Chamber of the above formation of the Supreme Court of Justice of the nation, published in the Gazette of the Judicial Weekly of the Federation, volume 72, December 1993, page 41, with the heading: "ARBITRAL AWARD, RULINGS OF HOMOLOGATION AND ENFORCEMENT OF. INDIRECT AMPARO, IN TERMS OF ARTICLE 114, SECTION III, OF THE LAW OF AMPARO, AND NOT THE DIRECT AMPARO ALLUDED TO IN 158 OF SUCH LAW.".

FIRST COLLEGIATE COURT OF THE FIFTEENTH CIRCUIT.

Amparo in review 138/2002. Mecalux, México, S.A. de C.V. 28 May 2002. Unanimous vote. Drafting judge: Pedro Fernando Reyes Colín. Secretary: Ángel Rodríguez Rico.

(Emphasis added)

Notwithstanding the above, as has already been indicated, PEP is trying to have the substance of the matters resolved by the arbitral award reviewed alleging supposed violations of public policy based on section II of article 1457 of the Commercial Code, which establishes:

"**Article 1457.** Arbitral awards **_may only_** be annulled by the competent judge when:
**…..**

**II.** The judge proves that according to Mexican law, the object of the dispute cannot be submitted to arbitration, or that the award is contrary to **public policy**."

The direct antecedent of this provision is found in the United Nations ICSID Model Law on International Commercial Arbitration, which in 1993 was adopted by the federal

43

lawmakers into the Commercial Code, in order to harmonize Mexican arbitration law with the universally recognized valid principles in the area, thereby harmonizing its legal framework with those of the other countries of the planet. This purpose is evident from the simple reading of the statement of legislative intent that for the reform of the Commercial Code was presented by the Federal Executive, as follows:

> "From the above explanation, it can be concluded that, in international commerce it is very convenient to have a modern law of commercial arbitration, **underlined: universally known, and widely accepted in the international commercial medium**; these are the reasons behind this decree that amends and adds several provisions of the Commercial Code and the Federal Code of Civil Procedures.

> If meriting the approval of this honorable Congress of the Union, the provisions of the Model Law on International Commercial Arbitration of the United Nations Commission on International Trade Law (UNCITRAL) would be incorporated, **which is the result of a universal negotiation at the headquarters of the United Nations. The General Assembly of this body recommended all countries to duly examine the mentioned Model Law and take into account the convenience of _harmonizing_ the procedural arbitration law and the specific needs of international commercial arbitration practice.**

> As the Secretariat of the UNCITRAL notes, **the Model Law constitutes a solid and motivating basis for the harmonization and perfecting desired of the national laws**. It regulates all the stages of the arbitral procedure, from the arbitration agreement, to the recognition and enforcement of the arbitral award, **and reflects the global consensus on the principles and most important aspects of international arbitration practice. It is acceptable for the countries of all the regions and for the legal regulations or economic systems of the world**.

> …..

> Our country actively participated in the drafting of the Model Law, so that the needs and peculiarities of our laws and traditions were taken into account during its drafting."

44

Considering the above, the cause for setting aside alleged by PEP was adopted from article 34 of this Model Law, which establishes the setting aside of an arbitral award that violated public policy, in the following terms:

> **"Article 34.** Application for setting aside as exclusive recourse against arbitral award
>
> 1) Recourse to a court against an arbitral award may be made only by an application for setting aside in accordance with paragraphs 2) and 3) if this article.
>
> 2) An arbitral award may be set aside by the court specified in article 6 only if:
>
> …..
>
> b) the court finds that:
>
> i) the subject-matter of the dispute is not capable of settlement by arbitration under the law of this State; or
>
> **ii) the award is in conflict with the public policy of this State."**

As can be seen, the rules of the Model Law and of the Commercial Code in relation to the cause for setting aside are identical and only differ in regard to their form.

The concept of public policy in relation to the setting aside and/or enforcement of an arbitral award is a topic that has been widely developed in the literature and international case law regarding this Model Law, which undoubtedly allows us to clarify the meaning and scope of section II of article 1457. In fact, Mexican case law has established that for interpreting the provisions of the Commercial Code from a teleological and historical point of view, it is <u>necessary</u> to look to the commentary in relation to the Model Law, as can be seen from the following case law:

> "Registry No.: 176,581
> Isolated decision
> Material(s): Civil
> Ninth Period
> Instance: Collegiate Circuit Courts
> Source: Judicial Weekly of the Federation and its Gazette
> XXII, December 2005

Decision: I.3o.C.502 C
Page: 2650

**ARBITRATION AGREEMENT, NULLITY OF. COMPETENCE OF THE ARBITER AND NOT OF THE ORDINARY JUDGE TO HEAR THE RESPECTIVE ACTION FOR NULLITY, BECAUSE THE PURPOSE OF ARTICLES 1424 AND 1432 OF THE COMMERCIAL CODE IS TO MAKE EFFECTIVE THE ARBITRATION AGREEMENTS AND FACILITATE THE CARRYING OUT OF ARBITRAL PROCEEDINGS.** To interpret the principles that regulated arbitration in the Commercial Code, from the teleological and historical point of view, it is necessary to have in mind that their antecedent is in the Model Law on International Commercial Arbitration of the United Nations Commission on International Trade Law (UNCITRAL), the provisions of which were incorporated into the national commercial law in order to include therein the aspects favorable to arbitration that are found in such model law, as can be seen in the statement of legislative intent of the reform decree published in the Official Federal Gazette on July 22, 1993, **as well as from the corresponding opinions issued by the respective Issuing and Reviewing Bodies, which is to say of Representatives and of Senators, such that it is convenient to go to the text of the mentioned model law, in the provisions that are similar or identical in content, and to the explanation of such provisions by the secretariat of the mentioned international commission.** This similarity in regulatory content is found in articles 1424 and 1432 of the Commercial Code, and 8 and 16 of the model law, the purpose of which is to facilitate and make effective the recognition of arbitration agreements, and to prevent the use of delaying tactics, although it involves the exercise of supervisory or control powers that are recognized as necessary by the judicial courts. The above purpose of the regulation of the remission to arbitration and of the power to determine competence by the arbitral tribunal, based on the arbitral principle of German origin called "Kompetenz-Kompetenz", or competence-competence, which is implicitly found in the text of articles 1424 and 1432 of the Commercial Code, given their origin and the similarity with the rules that inspired them, reveals that the Mexican lawmaker sought to make the arbitration agreement fully effective and to facilitate the carrying out of arbitrations, if there is an agreement on this form of dispute resolution, preventing the use of dilatory tactics in the carrying out of these proceedings, even when the necessary judicial control over the validity of the arbitration agreement is exercised, which, in terms of article 1432 of the Commercial Code, can be done before the arbitral award is issued, or subsequent to this, which is to say it can be prior or ex post. Therefore, when an arbitration agreement exists on the competence of the arbiter to

46

hear the nullity of the arbitration agreement, the competence of the ordinary Judge of the State is excluded, in order to fully respect the will of the parties in agreeing to the resolution of disputes, including the nullity of the arbitration agreement, through the arbitral proceeding.

THIRD COLLEGIATE COURT IN CIVIL MATTERS OF THE FIRST CIRCUIT.

Amparo in review 14/2005. Servicios Administrativos de Emergencia, S.A. de C.V. 19 May 2005. Unanimous vote, with an explanatory vote of Magistrate Anastacio Martínez García. Drafting judge: Neófito López Ramos. Secretary: Raúl Alfaro Telpalo."

(Emphasis added)

The violation of public policy as a cause for setting aside an arbitral award is a figure widely discussed in the international forum, due to the fact that through it parties for whom an award is unfavorable have sought to use the supposed ambiguity of the concept, and under such pretext or artificial reasoning they have demanded that the judge revoke the resolution issued by the arbitrators, as if it was an appeal that is pronounced on the legality of the reasoning on the merits of the arbitral tribunal.

These abuses have been widely reported by the representative appointed by the Mexican government to UNCITRAL, Dr. José María Abascal Zamora. However, in his article "*La interpretación uniforme de la Convención de Nueva York y del Título IV del Libro Quinto del Código de Comercio" (The uniform interpretation of the New York Convention and of Title IV of the Fifth Book of the Commerce Code)*, Dr. Abascal Zamora maintains that these abuses resulting from the supposed ambiguity of the concept "public policy" have not been answered by the domestic judicial courts, arguing the following:

"**6. On the concept of public policy and its strict interpretation.**

It is human that the loser, who agreed to arbitration when he was interested in entering into the contract, does not want to comply when confronted with an unfavorable award. That losing party tries

47

to ignore its obligation and seeks its setting aside and the rejection of its enforcement. The way that is considered easiest to convince a court to analyze the merits of the question resolved by the arbitrators, is the allegation that the award violates public policy.

<u>Since paragraph 2 of article V of the NYC was created, which permits a judge to deny the enforcement if he considers that it violates public policy, it was feared that a potential shortfall had been opened which, through the judicial review of the substance of the case, would make worthless the intention of the parties to agree to arbitration. However, the international case law has demonstrated that those fears were unfounded; notwithstanding the fact that the defense of public policy is the one asserted most, it has been systematically rejected by the judges</u> […].

…..

There are two decisions that have been systematically observed in the international case law.

The first was a decision that interpreted subsection (b) of paragraph 2 of article V of the NYC, according to which the Court rejected the claim that the abandonment of an American company of a construction project in Egypt, because of the Six-day War, could be excused by the breaking of bilateral relations between the United States of America and Egypt. Asserting that an expansive construction of this defense could vitiate the basic force of the NYC of removing obstacles preexisting to the enforcement, **the Court said that: the enforcement of arbitral awards may only be denied on the bases that the enforcement would violate basic notions of morality and justice** … by making the "national policy" of the United States into "public policy", the appellant misinterprets the concept, since **to read the defense of public policy as a parochial means of protecting the interests of national policy, would seriously debilitate the utility of the convention**. The provision does not mean to encapsulate the vicissitudes of the national policy within the title of "public policy" […].

In the same, STEWART (note on page 94), cites the second, a German resolution (…) which rejects the defense of public policy asserting that such violation only exists under German law **if the arbitral award violates a rule of the basic principles of the public economy or clearly contradicts in an intolerable manner the principles of German justice.**"

48

(Emphasis added)

Consistently with the restrictive meaning that these two resolutions of domestic courts of the United States and Germany have given to public policy and its implications in the setting aside or enforcement of an arbitral award, Alan Redfern, Martin Hunter, Nigel Blackaby and C. Partasides,[1] have explained in turn that the greater part of the countries developed in the area of arbitration have coincided in the common formulation of a restricted concept of "public policy" and mention the following:

> "*9–32  Finally, the* __*Model Law*__ *establishes that an arbitral award can be set aside if a national court of the place of arbitration finds that the award is in conflict with the public policy of its own country.*
>
> *Most developed arbitral jurisdictions have similar conceptions of public policy. According to the Swiss Federal Supreme Court, public policy denotes __fundamental legal principles, a departure from which would be incompatible with the Swiss legal and economic system__.(101) Similarly, German courts have held that an award will violate public policy __if it conflicts with fundamental notions of justice, bonos mores or conflicts with principles which are fundamental national or economic values__.(102) Again in similar terms, the Superior Court of Justice of Ontario refused to set aside an award rendered by a NAFTA tribunal, holding that for an award to offend public policy:*
> *[it]'must fundamentally offend the most basic and explicit principles of justice and fairness in Ontario, or evidence intolerable ignorance or corruption on the part of the arbitral Tribunal'… The Applicant must establish that the awards are contrary to the essential morality of Ontario.(103) (…)[2]"*
> (Emphasis added)

Under this same restricted line of the concept of public policy, the UNCITRAL Report on the Model Law complements this notion of it, to explain a little more its scope and to

---

[1]  REDFERN, Alan; HUNTER, Martin; BLACKABY, Nigel; and PARTASIDES, C. *Law and Practice of International Commercial Arbitration,* Kluwer Law International, 2004, pp. 1-50.
[2]  Lastly, the __Model Law__ states that an arbitral award may be set aside if a national court of the place of arbitration finds that the award is in conflict with the public policy of its own country.

49

indicate corruption, bribery and fraud as causes for the setting aside of an award. In this respect, the following is stated in the report of the Commission:[3]

> *"It was understood that the term 'public policy', which was used in the 1958 New York Convention and many other treaties, covered* <u>*fundamental principles of law and justice in substantive as well as procedural respects*</u>*.* <u>*Thus, instances such as corruption, bribery and fraud and similar serious cases would constitute a ground for setting aside.*</u> *(…)."*[4]

Now, to interpret section II of article 1457 of the Commercial Code, this restricted concept of public policy understood *"as a series of fundamental principles of law and justice whose violation is seriously incompatible with the values or the economic or legal system of a country"* must be analyzed in light of the principles governing arbitration and the job of the Judge when ruling on the setting aside proceeding.

According to the scholar Jorge Alberto Silva, the review by the Judge of the award is limited and specific, being restricted to the review of questions of form and not substance. In his work on international commercial arbitration in Mexico, Professor Silva indicates that:[5]

> *"It is prohibited to review the substance of the matter resolved, it is the principle on which the review of the award is based.*
>
> Gómez Lara follows the ideas that were set forth to him in a reception decision and he asserts that of the violations alleged, the judicial court may examine those of procedure, not of substance.
>
> The exequatur court will not examine the factual arguments set forth in the proceeding nor the reasoning that the arbiter used when rendering the award".

---

[3] BROCHES, Aron. *Commentary on the Uncitral Model Law*, International Council for Commercial Arbitration, Kluwer Law, Vol. IV, 2004.
[4] "It was understood that the term 'public policy', which was used in the 1958 New York Convention and many other treaties, covered **fundamental principles of law and justice in substantive as well as procedural respects**. **Thus, instances such as corruption, bribery and fraud and similar serious cases would constitute a ground for setting aside.** (…)."
[5] SILVA, Jorge Alberto. *Arbitraje comercial internacional en México*, second edition, Oxford, Mexico, 2001, p. 252.

In relation to this same scope of the mission of the Judge, in the *Report of the Secretary General of the United Nations with respect to an analytical compilation of comments by governments and international organizations on the draft text of a model law on international commercial arbitration*, the government of Qatar stated its interest in making clear the role of the Judge in analyzing the action for setting aside an award for violation of public policy, and concluded the following:[6]

> **"Where the rights of the parties are determined in pecuniary form, by recognition of a title, or in another way which does not in itself affect the public order in the country of recognition or enforcement, the public policy reason should not be used for refusing recognition or enforcement. <u>Otherwise, this would mean reopening the consideration of the dispute in which a decision has already been made, and as a consequence of such action, arbitral proceedings would be wasted and the confidence necessary in transactions in general and in international transactions in particular would be shaken. In support of its view, Qatar notes that many States, among them the United States of America, have legislation and certain case law which provide for such restricted interpretation of public order. Consequently, Qatar suggests that the following text be inserted at the end of paragraph (1)(b)(ii):</u>**

> *"In deciding whether an arbitral award would be contrary to the public policy of the State, there shall be <u>no reconsideration of the subject-matter of the dispute upon which a ruling has been made by that award and the decision shall relate only to the proceedings or actions that will be required by the recognition or enforcement"</u>.*

> (Emphasis added)

As can be observed, the analysis of a judicial court of the notion of public policy as a cause for setting aside an award is clearly restricted by the function of the Judge not to

---

[6]        (A/CN.9/263    and    Add.1-3),    p.    85.    *Found    at:*
http://daccessdds.un.org/doc/UNDOC/GEN/NL8/500/50/PDF/NL850050.pdf?OpenElement

51

enter into an analysis of the substance of the case, being limited to resolving the formal questions restrictively indicated by article 1457 of the Commercial Code.

In the case in question, since it is in its interest to do so, PEP has attempted to weaken the above explained concept of public policy and its restriction that in relation to arbitration it has with respect to the role of the Judge in the review of the award. Illogically and recklessly PEP has maintained that "some authors" assert that in the setting aside proceeding the judge can enter into an analysis of the substance of the award, but the only name that it gives of these "authors" to support its position is that of Dr. Francisco González de Cossio, citing page 19 of his work Manual de Arbitraje Comercial (Manual of Commercial Arbitration).

In this respect, page 19 of the work Manual de Arbitraje Comercial of Dr. Francisco González de Cossio cited by PEP does not mention anything with respect to the topic of setting aside the award for violations of public policy and much less with respect to the review of the substance of the case. On the contrary, upon reviewing the work cited by PEP it is seen that the author cited himself holds precisely the position that is contrary to its illegitimate interests, but consistent with what has been explained in this brief.

In effect, Dr. González de Cossio makes it very clear in his work Manual de Arbitraje Comercial how the Judge may not enter into a review of the substance of the case, and when distinguishing the differences between the appeal recourse and the setting aside recourse, indicates the following[7]:

> "There is a conceptual difference between, on the one hand, the appeal and, on the other hand, the recourses existing in relation to awards. Their different nature lies in the fact that an appeal examines the substance of the award (which is to say both the facts and the law) and the court that makes such review has the power to confirm, revoke or modify it.
>
> In the recourses for setting aside, recognition and enforcement, the competent body has a limited jurisdiction. Its level of analysis is

---

[7] GONZÁLEZ DE COSSÍO, Francisco. *Ejecución de Laudos Arbitrales* in *Manual de Arbitraje Comercial*, México, Porrúa 2004, pp. 168 to 170.

> limited to the determination of the presence of any of the causes for setting aside or not enforcing. The body making this review does not establish the correct determination of the facts nor the correct application of the law. It only decides if there is some defect in the issuance of the award that justifies its invalidation."

Under this same line of thinking, among the guiding principles of arbitration Dr. González de Cossío indicates the following:

> "The awards: a) Have to be enforced, b) Without being able to require more rigorous conditions for local awards than for foreign ones, c) Mexican judges having the discretion, but not the obligation, to set them aside or not enforce them only in the cases expressly contemplated, d) Provided the presumption of their validity is overcome, and **e) Provided the substance of the award is not analyzed."**

> (Emphasis added)

Thus, it is clear that PEP is seeking to take advantage of the supposedly ambiguous concept of "public policy" so that this court will enter into the analysis of the substance of the matter in order to analyze the causes for setting aside the award presented. However, as has been explained in the preceding pages, the concept of public policy is a restricted concept that can only be understood in arbitration matters in relation to the role that the Judge must play in processing the setting aside proceeding.

**D)    THE AWARD IS NOT CONTRARY TO PUBLIC POLICY.**

PEP repeatedly alleges that the award is contrary to and violates public policy, and therefore in terms of article 1457, section II it should be set aside.  For such purposes, PEP presents various reasons and arguments whose invalidity is shown below in detail.

1.- <u>The compensation determined by the Arbitral Tribunal in favor of COMMISA is legally and contractually justified.</u>

53

PEP alleges in relation to practically all the decisions adopted by the Arbitral Tribunal in relation to the technical dispute numbers 19, 27, 34, 35, 37, 39, Financial Expenses and Payment of Expenses and Costs of the Arbitration that the award is contrary to public policy because such decisions are not legally and contractually justified and therefore they are not duly grounded in law and fact.

On this basis and in a confusing manner, PEP also alleges that the decision adopted in relation to technical dispute number 36 has such defect, but with respect thereto it does not allege the violation of public policy, but rather asserts that the Arbitral Tribunal exceeded its mission by resolving the dispute without a legal or contractual basis.

This argument and cause for setting aside is a clear example of the intent of PEP to have the substance of the arbitral award analyzed, under the pretext of a violation of public policy. Nevertheless, it is invalid for the following reasons.

First of all, as explained in section C) of this chapter VI, any argument that in a setting aside procedure an analysis of the substantive decisions of the proceeding should be done is invalid.

The fact that it is alleged that the substantive decisions questioned supposedly violate public policy is not exempt from the above, since the demonstration of such objection must result from strict application and also has to be clear and without question, which is not the case in any of the arguments presented by PEP with respect to the decisions adopted by the Arbitral Tribunal in its award, when resolving technical dispute numbers 19, 27, 34, 35, 37, 39, Financial Expenses and Payment of the Arbitration Expenses and Costs.

Contrary to what PEP maintains, the Arbitral Tribunal did legally and contractually reason and justify the decisions contained in its award, as is explained in detail below:

    a) Decision with respect to Technical Dispute number 19.

When resolving the claim identified in the award as "Technical Dispute" number 19, the Court determined that upon executing the work entrusted, COMMISA was confronted with a series of elements not foreseen in the plans provided by PEP and that constituted obstructions for the placement of the ducts in the manner agreed.  It was, therefore, a problem of contractual execution attributable to omissions of PEP that the latter recognized as part of its responsibility.

On this point, the Arbitral Tribunal determined that there was an agreement between the parties that these obstructions resulted in additional works, based on the Contract Amendment number 12.   Furthermore, the Tribunal established that COMMISA presented in timely fashion the claims resulting from these obstructions and that their acceptance or rejection by PEP was an act unrelated to COMMISA on which the validity of its claims should not depend.

Finally, the Arbitral Tribunal, based on the analysis of the characteristics of these claims and the express or tacit agreement reached by the parties with respect to them, decided to order PEP to pay the amounts indicated in the award.

   b)  Decision with respect to Technical Dispute number 27.

In Technical Dispute 27, COMMISA claimed the payment of $63,469 pesos and US$1,948,210 dollars for the difference in the waiting time rates of the Castoro 10. This was because PEP ordered a change in the work schedule as the result of which the Castoro 10 was used instead of the Bar Protector.  For its part, PEP maintains that the prices were agreed for activities and not for vessels and that in any case, it would only be entitled to claim the amount of US$ 316,985 dollars minus $1,888,065 pesos in favor of PEP.

The Arbitral Tribunal studied the evidence offered and determined that since the Supervisor requested from COMMISA the price quote of the vessel for this type of work

and that COMMISA indicated that its rate would be the same, it was understood that PEP accepted the offer of COMMISA by ordering that the platform work be done with the Castoro 10.

Consequently, the Arbitral Tribunal partially agreed with the argument of COMMISA and ordered PEP to pay COMMISA the amount of $62,502 pesos plus US$1,947,288 dollars.

c)  Decision with respect to Technical Dispute numbers 34 and 35.

**In Technical Dispute 34** COMMISA claimed the payment of 30,309,308 PME plus 28,885,334 USD for the debt for delay in the initiation of the works of the Bar Protector; and **in Technical Dispute 35**, the payment of 18,494,205 USD for the delay in the initiation of the works of the Castoro 10. For its part, PEP considered the claims invalid and argued that the payments for waiting time would begin to accrue once the vessels passed the check list and were put at its disposal.

The Tribunal considered that from August 20, 1998 there was evidence that COMMISA warned and informed PEP with respect to the costs that could be caused by the rescheduling of the works, and therefore on March 5, 1999, the Supervisor requested my principal to present some estimates of the costs that it would have to indemnify – which request was answered on March 15[8] of the same year –. A fundamental factor in the analysis of the Arbitral Tribunal was the formal process of review of the contract that occurred between the parties and during which Change Order number 1, Rev. 2 was accepted and **signed** by both, in which PEP agreed to cover for COMMISA the "fair, reasonably and duly proven costs" that were incurred; it also agreed to the extension of the time period requested by COMMISA of 117 days.

---

[8] It should be mentioned that the prices offered to PEP were less than those that in turn COMMISA contracted with EMC.

Having analyzed the evidence offered, the tribunal determined based on a **literal reading of the contract** – paragraph 168 and thereafter of the award – and **strictly according to law** – paragraphs 179 and thereafter –, that the payment of the waiting time rates that COMMISA requested was not applicable if the wait was produced before the vessel was mobilized, and since the payment could only be quantified based on the "fair, reasonable and proven costs", the result was an order to pay 13,923,014 USD.

Finally, and in relation to the Technical Dispute in question, two points should be emphasized: (i) the Tribunal analyzed whether Technical Disputes 34 and 35 were compatible with the Terms of Reference and determined that they were – paragraph 187 and thereafter –; and (ii) the Tribunal clarified in the award that, contrary to what PEP argues, the request to offer additional evidence was made to both parties through communication A 49 and not only to COMMISA.

      d)  Decision with respect to Technical Dispute number 37 and 39.

In Technical Dispute 37, COMMISA claimed the payment of 6,877,277 PME plus 11,632,024 USD for the debt for the crossings work in contract EPC-28; and in Technical Dispute 39, the payment of 1,000,991 PME plus 2,924,951 USD, for crossings under contract EPC-027 which was incorporated into EPC-28.

**In relation to Technical Dispute 37**, since the separation between the ducts was less than one meter, PEP argued that my principal had not approved or quantified the items claimed and that in any case, a lesser distance between pipes would imply a savings in costs.

In this respect, the Tribunal concluded that based on a document requesting technical specifications, signed by both parties, it was agreed that specific crossings could have a separation of 0.5 m, instead of one meter and that the impact on costs of this reduction in separation would be evaluated when making the estimates. In addition to the above,

57

the fact that COMMISA obtained the ABS certification[9] and that the Supervisor had approved on behalf of PEP the technical specifications of the crossings that my principal submitted to its consideration, led the Tribunal to accept the entire claim of COMMISA and to order PEP to pay 6,877,277 PME plus 11,632,024 USD.

**In relation to Technical Dispute 39,** COMMISA alleged that PEP entrusted to it eight crossings corresponding to line 27 and that now it refused to pay the corresponding unit price. For its part PEP argues that with respect to crossings 2, 3, 5, 7 and 8, they have a pipe separation less than one meter; and with regard to crossings 1, 4 and 6, it mentions that they are situated in an expansion curve that has its own unit price.

The Arbitral Tribunal reached the same conclusions as in Technical Dispute 37 with regard to crossings 2, 3, 5, 7 and 8. With regard to the rest of the crossings, the Tribunal determined that since PEP entrusted the crossings to my principal, this created a legitimate expectation that such work would be paid for according to the agreed unit prices. Therefore, the Tribunal accepted the entire claim of COMMISA and ordered PEP to pay the amount of 1,000,991 PME plus 2,924,951 USD.

      e)  Decision with respect to Financial Expenses.

In addition to alleging a supposed absence of legal and contractual grounds for this order to pay, PEP argues the supposed violation of article 16 of the Constitution, as well as a supposed inability to state its defense as a result of the supposed failure to analyze the arguments of PEP in relation to the financial expenses.

In effect, first of all, formally the guarantee of due process cannot be violated by an arbitral award, since it is not an act of authority.  Therefore, any argument in this regard of PEP cannot be addressed.

---

[9] Certification Agency designated by PEP.

Aside from the above noted formal aspect, even considering the question from a strictly material point of view, the valuing of and ordering PEP to pay financial expenses in the arbitral award did not leave PEP unable to state its defense.

The obligation to pay interest (Financial Expenses) arises from the Contract and the Arbitral Tribunal only applied it.

In this context, each of the arguments made by PEP was analyzed and discarded by the Arbitral Tribunal, based on its interpretation of what was agreed to in the Contract. Thus, PEP was not unable to state its defense nor much less was this dispute resolved without legal or contractual basis as such party erroneously alleges.

Specifically, from the text of the award it can be seen that the Arbitral Tribunal determined that the contractual provision applicable to this dispute was clause 3.8.6 of the Contract, which establishes that: *"in case of delay in the payment of estimates and cost adjustments PEP, at the request of the Contractor, will pay financial expenses according to a rate that will be equal to the rate established in the Federal Revenue Law in cases of extension for the payment of tax obligations …"*, in relation to clause 3.8.8 which releases PEP from paying financial expenses when PEP legitimately suspends the payment of the estimates.

Interpreting the contractual provisions based on the evidence and arguments presented by the parties, the Arbitral Tribunal determined that the requirements for having to pay interest were: (i) that there is a delay in the payment of estimates and cost adjustments; which is to say that they have not been paid within the 30 days following the presentation of the corresponding estimate, in accordance with clause 3.8.2 of the Contract; (ii) that the Contractor requested its payment and (iii) that PEP does not have any legitimate cause for suspending the payment of the seven indicated in clause 3.8.8 of the Contract.

59

With regard to the first requirement, the Arbitral Tribunal systematically interpreted the Contract and determined that, considering that *"the Contract is based on the principle that the Contractor must continue performing the work entrusted to it and that it would be remunerated by PEP within a term of 30 days from the finalization of the work"*, PEP must pay COMMISA all the amounts owed *"no later than 30 days after its delivery, which is to say September 29, 2002."*[10]   The Arbitral Tribunal complemented its argument indicating that it is from the date of final delivery of the works when "the contractual mutuality is broken", since from that date PEP obtained the use and enjoyment of the work (without PEP having alleged the existence of flaws, defects or other defaults) and on the other hand COMMISA suffers an impoverishment for not having received the price.

The Arbitral Tribunal also resolved that given the presentation of supporting invoices and documentation in the filing office of PEP, in accordance with clause 3.8.3, the normal procedure for payment of estimates during the performance of the works was applicable, not the collection of amount claimed through an arbitral proceeding.

With regard to the supposed failure to formally demand payment, the Arbitral Tribunal Arbitral applied clause 3.8.6 of the Contract literally, which does not require any judicial or extrajudicial formal demand for payment, but only a "request" for payment and the Tribunal indicated that the arbitral claim satisfied this requirement of a request.  If the formal demand for payment were necessary under article 2080 of the Federal Civil Code, the Arbitral Tribunal established that the Total Physical Reception Certificate satisfied that requirement, since COMMISA set forth its claims in such document and PEP was aware of their existence.[11]

---

[10] Arbitral award ¶743.  The Tribunal counted the 30 days from August 30, 2002, the date of signature of the Total Physical Reception Certificate.
[11] Arbitral Award ¶748.

60

Finally, the Arbitral Tribunal held that clause 3.8.6 does not impose as a requirement that the amounts be liquid in order for, *"late payment interest to accrue"*[12] in relation to them.

As can be appreciated, the Arbitral Tribunal made a series of determinations regarding the content and scope of the clauses of the Contract applicable to the payment of financial expenses.  In the Arbitral Award, the Arbitral Tribunal interpreted the Contract systematically, to establish the date on which the 30 day term that PEP had to pay expired, as well as the requirements that had to be met in order to generate the obligation to pay financial expenses.  Finally, the Arbitral Tribunal determined that such requirements had been met.

These substantive determinations have the effect of res judicata and cannot be reviewed again by the judicial authority since they have a clear legal and contractual basis; therefore they cannot now be questioned alleging that supposedly the award ordered the payment of claims without contractual and legal grounds and thereby supposedly violated public policy.

> 2.- <u>The Contract is not an administrative contract and therefore a surrendering of COMMISA's interest to that of PEP cannot be alleged.</u>

The fundamental argument on which PEP bases the setting aside of the arbitral award is that according to PEP, the Contract is an administrative agreement signed by a state entity to which a series of budgetary provisions found in the Constitution and secondary laws apply, which make the Contract a document that according to PEP cannot be interpreted and, in the end, with respect to which it is impossible to legally apply indemnifications since supposedly they are not expressly provided for in the budget of PEP, nor expressly contained in the Contract.

---

[12] Arbitral Award ¶749.

Thus, according to PEP the determinations of the Arbitral Tribunal contained in the award violate public policy since according to PEP only its contractual and legal interpretation is the correct one and if it is not adopted, then the budgetary provisions of public policy are violated.   With this PEP attempts to argue that based on the observance of budgetary discipline provisions that govern it internally, it is exempt from liability for the violation of its freely assumed contractual commitments.

PEP's position is incorrect and is clearly based on a series of sophisms and fallacies that do not hold up against a serious analysis.

**First of all, it should be indicated that the law cited by PEP refers to internal budgetary discipline provisions that are binding on PEP, but not on COMMISA nor much less can or should be considered and applied by the Arbitral Tribunal in issuing its award.**

In this context, the dispute set forth and resolved through the arbitral award was a contractual dispute to which the corresponding Civil Law rules applied, pursuant to the terms of article 13 of the Law of Acquisitions and Public Works which is applicable to it and provides the following:

> **"Article 13.-** For anything not provided for in this Law, the Civil Code for the Federal District in Local Matters and for the Entire Republic in Federal Matters and the Federal Code of Civil Procedures will apply."

Furthermore, it is relevant to emphasize that according to article 14 of the Organic Law of Petroleos Mexicanos and Subordinated Bodies (Ley Orgánica de Petróleos Mexicanos y Organismos Subordinados), PEP is authorized, as happened in the case under analysis, to submit to the decision of an Arbitral Tribunal the disputes arising from the contracts it executes, and therefore to now allege that basically the Arbitral Tribunal cannot resolve the disputes set before it due to internal budgetary discipline provisions of PEP is incorrect. Such article establishes the following:

> "**Article 14.-** The legal transactions executed by Petróleos Mexicanos or any of its Subsidiaries shall be governed by the applicable Federal Laws and the national disputes in which it is involved, whatever their nature, will be under the competence of the Federal courts, except in the case of an arbitration agreement, being exempt from granting the guarantees that the laws require of the parties, even in the cases of court disputes.
>
> In the case of international legal transactions, Petróleos Mexicanos or its Subsidiaries may agree to the application of foreign law, the jurisdiction of foreign courts in commercial matters and execute arbitration agreements when such is in the best interest of fulfilling its purpose."

In addition, and concentrating specifically on the provisions invoked by the claimant, it should be specified that article 134 of the Constitution of the United Mexican States provides, in relevant part, the following:

> "**Article 134.** The economic resources of the Federal Government and the Government of the Federal District, as well as their respective public administrations, will be administered efficiently, effectively and honestly in order to satisfy the objectives for which they are to be used.
>
> The acquisitions, leasing and alienations of all types of goods, provision of services of any kind and **the contracting of works that are done, shall be awarded or carried out through public bidding** by an invitation to tender bids in which solvent offers are freely presented in closed envelop, which will be opened publicly, in order to ensure the State the best conditions available with regard to price, quality, financing, opportunity and other relevant circumstances …"

From the cited article it can be seen that our Constitute establishes that **all the contracts to which the State is a party** shall be subject to a public bidding procedure.[13]

---

[13] Except when a bid is not appropriate for securing the best conditions for the State – third paragraph of article 134 of the Constitution –.

63

In this regard, any contracting of public works by the State shall be subject to the Law of Public Works and Related Services (Ley de Obras Publicas y Servicios Relacionados),[14] which regulates the actions regarding the planning, programming, budgeting, contracting,[15] expenditure, execution and control of the public works, as well as the services related to them.

In conclusion, all contracting done by the State in relation to public works is regulated by the Law of Public Works and Related Services.

However, it should be clarified that not every contract executed by the State or its state-owned agencies is an administrative contract.  In effect, the administrative nature of a contract does not arise from the fact that the State is a party to it or that it is entered into and regulated by a Federal Law, such as the Law of Public Works and Related Services, but rather to two specific factors:

    a)  That the administrative body executes it to satisfy the public interest.

    b)  That there is a relationship of subordination between the authority and the private party.

Below each of these will be explained in greater detail and it will be analyzed whether or not the contract met such requirements.

### a) That the administrative body executed it to satisfy the public interest.

The administrative body that executed the contract was PEP and the purpose of the contract, as established in the second clause of the instrument, was *"the execution of a work consisting of design, procurement, manufacture, pipelines, anticorrosive coating,*

---

[14] Published in the Official Federal Gazette on January 4, 2000 and which derogated the Acquisitions and Public Works Law.
[15] In Title Three of the Law.

ballasting, cathodic protection, rising ducts, installation and testing of valves." As can

been seen, PEP contracted COMMISA in order to carry out works on its pipeline and

duct system, which does not imply a satisfaction of the public interest, but rather the

maintenance of its installations.

The courts of our country have indicated that for a contract to have the public interest as

its purpose, its purpose must be **intimately** linked to satisfying collective needs and that

the satisfaction of those needs is not indifferent to the form of execution of the

contractual obligations. Below court precedent issued by the Plenary of the Supreme

Court of Justice of the Nation is transcribed, in which the interpretation described can be

seen:

> **"ADMINISTRATIVE CONTRACT. DISTINGUISHED BY THEIR PUBLIC POLICY PURPOSE AND BY THE EXORBITANT REGIME OF CIVIL LAW TO WHICH THEY ARE SUBJECT.** The administrative nature of a contract executed between a state body and a private party can validly be deduced from the public policy purpose pursued, also identified as public or social utility, as well as the exorbitant regime of civil law to which it is subject. From this it is inferred that **contracts executed by a state body with private parties are governed by private law when their purpose is not closely and necessarily linked to the fulfillment of the public attributions of the State and, therefore, the satisfaction of the collective needs is not harmed because in those acts the State does not make use of the means that authorizes its special regime.** On the other hand, when the purpose or end of the contract is intimately linked with the fulfillment of the state attributions, such that the satisfaction of the collective needs is not indifferent to the form of execution of the contractual obligations, then an administrative contract would exist, it being valid to stipulate exorbitant clauses that, from the point of view of private law, would be null and void, but that in the administrative area are not, due to the need to ensure the regular and continuous functioning of the public service.
>
> Ordinary civil federal proceeding 1/2000. Jesús Guillermo Puente Cutiño. 20 February 2001. Unanimous ten votes. Absent: Genaro David Góngora Pimentel. Presiding judge: Juan Díaz Romero. Secretary: Silverio Rodríguez Carrillo.
>
> The Plenary Court, in its private session held today, March 29th of this year,

approved, with the number IX/2001, the above isolated decision; and determined that the vote is adequate to become court precedent. Mexico City, Federal District, on March 29, 2001.

Registry No. 189995, Ninth Period, Instance: Plenary, April 2001, Material(s): Administrative, Civil"

(Emphasis added)

For its part, scholars have indicated – in the words of Marienhoff – that public service is *"the activity intended to immediately satisfy the needs of the social group and of the individuals that are part of it",* and that one of the most outstanding traits of the public services is that they should not be principally in pursuit of profit.

In the case in question, in the contract PEP is not pursuing the satisfaction of collective needs, which is to say, it is not performing tasks of the State as such.

**b) There is a relationship of subordination between the authority and the private party**

There can be three types of relationships between the parties to a contract in which the State is involved:

(i)     of coordination: those that are established between private parties or between agencies of the public power – in its private capacity – and private parties;

(ii)    of *supra* ordination: those between different agencies of the public power in their capacity of authorities

(iii)   of *supra* subordination: those established between agencies of the public power as **authorities** and private parties.

66

In the case of the contract in question here, the parties constituted a relationship of voluntary cooperation between PEP and COMMISA, and not a relationship of supra subordination between authority and private party.

Therefore it was a private contract in which both parties acquired rights and obligations and fixed the terms of the relationship, including arbitration as a means for resolving any future disputes arising during the life of the contract.

As a conclusion to what we have explained, the fact that the Contract is governed by the Law of Acquisitions and Public Works[16] does not give it the character of **an administrative contract**, rather its purpose must be looked to which is imminently private.

Thus, and since clearly private interests converge in the Contract, the contract is a Private Contract. Consequently, the assertion by the plaintiff that in the contract the private interests of COMMISA and the public interests of PEP come into conflict is false.

The above clarification is extremely important given that PEP attempts to argue that since its interest is public, the latter must prevail over the private interest of COMMISA. This is clearly false because the contract was signed between two private parties and there is no one interest above the other, there are simply clauses that determine the obligations and rights of the parties in relation to the contract and the Arbitral Tribunal has decided according to what was agreed by the parties.

To think otherwise, which is to say to consider that a contract in which the State is involved will always be in the public interest and that therefore the interests of the State must prevail over those of the private party, would lead us to the absurd conclusion that every contract in which the State participates lacks legal certainty and that what prevails

---

[16] This Law began to govern the contract from when it entered into force in the year 2000; prior to that the Law of Acquisitions and Public Works was in force.

are the arbitrary decisions that the State can adopt against which the private party has no recourse since its interest is considered inferior.

On the contrary, the legal regime of the country provides that when an authority acts in violation of the contractual provisions and thereby affects the private party, the latter has the option to make use of one of the means of defense for asserting the rights that the contract and the Constitution and the laws have granted it, thereby having the contractual violation declared illegal and being indemnified directly for the damages and losses suffered as a result of the illegal conduct of the authority.

That was exactly what COMMISA did when it went to arbitration – according to the terms agreed to in the contract – in order that the actions of PEP that violated the contractual provisions be sanctioned, thereby remedying the damages caused to it.

Finally, it should be indicated that if the position of PEP that the Contract is administrative and not civil were accepted, this would lead to the absurd result that Your Honor would not be authorized or competent (by reason of subject matter) to hear this proceeding for setting aside the award.

3.- <u>The Arbitral Award did not violate any budgetary provision.</u>

First of all it is necessary to clarify that the laws and articles cited by PEP in its claim to set aside the arbitral award, and based on which it develops a series of arguments to conclude – erroneously – that the public interest has been violated, are deceptively interpreted in an isolated manner and on many occasions they are provisions that do not apply to the case in question or that have been derogated by other laws.  Therefore, below the legal framework with the laws applicable to the arbitral award is offered and it is explained why such award is in accordance with the Law.

68

PEP considers that the arbitral award is contrary to Mexican provisions of public policy, and specifically in relation to the Federal Political Constitution, argues that the award violates the provisions of articles 126 and 134.

Article 126 of the Constitution establishes the following:

> "Article 126. No payment may be made that is not contemplated in the Budget or determined by subsequent law."

PEP maintains that the arbitral award violates this principle when it imposes an obligation to pay an amount that is not contemplated in the budget. This conclusion is incorrect considering that the arbitral award at no time orders PEP to make the payment with money that is not contemplated in the budget.

If one studies the Constitution as a whole, and not just article 126 alone, it will be seen that article 13 of our Magna Carta contemplates **that the State is responsible for any damages that due to its irregular activity** it may cause to private parties.

In effect, article 113 in relevant part provides the following:

> "Article 113. …
>
> The liability of the State for any damages that, as a result of its irregular administrative activity, it may cause to the assets or rights of private parties, will be strict and direct. Private parties will have the right to indemnification according to the bases, limits and procedures established in the laws."

If we take as a premise the fact that the Constitution itself establishes that the State can be liable and that if it is it must indemnify the private party, then we have to conclude that the payment of such indemnification is constitutionally valid and that – according to article 126 – must be charged to the budget. The above is valid pursuant to the

applicable law, and further on the manner in which such payment should be made from the budget will be detailed.

Therefore, we can conclude that the arbitral award is in accordance with the law and that the fact that it orders PEP to pay an indemnification for the liability it incurred when it violated the contract signed with COMMISA is not contrary to public policy.

Furthermore, PEP considers that the arbitral award violates the penultimate paragraph of article 134 of the Constitution which provides that *"the handling of federal economic resources will be subject to the bases of this article"*.

The argument of PEP is unfounded and to demonstrate this it is necessary to understand the context of the article and not only the paragraph cited, and therefore below it is transcribed in its totality:

> "**Article 134.**   The economic resources at the disposal of the Federal Government and the government of the Federal District (as well as their respective state enterprises and administrations) will be administered with efficiency, effectiveness, and honesty, to satisfy their objectives.
>
> Acquisitions, leases, and transfers of all classes of goods, giving of services of any nature, and the contracting of works that the government undertakes, will be decided or carried out through open bidding by means of a public meeting where solvent propositions are presented. The propositions will then be presented as sealed bids, to be open publicly, to the end of assuring to the state the best conditions available in price, quality, financing, opportunity, and other pertinent areas.
>
> When the bidding to which the previous paragraphs refers is not suitable to assure these conditions, the laws will establish the bases, procedures, rules, requirements, and other elements to guarantee the economy, effectiveness, efficiency, impartiality, and honestly that the assures the best conditions for the state.
>
> **The handling of federal economic resources will be subject to the bases of this article.**

70

> Public servants will be responsible for compliance with these bases in the terms of the fourth title of this Constitution."

> (Emphasis added)

As can be seen, article 134 provides the principles and the bases that must be followed when the State contracts services, the construction of works or acquires, leases or alienates all types of goods. In this regard, we should have clear that such provision in no manner contradicts the fact that the State is liable for the damages it causes to private parties. Therefore, the argument made by PEP that the arbitral award is contrary to the provisions of article 134 of the Constitution is unfounded.

Furthermore, PEP maintains that all the modifications to the public works contracts that generate new obligations to be executed against federal resources must be explicit, and the above it bases on article 70 of the Law of Acquisitions and Public Works which establishes the following:

> "Article 70.- The agencies and entities may, within the approved program of investments, under their responsibility and for legally grounded and explicit reasons, **modify public works contracts** by amendments, provided they, considered jointly or separately, do not surpass twenty-five percent of the amount or the term agreed in the contract, nor imply substantial variations to the original project.

> If the modifications exceed the percentage indicated or vary the project substantially, an additional agreement should be executed by the parties, on one occasion, with respect to the new conditions, in terms of article 29. This additional agreement shall be authorized under the responsibility of the head of the agency or entity or by the administrative head or his equivalent in entities. Such changes may not, in any way, affect the conditions that refer to the essential nature and characteristics of the work contemplated in the original contract, nor be agreed to elude in any manner compliance with the Law or the Treaties.

> The head of the agency or entity, without possibility of delegation, shall inform the Ministry, the Controller and, if applicable, the governmental body of the authorizations referred to in the above paragraph. To this effect, no later than the last business day of

71

each month a report shall be presented referring to the authorizations granted in the immediately prior calendar month.

The limits established in this article will not be applicable in the case of contracts whose works refer to the conservation, maintenance or restoration of the properties referred to in article 5 of the Federal Law of Monuments and Archeological, Artistic and Historical Zones, in which it is not possible to determine the catalog of concepts, the amounts of work, the corresponding specifications or the execution schedule."

(Emphasis added)

My principal considers that PEP is correct in the sense that the **modifications** of public works contracts that generate new obligations against federal resources must be explicit and comply with the procedure and conditions contemplated in article 70 cited above.

However, PEP attempts to apply such rule – **which refers only to contractual modifications** – to obligations that arise for it as a result of a contractual breach that has been analyzed and determined by the Arbitral Tribunal.

In conclusion, the arbitral award does not violate article 70 of the Law of Acquisitions and Public Works because it is not a contractual modification but rather an order to pay an indemnification for contractual breach, and therefore the origin of the obligations of PEP should not follow the provisions of such article.

With regard to the violation of the provisions of the *Reglamento de la Ley Federal de Presupuesto, Contabilidad y Gasto Publico Federal* (Regulation of the Federal Law of the Budget, Accounting and Federal Public Expenditure) – now the *Reglamento de la Ley Federal de Presupuesto y Responsabilidad Hacendaria* (Regulation of the Federal Budget and Treasury Responsibility Law), the same is also unfounded**.**

Before analyzing the articles that PEP considers have been violated at the regulation level, the following clarification should be made.

72

The Regulation of the Federal Budget and Treasury Responsibility Law was published in the Official Federal Gazette on June 28, 2006 and entered into force - according to its first transitory article – the day following its publication, **derogating** – in terms of its second transitory article – the Regulation of the Federal Law of Budget, Accounting and Federal Public Expenditure.

Thus it is inconsistent that PEP bases its claims on two regulations that by definition cannot regulate at the same time the expenditures of PEP since one has abrogated the other.

In this regard, COMMISA considers that the Regulation of the Federal Budget and Treasury Responsibility Law is applicable to this case because it is that regulation that was in force at the time that the Arbitral Tribunal issued the arbitral award, but above all because it will be that Regulation that will govern the form and mechanism based on which PEP will have to pay the indemnification it has been ordered to pay.

Notwithstanding the above, below the articles that PEP considers have been violated of both regulations will be analyzed:

- Article 44 section III of the Regulation of the Federal Law of the Budget, Accounting and Federal Public Expenditure:

PEP considers that article 44 section III of the Regulation of the Federal Law of the Budget, Accounting and Federal Public Expenditure has been violated because the payment it is being obligated to make is not found duly justified and proven in the provisions and legal documents that determine the obligation to make the payment.

This article establishes the following:

73

"Article 44.- The entities must ensure under their responsibility that the payments that are made charged to their approved budgets are made subject to the following requirements:

I. That they correspond to obligations actually accrued, with the exception of the advance payments established in other laws and those mentioned in article 64 of this Regulation.

II. That they are made within the limits of the authorized financial calendars, and

**III. That they are duly supported and proven with the respective original documents, supported being understood in terms of the provisions and legal documents that determine the obligation to make a payment and, for proven, the documents that show the delivery of the corresponding amounts of money."**

In this respect, COMMISA considers that the arbitral award, and eventually the resolution of the competent judge ordering its enforcement, **are legal documents that determine the obligation to make the payment.**

It is illogical to think that a resolution issued by the competent authority does not constitute a legal document which is a source of obligations for the State. To think in this manner, we would necessarily have to conclude that there is no manner to order the State to pay through an arbitral or court proceeding because the resolutions will not be sufficient to justify the payment it is ordered to make.

For their part, articles 69 and 70 of the same regulation cited by PEP, are not applicable to this case because they refer to the formalities and requirements for the orders and contracts in order to serve as supporting evidence for public expenditure. Therefore, they are not applicable to the arbitral award.

- <u>Article 66 section III of the Regulation of the Federal Budget and Treasury Responsibility Law:</u>

74

PEP considers that the arbitral award is contrary to article 66 section III of the Regulation of the Federal Budget and Treasury Responsibility Law, which provides the following:

> "Article 66. The agencies and entities will be responsible for ensuring that the payments made charged to their budgets are made subject to the following requirements:
>
> I. That they correspond to obligations actually accrued, with the exception of the advance payments established in other laws and those mentioned in article 64 of this Regulation.
>
> II. That they are made within the limits of the authorized financial calendars, and
>
> **III. That they are duly supported and proven with the respective original documents, supported being understood in terms of the provisions and legal documents that determine the obligation to make a payment and, proven, in terms of the documents that show the delivery of the corresponding amounts of money."**
>
> The records of the expenditures that do not constitute payments will be adjusted to be compatible with this Section, as determined by the Ministry."
>
> (Emphasis added)

As was stated in the prior section – in relation to article 44 of the Regulation of the Law of the Budget, Accounting and Federal Public Expenditure –, my principal considers that the arbitral award, and eventually the resolution of the competent judge ordering its execution, **are legal documents that determine the obligation to make the payment.**

The best way to prove this is by fully analyzing both the Federal Budget and Treasury Responsibility Law and its Regulation, from which it can be seen that both regulations contemplate the possibility and the procedure to be following for paying obligations to private parties whose origin is the liability of the State.

75

Article 2 of the Federal Budget and Treasury Responsibility Law offers us a series of definitions, among which we find that of the accrued budget.

> **"Article 2.-** For purposes of this Law, the following terms will have the meanings indicated:
>
> …
>
> XXXVI. Accrued budget: the **recognition of the payment obligations** of the executors of expenditures with third parties, for the commitments or requirements complied with by them according to the applicable provisions, **as well as the payment obligations arising** by mandate of treaties, laws or decrees, as well as **definitive rulings and judgments**, and the expenditures referred to in article 49 of this Law;…"
>
> (Emphasis added)

As can be seen, the cited law expressly establishes that the executors of expenditures must recognize the payment obligations with third parties resulting from definitive rulings or judgments.

In this regard, it is clear that the arbitral award is a definitive ruling and therefore the payment of the obligations it imposes on PEP must be recognized and form part of the accrued budget.

In this respect, it should be indicated that the law in question is the law that regulates articles 126, 127 and 134 of the Constitution, which were specifically invoked by PEP as a basis for its argument that obligations resulting from a ruling cannot be paid. The above again shows that PEP is wrong and that the payments it was ordered to make in the arbitral award are valid under law and therefore are not contrary to public policy.

In this same regard, article 4 of the same regulation provides the following:

> "Article 4.- The federal public expenditure comprehends expenditures for current outlays, including the payments for the public debt; physical investment; financial investment; **as well as economic liability;** made by the following executors of expenditures:
>
> I. The Legislative Power;
> II. The Judicial Power;
> III. The autonomous entities;
> IV. The administrative courts;
> V. The Attorney General of the Republic;
> VI. The Presidency of the Republic;
> VII. The agencies, and
> **VIII. The entities."**

From the cited article it can be clearly seen that expenditures of the federal public expenditures include those originating from the economic liability of the executors of the public expenditure, including the entities.

From the above it is concluded that the Law itself is contemplating that the State can incur economic liability and that therefore there can be expenditures made to indemnify such liability.

For its part, article 47 of the cited law provides the procedure that should be followed by the executor of the expenditure – in this case PEP – in order to cover the obligations of any kind resulting from definitive rulings issued by a competent authority. The provision is transcribed below:

> **"Article 47.- The executors of expenditures, charging to their respective budgets and in accordance with the general applicable rules, shall pay** the corresponding federal, state and municipal contributions, as well as **the obligations of any kind resulting from <u>definitive rulings</u> issued by a competent authority.**
>
> **The budgetary adjustments that may be necessary in order to pay obligations referred to in the final part of the above paragraph may not affect compliance with the objectives and the goals of the priority programs approved in the Expenditures Budget.**

> **The agencies and entities that cannot cover all the obligations in accordance with the above paragraph will present to the competent authority a payment schedule which shall be considered for all legal purposes in process of execution with respect to the ruling that has been issued**, for purposes of covering the obligations up to an amount that does not affect the objectives and goals of the priority programs, without prejudice that the rest of the obligations shall be paid in the subsequent fiscal years according to such schedule.
>
> The Legislative and Judicial Powers and the autonomous entities, if necessary, will establish a proposal for compliance with obligations, observing the relevant provisions of the second and third paragraphs of this article."
>
> (Emphasis added)

The cited article clearly shows that the legal regime applicable to the public expenditures of PEP require it to pay the obligations derived from definitive rulings issued by a competent authority from its budget, and it even establishes the form in which the obligations should be paid if the amount owed cannot be covered, for which the State is authorized to present before the competent authority a payment schedule that shall be considered for all legal purposes in process of execution with respect to the ruling that has been issued.

In addition article 57 of the Regulation of the Federal Budge and Treasury Responsibility Law contemplates that in terms of article 41, section II, subsection f) of the Law, the expenditures to cover indemnifications and obligations arising from definitive rulings issued by a competent authority shall be understood **as obligatory expenditures** up to the amount corresponding to it to exercise in such year.

For greater clarity, both articles are transcribed below:

> "Article 41 of the <u>Law</u>.- The draft Expenditures Budget will contain:
> …
> II. The draft Decree, the annexes and volumes, which will include:
> …

**f) A specific chapter that incorporates the previsions for expenses corresponding to obligatory expenditures**;…"
(Emphasis added)

"Article 57 of the <u>Regulation</u>.- For purposes of article 41, section II, subsection f) of the Law, obligatory expenses will be understood as the following:
…
VII. Expenditures to cover indemnifications and obligations that are derived from definitive rulings issued by a competent authority up to the amount corresponding to it to exercise in such year, which is determined in accordance with article 47 of the Law;"

The contents of both articles lead us necessarily to the conclusion that the expenditures to cover indemnifications and obligations derived from definitive rulings by a competent authority must necessarily be incorporated into the previsions for obligatory expenses included in the expenditures budget.

The above again shows that there is no violation of public policy by ordering PEP to pay obligations, and furthermore it is shown that the payment of such obligations is necessarily incorporated into the expenditures budget and therefore their payment is in accordance with the law and above all with constitutional principles.

If we look at each of the challenges made by PEP with respect to the specific claims, we see that, contrary to what PEP maintains, the indicated violations do not exist as detailed below:

a) In resolving Technical Dispute 36 the articles mentioned by PEP are not violated.

Articles 126 and 134 of the Constitution have not been violated considering that from a comprehensive reading of the Constitution it can be seen that it contemplates the existence of the liability of the State. Furthermore, the regulatory law of such articles, the Federal Budget and Treasury Liability Law, contemplates the validity of and the

79

conditions in which the payment of the obligations of the State declared in definitive judgments and rulings must be made.

For its part, article 70 of the Law of Acquisitions and Public Works has not been violated since it refers only to the requirements and conditions that must be complied with in relation to **modifications** of public works contracts that generate new obligations on federal resources. However, such rules are not applicable to the obligations PEP has been ordered to pay for contractual breach, which has been analyzed and determined by the Arbitral Tribunal.

Furthermore, article 44 section III of the Regulation of the Federal Law of the Budget, Accounting and Federal Public Expenditure, has not been violated considering, first of all, that it is not applicable to the arbitral award because it was derogated prior to the award's issuance and in addition it would not govern the payment of the obligations PEP has been ordered to pay. Supposing without conceding that the article were applicable to this case, it would not have been violated since the arbitral award and the judgment that will eventually order its enforcement constitute legal documents that permit the determination of the obligation to make the payment in accordance with section III of the cited article.

Article 66 section III of the Regulation of the Budget and Treasury Responsibility Law also has not been violated considering that the arbitral award and the eventual ruling of a competent judge ordering its enforcement, are legal documents that determine the obligation to pay the obligations that PEP has been ordered to pay. This is clear from a comprehensive reading of such regulation, which establishes the form in which such obligations must be paid from the budget.

For their part, articles 69 and 70 of the Regulation of the Federal Law of the Budget, Accounting and Federal Public Expenditure, have not been violated considering, first of all, that they are not applicable to the arbitral award because they were derogated prior to the award's issuance and in any case they would not govern the payment of the

80

obligations PEP has been ordered to pay. Supposing without conceding that the articles did govern this case, they refer to formalities and requirements applicable to orders and contracts in order for them to be considered supporting documentation for public expenditure. Therefore, they are not applicable to the arbitral award.

Finally, article 29 of the Law of Acquisitions and Public Works has not been violated because this only refers to the conditions and requirements that must be complied with for the State to contract acquisitions, leases, services or public works, and therefore such rules are not applicable to the obligations PEP was ordered to pay for a contractual breach that has been analyzed and determined by the Arbitral Tribunal.

b)    The resolution of Technical Disputes 34 and 35 did not violate the provisions mentioned by PEP.

First, article 44 section III of the Regulation of the Federal Law of the Budget, Accounting and Federal Public Expenditure, has not been violated considering, first of all, that it is not applicable to the arbitral award because it was derogated prior to the award's issuance and in addition it would not govern the payment of the obligations PEP has been ordered to pay. Supposing without conceding that the article were applicable to this case, it would not have been violated since the arbitral award and the judgment that will eventually order its enforcement constitute legal documents that permit the determination of the obligation to make the payment in accordance with section III of the cited article.

Neither was article 66 section I of the Regulation of the Federal Budget and Treasury Responsibility Law violated in the arbitral award since this refers to the rules that govern the payment of contractual obligations, and therefore their regulation is not applicable to the payment order imposed on PEP in the arbitral award, which is the result of a contractual breach and its compliance is governed by another series of articles which have already been listed and analyzed in section *"c) Regulation of the Federal Law of*

81

*the Budget, Accounting and the Federal Public Expenditure – now the Regulation of the Federal Budget and Treasury Responsibility Law –".*

Finally, neither was article 65 of the Law of Acquisitions and Public Works violated, since contrary to what PEP argues, it is contractually obligated to indemnify COMMISA for these claims since PEP incurred omissions and delays exclusively attributable to it and with respect to which it assumed its responsibility.

Moreover, this determination cannot be reviewed in this proceeding alleging a supposed liability restricted by article 65 of the cited Law of Acquisitions and Public Works, since it is a fact that PEP can extend such liability contractually, as well as that such article refers to a situation of delay in which the other party has not been in turn obligated to make expenditures to comply with its obligations on the date originally agreed, as happened in this case.

c) The resolution of Technical Disputes 37 and 39 did not violate the articles PEP mentions.

Articles 126 and 134 of the Constitution have not been violated considering that a comprehensive reading of the Constitution shows that it contemplates the existence of State liability. In addition, the regulatory law of such articles, the Federal Budget and Treasury Responsibility Law, contemplates the validity and conditions under which obligations decreed in definitive judgments and rulings must be paid.

Article 44 section III of the Regulation of the Federal Law of the Budget, Accounting and Federal Public Expenditure, has not been violated considering, first of all, that it is not applicable to the arbitral award since it was derogated prior to the issuance of the award and in any case it would not govern the payment of the obligations PEP was ordered to pay.  Supposing without conceding that the article was applicable to this case, it has not been violated because the arbitral award and the judgment eventually issued ordering

its enforcement constitute legal documents that permit the determination of the obligation to make a payment in accordance with section III of the cited article.

For its part, article 66 section III of the Regulation of the Federal Law of the Budget and Treasury Responsibility, has not been violated considering that the arbitral award and eventually the ruling of the competent judge ordering its enforcement, are legal documents that determine the obligation to make the payments that PEP has been ordered to make. This is evidenced from the comprehensive reading of such regulation, which provides for the manner in which such obligations must be paid from the budget.

Finally, article 57 of the Law of Acquisitions and Public Works has not been violated since it refers to the types of contracts that exist in relation to public works, and is not relevant for purposes of the award. It is important to recall that the causes for setting aside can only refer to those that are committed at the time of issuing the award and not to substantive questions of the case.

In this regard, article 57 refers to the concept of unit price, which was respected by the Arbitral Tribunal in its award because based on that it determined the compensation to which COMMISA was entitled with respect to the work done and interpreting the characteristics of such work in relation to the unit prices agreed by the parties.

Thus is it clear that there is no violation in the arbitral award of such provision.

   d) The resolution of Technical Dispute 19 did not violate the provisions mentioned by PEP.

Article 70 of the Law of Acquisitions and Public Works has not been violated since such article only refers to the requirements and conditions that any **modifications** to public works contracts that generate new obligations charged to federal funds must comply with.  However, such rules are not applicable to the obligations PEP was ordered to pay

as a result of a contractual breach that has been analyzed and determined by the Arbitral Tribunal.

e) The resolution of Technical Dispute 27 did not violate the provisions mentioned by PEP.

Article 57 of the Law of Acquisitions and Public Works has not been violated given that it refers to the types of contracts that exist in relation to public works, and this is not relevant in relation to the award. It is important to recall that the causes for setting aside can only refer to those committed at the time of issuing the award and not to substantive issued of the case.

Finally, PEP argues in its pleadings regarding the setting aside of the arbitral award that the law prohibits the stipulation of contract penalties and late payment interest against entities in contracts and orders. In this respect, it should be stated that the order in favor of COMMISA determined by the Arbitral Tribunal was not the result of a contract penalty or late payment interest, but rather an indemnification for breach of contractual obligations, and therefore there is no legal violation that could justify the setting aside of the award.

4.- <u>The Arbitral Award does not modify the Contract and, therefore, it does not violate Article 70 of the applicable Law of Acquisitions and Public Works.</u>

PEP questions the decisions adopted with respect to the Technical Dispute numbers 19 and 36 alleging that in such decisions the interpretation of the Arbitral Tribunal modifies the Contract violating article 70 of the Law of Acquisitions and Public Works by not complying with the formalities set forth therein.

**In relation to this point, the argument of PEP is clearly incorrect and tendentious. The Arbitral Tribunal did not modify the Contract, it simply applied and enforced the agreement adopted by the parties.**

84

In effect, the Arbitral Tribunal based its decisions on the agreement PEP itself made to compensate COMMISA for any modifications to the Schedule of the works.

As can be appreciated from the reading of the arbitral award (pages 51 to 60 with respect to technical dispute number 36; and pages 127 to 133, in relation to technical dispute number 19) the Arbitral Tribunal determined, after evaluating the evidence and arguments of COMMISA and PEP, that PEP assumed the obligation to compensate COMMISA for the additional costs the latter may incur derived from the exercise by PEP of its right to reschedule the works.

At no time did the Arbitral Tribunal attempt to modify the obligations freely contracted by the parties, nor substitute itself for the will of the parties and establish terms and conditions different from those agreed on.  The Tribunal limited itself to applying the contractual provisions agreed to by PEP and COMMISA that the Arbitral Tribunal determined were applicable to the case in question.  Specifically, the Arbitral Tribunal determined that "*any modification of the schedule constitutes an extraordinary work, which has to be satisfied in accordance with clause 6.1 of the contract.*"

By arguing that the Arbitral Tribunal "modified" the Public Works Contract, PEP tacitly but necessarily assumes that the Arbitral Tribunal erred in its evaluation of the evidence and/or interpretation of the Contract.  That is to say, PEP presumes that it was not obligated to compensate COMMISA for the additional costs of the rescheduling of the works, and that the Arbitral Tribunal made an erroneous decision when it resolved otherwise.  Thus in summary, the decisions on the facts and law of the Arbitral Tribunal are being challenged under the pretext of a violation of public policy.

As the Mexican courts have established on repeated occasions, the judicial authority that hears the enforcement of an award and/or the claim for its setting aside cannot review the decision on the merits of the arbitral award, only the form.  By demanding the setting aside based on this argument, PEP is requesting Your Honor to resolve,

expressly or tacitly, that the Arbitral Tribunal erroneously evaluated the evidence offered and that its decision regarding the facts must be reviewed judicially. As we indicated, this is contrary to the provisions of the Commercial Code in relation to arbitration (which only permits the setting aside of an arbitral award in the restricted cases indicated in art. 1457 of the Commercial Code) and the decisions of the Mexican courts expressly recognize that the substantive rulings of the Arbitral Tribunal cannot be judicially overturned. In this regard, what is resolved by the Arbitral Tribunal has the nature of res judicata (as already mentioned in the cited isolated decision) **ARBITRATORS. THEIR RESOLUTIONS ARE ACTS OF AUTHORITY, AND THEIR ENFORCEMENT CORRESPONDS TO THE JUDGE DESIGNATED BY THE PARTIES** in section C) of this chapter VI.

In this regard, it should be mentioned that the Mexican courts have clearly established the principle that the judicial authority cannot review the *substance* of the arbitral award, which is to say the determination by the tribunal of the disputed facts and arguments offered by the parties:

> **Registry No.** 186229
> **Localization:**
> Ninth Period
> Instance: Collegiate Circuit Courts
> Source: Judicial Weekly of the Federation and its Gazette
> XVI, August 2002
> Page: 1317
> Decision: XV.1o.50 C
> Isolated Decision
> Material(s): Civil
>
> **ARBITRAL AWARD. ITS HOMOLOGATION BY ORDINARY JUDICIAL AUTHORITY AND ITS ANALYSIS, IN AMPARO, DOES NOT PERMIT THE STUDY OF THE SUBSTANCE OF THE RULING.**
>
> An arbitral award is the decision of a non-state body, agreed to by the parties, to resolve a dispute, either present or future; thus, for purposes of the ordinary court proceeding the latter remains under the exclusive authority of the decision of the arbitral tribunal and becomes an extension of that decision, which being an act of private parties, in regard to its ruling, is not subject to constitutional review; however, such constitutional review may be given with respect to the ruling of homologation issued by a state judicial body, which, of course, will be limited to the result of the analysis of the due formation of the arbitral tribunal, of due

86

process, of the manifestation of the agreement of the parties to submit to arbitration, of the matters subject to arbitration and of **the other situations contemplated in article 1462 of the Commerce Code, situations that, as indicated, only contemplate questions of form and not of substance**, and, once the homologation is accomplished, of the acts of enforcement with which the Judge helps to fulfill the award; therefore in the amparo only those questions can be pleaded and not any regarding the substance and ruling of the award. This is supported with the interpretation upheld by the Third Chamber of the above formation of the Supreme Court of Justice of the Nation, in the isolated decision, published in the Judicial Weekly of the Federation, Fifth Period, Volume XXXVIII, page 801, with the heading: "ARBITRATION.", in which it is considered that **arbitration is a convention that the law recognizes, which constitutes a *renouncement* by the private parties of the right for the judicial authority to take up a dispute**, and therefore it has negative procedural significance, in that the parties entrust the resolution of their disputes to one or more private parties, called arbitrators; however, these are not officials of the State and nor do they have jurisdiction of their own or delegated, and their powers only arise from the agreement of the parties, expressed according to law, and while the arbitral award cannot be revoked unilaterally by one of the interested parties, it is not ready for execution in itself, since it can only be considered to be a work of the legal reasoning that is resorted to by the State, and therefore it can only be enforced through an act carried out by a judicial body which, without removing its private nature, assumes its contents, and it is then that it becomes a judicial act. However, **the Judges are not authorized to review the awards as a whole, since otherwise they could nullify them, even for substantive questions, for which it would be necessary that first the parties appear before the Judge to set forth the debate, and the system generally adopted consists of if the violation contained in the award violates public order, the Judge should not order its enforcement, but if it only harms private interests he should order it**; and once its enforcement is judicially declared it becomes a judicial act and it is then that the aggrieved party can go before the Federal courts to file an amparo, which must be processed in a double proceeding, as is indicated in court precedent number 32/93 of the Third Chamber of the above formation of the Supreme Court of Justice of the nation, published in the Gazette of the Judicial Weekly of the Federation, volume 72, December 1993, page 41, with the heading: "ARBITRAL AWARD, RULINGS OF HOMOLOGATION AND ENFORCEMENT OF. INDIRECT AMPARO, IN TERMS OF ARTICLE 114, SECTION III, OF THE LAW OF AMPARO, AND NOT THE DIRECT AMPARO ALLUDED TO IN 158 OF SUCH LAW.".

FIRST COLLEGIATE COURT OF THE FIFTEENTH CIRCUIT.

Amparo in review 138/2002. Mecalux, México, S.A. de C.V. 28 May 2002. Unanimous vote.
Drafting judge: Pedro Fernando Reyes Colín. Secretary: Ángel Rodríguez Rico.

This same court precedent clearly establishes that the award must be enforced when only private interests are affected and that, according to the contrary reasoning, it is considered that the award is contrary to public policy when the public interest is harmed. In this regard, it is relevant that PEP is a state entity or an entity of the centralized public administration, with its own legal status and assets that engages in commerce.

An arbitral award that orders PEP to compensate additional costs derived from a decision freely adopted by PEP in the context of a commercial relationship (derived from the Works Contract), from a contract entered into by PEP in its capacity as a private commercial entity (which is to say without exercising a state function or power) cannot be considered contrary to public policy.  According to this principle, it is clear that the arbitral award whose setting aside is requested by PEP does not harm the public interest since it affects only the economic interests of PEP, derived from its actions as a private entity in the development of business activities, as is fully explained in the number immediately above.

>    5.- <u>The orders to pay contained in the Arbitral Award do have a contractual basis and do not refer to payments unforeseen in the Contract.</u>

The plaintiff bases its claim for setting aside the arbitral award on the fact that the amounts it was ordered to pay with respect to the claims related to the technical disputes 27, 37 and 39 were not foreseen in the contract as such and therefore they were not provided for in the budget, which violated public policy.

Such assertions of the plaintiff are unfounded and therefore they cannot result in the partial setting aside of the award.

As has been maintained through this response to the claim, the arbitral award can only be set aside pursuant to the causes set forth in the different sections of article 1457 of the Commercial Code.

This article does not establish as a cause for setting aside the incorrect interpretation or application of the contractual or legal provisions by the arbitral tribunal. The system of challenging commercial awards under Mexican law does not establish as a cause for setting aside an error or mistake in the interpretation of the law.

The plaintiff alleges exactly this when stating that the arbitral tribunal ordered PEP to pay indemnifications not foreseen in the contract. Therefore, it is not possible to consider such assertion valid as a cause for setting aside the award.

But in addition, aside from the above, supposing that such question could be analyzed as a cause for setting aside the award, it is considered that the plaintiff would still not be correct due to the fact that the claims referred to, which it was ordered to pay in the award, are indemnification for contractual breaches.

From the analysis of such claims and the determination of their validity in the arbitral award, it is clear that the support for the claims for indemnification of COMMISA against PEP is found in the contract.

In the case of claims 37 and 39, according to the terms and conditions of the invitation to bid, it is seen that they have to do with contractual breaches by PEP in relation to ducts and crossings.

The terms and conditions of the invitation to bid that are integrated into the contract provided that PEP was obligated to provide correct information with respect to the conditions of the seabed where COMMISA must install the ducts.

PEP provided incorrect information with respect to such seabed, which obligated COMMISA to carry out additional works. The fact of providing incorrect information caused harm to COMMISA.

89

The same applies with respect to the claim related to technical dispute number 27 which consisted of an indemnification for waiting times of the vessel called "Castoro 10" while work was done on the platforms and the rising ducts.

As can be seen from the award, PEP breached the contract given that in the middle of the execution of the work it ordered COMMISA to carry out additional works with such vessel on the platforms and rising ducts in spite of the fact that the original contract did not foresee this as work to be carried out by such vessel. This caused COMMISA to incur additional costs as a result of the change of plans of PEP. PEP never recognized such expenses incurred by COMMISA.

Under Mexican law, whomever causes harm to another as a result of the breach of an obligation is obligated to give restitution for such harm.

Even if it is true that the parties did not provide for a specific indemnification for such damage in the contract, this does not imply that the arbitral tribunal exceeded its authority for the two reasons mentioned.

The first of these consists of the fact that PEP had the contractual obligation to provide the correct information on the seabed.

In addition, in any case, the Federal Civil Code, applicable as substantive law, establishes as an inherent clause of all contracts the obligation to indemnify for damages caused.

Finally, as can be seen from exhibit C of the contract, the parties agreed on the possibility of and their obligations to pay additional works.

Therefore, it must be considered that such assertions of the plaintiff do not support the setting aside of the award.

6.- <u>The award correctly applies the contractual and civil law provisions and aside from that, its determinations in respect thereto cannot be considered to violate public policy.</u>

As was already specified in section B) of this chapter, in spite of the fact that PEP alleges at first that the Contract cannot be interpreted applying the provisions of Civil Law, subsequently it contrarily alleges that the arbitral award is contrary to public policy precisely because such provisions were not applied.

Thus the position of PEP in this respect consists of asserting that in those cases in which the decision of the Arbitral Tribunal resulted in an order to pay contrary to its interests, it incorrectly applied the applicable Civil Law provisions and principles and that, for this reason, public policy was violated.

Obviously, this position of PEP is incorrect since the simple incongruence between the interpretations that are part of the substantive determinations of the award, cannot under any excuse (as invoked by PEP) serve to support a review of the substance of the case.  It is stated again that the causes for setting aside are restrictive and above all that the arguments for supporting a violation of public policy cannot be used as an excuse to review the legal interpretations and evidentiary evaluations contained in the arbitral award.

In this regard, PEP attempts to support its wrongful inducement for the Judge to review the substance of the matter referring to a bibliography supposedly existing in an article entitled "*El orden público como motivo para negar el reconocimiento y ejecución de laudos arbitrales internacionales*" (Public policy as a reason for denying the recognition and enforcement of international arbitral awards) of professor José Luis Siqueiros.[17] However, from a reading of this article no opinion in line with its claim can be seen and,

---

[17] SIQUEIROS, José Luis. *El orden público como motivo para negar el reconocimiento y ejecución de laudos arbitrales internacionales*, Jurídica, No. 32, April 2003, Mexico, pp. 45-58.

on the contrary, professor Siqueiros adopts a much more restricted view of the concept of "public policy", maintaining that it can only be considered a cause for setting aside an award in exceptional circumstances and under an analysis done from an international and not a local perspective, there being in the world a trend toward favoring the efficiency of arbitration and the enforcement of the corresponding award. In this respect, this author argues the following:

> "Accepting that the national and universal court precedent has not been unanimous in this area, **it can be asserted that the current tendency favors the enforcement of the arbitral decision**. The European Court of Justice in a recent decision (1999) determined:
>
> "… **it is in the interest of the efficiency of the arbitral proceeding that the challenging of arbitral awards be limited to their scope and that *their setting aside or the refusal to recognize them only be possible in exceptional circumstances*"**.
> **…..**
>
> As indicated previously, the judicial authority of the State required to recognize and enforce a foreign award, must apply the principles of ***international public policy***, as conceived in such State. **By virtue of this it should ignore those principles that are considered fundamental in the context of the law that regulates the contract, or of the law applicable in the place of its performance**; nor should it consider the law in force in the place of arbitration. These three alternatives were available for the arbitral tribunal that issued the award, but they are not available for the judge that analyzes its enforcement.[18]"
>
> (Emphasis added)

In relation to what is indicated in this last paragraph, it is important to see how in the opinion of Professor Siqueiros the judge that hears the claim for setting aside an award can only consider the principles of international public policy in order to issued its decision, ignoring the fundamental principles derived from the law that is applicable to the contract or to the place of its performance.

---

[18] *Ibidem*, p. 46 and 47.

92

This internationalist position of Professor Siqueiros is unanimously shared by the national and foreign scholarship, and therefore it is contradictory and paradoxical that PEP attempts to base its fraudulent claim on this opinion, which only reflects the brazen nature of its claim.

In addition, referring to the recommendations of the International Commercial Arbitration Commission of the International Law Association with respect to what should be considered public policy in the light of an action to set aside an award, the same José Luis Siqueiros indicates as applicable the following rules, among others:

> 2(c) When one of the parties could have opposed the issuance of the award based on a fundamental principle but did not do so, it will not be entitled to invoke it afterwards for purposes of refusing the recognition and enforcement of the award already issued.
> …..
>
> 3(a) The violation on the one hand of a mere "compulsory rule" (i.e. a rule that is compulsory but does not form part of the international public policy of a State, to the extent that its application is not compulsory to the specific case), shall not constitute an obstacle to the recognition and enforcement of the award, even when such rule is an integral part of: the law of the forum, the law governing the contract, the law in force in the location of the performance of the contract or the law governing in the place of arbitration.
> ……
>
> […] "Public law", a notion that is also very similar to that of public policy, is not a synonymous concept. The latter refers to fundamental principles.[19]

As can be observed, the concept of public policy is strictly limited in function of the restrictive role the judge hearing the action for setting aside the award has. In fact, it is even argued that if the plaintiff had the opportunity to allege the supposed violation of

---

[19] *Ibidem*, p. 49 and 50.

public policy in the arbitral proceeding, which in this case clearly could have been done making a motion to prevent the payment of its debt, the plaintiff is not entitled to allege that based on such defense the award issued should not be enforced or recognized.

In this context, and aside from the fact that they cannot be subject to review in this proceeding, below it is shown specifically that the supposed violations of Civil Law alleged by PEP are unfounded:

a)    Article 14 of the Constitution was not violated with the resolution of Technical Dispute number 36.

Article 14 of the Constitution is not applicable to the arbitral awards because it involves a principle that is only binding on state Courts.  The rules according to which an arbitral award should be issued in the case in question are those contemplated in the rules of Arbitration of the ICC, and therefore the arguments of the plaintiff that the supposed errors in application of the civil law in the arbitral award are contrary to public policy, cannot be addressed.

Furthermore and independently of the above, it should be indicated that from the text of the final award, pages 51 to 60, it can be seen that the Arbitral Tribunal did use valid legal reasoning to support its conclusions and decisions, and therefore in this respect no cause for setting aside occurred.

b)    When resolving Technical Dispute numbers 34 and 35, the Arbitral Tribunal correctly applied the provisions regarding the causation of the damages and losses to order PEP to pay them.

Again, in relation to this claim PEP alleges that the Arbitral Tribunal violated public policy by not duly grounding its order to pay damages and losses in law and fact.

In regard to this argument, we restate that the arbitral award is not an act of authority to which the requirements of duly grounding in fact and law established by article 16 of the Constitution are applicable or demandable. As explained subsequently in section F) of this chapter VI, the requirements that the award has to comply with are derived from the Rules of Arbitration of the International Chamber of Commerce which basically require that the decisions contained in the award be reasoned.

Again from the text of the award at pages 36 to 51 it can be seen that the Arbitral Tribunal reasoned its decisions as required by the Rules of Arbitration of the International Chamber of Commerce.

Therefore, the argument of PEP that the decision on the damages and losses related to Technical Disputes 34 and 35 is not duly grounded in law and fact based on the corresponding articles of the Civil Code cannot be addressed, given that such argument is not a cause for setting aside an award, since it would involve reviewing the substance of the decision without the existence or evidence of the violation of any true principle of public policy.

Aside from the above and even adopting the incorrect focus that PEP attempts to give the obligation to reason the award, it should be indicated that such is complied with by clearly specifying the reasons on which the Arbitral Tribunal based its decisions, without it being necessary as PEP argues, to do an exhaustive analysis and cite innumerable and unnecessary legal provisions.   It is enough that the decision be explained, reasoned and justified for the award to be valid (regardless of whether such reasons are or are not correct to anyone else or even to the State Court).

In this context and even though the standard of due grounding in law and fact demanded by the Mexican Constitution is not applicable to an arbitral award, it should be mentioned that even such standard is interpreted by our highest courts as a flexible requirement that has more to do with its purpose (to permit the parties to present an

95

adequate defense) than to formalities or citing of legal provisions.  The relevant part of the following court precedent is applicable hereto:

> "Registry No.: 175,082
> **Court precedent**
> Matter(s): Local
> Ninth Period
> Instance: Collegiate Circuit Courts
> Source: Judicial Weekly of the Federation and its Gazette
> XXIII, May 2006
> Decision: I.4o.A. J/43
> Page: 1531
>
> **GROUNDING IN LAW AND FACT. THE FORMAL ASPECT OF THE GUARANTEE AND ITS PURPOSE TRANSLATE INTO EXPLAINING, JUSTIFYING, MAKING POSSIBLE A DEFENSE AND COMMUNICATING THE DECISION**. The formal contents of the guarantee of due process established in article 16 of the Constitution regarding the grounding in law and fact has as its primary purpose and reason that the party being judged knows the "why" of the conduct of the authority, which translates into indicating in detail and completely the essence of all the circumstances and conditions that determine the act of will, such that it is evident and very clear to the affected party to be able to question and contest the merits of the decision, affording such party a real and authentic defense. Therefore, it is not sufficient that the act of authority only observe a pro forma justification but inconsistently, insufficiently or imprecisely, which impedes the purpose of the knowledge, proving and relevant defense, **nor is it valid to require a superfluous amplitude or abundance, since the expression of what is strictly necessary to explain, justify and allow for the defense, and to communicate the decision is sufficient for the decision to be considered duly grounded in law and fact**, explaining the relevant facts for deciding, citing the applicable rule and a minimum but sufficient argument to show the reasoning from which the relationship of logical pertinence of the facts to the law invoked is deducted, which is the subsumption.
>
> FOURTH COLLEGIATE COURT IN ADMINISTRATIVE MATTERS OF THE FIRST CIRCUIT.
>
> Direct Amparo 447/2005. Bruno López Castro. 1 February 2006. Unanimous vote. Drafting judge: Jean Claude Tron Petit. Secretary: Claudia Patricia Peraza Espinoza.
> Amparo in review 631/2005. Jesús Guillermo Mosqueda Martínez. 1 February 2006. Unanimous vote. Drafting judge: Jean Claude Tron Petit. Secretary: Alma Margarita Flores Rodríguez.

96

Direct Amparo 400/2005. Pemex Exploración y Producción. 9 February 2006. Unanimous vote. Drafting judge: Jesús Antonio Nazar Sevilla. Secretary: Ángela Alvarado Morales.
Direct Amparo 27/2006. Arturo Alarcón Carrillo. 15 February 2006. Unanimous vote. Drafting judge: Hilario Bárcenas Chávez. Secretary: Karla Mariana Márquez Velasco.
Amparo in review 78/2006. Juan Alcántara Gutiérrez. 1 March 2006. Unanimous vote. Drafting judge: Hilario Bárcenas Chávez. Secretary: Mariza Arellano Pompa.

c)    When resolving Technical Dispute numbers 37 and 39, the Arbitral Tribunal correctly applied the provisions regarding the adequate compensation for PEP.

PEP alleges in the line of argument as the above points that the Arbitral Tribunal is applying incorrectly the contractual and legal provisions of the case, by not recognizing that the payments made by PEP to COMMISA in relation to Technical Disputes 37 and 39 constitute an undue payment that cannot serve to justify the amount of the compensation owed to COMMISA.

This argument again cannot be addressed because it refers to decisions and questions of substance of the Arbitral Tribunal which in no manner can be characterized as a violation of Mexican public policy.

d)    When resolving Technical Dispute number 27, the Arbitral Tribunal correctly applied the provisions regarding the consent manifested by PEP on the treatment that had to be given to the differences between the applicable rates and the rates claimed by COMMISA.

Again, PEP mentions that the Arbitral Tribunal ruled without correctly applying article 1805 of the Civil Code regarding the consent given by such entity to certain payments for differences in rates and, that therefore, the guarantee of exact application of the Law guaranteed by article 14 of the Constitution was violated.

97

As we have indicated previously, since article 14 of the Constitution is not applicable to arbitration because it is not a judicial proceeding that culminates with an act of authority, any argument in which PEP alleges the incorrect application of civil law rules cannot be addressed, because the inaccurate or incorrect interpretation of the civil law is not a cause for setting aside.

We state again that the substance of the award cannot be reviewed at the time of requesting the setting aside of the award, alleging as a pretext that the decisions or reasoning contained in it are contrary to public policy, **because in the judgment of one of the parties they were erroneous**.  It is necessary, in this regard, to prove the existence of a specific violation of public policy; the allegation of an incorrect legal analysis cannot be considered in itself as a violation of public policy as the plaintiff argues.

In this regard, this argument of PEP must be rejected.

> e)     The Arbitral Tribunal correctly applied the contractual and legal provisions when it ordered the payment of Financial Expenses.

PEP alleges that if COMMISA did not estimate the works (that gave rise to the financial expenses) in a timely fashion it does not have the right to claim financial expenses and, therefore, the order violated public policy because the Civil Law is not correctly and strictly applied since the Contract is not adequately interpreted and, in addition, it is ordered to capitalize the interest.

With regard to the first argument of PEP that in the award international public policy was violated because COMMISA was permitted to take advantage of its own deceptiveness since it obtained an order in its favor for financial expenses in spite of the fact that according to PEP it did not comply with the estimations procedure prior to its claims, this claim again cannot be addressed because it constitutes a substantive ruling of the Arbitral Tribunal that cannot be reviewed by this court.

98

In this regard, the "pretext of public policy" used on this occasion that supposedly in the award a supposed deceptive act of COMMISSA is being favored and rewarded is unfounded.

In effect, the concept of deception found in the Federal Civil Code of supplemental application to commercial matters contemplated in the contract that generated the dispute resolved by the final award and that is contained in article 1815 establishes the following:

> "**Article 1815.-** Deception in contracting is understood as any suggestion or artifice used to mislead other parties or maintain their misconception; and bad faith shall be understood as the covering up of the error of one of the contracting parties, once it is known."

According to the above cited concept, it should be noted to Your Honor that PEP at no time showed that COMMISA had engaged in any act to mislead PEP, or maintain a misconception of PEP, nor much less to mislead or maintain a misconception of the Arbitral Tribunal.

Furthermore, as provided in the Federal Civil Code, applicable to this case, fraud as an act of any person is an element that cannot be presumed lightly as PEP presumptuously argues; rather it must be fully evidenced to the degree that no doubt exists that there was a real intention to cause harm to someone else, which PEP never proved. This is confirmed in the judicial precedent that is cited below:

> "Registry No.: 185,014
> Isolated decision
> Matter(s): Civil
> Ninth Period
> Instance: Collegiate Circuit Courts
> Source: Judicial Weekly of the Federation and its Gazette
> XVII, February 2003
> Decision: V.1o.25 C
> Page: 967

99

**INDEMNIFICATION ACTION FOR THE ABUSIVE EXERCISE OF A RIGHT. ITS ELEMENTS.** Article 1912 of the Federal Civil Code, which provides: "When in exercising a right harm is caused to another, there is an obligation to indemnify the harm if it is shown that the right was only exercised in order to cause the harm, without utility to the one exercising the right", accepts according to its terms the theory of the abuse of rights of Julien Bonnecase, who argues that the true notion of the abuse of a right is reduced to its psychological form, as the exercise of a right without utility to the one exercising it and exclusively for an injurious purpose and is composed of four elements: The first element consists of the power of action, represented by a right that an organization receives from the lawmaker, material in some form, with respect to which its holder may be strictly limited to the secret intention of making use of it only to harm another person. The second refers to the absence of all utility as a result from the exercise of the right, this being understood as the absence of all "serious and legitimate interest", in which case the courts should not easily admit, for purposes of its exercise, the absence of all utility for its holder, which is to say they should not limit themselves to registering the lack of actual interest, but rather look to the future and examine if the act, at that time lacking utility, could become useful in the future. The third element involves the harmful intention in its psychological sense, which is to say, as we understand it, which constitutes the essential characteristic of the notion of abuse of a right; the harmful intention must be absolutely characterized and be absorbed into the **notion of civil law fraud**, which is to say, to the intention to harm, the materialization of which does not have a doubtful meaning and reveals the intention with which it has been done. And finally, the harm caused to another person, an absolutely necessary element that in the procedural order is the first to appear and which leads to verifying the existence of the other elements where it exhausts its role and does not reappear until the time of valuing the appropriate amount of indemnification (Tratado Elemental de Derecho Civil. Volume I. Bonnecase, Julien. Editorial Harla, México, Distrito Federal, 1997, pages 824 to 827). Consequently, indemnification for the abuse of a right will be applicable if and only if the indicated elements are present, which are the exercise of a right, the harmful intention in the exercise of the right, the absence of utility for the holder of that right and the harm caused to the other person; since it cannot be considered that there was an abusive exercise of a right when notwithstanding the harmful intention of the one holding the right to harm the other, its exercise brings a benefit to the right holder or, when without bringing a benefit to its holder, there is no intention to provoke the harm caused.

100

FIRST COLLEGIATE COURT OF THE FIFTH CIRCUIT.

Direct Amparo 6/2002. Pesquera Mare, S.A. de C.V. 14 October 2002. Unanimous vote. Drafting judge: Mario Pedroza Carbajal. Secretary: Laura Catalina Maldonado Arce."

(Emphasis added)

In the above explained terms we can conclude that PEP at no time evidenced in what consists the fraud it attributes to COMMISA in the matter of the financial interest which the Arbitral Tribunal finally ordered it to pay in the award being challenged in this proceeding. This lack of evidence is sufficient for Your Honor to declare the argument set forth by PEP as a supposed cause for setting aside the award to be invalid.

The fact that the Arbitral Tribunal has determined in its final award to issue an order for financial expenses against PEP, regardless of whether or not COMMISA strictly complied with the procedure of formulating the prior estimates, is a substantive topic and relates to the interpretation of the Contract, which is beyond the analysis that Your Honor should engage in with respect to this proceeding.

Furthermore, in relation to the supposed violation of the prohibition contained in articles 2397 of the Federal Civil Code and 363 of the Commercial Code, because supposedly in the award PEP is being ordered to capitalize interest, it must be stated that this is not supported, not even in the plaintiff's own arguments.

From the text of the setting aside claim it can be seen that PEP does not explain its theory of why the arbitral award orders the capitalization of interest.  On the contrary, from the arbitral award (pages 169 to 174) it can be seen that the Arbitral Tribunal determined that the applicable contractual provision was clause 3.8.6 of the Contract, which establishes that "in case of delay in the payment of estimates and cost adjustments PEP, at the request of the Contractor, will pay financial expenses according to a rate that will be equal to the rate established in the Federal Revenue Law (Ley de Ingresos de la Federación) in the cases of extension for the payment of tax

101

obligations …", in relation to clause 3.8.8 which releases PEP from paying financial expenses when PEP legitimately suspends the payment of the estimates.

From these provisions as well as the resolutive points of the award it cannot be seen that interest must be capitalized as PEP alleges erroneously and without basis.

In this regard, the fact that the interest must be paid at the same time as the principal and that they are caused daily under such payment is made, does not imply any capitalization of interest as PEP maintains.

Consequently, these arguments for the setting aside of the award are also unfounded and cannot be addressed.

    7.- <u>The decisions contained in the arbitral award are not incongruent.</u>

The arguments presented by PEP that the award is contrary to public policy because it is not grounded in fact and law – as it claims on page 32 of its setting aside brief – are invalid because according to article 25 of the Rules of Arbitration of the International Court of Arbitration of the International Chamber of Commerce, the Tribunal is only obligated to reason its award, not comply with the constitutional guarantee of due grounding in law and fact since it is not an act of authority to which such requirement applies.

Grounding in fact should be understood as the circumstances, reasons or causes of fact that lead the Tribunal to decide a certain way applying the appropriate law.

In the specific case, Your Honor can see that the award, in each Technical Dispute it analyzes, takes into account, examines and studies: (i) the positions and arguments of the parties; (ii) the proven facts; and (iii) makes a general analysis of the case record.

Having done the above and complying with the requirements of justice and impartiality established in article 15 of the Rules of Arbitration of the International Court of Arbitration of the International Chamber of Commerce, the Tribunal reaches a conclusion that is clearly reasoned and grounded in fact.

The fact that the award clearly and succinctly explains the motives, steps and reasoning leading the Tribunal to its ruling, evidences the **congruence** with which it has issued the award.

In effect, the award is congruous and was issued in accordance with legal methodology.

The Courts of our country have determined what the principle of congruency – which must be present in all rulings – should be understood as, in relation to which two court decisions are cited below:

> "**CONGRUENCE. PRINCIPLE OF, IN THE DECISION.** Congruence means inference or acceptance with regard to the motives of the complaint or claim and the concession that the judge makes to it, which is to say, agreement in regard to the extension, concept and scope between what is ruled by the judicial body and the claims, responses, and other relief filed opportunely by the parties.
>
> THIRD COLLEGIATE COURT OF THE SECOND CIRCUIT.
>
> Direct Amparo 313/89. Guillermo Toledo Castillo. 31 May 1989. Unanimous vote. Drafting judge: María del Carmen Sánchez Hidalgo. Secretary: María Concepción Alonso Flores.
>
> Registry No.: 228,210, Isolated decision, Eighth Period, January to June of 1989"
> (Emphasis added)
>
> "**PRINCIPLE OF CONGRUENCE. THAT SHOULD PREVAIL IN EVERY JUDICIAL RULING**. In every judicial proceeding it must be ensured that the principle of congruency is complied with in ruling on the dispute in question, which in essence means that the decision be congruent not only with itself but also with the dispute, which is based on that when resolving such dispute the arguments

103

of the parties have been addressed, without omitting anything, or adding questions not raised, or containing contradictory arguments or arguments that contradict the resolutive points.

FIRST COLLEGIATE COURT IN ADMINISTRATIVE MATTERS OF THE FIRST CIRCUIT.

Amparo in review 731/90. Hidroequipos y Motores, S. A. 25 April 1990. Unanimous vote. Drafting judge: Samuel Hernández Viazcán. Secretary: Aristeo Martínez Cruz.

Note: This interpretation has become binding case law I.1o.A. J/9, published in the Judicial Weekly of the Federation and its Gazette, Ninth Period, Volume VIII, August 1998, page 764, with the heading: "PRINCIPLE OF CONGRUENCE. WHICH MUST PREVAIL IN EVERY JUDICIAL RULING.

Registry No.: 224,049, Eighth Period, Instance: Collegiate Circuit Courts, January 1991"

From both judgments it can be seen that for a ruling to be congruent, it must be:

(i)     Congruent with itself and with the matter in dispute.

(ii)    Issued addressing the arguments made by the parties.

(iii)   Exhaustive in the sense of including all the issues raised by the parties.

(iv)    Issued based on an inference or acceptance between the claims and the decisions of the judge.

In this regard, we can see that **the arbitral award is congruent** since it complies with the requirements of the principle of congruence.

In this regard, Your Honor can see that such guarantees were respected with regard to the parties as all times during the arbitral proceeding, as can be seen from the arbitral award in which there is a record of: (i) a due notification of PEP; (ii) an evidentiary period granted to the parties for the offering of evidence; (iii) a pleadings period and in general

a respect for the equal rights of the parties for proving their claims and defenses in the proceeding.

Therefore, it must be concluded that the award is in accordance with the law, and consequently it is not contrary to public policy, given that it was: (i) duly reasoned; (i) congruent; and (iii) issued respecting the principle of due process.

**E)    IN THE ARBITRAL AWARD THE ARBITRATION AGREEMENT WAS NOT INFRINGED BECAUSE THE DISPUTES IT RESOLVES WERE CONTEMPLATED IN IT AND DO NOT EXCEED ITS SCOPE.**

The other principal argument on which PEP bases is setting aside claim centers on alleging that the ruling on technical dispute numbers 36, 34, 35, 19 and 27 was outside the scope of the arbitral clause since they did not comply with the formal requirements established in clause 23.2 of the Contract and, therefore, the Arbitral Tribunal exceeded its scope by resolving them, which according to PEP means that the premises of subsection c) section I of article 1457 of the Commercial Code have been met.

In an unclear an incongruous manner, the same argument is repeated in relation to the supposed invalidity of the order to pay financial expenses, to allege a supposed violation of the arbitral rules of procedure because according to PEP a claim that is not contemplated within the scope of the arbitral clause is being resolved.

In addition, again justifying itself on this supposed cause for setting aside, PEP takes the opportunity to return to its substantive arguments with respect to the invalidity of the claims of the cited technical disputes claimed by COMMISA in the arbitration, with the clear and invalid intention that Your Honor again analyze them as if this were an appeal of the award.

Below it is shown in detail how the arguments of PEP on this point are invalid, unfounded and cannot be addressed:

105

1.- <u>PEP consented and ratified its consent for the Arbitral Tribunal to hear and resolve the claims of COMMISA and, therefore, this cause for setting aside cannot be addressed</u>.

As clearly explained in Chapter III of this Answer (regarding the decision of the Arbitral Tribunal on its own competence), PEP tacitly consented to the competence of the Arbitral Tribunal to hear and resolve on all the disputes that COMMISA presented to it, since it did not challenge in due time and form (within the term of one month established in article 1432 of the Commercial Code), the decision adopted by the Arbitral Tribunal in that respect.

In this regard, it is important to mention that as indicated in subsection d) of chapter III, PEP consented during the arbitration that COMMISA submit to the Arbitral Tribunal the resolution of the technical disputes identified under the numbers 36, 34, 35, 37, 39, 19 and 27.

In addition, not only did PEP consent to the above during the arbitral proceeding, it also ratified such consent by not challenging the decision contained in the terms of reference on the competence of the Arbitral Tribunal within the legal term of one month that it had to do so.

In this context the argument of PEP that the decision on the claims of COMMISA presented in the arbitration are outside of the scope of the arbitral clause is clearly invalid, and therefore the cause for setting aside invoked must be rejected by Your Honor.

106

2.- <u>According to clauses 23.2 and 23.3 of the Contract, the fact that the technical dispute was not presented formally according to the procedure does not imply that the disputes that have survived in relation to such matters are not subject to arbitration.</u>

PEP alleges that the claims presented by COMMISA during the arbitration did not comply with the formal requirements to be considered Technical Disputes and therefore according to PEP there was no contractual basis for the Arbitral Tribunal to resolve them.

The agreement of the parties to a contract to submit all their disputes to alternative means of dispute resolution is very common in the modern business world.

It is also very common that the parties agree in their contract to methods of dispute resolution that allow them to settle internally prior to having to submit the dispute to a procedure conducted by third parties such as arbitration.

However, it should not be lost from view that the two types of procedures, arbitration and those procedures known as mediation or conciliation are different and the consequences and scope are not procedurally opposed.

In the proceedings known as medication or conciliation, the parties agree to commit to submit to a specific procedure in which a third party may intervene with purely negotiating and conciliation powers to help the contracting parties resolve their disputes themselves and reach a settlement.

These types of proceedings are agreed to in highly complex contracts where there are a large number of bilateral agreements, normally to be carried out over time and generally the fulfillment of some depend on the prior fulfillment of others, all leading to the fulfillment of a specific goal, such as the provisions of a service, the execution of a work, etcetera.

Given the complexity of the contracts and of the obligations to be complied with by the parties, often a mechanism is required that permits the resolution of disputes by agreement, simply and quickly, such that the method allows for resolving the problems and continuing with the execution of the obligations of the contract.

Generally, these types of procedures refer to technical problems that can be presented during the development and execution of the contractual obligations and that require an adequate and prompt technical response for the parties that leads them directly to an agreement regarding the form and terms for facing the technical question without delaying the execution of the contract.

These types of procedures usually are usually provided for in the jurisdiction and competence clauses of the contracts as alternative dispute resolution mechanisms prior to arbitration.

However, the fact that they are dispute resolution mechanisms qualified as "prior to arbitration" simply implies that they are methods of conciliation between the parties that should be attempted before arbitration as a condition in time, not as a condition for the validity of the arbitral proceeding.

**The delineation consisting of exhausting the dispute resolution mechanisms prior to arbitration is simply a temporal premise, not a procedural one.**

The intention of the parties to agree to these types of clause has a merely practical effect with regard to performance of the contract. As has been said, the effect is to merely facilitate its execution. That is why they have the scope of conditioning the submitting of these types of disputes to these types of procedures prior in time to arbitration.

108

However, the condition of submitting of to these types of procedures prior to arbitration does not imply that the failure of the parties to exhaust them limits their subsequent arbitrability.

This is due to the fact that mediation and conciliation or a technical dispute resolution procedure, as in this case, are methods of dispute resolution different from arbitration.

In these types of dispute resolution methods there is no possibility of a compulsory resolution, since they are based on mutual agreement. For its part, in arbitration there is the possibility of a compulsory resolution of their dispute since the resolution of the dispute is entrusted to a third party.

The fact of submitting the dispute to a conciliation procedure or, as in this case, to a technical dispute procedure does not ensure a resolution. This is due to the fact that the resolution of the dispute depends only on their willingness to settle. If the parties do not want to cooperate, then there is no possibility of reaching a settlement. The resolution of the dispute in a technical dispute depends entirely on the parties.

If the parties do not reach a settlement or simply are incapable of commencing conditions for a negotiation, not even the clause that establishes this dispute resolution method is capable of preventing them from going to arbitration if they consider that they are entitled to compensation or indemnification derived from the contract.

However, in spite of all the possible situations derived from clauses that provide for alternative dispute resolution mechanisms, **none of the reasons for which the parties agree to this can lead to the conclusion** that the disputes that have not been submitted to a technical dispute procedure **cannot subsequently be resolved in arbitration.**

In this context, clause 23.3 of the contract that provides for the submission of the parties to arbitration establishes the following:

> "23.3 **Arbitration.** *Any controversy claim, difference or dispute that arises or is related to or linked with this contract or the breach thereof, will be definitively resolved by arbitration conducted in the Federal District, Mexico City, according to the Rules of Conciliation and Arbitration of the International Chamber of Commerce that are in force at that time. The number of arbitrators will be three and the arbitration will be conducted in Spanish. Notwithstanding the above, any technical dispute shall be submitted previously to the procedure set forth in Clause 23.2 and only if the parties cannot reach an agreement by such procedure, will they be authorized to make use of the recourse established in Clause 23.3".*

From the text of the arbitration clause the following conclusions can be reached:

1) **The clause is broad with regard to the scope of the disputes it covers.**

2) The arbitration clause determines that **any controversy** claim, different or dispute that arises or is related to or linked with the contract or its breach is arbitrable.

3) The arbitrability of the clause refers to which disputes the parties intend to submit to the analysis of the Arbitral Tribunal. In this case, from the drafting of the clause there is no doubt that the parties wanted to submit **any** dispute arising from the performance or interpretation of the contract to the Arbitral Tribunal.

Any dispute implies truly any of the possible disputes arising both from the interpretation and the performance of the Contract. In this case, the plaintiff considers that my principal did not exhaust the procedures established in clause 23.2 for the technical disputes and therefore ***ipso jure*** any claim arising from a technical dispute is not arbitrable.

However, the clause in question is very clear in that all disputes including interpretations regarding the provisions of the Contract shall be submitted to arbitration.

110

In this case, it should be considered that the questions regarding which are technical disputes and whether COMMISA correctly followed the procedure established in article 23.2 constitute precisely problems that arise from a controversy claim, difference or dispute that arises from or is related to or is linked with the contract or its breach.

Therefore, the possible dispute between the parties regarding whether or not COMMISA correctly submitted to the procedure established for technical disputes **must be resolved by arbitration and therefore it is a dispute subject to the arbitration agreement.**

To interpret the clause otherwise, as the plaintiff attempts to do, would be a mistake. As can be seen from its claim, the plaintiff attempts to demonstrate that COMMISA did not follow the procedure set forth in clause 23.2 of the contract corresponding to technical disputes.

The argument of the plaintiff is very confusing and incorrect in addition to being superficial given that it does not lead to a result consistent with the agreement of the parties.

If what the plaintiff argues were true and the failure to exhaust the procedure established in clause 23.2 would lead to the arbitrability of the clause then the risk would be run of making the arbitration clause **inoperable**.

According to the plaintiff the failure to follow the procedure of clause 23.2 prevents the Arbitral Tribunal from hearing such dispute. However, the first paragraph of the arbitral clause indicates that **all** the disputes arising from the contract shall be **definitively** resolved by arbitration.

If this were true, the first paragraph of the clause would not indicate that all disputes would be resolved by arbitration and it would make an express exception with respect to technical disputes.

111

Following the "logic" of the plaintiff, supposing that this were true, if the technical dispute ceases to be arbitrable then it would to be submitted to a state court, which would be contrary to the first paragraph of the arbitration clause.

On the contrary, it must be understood that what the arbitration clause refers to is a requirement of exhausting **a conciliation** of the claims derived from technical disputes which under no circumstances could **imply the impossibility of the dispute being submitted to arbitration.**

Therefore, it must be considered that the arguments on which the plaintiff bases its claim are not supported.

3.- <u>The claims related to "technical disputes" 34, 35, 36, 37 and 39 are not true technical disputes under clause 23.2 of the Contract.</u>

My principal does not accept the claim of the plaintiff that the mentioned claims are outside of the scope of the arbitration clause. However, even if it were true, the plaintiff's reasons for setting aside the award are unfounded because the referenced disputes do not fall under the definition of a technical dispute according to clause 23.2 of the Contract.

As seen in the setting aside claim of the plaintiff, its arguments are based on the presumption that COMMISA did not subject the disputes to the procedures established in clause 23.2 of the Contract that provide for the possibility of a conciliation between the parties to reach an agreement with respect to technical disputes.

However, the claim does not present facts or arguments of any kind that indicate why the claims related to "technical disputes" 34, 35, 36, 37 and 39 were technical disputes that had to be submitted to the procedures established in clause 23.2.

In relevant part, in clause 23.2 of the Contract the parties agreed to the following:

> "23.2 **Technical Disputes**. The contractor will not have the right to make any claim and PEP will not be liable for legal (including negligence) or contractual damages before the Contractor, its secondary suppliers or subcontractors, except in the cases specifically set forth in this Contract.
>
> For purposes of this clause a Technical Dispute shall be understood as any difference that arises for any claim or that is attributable to the interpretation or execution of this contract, with the Technical Exhibits of the Contract (A, B, B-1, B-2, B-3, CEV, DT, DT-1, DT-2.1, DT-3, DT-4, E-2, F-1 and F-2)

From the above transcription it can be seen that clause 23.2 defines what is a technical dispute basically as a dispute arising in relation to the technical exhibits "A", "B", "B-1", "B-2", "B-3", "CEV", "DT", "DT-1", "DT-2.1", "DT-2.2", "DT-3", "DT-4", "E-2", "F-1" and "F-2".

This implies that the classification and identification of a technical dispute depends on what arises in relation to one of the mentioned technical exhibits. Any other dispute arising from any question that is not related to the referenced technical exhibits cannot be considered a technical dispute.

For its part, clause 22 of the contract contains a list and description of the technical exhibits of the contract. Such clause establishes the following:

> "Clause 22
>
> EXHIBITS TO THE CONTRACT
>
> The parties agree to consider as exhibits to this Contract those indicated below which, duly signed by the parties, form part of this instrument.
>
> Description

113

| | |
|---|---|
| EXHIBIT "A" | List of plans |
| EXHIBIT "B" | General Requirements |
| EXHIBIT "B-1" | Scope of Work and specifications |
| EXHIBIT "B-2" | Administrative Matters |
| EXHIBIT "B-3" | General data requirements |
| EXHIBIT "C" | Catalog of concepts, amounts of work and unit prices proposed. |
| EXHIBIT "CE" | Detail of the unit price per type of costs, includes "CE-2, CE-4, CE-6, CE-7, CE-8, CE-9, CE-10, CE-11, CE-12, CE-13, Ce-14, CE-15, CE-16, CE-17 (A and B), CE-18 and CE-19" |
| EXHIBIT "CEV" | Evaluation criteria include "CEV-1, CEV-3, CEV-4, CEV-5, CEV-6, CEV-7, CEV-8, CEV-9, CEV-10, CEV-11, CEV-12, CEV-13 and CEV-14". |
| EXHIBIT "DT" | Schedule for critical route method. |
| EXHIBIT "DT-1" | Construction machinery and equipment plan. |
| EXHIBIT "DT-2.1" | Schedule for procurement of construction materials. |
| EXHIBIT "DT-2.2" | Schedule for acquisition of permanent installation equipment. |
| EXHIBIT "DT-3" | Schedule for Manual Workers. |
| EXHIBIT "DT-4" | Schedule for design, management and services personnel. |
| EXHIBIT "E-2" | Permanent installation equipment that the Contractor will provide. |
| EXHIBIT "F-1" | Materials and replacements that the contractor will provide. |
| EXHIBIT "F-2" | Construction equipment that the contractor will provide. |

114

The plaintiff does not clarify in its claim why it considered that the claims derived from the so-called technical disputes 34, 35, 36, 37 and 39 whose resolutions in the arbitral award it is attempting to set aside are strictly technical disputes, as referred to in clause 23.2 related to the technical exhibits referred to therein.

The plaintiff did not address this circumstance, which is an element of its action. Thus, by not doing so its claim, in addition to being technically deficient, it is also vague.

My principal considers that the claims arising from the mentioned disputes do not fall under the scope of the technical exhibits referred to in clause 23.2.

The claims related to technical disputes 34, 35, 36, 37 and 39 are the following:

### a) Technical Disputes 34 and 35:

As can be seen for the arbitration claim (pages 88 to 102), these disputes arise from the fact that the Contract obligated COMMISA to keep its vessels called "BAR PROTECTOR" and "CASTORO 10" available for work. For its part, PEP agreed to provide in a timely and appropriate fashion access to the work site, which was required to terminate the platforms. The delay of PEP caused serious **waiting times** for both vessels, which were the cause of these claims.

### b) Technical Dispute 36:

As can be seen in the arbitration claim (pages 103 to 111) this claim **arises from the delays** suffered by COMMISA because of bad weather. As a consequence of the extension of the term of the Contract from an original term of 528 days to a total term of 1322 days, COMMISA was obligated to work under climatic conditions must less favorable that those that were taken into consideration for purposes of its offer in the bidding process.

115

### c) Technical Disputes 37 and 39:

As seen from the arbitration claim (pages 111 to 123) this claim arose from the debts of PEP owed to COMMISA for the **crossings** work delivered and located on the seabed.

As stated in the claims they had their origins in the following events:

### d) Delays and waiting times, as well as crossings.

As can be seen from clause 23.2 of the Contract which contains a list of the technical exhibits with respect to which a technical dispute procedure should have been followed before going to arbitration, none of them refer to the technical exhibit that regulates matters related to **crossings and waiting times**.

Therefore, it is necessary to look to the provisions of exhibit C, which is the exhibit that governs crossings and waiting times. Such exhibit C is not in the list of the technical exhibits mentioned in clause 23.2. In this exhibit which regulates the unit prices, the following is defined:

> "Page 30:
>
> "Crossings (unit = each one) This element of payment is established to compensate the **contractor for all additional work associated with crossings**. A unitary price will be established for interment and a unit price for crossings exposed. It will be paid in addition to the price of the duct indicated previously."
>
> Page 31:
>
> Waiting time for orders (unit=days) The time passed, measured in minutes, between the reception of the instruction of PEP/Supervisor to detain the work (**or when access is denied to the Pemex facilities**) and the reception of the instructions to restart the work (or when access is granted to the Pemex facilities). The days will be prorated to the closest minute (1,440 minutes per day)."

116

As can be seen from the transcriptions, the technical support of the claims referred to are provided for in **exhibit C**. Such exhibit is not on the list of the technical exhibits of clause 23.2 of the Contract.

Therefore, my principal is not obligated to follow the technical dispute procedure with respect to these claims before going to arbitration and, consequently, there is not even the possibility of analyzing the claim of the plaintiff. Thus also for these reasons the action must be declared in valid.

4.-    <u>In any case, the scope that the plaintiff attempts to give to the second paragraph of the arbitration clause of the Contract is contrary to article 1797 of the Federal Civil Code and would excuse the necessity of making use of the technical dispute procedure</u>.

As has been indicated previously, the intention of the plaintiff is to set aside the award because according to PEP it included disputes that were not within the scope of the arbitration agreement and therefore, according to its "logic", this generated the incompetence and an exceeding of authority by the Arbitral Tribunal.

The plaintiff considers that given that my principal did not formally present the technical dispute proceedings specifically related to the claims of technical dispute numbers 34, 35, 36, 37 and 39, then such claims were outside the scope of the arbitration agreement.

Such interpretation is neither logical nor plausible in view of the fact that it could generate:

i)    the extreme circumstance of conditioning compliance with the arbitration clause to the discretion of one of the contracting parties (PEP), and

ii)    limiting the contractor's access to justice.

117

Such assertions are supported by articles 1797 and 2225 of the Federal Civil Code in relation to article 14 of the Political Constitution of the United Mexican States, which paradoxically are repeatedly cited by the plaintiff.

Such articles expressly establish the following:

> **"Article 1797.-** The validity of and compliance with contracts cannot be left to the discretion of one of the contracting parties.
>
> **Article 2225.-** Illicitness in the purpose, the end or the condition of the act results in its nullity, either absolute or relative, as provided by the law."

From an interpretation of the above it can be seen that it is not valid to interpret a clause of a contract in such a way as to leave compliance with it and, therefore, its effectiveness to the discretion of one of the contracting parties.

Thus the interpretation proposed by PEP of requiring the contractor to exhaust a conciliation procedure with PEP is unacceptable as contrary to the texts of the cited articles.

In other words, to require COMMISA to conciliate with PEP, would require it to follow a scaled procedure that would not necessarily lead the parties to a settlement. In this way, if PEP is not willing to negotiate according to the procedure established in clause 23.2 then this would impede the contractor from formally submitting its claim arising from a technical dispute.

In effect, if PEP refuses to negotiate or simply refuses to receive the documentation of the contractor, then **it would be impossible for the contractor to formalize the technical dispute** according to the requirements of clause 23.2 of the contract. If this

happens, then any claim it wanted to asset in arbitration would be considered subsequently by PEP as a claim **that falls outside of the arbitration clause**.

This implies that the clause permits **compliance with the obligation** of formally submitting the technical dispute **to be at the discretion of PEP.**

Furthermore, the above alone shows the consequences of the erroneous interpretation of PEP in relation to the scope and purpose of the arbitration clause. Therefore, it must be considered that if the claim of the plaintiff is accepted, this would result in **the nullity of such obligation** (of a prior conciliation) which would be impossible for the contractor to do.

Therefore if this obligation is null and void, the arbitral claim of the plaintiff of this supposed contractual breach by the defendant cannot validly be made to depend on it.

But in addition, PEP's interpretation must be considered null and void given that it constitutes **an obstacle for obtaining justice** to which all persons are entitled and is established in article 17 of the Political Constitution of the United Mexican States.

According to the plaintiff, the failure to formally file a technical dispute prevents the submission of the dispute to arbitration. But if the dispute is not arbitrable *ipso jure* then the contractor loses **its right** to obtain justice, which is contrary to the Constitution since it submitted **all its disputes** to arbitration by virtue of the same clause.

Therefore, my principal considers that the reasoning of the plaintiff is invalid for provoking the setting aside of the award with regard to these claims.

5.-    <u>The order to pay financial expenses contained in the arbitral award is valid since it is based on the delay in the payment of the indemnifications determined by the Arbitral Tribunal, as well as the terms of the Contract.</u>

119

PEP alleges that since the disputes that gave rise to the orders to pay on which the financial expenses are based were never formalized as technical disputes, the award decided on matters outside of the scope and purpose of the arbitration clause.

Which is to say PEP makes the nullity of the order to pay financial expenses depend on the nullity of the orders to pay the principal amount on which such expenses are calculated and which refer to the arbitrability of the claims of COMMISA.

In this context and since it has already been clearly and fully demonstrated that the orders to pay contained in the award with respect to the claims identified by COMMISA as technical dispute numbers 36, 34, 35, 37, 39, 19 and 27 are valid because they refer to questions or disputes that can be and were validity resolved by the Arbitral Tribunal within the scope of the competence that the arbitration clause of the Contract, then it is clear that the order to pay financial expenses on such amount is also valid.

**F)    DURING THE ARBITRATION AND IN THE FINAL AWARD THE RULES OF ARBITRAL PROCEDURE WERE NOT VIOLATED.**

1.-    <u>The concepts of grounding in fact and law established in article 16 of the Constitution are not applicable to an arbitral award, nor to the processing of an arbitral procedure</u>.

PEP alleges as a violation of its rules of procedure to which the parties submitted that, according to PEP, in the decisions contained in the award with respect to technical dispute numbers 34, 35, 36 and financial expenses the award was not grounded in fact and law or in the clauses of the Contract, in violation of article 16 of the Constitution.

This argument of PEP cannot be addressed here taking into consideration the following:

The imperative principles for legal supporting of the decisions issued by Mexican Courts, required by the Constitution, regarding *grounding in fact and law*, are **not**

120

applicable to the structure that an award must have in relation to reasoning used to reach the conclusion that is finally arrived at by any Arbitral tribunal when issuing a final award. In this regard all the supposed grievances with the appearance of an appeal or concepts of violation that the presenter of the setting aside of the award herein responded to suffers, in the sense of alleging that the right to a hearing was violated as if the arbitral proceeding were a proceeding followed according to the procedural rules of the judicial proceeding, are completely invalid.

Article 25 of the Rules of Arbitration of the International Chamber of Commerce, only oblige the Arbitral Tribunal to issue a *reasoned* award. This expression has been understood in the legal scholarship on international arbitration as that the Arbitral Tribunal must only give *its* reasons with respect to the determinations that it finally issues in the final award, including considering an award *reasoned* in spite of the fact that within the reasoning of the Arbitral Tribunal there are contradictions. It is especially important that Your Honor take into account that the legal scholarship expressly holds that the Judges will not enter into the merits of the substantive questions resolved by the Arbitral Tribunal. This is confirmed in the quote below from the arbitration manual entitled "*Fouchard, Gaillard, Goldman on International Commercial Arbitration",* edited by Emmanuel Gaillard and John Savage:

> "Where the grounds for the award must be stated, that does not mean that they must be well-founded in fact or law. A court reviewing the award to ensure that reasons have been given will not of course review the substantive findings of the award. Thus, even grounds that are clearly wrong will satisfy the requirement that the arbitrators state the reasons for their award." [20]

Similarly to the above, Yves Derains and Erick A. Schwartz in their work *El Nuevo Reglamento de Arbitraje de la Cámara de Comercio Internacional*, have stated with respect to the obligation to provide reasoning, established in article 25(2) of the mentioned Rules, as follows:

---

[20] GAILLARD, Emmanuel and SAVAGE, John, *Fouchard Gaillard Goldman on International Commercial Arbitration*, The Hague/Boston/ London, Kluwer Law International, 1999, p. 763.

> "… the reasoning expressed in the award must demonstrate that the Arbitral Tribunal <u>has taken the positions of the parties into account</u>."[21]

> *(Emphasis added)*

It is irrefutable that the only obligation on the Arbitral Tribunal in issuing its award is that it has taken into account the reasoning, that such is demonstrated, that it has taken into account the position of the parties, which is fully complied with in the final award in question.

The fact that the final award of January 15, 2008 constitutes res judicata, and that Your Honor may only carry out an analysis of the merely formal aspects with respect thereto, is confirmed in the following court precedent:

> "Registry No. 189345
> Location**:**
> Ninth Period
> Instance: Collegiate Circuit Courts
> Source: Judicial Weekly of the Federation and its Gazette
> XIV, July 2001
> Page: 1107
> Decision: I.3o.C.231 C
> Isolated Decision
> Matters(s): Civil
>
> **ARBITRATORS. THEIR RESOLUTIONS ARE ACTS OF AUTHORITY, AND THEIR EXECUTION CORRESPONDS TO THE JUDGE DESIGNATED BY THE PARTIES.** For the enforcement of an arbitral award it is necessary to have an act carried out by a judicial body, which without taking away its private nature, assumes its content, such that the award is enforceable by virtue of the judicial act, which is only the necessary complement for enforcing what is resolved by the arbitrator, since the award is a resolution issued by the arbitrator that resolves the dispute that arose between the parties, being considered res judicata and constituting an instrument that motivates enforcement, before the competent Judge that must provide the procedural means necessary to carry out the rulings of the award. Therefore, ***the***

---

[21] DERAINS, Yves y SCHWARTZ, Erick A., *El Nuevo Reglamento de Arbitraje de la Cámara de Comercio Internacional*, México, D.F., Oxford, 2001, p. 349.

*award is a resolution that has the attributes of unchallengeability, immutability and enforceability*, only that the efficacy and concrete carrying out of the resolution is always the responsibility of the competent Judge designated by the parties or the judge of the place of the proceeding. The arbitrator lacks the power to enforce on its own the award that it issued, because it does not have the power or command, which is one of the attributes of the judicial branch and is inherent in the judicial bodies of the State. This implies that **the arbitrator lacks the force of the State to enforce the award, but** *the award itself is not dispossessed of the attributes of* <u>res judicata</u>, **since the authority to decide the dispute is a delegation made by the State through the law, and it only reserves the power of enforcement**. The Judge before whom the enforcement of an award issued by an arbitrator to declare the requirement of payment is requested, should and can only confirm the existence of the award, as a resolution that has established specific conduct, unchallengeable and immutable and that, therefore, must come from a proceeding in which the essential procedural formalities have been respected, and that is not contrary to a matter of public policy.

THIRD COLLEGIATE COURT IN CIVIL MATTERS OF THE FIRST CIRCUIT.

Direct Amparo 1303/2001. Constructora Aboumrad Amodio Berho, S.A. de C.V. 8 March 2001. Unanimous vote. Drafting judge: Neófito López Ramos. Secretary: Lina Sharai González Juárez.

Note: By executory order of October 26, 2001, the Second Chamber declared the contradictory decisions 14/2001-PL in which this matter participated to be eliminated."

In addition to the above, supposing without conceding that the arguments of PEP with respect to a supposed obligation of the Arbitral Tribunal to ground the final award in fact and law were valid, Your Honor must take into consideration that PEP argues that the award suffered from a *lack* of grounding in fact and law, which in any case would be absolutely false, and the only thing that could in any case be imputed to it would be an *incorrect* grounding in fact and law. The distinction between "lack of" and "incorrect" grounding in fact and law has been clearly defined by court precedent of the national courts as can be seen in the following binding precedent:

"Registry No. 170307

123

Location:
Ninth Period
Instance: Collegiate Circuit Courts
Source: Judicial Weekly of the Federation and its Gazette
XXVII, February 2008
Page: 1964
Decision: I.3o.C. J/47
**Binding precedent**
Matter(s): Local

**GROUNDING IN FACT AND LAW. THE DIFFERENCE BETWEEN THE LACK OF AND THE INCORRECT SATISFACTION OF BOTH CONSTITUTIONAL REQUIREMENTS GOES BEYOND THE ORDER IN WHICH THE CONCEPTS OF VIOLIATION MUST BE STUDIED AND THE EFFECTS OF THE PROTECTIVE RULING.** The lack of grounding in fact and law is a formal violation different from the undue or incorrect grounding in fact and law, which is a material or substantive violation, the effects generated by the existence of one or the other being different, and therefore the first omission must studied first. In effect, the first paragraph of article 16 of the Constitution establishes the requirement that the authorities ground their acts that affect the sphere of the citizens in fact and law, but the violation of the constitutional mandate the expression of both in the acts of authority can take two different forms, which are: that arising from its lack and that corresponding to its incorrectness. The lack of grounding in fact and law is produced when the legal provision applicable to the matter and the reasons that have been considered for concluding that the case falls under this legal provision are not expressed. On the other hand, there is an incorrect grounding when in the act of authority a legal provision is invoked, but it is not applicable to the matter due to the specific characteristics of such matter that prevent make it inapplicable; and an incorrect reasoning, in the situation where the reasoning of the authority for issuing the act are indicated, but they are inconsistent with the contents of the law that applies to the case. Thus the lack of grounding in fact and laws means the lack or absence of such requirements, while the undue or incorrect grounding in fact and law occurs with the presence of both constitutional requirements, but with incongruence between the application of the law and the reasoning formulated by the authority with the specific case. The mentioned difference allows us to see that in the first case there is a formal violation given that the act of authority lacks inborn, connatural elements, by virtue of a constitutional imperative, and therefore once aware of its absence by reading the challenged act, the amparo [constitutional appeal] requested should be granted; and in the second case consisting in a material or substantive violation because the

124

formality has been complied with by the expression of grounds in fact and law, but they are incorrect, which, as a general rule, will also give rise to a protective ruling, however, a prior analysis of the content of the matter will be necessary in order to reach the conclusion of the mentioned incorrectness. By virtue of this distinctive note, the effects of the granting of the amparo, in the case of a judicial resolution, are also different from one case to the other, since although there is a common element, which is that the authority reverses the unconstitutional act, in the first case it will be in order to correct the irregularity expressing the previously absent grounding in fact and law, and in the second case in order to provide different grounds and reasoning to those previously formulated. This difference also goes beyond the order in which the arguments asserted by the complainants should be studied, since if in one case there a lack of the constitutional requirements in question is found, which is to say, a formal violation, the amparo will be granted for the indicated effects, without the analysis of the motives of dissent that, concurring with those related to the defect, have to do with the incorrectness of both elements inherent to the act of authority; however, if the first have been satisfied, it will be feasible to study the undue grounding in fact and law, which is to say the material or substantive violation.

THIRD COLLEGIATE COURT IN CIVIL MATTERS OF THE FIRST CIRCUIT.

Direct Amparo 551/2005. Jorge Luis Almaral Mendívil. 20 October 2005. Unanimous vote. Drafting judge: Neófito López Ramos. Secretary: Raúl Alfaro Telpalo.
Direct Amparo 66/2007. Juan Ramón Jaime Alcántara. 15 February 2007. Unanimous vote. Drafting judge: Neófito López Ramos. Secretary: Raúl Alfaro Telpalo.
Direct Amparo 364/2007. Guadalupe Rodríguez Daniel. 6 July 2007. Unanimous vote. Drafting judge: Neófito López Ramos. Secretary: Greta Lozada Amezcua.
Direct Amparo 513/2007. Autofinanciamiento México, S.A. de C.V. 4 October 2007. Unanimous vote. Drafting judge: Neófito López Ramos. Secretary: Raúl Alfaro Telpalo.
Direct Amparo 562/2007. Arenas y Gravas Xaltepec, S.A. 11 October 2007. Unanimous vote. Drafting judge: Neófito López Ramos. Secretary: Raúl Alfaro Telpalo."

(Emphasis added)

In the arbitral award there are different legal grounds, as well as the motives and reasoning used in applying such legal grounds by the Arbitral Tribunal, resolving the *merits* of the matter and following the procedural rules of the Rules of Arbitration of the

International Chamber of Commerce. Thus, as long as there is reasoning, the only thing to which the Arbitral Tribunal was obligated under article 25(2) of the Rules of Arbitration of the Chamber of Commerce, which is that the award be reasoned, was fully complied with. With that, Your Honor is prevented from analyzing the reasoning of the Arbitral Tribunal in issuing its decision and in this regard such final award is res judicata, and therefore any argument of PEP in relation to the supposed nullity from a supposed lack of grounding in fact and law must be declared invalid.

2.- <u>The decisions contained in the award are not partial</u>.

PEP demands the setting aside of the award arguing that the arbitral tribunal showed partiality, to its detriment, in all those decisions that are unfavorable toward it.

Aside from the fact that this assertion is false, the partiality of the arbitrators is not one of the causes of setting aside restrictively indicated by article 1427 of the Commercial Code and any objection in this respect must be made during the arbitral proceeding, as provided in article 1429 of the Commercial Code and article 11 of the Rules of Arbitration of the International Court of Arbitration of the International Chamber of Commerce, to which the parties voluntarily submitted. These two articles respectively establish the following:

> **"Article 1429.** The parties may freely agree on the procedure for the recusal of arbiters.
>
> In the absence of such agreement, the party seeking recusal shall, within fifteen (15) days from the time that the arbitration tribunal has been constituted, or fifteen (15) days from the time that he attains knowledge of the causal facts, submit in writing the circumstances he believes do justify agreed qualifications of the challenged arbiter.  Unless he voluntarily resigns or the other party accepts the recusation, the arbitration tribunal shall resolve the recusal of the impugned arbiter.
>
> If a petition for recusal pursuant to the preceding paragraph is rejected, within thirty (30) days from notice of rejection the petitioner may go before the judge and request a review.  The judge's decision is not appealable.  During such

126

time the arbitration tribunal, including the impugned arbiter, may proceed with the matte before the until concluding with an award.

**Article 11**
**Challenge of Arbitrators**
1
A challenge of an arbitrator, whether for an alleged lack of independence or otherwise, shall be made by the submission to the Secretariat of a written statement specifying the facts and circumstances on which the challenge is based.
2
For a challenge to be admissible, it must be sent by a party either within 30 days from receipt by that party of the notification of the appointment or confirmation of the arbitrator, or within 30 days from the date when the party making the challenge was informed of the facts and circumstances on which the challenge is based if such date is subsequent to the receipt of such notification.
3
The Court shall decide on the admissibility and, at the same time, if necessary, on the merits of a challenge after the Secretariat has afforded an opportunity for the arbitrator concerned, the other party or parties and any other members of the Arbitral Tribunal to comment in writing within a suitable period of time.
Such comments shall be communicated to the parties and to the arbitrators.

There is no provision in the Commercial Code on which the setting aside of an award can be based alleging the lack of impartiality of the arbitrators in the proceeding, since this law specifically establishes a different procedural point in which the objections of this nature can be asserted and that "by chance" were not presented by PEP at the appropriate time, but which it now attempts to assert in order to avoid paying the amounts ordered in the award.

Supposing without conceding that what PEP alleges as a cause of setting aside is a violation of public policy resulting from a supposed partiality of the arbitral tribunal in issuing the rulings contained in the award (which it has not done and therefore the court cannot analyze trying to remedy the deficiency in its complaint), in this scenario it is clear that what the plaintiff would be requesting is the review by this Court of the motives

and reasoning on which the arbitral tribunal based its award, which as has been stated, exceeds the review that the law entrusts to it, which in the words of Dr. Francisco González de Cossio cited by the petitioner itself, consists of the following:

> The judge only has competence to determine if one of the causes of setting aside or non-enforcement exist. **It cannot analyze or reevaluate the substance of the award**. That is to say, it cannot review the facts or the application of the law that was the basis for the rulings contained in the award.[22]

Furthermore, even in the case that exceeding its function this Court were to decide to analyze the merits of the case to determine if the arbitral tribunal acted partially when issuing the award (which would make its judgment illegal), in order to declare the setting aside of the award in question it must be shown objectively in any case that the arbitrators distanced themselves from their legal convictions on the case to resolve contrarily, and also having to the absence of all logic or congruency in the reasoning stated by the arbitrators and that the rulings in such award were issued only to harm one of the parties and benefit the other. Otherwise the partiality of the arbitral tribunal would be unproven, since the arbitrators have the authority to resolve a dispute definitively by the application and interpretation that they themselves make of the applicable law and the facts presented and proved by the parties in the proceeding.

The burden of proof of the petitioner to demonstrate the partiality of the arbitrators at the time of issuing at the time of issuing the award is very high and can only be achieved with the coexistence of objective elements that generate conviction in the motives for which the rulings of the award were adopted, such as bribes, kickbacks or premiums given by the prevailing party to the members of the tribunal. However, these acts have not occurred and therefore the petitioner could never prove them. While the existence of acts of corruption would be a presumption of a clear violation of public policy, we insist that the award has been issued with complete freedom by the arbitral tribunal and none

---

[22] GONZALEZ DE COSSÍO, Francisco. *Arbitraje*, editorial Porrúa, first edition, Mexico, 2004, p. 406.

of its members was affected by any cause that could be considered an obstacle or incentive to resolve in a particular manner.

In addition, the burden of proof that the petitioner has not satisfied is complemented with the principle of the presumption of the validity of the award, which has been described in national scholarship in the following terms:

> The *presumptio in favorem validiatis sententiae* is applied to arbitral awards and therefore they are presumed valid and enforceable. Thus a regimen of exception and discretion is established in the possible determination of its setting aside. Given this presumption, the burden of proof for its setting aside and enforcement corresponds to the party seeking to set aside or prevent its enforcement.[23]

In the case in question the petitioner has not contributed any objective element that would invalidate the application of this principle and show the partiality to its detriment of the arbitral tribunal. Much less has the petitioner contributed any element that such supposed partiality has been translated into the issuance of an award whose enforcement would be a violation of public policy, this being understood as a series of fundamental principles of law and justice whose violation is seriously incompatible with the Mexican values or economic or legal system.

In reality, PEP alleges the partiality of the arbitral tribunal simply because it does not like the ruling. PEP lost the arbitration and is alleging anything it can to avoid paying my principal the amounts that it has a right to receive. Notwithstanding this, the Commercial Code and the interpretation of its provisions by scholars allows us to clearly conclude that the petitioner does not demonstrate the element so fits action, by not contributing any element of conviction that objectively demonstrates that the arbitral tribunal acted partially when issuing the award and that this conduct furthermore resulted in the issuance of an award violating the fundamental principles of justice and law that govern the Mexican economic and legal system.

---

[23] *Ibidem*, p. 405.

Therefore, this argument of the plaintiff is unfounded.

    3.- <u>The decision contained in the award on financial expenses was not based on Equity, but rather on contractual provisions and specific legal provisions</u>.

PEP falsely and tendentiously states that the decision adopted with respect to the financial expenses is based on equity, only because its arguments were not accepted. This argument can be easily discredited just by analyzing the contents of pages 168 to 174 where the Arbitral Tribunal, as has been explain in prior points, determined the amount and form causation and calculation of the financial expenses that have to be reimbursed to my principal based on several legal and contractual provisions.

**G) ANSWER TO OTHER CONSIDERATIONS AND ARGUMENTS USED TO SUPPORT THE SETTING ASIDE OF THE DECISION ON TECHNICAL DISPUTE NUMBER 36.**

PEP alleges that the dispute was presented by COMMISA at a time when it was no longer permitted contractually and therefore it could not be subject to arbitration.

Nevertheless, the fact that COMMISA had presented technical dispute number 36 after the works were concluded does not mean that the claim cannot be subject to arbitration.

As has been explained previously, my principal maintains that the failure to comply with the second paragraph of the arbitral clause does not result in a possible dispute being removed from the scope of the arbitration clause.

Independently of this, my principal considers that the claim of the plaintiff cannot result in the setting aside of the award given that it is based on a mistaken reading and interpretation of the second paragraph of the arbitral clause.

As can be seen from the provisions of the arbitration clause number 23.3 of the contract, the only requirement imposed for processing the technical disputes is that they be presented prior to arbitration. The clause does not impose the obligation on the contractor of presenting the technical dispute before the works are concluded or at the time of the final delivery.

**The condition that such clause imposes is that the technical dispute be presented prior to arbitration.**

**Thus is it sufficient that my principal had presented its dispute prior to the presentation of the arbitration to comply with this requirement.**

That is what actually occurred as can be seen from the facts as stated in the plaintiff's claim for setting aside, as well as in the arbitral award and the arbitration claim. The following can be seen from such documents:

PEP agreed that Technical Dispute 36 be presented after the Termination and Delivery of the Work.

At the time of signature of the Delivery Certificate, PEP recognized and agreed that, as of the date of its signature, there were certain technical disputes pending presentation by PEP, among them Dispute 36, by virtue of which COMMISA claimed the payment of compensation for delays suffered because of bad weather.

Subsequently, PEP agreed to form a series of work groups to address the disputes that were presented after the Delivery Certificate, including specifically Dispute 36.[24] PEP received, analyzed and resolved Dispute 36, presented by PEP.

---

[24] Laudo arbitral ¶235.

131

PEP's conduct clearly proves that the correct interpretation of the Contract is that the disputes such as the one identified as number 36 are fully acceptable within the framework of the arbitration clause, even though it was presented after the signature of the Delivery Reception Certificate.

According to Mexican case law, this manifestation of PEP's agreement is valid, even if it is not in writing:

> **"**Registry No. 172234
> Location:
> Ninth Period
> Instance: Collegiate Circuit Courts
> Source: Judicial Weekly of the Federation and its Gazette
> XXV, June 2007
> Page: 1048
> Decision: XIX.2o.A.C.46 C
> Isolated Decision
> Matter(s): Civil

> **CONTRACTS. THEY CAN BE EXPRESSLY OR TACITLY AMENDED BASED ON "FREE WILL", PROVIDED THE PUBLIC ORDER, MORALS OR GOOD CUSTOMS ARE NOT AFFECTED, EVEN WHEN THE FORMALITY OF MAKING MODIFICATIONS IN WRITING HAS BEEN AGREED TO IN A SPECIFIC CLAUSE (LEGISLATION OF THE STATE OF TAMAULIPAS).**

> In terms of articles 1255, 1256 and 1300 of the Civil Code for the State of Tamaulipas, a contract is the agreement of two or more persons to create, transfer, modify, conserve or extinguish obligations, and therefore the free will of the parties is the supreme law which translates into contractual freedom, which usually has two aspects, the external and the internal, this latter also called by doctrine "free will", where the first is the power to decide whether or not to enter into the contract and, the second, is the possibility of establishing the contents of the agreement between the parties, which is to say the rights and obligations of each of the parties. Such freedom is not an unlimited right enjoyed by the contracting parties, since its is limited by public order, morality and good customs, which means that the parties in use of that maximum authority that prevails in contracts, such as the will to choose, as long as such principles are not violated, can expressly or tacitly create, transfer, modify, conserve or extinguish what was initially agreed to, even when they have agreed in a specific clause that this can only be done when agreed to in writing, since while this also is the will expressed by the parties in the contract, such agreed formality cannot be considered immutable,

132

because it does not protect any public order right and nor is its modification or cancellation contrary to morality or the law.

SECOND COLLEGIATE COURT IN ADMINISTRATIVE AND CIVIL MATTERS OF THE NINETEENTH CIRCUIT.

Direct amparo 126/2005. Inmobiliaria Ayusa, S. de R.L. de C.V. 28 June 2005. Unanimous vote. Drafting judge: Jorge Sebastián Martínez García. Secretary: Jesús Garza Villarreal.

**Furthermore, the Principle of Good Faith prevents PEP from asserting clauses or agreements that PEP itself agreed were not applicable.**

Art. 1796 of the Federal Civil Code, which PEP invokes as the basis for alleging that the Arbitral Tribunal should not have accepted Technical Dispute 36, obligates PEP and COMMISA to work in good faith to comply with the Contract. One of the consequences imposed by good faith on the contracting parties is to not abuse the exercise of their rights:

Registry No. 183878
Localization:
Ninth Period
Instance: Collegiate Circuit Courts
Source: Judicial Weekly of the Federation and its Gazette
XVIII, July 2003
Page: 1061
Decision: I.8o.C.251 C
Isolated Decision
Material(s): Civil

**BILATERAL CONTRACTS, GOOD FAITH IN THEIR PERFORMANCE.**

A breach of the obligations assumed by one of the contracting parties is not sufficient to justify a breach by the other party; it is essential that the first breach be of such importance that the interest of the other party is or could be unsatisfied, based on the functional interdependence of the reciprocal consideration; this is what is required by the principle of **good faith** in the performance of the **contract** as established in article 1796 of the Civil Code for the Federal District, since if contracts from when they are perfected bind the parties not only to performance of what has been expressly agreed to but also to the consequences that, according to their nature, are in accordance with **good faith**, this same rule leads to the conclusion that the claim that one of the parties is released from its performance when the non-performance of

133

the other contracting party is not significant is inadmissible, given that this would imply an abusive exercise of that right contrary to the purposes that the law had in mind by recognizing it –that of preserving contractual mutuality – and exceed the limits imposed by **good faith**.

EIGHTH COLLEGIATE COURT IN CIVIL MATTERS OF THE FIRST CIRCUIT.
Direct amparo 273/2003. Sistema de Transporte Colectivo. 18 June 2003. Unanimous vote.
Drafting judge: Abraham S. Marcos Valdés. Secretary: María Teresa Lobo Sáenz.

According to the principle of good faith, interpreted and applied by Mexican courts, PEP cannot now invoke an agreement or covenant (that the Technical Disputes may only be filed before the termination of the works) that PEP itself agreed not to apply.  The Mexican courts have determined that a party cannot invoke in its favor a clause that such party agreed, even tacitly, to leave inoperative:

**Registry No.** 271663
**Localization:**
Sixth Period
Instance: Third Chamber
Source: Judicial Weekly of the Federation
Fourth Part, XXIX
Page: 43
Isolated Decision
Material(s): Civil

**LEASE, WAIVERS THAT CANNOT BE INCLUDED IN CONTRACTS OF.**
While it is true that the provisions of article 2432 of the Civil Code are not waivable, as established in article 2433 of such code, this rule is applied to prevent the inclusion of this waiver in the contracts and so that if it is included it will not be enforceable; but this does not imply that the a party having the right to each action cannot cease to exercise it. Thus if during five years the contracting parties agreed not to enforce a particular clause of the contract, this agreement shows from the strength of the facts themselves, that the tenant did not recognize the validity of such stipulation. Therefore, **it does not seem to be in accordance with the good faith that should prevail in contracts to invoke after five years a clause that has become inoperative by consent of the parties who manifested by the manner of complying with the other stipulations their tacit agreement in that regard**.

Direct amparo 2348/57. María Cristina Milchorena. 19 November 1959. Five votes. Drafting judge: José López Lira.

In conclusion, the actions of PEP indicate that its setting aside claim must be declared invalid and furthermore, this is a question of substance and interpretation of the Contract and therefore Your Honor is impeded from addressing it.

**H) ANSWER TO OTHER CONSIDERATIONS AND ARGUMENTS USED TO SUPPORT THE SETTING ASIDE OF THE DECISION ON TECHNICAL DISPUTE NUMBERS 34 AND 35.**

> 1.-    The Arbitral Tribunal has the authority to resolve the substantive questions as it considers best, independently of the arguments of the parties and this does not imply a violation of the arbitration agreement with respect to the rulings in relation to the claims of dispute numbers 34 and 35.

According to the plaintiff, the arbitral tribunal violated the arbitration agreement in view of the fact that it resolved a dispute not submitted to its consideration. According to the plaintiff the arbitral tribunal did not resolve an indemnificatory action but rather an action of non-recoverable expenses that were not claimed nor were subject to the arbitration and thereby violated article 19 of the Rules of Arbitration of the International Chamber of Commerce.

First of all, it must be considered that the arbitral tribunal is only bound by the agreements established by the parties. Such agreements can be determined in the arbitration agreement, in the terms of reference or in any other agreement during the arbitration procedure.

According to the arbitration agreement (clause 23.3 of the contract) the parties agreed to confer powers to the arbitral tribunal in accordance with the Rules of Arbitration of the International Chamber of Commerce.

Article 15 of the Rules of Arbitration of the International Chamber of Commerce is a reflection of this principle. Such article establishes the following:

135

> **"Article 15**
> **Rules Governing the Proceedings**
> 1
> The proceedings before the Arbitral Tribunal shall be governed by these Rules and, where these Rules are silent, by any rules which the parties or, failing them, the Arbitral Tribunal may settle on, whether or not reference is thereby made to the rules of procedure of a national law to be applied to the arbitration.
> 2
> In all cases, the Arbitral Tribunal shall act fairly and impartially and ensure that each party has a reasonable opportunity to present its case."

This also implies that the arbitral tribunal has powers to determine what is the applicable law, as well as the applicable legal consequences according to the claims of the parties and the facts on which they are based.

In this specific case, according to the claim of the plaintiff in which it cites the arbitral claim regarding my principal, as well as the claim of my principal, the latter claimed the following in relation to the waiting times:

> "Commisa demands compensation for approximately US$81 million dollars. Such amount is calculated in accordance with Contract EPC-28. If for some reason the Arbitral Tribunal determines that the quotes or fees for waiting times or reserve that are established in Contract EPC-28 are not applicable for the calculation of the compensation corresponding to these delays, Commisa respectfully requests that an award be issued according to which the payment of indemnification by PEP is declared that is sufficient to compensate Commisa for the damages and losses suffered as a consequence of the above suffered delays. For such purposes, Commisa considers that such damages and losses come to approximately US$81 million dollars …"

Such claim of COMMISA did not fall outside the scope of the arbitration agreement nor implied any incitation to the arbitral tribunal to violate it. It is very clear that COMMISA's claim was an indemnification for having its two vessels idle for causes attributable to PEP and it requested from the arbitral tribunal the liberty to grant an indemnification as it thought relevant.

136

In this regard, in the terms of reference that were signed and accepted by PEP the arbitral tribunal determined the following:

> **"C) <u>Points in dispute in relation to the claims and petitions formulated by the claimant</u>**
>
> 3. a) Have there been delays attributable to the Respondent and suffered by the Claimant, that have affected at the beginning of the works of the two principal vessels, the Castoro 10 and the Bar Protector?
>
> b) Have there been delays attributable to the Respondent, because due to the delays of PEP the Claimant had to carry out the works agreed to in Contract EPC-28 in unfavorable climatic conditions as a result in the change of season?
>
> c) If the answers to questions 3. a) and/or 3 b) are affirmative, does the Claimant have the right to receive from the Respondent compensation and/or indemnification for damages and losses or should such claim be rejected if it is considered one of the exceptions articulated by the Respondent? If the compensation and/or indemnification is declared valid, what would its amount be?"

According to the terms of reference entrusted by the parties to the arbitral tribunal, the latter was entrusted with determining, obviously according to the dispute set forth and according to the evidence offered by the parties, if COMMISA was entitled to any indemnification for the waiting times and how much it would be.

This was accepted by PEP as can be seen from the terms of reference. This implies that PEP agreed that the arbitral tribunal should decide this according to the dispute. This is consistent with what was agreed by the parties and in accordance with the requirements of the Rules of Arbitration of the International Chamber of Commerce.

Thus if PEP agreed to the terms of reference, it cannot be considered that the arbitral tribunal has exceeded its authority or violated the arbitration agreement.

As can be seen from the challenged award, the arbitral tribunal decided pursuant to the terms of reference to order PEP to pay an indemnification for the waiting times, if such indemnification was determined as damages or losses or as rates or whatever form is irrelevant for purposes of the setting aside of the award as is claimed by PEP given that as can be seen from the above explanation, the arbitral tribunal complied with the terms of reference agreed to by the parties.

**The parties authorized the arbitral tribunal to decide on the validity of the indemnification as well as to determine its amount.**

In this regard the assertion of PEP is also unfounded that it was left **without a means of defense** since **it knew and agreed to** the terms and conditions of the **terms of reference**.

PEP knew in a timely fashion the claims of COMMISA. Furthermore, it had the opportunity to answer the claim and knew in a timely fashion the terms of the terms of reference, it had the opportunity to offer evidence and assert its allegations in relation to the case. As can be seen from the arbitral proceeding such circumstance was not unknown by PEP.

Thus there is no way to validly assert that PEP was deprived of its opportunity to state its defense either for the claims of COMMISA or for the rulings of the arbitral tribunal in relation to them.

**Furthermore, also unfounded is the argument of PEP that COMMISA claimed the same amount for two different causes of action: a) waiting rates and b) damages and losses and that such circumstance alone was sufficient to set aside the award.**

This argument made by the plaintiff as an excuse for setting aside the award has nothing to do with the causes for setting aside established in article 1457 of the

138

Commercial Code. The circumstance alleged by the plaintiff is, in any case, a circumstance **related to the substance of the arbitral dispute**.

As has been demonstrated, the parties gave powers to the arbitral tribunal to resolve the merits of the dispute by virtue of both the arbitration clause and the terms of reference.

All the questions manifested by the arbitral tribunal with regard to this are substantive questions that it was fully authorized to resolve. Whether or not the claim of COMMISA was valid simply has to do with questions that do not go beyond the agreements of the parties and have nothing to do with the causes for setting aside.

**In the same regard, the argument of PEP that according to clause 23.2 PEP is not liable for legal or contractual damages not foreseen in the contract and that therefore any claim based on them is not arbitrable, must be rejected.**

This question also corresponded exclusively to the arbitral tribunal as an object of analysis of the substance of the dispute. As has been indicated, the parties gave powers to the arbitral tribunal to interpret the Contract and determine its legal consequences. Therefore, it corresponded to the arbitral tribunal to analyze such question as part of the disputed points of the arbitral proceeding.

Under no circumstances can it be considered that the analysis of such question could result in the setting aside of the award. This is due to the fact that the correct or incorrect interpretation of the Contract containing the rights and obligations of the parties is not a reason for setting aside the award. As has been indicated throughout the answer to the claim, the causes for setting aside are limited and express and prevent Your Honor from analyzing the substance of the matter resolved in the award.

**The same consideration must be made with respect to the fair, reasonable and duly proven costs that have accrued.**

139

The determination of the fair, reasonable and proven costs owed to COMMISA for this concept is contained in paragraphs 178 to 183 of the Arbitral Award.

In principle, the Arbitral Tribunal determined that, in spite of the fact that the Contract made reference to "just, reasonable and proven costs", it did not have powers of an amicable compositeur; rather the amount of the indemnification had to be calculated multiplying the number of waiting days actually proven, by the amount that "COMMISA actually had to pay EMC according to the Subcontract" for leasing the vessels.

COMMISA argued that the amounts it was entitled to must be calculated based on the daily rate for delay contracted in the Subcontract executed by COMMISA and EMC.

However, and in spite of the objection of COMMISA, the Arbitral Tribunal considered that COMMISA was not entitled to such amounts, in spite of having paid them to EMC by virtue of a certain Settlement Agreement executed on September 30, 2004 by COMMISA, EMC and its respective holding companies (Halliburton Brown Root Limited ("HBR") and European Marine Investments Limited ("EMI").

Here it is important to reiterate that the Arbitral Tribunal determined that the evidence offered was sufficient to prove that COMMISA had actually paid such amounts and that the payment made under the Settlement Agreement (which actually consisted of a condonation of debt) was sufficient to prove that such amounts were actually paid by COMMISA.

In effect, the Arbitral Tribunal used certain rates contained in a price quote that COMMISA had offered PEP, and that were less than those actually paid by COMMISA. The Arbitral Tribunal based its decision on the presumption that COMMISA could have obtained better rates than those established in the Subcontract and that it was obligated to do so as its duty to mitigate the damages. In other words, the Arbitral Tribunal ordered PEP to indemnify COMMISA for the delays caused using a rate less than the

140

arte that COMMISA actually paid, since COMMISA "was capable (or could have been capable)" of obtaining a discount from EMC on such rates.

2.-    The Evaluation of the Evidence by the Arbitral Tribunal cannot be Reviewed by the Courts. The Evaluation of the Evidence is a Question of Substance.

As has been indicated by the Mexican court decisions, the determination of the facts based on the evidence offered and analyzed is a substantive question corresponding to the Arbitral Tribunal. And what is resolved by the Arbitral Tribunal has the effect of res judicata, which can only be reviewed by the judicial authority when the arbitral award is contrary to public policy.

In this regard it is necessary to restate that the determination of the disputed facts done by the Arbitral Tribunal has the effect of res judicata, as is clearly indicated in the cited court decisions.

Unless in the determination of the disputed facts the Arbitral Tribunal has violated essential procedural formalities or has resolved a dispute outside of the scope of the arbitration agreement, what is resolved by the Arbitral Tribunal in relation to the disputed facts cannot be challenged.  The facts, *per se*, are not nor can be contrary to public policy and therefore there is no way under Mexican law that the resolution of the disputed facts can be set aside under this premise.

Therefore, it also must be considered that such reasons for setting aside are completely unfounded.

3.-    The fact that COMMISA had presented technical dispute numbers 34 and 35 once the works were finished cannot mean that the claim cannot be subject to arbitration.

As has been explained previously, my principle maintains that a failure to comply with the second paragraph of the arbitration clause does not result in the possible dispute being outside the scope of the arbitral clause.

Notwithstanding this, my principal considers that the claim of the plaintiff cannot generate the setting aside of the award because it is based on a mistaken reading and interpretation of the second paragraph of the arbitration clause.

As can be seen from the arbitration clause number 23.3 of the contract, the only requirement imposed for processing the technical disputes is that they be presented prior to the arbitration. The clause does not impose the obligation on the contractor that the technical dispute be presented before the works are concluded or at the time of final delivery.

**The condition that the clause in question imposes is that the technical dispute be presented prior to the arbitration.**

**Thus it is sufficient that my principal presented its dispute prior to the presentation of the arbitration for such condition to have been complied with.**

That is what actually happened as can be seen in the facts of claim for setting aside of the plaintiff, as well as from the arbitral award and the arbitration claim. From such documents the following can be seen:

COMMISA prepared its offer of unit prices according to Exhibit C of the contract to try to recover the waiting times. In a meeting held on March 5, 1999, PEP requested that my principal (COMMISA) present two estimates for costs for delays in the construction: one estimate in which COMMISA would assume the immediate transfer of the vessels and one estimate in which COMMISA would assume that the vessels would be transferred to the site of the works in August 1999. COMMISA made such estimates.

During a meeting on March 18, 1999 my principal requested PEP to respond to its cost estimates. However, PEP never responded. PEP also did not respond to the cost estimates that COMMISA provided to it.

As can be seen from the above, my principal initiated the technical dispute procedures related to these claims. However, for causes attributable to PEP it could not continue with the formalization of the claim.

As can be seen from the above, my principal did comply with the condition of carrying out the technical dispute procedure **before initiating the arbitration.** The exact time at which it did so is irrelevant. The only condition that the clause imposes is that it has been initiated prior to the arbitration, which was done.

Therefore, if my principal complied with the requirement of presenting the dispute prior to going to arbitration, then it must be considered that it did comply with the condition of the second paragraph of clause 23.3 of the contract.

4. <u>By resolving these claims in the award the arbitral procedure was not violated since the Mission of the Arbitral Tribunal was fully complied with, article 19 of the Rules of the International Chamber of Commerce was not violated, and PEP was not deprived of the possibility to state its defense</u>

Also unfounded is the allegation of the plaintiff that the arbitral tribunal violated the terms of reference because the expenses related to the claims derived from technical disputes 34 and 35 were neither accrued nor proven.

Such assertions have no support given that, as has been explained, the topics of the burden of proof, the proving of facts and other topics that have to due with the substance of the dispute in the arbitration are not allegations that can validly set aside the arbitral award.

143

As has been explained, PEP accepted the terms of reference and in such document it was clearly established that one of the points to resolve would be the indemnification for the waiting times.

The terms of reference was signed and accepted by PEP in which the arbitral tribunal determined the following:

> *"C) Points in dispute in relation to the claims and petitions formulated by the claimant*
>
> 5. a) Have there been delays attributable to the Respondent and suffered by the Claimant, that have affected at the beginning of the works of the two principal vessels, the Castoro 10 and the Bar Protector?
>
> b) Have there been delays attributable to the Respondent, because due to the delays of PEP the Claimant had to carry out the works agreed to in Contract EPC-28 in unfavorable climatic conditions as a result in the change of season?
>
> c) If the answers to questions 3. a) and/or 3 b) are affirmative, does the Claimant have the right to receive from the Respondent compensation and/or indemnification for damages and losses or should such claim be rejected if it is considered one of the exceptions articulated by the Respondent? If the compensation and/or indemnification is declared valid, what would its amount be?"

According to the terms of reference entrusted by the parties to the arbitral tribunal, the latter was entrusted with determining, obviously according to the dispute set forth and according to the evidence offered by the parties, if COMMISA was entitled to any indemnification for the waiting times and how much it would be.

This was accepted by PEP as can be seen from the terms of reference. This implies that PEP agreed that the arbitral tribunal should decide this according to the dispute. This is consistent with what was agreed by the parties and in accordance with the requirements of the Rules of Arbitration of the International Chamber of Commerce.

144

Article 19 of the Rules of Arbitration of the International Chamber of Commerce establishes the following:

> **"Article 19**
> **New Claims**
> After the Terms of Reference have been signed or approved by the Court, no party shall make new claims or counterclaims which fall outside the limits of the Terms of Reference unless it has been authorized to do so by the Arbitral Tribunal, which shall consider the nature of such new claims or counterclaims, the stage of the arbitration and other relevant circumstances."

According to what was proven in the arbitration, it was fully evidenced that the vessels had waiting times addition to those agreed to by the parties. It was also demonstrated that the waiting times that COMMISA had to endure were due to the failure of PEP to provide access to the site on time.

The breach of PEP was proven beyond a doubt. However, the claim of the plaintiff is infantile in its argument that the expense was not proven. Regardless of the fact that this is a substantive question of the arbitration. Obviously the nature of the breach and its consequences must be addressed. If COMMISA had its vessels idle for causes attributable to PEP it is logical and consistent that it would have a right to collect an indemnification.

PEP's argument is very superficial that COMMISA would have to have demonstrated the expense. As has been said, the vessels were idle in the high seas and at the disposal of PEP, waiting for PEP. This obviously has a cost, simply the cost of not being able to use the vessel for other business. Therefore, the order of the arbitral tribunal to pay the indemnification did not violate the arbitral proceeding for two reasons, one of form and one of substance.

145

The one of form lies in the fact that the terms of reference established the question of the possibility of indemnifying my principal simply for waiting times.

The one of substance lies in the fact that it was proved that PEP breached its obligations and forced my principal to keep its vessels idle.

This does not imply in any way the violation of article 19 of the Rules of Arbitration of the International Chamber of Commerce. What was determined by the arbitral tribunal did not imply the admission of a new demand, no new claim presented. PEP knew from the beginning the scope of the claim and the scope of the dispute established in the terms of reference. There is no doubt that PEP had the opportunity to present its defense and the ruling that is analyzed was not the result of a new claim.

Therefore it must be considered that these arguments are also unfounded.

**I) ANSWER TO OTHER CONSIDERATIONS AND ARGUMENTS THAT ARE USED TO SUPPORT THE SETTING ASIDE OF THE DECISION ON TECHNICAL DISPUTE NUMBER 19.**

PEP alleges the violation of the principle of due process because when technical dispute 19 was resolved, the Arbitral Tribunal was not assisted with expert testimony.

PEP's allegations in relation to technical dispute 19 are unfounded by virtue of the fact that they have to do with substantive questions of the arbitration that are not reasons for setting aside under article 1457 of the Commercial Code, in addition to the fact that the cited due process principal refers to a constitutional guarantee only applicable to the authorities in relation to acts affecting private parties and not arbitral awards.

In effect, the violation of the **principle of due process**, in view of the fact that supposedly the arbitral tribunal resolved this dispute **without expert assistance**, as well as what it resolved with respect to **technical problems not foreseen in the**

146

**contract** are all substantive problems of the arbitral award that under no circumstance may be reviewed under the auspices of article 1457 of the Commercial Code since none of them are included under its premises.

In this same regard the arguments of PEP explained in paragraph 230 of its claim that the claims of COMMISA for thirty-one events of obstruction **had already been precluded** given that they were not formalized by PEP as extraordinary works, are clearly unfounded.

That fact that such claims had not been formalized by PEP as extraordinary works does not result in the impossibility of claiming them. This is so because as PEP itself argues in this claim and has been presented as a defense by my principal throughout this claim, according to article 1797 of the Federal Civil Code, it is not valid to leave compliance with the obligations to one of the contracting parties. **It would be absurd for the validity of a claim to depend on its classification by PEP as an extraordinary work.** Therefore, it is not valid for PEP to now claim the validity of the award depends on this circumstance.

In this regard the position of PEP is absurd that all the extraordinary works done by COMMISA must be proven and if the arbitral tribunal ordered they be paid for without its consent this should result in the setting aside of the award. As has been indicated, compliance with the obligations cannot be left to the discretion of one of the parties. **In addition to this, it is a matter in dispute in this arbitration that the arbitral tribunal is authorized to resolve.** Therefore it cannot be considered that the order to pay went beyond the scope of the arbitral clause and that this in any way violates public policy.

Furthermore, as has been explained, the questions related to ducts according to exhibit C of the contract did not require formalization as technical disputes. Therefore such circumstance is irrelevant for a possible preclusion of rights. **The same must be considered with respect to the argument related to exhibit B-2 based on the same principle.**

147

In the final analysis, as has been argued throughout this answer to the claim, the matter of the formalization of the claims as technical disputes is not a matter that implies the violation of the arbitration agreement or an overextension of the authority the arbitrators that could result in the setting aside of the award. On the contrary, such questions are part of the points in dispute in the arbitration. **To presume otherwise would lead to the absurd result of agreeing that any incorrect interpretation of the contract would imply the violation of the arbitral agreement.**

Finally and in relation to PEP's argument that the decision on technical dispute number 19 refers to technical problems not foreseen in the Contract and therefore the decision on them exceeds the terms of the arbitration agreement is also incorrect.

As has been indicated in the defense in relation to the claims of the technical disputes 34, 35, 36, 37 and 39, particularly 37 and 39 regarding **crossings of ducts established in the seabed,** it is clear that such questions are regulated in technical exhibit C. Technical exhibit C is not included in clause 23.2 of the contract. **The obstructions must be considered extraordinary works related to the ducts according to exhibit C of the Contract.**

Therefore since those regarding ducts cannot be considered a technical dispute referred to in such clause, then COMMISA cannot be required to exhaust such procedure.

For all these reasons it is also considered that the setting aside proposed by the plaintiff is unfounded.

**J) VALIDITY OF THE ORDER TO PAY EXPENSES AND COSTS OF THE ARBITRATION.**

PEP challenges the order container in the arbitral award to pay the expenses and costs of the arbitration without invoking a cause for setting aside the award with respect to

such point and specifically challenging the substantive arguments made by the Arbitral Tribunal with respect to this point.

The deficiency in the presentation of PEP vitiates its argument and makes it impossible to address *per se*.

Apart from the above, and assuming without conceding that this "challenge" of PEP could be addressed, it is clear that the ruling against PEP contained in point 6 of the decision of the Arbitral Tribunal regarding costs, found at pages 182 and 183 of the final award which is being challenged in this ancillary claim is in itself valid since it was issued in compliance with article 31 of the Rules of Arbitration of the Internacional Chamber of Commerce which governs the proceeding from which the award is derived whose setting aside is claimed by PEP, as follows:

> "6.    To order, in relation to expenses and costs:
>
> (i) Each party to assume half of the fees and expenses of the arbitrators, half of the administrative expenses of the Internacional Chamber of Commerce and its own defense expenses.
>
> (ii) That PEP pay to COMMISA 200,000 USD as expenses incurred by the latter in defending itself from the objections of lack of competence of the Arbitral Tribunal and lack of procedural requirements filed by the former."

In effect, the Rules of Arbitration in question confer to the Arbitral Tribunal a discretional power to set the costs of the arbitration it considers reasonable, which is verified in the text of article 31, which is quoted below for greater clarity:

> "**Article 31**
> **Decision as to the Costs of the Arbitration**
> 1
> The **costs of the arbitration** shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scale in force at the time of the commencement of the

arbitral proceedings, as well as the fees and expenses of any experts appointed by the Arbitral Tribunal and the **reasonable legal and other costs** incurred by the parties for the arbitration.

2

The Court may fix the fees of the arbitrators at a figure higher or lower than that which would result from the application of the relevant scale should this be deemed necessary due to the exceptional circumstances of the case. **Decisions on costs other than those fixed by the Court may be taken by the Arbitral Tribunal** at any time during the proceedings.

3

**The final Award shall fix the <u>costs of the arbitration</u> and <u>decide which of the parties shall bear them or in what proportion they shall be borne by the parties</u>.**"

(Emphasis added)

As can be seen from the transcribed article of the ICC Rules of Arbitration, it is the arbitral tribunal that, by agreement of the parties, is authorized to set the costs of the arbitration in the final award and decide who and in what proportion they shall be paid.

Both the most respected international scholarship regarding the interpretation of the ICC Rules of Arbitration and arbitration practice emphasize the discretion the arbitrators enjoy to establish the distribution of the payment of the costs of the arbitration.

Thus, Yves Derains and Eric A. Schwartz[25] indicate that "*according to art. 31(3)* [of the ICC Rules of Arbitration]*, the arbitrators have complete discretion to assign the costs in they manner they consider appropriate.*"[26]   This same position is also taken by W. Lawrence Craig, William W. Park and Jan Paulsson, three other big internationally known authors in the area of international commercial arbitration and, in particular, can be seen in the interpretation and application of the ICC Rules of Arbitration.[27]

---

[25] Both authors former secretary generals of the ICC International Court of Arbitration.

[26] DERAINS, Yves and Eric A. SCHWARTS, El Nuevo Reglamento de Arbitraje de la Cámara de Comercio Internacional (Guía de arbitraje comercial internacional), Colección de Estudios Jurídicos, Edit. Oxford University Press, Mexico, 2001; p. 414.

[27] CRAIG, W. Laurence, William W. PARK and Jan PAULSSON, *International Chamber of Commerce Arbitration*, 3a ed., Edit. Oceana Publications, Inc., United States of America, 2000; pp. 394 and 395.

In regard to the consideration of the rulings of the award on the claims made and of the procedural conduct of the parties, the arbitral jurisprudence illustrates the use of simple formulas to prorate the arbitration costs: in an award issued under the ICC Rules of Arbitration,[28] they emphasize the following reasoning: (i) **the arbitral tribunal enjoys broad discretion** under the ICC rules; and (ii) constitute an equitable solution that distributes the benefit of the costs in the same proportion as the validity of the claimed made by the parties (useful principle for the case of reciprocal claims).[29]

Finally in this section it is important to indicate that it is the normal practice in commercial arbitration that if one party wins all its claims the costs of the arbitration, as well as the reasonable costs of representation of the winning party, are imposed on the losing party. This practice has the double function of relief and dissuasion.

The above implies that the arbitral tribunal must take into account all the circumstances of the case to distribute the costs justly and equitably.  One important criterion in this is the conduct of the parties in the procedure.  When a claim is frivolous or one party provoked expenses or unjustified delays in the procedure by active conduct (dilatory tactics) or omission, in general the arbitral tribunal should take such circumstances into account charging against it the expenses generated thereby for the other party.[30]

In this regard, as Your Honor can appreciate, the fixing of the costs by the Arbitral Tribunal against PEP, was done in compliance with and based on the authority conferred on it by article 31 transcribed above of the ICC Rules of Arbitration.

This was the reasoning that the Arbitral Tribunal used to issue the above transcribed order to pay costs.

---

[28] Collection of ICC Arbitral Awards, 1986-1900, p. 52, case No. 3267, of the year 1984.
[29] GRAHAM TAPIA, Luis Enrique, *El arbitraje comercial*, Colección de Obras Monográficas, reprint of the 1st ed., Edit. Themis, Mexico, 2007; p. 290.
[30] GONZÁLEZ DE COSSÍO, Francisco, *Arbitraje*, *Op. cit. Supra*, Note 22; p. 306.

In addition, as can be seen from paragraph 767, the Arbitral Tribunal also supported its decision on the contents of article 1455 of the Commercial Code, which also the criterion of reasonability of the costs, according to the specific case, as can be seen in the following cite:

> "**Article 1455.-** Except as provided by the next paragraph, <u>costs of the arbitration shall be borne by the party against whom an award is made</u>. Nevertheless, the arbitration tribunal may make a pro rata distribution of the costs between the parties if it decides that such distribution is reasonable in light of the circumstances of the case.
>
> <u>The arbitration tribunal shall decide</u> which party shall pay the costs of representation and legal assistance, or if they can be prorated among the parties and if the tribunal determines <u>this to be reasonable</u> considering the circumstances of the case, it shall do so.
> …"

From a logical and systematic interpretation of the transcribed article, it can be derived that our law on commercial arbitration establishes, among other things, the following rules with regard to costs:

(i) Only if the parties are silent with respect to the costs of the arbitration, will the following rules of the Commercial Code be applied:

   a. It is the arbitral tribunal that will fix the costs of the arbitration in the final award.

   b. Both the fees of the arbitral tribunal and the cost of representation and of legal assistance, will be determined by the arbitral tribunal in a reasonable amount taking into account the amount of the dispute, the complexity of the matter, the time dedicated by the arbitrators and any other circumstances pertinent to the case.[31]

---

[31] An unfortunate copy of the Rules of Arbitration of UNCITRAL authorizes one of the parties to request a judge to, at its entire discretion, participate in the process of determining the costs of arbitration, but being

   c.  The costs of arbitration will be borne by the losing party. However, ***the arbitral tribunal may prorate the elements of these costs between the parties if it decides that prorating is reasonable, taking into account the circumstances of the case***.

In this context and according to Prof. José Luis Siqueiros, a recognized Mexican jurist and expert in commercial arbitration, in absence of an agreement between the parties, the arbitral tribunal is expressly authorized by the Commercial Code to establish the costs of the arbitration in the final award, ensuring they are reasonable under the circumstances of the case. Although the general rule is that the costs will be borne by the losing party, the arbitral tribunal is authorized to prorate[32] the elements of the costs between the parties.[33]

Dr. Luis Enrique Graham Tapia reaches the same conclusion when he states that with "*unless otherwise agreed by the parties, **the tendency in arbitration is to entrust the arbitral tribunal with a wide margin of discretion with regard to the distribution of the costs between the parties**. Thus, the arbitrator can take into consideration: i) the procedural conduct of the parties; ii) the award (in favor or against) in regard to the claims made.*"[34] [Emphasis added]

In this context, and with regard to the substance of the matter, in the final award the Arbitral Tribunal resolved that each of the parties should pay half of the administrative expenses and assume its own defense expenses, since both COMMISA, and PEP, had been only partially winners.

---

able only to make the observations he considers appropriate with respect to the arbitrators fees, but it will be the arbitral tribunal itself that in the ultimate instance shall fix the corresponding amount of their fees.

[32] The verb prorate, as used by article 1455 of the Commercial Code, means, according to the Real Academia de la Lengua, to divide an amount between two or more persons, according to the part that proportionally belongs to each one.

[33] SIQUEIROS, José Luis and Alexander C. HOAGLAND, *International Handbook on Commercial Arbitration*, Vol. III, International Council for Commercial Arbitration (ICCA), Edit. Kluwer, La Haya / Londres / Nueva York, 1995.

[34] GRAHAM TAPIA, Luis Enrique, *El arbitraje comercial*, *Op. cit. Supra*, Note 29; p. 290.

153

On the other hand, the Arbitral Tribunal determined that since COMMISA was the winning party in all of the objections made by PEP with regard to the supposed lack of competence of the Arbitral Tribunal and lack of procedural requirements, PEP must assume the reasonable expenses incurred by COMMISA in defending against these objections, which the Tribunal fixed at USD $200,000 (two hundred thousand dollars of the United States of America 00/100).

As can be appreciated, there is no question of public policy, violation of procedural rules or any other causes of nullity that are applicable to this order to pay costs.

The argument made by PEP that it was not the losing party with respect to the procedural objections of incompetence that it presented in court, in this ancillary proceeding, is absolutely invalid and cannot be addressed, since it refers to a substantive decision, issued by the Arbitral Tribunal in exercise of the powers that for purposes of distributing the arbitration costs, are conferred to it by article 31 of the Rules of Arbitration of the International Chamber of Commerce.

Definitively, the fact that the Arbitral Tribunal has decided that it was reasonable that PEP has to pay the amount it was ordered to pay for having lost a particular point of the dispute resolved in the final award, has nothing to do with the limited causes for setting aside that the Commercial Code establishes.

**Neither in article 1457 nor in any other article of the Commercial Code is there any authorization or cause that authorizes the competent judge to review what has been resolved by the arbitral tribunal in the award on the fixing and determination of the payment of the costs of an arbitral procedure.**

It is the arbitral tribunal who decides the matters of an arbitration.  A judge that hears a request for setting aside (or recognition and enforcement) of an award is not authorized to examine such decisions or modify them.[35]

As has been mentioned on several occasions in this document, article 1457 establishes, limited thereto and strictly interpreted, the causes for which the competent judge can set aside an arbitral award.

In neither of the two sections of such article 1457 (and its various subsections), is the possibility established of the competent judge setting aside an arbitral award for what has be decided in relation to the fixing and determination of the costs of an arbitration. Furthermore and as has been duly evidenced in previous section, the examination of the different causes for setting aside of article 1457 also do not authorize the judge, under any circumstances, to review or analyze the substantive decisions adopted by the arbitral tribunal in the award.

Even when it is attempted to apply by analogy one of the causes for setting aside contemplated in article 1457, it must be restated that the arbitral tribunal, at all times, acted within the powers and with the attributes that the arbitration clause and the Commercial Code conferred to it.

With respect to the costs of the arbitration, it has been duly evidenced that the arbitral tribunal complied at all times with the arbitration agreement and that such agreement is not in conflict with any provision of the Commercial Code or with any other provision that by agreement of the parties or by legal mandate was applicable to the arbitration.

Therefore, this order to pay costs should prevail and so be declared by Your Honor, because it was determined in accordance with article 31 of the Rules of Arbitration applicable to the dispute by the Arbitral Tribunal.

---

[35] GONZÁLEZ DE COSSÍO, Francisco, *Arbitraje*, *Op. cit. Supra*, Note 22; p. 300.

## LAW

I deny the application of the legal provisions invoked by the plaintiff both procedural and substantive.

In addition, I hereby come to file against PEP,

## COUNTERCLAIM

The above is requested by virtue of the fact that my principal participated as claimant in the arbitral proceeding number 13716/CCO/JRF before the International Court of Arbitration of the International Chamber of Commerce and in which a definitive and unappealable award was issued that ordered the respondent PEP to pay various claims to my principal.

In view of the above, with due respect I request that Your Honor:

**1.-** Recognize the validity of the final award dated January 15, 2008, issued in the arbitral proceeding number 13716/CCO/JRF before the International Court of Arbitration of the International Chamber of Commerce.

**2.-** Consequently, order PEP to pay my principal the amounts determined in its favor in such award, according to the specifications of the arbitral award contained in the section called "**XII. DECISION**", found at pages 182 and 183 of such award, which are quoted below:

> "…
>
> 3.    …the sum of "S" Mexican Pesos ["PME"], calculated according to the following formula:

156

S = (A + B) x 0,995

in which

"S" is the sum in PME that PEP shall pay Commisa.

"A" is equal to 10,928,728 PME.

"B" is a sum in PME that results from converting 75,075,635 Dollars of the United States of America ["USD"] in PME at the sale exchange rate that the Bank of Mexico has determined and published in the Official Gazette of the Federation on the business day immediately prior to September 29, 2002.

"+" is the addition sign.

"x" is the multiplication sign.

"=" is the equals sign.

0.995 reflects the reduction of the 5 to the thousand that Commisa is obligated to make in favor of the Ministry of Controller and Administrative Development.

4.    … pay Commisa, for financial expenses arising from the Contract EPC-28, interest calculated on the sum "S", defined in the above mentioned Decision; the financial expenses will be accrued from September 29, 2002 until the date of actual payment, at the rate at that time established in the Federal Revenue Law for the cases of extension in the payment of tax obligations; the calculation will be made per day and the payment of the financial expenses will be made together with the sum "S" defined in the above mentioned Decision.

…

6.    Ordering, in relation to expenses and costs:

(ii)    … to pay Commisa 200,000 USD as expenses incurred by the latter in its defense against the objections of lack of competence of the Arbitral Tribunal and of lack of procedural requirements presented by the former."

**3.-** Order PEP to pay the amount Your Honor determines for the expenses and costs arising from this proceeding.

**A.**    ***Service of process***.      In order to serve process on the state entity PEP for this counterclaim, I request Your Honor to order PEP to be **personally notified** of this counterclaim in accordance with the binding court precedent cited below:

"Registry No.: 178,647
**Court precedent**
Matter(s): Civil
Ninth Period
Instance: First Chamber
Source: Judicial Weekly of the Federation and its Gazette
XXI, April 2005
Decision: 1a./J. 134/2004
Page: 617

**COUNTERCLAIM. THE COURT RULING THAT ADMITS IT MUST BE NOTIFIED PERSONALLY TO THE COUNTERCLAIM DEFENDANT (LAWS OF BAJA CALIFORNIA AND THE FEDERAL DISTRICT).** The procedural codes of Baja California and the Federal District do not establish the form in which a counterclaim must be notified, only saying that the plaintiff must be notified so that it may respond. The expression "to serve notice" does not refer to the form in which the counterclaim must be notified, but rather the manner in which the parties can have access to the case records and the documents that are attached, so that they know their contents and can challenge them. Therefore, since there is a legal gap with regard to the form in which the ruling admitting the counterclaim should be notified, the nature of the counterclaim should be taken into consideration, which implies the exercise of actions against the plaintiff in the principal case, for which it also constitutes a claim that, as such, should receive the same treatment as that given the principal claim. In this way, if both codes establish that **once the claim is admitted notice of it shall be served on the defendant and the defendant shall be summoned to answer it**, in the case of the counterclaim notice should also be served. This implies that **the corresponding admission ruling must be notified personally**, accompanied by the copies of such counterclaim, as occurs when notice is served of the principal claim. The above is in order to comply with the guarantee of legal certainty established in article 14 of the Constitution in favor of the counterclaimed party, because although it already knows of the proceeding and the authority before whom it is being processed, it does not know the claims of the opposing party and the actions that are exercised against it in the counterclaim, and therefore, if the defendant is not personally notified of the admission ruling on such counterclaim, its guarantee of defense would be limited

being unable to respond to the actions of the counterclaim and contradict them through the evidence it considers relevant for this purpose.

Contradictory decisions 99/2004-PS. Between the Third Collegiate Court in Civil Matters of the First Circuit and the Third Collegiate Court of the Fifteenth Circuit. 17 November 2004. Majority of three votes. Dissenting votes: José Ramón Cossío Díaz and Olga Sánchez Cordero de García Villegas. Drafting judge: José Ramón Cossío Díaz. Secretary: Fernando A. Casasola Mendoza.

Binding precedent 134/2004. Approved by the First Chamber of this High Court, in session on the first of December of two thousand four."

The domicile to serve process is located at:

**Gerencia Jurídica de Exploración y Producción**

**Marina Nacional 329 Edificio A, Octavo Piso**

**Colonia Huasteca, Delegación Miguel Hidalgo**

**México, DistritoFederal, C.P. 11311**

**B.**  *__Claims asserted in the Complaint__*. According to article 1461 of the Commercial Code, an arbitral award will be recognized as binding by Mexican judges and, after a presentation of a written petition by the interested party, will be enforced.

To issue this enforcement it is solely and exclusively required that the petitioner, in accordance with the second paragraph of mentioned article 1461 of the Commercial Code, attach a duly authenticated copy of the award or a certified copy thereof, and the original of the arbitration agreement or a certified copy thereof, which served as the basis for the arbitral proceeding and the respective award. In this regard, it is relevant to quote the following court precedent:

"Ninth Period
Instance: EIGHTH COLLEGIATE COURT IN CIVIL MATTERS OF THE FIRST CIRCUIT.
Source: Judicial Weekly of the Federation and its Gazette
Volume: VIII, August 1998
Decision: I.8o.C.159 C
Page:  877

**ARBITRAL AWARD ISSUED IN MEXICAN TERRITORY, FORMALITIES TO BE MET IN THE HOMOLOGATION PROCEEDING.** According to article 1461 of the Commercial Code, the homologation proceeding for an arbitral award must meet the formalities established in such article, as well as in article 360 of the Federal Code of Civil Procedures, which formalities are the following: 1) Presentation of the corresponding written request to the first instance Judge; 2) Original presentation of the authenticated award or a certified copy thereof; 3) Presentation of the original of the arbitration agreement or a certified copy thereof, and 4) Those established in article 360 of the federal civil procedures code; which are: a) Once the proceeding is filed, the Judge will serve process on the parties, with three days to respond. b) If the parties do not offer evidence in that period and the court does not consider it necessary, a pleadings hearing will be called within the three following days, which will be held whether or not the parties appear. c) If evidence is offered or the court considers it necessary, a period for presenting evidence of ten days shall be opened. d) Once the pleadings hearing is held within the next five days the corresponding ruling will be issued.

EIGHTH COLLEGIATE COURT IN CIVIL MATTERS OF THE FIRST CIRCUIT.

Amparo in review 65/97. Lydia Marina de Álvarez and others. 31 March 1997. Unanimous vote. Drafting judge: Guillermo Antonio Muñoz Jiménez. Secretary: Ana Luisa Mendoza Vázquez."

According to the requirements of the Commercial Code enumerated in the above court precedent, attached hereto as **EXHIBIT TWO** is a certified copy of the arbitral award dated March 15, 2008, whose recognition and execution is requested herein.

With regard to the original of the arbitration agreement, it has already been exhibited by the opposing party in this proceeding under Exhibit number 4 and was recognized as valid and binding by PEP.

In this regard, in accordance with article 210 of the Federal Code of Civil Procedures which establishes that the document that a litigant presents at trial, full evidence against it, regarding the offering of the arbitration agreement in question by the opposing party and the recognition thereof by my principal, the requirement of exhibition of the original of such agreement has effectively been complied with. The above is supported by the judicial interpretation cited below:

"Registry No. 362651
Location:
Fifth Period
Instance: Third Chamber
Source: Judicial Weekly of the Federation
XXXVI
Page: 2020
Isolated Decision
Matter(s): Civil

**DOCUMENTS, PROBATORY WEIGHT OF. The document presented by one of the parties in a proceeding, <u>is full evidence against it</u>**, in all its party, even if the co-litigator does not recognize it, in accordance with article 1298 of the Commercial Code.

Appeal request 165/26. Straffon Tomás. 2 December 1932. Unanimous four votes. Absent: Manuel Padilla. The publication does not mention the name of the drafting judge.

(Emphasis added)"

The above referenced arbitral award was drafted in Spanish and therefore there is not need to present a translation of it.

It is also important to emphasize that the Judicial Authority may not review the substance of the matters resolved by the arbitral award whose recognition and enforcement is requested. It is absolute and unchallengeable, the final award whose enforcement is requested, it has the character of res judicata, which is verified in the following judicial decisions:

"**Registry No.** 189345
**Localization:**
Ninth Period
Instance: Collegiate Circuit Courts
Source: Judicial Weekly of the Federation and its Gazette
XIV, July 2001
Page: 1107
Decision: I.3o.C.231 C
Isolated Decision
Material(s): Civil

161

**ARBITRATOR. HIS RULINGS ARE ACTS OF AUTHORITY, AND THEY SHALL BE ENFORCED BY THE JUDGE APPOINTED BY THE PARTIES.**

For the enforcement of an arbitral award an act carried out by a judicial body is necessary that, without thereby depriving the award of its private nature, assumes its content, such that the award is enforceable by virtue of the judicial act, which is only the necessary complement for enforcing what is resolved by the arbitrator, given that the award is a ruling issued by the arbitrator that resolves the dispute between the parties, with the quality of res judicata and constitutes an instrument that results in execution before the competent Judge who must provide the necessary procedural means to enforce the award. Therefore, ***the award is a ruling having the attributes of unappealability, immutability and enforceability***, only the efficacy and specific carrying out of the ruling always remain to the competent Judge designated by the parties or the judge of the place of the proceeding. The arbitrator lacks the authority himself to enforce the award that he issued, because he does not have police or sovereign power, which is one of the attributes of the courts that is inherent in the judicial bodies of the State. This implies that **the arbitrator lacks the enforcement powers of the State in order to enforce the ruling, but *the award itself is not divested of the attributes of res judicata*, given that the authority to decide the dispute is a delegation made by the State through the law, and only the enforcement authority is reserved to it**. The Judge before whom the enforcement of an award issued by an arbitrator is requested, in order to declare the requirement of payment, should and can only verify the existence of the award, as a ruling that has established a specific conduct, unchallengeable and immutable and that, therefore, must be the result of a proceeding in which all essential due process formalities have been respected, and that there is nothing contrary to public order.

THIRD COLLEGIATE COURT IN CIVIL MATTERS OF THE FIRST CIRCUIT.

Direct amparo 1303/2001. Constructora Aboumrad Amodio Berho, S.A. de C.V. 8 March 2001. Unanimous vote. Drafting judge: Neófito López Ramos. Secretary: Lina Sharai González Juárez.

Note: By court decree dated October 26, 2001, the Second Chamber declared the contradictory court opinion 14/2001-PL in which this criterion was involved to be null and void.

**Registry No.** 186229
**Localization:**
Ninth Period
Instance: Collegiate Circuit Courts
Source: Judicial Weekly of the Federation and its Gazette
XVI, August 2002
Page: 1317
Decision: XV.1o.50 C
Isolated Decision
Material(s): Civil

**ARBITRAL AWARD. ITS HOMOLOGATION BY ORDINARY JUDICIAL AUTHORITY AND ITS ANALYSIS, IN AMPARO, DOES NOT PERMIT THE STUDY OF THE SUBSTANCE OF THE RULING.**

An arbitral award is the decision of a non-state body, agreed to by the parties, to resolve a dispute, either present or future; thus, for purposes of the ordinary court proceeding the latter remains under the exclusive authority of the decision of the arbitral tribunal and becomes an extension of that decision, which being an act of private parties, in regard to its ruling, is not subject to constitutional review; however, such constitutional review may be given with respect to the ruling of homologation issued by a state judicial body, which, of course, will be limited to the result of the analysis of the due formation of the arbitral tribunal, of due process, of the manifestation of the agreement of the parties to submit to arbitration, of the matters subject to arbitration and of **the other situations contemplated in article 1462 of the Commerce Code, situations that, as indicated, only contemplate questions of form and not of substance**, and, once the homologation is accomplished, of the acts of enforcement with which the Judge helps to fulfill the award; therefore in the amparo only those questions can be pleaded and not any regarding the substance and ruling of the award. This is supported with the interpretation upheld by the Third Chamber of the above formation of the Supreme Court of Justice of the Nation, in the isolated decision, published in the Judicial Weekly of the Federation, Fifth Period, Volume XXXVIII, page 801, with the heading: "ARBITRATION.", in which it is considered that **arbitration is a convention that the law recognizes, which constitutes a *renouncement* by the private parties of the right for the judicial authority to take up a dispute**, and therefore it has negative procedural significance, in that the parties entrust the resolution of their disputes to one or more private parties, called arbitrators; however, these are not officials of the State and nor do they have jurisdiction of their own or delegated, and their powers only arise from the agreement of the parties, expressed according to law, and while the arbitral award cannot be revoked unilaterally by one of the interested parties, it is not ready for execution in itself, since it can only be considered to be a work of the legal reasoning that is resorted to by the State, and therefore it can only be enforced through an act carried out by a judicial body which, without removing its private nature, assumes its contents, and it is then that it becomes a judicial act. However, **the Judges are not authorized to review the awards as a whole, since otherwise they could nullify them, even for substantive questions, for which it would be necessary that first the parties appear before the Judge to set forth the debate, and the system generally adopted consists of if the violation contained in the award violates public order, the Judge should not order its enforcement, but if it only harms private interests he should order it**; and once its enforcement is judicially declared it becomes a judicial act and it is then that the aggrieved party can go before the Federal courts to file an amparo, which must be processed in a double proceeding, as is indicated in court precedent number 32/93 of the Third Chamber of the above formation of the Supreme Court of Justice of the nation, published in the Gazette of the

163

Judicial Weekly of the Federation, volume 72, December 1993, page 41, with the heading: "ARBITRAL AWARD, RULINGS OF HOMOLOGATION AND ENFORCEMENT OF. INDIRECT AMPARO, IN TERMS OF ARTICLE 114, SECTION III, OF THE LAW OF AMPARO, AND NOT THE DIRECT AMPARO ALLUDED TO IN 158 OF SUCH LAW.".

FIRST COLLEGIATE COURT OF THE FIFTEENTH CIRCUIT.

Amparo in review 138/2002. Mecalux, México, S.A. de C.V. 28 May 2002. Unanimous vote. Drafting judge: Pedro Fernando Reyes Colín. Secretary: Ángel Rodríguez Rico.

(Emphasis added)

Having complied with all the requirements established by the Commercial Code and not falling under any of the premises set forth in article 1462 of that same code, in order to provide Your Honor with the background that led to this request for enforcement, below I explain the following:

## FACTS

**FIRST.-** The claimant **COMMISA** presented its request for arbitration against the respondent PEP, on February 11, 2005.

**SECOND.-** The respondent PEP presented its answer to such request for arbitration and a counterclaim on May 3, 2005.

**THIRD.-** The claimant **COMMISA** presented its rebuttal to the counterclaim on June 15, 2005.

**FOURTH.-** The Arbitral Tribunal was formed and on June 2, 2005, the co-arbitrators José W. Fernández and Darío Oscós Coria designated Juan Fernández-Armesto as Chairman of the Arbitral Tribunal. This designation was confirmed by the Secretary General of the International Court of Arbitration of the International Chamber of Commerce on the 10th of such month and year.

164

**FIFTH.-** The Arbitral Tribunal prepared a draft of the Terms of Reference and it was signed, within the term extended by the International Court of Arbitration of the International Chamber of Commerce in its session on August 12, on October 31, 2005.

On September 20, 2005, the Arbitral Tribunal issued Procedural Order No. 1 which included the procedural calendar.

**SIXTH.-** The claimant **COMMISA** presented its claim on January 16, 2006. The respondent PEP answered such claim and filed a counterclaim on March 2, 2006.

**SEVENTH.-** On April 5, 2006, the claimant **COMMISA** presented its rebuttal and on May 9, 2006, the respondent PEP presented its rejoinder.

**EIGHTH.-**  The corresponding hearings were held on June 5-9, 2006 in the Hotel JW Marriott in Mexico City, Federal District.

**NINTH.-**  On January 15, 2008, the arbitral award was issued by the Arbitral Tribunal composed of Juan Fernández Armesto as Chairman and José W. Fernández and Darío Oscós Coria as co-arbitrators resolving the following:

> "1.    Declaring that it is competent to resolve all the claims and petitions formulated by "Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V." ["Commisa"] in its complaint and by "PEMEX-Exploración y Producción" ["PEP"] in its counterclaim.
>
> 2.    Declaring that there is no impediment for hearing all the claims and petitions formulated by Commisa in its complaint and by PEP in its counterclaim.
>
> 3.    Ordering PEP to pay Commisa, as due remuneration and indemnification under the contract EPC-28, the sum of "S" Mexican Pesos ["PME"], calculated according to the following formula
>
> S = (A + B) x 0,995

in which

"S" is the sum in PME that PEP shall pay Commisa.

"A" is equal to 10,928,728 PME.

"B" is a sum in PME that results from converting 75,075,635 Dollars of the United States of America ["USD"] in PME at the sale exchange rate that the Bank of Mexico has determined and published in the Official Gazette of the Federation on the business day immediately prior to September 29, 2002.

"+" is the addition sign.

"x" is the multiplication sign.

"=" is the equals sign.

0.995 reflects the reduction of the 5 to the thousand that Commisa is obligated to make in favor of the Ministry of Controller and Administrative Development.

4.    Ordering PEP to pay Commisa, for financial expenses arising from the Contract EPC-28, interest calculated on the sum "S", defined in the above mentioned Decision; the financial expenses will be accrued from September 29, 2002 until the date of actual payment, at the rate at that time established in the Federal Revenue Law for the cases of extension in the payment of tax obligations; the calculation will be made per day and the payment of the financial expenses will be made together with the sum "S" defined in the above mentioned Decision.

5.    Declaring that the amounts that PEP has been ordered to pay by virtue of this award do not include the Mexican Value Added Tax.

6.    Ordering, in relation to expenses and costs:

(iii)    Each party to assume half of the fees and the expenses of the arbitrators, half of the administrative expenses of the International Chamber of Commerce and its own defense expenses.

(ii)    Ordering PEP to pay Commisa 200,000 USD as expenses incurred by the latter in its defense against the objections of lack of competence of the Arbitral Tribunal and of lack of procedural requirements presented by the former."

7.    Rejecting all the other claims and petitions of the parties.

166

The decision of the Arbitral Tribunal is adopted unanimously, with the exception that the arbitrator D. Oscós Coria dissents from the opinion of the majority in relation to Technical Disputes 36 ("Bad weather that affected the works of the Castoro 10 and of the Bar Protector"), 34 and 35 ("Waiting times for delays in the initiation of the works of the Castoro 10 and the Bar Protector") and the calculation of interest and costs. His dissenting opinion in these aspects will be presented in a dissenting opinion."

## LEGAL CONSIDERATIONS BY VIRTUE OF WHICH THE ACTION THAT IS EXERCISED BY MEANS OF THIS PROCEEDING SHOULD BE CONSIDERED VALID AND GROUNDED

**1.-** My principal is entitled to claim the order issued in the award of arbitral proceeding 13716/CCO/JRF given that it participated as claimant, which was recognized by the Arbitral Tribunal before which it obtained a favorable award.

As can be seen from the actions in the mentioned arbitral proceeding, the definitive award of which is evidence and the document on which the action in the case under consideration herein is based, on January 15, 2008, the Arbitral Tribunal composed of José W. Fernández, Juan Fernández Armesto and Darío Oscós Coria ordered the respondent, as can be seen on pages 182 and 183 of the mentioned award, to pay the following amounts:

"...

3.    ...the sum of "S" Mexican Pesos ["PME"], calculated according to the following formula:

S = (A + B) x 0,995

in which

167

"S" is the sum in PME that PEP shall pay Commisa.

"A" is equal to 10,928,728 PME.

"B" is a sum in PME that results from converting 75,075,635 Dollars of the United States of America ["USD"] in PME at the sale exchange rate that the Bank of Mexico has determined and published in the Official Gazette of the Federation on the business day immediately prior to September 29, 2002.

"+" is the addition sign.

"x" is the multiplication sign.

"=" is the equals sign.

0.995 reflects the reduction of the 5 to the thousand that Commisa is obligated to make in favor of the Ministry of Controller and Administrative Development.

4.    … pay Commisa, for financial expenses arising from the Contract EPC-28, interest calculated on the sum "S", defined in the above mentioned Decision; the financial expenses will be accrued from September 29, 2002 until the date of actual payment, at the rate at that time established in the Federal Revenue Law for the cases of extension in the payment of tax obligations; the calculation will be made per day and the payment of the financial expenses will be made together with the sum "S" defined in the above mentioned Decision.

…

6.    Ordering, in relation to expenses and costs:

(ii)    … to pay Commisa 200,000 USD as expenses incurred by the latter in its defense against the objections of lack of competence of the Arbitral Tribunal and of lack of procedural requirements presented by the former."

**2.-** This counterclaim is valid without first having required previously the payment from the respondent since the service of process of each action should make the judicial payment order.

**3.-** The persons who acted as arbitrators in the arbitral proceeding never found impediments to hear and resolve the dispute submitted to its competence.

168

In view of the above, it should be mentioned that the Arbitral Tribunal was adequately and correctly formed because:

My principal complied with the provisions of the arbitration clause and the Rules of Arbitration of the International Chamber of Commerce at the time of designating its arbitrator, as did PEP.

As a result of the above and as has been duly mentioned, it is further explained that my principal appointed such arbitrator based on his reputation and prestige as an impartial and independent arbitrator knowledgeable in both arbitration and legal commercial matters.

**4.-** This proceeding for the recognition and enforcement of the arbitral award is valid given that the parties voluntarily and expressly submitted to the arbitral proceeding.

**5.-** The matters resolved by the Arbitral Tribunal do not involve the declaration of a violation in relation to administrative law, but rather the breach of a contractual obligation.

The specific case has as its premise the prior existence of an obligation agreed to by the parties for which the consequence of breach is the payment of indemnification for damages caused by PEP to my principal, which legal situation implied the validity of the arbitral proceeding.

**6.-** None of the premises set forth in article 1462, section II of the Commercial Code are present.

169

In effect, as seen in such article, the judge can reject the recognition of the arbitral award if the subject of the dispute cannot be subjected to arbitration or if the recognition or enforcement of the award is contrary to public policy.

In this regard, there were never violations that could be considered procedural or formality or substantive violations in the issuance of the award. Such questions cannot be considered to imply a violation of public policy.

The concept of public policy referred to in article 1462 of the Commercial Code has nothing to do with the formalities of the arbitral proceeding. On the contrary, what the law refers to there is that the award or its enforcement implies the violation of laws that for their importance contain values superior to the legal provisions. That is to say that the text of the law does not refer to procedural rules of arbitration, but rather substantive rules that due to their importance are considered elevated to the category of public policy.

In this context, the arbitral award is reasoned according to Mexican law. It contains the citation of the articles that the arbitrators considered applicable to the specific case, and it also contains the reasons, circumstances and considerations of fact and law by which they determined the rulings.

It should also be mentioned that according to article 25 of the Rules of Arbitration of the International Chamber of Commerce, the only obligation that the arbitrators have in relation to the contents of the award is that it be reasoned. However, such reasoning should not nor can be interpreted in terms of the obligation of the Mexican state judicial authorities, since this comes from the principle of due process existing in Constitutional law, while the obligation to reason the award comes from an agreement between the parties.

In this regard, the Rules of Arbitration of the International Chamber of Commerce do not define the terms and scope of what should be understood for a reasoned award.

170

However, the interpretation that has been given in arbitration practice, above all considering the versions of such article 25 that exist in other languages (as for example in English "The Award shall state the reasons upon which it is based" whose free translation would be "El Laudo establecerá las razones en las cuales se encuentra basado"), is that it is sufficient that in the award the reasons for the decision are expressed for it to be valid.

**7.-** There were no violations of the arbitration procedures. As can be seen from article 15 of the Rules of Arbitration of the International Chamber of Commerce, domestic procedural law is only applicable if the Rules are silent and in addition, the Arbitral Tribunal considers it convenient to make reference to it.

For its part, article 15 paragraph 2 of the mentioned Rules of Arbitration provide for the opportunity to state a defense. In this respect, such article establishes that the Arbitral Tribunal shall grant the parties sufficient opportunity to explain their case.

This should be understood to mean that the arbitral proceeding must comply with sufficient formalities to be able to formulate a resolution of the disputes. That is to say, it must provide the opportunity for both the claimant and the respondent to be able to explain their cases in order to formulate the matters in dispute.

It also requires that the parties be able to offer the evidence that supports their claims, that they be allowed to argue their case if necessary and that the Arbitral Tribunal issue an award that congruously addresses the points raised.

The supposed incongruous application of administrative rules and commercial or even civil rules alleged inconsistently and without a logical sequence by PEP with respect to the form in which the arbitral proceeding was carried out are not essential procedural formalities. Neither is the form in which the Arbitral Tribunal decided to interpret the obligational contents of the contract, especially the arbitration agreement contained in clause 23.3 of the contract on which the action is based and the scope such agreement

171

could have with respect to the different disputes that could arise with the execution of such contract.

Such elements form part and are derived specifically from the exclusive jurisdiction that the Arbitral Tribunal has over the substantive matters. The manner of evaluating the evidence, as well as the considerations by virtue of which the Arbitral Tribunal adopts its decisions have nothing to do with essential procedural formalities. Such questions cannot be subjected to analysis by a state court.

The autonomy of the Arbitral Tribunal in the adoption of its decisions and the corresponding recognition by the state courts is exactly the reason for the existence of commercial arbitration. The purpose of such institution is the existence and the recognition of a dispute resolution mechanism based on contractual agreement and whose limits should be minimal in order to comply with its reason for being, with is the speed and economy of commercial law.

In this regard, the arguments of the respondent are that the award should not be recognized because the supposed essential procedural formalities were not observed, which it considers are the act of considering the public interest involved in the contract on which the action is based, the supposed failure to ground in law and fact in administrative law provisions supposedly applicable to the contract on which the action is based, the probatory value given to the documents offered as evidence, and the analysis of the reasoning with respect to the arbitrability of the dispute with respect to the technical disputes submitted to arbitration, are not arguments which, as explained and as required by article 1462 of the Commercial Code can result in the setting aside of the award.

8.- It is also important to take into account the provisions of article 33 of the Rules of Arbitration of the International Chamber of Commerce which establishes that if a party fails to object to any act it considers violates its rights to an adequate defense at the time such occurs, it will be understood that such party has lost its right to object.

172

This rule is confirmed in subsection **(vii)** of point **G)** of the Terms of Reference to which the parties were bound, as follows:

> "If during the development of the proceeding either of the parties considers that its right to a fair and equitable process or the principles of equity, hearing and refutation is being violated, such party shall inform the Arbitral Tribunal as soon as it becomes aware thereof, it being understood that if it does not do so at the first opportunity, it waives any such allegation in the future."

PEP never informed the Arbitral Tribunal of any violation of this kind. Therefore, Your Honor must consider that it has waived its right to allege any type of argument that its guarantee to a hearing or due process was violated.

In this regard the cause established in subsection b) of section I of article 1462 of the Commercial Code for the losing party in the final award whose recognition and enforcement is requested to allege a violation of its rights to an adequate defense, is absolutely excluded.

The fact of the loss of this right is given even greater support by what is established in paragraph 41 of the final award in question, found at page 11 thereof, in which it is recognized that PEP was asked "*if at any time in the arbitral proceeding the principles of a hearing, rebuttal and equity had be infringed or if it had suffered any type of procedural inability to defend its interests*" and that it declared that it had not suffered any procedural inability to defend its interests and that the arbitral proceeding was carried out in accordance with the principles of due process.

## **DOCUMENTS**

In compliance with articles 1061 and 1378 of the Commercial Code I will now list the documents on which my principal bases its request for relief.

173

**1.-  THE PUBLIC DOCUMENT,** consisting of public instrument number 58,042, dated March 14, 2008, issued by Notary Public number 1 of the Federal District,  Licenciado Roberto Nuñez Y Bandera recording the power granted by COMMISA in favor of Licenciado Marco Tulio Venegas Cruz and others.

This evidence proves the representative capacity with which COMMISA appears in this ancillary setting aside proceeding. It is appropriate for proving this fact because the power contained in the mentioned public instrument was granted before a commissioned public officer complying with the formalities required by the Federal Civil Code for such purposes.

This evidence is related to each and every one of the facts of this response and counterclaim, particularly with the representative capacity with which the undersigned Marco Tulio Venegas Cruz appears in representation of COMMISA.

**2.-  THE PRIVATE DOCUMENT,** consisting of the certified copy dated February 28, 2008 issued by Jason A. Fry, Secretary General of the International Court of Arbitration of the International Chamber of Commerce with respect to the final award dated January 15, 2008 issued in the arbitration 13716/CCO/JRF between COMMISA and PEP.

This evidence is offered in compliance with article 1061 of the Commercial Code for purposes of the recognition and enforcement of the final award by Your Honor.

This certified copy is appropriate for evidencing such claim by virtue of the fact that the certification it contains was issued by an officer of the International Court of Arbitration of the International Chamber of Commerce which was the administrating institution of the arbitration that resulted in the award in question in this proceeding.

This evidence is related to each and every one of the fact of this response and particularly to those referred to in the counterclaim.

174

**3.-  THE PRIVATE DOCUMENT,** consisting of a certification dated February 29, 2008 issued by Jason A. Fry, Secretary General of the International Court of Arbitration of the International Chamber of Commerce which certifies the following:

1)      that, CORPORACIÓN MEXICANA DE MANTENIMIENTO INTERGRAL, S. DE R.L. DE C.V. (formerly called CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S.A. DE C.V.) (Mexico) has been the Claimant in an arbitration against PEMEX-EXPLORACIÓN Y PRODUCCIÓN (Mexico) (the "Respondent") (reference number 13716/CCO/JRF);

2)      that the Arbitration Claim was received by the Secretariat on February 14, 2005;

3)      that according to the record of the express mail service DHL, the Arbitration Claim was received by the Respondent  on February 22, 2005;

4)      that the Answer to the Arbitration Claim was presented on May 3, 2005;

5)      that, according to the record of the express mail service DHL, the Final Award dated January 15, 2008 was received by the Respondent on February 11, 2008.

This evidence is offered to prove the facts that are manifested in the certification in relation to several procedural events that took place during the processing of the arbitral proceeding 13716/CCO/JRF. This evidence is appropriate for proving the claims contained therein because it was issued by the Administrative Institution of the arbitration that concluded with the award in question in relation to this proceeding.

This evidence is related to each and every one of the facts of this document, especially with the fact that the essential procedural formalities established in the Rules of Arbitration of the International Chamber of Commerce were complied with.

**4.-  THE PRIVATE DOCUMENT,** consisting of a certified copy dated February 28, 2008 signed by Mr. Jason A. Fry, Secretary General of the International Court of Arbitration of

the International Chamber of Commerce with respect to the Terms of Reference signed by the arbitrators and the representatives of COMMISA and PEP.

This is offered to evidence the express manifestation of the desire and agreement that existed between the parties to the arbitration with respect to the points on which the Arbitral Tribunal should decide, which is to say the establishment of the points in dispute that the latter must resolve. This evidence proves that the parties expressly submitted to the determination that the Arbitral Tribunal would issue, consisting of the final award the PEP has now asked to be set aside.

This evidence is appropriate for proving the claim referred to in the above paragraph because it fully corresponds to the original that was signed by the parties at that time.

This evidence is related to each and every one of the facts narrated in this document, particularly with the fact that the Arbitral Tribunal resolved in the final award the points that the parties expressly consented should make up the points in dispute of the arbitration.

**5.-  THE PUBLIC DOCUMENT,** consisting of the file dated May 19, 2008, issued by Lic. Miguel Soberón Mainero, Notary Public number 181, of the Federal District, with respect to the document consisting of Exhibit C of Contract number PEP-O-IT 136/98.

This evidence is offered to prove that what was covered in Exhibit C were the matters to which clause 23.2 exclusively and restrictively referred and in this regard, only with respect to the material covered in such Exhibit C could any technical disputes have arisen. In this regard, the technical disputes referred to in Exhibit C are not those regarding which the arbitral award ordered PEP to pay.

This evidence is appropriate to prove the fact in question because it is prima facie evidence of the contents of such Exhibit C and in this regard it will make it beyond a

doubt that the text of clause 23.2 of the Contract only referred to technical disputes that may arise as a result of the provisions of such Exhibit C.

This evidence is related to all the facts of this response and counterclaim document, especially with the orders issued in the arbitral award referring to technical disputes other than those contemplated in clause 23.2. of the Contract.

**6.- THE PUBLIC DOCUMENT** consisting of the translation dated May 19, 2008, done by Alberto de la Santa Cruz Manzano Alba, Expert Translator No. P.125-2004, with respect to the citations: the first of them consisting of paragraph 9-32 of the book REDFERN, Alan; HUNTER, Martin; BLACKABY, Nigel; and PARTASIDES, C. *Ley y Práctica del Arbitraje Comercial Internacional*, Klewer Law Internacional, 2004, pp. 1-50; the second consisting of a paragraph on page 180 of the book BROCHES, Aron. *Comentario del Modelo de Ley Uncitral, Consejo Internacional de Arbitraje Comercial*, Kluwer Law Internacional, Vol. IV, 2004.

This evidence is offered to prove the compliance of COMMISA with respect to the provisions of article 131 of the Federal Civil Procedures Code in relation to the translations that should be made into Spanish with respect to documents that are presented in a foreign language. This is appropriate to prove such compliance because it was issued by a translator authorized to issue translations such as this one.

This evidence is related to each and every one of the facts of this response and counterclaim document, especially regarding the international arbitration doctrine in relation to the most accepted concept of "public policy", which is completely distinct from the one deceitfully proposed by PEP.

**7.- THE PRIVATE DOCUMENT,** consisting of the Unit Price Fixed Time Public Works Contract number PEP-O-IT-136/98 dated September 4, 1998 entered into between COMMISA and PEP, which was the subject of the arbitration that gave rise to the final award in question in this ancillary proceeding.

177

This evidence is offered based on article 210 of the Federal Civil Procedures Code and I make my own such document offered by PEP in its initial claim for setting aside the award, as point 4, of the section called "List of Documents Attached to the Claim" found at page 292 thereof. This evidence proves the existence of the arbitral clause 23.3 and the basis of all the claims resolved in the arbitral award in question in the ancillary procedure and whose recognition and enforcement is requested by COMMISA.

This evidence is related to all the facts of this document, especially with the contractual basis for the arbitral dispute, the competence of the Arbitral Tribunal to decide with respect to the disputes that arose in relation to such contract and the final award itself.

For all that is explained and supported above,

I respectfully request that **YOUR HONOR**:

**FIRST.-** Accept me as appearing formally, in representation of **CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V.,** to file this ancillary proceeding of recognition and enforcement of the arbitral award, and exhibiting the documents attached hereto.

**SECOND.-** Order service of process on PEMEX EXPLORACIÓN Y PRODUCCIÓN by personal notification.

**THIRD.-** At the appropriate procedural time, issue a judgment declaring the recognition and enforcement of the award requested by my principal to be valid and ordering PEMEX EXPLORACIÓN Y PRODUCCIÓN to pay the amounts it was ordered to pay in the award for January 15, 2005.

**I ATTEST TO THE ABOVE**

Mexico City, Federal District, May 19, 2008.


_____
**MARCO TULIO VENEGAS CRUZ**
in representation of
**CORPORACIÓN MEXICANA DE MANTENIMIENTO
INTEGRAL, S. DE R. L. DE C.V.**

179

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | | |
|---|---|---|
| CORPORACIÓN MEXICANA | ) | |
| DE MANTENIMIENTO INTEGRAL, | ) | |
| S. DE R.L. DE C.V., | ) | |
| | ) | CASE NO.:  1:08-CV-00469 (RWR) |
| | ) | |
| Petitioner, | ) | |
| | **)** | |
| | **)** | |
| | ) | |
| v. | ) | |
| | ) | |
| PEMEX EXPLORACIÓN | ) | |
| Y PRODUCCIÓN, | ) | |
| | ) | |
| Respondent. | ) | |
| | **)** | |

[PROPOSED]
**ORDER AND JUDGMENT**

Upon consideration of **(A)** the Petition of Petitioner Corporación Mexicana de

Mantenimiento Integral S. de R.L. de C.V. ("Commisa") for an order pursuant to 9 U.S.C.

§§207, 302 and 304: (i) confirming, recognizing and enforcing the arbitral award dated January

15, 2008 (the "Award") by the arbitral tribunal in the ICC International Court of Arbitration in

the arbitration captioned *Corporación Mexicana de Mantenimiento Integral S. de R.L. de C.V. v.*

*PEMEX Exploración y Producción*; (ii) directing the entry of judgment in favor of Commisa

against PEMEX Exploración y Producción ("PEP") in the following amounts (1) the principal

amount of $71,074,724.40, (2) accrued interest thereon from September 27, 2002 to March 31,

2008 in the amount of $52,299,704.31; (3) Mexican value added tax thereon of $18,506,164.31;

(4) accrued interest thereon from March 31, 2008 to the date of this Order and Judgment at the

annual rate of 9% accruing in the amount of $30,194.63 per day; (5) arbitration costs of

$200,000; (6) Mexican vat thereon of $30,000; (7) post-judgment interest on the foregoing

amounts at the annual rate of 9% accruing in the amount of $30,194.63 per day for each day after

the date of entry of judgment to the date of payment; and (8) Commisa's costs of suit in this

proceeding in the amount $[          ] as taxed by the Clerk; and **(B)** PEP's Motion to Dismiss

the Petition to Confirm the Award, and all papers relating thereto

**NOW, IT IS HEREBY ORDERED, ADJUDGED AND DECREED** that

PEP's Motion to Dismiss the Petition to Confirm the Award is denied;

**ORDERED, ADJUDGED AND DECREED** that the Award shall be and hereby

is confirmed, recognized and enforceable;

**ORDERED, ADJUDGED AND DECREED** that Petitioner Commisa shall have

judgment and recover from Respondent PEP the following amounts: (1) the principal amount of

$71,074,724.40, (2) accrued interest thereon from September 27, 2002 to March 31, 2008 in the

amount of $52,299,704.31; (3) Mexican value added tax thereon of $18,506,164.31; (4) accrued

interest thereon from March 31, 2008 to the date of this Order and Judgment in the amount of

$30,194.63 per day; (5) arbitration costs of $200,000; (6) Mexican vat thereon of $30,000;

(7) post-judgment interest at the annual rate of 9% on the foregoing amounts in the amount of

$30,194.63 per day for each day after the date of entry of judgment to the date of payment; and

(8) Commisa's costs of suit in this proceeding in the amount $[          ] as taxed by the Clerk,

all for which execution may issue.

Dated:  Washington, D.C.
             June ___, 2008

                                         ENTERED:

                                         _____
                                         UNITED STATES DISTRICT COURT JUDGE

Copies to:

Robert M. Kennedy
HUGHES HUBBARD & REED LLP
1775 I Street, N.W.
Washington, DC 20006

Christopher M. Paparella
HUGHES HUBBARD & REED LLP
One Battery Park Plaza
New York N.Y. 10004-1482

Robert B. Duncan
René E. Browne
HOGAN & HARTSON L.L.P.
Columbia Square
555 Thirteenth Street, N.W.
Washington, D.C. 20004-1109