# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| In the Matter of the Arbitration Between ) | |
| ) | |
| CORPORACIÓN MEXICANA ) | |
| DE MANTENIMIENTO INTEGRAL, ) | |
| S. DE R.L. DE C.V., ) | |
| a Mexican corporation, ) | |
| ) | Case No. 08-CV-00469-RWR |
| Petitioner, ) | |
| ) | |
| v. ) | |
| ) | |
| PEMEX EXPLORACIÓN Y PRODUCCIÓN, ) | |
| Gerencia Jurídica de Exploración y Producción ) | |
| Marina Nacional 329 Edificio A, Octavo Piso ) | |
| Colonia Huasteca, Delegación Miguel Delgado ) | |
| Mexico City, Federal District ) | |
| Mexico C.P. 11311, ) | |
| ) | |
| Respondent. ) | |

## PEMEX EXPLORACIÓN Y PRODUCCIÓN'S
## NOTICE OF FILING ENGLISH TRANSLATIONS OF RESPONDENT'S
## COMPLAINT TO NULLIFY THE ARBITRAL AWARD AND PETITIONER'S
## RESPONSE TO COMPLAINT TO NULLIFY ARBITRAL AWARD FILED IN MEXICO

Respondent, Pemex Exploración y Producción ("PEP"), hereby provides notice of filing

the certified English translations of PEP's Complaint to Nullify the Arbitral Award and

Petitioner's Response to PEP's Complaint to Nullify the Arbitral Award, attached hereto as

**Exhibit 1** and **Exhibit 2**, respectively.  The original versions of these filings, in Spanish, were

previously filed on May 21, 2008 and May 28, 2008.  *See* PEP's Motion to Dismiss Petition to

Confirm Arbitration Award and Memorandum of Points and Authorities in Support Thereof, at

Exhibit A (D.E. 7); PEP's Notice of Filing Petitioner's Response to Complaint to Nullify

Arbitral Award Filed in Mexico, at Exhibit A (D.E. 8).

Dated:    June 24, 2008

Respectfully Submitted:


s/ Daniel E. González
Robert B. Duncan (D.C. Bar No. 416283)
René E. Browne (D.C. Bar No. 463989)
HOGAN & HARTSON L.L.P.
Columbia Square
555 Thirteenth Street, NW
Washington, D.C. 20004-1109
Tel. (202) 637-5600
Fax. (202) 637-5910
E-mail: rbduncan@hhlaw.com
E-mail: rbrowne@hhlaw.com
*Attorneys for Respondent Pemex Exploración y
Producción*

Daniel E. González (D.C. Bar No. 503371)
Richard C. Lorenzo (Florida Bar No. 071412)
(admitted *pro hac vice*)
Maria Eugenia Ramirez (Florida Bar No. 349320)
(admitted *pro hac vice*)
HOGAN & HARTSON L.L.P.
1111 Brickell Avenue, Suite 1900
Miami, Florida 33131
Tel. (305) 459-6500
Fax. (305) 459-6550
Email: degonzalez@hhlaw.com
Email: rlorenzo@hhlaw.com
Email: meramirez@hhlaw.com
*Attorneys for Respondent Pemex Exploración y
Producción*

## CERTIFICATE OF SERVICE

I hereby certify that on June 24, 2008, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.  I also certify that the foregoing document is being served this day on all counsel of record identified on the attached Service List in the manner specified, either via transmission of Notices of Electronic Filing generated by CM/ECF, or in some other authorized manner for those counsel or parties who are not authorized to receive electronically Notices of Electronic Filing.

s/ Daniel E. González
Daniel E. González

HOGAN & HARTSON L.L.P., 1111 BRICKELL AVENUE, SUITE 1900 • MIAMI, FL 33131 • TEL. (305) 459-6500 • FAX (305) 459-6550

**SERVICE LIST**
**COMMISA V. PEP**
**CASE NO. 08-CV-00469**
**UNITED STATES DISTRICT COURT, DISTRICT OF COLUMBIA**

**Robert M. Kennedy, Jr.**
Hughes Hubbard & Reed LLP
1775 I Street, N.W.
Washington, D.C. 20006-2401
Telephone: (202) 721-4600
Facsimile: (202) 721-4646
kennedyr@hugheshubbard.com
Attorney for Petitioner

Via Transmission of Notices of Electronic Filing
Generated by CM/ECF

**Christopher M. Paparella**
Hughes Hubbard & Reed LLP
One Battery Park Plaza
New York, New York 10004-1482
Tel (212) 837-6644
Fax (212) 422-4726
paparella@hugheshubbard.com
Attorney for Petitioner

Via First Class Mail, postage pre-paid

4

# EXHIBIT 1 (PART 1)

# Language Innovations, LLC℠

*Helping businesses communicate worldwide*

1725 I Street, NW
Suite 300
Washington, D.C. 20006

Tel.    202-349-4789
Fax    202-349-4152
email   translate@language-innovations.com

## TRANSLATION CERTIFICATION

This is to certify that the translation of the attached document(s), **Ref.: Complaint to Nullify Arbitral Award,** was performed by a professional translator and is to the best of our knowledge and ability, a true and accurate translation of the original text delivered to Language Innovations, LLC by our client, **Hogan & Hartson, LLP**. The original document was translated from **Spanish** into **English** and at completion delivered to the client on **June 23, 2008.**

I hereby declare that all statements made herein are of my own knowledge and are true and that all statements made based on information or belief are believed to be true.

Language Innovations, LLC hereby agrees to keep the content of this translation confidential according to ethical and legal standards of the profession of Translation. Language Innovations, LLC agrees not to discuss, evaluate, distribute or reproduce any material included in or related to the translation of this document.

Date: _June 24, 2008_

Signature: _____

Mariela Díaz-Butler, Manager
Language Innovations, LLC

Subscribed and sworn before me this _24th_ day of _June_ 20 _08_, at Washington, DC.

_____
JAMES M. REED
Notary Public
My Commission expires: Notary Public District of Columbia
My Commission Expires June 30, 2012

PEMEX EXPLORACIÓN Y PRODUCCIÓN
VS.
CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C.V.
**MOTION TO VACATE ARBITRATION AWARD**

**ANCILLARY CLAIM**

<table>
<tr><td>C O M M O N<br>FILING OFFICE OF<br>THE DISTRICT COURTS IN<br>[illegible]<br>Jan 7 2:43 PM 2008<br>Forty-six [illegible]<br>CIVIL MATTERS<br>THE FEDERAL DISTRICT</td></tr>
</table>

**ASSIGNED DISTRICT COURT JUDGE FOR CIVIL MATTERS IN THE FEDERAL DISTRICT**

I, **JOSÉ NESTOR GARCÍA REZA,** in my capacity as legal counsel for PEMEX EXPLORACION Y PRODUCCION (hereinafter and for judicial economy purposes referred to as "PEP"), as evidenced by a certified copy of notarial instrument No. 13,250, attested before Notary Public No. 229 of the Federal District, MARCO ANTONIO RUIZ AGUIRRE, which is attached hereto and contains my designated address for service of process of any kind, located at AVENIDA PASEO DE LA REFORMA No. 265 PISO 2, LOCAL 3, C.P. 06500, DELEGACION CUAUHTEMOC, here in Mexico City, FEDERAL DISTRICT, and hereby authorize Attorneys JORGE HERNANDEZ ROMO, MIGUEL ANGEL HERNANDEZ ROMO, MIGUEL ANGEL HERNANDEZ-ROMO VALENCIA, JORGE ENRIQUE HERNANDEZ MARIN, JAIME DUARTE AISPURO, HECTOR OMAR LOPEZ REYNOSO, MARIO ENRIQUE AGUILAR ARAUJO and CLAUDIO ERIC DEVEZE MONTOYA, interchangeably, to receive service of process of any kind, as well as

1

JULIO SERGIO CORONEL ESPEJEL and GERARDO BAROJAS LECHUGA, interchangeably, respectfully appear before you and state: Pursuant to the provisions of Articles 1457, 1458, 1460 and any other applicable provisions of the Commercial Code, and pursuant to Article 360 of the Federal Code of Civil Procedure, in the name and on behalf of PEP, I hereby bring action in the ancillary proceedings of CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C. V. (hereinafter and for judicial economy purposes referred to as "**COMMISA**") domiciled at HOMERO No. 534-7° PISO 7 COLONIA CHAPULTEPEC MORALES, MEXICO 11570, D. F., to vacate the Arbitration Award issued by arbitrators JUAN FERNANDEZ-ARMESTO, JOSÉ W. FERNÁNDEZ and DARIO ULISES OSCÓS CORIA in Arbitration Proceeding 13716/CCO/JRF brought by **COMMISA** against **PEP**, overseen by the International Court of Arbitration of the International Chamber of Commerce, and which was to be resolved in accordance with Federal Mexican Law as to the merits of the case and pursuant to the arbitration rules of the International Court of Arbitration of the International Chamber of Commerce as to the proceeding, **of which my client PEP was notified on February 11, 2008**. We are seeking to VACATE THE AWARD on the grounds that it (a) is contrary to public policy because it is contradictory and unfounded,

(b) contains decisions that go beyond the scope of the arbitration agreement and (c) makes reference to disputes that are not provided for in the arbitration agreement, and we ask that the ancillary defendant be subject to the following

## CONSIDERATIONS

a)  That the aforesaid arbitration award be vacated on the grounds that it is contrary to public policy, it rules on matters that were not introduced by the parties during the arbitration proceeding and was issued by arbitrators acting beyond the scope of their authority,

b)  That the ancillary defendant be ordered to pay the expenses and costs arising out of the processing and conduct of this ancillary proceeding.

## **TIMELINESS OF CLAIM TO VACATE**

As stated above, my client was notified of the arbitration award on February 11, 2008, and therefore my client has filed this claim within the 3-month period granted by Article 1458 of the Commercial Code.

This ANCILLARY CLAIM TO VACATE THE ARBITRATION AWARD is based upon the following CASE BACKGROUND, FACTS AND CONSIDERATIONS OF LAW.

3

# **BACKGROUND**

I.- On September 4, 1998, PEP and COMMISA entered into Fixed-Time, Unit Price Public Works Contract No. PEP-O-IT-136/98 (or IPC-28), the subject of which consisted of: design, procurement, manufacture, laying of pipes, anticorrosion lining, ballast, cathodic protection, risers, installation and testing of valves, originally contracted for a term of 528 calendar days and for an amount of $155,975,313.77 Mexican Pesos and $171,851,364.10 United States Dollars.

The aforesaid Public Works Contract is an administrative contract, given that it is regulated by the Government Procurement and Public Works Act (hereinafter and for judicial economy purposes referred to as LAOP) and the Regulations of the Public Works Act, among other administrative provisions, the purpose of which is the furtherance of public interest consisting of public works, and therefore the performance of the contract and regulation thereof is a matter of public policy and social interest, as set forth in Article 134 of the Constitution, and Article 1 of the LAOP.

II. PEP and COMMISA signed 16 amendatory agreements, which are listed below:

4

| No. | Date | Reason |
|-----|------|--------|
| 1 | 02/04/2000 | Extension due to bad weather. |
| 2 | 05/31/2000 | Extension of work |
| 3 | 07/20/2000 | schedule. |
| 4 | 08/29/2000 | Extension due to bad weather. |
| 5 | 11/03/2000 | Extension due to bad weather. |
| 6 | 11/21/2000 | Increase in contract amount. |
| 7 | 12/26/2000 | Breakdown of prices. |
| | | Single Term (amendment |
| 8 | 05/16/2000 | of work schedule) |
| 9 | 06/13/2001 | Amendment of contract amount. |
| | | Amendment of amount for special |
| 10 | 09/19/2001 | work activities. |
| 11 | 11/29/2001 | Amendment of contract amount. |
| 12 | 12/22/2001 | Amendment of contract amount. |
| 13 | 02/01/2002 | Amendment of contract amount. |
| 14 | 02/22/2002 | Extension of contract termination |
| 15 | 03/16/2002 | date. |
| 16 | 05/31/2002 | Extension of work completion date. |
| | | Extension of work completion date. |
| | | Extension of work completion date. |

III. In Clause 23.3 of the Contract, PEP and COMMISA agreed to submit to arbitration to resolve any controversy, claim or dispute arising out of or relating

5

to or in connection with the contract, or breach thereof; the arbitration proceedings were to be conducted in the Spanish language in accordance with the Arbitration Rules of the International Chamber of Commerce (ICC) in the Federal District of Mexico. The parties further agreed that, **notwithstanding the foregoing,** (that is, regardless of whether the matter involves a controversy, claim or dispute arising out of or relating to or in connection with the contract, or breach thereof), all technical disputes were required to **first be submitted** to the procedure provided for in Clause 23.2 of the same Contract.

IV. The work performed under the contract was completed on April 8, 2002 and formally received by PEP through "Certificate of Full Acceptance of Physical Work", dated August 30, 2002.

V. Upon conclusion of the work covered under the Public Works Contract, COMMISA estimated that PEP owed it a total amount of 147 million dollars for: i) Debts under Contract IPC-28 arising out of delays caused by PEP in starting the construction work of COMMISA; ii) Debts due to interruptions caused by PEP in COMMISA's work after the latter had commenced its activities, and for additional work requested and not yet paid for by PEP; and, iii) Debts for work performed

6

under the original scope of Contract IPC-28.

VI. Based on the foregoing reasons, and given that it was not able to resolve its differences with PEP, on February 14, 2005, COMMISA requested Arbitration from the International Chamber of Commerce.

VII. COMMISA initiated arbitration proceedings against PEP. PEP was notified of COMMISA's claim on February 22, 2005 (Reference: Case 13716/CCO/JRF) by the Secretariat of the International Chamber of Commerce International Court of Arbitration.

VIII. Pursuant to Article 1.2 of the ICC Arbitration Rules, the Court of Arbitration itself does not settle disputes, but rather, has the function of overseeing arbitration proceedings and ensuring the application of the Rules. The dispute or claim is decided by one or more arbitrators, who collectively are referred to as the "Arbitration Tribunal".

IX. The Arbitration Tribunal was comprised of three Arbitrators, specifically: Don Juan Fernández-Armesto, Chairman of the Arbitration Panel designated by the International Court of Arbitration; José W. Fernández, Arbitrator designated by the claimant; and Darío Ulises Oscós Corta, Arbitrator designated by PEP. For the purposes of the Arbitration Proceeding, these arbitrators indicated the following addresses, respectively:

a) Armesto & Asociados, General Pardiñas 102, 28006 Madrid, Spain; Fax 00 34 91 515 9145; e-mail: jfa@jfarmesto.com.

b) Latham & Watkins LLP, 885 Third Avenue, New York, New York 10022, Fax 001 212 326 2061, e-mail: jose.fernandez@lw.com.

c) Darío Oscos, S. C., Joaquín Gallo No. 53, Colonia Chimalistac, Delegación Coyoacán, Mexico, Distrito Federal, Zip Code 04340, Fax 55 50 12 73, e-mail: doscos@oscosabogados.com.mx

X. It is important to note that Arbitration Tribunals are not permanent Tribunals, but are formed to decide each of the matters entrusted to them and they are administered by the International Court of Arbitration, a division of the International Chamber of Commerce, headquartered in Paris, France; Arbitration Tribunals dissolve after they have issued the Award or when the remedies of request for interpretation, clarification or correction of the award have been exhausted.

Furthermore, the Arbitration Tribunals do not have one specific location for all cases, and therefore the written communications and filings of the parties are sent by e-mail, fax or messenger service, in accordance with Article 3.2 of the

8

ICC Arbitration Rules and Procedural Order No. 1, issued by the Arbitration Tribunal, to the registered addresses of the arbitrators.

The registered address of the ICC International Court of Arbitration is 38 Cours Albert 1er, 75008, Paris, France, Fax 0033149532933 and e-mail arb@iccwbo.org. For the purposes of the arbitration in question, communications were sent to D. José Ricardo Feris, the counsel in charge of the case file, at e-mail address jfs@iccwbo.org.

This is also the reason why the parties do not have formal receipts for the communications sent to the Arbitration Tribunal, given that the majority of communications are sent by electronic means.

XI. Neither the arbitrators comprising the Arbitration Tribunal, nor the ICC International Court of Arbitration have an interest in the award, because they have no interest in the terms under which it is issued, and therefore have no interest in the terms under which the judgment of this motion is issued.

XII. Article 34 of the Arbitration Rules, to which both of the parties had submitted as the procedure for settling their differences, stipulates that neither the

9

arbitrators, nor the Court, the ICC, its employees, nor the ICC National Committees shall be liable to any person for any act or omission in connection with the arbitration.

XIII. Article 1 of the Federal Code of Civil Procedure, supplementary to the Commercial Code, stipulates that:

> *"Initiation of or participation in a judicial proceeding is limited to parties who have an interest in the declaration or affirmation of a right, or imposition of a sentence by the judicial authority, and to parties seeking the opposite".*

In this regard, by not having an interest in the issued award, and because the award does not affect the assets or any other right of the arbitrators, of the Court or of the ICC, these parties also lack the legal right to intervene in the action brought herein. By way of analogy, the following court opinion is relevant to note:

> **"ARBITRATORS. IN AMPARO\* PROCEEDINGS, LACK LEGITIMATE INTEREST TO BRING ACTION AGAINST A DECISION VACATING AN ARBITRATION AWARD, AS SUCH AWARD DOES NOT CAUSE A DIRECT HARM TO THEIR ASSETS OR PERSON**[1]. In order for an amparo action to be valid, the moving party must unequivocally prove to the federal court that the actions of the responsible authority have caused direct harm to their person, rights, assets or possessions, so that the alleged violation of rights may be examined ipso facto, a situation that does not occur when the petitioners are members

---

\* Translator's Note: Constitutional remedy aimed at preserving the rights and freedoms established by the Constitution from legislative acts, acts of authority and court decisions.
[1] **Record No.: 181,790. Excerpt from Court Opinion. Matter(s): Local. Ninth Series. Instance: Three-Judge Circuit Courts. Source: Supreme Court Reports and Gazette. XIX. April, 2004. Opinion: I.10.C.7 K. Page: 1388.**

of an arbitration tribunal, because if the action is brought against the award issued by the latter **and said award is vacated, the effects of the challenged act alone do not adversely affect any rights in rem or material rights of the members of the arbitration tribunal** in an objectively observable manner, such that it would constitute an impairment that would directly and personally harm them, as if in the challenged decision itself, the Judge, in vacating the award issued by the members of the tribunal, had imposed a fine on them or had determined that they did not have the right to collect fees. In other words if, from the decision which constitutes the challenged act, it is not concluded that there has been direct harm to the assets or persons of the petitioning arbitrators, taking into account that such harm must be unequivocally proven and not merely inferred based on presumptions, then the prerequisites necessary to constitute an infringement of their legal interest that would legally warrant an amparo proceeding have not been met, which is what constitutes the grounds for inadmissibility provided for in Article 73, Section V of the Amparo Law.

TENTH THREE-JUDGE CIVIL COURT OF THE FIRST CIRCUIT.

Amparo review 390/2003. José Sáenz Viesca, et al. February 17, 2004. Unanimous vote. Reporting Judge: Víctor Hugo Díaz Arellano. Clerk: Elizabeth Estrada Mier."

XIV. After the Arbitration Tribunal was designated on September 6, the Terms of Reference, which set forth the issues to be decided by the Arbitration Tribunal, was signed by both the parties and the Arbitration Tribunal at a hearing held in Mexico City.

XV. Section II of the Arbitration Award (Page 7 of the Award) states that in the arbitration agreement, both the arbitrators and the parties to the arbitration

had determined in Item 11 (eleven) as follows:

> **"The arbitrators lack powers of amiable compositeur**
> **or to decide in equity"**

**XVI.** On September 6, 2005, the parties and the Arbitration Tribunal agreed in Paragraph (H) of the Terms of Reference **that the Federal Laws of the United Mexican States is the law that will be applicable to the subject-matter of the dispute. Therefore, the parties agreed that the arbitration would be conducted in strict application of the law and not based on the principles of equity or fairness.**

XVII. The process was conducted as described below:

- On January 16, 2006, COMMISA filed a detailed brief of its Claim with the Arbitration Tribunal, in accordance with the requirements of Procedural Order 1, dated December 12, 2005.

- On March 2, 2006, PEP filed its answer to COMMISA's detailed brief, wherein PEP asserted a counterclaim.

- On April 5, 2006, COMMISA filed its Rebuttal Brief and Answer to the Counterclaim, in accordance with the letter dated March 31, 2006.

- PEP filed its Rejoinder on May 9, 2006.

- A procedural hearing was held on June 5 – 9, 2006 in Mexico City, at which the parties presented their case, introduced testimonial evidence

and debated each of the matters in dispute.

- The parties presented their closing arguments on August 11, 2006.

- On December 13, 2006, the Arbitration Tribunal issued Procedural Order No. 6, whereby it ordered Proceedings for the Introduction of Additional Evidence and prepared a questionnaire for such purpose, which was completed and submitted by both parties, thereby allowing for the respective introduction of new evidence.

- On March 12, 2007, PEP and COMMISA filed responses in reference to the Proceedings for the Introduction of Additional Evidence ordered by the Arbitration Tribunal.

- On August 20, 2007, the parties submitted to the Arbitration Tribunal new information required for Additional Evidence, specifically in relation to Technical Disputes 34 and 35, which will be described in a subsequent section.

- On October 10, 2007, the Arbitration Tribunal notified the parties of the closing of the trial period.

XVIII. Please note, Your Honor, that the matter in dispute in the Arbitration proceeding is complex. COMMISA presented its claims in 39 parts, which it incorrectly termed "Technical Disputes" (from 1 to 39), each with a different factual and legal basis, but having as a common cause of action the performance of Fixed-Time, Unit Price Public Works Contract No. PEP-O-IT-136/98 (IPC-28),

the subject of which, as mentioned earlier, consisted of: design, procurement, manufacture, laying of pipes, anticorrosion lining, ballast, cathodic protection, risers, installation and testing of valves.

In this regard, both the claim and rebuttal brief, as well as the answer and rejoinder, were drafted, and individually addressed each of these so-called "Technical Disputes", although their name does not conform to the conditions agreed upon in the Public Works Contract. It is very important to make this distinction, because the contract stipulated that technical disputes were to be resolved prior to arbitration, and only after they had been resolved could they be submitted to the arbitration tribunal.

In point of fact, the parties had agreed as follows in the Public Works Contract:

> "23.2 _Technical Disputes._ The Contractor waives the right to any claim and PEP shall not be liable to the Contractor, its secondary suppliers or subcontractors, for any legal (including negligence) or contractual damages, except in those cases specifically provided for in this Contract.
>
> For the purposes of this Clause, Technical Dispute shall mean any disagreement between the Supervisor and the Contractor that arises out of any claim or is attributable to the interpretation or performance of this Contract, in connection with the Technical Appendices to the Contract

*(A, B, B-1, B-2, B-3, CEV, DT, DT-1, DT-2.1, DT-2.2, DT-3, DT-4, E-2, F-1, AND F-2)*

*If for any reason the Supervisor and the Contractor are unable to agree on a manner to resolve an adjustment claim arising out of a Technical Dispute, the Contractor shall officially communicate said Technical Dispute in writing to the Supervisor and ask for the latter's opinion on resolving the matter. This type of request must be clearly identified by the Contractor, specifying that it involves a Technical Dispute subject to resolution pursuant to this Clause 23, and must contain a summary of the matters in dispute and the Contractor's proposal for resolution thereof.*

*...................................................................................................*
*..............................."*

*"23.3 __Arbitration__. Any controversy, claim, difference or dispute arising out of or in connection with this Contract, or the breach thereof, shall ultimately be decided by arbitration conducted in the Federal District of Mexico, in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce then in effect. The number of arbitrators shall be three, and the arbitration shall be conducted in the Spanish language. **Without prejudice to the foregoing, all technical disputes must first be subject to the procedure provided for in Clause 23.2, and only in the event that the parties fail to reach an agreement after having submitted to such procedure shall they have recourse to the remedy provided for in Clause 23.3"**.*

XIX. On February 11, 2008, PEP received the final Award issued by the Arbitration Tribunal in Mexico City, Federal District on January 15, 2008, which, in essence:

15

a) Ordered PEP to pay COMMISA MXP $10,928,728.00 and USD 75,075,635.00, the amount remaining after payment of the amount set forth in the counterclaim. The USD-denominated amount was to be paid in Mexican Pesos at the rate of exchange published in the Official Gazette of Mexico on the business day immediately preceding September 29, 2002.

b) The deduction of the aforesaid amount from the fees of the Ministry of Public Administration (hereinafter and for judicial economy purposes referred to as "SEFUPU"), is equal to 0.5% [five mills] of the total amount ordered in the Final Award.

c) Ordered PEP to pay COMMISA financial costs, from September 29, 2002 until the date on which payment is verified, at the rate established at any given time by the Federal Internal Revenue Law for extension of the deadline for tax obligations: to be calculated by days on the basis of the amount resulting from multiplying the payment order in Pesos indicated above in Paragraph a) by 0.995, with the payment thereof to be made together with the principal amount.

d) Ordered PEP to pay value-added tax, and

e) Ordered PEP to pay COMMISA USD $200,000.00 for expenses incurred in the arbitration proceeding.

16

XX. The following tables contain the specific details of the Arbitration Tribunal's decision:

**Compensation claimed by COMMISA:**

### Comparative Chart - Case 13716/CCO/JRF (IPC-28)

| Technical Disputes | Item | COMMISA Position | | PEP Position | | Final Award |
|---|---|---|---|---|---|---|
| | | MXP | USD | MXP | USD | |
| 1-18 & 22 | Settled Disputes | $2.462,064.00 | $13,249,376.00 | (-) $2,386,203.92 | $13,336,334.49 | (-)$2386.203 MXP $13,336,334 USD |
| 19 | Obstructions | $2.049,594.48 | $4.851,169.60 | $975,044.16 | $2,270,800.94 | $1.225.734 MXP $2,831,053 USD |
| 20 | Placement; Bags of Sand, Cement | $21,568.50 | $710,993.00 | $100,390.59 | $52,909.93 | $27.064 MXP $61,062 USD |
| 21 | Placement; Bags of Sand, Cement | $21,568.50 | $710,993.00 | $39,525.93 | $40,984.98 | $18.225 MXP $78,695 USD |
| 23 | Additional Engineering Work, Agreement 12 | 0.00 | $1,091,045.39 | 0.00 | $178.033.03 | $ 0.00 MXP $1,091,045 USD |
| 24 | Prior Inspection | 0.00 | $521,865.35 | 0.00 | 0.00 | Rejected |
| 25 | Insurance Deductible | 0.00 | $250.000.00 | 0.00 | 0.00 | $0.00 MXP $250,000 USD |
| 26 | Adjustment of Costs Quoted in Dollars | 0.00 | $3.285,222.05 | 0.00 | 0.00 | Rejected |
| 27 | Differential for Work on Platforms | $63,468.69 | $1,948,210.00 | 0.00 | $104,408.08 | $62.502 MXP $1,947,288 USD |
| 28 | Storage, Transport, Loading and Unloading of Piping | 0.00 | $414,470.08 | 0.00 | $412,441.22 | $0.00 MXP $412,440 USD |
| 29 | Wait Times and Additional Transports C10 | $2.877,082.80 | $4,177,552.00 | 0.00 | 0.00 | $1.222.395 MXP $1,356,793 USD |
| 30 | Wait Times and Additional Transports 8P | $4,880,945.41 | $3,873,876.00 | 0.00 | 0.00 | $2.722.538 MXP $2,163,068 USD |
| 31 | Conditioning of C-10 Barge | $1,498,175.00 | $3,107,462.00 | 0.00 | 0.00 | Rejected |

| 32 | Additional Transports C-10 and 8P | $239,458.00 | $793,330.00 | $39,643.55 | $67,568.13 | $180,915 MXP $667,291 USD |
| 33 | Extension of Engineering Schedule | 0.00 | $9,895,687.50 | 0.00 | 0.00 | Rejected |
| 34 | Initial Wait Times, Bar Protector | $30,309,308.00 | $28,885,344.00 | 0.00 | 0.00 | $0.00 MXP $9,301,536 USD |
| 35 | Initial Wait Times, Castoro 10 | 0.00 | $18,494,205.33 | 0.00 | 0.00 | $0.00 MXP $4,891,478 USD |
| 36 | Bad Weather | $33,308,347.00 | $26,415,850.00 | 0.00 | 0.00 | $0.00 MXP $22,038,954 USD |
| 37 | IPC-28 Crossings | $6.877,278.00 | $11,632,024.00 | $3.261,832.08 | (-) $304,761.14 | $6.877,278 MXP $11,632,024 USD |
| 38 | Modification of Milestone Date | 0.00 | $725,000.00 | 0.00 | 0.00 | $0.00 $396,765 USD |
| 39 | IPC-27 Crossings | $1.000,991.00 | $2.924,951.00 | $599,538.72 | $975,538.72 | $1.000,991 MXP $2.924,951 USD |
| | Total | $85,609,849.00 | $137,904,626.30 | $2,629,771.11 | $17,134,432.30 | $10,851,436 MXP $75,110,777 USD |

## Compensation sought by PEP in counterclaim:

### PEP Counterclaim

| Counterclaim | Claimed | | Awarded | |
|---|---|---|---|---|
| | MXP | USD | MXP | USD |
| Payment of penalty for delay in delivery of final documentation | 0.00 | $ 1,135,000 | Rejected | |
| Payment of penalty for delay in completion of gas pipeline | 0.00 | $ 135,000 | 0.00 | $17,280 |
| Payment for support rendered for crane service | $1,261 | $153 | $1,261 | $153 |
| Adjustments to the prices of items 2 and 10 of line 28-04 | $430,457 | $705,789 | Rejected | |
| Adjustments to the price of item 10 of line 28-02 | $21,449 | $17,709 | $21,449 | $17,709 |
| Total | $453,167 | $1,858,651 | $22,710 | $35,142 |

XXI. Co-Arbitrator, Darío Oscós Coria, Esq., issued an individual vote to dissent from the majority opinion in the decision adopted by the Arbitration Tribunal for Disputes 36 (bad weather) and 34 and 35 (delays in commencement of work with vessels), as he believed that: 1) the agreement between the parties was violated given that the arbitration tribunal was only authorized to rule on the matter in compliance with the federal laws of Mexico; however, disregarding this fact, on certain matters the arbitration tribunal decided in equity; ii) the Arbitration Tribunal exceeded the terms of the arbitration agreement; and iii) the terms of the contract were breached in violation of Article 70 of the LAOP, and Article 14 of the Political Constitution of Mexico.

The dissenting arbitrator, Darío Oscós Coria, Esq., also dissented with regard to the order for payment of financial costs based on the fact that the legal and contractual requirements to warrant such order had not been met; and also dissented from the order to pay the expenses incurred in the arbitration proceeding, due to the inadmissibility of the aforesaid claims.

XXII. PEP believes that the Final Award is null and void in view of the numerous grounds provided for in Article 1457 of the Commercial Code, which will be set forth in the

19

statement of facts section below.

## STATEMENT OF FACTS

**I. <u>Grounds for Vacation of Final Award in relation to the decision of Technical Dispute 36: Bad weather during the Castoro 10 and Bar Protector jobs.</u>**

**1** .-COMMISA filed a claim against PEP seeking compensation for delays allegedly suffered by COMMISA as a result of the extension of the Contract validity term in connection with Project IPC-28. The original contract provided for a term of 528 days, which was subsequently extended to 1322 days. COMMISA alleged that due to this extension, it was required to work under much less favorable weather conditions than those it had taken into account for the purpose of determining the unit prices quoted in its proposal in the bidding process for Contract IPC-28.

2.- PEP responded that this claim was inadmissible and could not be subject to arbitration. Despite PEP's objection, the decision of the Arbitration Tribunal was to examine said claim and rule against PEP, ordering it to pay partial costs thereon. The foregoing constitutes grounds for vacation of the Arbitration Award, for the following reasons:

**FIRST**

3.- The decision of the Arbitration Tribunal to admit COMMISA's claim set forth in so-called Technical Dispute 36, entitled *"Bad weather that affected the Castoro 10 and Bar Protector jobs"* (Castoro 10 and Bar Protector are two vessels COMMISA used to perform the work) and ordering PEP to pay COMMISA the amount of USD $22,038,954.00, (as stated in Section VII.2, Pages 51 - 60 of the Final Award) is null and void because it violates provisions of Mexican public policy, specifically those set forth in Articles 126 and 134 of the Federal Political Constitution; Article 70 of the LAOP; Article 44, Section III of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending, and Article 66, Section III of the Regulations of the Federal Law on Budget and Fiscal Responsibility.

4.- Article 126 of the Federal Political Constitution stipulates:

> *"No payment shall be made that is not included in the budget or provided for by subsequent law".*

5.- Article 134 of the Federal Political Constitution stipulates, in its penultimate paragraph, that:

> *"The management of federal funds shall be subject to the terms set forth in this article"*

6.- In accordance with the provisions of the above-transcribed articles, it is clear that the management of federal funds, and the payment of obligations through said funds, is a constitutional matter and therefore, a matter of Mexican public policy.

7.- These basic principles are reflected in numerous laws related to the budgeting and administration of federal public spending, including the LAOP, which establishes in Article 1:

> "*Article 1.- This law is of public order and social interest, and its purpose is to regulate actions relating to the planning, scheduling, **budgeting, expenditure, implementation**, conservation, maintenance and control of acquisitions and leasing of personal property, provision of services of any kind; as well as **public works** and related services **contracted** for by:*
> *I. ......*
> *V. decentralized agencies, and*
> *VI. ......".*

8.- In addition, Article 39 of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending, which is applicable with regard to the legal relationship formed under the Public Works Contract, provides as follows:

> *"**Article 39.**- The execution of federal public spending shall consist of the management and application of resources by entities, in order to fulfill the objectives and goals of the programs contained in their approved budgets."*

9.- Article 2, Section VI of the Federal Law on Budget, Accounting and Federal Public Spending, defines entities as decentralized government agencies, which PEP is.

10.- Based on the foregoing, it can be concluded that any expenditure and execution of a public works project made by decentralized agencies, such as PEP, is a matter of Mexican public policy because it refers to the administration of federal funds, and the payment of obligations in connection with budgeted federal funds.

11.- Therefore, obligations charged to the federal budget must be explicit, particularly those derived from public works contracts, **and obligations may not arise from a primarily administrative contract, by analogy or majority opinion, or through interpretations of civil law.** Similarly, all modifications to public works contracts which give rise to new obligations and are to be paid with federal funds must be explicit, as provided in Article 70 of the LAOP, which establishes:

> *"Article 70.- Government agencies and entities may, under the approved investment plan, assuming full responsibility and for well-founded and explicit reasons, modify the public works contracts through agreements, provided that such agreements do not exceed, either individually or as a whole, twenty-five percent of the amount or time period agreed to in the contract, or entail substantial changes to the original contract.*
>
> *If such modifications exceed the aforesaid percentage or substantially alter the project, the parties shall, one time only, enter into an additional agreement concerning the new conditions, in accordance with Article 29. This additional agreement must be authorized under the responsibility of the head of the agency or entity or chief of staff or equivalent position at entities. Said modifications shall not, in any manner, affect the conditions relating to the nature or essential characteristics of the works under the original contract, or constitute an agreement to evade in any manner compliance with the Law or Treaties...".*

12.- A violation of the provisions of Article 70 of the LAOP is so serious that Article 15 of the same law provides penalty measures for any omission to the text of the Law, nullifying the act in its entirety, depriving it from taking any legal effect or being ratified or approved by consensus of the parties. In point of fact, Article 15 of the LAOP stipulates:

> *"Article 15.- .....*
>
> *All acts, contracts and agreements entered into by government agencies and entities in violation of the provisions of this Law shall be null and void by operation of law".*

13.— Continuing with these same provisions, which constitute PUBLIC POLICY, Article 44, Section III of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending, and Article 66, Section III of the Regulations of the Federal Law on Budget and Fiscal Responsibility, respectively provide as follows:

> "Article 44.- Entities must ensure, under their own responsibility, that any payments they make against their approved budgets are made in accordance with the following requirements:
> I.;....
> III. They must be duly founded and evidenced with the respective original documents, with supporting evidence meaning those legal provisions and documents which provide for the obligation to make a payment, and proof of payment being those documents which evidence the delivery of the corresponding amounts of money."

> "Article 66. Payments made against the Disbursement Budget shall be made by the agencies through the Treasury. Payments by entities shall be made through their own treasury offices, for which they must keep the appropriate budgetary records on their own cash flows.

> In making their disbursements, agencies shall also [ensure]:
> I.-  ...".
> III..... They must be duly founded and evidenced with the respective original documents, with supporting evidence meaning those legal provisions and documents which provide for the obligation to make a payment, and proof of payment being those documents which evidence the delivery of the corresponding amounts of money...."

25

.

**According to these last two articles cited above, all payments made against the federal treasury must be provided for in:**

> **i)** **A legal provision; or**
>
> **ii)** **A legal document.**

**Furthermore, said obligation must be clear or explicit, and not implicit or deduced by analogy, majority opinion, or supposedly determined by *"equity",* as evidenced by all of the above legal references.**

14.- In essence, the foregoing means that the formalization of obligations allows for their budgeting, administration and control, in compliance with Article 126 of the constitution, which states that payments may be made against federal funds only when they are provided for in the budget.

15.- In this case, the Arbitration Tribunal has ordered PEP to pay COMMISA, through federal funds, as is customary for all public works projects, a total amount of USD $22,038,954.00 for interruptions in the execution of the work covered under the aforesaid public works contract, due to adverse weather conditions or bad weather which are considered, both under the contract and by law, to be acts of God or force majeure events, despite the fact that said order has no contractual or legal (set forth in a law) basis.

26

16.- It is a principle of civil law that no person may be held responsible for acts of God or force majeure events, except when expressly so agreed. The Federal Civil Code stipulates:

> *"Article 1847. A penalty may not be enforced when the obligated party thereof was not able to perform the contract due to an act of the obligee, an act of God or insurmountable force."*

17.-. In Fixed-Time, Unit Price Public Works Contract No. PEP-O-IT-136/98 (IPC-28), the parties agreed that an act of God would result in an extension of the work schedule for the same period of time which such work was delayed due to said act, **with no agreement whatsoever as to financial compensation, that is, payments against the federal treasury for work schedule interruptions caused by adverse weather conditions or bad weather, which are considered to be acts of God or force majeure events**. Specifically, PEP and COMMISA agreed in Clause 12.1 of the Contract:

> *"12.1 **Scope of Acts of God or Force Majeure.** ...... In the case of off-shore jobs, storms shall only be considered acts of God or force majeure when so determined mutually by the supervisor of PEP and the authorized representative of the Contractor, and with an entry made in the logbook indicating that the activities*

> are suspended due to an act of God or force majeure; in the event of a dispute, the parties shall abide by the account of the Port Authority located nearest to the Work Site that had officially declared the closing of such port."

> "12.4 **_Effects of Acts of God or Force Majeure_**. Unless an Act of God or Force Majeure event has completely and definitively hindered the performance of this Contract, or affected such performance to a considerable extent, in which case the parties shall abide by the provisions of Clause 10.2.4, the Act of God or Force Majeure shall only delay the performance of the obligations entered into in this Contract, and not to excuse non-performance".

18.- In addition, PEP and COMMISA had expressly agreed in Clause 23.2 of the Public Works Contract that PEP would not be held liable for any contractual or legal damages, except in those cases specifically provided for in the Contract. Said contract provision states:

> "23.2 **_Technical Disputes._** The Contractor waives the right to any claim and PEP shall not be liable to the Contractor, its secondary suppliers or subcontractors, for any legal (including negligence) or contractual damages, except in those cases specifically provided for in this Contract...."

Thus, the Contract contains an express Clause which specifies that in the case of delays in the work schedule due to Acts of God or Force Majeure (storms), PEP would only be obligated to postpone the end date for the work. Furthermore, Clause 23.2 of the Public Works Contract entered into by COMMISA and PEP, cited above,

28

does not contain any implicit payment obligation for acts of God or force majeure, thereby reaffirming that all payment obligations would have to have been expressly agreed, in accordance with the budget laws mentioned above.

This clause has a double effect: on one hand it constitutes an exclusion from liability for PEP, that is, that PEP is not economically liable for bad weather because such liability is not stipulated in the contract; and on the other, any dispute related to this matter falls outside the scope of arbitration, since because financial compensation had not been provided for in the contract, payment of compensation or any dispute, claim or controversy seeking such payment cannot be the subject of arbitration, given that the liability of PEP has been excluded.

19.-Furthermore, in the 16 Amendatory Agreements entered into by the parties, the parties never modified the rights and obligations, or the liability releases contained in Clause 12 of the Contract, relating to Acts of God or Force Majeure. In fact, in each one of the Amendatory Agreements, the parties expressly reiterated that each of the clauses of the original contract were to remain unchanged, unless they had been modified. That is, given that in each addition to the contract, COMMISA agreed

29

to work under the clause which released PEP from payment for interruptions caused by bad weather, it is clear that such exemption is valid during the original contract term and the extensions agreed upon in said agreements.

20.- Despite the facts set forth in the foregoing sections, the Arbitration Tribunal, "*has concluded that the unit prices agreed to in the Contract refer to the performance of the work in the months provided for in the original work plan; said prices do not cover the performance of work on other dates, on which the risk of bad weather may be significantly higher or lower.* (Paragraph 220, Page 54 and Paragraph 228, Page 55 of the Final Award).

21.- The Arbitration Tribunal determined, without legal basis, that any work that was not included in the plan, that is, those jobs performed during a time period different from that originally planned, *constitutes a special or additional job which must be paid for as such pursuant to Clause 6.1 of the Contract*" (Paragraphs 222 and 223, Page 54 of the Final Award).

22.- The foregoing assertion is false. Clause 1 of the Public Works Contract defines what a project is and what a plan is. When the Contract uses the word ***Project***, it is referring to the modernization and optimization of the Cantarell Oilfield,

which is located in Campeche Bay, Mexico. The **Work Plan** refers to the precedence network diagram that must be prepared by the Contractor (COMMISA) in accordance with Item 3 of the *Work Plan* contained in Appendix B-2[2]. Work means any explicit or implicit activity which the Contractor must perform under the Contract in order to complete the execution of the project.

From the foregoing, it is clear that a job performed outside of the time period originally agreed is not a special job, because the work plan is not a calendar of activities, but rather, the logical and sequential order of the jobs or activity network comprising the works, and which ones are to be performed first and which are to follow, according to their interdependency. In other words, if the work is listed in the activity precedence network, and is performed in a different time period than originally agreed, it is still the original work, and it is incorrect to modify the prices pursuant to Clause 6.1 of the Contract, because that clause refers exclusively to special work.

It is important to note that bad weather is not an explicit or implicit activity of the works,

---

[2] According to Item 3 of Appendix B-2, the work plan must consist of a precedence network diagram which uses the critical path method to show each essential and individual activity, in a logical and sequential manner, and which should specify the duration and logical sequence of activities, the number of days, and the interdependency between the activities, including those performed off-site.

31

particularly because in no way could COMMISA schedule periods of bad weather. Therefore, when they occur, and if they affect the completion of the work, the completion date for such work is extended[3].

23.- The Arbitration Tribunal issued the arbitration award in violation of the principles of public order, which is constitutional sovereignty, given that it did not provide the grounds or reasoning for its decision, it altered the legal regulation of public policy for the management of public funds, and the payment of obligations against the federal treasury, as evidenced by the following: i) it did not cite a Mexican law to support its decision; ii) it did not cite a specific contractual clause from the agreements stating that PEP is economically liable for bad weather upon expiration of the original contract term.

It is clear that the Arbitration Tribunal failed to properly provide a basis or grounds to support PEP's payment obligation, thereby disregarding a clause agreed upon by the parties that specifically provides otherwise, which is a violation of law in matters relating to payments charged against the public treasury. In Paragraph 228, Page 55 of the Final Award, the Arbitration Tribunal attempts to provide a basis for its decision, but in fact does not cite any contractual provision establishing PEP's liability for acts of God,

---

[3] This is also indicative of the lack of common sense of the Arbitration Tribunal. Even under the original terms of the Contract, it was possible that COMMISA would perform work outside of the original schedule, because it was possible that the Work completion deadline could be extended due to bad weather.

neither during the original contract term nor after the end of the originally contracted period.

In fact, the arbitration tribunal stated:

228. In short, PEP acknowledged in Change Order No. 56 and Amendatory Agreement No. 12:

- that the unit prices offered by Commisa and included in the Contract implicitly included an estimate which provided that for every 100 work days, the Castoro 10 would experience 8.45 days of bad weather and the Bar Protector 5.02;
- that if they commissioned work to be performed during periods with a greater likelihood of bad weather than those provided in the original schedule, the impact from the bad weather was shared: the Contractor assumed responsibility for the days included in its unit prices, and PEP assumed responsibility for the other days, and that they were determined by direct observation and it paid the corresponding wait time for such days.

It is also important to note that an express agreement is not sufficient to create a payment obligation against the budget, and we insist there is no such obligation in this case, but rather, said agreement must be documented and comply with the express formalities required by law.

24.- The Regulations of the Federal Law on Budget, Accounting and Federal Public Spending provide a definition of a proof of payment document. These Regulations were in force during the term and performance of the public works contract, and therefore are clearly the reference for determining whether or not a payment obligation against the

federal budget exists. Articles 69 and 70 of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending provide:

> "*Article 69.- <u>In the execution of federal public spending for procurements, general services and works, entities shall formalize the corresponding agreements through the award, issuance and approval of public works contracts, purchase orders for the procurement of goods and services, and agreements and budgets in general, as well as the authorization of the latter, which must satisfy the same requirements as purchase orders and contracts in order to constitute valid proof thereof.".</u>*

> *In the case of procurements and public works, the Entities must have the respective plans and proposals for such procurements and works, in accordance with applicable legal provisions and regulations.*

> *"Article 70.- In order for the purchase orders and contracts referred to in the preceding article to serve as supporting documentation, they must conform to the following requirements:*

> *I. In no case shall a stipulation for liquidated damages or default penalties against the entities be accepted;*
> *Payment of tax liabilities shall not be authorized except for import duties and those tax liabilities to which by law the entities are subject or accept the transfer thereof;*
> *II. Any contract which is to be paid with internal or external borrowings shall require the prior written authorization of the Ministry. The financing for such loans shall be processed through or with the authorization of the Ministry of the Treasury and Public Credit;*
> *III. The validity term, total amount, date of completion or delivery of the goods and services contracted for, and the date and terms*

*of payment must be clearly indicated therein. In cases where a specific amount cannot be indicated due to the nature of the contract, the terms and conditions for setting such amount must be set forth;*
*IV. When applicable, the corresponding performance bond must be provided, and*
*V. Conform to the provisions of Article 42 of these Regulations.*

25.- The order by the Arbitration Tribunal is not duly founded, given that it does not cite any law or contract provision indicating that PEP had agreed to payment obligations due to bad weather, to the detriment of the public interest. The need to budget, administer and control public works, and the payment obligations arising therefrom, are matters of public order, given that they are founded in the Political Constitution of the United Mexican States. For these reasons, the decision of the Tribunal violates Articles 126 and 134 of the Mexican Constitution, and thus the Mexican legal system and the public order said system enforces, thereby nullifying the award.

Therefore, the Tribunal's analysis regarding the assessment of this dispute is also illegal and contrary to public order.

26.- Our federal courts affirm the position of PEP by establishing as follows:

Record No.: 179,575
Excerpt from Court Opinion

35

Matter(s): Administrative
Ninth Series
Instance: Second Chamber
Source: Supreme Court Reports and Gazette.
XXI. January, 2005.
Opinion: 2a. IX/2005
Page: 605

**PUBLIC SPENDING**.
From Article 31, Section IV of the Political Constitution of the United Mexican States, which provides that Mexicans have an obligation to "contribute to public spending, including that of the Federation, as well as the Federal District or the State or Municipality in which they reside, in a proportional and equitable manner, as provided by law", in relation to Articles 25 and 28 of the Constitution itself and in doctrine, it is inferred that **the concept of "public spending" has a social meaning and an impact on the public interest, given that the amount of taxes collected are used to meet public or social needs, or for public services**, thus, the material concept of "public spending" lies in the use of the tax collections which the State must guarantee for the benefit of society.
Amparo, under review 1305/2004. Jorge Ernesto Calderón Durán. November 19, 2004. Five votes. Reporting Judge: Juan Díaz Romero. Clerk: César de Jesus Molina Suárez.


Record No.: 336,366
Excerpt from Court Opinion
Matter(s): Administrative
Fifth Series
Instance: Second Chamber
Source: Supreme Court Reports
XL
Opinion
Page: 677


**ADMINISTRATIVE CONTRACTS**
Whatever provisions are made by two contracting parties, they may

not stand if they are contrary to a mandatory law, particularly when they contradict the final provisions of the General Constitution, and as Article 28 thereof states that "in the United Mexican States, there shall be no monopolies or government monopolies of any kind; nor exemption from taxes…..", if exemption from taxes for a particular industry was stipulated in an administrative contract, the pertinent clause could stand until the promulgation of the 1917 Constitution; however, in light of said promulgation, it can no longer exist, and the contracting authorities have not committed any violation in being uninformed of the validity of such clause, as the Supreme Court of Justice has established that actions which are null and void by operation of law may be revoked by or before the administrative authority, without having to resort to the courts.

Amparo proceeding against acts of administrative officials, Review 433/25.

Compañía Hidroeléctrica e Irrigadora del Chapala, S.A. January 23, 1934. Three-Vote Majority. Dissenting: Daniel V. Valencia and Luis M. Calderón. The publication does not mention the name of the reporting judge.

Record No.: 331,037
Excerpt from Court Opinion
Matter(s): Administrative
Fifth Series
Instance: Second Chamber
Source: Supreme Court Reports
LVII
Opinion:
Page: 220

**ADMINISTRATIVE CONTRACTS, APPLICATION OF THE CIVIL CODE, IN.**

Application of the provisions of the Civil Code is not always compulsory in administrative matters, when it is preferable, above all other laws, to adhere to Constitutional provision.

Amparo proceeding against acts of administrative officials, under review 3977/36. Gavito Hermanos y Compañía. July 8, 1938. Unanimous, five votes.

37

Issuing Judge: José María Truchuelo.


Record No.: 189,995
Excerpt from Court Opinion
Matter(s): Administrative, Civil
Ninth Series
Instance: Plenary
Source: Supreme Court Reports and Gazette
XXIII, April, 2001
Opinion: P.IX/2001
Page: 324


**ADMINISTRATIVE CONTRACTS, ARE DISTINGUISHED BY THEIR PUBLIC ORDER OBJECTIVE AND BY THE EXORBITANT CIVIL LAW SYSTEM TO WHICH THEY ARE SUBJECT.**

The administrative nature of a contract entered into between a state agency and an individual can be accurately determined from the public order objective it seeks to achieve, also identified as public interest or social interest, as well as the exorbitant civil law system to which they are subject. From the foregoing, it is inferred that contracts entered into between state agencies and individuals are governed by private law when their purpose is not closely and essentially tied to the performance of the public functions of the State, and therefore, the fulfillment of social needs is not affected because in such acts, the State does not utilize the means it is authorized to use by its special system. On the other hand, when the purpose or objective of the contract is closely tied to the performance of state functions, such that the fulfillment of social needs is not indifferent to the manner in which contractual obligations are performed, then it is an administrative contract, which may contain exorbitant clauses which, from a private law perspective, could be null and void, but are valid in the administrative field, in accordance with the need to ensure the regular and ongoing operation of the

38

public service.

Ordinary federal civil action 1/2000. Jesús Guillermo Puente
Cutiño. February 20, 2001. Unanimous, ten votes. Absent:
Genaro David Góngora Pimentel. Reporting Judge: Juan Díaz
Romero. Clerk: Silverio Rodriguez Carrillo.
The Full Court, in a private session held today, March twenty-
ninth of this year approved, with No. IX/2001, the foregoing
excerpt of court opinion; and determined that the vote is
appropriate to establish a court precedent. Mexico, Federal
District, March twenty-ninth, two thousand one.

## SECOND

27.- The decision of the Arbitration Tribunal to admit COMMISA's claim set forth in

"Technical Dispute" 36, entitled *"Bad weather that affected the Castoro 10 and Bar*

*Protector jobs"*, and ordering PEP to pay COMMISA an amount of USD $22,038,954.00,

(Section VII.2, Pages 51 - 60 of the Final Award) falls within the grounds for vacation set

forth in Article 1457, Section I, Paragraph c), and Section II of the Commercial Code,

which provides that an Award may be vacated when it contains decisions that exceed

the terms of the arbitration agreement or is contrary to public order.


28.- As stated previously, the Arbitration between PEP and COMMISA is an arbitration

which must be resolved in strict application of the law, that is, based on the law and not

on the principles of equity or fairness, which did not occur in our case. Furthermore, the

parties and the arbitration tribunal are required to observe the principle of *pacta sunt*

*servanda*, set forth in Article 1796 of the Federal Civil Code, which provides:

> **"Article 1796.-** *Contracts are formalized by consent alone, except for those which must comply with formalities provided by Law. Once they become formalized, the contracting parties are bound not only to the performance of the express agreements made therein, but also to any consequences which, according to their nature, are consistent with good faith, custom or the law".*

Therefore, the Arbitration Tribunal lacks the authority to modify or alter the contractual provisions entered into by PEP and COMMISA, in equity or as amiable compositeur. In this regard, the express text of the Original Contract must be respected, irrespective of the climate change that occurred during the contract term.

29.- Our federal courts have affirmed the position of PEP by establishing:

> Record No.: 186,972
> **Jurisprudence**
> Matter(s): Civil
> Ninth Series
> Instance: Three-Judge Circuit courts
> Source: Supreme Court Reports and Gazette
> XV, May, 2002
> Opinion: I.8o.C. J/14
> Page: 951

> **CONTRACTS, THOSE LEGALLY ENTERED INTO MUST BE PERFORMED IN GOOD FAITH, REGARDLESS OF THE OCCURRENCE OF UNFORESEEN FUTURE EVENTS THAT**

40

**AFFECT THE PERFORMANCE OF THE OBLIGATION, IN ACCORDANCE WITH THE CONDITIONS PREVAILING AT THE TIME SUCH OBLIGATION WAS MADE.**

In accordance with Articles 1796 and 1797 of the Civil Code for the Federal District, which supplement the system of enforceability of contracts upon formalized thereof, do not adopt the theory of improvidence or the *rebus sic stantibus* clause derived from unforeseen events that could change the original conditions that existed when the contract was made, but rather, the system followed in said Civil Code adopts, in a general manner, the principle of *pacta sunt servanda*, which means that the agreement between the parties must be respected, that is, that contracts entered into legally must be performed in good faith, regardless of the occurrence of unforeseen future events that may affect the performance of the obligation in accordance with the terms and conditions prevailing at the time it was made, without modification of the contract conditions by the judge. EIGHTH THREE-JUDGE CIVIL COURT OF THE FIRST CIRCUIT.

Direct Amparo 246/98. Martha Irene Bustos González. November 12, 1998. Unanimous vote. Reporting Judge: Carlos Arellano Hobeisberger. Clerk: José David Cisneros Alcaraz.

Direct Amparo 1284/98. Industrias Carmen, S.A. de C.V. December 11, 1998. Unanimous vote. Reporting Judge: Carlos Arellano Hobeisberger. Clerk: José David Cisneros Alcaraz.

Direct Amparo 29/2001. Gustavo Parrilla Corzas. June 22, 2001. Unanimous vote. Reporting Judge: Patricio González-Loyola Pérez. Clerk: Enrique Villanueva Chávez.

Direct Amparo 427/2001. Dachi, S.A. de C.V. June 22, 2001. Unanimous vote. Reporting Judge: Carlos Arellano Hobeisberger. Clerk: Dante Adrián Camarillo Palafox.

Direct Amparo 2/2002. Restaurante Villa Reforma, S.A. de C.V., et al. March 25, 2002. Unanimous vote. Reporting Judge:

Patricio González-Loyola Pérez. Clerk: Enrique Villanueva Chávez.

30.- In this case, the arbitration tribunal, without any legal basis whatsoever, granted COMMISA the right to receive payments for work interruptions due to bad weather, in violation of the agreement made by the parties in the Public Works Contract, Clause 12.4 of which provides:

> "*12.4 **Effects of Acts of God or Force Majeure**. Unless an Act of God or Force Majeure event has completely and definitively hindered the performance of this Contract, or affected such performance to a considerable extent, in which case the parties shall abide by the provisions of Clause 10.2.4, the Act of God or Force Majeure shall only delay the performance of the obligations entered into in this Contract, and not to excuse non-performance*".

(but in no way does an act of God serve as a basis for increasing the agreed prices, as the arbitration tribunal asserts)

31.- The arbitration award we are seeking to vacate also violates the provisions of Article 70 of the LAOP, which provides:

> "*Article 70.- Government agencies and entities may, under the approved investment plan, assuming full responsibility and for well-founded and explicit reasons, modify the public works contracts through agreements, provided that such agreements do not exceed, either individually or as a whole, twenty-five*

*percent of the amount or time period agreed to in the contract, or entail substantial changes to the original contract.*

*If such modifications exceed the aforesaid percentage or substantially alter the project, the parties shall, one time only, enter into an additional agreement concerning the new conditions, in accordance with Article 29. This additional agreement must be authorized under the responsibility of the head of the agency or entity or chief of staff or equivalent position at entities. Said modifications shall not, in any manner, affect the conditions relating to the nature or essential characteristics of the works under the original contract, or constitute an agreement to evade in any manner compliance with the Law or Treaties...".*

32.- Given that the parties never entered into an amendatory agreement to increase the contract price in the event of bad weather, or to document the obligation to pay for bad weather resulting in an extension of the work plan, the Arbitration Tribunal has no legal authority to order PEP to pay for bad weather conditions affecting the work of the Castoro 10 and Bar Protector vessels.

33.- By ordering PEP to pay for bad weather conditions, the Arbitration Tribunal has violated the agreement and exceeded the legal limit of 25% provided for in Article 70 cited above, thereby attempting to modify the works contract and thus, the arbitration award is null and void.

34.- The Arbitration Tribunal acted beyond the scope of the matter in dispute, since no claim was made in the arbitration for formalization of an agreement establishing new work conditions, that would provide for payment for bad weather conditions. On the contrary, the claimant is only seeking payment. Because COMMISA's claim is solely for the payment, the Arbitration Tribunal should have determined the admissibility or inadmissibility of such claim based on the conditions of the project set forth in the contract and on the 16 amendatory agreements, which only provide, in the case of bad weather, for an extension of the work completion deadline; rather than first changing or modifying the contract terms and then awarding payment, because in doing so, the tribunal exceeded the arbitration agreement by not deciding in strict application of the law.

35.- The Arbitration Tribunal cannot, by its own authority, modify the rights and obligations agreed to by the parties. The Arbitration Tribunal does not have the authority to modify the terms and conditions of the contract.

36.- It is also important to note that PEP's ability to modify contracts has been reduced, in accordance with Article 70 of the LAOP, cited above, and the provisions of Article 29 of the same law, transcribed below:

> *"**Article 29.-** Government agencies and entities may convene, award and carry out actions in connection with*

*purchases, leases, services and public works, only when funds are available in their approved budget for the corresponding budget item. In exceptional cases and with prior authorization from the Ministry, agencies and entities may convene such processes without having funds available in their budget.*

*For public works, they must also have the pertinent studies and plans, construction standards and specifications, project schedule and, if applicable, the supply schedule.*

*Any public servant who authorizes actions in violation of the provisions of this article shall be subject to applicable sanctions."*

In other words, by law, it is legally impossible that the actions of PEP or its officers, in the performance of a contract, could give rise to obligations other than those agreed; in order for this to happen, such intent must be expressly stated, and after completion of the contract modification procedure provided for in the law.

37.- The decision of the Arbitration Tribunal in this case also violates provisions on planning, budgeting and execution of federal public spending, which are matters of public order, as they are provided for in Articles 126 and 134 of the Political Constitution of Mexico, thereby rendering arbitration award null and void.

45

In view of the foregoing, the arbitration tribunal's analysis regarding the assessment of this dispute is also illegal and contrary to public order, and thus the arbitration award is null and void.

## THIRD

38.- The award issued by the Arbitration Tribunal granting the claim of COMMISA set forth in Technical Dispute 36, entitled *"Bad weather that affected the Castoro 10 and Bar Protector jobs",* and ordering PEP to pay COMMISA an amount of USD $22,038,954.00, (Section VII.2, Pages 51 - 60 of the Final Award) falls within the grounds for vacation set forth in Article 1457, Section I, Paragraph c), of the Commercial Code, which provides that an Award may be vacated when it *"...refers to a dispute not provided for in the arbitration agreement or contains decisions that exceed the terms of the arbitration agreement."*

39.- In the arbitration agreement entered into by PEP and COMMISA set forth in Contract PEP-O-IT-136/98, it was agreed that only those disputes or claims that were officially confirmed to be Technical Disputes would be subject to arbitration, as evidenced by the following:

> *"23.2 **Technical Disputes.** The Contractor waives the right to any*

claim and PEP shall not be liable to the Contractor, its secondary suppliers or subcontractors, for any legal (including negligence) or contractual damages, except in those cases specifically provided for in this Contract.

For the purposes of this Clause, Technical Dispute shall mean any disagreement between the Supervisor and the Contractor that arises out of any claim or is attributable to the interpretation or performance of this Contract, in connection with the Technical Appendices to the Contract (A, B, B-1, B-2, B-3, CEV, DT, DT-1, DT-2.1, DT-2.2, DT-3, DT-4, E-2, F-1, AND F-2)

If for any reason the Supervisor and the Contractor are unable to agree on a manner to resolve an adjustment claim arising out of a Technical Dispute, _the Contractor shall officially communicate said Technical Dispute in writing to the Supervisor and ask for the latter's opinion on resolving the matter. This type of request must be clearly identified by the Contractor, specifying that it involves a Technical Dispute subject to resolution pursuant to this Clause 23, and must contain a summary of the matters in dispute and the Contractor's proposal for resolution thereof._

………………………………………………………………………………
…………………………………….."

"23.3 __Arbitration.__ Any controversy, claim, difference or dispute arising out of or in connection with this Contract, or the breach thereof, shall ultimately be decided by arbitration conducted in the Federal District of Mexico, in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce then in effect. The number of arbitrators shall be three, and the arbitration shall be conducted in the Spanish language. **Without prejudice to the foregoing, all technical disputes must first be submitted to the procedure provided for in Clause 23.2, and only in the event that the parties fail to reach an**

*agreement after having submitted to such procedure shall they have recourse to the remedy provided for in Clause 23.3".*

In accordance with the contractual Clauses set forth above, disputes were of a strictly formal nature, since if the Supervisor and the Contractor did not agree on a manner to resolve an adjustment claim arising out of a Technical Dispute, the Contractor then had to communicate the matter in writing, **specifying in the document that it was a technical dispute,** provide a summary of the events that gave rise to the claim, and submit a proposal for resolving the matter.

40.- Despite the agreements between the parties and despite the fact that COMMISA failed to perform its contractual obligations concerning technical disputes, the arbitration tribunal determined as follows in Paragraphs 233 and 234 of the award:

> "*232. PEP also asserts that Commisa did not communicate this situation during the term of the Contract. In the opinion of the Arbitration Tribunal, the evidence introduced shows that the above assertion is not true.*
>
> *233. From the start of the rescheduling period, Commisa kept a record of the possible additional costs for the worsening weather conditions. On fact, on March 5, 1999, PEP had asked the Contractor for the estimated costs for a potential adjustment of the schedule. Commisa responded in a letter dated March 15, 1999, in which it provided some figures: 49M USD (or 28M USD, depending on the circumstances). Commisa added: "This does not include any additional down time for weather*

> <u>conditions as a result of the extension of the work schedule."</u>
>
> *234. The above-mentioned letter proves that, at least as of March, 1999, Commisa was expecting to be compensated for any additional bad weather experienced as a result of the work schedule extension. It is true that during the development of the Contract PEP only acknowledged the right to compensation in Change Order No. 56 and Amendatory Agreement No. 12. However, there is no evidence whatsoever that Commisa had abandoned its claim and its efforts to collect the amount it was due. Clear evidence of this is that when the Certificate of Full Acceptance of Physical Work was signed, a clear reference was made to the fact that Commisa still had claims pending and among them was, specifically, the "compensation for weather conditions (Castoro 10 and Bar Protector)"..*

The opinions of the arbitration tribunal are without basis and legal grounds, as it determined that COMMISA had submitted a technical dispute, when it is clear that actions referred to do not constitute a technical dispute. In fact, at that time, the matter the arbitration tribunal is referring to had not yet been the subject of dispute.

Furthermore, the arbitration tribunal attempts to justify the penalty it ordered against PEP for bad weather conditions with unlawful assertions.

41.- In view of the fact that COMMISA failed to comply with the contractual claim procedure established by the parties in the contract, it was clear that the arbitration tribunal did not have the authority to examine said claim. Nevertheless, in order to rectify this omission by the contractor, the arbitration tribunal makes reference to a letter from COMMISA dated March 15, 1999, when it was clear that on that date the vessels Castoro 10 and Bar Protector hadn't even started to work. Based on the foregoing, it is evident that there was no claim by COMMISA due to bad weather, and therefore said letter, dated prior to the commencement of the work, cannot substitute the formal procedure for a claim as agreed in the Contract. Furthermore, a claim, pursuant to the terms of the contract between PEP and COMMISA, could only arise out of the performance of the work and not beforehand, as the arbitration tribunal attempts to illustrate and justify without basis.

42.- The arbitration tribunal, in its effort to rectify the omissions of COMMISA by failing to comply with the claim procedure (formulation of a technical dispute), once again makes unfounded assertions and purely subjective interpretations where it states that: *"...when the Certificate of Full Acceptance of Physical Work was signed, a clear reference was made to the fact that Commisa still had claims pending*

# EXHIBIT 1 (PART 2)

and among them was, specifically, the "compensation for weather conditions (Castoro 10 and Bar Protector)". In no way can COMMISA's statement in the Certificate of Full Acceptance of Physical Work be interpreted as adherence to the claim procedure established in Clause 23.2 of the contract entered into by PEP and COMMISA, since COMMISA never stated it had submitted a claim to the PEP Supervisor, because they had only begun preparing it, and much less had it complied with all of the formalities required for such a claim.

In order to more clearly demonstrate this point, it is important to transcribe the exact text appearing on Page 17 of said Certificate of Full Acceptance of Physical Work:

> "CLAIMS BEING PREPARED BY COMMISA
> …
>
> SET 7 Compensation for weather
> conditions (Castoro 10 and Bar Protector).
> PENDING PENDING"

The foregoing transcription fully and conclusively evidences that as of the date on which the Certificate of Full Acceptance of Physical Work was signed, no type of claim or technical dispute had been filed by COMMISA in reference to bad weather affecting the work of the vessels Castoro 10 and Bar Protector. Despite this, and in a clearly excessive and erroneous interpretation of the contract and the rights and obligations arising therefrom, the arbitration tribunal stated in Paragraph 234 of the award that:

*"It is true that during the Contract term, PEP only acknowledged the right to compensation in Change Order No. 56 and Amendatory Agreement No. 12. However, there is no evidence whatsoever that Commisa had abandoned its claim and its efforts to collect the amount it was due."*

The Arbitration Tribunal never ruled on the matter in dispute, which was essentially whether COMMISA had complied with the formalities or requirements for its claims, not whether or not COMMISA had exercised its right to claim.

The arbitration tribunal's assertion as to this latter issue is unfounded, given that it states that there is no evidence whatsoever that COMMISA had abandoned its claim, as if that were the condition for rendering the bad weather claim inadmissible, when in fact, for this type of claim, there was a mandatory requirement for COMMISA to comply with an affirmative covenant, which stipulated that if the Supervisor and the Contractor did not initially agree on a manner to resolve an adjustment claim arising out of a Technical Dispute, then the contractor had to communicate the matter in writing, specifying in the document that it was a technical dispute, provide a summary of the events that gave rise

to the claim and submit a proposal for resolving the matter, a requirement which COMMISA clearly did not meet.

43.- Given that the arbitration tribunal did not rule on COMMISA's claim regarding bad weather in accordance with the claim procedure stipulated in the contract, it is clear that the tribunal did not abide by the contract provisions in issuing its decision, thereby exceeding the authority granted to it by PEP and COMMISA to decide the matters submitted by the parties in strict accordance with the law. By virtue of the foregoing, the decision issued by the arbitration tribunal is null and void, as it falls within the grounds for vacation set forth in Article 1457, Section I, Paragraph c), which is transcribed below for immediate reference:

> "ARTICLE 1457. Arbitration awards may only be vacated by the judge of competent jurisdiction when:
>
> I.       The party who brings the action proves that:
>
> c) **The award** refers to a dispute that is not provided for in the arbitration agreement or **contains decisions that exceed the terms of the arbitration agreement…**" (Emphasis added).

This is of great legal relevance, because the official filing of a Technical Dispute, and only that action, can give rise to the procedure for obtaining a proof of claim document,

pursuant to Article 44, Section III of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending, and Article 66, Section III of the Regulations of the Federal Law on Budget and Fiscal Responsibility. In other words, a payment obligation cannot be charged against the federal treasury unless there is a document that proves the validity of such payment.

Thus, the final part of the fourth paragraph and the beginning of the fifth paragraph of Clause 23.2 of the contract state as follows:

> *"The foregoing is based on the understanding that any decision regarding a technical-contractual modification which implies or necessarily results in an increase in the Contract amount or the schedule established in Clauses 3.1 and 4.1, respectively, will require the prior written approval of the Project representative...... Once written acceptance of the supervisor's decision is received from the Contractor, the Contract shall be amended as appropriate and the decision shall be implemented."*

Clause 5 of the Contract, entitled "Modifications to the Contract", provides as follows:

> *"The parties agree that for well-founded and explicit reasons, and **through the signing of an agreement**, PEP may modify the Contract in accordance with the provisions of Article 70 of the Government Procurement and Public Works Act."*

45.- In this case, COMMISA formally filed this dispute extemporaneously at a time when, pursuant to the contract, it could no longer be accepted, and therefore it could not be the subject of arbitration or validly considered.

46.- It is clear from the Certificate of Full Acceptance of Physical Work dated August 30, 2002 that the plaintiff had not formally filed a technical dispute for bad weather, in accordance with the terms and conditions of the contract, setting forth the grounds for its claim in writing. This is evidenced in Paragraph 234, Page 56 of the Final Award and the Dissenting Vote of D. Darío Oscós, Paragraphs 2 and 3 of Page 2, which forms an integral part of the Final Award. Paragraph 234 states as follows:

> 234. The above-mentioned letter proves that, at least as of March, 1999, Commisa was expecting to be compensated for any additional bad weather experienced as a result of the work schedule extension. It is true that during the development of Change No. 56 and Amendatory Agreement No. 12 [sic]. However, there is no evidence whatsoever that Commisa had abandoned its claim and its efforts to collect the amount it was due. Clear evidence of this is that when the Certificate of Full Acceptance of Physical Work was signed, a clear reference was made to the fact that Commisa still had claims pending and among them was, specifically, the "compensation for weather conditions (Castoro 10 and Bar Protector)".

47.- Similarly, in Paragraphs 233 and 234, Page 56 of the Final Award, the Arbitration Tribunal, based on a letter regarding another matter, which under no circumstances can be considered the formal filing of a technical dispute, states that COMMISA had supposedly asserted its right to a claim for bad weather due to the rescheduling of the jobs. The paragraph in question states that "*This does not include any additional down time for weather conditions as a result of the extension of the work schedule*". In other words, during the contract term, COMMISA never formally requested that PEP make a decision regarding its expectation to be paid for down time for weather conditions as a result of the work schedule extension.

48.- As stated previously, it wasn't until the conclusion of the contract and in the certificate of acceptance dated August 30, 2002 that COMMISA announced its intention to file a technical dispute for bad weather, as evidenced in said Certificate, on Page 56, Paragraph 234 of the Final Award and in the Dissenting Vote of D. Darío Oscós, Paragraphs 3, 4 and 5, Pages 2 and 3, which forms an integral part of the Final Award. Furthermore, it wasn't until April 8, 2003 (Document COM/EP2800/2003-5556), seven months after the work was completed, that COMMISA filed its dispute, which was

rejected by PEP because it was submitted too late.

49.- The Contract, in Appendix B-2 "General Terms", Section 5 "Modifications", provides that "*any delay by the contractor in giving notice or submitting the proposal referred to in the preceding paragraph, shall be sufficient grounds to reject the claim if such delay is detrimental to PEP and to the extent of such detriment. **In no case shall a claim by the Contractor be considered if it is made subsequent to the Partial or Complete Acceptance**...*".

The arbitration tribunal disregarded this agreement and therefore did not base the arbitration award on the law.

50.- It is important to emphasize the fact that the functions of the Works Supervisor do not end once the work is completed, but continue until all of the rights and obligations arising therefrom have terminated. Therefore, the Arbitration Tribunal cannot conclude that it was not legally or factually possible for COMMISA to act in accordance with the Contract.

51.- On April 8, 2003, seven months after the work was completed, when it was too late to have any legal effect, COMMISA asked the Contract supervisor, Engineer Alfredo

Gómez Rangel to formalize the Technical Dispute regarding bad weather (COM/EP2800/2003-5556). The Arbitration Tribunal knew of this document and yet, in violation of the guarantees of due process, failed to consider it for the purposes of the arbitration award, as evidenced by the reference to this fact made by arbitrator Darío Oscós Coria in his Dissenting Vote (Page 4, Paragraph 8).

52.- Furthermore, said document shows that, taking into account the conduct of the parties, a technical dispute had to be formalized in order for COMMISA's claim to be accepted; as of the conclusion of the Contract term, COMMISA had not officially filed a Technical Dispute in reference to this matter, and its claim was filed extemporaneously, when there was no longer a legal possibility that PEP would consider the merits of the matter.

53.-In view of the foregoing, the Arbitration Tribunal's determination that the technical dispute was formalized is illegal, and contradicts the express statement of COMMISA. It also evidences the bias of the arbitration tribunal, in violation of Article 17 of the Constitution, because it apparently ruled taking into account the conduct of PEP (Paragraph 118 of the Final Award), but did not examine the conduct of COMMISA.

It is also important to note that this reinforces the position of PEP regarding the "Certificate of Full Acceptance of Physical Work", in that COMMISA did not officially file

technical dispute in connection with technical disputes 19, 27, 34 and 35, and the Arbitration Tribunal, acting in violation of the works contract, improperly ruled on these matters.

54.- In accordance with the works contract, prior to submitting a dispute to arbitration, COMMISA was required to have formalized its Technical Dispute in a timely manner, as stipulated in the arbitration agreement set forth in Clause 23.3 of the Public Works Contract. Otherwise, said Technical Dispute could not be the subject of arbitration and therefore, the determinations of the Arbitration Tribunal refer to a dispute that was not provided for in the arbitration agreement, given that only formal technical disputes can be the subject of arbitration, since the Arbitration Tribunal was only authorized to issue final decisions on technical disputes. Because it does not comply with the foregoing, the decision of the Arbitration Tribunal is null and void, given that the grounds for vacation set forth in Article 1457, Section I, Paragraph c) of the Commercial Code have been met, and which state as follows:

> "c) *The award refers to a dispute that is not provided for in the arbitration agreement.*

Therefore, any analysis regarding the admissibility and assessment of this dispute is also illegal and contrary to public policy.

59

## FOURTH

55.- The decision of the Arbitration Tribunal to admit COMMISA's claim set forth in so-called Technical Dispute 36, entitled *"Bad weather that affected the Castoro 10 and Bar Protector jobs",* and ordering PEP to pay COMMISA an amount of USD $22,038,954.00, (Section VII.2, Pages 51 - 60 of the Final Award) falls within the grounds for vacation set forth in Article 1457, Section I, Paragraph c) of the Commercial Code, which provides that an Award may be vacated when it contains decisions that exceed the terms of the arbitration agreement.

56.- There is no justification for the Arbitration Tribunal to have violated the contract stipulations on Technical Controversies and Arbitration that were set forth under Clauses 23.2 and 23.3 of the Contract to allow a simple claim to become the subject of arbitration. COMMISA'S disagreement with the conditions of the contract does not make its claim eligible for arbitration; for that, it would have had to formally request that PEP decide on the issue during the effective term of the Contract, which it never did, and it has been thus proven during the arbitration, as stated in Paragraph 234, Page 56 of the Final Award; and in the Dissenting Vote of Darío Oscós, Paragraphs 3, 4 and 5,

Pages 2 and 3, which forms an integral part of the Final Award.

57.- This Arbitration between PEP and COMMISA is strictly by law, so the rights and powers of the parties are determined based on legal or contractual provisions, a fact that the arbitration tribunal failed to observe. Also, both the arbitration tribunal and the parties are required to observe the principle of *pacta sunt servanda* set forth in Article 1796 of the Federal Civil Code, which provides:

> *"**Article 1796.-** Contracts are formalized by consent alone, except for those which must comply with formalities provided by Law. Once they become formalized, the contracting parties are bound not only to the performance of the express agreements made therein, but also to any consequences which, according to their nature, are consistent with good faith, custom or the law".*

58.- Contractually, formalizing a dispute is not the same as surmising or presuming a supposed right, as COMMISA has done. The Arbitration Tribunal's decision was entered without having any legal basis or basis in law, because it left the performance of the contract to COMMISA'S discretion, which is expressly prohibited by Article 1797 of the Federal Civil Code, which provides:

> *"**Article 1797.-** The validity and performance of contracts cannot be left to the discretion of one of the contracting parties."*

This principle has great significance in public works contracts, which are regulated by administrative law and wherein the parties' own discretion in contracting is restricted by their very nature, and because they contain provisions of public interest which come directly from Articles 126 and 134 of the Constitution regarding public spending and public works.

59.- Based on the above, it is clear that the Arbitration Tribunal has no authority whatsoever to violate the contractual provisions entered into between PEP and COMMISA, nor may the Arbitration Tribunal decide in equity or as amiable compositeur. Furthermore, such a stipulation would become void by operation of law because it would mean giving the Arbitration Tribunal powers to regulate matters of Mexican public policy, which are already included in Mexican public policy laws. Therefore, the arbitration award was required to only address compensation provided for in the Public Works Contract and the admissibility thereof pursuant to the conditions also provided in the contract, and in accordance with Mexican Laws (strict interpretation of the law).

60.- Thus, the Arbitration Tribunal was required to correctly apply Clauses 23.2 and 23.3 of the Contract in accordance with the text thereof. That is, the Arbitration

Tribunal erroneously applied Clauses 23.2 and 23.3 of the Contract, thereby exceeding the breach clause. The Arbitration Tribunal entered an award without proper basis and grounds by issuing an order against PEP due to bad weather by invoking a letter from COMMISA dated March 15, 1999 (transcribed previously herein) as well as the Certificate of Full Acceptance of Physical Work dated August 30, 2002, with which it determined that COMMISA had provided proof of possible additional costs at that time due to an increase in bad weather conditions and that there was no evidence whatsoever that COMMISA had abandoned its claim, when the only thing that is true is that in the month of March of 1999, the vessels Castoro 10 and Bar Protector had not yet begun to work on the IPC-28 jobs; therefore, the determination that COMMISA was able to make any claim related to those vessels on that date is completely void of legal logic, basis or reasoning.

61.- It is illegal for the Arbitration Tribunal to have held in the award that a technical dispute had been formally filed simply because COMMISA, in a document dated March 15, 1999, in reference to Disputes 34 and 35, stated that: *"This does not include any additional down time for weather conditions as a result of the extension of the work schedule."*

62.- On the other hand, and as stated in previous sections, in no way did COMMISA make any type of claim in connection with bad weather that affected the work of said vessels in the Certificate of Full Acceptance of Physical Work (because it was still in the process of being prepared as evidenced in said certificate) and much less did it satisfy the requirements stipulated in Clause 23.2 of the contract, as it was required to do in order to validly file its claims in an arbitration proceeding, pursuant to Clause 23.3 of said Contract. Despite this, the Arbitration Tribunal held that COMMISA'S actions were in compliance with the contract, which served as its basis for the order issued against PEP.

63.- When the Arbitration Tribunal violated and disregarded the content of Clauses 23.2 and 23.3 of the contract, and instead based and supported its decision on documents that do not comply with the formalities required in the contract in order to hold that COMMISA'S claims were valid and filed in due time, it is clear that the Arbitration Tribunal exceeded the arbitration agreement, because its obligation was to rule on any matters put before it per strict application of the law, which it failed to do as evidenced above, and therefore, the arbitration award is null and void, pursuant to the

provisions of Article 1452, Section I, Part c) of the Commercial Code.

64.- Furthermore, the application of a civil law is also a matter of public interest, as required by Article 14 of the Federal Political Constitution, the final paragraph of which provides a constitutional right to due process of law, the preservation of which is a matter of Mexican public interest.

Article 14 of the Constitution states:

> *"Article 14.- ...In civil law proceedings, the final judgment must be by the letter of the law or in accordance with the legal interpretation of the law, and in the absence thereof, shall be based on general principles of law."*

Therefore, any analysis as to the admissibility and assessment of this dispute in the manner in which it is done by the Arbitration Tribunal is also illegal and against public interest.

65.- This argument also relates to the decision of the Arbitration Tribunal, set forth in Section VI of the Final Award, whereby it holds that it has jurisdiction to hear all disputes and claims filed by COMMISA, asserting that all of these matters are related or

linked to the Contract in connection with Project IPC-28, including Technical Disputes pursuant to the Contract, according to Paragraphs 105 and 129 of the Final Award, when they should have been decided pursuant to the works contract through a different procedure prior to arbitration. Thus, for additional information regarding the violations of the right to due process committed by the Arbitration Tribunal on this matter, and in order to avoid repetition, we ask that this court refer to the appropriate section of this document (Facts 472 - 508), wherein we refute the Arbitration Tribunal's decision holding that it has jurisdiction to hear this matter, and which we request be incorporated herein by reference.

## II. **Grounds for Vacation of the Final Award, concerning the decision of Disputes 34 and 35: Down time due to delays in starting the Work of the Castoro 10 and the Bar Protector.**

66.- In so-called "Technical Disputes 34 and 35", COMMISA alleges that the Public Works Contract required it to have its vessels available from the beginning of the Contract, but despite this, the platforms that were required in order to commence the work with vessels were not completed on schedule. It then alleges that PEP delayed its access to the jobsite and the commencement of work with vessels, and that as a result,

COMMISA experienced extensive down times for the vessels Bar Protector and Castoro 10.

67.- PEP replied that this claim was unfounded because the vessels were not operating, and also because this claim could not be the subject of arbitration.

68.- Despite PEP's assertions, the Arbitration Tribunal decided to partially grant this compensation and to order PEP to make various payments, thereby rendering the Final Award entered null and void, in accordance with the following considerations.

## F I R S T

69.- The award issued by the Arbitration Tribunal declaring the partial validity of COMMISA's claim set forth in so-called Technical Disputes 34 and 35, entitled *"Down time due to delays in commencing the Castoro 10 and Bar Protector jobs"* and ordering PEP to pay COMMISA an amount of USD $13,923,014.00 is null and void, because the assertions made by the Arbitration Tribunal, appearing in Section VII.1 of the Award on Pages 36 - 50, show that its decision falls within the grounds for vacation set forth

in Article 1457, Sections I and II of the Commercial Code, which provides that an Award may be vacated when it has violated the arbitration agreement, or when there has been a serious violation of the arbitration procedure, or if the decision contained in the award violates public policy.

70.- In Section I above (consideration one of this claim), it was established that the management of federal resources and the system for payment of obligations charged to such federal resources, is a constitutional system arising out of Articles 126 and 134 of our Constitution, and therefore, any violation of these articles would also violate the legal system on budgeting and public spending, which is specifically set forth in the Constitution. We are asking that said provisions be incorporated into this section to avoid repetition.

71.- It has also been evidenced, from a reading of Articles 1 and 15 of the Government Procurement and Public Works Act (LAOP), that said act is a public policy of social interest, given that its purpose is to govern actions relating to the planning, scheduling, budgeting, expenditure, implementation and control of public works and services related thereto contracted for by decentralized agencies, in complete accordance with the constitutional system we are referring to. Likewise, and in order to

avoid repetition, we ask that these arguments be incorporated by reference for judicial economy purposes.

72.- **The Contract was restricted on some issues arising out of penalties or concerning acts of God or force majeure, and the Tribunal could not rule on them because it would be deciding in equity and not strictly by law, the principle by which the award should have been issued.**

73.- Therefore, the conditions and requirements for payment of obligations assumed by virtue of or in connection with public works contracts, because they are charged against federal funds, are subject to public policy provisions pertaining to constitutional and administrative public law, but not commercial law.

74.- Thus, in this same context, we can cite Article 44, Section I of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending, and Article 66, Section I of the Regulations of the Federal Law on Budget and Fiscal Responsibility, which stipulate as follows:

> "Article 44.- Entities must ensure, under their own responsibility, that any payments they make against their approved budgets are made in accordance with the following requirements:
> I.      **They must be made for obligations actually performed**, with the exception of the advance payments

*provided for in the law and those mentioned;…".*

*"Article 66. Payments made against the Disbursement Budget shall be made by agencies through the Treasury. Payments by entities shall be made through their own treasury offices, for which they must keep the appropriate budgetary records on their own cash flows.*
*In making their disbursements, agencies shall also [ensure]:*
*I.*     ***They are made for obligations actually performed,*** *with the exception of the advance payments provided for in applicable provisions…"*

**75.- In this case, the payment determined by the Arbitration Tribunal was not actually earned by COMMISA, so therefore, the award ordering PEP to pay the above-mentioned amounts of money is unfounded, without basis and therefore void because it violates the public policy provisions set forth in the Constitution.**

76.-  As stated in previous sections, COMMISA was claiming down time caused by delays in starting the jobs. In the Contract, down times are a payable work item, contained in the final paragraph of Clause 10.1.2. In Paragraphs 165 - 167 of the Arbitration Award, appearing on Page 44, the Arbitration Tribunal held that said down times were not applicable to this case, given that those costs or charges may only be paid for suspensions after the work with the vessels had been started. In fact, the

Arbitration Tribunal determined:

> "165. In this arbitration proceeding, the Claimant asserts that the days of delay attributable to PEP should be paid at the down-time charge agreed upon in the Contract for down time occurring after mobilization.

> "166. The Arbitration Tribunal does not agree. In its opinion, down-time charges are only applicable if interruptions occur in the operation of the vessels, once they have been mobilized and admitted to the jobsite. **On the contrary, the down-time charges are not applicable if the delays that occur are delays in placing the vessels into service before mobilization.** In these cases, the agreement is that PEP will pay Commisa for any reasonable and proven costs it suffered as a result of such delay.

> The foregoing conclusion of the Tribunal is based on the literal meaning of the Contract itself (i), on the pre and post contractual actions by the parties (ii) and on the financial logic of the transaction (iii).

77.- Based on this reasoning, the Arbitration Tribunal continued on with its analysis of the case and wrongly issued a payment order against PEP. As we can see in the transcription of the Claimant's assertions appearing in Paragraph 80, Page 23 of the Final Award, another claim was made by COMMISA in connection with these events, as follows:

71

*"Commisa is suing for compensation of approximately US$81 million dollars. Said amount is calculated in accordance with Contract EPC-28. In the event that, for any reason, the Arbitration Tribunal were to decide that the costs or charges for down or reserve time stipulated in Contract EPC-28 are not applicable for the purpose of calculating compensation for such delays, Commisa is respectfully requesting that the Tribunal enter an award ordering PEP to pay compensation that is sufficient to compensate Commisa for the damages and losses suffered as a result of the delays experienced beforehand. For such purposes, Commisa estimates that said damages and losses amount to approximately US$81 million dollars..."*

78.- That is, COMMISA was seeking payment of the down-time costs agreed for the work with vessels, or in absence thereof, compensation for damages and losses; and thus, because COMMISA'S first claim was decided unfavorably, it proceeded to examine the second one.

79.- In examining COMMISA's claim and the Arbitration Tribunal's position set forth in the Final Award, together with the public policy requirement that payments must be for work actually performed, we have the following:

a) The work item for *"delays in placing the vessels into service prior to mobilization"* (Paragraph 166, Page 44 of the Final Award) does not exist in the

Contract, let alone as a payable work item, so there is no contractual obligation to pay for this event.

b) The phrase "*delays in placing the vessels into service prior to mobilization*" clearly shows the baseless nature of the facts asserted in the Contractor's claim; that is, it is claiming payment for not evidencing the operating conditions of the vessels, for not working, or for postponing the date on which they would start working.

In addition, whether the obligations for which payment is being claimed are actually due, as required by Articles 44 Section I of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending and Article 66, Section I of the Regulations of the Federal Law on Budget and Fiscal Responsibility, may be interpreted with respect to the work items agreed in the contract or the damages and losses requested by COMMISA, as though they have actually been completed in accordance with the plans, the quality and specifications agreed[4], and including the operations and materials provided for in the agreed scope of work[5], or if they are actually due.

---

[4] **Regulations of the Public Works Law. Article 42.** *"For the purposes of Article 39 of the Law: I. Unit price shall be understood to be the amount for total compensation or payment to be paid to the contractor by unit item of finished work; performed according to plans, construction specifications and quality standards…"*

[5] **General Rules for Execution and Contracting of Public Works:** *"5.2.3 WORK ITEM. Set of operations and materials which, according to appropriate forms and specifications, comprise each of the parts into which studies and plans, execution and equipping of the works, placing into service, preservation or maintenance thereof and supervision of such work are conventionally divided for purposes of measurement and payment."*

80.- According to Mexican civil law, payment of damages and losses does not automatically arise as a direct and immediate consequence of a contractual breach. On the contrary, that connection must be proven separately from the amount of damages. The foregoing is based on Article 2110 of the Federal Civil Code, which provides:

> **"Article 2110.** Damages and losses must be an immediate and direct consequence of non-performance of the obligation, whether they have been incurred or must necessarily be incurred."

81.- Our highest authorities have reiterated in established jurisprudence the provisions of Article 2110 of the Federal Civil Code, as follows:

> **DAMAGES AND LOSSES. ENTITLEMENT THERETO MUST BE PROVEN SEPARATELY FROM NON-PERFORMANCE OF THE OBLIGATION ON WHICH THEY ARE BASED, WHILE THE OBLIGATION DOES NOT ALWAYS NECESSARILY MEAN THAT ANY ARE INCURRED**[6]. Although, in accordance with the provisions of Article 2110 of the Federal Civil Code, such items must be the result of non-performance of an obligation, it cannot be asserted under such conditions that the damaged party must necessarily suffer a loss or detriment to its assets or become deprived of any lawful gain pursuant to Articles 2108 and 2109 of this same law, since there will be cases

---

[6] **Record No.: 184,165. Jurisprudence. Matter(s): Civil. Ninth Series. Instance: Three-Judge Circuit Courts. Source: Supreme Court Reports and Gazette. XVII, June, 2003. Opinion: I.7o.C J/9. Page: 727.**

in which even though an obligation is not performed, it will not result in damage of that kind. **From the foregoing, it follows that it is not sufficient to evidence the above-mentioned situation in order to allege that damages and losses were caused, which must be separately proven, because to maintain otherwise would lead to ordering punishment automatically, even in cases where none of the damages mentioned had been sustained.** Such is the meaning of this jurisprudence, which can be seen in the Appendix to the Supreme Court Reports, 1917-1985, Fourth Part, Page 357, which reads: "DAMAGES AND LOSSES. GENERIC COURT ORDER.- Articles 85, 515 and 516 of the Code of Civil Procedure for the Federal District and the procedural codes of the States of the Republic having the same provisions, allow us to conclude that if the petitioner in a suit brought for the primary purpose of securing payment for damages and losses has proven the existence thereof and their right to be compensated, but failed to provide evidence conducive to establishing amount thereof or to establishing a framework pursuant to which payment should be made, a generic order for payment of such damages is appropriate, with determination of the amount thereof reserved for the enforcement of judgment proceedings." From the time that the criteria requires proof of right to compensation, this can be none other than the presence of the loss, detriment or deprivation that have already been mentioned, and therefore, if these have not been proven, an order for payment of damages and losses is not proper, even if the order requiring fulfillment the obligation still stands. SEVENTH THREE-JUDGE CIVIL COURT OF THE FIRST CIRCUIT.

Direct Amparo 1177/93. Autos Tlaxcala, S.A. de C.V. and Hermanos Rivera, S.A. de C.V. April 6, 1993. Unanimous vote. Reporting Judge: Carlos Gerardo Ramos Córdova. Clerk: Irma Rodríguez Franco.

Direct Amparo 3123/2001. Petróleos Mexicanos. November 29, 2001.

75

Unanimous vote. Reporting Judge: Anastacio Martínez García. Clerk: Carlos Arturo Rivero Verano.

Direct Amparo 466/2002. Aseguradora Hidalgo, S.A. July 11, 2002. Unanimous vote. Reporting Judge: Sara Judith Montalvo Trejo. Clerk: Teresa Bonilla Pizano.

Complaint 90/2002. January 16, 2003. Unanimous vote. Reporting Judge: Anastacio Martínez García. Clerk: Carlos Arturo Rivero Verano.

Direct Amparo 154/2003. Promociones Russek, S.A. de C.V. April 10, 2003. Unanimous vote. Reporting Judge: Anastacio Martínez García. Clerk: José Ybraín Hernández Lima.

**DAMAGES AND LOSSES ARISING FROM BUSINESS TRANSACTIONS. NON-PERFORMANCE ALONE DOES NOT AUTOMATICALLY GIVE RISE TO THE SAME**[7]. In accordance with Article 376 of the Commercial Code, in commercial sales transactions, once a contract is executed, the complying party shall be entitled to demand from the non-complying party either the rescission or performance of the contract and compensation, in addition to damages and losses. However, it does not follow from this that when non-performance by one of the parties to a commercial contract is proven, any damages and losses caused, or the amount thereof, are also held to be proven, because it can only be inferred from said legal provision that the complying party is entitled to demand from the non-complying party either rescission or mandatory performance of the contract, in addition to other legal consequences such as compensation for damages and losses. **Therefore, regardless of whether or not these business transactions are profitable, in order for said compensation to be legally warranted, it is necessary to prove at trial that profits could have been obtained, and that such profits were not earned due to the defendant's non-performance**, because otherwise, it would mean holding that said damages were produced

---

[7] Record No.: 178,481. Excerpt from Court Opinion. Matter(s): Civil. Ninth Series. Instance: Three-Judge Circuit Courts. Source: Supreme Court Reports and Gazette. XXI, May 2005. Opinion: III.2o.C.94 C. Page 1448.

automatically, which is not provided by the law.
SECOND THREE-JUDGE CIVIL COURT OF THE THIRD
CIRCUIT.
Direct Amparo 549/2004. Pablo Álvarez Magaña.
November 26, 2004. Unanimous vote. Reporting Judge:
José Guadalupe Hernández Torres. Clerk: José
Guadalupe Bustamante Guerrero.

82.- It is important to clearly establish what damages were claimed by COMMISA. And the answer is that COMMISA only sought payment of the down-time charges set forth in the contract (Paragraph 80, Page 23 of the Final Award, transcribed above) as damages, which were held to be invalid and inapplicable by the Arbitration Tribunal (Paragraphs 165 - 167, appearing on Page 64 of the Final Award).

83.- In other words, COMMISA was seeking the same amount under two different causes of action: (a) for downtime costs, and (b) for damages and losses, which is entirely improper. In this regard, it is important to note that the federal civil code, applied in a supplementary fashion, provides in Article 1840 as follows:

> "Art. 1840.- Contracting parties may stipulate certain compensation as a penalty in the event that the obligation is not performed or is not performed as agreed. If such stipulation is made, damages and losses cannot also be claimed."

84.- The mere application of Article 1840 of the Federal Civil Code should have been sufficient for the Arbitration Tribunal to have held that COMMISA's claim for damages was inadmissible; the Tribunal was aware of this legal provision, given that this situation was recognized by COMMISA itself in its communiqué "C 44" (Paragraph 26, Page 9), concerning the Proceedings for the Introduction of Additional Evidence, which it cited as evidence, adding that because all COMMISA was requesting was payment of down-time costs, it had no obligation to prove any damages (or which is equivalent to saying that no damages had been proven during the proceeding).

That would have been sufficient for COMMISA's claim for damages and losses to be declared inadmissible, because it never showed any damages whatsoever in its claim, but instead, all that COMMISA did was argue that it was entitled to payment for down-time costs. Despite this, and in an inconsistent manner, the Arbitration Tribunal never proposed to establish whether the action for damages and losses was admissible or inadmissible, which was of course clearly and obviously improper.

85.- The Arbitration Tribunal's decision has harmed PEP, because despite the fact that there was no petition by COMMISA, the Arbitration Tribunal on its own, and in violation of the principle of strict construction and equality to which the parties are

entitled during the proceedings, as well as the principle of impartiality which should govern its conduct, acted beyond the scope of the authority it had been given and disregarded provisions of public policy by ruling as to the admissibility of a compensation that is entirely different from that claimed by COMMISA; that is, the Arbitration Tribunal ruled on a matter different from the matter submitted to it.

86.- This conduct by the Arbitration Tribunal is sufficient to vacate the arbitration award.

87.- The Arbitration Tribunal saw that the first two paragraphs of Clause 10.1.2 of the Contract govern the payment of "Unrecoverable Costs", which are defined as any costs that the Contractor could have incurred in the event the work was suspended pursuant to Clause 10.1 of the Contract, and **only at the request of the Contractor itself**. Such costs must be reasonable, **duly proven** and directly related to the Contract.

88.- It is important to note that these unrecoverable costs govern a condition different from that for suspension of work with vessels that is subject to payment of down-time costs (as admitted by the Tribunal at the beginning), and these costs are governed by this same Clause 10.1.2, Paragraph Three, and the Arbitration

Tribunal had already declared this compensation unfounded; and in the same fashion, unrecoverable costs are compensation that is different from compensation for damages and losses, which it did not even examine.

89.- In addition, the Arbitration Tribunal also saw that according to Change Order No. 1, Rev 2, PEP had agreed to pay COMMISA for any *"fair, reasonable and duly proven costs"* that might be owed.  As the Arbitration Tribunal correctly acknowledged (see Paragraphs 174[8] and 175[9], Page 45 of the Final Award), this definition is similar to the definition for "Unrecoverable costs" contained in the first and second paragraphs of Clause 10.1.2. Thus, it is clear that according to Change Order No. 1, Rev 2, PEP had agreed to indemnify COMMISA for any Unrecoverable costs that were duly evidenced by COMMISA, but in no way did it agree to pay the Costs for Down-Time or Inactivity defined in paragraph three of said Clause 10.1.2 established for down-time with vessels, or any other compensation.

---

[8] "In the replies to questions posed by bidders at the Clarification Meeting, the Defendant made it clear that in the event it were to exercise its right to reschedule dates, PEP would compensate the Contractor by applying the contractual provisions, and that the down-time charges would apply during suspension of operations".

[9] "Even more significant than these pre-contract clarifications is the conduct of the parties in the performance of the Contract. In Change Order No. 1, Rev 2, signed by both parties, they agreed to extend the term for bringing in the vessels, and PEP agreed to pay the Contactor for any "fair, reasonable and duly proven costs" it might have incurred. It should be emphasized that the terms used in this Change Order are identical to those used in the first paragraph of Clause 10.2.1 of the Contract. Therefore, there is no doubt that the parties understood that what was agreed in the Contract in the event of a delay in bringing in the vessels, was that PEP would reimburse the actual costs incurred by the Contractor, and not that the latter would be entitled to collect down-time charges."

80

90. That is, in Change Order 1, Rev 2, PEP did not agree to pay for the down times of the ship COMMISA was claiming. Nevertheless, the Arbitration Tribunal wrongfully determined it to be applicable to this case (which will be a subject of the grounds for vacation set forth in a subsequent section).

91.- The point being made in this section is that under no basis or grounds for claim has COMMISA demonstrated that it is entitled to collect the amounts it is claiming.

92.- Given that COMMISA did not prove that it is in fact entitled to collect the amounts it is claiming, then the Arbitration Tribunal, by ordering PEP to pay COMMISA certain amounts that have not been proven to be owed, is ordering PEP to perform an action which Mexican law forbids it to perform. That is, it will be shown that there is no contractual or legal justification for this payment (see also Paragraph Four of this Section).

93.- The Regulations of the Federal Law on Budget, Accounting and Federal Public Spending, public policy provisions, Article 2110 of the Federal Civil Code, and civil jurisprudence, as well as the Works Contract and subsequent agreements, provide that the payment of obligations, damages or costs may only be made if they have

actually been earned, incurred or proven, which did not occur in this case. The Arbitration Tribunal had supposedly confirmed a contractual breach (which is denied given that PEP's right to suspend work is clearly stipulated in Clauses 4.4 and 10.1 of the Contract, and because it is provided for, it was clearly done legitimately), and then, without providing any explanation for the cause of the damages (lack of legal basis and grounds), said Arbitration Tribunal took it upon itself to directly determine the amount of compensation, and therefore the award contains a serious violation of due process and the essential procedural requirements.

94.- It is important to note that for the performance of the work covered under the public works contract, the contractor (COMMISA) was required to have vessels capable of performing off-shore work, whether for laying underwater pipelines or connecting them to platforms. COMMISA did not have its own vessels and subcontracted the Castoro 10 and Bar Protector vessels from the company EMC.

95.- The start date for the work was postponed because certain offshore petroleum platforms, related to the subject of the Works Contract for Project IPC-28, were not completed on time. COMMISA alleged to the Arbitration Tribunal that,

pursuant to Public Works Contract, it was required to have its vessels available, further asserting that PEP's delay in allowing access to the work site caused considerable down time for the Bar Protector and Castoro 10 vessels, for which it should have been compensated.

96.- Based on COMMISA's claim, it is clear that the cost or damages to be paid (if COMMISA in fact had a contractual or legal basis for such claim, for the reason explained in Part Three of this Section) would be the amounts actually paid by COMMISA to the owner of the vessels for the delay in placing the vessels into service, in the event said vessels had been available. Or, according to the Arbitration Tribunal's position, COMMISA had to prove that it had incurred unrecoverable costs (it is important to point out that to date, COMMISA has not produced evidence of the first or the second).

97.- In spite of this, the Arbitration Tribunal, without legal basis or grounds, ordered PEP to make the aforesaid payment.

98.- Based on all of the foregoing, we can establish what type of events COMMISA was required to prove for the admissibility of its claim; and it has also been shown that the payment amount ordered by the Arbitration Tribunal (Paragraph 183 of

the Final Award) does not adhere to the public policy regulations applicable to this case, as its basis falls outside of the factual and regulatory context of the proceeding and the legal framework to be applied, given that the cost ordered i) was not actually incurred; and, ii) was not duly proven, requirements on which the Tribunal had stated it would base its decision, in accordance with the Terms of Reference.

This is not a case of improper application of the law, but rather, of a violation of rules that substantially affect public spending, a matter of constitutional sovereignty.

99.- **In order for a cost to have been duly incurred**, the parties must be capable of performing the obligations assumed in the Contract. Thus, for a cost to have these characteristics, the following is required: 1) The existence of a delay attributable to PEP; and, 2) It must be a cost agreed in the contract or that is payable because the contractual conditions for its payment have been met.

100.- Supposing, without conceding, that there were a delay attributable to PEP (there was not, because it was a right of PEP), the absence of the second requirement would be sufficient cause to dismiss the action, particularly when taken together with the text of Article 65 of the Government Procurement and Public Works Act and numerous Mexican public policy regulations.

101. Notwithstanding the foregoing, we would like to make clear certain matters at issue so as to better understand the illegal conduct of the Arbitration Tribunal. First, the delay in starting the work, due to the lack of platforms, was an event that was separate from the conditions for payment of down-time costs for vessels. In other words, if COMMISA did not prove in any way that its vessels were at the work site and ready to operate, it had no right whatsoever to payment. Therefore, the assignment of responsibility to PEP by the Arbitration Tribunal in Paragraph 153 of the Final Award[10] is illegal.

102.- In view of the foregoing, it is clear that the award is irrational, given that the Arbitration Tribunal did not examine therein the defense of PEP or the action of COMMISA. The main defense asserted by PEP challenged whether the vessels were available and in operating condition so as to warrant the payment of down-time charges, as stated in Paragraph 131 of the Final Award[11], and with which, it appears, the Tribunal agreed, according to its statement in Paragraph 166 of the Final Award.

---

[10] However, if the contract terms for the operation of vessels had been met, only in that case would it be possible to speak of delays attributable to PEP, if it didn't provide access to the work site. Otherwise, performance of the operations for placement into service was the responsibility of COMMISA, and as long as it did not fulfill this obligation, it could not demand that PEP perform its obligation.

[11] The motion to dismiss for non-performance of obligations [exceptio non adimpleti contractus] is intended to defer performance. It does not dispute the contract: both parties remain bound thereby and the mere performance by the party who failed to do so is sufficient to prevent the other party from invoking this defense; the party who failed to perform could demand performance. A situation of waiting is created: there is temporary refusal to perform. Thus, there is no payment if there are no vessels in operating condition pursuant to the Contract.

85

However, the Arbitration Tribunal, acting beyond the scope of its authority, added new claims to the dispute, and thereby altered the proceedings in favor of COMMISA, as will be shown in part two of this section.

103.- The bias of the Arbitration Tribunal is even more apparent in Paragraph 159 of the Final Award, where it states that on two occasions, PEP opposed the mobilization of the vessels, when it was only demanding that COMMISA perform its contractual obligations. By determining that these documents, in accordance with their content, evidence that PEP opposed the arrival of the ships, the arbitration tribunal failed to provide proper basis and grounds for the arbitration award.

104.- This lack of proper basis by the arbitration tribunal is also shown in its own reference to documents when making the above conclusion wherein, at the bottom of Page 88 (Page 42 of the award), the arbitration tribunal cites documents CV 37 and CV 40, which are not related in any way to the matter at hand.

105.- In an e-mail message dated June 29, 2006, the Clerk of the Arbitration Tribunal, Deva Villanúa, attached a list of the documents submitted by the parties during the arbitration hearing, which reads, in reference to document CV 37:

*"Reference, report. Activity Log. Mobilization ship "DSV". (2 pages.) COM-PEP 020700-703".*

*The document titled CV 40, is described with the following information:*

*"Ref: Appendix B 1, Clause 3.5. 1. Re: Mobilization Schedule."*

An extensive review of both documents shows that they do not contain anything to suggest that PEP had objected to the mobilization of the vessels, as the arbitration tribunal erroneously and without basis asserts in Item 159 of the award; in fact, the first document mentioned above is an activity report for said ship while under the control of COMMISA itself; the second document is an appendix to the contract consisting of an activity schedule, and which does not contain an objection by either of the parties to the mobilization of vessels.

106.- It is also important to note that, as an example of the type of documents the Arbitration Tribunal had to examine in reaching its decision, Document EP2800/COM/99-1696, dated June 11, 1999 and Document EP2800/COM/99 1604 of May 21, 1999, which was produced as evidence in the arbitration proceeding. In these documents, PEP demanded that COMMISA perform its contractual obligations concerning the arrival of

the vessels, a demand which in no way could be construed as an objection to the arrival of the vessels.

The arbitration award is therefore unfounded.

107.- In Paragraph 166 of the Final Award, the Arbitration Tribunal acknowledges that the vessels had not been put into service, that is, that they hadn't been moved to the work site, or admitted to said site[12], where it states:

> 166. The Arbitration Tribunal does not agree. In its opinion, the down-time charges are only applicable if interruptions occur in the operation of the vessels, once they have been mobilized and admitted to the jobsite. On the contrary, the down-time charges are not applicable if the delays that occur are delays in placing the vessels into service before mobilization. In these cases, the agreement is that PEP will pay Commisa for any reasonable and proven costs it suffered as a result of such delay."

Also see Paragraph 169 of the Final Award.

108.- That is, the work hadn't yet commenced. Nevertheless, the Arbitration Tribunal stated in Paragraph 168 of the Final Award that said claim fell within the regulatory condition set forth in Clause 10 and Clause 10.1.2 of the Contract, regarding

---

[12] Clause 16.1.1 of the Contract clearly provides that until the vessels have undergone and passed the Check List or inspection to verify their condition and capacity to perform the work, and to confirm that they have all of the permits and records necessary to travel in Mexican waters, they cannot be placed into service. If the vessels do not pass inspection, they cannot be considered available.

suspension of work ordered by PEP and the payment of unrecoverable costs, in accordance with Paragraphs 174[13] and 175[14] of the award, which is completely unfounded.

109.- The delays in the placement into service of the vessels prior to mobilization is not a payable work item under the contract, because it would be illegal and punishable by law if a public entity or public servant made a payment for something that cannot be considered work, or suspension of work.

110.- Article 65[15] of the LAOP is clear evidence of this fact, given that the only measure it provides for a delay in the commencement of work due to lack of access to the job site is an extension of the work completion date.

15 Article 65.- The performance of the work contracted for shall commence on the indicated date, and for such purpose, the contracting agency or entity shall, in a timely manner, make the property where the work will be performed available to the contractor. Failure to do so by the agency or entity will result in an extension, for a time period equivalent to the delay, of the date originally agreed for the completion of the work.

---

[13] In the responses to questions posed by bidders at the Clarification Meeting, the Defendant made it clear that in the event it were to exercise its right to reschedule dates, PEP would compensate the Contractor by applying the contractual provisions, and that the down-time charges would apply during suspension of operations".

[14] "Even more significant than these pre-contract clarifications is the conduct of the parties in the performance of the Contract. In Change Order No. 1, Rev 2, signed by both parties, they agreed to extend the term for bringing in the vessels, and PEP agreed to pay the Contactor for any "fair, reasonable and duly proven costs" it might have incurred. It should be emphasized that the terms used in this Change Order are identical to those used in the first paragraph of Clause 10.2.1 of the Contract. Therefore, there is no doubt that the parties understood that what was agreed in the Contract in the event of a delay in bringing in the vessels, was that PEP would reimburse the actual costs incurred by the Contractor, and not that the latter would be entitled to collect down-time charges.

[15] Article 65.- The performance of the work contracted for shall commence on the indicated date, and for such purpose, the contracting agency or entity shall, in a timely manner, make the property where the work will be performed available to the contractor. Failure to do so by the agency or entity will result in an extension, for a time period equivalent to the delay, of the date originally agreed for the completion of the work.

111. Furthermore, given that this provision provides for the case of lack of access to the work site, and Articles 71[16] and 72[17], Paragraph I of the LAOP provide for the case of suspension of work activities, it is clear that said legal distinctions nullify the Arbitration Tribunal's decision to apply the legal effects of Clause 10 of the Contract, which provides for the suspension of work, to the case of delays in the commencement of the work. This analogy does not apply in matters of public spending, and even less so when these situations are regulated by law.

112.- These provisions also show that Clause 10 of the Contract encompasses the provisions of Articles 71 and 72, Section I of the LAOP, and that Clause 10 of the Contract does **not** include those of Article 65 of the LAOP, and that in general, the Contract does not contain a provision on payment for delays in the commencement of work. Furthermore, this allows us to conclude that if compensation for this item was not agreed to in the contract, and Article 65 of the LAOP does not provide for this event, it is clear that the payment order has no legal or contractual basis.

---

[16] Article 71.- Agencies and entities may temporarily suspend the contracted work, in whole or in part, for any valid reason. The directors of the agencies and managing boards of the entities shall designate public servants who will be authorized to order said suspension.

[17] Article 72.- In the suspension, administrative rescission or early termination of Public Works Contracts, the following shall be observed: I. When suspension of work is decided or the contract is rescinded for reasons attributable to an agency or entity, the latter shall pay for the work performed, and any unrecoverable costs, provided such costs are reasonable, duly evidenced and are directly related to the contract in question;

113.- PEP agreed from the time of the bidding process to pay for down time pursuant to the Contract, and the terms of the Contract are clear: suspension of work performed with vessels would incur down-time charges provided that the vessels were operating. If the vessels were not operating, there is clearly no payment obligation, because a delay in placing said vessels into service only gives rise to an extension of the work completion date.

114.- **The cost is not duly proven**, given that the document pursuant to which the Arbitration Tribunal established the cost, is a proposal by COMMISA to minimize damages (see paragraphs 180, 181, 182 and 183, Pages 46 and 47 of the Final Award). That is, it is a proposal from COMMISA dated March 15, 1999, proposing a charge for the down time of the vessels due to the delay in the commencement of work, which is attached hereto as evidence.

115.- Therefore, it is clear that a charge is not an incurred cost (amounts actually paid), but rather, a proposal for a price to be paid during the period of the delay. The date of the document itself is clear evidence that it is not an incurred cost, because it is dated before the conclusion of the initial delay. The document is dated March 15, 1999, and the work with Castoro 10 began on August 10, 1999, five months later, and the work with

Bar Protector began on March 3, 2000, nearly a year later, as shown in Paragraph 152 of the Final Award. Furthermore, COMMISA describes its proposal in the above-mentioned document as follows:

> 1. Probable Reserve Costs if the construction vessels are mobilized....
> 2. Order of Magnitude of Estimated Costs for postponing the offshore work to August 5, 1999.

Thus, a simple reading of the document dated March 15, 1999, shows that they were probable or estimated costs (not incurred costs). Furthermore, these were the costs that would arise if the vessels were mobilized on that date, which did not occur (see Paragraph 166 of the Final Award). Therefore, the cost is conditional upon said mobilization, not for having the vessels immobile.

116.- COMMISA never produced invoices or any other pertinent document to confirm that payments were actually made for the leasing of ships, mobilization or demobilization, etc.; these invoices were the proof that COMMISA would have had to produce to evidence the cost that was actually incurred. By contrast, it was proven in the arbitration proceeding that COMMISA never made a payment for the leasing of ships to

EMC, the subcontractor and owner of the vessels (see Paragraph 180[18], Pages 46 and 47 of the Final Award), which means that the sublease Contract is not a valid means of proof either. In fact, COMMISA never even produced the agreement for said transaction, and the Tribunal never requested it, but did request other additional documents and information it did not use in deciding the dispute.

117.- Unrecoverable costs were not incurred, and in order to conclude that they did, one would have to understand the meaning of "unrecoverable cost". The Arbitration Tribunal never examined this concept: <u>The Arbitration Tribunal ordered the payment of unrecoverable costs when it doesn't know what unrecoverable costs are</u>.

118.- The definition of unrecoverable costs set forth in Clause 10.1.2 of the Contract is general and not limitative, and thus was susceptible to abuse by the Contractor. Nevertheless, in the OP-5 regulatory standards, the Office of the Comptroller General (SECODAM), now the Ministry of Public Administration (SFP)[19], defined, in the exercise of the authority conferred upon it by Article 8 of the LAOP, what these costs were in the case of suspension of work:

---

[18] "...The Plaintiff has acknowledged that this amount was not paid directly to EMC, but was discharged as a result of a Settlement Agreement entered into on September 30, 2004 by COMMISA, EMC and their respective parent companies (Halliburton Brown & Root Limited and European Marine Investments Limited).

[19] Available at the following website: http://200.34.175.29:8080/wb3/wb/SFP/op_deroga06.

Case 1:08-cv-00469-RWR    Document 13-3    Filed 06/24/2008    Page 45 of 51

1.  *Lease of inactive equipment, or if more economical, freights to remove and return such equipment to the work site;*
2.  *Guards and maintenance and surveillance personnel for the facilities and works assigned during the work suspension period;*
3.  *Project administration costs relating to fees, wages and compensation for mandatory technical and administrative personnel having a specific function during the suspension period;*
4.  *Cost of maintenance and lease, if applicable, of offices and other site facilities.*

119.- This criteria was in effect during the performance of the Works and in connection with the Government Procurement and Public Works Act, which is applicable to the Contract. Subsequently, the Regulations of the Public Works and Related Services Law, in Article 116, adopted provisions on unrecoverable costs, with the following definitions:

> "**Article 116**.- *In the event of suspension of work, the payment of unrecoverable costs shall be limited to the following:*
> *I. Lease of equipment, or if more economical, freights to remove and return such equipment to the work site;*
> *II. Up to two percent of the direct costs for scheduled work items which were not performed during the suspension period. In no case may the amount applied be greater than the amount determined by the contractor for indirect costs of the central offices in its proposal;*

94

*III. Guards and maintenance and surveillance personnel for the facilities and works assigned during the work suspension period;*

*IV. Project administration costs relating to fees, wages and compensation for mandatory technical and administrative personnel having a specific function during the suspension period;*

*V. Mandatory labor personnel that has a specific function during the suspension period and has not been transferred to another work site;*

*VI. Cost of maintenance and lease, if applicable, of offices and other site facilities, and*

*VII. If applicable, the cost required to extend the period of the bonds.*

*Calculation of these costs shall be based on the schedules and costs originally proposed by the contractor, applying the last percentage adjustment approved prior to the suspension."*

120.- In examining this concept of unrecoverable costs, we can see that PEP was not required to pay for the leasing of the vessels if more economic options were available, such as returning the vessels to their original location or leaving them where they were, **which is what occurred**.

121.- The document dated March 15 ,1999, and cited by the Arbitration Tribunal as the basis for its assessment of the non-existent damages, does not calculate the cost according to this regulatory provision. Therefore, COMMISA was not claiming Unrecoverable Costs, or if it was, such claim was clearly made outside of the definition of what could be claimed as unrecoverable costs.

95

122.- In conclusion, COMMISA was never actually entitled to the payment obligation alleged, and much less did it prove the amount of the expense incurred, as required by the Regulations of the Law on Budget, Accounting and Federal Public Spending, which is applicable to this case because it was in force during the term of the Public Works Contract, and establishes the rights and obligations assumed by the parties. The payment involves a public rather than individual interest, as it is a disbursement of federal funds or implementation of public spending, governed by principles arising directly from the Mexican Constitution, and therefore a determination of the validity of such payment should **NOT** be made based on principles of civil law, such as by analogy or majority opinion, because these would be unfounded or unbudgeted payments (Article 126 of the Constitution). The interest to be satisfied is the public interest, and not the individual interest of COMMISA.

The following judicial opinion supports this argument:

> **ADMINISTRATIVE CONTRACTS, ARE DISTINGUISHED BY THEIR PUBLIC POLICY OBJECTIVE AND BY THE EXORBITANT CIVIL LAW SYSTEM TO WHICH THEY ARE SUBJECT[20].**
> The administrative nature of a contract entered into between a state agency and an individual can be accurately determined

---

[20] Record No.: 189,995. Excerpt from Court Opinion. Matter(s): Administrative, Civil. Ninth Series. Instance: Plenary. Source: Supreme Court Reports and Gazette. XIII, April, 2001 Opinion: P.IX/2001 Page: 324.

<u>from the public policy objective it seeks to achieve, also identified</u> <u>as public interest or social interest, as well as the exorbitant civil</u> <u>law system to which they are subject.</u> From the foregoing, it is inferred that contracts entered into between state agencies and individuals are governed by private law when their purpose is not closely and essentially tied to the performance of the public functions of the State, and therefore, the fulfillment of social needs is not affected because in such acts, the State does not utilize the means it is authorized to use by its special system. On the other hand, when the purpose or objective of the contract is closely tied to the performance of state functions, such that the fulfillment of social needs is not indifferent to the manner in which contractual obligations are performed, then it is an administrative contract, which may contain exorbitant clauses which, from a private law perspective, could be null and void, but are valid in the administrative field, in accordance with the need to ensure the regular and ongoing operation of the public service.

Ordinary federal civil action 1/2000. Jesús Guillermo Puente Cutiño. February 20, 2001. Unanimous, ten votes. Absent: Genaro David Góngora Pimentel. Reporting Judge: Juan Díaz Romero. Clerk: Silverio Rodriguez Carrillo.

The Full Court, in a private session held today, March twenty-ninth of this year approved, with No. IX/2001, the foregoing excerpt of court opinion; and determined that the vote is appropriate to establish a court precedent. Mexico, Federal District, March twenty-ninth, two thousand one.

123.- Therefore, both the analysis regarding the assessment of this dispute and the order against PEP are illegal and contrary to public policy, and in view of these facts, the court must enter an order vacating the arbitration award.

## SECOND

124.- The decision of the Arbitration Tribunal to admit COMMISA's claim set forth in so-called "Technical Disputes" 34 and 35, entitled *"Down time due to delays in commencing the Castoro 10 and Bar Protector jobs",* and ordering PEP to pay COMMISA an amount of USD $13,923,014.00 is null and void, because it refers to a dispute that is not provided for in the arbitration agreement or contains decisions that exceed the terms of the arbitration agreement, the grounds for vacation set forth in Article 1457, Section I, Paragraph c) of the Commercial Code.

124.- In the arbitration proceeding and Final Award, the Arbitration Tribunal and the parties addressed three distinct claims or causes of action, as explained in the previous section: i) down-time costs or charges (reserve fees); ii) unrecoverable costs; and iii) damages and losses.

125.- Down-time costs or charges (reserve fees) are provided for in the final paragraph of Clause 10.1.2 and are defined as follows:

> *"In the event that the Works are suspended for reasons attributable to PEP during the period in which the vessel(s) are operating, PEP shall pay the Contractor only for the*

> *Down-Time Charges (Reserve - Code Nos. 10-01, 10-02, 10-03, 10-04 and 10-5) which are applicable, according to the provisions of Appendix "C' of this Contract, with the understanding that this does not include the payment of unrecoverable costs".*

126.- Unrecoverable costs are defined in the first and second paragraphs of Clause 10.1.2 of the Contract, as follows:

> *"In the event of suspension of the Works pursuant to the provisions of Clause 10.1, PEP shall pay the Contractor, **at the latter's request,** for the work performed and any unrecoverable costs that the Contractor may have incurred, provided that, in the opinion of PEP, such costs are reasonable, duly proven and directly related to this Contract."*

This definition is taken from Article 72, Section I of the LAOP, which provides:

> *Article 72.- In the suspension, administrative rescission or early termination of public works contracts, the following shall be observed:*
> *I. When suspension of work is decided or the contract is rescinded for reasons attributable to an agency or entity, the latter shall pay for the work performed, and any unrecoverable costs, provided such costs are reasonable, duly evidenced and*

*are directly related to the contract in question;....."*

The definition of unrecoverable costs contained in the LAOP is stated in a general and not limitative manner, and was therefore susceptible to absurd claims by Contractors. For this reason, the SECODAM issued an administrative interpretation of said legal provision, in accordance with Article 8 of the LAOP[21].

The OP-5 regulatory standards of the Office of the Comptroller General (SECODAM), now the Ministry of Public Administration (SFP)[22], in relation to Article 72 of the LAOP, defines what these costs are in the case of suspension of work:

1. *Lease of inactive equipment, or if more economical, freights to remove and return such equipment to the work site;*
2. *Guards and maintenance and surveillance personnel for the facilities and works assigned during the work suspension period;*
3. *Project administration costs relating to fees, wages and compensation for mandatory technical and administrative personnel having a specific function*

---

[21] Article 8.- The Ministry, the Office of the Comptroller General and the Ministry of Commerce and Industrial Development, in the scope of their respective jurisdictions, shall be authorized to interpret this Law for administrative purposes. The Ministry and the Office of the Comptroller General shall issue any administrative provisions that are required for proper compliance with this Law, taking into account the opinion of the other ministry and, when applicable, of the Ministry of Commerce and Industrial Development. Said provisions shall be published in the Official Gazette of Mexico.

[22] Available at the following website: http://200.34.175.29:8080/wb3/wb/SFP/op_deroga06.

# EXHIBIT 1 (PART 3)

*during the suspension period;*

4. *Cost of maintenance and lease, if applicable, of offices and other site facilities.*

Subsequently, the Public Works and Related Services Law, in Article 116, adopted provisions on unrecoverable costs, with the following definitions:

> *"Article 116.- In the event of suspension of work, the payment of unrecoverable costs shall be limited to the following:*

I. *Lease of equipment, or if more economical, freights to remove and return such equipment to the work site;*

II. *Up to two percent of the direct costs for scheduled work items which were not performed during the suspension period. In no case may the amount applied be greater than the amount determined by the contractor for indirect costs of the central offices in its proposal;*

III. *The guards and maintenance and surveillance personnel for the facilities and works assigned during the work suspension period;*

IV. *Project administration costs relating to fees, wages and compensation for mandatory technical and administrative personnel having a specific function during the suspension period;*

V. *Mandatory labor personnel that has a specific function during the suspension period and has not been transferred to another work site;*

VI. *Cost of maintenance and lease, if applicable, of offices and other site facilities, and*

101

> **VII.**    *If applicable, the cost required to extend the period of the bonds.*
> *Calculation of these costs shall be based on the schedules and*
> *costs originally proposed by the contractor, applying the last*
> *percentage adjustment approved prior to the suspension."*

127.- It is important to note that the Arbitration Tribunal erroneously determined, without basis, that unrecoverable costs were produced when the start or continuation of the work was delayed, (Paragraph 168, Page 44 of the Final Award), which is untrue, as shown in Part One of this section, where it was explained that a delay in the commencement of the work is compensated only with a postponement of the work end date. Furthermore, the foregoing is corroborated by the first line of Paragraph One of Clause 10.1.2 of the Contract, which provides: "*In the event that the* **works** *are suspended....*"

128.- Compensation for damages is a general requirement whereby a person receives financial compensation for any harm to their assets, or for having been deprived of a legitimate profit.

129.- Pursuant to Articles 1910, 1915 and 1934 of the Federal Civil Code, compensatory action is an action based on civil laws, and not on the Contract or the LAOP.

130.- The above shows that the contract and law clearly distinguish between the concepts of "down-time charge", "unrecoverable cost" and "compensation".

131.- COMMISA's cause of action in this case, transcribed in Paragraph 80, Page 23 of the Final Award, regarding Disputes 34 and 35, was the following:

> *"Based on the foregoing claims, Commisa is suing for compensation of approximately US$81 million dollars. Said amount is calculated in accordance with Contract EPC-28. In the event that, for any reason, the Arbitration Tribunal were to decide that the costs or charges for down or reserve time stipulated in Contract EPC-28 are not applicable for the purpose of calculating compensation for such delays, Commisa is respectfully requesting that the Tribunal enter an award ordering* **PEP to pay compensation that is sufficient to compensate Commisa for the damages and losses suffered as a result of the delays experienced beforehand.** *For such purposes, Commisa estimates that said damages and losses amount to approximately US$81 million dollars…"*

In other words, COMMISA was claiming:

i)      Payment of the Down-Time Costs or Charges or Reserve Fees established in the Contract for Project IPC-28, and in the event that said charges were not applicable,

ii)    Payment of compensation for damages and losses.

132.- The Arbitration Tribunal denied the claim for payment of down-time charges or reserve costs, as stated in Sections 165, 166 and 1667, Page 44 of the Final Award. Thus, the compensatory action was only issue left for the Arbitration Tribunal to examine.

133.- However, the Arbitration Tribunal never considered the compensatory action in the Final Award, but instead ruled on the basis of unrecoverable costs, as shown in Paragraphs 168 - 183, Pages 44 - 47, of the Final Award, a matter which was not a subject of the arbitration.

In fact, **COMMISA never asked to be reimbursed for unrecoverable costs, which was a mandatory requirement for such costs to be granted, pursuant to the first paragraph of Clause 10.1.2 of the Contract**, and Article 19 of the ICC Arbitration Rules.

134.- The Arbitration Tribunal, by deciding complaints or matters that were not the subject of arbitration, exceeded its functions and grossly violated the arbitration procedure agreed by the parties, thereby rendering the arbitration award null and void pursuant to the provisions of Article 1457, Section I, Paragraph d) of the Commercial Code.

135.- In Clause 23.2 of the Contract, which is the arbitration agreement entered into between the parties, it was agreed that the arbitration would be conducted in accordance with the Arbitration Rules issued by the ICC. Article 19 of the ICC arbitration rules stipulates that:

> *"After the Terms of Reference have been signed or approved by the Court, no party shall make new claims or counterclaims which fall outside the limits of the Terms of Reference, unless it has been authorized to do so by the Arbitration Tribunal, which shall consider the nature of such new claims or counterclaims, the stage of the arbitration and other relevant circumstances."*

136.- The Arbitration Tribunal introduced new claims into the proceedings on its own initiative, with no request from the parties and without specifically indicating that they were new claims, in bad faith and to the benefit of COMMISA. The arbitration award is also null and void for this reason.

137.- Furthermore, in Procedural Order No. 6 (Letter "A 39" dated December 13, 2006) issued by the Arbitration Tribunal, it ordered proceedings for the introduction of additional evidence pursuant to Article 20.5 of the ICC Arbitration Rules. The Arbitration Tribunal asked the parties to respond to the following questions concerning Part 2 of Disputes 34 and 35:

*"What direct costs were caused to the Claimant as a result of the delay in starting the Bar Protector and Castoro 10 jobs?*

*Specifically, what amounts were paid to EMC[23] as compensation for the delays?*

*Has this directly given rise to other costs?"*

138.- PEP did not doubt the good faith of the Arbitration Tribunal initially, because these questions appeared to be related to COMMISA's claim for compensation of damages. Furthermore, when COMMISA responded to the Tribunal's request in Letter C 44, attached hereto as evidence, it specifically stated that the only costs it was seeking were the down-time charges agreed to in the third paragraph of Article 10.1.2 of the Contract (not the direct costs, amounts paid to EMC, or indirect costs), a request which the Arbitration Tribunal ultimately determined to be unfounded (Paragraphs 166 and 172 of the Final Award).

139.- Despite the parties' response to the request of the Arbitration Tribunal, the Arbitration Tribunal, through Letter "A 49" of July 31, 2007, once again requested additional evidence from the parties with regard to the following:

---

[23] EMC is the subcontractor and owner of the vessels.

*2. At this time, the Arbitration Tribunal needs to request additional information on a specific issue concerning Technical Disputes 34 and 35 in order to finish drafting the award. We need to determine, within the cost of leasing for the Castoro 10 and Bar Protector vessels:*

*(i)     what is a **fair and reasonable rate** to be reimbursed for the postponement in the start of the work and*

*(ii)    what amount has Commisa actually paid to EMC....*

*4. The Arbitration Tribunal asks that COMMISA submit, by August 10, 2007, claims and any evidence it deems necessary in order to show:*

*(i)     that the indicated charges represent, within the framework of the leasing, a **fair and reasonable cost** for the postponement of the start of the work schedule, and*

*(ii)    that the indicated charges were actually incurred and paid by Commisa.*

140.- Based on the case records and account rendered by my client, we can see that COMMISA never petitioned for payment of fair and reasonable costs or charges, a fact which COMMISA even acknowledged in its response to the request for additional evidence. At that time, PEP was still unaware of the Tribunal's intentions.

141.- In order to clarify COMMISA's position on the matter in question, and which leaves no doubt as to the nature of its claim, below is a transcription of COMMISA's response to

Letter "A 49" of the Arbitration Tribunal:

> "...Commisa is surprised and concerned by the Arbitration Tribunal's post-hearing request for this information, which was never mentioned by PEP in its filings and is not relevant to the issues raised in Technical Disputes 34 and 35. Commisa respectfully asks the Arbitration Tribunal to clarify its reasons for requesting said information regarding the amounts Commisa paid to EMC for the vessels during the down-time claimed in Technical Disputes 34 and 35. Commisa is requesting said clarification because it was fully explained in the filings and the hearing for this case (and there is no real dispute), that, pursuant to Contract EPC-28, the amounts paid by Commisa to EMC are completely irrelevant to Commisa's claims for down-time in Technical Disputes 34 and 35.
>
> Contract PC-28, which was prepared by PEP, contains specific unit charges referred to as "down-time charges" for Castoro 10 and Bar Protector.
>
> Contract EPC-28 stipulates that said charges would be paid by PEP to Commisa under the heading of a type of additional work defined as "down-time". Among other things, Appendix C of Contract EPC-28 stipulates that PEP would pay Commisa down-time charges for any period during which Commisa's vessels were on stand-by due to lack of access to the work [site] during the term of Contract EPC-28. Payments made by Commisa to EMC are irrelevant to determining whether PEP owes Commisa down-time costs for the down time claimed in Technical Disputes 34 and 35. In fact, during the term of Contract EPC-28, PEP

108

*accepted and paid for other down-time periods at the down-time rates agreed to in Contract EPC-28 and never stated that the down times paid by Commisa to EMC were connected in any way to that obligation. As stated previously, Technical Disputes 34 and 35 are only seeking payment of the down-time charges agreed to in Contract EPC-28 (reduced to take into account the mitigation efforts by Commisa) for the down-time experienced by Commisa at the start of Contract EPC-28.*

*Technical Disputes 34 and 35 are not based on the amounts paid by Commisa under its subcontract with EM [sic].*

*In view of the foregoing, Commisa respectfully asks the Arbitration Tribunal to clarify to the parties the basis for its request for Commisa to provide information regarding the amounts Commisa paid to EMC for the down time claimed in Technical Disputes 34 and 35."*

142.- Up until the award was issued, PEP understood that what the Arbitration Tribunal was seeking in Letter "A 49" (Paragraphs 168,169 and 170), and what the Tribunal was referring to with the unrecoverable costs mentioned in the second paragraph of Clause 10.1.2 of the Contract, and in Change Order No. 1 Rev. 2 (compensation that was not claimed by COMMISA). The Arbitration Tribunal never informed the parties that this involved a new claim, or invited the parties to discuss its admissibility, but only requested that COMMISA provide evidence substantiating the amount thereof and that PEP disprove the amount proposed by COMMISA, thereby acting reticently and in bad faith.

143.-Thus, on its own initiative and without the consent of the parties, particularly PEP, the Arbitration Tribunal introduced new claims under the pretense of additional evidence, in violation of the Rules of Arbitration of the ICC (Article 19), the contract (Clause 10.1.2, second paragraph) and the impartiality of the judge, by considering the interest of COMMISA above all other matters.

144.- Both PEP and COMMISA objected to the Tribunals' Letter "A 49", whereby it ordered the production of additional evidence under the terms specified above.

145.- The Arbitration Tribunal responded in Letter "A 50" of August 6, 2007, wherein it stated that it lacked relevant information that was needed for its deliberations prior to issuing the final award.

146.- For its part, PEP, in Letter "R 39" of August 7, 2007, objected to the additional evidence ordered in Letter "A 49" of July 31, 2007, arguing that the Arbitration Tribunal exceeded the limits of Article 20.5 of the ICC Rules of Arbitration, regarding additional evidence for clarification purposes, and violated the rules of a proceeding conducted strictly in accordance with the law (Section I, Paragraphs 1 and 8), as well as the

principle of equality of the parties, and left PEP without a proper defense. In Paragraph III of Letter R 39, PEP also objected to the document dated March, 15 1999, referred to in Part One of this section.

147.- In Letter "A 51", the Arbitration Tribunal referred to the award in response to PEP's objections, citing Paragraphs 184 - 189 of the Final Award, asserting that it had not exceeded its authority and did not violate Article 1432 of the Mexican Commercial Code, because it involved a claim by COMMISA, set forth in Section C (c) in relation to the *Claims and Petitions of the Complainant* in the Terms of Reference, and was also listed in *Matters in Dispute to be Resolved*, contained in Section D of the same document.

148.- However, in none of these sections is reference made to the concepts of fair and reasonable costs or unrecoverable costs. A reading of the Terms of Reference, which is submitted as evidence, only shows that COMMISA requested payment of the down-time charges agreed to in the contract for suspension of the work performed with vessels, or payment of said charges under the heading of compensation for damages. Thus, the

lack of basis and grounds for the award is evidenced by a simple reading of the Terms of Reference.

149.- There can be no question that the award contradicts common sense, since COMMISA itself acknowledged that it was not seeking payment of fair and reasonable costs or unrecoverable costs. If, in contrary to the clear text of COMMISA's request, and its own explanation of the terms of its request, the Tribunal decides that COMMISA's intentions were otherwise, it is clear that this is an irrational and absurd decision that lacks grounds and basis and was not issued in strict application of the law, but rather arbitrarily, based on principles of equity.

Vacation of the arbitration award is also warranted for this reason.

150.- Furthermore, the Arbitration Tribunal determined that it did not violate the principle of equality of the parties in Paragraphs 192 - 194 of the Final Award, based solely on the fact that it had granted PEP the right to reply and produce evidence in that regard. This is an illegitimate argument by the Arbitration Tribunal, given that, on the one hand, it is clear that the Tribunal in this case corrected the deficiency or amended the pleadings of COMMISA, although it was not authorized to do so by the Arbitration Rules, the parties or sound judgment, taking into account the equality of the parties to the proceeding, as COMMISA is a Mexican company and subsidiary of Halliburton, one of the largest

construction firms in the world; and on the other hand, the Tribunal never informed PEP that the matter involved a new complaint or an amendment of COMMISA's complaint.

151. - In Paragraphs 195 - 198 of the Final Award, the Arbitration Tribunal determined that its conduct had not left PEP without a defense because it had been afforded the opportunity to present arguments and evidence against COMMISA's claim for damages. This assertion of the Arbitration Tribunal is entirely devoid of legal basis, given that the matter in dispute established as of the Terms of Reference for the arbitration proceeding was to determine whether the payment of down-time charges or compensation for damages were warranted, and PEP objected to COMMISA's claims as alleged; thus, if the Arbitration Tribunal ruled on a matter other than the matter submitted, we have an excess of the authority conferred on the Arbitration Tribunal by the parties, and an inconsistency in the award, given that it is clear that the Arbitration Tribunal acted on its own initiative and without the knowledge of PEP.

152.- The Arbitration Tribunal cannot argue that the proceedings for the introduction of additional evidence were sufficient to safeguard the interest of PEP, **because what would truly safeguard the interest of PEP is a properly conducted proceeding on new claims, and not a simple proceeding to introduce new evidence**.

153.- Observance of due process is provided as grounds for vacation in Article 1457, Section I, Part b) of the Commercial Code, where it states that any event which impedes one or more of the parties, as in this case, "from asserting their rights" is grounds for vacation; but in addition, it is a requirement of public policy set forth in Article 14 of the Constitution which specifically protects the right to a hearing and the essential formalities of the proceeding.

154.- Furthermore, the incongruity of the award, in ruling on claims not submitted by the parties, violates the parties' agreement on the arbitration proceeding, by failing to adhere to Article 19 of the ICC Arbitration Rules, and thereby incurring in the grounds for vacation provided for in Section I, Part d) of Article 1457 of the Commercial Code.

155.- Thus, the analysis and decision of the Arbitration Tribunal as to the assessment of this dispute is also illegal and contrary to public policy, thereby rendering the arbitration award null and void.

<u>THIRD</u>

156.- The award issued by the Arbitration Tribunal, granting the claim of COMMISA set forth in so-called Technical Disputes 34 and 35, entitled "*Down time due to delays in*

114

*starting the work of Castoro 10 and Bar Protector"*, and ordering PEP to pay an amount of USD $13,923,014.00 is null and void, as shown in the following statements of fact.

157.- The assertions made by the Arbitration Tribunal, appearing in Section VII.1 of the Award on Pages 36 - 50, show that its decision constitutes grounds for vacation, as set forth in Article 1457, Section I, Part c) of the Commercial Code, which provides that an Award may be vacated when it *"...refers to a dispute that is not provided for in the arbitration agreement or contains decisions that exceed the terms of the arbitration agreement."*

158.- Clause 23.2 of the Contract entered into by the parties stipulates that COMMISA does not have the right to claim and that PEP is not liable to the contractor or subcontractor for any legal or contractual damages that are not specifically provided for in the Contract. That is, pursuant to the contract, the liability of PEP was limited to the agreements made therein, thereby excluding the payment of any compensation provided for in the laws.

159.- In the scope of the arbitration agreement, said contract provision stipulated that any claim, controversy or dispute for damages which was not specifically provided for

in the Contract, could not be considered a Technical Dispute, that is, a dispute related or connected to the contract.

160.- Furthermore, it was also agreed that before the parties could request settlement of a dispute through arbitration, they would first have to resort to a prior dispute resolution mechanism. In other words, any claim for damages that was not provided for in the contract could not be considered a controversy or dispute in connection with the enforcement or performance of the contract, or the non-performance thereof.

161.- The final part of Clause 23.3 of the Contract stipulated that only if the parties were unable to reach an agreement through the formalization of a Technical Dispute could they then submit the matter to arbitration. That is, any compensation that was not provided for in the contract could not be the subject of arbitration unless it was first claimed or debated in a technical dispute.

162.- In short, Clause 23.2 of the Contract stipulates in which cases and under what circumstances the parties may resort to arbitration: that is, if the claim is not for contractual compensation, not only is payment of such compensation not allowed, but cannot be the subject of arbitration either.

116

163.- Given that the financial compensation granted by the Arbitration Tribunal for delays in the commencement of the Castoro 10 and Bar Protector jobs, in the erroneously termed "Technical Disputes 34 and 35" were not provided for in the Contract, in no way can these compensations or payments be the subject of a dispute or claim, nor can they be subject to arbitration, and by deciding said disputes in favor of COMMISA, the Arbitration Tribunal violated the arbitration agreement set forth in Clause 23.3 of the Contract, which states that a dispute or controversy.may only be submitted to arbitration if it had first been formally submitted to the Technical Dispute procedure described in Clause 23.2, or more accurately stated, if the compensation was not provided for in the contract, then the contractor does not have the right to bring any claim in relation thereto, and the Arbitration Tribunal may not even consider whether the Contractor has the right to collect payment, nor may it grant such compensation in the award.

164.- This matter goes to the merits of the case, and is clearly related to contractual provisions established to prevent COMMISA from bringing unfounded claims that are not provided for in the Contract. It is also important to note, Your Honor, that the Arbitration Tribunal has no basis for asserting, in Paragraphs 103, 104 and 105 of the Final Award, that COMMISA's claims are related to the contract because they are based on

contractual events when no penalty was stipulated in the contract for such events, because what COMMISA was in fact seeking was monetary payment of an obligation.

165.- In the two preceding paragraphs (first and second) of this section, we have shown that the contract did not contain any agreements for financial compensation in the event of delays in the commencement of the work due to lack of access to the platforms, or for delays in placing the vessels into service, and it has also been demonstrated in this section that COMMISA did not have the right to claim legal damages; in view of these facts, it is clear that the Arbitration Tribunal violated the arbitration agreement and ruled on matters that the parties had not agreed could be subject to resolution by arbitration, and therefore the award was issued in violation of Article 1457, Section I, Part c) of the Commercial Code.

166. In view of the foregoing, any analysis and decision by the arbitration tribunal as to the admissibility and assessment of this dispute is illegal and contrary to public policy, and therefore the arbitration award is void.

## **FOURTH**

167.- The decision of the Arbitration Tribunal, granting COMMISA's claim set forth in

Technical Disputes 34 and 35, entitled *"Down time due to delays in starting the work of Castoro 10 and Bar Protector"*, and ordering PEP to pay COMMISA an amount of USD $13,923,014.00 is null and void pursuant to the grounds provided in Article 1457, Section I, Part c) of the Commercial Code, which provides that an Award may be vacated when it *"…refers to a dispute that is not provided for in the arbitration agreement or contains decisions that exceed the terms of the arbitration agreement."*

168.- The Arbitration Tribunal violated prerequisites of admissibility, which prohibit consideration of this dispute as a subject of arbitration. Furthermore, the conduct of COMMISA during the arbitration proceeding has made it impossible to justify any payment in its favor, as required by Mexican public policy regulations.

169.- In the Contract entered into between PEP and COMMISA, it was agreed that only those disputes or claims that were previously formalized as Technical Disputes would be subject to arbitration. In fact, in Clauses 23.2 and 23.3 of the Contract, the parties agreed as follows:

> "23.2 **Technical Disputes.** *The Contractor waives the right to any claim and PEP shall not be liable to the Contractor, its secondary suppliers or subcontractors, for any legal (including negligence) or contractual damages, except in those cases specifically provided for in this Contract.*

119

*For the purposes of this Clause, Technical Dispute shall mean any disagreement between the Supervisor and the Contractor that arises out of any claim or is attributable to the interpretation or performance of this Contract, in connection with the Technical Appendices of the Contract (A, B, B-1, B-2, B-3, CEV, DT, DT-1, DT-2.1, DT-2.2, DT-3, DT-4, E-2, F-1, AND F-2)*

*If for any reason the Supervisor and the Contractor are unable to agree on a manner to resolve an adjustment claim arising out of a Technical Dispute, <u>the Contractor shall officially communicate said Technical Dispute in writing to the Supervisor and ask for the latter's opinion on resolving the matter. This type of request must be clearly identified by the Contractor, specifying that it involves a Technical Dispute subject to resolution pursuant to this Clause 23, and must contain a summary of the matters in dispute and the Contractor's proposal for resolution thereof.</u>*

*......................................................................................................*
*.............................................."*

"23.3 <u>**Arbitration**</u>. *Any controversy, claim, difference or dispute arising out of or in connection with this Contract, or the breach thereof, shall ultimately be decided by arbitration conducted in the Federal District of Mexico, in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce then in effect. The number of arbitrators shall be three, and the arbitration shall be conducted in the Spanish language.* **Without prejudice to the foregoing, all technical disputes must first be subject to the procedure provided for in Clause 23.2, and only in the event that the parties fail to reach an agreement after having submitted to such procedure shall they have recourse to the remedy provided for in Clause 23.3".**

170.- In accordance with the above-transcribed contract clauses, on the one hand, there are simple controversies, disputes or claims, and on the other, there are formal technical disputes that must be formally submitted in writing, **specifying in the document that it is a technical dispute** and providing the facts that give rise to the claim, and a proposal to resolve the same.

171.- These contractual agreements of extreme importance, since once a claim is formalized as a Technical Dispute, the dispute or claim in question then becomes the subject of arbitration, in accordance with the agreement signed by the parties.

172.- Likewise, only the act of formally filing a claim as a Technical Dispute can give rise to the procedure for obtaining a proof of claim document, pursuant to Article 44, Section III of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending, and Article 66, Section III of the Regulations of the Federal Law on Budget and Fiscal Responsibility, previously transcribed in the first part of this section. In other words, a payment obligation cannot be charged against the federal treasury unless there is a document that proves the validity of such payment.

173.- In this regard, the final part of the fourth paragraph and the beginning of the fifth paragraph of Clause 23.2 of the Contract state as follows:

> *"The foregoing is based on the understanding that any decision regarding a technical-contractual modification which implies or necessarily results in an increase in the Contract amount or the schedule established in Clauses 3.1 and 4.1, respectively, will require the prior written approval of the Project representative...... Once written acceptance of the supervisor's decision is received from the Contractor, the Contract shall be amended as appropriate and the decision shall be implemented."*

174.- Clause 5 of the Contract, entitled *"Modifications to the Contract"*, stipulates that *"The parties agree that for well-founded and explicit reasons, and **through the signing of an agreement**, PEP may modify the Contract in accordance with the provisions of Article 70 of the Government Procurement and Public Works Act."*

175.- The arbitration tribunal agreed to conduct the arbitration and issue the arbitration award pursuant to Mexican Federal Laws; it was, or should have been, familiar with said laws and ruled in accordance with the same, which it failed to do.

176.- In fact, as evidenced in the Arbitration proceeding, the claimant COMMISA submitted and formalized this dispute extemporaneously at a time when, pursuant to the

122

contract, it could no longer be accepted, and therefore could not be the subject of arbitration or validly considered.

177.- The Certificate of Full Acceptance of Physical Work dated August 30, 2002, attached hereto as evidence, shows that as of that date, COMMISA had not formally filed a technical dispute for obstructions (T.D. 19), payment of differences for down time for Castoro 10 work on platforms (T.D. 27), for delays in the commencement of work with vessels under the terms and conditions of the contract (T.D. 34 and 35), or for delays due to bad weather (T.D. 36). See also the Dissenting Vote of D. Darío U. Oscós, which forms an integral part of the Final Award.

178.- On Page 17 (Folio 1158) of the Certificate of Full Acceptance of Physical Work for Contract PEP-O-IT-136/98, dated August 30, 2007, there is a section entitled "CLAIMS BEING PREPARED BY COMMISA." These pending claims are divided into various sets, as described below:

Sets 1 - 5 refer to extraordinary claims relating to construction work involving

the removal of obstructions, which in the award were decided as Technical Dispute 19.

Set 7 refers to "Compensation for weather conditions" (Castoro 10 and Bar Protector), which in the award was decided as Technical Dispute 36.

**Set 13 contains the claim for "Delay in the commencement of construction due to unavailability of platforms" (Change Notice 23), which in the award were decided as  Technical Disputes 34 and 35; the claim for "Cost Variation for work on pipelines (top sides)", which in the award were decided as Technical Dispute 27.**

179.- It must be emphasized that the Certificate of Full Acceptance of Physical Work was signed by representatives of COMMISA, Engineers Juan Manuel Herrera and Nicolás Martínez Bocanegra, and representatives of PEP.  It is also important to note that the list of pending Claims or Technical Disputes, was à statement made by COMMISA, as shown in the paragraph appearing at the bottom of the list which reads, verbatim:

> "THE CONTRACTOR STATES THAT THIS CHART IS PENDING INCLUSION OF THE AMOUNTS FOR SOME PRICES (for example, in the claim for bad weather, that is, as of,

that date, COMMISA hadn't even specified a liquidated amount)
IN    CONNECTION    WITH    EXTRAORDINARY    WORK
PERFORMED, AND SEVERAL OTHER CLAIMS THAT ARE
CURRENTLY BEING PREPARED."

180.- The preclusion of COMMISA's right to submit its claims to arbitration goes hand in

hand with the preclusion of its right to demand payment from PEP of any amount of

money derived from such claims, in accordance with the following:

Appendix B, Section 5 of the Contract, entitled "Modifications", provides that "*any delay*

*by the contractor in giving notice or submitting the proposal referred to in the preceding*

*paragraph, shall be sufficient grounds to reject the claim if such delay is detrimental to*

*PEP and to the extent of such detriment. **In no case shall a claim by the Contractor***

***be considered if it is made subsequent to the Partial or Complete Acceptance**...*".

The fact is that COMMISA needed to formalize its Technical Dispute in a timely manner,

prior to the arbitration as a *sine qua non* condition, as stipulated in the arbitration

agreement contained in Clause 23.3 of the Public Works Contract. Otherwise, said

Technical Dispute could not be the subject of arbitration, which means that the

determinations of the Arbitration Tribunal refer to a dispute that is not provided for in the

125

Arbitration agreement, since only formal technical disputes can be the subject of arbitration, or they contain decisions that exceed the terms of the arbitration agreement, since the Arbitration Tribunal may only issue final decisions on technical disputes.

181.- In view of the foregoing, and given that the Arbitration Tribunal decided Technical Disputes 34 and 35, it is clear that it violated the arbitration agreement by failing to observe the admissibility requirements, or conditions to make the technical dispute the subject of the arbitration proceeding, according to Paragraph 199 of the Final Award.

Therefore, the award issued by the arbitration tribunal is void.

182.- There is no valid reason for the Arbitration Tribunal to have violated the contract provisions on Technical Disputes and Arbitration that were set forth in Clauses 23.3 and 23.3 of the Contract to prevent a simple claim from becoming the subject of arbitration. COMMISA's failure to observe the terms of the contract does not make its claim arbitratable; for that, it would have had to formally ask PEP to decide on the issue during the Contract term, which it never did, as we evidenced in the arbitration proceeding. In this regard, we ask the court to refer to the Dissenting Vote of D. Darío Oscós,

Paragraphs 34 – 38, Pages 12 and 13, which forms an integral part of the Final Award and which shows that the arbitrators knew of the Acceptance Certificate.

183.- The Arbitration between PEP and COMMISA is based on the law, and therefore the rights and authorities of the parties are determined based on legal or contractual provisions, which the arbitration tribunal failed to observe in this case. Furthermore, the parties and the arbitration tribunal are required to observe the principle of *pacta sunt servanda*, set forth in Article 1796 of the Federal Civil Code, which provides:

> **"Article 1796.-** *Contracts are formalized by consent alone, except for those which must comply with formalities provided by Law. Once they become formalized, the contracting parties are bound not only to the performance of the express agreements made therein, but also to any consequences which, according to their nature, are consistent with good faith, custom or the law".*

184.- Formalizing a dispute by contract is not the same as surmising or presuming a supposed right, as COMMISA did. The decision of the Arbitration Tribunal approved COMMISA's actions, in violation of the arbitration agreement. In other words, the arbitration tribunal allowed the performance of the contract, as it relates to compliance with terms of arbitration stipulated therein, to be subject to COMMISA's discretion,

which is expressly prohibited by Article 1797 of the Federal Civil Code.

> **Article 1797.-** *The validity and performance of contracts cannot be left to the discretion of one of the contracting parties."*

The principle set forth in Article 1797 transcribed above has an even greater significance in public works contracts, which are regulated by administrative law and which, by their very nature, limit the parties' discretion in the contracting process, and because they contain provisions of public policy which are derived directly from Articles 126 and 134 of the Constitution regarding public spending and public works.

185.- Furthermore, the Arbitration Tribunal has no authority whatsoever to modify or amend the contractual provisions entered into by PEP and COMMISA, ex aequo et bono or as amiable compositeur, given that such a stipulation would become void by operation of law because it would mean giving the Arbitration Tribunal powers to regulate matters of Mexican public interest, which are already provided for in Mexican public policy laws. That is why the Arbitration was to be decided in accordance with the law. That is, determining what obligations arise out of a public works contract is not a subject of arbitration, given that such authority is vested in the law and the Mexican government. Rather, the arbitration tribunal's sole task was to determine whether the claim

referred to a compensation provided for under the contract, and to proceed accordingly.

186.- In this regard, the Arbitration Tribunal was required, first and foremost, to apply Clauses 23.2 and 23.3 of the Contract in accordance with the text thereof, which it did not do. That is, it improperly applied Clauses 23.2 and 23.3 of the Contract, thereby exceeding the arbitration agreement.

187.- Furthermore, the application of a civil law is also a matter of public interest, as it is derived from the mandate of Article 14 of the Federal Political Constitution which, in its final paragraph, provides a constitutional right to due process of law, the preservation of which is a matter of Mexican public interest.

> *"Article 14.- ...In civil law proceedings, the final judgment must be by the letter of the law or in accordance with the legal interpretation of the law, and in the absence thereof, shall be based on general principles of law."*

188.- This argument also applies to the decision of the Arbitration Tribunal contained in Section VI of the Final Award, whereby it holds, in Paragraphs 105 and 129 of the Final Award, that it has jurisdiction to hear all disputes and claims brought by the Claimant,

asserting that all of the matters are related or linked to the Contract with regard to Project IPC-28, or constitute Technical Disputes pursuant to the terms of Contract.

For a better understanding of this argument, we ask that Your Honor refer to PEP's arguments challenging the decision of the arbitration tribunal wherein it holds that it has jurisdiction in the arbitration proceeding and to decide this matter, in order to avoid unnecessary repetition and in the interest judicial economy.

189.- In conclusion, the Arbitration Tribunal failed to comply with the procedure agreed upon by the parties, which was for the arbitration to be decided strictly according to law. In Clause 23.3 of the Contract, it was agreed that the arbitration proceeding would be conducted in accordance with the ICC Rules of Arbitration. Article 17.3 of the ICC Rules of Arbitration states that the law will be applied to the proceeding, unless the parties expressly instruct the Tribunal to assume the powers of amiable compositeur or decide ex aequo et bono.

Thus, the conduct of the Arbitration Tribunal constitutes grounds for vacation, as provided in Section I, Part d) of Article 1457 of the Commercial Code, because it seriously violated the arbitration procedure as described above. In view of the foregoing,

any analysis as to the admissibility and assessment of this dispute is also illegal and contrary to public policy.

III. Grounds for Vacating Award in relation to the Decision on Technical Disputes 37 and 39 regarding Crossings

190.- The arbitration award ordering PEP to pay COMMISA the full amount of compensation sought in the disputes concerning crossings (37 and 39) violates Mexican public policy provisions, which constitutes grounds for vacating the Final Award, in accordance with the provisions of Article 1457, Section II of the Commercial Code.

191.- In the Public Works Contract, which is the source of the dispute, the parties established jobs or work items referred to as crossings, and agreed that completion of these jobs to the satisfaction of PEP, in terms of specifications and projected quality, would give rise to payment of the unit prices agreed and set forth in Appendix "C" of the Contract. Nevertheless, .disregarding the above-described contractual relationship, the Arbitration Tribunal ordered PEP to make said payment despite the fact that it was not evidenced that the job had been performed and completed in accordance with the proposed work item.

All of the Arbitration Tribunal's considerations and decisions regarding this matter appear in Section VII. 3, Pages 60 – 70 of the Final Award.

131

•

192.- It has been established herein, on numerous occasions, that payment by PEP for work performed in public works projects constitutes use and management of public funds, pursuant to Article 1 of the Government Procurement and Public Works Act, Articles 1 and 2 of the Federal Law on Budget, Accounting and Federal Public Spending, and Article 39 of its Regulations, which means that it is a matter of public policy, in accordance with Articles 126 and 134 of the Federal Political Constitution.

Therefore, the conditions and requirements for payment of obligations assumed by virtue of or in connection with public works contracts, because they are charged against federal funds, are subject to public policy provisions pertaining to public law, and not commercial law, and therefore the study of the same goes beyond the private sphere and their interpretation must be more exact.

Thus, of these provisions, we can cite Article 44, Section I of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending, and Article 66, Section I of the Regulations of the Federal Law on Budget and Fiscal Responsibility, which stipulate, respectively, as follows:

132

*"Article 44.- Entities must ensure, under their own responsibility, that any payments they make against their approved budgets are made in accordance with the following requirements:*
*I. They must be made for obligations actually performed, with the exception of the advance payments provided for in the law and those mentioned;…".*

*"Article 66. Payments made against the Disbursement Budget shall be made by agencies through the Treasury. Payments by entities shall be made through their own treasury offices, for which they must keep the appropriate budgetary records on their own cash flows.*
*In making their disbursements, agencies shall also [ensure that]:*
*I.     They are made for obligations actually performed, with the exception of the advance payments provided for in applicable provisions…"*

**194.- As stated previously, the "obligation" that gives rise to the payment was not actually performed, that is, the work contracted for was not completed.**

The fact that the work was not performed as originally planned and agreed in the contract is a fact that was proven in the arbitration proceeding, as shown in the account of events set forth in the Arbitration Award itself. That is, COMMISA asked to perform the crossings work with a specification different from that originally agreed, which required fewer resources for the jobs to be performed. PEP approved these jobs because they were technically acceptable. See Section Vii. 3, Pages 60 – 70 of the Final

Award. However, the Arbitration Tribunal failed to take into account these new contractual conditions, which are essential to generating the payment in accordance with Mexican law on public spending and which are a matter of public policy, as explained below.

195.- The Public Works Contract that is the subject of the Arbitration is a unit price works contract pursuant to Article 57 of the Government Procurement and Public Works Act, which very clearly provides that the **total payment or compensation that must be made to the contractor shall be paid by work item unit completed.** In fact, the pertinent part of said article provides:

> *"Article 57.- For the purposes of this Law, there are two different types of public works contracts:*
>
> *I. On the basis of unit prices. In which case the total amount of* ***payment or compensation that must be made to the contractor shall be paid by work item unit completed,*** *or*

196.- The General Rules for the Procurement and Execution of Public Works, which are applicable to the legal relationship created by the Public Works Contract, provide a definition of unit price in Section 5 on guidelines for the integration of unit prices, as follows:

*'5.2.5 UNIT PRICE. Total amount per unit of measurement of each work item."*

197.- This legal provision was ratified in Clause 3.3. of the Contract, to the effect that payment would only be authorized upon conclusion of the work item agreed, as follows:

> *"3.3 Unit prices. The work covered under this Contract shall be paid on the basis of unit prices, as set forth in Appendix "C" of this Contract. Said work includes the total payment or compensation that must be paid to the Contractor for the work, under the headings of direct cost, indirect cost, financing and earnings, as well as the cost of additional obligations in favor of the Contractor stipulated herein. Said unit prices are fixed and only the direct costs comprising the same may be adjusted, in the cases and under the conditions provided in Clause 3.7 of this Contract".*

198.- The Arbitration Tribunal never understood the problem or matter in dispute and thus never ruled on it in accordance with Mexican Federal Law, despite the fact that it was accurately presented by PEP. That is, it was not a matter of determining whether the crossings were done by COMMISA or if they were accepted by PEP, but that the manner in which COMMISA did the crossings was not consistent with the work item originally agreed in the contract and pursuant to which the unit price agreed for completion of each work item was fixed.

135

This correlation between the unit price and the work item is established by law, as provided in Section 5.1.2 of the General Rules for the Procurement and Execution of Public Works, and in Clause 3.3 of the Contract cited above.

199.- Similarly, the Regulations of the Public Works Act, which are applicable to this dispute, provide:

> **"ARTICLE 31.-** *The proposal which bidders must deliver for the submission and opening thereof shall contain the following:*
>
> I.  *Bid bond and proposal commitment letter;*
> II. *Written statement confirming bidder is familiar with the work site;*
> III. ***Document listing work items, units of measurement, amounts of work, proposed unit prices and partial and total amounts of the proposal:***
> IV. *General information on the cost of materials to be placed at the work site, cost of labor and cost for use of construction machinery;*
> V. ***Analysis of unit prices of the requested items, broken down into direct costs, indirect costs, cost of financing the work and service charges. The procedure for analysis of unit prices may be by distribution of resources on scheduled dates or based on production per hour or shift.***
>
> *Direct costs shall include charges for materials, labor, tools, machinery and construction equipment.*

*Indirect costs shall be expressed as a percentage of the direct cost, and shall be itemized as costs for administration of central offices, of the works, and insurance and bonds.*

*The financing costs of the work shall be represented by a percentage of the sum of the direct and indirect costs; calculation of this cost shall take into account the expenses to be paid by the contractor in performing the work, the advance payments and estimates it will receive and the interest rate it will apply, with the corresponding analysis attached thereto.*

*The service charge shall be set by the contractor by applying a percentage on the total amount of the direct, indirect and financing costs;*

VI.     *Work schedules, use of construction equipment and machinery, purchase of materials and permanently installed equipment, as well as use of technical, administrative and service personnel to oversee the supervision and administration of the work, in the manner and under the terms requested, and*

VII.    *List of construction equipment and machinery, indicating whether the bidder is the owner, and physical location of the same.*

*Foreign bidders submitting proposals must certify that their proposals were prepared under the same conditions in terms of price, cost, financing, opportunity, and any other pertinent conditions, as those that would have been available to domestic bidders in preparing their proposals."*

200.- In accordance with the General Rules for the Procurement and Execution of Public Works, because a work item is defined as follows:

> "*5.2.3 WORK ITEM.* **Set of activities and materials** *which, in accordance with the respective forms and specifications, make up each of the parts in which the studies and projects, implementation and provision of equipment, commissioning, conservation or maintenance and supervision of the works are traditionally divided, for measurement and payment purposes*".

201.- Given that a work item is essentially a set of activities and materials, it is clear that the unit price refers to these costs.

Thus, the Arbitration Tribunal, without grounds or cause, determined that there is no legal basis for modifying the unit prices. In other words, if the set of activities and materials actually employed in the crossings work were those originally planned, then it would be correct to apply the unit prices of the Contract. If said activities and materials are not the same as those originally agreed, then what we have is a different type of work item, and application of the original prices is not appropriate, but rather, to establish extraordinary unit prices.

202.- The Arbitration Tribunal did not properly examine the matter, given that a crossing did not mean crossing one pipeline with another, but was the set of activities and materials that would be used in that work.

203.- Thus, PEP and COMMISA should have added and agreed upon extraordinary unit prices for the new jobs of COMMISA. Therefore, the payments already made by PEP constitute unnecessary or extra payments, which COMMISA is obligated to reimburse pursuant to the LAOP and the contract. Article 69 of the LAOP provides:

> *"Article 69.-*
>
> *If the contractor receives overpayment of any amount, it shall return the amount overpaid, plus applicable interest, at a rate equivalent to that established by the Federal Internal Revenue Law for extensions granted for payment of tax obligations. Charges shall be calculated based on the amount of overpayment in each case and will be computed by calendar days beginning on the date of payment until the amounts are actually made available to the government agency or entity".*

Clause 3.8.7 of the Contract, regarding overpayment, is also applicable to this case.

The payment offered by PEP was equivalent to the compensation resulting from both of the debts or outstanding amounts.

139

The foregoing applies to the crossings work claimed in Technical Dispute 37 before the Arbitration Tribunal, and also to the claims contained in Technical Dispute 39, in its entirety.

204.- There is no clearer example of the Arbitration Tribunal's violation of the public policy regulations cited above than the assertion made by the Tribunal in Paragraph 302, appearing on Page 70 of the Final Award, regarding crossings 1, 4 and 6 of IPC-27, wherein it determined that COMMISA's belief that it had the right to collect the payment provided for in the contract was valid, simply because PEP assigned it additional work with the crossings, while for the same reason, **it was PEP's expectation that COMMISA would perform the additional crossings work as originally stipulated in the contract, that is, that said work would include the activities and materials originally agreed upon, including, of course, the technical specifications provided at the very beginning.**

**This shows the bias of the Arbitration Tribunal, because it did not weigh the right of PEP against the right of COMMISA, but only examined the right of COMMISA.**

205.- Further evidence that reveals the lack of impartiality with which the Arbitration

140

Tribunal conducted itself in ruling on the crossings matter is seen in the following considerations set forth in Paragraphs 295 and 296 of the Award, which read, verbatim:

*'295. In February of 2000, during the performance of the work, the parties agreed that the separation in certain crossings could be reduced to 0.5 m., and that the impact this reduction (in the affected crossings, not the others) would have on the costs should be borne in mind.*

*The issue lies in determining exactly what impact decreasing the separation would have on the price. In Official Letter A39, the Tribunal asked the parties to calculate "approximately, the cost savings in dredging, in the number of sand bags and other supplies, in the man hours and machine operation that decreasing the separation between ducts from one meter to 0.5 meters would generate". In its response, COMMISA asserted that reducing the separation would not reduce the costs, but instead would require additional time and materials. For its part, PEP submitted a chart in which it specified an extraordinary unit price for each of the 19 crossings that, it alleged, had a distance of less than one meter. These extraordinary prices differ vastly from the unit prices agreed to in Appendix C of the Contract: in general, the portion of the extraordinary price given in PME is higher than the unit price, while exactly the opposite occurs with the portion given in USD.*

*296. <u>In conclusion,</u> given the conflicting positions of the parties, the Arbitration Tribunal has reached a decision based on additional information contained in the case records: which is an undisputed fact that, during the performance of the Contract, PEP paid 100% of the price of the crossings in which the separation was less than one meter. This fact appears to suggest that, during the performance phase the parties had*

*estimated that the crossings that had less than a meter of separation cost and were worth the same as the crossings with more separation distance. In view of this, the Arbitration Tribunal does not see any compelling reason why it should not extend the same rule to the rest of the crossings that have reduced separation, and has decided that all of the crossings, regardless of their separation, must be paid for at the unit prices agreed in the Contract.*"

206.- The Arbitration Tribunal's determination is contrary to law, because payment of an amount that is not owed gives rise to an obligation for the contractor to reimburse the amount overpaid, and does not, as the Arbitration Tribunal states, constitute an obligation for PEP to pay what it does not owe.

207.- It is also important to note that the above-cited text shows the Arbitration Tribunal never understood the dispute and therefore did not resolve it pursuant to Mexican law, since it wasn't a matter of reducing the savings COMMISA obtained in the performance of the work, but rather, involved establishing new prices for the crossings, in view of the fact that COMMISA performed the work with a specification and quality different than those originally agreed (Paragraph 258 of the Final Award).

208.- Regarding the same topic of inconsistency, the transcribed text does not reflect the actions of the Arbitration Tribunal during the proceeding, or its own determinations. In point of fact, in Official Letter A 39, with which it enclosed Procedural Order No. 6, the Arbitration Tribunal requested that PEP and COMMISA calculate the cost savings in

142

dredging, in the number of sand bags and other supplies, and in man hours and machine operation that decreasing the separation between ducts from one meter to 0.5 meters would generate, given that the arbitration tribunal determined in conclusions of law 1 and 3 of Procedural Order No. 6 as follows:

> *"1. The Arbitration Tribunal has had the opportunity to extensively review the thousands of documents which make up the annexes and appendices of the parties' filings."*

> *"Having completed its review of the documentation, the Arbitration Tribunal believes that a whole series of issues have come to light which will require clarification in order for these proceedings to be conducted properly. These issues have not been adequately addressed by the parties in their briefs or the evidence submitted has been deficient. Therefore, the Arbitration Tribunal has decided to order Proceedings for the Introduction of Additional Evidence for the purpose of obtaining new allegations and evidence from the parties."*

209.- That is, the Arbitration Tribunal first states that it has had the opportunity to extensively review "the thousands of documents which make up the annexes and appendices of the parties' filings", and then goes on to say that it completed its review of the documentation, and a whole series of issues have come to light which will require clarification in order for these proceedings to be conducted properly, as said issues have not been adequately addressed by the parties in their briefs or the evidence submitted has been deficient, and that in view of this, the tribunal decided to order these

143

proceedings for the introduction of additional evidence, in order to obtain new allegations and evidence from the parties."

210.- The conduct of the tribunal constitutes an express acknowledgement by the Arbitration Tribunal, which as of the date Official Letter A 39 and Procedural Order No. 6 were issued, both on December 13, 2006, the Arbitration Tribunal lacked sufficient information, including both arguments and evidence, to issue a decision on COMMISA's claim referred to as "Technical Dispute 37".

211.- In contrast to its own actions and requests, the Arbitration Tribunal, in Section 295 of Award, stated that in its response, COMMISA asserted that reducing the separation would not decrease the costs, but instead would require additional time and materials, while PEP submitted a chart in which it specified an extraordinary unit price for each of the 19 crossings that had a distance of less than one meter, to which the arbitration tribunal added that these extraordinary prices differ vastly from the unit prices agreed to in Appendix C of the Contract.

212.- In this same vein, the tribunal determined in Section 296 of the Award, that given the conflicting positions of the parties, the Arbitration Tribunal had decided, based

on additional information contained in the case records, given that it is an undisputed fact that during the performance of the Contract, PEP paid 100% of the price of five crossings in which the separation was less than one meter, not finding, in its opinion, any compelling reason why it should not extend the same rule to the rest of the crossings that have reduced separation, and decided that all of the crossings, regardless of their separation, must be paid for at the unit prices agreed in the contract. The latter determination is contrary to law, because payment of an amount that is not owed gives rise to an obligation for the contractor to reimburse the amounts overpaid, and does not, as the Arbitration Tribunal states, constitute an obligation for PEP to pay what it does not owe.

213.- The very conduct of the tribunal contradicts the decision made in the Arbitration Award, since at one point, the Arbitration Tribunal clearly and specifically acknowledged that it did not have enough information to issue a decision, and therefore ordered proceedings for the introduction of additional evidence (which it subsequently decided to disregard due to the conflicting positions of the parties), and later issued a decision on a piece of information that was already in the case records before it ordered said proceedings for additional evidence; therefore, it is clear that the Arbitration Tribunal issued a decision based on partial and subjective criteria, of fairness, thereby

145

disregarding the Mexican federal laws it has agreed to observe in the arbitration, without valid and objective facts. That is, the arbitration tribunal issued the award in a state of ignorance similar to the state it was in prior to drafting Letter A 39 and Procedural Order No. 6. In other words: if the decision was not based on the additional evidence submitted by the parties, it means that, according to its own words, said decision was based on insufficient evidence.

214.-Therefore, the decision issued by the Arbitration Tribunal constitutes grounds for vacating the arbitration award, pursuant to Article 1457, Section I, Part c), given that it exceeded the powers conferred on it by the parties by failing to rule strictly according to law on the matters submitted by the parties, which it had an obligation to do. Instead, it decided to rule based on subjective criteria and arguments that did not contain the elements required for a proper decision, as evidenced by the Arbitration Tribunal's own statement, contained in Part 3 of Procedural Order No. 6, where it reads: *"The Arbitration Tribunal believes that a whole series of issues have come to light which will require clarification in order for these proceedings to be conducted properly."*

146

On the contrary, it was by not taking into account the arguments and evidence produced by the parties, particularly PEP, in the proceedings for the introduction of additional evidence THAT IT FAILED TO PROPERLY CONDUCT THE PROCEEDING.

**215.- Thus being the case, the Arbitration Tribunal ordered PEP to pay for work that was not performed by COMMISA, in clear violation of the constitutional and public policy provisions that regulate public spending in works contracts, and therefore the award is void.**

### III. O T H E R   D I S P U T E S

**1. Technical Dispute 19: Claims due to Obstructions.**

216.- The award is also rendered void by Technical Dispute 19, concerning the claims on obstructions contained in the Final Award, appearing on Pages 127 - 132 (Paragraphs 500 - 526), given that it refers to a dispute that was not provided for in the arbitration agreement and therefore, the decision exceeds the terms of the arbitration agreement, pursuant to Article 1457, Section I, Part c), of the Commercial Code.

217.- During the performance of the Contract IPC-28, the subject of which was the laying of underwater pipelines, risers and connecting them to offshore platforms, technical

problems arose that had not been provided for in the contract, and the parties referred to these issues as obstructions.

218.- Said obstructions presented physical obstacles that prevented the contractor from laying the pipelines and connecting them to the platforms, and included trash deposited on the sea-bed, brush, or construction-related issues that were not provided for in the plans, among others. These obstructions are considered extraordinary work.

219.- COMMISA filed claims against PEP seeking payment of 80 obstructions, of which PEP only acknowledged 29 as legitimate and subject to payment, but which were not paid due to the "all or nothing" stance adopted by COMMISA.

220.- The Arbitration Tribunal determined that 74 of the obstruction claims were valid and subject to payment, based on the following reasons:

i)      PEP did not recognize twenty of these events as obstructions, as it either determined that they were already provided for in the contract or non-existent. Nevertheless, the Arbitration Tribunal, with no basis whatsoever (Paragraph 521 of the Arbitration Award), held that 14 of these were legitimate, and that PEP was not liable for 6 of them, due to COMMISA's express acknowledgement that such

148

events were not obstructions.

ii)     Of the remaining 60 events, PEP argued that technically, they could all be classified as obstructions, but PEP only acknowledged the payment of 29 of these cases as valid, because in the remaining 31 cases, COMMISA's right to claim compensation had been precluded.

221 .- With regard to the first group of obstructions, i.e., the twenty not recognized by PEP, the Arbitration Tribunal exceeded its powers by ruling on matters that were not provided for in the arbitration agreement, thus rendering the Award null and void.

In fact, there was a technical disagreement between PEP and COMMISA as to whether these 14 events qualified as obstruction. Furthermore, It is important to note the illegal conduct of the Arbitration Tribunal in ruling on a technical matter with no supporting expert evidence whatsoever, and without factual or legal basis (Paragraph 521 of the Arbitration Award).

222.- If COMMISA did not agree with PEP's decision, it was required, pursuant to the terms of the contract, to formalize its claims as Technical Disputes, which it did not do.

As we have stated numerous times, in the contract entered into by PEP and COMMISA, it was agreed that only those disputes or claims that were formalized as Technical Disputes could be the subject of arbitration, as shown below and as stipulated in Section 23.2, which states:

> "23.2 _Technical Disputes._ The Contractor waives the right to any claim and PEP shall not be liable to the Contractor, its secondary suppliers or subcontractors, for any legal (including negligence) or contractual damages, except in those cases specifically provided for in this Contract.
>
> For the purposes of this Clause, Technical Dispute shall mean any disagreement between the Supervisor and the Contractor that arises out of any claim or is attributable to the interpretation or performance of this Contract, in connection with the Technical Appendices of the Contract (A, B, B-1, B-2, B-3, CEV, DT, DT-1, DT-2.1, DT-2.2, DT-3, DT-4, E-2, F-1, AND F-2)
>
> If for any reason the Supervisor and the Contractor are unable to agree on a manner to resolve an adjustment claim arising out of a Technical Dispute, _the Contractor shall officially communicate said Technical Dispute in writing to the Supervisor and ask for the latter's opinion on resolving the matter. This type of request must be clearly identified by the Contractor, specifying that it involves a Technical Dispute subject to resolution pursuant to this Clause 23, and must contain a summary of the matters in dispute and the Contractor's proposal for resolution thereof._
> ...........................................................................................
> ..............................................."

# EXHIBIT 1 (PART 4)

> "23.3 <u>Arbitration</u>. *Any controversy, claim, difference or dispute arising out of or in connection with this Contract, or the breach thereof, shall ultimately be decided by arbitration conducted in the Federal District of Mexico, in accordance with the Rules of Conciliation and Arbitration of the International Chamber of Commerce then in effect. The number of arbitrators shall be three, and the arbitration shall be conducted in the Spanish language. **Without prejudice to the foregoing, all technical disputes must first be subject to the procedure provided for in Clause 23.2, and only in the event that the parties fail to reach an agreement after having submitted to such procedure shall they have recourse to the remedy provided for in Clause 23.3**".*

223.- According to the foregoing contract Clauses, there are controversies, disputes or claims that are informal, for lack of a better term (although obviously they must be made in writing), and formal. Formal disputes must be formally submitted in writing, specifying in the document that it is a technical dispute, along with an account of the facts that gave rise to the claim, and a proposal for resolution of the same.

224.- This point has fundamental legal significance, since the formalization of a Technical Dispute, and only that action, can give rise to the procedure for obtaining a proof of claim document, pursuant to Article 44, Section III of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending, and Article 66,

Section III of the Regulations of the Federal Law on Budget and Fiscal Responsibility. In other words, a payment obligation cannot be charged against the federal treasury unless there is a document justifying such payment.

225.- In this regard, the final part of the fourth paragraph and the beginning of the fifth paragraph of Clause 23.2 of the Contract state as follows:

> *"The foregoing is based on the understanding that any decision regarding a technical-contractual modification which implies or necessarily results in an increase in the Contract amount or the schedule established in Clauses 3.1 and 4.1, respectively, will require the prior written approval of the Project representative...... Once written acceptance of the supervisor's decision is received from the Contractor, the Contract shall be amended as appropriate and the decision shall be implemented."*

226.- Clause 5 of the Contract, entitled *"Modifications to the Contract"*, stipulates that *"The parties agree that for well-founded and explicit reasons, and **through the signing of an agreement**, PEP may modify the Contract in accordance with the provisions of Article 70 of the Government Procurement and Public Works Act."*

227.- Contractually, formalizing a dispute is not the same as surmising or presuming an alleged right, as COMMISA did. The decision of the Arbitration Tribunal approved

COMMISA's actions, in violation of the arbitration agreement. In other words, the arbitration tribunal determined that the performance of the contract, as it relates to compliance with terms of arbitration stipulated therein, was subject to COMMISA's discretion, which is expressly prohibited by Article 1797 of the Federal Civil Code, which provides:

> **"Article 1797.-** *The validity and performance of contracts cannot be left to the discretion of one of the contracting parties."*

228.- The principle set forth in Article 1797 transcribed above has great significance in public works contracts, which are regulated by administrative law and which, by their very nature, limit the parties' discretion in the contracting process, and because they contain provisions of public policy which are derived directly from Articles 126 and 134 of the Constitution, regarding public spending and public works.

The fact that the obstruction events were not formalized as technical disputes is evidenced on Page 17 of the oft-cited Acceptance Certificate, dated August 30, 2002, where it states that these claims were only just being prepared.

229.- The fact is that for the purposes of arbitration, COMMISA needed to formalize its Technical Dispute in a timely manner, prior to the arbitration, as stipulated in the arbitration agreement contained in Clause 23.3 of the Public Works Contract, and because COMMISA failed to do so, said Technical Dispute could not be the subject of arbitration, which means that the determinations of the Arbitration Tribunal refer to a dispute that is not provided for in the arbitration agreement, since only formal technical disputes can be the subject of arbitration, or they contain decisions that exceed the terms of the arbitration agreement, since the Arbitration Tribunal may only issue final decisions on technical disputes.

230.- With regard to the second group, there is no legal justification for the arbitration tribunal to order PEP to pay for the 31 obstruction events, because COMMISA's right to claim them had already been precluded. That is, there was no order from PEP identifying said obstructions as extraordinary work, or a law that classifies them as payable work. On the contrary, recognizing them as such outside of the contract provisions and applicable legal framework is a violation of several Mexican public policy provisions.

231.- It is clear that all of the work must be validated as such, whether in a contract, an agreement or a change order or notice, in accordance with Articles 44, Section III of the

154

Regulations of the Federal Law on Budget, Accounting and Federal Public Spending, and 66 of the Federal Law on Budget and Fiscal Responsibility, cited above, which are provisions that govern public spending allocations, such as payments for public works, and are therefore Mexican public policy provisions.

232.- In this regard, we can also cite Article 70 of the LAOP, which provides the conditions for modifying public works contracts in terms of time and amount. Article 70 of the LAOP provides, as a general rule, that public works contracts may only be modified in exceptional cases. In these cases, extraordinary and additional work must be clearly identified as such, given that they are exceptional events, which must adhere to the same formalities as the original work. In other words, the Contractor may not perform extraordinary work without an express order from PEP, and in the absence thereof, said work is not only unbillable, but the Contractor will be liable for the same.

233.- Pursuant to these provisions, the Contractor cannot unilaterally determine that work is extraordinary and perform the same without an express order from PEP. Public works contracts do not favor the interest of the Contractor, but rather the interest of the

155

public treasury, and thus the principle of public interest does not operate to the benefit of COMMISA to be reimbursed by PEP, but just the opposite. In this case the public interest operates to preclude the payment of work performed unilaterally by COMMISA, and also liability for damages.

234.- Section 5, entitled "Modifications", of Contract Appendix B-2, entitled "General Terms", provides as follows:

> "Any modification which involves changes to the provisions originally agreed in the Contract, or any additional provisions, must be formalized by means of written agreement between the parties, in accordance with the conditions set forth in Clause 5 of the Contract.

> "If at any time the Contractor deems that actions or omissions by PEP constitute a change in the work that has not been the subject of a change notice, the Contractor shall submit, within ten (10) calendar days of the action or omission, a Change Notice Request, along with a detailed explanation of the reason for such request. The Supervisor shall either issue a change notice or deny the request in writing.

> ----------------------------------------------------------------------------
> -----------------------------------------

> "If the Contractor determines that the Change Notice will affect the cost or time required for the performance of any part of the Work, it must notify PEP in writing, within ten (10) calendar days following the date on which it received the Change Notice, and

> *must also furnish to PEP, within the twenty (20) subsequent*
> *calendar days, a written proposal specifying the nature, effect on*
> *the schedule and financial scope of said request, in sufficient*
> *detail so as to allow for a thorough analysis and negotiation.*
>
> *"<u>Any delay by the contractor in giving notice or submitting the</u>*
> *<u>proposal referred to in the preceding paragraph, shall be</u>*
> *<u>sufficient grounds to reject the claim if such delay is detrimental</u>*
> *<u>to PEP and to the extent of such detriment</u>. **In no case shall a***
> ***claim by the Contractor be considered if it is made***
> ***subsequent to the Partial or Complete Acceptance**...".*

235.- The above-transcribed provision is very clear: the Contractor had a period of ten days to notify PEP of any change in the contractual conditions that could cause an increase in the duration or amount of the Contract. Similarly, it was also required to submit a financial proposal for resolving the matter to PEP within the following twenty days.

236.- Furthermore, the right of PEP to order the performance of extraordinary work or reject the performance of such work is also provided for in the law. Thus, in the event that the conditions proposed by the Contractor were not acceptable to PEP, PEP could still perform the work, whether directly through its own resources or by assigning it to third parties (Rule 3.3.4 of the General Rules for the Procurement and Execution of

Public Works), for the purpose of ensuring the best conditions for the State in terms of quality and price.

237.- For the above reasons, a timely and formal notice from the Contractor of all of the events that would produce extraordinary work was required, since it would have given rise to a work order and the possibility for COMMISA to perform such work without violating the LAOP. Given COMMISA's failure to comply with this requirement, PEP is authorized to deny payment of such work if it has caused harm to the federal treasury, as it did in this case. In point of fact, Clause 8.1.9 of the Contract provides:

> *"8.1.9. Work Exceeding Contract Price. If the Contractor performs work whose value exceeds the price agreed upon in this Contract without prior written authorization from PEP, regardless of any liability it incurs for such Work, it shall not have the right to claim any payment whatsoever for the same."*

238.- That is, the performance of extraordinary work without due consent from PEP causes harm to the federal treasury and is not a benefit, given that such work encumbers funds that are not provided for in the budget and are earmarked for other purposes, and which also resulted from a unilateral action by the Contractor that does not assure the most favorable economic and technical conditions for the State.

239.- The above-transcribed legal principles were agreed to by the parties in Clause 6 of the Contract, concerning Extraordinary Work, as follows:

> *"The Contractor agrees to perform any extraordinary work that may be required during the performance of the Contract, with extraordinary work meaning that work which is not included in the project and the work plan. In all cases, prior to the performance of the extraordinary work, PEP shall furnish the corresponding work order to the Contractor in writing, with the understanding that the work items, specifications and respective unit prices will be incorporated into the Contract for all effects and purposes, pursuant to the agreement signed by the parties."*

240.- Therefore, it was not enough for COMMISA to notify PEP of the obstruction events, as the Arbitration Tribunal had determined, but it needed to request a change order and propose a price for the extraordinary work, and then wait for PEP's decision. In fact, for any change notice COMMISA made extemporaneously, it was required to wait for a response from PEP.

241.- Under no circumstances can PEP be held liable for the Change Notice not being issued, as the Arbitration Tribunal has done, for two reasons: (a) PEP has the right to deny COMMISA's request, and (b) COMMISA was required to wait for an express order from PEP before starting the work.

159

242. This case is not about the fact that the work was not formalized, but rather, that there are no grounds to obligate PEP, as a government agency, to pay. The Arbitration Tribunal endorses the actions of COMMISA by imposing prices and additional and extraordinary work on PEP outside of the scope of the contract. That is, the arbitration tribunal determined that COMMISA was justified in performing the extraordinary work without prior authorization from PEP, and without regard for the public policy provisions that regulate budget execution.

243.- This decision by the Arbitration Tribunal violates Mexican public policy and renders the Final Award null and void for two reasons:

a.   Article 70 of the LAOP, as explained previously, favors the firmness of contractual conditions and limits the conditions for contractual modifications. This provision preserves several principles of public policy, specifically: the attainment of optimal economic conditions for the State and efficiency in public spending. It is aimed at preventing the assignment, via contract modification, of new work that should be the subject of a public tender, and unwarranted modification of the prices offered by the Contractor.

Thus being the case, and despite the fact that it was not authorized to do so in Contract Clause 23.3 or in the Terms of Reference, the Arbitration Tribunal modified the contractual conditions to order the payment of extraordinary work, and what is worse, it violated provisions of Mexican public policy to order the admissibility and payment of extraordinary work. Thus, this dispute is null and void by virtue of the violation of Article 1457, Section I, Part c) and Section II of the Commercial Code.

b.    Payments made against the public treasury must be justified, whether in a document or in a law. Otherwise, they are classified as extra work and harmful the public treasury. Therefore, the principle of public interest is not applicable in this case, and COMMISA does not have the right to any compensation, because its [alleged] right is derived from an unlawful act, and unlawful acts do not generate consequences of any kind.

For the foregoing reasons it is clear that the Arbitration Tribunal issued its award in violation of Mexican public policy regulations, thus rendering the award null and void.

**2. Technical Dispute 27: costs for the difference in down-time charges for the Costoro 10 in platform Jobs.**

161

244.- During the performance of the jobs covered under the work contract for Project IPC-28, work interruptions or suspensions that were provided for in the Contract occurred. Pursuant to the Contract, any interruptions or suspensions in work projects involving the use of vessels would give rise to payment of down-time charges or stand-by fees.

245.- For the performance of the work, COMMISA leased two vessels: the Castoro 10 and the Bar Protector. In accordance with their characteristics and capacities, the first was used for pipe laying work and the second for platform work.

246.- In view of the obvious difference between pipe laying work and platform work, and considering the type of vessel that was originally going to be used for each of those jobs, different down-time charges were established in Contract Appendix C for the Castoro 10 and the Bar Protector, since the ships each performed different jobs; that is, there were down-time charges for suspensions in the pipe laying work, and different down-time charges for platform work, with the highest amount being the charges agreed for suspensions in pipe laying work.

247.- Due to the unavailability of the Bar Protector vessel, it was necessary for the Castoro 10 to perform the platform jobs, which had already been planned for in the Contract (Appendix B-2, Work Plan). During the work period, events occurred which resulted in suspension of the Castoro 10 jobs, and thus gave rise to the payment of down-time charges or stand-by fees.

248.- The dispute between the parties involved determining which down-time charges were applicable: the amount agreed for pipe laying work claimed by COMMISA, or the amount agreed for platform work asserted by PEP, a position which it later changed to propose the payment of extraordinary unit prices.

249.- COMMISA maintained that the down-time charges for pipe work should be paid because that charge reflected the use of the Castoro 10. PEP initially maintained that the down-time charges for platform work were applicable, because those charges had been established for the work in question. PEP paid and COMMISA received the payment of down-time charges in accordance with charge stipulated for platform work, later claiming payment of the difference between that charge and the amount agreed for pipe laying work.

250.- In view of the fact that the jobs actually performed used different resources, which were taken into consideration when establishing or agreeing on the down-time charges for suspension events for the various types of jobs, PEP proposed to COMMISA, as it had explained to the Arbitration Tribunal, that the appropriate course of action was to establish extraordinary unit prices for any work that was not actually the same as the work originally defined in the contract and, if applicable, to pay any difference.

251.- The Tribunal ruled that the correct action was to pay COMMISA the down-time charges for pipe laying work, and that PEP therefore owed the amount of said difference. In issuing the award, the Arbitration Tribunal based its decision on the aforesaid charges for extraordinary work proposed by COMMISA, and PEP did not object (it is important to note that it did not consent either).

The statements of fact and conclusions of law for this dispute appear in Section VII of the Final Award, on Pages 127 - 132, Paragraphs 500 - 526.

252.- The legal grounds asserted by the Arbitration Tribunal are erroneous and violate several Mexican public policy provisions regarding the use of federal funds, and vacation of the arbitration award is therefore warranted.

253. First, it is important to underscore the fact that there was no meeting of the minds between the parties. In point of fact, PEP never agreed to pay down-time charges for pipe laying work during the suspensions in the platform jobs. On the contrary, the actions of PEP show that it offered and paid a charge different from that requested by COMMISA (only "differences" are claimed).

254.- Secondly, the Arbitration Tribunal did not consider the actions of the parties in arriving at its decision; specifically, the actions aimed at identifying the proper procedure for determining the payment amount COMMISA was entitled to claim. These actions were evidenced in Technical Dispute 17, wherein COMMISA accepted payment of extraordinary unit prices for the platform work in which the Castoro 10 was used instead of the Bar Protector. Therefore, the conduct of the Arbitration Tribunal is incongruent, and it disregarded the mission entrusted to it by the parties.

255.- The decision was not made based on strict application of the law. Article 1805 of the Federal Civil Code, which applies to this case, provides that the absence of a response to a contractual proposal made without a response deadline, will result in an implied rejection of said proposal. Thus, the fact that PEP did not respond to COMMISA's proposal implies its rejection, and not its acceptance as the Arbitration

Tribunal has incorrectly determined. PEP's silence does not imply consent and is not the source of obligations.

256.- In this case, consent must be explicit, pursuant to Article 1803, Section II, final part, of the Federal Civil Code; General Rule 3.3.4 for the Procurement and Execution of Public Works; and Clauses 6 and 6.1 of the Contract, and thus the performance of the work does not automatically produce approval of the price unilaterally proposed by COMMISA. Therefore, there is no obligation to be paid with public funds.

257.- All of these legal violations clearly led to the Arbitration Tribunal ordering the payment of work that was not actually performed. In other words, it ordered the payment of prices that had not been established as compensation for the extraordinary work performed, but for other work that included activities and resources different from those used in the work now subject to payment. In terms of application and execution of spending for the payment of public works, there is no legal justification for the payment because no cost was actually incurred, that is, the work item originally agreed upon was not completed. The issues set forth herein are similar to those presented in the Section where crossings were discussed, and therefore the same legal and factual principles apply.

258.- The fact that the work was not performed as originally planned and agreed is a fact that was fully proven in the arbitration proceeding, as shown in the account of events set forth in the Arbitration Award itself.  Specifically, COMMISA asked to perform work on the platform using the Castoro 10 instead of the Bar Protector, that is, using resources different from those originally agreed. PEP approved these jobs because they were technically acceptable. However, the Arbitration Tribunal failed to take into account these new contractual conditions, which are essential to generating payment, in accordance with Mexican law on public spending, which are a matter of public policy.

259.- The Public Works Contract that is the subject of the Arbitration is a unit price works contract pursuant to Article 57 of the Government Procurement and Public Works Act, which very clearly stipulates that the **total payment or compensation that is to be made to the contractor shall be paid by work item unit completed.** Said legal provision provides as follows:

> "*Article 57.- For the purposes of this Law, there are two different types of public works contracts:*
> *I. On the basis of unit prices, in which case the total amount of* **payment or compensation that is to be made to the contractor**

*shall be paid by work item unit completed, or…..”*

260.- For its part, the General Rules for the Procurement and Execution of Public Works, which are applicable to the legal relationship created by the Public Works Contract, provide a definition of unit price in Section 5, regarding guidelines for the integration of unit prices, as follows:

> *“5.2.5 UNIT PRICE. Total amount per unit of measurement of each work item.”*

261.- This legal provision was adopted in the Contract, to the effect that payment would only be authorized upon conclusion of the work item agreed. In fact, in Clause 3.3 of the contract, the parties agreed as follows:

> *“**3.3 Unit prices.** The work covered under this Contract shall be paid on the basis of unit prices, as set forth in Appendix “C” of this Contract. Said work includes the total payment or compensation that must be paid to the Contractor for the work, under the headings of direct cost, indirect cost, financing and earnings, as well as the cost of additional obligations in favor of the Contractor stipulated herein. Said unit prices are fixed and only the direct costs comprising the same may be adjusted, in the cases and under the conditions provided in Clause 3.7 of this Contract”.*

262.- This correlation between the unit price and the work item is established by law, as provided in Section 5.1.2 of the General Rules for the Procurement and Execution of Public Works, and in Clause 3.3 of the Contract cited above. Similarly, the Regulations of the Public Works Act, which are applicable to this dispute, provide as follows:

> **"ARTICLE 31.-** *The proposal which bidders must deliver for the submission and opening thereof shall contain the following:*
>
> VIII.    *Bid bond and proposal commitment letter;*
> IX.    *Written statement confirming bidder is familiar with the work site;*
> X.    ***Document listing work items, units of measurement, amounts of work, proposed unit prices and partial and total amounts of the proposal;***
> XI.    *General information on the cost of materials to be placed at the work site, cost of labor and cost for use of construction machinery;*
> XII.    ***Analysis of unit prices of the requested items, broken down into direct costs, indirect costs, cost of financing the work and service charges. The procedure for analysis of unit prices may be by distribution of resources on scheduled dates or based on production per hour or shift.***
>
> *Direct costs shall include charges for materials, labor, tools, machinery and construction equipment.*
>
> *Indirect costs shall be expressed as a percentage of the direct cost, and shall be itemized as costs for the*

*administration of central offices, of the works, and insurance and bonds.*

*The financing costs for the work shall be represented by a percentage of the sum of the direct and indirect costs; calculation of this cost shall take into account the expenses to be paid by the contractor in performing the work, the advance payments and estimates it will receive and the interest rate it will apply, with the corresponding analysis attached thereto.*

*The service charge shall be set by the contractor by applying a percentage on the total amount of the direct, indirect and financing costs;*

XIII.   *Work schedules, use of construction equipment and machinery, purchase of materials and permanently installed equipment, as well as use of technical, administrative and service personnel to oversee the supervision and administration of the work, in the manner and under the terms requested, and*

XIV.    *List of construction equipment and machinery, indicating whether the bidder is the owner, and physical location of the same.*

*Foreign bidders submitting proposals must certify that their proposals were prepared under the same conditions in terms of price, cost, financing, opportunity, and any other pertinent conditions, as those that would have been available to domestic bidders in preparing their proposals."*

263.- In accordance with the General Rules for the Procurement and Execution of

Works, a work item is defined as follows:

> *"5.2.3 WORK ITEM.* **Set of activities and materials** *which, in accordance with the respective forms and specifications, make up each of the parts in which the studies and projects, implementation and provision of equipment, commissioning, conservation or maintenance and supervision of the works are traditionally divided for measurement and payment purposes".*

264.- Given that a work item is essentially a set of activities and materials, it is clear that the unit price refers to these costs. Thus, the Arbitration Tribunal, without grounds or cause, determined that there is no legal basis for modifying the unit prices. In other words, if the set of activities and materials actually employed in the pipe laying work were the same as those originally planned, then it would be correct to apply the unit prices of the Contract. If said activities and materials are not the same as those originally agreed, then what we have is a different type of work item, and it is not appropriate to apply the original prices, but rather, to establish extraordinary unit prices.

265.- We have already established herein that a payment by PEP for work performed in public works projects constitutes use and management of public funds, pursuant to

Article 1 of the Government Procurement and Public Works Act, Articles 1 and 2 of the Federal Law on Budget, Accounting and Federal Public Spending, and Article 39 of its Regulations, which means that it is a matter of public policy, in accordance with Articles 126 and 134 of the Federal Political Constitution.

266.- Therefore, the conditions and requirements for the payment of obligations assumed by virtue of or in connection with public works contracts, because they are charged against federal funds, are subject to public policy provisions pertaining to public law, and not commercial law.

267.- Thus, of these provisions, we can cite Article 44, Section I of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending, and Article 66, Section I of the Regulations of the Federal Law on Budget and Fiscal Responsibility, which stipulate, respectively, as follows:

> "Article 44.- Entities must ensure, under their own responsibility, that any payments they make against their approved budgets are made in accordance with the following requirements:
> *I. They must be made for obligations actually performed*, with the exception of the advance payments provided for in the law and those mentioned;...".

> "Article 66. Payments made against the Disbursement Budget shall be made by agencies through the Treasury. Payments by

> *entities shall be made through their own treasury offices, for which they must keep the appropriate budgetary records on their own cash flows.*
> *In making their disbursements, agencies shall also [ensure that]:*
> *I.    They are made for obligations actually performed, with the exception of the advance payments provided for in applicable provisions..."*

**As stated previously, in this case, the "obligation" that gives rise to the payment was not actually performed, that is, the work item contracted for was not completed, and thus payment thereof is null and void, and the payment order violates provisions of Mexican public policy.**

268.- Furthermore, it is important to point out that COMMISA never formalized this claim as a technical dispute, and as we have already explained, the fact that the obstruction events were not formalized as technical disputes is evidenced on Page 17 of the oft-cited Acceptance Certificate, dated August 30, 2002, where it states that these claims were only just being prepared.

### V. Financial Costs

**First**

269.- The Arbitration Tribunal did not provide a legal basis to evidence fulfillment of the necessary statutory presumptions or requirements, which are Mexican public policy provisions, to justify ordering PEP to pay financial costs. Furthermore, COMMISA did not evidence in the arbitration proceeding that it had complied with the payment procedure established in the contract. As we have mentioned, said payment procedure is a matter of public policy, as it involves funds budgeted by the federal government. That is, they are funds whose disbursement, spending, execution or application are regulated by constitutional provisions and which are intended for the furtherance of public interest, and not individual interest.

In other words, if COMMISA did not assess the jobs in a timely manner, it is not entitled to claim financial costs because it violated public policy provisions that precluded it from exercising that right. This contractual agreement, which reproduces a provision of law, must be strictly interpreted, given that resources pertaining to public spending cannot be made available by analogy, majority opinion, or a simple principle of commercial law such as that invoked by the Arbitration Tribunal.

270.- The Arbitration Tribunal determined (in Paragraphs 734[24] and

---

[24] "734. With regard to the interest accrued by the unpaid amounts, this matter is provided for in Clause 3.8.6 of the Contract, which stipulates that "in the event of a delay in the payment of cost estimates and adjustments, PEP, at the request of the Contractor, shall pay financial charges at a rate equivalent to that established in the Federal Internal Revenue Law for extensions granted for the payment of tax obligations", with Clause 3.8.8 further adding that, in exceptional cases, financial charges will not be incurred when PEP suspends payment of estimates for valid reasons."

735[25] of the Final Award) that based on its interpretation of Contract Clauses 3.8.6 and 3.8.8, collectively, that payment of the financial charge was applicable in accordance with the following requirements:

i)      Payment of financial charges applies in cases of a delay in the payment of estimates.

ii)     A delay in the payment of estimates occurs when payment is not made within 30 days from the date the estimate is furnished to the supervisor.

iii)    Said payment becomes payable at the request of the Contractor

iv)     There cannot be a valid reason for PEP to deny the payment.


**One.**

271.- As to the first point, we would like to note that the Arbitration Tribunal was completely mistaken in its conclusions, if we take into account that an estimate is the act whereby the volume or amount of work actually performed is determined, and a value is assigned to the same, applying the approved unit prices to said amounts of work by unit of measurement. An estimate is also the document where said assigned value is recorded. Therefore, an estimate of a [public] works project is a formal act.

---

[25] *"735. Based on Clauses 3.8.6 and 3.8.8 of the Contract, taken together, we have reached the following conclusions:*
*- in order for financial charges to accrue, the first requirement is that **there has been a delay in the payment of cost estimates and adjustments**. Delay means that the outstanding amounts have not been paid on time. And the payment term is stipulated in Clause 3.8.2: 30 days after delivery of the corresponding estimate.*
*- with regard to the start of the accrual period, Clause 3.8.6 merely states that the Federal Internal Revenue Law rate will begin to accrue in the event of a "delay", that is, "upon expiration of the payment term" for said amounts. And the payment term is 30 days, beginning on the date of the corresponding estimate (Clause 3.8.2). The financial charges will cease to accrue on the date the payment is made in cash."*

272.- An estimate is defined in Rule 5.2.6 of the General Rules for the Procurement and Execution of Public Works, which is applicable to the matter at hand, as the "*Valuation of the work performed in a given period by applying the unit prices of the work items contracted for such period or the percentage of the lump sum agreed for the completion of each unit of work or of the work project. By extension, the document setting forth the aforesaid valuations for purposes of payment.*"

273.- In contrast, the legal effect of the "Certificate of Full Acceptance of Physical Work" is: i) verification, by the government agency or entity (PEP), that the works have been duly completed within the time period agreed in the contract; ii) once the above has been confirmed, proceed to the acceptance of such work; iii) to determine the date as of which the contractor will become liable for hidden defects or any other defect in the work. The foregoing is provided in Articles 74 and 75 of the Government Procurement and Public Works Act, Article 49 of the Regulations of the Public Works Act, and Clause 9.2.6 of the Contract.

274.- However, despite the fact that it had agreed to apply Mexican federal regulations to the case, the Arbitration Tribunal did not consider these regulatory provisions in rendering its decision, because it failed to address the first premise

the Tribunal itself had established, which is extremely incongruous, and therefore the award is in direct contradiction with itself. That is, the first thing the Arbitration Tribunal was required to establish was the definition of estimate, and whether the estimate had been prepared and delivered to the supervisor, which the Tribunal never did. Furthermore, the Arbitration Tribunal viewed the matter very differently than it originally asserted:

275.- In Paragraph 743[26] of the final award, the Arbitration Tribunal determined that it had been agreed in the Contract that payment would be due each time a portion of the work was completed, according to the manner in which it was divided in the contract, and concluded, based on this interpretation, that once the work was completed and delivered, payment of all of the project work would be due. Thus, following that line of reasoning, it incorrectly concluded that PEP was in default as of the time the jobs were completed and the work was accepted by PEP, disregarding the fact that the contract clauses on payment stipulate that an estimate for the work is required prior to payment; and eluding the initial premise asserted by the Tribunal itself - that it had concluded the payment term commenced upon delivery of the estimate, and not upon completion of the work.

---

[26] "The Contract is based on the principle that the Contractor was to continue performing the work as assigned, and that it would be paid by PEP within 30 days of completion of the work – as inferred from Clause 3.6 therein..."

177

276.- The contract clauses in question (3.8.6 and 3.8.8) replicate the provisions of the first paragraph of Article 69 of the LAOP, which clearly stipulates that an unpaid estimate is required in order for payment of financial charges to apply, and not the delivery and acceptance of the work, as follows:

> "Article 69.- In the event of non-payment of cost estimates and adjustments, the government agency or entity, at the request of the Contractor, shall pay financial charges at a rate equivalent to that established in the Federal Internal Revenue Law for extensions granted for the payment of tax obligations. Such charges shall be calculated based on the unpaid amounts and will be computed by calendar days, as of the expiration of the payment term, until the amounts are actually made available to the contractor...."

277.- Furthermore, the criteria for default, from a business perspective (income, reciprocity), do not apply to public works contracts, and therefore the preparation and submission of an estimate is a mandatory requirement for ordering payment of financial charges, and because said estimates do not exist, there is no basis to justify payment of the work, and even less to warrant payment of the corresponding financial costs.

278.- In Article 70, Section I of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending, which was in force during the term and

performance of the public works contract, provides that public works contracts may not stipulate penalties for liquidated damages or default interest against government agencies, as follows:

> *"Article 70.- In order for the purchase orders and contracts referred to in the preceding article to serve as supporting documentation, they must conform to the following requirements:*
>
> *I. **In no case shall a stipulation for liquidated damages or default penalties against the entities be accepted;***

This shows that the award is incongruent and unfounded, because it neither defines nor considers the provisions of this article, but clearly relies on others, despite the fact that it has ostensibly cited the contract clauses for this case.

In view of the foregoing, vacation of the arbitration award is warranted.

**Two**.

279.- With regard to the second premise established by the arbitrator for the payment of financial charges, that is, the date on which financial charges would begin to accrue, the Tribunal determined that date to be the day following September 29, 2002.

280.- The arbitrator determined that the payment was to be made within 30 days following the complete physical acceptance of the works

179

(Paragraph 743[27] of the final award), because he concluded that as of that time, PEP had benefited from the receipt and use of the contracted goods or works without having paid for them, and that COMMISA suffered a loss by not receiving the [full] price (Paragraph 743 of the final award, already transcribed). Therefore, the Tribunal determined (Paragraph 743 of the final award) that if the complete physical acceptance of the works took place on August 30, 2002, then from that date, PEP had 30 days to pay for said work, with a final due date of September 29, 2002[28]. Thus, interest began to accrue on the following day, according to the Arbitration Tribunal.

281.- It is important to not that the arbitrator's conclusions are unfounded, given that the payment obligation is not created through the acceptance of the work, but through the estimate, because the contract is a unit price contract, and NOT a lump sum contract. That is, in lump sum construction contracts[29], the payment amount is determined by applying the agreed unit prices to the amounts of work actually

---

[27] "....It is a proven fact that on August 30, 2002, the Contractor delivered the totality of the work to PEP, with both parties signing the Certificate of Full Physical Acceptance. An interpretation of Clauses 3.8.2 and 9.2.6 of the Contract, collectively, shows, in the opinion of the Tribunal, that PEP had an obligation to pay Commisa all of the amounts due for the construction of the work, within 30 days of its delivery at the latest, that is, on September 29, 2002. This interpretation is based on a systematic analysis of the Contract, and also satisfies, in an equitable manner, the interests of the parties involved" ... "Up until the Certificate of Physical Acceptance, PEP had not received the work to its complete satisfaction and, therefore, there was no reciprocal obligation to pay the price in full. With the Certificate of Physical Acceptance, the reciprocal obligations between the parties ceased to exist: the patrimony of the Respondent is increased, since it benefits, to its complete satisfaction, from the work without having paid for it in full, while the Contractor suffers a loss, since it has rendered its services without receiving the [full] price. **In order to reestablish reciprocity, the amounts not paid by PEP must be increased by the accrual, beginning on September 29, 2002, of a default penalty, calculated at the rate agreed to in the Contract.**"

[28] A violation as to the merits of the case is that the Arbitration Tribunal started counting the term on the same date as the Certificate of Complete Physical Acceptance of the works, and not the following day.

[29] In lump sum construction contracts, payment is determined by the result: once the work is finished, the Contractor receives the payment.

180

Performed, pursuant to Article 57, Section I of the LAOP, and Clauses 3.3, 3.4 and 3.8 of the Contract. "… in this case, the price is not determined by the totality of the work, but by each part, using a unit or measurement as a frame of reference" (Humberto Podetti. Construction Contract. Astrea Publishing. Page 244).

282.- This argument is related to the legal definitions of "Work Item", "Unit of Measurement" and "Unit Price" set forth in part 2 of the section entitled "Other Disputes", regarding the claim on the differences in down-time charges for platform work, which we ask be incorporated herein by reference for judicial economy purposes.

383.- In addition, it is not the Supervisor or the On-Site Project Manager who will pay the estimate. These individuals only receive the estimate, and they approve it if the work volume and cost amounts indicated therein are duly justified. On this point, the Arbitration Tribunal is mistaken, because the function of the Supervisor is not to pay estimates, and the Supervisor is not authorized to draw on PEP's budget, and if hypothetically and effectively said party were able to do so, it would be a non-performance of their duties imposed by Article 8, Sections I and IV, of the Law on Administrative Responsibilities of Public Servants, and they would be subject to

applicable penalties. Furthermore, it would be illegal: it is legally forbidden for the Supervisor to pay claims. The Tribunal never managed to understand the appropriate time for payment of estimates.

384.- PEP payments cannot be made by any agency other than the single-counter payment office of PEP (Article 11 of the Federal Law on State-Owned Companies), and likewise, the payments of the federal public administration may only be made through the Federal Treasury, in accordance with Article 39 of the Public Service Law of the Federal Treasury.

385.- In Paragraph 746[30] of the Final Award, the Arbitration Tribunal determined that submitting the estimate and corresponding invoice at the PEP single-counter payment office was a manner of eliminating the payment term for the work, that the clause is only applicable during the contract term and not once the contract has terminated; further asserting that in order to order payment of financial charges, it is sufficient to

---

[30] "746. The first argument asserted by PEP was that the Contractor was required to submit an invoice and supporting documentation at the single-counter payment office of PEP, located in the Ciudad de Carmen, Campeche, as stipulated in Clause 3.8.3 of the Contract. This argument does not convince us." The payment procedure through the single-counter payment office is provided for payments during the performance of the work, not for payments sought through arbitration, years after the project has concluded. Furthermore, pursuant to Clause 3.8.6, on non-payment, default penalties must be paid "in the event of a delay in the payment of cost estimates and adjustments, PEP, at the request of the Contractor". This clause only requires that there must have been a "delay in the payments" and that Commisa must have requested payment of default penalties, not that Commisa has to submit any type of documentation at the single-counter payment office in Ciudad de Carmen. Given that the two requirements stipulated by Clause 3.8.6 have been met, the Arbitration Tribunal is certain that financial charges must be accrued."

provide evidence of the payment delay and the request of the contractor, and not that any documents had been submitted at the single-counter office.

386.- These assertions by the Arbitration Tribunal are unfounded. PEP has never said that in order for the payment of financial costs to be applicable, COMMISA had to request such payment in writing at the single-counter office. What PEP has maintained from the beginning is that PEP has not defaulted on any payment obligation, because in order for that to occur, COMMISA had to establish said payment obligation in accordance with the provisions of the Contract and the LAOP.

387.- In this case, the Arbitration Tribunal violated the system for control of public spending contained in the federal disbursement budget, which assigns the processing of said payments charged against federal funds to one single agency. If the payment is handled by a single agency, which in the case of PEP is the single-counter office, when we talk about payment delays, it must be understood to mean delays of the single-counter office. The system for assignment of functions and responsibilities of public administration does not allow this situation to be resolved primarily through private law.

388.- Thus, the contract provision on payment procedure, set forth in Clause 3.8.1,

first paragraph, final part, and Clause 3.8.4 is obligatory for the parties (in addition to the fact that the contract does provide for any limitations in this regard) during and after the term of the contract, pursuant to a mandatory regulation governing disbursement of federal funds. That is, the Contractor must (personally) submit its estimate at the single-counter office, and if it is not paid within 30 days, then, and only in that case, will financial charges apply.

389.- In other words, COMMISA needed to obtain authorization of the estimates, i.e., the Contract Supervisor's approval of the valuation made by the Contractor of the work performed. For this, it first needed to prepare estimates. This brings us to another nullifying defect in the decision, which is the arbitrator's predisposition to presume that COMMISA's claims had merit, and that PEP was required to pay them without further consideration; see Paragraph 749[31] of the final award, in which the Tribunal states that "it would be sufficient for PEP to express disagreement with the settlement in order to avoid paying financial charges." That is, it presumes good faith on the part of the contractor and bad faith on the part of PEP, without justification, which is a clear sign of bias in favor of COMMISA and against PEP.

,

---

[31] "...To determine otherwise would be the same as leaving the payment of financial charges to the broad discretion of PEP, which by merely disagreeing with the amounts claimed could avoid its obligation to pay default penalties. This interpretation of the Contract could never be accepted, as it violates the mandatory principle set forth in Article 1797 of the Civil Code: *The validity and performance of contracts cannot be left to the discretion of one of the contracting parties.*"

184

390.- This opinion of the Arbitration Tribunal also violates budgetary provisions which stipulate that government agencies cannot make payments against the federal treasury without first confirming that it is for a cost actually incurred (Article 44 of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending, and Article 66 of the Regulations of the Federal Law on Budget and Fiscal Responsibility), and in this case, that cannot happen until an estimate is submitted. Therefore, no payment term can commence, and nor have the conditions been met to create an obligation to pay financial charges to COMMISA.

391.- It is useful refer to the arguments of the Arbitration Tribunal set forth in Paragraph 744[32] and 748[33] of the Final Award, which states that the "Certificate of Full Physical Acceptance of the Works" also serves as a formal demand for payment, which contradicts the legal provisions and arguments set forth above. The "Certificate of Full Physical Acceptance of the Works" is not a document that could be considered a demand for payment, not only because of the legal effects of its issuance, as

---

[32] "744. The foregoing conclusion is supported by the text of Article 2080 of the Civil Code, which provides that "If the date by which payment must be made has not been established and determinate obligations are involved, the creditor cannot claim it until thirty days after any formal demand for payment has been filed, whether in court, out of court, before a notary or before two witnesses. That is, even if our interpretation was that the Contract does not stipulate a time period for PEP to make the final payment, according to the Civil Code, such payment must have been made within 30 days following the out-of-court demand for payment, which was brought through the Certificate of Full Physical Acceptance, wherein Commisa stated its claims and of which PEP, by virtue of having received and signed the document, was informed."

[33] "748. As to the first of these arguments, the literal text of Clause 3.8.6 of the Contract does not state that any type of demand or indication is required in order for interest to accrue, but only a request to that effect by the Contractor, which has occurred in this arbitration. Moreover, even if it were required, pursuant to Article 2050 of the Civil Code, that Commisa had to make a formal demand for payment to PEP in order for interest to accrue, this would have occurred through the Certificate of Full Physical Acceptance, wherein the Claimant stated its claims, thereby informing the debtor of their existence."

explained earlier, but mainly because COMMISA was required to submit, subsequent to said certificate (and act), its final estimate in accordance with Rule 5.2.7[34] of the General Rules for the Procurement and Execution of Public Works.

392.- Without a settlement amount for the work (liquidated amount), a demand for payment cannot take effect. A collect notice becomes valid when COMMISA submits a duly authorized estimate and corresponding invoice at the single-counter office of PEP, and if the collection notice does not take effect, a payment term cannot be initiated against PEP, and if there is no delay, there are no grounds for applying financial charges.

**Three.**

393.- As to whether said payment may be ordered at the Contractor's request, this is true, provided that PEP has refused to authorize an estimate without justification, or the single-counter office has failed to make payment thereof within thirty days. The fact that COMMISA has requested payment of financial charges solely because it completed and delivered its jobs and thirty days elapsed, is not consistent with the public policy provisions mentioned above.

---

[34] "5.2.7 Settlement: Final estimate wherein the total payment amount for the work performed pursuant to the Contract is determined.

394.- The payment procedure stipulated in the contract basically provided that the contractor had to prepare its estimates, then submit the estimates (with all documentation supporting the valuation) to the work supervisor for approval; once approved, if the amount did correspond to the work actually performed with the quality and in the amount required by the contract, the Contractor had to submit this, along with its invoice, to PEP's single-counter office. COMMISA never even proved it had complied with this procedure, and the arbitration tribunal did not require it to do so.

395.- For quick reference and to facilitate the task of this Court, we are transcribing below the contents of the above-cited clauses 3.8.1, 3.8.2, 3.8.6 and 3.8.8 of Contract No. PEP-O-IT-136/98.

> "3.8 Form of Payment. The work covered under this Contract shall be paid through the preparation of estimates that will cover periods of one calendar month; these estimates shall be submitted by the Contractor to the Supervisor together with documentation justifying payment thereof within the 4 (four) working days following the cutoff date, which shall be the last day of each month; if the estimates are not submitted within the above time period, the work items covered therein shall be included in the following estimate.
>
> 3.8.1 Review, Approval and Authorization of Estimates. Within the 8 (eight) calendar days following the date on which the estimates were received, the supervisor shall review and, if

*appropriate, issue a payment recommendation for the estimates, and then forward them to the authorized representative of the Cantarell Project Administrative Office, which shall authorize payment thereof to the Contractor within a period of 2 (two) calendar days so the Contractor may submit them, together with the corresponding invoice, to the Single-Counter office of PEP, which will then begin processing the payment.*

*In the event that any technical or numerical differences arise during the review of estimates, the Supervisor shall immediately report this to the Contractor so that such differences can be reconciled if possible, and the estimate in question can be approved by the Supervisor, if applicable, within the 8 (eight) days indicated for the review of estimates.*

*If it is not possible to resolve all of the differences so the estimate can be approved within the aforesaid time period, pending items must be resolved and included in the following estimate.*

*Estimates and settlements shall not be held to be acceptance of the Works, even if they have been paid, because PEP expressly reserves the right to bring claims for omitted or poorly performed work or for payment of improper items.*

*In the event the Contractor is declared bankrupt or makes a general assignment for the benefit of creditors, or if a trustee or receiver is appointed due to the Contractor's insolvency, or if this Contract becomes partially or fully terminated, ownership of all equipment and materials that the Contractor may have conveyed to PEP in accordance with Clause 16.4 shall not become part of the Contractor's assets unless otherwise stipulated by applicable law.*

*If the Contractor does not agree with the estimates or with the*

amount paid for such estimates, it shall have a period of 30 (thirty) days starting as of the date on which the estimate or payment thereof is authorized, as appropriate, for filing a written claim. If the Contractor fails to file a claim before the conclusion of this term, it will be understood to be a final acceptance by the Contractor of the estimate or payment, with no entitlement to any subsequent claim.

3.8.2 Term for Payment of Estimates. Payment of estimates shall be made 30 (thirty) calendar days following the date on which the Contractor submits the estimates to the PEP Supervisor.

At the Contractor's request, payment of any cost adjustments that may result from the application of Clause 3.7 shall be made 30 (thirty) calendar days from the date on which PEP issues a decision in writing as to the increase or decrease, by using the estimates mentioned in this Clause, which shall contain payments for the Work performed and any adjustments made thereon, if appropriate, and in the event these are not included in the same estimate, they shall be included in the next estimate, along with the corresponding clarification.

When, according to the payment terms and conditions, a final due date falls on a non-banking day at the payment site, the following schedule shall apply:

| Non-banking day due date | | Payment |
|---|---|---|
| Sunday (Monday) | Day | after |
| Saturday (Friday) | Day | before |
| Monday through Thursday | Day | after |
| Friday (Thursday) | Day | before |

3.8.6 Failure to Observe Payment Due Dates for Estimates. In the event of a delay in the payment of cost estimates and

189

*and adjustments, PEP, at the request of the Contractor, shall pay financial charges at a rate equivalent to that established in the Federal Internal Revenue Law for extensions granted for the payment of tax obligations. Such charges shall be calculated based on the unpaid amounts and will be computed by calendar days, as of the expiration of the payment term, until the amounts are actually made available to PEP…."*

*3.8.8 Right to Suspend Payments. It is expressly agreed by the parties that PEP may suspend payment of estimates for any completed Work that may have been or may be submitted for collection by retaining the amounts thereof, and no payment for financial charges shall be due on such suspension, and any situation for which PEP could become liable if it remains unpaid shall be at the Contractor's own liability and cost (example: unpaid withholding and back taxes), in the event that any of the following conditions arise:*

| | |
|---|---|
| *I.* | *Default by the Contractor in submitting the performance bond or the corresponding endorsements pursuant to and within the time periods stipulated for such purpose in Clauses 7.1 and 7.1.3.* |
| *II.* | *Default by the Contractor in submitting certified copies of the policies and/or certificates provided for under Clause 7.3.2 pursuant to and within the time periods stipulated in Clauses 7.3.2 and 7.3.3.* |
| *III.* | *If there are any claims by PEP against the Contractor pending resolution;* |
| *IV.* | *The Contractor is in substantial default in the performance of any of its contract obligations, including but not limited to the schedule, quality assurance and* |

190

> *health and safety requirements.*
>
> V.    *The Contractor has failed to submit the Work Schedule according to the terms and conditions stipulated in Item 3 (Work Schedule) of Appendix "B-2".*
>
> VI.   *There are amounts for which payment by the Contractor to PEP is pending for overpayments; or*
>
> VII.  *Compensation to PEP arising from other transactions has been determined."*

396.- The above transcription shows the baseless, erroneous and incorrect judgment by the Tribunal, arising out of a mistaken and partial interpretation of the content of the clauses of the contract entered into between PEP and COMMISA, since, in arriving at its decision, it only took Clauses 3.8 (form of payment), 3.8.2 (term for payment of estimates), and 9.2.6 (Acceptance Certificate) into consideration, while completely ignoring and rejecting the content of Clause 3.8.1 on the Review, Approval and Authorization of Estimates, which provides in the first paragraph thereof that once payment of the estimates in question has been authorized, they would be returned to the contractor so it can submit them, together with the corresponding invoice, to the PEP single-counter office so it can process the payment.

397.- Based on all of the assertions set forth above, and the contract provisions cited herein, it is clear that the decision of the Arbitration Tribunal was not made

in observance of the agreement executed by the parties, thereby violating the parties' agreement that this arbitration was to be decided strictly in accordance with law[35] and also violating article 17(2) of the ICC Rules of Arbitration pursuant to which the arbitration was conducted, which clearly stipulates that when the Arbitration Tribunal issues an award, it must take into account the provisions stipulated in the contract.

**Four.**

398.- As to the argument that there is no legitimate cause to suspend payment, the Arbitration Tribunal does not address this requirement in reference to the admissibility of the financial charges. That is, it fails to provide any argument, reasoning or grounds in any part of this decision to show that there is no basis for suspension, despite that fact in Paragraph 735[36] of the final award, it mentions that it was relevant to cite Sections III and IV of Contract Clause 3.8.8. This action alone renders the arbitration award invalid as it is a blatant violation of the due process (due to lack of grounds and congruence) that is safeguarded in our legal system by Article 16 of the Constitution, and is an action that left PEP without a proper defense. This decision by the Arbitration Tribunal also violates the ICC Rules of Arbitration, regulations pursuant to which the guidelines for the

---

[35] "5.2.7 An arbitration proceeding is, by nature, conducted in strict accordance with the law, unless the parties expressly agree that the arbitration Tribunal shall act as amiable compositeur or *ex sequo et bono,* in accordance with Article 17(3) of the ICC Rules of Arbitration.

[36] "...the third requirement is that PEP must not have a legitimate cause to suspend the payment; Clause 3.8.8 lists seven causes of this type, with only two that are potentially relevant to deciding the matter in dispute, which are (III) and (IV); according to the first, PEP may suspend payment without accruing interest if there are *"claims pending resolution by PEP against the Contractor"*; the second extends the scope of such suspensions to situations in which *"the Contractor is in substantial default in the performance of its contractual obligations."*

arbitration proceeding were developed, and Article 25(2) of which stipulates that the award must state the reasons upon which it is based, and Article 27 states that it must be consistent, and therefore, the award was not issued in accordance with the arbitration rules agreed upon by the parties. This procedural violation it so serious that it alone constitutes grounds for vacating the award.

399.- However, we must repeat that the main cause for suspending payment is the absence of estimates (Rule 5.2.7 of General Rules for Procurement and Execution of Public Works, which provides for a final estimate of the contract). That is, in order to pay the contract in full, a final estimate must be prepared, and not the mere acceptance of the work. Rule 5.2.7 provides:

> "5.2.7 Settlement: Final estimate wherein the total payment amount for the work performed pursuant to the Contract is determined.

400.- Thus, PEP's objection to the arbitration tribunal that COMMISA'S claims were not paid was valid, because the Arbitration Tribunal's assertion set forth in Paragraph 749[37]

---

[37] "749. And as to the argument on lack of liquidity, this cannot be valid either, because Clause 3.8.6 of the Contract does not require that amounts be payable for late interest to be due on them. It is enough for the value of the amounts owing to be determined, as it was in this Award, for interest to become due from the date they should have been paid by the contract. To understand otherwise would be the same as leaving payment of financing expenses to PEP's free discretion, which could evade its obligation to pay late interest by merely disagreeing over the amounts claimed. This interpretation of the contract could never be accepted because as it violates the mandatory principle set forth in Article 1797 of the Civil Code: *The validity and performance of contracts cannot be left to the discretion of one of the contracting parties.*"

of the Final Award that Clause 3.8.6 of the Contract does not require that the amounts be liquidated in order for financial charges to apply is illegal and incorrect. In addition, the Arbitration Tribunal blatantly continues to ignore the definition of estimate, which clearly determines liquidated amounts in the valuation of the work, and is essential for entering an award in connection with financial charges.

401.- It is important to emphasize the fact the functions of the Works Supervisor do not end once the work is completed, but continue until all of the rights and obligations arising therefrom have terminated, that is, until the contract is settled through the final estimate.

402.- In point of fact, on April 8, 2003, seven months after the work was completed, when it was, of course, too late to have any legal effect, COMMISA asked the Contract supervisor, Engineer Alfredo Gómez Rangel to formalize the Technical Dispute regarding bad weather (COM/EP2800/2003-5556). The Arbitration Tribunal was familiar with this document and yet negligently failed to consider it in the decision, as evidenced by the reference made to this fact by arbitrator Darío Oscós Coria in his Dissenting Vote (Page 4, Paragraph 8), which forms and integral part of the arbitration award.

194

403. Furthermore, this same document shows that, taking into account the conduct of the parties, as of the conclusion of the Contract term, COMMISA had still not formalized any Technical Disputes in reference to this matter, and its claim was filed extemporaneously, when there was no longer a legal possibility that PEP would consider the merits of the issue. That is, there was no possibility of creating any type of obligation.

404.- In view of the foregoing, the Arbitration Tribunal's position that the technical dispute was formalized is unfounded, and directly contradicts the express statement of COMMISA. That is, in the Acceptance Certificate, there were amounts that were owed for certain disputes, when the claim was only just being prepared, and in some cases, such a bad weather, an assessment was not even included. Furthermore, this evidences the bias of the tribunal, because it apparently ruled taking into account the conduct of PEP (Paragraph 118 of the Final Award), but did not examine the conduct of COMMISA.

405- This also reinforces PEP's the interpretation of the Certificate of Full Acceptance of the Works as to the fact that COMMISA also failed to formalize its technical dispute for so-called "technical disputes" 19, 27, 34 and 35.

195

406.- Preparation of an estimate was a mandatory requirement of the Contract, and the parties adapted their conduct to comply with such requirement. During the term of the contract entered into with PEP, according to the Certificate of Full Physical Acceptance of Work dated August 30, 2002, signed by PEP and COMMISA, the latter submitted 52 estimates which were approved and paid by PEP, with a total amount of $251,188,059.62 in domestic currency and 215,903,797.64 United States Dollars paid for completed work, and it submitted 4 estimates for cost adjustments, totaling $90,562,422.65 in domestic currency, which was expressly recorded in said Certificate on Pages 14 and 15.

407.- Furthermore, on Page 23 of the Certificate of Full Physical Acceptance of Work, under the heading ITEMS PENDING PAYMENT, it was established that the Contractor would submit an estimate in order to authorize such payment prior to mediation. Therefore, the actions of the parties confirm the mandatory nature of the payment procedure, the authorization of estimates and their submission at the payment counter, even after the contract had concluded, and therefore the Arbitration Tribunal has once again violated the ICC Rules of Arbitration (Article 17 (2)).

408.- In view of the foregoing, it is clear that the action for payment of financial charges was not proven or substantiated by COMMISA from either a public law or private law

Perspective; however and despite that, the Arbitration Tribunal issued an award in violation of public policy regulations, thereby rendering the award null and void.

**Vacation**

409.- It is clear that the facts determined by the Arbitration Tribunal as a basis for ordering payment of financial charges did not occur. It is also clear that the unfounded and erroneous conclusions of the Tribunal are a product of its attempt to resolve a dispute of an administrative nature, and subject to payment of public funds, based on principles and precepts of commercial law.

410.- As explained in the pertinent section, the Arbitration Tribunal did not apply the provisions that are applicable to this case. In no part does the Tribunal make reference to public policy provisions that regulate payments charged to the budget of government agencies.

411.- Furthermore, the Arbitration Tribunal, which had agreed to issue the arbitration award not in equity, but strictly by law, applying the federal laws of Mexico, clearly stated in the decision that **"it also satisfies, in an equitable manner, the interests of the parties involved"** (Paragraph 743 of the Final Award, transcribed above, without

understanding that the interests in question are not both private interests, but rather, there is a discrepancy between a public interest and a private interest in which interchangeable justice is not appropriate for deciding the matter in dispute (see Paragraphs 739[38] and 740[39] of the Final Award). The bias of the Arbitration Tribunal is also apparent in the in the cases indicated above: that is, the Tribunal places greater importance on the benefit of the Contractor than unrestricted observance of the contract. **Specifically, the Tribunal is allowing COMMISA to benefit from its own fraudulent conduct, because it clearly did not comply with the payment procedure established in the contract, which is a violation of international public policy, given that no country allows the performance of a contract to be left to the discretion of one of the parties thereto. Even if the Arbitration Tribunal's determination were accurate (which it is not), releasing COMMISA from its obligation to abide by the contract simply because it suffered a loss is completely unjustified, and violates the rule of law.**

---

[38] 739. It is a proven fact that on August 30, 2002, both parties signed and issued the Acceptance Certificate provided for in Clause 9.2.6 of the Contract, in which it was recorded that the work was delivered to the Owner, and that the Contractor was seeking payment of certain amounts. Since that time, PEP has been using, to its satisfaction, the pipeline systems which are the subject matter of the Contract.

[39] The Arbitration Tribunal states for the record that PEP has not alleged that the work contains defects of any kind, nor has it brought any claims against Commisa for breach of its obligations under the Contract. Since August 30, 2002, PEP has been enjoying the satisfactory and peaceful use of the work Commisa built and delivered to it. However, the Contractor has not received a substantial portion of the unpaid price, despite the fact that five years have passed since the work was delivered.

412.- For cases of technical differences, the Contract provided in Clause 23.2 the possibility of submitting these matters to Dispute Board (technical dispute), further establishing such process as a *sine qua non* procedural requirement for submitting to arbitration.

413.- In accordance with the Terms of Reference (Section C, Paragraph (d), Item 2 d), PEP expressly requested application of Article 126 of the Mexican Political Constitution, of the Law on Budget, Accounting and Federal Public Spending, of the Regulations of the Law on Budget, Accounting and Federal Public Spending, of the Federal Law on Responsibility of Public Servants, the General Law on National Property; and of the Government Procurement and Public Works Act, among others, none of which was applied by the arbitration tribunal.

414.- The laws governing the merits of the case, or the substantive laws applicable to the arbitration, were the federal laws of Mexico, as stated in Section H of the Terms of Reference. Administrative laws were particularly relevant since the contract subject to the dispute is an administrative contract.

415.- The Public Works Contract is an Administrative Contract, and not a Civil Contract. This is reflected in the fact that it was entered into by a decentralized government

199

agency, such as PEP; and is regulated by the Government Procurement and Public Works Act, and was made in benefit of the public interest, in accordance with Article 134, Paragraph II of the Constitution.

416.- Administrative Contracts are not subject to the same rules as Civil Contracts, and thus they cannot be interpreted in the same way. For example, it is already an established precedent in the federal courts that administrative contracts establish an exorbitant system of laws, that is, they benefit the State. Similarly, contracting capacity and the consent of the State for contracting is governed by countless legal provisions, such and the LAOP, the Federal Law on Administrative Responsibility of Public Servants, the Federal Law on Budget and Fiscal Responsibility; the Law on State-Owned Companies; the treasury service law, among others, as well as the regulations thereto, administrative rules, guidelines, rulings and announcements issued by the government authority. Because of this, very few matters can be negotiated, or disputed, by the parties in a public works contract.

417.- Similarly, the Arbitration Tribunal cannot disregard Mexican public policy regulations, that is, under no circumstances can the Arbitration Tribunal determine that payments charged to the federal treasury be made by agencies other than those

# EXHIBIT 1 (PART 5)

stipulated in the law, nor can it alter the payment procedures for federal resources, also established in the interest of an efficient and honest management of the federal resources, and much less based on commercial principles.

418.- On the other hand, COMMISA's private interest, such as the right to obtain compensation for its work, can in no way prevail over the public interest to an efficient, effective and honest management of public resources, [all these] guiding principles contemplated in article 134 of the Constitution. Therefore, by having its case based on a clearly ineffective and invalid act on the part of the Arbitration Tribunal, the order to pay financial expenses also violates the legal-constitutional system of administration of federal resources.

419.- Having understood this, the commercial nature of the arbitration proceeding does not change the administrative nature of the contract that is the basis of the action. This being the case, the interpretation and application of the public works administrative contract pursuant to private law turns out to be inconsistent with the contract's nature and objective. Reason for which, having established the regulatory framework for the public works contract incorrectly, the Arbitration Tribunal made the

obvious mistake of applying the principles of commercial law to legal relationships of an administrative nature.

**Second**

420.- The Final Decision issued is likewise null and void as pertains to the penalty for payment of finance charges (or interests, as they are considered by the Arbitration Tribunal) since it violates Mexican public interest regulations, in accordance with Article 1457, section II of the Commercial Code.

421.- In fact, Mexican law prohibits the capitalization of interests not yet accrued, under penalty of nullity and, similarly, it prohibits the capitalization of finance charges. In the case of accrued interests or finance charges, this shall require necessarily a consensus from the parties and, above all, from the person who will be paying them. In this case, the law may not be a substitute nor may it replace the will of the parties, nor may it override such will. The Tribunal may also not do this because it is not a right that is available to it and that, moreover, remains unavailable as long as there is no agreement. The will's autonomy is unlimited in this matter.

422.- The articles that support these arguments are article 2397 of the Federal Civil Code and article 363 of the Commercial Code, which state the following, respectively:

*"Article 2397.  The parties may not, under penalty of nullity, agree in advance that interests should be capitalized and produce interests."*

*"ARTICLE 363.  Interests that are due and not paid shall not accrue interests.  The contracting parties will be able to capitalize them, however."*

423.-  Contrary to the provisions of the above-transcribed legal dispositions, the Arbitration Tribunal resolved that:

*"Finance charges will be calculated **by calendar days and will be paid in PME together with the principal ... **"*

This can be seen in paragraphs 750 and 780, pages 174 and 180 of the Arbitration Award, which state:

*"750.  In terms of this litigation point, the Arbitration Tribunal decided that:*
*- -----------------------------------*
*- the finance charges will be calculated in calendar days and will be paid together with the principal for the amounts owed by PEP."*

*"780.  ......... .  The finance charges will be calculated in calendar days and will be paid together with the principal for the amounts owed by PEP."*

424.-  Therefore, the right to capitalize the interests is a dispute outside the Arbitration agreement because a clause to this effect does not and cannot exist, because the

applicable provisions prohibit the addition of the interest generated to the capital, as a base for calculating the interests.  In this manner, the person who adjudges also incurs in the grounds for vacation that is contemplated in article 1457 section I, par. c) of the Commercial Code, since it oversteps its mandate.

425.-  In addition, the Arbitration Tribunal's intent that finance charges or interests be calculated on a daily basis implies the daily capitalization of the sums generated, which is a business that is prohibited by Mexican law, and its decision goes against the public interest since it precisely opposes a prohibitive law whose penalty is the nullity of the action.

## VI.  Examination of the Grounds for Vacation of the Decision.

426.-  The petition for the nullity of the arbitral commercial award is ruled by the Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958 (New York Convention), the Inter-American Convention on International Commercial Arbitration (Panama Convention), and Section 4, Chapter VII of the Commercial Code, which encompasses articles 1457, 1458, 1459 and 1460; in conformity with article 133 of the Federal Political Constitution.

427.-   The Convention on the Recognition and Enforcement of Foreign Arbitral Awards of June 10, 1958, ratified by the Mexican Senate in 1971, commonly known as the New York Convention, states in its first article that said Convention will be applied to the recognition and enforcement of arbitral awards issued within the territory of a state different than the one in which the recognition and enforcement of said awards is being petitioned for, and which should originate from differences between natural persons or legal entities.

428.-   The New York Convention sets forth in its Article V a series of principal causes or motives for a national jurisdictional court to deny the recognition of a commercial arbitral award and/or to reject its enforcement.   These principal causes or motives are also useful for the affected party to petition, in the course of proceedings, for the annulment of the commercial arbitral award.   Such causes are the following:

> "Article V
> 1.   The recognition and enforcement of the award can only be denied at the request of the party against which it is issued if said party proves, before the competent authorities of the country in which such recognition and enforcement has been requested:
>   a)   That the parties in the agreement to which Art. II makes reference were subject to a legal incapacity by virtue of the law that applies to them, or that said agreement is not valid by virtue of the law to which the parties submitted or, if there were no indications in this respect, by virtue of the

*laws of the State in which the award was issued; or*

    b)  *That the party against whom the arbitral award is issued has not been duly notified of the Arbitrator's appointment or of the arbitration proceedings, or has been unable, for any other reason, to get recognition for its defense resources; or*

    c)  *That the award refers to a dispute that is not provided for in the arbitration or not included in the arbitration clause, or contains provisions that exceed the terms of the arbitration or of the arbitration clause; nevertheless, if the provisions of the award that refer to the matters submitted to arbitration can be separated from those that were not submitted to arbitration, the first ones can be recognized and enforced; or*

    d)  *That the constitution of the arbitration tribunal or of the arbitral proceeding have not adapted to the agreement entered into between the parties or, in the absence of such agreement, that the constitution of the arbitration tribunal or of the arbitral proceeding have not adapted to the laws of the State in which the arbitration took place; or*

    e)  *That the sentence is not yet mandatory for the parties or has been annulled or suspended by a competent authority of the State in which such award was issued, pursuant to said State's laws.*

2.  *The recognition and enforcement of an arbitral ruling can also be denied if the competent authority of the State in which such recognition and enforcement is being requested is able to prove:*

    a)  *That, according to the law of this State, the object of the dispute is not suited to being solved via arbitration means; or*

    b)  *That the recognition or enforcement of the ruling go against the public interest of the same State."*

The Inter-American Convention on International Commercial Arbitration (Panama Convention) contains a provision similar to the New York Convention's, including the sufficient causes or motives to deny the enforcement of the arbitral commercial award or to solicit its annulment, provision which is transcribed as follows:

> "Article 5
> 1. The recognition and enforcement of the award can only be denied at the request of the party against which it is issued if said party proves, before the competent authorities of the State in which such recognition and enforcement are being requested:
> a)  That the parties in the agreement were subject to a particular legal incapacity by virtue of the law that applies to them, or that said agreement is not valid by virtue of the law to which the parties submitted or, if there were no indications in this respect, by virtue of the laws of the State in which the award was issued; or
> b)  That the party against whom the arbitral award is issued has not been duly notified of the Arbitrator's appointment or of the arbitration proceedings, or has been unable, for any other reason, to get recognition for its defense resources; or
> c)  That the award refers to a dispute that is not provided for in the agreement between the parties to submit to arbitration proceedings; nevertheless, if the provisions of the award that refer to the matters submitted to arbitration can be separated from those that were not submitted to arbitration, the first ones can be recognized and enforced; or
> d)  That the constitution of the arbitration tribunal or of the arbitral proceeding have not adapted to the agreement entered into between the parties or, in the absence of such agreement, that the constitution of the arbitration tribunal or of the arbitral proceeding have not

*adapted to the laws of the State in which the arbitration took place; or*

*e)  That the sentence is not yet mandatory for the parties or has been annulled or suspended by a competent authority of the State in which such award was issued, pursuant to said State's laws.*

2.  *The recognition and enforcement of an arbitral ruling can also be denied if the competent authority of the State in which such recognition and enforcement is being requested is able to prove:*

*a)  That according to the law of this State, the object of the dispute is not suited to being solved via arbitration means; or*

*b)  That the recognition or enforcement of the ruling goes against the public interest of the same State."*

430.-  Article 1457 of the Commercial Code sets forth the causes based on which the parties to the arbitration can petition for the annulment of the arbitral commercial award.  The causes are as follows:

*"ARTICLE 1457.   Arbitral awards can only be annulled by the competent judge when:*

*I. The party that petitions for this action proves that:*

*a) One of the parties to the arbitration was affected by a legal incapacity, or that said agreement is not valid by virtue of the law to which the parties have submitted or, if there were no indications in this respect, by virtue of the Mexican law;*

*b)  It was not duly notified of the Arbitrator's appointment or of the arbitration proceedings, or it has been unable, for any other reason, to get recognition for its rights;*

*c)  The award refers to a dispute that is not provided for in the arbitration agreement or contains decisions that exceed the terms of the arbitration agreement.   Nevertheless, if the provisions of the award that refer to the matters submitted to arbitration can be separated from those that were not, only the latter may be annulled; or*

> *d)  That the composition of the arbitration tribunal or of the arbitral proceeding did not adjust to the agreement entered into between the parties, except when said agreement is in conflict with a provision of this section from which the parties were unable to separate or, in the absence of such agreement, that the parties did not adapt to this section; or*
>
> *II. The judge verifies that, according to Mexican law, the object of the dispute is not suited to arbitration or that the award goes against the public interest."*

431.-  As can be observed, all of these regulations are similar in pointing out the causes that deny the recognition or enforcement of the arbitral commercial award. Some of these causes have been invoked by PEP to solicit the annulment of the award. Therefore, these will be listed next, together with their dogmatic development, in order to clearly demonstrate that the facts and the laws invoked in the corresponding chapter are consistent with the aforementioned annulment causes, which are the following.

432.-  The impossibility for PEP to assert its rights or defense resources in the Arbitration (absence of due process), sanctioned in article V, section 1, par. b) of the New York Convention; article 5, section 1, par. b) of the Panama Convention; and article 1457, section I, par. b) of the Commercial Code.

209

433.-   When the decision is not provided for in the arbitration agreement, it exceeds the terms of arbitration (*plus petitio* or *extra petita*) sanctioned in article V, section 1, par. c) of the New York Convention; article 5, section 1, par. c) of the Panama Convention; and article 1457, section I, par. c) of the Commercial Code.

434.-   When the proceeding contradicts the arbitral agreement (undue arbitral proceeding), sanctioned in article V, section 1, par. d) of the New York Convention; article 5, section 1, par. d) of the Panama Convention; and article 1457, section I, par. d) of the Commercial Code.

All of these grounds are being invoked and a complaint is filed upon request of the party.

435.-   When the award goes against the Mexican public interest, sanctioned in article V, section 2, par. b) of the New York Convention; article 5, section 2, par. b) of the Panama Convention; and article 1457, section II of the Commercial Code.

**These grounds for nullity require that an examination by the jurisdictional court be carried out officially and, in addition, they allow for an in-depth review by the Arbitration Tribunal of the**

**proceedings and of the evidence submitted and presented, if this were necessary in order to demonstrate the violation of the Mexican public interest.**

436.- The concept stated in the above paragraph is clear in international private law. Resolution 3 (c) adopted by the International Law Association, in its Seventieth Conference in New Delhi, India, April 2-6, 2002, at which a series of recommendations to State courts, prepared by its International Arbitration Committee, with the purpose of establishing General Bases, Fundamental Principles, General Rules regarding the **Concept of Public Interest** and of what, in this context, are International Obligations (Dr. José Luis Siqueiros, *PUBLIC INTEREST AS A MOTIVE TO DENY THE RECOGNITION AND ENFORCEMENT OF INTERNATIONAL ARBITRAL AWARDS*, in *Pauta* magazine, No. 40, page 21) were approved.

*"Recommendation 3 (c)  When one of the parties claims a violation of the forum's public interest, and such violation cannot be proven through a simple review of the decision and can only be determined by scrutinizing the factual antecedents of the case, the court may then carry out a new examination of the facts."*

437.- This idea regarding the concept of public interest was

reintroduced in the Final Report of the International Arbitration Committee of the International Law Association, that was presented at said Association's Conference in London, England, in July of 2002, and where it was granted definitive support (Alvaro López de Argumedo Piñeiro and Marcos de Benito Llopis-Llombart, PUBLIC INTEREST AS A REASON TO DENY THE RECOGNITION OF A FOREIGN ARBITRAL AWARD: CRITERIA FOR ITS PRACTICAL APPLICATION, in *Actualidad Jurídica Uría y Menéndez* magazine, November 2005, page 120).

"*Recommendation 3 (c)  - When the alleged violation of a public interest norm is not evident from a simple reading of the arbitral decision, the exequatur Court may become involved to examine the tactical and legal fundamental facts of the matter.*"

438.-  Other arbitration experts also adopt this idea, such as Francisco González de Cossío, who accepts the possibility of a judge reviewing the facts of the case in an exceptional situation, if it were necessary to determine said violation of public interest (Francisco González de Cossío, ENFORCEMENT OF ARBITRAL AWARDS,  in the Commercial Arbitration Manual, Porrúa Editorial, page 19).

**One.**

439.-  The objective of declaring an annulment

212

when a person is not allowed to assert their rights or defense resources, is for the parties to have a minimum level of justice and equality.  Due process is what is known within the Mexican constitutional law environment as the right to a hearing; a guarantee whose fulfillment lends credibility to any type of proceeding and generates trust in its results.  It is not necessary to add that due process is a response to a universal principle of justice.

440.-  In this case we try to establish that PEP did not have the possibility to assert its rights, and this impossibility resulted in a ruling counter to its interests.  This cause was invoked in our arguments against the decision for Dispute 34 and 35 (second), in which the Arbitration Tribunal awarded to COMMISA payments that were never claimed by COMMISA.  It is worth remembering that it was proven that the Arbitration Tribunal independently added an issue to the dispute that was not a part of the lawsuit, and ordered PEP to pay a sum of money to COMMISA, by way of compensation, for non-recoverable costs that were supposedly incurred, when COMMISA had only requested either the payment of stand-by tariffs due to suspension of the work or, in its absence, an indemnification for damages and losses.  The Arbitration Tribunal justified its actions based on the Actions for Rapid Adjudication, which did not offer PEP the opportunity to assert its rights, as has already been stated.

In this respect, our highest authorities have established the following:

**ARBITRATOR.  HIS RESOLUTIONS ARE ACTS OF AUTHORITY AND THEIR ENFORCEMENT IS THE RESPONSIBILITY OF THE JUDGE DESIGNATED BY THE PARTIES.**[40]  In order to enforce an arbitral award, it is necessary to have the mediation of an act, carried out by a jurisdictional organ that, without taking away its private nature, takes charge of its content in such a manner that the award is enforceable by virtue of the jurisdictional act, which is the only complement necessary to execute that which was resolved by the Arbitrator, since the award is a resolution dictated by an Arbitrator who settles the dispute that has arisen between the parties, with status as res judicata and as a basis to motivate its enforcement, before a competent Judge who must provide the necessary procedural means to allow the award's resolution to be fulfilled.  Therefore, the award is a resolution that has the attributes of non-refutability, inability to be amended, and coercibility, except that the effectiveness and concrete execution of the sentences are always dependent on the competent Judge designated by the parties or the proceedings' location.  The Arbitrator does not have the authority to enforce, by himself, the award that was issued, since he does not have the power or imperium, which is one of the attributes of the jurisdiction, and which is inherent to the State's jurisdictional organs.  This implies that the Arbitrator lacks the State's power to execute the sentence, but the award itself is not dispossessed of the faculties of res judicata, since the authority to resolve the dispute is granted by the State through judicial norms, and only the authority to enforce is reserved.  The Judge before whom the enforcement of an award that was issued by an Arbitrator is petitioned, in order to order payment as required,

---

[40] Registry No: 189, 345.  Isolated opinion.  Material(s): Civil. Ninth Term.  Jurisdictional Stage:  Associate District Courts.  Source:  *Semanario Judicial de La Federación y su Gaceta* (The Federation's Weekly Law Journal and its Gazette).  XIV, July 2001.  Opinion: I.3o.C.231 C.  Page: 1107.

solely must and should verify the existence of said award, as a resolution that has established a specific, non-refutable, non-amendable conduct and that, thus, **must arise from a proceeding in which the proceeding's essential formalities have been observed**, and that does not go against public interest matters.

THIRD THREE-JUDGE CIVIL COURT OF THE FIRST CIRCUIT.

Direct amparo 1303/2001. Constructora Aboumrad Amodio Berho, S.A. de C.V. March 8, 2001. Unanimous vote. Speaker: Neófito López Ramos. Secretary: Lina Sharai González Juárez.

**Two.**

441.- When the decision is not provided for in the arbitration agreement, or it exceeds the terms of the arbitration agreement (*plus petitio* or *extra petita*), it causes the nullity of the award, because the dispute refers to controversies not included in the arbitration agreement; in other words, when the topics of the arbitration case are not part of the arbitration agreement in order to be the specific subject matter of the Arbitration Proceedings.

442.- Pursuant to Clause 23.2 of the Contract, those disputes, claims or controversies that have not been formalized as technical disputes and, similarly, those compensations for legal damages that have not been expressly agreed upon in the contract, cannot be the subject matter of arbitration.

443.- In that tenor, it was demonstrated that, in terms of the technical disputes 34 and 35 (fourth), regarding initial delays

involving work with boats, technical dispute 36 (third and fourth), regarding compensation for adverse weather, partially in terms of technical dispute 19 regarding obstructions, and technical dispute 27, regarding payment of differences, these were not specifically formalized as technical disputes, reason for which they could not be subject matters of the arbitration. In the same manner, in terms of technical dispute 36 (first) regarding compensation for adverse weather, it was demonstrated that the payment for adverse weather was not an obligation that PEP committed to by virtue of the contract and, rather, it was demonstrated that PEP was not under any obligation to provide compensation for events considered to be *force majeure* or acts of God, such as adverse climactic conditions.

**Three.**

444.- When the proceeding goes against the arbitration agreement (undue arbitral proceeding). In this tenor, we have claimed and provided evidence that the arbitral court did not settle the dispute under strict law, in addition to the fact that the award is incongruent and contradictory within itself.

445.- The Arbitration Court did not respect the strict law. The arbitration proceeding rules agreed upon between the parties, in conformity with clause 23.3 of the contract, were the Arbitration Rules of the International Chamber of Commerce

that should be in effect at the time of arbitration.  In accordance with article 17(3) of the ICC's Arbitration Regulations, the arbitration proceeding bases, by nature, on strict law, unless the parties should expressly agree that the arbitral court will act as amiable compositeur or *ex aequo et bono*.  It was not expressed in any part of the arbitration agreement to which we refer, nor in the Mission Statement, that the Arbitration Tribunal would act as amiable compositeur or that the same would be resolved on "equity".

In addition, in terms of the substance of the matter, this was to be resolved in conformity with Mexican federal law, pursuant to Chapter H of the Mission Statement.

446.-  What can be gathered from reading the Arbitration Award is that the Arbitration Tribunal placed a certain right or interest of COMMISA above any contractual or public interest consideration, ordering that its work be compensated.  Since the arbitration award is divisible, the issues of nullity can be tackled dispute by dispute. However, we can clearly identify a pattern of violation of the principle of strict law that affects the entire award.

447.-  There are multiple examples of violations to the principle of strict law in the arbitration award.

217

448.- In matters of competence, since clause 23.3 of the Contract, which establishes that a dispute should be formalized as a technical dispute as a prerequisite for submission to arbitration, was not observed.

449.- In technical disputes 34 and 35 (first, second, third and fourth) regarding initial delays involving work with boats; technical dispute 36 (first, second, third and fourth) regarding compensation for adverse weather; technical disputes 37 and 39 regarding crossings; technical dispute 19 regarding obstructions; technical dispute 27 regarding payments for differences; and in the decision for payment of finance charges, violations to the strict law can be observed.

450.- In all of these disputes the Arbitration Tribunal stopped applying the case's pertinent contractual clauses; it stopped observing the laws pertinent to the case, the application of which was expressly requested by PEP, especially that of administrative laws. For example, in dispute 36 it disregarded the fact that PEP did not have the obligation, pursuant to the contract, to render payment for adverse weather; in disputes 34 and 35 it did not take into account that COMMISA did not accredit any contractual or legal measure to be indemnified for any delays when initiating work with boats. In terms of dispute 19, it did not obey contractual regulations to determine the

limitation of the rights of the Plaintiff and, in disputes 27, 37 and 39 it ordered that the previously agreed-upon payment be rendered, for work that did not correspond to the work actually carried out by COMMISA.  In its decision regarding finance charges, and in order to solve the dispute, the Arbitration Tribunal evidently did not take into account, in any of these cases, the law that applies to finance charges nor the contract's essential clauses.

451.-  In addition, the award is incongruent and notably contradictory within itself.  For example, in technical disputes 34 and 35 (second), the Arbitration Tribunal orders that payment for a service be made to COMMISA, when COMMISA never requested such payment; in technical disputes 37 and 39 (regarding crossings), it orders that agreed-upon sums be paid as compensation for a different type of job; and if the foregoing were not enough, in the dispute regarding finance charges the Arbitration Tribunal first establishes correctly the norm's assumptions, but later takes into account some assumptions that are totally different to the first, and orders that PEP make payment based upon the latter assumptions.

452.-  All of these circumstances corrupt the arbitration award, as has already been determined by the jurisdictional courts, pursuant to the following opinion:

**ARBITRATION AWARD.  WHEN THE JUDGE MAY**

**DENY ITS ENFORCEMENT**[41].    National awards do not require judicial approval or homologation in order to be enforced; Judges can only refuse to enforce an award when the arbitration award is corrupted due to essential formalities not being respected.  Examples of these are:  1. The Arbitrator has not adhered to the arbitral commitment (article 616 of the Code of Civil Procedure for the Federal District); 2. It involves matters that may not be submitted to arbitration; 3. The appointment of the Arbitrator is done by someone who is not authorized to do so, or such appointment is not carried out in the manner and under the prerequisites established by law (articles 612 to 614 of the Code of Civil Procedure for the Federal District); 4. The appointed Arbitrator is incapable and, in the case that the person considered for this position or appointed as a legal official passes away, is rejected or excused, if there did not exist the possibility of naming a substitute, whether through an agreement by the parties, nor by legal provision (articles 222, 612, 613 and 622 of the Code of Civil Procedure for the Federal District); 5. If before issuing the award, the Arbitrators are revoked by express and unanimous agreement between the parties (article 618 of the Code of Civil Procedure for the Federal District); 6. The award is handed out when all of the terms and extensions granted by the committing parties, as well as the terms established by law (articles 617, 622, 624 and 627 of the Code of Civil Procedure for the Federal District) have already expired; 7. The fundamental rights to action and to defense have been violated; 8. **The agreement's nullity is declared, whether due to formal corruption or, because being subject to the rule of law and not to amiable composition, it does not fulfill the right to a hearing**.
FOURTH THREE-JUDGE CIVIL COURT OF THE FIRST CIRCUIT.
Amparo under review 364/2002.  Koblenz Eléctrica,

---

[41] Registry No: 186, 920.  Isolated opinion.  Material(s): Civil. Ninth Term.  Jurisdictional Stage: Associate District Courts. Source: *Semanario Judicial de La Federación y su Gaceta* (The Federation's Weekly Law Journal and its Gazette).  XV, May 2002.  Opinion: I.4o.C.53 C.  Page: 1241.

S.A. de C.V.  February 22, 2002.  Unanimous vote.  Speaker:  Marco A. Rodríguez Barajas.  Secretary: Ana Paola Surdez López.

**AWARD, THE JUDGES MAY DENY THE ENFORCEMENT OF, WHEN THEY OBSERVE THAT THE ARBITRATOR DID NOT FULFILL THE PROCEDURAL FORMALITIES THAT WERE AGREED UPON BY THE INTERESTED PARTIES, FOR SUCH MATTER IS A PUBLIC INTEREST ONE[42].**  Even though the Judges lack the authority to review the legality of the arbitration award, as pertains to its substance, in terms of an appeal, in the assumption that such legal recourse has not been waived by the parties they may reject, however, the enforcement of the award, **if they observe that the Arbitrator has ostensibly ignored the procedural prerequisites stipulated in the respective arbitration or arbitration clause**, with evident violation of the essential norms of any proceeding that is of public interest. SECOND THREE-JUDGE CIVIL COURT OF THE FIRST CIRCUIT. Amparo under review 286/77.  Etla, S.A.  September 23, 1977.  Unanimous vote.  Speaker:  Martín Antonio Ríos.

453.-  The violation of the arbitration agreement, with the understanding that the proceeding would base on strict law, is of utter importance, since the will of PEP to submit to arbitration, which is reiterated in the Mission Statement, was agreed upon with the prerequisite that this would involve a legal proceeding, resolved pursuant to Mexican federal laws.  In order to demonstrate the existence of such a violation to the proceeding that was agreed upon by the parties, one must study the decision of the Arbitration Court.

---

[42] Registry No: 252, 781.  Isolated opinion.  Material(s): Civil. Seventh Term.  Jurisdictional Stage:  Associate District Courts.  Source:  *Semanario Judicial de La Federación* (The Federation's Weekly Law Journal).  103-108 Sixth Part. Opinion: Page: 129.  Genealogy:  Report 1977, Third Part, Associate District Courts, opinion 9, page 264.

221

454.- In addition, in this case, there are no possible damages that could lead the person who adjudges to proceed in a manner different to the one agreed upon by the parties. Any contractual obligation and its scope were well known by the contractor, and the contracting took place under those terms.

455.- The strict law is even more important in administrative law since, as has already been explained in the course of this document, a public works contract is an administrative contract that summarizes, inevitably, a series of norms relating to the control and execution of such public works, as well as to the control and application of federal resources, which fall within a budget control system established in articles 126 and 134 of the Federal Political Constitution, reason for which its violation doubtlessly annuls the award issued.

**Four**

456.- The principal argumentation of PEP centers on the fact that the decisions relating to Disputes 34, 35 and 36, and to finance charges, violate the Mexican public interest. Certainly, an award is to be annulled if it violates the Mexican public interest (article 1457, section II of the Commercial Code).

457.- There is a dogmatic discussion in arbitration, and in the doctrine of private international law, on the significance of public interest, which we will try to explain, not to reach a definitive conclusion, which is not the objective, but for the person who adjudges to have a foundation for establishing the legal basis of PEP's request.

458.- There are public interest notions provided by legal dogma. In this case, public interest encompasses the most basic notions of morality and justice within one judicial system (Francisco González de Cossío, ENFORCEMENT OF ARBITRATION AWARDS, in the Commercial Arbitration Manual, Porrúa Editorial, page 191).

459.- On the other hand, several authors point out the following in terms of public interest: "*Public interest makes reference to the fundamental norms of cohabiting in a specific country, which norms coincide with the basic norms of the Constitution*[43]", or "*public interest encompasses all the imperative dispositions, in other words, all those that the parties will not be able to repeal in their individual agreements*[44]", or public interest is the "*system that will uphold the principles of justice in a State for the correct interpretation of its laws, and to ensure the proper administration of justice and avoid,*

---

[43] Eloy Ruibola Santana, quoted by Francisco Gorjón Gómez in COMMERCIAL ARBITRATION AND ENFORCEMENT OF AWARDS, Mc Graw Hill, page 271.
[44] Ibrahim Fadlallah, quoted by Francisco Gorjón Gómez in COMMERCIAL ARBITRATION AND ENFORCEMENT OF AWARDS, Mc Graw Hill, page 272.

*within the arbitration procedure, any arbitrariness into which the Arbitrators themselves could fall[45]".*

460.- It is unquestionable that the public interest is composed of: i) the fundamental principles relating to justice and morality that the State aims to protect even when it is not directly involved; ii) the rules designated to serve the political, social and economic interests of said State, known as police laws (*leyes de policía*) or public interest rules; and iii) the obligation of the State to respect its obligations before other States or international organizations (Francisco González de Cossío, above-cited work, page 191).

461.- There will be a violation to the public interest if the following occurs: i) the arbitration award infringes upon the principles of justice and morality that a State aims to protect; ii) the arbitration award contradicts public interest provisions that serve to satisfy the political, social or economic interests of the State; or iii) it implies a violation of the international obligations of the State.

462.- The public interest principles of justice and morality can be procedural or substantive, and may adapt in accordance with the irregular manner in which the arbitration was carried out, and the grave breach of the guarantees (constitutional or fundamental) of the process,

---

[45] F.A. Mann, quoted by Francisco Gorjón Gómez in COMMERCIAL ARBITRATION AND ENFORCEMENT OF AWARDS, Mc Graw Hill, page 272.

224

according to the Mexican legal system, or because the award infringes upon an
imperative norm (Francisco Gorjón Gómez, COMMERCIAL ARBITRATION AND
ENFORCEMENT OF AWARDS, Mc Graw Hill, page 274); and likewise, within the
public interest regulations we also find all of the basic dispositions that regulate the
public economy.

All of the concepts set forth herein fall within the "public interest", which PEP
claims has been breached in the award.

463.-  The constitutional legal system established in articles 126 and 134 of the
Constitution, on the execution of public works and the use and control of the budget or
federal public expenses is, indeed, protective of the public interest because it addresses
the political, economic and social needs of the Mexican State.

These provisions, moreover, are the basic constitutional principles of some other
countries.  For example, the Spanish Constitution, in its article 133 (4), states that public
administrations will only be able to enter into financial obligations and incur expenses in
accordance with the laws.  Also, the Colombian Constitution, in its Section XII, regulates
the economic and public assets regime, and we can point out that its article 345 is
similar to article 126 of the Mexican Constitution.  With these references we are able to
affirm that the budgetary and public expense norms

are basic economic principles of the Mexican State and of a large number of members of the international community, and they are not mere domestic public interest legal concepts.

464.-  Above all, in terms of the objection to the decision on technical disputes 34, 35 and 36 and on finance charges, we have argued for a series of violations to public interest provisions, such as the order to pay for obligations that were not contractually entered into and that do not derive from law; payment for work that was not carried out or costs that were not incurred; orders for payments that contradict public interest regulations regarding payment at the expense of federal resources, and violations of the State's responsibility for default interest and, in general, of the administrative legal system that constitutes the framework for regulation of public works contracts, which establishes an exorbitant legal regime favoring the State and aiming to achieve public good.

465.-  In its resolution, the Arbitration Tribunal failed to apply public interest administrative regulations.  This lack of observance of Mexican law or of applicable norms cannot be considered a simple legal error for two reasons:  the first reason has already been explained:  this conduct by the Tribunal constitutes a violation of the arbitration agreement, the terms of which make it clear that the arbitration proceeding

would base on strict law. The second reason is that the specifications of said provisions cannot be waived since their observance is mandatory and had to be taken into account mandatorily by the Tribunal. The lack of observance of such norms in this case, we reiterate, is not an issue of law or repealing the decision, but rather it is an issue of public interest, in accordance with the nature of the norms that were not applied.

In this tenor, our highest authorities have established the following:

> **ADMINISTRATIVE CONTRACTS, APPLICABILITY OF THE CIVIL CODE IN**[46]. The precepts of the Civil Code are not always to be applied compulsorily, when in the case of administrative matters a precept of the Constitution is to be preferably observed over any other legislation.
> Amparo proceeding against acts of administrative officials, Review 3977/36.
> Gavito Hermano y Compañia. July 8, 1938. Unanimous, five votes.
> Reporter: José María Truchuelo.
>
> **PUBLIC INTEREST. IT IS AN INDETERMINATE LEGAL CONCEPT THAT IS MADE CURRENT IN EVERY SPECIFIC CASE, ATTENDING TO THE MINIMUM REGULATIONS FOR SOCIAL COHABITATION**[47]. Public interest does not constitute a concept that can be configured based upon a formal declaration within a law. On the contrary, it has been the consistent opinion of the Supreme Court of Justice of the Nation, that is the responsibility of the person who adjudges to review its presence in each concrete case, so that it shapes up as

---

[46] Registry No: 331, 037. Isolated opinion. Material(s): Administrative. Fifth Term. Jurisdictional Stage: Second Court. Source: *Semanario Judicial de La Federación* (The Federation's Weekly Law Journal). LVII. Opinion: Page: 220.

[47] Registry No: 177, 560. Isolated opinion. Material(s): Common. Ninth Term. Jurisdictional Stage: Associate District Courts. Source: *Semanario Judicial de La Federación y su Gaceta* (The Federation's Weekly Law Journal and its Gazette). XXII, August 2005. Opinion: I.4o.A.63 K. Page: 1956.

an indeterminate legal concept of impossible definition **whose concept can only be outlined by the circumstances of manner, time and place that should prevail at the time that the valuation takes place.  In any case, in order to give it significance, the person who adjudges must have present the essential conditions for the harmonious development of the community, in other words, the minimum rules for social cohabitation**; this is done with the knowledge that the decision that is made in a specific case cannot rest upon mere subjective estimations, but rather upon objective elements that represent the fundamental concerns of society, always seeking not to obstruct the effectiveness of third party rights.

FOURTH THREE-JUDGE CIVIL COURT OF THE FIRST CIRCUIT.
Direct amparo 312/2004.  Alberto Salmerón Pineda.  January 12, 2005.  Unanimous vote.  Speaker:  Jesús Antonio Nazar Sevilla.  Secretary:  Ernesto González González.
Direct amparo 453/2004.  Hospital Angeles del Pedregal, S.A. de C.V.  February 23, 2005.  Unanimous vote.  Speaker:  Jesús Antonio Nazar Sevilla.  Secretary:  Indira Martínez Fernández.

**PUBLIC INTEREST, LAWS OF**[48].  The public interest that takes into account the law and jurisprudence in order to establish a norm on radical nullities, cannot be constituted by the sum of merely private interests; in order for public interest to be involved, **it is of essence that the interests that are the subject of the matter be important in such a way that, despite the lack of damages and even the acquiescence of the interested party, the prohibited action could cause damages to the community, the State or the nation**.
Direct civil amparo 2785/31.  Díaz Rubín, Pedro, and co-appellants.  March 30, 1933.  Unanimous, four votes.  Absent:  Manuel Padilla.  The publication does not provide the speaker's name.

---

[48] Registry No: 362, 355.  Isolated opinion.  Material(s): Common.  Fifth Term.  Jurisdictional Stage:  Third Court.  Source: *Semanario Judicial de La Federación* (The Federation's Weekly Law Journal).  XXXVII, August 2005.  Opinion:  Page: 1835.  Genealogy:  Appendix 1917-1985, Eighth Part, Common, opinion relating to jurisprudence 193, page 315.

**PUBLIC INTEREST LAWS, WAIVER OF (FEDERAL DISTRICT LEGISLATION)**[49].

In articles 6th, 15 and 1309 of the Civil Code of 1884 one can find, respectively, the ineffectiveness of waiving public interest laws, the prohibition of their alteration through an agreement between private parties, and the consideration of such a waiver as being non-existing.

Amparo proceeding against acts of administrative officials, under review 8398/39.   Formoso Padín, Joaquín.   October 20, 1941. Unanimous, four votes.  Absent:  Eduardo Vasconcelos.  Reporter: Roque Estrada.


### VII.  Costs Incurred in the Arbitration

466.-  In paragraphs 764 to 771, pages 177 to 179, and Chapter XII, section 6, sub-section (ii) of the Arbitration Award, the Arbitration Tribunal sentences PEP to pay to COMMISA the costs incurred in the arbitration, in the amount of US$ 200,000, for having filed a motion to dismiss for lack of jurisdiction.

The Arbitration Tribunal considers the following in paragraph 770, basing upon the criterion of defeat[50]:

> "*In terms of the pretensions to lack of competence of the Arbitration Tribunal, and to the lack of prerequisites for admissibility set forth by the Defendant, the Arbitration Tribunal has rejected them in their entirety, stating that <all of the pretensions and petitions formulated by the Plaintiff in its lawsuit, and by the Defendant in its counterclaim, are subject to clause 23.3 of the Contract, and that the*

---

[49] Registry No: 308, 917.  Isolated opinion.  Material(s): Civil. Fifth Term.  Jurisdictional Stage:  Fourth Court.  Source: *Semanario Judicial de La Federación* (The Federation's Weekly Law Journal). LXX. Opinion: Page: 1195.

[50] Paragraph 767 of the Final Decision.-  "Neither the parties, nor the Regulations of the ICC have set the criterion that the Arbitration Tribunal must follow in assigning expenses and costs between the parties.  Faced with this deficiency, the Arbitration Tribunal turns to article 1455 of the Comm. Code that is dedicated to costs, which establishes the criterion of defeat, permitting the Arbitration Tribunal to prorate the elements of these costs between the parties if it should deem it so reasonable, <taking under consideration the circumstances of the case>."

*Arbitration Tribunal has the competency to resolve them>. With the Defendant having been completely defeated in its jurisdictional objections, it has the obligation to assume the percentage of reasonable costs that the Plaintiff has incurred in order to contest said pretensions.   The Arbitration Tribunal, in view of the circumstances of the case, decides that these costs total US$ 200,000 and that they must be paid by the Defendant."*

467.-  The criterion of defeat is not applicable when resolving the motion to dismiss based on procedural defect, because such resolution does not form judgment on any point of the litigation that was filed by the parties but, as in the case at hand, the matter of which is the Competent Tribunal has only been decided on principle (and not in an invulnerable manner)[51].  Therefore, payment of this sum is completely unjustified. The following case law serves as support, when applied analogously to the interpretation of article 1455 of the Commercial Code:

> **COSTS IN THE COMMERCIAL EXECUTIVE TRIAL.   THE SENTENCE FOR PAYMENT IS NOT ADMISSIBLE WHEN THE JURISDICTIONAL PLEA TO DISMISS FOR LACK OF JURISDICTION (INTERPRETATION OF ARTICLE 1084, SECTION III, OF THE COMMERCIAL CODE)[52] IS DECLARED ADMISSIBLE BY INTERLOCUTORY ORDER.** Pursuant to such provision, the party that initiates an executive trial and does not receive a favorable ruling shall be sentenced to pay the costs.  In this provision it can be observed that section III of article 1084 of the Commercial Code adopts the theory of defeat,

---

[51] It is reiterated that, in conformity with article 1432 of the Commercial Code, the definitive resolution on the competence of an Arbitration Tribunal corresponds to the jurisdictional organs, reason for which it is neither a definitive nor a non-appealable resolution.

[52] Registry No: 175, 979.   Jurisprudence.   Material(s): Civil. Ninth Term.   Jurisdictional Stage:  First Court.   Source: *Semanario Judicial de La Federación y su Gaceta* (The Federation's Weekly Law Journal and its Gazette).   XXIII. February 2006.   Opinion: 1a./J. 185/2005. Page: 175.

230

according to which the sentence is always determined by the result of the proceeding, which makes the plaintiff the defeated party when the admissibility of its action is not accredited. In this sense, it can be concluded that in executive trials in which an interlocutory order is issued declaring the motion to dismiss for lack of jurisdiction, asserted through a jurisdictional plea, as admissible, and in which the court files are remitted to a different Judge, the assumption that is contained in the cited section is not binding and, therefore, the order for payment of costs is not admissible, for that resolution does not resolve the lawsuit that was filed **and, thus, the plaintiff cannot be considered the defeated party, since the result of the proceeding is not objectively against said party since the jurisdictional plea to dismiss for lack of jurisdiction only implies that a different judge will take over the case, to resolve what he is legally able to**. Notwithstanding the foregoing, the sentence for costs can also be decreed through interlocutory orders, but only for those that impede a pronouncement on substance to resolve the principal issue set forth.

**Opinion contradiction 128/2005-PS.** Among those substantiated by the First and Third Three-Judge Civil Courts, both in Civil Matters of the Fourth Circuit. November 23, 2005. Five votes. Speaker: José de Jesús Gudiño Pelayo. Secretary: Rogelio Alberto Montoya Rodríguez.

**Jurisprudence opinion 185/2005. Approved by the First Court of this High Tribunal, in session on November thirtieth, two thousand five.**

468.- In addition, the Arbitration Tribunal decided in Procedural Order No. 2 to resolve the issue of competence together with the substance of the matter, and it did so. There were no additional hearings or proceedings relating to the matter of competence, but rather this was litigated together with the substance of the case, reason for which

no additional delays or costs could have been generated.  On its part, it was the Arbitration Tribunal itself that delayed the proceeding in order to excuse the deficiencies of the complaint and of COMMISA's evidence in relation to disputes 34 and 35, as has been written in the antecedents to the arbitration process, reason for which the order for payment of costs incurred in the arbitration is not only unjustified, but also completely unfair.

469.- Now, the principal point of the case is that Technical Disputes 34, 35 and 36, regarding delays in the initiation of work with boats and adverse weather, are inadmissible since they are neither subjects for arbitration nor do they constitute technical disputes in terms of clause 23.2 of the Contract, or because they are not recoverable legal damages pursuant to the Contract and to an agreement excusing responsibility in favor of PEP; as has already been set forth in considerations three and four of the chapters corresponding to the causes for nullity and the rulings on such causes.

470.- In that sense and due to the congruency of the resolution, the nullity of the Arbitration Award in terms of the above-mentioned disputes, or the definitive resolution on the incompetence of the Arbitration Tribunal, have as a necessary consequence the annulment of this order for payment of costs incurred in the arbitration.

471.- In other words, if the subject of the technical disputes 34, 35 and 36 is not a legal or contractual loss for which PEP needs to make compensation, or the disputes are not subject to arbitration based on contractual provisions, or if the Arbitration Tribunal does not have the competence to rule on the disputes filed by COMMISA - as such a court must rule – it is clear that its resolution will have to amend this ruling for allegedly incurred costs, in the same manner and for the same reason.

## VIII.  Competence of the Arbitration Tribunal.

472.- The third paragraph of article 1432 of the Commercial Code states that the Arbitration Tribunal shall have the competence to rule on its own competency.  It gives the National Courts authority, once the issue of competence has been decided in the first instance by the Arbitration Tribunal, to definitively establish the competency of said Arbitration Tribunal based upon the arbitration agreement.

473.- The Arbitration Tribunal decided to resolve the matter of competency that was set forth by PEP together with the case's main subject matter, in conformity with Procedural Order No. 2.  This occurred indeed, as can be observed in Chapter VI of the Final Decision, when litigation points 1 (a) and 2 (a), (b) and (c) were ruled upon, reason for which the opportune procedural moment to request from you, Your Honor, to rule

233

definitively on the competency of the Arbitration Tribunal, is jointly with the claim for nullity of the award, since the cause for both of them is precisely the award that was issued and the ruling on matters that were not provided for in the arbitration agreement, pursuant to article 1457, section I, paragraph c) of said ordinance.

474.- Litigation point 1 (a) referred to the following:

*"Do all the claims and petitions formulated by the Plaintiff in its lawsuit, and by the Defendant in its counterclaim constitute <A controversy, complaint, difference or dispute that supervenes or is related to or linked to the Contract or the Contract's non-fulfillment (as required by clause 23.3 of the same), and does the Arbitration Tribunal have the competency to resolve them?"*

The Arbitration Tribunal declared itself competent to examine all of the disputes and claims filed by the Plaintiff, alleging that all of the topics were related or linked to the Contract regarding Project IPC-28, and are subject to clause 23.3 of the Contract, according to paragraphs 103[53] and 105[54] of the Arbitration Award, disregarding the text in Clauses 23.2 and 23.3 of the Contract, among others.

475.- It is important to underscore that, in conformity with clause 23.3 of the Contract, two bases must be proven in order for a dispute, complaint or technical

---

[53] "When analyzing the Plaintiff's claims it becomes clear that these are claims <that are linked to the Contract> and, more specifically, with its fulfillment or non-fulfillment (as is required by Clause 23.3 of the Contract). The Tribunal does not have any doubt that the intention of the parties when entering into the Contract was precisely for claims of the kind that have been formulated today by COMMISA, to be resolved through arbitration."

[54] "In summary, the Arbitration Tribunal arrives at the conclusion that all of the petitions and claims formulated by the Plaintiff in its lawsuit and by the Defendant in its counterclaim, are subject to clause 23.3 of the Contract, and that the Arbitration Tribunal has the competence to resolve them."

dispute to be the subject matter of arbitration:  a) that they are related or linked to the

contract or to the non-fulfillment of the contracts, and b) that they have been formalized

as technical disputes.  In this matter, the Arbitration Tribunal only addresses the first of

the two conditions, even when the parties had clearly agreed the following in clauses

23.3 of the Contract:

> "23.3 _**Arbitration.**_ *Any controversy, complaint, difference or dispute that supervenes or is related to or linked to the Contract, or the non-fulfillment of this Contract, will be ultimately settled through arbitration carried out in the Federal District, Mexico, pursuant to the Rules of Conciliation and Arbitration of the International Chamber of Commerce that should be in effect at that time.  The number of Arbitrators will be three, and the language in which the arbitration is conducted shall be Spanish.* **Notwithstanding the foregoing, any technical dispute will have to previously undergo the procedure specified in Clause 23.2, and only in the case that an agreement between the parties is not reached through this procedure, the parties will be authorized to use the legal recourse that is provided in Clause 23.3."**

476.-  This division of requirements contained in the arbitration agreement is

incongruent and constitutes an undue study of the case because competency is also

determined based on the fulfillment of prior procedures, because it is no longer

examined as a whole in the arbitration agreement, and because the arbitration

agreement cannot be understood

if it is not related to clauses 23.1 and 23.2[55] of the same Contract.

477.- In its consideration 104, the Arbitration Tribunal solely declares in a dogmatic manner that all disputes are linked to the contract, or to its fulfillment or non-fulfillment, but it does not make a case-by-case analysis of whether such disputes are effectively related to the contract.

478.- The Arbitration Tribunal simply and solely states that if the disputes arose while the contract was in effect, and taking the execution of the Contract as a pretext, then such disputes are subject to arbitration.  It does not take into account that the system of responsibility derived from the Contracts, and agreed upon with COMMISA for the benefit of PEP, only allows COMMISA to file claims for services that were expressly agreed upon in the Contract, holding PEP harmless for any legal loss that was not specified in the Contract.  Clause 23.2 of the Contract, in its first part, literally states the following:

> **"23.2  Technical disputes.  The Contractor shall not have the right to assert any claim and PEP shall not be responsible before the Contractor, its sub-suppliers or sub-contractors, for contractual or legal losses (including negligence), except in those cases specifically provided for in this Contract..."**

---

[55] In other words, Clause 23 is subdivided into 23.1, 23.2 and 23.3.

236

In other words, this Clause assumes the contents of article 2117 of the Civil Code, which allows contractors to regulate their responsibility and to exclude general norms on responsibility.   PEP's responsibility is limited by the contract itself, and COMMISA waived any other type of claim.

In this exception they were specifically referring to two claims:   dispute 36 regarding adverse weather, and disputes 34 and 35 regarding boats.

479.-  In the Contract for Public Works at Unit Prices and Predetermined Time number PEP-O-IT-136/98 (IPC-28), it was specifically agreed by the parties that there would be no financial compensation, i.e. payments burdening the national treasury, for any suspensions in the execution of the work due to adverse climactic conditions or bad weather, considered as acts of God or *force majeure*.  Indeed the following was agreed in clauses 12.1 and 12.4 of the contract:

> "12.1  ___Scope of Acts of God or Force Majeure.___
> .....    *Being that this involves offshore work, storms will only be considered an act of God or force majeure when it is so determined jointly by the PEP supervisor and by the Contractor's authorized representative, recording in the logbook that activities are being suspended due to acts of God or force majeure; in the case of disagreement, they shall be subject to*

*the policies of the Port Authority for the port that is closest to the worksite, that should have officially declared the closing of said port."*

*"12.4 **Effects of the Act of God or Force Majeure.** Unless the Act of God or Force Majeure impedes the fulfillment of this Contract totally and definitively, or in a considerable manner, in which case the provisions of Clause 10.2.4 shall be observed, the Act of God or Force Majeure will only serve to defer the completion of the obligations agreed upon in this Contract and not to excuse their non-completion."*

480.- Likewise, it was agreed in clause 23.2 of the Contract that PEP would not be responsible for any contractual or legal loss, except in the cases specifically mentioned in this Contract, as follows:

*"23.2 **Technical Disputes**. The Contractor shall not have the right to assert any claim and PEP shall not be responsible before the Contractor, its sub-suppliers or sub-contractors, for contractual or legal losses (including negligence), except in those cases specifically provided for in this Contract…"*

In this sense, we have an express Clause in the Contract which specifies that, in the case of work suspensions due to Acts of God or *Force Majeure* (storms), PEP will only have the obligation to defer the date of completion of the work.

In addition, clause 23.2 of the Contract has a double effect:  the first has to do with substance since it represents a waiver of responsibility for PEP, in other words,

PEP is not financially responsible for bad weather since that responsibility is not stated in the contract (only the deferment of the completion date), while the second one is a procedural one, i.e. if it does not involve a financial obligation in the contract, its payment, or any other dispute, claim or controversy that seeks payment, it cannot be subject to arbitration since it cannot be constituted as a technical dispute relating to the execution of the works.

Following this guideline, Clause 12 of the Contract, relating to Acts of God or *Force Majeure*, was not modified or altered in the 16 Modifying Agreements entered into between the parties. On the contrary, it was expressly agreed in each one of them that each of the clauses in the original contract subsisted without any alteration whatsoever, as long as they were not expressly modified.

481.-  In conclusion, Technical Dispute 36 is not subject to arbitration based upon the agreement of the parties, and the Arbitration Tribunal does not have the competence to resolve it, since it is not a service that was agreed upon in the contract at PEP's cost and in favor of COMMISA.

482.-  In terms of disputes 34 and 35, regarding delays in the initiation of work due to the absence of platforms, COMMISA's claim, found in paragraph 80, page 23

239

of the Final Decision, and on page 8 of the Mission Statement, paragraph (c) 3 (c), was the following:

> *"Based on the previously-specified claims, Commisa demands compensation of approximately US$ 81 million. Said figure is calculated according to Contract EPC-28. In the case that, for any reason, the Arbitration Tribunal should determine that the fees or rates for standby or reserve times that are set forth in Contract EPC-28 are not applicable to the calculation of the compensation for these delays, Commisa respectfully requests that an award be issued pursuant to which compensatory payment by PEP is decreed, that should be sufficient or should compensate Commisa for damages and losses incurred as a result of the delays experienced. To these effects, Commisa estimates that said damages and losses total approximately US$ 81 million."*

In other words, COMMISA was claiming payment for damages and losses, in the case that payment for standby fees as agreed upon in the contract were not admissible (and the Tribunal decided that they were not)[56].

483.- This claim for damages and losses is outside the scope of arbitration, or is not a subject matter of arbitration, because it does not involve a service agreed upon in the contract in favor of COMMISA or, looked at in a different way, in conformity with the first paragraph of clause 23.2 of the Contract, PEP is exempt from payment for any service that is not contemplated in the

---

[56] Paragraphs 165, 166 and 167 of the Final Decision.

240

Contract. As a result, faced with the impossibility of any technical dispute regarding this subject matter, the Arbitration Tribunal lacks the competence to resolve it.

484.- In this manner, the Arbitration Tribunal infringed upon the competency set forth in the arbitration agreement, and the arbitration agreement itself, reason for which the person who adjudges must definitively rule that the Arbitration Tribunal lacks the competency to resolve the aforementioned disputes.

485.- This clear explanation on the incompetence of the Arbitration Tribunal is to be fought in the ruling by means of two insufficient considerations:

In paragraphs 100 and 101 the Arbitration Tribunal considers, respectively, the following:

> "...Compare this clause (23.3) with the standard text of the arbitration clause proposed by the ICC itself: <all of the disagreements that should derive from this contract or that should be related to it>. It can be inferred from the comparative analysis that the intention of the parties when entering into Contract EPC-28 was not to restrict the scope of submission to arbitration but, on the contrary, to agree that all type of disputes deriving from the Contract, or simply linked to it, were to be resolved through arbitration."

> "As article 1851 of the Federal Civil Code (<C.c.>) states, <if the terms of a contract are clear and leave no doubt as to the intention of the contracting parties, the clauses shall be followed in a literal sense.> And in the case at hand, the

241

> *terms of Clause 23.3 are absolutely clear, and leave no doubt whatsoever that the parties were in agreement that all disputes deriving from the fulfillment or non-fulfillment of the Contract, without any exceptions, were to be resolved through arbitration."*

These considerations by the Arbitration Tribunal lack a foundation.  In the first argument, the Arbitration Tribunal does not take into consideration that the sample arbitration clause from the ICC is not similar to clause 23.3 of the contract, establishing the arbitration agreement, because the latter sets forth limits to the arbitration by stating:

> *"23.3 **Arbitration**.  Any controversy, complaint, difference or dispute that supervenes or is related to or linked to the Contract, or the non-fulfillment of this Contract, will be ultimately settled through arbitration carried out in the Federal District, Mexico, pursuant to the Rules of Conciliation and Arbitration of the International Chamber of Commerce that should be in effect at that time.  The number of Arbitrators will be three, and the language in which the arbitration is conducted shall be Spanish.  **Notwithstanding the foregoing, any technical dispute will have to previously undergo the procedure specified in Clause 23.2, and only in the case that an agreement between the parties is not reached through this procedure, the parties will be authorized to use the legal recourse that is provided in Clause 23.3."***

This being the case, it is clear that it was not the will of the parties that any dispute or controversy be the subject matter of arbitration, except for those that would have been formalized as technical disputes.  For the same reason, the second consideration by the arbitration tribunal is unfounded and inexact, since it evidently does not attend to the

242

literal tenor of clause 23.3, nor does it attend to the content of clause 23.2, regarding technical disputes.  Faced with such lack of observation of pertinent provisions, it is evident that the decision is unfounded.

486.-  Now, paragraph 104 of the Arbitration Award expresses the following in regards to the same topic:

> *"The position of PEP is especially incongruous since it has presented a series of complaints in a counterclaim; in them it requests that the Contractor be sentenced to payment under a penalty clause included in the Contract, and for the costs of specific support given to Commisa during execution of the work.  In terms of the counterclaims, PEP indeed asserts that the Arbitration Tribunal has competency and that the litigation is correctly filed.   The Arbitration Tribunal is not able to comprehend how it can be argued that the plaintiff's complaints are exempt from clause 23.3 of the Contract, while the Defendant's counterclaims are included within its scope."*

487.-   The payment of conventional penalties claimed by PEP through a counterclaim are established in Clauses 11 and 11.1 of the Contract, reason for which PEP's conduct could not be contradictory in any way.  In addition to this, Clause 23.2 was established in favor of PEP and not of the Contractor.  In other words, COMMISA does indeed have an obligation to compensate PEP for any loss or damages that should result from execution of the work or from the fulfillment or non-fulfillment of the work, because PEP did not exempt it from

243

responsibility in those cases; COMMISA did exempt PEP from payment for damages that were not expressly agreed upon.

488.- Litigation points 2 (a), (b) and (c) consist in the following:

> "**(a)** Do any of the complaints or petitions formulated by the Plaintiff constitute a technical dispute, as this concept is defined in Contract EPC-28? **(b)** Should the answer to the foregoing question 2(a) be affirmative - have said technical disputes been submitted to the procedure that is provided in clause 23.2 of the Contract? **(c)** Should the answer to the foregoing question 2(a) be negative - what would the consequence in terms of the present arbitration be?"

Regarding this topic, the Arbitration Tribunal decided the following, in an unfounded and erroneous manner, in paragraph 121 of the Arbitration Award:

> "...the principal petition of the Plaintiff consists in 39 Technical Disputes that were correctly submitted to the procedure stipulated in clause 23.2 of the Contract, providing grounds for the use of arbitration proceedings for their reclamation; ... and in consequence, there is no impediment whatsoever to examining such reclamations in depth."

It is also important to point out in this paragraph that the position of the Arbitration Tribunal, in considering that the counterclaims of PEP and the request for a time extension do not need to be formalized as

technical disputes is unfounded, since they were filed after the project had ended and the Supervisor's term had concluded.

489.-  To be able to understand this point clearly, it is important to understand that it is a Technical Dispute.  The parties agreed to the following in clause 23.2 of the Contract:

> 23.2  _Technical disputes_.  _The Contractor shall not have the right to assert any claim and PEP shall not be responsible before the Contractor, its sub-suppliers or sub-contractors, for contractual or legal losses (including negligence), except in those cases specifically provided for in this Contract._
>
> _For purposes of this Clause, a Technical Dispute shall be understood to be any discrepancy that should arise from any claim, or that could be attributable to the interpretation or execution of this Contract, between the Supervisor and the Contractor, in regards to the Contract's Technical Annexes (A, B, B-1, B-2, B-3, CEV, DT, DT-1, DT-2.1, DT-2.2, DT-3, DT-4, E-2, F-1, and F-2)._
>
> _If, for any reason, the Supervisor and the Contractor should not agree in their views to resolving a claim for adjustment deriving from a Technical Dispute, the Contractor will have to formalize said Technical Dispute in writing, to the Supervisor, and request the corresponding resolution.  This type of petition from the Contractor must be clearly identified as such, stating that it is a Technical Dispute subject to resolution under this Clause 23, and must contain a summary of the disputed facts and a proposal from the Contractor to resolve them..."_

490.-  In conformity with the previously-transcribed clause, we understand that there can be disagreements, disputes or claims that are informal, to give them a name

245

(although it is obvious that they have to be in writing), and some that are formal.  Formal disputes must be submitted in writing, in a formal manner, and **specify in the document that this involves a technical dispute**, providing the facts that are the grounds for the claim, and a proposal for a solution.

491.-   The facts in this case are, as has been shown during the Arbitration proceeding, that defendant COMMISA presented and formalized technical disputes 19, 34, 35 and 36 outside time limits, when they could no longer be taken care of pursuant to contractual provisions, reason for which they could no longer be subject to arbitration nor be validly taken into account.

492.-   In the *Acta de Recepción Física Total de los Trabajos* (Certification for Complete Physical Receipt of the Projects) dated August 30, 2002, which is annexed as evidence to this petition, it is clear that, as of that date, the plaintiff had not formally submitted a technical dispute due to obstructions (T.D. 19), payment of differences for standby times, for Castoro 10 work in the platforms (T.D. 27), for delays in the initiation of work involving boats under the contractual terms and conditions (T.D. 34 and 35), or for delays due to adverse weather, setting forth in writing the reasons for its claim (T.D. 36).  See also the Independent Vote of Arbitrator D. Darío Oscós Coria, which is a part of the Final Decision.

493.- On page 17 (folio 1158) of the Certification for Complete Physical Receipt of the Contract PEP-O-IT-136/98 dated August 30, 2007, there is a chapter entitled "CLAIMS BEING PREPARED BY COMMISA." These claims under preparation are divided into various sets of complaints, which are the following:

Sets 1 to 5 have to do with several extraordinary items relating to construction work involved in the withdrawal of obstructions, which were resolved in the ruling as Technical Dispute 19.

Set 7 refers to "Damages due to climate conditions" (Castoro 10 and Bar Protector), that was resolved in the ruling as Technical Dispute 36.

Set 13 includes the claim for "Delays in the initiation of construction due to the lack of availability of the platforms" (Notification of Change 23) which were resolved in the ruling as Technical Disputes 34 and 35; the claim for "Variation in the costs for work in the upper pipes (top sides)", that were resolved in the ruling as Technical Dispute 27.

494.- It is very important to point out that the Certification for Complete Physical Receipt of the Projects was signed by the COMMISA representatives, Engineers Juan

Manuel Herrera and Nicolás Martínez Bocanegra, as well as by the representatives of PEP. It is important to highlight, similarly, that the list of Claims or Technical Disputes being prepared, was a manifestation made by COMMISA, as can be derived from the paragraph located at the foot of the list which states, verbatim:

> "THE CONTRACTOR STATES THAT THIS CHART IS STILL MISSING THE TOTAL FOR A FEW FIGURES (such as in the claim for adverse weather, i.e. on this date COMMISA did not even have a cash amount) AS PERTAINS TO EXTRAORDINARY WORKS CARRIED OUT, AS WELL AS SEVERAL OTHER CLAIMS THAT ARE UNDER PREPARATION AS OF THIS TIME."

495.- The limitation of COMMISA's right to air its claims via arbitration goes hand in hand with the limitation of its right to claim payment from PEP for any sums due to such claims, since Annex B, Section 5 of the Contract, entitled "Modifications", establishes that *"any delay on the part of the contractor to notify or present the proposal to which the prior paragraph refers to will be sufficient cause to reject such claim, if such delay harms PEP and to the extent of such harm.  **Under no circumstances will a claim by the Contractor be accepted, if it takes place after the Partial or Complete Receipt...**"*

This being the case, we can assert that the Arbitration Tribunal's considerations are unfounded and at times even go against common sense, as will be explained as follows.

496.- In the chapter corresponding to other disputes it was clearly established that COMMISA observed the procedure for contractual amendment that was provided in the contract in only 29 cases of work adaptation and removal of obstructions. The other 51 obstruction complaints did not fulfill this prerequisite and it is so demonstrated in the Certification for Complete Physical Receipt, the relevant part of which we have transcribed in the foregoing paragraphs.

For this reason, the Arbitration Tribunal's assertion in the final part of paragraph 112 of the Arbitration Award is unfounded and false, because technical dispute 19 was never granted such character. Moreover, the consideration of the Arbitration Tribunal within the context of the Contract is unintelligible, because we are not talking about one single technical dispute but rather of at least five technical disputes relating to obstructions, if not more, pursuant also to the Certification for Complete Physical Receipt of the Projects already transcribed above.

In paragraph 115, the Arbitration Tribunal points out that:

> "*It is proven that on August 30, 2002, the parties presented the <Certification for*

249

> *Complete Physical Receipt> provided for in clause 9.2.6 of the Contract. In this Certification, both parties acknowledged that there were approximately 30 claims underway having to do with Technical Disputes, and Commisa noted that the total for extraordinary works carried out, as well as diverse additional claims, were yet to be included, which implies that the reclamation existed for purposes of Annex B of the Contract, even if its quantification were still pending..."*

The Arbitration Tribunal errs once again in this assertion. The complaints that were listed in the "Certification for Complete Physical Receipt" of the Projects were undergoing preparation. In other words, they were submitted after the aforementioned Certification, when they could no longer be accepted pursuant to the final part of Section 5 of Annex B-2 to the Contract[57], nor much less could they be formalized as technical disputes. It is also important to mention that the Contract makes a distinction between claims and Technical Disputes, reason for which their utilization as synonyms on the part of the Arbitration Tribunal is unfounded.

497.- The Arbitration Tribunal makes an unfounded assertion in paragraph 115 of the Arbitration Award, when it points out that PEP expressly admitted in its Final Brief (document R 29, page 21, that accompanies this brief as evidence) that COMMISA's 39 claims were substantiated as Technical Disputes under the

---

[57] "...any delay on the part of the contractor to notify or present the proposal to which the prior paragraph refers to will be sufficient cause to reject such claim, if such delay harms PEP and to the extent of such harm. **Under no circumstances will a claim by the Contractor be accepted, if it takes place after the Partial or Complete Receipt...**

# EXHIBIT 1 (PART 6)

terms of Clause 23.2 of the Contract.  In fact, the arbitration tribunal states:

> "Even when in contract IPC-28 COMMISA and PEP established a procedure to settle all those divergences that could arise from the interpretation or execution of the contract <clause 23.2 Technical Disputes> <some claims were indeed resolved under the terms of said procedure>, the parties established discussion groups"

With this, the Arbitration Tribunal is not right in asserting that PEP acknowledged the 39 claims as technical disputes, since it only acknowledged a few.  The phrase also does not allow it to identify which of the 39 claims were granted the character of technical disputes and, most importantly, the Arbitration Tribunal cannot assert in a substantiated manner that this refers to the claims submitted after the "Certification for Complete Physical Receipt" of the Projects.

498.-  In paragraph 117 the Arbitration Tribunal asserts that it did not terminate COMMISA's rights for having abandoned the discussion groups, due to the following reason: "...*According to the literal tenor of clause 23.2 of the Contract, once 30 natural days have passed from the start of negotiations, both parties have grounds for access to arbitration...*".

499.-   After the Certification for Complete Physical Receipt of the Projects, neither claims nor technical disputes were admissible,

pursuant to the provisions of the last paragraph of Section 5 of Annex B-2 of the Contract. The negotiations to which the last paragraph of article 23.2 of the Contract refers to, are to definitively resolve a Technical Dispute that was previously resolved by the Supervisor of the Contract. Legally speaking, this was impossible in this case, because neither had a claim been prepared, nor did a resolution from the supervisor exist.

Negotiations took place, as is common with all operations that do not have a satisfactory ending for the parties, in order to try and avoid a lawsuit or an arbitral dispute, depending on the case.

500.-  The cited negotiations were taken out of context by the Arbitration Tribunal to determine, at its convenience, that the contractual procedure had been observed, and this is not the case. The Tribunal actually contradicts itself, because it acknowledges that once the project has been received and accepted, and the functions of the Supervisor have ceased, there is no possibility to carry out the procedure described in clause 23.2 of the Contract (paragraph 118 of the Final Decision). In fact, the arbitration tribunal states:

> *"118. The allegation by PEP is, moreover, incongruent with its own attitude in this arbitration: PEP has asserted complaints through counterclaims, without having claimed nor proven, in their respect, the observance*

*of the Technical Dispute procedure specified in Clause 23.2...*"

501.- In order for the above-transcribed consideration to be true, it first needs to be proven that PEP is subject to Clause 23.2 of the Contract in order to assert its claims. This is not the case because, as is stated in the third paragraph of the numeral indicated, COMMISA is the one that is obligated to make a formal assertion since "*If, for any reason, the Supervisor and the Contractor should not agree in their views to resolving a claim for adjustment deriving from a Technical Dispute, **the Contractor** will have to formalize said Dispute...*"

502.- We insist once again, that COMMISA is liable to PEP for any damages it should cause, contractual or legal, without limitations and without previous requirements. It is so agreed in the Contract yet, once again, the Arbitration Tribunal ignores that this is an administrative contract, not a commercial one, and it is subject to different principles.

503.- For the same reason, the Arbitration Tribunal's consideration, contained in the same paragraph 118, stating that:

> "*PEP's conduct shows what the strict interpretation of clause 23 of the Contract should be: Technical Disputes can only be asserted during the phase in which the work is being executed.*

> *Once the work has ended, when the Certification for Complete Receipt of the project has been submitted, the Supervisor's functions will cease and, therefore, there is no possibility to carry out the procedure described in clause 232[sic] of the Contract. It is for this reason that the defendant has been able to validly assert its counterclaim assertions, without having to go through the procedure for Technical Disputes."*

is unfounded and false.

The only things that can be deduced from PEP's conduct are that, not having the obligation to formalize its complaints as Technical Disputes, such complaints could be made during execution of the project or once the project was received, and could be subject to arbitration since they were related to the contract. The contract contains several clauses in this respect, making the contractor liable for badly-executed work, missing work, hidden defects and guarantees. Contrary to this, the Contractor is unable to formalize its disputes once the contract has expired, pursuant to the last paragraph of Section 5 of Annex B-2 of the Contract, and much less can it formalize them as Technical Disputes. If appropriate, COMMISA would have to assert its rights before National Courts, with no recourse to arbitration, since it did not fulfill the second condition of making a dispute, reclamation or claim subject to arbitration.

The interpretation of this clause by the Arbitration Tribunal is insufficient. It cannot seriously affirm that the Contractor has the right to assert its claims when it feels like it, after the Contract has expired, since this breaches

254

the contractual principle that prevents the fulfillment of the contract from being left at the discretion of one of the parties, which is a fundamental principle of private international law, which the Arbitration Tribunal violated. The contractor can no longer and in no manner set forth its claims in arbitration.

504.- It is important to underscore that the functions of the Work Supervisor do not cease once the work has been completed, but rather when all of the rights and obligations resulting from such work have expired; in other words, when the contract has been liquidated through the final valuation to which we already referred in the chapter corresponding to Finance Charges. However, on April 8, 2003, seven months after the work was completed, indeed, in an untimely manner and without any possibility of being effective, COMMISA requested from the Contract's supervisor, Engineer Alfredo Gómez Rangel, that he formalize the Technical Dispute regarding adverse weather (Document COM/EP2800/2003-5556). This document was known by the Arbitration Tribunal and was negligently not taken into account in the ruling, as is evidenced by the citation of such document that the dissenting Arbitrator, Lic. Darío Oscós Coria, makes in his Independent Vote (page 4, paragraph 8).

505.- In addition to this, this document also proves, taking into account the conduct of the parties, that COMMISA had not yet formalized any type of Technical Dispute

255

in this matter when the Contract expired, and that its claim was outside time limits, when there was no legal possibility for PEP to examine the substance of the matter (for example, in a manner similar to an extemporaneous recourse, which is ineffective in proving finality in the amparo).   Therefore, the attitude of the Arbitration Tribunal is absurd when attempting to demonstrate that the technical dispute was formalized, even contradicting the express statement by COMMISA, and this also forms a legal basis for the nullity of the arbitration award.

We underscore that this reinforces PEP's interpretation of the "Certification for Complete Physical Receipt" of the Projects, in the sense that COMMISA also did not formalize its technical disputes in terms of technical disputes 19, 27, 34 and 35.

506.-  With these considerations the Arbitration Tribunal tries to justify, in an unfounded manner, that COMMISA had no obligation to observe clause 23.2 of the contract; in addition, it contradicts itself when ruling on the substance of the disputes, reasons for which the award is completely incongruent and, therefore, lacks grounds and motives, breaching the constitutional sovereignty which is a matter of public interest, thus rendering the award as null.

For example, in dispute 36, the Arbitration Tribunal tries to justify that the Contractor did indeed submit a

technical dispute.  See paragraphs 233 and 234, page 56, of the Final Decision, in which the Arbitration Tribunal manifests that COMMISA supposedly asserted its right to remuneration for the rescheduling of work due to adverse weather, which in no manner can be considered as the formalization of a technical dispute.  The paragraph in question states: "*This does not include any additional waiting times due to weather conditions, based on an extension in the work schedule.*"

507.-  Contractually, the formalization of a dispute is not the same as insinuating or presuming an alleged right, as COMMISA did.  The Arbitration Tribunal's ruling approved the conduct of COMMISA, fully contradicting the contractual agreement.  The truth is that, for the effects of arbitration, COMMISA would have needed to formalize all of its claims, as required in the arbitration agreement contained in Clause 23.3 of the Public Works Contract, beforehand and in a timely manner.  If that was not done, said Technical Dispute could not be subject to arbitration, since the considerations of the Arbitration Tribunal refer to disputes not stipulated in the arbitration agreement, and only formal technical disputes can be subject to arbitration; or, as the case may be, the Arbitration Award includes decisions that exceed the terms of the arbitration agreement since the Arbitration Tribunal may only make a final ruling on technical disputes.

508.- From all of the above, it is evident that the arbitration award covers disputes not provided for in the arbitration agreement, that the arbitration award exceeds the terms of the arbitration agreement, that the arbitration award goes against the public interest, and that therefore there is a legal basis to declare the nullity of the arbitration award.

## M E A S U R E S   R E Q U E S T E D

Pursuant to the provisions of article 384 of the Federal Code of Civil Procedures, I ask that Your Honor decree the measures necessary to maintain the existing *de facto* situation.

In other words, my client requests that Your Honor order that COMMISA abstain from executing and/or carrying out any other action with the intent of soliciting the acknowledgement or execution of the arbitration award, the nullity of which is being petitioned, or any action carried out in or to execute the arbitration award.

It is clear that in the present case, the order to maintain the status quo does not cause damage nor loss of any kind to the defendant COMMISA, since my principal is solvent and is exercising its right to petition for the nullity of the arbitration award, which is a legitimate right due to the fact that, as has been demonstrated throughout this document, the arbitration proceeding did not adhere to the agreement entered into between the parties, the award goes against the public interest, the award contains decisions that

exceed the terms of the arbitration agreement, and the arbitration tribunal issued a ruling pursuant to equality and not pursuant to strict law, as had been stipulated between the parties.

Aside from this, my principal is exempt from providing the guarantee required by article 387 of the Federal Code of Civil Procedures, in conformity with the provisions of article 4 of the same ordinance which states:

> "Article 4.- The institutions, services and agencies of the Federation's Public Administration and of the States will have, within the legal process, and in any manner in which they should intervene, the same situation as any other party; but neither an order for execution nor garnishment can ever be dictated against them, **and they shall be exempt from providing the guarantees that this Code requests from the parties.**"

## E V I D E N C E

Based on articles 360 and related provisions of the Federal Code of Civil Procedure, the following evidence is offered:

## I. DOCUMENTARY

1. **Seventeenth testimony of Public Instrument No. 13,250** of Book 288, witnessed by Public Notary 229 of the Federal District, Lic. Marco Antonio Ruiz Aguirre, which is being offered to demonstrate the legal capacity and representation of PEP that has been granted to Lic. José

Néstor García Reza, and that is expressed in the preamble to this petition.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

This evidence is suitable to demonstrate the legal capacity in which I act, since it provides evidence of such authorization in a public document, in conformity with section I of article 2555 of the Federal Civil Code, and because it provides conclusive evidence under the terms of article 1292 of the Commercial Code.

2. **Final Decision** issued on January 15, 2008, in the Arbitration Proceeding, reference:  Case 13716/CCO/JRF, initiated by Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V., against PEMEX Exploración y Producción.

This evidence is offered with reference to the *de facto* and *de jure* Chapters, numbered II to XI of the present document, to demonstrate the purpose and the cause or causes for the present petition for nullity.  This document is suitable to demonstrate the purpose and the cause or causes for nullity, under the terms of article 1461 of the Commercial Code, applied based on majority opinion, that requires the original award or a certified copy of it as the base document for the action.

260

This document contains the considerations and decisions of the Arbitration Tribunal, which PEP deems as voidable due to their infringement upon article 1457 of the Commercial Code. This is the main document with which PEP will demonstrate the flaws in the decisions of the Arbitration Tribunal regarding the Disputes: 19, regarding obstructions; 27, regarding differences due to waiting times for work in platforms; 34 and 35, regarding delays in work involving boats due to lack of access; 36, regarding payment for work suspensions due to adverse weather; 37 and 39, regarding crossing work; the decision on payment of finance charges; the decision in which it declares itself competent to examine all the disputes; and the decision to sentence PEP to payment of costs incurred in arbitration; whether because the Arbitration Tribunal left PEP with a lack of protection, impeding it from asserting its rights; or referred in the ruling to a dispute that was not provided for in the arbitration agreement or that exceeded the terms of arbitration; or because the arbitral proceeding did not observe the agreement between the parties entered into in the arbitration clause, or because the ruling contains decisions that go against the Mexican public interest.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

261

3. **Communication from the International Arbitration Court** of the International Chamber of Commerce, dated February 7, 2008, signed by D. José Ricardo Feris, Advisor to the Secretariat of the International Arbitration Court of the International Chamber of Commerce, sent by courier and received by the Office of the Attorney General of Petróleos Mexicanos on February 11, 2008, which is offered to demonstrate the timeliness of this petition.

This document is suitable for demonstrating the notification of the ruling, bearing in mind that it was carried out by the Secretariat of the International Arbitration Court, under the terms of articles 3.2 and 28.1 of the Arbitration Regulations of the ICC, procedural ordinance pursuant to which the arbitration proceeding took place, attending to the arbitration clause found in clause 23.3 of the Public Works Contract.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

4. **Contract No. PEP-O-IT-136/98 (IPC-28)** entered into between Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. (COMMISA) and Pemex Exploración y Producción (PEP), dated September 4, 1998,

documentation that is hereby offered in terms of the *de facto* and *de jure* chapters I, IV, V, VI, VII, VIII, IX, X and XI of the present petition. The facts that we intend to prove with this documentation are the following:

a)  The arbitration agreement: Clause 23.3 of the Contract contains the arbitration clause signed by PEP and COMMISA, through which they agreed to resolve their technical disputes via arbitration, in conformity with the Arbitration Regulations of the International Chamber of Commerce, as well as that said arbitration would take place in the city of Mexico, Federal District, and that it would be carried out in the Spanish language.

b)  The method for resolving disputes between the parties, in conformity with clause 23 of the Contract, which prescribes the application of Mexican federal laws for the regulation of the Contract in its paragraph 23.1; the technical disputes procedure as a prerequisite to arbitration in its paragraph 23.2; and its paragraph 23.3 which sets forth the arbitration agreement and the stipulation that only technical disputes may be submitted to arbitration.

c)  The first paragraph of clause 23.2 of the Contract determines PEP's lack of liability for those legal damages (contractual or due to negligence),

that were not expressly agreed upon in the Contract.

d) The purpose of the Contract, and COMMISA's obligation to finish the work under observance of the provisions of the diverse regulations and of the technical annexes to the Contract, obligation which is contained in clause 1.

e) The terms of payment of the contract, pursuant to clause 3 of the Contract: This clause demonstrates that we are dealing with a work contract for unit prices; that a formal procedure for payment was established which neither the Arbitration Tribunal nor COMMISA complied with; the functions of the supervisor during the payment procedure; the need to prepare an estimate in order to obtain payment, and its authorization and submission by COMMISA to the one-stop window.

f) The requirements pursuant to which payment for finance charges is carried out.

g) The effects of work suspensions due to *force majeure*, pursuant to clauses 4.4 and 12.1 and 12.2, which would only generate delays but not payment.

h) The formal nature of the contractual amendments (clause 5).

264

i) Clause 6 serves to prove the obligation that the Contractor has to carry out extraordinary work; the definition of such; and its remuneration.

j) The nature of the Certification for Physical Receipt of the Projects, under the terms of clause 9.2.6 of the Contract;

k) Conditions for remuneration during work suspensions, and the definition of non-recoverable expenses (clause 10.1.2).

l) The non-existence of liability in the case of *force majeure*, and the consideration granted to adverse weather conditions based on *force majeure*, pursuant to clause 16.

m) The obligations of the Contractor relating to boats (clause 16), and

n) Any other reference to agreements contained in the Public Works Contract.


This document is suitable to demonstrate the agreement between the parties for the execution of the public works solicited, in conformity with article 214 of the Federal Code of Civil Procedure, above any witnesses or presumptions.


I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**5. Annex B 2 "Generalities" of the Contract** No. PEP-O-IT-136/98 (IPC-28) entered into between Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. (COMMISA) and Pemex Exploración y Producción (PEP), which forms an integral part of the Works Contract, and which is offered in terms of the *de facto* and *de jure* chapters IV, third and fourth sections, V, fourth section, VII, sections 1 and 2, and XI, of this petition, to show what is meant by "Work Program" (numeral 3) as well as the non-observance by COMMISA of the procedure for contractual modification, and the limitation of its right to execute any claim (numeral 5). This document is suitable to demonstrate these facts or laws, because it constitutes a technical annex that covers these topics as they relate to the Contract.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**6. Annex B 2 "Plan for Execution of the Work" of the Contract** No. PEP-O-IT-136/98 (IPC-28) entered into between Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V. (COMMISA) and Pemex Exploración y Producción (PEP), which is offered in terms of Chapter V, first section of this petition, to demonstrate the

266

conditions under which the boats arrived, in terms of the payment of fees for waiting times.  This document is suitable to that effect, since it is a part of the Contract.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**7.  Agreement Number One of the Contract** No. PEP-O-IT-136/98 (IPC-28) dated February 4, 2000; this document is presented in terms of Chapters IV and XI, relating to adverse weather and incompetence of the Arbitration Tribunal, and is being submitted to demonstrate that:  i) all modifications must be formalized in agreement; ii) that any clause that is not expressly modified is still binding for the parties; iii) that clause 12 regarding *force majeure* was not modified; and iii[sic]) that clause 23.2 on legal damages was never modified.  This document is suitable since it is a part of the Contract.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**8.  Agreement Number Two of the Contract** No. PEP-O-IT-136/98 (IPC-28) dated May 31, 2000; this document is presented in terms of Chapters IV and XI, relating to adverse weather and incompetence of the Arbitration Tribunal, and is being submitted to demonstrate that:  i) all modifications must be formalized in agreement; ii) that any clause that is not expressly modified is still binding for the parties; iii) that clause 12 regarding *force majeure* was not modified; and iii[sic]) that clause 23.2 on legal damages was never modified.  This document is suitable since it is a part of the Contract.

267

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**9. Agreement Number Three of the Contract** No. PEP-O-IT-136/98 (IPC-28) dated July 20, 2000; this document is presented in terms of Chapters IV and XI, relating to adverse weather and incompetence of the Arbitration Tribunal, and is being submitted to demonstrate that:  i) all modifications must be formalized in agreement; ii) that any clause that is not expressly modified is still binding for the parties; iii) that clause 12 regarding *force majeure* was not modified; and iii[sic]) that clause 23.2 on legal damages was never modified.  This document is suitable since it is a part of the Contract.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

268

**10. Agreement Number Four of the Contract** No. PEP-O-IT-136/98 (IPC-28) dated August 29, 2000; this document is presented in terms of Chapters IV and XI, relating to adverse weather and incompetence of the Arbitration Tribunal, and is being submitted to demonstrate that: i) all modifications must be formalized in agreement; ii) that any clause that is not expressly modified is still binding for the parties; iii) that clause 12 regarding *force majeure* was not modified; and iii[sic]) that clause 23.2 on legal damages was never modified. This document is suitable since it is a part of the Contract.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**11. Agreement Number Five of the Contract** No. PEP-O-IT-136/98 (IPC-28) dated November 3, 2000; this document is presented in terms of Chapters IV and XI, relating to adverse weather and incompetence of the Arbitration Tribunal, and is being submitted to demonstrate that: i) all modifications must be formalized in agreement; ii) that any clause that is not expressly modified is still binding for the parties; iii) that clause 12 regarding *force majeure* was not modified; and iii[sic]) that clause 23.2 on legal damages was never modified. This document is suitable since it is a part of the Contract.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**12.  Agreement Number Six of the Contract** No. PEP-O-IT-136/98 (IPC-28) dated November 21, 2000; this document is presented in terms of Chapters IV and XI, relating to adverse weather and incompetence of the Arbitration Tribunal, and is being submitted to demonstrate that:  i) all modifications must be formalized in agreement; ii) that any clause that is not expressly modified is still binding for the parties; iii) that clause 12 regarding *force majeure* was not modified; and iii[sic]) that clause 23.2 on legal damages was never modified.  This document is suitable since it is a part of the Contract.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**13.  Agreement Number Seven of the Contract** No. PEP-O-IT-136/98 (IPC-28) dated December 26, 2000; this document is presented in terms of Chapters IV and XI, relating to adverse weather and incompetence of the Arbitration Tribunal, and is being submitted to demonstrate that:  i) all modifications must be formalized in agreement; ii) that any clause that is not expressly modified is still binding for the parties; iii) that clause 12 regarding *force majeure* was not modified; and iii[sic]) that clause 23.2 on legal damages was never modified.  This document is suitable since it is a part of the Contract.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**14.    Agreement Number Eight of the Contract** No. PEP-O-IT-136/98 (IPC-28) dated May 16, 2001; this document is presented in terms of Chapters IV and XI, relating to adverse weather and incompetence of the Arbitration Tribunal, and is being submitted to demonstrate that:  i) all modifications must be formalized in agreement; ii) that any clause that is not expressly modified is still binding for the parties; iii) that clause 12 regarding *force majeure* was not modified; and iii[sic]) that clause 23.2 on legal damages was never modified.  This document is suitable since it is a part of the Contract.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**15.    Agreement Number Nine of the Contract** No. PEP-O-IT-136/98 (IPC-28) dated June 13, 2001; this document is presented in terms of Chapters IV and XI, relating to adverse weather and incompetence of the Arbitration Tribunal, and is being submitted to demonstrate that:  i) all modifications must be formalized in agreement; ii) that any clause that is not expressly modified is still binding for the parties; iii) that clause 12 regarding *force majeure* was not modified; and iii[sic]) that clause 23.2 on legal damages was never modified.   This document is suitable since it is a part of the Contract.

271

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**16. Agreement Number Ten of the Contract** No. PEP-O-IT-136/98 (IPC-28) dated September 19, 2001; this document is presented in terms of Chapters IV and XI, relating to adverse weather and incompetence of the Arbitration Tribunal, and is being submitted to demonstrate that:  i) all modifications must be formalized in agreement; ii) that any clause that is not expressly modified is still binding for the parties; iii) that clause 12 regarding *force majeure* was not modified; and iii[sic]) that clause 23.2 on legal damages was never modified.   This document is suitable since it is a part of the Contract.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**17. Agreement Number Eleven of the Contract** No. PEP-O-IT-136/98 (IPC-28) dated November 29, 2001; this

document is presented in terms of Chapters IV and XI, relating to adverse weather and incompetence of the Arbitration Tribunal, and is being submitted to demonstrate that: i) all modifications must be formalized in agreement; ii) that any clause that is not expressly modified is still binding for the parties; iii) that clause 12 regarding *force majeure* was not modified; and iii[sic]) that clause 23.2 on legal damages was never modified. This document is suitable since it is a part of the Contract.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**18. Agreement Number Twelve of the Contract** No. PEP-O-IT-136/98 (IPC-28) dated December 22, 2001; this document is presented in terms of Chapters IV and XI, relating to adverse weather and incompetence of the Arbitration Tribunal, and is being submitted to demonstrate that: i) all modifications must be formalized in agreement; ii) that any clause that is not expressly modified is still binding for the parties; iii) that clause 12 regarding *force majeure* was not modified; and iii[sic]) that clause 23.2 on legal damages was never modified. This document is suitable since it is a part of the Contract.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

273

**19. Agreement Number Thirteen of the Contract** No. PEP-O-IT-136/98 (IPC-28) dated February 1, 2002; this document is presented in terms of Chapters IV and XI, relating to adverse weather and incompetence of the Arbitration Tribunal, and is being submitted to demonstrate that:  i) all modifications must be formalized in agreement; ii) that any clause that is not expressly modified is still binding for the parties; iii) that clause 12 regarding *force majeure* was not modified; and iii[sic]) that clause 23.2 on legal damages was never modified.   This document is suitable since it is a part of the Contract.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**20. Agreement Number Fourteen of the Contract** No. PEP-O-IT-136/98 (IPC-28) dated February 22, 2002; this document is presented in terms of Chapters IV and XI, relating to adverse weather and incompetence of the Arbitration Tribunal, and is being submitted to demonstrate that:  i) all modifications must be formalized in agreement; ii) that any clause that is not expressly modified is still binding for the parties; iii) that clause 12 regarding *force majeure* was not modified; and iii[sic]) that clause 23.2 on legal damages was never modified.   This document is suitable since it is a part of the Contract.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**21.  Agreement Number Fifteen of the Contract** No. PEP-O-IT-136/98 (IPC-28) dated March 16, 2002; this document is presented in terms of Chapters IV and XI, relating to adverse weather and incompetence of the Arbitration Tribunal, and is being submitted to demonstrate that:  i) all modifications must be formalized in agreement; ii) that any clause that is not expressly modified is still binding for the parties; iii) that clause 12 regarding *force majeure* was not modified; and iii[sic]) that clause 23.2 on legal damages was never modified.   This document is suitable since it is a part of the Contract.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**22.  Agreement Number Sixteen of the Contract** No. PEP-O-IT-136/98 (IPC-28) dated May 31, 2002; this document is presented in terms of Chapters IV and XI, relating to adverse weather and incompetence of the Arbitration Tribunal, and is being submitted to demonstrate that:  i) all modifications must be formalized in agreement; ii) that any clause that is not expressly modified is still binding for the parties; iii) that clause 12 regarding *force majeure* was not modified; and iii[sic]) that

275

clause 23.2 on legal damages was never modified.  This document is suitable since it is a part of the Contract.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**23. Arbitration Regulations** of the International Chamber of Commerce that are effective as of January 1st, 1998.  This document is submitted to demonstrate the laws or procedural norms applied to the arbitration proceeding; as well as in terms of the *de jure* and *de facto* chapters I, II, III, V (second and fourth), VIII (three and four), and IX (three), in order to demonstrate the Arbitration Tribunal's non-observance of the same.  This document is suitable because the Arbitration proceeding should have been executed under observance of its provisions.  Please note that an official or private copy of the International Chamber of Commerce is being exhibited herein.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**24. Mission Statement**.   This document, issued by the parties and the Arbitration Tribunal during the arbitration proceeding, is being submitted in terms of the *de jure* and *de facto* chapters II, V (first, second, third and fourth), VIII (nullity), IX (three) and XI of this document, and is being offered to demonstrate: 1) the date of the mission statement as well as the date to file new claims; ii) the litigation points to be resolved by the Arbitration Tribunal and the claims and complaints of the parties; iii) that the Arbitrators were never given the authority to decide on cases as amiable compositeurs or *ex aequo et bono*; and iv) the grave violation committed by the

276

Arbitration Tribunal against the arbitration proceeding by deciding upon matters that were not litigation issues nor claims by any of the parties.

This document proves the facts listed since, pursuant to article 18 of the Arbitration Regulations, the Arbitration Tribunal is to include in this document a summary explanation of the parties' claims, and a list of the litigation points to be resolved.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**25. Procedural Order No. 1 ter**. This document is a record from the Arbitration Tribunal and is being submitted in relation to the *de jure* and *de facto* chapters II and III, to show that communications during the arbitration proceeding were conducted through courier, fax or e-mail. This document is suitable to this effect, in terms of the fact that

it was agreed, on page 11 of the Mission Statement, that communication by all the parties and the Tribunal would be conducted in the manner that was agreed upon in the procedural orders issued by the Arbitration Tribunal.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

26. **Procedural Order No. 2** and Communication A 24 from the Arbitration Tribunal. These documents are records from the Arbitration Tribunal and are being submitted in relation to the *de jure* and *de facto* chapters X and XI, to demonstrate that the Arbitration Tribunal decided to resolve the matters of competency in the Final Decision and that, therefore, the matters of competency and jurisdiction set forth by PEP did not delay the process nor did they generate additional arbitration costs for the other party. This document is suitable to such effect since the Arbitration Tribunal executed the arbitration proceeding by means of procedural orders.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

27. **Procedural Order 6** and Communication A 39 of the Arbitration Tribunal. These documents are records from the Arbitration

278

Tribunal and are being submitted in relation to the *de jure* and *de facto* chapter V (second), to demonstrate the order and the content of the actions for rapid adjudication ordered by the Arbitration Tribunal, as well as the grave violation of the arbitration procedure on the part of the Arbitration Tribunal; similarly, they are submitted in relation to chapter VI, to demonstrate that the Arbitration Tribunal did not understand PEP's arguments and motions, and that it resolved the crossings dispute using deficient proof. This document is suitable to such effect since the Arbitration Tribunal executed the arbitration proceeding by means of procedural orders.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

28.  **Communication C 44 by COMMISA**, dated March 12, 2007.  This communication is being submitted in relation to chapter V (second) of this petition, in order to show what were COMMISA's demands in terms of technical disputes 34 and 35, as well as the grave violation of the arbitration proceeding by the Arbitration Tribunal. This document is suitable to this effect since it originates directly from the opposing party, COMMISA.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

29. **Communication A 49 by the Arbitration Tribunal**, dated July 31, 2007. This record from the Arbitration Tribunal is being submitted in relation to chapter V (second) of this petition, in order to show that the Tribunal introduced new demands to the action with the pretext of requesting additional proof from the parties, that it left PEP with a lack of protection, and that it gravely violated the arbitration proceeding. This document is suitable to this effect since it originates directly from the Arbitration Tribunal, and is referenced in the Tribunal's considerations.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

30. **Communication C 47 by COMMISA**, dated August 3, 2007. This record from COMMISA is being submitted in relation to chapter V (second) of this petition, in order to show that the Tribunal introduced new demands to the action with the pretext of requesting additional proof from the parties; that it left PEP with a lack of protection, and that it gravely violated the arbitration proceeding. This document is suitable

to this effect since it originates directly from COMMISA, the defendant in the arbitration.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**31. Communication A 50 by the Arbitration Tribunal**, dated August 6, 2007. This record from the Arbitration Tribunal is being submitted in relation to chapter V (second) of this petition, in order to show that the Tribunal introduced new demands to the action with the pretext of requesting additional proof from the parties, that it left PEP with a lack of protection, and that it gravely violated the arbitration proceeding. This document is suitable to this effect since it originates directly from the Arbitration Tribunal.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**32. Communication R 39 by PEP** dated August 7, 2007. This communication by PEP is being submitted in relation to chapter V (second) of this petition, in order to show that PEP opposed, with due timeliness, the Arbitration Tribunal's action which aimed at gravely violating the Arbitration proceeding. This document is suitable

to this effect because it shows that PEP did not waive its right to object on the nullity of the ruling on disputes 34 and 35, under the terms of article 33 of the Arbitration Regulations.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**33. Communication A 51 by the Arbitration Tribunal**, dated August 10, 2007. This communication from the Arbitration Tribunal is being submitted in relation to chapter V (second) of this petition, in order to show that the Arbitration Tribunal decided in its Communication R 39 to postpone the objection filed by PEP until the Final Decision ruling. This document is suitable in demonstrating this fact since its author is the Arbitration Tribunal.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**34. Communication C 49 by COMMISA**, dated August 21, 2007. This record from COMMISA is being submitted in relation to chapter V (second) of this petition, in order to show that the Tribunal introduced new demands to the action with the pretext of requesting additional proof from the parties, that

it left PEP with a lack of protection, and that it gravely violated the arbitration proceeding. This document is suitable to this effect since it originates directly from COMMISA, the defendant.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**35. Document COM/EP2800/2003-5556, dated April 8, 2003,** received by PEP on that same date. This document is being submitted in relation to the *de jure* and *de facto* chapters IV (third), VIII and XI, in order to show that the Technical Dispute 36 regarding adverse weather was filed outside of time limits, after the work had been completed; that the technical dispute needed to be formalized as a prerequisite to arbitration; that the Supervisor to the Contract was still performing functions on that date. This document is suitable to that effect because it was referenced in the independent vote by Lic. Darío Oscós Coria, designated co-Arbitrator, as proof of his dissenting vote.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

.

283

**36. Written Pleadings by PEP.** This record by PEP within the arbitration proceeding is being submitted in relation to chapter XI, in order to demonstrate that not all of COMMISA's claims were formalized as technical disputes, and to prove the Arbitration Tribunal false on this point and, similarly, to make its negligence evident in terms of the valuation of the evidence.

This document is suitable to this effect because the Arbitration Tribunal expressly references this document in order to accredit those facts that we intend to prove false.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**37. Communication dated June 29, 2006**, submitted by Lic. Deva Villanúa Gómez, itemizing the list of documents presented in the hearings for this case. This document is being offered as proof in relation to chapter V (second) in order to demonstrate that the Arbitration Tribunal did not base nor substantiate its Award, given that its text precisely contradicts the Tribunal's considerations. This document is suitable since the undersigned is the Administrative Secretary of the Arbitration Tribunal, pursuant to section E of the Mission Statement.

284

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**38. Modification Order No. 1, Rev. 2 of the Contract** PEP-O-IT-136/98. This document is being submitted in relation to chapter V (first and second) in order to demonstrate that PEP did not commit to pay for stand-by times due to initial delays with the boats; that the Arbitration Tribunal introduced new demands to the action in an unofficial manner; that the Arbitration Tribunal acted in bad faith in the actions for rapid adjudication; and, in general, the grave violation to the arbitration process on the part of the Arbitration Tribunal.

This document is suitable to producing the indicated probatory effect, since the Arbitration Tribunal based its decision precisely on this document.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**39. Document COM/EP2800/99-0302** dated March 15, 1999. This document is being submitted in relation to chapters VIV, V and XI of this petition, in order to demonstrate, in terms of the dispute regarding adverse weather and incompetence, that the technical dispute was not formalized as a prerequisite to arbitration and, in terms of the dispute regarding initial delays, to demonstrate that COMMISA did not prove that any damages were caused, and that the Arbitration Tribunal ordered that payment be made for services for which there was no entitlement to receive payment. This document is suitable for this purpose because the Arbitration Tribunal expressly references this document to prove that

285

COMMISA formalized a technical dispute regarding adverse weather, and to determine the fees that PEP had to pay for the delays with the boat projects.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**40. Document No. DEPC-RPEP-IPC-28-001-2002** dated August 30, 2002.  This document is a record of the Complete Physical Receipt of the Projects for Contract No. PEP-O-IT-136/98, entered into between Pemex Exploración y Producción and Corporación Mexicana de Mantenimiento Integral, S. de R.L. de C.V.  This document is submitted in relation to the *de facto* and *de jure* chapters I, IV, V, VII, VIII and X, to show the date of completion of the work; that at the time of preparation of the Mission Statement, COMMISA had not formalized its technical disputes relating to adverse weather, initial delays, obstructions, payment of differences for work in platforms; that the right of COMMISA to make claims

regarding these matters had terminated; that in these matters COMMISA did not fulfill the prerequisites stipulated in the Contract in order to submit to arbitration; and that the Arbitration Tribunal exceeded its power by resolving disputes not contemplated in the arbitration agreement.  This document is suitable to this effect since it is referenced in the Independent Vote of Lic. Darío Oscós Coria, dissenting co-Arbitrator.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**41.  Document EP2800/COM/99-1696** dated June 11, 1999.  This document is offered as proof in relation to chapter V (second) to show that the Arbitration Tribunal did not base nor substantiate its Award, given that its text precisely contradicts the considerations of the Tribunal.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**42.  Document EP2800/COM/99 1604** dated May 21, 1999.  This document is offered as proof in relation to chapter V (second) to show that the Arbitration Tribunal

did not base nor substantiate its Award, given that its text precisely contradicts the considerations of the Tribunal.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

43.    **Document**.    This is the independent vote issued by the Arbitrator Darío Ulises Oscós Coria, a member of the Tribunal, in the arbitration ruling for the arbitration proceeding 13716/CCO/JRF, administered by the International Arbitration Court of the International Chamber of Commerce, and which is part of the Arbitration Award that is being challenged, being submitted herein to demonstrate all of the facts that are being attributed to it.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

44.    **Document**.    This contains all the proceedings in arbitral case 13716/CCO/JRF, administered by the International Arbitration Court of the International Chamber of Commerce, with COMMISA as the plaintiff and PEP as the defendant, which I shall exhibit at a timely procedural opportunity and once it is issued to me by the Arbitration Tribunal, via the President of the Secretariat of the ICC's International Arbitration Court, from whom it has already been requested, as is evidenced through a copy of said written request that is being exhibited to this end.  However, if Your Honor

should deem it so pertinent, I ask that you request that the file corresponding to said arbitration proceedings be remitted, since it involves proceedings that have been fully concluded.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**45. Magazine article**. Public interest as a reason to deny the acknowledgement and execution of international arbitration awards, undersigned by Dr. José Luis Sequeiros; being submitted in relation to chapter IX of this petition to substantiate the private international law that was referenced and the violation to the public interest that the award represents.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

**46. Magazine article**. Public interest as a reason to deny the acknowledgement of a foreign arbitration award:  criterions for its practical application, signed by Alvaro López de Argumedo Piñeiro and Marcos De Benito Llopis-Llombart, that is being submitted in relation to chapter IX of this petition to substantiate the private international

289

# EXHIBIT 1 (PART 7)

law that was referenced and the violation to the public interest that the award represents.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

## II. PRESUMPTIONS OF LAW.

Consisting of those presumptions that the Law or person who adjudges should derive from past and future proceedings, which should favor us.

I associate this evidence with each and every one of the antecedents of this claim, as well as with each and every one of the facts of the claim.

## L A W

I.  In terms of the proceeding, articles 1457, 1458, 1459, 1460 and related provisions of the Commercial Code are applicable.    Similarly, articles 360 et seq. and related provisions of the Federal Code of Civil Procedure are also applicable.

II.  In terms of the substance, articles 126 and 134 of the Political Constitution of the United Mexican States are applicable, as well as

the federal norms and case law opinions referenced in the course of this petition.

## LIST OF DOCUMENTS THAT ACCOMPANY
## THE PETITION

1.-  Notarial certified copy of Public Instrument No. 13250, dated April 7, 2003, witnessed by Notary Public No. 229 of the Federal District, LIC. MARCO ANTONIO RUIZ AGUIRRE, which includes the power of attorney that PEMEX EXPROPIACIÓN Y PRODUCCIÓN grants to LIC. JOSÉ NÉSTOR GARCÍA REZA.


2.-  Notarial copy certified by LIC. EDUARDO FRANCISCO GARCÍA VILLEGAS SÁNCHEZ CORDERO, owner of Notary Office No. 248 of the Federal District, containing the AWARD for Arbitration 13716/CCO/JRF by the International Arbitration Court of the International Chamber of Commerce, dated January 15, 2008, having been carried out with CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V. (México) as the Plaintiff and PEMEX EXPLORACIÓN Y PRODUCCIÓN (México) as the Defendant.


3.-  Notarial copy certified by LIC. EDUARDO FRANCISCO GARCÍA VILLEGAS SÁNCHEZ CORDERO, owner of Notary Office No. 248 of the Federal District, containing the INDEPENDENT VOTE IN THE FINAL AWARD, issued by co-Arbitrator LIC. DARÍO ULISES OSCÓS CORIA, dated January 15, 2008,

291

for Arbitration 13716/CCO by the International Arbitration Court of the International Chamber of Commerce, having been carried out with CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V. (México) as the Plaintiff and PEMEX EXPLORACIÓN Y PRODUCCIÓN (México) as the Defendant.

4.- Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and of Federal Real Estate Property, with jurisdiction and residency in the City of Villahermosa, Tabasco, containing the Contract for Public Works at unit prices and pre-determined time, entered into by PEMEX EXPLORACIÓN Y PRODUCCIÓN on September 4, 1998, and by CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V.

5.- Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and of Federal Real Estate Property, with jurisdiction and residency in the City of Villahermosa, Tabasco, containing the INTERNATIONAL PUBLIC TENDER No. 18575003-016-98, that is ANNEX "B-2" to PEMEX EXPLORACIÓN Y PRODUCCIÓN, certification dated April 8, 2008.

6.- Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and of Federal Real Estate Property, with jurisdiction

292

and residency in the City of Villahermosa, Tabasco, dated April 3, 2008, containing a narrative description of the plan for execution of the work, submitted by CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V.

7.- Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and of Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, containing Agreement No. ONE to Contract PEP-O-136/98 that was entered into between PEMEX EXPLORACIÓN Y PRODUCCIÓN and CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., certification dated April 3, 2008.

8.- Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and of Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, containing Agreement No. TWO to Contract PEP-O-136/98 that was entered into between PEMEX EXPLORACIÓN Y PRODUCCIÓN and CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., certification dated April 3, 2008.

9.- Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and of Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, containing Agreement No. THREE to Contract PEP-O-136/98 that was entered into between PEMEX EXPLORACIÓN Y PRODUCCIÓN and CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., certification dated April 3, 2008.

10.- Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and of Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, containing Agreement No. FOUR to Contract PEP-O-136/98 that was entered into between PEMEX EXPLORACIÓN Y PRODUCCIÓN and CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., certification dated April 3, 2008.

11.- Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and of Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, containing Agreement No. FIVE to Contract PEP-O-136/98 that was entered into between PEMEX EXPLORACIÓN Y PRODUCCIÓN and CORPORACIÓN MEXICANA DE

MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., certification dated April 3, 2008.

12.-    Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and of Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, containing Agreement No. SIX to Contract PEP-O-136/98 that was entered into between PEMEX EXPLORACIÓN Y PRODUCCIÓN and CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., certification dated April 3, 2008.

13.-    Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and of Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, containing Agreement No. SEVEN to Contract PEP-O-136/98 that was entered into between PEMEX EXPLORACIÓN Y PRODUCCIÓN and CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., certification dated April 3, 2008.

14.-    Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and of Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, containing

Agreement No. EIGHT to Contract PEP-O-136/98 that was entered into between PEMEX EXPLORACIÓN Y PRODUCCIÓN and CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., certification dated April 3, 2008.

15.-    Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and of Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, containing Agreement No. NINE to Contract PEP-O-136/98 that was entered into between PEMEX EXPLORACIÓN Y PRODUCCIÓN and CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., certification dated April 3, 2008.

16.-    Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and of Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, containing Agreement No. TEN to Contract PEP-O-136/98 that was entered into between PEMEX EXPLORACIÓN Y PRODUCCIÓN and CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., certification dated April 3, 2008.

17.-    Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and of Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, containing Agreement No. ELEVEN to Contract PEP-O-136/98 that was entered into between PEMEX EXPLORACIÓN Y PRODUCCIÓN and CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., certification dated April 22, 2008.

18.-    Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and of Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, containing Agreement No. TWELVE to Contract PEP-O-136/98 that was entered into between PEMEX EXPLORACIÓN Y PRODUCCIÓN and CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., certification dated April 3, 2008.

19.-    Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and of Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, containing Agreement No. THIRTEEN to Contract PEP-O-136/98 that was entered into between PEMEX EXPLORACIÓN Y PRODUCCIÓN and CORPORACIÓN MEXICANA DE

297

MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., certification dated April 3, 2008.

20.-    Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and of Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, containing Agreement No. FOURTEEN to Contract PEP-O-136/98 that was entered into between PEMEX EXPLORACIÓN Y PRODUCCIÓN and CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., certification dated April 3, 2008.

21.-    Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and of Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, containing Agreement No. FIFTEEN to Contract PEP-O-136/98 that was entered into between PEMEX EXPLORACIÓN Y PRODUCCIÓN and CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., certification dated April 3, 2008.

22.-    Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and of Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, containing

Agreement No. SIXTEEN to Contract PEP-O-136/98 that was entered into between PEMEX EXPLORACIÓN Y PRODUCCIÓN and CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., certification dated April 3, 2008.

23.-   Petition sent by the General Attorney at PEMEX EXPLORACIÓN Y PRODUCCIÓN to the Secretariat of the International Arbitration Court, D. JOSE RICARDO FERIS, International Arbitration Court of the International Chamber of Commerce, dated April 24, 2008, in which he requests that a certified or authenticated copy of the proceedings in the file for the ICC arbitration proceeding reference No. 13716/CCO/JRF, filed by CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V. (México) against PEMEX EXPLORACIÓN Y PRODUCCIÓN (México), consisting in the Mission Statement, the Procedural Orders issued, the communications from the Arbitration Tribunal, including those from the Administrative Secretariat, and those communications originating from COMMISA and PEP, be issued.

24.-   Electronic mail sent on April 30, 2008, at 11:06 AM, by CLAUDIO ERIC DEVEZE MONTOYA, to JOSE RICARDO FERIS of the Chamber of Commerce's International Arbitration Court, in which he requests a copy of the reference file for CASE 13716/CCO/JRF, CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S.

DE R.L. DE C.V., (Mexico) and PEMEX EXPLORACIÓN Y PRODUCCIÓN (México), as well as a copy of the TRANSMISSION LOG, number 921 0034915159145, with a starting time of 01-15 07:05 PM 00'36" MCE, page 001 with the result (correct), and number 922 0033149532933, with a starting time of 01-15 07:06 PM 00'18" MCE, page 001 with the result (correct).

25.- Electronic mail sent on April 30, 2008, at 11:10AM by CLAUDIO ERIC DEVEZE MONTOYA to the members of the Arbitration Tribunal, D. JUAN FERNÁNDEZ-ARMETO, D. JOSE W. FERNÁNDEZ and D. DARIO OSCOS CORIA of CASE 13716/CCO/JRF, CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., (Mexico) and PEMEX EXPLORACIÓN Y PRODUCCIÓN (México).

26.- Original of the MISSION STATEMENT for the Arbitration between CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., (Mexico) and PEMEX EXPLORACIÓN Y PRODUCCIÓN (México), CASE ICC No. 13716/CCO, before the International Arbitration Court of the International Chamber of Commerce.

27.- Copy of Procedural Order No. 1 ter for the Arbitration between CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V.,

(Mexico) and PEMEX EXPLORACIÓN Y PRODUCCIÓN (México), CASE ICC No. 13716/CCO, before the International Arbitration Court of the International Chamber of Commerce.

28.-  Copy of Procedural Order No. 2, Document A 24, for the Arbitration between CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., (Mexico) and PEMEX EXPLORACIÓN Y PRODUCCIÓN (México), CASE ICC No. 13716/CCO, before the International Arbitration Court of the International Chamber of Commerce.


29.-  Letter dated December 13, 2006, written by the President of the Arbitration Tribunal Juan Fernández-Armesto to the attorneys for the parties in the Arbitration, both the plaintiffs as well as the defendants, to which he attached PROCEDURAL ORDER No. 6 for the Arbitration between CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., (Mexico) and PEMEX EXPLORACIÓN Y PRODUCCIÓN (México), in CASE ICC No. 13716/CCO, carried out before the International Arbitration Court of the International Chamber of Commerce.

30.-  Electronic mail by the Secretary of the International Arbitration Court under JOSE RICARDO FERIS, addressed to DEVEZE MONTOYA, in which he acknowledges receipt of his communication dated April 30, 2008, in CASE 13716/CCO/JRF, CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., (Mexico) and PEMEX EXPLORACIÓN Y PRODUCCIÓN (México).

31.- Copy of communication C-44, ADDITIONAL ANSWERS TO THE QUESTIONS FROM THE TRIBUNAL INCLUDED IN PROCEDURAL ORDER No. 6, sent by the Plaintiff's attorneys in the arbitration CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., to the International Chamber of Commerce's International Arbitration Court.

32.- Letter dated July 31, 2007, sent by JUAN FERNÁNDEZ-ARMESTO, President of the Arbitration Tribunal in CASE ICC No. 13716/CCO, to the attorneys for the plaintiffs and the defendants.

33.- Electronic mail dated August 3, 2007, sent by CHRIS PAPARELLA, attorney for the plaintiffs in the Arbitration, to the Arbitrators in the case CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., versus PEMEX EXPLORACIÓN Y PRODUCCIÓN, CASE ICC No. 13716/CCO, Communication C.47.

34.- Letter dated August 6, 2007, sent by Juan Fernández-Armesto, President of the Arbitration Tribunal in the CASE ICC No. 13716/CCO, CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., (Mexico) and PEMEX EXPLORACIÓN Y PRODUCCIÓN (México), to the attorneys for the plaintiffs and the defendants in this arbitration.

35.- Letter dated August 7, 2007, written by attorney JAIME DUARTE AISPURO in representation of PEMEX EXPLORACIÓN Y PRODUCCIÓN, to the members of the Arbitration Tribunal, in which he expresses an objection to communications A-49 and A-50 remitted by the Arbitration Tribunal, and opposes the motion that the Arbitration Tribunal has exceeded its authority.

36.- Letter dated August 10, 2007, written by Juan Fernández-Armesto, President of the Arbitration Tribunal in CASE ICC No. 13716/CCO, to the attorneys for the plaintiffs and the defendants in this arbitration.

37.- Electronic mail dated August 21, 2007, addressed by Mr. CHRIS PAPARELLA to the Arbitrators and to Mr. José Ricardo Feris, of the ICC's International Arbitration Court, in CASE ICC No. 13716/CCO, CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., versus PEMEX EXPLORACIÓN Y PRODUCCIÓN, Communication C.49.

38.- Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, directed by JAIME VÁZQUEZ TOBIAS, Legal Representative of CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., and PEMEX EXPLORACIÓN Y

303

PRODUCCIÓN, in regards to the Public Works Contract at Unit Prices and Predetermined Time No. PEP-O-IT-136/98.

39.- Electronic mail dated June 29, 2006, sent by DEVA VILLANÚA GÓMEZ to the attorneys for the plaintiffs and the defendants, and to the Arbitrators in CASE ICC No. 13716/CCO, to which he attaches a TABLE with all the documents submitted during the hearing.

40.- Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, of the Order for Contract Amendment, for the Cantarell project at PEMEX, which contains descriptions of modifications in terms of timeframes for execution, as well as start dates and critical completion dates.

41.- Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, dated March 15, 1999, sent by CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V., to PEMEX EXPLORACIÓN Y PRODUCCIÓN, regarding the matter of SAVING AND RESCHEDULING OF COSTS.

42.-    Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, dated June 11, 1999, sent by the Supervisor to Contract PEP-O-IT-136/98 (EPC-28), ENG. MARWAN F. ABBASSI, to ENG. NICOLAS MARTINEZ, Project Director for project EPC-28 of CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S.A. DE C.V., in regards to contract PEP-O-IT-136/98 (EPC-28), ANNEX B1, CLAUSE 3.5.1, Document COM/EP2800/99-558, May 31, 1999, and Document EP2800/COM/99-1604, May 21, 1999.

43.-    Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, of Contract No. PEP-O-IT-186/98, Certification for Complete Physical Receipt, signed by the two parties that entered into Contract PEP-O-IT-136/98.

44.-    Notarial copy certified by LIC. CARLOS EFRAÍN RESÉNDEZ BOCANEGRA, Notary Public No. 18 of the State and Federal Real Estate Property, with jurisdiction and residency in this City of Villahermosa, Tabasco, of the letter dated May 21, 1999, sent by Eng. Marwan F. Abbassi, Supervisor of Contract 1999, to Eng.

Nicolas Martinez, Project Director for EPC-28, CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S.A. DE C.V.

45.- Copy of an Article written by Dr. José Luis Siqueiros, entitled PUBLIC INTEREST AS A MOTIVE TO DENY THE RECOGNITION AND ENFORCEMENT OF INTERNATIONAL ARBITRAL AWARDS.

46. Copy of an Article written by ALVARO LOPEZ DE ARGUMEDO PIÑEIRO and MARCOS DE VENITO LLOPIS-LLOMBART, entitled PUBLIC INTEREST AS A REASON TO DENY THE RECOGNITION OF A FOREIGN ARBITRAL AWARD: CRITERIA FOR ITS PRACTICAL APPLICATION.

47.- Copy of the document submitted to the Arbitration Tribunal by PEMEX EXPLORACIÓN Y PRODUCCIÓN, signed by its General Attorney JOSÉ NÉSTOR GARCÍA REZA, containing the SUMMARY OF WRITTEN ARGUMENTS.

48.- Edition of the Arbitration Regulations of the International Arbitration Court, in effect as of January 1, 1998.

49.- Certified copy of the Communication by the International Chamber of Commerce's International Arbitration Court, dated February 7, 2008, signed by D. José

Ricardo Feris, Advisor to the Secretariat of the International Chamber of Commerce's International Arbitration Court, sent by courier and received by the Office of the General Attorney of Petróleos Mexicanos on February 11, 2008, attached to which are the award issued and a copy, for information purposes, of the dissenting opinion of Mr. Darío Oscós Coria.

## C L A I M E D   I T E M S :

In this tenor, based on everything that has been presented and substantiated, PEP requests the following:

**FIRST.-**  That the undersigned be considered in the capacity of attorney for Pemex Exploración y Producción, capacity that is manifested and accredited with the attached testimony; that the capacity that I manifest be acknowledged, and to deem the professionals as authorized under the terms indicated in this document.

**SECOND.-**  That Pemex Exploración y Producción be considered in its request via ANCILLARY PROCEEDINGS for the TOTAL ANNULMENT of the Arbitration Award issued in the Arbitration Case 13716/CCO/JRF, under the terms of article 360 of the

Federal Code of Civil Procedure, and of articles 1457 and 1458 of the Commercial Code.

**THIRD.-**   That the related documentary proof submitted and exhibited by PEP be considered, proof that has been presented based on its fundamental character, in order to accredit the factual requirements for the intended action.

**FOURTH.-**  That the requested measure be granted.

**FIFTH.-**   To order the notification and summons of CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S.A. DE C.V. (COMMISA), at the domicile that was provided for this purpose at the start of this initial petition, which matches the domicile designated by them to hear and receive notifications in their claim, using the single copies exhibited for this purpose, so that they can respond to the referenced claim within the legal timeframe.

**SIXTH.-**  To open evidentiary proceedings in due time.

**SEVENTH.-**   To declare this petition as admissible once the procedural action is concluded, and in due time to declare the annulment of the Final Decision issued in the Arbitration Case 13716/CCO/JRF.

**EIGHTH.-**   With the prior certification and comparison of the single copies of the documents presented as proof in this pleading, as well as of the Testimonies with which we accredit capacities, to order the return of the originals to any of the persons authorized to receive notifications, who are specified in the preamble to this petition.


Mexico, Federal District, May 6, 2008


Sincerely,

[Signature]

**LIC. JOSÉ NÉSTOR GARCÍA REZA**
OAG/0482/2008
**Legal Representative of PEP**

[Signature]

# EXHIBIT 2 (PART 1)

HOGAN & HARTSON L.L.P., IIII BRICKELL AVENUE, SUITE I900 • MIAMI, FL 33I3I • TEL. (305) 459-6500 • FAX (305) 459-6550

# Language Innovations, LLC™

*Helping businesses communicate worldwide*

1725 I Street NW
Suite 300
Washington, D.C. 20006

tel      202.349.4180
fax      202.349.4182
email    translate@languageinnovations.com

## TRANSLATION CERTIFICATION

This is to certify that the translation of the attached document(s), **Ref.: Response to Complaint to Nullify Arbitral Award,** was performed by a professional translator and is to the best of our knowledge and ability, a true and accurate translation of the original text delivered to Language Innovations, LLC by our client, **Hogan & Hartson, LLP.** The original document was translated from **Spanish** into **English** and at completion delivered to the client on **June 23, 2008.**

I hereby declare that all statements made herein are of my own knowledge and are true and that all statements made based on information or belief are believed to be true.

Language Innovations, LLC hereby agrees to keep the content of this translation confidential according to ethical and legal standards of the profession of Translation. Language Innovations, LLC agrees not to discuss, evaluate, distribute or reproduce any material included in or related to the translation of this document.

Date: _June 24, 2008_

Signature: _____

Mariela Diaz-Butler, Manager
Language Innovations, LLC

Subscribed and sworn before me this ___24th___ day of ___JUNE___ 20 _08_, at Washington, DC.

JAMES M. REED
Notary Public District of Columbia Notary Public
My Commission expires My Commission Expires June 30, 2012

*{Handwritten note}*

*Personal notification*
*May 22, 2008*

PEMEX EXPLORACIÓN Y PRODUCCIÓN

vs.

CORPORACIÓN[a] MEXICANA DE MANTENIMIENTO
INTEGRAL, S. DE R.L. DE C.V.

File number 158/2008-II

Subject: Response is given to the motion for nullity

**EIGHTH DISTRICT JUDGE FOR CIVIL MATTERS
IN THE FEDERAL DISTRICT**

**MARCO TULIO VENEGAS CRUZ**, in representation of the company called **CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C.V. (hereinafter called "COMMISA")**, as evidenced in this act through the second testimony of official public document number 58,042, drawn up and verified in the presence of Notary Public no. 1 of the Federal District, Licenciado Roberto Nuñez y Bandera, in which there is a record of the power of attorney bestowed by COMMISA to the undersigned, a document that is attached as <u>**ANNEX ONE**</u> of the present pleading and which I ask to be returned to me once it has been validated and compared with the simple copy thereof that accompanies it, indicating as the residence for hearing and receiving notifications the one located on **Guillermo González Camarena número 1100, 7o piso (7th floor), Colonia Santa Fe, Centro de Ciudad (City Center), Delegación Álvaro Obregón, postal code 01210** and authorizing, in the broad terms of the third paragraph of article 1069 of the Code of Commerce, attorneys-at-law **Fernando Moreno Gómez de Parada (with professional card number 1516258), Edmond Frederic Grieger Escudero (with professional card number 4204176), Montserrat Manzano Escalón (with professional card number 4214290), Alberto Muerza Sierra (with professional card number 2948545), Adrián Magallanes Pérez (with professional card number 5295822) and Diego Ignacio Sierra Laris (with professional card number 68851 for a law clerk for the practice of law)**; and authorizing, in the terms of the third from last paragraph, to hear and receive notifications, documents and securities, so that it may stand on the record, the law clerks **Robert Edward Dolan Isunza, Elías de Anda Madrazo, Raymundo Soberanis Coréts, Ricardo Rabasa Cossu, Alejandra Cárdenas Ducker, Mariana García Martínez Parente and Pablo Usoblaga Hegewisch**, I appear before you with the respect that is due and I state:

That on the fourteenth of May of the present year, a copy was delivered to my client of the motion for nullity of the arbitral award filed by PEMEX EXPLORACIÓN Y PRODUCCIÓN (hereinafter "PEP"), when it received notification of the decision dated the ninth of May, two thousand and eight, whereby the motion

---

[a] *Translator's note:* The original reads "COROPRACIÓN" but the translation assumes that this is a typo.

1

of reference was recorded as submitted and admitted and a time limit of three days was granted to my client for it to state whatever might be appropriate to its interest.

In view of the foregoing, since I am within the time limit of three days that was granted for this purpose by the Judge, and on the basis of the prescription of article 1460 of the Code of Commerce, as well as article 360 of the Federal Code of Civil Procedure, I come before you to give reply to the motion filed by PEP as follows:

## I.  BENEFITS CLAIMED

Each and every one of the benefits demanded from my client by the plaintiff is inadmissible, by virtue of the following:

a)      We reject the admissibility of the petition that the arbitral award rendered in arbitration proceeding 13716/CCO/JRF be decreed null, given that this decision: i) is not contrary to public policy; ii) resolved the disputes submitted by the parties to the arbitration; and iii) was rendered within the exercise of the faculties granted to the arbitrators by the parties.

b)      It is likewise inadmissible the penalty requested by PEP whereby my client should be condemned to the payment of the expenses and costs occasioned by the processing of the present motion.

## II.  PRELIMINARY CONSIDERATIONS

In the first place, and as a preliminary question of order, we call Your Honor's attention to the disorderly and unclear manner in which the petition for nullity is presented.

Basically, the plaintiff sets forth, in the eight paragraphs (Roman numerals I to VII) of its chapter "FACTS," in a disorderly, repetitive and confused manner, its legal arguments concerning the reasons for which it deems that the arbitral award should be declared null.

Likewise, in paragraph VIII of its chapter "FACTS," it attempts, incidentally in an untimely manner, to impugn the decision made by the arbitrators on their own jurisdiction.

The presentation of the petition, in the terms indicated above, is totally lacking in legal technique, to the extent that arguments of law are presented as matters of fact.

And if the foregoing were not enough, and perhaps with the intent of confusing Your Honor, the legal arguments in the paragraphs of reference extend for over 200 pages in a repetitive and confused manner, impugning issues related to the merits of the case in the arbitral award rendered by the Arbitral Tribunal, just as if it were a matter of an "appeal" or a "suit for 'amparo'[b]" against the decision, forgetting that, in accordance with article 1457 of the Code of Commerce, the causes for which an arbitral award can be annulled are exceptional and restrictive and none of them permit the revision, modification or annulment of the lines of reasoning and decisions on the facts adopted in the arbitral award.

In view of the foregoing, considering the disorderly, confused manner, lacking proper legal technique, in which the motion to annul the arbitral award filed by PEP is set forth, and for the purpose of answering each one of its allegations and arguments in a precise and orderly manner, Your Honor will find a short index of the structure of the present Response:

III.     RESPONSE TO THE BACKGROUND INFORMATION ................................................................6

IV.     RESPONSE TO THE FACTS ..........................................................................................10

V.     INADMISSIBILITY OF THE CHALLENGE TO THE DECISION CONCERNING THE JURISDICTION OF THE ARBITRAL TRIBUNAL TO ISSUE THE AWARD ...............................................12

      A)     EXCEPTION DERIVING FROM THE INAPPLICABILITY OF ARTICLE 1432 OF THE CODE OF COMMERCE TO PETITION THE JUDGE TO RULE ON THE VALIDITY OF THE JURISDICTION ASSUMED BY THE ARBITRAL TRIBUNAL .................................................................................................................12

      B)     EXCEPTION DERIVING FROM THE INAPPLICABILITY OF ARTICLE 1457 OF THE CODE OF COMMERCE TO SUPPORT THE ALLEGED LACK OF JURISDICTION OF THE ARBITRAL TRIBUNAL AS A CAUSE FOR THE NULLITY OF THE ARBITRAL AWARD ...................................................................................14

      C)     EXCEPTION DERIVING FROM THE FACT THAT THE ARBITRAL TRIBUNAL HAS JURISDICTION TO RESOLVE ALL DISPUTES ARISING FROM THE CONTRACT, IN ACCORDANCE WITH THE ARBITRATION CLAUSE16

      D)     EXCEPTION DERIVING FROM THE FACT THAT THE ADMISSIBILITY OF THE CLAIMS OF COMMISA WAS PART OF THE MISSION GIVEN BY THE PARTIES TO THE ARBITRATORS AND PEP DID NOT OBJECT TO THESE DETERMINATIONS.  FOR THIS REASON, IN ACCORDANCE TO WHAT IS ORDERED BY ARTICLE 33 OF THE REGULATIONS OF THE INTERNATIONAL ARBITRAL TRIBUNAL, PEP CONSENTED TO THE JURISDICTION OF

---

[b] *Translator's note:*  The word "amparo" (whose common meaning is "protection" or "shelter") is a special legal term in Mexican law.  It means a petition for protection under the Constitution against a decision made by a court of law or an administrative entity, almost always a government agency.

3

THE ARBITRAL TRIBUNAL AND THE ADMISSIBILITY OF THE ANALYSIS OF THE TECHNICAL DISPUTES AND LOST ITS RIGHT TO FILE A PETITION FOR THE NULLITY OF THE ARBITRAL AWARD. ...................................25

VI.    RESPONSE TO THE GROUNDS FOR NULLITY AND OTHER ARGUMENTS INVOKED BY THE PLAINTIFF.....................................................................................................................................20

A)    INAPPLICABILITY OF THE NEW YORK CONVENTION AND THE PANAMA CONVENTION TO THE PROCEDURE INITIATED BY THE PLAINTIFF ............................................................................29

B)    EVIDENT AND INTRINSIC CONTRADICTIONS PRESENT IN THE MOTION FOR NULLITY.....................31

C)    LEGAL IMPOSSIBILITY FOR ENTERING, IN THE PROCEEDINGS FOR NULLITY, INTO THE STUDY OF THE FACTS OF THE CASE BY ALLEGING VIOLATIONS AGAINST PUBLIC POLICY OR OTHER GROUNDS FOR NULLITY34

D)    THE ARBITRAL AWARD IS NOT CONTRARY TO PUBLIC POLICY ........................................................45

1. – The compensation determined by the Arbitral Tribunal in favor of COMMISA has legal and contractual justification.............................................................................................45

2. – The Contract is not a contract of administrative nature and, consequently, it is impossible to allege any submitting of the interest of PEP over that of COMMISA ...................................51

3. – The Arbitral Award does not violate any provision of budgetary nature  ..........................57

4. – The Arbitral Award does not modify the Contract and, therefore, does not violate Article 70 of the applicable Law on Acquisitions and Public Works.....................................................70

5. – The penalties contained in the Arbitral Award do have contractual foundation and do not refer to payments not provided for in the Contract ...................................................................73

6. - The award correctly applies the contractual and legal provisions of a civil nature and, apart from this, its determinations in this respect may not be considered as violations against public policy ..................................................................................................................................75

7. – The determinations contained in the arbitral award are not incongruent. .........................84

E)    IN THE ARBITRAL AWARD THERE WAS NO INFRINGEMENT AGAINST THE ARBITRATION AGREEMENT, BECAUSE THE CONFLICTS THAT IT RESOLVES ARE INDEED CONTEMPLATED THEREIN AND DO NOT GO BEYOND ITS SCOPE. ................................................................................................................87

1. – PEP consented and ratified its consent for the Arbitral Tribunal to hear and to resolve the claims of COMMISA and, consequently, this ground for nullity is inadmissible. .....................87

2.- In accordance with clauses 23.2 and 23.3 of the Contract, the fact of not setting forth the technical dispute in accordance to procedure does not imply that the conflicts that may have subsisted in relation to said issues are not capable of being arbitrated. ..................................88

3. – The claims relating to the "technical disputes" 34, 35, 36, 37 and 39 are not true technical disputes in accordance with clause 23.2 of the Contract. ........................................................93

4. – In any case, the scope that the plaintiff attempts to give to the second paragraph of the arbitration clause of the Contract is contrary to article 1797 of the Federal Civil Code and would excuse the need to resort to the procedure for technical dispute. ..............................97

5. – The order to pay financial expenses in the arbitral award is valid, in that it is based in the delay in the payment of the indemnities determined by the Arbitral Tribunal, as well as in the terms of the Contract. .............................................................................................................99

F)   DURING THE ARBITRATION AND IN THE ARBITRAL AWARD, THE RULE FOR ARBITRATION PROCEDURES WERE NOT VIOLATED ........................................................................................100

1. – The concepts of provision of legal grounds contemplated in article 16 of the Constitution are not applicable to an arbitral award, or in the manner of proceeding in proceedings of an arbitral nature.......................................................................................................................100

2. – The decisions contained in the award are not biased. ....................................................104

3. – The decision contained in the award concerning the financial expenses is not founded upon Equity, but on specific contractual and legal provisions ...............................................108

G)   RESPONSE TO OTHER CONSIDERATIONS AND ARGUMENTS THAT ATTEMPT TO SUPPORT THE NULLITY OF THE DECISION CONCERNING TECHNICAL DISPUTE NUMBER 36.........................................108

H)   RESPONSE TO OTHER CONSIDERATIONS AND ARGUMENTS THAT ATTEMPT TO SUPPORT THE NULLITY OF THE DECISION CONCERNING TECHNICAL DISPUTES NUMBERS 34 AND 35. ........................112

1. – The Arbitral Tribunal has authority to resolve issues of fact as it best deems, apart from any arguments of the parties and this does not involve any violation of the arbitration agreement with respect to the penalties related with the claims of disputes numbers 34 and 35.  .......................................................................................................................................112

2. – The evaluation of the Evidence by the Arbitral Tribunal cannot be reviewed judicially. The evaluation of the Evidence is a matter of the facts of the case.  ..................................117

3. – The fact that COMMISA may have set forth technical disputes number 34 and 35 once the work was completed cannot cause the claim to cease to be a matter for the arbitration.118

I)   RESPONSE TO OTHER CONSIDERATIONS AND ARGUMENTS THAT ATTEMPT TO SUPPORT THE NULLITY OF THE DECISION CONCERNING TECHNICAL DISPUTE NUMBER 19 ........................................121

J)   VALIDITY OF THE ORDER TO PAY EXPENSES AND COSTS OF THE ARBITRATION. ........................123

As can be seen from the index transcribed above, in the first place, responses are given solely and exclusively to the facts contained in the chapter on BACKGROUND INFORMATION, as well as the few actual references contained in the chapter on THE FACTS of the petition.

Subsequently, and since it was an issue of a procedural nature, there is demonstrated the inadmissibility of the claim that has been set before Your Honor concerning the decisions contained in the arbitral award whereby the Arbitral Tribunal rules on its own jurisdiction.

Finally there are presented the exceptions, defenses and arguments whereby response is given to the arguments that were set forth in a confused and not very technical manner by the plaintiff in its chapter on "THE FACTS" in order to support the supposed grounds for the nullity of the arbitral award that it alleges.

In this context, and for the purpose of affording and facilitating Your Honor an adequate analysis of the present conflict, in our response to the arguments for nullity presented by the plaintiff, we will firstly focus on the general lines of the themes that are repeated time and again in its petition and, subsequently we focus on the particular response to its lines of reasoning.  **From this moment it should be specified that, through the present response to the petition and solely for the purpose of making it easier to follow the arguments of the parties, COMMISA refers to its own claims and petitions that were resolved in the arbitral award as "Technical Disputes," without implying that COMMISA considers them so, or claims that they fit the definition of "Technical Dispute" that is contained in clause 23.2 of the Contract, because they involve claims and petitions that are very diverse in nature and characteristics.**

As for the background information presented by the plaintiff, I will refer to each one of them in the order in which they were set forth:

### III.    RESPONSE TO THE BACKGROUND INFORMATION

I.    The background item correlative to the petition for nullity to which we are responding contains the description of various different facts, and thus we will refer to each one of them in particular.

1.1 – The contents of the first paragraph of Background Item I relating to the data of the contract PEP-O-IT-136/98 (or IPC-28) (hereinafter referred as to the "Contract") are true.

1.2 – The contents of the second paragraph of Background Item I are false and are hereby denied for all legal purpose and, with respect thereto, the following clarifications are made:

a)    With respect to the assertion of the plaintiff filing the petition, which textually reads that *"the Public Works Contract described is an administrative contract, because it is regulated by the Law on Acquisitions and Public Works (hereinafter designated as LAOP*

*for the sake of procedural economy) and the Regulations of the Law on Public Works, as well as other administrative provisions,"* my client declares that this statement is false in view of the fact that contract PEP-O-IT-136/98 (or IPC-28), as will be demonstrated further on, **is not an administrative contract.**

The Contract was signed by PEP as a private entity, which responds to the private interests of said entity and subject to the system of Civil Law, just as this is broadly and repeatedly acknowledged by PEP in its petition for nullity of the arbitral award.

b)     With respect to the assertion by the plaintiff in the petition for nullity, which textually reads, in relation to the Contract, that its *"object pursues a collective interest consisting in a public work, therefore its fulfillment and its regulation are related to public policy and the interest of society, as can be inferred from article 134 of the Constitution and article 1 of the LAOP,"* my client declares that it is false, as will be demonstrated further on, that: i) the object of the contract pursues a collective interest; and ii) its fulfillment and its regulation are related to public policy and the interest of society.

II. -    The background item correlative to the petition for nullity to which we are responding, relating to the signing of sixteen amending agreements between PEP and COMMISA, is true.

III. -    The background item correlative to the petition for nullity to which we are responding **is hereby denied** on account of the terms in which it is drawn up and my client declares that the truth about this fact is contained, in any case, in the arbitration clause agreed upon in the Contract and reference is made to its word-for-word text for all legal effects that may apply.

IV. -    The background item correlative to the petition for nullity to which we are responding **is hereby denied** on account of the terms in which it is drawn up and my client declares that the truth about this fact is contained in the arbitral award and reference is made to its word-for-word text for all legal effects that may apply.

V. -    The background item correlative to the petition for nullity to which we are responding **is hereby denied** on account of the terms in which it is drawn up and my client declares that the truth about this fact is contained, in any case, in the claims that COMMISA presented before the Arbitral Tribunal and which were transcribed in the arbitral award in chapter V designated as "Claims of the Parties" – starting from paragraph 80 -.

VI. -    The background item correlative to the petition for nullity to which we are responding **is hereby denied** on account of the terms in which it is drawn up and my client declares that the truth about this fact is contained, in any case, in the arbitral award – paragraphs 12 and 79 - and reference is made to its word-for-word text for all legal effects that may apply.

VII. -    The background item correlative to the petition for nullity to which we are responding **is hereby denied** on account of the terms in which it is drawn up and my client declares that the truth about this fact is contained, in any case, in the arbitral award and reference is made to its word-for-word text for all legal effects that may apply.

VIII. -    The background item correlative to the petition for nullity to which we are responding **is hereby denied** on account of the terms in which it is drawn up and my client declares that the truth about this fact is contained in the Regulations on Arbitration of the International Chamber of Commerce and reference is made to its word-for-word text for all legal effects that may apply.

IX. -    The background item correlative to the petition for nullity to which we are responding is true.

X. -    The background item correlative to the petition for nullity to which we are responding **is hereby denied** on account of the terms in which it is drawn up and my client declares that the truth about this fact is contained in the Regulations on Arbitration of the International Chamber of Commerce.

In relation to the name of the counselor in charge of the case in the International Arbitral Tribunal of the International Chamber of Commerce, it is correct that it was Mr. José Ricardo Feris.

XI. -    The background item correlative to the petition for nullity to which we are responding is true.

XII. -    The background item correlative to the petition for nullity to which we are responding is true.

XIII. -    The background item correlative to the petition for nullity to which we are responding **is hereby denied** on account of the terms in which it is drawn up.

XIV. -    The background item correlative to the petition for nullity to which we are responding is true.

XV. -    The background item correlative to the petition for nullity to which we are responding **is hereby denied** on account of the terms in which it is drawn up and my client declares that the truth about this fact is contained in the Arbitration Agreement signed between PEP and COMMISA and reference is made to its word-for-word text for all legal effects that may apply.

XVI. -    The background item correlative to the petition for nullity to which we are responding **is hereby denied** on account of the terms in which it is drawn up and my client declares that the truth about this fact is contained in the Arbitration Agreement signed between PEP and COMMISA and in the Mission Statement and reference is made to its word-for-word text for all legal effects that may apply.

XVII.-    The background item correlative to the petition for nullity to which we are responding **is hereby denied** on account of the terms in which it is drawn up and my client declares that the truth about this fact is contained in the narration made of the procedure in the arbitral award and reference is made to its word-for-word text for all legal effects that may apply.

XVIII.-    The background item correlative to the petition for nullity to which we are responding **is hereby denied** on account of the terms in which it is drawn up.  Notwithstanding the foregoing, and since it is considered essential for the litigation that has been set forth, the following clarifications are made:

a) Clause 23.3 of the Contract establishes, word for word, the following:

> "23.3  Arbitration.  Any controversy, claim, difference or dispute that may occur or be related to or connected to this contract or the non-fulfillment thereof shall be settled **definitively** through arbitration conducted in the Federal District, Mexico, in accordance with the Rules on Conciliation and Arbitration of the International Chamber of Commerce that are in effect at that time.  The number of arbitrators shall be three and the language to conduct the arbitration shall be Spanish.  Notwithstanding the foregoing, any technical dispute **must be previously submitted to the procedure provided for in Clause 23.2 and, only in the event that an agreement is not reached between the parties by means of said procedure,** the parties shall be entitled to have recourse to the proceeding provided for in Clause 23.3."

As can be inferred from the clause transcribed, **any dispute** related to the Contract must be resolved definitively by means of arbitration.  In this context, it is evident that the scope of the clause is broad and not restricted, as PEP maintains without any foundation.

9

Thus, from the wording of the clause of reference, it cannot be inferred, as the plaintiff claims, that those disputes that were not submitted to the procedures of clause 23.2 are not under the jurisdiction of the Arbitral Tribunal.

On the contrary, the arbitration clause determines that **all** disputes deriving from the Contract must be resolved by means of arbitration, since the clause does not establish any limitation with respect to which disputes the Arbitral Tribunal may hear.

XIX. -   The background item correlative to the petition for nullity to which we are responding is true.

XX. -   The background item correlative to the petition for nullity to which we are responding **is hereby denied** on account of the terms in which it is drawn up and my client declares that the truth about this fact is contained in the arbitral award – pages 163 and 164 - and reference is made to its word-for-word text for all legal effects that may apply.

XIX. -   The background item correlative to the petition for nullity to which we are responding **is hereby denied** on account of the terms in which it is drawn up and my client declares that the truth about this fact is contained in the arbitral award and in the dissenting vote issued by co-arbitrator Licenciado Dario Oscós Coria.

Nevertheless, in this respect it is clarified that Your Honor does not have faculties to analyze the arguments that the co-arbitrator challenges in his dissenting vote relating to why the co-arbitrator dissents on the penalty of the payment of the financial expenses and the expenses incurred in the arbitration.  The foregoing is based on article 1457 of the Code of Commerce, which, in establishing restrictively and exceptionally the causes for which an arbitral award can be annulled, it prevents the Judge who is hearing the petition for nullity from analyzing the aspects of fact and substance of the arbitral award.

XXII. -   The background item correlative to the petition for nullity to which we are responding **is hereby denied**, given that, as will be shown in the present document, the arbitral award is not vitiated with nullity.

IV.      **RESPONSE TO THE FACTS**

With respect to the facts, I will refer to each one of them below, in the order in which they were presented and making clear reference to the designation attributed to them by the plaintiff petitioning for nullity.

The foregoing is important, given that the facts were set forth in chapters or themes without following any logical numerical order:

I. – Each and every one of the assertions of fact contained in fact I, designated by the plaintiff as *"Causes for Nullity of the Arbitral Award with relation to the decision on Technical Dispute 36. Adverse weather in the work on "la Castoro 10" and the "Bar Protector,"* is hereby denied. Specifically, it is false, as will be shown in the present document, that the arbitral award is vitiated with nullity.

II. - Each and every one of the assertions of fact contained in fact II, designated by the plaintiff as *"Causes for Nullity of the Arbitral Award with relation to the decision on Technical Disputes 34 and 35. Down time on account of delay in the start of the work on "la Castoro 10" and the "Bar Protector,"* is hereby denied. Specifically, it is false, as will be shown in the present document, that the arbitral award is vitiated with nullity.

III. - Each and every one of the assertions of fact contained in fact III, designated by the plaintiff *"Causes for Nullity of the Arbitral Award with relation to the decision on Technical Disputes 37 and 39 relating to "Cruces,"* is hereby denied. Specifically, it is false, as will be shown in the present document, that the arbitral award is vitiated with nullity.

IV. - Each and every one of the assertions of fact contained in the fact to which we are responding and which is a part of the Chapter that is confusedly and erroneously designated as *"III. OTHER DISPUTES"* and that was designated by the plaintiff in the petition for nullity as *"1. Technical Dispute 19: Claims for Obstructions,"* is hereby denied. Specifically, it is false, as will be shown in the present document, that the arbitral award is vitiated with nullity.

V. - Each and every one of the assertions of fact contained in the fact to which we are responding and which is a part of the Chapter that is confusedly and erroneously designated as *"III. OTHER DISPUTES"* and that was designated by the plaintiff in the petition for nullity as *"2. Technical Dispute 27: costs on account of the differential in fees for down time for "Castoro 10" in platform work,"* is hereby denied. Specifically, it is false, as will be shown in the present document, that the arbitral award is vitiated with nullity.

VI. - Each and every one of the assertions of fact contained in the fact to which we are responding and which was designated by the plaintiff in the petition for nullity as *"V. Financial Expenses,"* is hereby denied. Specifically, it is false, as will be shown in the present document, that the arbitral award is vitiated with nullity.

VII. - Each and every one of the assertions of fact contained in the fact to which we are responding and which was designated by the plaintiff in the petition for nullity as *"VI. Examination of the Causes for Nullity of the Arbitral Award,"* is hereby denied. In this fact PEP summarizes the causes for nullity that it considers the final arbitral award to have. In relation to this, my client will provide a succinct study of the reasons for which the arbitral award is not vitiated with nullity.

VIII. - Each and every one of the assertions of fact contained in the fact to which we are responding and which was designated by the plaintiff in the petition for nullity as *"VII. Costs Incurred in the Arbitration,"* are hereby denied. In this fact PEP argues that the determination made by the Arbitral Tribunal in ordering PEP to pay COMMISA the costs incurred in the Arbitration was not justified in law. In this respect, my client declares that Your Honor does not have jurisdiction to analyze this issue, given that it is a question of a decision on the merits of the case and, in addition, the plaintiff in the petition for nullity does not argue for a cause for nullity in this fact, therefore Your Honor does not have jurisdiction to study the fact to which we are referring.

IX. Each and every one of the assertions of fact contained in the fact to which we are responding and which was designated by the plaintiff in the petition for nullity as *"VIII. Jurisdiction of the Arbitral Tribunal,"* is false and hereby denied.

## V.     INADMISSIBILITY OF THE CHALLENGE TO THE DECISION CONCERNING THE JURISDICTION OF THE ARBITRAL TRIBUNAL TO ISSUE THE AWARD

A)     EXCEPTION DERIVING FROM THE INAPPLICABILITY OF ARTICLE 1432 OF THE CODE OF COMMERCE TO PETITION THE JUDGE TO RULE ON THE VALIDITY OF THE JURISDICTION ASSUMED BY THE ARBITRAL TRIBUNAL.

Article 1432, on which the plaintiff bases its claim that Your Honor should review and rule on the decision adopted in the final arbitral award by the Arbitral Tribunal with respect to its own jurisdiction, is not applicable to this specific case.

As can be inferred from the petition, particularly from paragraphs VI and VIII, in which the plaintiff disputes the jurisdiction of the Arbitral Tribunal, the plaintiff bases the admissibility of its action on what is prescribed by article 1432 of the Code of Commerce.

Specifically, the plaintiff argues, based on the article cited, that it is entitled to challenge the resolution of the Arbitral Tribunal on its own jurisdiction.  This assertion is incorrect.

Article 1432 of the Code of Commerce, cited above, textually establishes the following:

> **"Article 1432. –** The Arbitral Tribunal shall have faculties to decide on its own jurisdiction, even concerning the exceptions relating to the existence of the validity of the arbitration agreement.  For this purpose, the arbitration clause that is part of a contract shall be considered as an agreement independent of the other stipulations of the contract.  The decision of the Arbitral Tribunal declaring a contract to be null shall not, by that sole fact, bring about the nullity of the arbitration clause.
>
> The exception of lack of jurisdiction of the Arbitral Tribunal must be raised, at the latest, at the time the response is presented.  The parties shall not be prevented from raising the exception by the fact that they may have designated an arbitrator or taken part in designating him.  The exception based on the claim that the Arbitral Tribunal has exceeded its mandate must be raised as soon as the matter that supposedly exceeds its mandate is brought up during the arbitration proceedings.  The Arbitral Tribunal, in any of these cases, may consider an exception presented subsequently if it considers the delay to be justified.
>
> The Arbitral Tribunal may rule on the exceptions to which reference is made in the previous paragraph immediately or in the arbitral award on the facts of the case.  **If, before issuing its decision on the facts of the case, the Arbitral Tribunal declares that it has jurisdiction, either of the parties, within thirty days from the day they are notified of this decision, may request that the judge issue a definitive ruling,** a resolution that shall not be subject to appeal.  While this request is pending, the Arbitral Tribunal may pursue its activities and issue an award.

(Emphasis added)

As can be seen in the foregoing transcription, the Code of Commerce gives the parties the opportunity to challenge before a state court the decision issued with respect to the jurisdiction of the Arbitral Tribunal, only and exclusively in **those cases in which the Arbitral Tribunal rules on its own jurisdiction before ruling on the facts of the case and with a time limit of thirty days.**

In this context, the plaintiff's petition turns out to be baseless.

Indeed, in accordance to what is prescribed by article 1432 of the Code of Commerce, PEP could only challenge the decision concerning the jurisdiction of the Arbitral Tribunal if the decision had been adopted

in a preliminary award prior to the issuing of the final arbitral award on the facts of the case. In addition, PEP had one month to raise its objection, counting from the moment that the Arbitral Tribunal decided on its jurisdiction.

In this way, if the plaintiff had the intent to challenge the jurisdiction of the Arbitral Tribunal before a state court, in any case, it should have done so within the month following the moment when the Arbitral Tribunal ruled on its jurisdiction for the first time, which occurred when the Mission Statement was issued on the twenty-fifth of October of the year two thousand and two.

Obviously PEP did not challenge the jurisdiction assumed in the Mission Statement by the Arbitral Tribunal within the month following the twenty-fifth of October, two thousand and two; therefore it is clear that it consented to the jurisdiction that was specified therein, as can be seen from the text of the Mission Statement that is transcribed in paragraph B) of the present paragraph (page 26 of the present Response).

Indeed, the Mission Statement is a document signed by the parties and, above all, by the Arbitral Tribunal, in which all those involved agree on the points of fact and of law that are to be matter for the arbitration. In this context, this document serves as a consensus decision about the scope of the competence and jurisdiction of the Arbitral Tribunal. Therefore, the fact that there is now an attempt to challenge the jurisdiction of the Arbitral Tribunal, such a claim is notoriously untimely.

**Consequently, considering that the decision of the Arbitral Tribunal on its own jurisdiction is contained in the final arbitral award that resolves the facts of the case and, also considering that, in any case, PEP did not challenge the decision on the jurisdiction of the Arbitral Tribunal within the time limit of one month provided by article 1432 of the Code of Commerce, it is evident that the plaintiff's petition based on said precept turns out to be baseless.**

B) EXCEPTION DERIVING FROM THE INAPPLICABILITY OF ARTICLE 1457 OF THE CODE OF COMMERCE TO SUPPORT THE ALLEGED LACK OF JURISDICTION OF THE ARBITRAL TRIBUNAL AS A CAUSE FOR THE NULLITY OF THE ARBITRAL AWARD.

Article 1457 of the Code of Commerce does not contemplate, as a supposition of nullity, the lack of jurisdiction of the Arbitral Tribunal.

The plaintiff's claim is lacking in any legal basis by virtue of the fact that, according to what can be inferred from its petition, its action is intended to obtain the nullity of the arbitral award on the basis of the fact that the Arbitral Tribunal lacked jurisdiction to examine and to settle everything relating to those technical disputes that were not submitted by the contractor to the proceeding contemplated in clause 23.2 of the contract.

This support of the plaintiff's claim is illegal by virtue of the fact that the only suppositions for the nullity of an arbitral award are those contemplated in article 1457 of the Code of Commerce and the **lack of jurisdiction of the Arbitral Tribunal is not included among them.**

The article cited textually establishes the following:

> **"Article 1457. –** Arbitral awards may be annulled by the judge having jurisdiction only when:
>
> I.- The party that files the action proves that:
>
> a) One of the parties to the arbitration agreement was affected by some lack of capacity, or that said agreement is not valid by virtue of the law to which the parties have submitted it, or if nothing were indicated in this respect by virtue of Mexican law.
>
> b) It was not given due notification of the designation of an arbitrator or of the arbitration proceedings, or would not have been able, for any other reason, to assert its rights.
>
> c) The arbitral award refers to a dispute not contemplated in the arbitration agreement or contains decisions that go beyond the terms of the arbitration agreement. Notwithstanding, if the provisions of the arbitral award that refer to the issues submitted to the arbitration can be separated from those that are not, only the latter can be annulled; or
>
> d) The composition of the Arbitral Tribunal or the arbitration proceeding was not set in the agreement made between the parties, unless said agreement was in conflict with a provision of the present title, from which the parties could not deviate or, in the absence of said agreement, they did not comply with the present title; or
>
> II. – The judge finds that, according to Mexican law, the object of the controversy is not subject to arbitration, or that the arbitral award is contrary to public policy."

The argument of the plaintiff with respect to jurisdiction does not fit any of the suppositions of article 1457 of the Code of Commerce transcribed above, it cannot be considered that the issue of jurisdiction can cause the nullity of the arbitral award.

From a simple reading of the subsections of the article cited, it can be inferred that the arbitral award can be annulled for various causes. Most of them have to do with the fact that the parties have had an opportunity for defense, that the arbitration agreement must be valid, that the dispute is capable of being submitted to arbitration or else that the arbitral award is contrary to public policy.

Nonetheless, none of them contemplates as a cause of nullity that the Arbitral Tribunal lacks jurisdiction; therefore the claim for nullity by the plaintiff based on this supposed lack of jurisdiction is lacking in legal basis and, in this sense, must be declared inadmissible.

C) EXCEPTION DERIVING FROM THE FACT THAT THE ARBITRAL TRIBUNAL HAS JURISDICTION TO RESOLVE ALL DISPUTES ARISING FROM THE CONTRACT, IN ACCORDANCE WITH THE ARBITRATION CLAUSE.

The plaintiff argues that the Arbitral Tribunal lacks jurisdiction to hear claims related to technical disputes that were not duly set forth, as well as disputes, which, in its opinion, cannot be submitted to the jurisdiction of the Arbitral Tribunal by virtue of the fact that they are not provided as expenses that can be indemnified under the contract.

These arguments are incorrect by virtue of the fact that they confuse the concepts of jurisdiction and admissibility.

The jurisdiction of the Arbitral Tribunal is the power that is held by an institution to rule on a dispute. On this particular point, it is relevant to emphasize that the power of the Arbitral Tribunal to rule on its own jurisdiction is framed within the principle of the autonomy of the arbitration clause.

In accordance with this principle, apart from the validity or existence of the original contract, as well as the claims deriving from the contract, the arbitration clause subsists as an independent agreement and is valid *per se*.

This principle of the autonomy of the arbitration clause is even recognized by the first paragraph of article 1432 of the Code of Commerce, which provides the following:

> **"Article 1432. –** The Arbitral Tribunal shall have faculties to decide on its own jurisdiction, even concerning the exceptions relating to the existence of the validity of the arbitration agreement. **<u>For this purpose, the arbitration clause that is part of a contract shall be considered as an agreement independent of the other stipulations of the contract.</u>**

16

> The decision of the Arbitral Tribunal declaring a contract to be null shall not, by that sole fact, bring about the nullity of the arbitration clause.

(Emphasis added)

As a consequence of the principle of the autonomy of the arbitration clause, it is evident that the Arbitral Tribunal constituted on the basis thereof has the faculty to determine its own jurisdiction to hear and settle the disputes that are presented to it and that are within the scope and object of said clause, regardless of whether the claims of each party that are part of the disputes in particular turn out to be founded or not.

**In this context it is necessary to clearly distinguish between the jurisdiction of the Arbitral Tribunal to rule on any given petition or claim and the admissibility of said claim.**

The admissibility of a claim refers to the existence of the necessary presuppositions, which, if verified, allow the court to examine the merits on which the claim is based.

According to the plaintiff, in accordance to clause 23.3 of the Contract, the Arbitral Tribunal lacks jurisdiction to hear any disputes that have not followed the proceeding contemplated in clause 23.2.

Such an assertion by the plaintiff is groundless, as can be inferred from the interpretation of the arbitration clause itself established in clause 23.3 of the Contract, which is transcribed below:

> "23.3 Arbitration. Any controversy, claim, difference or dispute that may occur or be related to or connected to this contract or the non-fulfillment thereof shall be settled **definitively** through arbitration conducted in the Federal District, Mexico, in accordance with the Rules on Conciliation and Arbitration of the International Chamber of Commerce that are in effect at that time. The number of arbitrators shall be three and the language to conduct the arbitration shall be Spanish. Notwithstanding the foregoing, any technical dispute **must be previously submitted to the procedure provided for in Clause 23.2 and, only in the event that an agreement is not reached between the parties by means of said procedure,** the parties shall be entitled to have recourse to the proceeding provided for in Clause 23.3."

As can be inferred from the clause transcribed above, any dispute relating to the contract must be resolved definitively by means of arbitration. Nevertheless, in some cases, such as those in which technical disputes are involved, prior to arbitration, the parties must resort to the procedure provided for in

clause 23.2 of the Contract. If the parties do not reach an agreement in accordance to this procedure, they may then resort to arbitration.

From the wording of the clause of reference, it cannot be inferred, as the plaintiff claims, that those disputes that have not been submitted to the procedure of clause 23.2 are not within the jurisdiction of the Arbitral Tribunal.

On the contrary, the arbitration clause determines that **all** disputes deriving from the contract must be resolved through arbitration. The clause does not establish any limitation whatsoever with respect to which disputes may be heard by the Arbitral Tribunal.

The only conditioning factor that might be established by the arbitration clause refers to the necessity for the parties to have recourse to a technical dispute procedure **during the execution of the work** instead of resorting to arbitration. Nevertheless, this does not imply that any disputes between the parties that might derive from a technical dispute cannot be resolved in arbitration, including the particular circumstance consisting of the verification as to whether or not the contractor had recourse to the procedure to resolve a technical dispute provide for in clause 23.2 of the contract.

This implies that the Arbitral Tribunal likewise has jurisdiction to decide whether the contractor validly followed the technical dispute procedure or not. Contrary to what is argued by the plaintiff, the fact that the contractor might not have exhausted the technical dispute procedure provided for in clause 23.2 does not generate any lack of jurisdiction on the part of the Arbitral Tribunal.

As has been indicated, the jurisdiction of a court is the power it has to definitively decide concerning disputes; in this case, **all disputes** arising between the parties. The procedural conduct of the parties during the execution of the work cannot be grounds for limiting the jurisdiction of the Arbitral Tribunal. In this sense, the first paragraph of the arbitration clause is very clear when it establishes that the parties have agreed that all disputes deriving from the Contract would be submitted to the Arbitral Tribunal.

On this particular point, it is relevant to take into consideration the rules for interpretation of contracts established by articles 1851, 1852, 1853, 1854, 1855 and 1857 of the Federal Civil Code.

In accordance with these rules, there are basically two ways to interpret contracts; one of them follows the subjective method; in other words, to determine what was the true intention of the parties while

paying attention, in principle, to the literal sense of the clauses, to the evident intention of the contracting parties.

Said method likewise determines that no matter the generality of the terms of a contract, matters and cases different from what the interested parties intended to contract should not be understood in it [i.e. the contract] and that the clauses must be interpreted by one another, by attributing to the doubtful ones the meaning that results from all of them.

In addition, from the precepts invoked, it can be inferred that the conduct observed by the parties before, during and in the execution phase of the contract, has a relevant value as a means for its interpretation, by reason of the principle of coherence and continuity of the contract. In order to resort to this means, it is necessary for the acts of the parties to have relevance in relation to the contractual intent that is to be deduced from them and with the sense of the contract.

It is necessary, in addition, for these acts to be common or, if they are executed by one party only, for there to exist their express or tacit acceptance by the other. This "interpretative behavior" throws light on the true intention of the contracting parties, with respect to the scope they intended to give to the commitment, to the fulfillment whereof they are subject.

The other method of interpretation follows an objective criterion, which ignores the conduct of the parties, and leaves the interpreter a limited line of reasoning for determining the meaning of the terms of the contract.

In this sense, article 1857 of the precept cited follows this methodology and determines that, whenever it might be impossible to resolve the doubts using the rules established in the foregoing articles, if they [i.e. the doubts] apply to accidental circumstances of the contract, and if the latter [i.e. the contract] were to be gratuitous, the doubt is to be resolved in favor of the greater reciprocity of interests.

The same precept establishes that if the doubts, the resolution of which is dealt with in said article, were to apply to the main object of the contract, in such a way that it is impossible to arrive at the knowledge of what was the intention or the intent of the contracting parties, the contract will be null.

In this sense, it must be understood that when there is no doubt about the clarity of the terms of contracts, the clauses thereof must be interpreted in a broad sense in such a way that their binding content have their full effect.

**Record No.** 174760
Localization:
Ninth Session
Instance:  Three-Judge Circuit Courts
Source:  *Semanario Judicial de la Federación* and its Gazette
XXIV, July 2006
Page: 1177
Excerpt[c]: 1 6o.C 402 C
Isolated excerpt
Case(s):  Civil

**CONTRACTS.  THEORY OF THE PREEMINENCE OF THE INTENT OF THE PARTIES IN THEM.**  From the interpretation of article 1851 of the Civil Code for the Federal District, there are derived two hypotheses that must be applied to contracts to determine their legal scope; namely, the literal sense of their clauses and the intention of the contracting parties. Nonetheless, from the second paragraph, one notes the content of the so-called theory of the preeminence of the intent of the contracting parties, which is placed above the material expression and considers objective factors apart from the intention of the interested parties, which can be deduced from the conduct shown by the parties, before, during and in the execution phase of the contract.  Consequently, from the wealth of evidence offered by the parties, consideration must be given to elements extrinsic to the contract in order to unravel the true intention of the parties, which is preeminent to the literal content thereof.

SIXTH THREE-JUDGE COURT FOR CIVIL CASES OF THE FIRST CIRCUIT.

Direct "amparo" 5106/2005.  Eduardo Yedid Cohen, August 18, 2005.  Unanimous vote.    Judge writing the decision: Gustavo R. Parrao Rodríguez.  Secretary: Abraham Mejía Arroyo."

The following rulings of the federal courts serve as support for the foregoing:

**Record No.** 385,432
Isolated excerpt
Case(s):  Civil
Fifth Session
Instance:  Auxiliary Chamber
Source:  *Semanario Judicial de la Federación*
CXVI
Excerpt:
Page: 325

**CONTRACTS, INTERPRETATION OF.**  The intent of the parties is the highest law in contracts, except for cases in which the public interest intervenes; and in accordance with the standards for the interpretation thereof, if the terms of a contract are clear and do not leave doubt concerning the intention of the contracting parties, one shall adhere to the literal sense of its clauses.

Direct civil "amparo" 10059/49.  Garza Félix S., June 2, 1958.  Unanimous decision – 5 votes.  The publication does not mention the name of the Judge writing the decision."

---

[c] *Translator's note:*  The more common meaning of "tesis" is "thesis"; in Mexican judicial terminology, "tesis" also means an excerpt from a higher court decision.  This is the presumed meaning here.

**Record No.** 214,023
Isolated excerpt
Case(s):  Civil
Eighth Session
Instance:  Three-Judge Circuit Courts
Source:  *Semanario Judicial de la Federación*
XII, December 1993
Excerpt:
Page: 847

**CONTRACTS, INTERPRETATION OF.**    For the correct interpretation of contracts, attention must be paid to the intent of the parties over their material expression.  Because, in accordance with article 1680 of the Civil Code in effect in the State of Mexico, if the terms of a contract are clear and do not leave doubt concerning the intention of the contracting parties, one shall adhere to the literal sense of its clauses, but if the words were to seem contrary to the obvious intention of the parties, the latter shall prevail over the former.  In this case, the nature of contracts is not dependent on their designation, but rather on the facts and the acts placed by them [i.e. the parties], in relation to the applicable provisions of law."

FIRST THREE-JUDGE COURT OF THE SECOND CIRCUIT

Direct "amparo" 325/93.  Consuelo Pérez, widow of Vergara.  May 25, 1993.  Unanimous decision.  Judge writing the decision:  Raúl Díaz Infante Aranda.  Clerk:  Rigoberto F. González Torres.

This excerpt reiterates the ruling sustained in jurisprudence 108, which can be seen on pages 302 and 303.  Fourth Part.  "*Tercera Sala del Apéndice de Jurisprudencia 1917-1985.*"

In the present case, as can be noted from clause 23.3 of the Contract, the parties agreed that **all disputes** arising from the contract were to be **resolved definitively** by means of arbitration.

The wording of the clause is very clear insofar as the intention of the parties that each and every dispute was to be resolved in arbitration.  This must likewise be understood in a broad sense.

Common commercial practices that take concrete form in contractual obligations generally embody the intention of the contracting parties, which involves a practical vision of business.

Since it is consistent with the aforesaid practical vision of business, it is common for the contracting parties to decide to submit **all of their disputes for possible solution by means of an arbitration agreement**.

This is consistent by virtue of the fact that all possible disputes deriving from a contract originate from the same normative cause, which is the main contract.  Thus it is logical, consistent, practical and the least costly [option] for a single arbitral tribunal to decide on the possible accumulation of disputes by means of an arbitration procedure.

In the present case, as can be inferred from a reading of clause 23.3 of the contract, its literal sense indicates that **all** disputes deriving from the contract must be resolved in arbitration.

Likewise, above and beyond the literal sense, the common practice of the parties, as well as their **intention and logic** indicates that it truly was the intention of the parties to submit each and every one of their disputes to an arbitral tribunal.

Contrary to what the plaintiff is attempting to argue, the fact that the second paragraph of the article cited contemplates a mechanism for conciliation prior to arbitration is of no relevance to the foregoing.

This is due to the fact that there does not exist, within the clause itself, nor in any other binding content agreed upon between the parties, any provision that, either expressly or by way of a valid interpretation, allows us to conclude that failure to exhaust the conciliation procedure implies that any related claim is out of the scope of the arbitration agreement.

In the clause under comment, the parties **did not expressly agree** that a lack of submission to the technical dispute procedure **would imply that it was not capable of being arbitrated**. There does not exist in the clause any literal element that would allow the generation of any doubt on the forcefulness of its first paragraph, which indicates that **all** disputes must be resolved **definitively** by means of arbitration.

Nor does there exist any valid interpretation that would allow one to conclude that the intention of the parties was to divide the disputes at some given moment and to exclude some from the arbitration clause on account of the sole fact of not exhausting the technical dispute procedure.

To presume this would imply accepting that the parties agreed to bifurcate the resolution of their disputes and to submit some to arbitration and others to the national courts having jurisdiction. There exists no other possibility; either the dispute is resolved by an outside party[d] through arbitration, or else through a suit before a national court.

If this were the case, it would have been consistent with the intent of the parties to include a clause that would indicate **which courts would have jurisdiction** in the event a dispute fell outside the arbitration clause. Nonetheless, there exists no provision within the contract that provides for such a circumstance.

---

[d] *Translator's note:* The word in the original Spanish text here is "heterocomponer". This is a neologism and there is not yet an authoritative English translation. The paraphrase in this translation is based on the normal meaning the Spanish verb "componer" and the usual meaning of the Greek root "hetero-"

In addition, as has been said, this would be contrary to the literal sense of the clause, which uses categorical words like "**all**" and "**definitively**." This would likewise be inconsistent with the practical and efficient sense of arbitration, for which reason the parties commonly opt for submitting their disputes to an arbitration proceeding.

As has been said, it is logical for the parties to a contract of this nature to opt for an integral solution for their disputes and not to bifurcate them, with the possibility of even ending up having **contradictory interpretations** of the same contract and the same obligations.

If the possibility were accepted that both an arbitral tribunal and a national court could rule on the interpretation of the same contract, [this] opens up the alternative for contradictory decisions, not concerning the same dispute obviously, but certainly concerning general issues of the contract, which at any given time might generate the inoperability of the clause and the method for solving disputes originally elected by the parties.

Things being thus, this court must consider that the plaintiff's claims are made dependent on improbable circumstances and interpretations of the arbitration clause.

Likewise and as a logical culmination of what has been presented, it must be considered that from a straightforward interpretation of the arbitration clause, it is also under the jurisdiction of the Arbitral Tribunal to determine whether the parties correctly submitted to the technical dispute procedure provided in clause 23.2 of the Contract. Likewise, it is under the jurisdiction of the Arbitral Tribunal to determine what exactly is the scope of the second paragraph of the arbitration clause is. It is also up to the Arbitral Tribunal to determine what the legal scope of any possible omission of the contractor with respect to submitting a technical dispute [to the technical dispute procedure].

In the present case, the Arbitral tribunal ruled correctly on these issues and, in the exercise of its jurisdiction, determined that the claims of COMMISA were indeed admissible.

In addition, the plaintiff's interpretation is incorrect when it attempts to give it a scope similar to the arbitration clause, by virtue of the fact that there is no provision within the arbitration clause itself that indicates that the Arbitral Tribunal loses its jurisdiction over the dispute on account of the sole fact that the contractor did not follow the procedure provided in clause 23.2 of the Contract. To accept this interpretation would lead us to the absurd conclusion that the Arbitral Tribunal resolves that a given claim is inadmissible because it did not comply with article 23.2 of the Contract, despite the fact that precisely

because of not having complied with said clause of the Contract, it could not rule on this. In other words, the Arbitral Tribunal would be ruling on the inadmissibility of a claim and at the same time, said inadmissibility would deprive it of its jurisdiction, making its ruling in this respect null.

Moreover, the plaintiff attempts to give clauses 23.3 and 23.2 a scope they do not have, given that the nature of clause 23.2 is different from what the plaintiff argues.

The nature of clause 23.2 has the purpose of fostering an arrangement between the parties **during the execution of the work** so that the parties will reach an agreement promptly that will allow them to continue with the work and prevent the formal establishment of litigation that might involve greater delays in the project or even its total suspension.

Clause 23.2 of the Contract orders the following:

> "23.2. Technical disputes. The contractor shall not be entitled to make any claim and PEP shall not be liable for legal or contractual damages (including negligence) with respect to the Contractor, its secondary suppliers or subcontractors, except in the cases specifically provided in this Contract.
>
> For the purposes of this clause, Technical Dispute shall be understood as any difference that arises on account of any claim or is attributable to the interpretation or execution of this contract, with the Technical Annexes of the Contract (A, B, B-1, B-2, CEV, DT, DT-1, DT-2.1, DT-3, DT-4, E-2, F-1 and F-2).
>
> If, for whatever reason, the Supervisor and the contractor do not coincide in the evaluation to resolve an adjustment claim deriving from a Technical Dispute, the Contractor must formalize said Technical Dispute in writing to the Supervisor and request from him the corresponding determination. This type of request by the contractor must be clearly identified, indicating that it involves a Technical Dispute subject to resolution under this clause 23, and it must contain a summary of facts in dispute and the Contractor's proposal for resolving them…"

As can be inferred from the clause transcribed, it is the purpose of the procedure of clause 23.2 that the parties are to resolve certain technical disputes amicably during the execution of the work. Nonetheless, neither from its wording nor from the wording of the arbitration clause can it be inferred that the omission of the contractor to present the formal technical dispute request subsequently precludes the submission of the claim in arbitration.

In this sense, the only effect of clause 23.3 in relation to clause 23.2 is the limitation consisting in that, prior to the claim of any service related to a technical dispute, the parties must attempt to **reach an agreement** through the formal technical dispute procedure.

As has been indicated, the reason for the method of solving disputes by means of a submitted agreement of the technical dispute is to encourage the parties to reach an agreement, during the execution of the work. Nonetheless, this does not imply that any indemnity that the contractor might be entitled to claim could no longer be claimed in arbitration, once the work has been completed, unless the technical dispute procedure was followed in a timely manner.

As can be inferred from the clauses analyzed, the parties' intention was not to provide a mechanism to preclude the jurisdiction of the Arbitral Tribunal, but rather, in any case, their only intention was to provide a mechanism prior to arbitration so that the parties would attempt to resolve their disputes related to technical disputes by mutual agreement, before resorting to arbitration.

**Therefore, it must be considered that all the causes for nullity, on which the plaintiff bases the lack of jurisdiction of the Arbitral Tribunal are baseless and Your Honor must rule in this sense by declaring the inadmissibility of the claims of PEP.**

D) Exception deriving from the fact that the admissibility of the claims of COMMISA was part of the mission given by the parties to the Arbitrators and PEP did not object to these determinations. For this reason, in accordance to what is ordered by article 33 of the Regulations of the International Arbitral tribunal, PEP consented to the jurisdiction of the Arbitral Tribunal and the admissibility of the analysis of the technical disputes and lost its right to file a petition for the nullity of the arbitral award.

As can be inferred from the request for arbitration submitted by COMMISA, as well as from the response to the request submitted by PEP, one point submitted as a dispute in the arbitration was the one relating to whether COMMISA followed the procedure provided for claims relating to technical disputes.

Such points were debated by the parties in the arbitration procedure by virtue of the fact that PEP **presented said issue as an objection** of admissibility, but not as an objection or defense relating to jurisdiction.

In the mission statement, the Arbitral Tribunal determined that it was necessary to resolve such issues as elements of admissibility.  This implies that PEP **consented** that issues relating to the technical dispute procedure are requirements for the admissibility of the claims, but not issues relating to the jurisdiction of the Arbitral Tribunal or issues that can be considered as outside or extraneous to the arbitration agreement.

**At the end of the mission statement, the parties signed their agreement with the terms of said document.**

In this sense, it must be considered that the plaintiff was in agreement and consented that the Arbitral Tribunal has jurisdiction to hear and to rule on the nature and interpretation of the performance of the parties concerning technical disputes.

As can be inferred from the mission statement, the Arbitral Tribunal determined the following:

(b)     Points in disputes related to the jurisdiction of the Arbitral Tribunal and requirements for admissibility:

1.      (a)  Do all the claims and petitions formulated by the Plaintiff in its suit and by the Defendant in its reply constitute a *"Controversy, claim, difference or dispute that arises or is related or is connected to the Contract or the non-fulfillment thereof,"* (as required by clause 23.3 thereof), and does the Arbitral Tribunal have jurisdiction to resolve them?

(b) Does the Arbitral Tribunal have jurisdiction to decree the compensation of the rights claimed in this arbitration deriving from Contract EPC-28, with obligations stemming from other contracts signed between the Plaintiff and the Defendant?

2.      (a)  Does any one of the claims or petitions formulated by the Plaintiff constitute a technical dispute, as this concept is defined in Contract EPC-28?

(b) If the answer to foregoing question 2 (a) is affirmative, has said technical dispute or have said technical disputes been submitted to the procedure provided in clause 23.2 of the Contract?

(c) If the answer to foregoing question 2 (a) is negative, what would be the consequence to the effects of the present arbitration?

At the end of the mission statement, the parties signed their agreement, as is shown hereinafter:

**1)**    **Declaration of the parties**

Both parties hereby declare that:

(i)    The persons that are signing this Mission Statement on behalf of the parties are duly authorized by virtue of the powers of attorney described below each signature.

(ii)    The execution of the Mission Statement does not require any authorization of an administrative nature.

As an expression of their consent, they sign it in six copies, one for the Plaintiff, one for the Defendant, three for the Court and one for the Secretariat of the International Chamber of Commerce, in Mexico City, dated September 6, 2005. The Defendant makes it a matter of record that the execution of this Mission Statement does not imply any renunciation with respect to the allegations concerning lack of jurisdiction and standing of the Arbitral Tribunal that it has presented, and to which reference is made in paragraph D) (b) of this document and which will be resolved by the Court itself.

PARTIES

CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R. L. DE C.V.

By power of attorney

*{Signature}*

Name of the representative *Christopher [illegible]*

Date and description of the power of attorney *September 2, 2005 – Public Deed 53 727*


PEMEX-EXPLORACIÓN Y PRODUCCIÓN
By power of attorney

*{Signature}*

Name of the representative *Jaime Duarte Aispuro [?]*

Date and description of the power of attorney *Public Deed 8710, date October 25, 2002*


In its arbitral award, the Court ruled in consistency with the mission entrusted to it by the parties in the following manner:

"*The Court arrives at the conclusion that:*

*the main petition of the Plaintiff consists of 39 Technical Disputes, **which were correctly submitted to the procedure provided in clause 23.2 of the Contract, leaving the way clear for arbitration of its claim;***

*The claims submitted by the Defendant by way of counterclaim and the request for an extension of the time limit presented by Commisa in its Conclusions Brief do not require submission to the procedure provided in clause 23.2 of the Contract, since they were presented once the work was completed and the Supervisor had left his post;*

*The accessory claims follow the fate of the main ones of those that convey the cause;*

*and, consequently, there is no impediment whatsoever to entering into consideration of the facts behind the claims."*

In accordance with the foregoing transcription, it turns out to be evident that the plaintiff consented that the Arbitral Tribunal did have jurisdiction to rule on the admissibility of the technical disputes and that these issues were indeed included within the arbitration agreement.

If the plaintiff was in agreement with such issues and consented concerning the jurisdiction of the Arbitral Tribunal and the scope of the arbitration agreement, then it is impossible to now consider it valid for it to intend to annul the arbitration award, precisely with said arguments.

Article 33 of the Rules of Arbitration of the Chamber of Commerce applicable to the present case precisely provides for this consequence. The article in question orders the following:

> **"Article 33**
> **Waiver**
>
> A party which proceeds with the arbitration without raising its objection to a failure to comply with any provision of these Rules, or of any other rules applicable to the proceedings, any direction given by the Arbitral Tribunal, or any requirement under the arbitration agreement relating to the constitution of the Arbitral Tribunal, or to the conduct of the proceedings, shall be deemed to have waived its right to object."[e]

In accordance to article 33 as cited, it turns out that the Rules of Arbitration of the International Chamber of Commerce contain a procedural safeguard to ensure that the parties are in agreement with the terms of the arbitration procedure, with the provisions of the rules themselves, with the orders of the Arbitral Tribunal, as well as with the stipulations contained in the arbitration agreement.

Now then, the article itself provides that, if the parties do not file an **objection during the arbitration procedure,** with respect to the procedural orders and other issues, also including the scope of the arbitration agreement, it is understood that they have waived their right to object to them subsequently.

As has been previously indicated, in the arbitration agreement, the parties agreed to consider as applicable for the resolution of their disputes the Rule of Arbitration of the International Chamber of

---

[e] *Translator's note:* This is the official English text of the article.

Commerce. Therefore, what is determined in article 33 turns out to be applicable to them in a binding manner.

Thus, as has been indicated, if PEP accepted, in the mission statement, that issues relating to the admissibility of claims related to technical disputes would be resolved by the Arbitral Tribunal, then it **consented** to such a determination in the terms of article 33 and **lost its right to object to it**.

Consequently, if the plaintiff consented to the **jurisdiction** of the Arbitral Tribunal, with the possibility for the court to study the **admissibility of the claims** related to technical disputes, and with the **terms of the arbitration agreement** in those senses, then it cannot now validly attempt to obtain the nullity of the arbitral award, precisely with the arguments referred to.

Finally, it should be pointed out that these determinations of the Arbitral Tribunal cannot in any way violate the guarantee of due process provided by article 16 of the Constitution, for the simple reason that an arbitral award cannot be in violation of guarantees. In this sense, to allege, as PEP does, that the determinations of fact and law by the Arbitral Tribunal are incorrect is not a valid argument in order to attempt to annul an arbitral award, because, precisely as it is explained through the present response, the facts of the case behind the arbitral award cannot be subject to revision by a state Court.

For these reasons, this objection must be considered to be founded and the action must be considered to be inadmissible and unfounded.

## VI.    RESPONSE TO THE GROUNDS FOR NULLITY AND OTHER ARGUMENTS INVOKED BY THE PLAINTIFF

A)    INAPPLICABILITY OF THE NEW YORK CONVENTION AND THE PANAMA CONVENTION TO THE PROCEDURE INITIATED BY THE PLAINTIFF

Firstly and given the inaccuracy of some of the legal foundations invoked by the plaintiff to support its suit, we will demonstrate to Your Honor that several of the ordinances mentioned in the suit for nullity are incorrect.

Thus, the plaintiff invokes the Convention on the Recognition and Enforcement of Foreign Arbitral Awards adopted in New York, United States of America, in the year 1958, in order to attempt to support and give foundation to its arguments for nullity. However, this ordinance is not applicable to the present case.

Indeed, in accordance with article 1 of said Convention, it is applicable only with respect to:

    i)          Recognition and enforcement of arbitral rulings (awards); and

    ii)         Only in relation to arbitral awards considered as foreign since they were issued in a State other than the one in which recognition and enforcement is requested.

Expressly, said article indicates the following:

**"Article 1**

1.   This Convention **shall apply to the recognition and enforcement of arbitral awards made in a State other than the State where the recognition and enforcement of such awards are sought**, and arising out of differences between persons, whether physical or legal.  It shall also apply to arbitral awards not considered as domestic awards in the State where their recognition and enforcement are sought."[f]

(Emphasis added).

Consequently, considering that the action filed by the plaintiff is a petition for nullity and not of recognition and enforcement and considering, in addition, that, in accordance with clause 23.3 of the Contract (the arbitration clause), the award was made in Mexico City, Federal District because that is where the arbitration had its seat, it is evident that one is not in the presence of an award that could be a matter of the Convention cited.

In the same sense, also not applicable is the Inter-American Convention on International Commercial Arbitration adopted in the year 1975 in Panama City; therefore the fact of invoking once again shows the ignorance of the plaintiff on the matter.

Indeed, in the Inter-American Convention cited, there is no article whatsoever that establishes or provides for an action [to obtain] the nullity of an arbitral award; therefore it is evident that the action filed by the plaintiff cannot be founded on said international treaty.

The foregoing, however, does not imply that **solely for purpose of interpretation** is it possible to pay attention to the commentaries and analyses made by the writers of treatises and Courts on the grounds for denying recognition and enforcement of arbitral awards that are found in both Conventions, but only to the extent that said grounds are substantially identical to the grounds for nullity contemplated by article 1457 of the Code of Commerce.

---

[f] *Translator's note:*  This is the official English text of the article.

B)    EVIDENT AND INTRINSIC CONTRADICTIONS PRESENT IN THE MOTION FOR NULLITY

Apart from the fact that there is a detailed presentation of the reasons for which the specific arguments of the plaintiff to support nullity turn out to be either precluded or inadmissible or unfounded, some obvious contradictions that are committed in the petition are brought out below.

1. – PEP repeatedly alleges that the Contract is a Contract that is Administrative in Nature (without defining clearly the origin and the consequences of this assertion) and that, for this reason, the Arbitral tribunal, when it resolved the disputes between the parties, should not have applied any of the rules of Civil Law.  (This argument is refuted further on in this response.)

Notwithstanding the foregoing, PEP also repeatedly and constantly alleges that the Arbitral tribunal violated public policy, because it did not correctly apply various precepts relating to disputes of Civil Law (an argument that is also refuted further on in this response.)   Specifically, in this sense, PEP alleged that, in the arbitral award, there are violations of the following provisions, among others, of Civil Law.

i.    Articles 1796 and 1797 of the Federal Civil Code, because supposedly the Arbitral tribunal assumed jurisdiction over the claims of COMMISA although the formalities for being considered technical disputes in the terms of the Contract were not fulfilled.

ii.    Article 14 of the Constitution (relative to the form of the resolution of civil disputes by state courts) when it alleged the nullity of the resolution issued by the court in relation to technical dispute number 36.

iii.    Article 16 of the Constitution and the civil regulations in the matter of damages (articles 1910, 1915, 1934 and 2110 of the Federal Civil Code), because supposedly there was no foundation or grounds for the causation of damages, when it rules on technical disputes numbers 34 and 35.

iv.     Article 1805 of the Federal Civil Code, when it did not rule in strict Civil law on technical dispute number 27.

v.     The principle of civil law that prevents one party from benefiting from its own deceit (because supposedly it is alleged that COMMISA did not comply with the contractual procedure of prior estimates), when it ruled on the claim for financial expenses.

vi.     Article 2397 of the Federal Civil Code and article 363 of the Code of Commerce, when it ruled on the claim for financial expenses, supposedly against the prohibition for capitalizing interest.

Thus, although the plaintiff constantly and repeatedly laments a supposed inconsistency in the arbitral award, it turns that it is the plaintiff that commits true inconsistencies when it first maintains the inapplicability of Civil Law and, subsequently alleges the violation of public policy, supposedly because Civil Law was not applied in the arbitral award. This contradiction, in itself, makes the motion for nullity notoriously inadmissible.

2.- There is even worse confusion, inconsistency and contradiction that the plaintiff commits in alluding to the Arbitral Tribunal as a state authority and in wanting to impose obligations on it as such. In this sense, the arguments are totally unfounded whereby the arbitral award violated the guarantee of exact application of the Law (in civil disputes) and of due provision of legal foundations and grounds, because neither is the Arbitral Tribunal an authority, nor, even less, does the arbitral award constitute an act of harassment, so that there would be the requirement for it to be duly supported by grounds. The following isolated excerpts serve as support for this:

**Record No.** 179,667
Isolated excerpt
Case(s): Constitutional, Civil
Ninth Session
Instance: First Court
Source: *Semanario Judicial de la Federación* and its Gazette
XXI, January 2005
Excerpt: 1a. CLXXVI/2004
Page: 411

**COMMERCIAL ARBITRATION. ARTICLES 1415 TO 1463 OF THE CODE OF COMMERCE DO NOT VIOLATE ARTICLE 13 OF THE FEDERAL CONSTITUTION. If we start from the basis that an arbitration judgment is a judgment that is processed before persons or institutions that are not Judges of the State, or if they are such, they are not acting as such, but rather as persons under private law**, it is not correct that the principles against

which a claim is made, when they establish the possibility for private individuals to subject their disputes to commercial arbitration, grant to courts of arbitration the status of special courts, because the ones who issue said arbitral awards are persons or institutions designated to resolve disputes between private persons, whether as amicable intermediates or in conscience, only if the parties have expressly authorized them to do so in accordance with article 1445, paragraph three, of the code cited.    These arbitral awards must be recognized and approved by the corresponding jurisdictional bodies, in order for them to acquire the legal force necessary for them to be completely binding, and for the purposes of their enforcement in accordance with article 1461 to 1463 of the aforementioned precept.    Thus the commercial arbitration regulated in the Code of Commerce does not violate article 13 of the Constitution, which, as a guarantee of equality in jurisdictional terms, prohibits special courts.

"Amparo" in appeal 237/2004.    Emilio Francisco Casares Lorel de Mola et al., April 28, 2004.    Unanimous ruling of 4 votes.    Absent:  Humberto Román Palacios.    Judge writing the opinion: Juan N. Silva Meza.    clerk:  Jaime Flores Cruz.

(Emphasis added).

Record No.  175,553
Isolated excerpt
Case(s):  Civil
Ninth Session
Instance:  Three-Judge Circuit Courts
Source:  *Semanario Judicial de la Federación* and its Gazette
XXIII, March 2005
Excerpt:  II.4o C 25 C
Page: 2038

**TIME DURING WHICH A CASE IS PENDING.  SAID EXCEPTION CANNOT BE USED, IF THERE EXISTS, ON THE ONE HAND, THE PROCESSING OF A MERCANTILE EXECUTIVE JUDGMENT AND, ON THE OTHER, AN ARBITRATION PROCEDURE.**  From the interpretation of article 1123 of the Code of Commerce, it can be noted that it is clear when it points out that said exception is admissible only when a Judge is already hearing a suit, in which there is equality between the parties, suits that have been filed and things that are claimed, a normative supposition that is not present when the dispute arises between a Judge and an Arbitrator.    The foregoing is asserted, **because an Arbitrator is not an official of the State, because his powers derived from the will of the parties, expressed in accordance with the law** and, although the arbitral ruling or award cannot be revoked by the will of one of the interested parties, it is not in itself executive, since it acquires this character only through the mediation of an act realized by a jurisdictional body, which, without taking away its private nature, assumes its content; consequently, the resolutions of an Arbitrator lack the power to impose penalties, given that their decisions are private acts since they come from private individuals and they are executive only when the bodies of the State have added to the logical matter of the award the jurisdictional matter of a ruling, thus it is evident that the jurisdictional function belongs to the State and can be conferred only to organs thereof; under such conditions, if, on one hand, there is the processing of a mercantile executive judgment and, on the other, an arbitration procedure, the exception of the time

during which a case is pending cannot be used in the executive judgment, given that this is admissible only when a Judge is already hearing the same case, a supposition that is not present in the case at hand, because the Arbitrator is not a Judge or a judicial authority, because, as has been noted, he is not an official of the State, and the powers he exercises derive from the will of the parties.

FOURTH THREE_JUDGE COURT FOR CIVIL CASES OF THE SECOND CIRCUIT

"Amparo" in appeal 255/2005.  Duroplasi Ramos Arizpe, S.A. de C.V., January 17, 2006.  Unanimous ruling.  Judge writing the opinion:  José Martínez Guzmán.  clerk: Francisco Peñaloza Heras.

(Emphasis added)

**Record No.** 366995
Localization:
Fifth Session
Instance: Fourth Court
Source: *Semanario Judicial de la Federación*
CXXIII
Page: 115
Isolated excerpt
Case(s): labor

**PRIVATE ARBITRATORS, THEIR RESOLUTIONS ARE NOT ACTS OF AUTHORITY.**  Although the appointment of an Arbitrator, by the will of the parties fully falls to the Central Board of Conciliation and Arbitration, this board does not act as a jurisdictional body, <u>but rather as any private Arbitrator, which is not an authority and which lacks power to impose penalties to enforce its determinations</u>.

Direct "amparo" in a labor matter 3937/52.  Labor Union of Truck Loaders, Commercial Firms and Related in the Region of Jalapa (Sindicato de Cargadores de Camiones, Casas Comerciales y Conexos de la Región de Jalapa), see January 7, 1955.  Unanimous ruling with four votes.  Absent: Luis Díaz Infante.  The publication does mention the name of the judge who wrote the decision.

(Emphasis added)

C)     LEGAL IMPOSSIBILITY FOR ENTERING, IN THE PROCEEDINGS FOR NULLITY, INTO THE STUDY OF THE FACTS OF THE CASE BY ALLEGING VIOLATIONS AGAINST PUBLIC POLICY OR OTHER GROUNDS FOR NULLITY

From the manner in which the petition for nullity is presented, it is evident that the objective of the plaintiff is to provoke, in one way or another, Your Honor to enter into the analysis of the facts of the cases resolved in the arbitral award.

In this way and always under the pretext of supposed violations of public policy, of the rules of the procedure and the arbitration agreement, issues of fact are reiterated, which were already defined and resolved by the Arbitral tribunal.

It will be enough for Your Honor to read the motion for nullity to realize that, rather than demonstrating supposed grounds for the nullity of the arbitral award, the plaintiff is practically presenting an appeal against those decisions that were unfavorable to it in the arbitral award, reiterating to this effect all its arguments of fact.

In this manner, if a decision contained in the arbitral award was not favorable to the plaintiff, it alleges that said decision is not founded in the contract or in law, or that it is partial, or that it violates public policy or that it goes beyond the scope of the jurisdiction of the Arbitral tribunal.  The invoking of the causes for nullity, in this context, becomes a mere pretext for causing the entire facts of the case to be reexamined in this instance, which turns out to be notoriously inadmissible, as will be explained below.

The Judicial Authority must refrain from entering into the study of the facts of the case resolved by the arbitral award, the recognition and enforcement of which is sought.  It is absolute and beyond discussion that the final arbitral award, the enforcement of which is counterclaimed later on, has the status of *res iudicata*.  The following isolated excerpt [of a ruling] turns out to be applicable in the present context.

**Record No.**  186,229
Isolated excerpt
Case(s):  Civil
Ninth Session
Instance:  Three-Judge Circuit Courts
Source:  *Semanario Judicial de la Federación* and its Gazette
XVI, August 2002
Excerpt:  XV 1o 50 C
Page: 1317

**ARBITRAL AWARD, ITS RATIFICATION BY ORDINARY JUDICIAL AUTHORITY AND THE ANALYSIS THEREFORE, IN AN "AMPARO" CASE, DOES NOT PERMIT THE STUDY OF ITS MEANING WITH RESPECT TO THE FACTS OF THE CASE.**  An arbitral award is the decision of a non-state body, thus convened by the parties to resolve a dispute, whether present or future; thus, for the effects of the ordinary instance, it is left to the exclusive power of decision of the arbitral tribunal and it comes to be an extension of that intent, which, since it is an act of private persons, with respect to its sense, it is not subject to constitutional review; nonetheless, such a constitutional review can occur with respect to the resolution of ratification issued by a state judicial body, which, of course, shall limit itself to the result of the analysis of the proper composition of the arbitral tribunal, the proper procedure, the manifestation of the intent of the parties to submit to the arbitration, of the matter thereof and the **other suppositions contemplated in article 1462 of the Code of Commerce, suppositions, which, as it noted, contemplate only issues of form and <u>not</u> of fact**, and, once the ratification has been given to the acts enforcement whereby the Judge assists in the enforcement of the arbitral award; therefore in the "amparo" proceeding, only these issues may be alleged and not those related

to the facts of the case and the sense of the arbitral award.  The foregoing is confirmed with the decision sustained by the Third Court of the previous session of the Supreme Court of Justice of the Nation, in the isolated excerpt, published in the *Semanario Judicial de la Federación,* Fifth Session, Volume XXXVIII, page 801, under the heading "ARBITRATION," in which it considers that **arbitration is a convention that the law recognizes, which constitutes a waiver of the private individuals for the judicial authority to hear a dispute; therefore it has negative procedural importance, inasmuch as the parties entrust the decision of their conflicts to one or more private individuals, called Arbitrators**; nonetheless, they are not officials of the State and they do not have proper or delegated jurisdiction[g], and their powers derive solely from the will of the parties, expressed, in accordance with the law and, while the arbitral award cannot be revoked at the will of one of the interested parties, it is not executive in itself, because it can only be considered as a word of the legal logic that is accepted by the State; therefore it can be enforced only through an act carried out by a jurisdictional body, which, without taking away its private nature, assumes its content and it is then that it is put on the same level as a jurisdictional act.  Nevertheless, Judges are not authorized to revise arbitral awards in an integral manner, because, otherwise they would be able to nullify them, even for issues of fact; for this purpose it would be necessary for the parties to appear first before the Judge to present to him the debate, and the system generally adopted is that, if the violation contained in the arbitral award transgresses public policy, it means that the Judge must not order its enforcement, but if it only is prejudicial to private interests, the Judge must order its enforcement; and once decreed judicially, its enforcement is raised to the category of a jurisdictional act and it is then that the one disadvantaged may have recourse to the federal courts with a petition of "amparo," which must be processed in a procedure involving two instances, as is noted in jurisprudence number 32/93 of the Third Court of the previous session of the Supreme Court of Justice of the Nation, published in the Gazette of the *Semanario Judicial de la Federación,* volume 72, December 1993, page 41, under the heading: "ARBITRAL AWARD, AGREEMENTS OF RATIFICATION AND ENFORCEMENT OF.  A SUIT FOR INDIRECT "AMPARO" AGAINST IT IS ADMISSIBLE, PURSUANT TO ARTICLE 114, SECTION III, OF THE LAW ON "AMPARO," BUT NOT THE DIRECT "AMPARO" TO WHICH ARTICLE 158 OF THE SAME LAW ALLUDES.

FIRST THREE-JUDGE COURT OF THE FIFTEENTH CIRCUIT.

"Amparo" in review 138/2002.  Meclux, México, S.A. de C.V., May 28, 2002.  Unanimous ruling.  Judge who wrote the decision:  Pedro Fernando Reyes Colín.  Clerk:  Ángel Rodríguez Rico."

(Emphasis added)

Notwithstanding the foregoing, as it has already been indicated, PEP is asking that [the Court] enter into the study of the facts of what was resolved by the arbitral award, alleging supposed violations of public policy founded on section II of article 1457 of the Code of Commerce, which establishes:

---

[g] *Translator's note:*  The Spanish language has two terms that correspond to the abstract meaning of the English term "jurisdiction."  The more common and general word is "competencia."  The word "jurisdicción," which is the word that appears here, is the power of a court to render decisions that have the force of law.

"**Article 1457.**    Arbitral awards **may only** be annulled by the judge having jurisdiction when

….

**II.**  The judge finds that, according to Mexican law, the object of the dispute may not be resolved by arbitration, <u>or that the arbitral award is contrary **to public policy**</u>."

This provision finds its direct antecedent in the Model Law on International Commercial Law of the United Nations Commission for International Trade Law, which was adopted in the year 1993 by our national legislators within the Code of Commerce, in order to harmonize Mexican arbitration law with the principles universally considered valid in the matter, thereby making its legal framework uniform with that of the other countries of the world.  This purpose becomes evidence from a simple reading of the explanation of the reasons for the reform of the Code of Commerce which was presented by the Federal Executive, in the following terms:

"From what has been explained, it is possible to conclude that, in international trade, it is very fitting [to adopt] modern legislation on commercial arbitration, **universally known and broadly accepted in international trade circles**; these reasons motivate the present decree initiative that reforms and adds various provisions from the Code of Commerce and from the Federal Code of Civil Procedure.

If it merits the approval of the honorable Congress of the Union, the provisions of the Model Law on International Commercial Arbitration of the United Nations Commission for International Trade Law (UNCITRAL), **which is the result of universal negotiations carried out within the United Nations.  The General Assembly of this body recommended to all countries that they should duly examine the aforementioned Model Law and should take into account the appropriateness of making arbitration procedural law <u>uniform</u> and the specific needs of the practice of international commercial arbitration.**

As noted by the Office of the Secretary of UNCITRAL, the Model Law constitutes a sound and encouraging basis for the desired harmonization and improvement of national laws.  It regulates all the stages of the arbitration process, from the arbitration agreement, all the way to the recognition and enforcement of the arbitral award, **and it reflects the worldwide consensus on the principles and most important aspects of the practice of international arbitration.  It turns out to be acceptable for countries of all regions and for the legal or economic systems of the world.**

….

Our country actively participated in the development of the Model Law, so that the needs and particularities of our laws and traditions were taken into account at the time of its development."

37

Considering the foregoing, the grounds for nullity alleged by PEP was adopted from article 34 of this Model Law, which provides for the nullity of an arbitral award that is in violation of public policy, in the following terms:

> **"Article 34.** The petition for nullity as the only recourse against an arbitral award.
>
> 1) Against an arbitral award, an appeal may be made to a court only by means of a petition for nullity in accordance to paragraphs 2) and 3) of the present article.
>
> 2) The arbitral award may only be annulled by the court indicated in article 6 when:
>
> …..
>
> b) the court finds:
>
> i) that, according to the law of this State, the object of the dispute may not be submitted to arbitration; or
>
> ii) **that the arbitral award is contrary to the public policy of this State."**

As can be observed, the supposed regulation of the Model Law and the Code of Commerce in relation to the grounds for nullity as alleged is identical and differs only with respect to its form.

The concept of public policy in relation to the nullity and/or enforcement of an arbitral award is an issue that has been amply developed in the doctrine and international jurisprudence surrounding this Model Law, which, without any room for doubt, allows us to clarify the sense and the scope of what is provided by section II of article 1457. In fact, Mexican jurisprudence has determined that, in order to interpret the provisions of the Code of Commerce from a teleological and historical point of view, it is <u>necessary</u> to consult the existing commentaries in relation to this Model Law, as can be inferred from the following jurisprudential criterion:

> **Record No.** 176,581
> Isolated excerpt
> Case(s): Civil
> Ninth Session
> Instance: Three-Judge Circuit Courts
> Source: *Semanario Judicial de la Federación* and its Gazette
> XXII, December 2005
> Excerpt: 1.3a C. 502 C
> Page: 2650
>
> **ARBITRATION AGREEMENT, NULLITY OF. COMPETENCE OF THE ARBITRATOR AND NOT OF THE ORDINARY JUDGE TO HEAR THE RESPECTIVE ACTION FOR NULLITY, BECAUSE ARTICLES 1424 AND 1432 OF THE CODE OF COMMERCE HAVE AS THEIR PURPOSE TO GIVE EFFICACY TO ARBITRATION AGREEMENTS AND TO FACILITATE THE**

**CARRYING OUT OF ARBITRATION PROCEDURES.**  In order to interpret the precepts that govern arbitration in the Code of Commerce, from the teleological and historical standpoint, it is necessary to bear in mind that their antecedent is found in the Model Law on International Commercial Arbitration of the United Nations Commission for International Trade Law (UNCITRAL), whose provisions were incorporated into domestic trade legislation in order to adjust it to the aspects favorable to arbitration that were noted in said proposed regulation, as can be inferred from the explanation of the reasons of the reform decree and additions published in the Official Gazette of the Federation ("Diario Oficial de la Federación") on the twenty-second of July, nineteen hundred ninety-three, **as well as from the corresponding advisory opinions issued by the respective Originating and Reviewing Chambers, namely the House of Deputies and the Senate, in such a manner that it is fitting to refer to the text of the aforementioned model law, in the precepts that maintain similarity or identity of content, and to the explanation of said provisions made by the secretariat of the aforesaid international commission.**  This similarity in regulatory content can be noted between articles 1424 and 1432 of the Code of Commerce and 8 and 16 of the model law, the purpose of which is to facilitate and give efficacy to the recognition of arbitration agreements, as well as to prevent the practice of dilatory tactics, although it is a matter of the exercise of the powers of supervision or control that are recognized as necessary on the part of judicial courts.  The aforesaid finality of the regulation of remanding to arbitration and of the power to determine competence on the part of the arbitral tribunal of German origin called "Kompetenz-Kompetenz," or "competence-competence," which is found implicitly in the text of articles 1424 and 1432 of the Code of Commerce, given the origin that they have and the similarity with the norms that inspired them, reveals that the Mexican lawgivers sought to give thorough efficacy to the arbitration agreement and facilitate the carrying out of arbitration procedures, in the event there existed an agreement on that form of resolving disputes, by preventing the use of delays in the substantiation of those procedures, even when the necessary judicial control over the validity of the arbitration agreement were exercised, which, in terms of article 1432 of the Code of Commerce, can be done before the arbitral award is issued, or subsequent to it; in other words, it may be prior or ex post factum.  Therefore, when there exists an arbitration agreement on the competence [or jurisdiction] of the Arbitrator to hear a petition for the nullity of the arbitration agreement, the competence of the ordinary judge of the State is excluded, in order to thoroughly respect the intent of the parties in agreeing on the resolution of disputes, including the nullity of the arbitration agreement, through arbitration procedure.

THIRD THREE-JUDGE COURT FOR CIVIL CASES OF THE FIRST CIRCUIT.

"Amparo" in review 14/2005. Servicios Administrativos de Emergencia, S.A. de C.V., May 19,2005.  Unanimous decision, with explanatory vote by Judge Anastacio Martínez García.  Judge who wrote the opinion:  Neófito López Ramos.  Clerk:  Raúl Alfaro Telpalo."

(Emphasis added).

The violation of public policy as grounds for the nullity of an arbitral award is a concept that is widely discussed in the international forum because, through it, parties for whom an arbitral award does not turn out favorably have sought to take advantage of the supposed ambiguity of the concept and under any pretext or artificial line of reasoning have sued for the judge to revoke the resolution issued by the Arbitrators, as if it were a matter of an appeal that is made on the legality of the reasoning on the facts of the case by the arbitral tribunal.

These abuses have been widely reported by the representative to the UNCITRAL designated by the Mexican government, Dr. José María Zamora.  However, in his article *"la interpretación uniforme de la Convención de Nueva York y del Título IV del Libro Quinto del Código de Comercio" ("The uniform interpretation of the Convention of New York and Title IV of Book Five of the Code of Commerce")*, Dr. Abascal Zamora maintains that these abuses that stem from the supposed ambiguity of the concept "public policy" have not found any response on the part of domestic judicial courts, maintaining the following:

> **"6. On the concept of public policy and its strict interpretation.**
>
> It is human for the loser, who was in agreement on arbitration when he had an interest in signing the contract, not to want to comply when he is confronted with an unfavorable arbitral award.  The party who loses tries to ignore its obligation and seeks its nullity and to have its enforcement denied.  The way that is considered the easiest to convince a court to analyze the facts of the case resolved by the Arbitrators is the allegation that the award violates public policy.
>
> Since the time when provision of paragraph 2 of article V of the Convention of New York was created, which allows a judge to deny enforcement if he deems that it violates public policy, there has been the fear that a potential hole had been opened, which, through the judicial review of the facts of the transaction, would ruin the parties' intention to agree on arbitration.  Nonetheless, international jurisprudence has demonstrated that these fears were false, even though the public policy defense is the one that is made the most frequently, it has been systematically rejected by judges […].
>
> …..
>
> There are two rulings that have been systematically observed in international jurisprudence.
>
> The first was a decision that interpreted section (b) of paragraph 2 of article V of the Convention of New York, according to which the Court rejected the claim that the abandonment of a construction project in Egypt by an American company, on account of the six-day War, could be excused by the breaking of the bilateral relations of the United States of America and Egypt.  Asserting that an expansive construction of this defense could nullify the basic effort of the Convention of New York to remove preexisting obstacles to enforcement, **the Court said that: the enforcement of arbitral awards could be denied only on the basis that**

# EXHIBIT 2 (PART 2)

**the enforcement would violate the basic notions of morality and justice**. ... in equating the "national policy" of the United States with "public policy," the appealing party mixes up the concept, because **to read the public policy defense as a parochial means for protecting the interests of national policy would seriously weaken the usefulness of the convention.** The provision does not mean encapsulating the vicissitudes of national policy under the heading of "public policy." [...].

In the same article, STEWART (note on page 94) cites the second decision, a German resolution (...) that rejects the public policy defense by affirming that such a violation exists under German law only **if the arbitral award violates a rule [or] the basic principles of the public economy or directly contradicts in an intolerable manner German principles of justice."**

(Emphasis added).

Consistent with the restrictive sense that these two rulings of the domestic courts of the United States and Germany have given to public policy and their implications in the nullity or enforcement of an arbitral award, Alan Redfern, Martin Hunter, Nigel Blackaby and C. Partasides[1] have set forth in turn that most of the countries that are developed in the matter of arbitration have concurred in the common formulation of a limited concept of "public policy" and mention the following:

*"9-32. Finally, the **Model Law** establishes that an arbitral award can be nullified if a national court in the place of the arbitration finds that the arbitral award is in conflict with the public policy of its own country.*

*Most developed arbitral jurisdictions have similar conceptions of public policy. According to the Swiss Federal Supreme Court, **public policy denotes fundamental legal principles, a departure from which would be incompatible with the Swiss legal and economic system.** (101). Similarly, **German courts have held that an award will violate public policy if it conflicts with fundamental notions of justice, "bonos mores" or conflicts with principles which are fundamental national or economic values.** (102). Again, in similar terms, the Superior Court of Justice of Ontario refused to set aside an award rendered by a NAFTA tribunal, holding that for an award to offend public policy:*

*"[it] must fundamentally offend the most basic and explicit principles of justice and fairness in Ontario, or evidence intolerable ignorance or corruption on the part of the arbitral tribunal" (...)"*

*The Applicant must establish that the awards are contrary to the essential morality of Ontario (103).* [h]

---

[1] REDFERN, Alan, HUNTER, Martin, BLACKABY, Nigel and PARTASIDES, C., *Law and Practice of International Commercial Arbitration,* Kluwer Law International, 2004, pp. 1 – 50.

---

[h] *Translator's note:* Note that most of the English text in the footnotes is not reproduced in the translation, because it has been placed into the body of the text, since the text was originally in English. Only the footnotes that are citations of books or articles are reproduced in the translation. The highlighted text does not appear in the Spanish text, but it does appear in the original footnote.

(Emphasis added)

Under this same restricted line of the concept of public policy, the Report of the UNCITRAL on the Model Law complements this notion that is held about the concept, in order to make its scope somewhat more explicit and to point to corruption, bribery and fraud as grounds for the nullity of an arbitral award. In this respect, in the Commission's report, the following is held[3]:

> "it was understood that the term "public policy," which was used in the 1958 New York Convention and many other treaties, covered fundamental principles of law and justice in substantive as well as procedural respects. Thus instances such as corruption, bribery and similar serious cases would constitute a ground for setting aside. (…)."

Now then, into order to interpret what is provided by section II of article 1457 of the Code of Commerce, this strict concept of public policy understood *"as a series of fundamental principles of law and justice, the violation of which is gravely incompatible with the values or the economic or legal system of a country"* must be analyzed in the light of the principles that govern arbitration and of the task of the Judge in resolving the motion for nullity.

According to legal expert Jorge Alberto Silva, the review that the Judge undertakes concerning the arbitral award is limited and specific, and is restricted to the review of questions of form and not of substance. In his work *"Arbitraje commercial internacional en México,"* [International commercial Arbitration in Mexico] Silva points out the following:[5]

> "It is prohibited to review the substance of the matter resolved; this is the principle on which the review of the arbitral award revolves.
>
> Gómez Lara follows the ideas that were presented to him in a decision on admissibility and asserts that, of the violations alleged, the judicial court may examine only those of procedure, not those of substance.

---

[3] BROCHES, Aron . *Commentary on the UNCITRAL Model Law,* International Council for Commercial Arbitration, Kluwer Law, vol. IV, 2004.

[5] SILVA, Jorge. *Arbitraje comercial internacional en México ("International Commercial Arbitration in Mexico"),* 2nd edition, Oxford, Mexico City, 2001, p. 252.

The exequatur court shall not examine the arguments of fact presented in the judgment nor the logic used by Arbitrator when he pronounces the reward."

In relation to this same scope of the mission of the Judge, in the *Report to the Secretary General of the United Nations on an analytical compilation of comments by governments and international organizations concerning the draft model law on international commercial arbitration,* the government of Qatar manifested its interest in clarifying what the task of the Judge was in analyzing a petition for nullity of an arbitral award for violation of public policy and concluded the following:

"Where the rights of the parties are determined in pecuniary form, by recognition of a title, or in another way which does not in itself affect the public order in the country of recognition or enforcement, the public policy reason should not be used for refusing recognition or enforcement. **Otherwise, this would mean reopening the consideration of the dispute in which a decision has already been made, and as a consequence of such, arbitral proceedings would be wasted and the confidence necessary in transactions in general and in international transactions in particular would be shaken. In support of its view, Qatar notes that many States, among them the United States of America, have legislation and certain case law which provide for such restricted interpretation of public order. Consequently, Qatar suggests that the following text be inserted at the end of paragraph (1) *(b)* (ii):**

"*In deciding whether an arbitral award would be contrary to the public policy of the State, there shall be no reconsideration of the subject-matter of the dispute upon which a ruling has been made by that award and the decision shall relate only to the proceedings or actions that will be required by the recognition or enforcement.*"

(Emphasis added)

As can be observed, the judicial court's analysis of the notion of public policy as a ground for the nullity of an arbitral award is clearly delimited by the function the Judge has of not entering into the study of the facts of the disputes, by limiting himself to resolving the formal issues indicated in a limitative manner by that same article 1457 of the Code of Commerce.

In the case that concerns us, so as to make it fit its claims, PEP has attempted to distort the concept of public policy set forth above and its delimitation that it has, in the matter of arbitration, with respect to the role of the Judge in the review of the arbitral award. In an illogical and rash manner, PEP has maintained

---

[6] (A/CN.9/263 y Add. 1-3). p. 85. *Can be seen on* http://daccessdds.un.org/doc/UNDOC/GEN/NL8/500/50/PDF/NL850050.pdf?OpenElement

that "several authors" assert that, in a motion for nullity, the judge can enter into the analysis of the subject matter of the arbitral award, but the only name of these "several authors" that he gives to support his position is that of Dr. Francisco González de Cossío, citing page 19 of his work, *Manual de Arbitraje Comercial* [Handbook on Commercial Arbitration].

In this respect, page 19 of the work *Manual de Arbitraje Comercial* by Dr. Francisco González de Cossío cited by PEP mentions nothing with respect to the topic of the nullity of an arbitral award on account of violations of public policy and much less about the review of the facts of the case. On the contrary, when reviewing the work cited by PEP, it can be noted that this same author that it cites holds precisely the position that is contrary to its illegitimate interests, but consistent with what has been set forth in the present brief up to now.

Indeed, Dr. González de Cossío makes it very clear, in his *Manual de Arbitraje Comercial*, that the Judge cannot enter into the review of the facts of the case and when he distinguishes the differences between the remedy of appeal and the remedy of a motion for nullity, he points out the following[7]:

> "There is a conceptual difference between, on the one hand, an appeal and, on the other, the remedies that exist in relation to arbitral awards. Their different nature is due to the fact that a remedy of appeal examines the facts of the arbitral award (in other words, both the facts and the law) and the court that does such a review has the power to confirm, revoke or amend the same.
>
> In motions for nullity, recognition and enforcement, the competent body has limited jurisdiction. Its level of analysis is limited to the determination of the presence of any one of the grounds for nullity or non-enforcement. The body that undertakes this review does not establish the correct determination of the fact nor the correct application of law. It solely decides if a defect has occurred in the issuing of the award that would justify its invalidation."

Under this same line of reasoning, within the guiding principles of arbitration, Dr. González de Cassío points out the following ones:

> "Arbitral awards: a) Must be enforced, b) And conditions that are more rigorous than for local arbitral awards cannot be required just because they are foreign, c) Since Mexican judges have the discretion, but not the obligation to annul them or not to enforce them only in the cases expressly contemplated, d) On condition that the presumption of their validity has not expired, and **e) As long as they do not analyze the facts of the case of the arbitral award."**

(Emphasis added)

---

[7] GONZÁLEZ DE COSSIO, Francisco. *Ejecución de Laudos Arbitrales ("Enforcement of Arbitral Awards")* in *Manual de Arbitraje Comercial ("Handbook on Commercial Arbitration")*. Mexico City. Porrúa 2004, p. 168 to 170.

This being the case, it is clear that PEP seeks to take advantage of the supposed ambiguous concept of "public policy" so that this judge will enter into the analysis of the substance of the case in analyzing the grounds for nullity as presented.   However, as has been set forth on previous pages, the concept of public policy is a concept that is restricted in character that can be understood in the matter of arbitration only with respect to the role that the Judge should follow in the processing of the motion for nullity.

D)      THE ARBITRAL AWARD IS NOT CONTRARY TO PUBLIC POLICY

PEP repeatedly alleges that the arbitral award is contrary to and violates public policy and, for this reason, in the terms of article 1457, section II, must be declared as null.   For this purpose, PEP advances various reasons and arguments, the inadmissibility of which will be demonstrated below in detail.

   1 – The compensation determined by the Court of Arbitration in favor of COMMISA has legal and contractual justification

In relation to practically all the decisions made by the Arbitral Tribunal in relation to technical disputes numbers 19, 27, 34, 35, 37, 39, Financial Expenses and Payment of Expenses and Costs of Arbitration, PEP alleges that the arbitral award is contrary to public policy because said decisions do not have legal and contractual justification and, to this extent, they are lacking in due legal foundation and grounds.

On the same bases and in a confused manner, PEP also alleges that, in the decision adopted in relation to technical dispute number 36, the same defect was committed but, with respect to this one, it does not allege the violation of public policy, but rather asserts that the Arbitral Tribunal went beyond its mission in resolving the dispute without legal or contractual foundation.

This argument and supposed ground for nullity is a clear example of PEP's attempt to have the facts of the case of the arbitral award analyzed, under the pretext of a violation of public policy.   Notwithstanding, this argument turns out to be inadmissible for the reasons that follow.

In the first place, just as was explained in paragraph C) of the present chapter VI, any argument tending to assert that, in a procedure for nullity of substance, that one should enter into the analysis of the decisions of substance of the procedure, is inadmissible.

It is no obstacle to the foregoing that it is alleged that the decisions of substance that are being called into question supposedly violate public policy, because the demonstration of said exception results from a strict application and also has to be clear and beyond doubt, which does not occur in any of the arguments advanced by PEP, with respect to the decisions adopted by the Arbitral Tribunal in its arbitral award, in resolving technical disputes numbers 19, 27, 34, 35, 37, 39, Financial Expenses and Payment of Expenses and Costs of Arbitration.

Contrary to what is maintained by PEP, the Arbitral Tribunal did reason and did justify, legally and contractually, the decisions contained in its arbitral award, as is explained in detail below:

    a) Decision with respect to Technical Dispute number 19.

In resolving the claim identified in the arbitral award as "Technical Dispute" number 19, the Tribunal determined that, in executing the work entrusted to it, COMMISSA encountered a series of elements not provided for in the construction plans supplied by PEP and that they constituted obstructions for the placement of the ducts in the manner agreed upon.  This therefore involves a problem of contractual execution attributable to omissions by PEP, which it acknowledged as part of its responsibility.

On this point, the Arbitral Tribunal determined that there existed an agreement between the parties that these obstructions gave rise to extraordinary work, with foundation in Amendment Agreement number 12. Likewise the Tribunal established that COMMISA presented, in a timely manner, the claims deriving from these obstructions and that whether or not they were accepted by PEP was a fact beyond COMMISA's control and the admissibility of its [i.e. COMMISA's] claims could not be subordinated to that [i.e. whether or not PEP accepted them].

Finally, the Arbitral Tribunal, based on the analysis of the characteristics of these claims and the express or tacit agreements arrived at by the parties with respect thereto, determined to condemn PEP to the payment of the penalties set in the arbitral award.

    b) Decision with respect to Technical Dispute number 27.

In Technical Dispute 17, COMMISA makes a claim for the payment of 63,469 pesos and $1,948,210 U.S. dollars for the differential in the wait fees of Castoro 10, on account of the fact that PEP ordered a change in the work schedule and therefore Castoro 10 was used instead of Bar Protector[i].  For its part,

---

[i] *Translator's note:*  "Castoro 10" and "Bar Protector" are the names of two ships.

PEP maintained that the prices were agreed upon for activities and not for ships and that, in any case, it would be entitled to claim only the amount of $316,985 U.S. dollars minus 1,888,065 pesos in favor of PEP.

The Arbitral Tribunal studied the items of evidence offered and determined that, since the Supervision asked COMMISA for the quote of the barge for this type of work and that COMMISA indicated that its fee would be the same, it is understood that PEP accepted COMMISA's offer when it ordered the work on platforms to be done with Castoro 10.

Consequently, the Arbitral Tribunal partially accepted COMMISA's claim and ordered PEP to pay COMMISA the amount of 62,502 pesos plus $1,947,288 U.S. dollars.

c) Decision with respect to Technical Disputes numbers 34 and 35.

**In Technical Dispute 34** COMMISA made a claim for the payment of 30,309,308 pesos plus $28,885,334 U.S. dollars for the charge for delay in the start of the work of Bar Protector; and in **Technical Dispute 35**, the payment of $18,494,205 U.S. dollars for the delay in the start of the work of Castoro 10. For its part, PEP considered the claims to be inadmissible and argued that the payments for wait times would begin to accrue once the ships passed the check list and were put at its disposal.

The Tribunal considered that, starting from August 20, 1998, there are various items of evidence that COMMISA advised and communicated to PEP with respect to the costs that could be occasioned by the rescheduling of the work, whereby, on March 5, 1999, the Supervisor asked my client to submit some estimates of the costs that it would have to indemnify – a request that was satisfied on March 15 of that same year-.[8] A fundamental factor in the analysis of the Arbitral Tribunal was the formal process for reviewing the contract that took place between the parties and during which Change Order number 1, Rev. 2 was accepted and signed by both parties, in which PEP consented to compensate COMMISA for "the just, reasonable and duly verified costs" that might be occasioned, likewise, the extension of the time limit by 117 days requested by COMMISA was accepted.

Once the items of evidence offered had been analyzed, the tribunal determined, on the basis of **the literal sense of the contract** – paragraph 168 and following of the arbitral award – and **strict law** –

---

[8] It should be pointed out that the prices offered to PEP were lower than those that COMMISA in turn agreed upon with EMC.

paragraphs 179 and following -, that the payment of the wait fee requested by COMMISA was not applicable if the wait was caused prior to when the ship was mobilized, therefore the penalty could be quantified only on the basis of the "just, reasonable and verified costs," which had as its result an order for the payment of $13,923,014 U.S. dollars.

Finally, and in relation to the Technical Dispute that is described, it is worthwhile to emphasize two things: (i) the Tribunal studied whether Technical Disputes 34 and 35 were compatible with the Mission Statement and determined that they were – paragraph 187 and following -; and (ii) the Tribunal explained in the award that, contrary to what PEP maintains, the requirement to offer additional items of proof was done to both parties by means of communication A 49 and not only to COMMISA.

> d) Decision with respect to Technical Disputes numbers 37 and 39.

In Technical Dispute 37, COMMISA made a claim for the payment of 6,877,277 pesos plus $11,632,024 U.S. dollars for the charge for the crossing work in contract EPC-28; and in Technical Dispute 39, the payment of 1,000,991 pesos plus $2,924,951 U.S. dollars for crossings in the scope of contract EPC-027 which was incorporated into EPC-28.

**In relation to Technical Dispute 37,** given that the separation between the pipes was less than one meter, PEP argued that my client had not approved or quantified the items claimed and that, in any case, a lesser distance between pipes implied a cost savings.

In this respect, the Tribunal concluded that, on the basis of the document requesting technical specifications, signed by both parties, it was agreed that certain crossings could have a separation of 0.5 meter instead of one meter and that the cost impact of this reduction in separation would be evaluated when making the estimates.  When joined to the foregoing, the fact that COMMISA obtained the certification of ABS[9] and that the Supervisor had approved on behalf of PEP the technical specifications of the crossings that my client submitted for its consideration, led the Tribunal to accept in full COMMISA's claim and to order PEP to pay 6,877,277 pesos plus $11,632,024 U.S. dollars.

**In relation to Technical Dispute 39,** COMMISA alleged that PEP ordered from it eight crossings corresponding to line 27 and that now it refuses to pay the corresponding unit price. For its part, PEP argues that, with respect to crossings 2, 3, 5, 7 and 8, that these have a separation between pipes of

---

[9] Certification agency designated by PEP.

less than one meter; and as for crossings 1, 4 and 6, it mentions that they are located on an expansion curve that has its own unit price.

The Arbitral Tribunal arrived at the same conclusions as in Technical Dispute 27 with respect to crossings 2, 3, 5, 7 and 8. As for the remainder of the crossings, the Tribunal determined that, since PEP ordered the crossings from my client, it created a legitimate expectation that this work was going to be remunerated in accordance with what had been arranged in the unit prices that had been agreed upon. Consequently, the Tribunal accepted in full COMMISA's claim and ordered PEP to pay the sum of 1,000,991 pesos plus $2,924,951 U.S. dollars.

e) Decision with respect to Financial Expenses.

In addition to alleging a supposed lack of legal and contractual foundation with respect to this penalty, PEP is arguing the supposed violation of article 16 of the Constitution, as well as an alleged defenselessness stemming from the alleged failure to analyze PEP's arguments in relation to the financial expenses.

As a matter of fact, in the first place, the guarantee of due process cannot be violated by an arbitral award, because it does not involve an act of authority. Therefore, any argument in this sense by PEP turns out to be inadmissible.

Apart from the formal aspect previously noted, even in considering from a strictly material standpoint, the estimation and penalty of financial expenses that was issued against PEP in the arbitral award did not leave it in a state of defenselessness.

The obligation of paying interest (Financial Expenses) derives from the Contract and the Arbitral Tribunal limited itself to enforcing it.

In this context, each one of the arguments advanced by PEP were analyzed and rejected by the Arbitral Tribunal, on the basis of its interpretation of what had been agreed upon in the Contract. Consequently, PEP was not left in a state of defenselessness, much less was this dispute resolved without legal or contractual basis as said party erroneously alleges.

Specifically, from the reading of the arbitral award, it can be seen that the Arbitral Tribunal determined that the contractual provision applicable to this dispute was clause 3.8.6 of the Contract, which establishes that: **"*in the event of a delay in the payment of estimates and adjustments of costs, PEP, at the request of the Contractor, shall pay financial expenses in accordance with a rate that***

*shall be equal to the one established in the Law on Income of the Federation in cases of extension for payment of tax liabilities...,"* in relation with clause 3.8.8, which releases PEP from paying financial expenses when PEP legitimately suspends the payment of estimates.

By interpreting the contractual provisions on the basis of the evidence and arguments presented by the parties, the Arbitral Tribunal determined that the requirements for the obligation of paying interest to be actualized were: (i) there must be a delay in the payment of estimates and cost adjustments; i.e., they were not paid within the 30 days following the submission of the corresponding estimate, pursuant to what is provided in clause 3.8.2 of the Contract; (ii) the Contractor must request payment thereof and (iii) PEP does not have a legitimate cause for suspending the payment, from among the seven [causes] indicated in clause 3.8.8 of the Contract.

With respect to the first requirement, the Arbitral Tribunal systematically interpreted the Contract and determined that, considering that *"the Contract is based on the principle that the Contractor was supposed to continue fulfilling the work entrusted to it and that it would be remunerated by PEP within a time limit of 30 days from the completion of the work,"* PEP had to pay COMMISA all the amounts due *"no later than 30 days after its delivery, i.e. September 29, 2002."*[10] The Arbitral Tribunal complemented its argument by pointing out that it is starting from the final delivery of the work that "the mutuality of obligations is broken," because starting from that date PEP obtained the use and enjoyment of the work (and PEP did not allege the existence of flaws, defects and other instances of non-performance) and, in contract, COMMISA suffers impoverishment from not having received the price.

The Arbitral Tribunal also resolved that the presentation of an invoice and support documentation at PEP's "one-stop" window[j], in accordance with what is provided in clause 3.8.3 was applicable to the normal procedure for the payment of estimates during the course of the work, not to the collection of amounts claimed by means of an arbitration procedure.

As far as the alleged lack of interpretation, the Arbitral Tribunal literally applied clause 3.8.6. of the Contract, which does not require any judicial or extrajudicial interpretation, but rather a simple "request" for payment and the Tribunal pointed out that the arbitral action took the place of said request. If interpretation were necessary under article 2080 of the Federal Civil Code, the Arbitral Tribunal established, the Act of Total Physical Acceptance would take its place,

---

[10] Arbitral Award ¶ 743. The Tribunal counted the 30 days starting from August 30, 2002, the date of the signing of the Act of Total Physical Acceptance.

[j] *Translator's note:* The Spanish expression "ventanilla única" (literally "single window") refers to a policy where a company or a government agency has one central point for all transactions, to spare people from "running around from one place to another."

50

since COMMISA had set forth its claims in said document and PEP had knowledge of its existence.[11]

Finally, the Arbitral Tribunal held that clause 3.8.6 does not impose as a requirement that the amounts be liquid in order for them *"to accrue interest for late payment."*[12]

As can be seen, the Arbitral Tribunal made a series of determinations about the content and scope of the clauses of the Contract applicable to the payment of financial expenses.  In the Arbitral Award, the Arbitral Tribunal interpreted the Contract systematically, in order to establish the date on which the 30-day time limit that PEP had in order to pay expired, as well as the requirements that had to be met in order for the obligation of paying financial expenses to be generated.  Finally, the Arbitral Tribunal determined that said requirements had been met.

These determinations relate to the substance; they have the effect of *res iudicata* and may not be reviewed again by the judicial authority, because they have a clear legal and contractual foundation; for this reason they cannot be called into question now by alleging that the arbitral award condemned [PEP] to compensation without contractual and legal foundation and, therefore, allegedly violated public policy.

### 2 – The Contract is not a contract of administrative nature and, consequently, it is impossible to allege any submitting of the interest of PEP over that of COMMISA

The focal point on which PEP bases itself to maintain the nullity of the arbitral award hinges on the fact that, according to it, the Contract is an agreement that is administrative in nature, signed by a semi-governmental entity, to which a series of provisions of a budgetary nature apply, which transform the Contract into a document, which, according to PEP, cannot be interpreted and, in the final instance, with respect to which it is impossible to legally derive orders to indemnify, since they are not expressly provided for in PEP's budget, nor are they expressly contained in the Contract.

Thus, according to PEP, the determinations of the Arbitral Tribunal contained in the arbitral award violate public policy, because, according to PEP, only its own legal and contractual interpretation is the correct one and, if that interpretation is not adopted, then budgetary provisions of public policy are violated.  With this, PEP claims that, on the basis of the

---

[11] Arbitral Award ¶ 748.
[12] Arbitral Award ¶ 749.

observance of provisions of financial discipline that govern it internally, it is exempted from liability for the violation of its contractual commitments that it freely assumed.

PEP's position is incorrect and is clearly based on a series of sophisms and fallacies that do not hold up to serious analysis.

**In the first place, it should be pointed out that the regulations cited by PEP refer to provisions of internal budgetary discipline that are binding on PEP, but not on COMMISA, much less can they or must they be considered and applied by the Arbitral Tribunal in makings its arbitral award.**

In this context, the dispute presented and resolved by the arbitral award was a dispute that was contractual in nature, to which the corresponding rules of Civil Law were applied, pursuant to article 13 of the Law on Acquisitions and Public Works, which is applicable to it and textually provides:

> "**Article 13.** – In what is not provided for by this Law, the Civil Code shall apply for the Federal District for local matters, and for the entire Republic for federal matters; and the Federal Code of Civil Procedure."

Likewise, it is relevant to emphasize that, in accordance with article 14 of the Implementing Law on Petróleos Mexicanos and Subordinate Agencies, PEP is empowered, just as occurred in the case that concerns us here, to submit to the decision of an Arbitral Tribunal disputes arising from any contracts that it signs; therefore, to now allege, as it is attempting to do, that, in practice, the Arbitral Tribunal cannot resolve the disputes that have been presented, owing to provisions of an [administrative [?]][k] nature and concerning the internal budgetary discipline of PEP is incorrect. Said article literally establishes the following:

> "**Article 14.-** Any legal acts that are signed by Petróleos Mexicanos or any one of its Subsidiary Agencies shall be governed by the applicable Federal Laws and domestic disputes, to which it may be a party, no matter what their nature, shall be under the jurisdiction of the federal courts, unless there is an arbitration agreement, being excepted from granting the guarantees that may be required from the parties, even in cases of judicial disputes.
>
> In the case of legal acts of an international character, Petróleos Mexicanos or its Subsidiary Agencies may agree on the application of foreign law, the jurisdiction of foreign courts in commercial matters and sign arbitration agreements, whenever this is suitable to attaining its object."

---

[k] *Translator's note:* The original text clearly has omitted a word. This translation, based on the context of this section, assumes that it was the word "administrative."

On the other hand, and focusing specifically on the provisions invoked by the plaintiff, it should be clarified that article 134 of the Constitution of the United States of Mexico provides, in its relevant passage, the following:

> "Article 134. The economic resources that are available to the Federal Government and the Government of the Federal District, as well as their respective semi-governmental public administrations, shall be administered with efficiency, effectiveness and honesty, in order to meet the objectives for which they are intended.
>
> Any acquisitions, leases and transfers of every type of property, provision of services of any nature whatsoever and **the contracting of any work that they shall carry out, shall be adjudicated or shall be carried out through public calls for tenders** so that solvent proposals will be submitted freely in sealed envelopes to be opened in public, in order to ensure the State of the best conditions available with respect to price, quality, financing, timeliness and any other relevant circumstances."

From the article cited, it can be inferred that our Constitution establishes that **all contracts to which the State is a party** must be subjected to the procedure of public bidding[13].

In this sense, any contracting of a public works project undertaken by the State must be subject to the Law on Public Works and Services Related thereto[14], which regulates actions relating to the planning, scheduling, budgeting, contracting[15], expenditure, execution and supervision of public works, as well as the services related thereto.

As a conclusion to what has been presented thus far, any contracting undertaken by the State in relation to public works must be regulated by the Law on Public Works and Services Related thereto.

Nevertheless, it must be explained that not every contract signed by the State or its semi-government entities is a contract that is administrative in nature. Indeed, the administrative character of a contract is not dependent on whether the State is party thereto or whether it is signed under and regulated by a Federal Law, such as the Law on Public Works and Services Related thereto, but rather on two specific factors:

    a)   That the administrative body signs it in order to satisfy public interests.

---

[13] Except when public bidding is not suitable for ensuring the best conditions for the State – third paragraph of article 134 of the Constitution.

[14] Published in the *Diario Oficial de la Federación* on January 4, 2000 and which revoked the Law on Acquisitions and Public Works.

[15] In Title Three of the Law.

    b)  That there is relationship of subordination between the authority and the governed subject.

Below there will be given an explanation in greater detail of each one of them and it will be analyzed whether or not the contract meets this requirements.

    **a)  That the administrative body signs it in order to satisfy public interests**.

The administrative body that signed the contract was PEP and the object of the contract, according to what was established in the second clause of the instrument, was *"the execution of a work consisting in the design, procurement, manufacture and laying of pipe, anticorrosive coating, ballast, cathode protection, ascending ducts, installation and testing of valves."*  As can be observed, PEP contracted COMMISA for the purpose of carrying out work in its system of pipes and ducts, which does not involve a satisfaction of the public interest, rather, in any case, maintenance of its installations.

The courts of our country have pointed out that, in order for a contract to have as its object the public interest, it is necessary for its finality to be **closely** linked to meeting collective needs and for the satisfaction of those needs not to be indifferent to the form of carrying out the contractual obligations. Below is transcribed the excerpt from jurisprudence issued by the plenary session of the Supreme Court of Justice of the Nation, in which the criterion that is described can be observed:

> **"ADMINISTRATIVE CONTRACTS.  ARE DISTINGUISHED BY THE PUBLIC POLICY FINALITY AND BY THE SYSTEM OUTSIDE THE SCOPE OF CIVIL LAW TO WHICH THEY ARE SUBJECT.** The administrative nature of a contract signed between a state body and a private entity can be validly deduced from the public policy finality that it pursues, identified as public utility or social utility, as well as the system outside the scope of civil law to which it is subject.  From this it can be inferred that <u>contracts signed by a state body with private individuals are governed by private law whenever their object is not closely and necessarily connected with the fulfillment of public duties of the State and, by the same token, the satisfaction of collective needs will not be harmed, because, in those acts, the State does not make use of the means that are authorized to it by its special status</u>.  On the contrary, when the object or the finality of the contract are intimately connected to the fulfillment of the duties of the state, in such a way that the satisfaction of the collective needs is not indifferent to the form of carrying out the contractual obligations, then one is in the presence of an administrative contract, then it is valid to

stipulate extraordinary clauses, which, from the viewpoint of private law, might be null but, in the administrative field, they are not, in view of the need to ensure the regular and continuous functioning of public service.

Federal civil ordinary judgment 1/2000.  Jesús Guillermo Puente Culiño.  February 20, 2001. Unanimous ruling with ten votes.  Absent:  Genaro David Gónara Pimentel.  Judge writing the opinion:  Juan Díaz Romero.  Clerk:  Silverio Rodríguez Carrillo.

The full Court, in its closed-door session held today, the twenty-ninth of this March, approved, with number IX/2001, the isolated ruling that appears above, and determined that the voting is suitable to be made part of a jurisprudential ruling.  Mexico City, Federal District, on the twenty-ninth of March, two thousand and one.

Register no. 189995. Ninth Session. Plenary. April 2001. Case(s):  Administrative, Civil.'

(Emphasis added).

For its part, the doctrine has indicated – in the words of Marienhoff – that public service is *"the activity that tends to the immediate satisfaction of the needs of the social group and the individuals that comprise it,"* and that one of the most outstanding traits of public services is that they are not mainly supposed to pursue purposes of profit.

In the specific case, we have the fact that, in the contract, PEP was not pursuing the satisfaction of collective needs; in other words, it was not carrying out tasks proper to the State.

**b)  That there is relation of subordination between the authority and the governed subject.**

The relations between the parties of a contract in which the State intervenes may be of three types:

(i)    coordination:  are those that are established between private individuals or between organs of public power – in their standing as a private subject – and those governed;

(ii)   *supra*-ordination:  occur between the various organs of public power in their status as authorities;

(iii)  *supra*-subordination: are those that are initiated between the organs of public power and the governed.

In the case of the contract that concerns us here, the parties constituted a relationship of voluntary coordination between PEP and COMMISA, and thus not a relation of supra-ordination and subordination between an authority and a governed subject.

Consequently, this was a contract that was private in character, in which both parties acquired rights and obligations and set the terms of the relationship, including arbitration as the means by which they were to resolve any future conflicts that might arise over the life of the contract.

As a conclusion to what has been presented, we hold that the fact that the Contract is regulated by the Law on Acquisitions and Public Works[16] does not confer on it the character of being an **administrative contract**, but rather one should pay attention to its finality, which is eminently private in character.

This being the case, and since obviously private interests converge in the Contract, we are in the presence of a Private Contract. Consequently, the assertion that the plaintiff in the motion whereby COMMISA's private interest is set against the public interest of PEP is false

The foregoing clarification is of utmost importance, since PEP is attempting to argue that, since its interest is public in character, it must take precedence over the private interest of COMMISA. This is clearly false, because the contract was signed between private entities and there is no interest that is higher than the other, there simply are clauses that determine the obligations and rights of the parties in relation to the contract and the Arbitral Tribunal has decided in accordance to what was agreed upon between the parties.

To think otherwise, i.e. to consider that, in a contract in which the State is a party, the contract is always going to be one of public interest and, for this same reason, the interests of the State must prevail over those of the governed subject, would lead us to the absurd conclusion of holding that every contract in which the State is a party is lacking in legal certainty and that what prevails are any arbitrary decisions that the State may adopt, in the face of which a private entity would have no field of action, since its interest would be considered as being of an inferior level.

On the contrary, the legal system of this country provides that whenever an authority acts in violation of the contractual provisions, thereby affecting the governed subject, the latter has the option of having recourse to one of the means of defense in order to affirm the rights that the contract, the Constitution and the laws have granted to it, thereby getting the contractual violation to be declared illegal and thereby obtaining restitution for the damage and harm suffered by the governed subject on account of the authority's illegal action.

---

[16] This law begins to govern the contract from the time it went into effect in the year 2002; before that, the Law on Acquisitions and Public Works was in effect.

That was exactly what COMMISA did when it resorted to arbitration – in the terms that had been agreed upon in the contract – in order to seek that the actions of PEP that violated the provisions of the contract would be sanctioned, thus compensating for the harm that had been caused to it.

Finally, it should be pointed out that, if one were to accept PEP's position that the Contract is administrative in nature and not civil, then one would arrive at the absurdity that Your Honor would be neither empowered nor competent (by reason of the matter) to hear the present motion for the nullity of the arbitral award.

   3. – <u>The Arbitral Award does not violate any provision of budgetary nature</u>.

First of all, it is necessary to clarify that the laws and articles that PEP cites in the motion for nullity of the arbitral award, and based on which it develops a series of arguments in order to conclude – erroneously – that public policy has been violated, are cleverly interpreted in an isolated manner and, on many occasions, they are precepts that do not apply to the specific case or have been revoked by other laws. Consequently, further on a legal framework of the statutes applicable to the arbitral award will be offered and it will be explained why the latter is consistent with law.

PEP considers that the arbitral award is contrary to provisions of Mexican public policy and, specifically, in relation to the Federal Political Constitution, argues that the award violates what is provided in articles 126 and 134.

Article 126 of the Constitution textually provides the following:

> "Article 126.  No payment may be made that is not included in the Budget or determined by subsequent law."

PEP maintains that the arbitral award violates this precept at the moment when it imposes an order that obligates it to the payment of an amount that is not provided in the budget.  This conclusion is mistaken, given that the arbitral award at no time orders PEP to pay the penalty with money that is not included in the budget.

If one studies the Constitution as a whole, and not only article 126 in an isolated manner, one will realized that our supreme law contemplates, in article 113, that **the State is liable for any harm that it causes to private entities on account of its irregular activity**.

Indeed, article 133, in its relevant part textually provides the following:

> "Article 113 …
>
> The liability of the State for any harm that it causes to the property or rights of private entities on account of its irregular administrative activity shall be objective and direct. Private entities shall be entitled to indemnification, in accordance with the bases, limits and procedures that may be established by the laws."

If we take as a premise that the Constitution establishes that the State may incur liability and that, in the event it does so, it must indemnify the private entity, then we must conclude that the payment of said indemnity is admissible, constitutionally speaking, and that – in accordance with article 126 cited above – it must be done by charging the budget. The foregoing is admissible according to the applicable legislation and the manner in which said payment must be made by charging the budget will be detailed further on.

This being the case, we can conclude that the arbitral award is consistent with law and that the fact that it condemns PEP to the payment of an indemnity on account of the liability it incurred in violating the contract signed with COMMISA is not contrary to public policy.

On the other hand, PEP asserts that the arbitral award violates the next-to-last paragraph of article 134 of the Constitution that provides that *"the management of federal economic resources shall be subject to the bases of this article."*

PEP's assertion is baseless and, in order to demonstrate this, it is necessary to understand the context of the article and not only the paragraph that it cites; therefore, it is transcribed in its entirety below:

> "**Article 134.** Any economic resources that the Federal Government and the Government of the Federal District have available, as well as their respective semi-government public administrations, shall be administered with efficiency, effectiveness and honesty, in order to meet the objectives for which they are intended.
>
> Any acquisitions, leases and transfers of every type of property, provision of services of any nature whatsoever and the contracting of any work that they shall carry out, shall be adjudicated or shall be carried out through public calls for tenders so that solvent proposals will be submitted freely in sealed envelopes to be opened in public, in order to ensure the State of the best conditions available with respect to price, quality, financing, timeliness and any other relevant circumstances.

Whenever the calls for tenders referred to by the previous paragraph are not suitable for ensuring said conditions, the laws shall establish the bases, procedures, rules, requirements and any other elements in order to accredit the economy, effectiveness, efficiency, impartiality and honesty that will ensure the best conditions for the State.

**The management of federal economic resources shall be subject to the bases of this article.**

Public servants shall be responsible for compliance with these bases in the terms of Title Four of this Constitution."

(Emphasis added).

As can be observed, article 134 provides for the principles and bases that must be followed whenever the State contract for the provision of services, the construction of works or acquires, leases or transfers any type of property. In this sense, we must be clear that said precept in no way contradicts the fact that the State should be liable for any harm that it may cause to private entities. On account of the foregoing, the argument advanced by PEP is unfounded in the sense that the arbitral award is contrary to the provisions of article 134 of the Constitution.

Furthermore, PEP maintains that all amendments to public works contracts that generate new obligations to be carried out [charged] against federal resources must be explicit, and this is based on article 70 of the Law on Acquisitions and Public Works, which textually reads as follows:

"Article 70. – Agencies and entities may, within the approved schedule of investments, under their responsibility, for founded and explicit reasons, **amend public works contracts** by means of agreements, on condition that these [agreements], considered as a whole or separately, do not exceed twenty-five percent of the amount or the time limit agreed upon in the contract or involve substantial variations from the original plan.

If the amendments exceed the percentage indicated or substantially vary the plan, for a single time, an additional agreement must be signed between the parties with respect to the new conditions, pursuant to article 29. This additional agreement must be authorized under the responsibility of the head of the agency or entity or by the highest official or his equivalent in entities. Said amendments may not in any way affect the conditions that refer to the nature or essential characteristics of the work that is the object of the original contract, nor may an agreement be made in order to evade in any way compliance with the Law or with Treaties.

The head of the agency or entity, without possibility of delegation, shall inform the Department, Office of the Comptroller or, if applicable, the body of government, of the authorizations referred to in the previous paragraph. To this effect, no later than the last business day of each month, a report must be submitted that will refer to the authorizations granted in the calendar month immediately preceding.

The limits that are established in this article shall not be applicable whenever it is a matter of contracts the projects of which relate to the preservation, maintenance or restoration of the buildings referred to by article 5 of the Federal Law on Archeological, Artistic or Historical Monuments and Zones, in which it is not possible to determine the catalog of concepts, the amounts of work, the corresponding specifications or the schedule for execution."

(Emphasis added).

Now then, my client considers that the PEP has right on its side in the sense that any amendments to public works contracts that generate new obligations [charged] against federal resources are to be explicit and comply with the procedure and the conditions contemplated in article 70 cited above.

Nevertheless, PEP claims that said rule applies – **which refers solely to contractual amendments** – to the obligations that arose for it on the grounds of a contractual non-performance that has been analyzed and determined by the Arbitral Tribunal.

In conclusion, the arbitral award does not violate article 70 of the Law on Acquisitions and Public Works, because it does not involve a contractual amendment, but rather the order to pay an indemnity for contractual non-performance, therefore the origin of the obligations charged against PEP does not have to follow what is provided in said precept.

As for the violation of the precepts of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending[l] – now the Regulations of the Federal Law on Budget and Budgetary Responsibility[m], this is also unfounded.

Before entering upon the study of the articles that PEP deems to have been violated on the regulatory level, the following clarification must be made.

The Regulations of the Federal Law on Budget and Budgetary Responsibility was published in the *Diario Oficial de la Federación* on June 28, 2006 and went into effect – in terms of its transitory article one – on the day following its publication, **revoking** – in terms of its transitory article two – the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending.

---

[l] *Translator's note:* The Spanish name is *Ley Federal de Presupuesto, Contabilidad y Gasto Público Federal.*
[m] *Translator's note:* The Spanish name is *Ley Federal de Presupuesto y Responsabilidad Hacendaria.*

Things being thus, it is incongruent for PEP to found its claims on two sets of regulations which, by definition, cannot regulate PEP's expenditures at the same time, given that one has revoked the other.

In this sense, COMMISA considers that the Regulations of the Federal Law on Budget and Budgetary Responsibility is applicable, given that these were legal precepts that were in effect when the Arbitral Tribunal issued its arbitral award, but especially because these are the ones that govern the form and the mechanism on the basis of which PEP will have to cover the indemnity to which it has been condemned.

Notwithstanding the foregoing, there is an analysis of the articles of both sets of regulations that PEP considers to have been violated.

 - Article 44, section III of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending:

PEP considers that article 44, of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending has been violated because the payment to which it is being obligated is not duly justified and supported in the legal provisions and documents that determine the obligation to make the payment.

The article in reference provides the following:

 "Article 44.- Entities must take care, under their responsibility, that any payments that are charged against their approved budgets will be made subject to the following requirements:

 I. That they correspond to commitments that have actually become due, with the exception of any advances that are provided in other legal regulations and mentioned in article 64 of the present Regulations.

 II. That they be made within the limits of the authorized financial calendars, and

 **III. That they be duly justified and supported with the respective original documents, with it being understood that justifying [documents] are legal provisions and documents that determine the obligation to make a payment and that supporting documents are those that demonstrate the delivery of the corresponding sums of money."**

In this respect, COMMISA considers that the arbitral award, and in turn, the resolution of the competent judge ordering its enforcement, **are legal documents that determine the obligation to make the payment.**

It is illogical to think that a regulation issued by a competent authority does not constitute a legal document that is a source of obligations for the State.  To think in this way, would necessarily lead us to conclude that there is no way that the State can be condemned by way of arbitral or jurisdictional procedure, because the resolutions would not be sufficient to justify the payment to which it is condemned.

For their part, articles 69 and 70 of the same regulations cited by PEP are not applicable to the particular case, given that they refer to the formalities and requirements that orders and contracts must have in order for them to have the character of a document justifying a public expenditure.  Consequently, these articles are not applicable to the arbitral award.

   - Article 66, section III of the Regulations of the Federal Law on Budget and Budgetary Responsibility:

PEP considers that the arbitral award is contrary to article 66, section III of the Regulations of the Federal Law on Budget and Budgetary Responsibility, which literally reads as follows:

> "Article 66.   Agencies and entities shall be responsible for seeing to it that payments charged to their budgets are made subject to the following requirements:
>
> I. That they correspond to commitments that have actually become due, with the exception of any advances that are provided in the applicable provisions.
>
> II. That they be made within the limits of the authorized financial calendars, and
>
> III. **That they be duly justified and supported with the respective original documents, with it being understood that justifying [documents] are legal provisions and documents that determine the obligation to make a payment and that supporting documents are those that demonstrate the delivery of the corresponding sums of money."**
>
> The records of outlays that do not constitute payments shall be adjusted so that they are compatible with what is provided in this Section, as determined by the Department."
>
> (Emphasis added)

Just as what was presented in the previous section – with relation to article 44 of the Regulations of the Law on Budget, Accounting and Federal Public Spending -, my client considers that the arbitral award, and in turn, the resolution of the competent judge ordering its enforcement, **are legal documents that determine the obligation to make the payment.**

The best way to support what is expressed here is by performing an integral analysis of the Federal Law on Budget and Budgetary Responsibility and its Regulations, from which it can be inferred that both precepts contemplate the possibility and the procedure that must be followed in order to pay obligations to private entities that have as their origin the responsibility of the State.

Article 2 of the Federal Law on Budget and Budgetary Responsibility offers a series of definitions, among which we find the one on budget that has come due.

> "Article 2. – For the purposes of this Law, [the following] shall be understood:
>
> …
>
> XXXVI. Budget that has become due:  **the recognition of the payment obligations** on the part of the executors of expenditures to third parties, for the commitments or requirements fulfilled by the latter in accordance with the applicable provisions, **as well as the payment obligations** that are derived through the mandate of treaties, laws or decrees, as well as **definitive resolutions and rulings,** and the outlays to which reference is made by article 49 of this Law; …"
>
> (Emphasis added)

As can be observed, the law cited expressly provides that the executors of expenditures must recognize the payment obligations that they may have with respect to third parties, which derive from definitive resolutions or rulings.

In this sense, it is clear that the arbitral award is a definitive resolution and, consequently, the payment of the obligations to which PEP is condemned must be recognized and form part of the budget that has become due.

In this respect, it should be pointed out that the law under comment is the precept that regulates articles 126, 127 and 134 of the Constitution, which were specifically invoked by PEP as a foundation for its argument that obligations derived from a resolution cannot be paid.  The above once again proves the fact that reason is not on PEP's side and that the obligations to which the arbitral award has condemned it are admissible and conform to law and, consequently, are not contrary to public policy.

In this same sense, article 4 of the same precept literally provides:

> "Article 4.- Federal public spending includes outlays for current expenditures, including payments of liabilities of the public debt: physical investment; financial investment; as well as asset liability; made by the following executors of expenditures:
>
> I. The Legislative Branch;
> II. The Judicial Branch;
> III. Autonomous entities;
> IV. Administrative courts;
> V. The Office of the Prosecutor of the Republic;
> VI. The Office of the President of the Republic;
> VII. The agencies and
> VIII. **The entities."**

From the article cited, it can be clearly inferred that outlays of federal public spending are those that have as their origin the asset liability of the executors of public expenditures, including the entities.

From what has been pointed out here, it can be concluded that the Law itself is contemplating that the State may incur asset liability and, consequently, there may be outlays that are made in order to cover said liability.

For its part, article 47 of the law being cited provides for the procedure that the executor of the expenditure is supposed to follow – PEP in this specific case – in order to cover the obligations of any nature that derive from the definitive resolutions issued by a competent authority. The precept is transcribed below:

> **"Article 47. – The executors of an expenditure that is to be charged to their respective budgets and, in accordance with the applicable general provisions, must cover** the corresponding federal, state and municipal contributions, as well as the obligations of any nature **that may derive from** <u>**definitive resolutions**</u> **issued by a competent authority.**
>
> **Any budgetary adjustments which, as the case may be, may be necessary for the payment of the obligations referred to by the final part of the preceding paragraph, may not affect the fulfillment of the objectives and goal of the priority programs approved in the Budget for Expenditures.**
>
> **Agencies and entities that are unable to cover the totality of the obligations in accordance to what is provided in the preceding paragraph, shall present to the competent authority a schedule for meeting payments that must be taken into consideration for all legal purposes in the process of execution with respect to any resolution that might have been issued,** for the purpose of covering the obligations up to an amount that does not affect the

objectives and goals of the priority programs, without prejudice to the fact that the remainder of the obligation must be paid in the subsequent fiscal years in accordance with said schedule.

The Legislative and Judicial Branches and the autonomous entities, in the event it becomes necessary, shall establish a proposal for fulfillment of obligations, observing in this matter what is provided in the second and third paragraphs of this article."

(Emphasis added).

The precept just cited convincingly demonstrates that the legal system applicable to PEP's public expenditures obligates it to cover any obligations that derive from definitive resolutions issued by a competent authority and charged to its budget, and even provides for the form in which the obligation is to be paid, if it is unable to cover the amount owed, for which purpose the State is authorized to present before the competent authority a schedule for the fulfillment of the payment, which must be taken into consideration for legal purposes in terms of the execution with respect to any resolution that might have been issued.

On the other hand, with respect to the Regulations of the Federal Law on Budget and Budgetary Responsibility, it contemplates in article 57, that in terms of article 41, fraction II, paragraph f) of the Law, outlays to cover indemnities that derive from definitive resolutions issued by a competent authority shall be understood **as an obligatory expenditure** up to the amount that must be paid in said year.

Below, both precepts are cited to provide greater clarity:

"Article 41 of the Law.- The draft Budget for Expenditures shall contain:
…

II. The draft Decree, the annexes and volumes, which shall include:
…

f) **A specific chapter that incorporates the expenditure forecasts that may correspond to obligatory expenditures: …"**
(Emphasis added)

"Article 57 of the Regulations. – For the purpose of article 41, fraction II, paragraph f) of the Law, the following shall be considered as obligatory expenditures:

VII. Outlays to cover indemnities and obligations that derive from definitive resolutions issued by a competent authority up to the amount that must be paid in said year, which shall be determined in accordance with article 47 of the Law."

The content of both precepts necessarily leads us to the conclusion that outlays to cover indemnities and obligations that derive from definitive resolutions issued by a competent authority must necessarily be incorporated in the forecasts of obligatory expenditures that comprise the budget of expenditures.

With what has been presented above, it is once again demonstrated that there is no violation of public policy when PEP is condemned to the payment of obligations and, in addition, it is accredited that the payment thereof is necessarily incorporated into the budget for expenditures; therefore the payment thereof is in conformity with the law and, above all, in harmony with constitutional principles.

By focusing on each one of the challenges raised by PEP with respect to specific claims, we see that, contrary to what is maintained by PEP, the violations indicated do not exist, as detailed below:

a) In resolving Technical Dispute 36, the precepts mentioned by PEP were not violated.

Articles 126 and 134 of the Constitution have not been violated, given that, from an integral reading of our Supreme Law, it can be inferred that the Constitution contemplates the existence of the State's responsibility. Likewise, the regulatory law of said articles and the Federal Law on Budget and Budgetary Responsibility contemplate the admissibility and the conditions under which the payment of the obligations charged to the State, as decreed in definitive rulings and resolutions must be paid.

For its part, article 70 of the Law on Acquisitions and Public Words has not been violated, given that this article refers only to the requirements and conditions that must be met by amendments to public works contracts that generate new obligations against federal resources. However, said rules are not applicable to the obligations to which PEP was condemned on the grounds of a contractual non-performance, which has been analyzed and determined by the Arbitral Tribunal.

Likewise, article 44, fraction III of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending has not been violated, given that, in the first place, it is not applicable to the arbitral award, given that it was revoked prior to when the arbitral award was made and also it is not going to govern the obligations to which PEP has been condemned. Now then, supposing (without conceding the point) that the article were applicable to the case that concerns us,

it has not been violated by reason of the fact that the arbitral award, which in turn orders its execution, constitute legal documents that allow for determining the obligation of making a payment in accordance with fraction III that has been cited.

Article 66, fraction III of the Regulations of the Federal Law on Budget and Budgetary Responsibility has not been violated either, given that the arbitral award and, in turn, the resolution of the competent judge ordering its execution, are legal documents that determine the obligation to make the payment of the obligations to which PEP has been condemned.  The foregoing can be shown from a full reading of said regulations, which provide for the form in which such obligations are to be met and charged to the budget.

For their part, articles 69 and 70 of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending have not been violated, given that, in the first place, they are not applicable to the arbitral award, given that they were revoked prior to when the arbitral award was made and also it is not going to govern the obligations to which PEP has been condemned.  Now then, supposing (without conceding the point) that the articles governed the case that concerns us, they refer to the formalities and requirements that must be met by orders and contracts in order for them to have the character of justifying a public expenditure.  Consequently, they are not applicable to the arbitral award.

Finally, article 29 of the Law on Acquisitions and Public Works has not been violated, given that this article refers only to the conditions and requirements that must be met in order for the State to contract for acquisitions, leases, services or public works; therefore said rules are not applicable to the obligations to which PEP was condemned on the grounds of a contractual non-performance that has been analyzed and determined by the Arbitral Tribunal.

      b)    In resolving Technical Disputes 34 and 35, the precepts mentioned by PEP were not violated.

In the first place, article 44 fraction III of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending has not been violated, given that, in the first place, it is not applicable to the arbitral award, given that it was revoked prior to when the arbitral award was made and, in addition, it is not going to govern the payment of the obligations to which PEP has been condemned.  Now then, supposing (without conceding the point) that the article were applicable to the case that concerns us, the article has not been violated for the reason that the arbitral award and the ruling that in turn orders its execution constitute legal documents that allow for determining the obligation of making a payment in accordance to fraction III of the precept just cited.

As for article 66, fraction I of the Regulations of the Federal Law on Budget and Budgetary Responsibility, it was not violated either in the arbitral award, given that this article refers to the rules that govern the payments of contractual obligations, therefore its regulation is not applicable to the penalty that has been imposed on PEP in the arbitral award, which is the result of a contractual non-performance and its fulfillment is governed by another series of articles that have already been enumerated and analyzed in paragraph "*c) Regulations of the Federal Law on Budget, Accounting and Federal Public Spending – now the Regulations of the Federal Law on Budget and Budgetary Responsibility – .*"

Finally, article 65 of the Law on Acquisitions and Public Works was not violated either, because, contrary to what PEP maintains, it is indeed contractually obligated to indemnify COMMISA on account of these claims, because PEP incurred omissions and delays that are imputable exclusively to it and, with respect to which it assumed its liability.

Also this determination cannot be reviewed in this instance by alleging some liability supposedly restricted by article of the already cited Law on Acquisitions and Public Works, because it is a fact that PEP may extend said liability contractually, just as said article makes reference to a hypothetical delay in which the other party has not in turn been obligated to make outlays in order to fulfill its obligations on the date originally agreed upon, just as occurred in the case that concerns us.

       c)    In resolving Technical Disputes 37 and 39, the precepts mentioned by PEP were not violated.

Article 126 and 134 of the Constitution have not been violated, given that, from an integral reading of our Supreme Law, it can be inferred that the Constitution contemplates the existence of the State's responsibility.  Likewise, the regulatory law of said articles and the Federal Law on Budget and Budgetary Responsibility contemplate the admissibility and the conditions under which the payment of the obligations charged to the State, as decreed in definitive rulings and resolutions, must be paid.

Article 44 fraction III of the Regulations of the Federal Law on Budget, Accounting and Federal Public Spending has not been violated, given that, in the first place, it is not applicable to the arbitral award, given that it was revoked prior to when the arbitral award was made and also it is not going to govern the obligations to which PEP has been condemned.  Now then, supposing (without conceding the point) that the article were applicable to the case that concerns us, it has not been violated

by reason of the fact that the arbitral award and the ruling that in turn orders its execution its execution, constitute legal documents that allow for determining the obligation of making a payment in accordance with fraction III that has been cited.

For its part, article 66 fraction III of the Regulations of the Federal Law on Budget and Budgetary Responsibility has not been violated, given that the arbitral award and, in turn, the resolution of the competent judge ordering its execution are legal documents that determine the obligation to make the payment of the obligations to which PEP has been condemned.  The foregoing can be shown from a full reading of said regulations, which provide for the form in which such obligations are to be met and charged to the budget.

Finally, article 57 of the Law on Acquisitions and Public Works has not been violated, given that this article refers to the types of contracts that exist in the area of public works, and this is not relevant for the purposes of the arbitral award.  It is important to recall that the grounds for nullity can refer only to those that are committed at the time the arbitral award is issued and not to substantive issues of fact.

More abundantly, article 57 refers to the concept of unit price, which was respected by the Arbitral Tribunal in its arbitral award, inasmuch as, based on the same, it determined the compensation to which COMMISA was entitled, with respect to the work carried and interpreting the characteristics of said work in relation to the unit prices agreed upon by the parties.

So then, it is evident that there exists no violation whatsoever in the arbitral award to the precept just cited.

d)  In resolving Technical Dispute 19, the precepts mentioned by PEP were not violated.

Article 70 of the Law on Acquisitions and Public Words has not been violated, given that this article refers only to the requirements and conditions that must be met by amendments to public works contracts that generate new obligations against federal resources.  However, said rules are not applicable to the obligations to which PEP was condemned on the grounds of a contractual non-performance, which has been analyzed and determined by the Arbitral Tribunal.

e)  In resolving Technical Dispute 27, the precepts mentioned by PEP were not violated.

Article 57 of the Law on Acquisitions and Public Works has not been violated, given that this article refers to the types of contracts that exist in the area of public works, and this is not relevant for the purposes of the arbitral award. It is important to recall that the grounds for nullity can refer only to those that are committed at the time the arbitral award is issued and not to substantive issues of fact.

Finally, PEP argues in its motion for nullity of the arbitral award that the legal system prohibits, in contracts and orders, the stipulation of contractual penalties and interest for late payment to be paid by the entities. In this respect, it should be pointed out that the penalty determined by the Arbitral Tribunal in favor of COMMISA was not the result of a conventional penalty or of interest for delay payment that was agreed upon, but rather for indemnity for non-performance of contractual obligations; therefore, there is also no legal violation whatsoever that might justify the nullity of the award as petitioned.

    4. <u>The Arbitral Award does not modify the Contract and, therefore, it does not violate Article 70 of the Law on Acquisitions and Public Works that is applicable.</u>

PEP calls into question the decisions made with respect to Technical Disputes 19 and 36 by alleging that, in them, the interpretation of the Arbitral Tribunal modifies the Contract, [thus] violating article 70 of the Law on Acquisitions and Public Works in failing to comply with the formalities provided therein.

**In relation to this point, PEP's reasoning is clearly incorrect and tendentious. The Arbitral Tribunal did not modify the Contract, it simply limited itself to applying and enforcing the agreement adopted by the parties.**

Indeed, the Arbitral Tribunal based itself on PEP's agreement itself in order to compensate COMMISA for any modifications in the Work Schedule.

As can be appreciated from the reading of the arbitral award (pages 51 to 60 with respect to technical dispute number 36; and pages 127 to 133 with respect to technical dispute number 19), the Arbitral Tribunal determined, after weighing the items of evidence and arguments of COMMISA and PEP, that PEP assumed the obligation of compensating COMMISA for any additional costs that the latter might incur, deriving from PEP's exercise of its right to reschedule the work.

At no time did the Arbitral Tribunal attempt to modify the obligations freely contracted by the parties, not to substitute itself for the intent of the parties or to establish terms and conditions different from those agreed upon. The Tribunal limited itself **to applying the contractual**

**provisions agreed upon by PEP and COMMISA, which the Arbitral Tribunal determined to be applicable in the specific case.**  Specifically, the Arbitral Tribunal determined that *"any modification in the schedule constitutes an extraordinary work, which must be compensated in accordance with clause 6.1 of the contract."*

In arguing that the Arbitral Tribunal "modified" the Public Works Contract, PEP tacitly but necessarily assumes that the Arbitral Tribunal erred in its assessment of the evidence and/or interpretation of the Contract.  In other words, PEP supposes that it was not obligated to compensate COMMISA for the additional costs deriving from the rescheduling of the work and that the Arbitral Tribunal ruled erroneously in resolving the contrary.  In a few words, it is challenging the determination of the facts and law made by the Arbitral Tribunal, under the pretext of a violation of public policy.

As they have defined on repeated occasions, the Mexican courts, the judicial authority that hears the execution of the arbitral ward and/or the petition for its annulment cannot review the facts of the case behind the arbitral award, but rather only the form.  In petitioning nullity on the basis of this argument, PEP is asking Your Honor to resolve, expressly or tacitly, that the Arbitral Tribunal erroneously assessed the proof offered and that its determination of the facts must be judicially reviewed.  As we pointed out, this is contrary to the provisions of the Code of Commerce on the subject (which permit only the annulment of the arbitral award in the cases indicated in a limitative manner in article 1457 of the Code of Commerce) and the jurisprudence of the Mexican courts, which expressly recognize that what has been resolved in substance by the Arbitral Tribunal cannot be challenged judicially:  in this sense, what has been resolved by the Arbitral Tribunal has the nature of *res iudicata (just as was mentioned when citing the isolated decision excerpt).*  **ARBITER.  HIS RESOLUTIONS ARE ACTS OF AUTHORITY, AND THEIR EXECUTION IS INCUMBENT ON THE JUDGE DESIGNATED BY THE PARTIES"** in paragraph C) of the present chapter VI.

In this same sense, it must be pointed out that the Mexican courts have clearly established the principle that the judicial authority may not review the facts of the case of the arbitral award; in other words, the determination made by the Tribunal of the facts disputed on the basis of the evidence and arguments offered by the parties:

**Record No.** 186229
Localization
Ninth Session
Instance:  Three-Judge Circuit Courts
Source:  *Semanario Judicial de la Federación* and its Gazette
XVI, August 2002
Page: 1317
Excerpt: XV. 1 o.50 C
Isolated excerpt
Case(s):  Civil

**ARBITRAL AWARD, ITS RATIFICATION BY ORDINARY JUDICIAL AUTHORITY AND THE ANALYSIS THEREFORE, IN AN "AMPARO" CASE, DOES NOT PERMIT THE STUDY OF ITS MEANING WITH RESPECT TO THE FACTS OF THE CASE.** An arbitral award is the decision of a non-state body, thus convened by the parties to resolve a dispute, whether present or future, for the effects of the ordinary instance, it is left to the exclusive power of decision of the arbitral tribunal and it comes to be an extension of that intent, which, since it is an act of private persons, with respect to its sense, it is not subject to constitutional review; nonetheless, such a constitutional review can occur with respect to the resolution of ratification issued by a state judicial body, which, of course, shall limit itself to the result of the analysis of the proper composition of the arbitral tribunal, the proper procedure, the manifestation of the intent of the parties to submit to the arbitration, of the matter thereof and the other suppositions contemplated in article 1462 of the Code of Commerce, suppositions, which, as it noted, contemplate only issues of form and <u>not</u> of fact, and, once the ratification has been given to the acts enforcement whereby the Judge assists in the enforcement of the arbitral award; therefore in the "amparo" proceeding, only these issues may be alleged and not those related to the facts of the case and the sense of the arbitral award. The foregoing is confirmed with the decision sustained by the Third Court of the previous session of the Supreme Court of Justice of the Nation, in the isolated excerpt, published in the *Semanario Judicial de la Federación,* Fifth Session, Volume XXXVIII, page 801, under the heading "ARBITRATION," in which it considers that **arbitration is a convention that the law recognizes, which constitutes a waiver of the private individuals for the judicial authority to hear a dispute;** therefore it has negative procedural importance, inasmuch as the parties entrust the decision of their conflicts to one or more private individuals, called arbitrators; nonetheless, they are not officials of the State and they do not have proper or delegated jurisdiction[n], and their powers derive solely from the will of the parties, expressed, in accordance with the law and, while the arbitration decision cannot be revoked at the will of one of the interested parties, it is not executive in itself, because it can only be considered as a word of the legal logic that is accepted by the State; therefore it can be enforced only through an act carried out by a jurisdictional body, which, without taking away its private nature, assumes its content and it is then that it is put on the same level as a jurisdictional act. Nevertheless, **Judges are not authorized to revise arbitral awards in an integral manner, because, otherwise they would be able to nullify them, even for issues of fact; for this purpose it would be necessary for the parties to appear first before the Judge to present to him the debate, and the system generally adopted, if the violation contained in the arbitral award transgresses public policy, means that the Judge must not order its enforcement, but if it only is prejudicial to private interests, the Judge must order its enforcement;** and once decreed judicially, its enforcement is raised to the category of a jurisdictional act and it is then that the one disadvantaged may have recourse to

---

[n] *Translator's note:* The Spanish language has two terms that correspond to the abstract meaning of the English term "jurisdiction." The more common and general word is "competencia." The word "jurisdicción," which is the word that appears here, is the power of a court to render decisions that have the force of law.

the federal courts with a petition of "amparo," which must be processed in a procedure involving two instances, as is noted in jurisprudence number 32/93 of the Third Court of the previous session of the Supreme Court of Justice of the Nation, published in the Gazette of the *Semanario Judicial de la Federación,* volume 72, December 1993, page 41, under the heading: "ARBITRAL AWARD, AGREEMENTS OF RATIFICATION AND ENFORCEMENT OF. AGAINST IT A SUIT FOR INDIRECT "AMPARO" IS ADMISSIBLE, PURSUANT TO ARTICLE 114, SECTION III, OF THE LAW ON "AMPARO," BUT NOT THE DIRECT "AMPARO" TO WHICH ARTICLE 158 OF THE SAME LAW ALLUDES.

FIRST THREE-JUDGE COURT OF THE FIFTEENTH CIRCUIT.
"Amparo" in review 138/2002. Mecalux, México, S.A. de C.V., May 28, 2002. Unanimous ruling. Judge who wrote the decision: Pedro Fernando Reyes Colín. Clerk: Ángel Rodríguez Rico."

This same precedent clearly establishes that the arbitral award must be executed whenever it harms exclusively private interests and that, on the other hand, it is considered that the arbitral award is contrary to public policy whenever it harms public interests. In this sense, there is room for the argument that PEP is a semi-government entity or an entity of the centralized public administration, with its own personality and assets and which acts in trade.

An arbitral award that orders PEP to make compensation for the additional costs deriving from a decision freely adopted by PEP in the context of a commercial relationship (the one deriving from the Public Works Contract), of a contract signed by PEP as a commercial private entity (i.e., not exercising a function or faculty proper to the State) cannot be considered as contrary to public policy. In accordance with this principle, it is evident that the arbitral award whose nullity PEP is seeking, does not harm public policy, because it affects merely the asset interests of PEP, deriving from its actions as an entity under private law in the conduct of business activities, as has been abundantly explained in the immediately preceding number.

   5. – The penalties contained in the Arbitral Award do have contractual foundation and do not refer to payments not provided for in the Contract

The plaintiff bases its claim for nullity of the arbitral award on the fact that the amounts to which it was condemned with respect to the claims related to technical disputes 27, 37 and 39 were not provided for in the contract as such and, for this reason, did not have any contractual support, which violates public policy.

Such assertions by the plaintiff are lacking in foundations and therefore are incapable of causing the partial nullity of the arbitral award.

As has been maintained throughout this response to the petition, the arbitral award is annullable only in conformity with the causes provided in the various fractions of article 1457 of the Code of Commerce.

The article of reference does not contemplate as a cause for nullity the incorrect interpretation or applications of the contractual or legal provisions on the part of the arbitral tribunal.  The system for challenging commercial arbitral awards, in accordance with Mexican law, cannot contemplate as a cause for nullity any error or incorrect assessment of the law.

This is precisely what the plaintiff alleges in determining that the arbitral tribunal condemned PEP to pay indemnities not contemplated in the contract.  Therefore, it is not possible to consider such assertion as a valid cause for the nullity of the arbitral award.

But, in addition, apart from the foregoing, supposing that said issue were analyzable as a cause for nullity of the arbitral award, it is deemed that reason is not on the plaintiff's side by virtue of the fact that the payments of reference to which it was condemned in the arbitral award are indemnities for instances of contractual non-performance.

From the analysis of said claims and the determination of their admissibility in the arbitral award, it is clear that the support of the claims for indemnification on the part of COMMISA against PEP do have contractual supports.

In the case of claims 37 and 39, in accordance with the bases of the call for tenders, it can be noted that the bases deal with instances of contractual non-performance on the part of PEP in relation to ducts and crossings.

The bases for the tender of bids, which form an integral part of the contract, provided that PEP was obligated to provide correct information with respect to the conditions of the sea bed where COMMISA was supposed to install the ducts of reference.

PEP provided incorrect information with respect to the sea bed, which forced COMMISA to carry out additional work.  The fact of providing incorrect information caused harm to COMMISA.

The same occurs with respect to the claim related to technical dispute number 27, which consisted in an indemnity for wait times of the vessel designated as "Castoro 10" while it carried out work on the platform and the ascending ducts.

As can be inferred from the arbitral award, PEP failed to fulfill the contract by virtue of the fact that, in the midst of the execution of the work, it ordered COMMISA to carry out additional work with said vessel on the platform and ascending ducts, despite the fact that the original contract did not provide for this as a task to be carried out by said vessel.  This caused COMMISA to incur additional costs on account of the change in the plans by PEP; PEP never recognized said expenses in favor of COMMISA.

In accordance with Mexican law, everyone that causes harm to another on account of non-fulfillment of an obligation is obligated to the reparation of said harm.

Even if it were true that the parties did not provide for a specific indemnity for such harm in the contract, this does not imply that the arbitral tribunal exceeded its powers for the two reasons pointed out.

The first of these consists in that there did exist the contractual obligation for PEP to provide the correct data about the sea bed.

In addition, in any case, the law, the Federal Civil Code, which is applicable as substantive law, provides as a natural clause of all contracts the obligation of indemnification on the basis of an instance of harm.

Finally, as can be inferred from annex C of the contract, the parties agreed upon the possibility and their obligation to pay for additional work.

For these reasons, it must be considered that such assertions of the plaintiff are likewise lacking in support for the annulment of the arbitral award.

> 6. – The arbitral award correctly applies the contractual and legal provisions of a civil nature and, apart from this, its determinations in this respect cannot be considered to be violations of public policy.

As was already clarified in paragraph B) of the present chapter, despite the fact that PEP initially alleges that the Contract cannot be interpreted by applying the provisions of Civil Law, subsequently, contradicting itself, it alleges that the arbitral award is contrary to public policy, precisely because it does not apply said provisions.

Thus PEP's position in this respect consists in asserting that in all those cases in which the determination of the Arbitral Tribunal resulted in an order contrary to its interests, it [i.e., the determination] incorrectly applied the applicable provisions and principles of Civil Law and, for this reason, public policy was violated.

Evidently, this position of PEP is incorrect, given that a simple disagreement over the interpretations on the substantive matter that are found in the arbitral award cannot, under any excuse (such as those invoked by PEP) serve to support a review on the facts of the case.  We reiterate that the cause for nullity are restrictive and, above all, that the arguments intended to support the violation of public policy cannot be used as an excuse in order to review the legal interpretations and the evidentiary evaluations contained in the arbitral award.

In this order of ideas, PEP attempts to support its deceitful claim that the Judge should enter into the study of the facts of the case, by basing itself on a supposedly existing bibliographical reference in an article entitled *"Public Policy as grounds for denying the recognition and execution of international arbitral awards"* by the expert José Luis Siqueiros[17].  However, from a simple reading of this article, one cannot infer any opinion that would conform to its attempt and, on the contrary, Siqueiros adopts a much more restricted vision of the topic of the analysis of "public policy.," maintaining that it can be considered as a cause for the nullity of an arbitral award in exceptional circumstances and under an analysis that he makes concerning an international and not a local perspective, since there's a tendency that exists in the world to favor the efficiency of arbitration and the execution of the corresponding arbitral award.  In this respect, the cited author maintains the following:

> "Accepting that jurisprudential precedents on the national and universal level have not been unanimous in this matter, **it can be affirmed that the current tendency favors the execution of the arbitral award**.  The European Court of Justice, in a recent ruling, decided:
>
> "… **it is in the interest of the efficiency of the arbitral process that the challenging of arbitral awards should be limited in their scope *and their nullity or the refusal to recognize them should be possible only in exceptional circumstances*."**
> …
>
> As has been indicated previously, the judicial authority of the State that is requested to recognize and execute the foreign arbitral award, must apply the principles of ***international public policy***, exactly as it is conceived in that State. **By virtue of this, it must ignore those principles that are esteemed as**

---

[17] SIQUEIROS, José Luis.  *El orden público como motivo para negar el reconocimiento y ejecución de laudos arbitrales internacionales*, Jurídica, no. 32, April 2003, Mexico City, pp. 45-58.

**fundamental in the context of the law that regulates the contract, or of the applicable law of the place of its fulfillment;** nor should it consider the law in effect in the seat of the arbitration.  These three alternatives were available for the arbitral tribunal that issued the arbitral award, but they are not accessible to the judge who analyzes their execution.[18]"

(Emphasis added)

In relation to what is indicated in this last paragraph, it is important to see, in Siqueiro's opinion, how the judge who hears the motion for the nullity of an arbitral award must consider only the principles of international public policy in order to render his ruling, while ignoring those fundamental principles derived from the law that is applicable to the contract or the law of the place of its fulfillment.

This internationalist position of the expert Siqueiro is unanimously shared by domestic and foreign doctrine; for this reason it is contradictory and paradoxical for PEP to attempt to base its deceitful claim on this opinion, which merely reflects the temerarious character of its petition.

On the other hand, in referencing the recommendations of the International Commercial Arbitration Commission of the "International Law Association," whereby public policy should be considered in the light of a motion for the nullity of an arbitral award, José Luis Siqueiros himself relates as applicable, among others, the following rules:

2(c) Whenever one of parties might have opposed the pronouncement of an arbitral award on the basis of a fundamental principle, but did not do so, he shall not have the right to invoke it later as a ground for refusing the recognition and the enforcement of the arbitral award already issued.

3(a) The violation, by one side, of a mere "imperative norm" (i.e. a norm that is imperative, but that does not form a part of the international public policy of a State, to the extent that its application to the specific case is not obligatory), shall not constitute an obstacle for the recognition and enforcement of the award, even when said norm is an integral part of the law of the forum, of the law that governs the contract, of the law in effect in the place of the fulfillment of the contract or of the law that governs in the place of the arbitration.

……

[…] The "public law," a notion that is very similar to public policy, is also not a concept that is synonymous with the latter.  The latter refers to fundamental principles.[19]

---

[18] *Ibidem*, p. 46 and 47.

[19] *Ibidem*, p. 49 and 50.

As can be observed, the concept of public policy is strictly limited in terms of the restrictive role of the judge who hears a petition for the nullity of an arbitral award.  In fact, it is even maintained that, if the plaintiff had the opportunity to allege this supposed violation of public policy in the arbitral procedure, which, in this case, it could have clearly done, by filing an exception that would avoid the payment of the amount owed charged to it, it does not have the right to allege that, on the basis of said defense, the arbitral award already made should not be enforced or recognized.

In this context, and apart from the fact that they cannot be subject to review in this instance, it will be specifically shown below that the supposed violations of Civil Law alleged by PEP turn out to be unfounded.

a)    Article 14 of the Constitution was not violated in resolving Technical Dispute number 36.

Article 14 of the Constitution is not applicable to arbitral awards because this involves a precept that is binding only on state courts.  The rules according to which an arbitral award must be issued in the case that concerns us are those contemplated in the Rules of Arbitration of the International Chamber of Commerce; therefore the arguments of the plaintiff are not admissible, in the sense that supposed inaccuracies in the application of the civil legislation within the arbitral award are contrary to public policy.

More abundantly and apart from the foregoing, it can be pointed out that, from a simple reading of the final arbitral award, on pages 51 to 60, it can be seen that the Arbitral Tribunal did carry out a valid legal line of reasoning in order to support its conclusions and determinations; for this reason there is not present any ground for nullity whatsoever.

b)    In resolving Technical Disputes 34 and 35, the Arbitral Tribunal correctly applied the provisions relating to the causing of damages in order to penalize PEP.

Once again, in relation to this claim, PEP alleges that the Arbitral Tribunal violated public policy by not duly providing grounds and foundations to its order for payment of damages.

In the face of this argument, we reiterate that the arbitral award is not an act of authority to which the requirements of due foundation and legal grounds established by article 16 of the Constitution

are applicable or required.  As is explained subsequently, in paragraph F) of the present chapter VI, the requirements that must be met by the arbitral award are derived from the Rules of Arbitration of the International Chamber of Commerce that basically requires that the determinations contained in the arbitral award should be reasoned.

Once again, from a reading of the arbitral award on pages 36 to 51, it can be seen that the Arbitral Tribunal did reason its determination, just as required by the Rules of Arbitration of the International Chamber of Commerce.

Therefore, PEP's argument that the decision on the damages related to Technical Disputes 34 and 35 is not duly founded and grounded in the corresponding articles of the Civil Code is inadmissible, given that said argument is not among the grounds for nullity of an arbitral award, because this would involve reviewing the facts of the decision, without the existence or the accreditation of any violation of any true principle of public policy.

Apart from the foregoing and still within the incorrect focus that PEP attempts to give to the obligation to reason out the arbitral award, it can be pointed out that this obligation is met by clearly specifying the reasons that the Arbitral Tribunal had in order to rule in a given sense, while it is not required, as PEP claims, for an exhaustive analysis and an interminable and pointless citation of legal principles to be made.  In this sense, it is sufficient for the decision to be explained, reasoned and justified in order for the arbitral award to be valid (and it does not even matter whether or not said reasons are correct for a third party or even for the State Court).

In this context, and even though the standard of due foundation and legal grounds required by the Mexican Constitution is not required for an arbitral award, it should be mentioned that even said standard is interpreted by our highest courts as a flexible requirement that has more to do with its finality (to allow for the adequate defense of the parties) than with formalisms or citations of precepts.  In this respect, the following binding jurisprudence is applicable:

Record No.  175,082
Jurisprudence
Case(s):  Common
Ninth Session
Instance:  Three Judge Circuit Courts
Source:  *Semanario Judicial de la Federación* and its Gazette
XXIII, May 2006
Excerpt: 1.4o.A J/43
Page:  1531

**FOUNDATION AND GROUNDS, THE FORMAL ASPECT OF THE GUARANTEE AND ITS FINALITY TRANSLATE INTO EXPLAINING, JUSTIFYING, MAKING THE DEFENSE POSSIBLE AND COMMUNICATING**

**THE DECISION.** The formal content of the guarantee of due process provided for in article 16 of the Constitution relating to foundation and grounds has as its primordial purpose and rationale that the accused should know the "reason why" of the authority's conduct, which translates into informing him in detail and in full the essence of all the circumstances and conditions that determined the act of intent, in such a manner that it will be evident and very clear for the one affected to be able to question and dispute the merit of the decision, thus allowing him a real and genuine defense. Therefore, it is not sufficient for the act of authority to merely observe a *pro forma* but incongruous citing of grounds, which would hinder the finality of knowledge, verification and relevant defense, **nor is it valid to require of it a superfluous breadth or abundance, because the expression of what is strictly necessary to explain, justify and make possible the defense, as well as to communicate the decision is sufficient in order for it to be considered duly founded and grounded**, by setting forth the facts relevant for deciding, by citing the habilitating norm and a minimum but sufficient argument in order to accredit the reasoning from which it deduced the relationship of logical relevance of the facts to the law that is invoked, which is the application of the facts to the case.

FOURTH THREE-JUDGE PANEL COURT FOR ADMINISTRATIVE CASES OF THE FIRST CIRCUIT.

Direct "amparo" 447/2005. Bruno López Castro, February 1, 2006. Unanimous vote. Judge writing the decision: Jean Claude Tron Petit. Clerk of the Court: Claudia Patricia Peraza Espinoza.
"Amparo" in review 631/2005. Jesús Guillermo Mosqueda Martínez. February 1, 2006. Unanimous vote. Judge writing the decision: Jean Claude Tron Petit. Clerk of the Court: Alma Margarita Flores Rodríguez.
Direct "amparo" 400/2005. Pemex Exploración y Producción. February 9, 2005. Unanimous vote. Judge writing the decision: Jesús Antonio Nazar Sevilla. Clerk of the Court: Ángela Alvarado Morales.
Direct "amparo" 27/2006. Arturo Alarcón Carrillo. February 15, 2006. Unanimous vote. Judge writing the decision: Hilario Bárcenas Chávez. Clerk of the Court: Karla Marianna Márquez Velasco.
"Amparo" in review 78/2006. Juan Alcántara Gutiérrez. March 1, 2006. Unanimous vote. Judge writing the decision: Hilario Bárcenas Chávez. Clerk of the Court: Mariza Arellano Pompa.

c)    In resolving Technical Disputes number 37 and 39, the Arbitral Tribunal correctly applied the provisions relating to adequate compensation for PEP.

PEP, in the same context as the foregoing points, alleges that the Arbitral Tribunal is incorrectly applying the contractual and legal provisions of the case when it does not recognize that the payments made by PEP to COMMISA on the basis of Technical Disputes 37 and 39 constituted an undue payment that could not be used to justify the amount of the compensation owed to COMMISA.

This argument once again turns out to be inadmissible, because it refers to decisions and issues of the facts of the case of the Arbitral Tribunal and in no way can they be characterized as a violation of Mexican public policy.

# EXHIBIT 2 (PART 3)

d)    In resolving Technical Dispute number 27, the Arbitral Tribunal correctly applied the provisions relating to the consent manifested by PEP about the treatment that had to be given to the differences between the applicable fees and those claimed by COMMISA.

Again PEP mentions that the Arbitral Tribunal made its ruling without correctly applying article 1805 of the Civil Code relating to the consent given by said entity to certain payments for differences in rates and, for this reason, the guarantee of exact application of the Law consecrated by article 14 of the Constitution was violated.

As we have pointed out previously, since article 14 of the Constitution is not applicable to arbitration because it does not involve a judicial procedure that culminates in an act of authority, any argument in which PEP alleges the inexact application of provisions of a civil nature turns out to be inadmissible, since the inexact or incorrect interpretation of civil law is not provided as a ground for nullity.

We once again reiterate that the substance of the arbitral award cannot be reviewed at the time that the nullity of the arbitral award is petitioned, by alleging as a pretext that the decisions or lines of reasoning contained therein are contrary to public policy, **because they were erroneous in the judgment of one of the parties**. It is necessary, in this sense, for the existence of a specific violation of public policy to be proven; the allegation of a correct [sic][o] legal analysis is unable to be taken into consideration in and on itself as a violation of public policy as claimed by the plaintiff.

By virtue of this, this argument by PEP must be rejected.

e)    In resolving the order concerning Financial Expenses, the Arbitral Tribunal correctly applied the contractual and legal provisions.

PEP alleges that, if COMMISA did not estimate the work (that gave rise to the financial expenses) in a timely manner, it does not have a right to make a claim for financial expenses and, for this reason, the order violates public policy because Civil Law is not applied in a correct and strict manner, since the Contract is not interpreted adequately and also [since] there is a capitalization of interest penalty imposed.

In relation to PEP's first argument in the sense that, in the arbitral award, international public policy is violated, because COMMISA is allowed to take advantage of its own deceit, because it obtains an order in its favor of payment of financial expenses, despite the fact that, according to

---

[o] *Translator's note:* The sense of the argument suggests that the intended word here should have been "incorrect," not "correct."

PEP, it did not comply with the procedure of prior estimates of its claims; this once again turns out to be inadmissible because it constitutes a ruling on substance by the Arbitral Tribunal, which cannot be reviewed in this instance.

More abundantly, the "pretext of public policy" used on this occasion, whereby the arbitral award supposedly is favoring and rewarding some supposed deceitful action by COMMISA, turns out to be inadmissible.

Indeed, the concept of deceit given by the Federal Civil Code that is of supplemental application to the commercial matter that is the object of the contract that generated the dispute resolved by the final arbitral award and that is contained in article 1815 establishes the following:

> **"Article 1815.** – Deceit in contracts is understood as any suggestion or artifice that is used in order to lead into error or to keep in error any one of the contracting parties; and through bad faith, the dissimulation of the error of one of the contracting parties, once it is known."

In accordance with the concept cited above, Your Honor may note that at no time did PEP prove that COMMISA had carried out any act to mislead PEP, or to keep it in error, or much less to mislead the Arbitral Tribunal or to keep it in error.

Likewise, according to what is provided by the Federal Civil Code, applicable to the specific case, deceit as acting by any person is an element that cannot be presumed, as PEP lightly and presumptuously holds, but rather it must be fully proven to the degree that there exists no doubt that there existed an intention to cause harm to someone else, which, it is insisted, PEP never proved. This is confirmed in the judicial precedent that is cited below:

> **Record No.** 185,014
> Isolated excerpt
> Case(s): Civil
> Ninth Session
> Instance: Three-Judge Circuit Courts
> Source: *Semanario Judicial de la Federación* and its Gazette
> XVII, February 2003
> Excerpt: V. 1o. 25C
> Page: 967

> **ACTION FOR INDEMNITY ON ACCOUNT OF THE ABUSIVE EXERCISE OF A RIGHT. ITS ELEMENTS.** Article 1912 of the Federal Civil Code, which establishes: "Whenever, in exercising a right that causes harm to another, there is an obligation to indemnify it, if it is demonstrated that the right was exercised solely for the purpose of causing the harm, without utility to the holder of the right," accepts in its terms the doctrinal thesis of the abuse of rights of Julien Bonnecase, which holds that the true notion of the abuse of a right is reduced to

its psychological form, as the exercise of a right without utility for its holder and with a purpose that is exclusively injurious and is composed of four elements. The first element consists in the power of action, represented by a right that an organization receives from the lawgiver, in some way material, with respect to which its holder may strictly limit itself with the secret intention of making use of it solely to harm another person.  The second refers to the absence of all utility derived from the exercise of the right, this being understood as the absence of all "serious and legitimate interest," in which the courts should not easily admit, on the grounds of its exercise, the absence of all utility for its holder; in other words, they must not limit themselves to noting the lack of current interest, but rather foresee the future and examine whether the act, momentarily bereft of utility, is likely to produce it in the future.  The third element involves the injurious intention in its psychological sense; in other words, as we understand it, which constitutes the essential characteristic of the notion of abuse of a right: the <u>injurious intention must be absolutely characterized and be absorbed **into the notion of deceit under common law**; in other words, into the intention to harm, the materialization of which does not have any doubtful meaning and reveals the intention with which it has been carried out</u>.  And, finally, the harm caused to another person, an element that is absolutely necessary, which, in the order of the procedure, is the first one to appear and which leads to verifying the existence of the other elements, which is where it exhausts its role, and does not reappear until the moment of evaluating the amount of the reparation owed (*Tratado Elemental de Derecho Civil ("Elementary Treatise on Civil Law")*. Volume I. Bonnecase, Julien.  Editorial Harla, Mexico City, Federal District, 1997, pages 824 to 827).  Consequently, there shall be room for the indemnification for the abuse of a right, as long as the elements pointed out are present; namely the exercise of a right, the injurious intention in the exercise of the right, the absence of utility for the holder of that right and the harm caused to another person; because it cannot be considered that there was an abusive exercise of a right whenever, despite the injurious intention of the holder to harm another, its exercise brings about a benefit in its favor; or else, whenever, without the existence of that benefit for its holder, there is no intention to bring about the harm that is caused.

FIRST THREE-JUDGE COURT OF THE FIFTH CIRCUIT

Direct "amparo" 6/2002.  Pesquera Mare, S.A. de C.V., October 14, 2002.  Unanimous vote.  Judge writing the opinion: Mario Pedroza Carbajal.  Clerk of the Court:  Laura Catalina Maldonado Arce."

(Emphasis added)

In terms of what has been set forth above, we can conclude that PEP at no time showed in what consisted the deceit it imputes to COMMISA on the subject of the financial expenses to which the Arbitral Tribunal finally condemned [PEP] in the arbitral award that is the object of the present procedure for nullity.  This lack of evidence is sufficient in order for Your Honor to declare as inadmissible the argument set forth PEP as a supposed ground for the nullity of the arbitral award.

Now then, the fact that the Arbitral Tribunal resolved in its final arbitral award to issue a penalty for financial expenses against PEP, apart from the question as to whether or not COMMISA strictly complied with the procedure for the integration of previous estimates, this is a topic of the substance and the interpretation of the Contract, which goes beyond the analysis to which Your Honor should be subject, with respect to the present motion for nullity.

Moreover, in relation to the supposed violation of the prohibition contained in article 2397 of the Federal Civil Code an article 363 of the Code of Commerce, because supposedly in the arbitral award, PEP is being condemned to capitalize interests, it should be pointed out that this is not supported even in the very arguments of the plaintiff.

From a reading of the petition for nullity, it can be noted that PEP does not explain its theory as to why the arbitral award condemns it to capitalize interest.  On the contrary, from the arbitral award (pages 169, 174) it can be inferred that the Arbitral Tribunal determined that the applicable contractual provision was clause 3.8.6 of the Contract, which establishes that "in the event of a delay in the payments of estimates and adjustments of costs, PEP, at the request of the Contractor, shall pay financial expenses according to a rate that shall be equal to the one established in the Federal Law on Income in the cases of extension for the payment of tax liabilities..." in relation with clause 3.8.8 that releases PEP from paying financial expenses, whenever PEP legitimately suspends the payment of the estimates.

From these precepts, and also from the resolution points of the arbitral award, it cannot be seen that there is any need to capitalize interest, as PEP alleges erroneously and without foundation.

In this order of ideas, the fact that the interest must be paid at the same time as the principal and that they are caused on a daily basis until said payment is verified, in no way implies any supposed capitalization of interest, as PEP is attempting to maintain.

Consequently, these arguments for the supposed nullity of the arbitral award also turn out to be baseless and inadmissible.

7. – <u>The determinations contained in the arbitral award are not inconsistent</u>.

The arguments advanced by PEP when it suggests that the arbitral award is contrary to public policy since it is lacking in foundation – as it does on page 32 of its motion for nullity – turn out

to be inadmissible, given that, in accordance with article 25 of the Rules of Arbitration of the International Court of Arbitration of the International Chamber of Commerce, the Tribunal is only obligated to reason its arbitral awards, but not to comply with the constitutional guarantee of due legal foundation and grounds, because it does not involve an act of authority for which said requirement is imposed on it.

Now then, in relation to the grounds, these should be understood as the circumstances, reasons or causes of fact that led the Tribunal to decide in a certain direction with compliance with the applicable law.

In the specific case, Your Honor may observe that the arbitral award, in each Technical Dispute that it analyzes, takes into account, examines and studies: (i) the positions and arguments of the parties; (ii) the facts proven; and (iii) makes an overall analysis of the records.

Once the foregoing had been done and fulfilling the requirements of justice and impartiality established in article 15 of the Rules of Arbitration of the International Court of Arbitration of the International Chamber of Commerce, the Tribunal arrives at a conclusion that is reasoned and grounded.

The fact that the arbitral award clearly and succinctly set forth the grounds, steps and lines of reasoning that led the Tribunal to make a certain resolution is evidence of the consistency with which the arbitral award has been issued.

Indeed, the arbitral award is consistent and was issued in conformity with legal logic.

The Courts of our country have determined what should be understood by the principle of consistency – which must be present in every resolution -, below two excerpts of jurisprudence are cited:

> **"CONSISTENCY.   PRINCIPLE OF, IN THE RULING.**   Consistence <u>means connection or acceptance in the face of the grounds of disagreement or claim</u> and the concession that judge makes to this; in other words, conformity with respect to extent, concept and scope between what was resolved by the jurisdictional body and the petitions, responses and other assertions made in a timely manner by the parties.
>
> THIRD THREE-JUDGE COURT OF THE SECOND CIRCUIT
>
> Direct "amparo" 313/80.  Guillermo Toledo Castillo, May 31, 1989.  Unanimous vote. Judge writing the opinion: María del Carmen Sánchez Hidalgo.  Clerk of the Court: Maria Concepción Alonso Flores.

Record no. 228,210.  Isolated excerpt.  Eighth Session, January to August 1989"

(Emphasis added)

**"PRINCIPLE OF CONSISTENCY.    THAT MUST PREVAIL IN EVERY JUDICIAL RESOLUTION.**  In every judicial procedure care must be taken to fulfill the principle of consistency when the dispute set forth is resolved, which essentially refers to that the ruling must be consistent not only with itself, but also with the dispute, which hinges on the condition that, in the resolution of the conflict, what is presented by the parties receives attention, without omitting anything or adding issues that have not been raised, or contain considerations contrary to one another or to points of the resolution.

FIRST THREE-JUDGE COURT FOR ADMINISTRATIVE MATTERS OF THE FIRST CIRCUIT.

"Amparo" in review 731/90.  Hidroequipos y Motores S.A., April 25, 1990. Unanimous vote.  Judge writing the opinion: Samuel Hernández Viazcán. Clerk of the Court:  Aristeo Martínez Cruz.

Note:  This criterion became a part of jurisprudence I.1o.A J/9, published in the *Semanario Judicial de la Federación* and its Gazette. Ninth Session. Volume VIII, August 1998, page 765, under the heading "PRINCIPLE OF CONSISTENCY. THAT MUST PREVAIL IN EVERY JUDICIAL RESOLUTION."

Register No. 224,049.  Eighth Session.  Instance:  Three-Judge Circuit Courts. January 1991."

From both criteria it can be inferred that, in order for a resolution to be consistent, it must be:

(i)     Consistent in itself and also with the dispute;

(ii)    Issued on the basis of what has been presented by the parties;

(iii)   Exhaustive in the sense that it includes all the issues presented by the parties;

(iv)    Issued on the basis of a connection between the claims and determinations made by the one judging.

In this sense, we can observe that **the arbitral award is consistent**, given that it meets the requirements of the principles of consistency.

In this sense, Your Honor can perceive that said guarantees were respected for the parties at every moment during the arbitral procedure, as can be inferred from the arbitral award, in which there is a record of: (i) a due summons to PEP; (ii) a period for evidence granted to the parties for the offering

thereof; (iii) a period for presenting arguments and, in general, respect for the right of equality that the parties have in order to prove their claims and defenses in the procedure.

As a consequence of what has been set forth, it must be concluded that the arbitral award adheres to law and, consequently, it is not contrary to public policy, inasmuch as it was: (i) duly grounded, (ii) consistent; and (iii) issued while observing due process.

E)    IN THE ARBITRAL AWARD THERE WAS NO INFRINGEMENT AGAINST THE ARBITRATION AGREEMENT, BECAUSE THE CONFLICTS THAT IT RESOLVES ARE INDEED CONTEMPLATED THEREIN AND DO NOT GO BEYOND ITS SCOPE

The other legal argument on which PEP bases its petition for nullity is centered on alleging that the resolution of technical disputes 36, 34, 35, 19 and 27 is outside the scope of the arbitration clause, because they did not meet the formal requirements established by clause 23.2 of the Contract and, for this reason, the Arbitral Tribunal exceeded its authority when it ruled on them, and for this reason, according to PEP, paragraph c), fraction I of article 1457 of the Code of Commerce applies.

In an unclear and inconsistent manner, the same argument is repeated in relation to the supposed nullity of the penalty of financial expenses, in order to allege a supposed violation of the rules of arbitral procedure because, according to PEP, a claim is being resolved that is not included within the scope of the arbitration clause.

In addition, once again justifying itself in this supposed ground for nullity, PEP takes advantage in order to again set forth its arguments on the facts of the case with respect to the inadmissibility of the claims of the aforementioned technical disputes raised by COMMISA in the arbitration, with the clear and inadmissible intention to get Your Honor to analyze them again, as though it were a matter of an appeal against the arbitral award.

Below it will be demonstrated in detail how PEP's arguments on this issue are inadmissible, unacceptable and unfounded:

 1. – <u>PEP consented and ratified its consent for the Arbitral Tribunal to hear and to resolve the claims of COMMISA and, consequently, this ground for nullity is inadmissible.</u>

As was clearly explained in Chapter III of the present Response (relating to the decision of the Arbitral Tribunal on its own jurisdiction), PEP tacitly consented to the jurisdiction of the Arbitral Tribunal to hear and rule on all the disputes presented to it by COMMISA, because it did not challenge at the proper time and in the proper form (within the time limit of one month provided by article 1432 of the Code of Commerce), the decision adopted by the Arbitral Tribunal in that respect.

In this order of ideas, it is important to point out, as was pointed out in paragraph d) of the cited Chapter III, PEP consented during the arbitration that COMMISA could submit to the Arbitral Tribunal the resolution of the technical disputes identified under numbers 36, 34, 35, 37, 39, 19 and 27.

In addition, not only did PEP consent to the foregoing during the arbitration procedure, but it also ratified said consent when it did not challenge the decision contained in the mission statement concerning the jurisdiction of the Arbitral Tribunal within the legal time limit of one month that it had for this purpose.

Under this context, PEP's argument whereby the decision on the petitions filed by COMMISA in the arbitration falls outside the scope of the arbitration now turns out to be clearly unacceptable; for this reason, this ground for nullity invoked must be rejected by Your Honor.

> **2.-** In accordance with clauses 23.2 and 23.3 of the Contract, the fact of not setting forth the technical dispute in accordance to procedure does not imply that the conflicts that may have subsisted in relation to said issues are not capable of being arbitrated.

PEP alleges that the demands presented by COMMISA during the arbitration did not meet the formal requirements to be considered as Technical Disputes and, consequently, according to it, there was no contractual foundation for the Arbitral Tribunal to rule on them.

The agreement of the wills of the parties in a contract to submit all their disputes to the alternative methods for the solution of disputes is extremely common in the modern business world.

Likewise it is very common for the parties to agree, in their contracts, on methods for the solution of conflicts that will allow them to reach an agreement before having to submit the dispute to a process of resolution by an outside party, which is what arbitration is.

However, one should not lose sight of the fact that both types of procedures, arbitration and those procedures known as mediation or conciliation are distinct and their consequences and scope are not procedurally set against one another.

In the procedures known as mediation or else conciliation, the parties agree to commit themselves to submitting to a specific procedure in which a third party with powers of mediation and conciliation intervenes in order to get the contracting parties to resolve disputes on their own and to reach an agreement.

These types of procedures are usually agreed upon in extremely complex contracts, in which there are a large number of bilateral obligations agreed upon, normally to be carried out over the course of time and, generally, the fulfillment of some is dependent on the prior fulfillment of the others, all directed to the fulfillment of a specific goal, such as the provision of a service, the execution of a work, and so forth.

Given the complexity of the contracts and the obligations to be fulfilled by the parties, often a mechanism is required that will allow for the resolution of disputes by mutual agreement and in a simple and rapid manner, in such a way that the method will make it possible to resolve any problems and continue with the fulfillment of the obligations of the contract.

Generally, these types of procedures relate to technical problems that may present themselves during the development and execution of the contractual obligations and that require an adequate and prompt technical response for the parties that will lead them directly to an agreement concerning the manner and terms of confronting the technical issue, without delaying the execution of the contract.

These types of procedures are usually provided in the clauses on jurisdiction and competence in contracts as alternative means for the solution of disputes prior to arbitration.

Nevertheless, the fact that they are means for the solution of disputes qualified as "prior to arbitration" simply implies that they involve methods of settlement between the parties that are supposed to be attempted before arbitration as a determining factor in time, but not as a determining factor for admissibility for the arbitral procedure.

**The procedure consisting in exhausting the means for the solution of disputes prior to arbitration is simply a temporal presupposition, not a procedural one.**

The intention of the parties in agreeing upon these types of clauses has a merely practical effect concerning the fulfillment of the contract. As has been said, the effect is merely to make its execution more flexible. Therefore, they have the scope of conditioning the submission of disputes to this type of procedures in a prior manner in time to arbitration.

However, the determining factor of the submission of these types of procedures prior to arbitration does not imply that the parties' failure to exhaust them limits their subsequent possibility of being arbitrated.

This is due to the fact that mediation and conciliation or else a technical dispute procedure, as in the present case, are methods for the solution of disputes distinct from arbitration.

In these types of methods for the solution of disputes, there is no possibility for arriving at a result in a necessary manner, by virtue of the fact that they are based on solution by the parties themselves. For its part, in arbitration, there does exist the possibility that the parties will necessarily arrive at a result with respect to their dispute by virtue of the fact that the solution of the dispute is entrusted to a third party.

The fact of submitting the dispute to a procedure of conciliation or else, as is the case here, to a technical dispute procedure does not ensure a result. This is due to the fact that the solution to the dispute depends solely on their willingness. If the parties do not wish to cooperate, then there is no possibility of arriving at a result. The solution of a dispute in a technical dispute is dependent solely on the parties.

Now then, if the parties do not reach an agreement, or simply are not capable of setting up conditions for a negotiation, not even the clause that provides for this method for the solution of disputes is capable of preventing them from resorting to arbitration, if they consider that they are entitled to a compensation or an indemnity deriving from the contract.

Nevertheless, despite all the possible situations deriving from clauses that provide for alternative means for the solution of disputes, **none of the reasons for which the parties make an agreement in this manner makes it possible to conclude** that any disputes that

90

have not been submitted to a technical dispute procedure are subsequently **not able to be resolved in arbitration.**

In this context, clause 23.2 of the contract, which provides for the submission of the parties to arbitration establishes the following:

> "23.3 _**Arbitration**_. _Any controversy, claim, difference or dispute that may occur or be related to or connected to this contract or the non-fulfillment thereof shall be settled definitively through arbitration conducted in the Federal District, Mexico, in accordance with the Rules on Conciliation and Arbitration of the International Chamber of Commerce that are in effect at that time._ _The number of arbitrators shall be three and the language to conduct the arbitration shall be Spanish. Notwithstanding the foregoing, any technical dispute must be previously submitted to the procedure provided for in Clause 23.2 and, only in the event that an agreement is not reached between the parties by means of said procedure, the parties shall be entitled to have recourse to the proceeding provided for in Clause 23.3._"

From a reading of the arbitration clause, the following conclusions may be drawn:

1) **The clause is broad as far as the scope of the disputes that it includes.**

2) The arbitration clause establishes that any controversy, claim, difference or dispute that may occur or be related to or connected to the contract or the non-fulfillment thereof is subject to arbitration.

3) The arbitrability of the clause refers to the disputes that the parties intend to submit to the analysis of the Arbitral Tribunal. In this case, from the simply wording of the clause, there is no doubt that the parties intended to submit **any** dispute deriving from the fulfillment or interpretation of the contract to the Arbitral Tribunal.

Any controversy truly implies any one of the possible disputes arising both from the interpretation and from the fulfillment of the Contract. In the present case, the plaintiff considers that my client did not exhaust the procedures provided in clause 23.2 for technical disputes and then consequently _**ipso jure**_ any claim deriving from a technical dispute is not subject to arbitration.

However, the clause under study is very clear inasmuch as all disputes, and even interpretations about the provisions of the Contract, must be submitted to arbitration.

In the present case, it must be considered that the issues relative to which are technical disputes and whether COMMISA correctly followed the procedure provided in article 23.2 are precisely problems that derive from a disputed claim, difference or dispute that occurs or is related to or is connected with the contract or its non-fulfillment.

Therefore, the possible dispute between the parties over whether COMMISA submitted correctly or not to the procedure provided for technical disputes **must be resolved through arbitration and therefore it involves a dispute that is a matter of the arbitration agreement.**

To interpret the opposite, as the plaintiff intends to do, would be an error.  As can be deduced from its written petition, it attempts to demonstrate that COMMISA did not observe the procedure provided in clause 23.2 of the contract corresponding to technical disputes.

The reasoning of the plaintiff is highly confused and mistaken in addition to being superficial, because it does not lead to a result that is consistent with the will of the parties.

If what the plaintiff claims were true and the failure to exhaust the procedure provided in clause 23.2 would lead to arbitrability [sic][p] of the clause, then the risk would be run of making the arbitration clause inoperable.

According to the plaintiff, the failure to follow the procedure of clause 23.2 prevent the Arbitral Tribunal from hearing said dispute.  Nonetheless, the first paragraph of the arbitration clause indicates that **all** disputes deriving from the contract must be resolved **definitively** by means of arbitration.

If this were true, the first paragraph of the clause would not indicate that all disputes should be resolved by means of arbitration and would make an express exception with respect to technical disputes.

Following the plaintiff's "logic," supposing that this were true, if a technical dispute were to cease to be subject to arbitration, then it would have to be submitted to a state court, which would be contrary to the first paragraph of the arbitration clause already referred to.

---

[p] *Translator's note:*  The direction of the argument suggests that the intended word was "inarbitrabilidad" (incapability of being arbitrated).

On the contrary, it must be understood that what the arbitration clause under analysis is referring to is a requirement to exhaust **conciliation** of claim deriving from technical disputes, which in no manner is capable of **implying the impossibility for the controversy to be capable of arbitration**.

For this reason, it must be considered that the arguments on which the plaintiff bases its claims are lacking in support.

> 3. – The claims relating to the "technical disputes" 34, 35, 36, 37 and 39 are not true technical disputes in accordance with clause 23.2 of the Contract.

My client does not accept the plaintiff's claim whereby the claims in reference fall outside the scope of the arbitration clause. However, even if this were true, its reasons for the annulment of the arbitral award are unfounded by virtue of the fact that the disputes of reference do not fall within the definition of dispute according to clause 23.2 of the Contract.

As can be noted from the petition for nullity of the plaintiff, its claims are based on the hypothesis that COMMISA did not submit to the procedures provided in clause 23.2 of the Contract, which provides for the possibility of conciliation between the parties to arrive at an agreement with respect to technical disputes.

Nevertheless, from the petition no facts or arguments of any kind can be inferred that might indicate the reasons for which the claims related to "technical disputes" 34, 35, 36, 37 and 39 were technical disputes that had to be submitted to the procedures provided in clause 23.2.

In this respect, in clause 23.2 of the Contract the parties agreed upon the following:

> "23.2. **Technical disputes**. The contractor shall not be entitled to make any claim and PEP shall not be liable for legal or contractual damages (including negligence) with respect to the Contractor, its secondary suppliers or subcontractors, except in the cases specifically provided in this Contract.
>
> For the purposes of this clause, Technical Dispute shall be understood as any difference that arises on account of any claim or is attributable to the interpretation or execution of this contract, with the Technical Annexes of the Contract ("A", "B, " "B-1," "B-2, " "CEV, " "DT, " "DT-1," "DT-2-1," "DT-2.2","DT-3," "DT-4," "E-2," "F-1" and "F-2"). …

From the foregoing transcription, it can be inferred that clause 23.2 defines what a technical dispute is, basically one that arises in relation to technical annexes "A", "B, " "B-1," "B-2, "B-3", "CEV", "DT", "DT-1", "DT-2.1", "DT-2.2","DT-3", "DT-4", "E-2", "F-1" and "F-2".

This implies that the classification and identification of a technical dispute is dependent on it arising in relation to any one of the technical annexes mentioned. Any other dispute that arises on the basis of some issue that is not related to the technical annexes of reference cannot be considered as a technical dispute.

For its part, clause 22 of the contract contains a list and description of the technical annexes of the contract. Said clause orders the following:

"Clause 22

ANNEXES OF THE CONTRACT

The parties agree to consider as annexes to the present contract the ones that are indicated below, which, duly signed by the parties, form an integral part of the present instrument.

Description

| ANNEX "A" | Relation of plans |
|-----------|-------------------|
| ANNEX "B" | General requirements |
| ANNEX "B-1" | Scope of the Work and specifications |
| ANNEX "B-2" | Administrative overview |
| ANNEX "B-3" | General data requirements |
| ANNEX "C" | Catalogue of concepts, quantities of work and proposed unit prices |
| ANNEX "CE" | Breakdown of the unit price by type of cost; includes "CE-2," CE-4, CE-6, CE-7, CE-8, CE-9, CE-10, CE-11, CE-12, CE-13, CE-14, CE-15, CE-16, CE-17 (A and B), CE-18 and CE-19" |
| ANNEX "CEV" | Evaluation criteria includes "CEV-1, CEV-3, CEV-4, CEV-5, CEV-6, CEV-7, CEV-8, CEV-9, CEV-10, CEV-11, CEV-12, CEV-13 and CEV-14." |
| ANNEX "DT" | Calendar program of critical route method |
| ANNEX "DT-1" | Program for machinery and construction equipment |

| ANNEX "DT-2.1" | Schedule for procurement of construction materials |
| ANNEX "DT-2.2" | Schedule for the acquisition of permanent installation equipment |
| ANNEX "DT-3" | Labor force program for manual work |
| ANNEX "DT-4" | Program for design, management and service personnel |
| ANNEX "E-2" | Permanent installation equipment that is to be provided by the Contractor |
| ANNEX "F-1" | Materials and replacement that is to be provided by the Contractor |
| ANNEX "F-2" | Construction equipment that is to be provided by the Contractor |

The plaintiff doesn't clarify in its petition the reasons why it considered that the claims deriving from so-called technical disputes 34, 35, 36, 37 and 39, whose penalties it is seeking to annul from the arbitral award, are technical disputes in the strict sense, in accordance with what it is ordered by clause 23.2, related with the technical annexes referred to therein.

The plaintiff ignored this circumstance, which is an element of its action. So, by not doing this, its petition, in addition to being technically deficient, is also obscure.

Now then, my client considers that the claims arising from the disputes of reference do not fall within the scope of the technical annexes referred to in clause 23.2.

The claims related with technical disputes 34, 35, 36, 37 and 39 are the following:

### a) Technical Disputes 34 and 35:

As can be inferred from the arbitration petition (pages 88 to 102), these disputes derive from the fact that the Contract obligated COMMISA to keep its vessels named "BAR PROTECTOR" and "CASTORO 10" available to work. For its part, PEP agreed to provide, in time and form, access to the work site, which depended on finishing the platforms. PEP's delay caused **serious wait times** for both vessels, which were the cause for these claims.

**b) Technical Dispute 36:**

As can be inferred from the arbitration petition (pages 103 to 111), this claim **derives from the delays** suffered by COMMISA on account of bad weather.  As a consequence of the extension of the validity period of the Contract from an original period of 528 days to a total period of 1322 days, this obligated COMMISA to work under climatic conditions that were much less favorable than those that it took into consideration for the purpose of its proposal in the bidding process.

**c) Technical Disputes 37 and 39:**

As can be inferred from the arbitration petition (pages 111 to 123), this claim derived from the amounts owed by PEP to COMMISA for the work on **crossings** buried and placed on the sea bed.

As can be noted from the claims, these had their origin in the following concepts:

**d) Delays and wait times, as well as crossings**

As can be inferred from clause 23.2 of the Contract, which contains a list of the technical annexes with respect to which a technical dispute should have been filed before resorting to arbitration, none of them provides for the technical annex that governs what relates to **crossings and wait times**.

Having presented the foregoing, we must pay attention to what is provided by annex C, which is the one that provides for what relates to crossings and wait times.  Said annex C is not included in the list of technical annexes provided by clause 23.2.  In this annex, which regulates what relates to unit prices, the following is defined:

"Page 30:

"Crossings (unit = each one). This element of payment is established to compensate **the contractor for all additional work associated with crossings**.  A unit price shall be established for burial and a unit price for exposed crossings.  It shall be paid in addition to the price of the pipe indicated previously."

Page 31:

Time awaiting orders (unit = days).  The time elapsed, measured in minutes, between the receipt of the instructions from PEP/Supervisor to stop the work (or

**whenever access to Pemex installations is denied**) and the receipt of instructions to resume the work (or whenever access to Pemex installations is granted). The days shall be prorated to the closest minute (1,440 minutes per day)."

As can be inferred from the texts transcribed, the technical supports for the claims of reference are found in annex C. Said annex is not included with the list of the technical annexes of clause 23.2 of the Contract.

For this reason, my client is not obligated to follow the technical dispute procedure with respect to these claims before resorting to arbitration and, consequently, there is not even the possibility of analyzing the plaintiff's claim. Therefore, for these reasons, the action must be declared inadmissible.

4. – In any case, the scope that the plaintiff attempts to give to the second paragraph of the arbitration clause of the Contract is contrary to article 1797 of the Federal Civil Code and would excuse the need to resort to the procedure for technical dispute.

As has been previously indicated, the plaintiff's intent is to annul the arbitral award inasmuch as it included, according to PEP, disputes that were provided within the arbitration agreement and, consequently, according to its "logic," this generated the lack of jurisdiction of the Arbitral Tribunal and that it exceeded its powers.

The plaintiff considers that, given that my client did not formally present the technical disputes procedures related with the claims from technical disputes 34, 35, 36, 37 and 39, then these claims were outside the arbitration agreement.

Such an interpretation is neither logical nor plausible by virtue of the fact that it could generate:

i)  the extreme of conditioning the application of the arbitration clause on the discretion of one of the contracting parties (PEP), and

ii) would limit the contractor's access to justice.

Such assertions find support in what is ordered by articles 1797 and 2225 of the Federal Civil Code in relation with article 14 of the Political Constitution of the United States of Mexico, which are paradoxically repeatedly cited by the plaintiff.

97

Expressly said articles indicate the following:

> "**Article 1797**.- The validity and fulfillment of contracts may not be left to the discretion of one of the contracting parties.

> "**Article 2225** – Illicitness in the object, in the end or in the condition of an act produces its nullity, either absolute or relative, according to what the law provides.

From the interpretation of the foregoing, it can be inferred that it is not valid to interpret one clause of a Contract in the sense of leaving its fulfillment and, thereby, its effectiveness to the will of any one of the contracting parties.

In this manner, the interpretation proposed by PEP of subjecting the contractor to exhausting a conciliation procedure with PEP is unacceptable because it is contrary to the text of the articles just cited.

More abundantly, if COMMISA were obligated to conciliate with PEP, it would be subjected to follow a procedure in a step-by-step manner, which may not necessarily lead the parties to an agreement.  In this way, if PEP does not have the willingness to negotiate in accordance with the procedure provided in clause 23.2, then this prevents the contractor from formally presenting its position or claim deriving from a technical dispute.

Indeed, if PEP refuses to negotiate or if it simply refuses to accept the contractor's documentation, then **it would be impossible for the contractor to formalize the technical dispute** in accordance to what is ordered by clause 23.2 of the contract.  If this occurs, then any claim that it would want to make in arbitration could be subsequently considered by PEP as a claim **that goes beyond the arbitration clause**.

This implies that the clause allows for **the fulfillment of the obligation** of formally submitting the technical dispute **to be at the discretion of PEP**.

In addition, the foregoing by itself demonstrates that the consequences of PEP's erroneous interpretation in relation to the scope and object of the arbitration clause.  For this reason, it must be considered that, if the plaintiff's claim were accepted, this would bring about the nullity of said obligation (of prior conciliation), eventually impossible to carry out by the contractor.

Therefore, if the obligation is null, the plaintiff's arbitral claim cannot validly be made to depend on this supposed non-fulfillment of the contract by the defendant.

But, in addition, said interpretation by PEP must be considered null, by virtue of the fact that it constitutes and obstacle to obtaining justice, the right to which is possessed by all persons and is consecrated in article 17 of the Political Constitution of the United States of Mexico.

According to the plaintiff, the omission of formally filing a technical dispute prevents the dispute from being open to arbitration.  But if the dispute is not open to arbitration *ipso jure,* then the contractor loses its right to obtaining justice, which is contrary to the Constitution, given that it submitted all its disputes to arbitration by virtue of that same clause.

For this reason, my client considers that the plaintiff's lines of reasoning are inadmissible for causing the nullity of the arbitral award with respect to these claims.

> 5. – <u>The order to pay financial expenses in the arbitral award is valid, in that it is based in the delay in the payment of the indemnities determined by the Arbitral Tribunal, as well as in the terms of the Contract</u>.

PEP alleges that, given that the disputes that give rise to the orders on which the [payment of] financial expenses are based were never formalized as technical disputes, the arbitral award exceeded the scope and object of the arbitration clause.

In other words, PEP makes the nullity of the order to [pay] financial expenses dependent on the nullity of the orders that determine the principal amount on which said expenses are calculated and which refer to the possibility for arbitrating COMMISA's claims.

In this context and, given that it has already been clearly and convincingly demonstrated that the orders contained in the arbitral award with respect to the claims identified by COMMISA as technical disputes numbers 36, 34, 35, 37, 39, 19 and 27, are valid since they refer to issues or disputes that could be and were actually resolved by the Arbitral Tribunal within the scope of competence given to it by the arbitration clause of the Contract, it is obvious that the order to pay financial expenses on said amount is also valid.

F) DURING THE ARBITRATION AND IN THE ARBITRAL AWARD, THE RULES FOR ARBITRATION PROCEDURES WERE NOT VIOLATED

1. – The concepts of provision of legal grounds contemplated in article 16 of the Constitution are not applicable to an arbitral award, or in the manner of proceeding in proceedings of an arbitrational nature.

PEP alleges as a violation of the rules of procedure to which the parties submitted the fact that, according to it, in the decisions contained in the arbitral award with respect to technical disputes numbers 34, 35, 36 and financial expenses, the arbitral award did not base itself and did not give grounds based on articles of laws or clauses of the Contract, in violation of article 16 of the Constitution.

This argument by PEP turns out to be unacceptable in view of the following considerations.

The imperative principles for the arguments in support of rulings issued by the Mexican Judiciary, ordered by the Constitution, relating to *foundations and grounds*, are not applicable to the structure that must be maintained in an arbitral award as far as the lines of reasoning that constitute the conclusion that is finally reached by an Arbitral Tribunal when it issues its final arbitral award. In this sense, all the supposed wrongs with an appearance of appeal or items of violation lamented by the one petitioning for the nullity of the arbitral award and which are now being responded to, in the sense of alleging that the right to a hearing was violated, as though the arbitration procedure were a trial pursued in accordance with the procedural rules of a judicial procedure, are completely inadmissible.

The Rules of Arbitration of the International Chamber of Commerce, in article 25 only obligates the Arbitral Tribunal to issue an arbitral award *based on grounds*. This expression has been understood in the doctrine of international arbitration as meaning that the Arbitral Tribunal must only give its reasons with respect to the determinations that it finally issues in the final arbitral award, and even considering an arbitral award as being *based on grounds*, even if, within the reasoning of the Arbitral Tribunal, there are contradictions. It is especially significant for Your Honor to take into account that the doctrine expressly holds that Judges must refrain from entering into the matter of the substantive issues resolved by the Arbitral Tribunal. The foregoing is confirmed in the citation that we shall make from the arbitration handbook called *"Fouchard, Gaillard, Goldman on International Commercial Arbitration,"* edited by Emmanuel Gaillar and John Savage.

"Where the grounds for the award must be stated, that does not mean they must be well-founded in fact or law.  A court reviewing the award to ensure that reasons have been given will not of course review the substantive findings of the award.  Thus even grounds that are clearly wrong will satisfy the requirement that the arbitrators state the reasons for their award."[20]

In a sense similar to the previous one, Yves Derains and Erick A. Schwartz in their work *A Guide to the New ICC Rules of Arbitration*, have given their view with respect to obligation to provide grounds, as provided in article 25(2) of the abovementioned Regulations, in the following sense.

"... the grounds given in the arbitral award must demonstrate that the Arbitral Tribunal <u>has taken into account the positions of the parties</u>."[21]

(Emphasis added)

It is irrefutable; the only obligation that exists in order for the Arbitral Tribunal to issue its award is that it has taken, insofar as the grounds, is that it be demonstrated from the award that it has taken into account the positions of the parties, an issue that is fulfilled more than adequately in the final arbitral award that is the object of the present procedure concerning the motion for nullity.

The fact that the final arbitral award of the fifteenth of January, two thousand and eight, constitutes *res judicata* and that Your Honor must occupy himself with the analysis of solely formal issues with respect to it, is confirmed in the following judicial opinions.

> **Record No.** 189345
> Location
> Ninth Session
> Instance:  Three-Judge Circuit Courts
> Source:  *Semanario Judicial de la Federación* and its Gazette
> XIV, July 2001
> Page: 1107
> Excerpt: 1. 3o C.231 C
> Isolated excerpt
> Case(s):  Civil
>
> **ARBITRATOR.  HIS RESOLUTIONS ARE [sic?][q] ACTS OF AUTHORITY AND THEIR ENFORCEMENT CORRESPOND TO THE JUDGE DESIGNATED BY THE PARTIES.**  For the enforcement of an arbitral award, there must be an act of authority carried out by

---

[20] GAILLARD, Emmanuel and SAVAGE, John, *Fouchard, Gaillard, Goldman on International Commercial Arbitration,* The Hague / Boston / London, Kluwer Law International, 1999, p. 753.  *Translator's note:*  The original Spanish text has a free translation that is faithful to the English original.  That Spanish translation is not reproduced in this translation.

[21] DERAINS, Yves and SCHWARTZ, Erick A., *El Nuevo Reglamento de Arbitraje de la Cámara de Comercio Internacional,* Mexico City, Oxford 2001, p. 349.  *Translator's note:*  The original English title is cited in the translated text.

---

[q] *Translator's note:*  There is a possible omission of the word for "not" in the transcription of this text in the original Spanish.  The writer of this document has repeatedly argued that an arbitral award is *not* an act of authority.

a jurisdictional body, which, without taking away its private nature, assumes its content, in such a way that, if the arbitral award is enforceable by virtue of the jurisdictional act, which is only the necessary complement in order to enforce what has been resolved by an arbitrator, because the arbitral award is a resolution issued by the arbitrator that settles the dispute that arose between the parties, with the status of *res judicata* and it constitutes a title that gives grounds for enforcement, before the competent judge who must lend the procedural means necessary in order for the content of what has been resolved in the arbitral award to be carried out.  For this reason, an arbitral award is a resolution that has the attributes of unassailability, immutability and enforceability, except that the efficacy and specific realization of what has been condemned are always incumbent upon the competent judge designated by the parties or the judge of the place of the judgment.  The arbitrator lacks the power to enforce, on his own, the arbitral award that he has issued, because he does not have the power or "imperium" (coercive authority), which is one of the attributes of jurisdiction and is inherent to the jurisdictional organs of the State.  **This implies that the arbitrator lacks the force of the State to make the order effective, but *the arbitral award in itself is not bereft of the attributes of <u>res iudicata</u>*, because the power to decide the controversy is a delegation made by the State, through juridical regulation, and it reserves to itself only the power of enforcing.**  The Judge before who the enforcement of an arbitral award issued by an arbitrator is requested, in order to issue the order for payment, has the ability and the duty only to verify the existence of the arbitral award, as a resolution that has established a correct line of conduct, unassailable and immutable and which, therefore, must originate from a procedure in which the essential formalities of the procedure have been observed and it must not be contrary to a matter of public policy.

THIRD THREE-JUDGE COURT FOR CIVIL CASES OF THE FIRST CIRCUIT.

Direct "amparo" 1303/2001.  Constructora Aboumrad Amodio Berho, S.A. de C.V., March 8, 2001.  Unanimous vote.  Judge writing the opinion:  Neófilo López Ramos.  Clerk of the Court:  Lina Sharai González Juárez.

Note: By its final judgment dated October 26, 2001, the Second Chamber ruled the non-existence of a contradiction in ruling 14/2001-PL, in which the present criterion was a part.

In view of the foregoing, supposing without conceding the point that PEP's arguments with respect to a supposed obligation of the Arbitral Tribunal to provide foundations and grounds for the final arbitral award were admissible, Your Honor must take into consideration that the plaintiff complains that the arbitral award committed a *failure* to provide foundations and grounds, a situation that would be absolutely false in any case, and the only thing that might be imputed to it would be an *undue* provision of foundations and grounds.  The distinction between "lack of" [or "failure to"] and "undue" provision of foundations and grounds has been clearly defined by the jurisprudence of the domestic courts, as can be seen from the following binding ruling:

**Record No.** 170307
Location:
Ninth Session
Instance:  Three-Judge Circuit Courts

Source: *Semanario Judicial de la Federación* and its Gazette
XXVII, February 2008
Page: 1964
Excerpt: I. 3o.C. J/47
***Jurisprudence***
Case(s): Common

**PROVISION OF FOUNDATIONS AND GROUNDS. THE DIFFERENCE BETWEEN THE LACK AND THE UNDUE SATISFACTION OF BOTH CONSTITUTIONAL REQUIREMENTS TRANSCENDS THE ORDER IN WHICH THE CONCEPTS OF VIOLATION MUST BE STUDIED AND FOR THE EFFECTS OF THE PROTECTIVE RULING.** The lack of the provision of foundations and grounds is a formal violation that is a difference from the undue or incorrect provision of foundations and grounds, which is a material violation or one of substance, with the effects generated by one or other being distinct; therefore, the study of the former omission must be made in a prior manner. Indeed article 16 of the Constitution establishes, in its first paragraph, the imperative for authorities to provide foundations and grounds for their acts that have an impact on the sphere of those governed, but an infraction of the constitutional mandate that requires the expression of both in acts of authority must take on two distinct forms; i.e. the one deriving from its lacking, and the one corresponding to its incorrectness. The lack of provision of foundations and grounds occurs when there is a failure to express the legal texts applicable to the matter and the reasons that were considered in order to find that the case may be subsumed into the hypothesis provided in that legal norm. In contrast, there is undue provision of foundations whenever, in the act of authority, the legal precept is indeed invoked, however, it turns out to be inapplicable to the subject on account of its specific characteristics that impede its being adequate or fitting into the normative hypothesis; and an incorrect provision of grounds, in the hypothetical case that the reasons that the authority has considered are indeed indicated in order to issue the act, but they are in dissonance with the content of the legal norm that is applied in the case. So, the lack of provision of foundations and grounds means the lack or absence of such requirements, while undue or incorrect provision of foundations and grounds entails the presence of both constitutional requirements, but with a disparity between the expression of norms and the lines of reasoning formulated by the authority in the specific case. The difference that has been pointed out makes it possible to note that, in the first hypothetical case, it is a matter of a formal violation, given that the act of authority is lacking in inherent, innate elements, both by virtue of a constitutional imperative; for this reason, once its absence has been noted through a simple reading of the act against which a claim is made, it will be admissible to grant the "amparo" requested, and in the second case, it consists of a material violation or one of substance, because there has been an observance of the form through the expression of foundations and grounds, but both are incorrect, which, as a general rule, will also give rise to a protective ruling; nevertheless, a prior analysis of the content of the subject will be necessary in order to reach a conclusion of the aforementioned incorrectness. By virtue of this distinctive note, the effects of granting the "amparo," since it is a case of a jurisdictional resolution, are likewise diverse in each of the cases, because, although there is a common element; namely that the authority should leave the unconstitutional act invalid; in the first hypothetical case it will be so that the irregularity will be remedied by expressing the provision of foundations and grounds that was previously absent, and in the second hypothetical case, so that it will provide foundations and grounds that are

different from those it formulated previously.   The difference that has been pointed out likewise goes beyond the order in which the arguments that may be advanced by the litigants ought to be studied, because, if in a case, there is observed a lack of the constitutional requirements that are involved; in other words, a formal violation, the "amparo" is to be granted for the effects indicated, excluding the analysis of the grounds for dissent, which, concurring with those having to do with the defect, deal with the incorrectness of both elements inherent to the act of authority, however, if the former have been satisfied, the study of the undue provision of foundations and grounds will be feasible; in other words, of the material violation or the violation of substance.

THIRD THREE-JUDGE COURT FOR CIVIL CASES OF THE FIRST CIRCUIT.

Direct "amparo" 551/2005.  Jorge Luis Almaral Mendívil. Octobe 20, 2005.  Unanimous vote.  Judge writing the opinion:  Neófilo López Ramos.  Clerk of the Court:  Raúl Alfaro Telpalo.
Direct "amparo" 66/2007. Juan Ramón Jaime Alcántara.  February 15, 2007.  Unanimous vote.  Judge writing the opinion: Neófilo López Ramos.  Clerk of the Court:  Raúl Alfaro Telpalo.
Direct "amparo" 364/2007.  Guadalupe Rodríguez Daniel.  July 6, 2007.  Unanimous vote. Judge writing the opinion: Neófilo López Ramos.  Clerk of the Court:  Greta Lozada Amezcua.
Direct "amparo" 513/2007.  Autofinanciamiento México, S.A. de C.V. October 4, 2007. Unanimous vote.  Judge writing the opinion: Neófilo López Ramos.  Clerk of the Court: Raúl Alfaro Telpalo.
Direct "amparo" 562/2007. Arenas y Gravas Xaltepec, S.A. October 11, 2007.  Unanimous vote.  Judge writing the opinion: Neófilo López Ramos.  Clerk of the Court:  Raúl Alfaro Telpalo.

(Emphasis added).

Now then, in the arbitral award, there is verification of the existence of various legal foundations, as well as the grounds and lines of reasoning for the application thereof that were developed by the Arbitral Tribunal in resolving the *substance* of the matter and observing the procedural provisions of the frequently cited Rules of Arbitration of the International Chamber of Commerce.  This being the case, since there are grounds that continue to exist, there will be full compliance with the only thing to which the Arbitral Tribunal was obligated in accordance with article 25(2) of the Rules of Arbitration of the International Chamber of Commerce, which was to provide grounds for the arbitral award.  With this, Your Honor is prevented from entering into the study of the lines of reasoning on account of which the Arbitral Tribunal issued its decision and, in this sense, the arbitral award already frequently cited has the standing of *res judicata*; therefore any argument by PEP relating to a supposed nullity deriving from a supposed lack of legal foundations and grounds must be declared inadmissible.

2. – The decisions contained in the award are not biased.

PEP is petitioning for the nullity of the arbitral award by arguing that the Arbitral Tribunal acted in a partial manner, to its detriment, in all those decision that are unfavorable to it.

Apart from the fact that this assertion is false, the partiality of the arbitrators is not one of the grounds for nullity that are indicated in a limitative manner by article 1427 of the Code of Commerce and every objection in this respect should have been raised during the arbitration procedure, just as provided by article 1429 of the Code of Commerce and article 11 of the Rules of Arbitration of the International Court of Arbitration of the International Chamber of Commerce, to which the parties voluntarily had recourse. These two articles establish the following respectively:

> **"Article 1429.** The parties may freely agree on the procedure for challenging arbitrators.
>
> In the absence of an agreement, the party that wishes to challenge an arbitrator shall send to the arbitral tribunal, within the fifteen days following the day on which it received knowledge of its composition or of circumstances that give rise to justified doubts with respect to the impartiality or independence of an arbitrator, or if he does not possess the qualities agreed upon, a document in which it sets forth the reasons for the challenge. Unless the arbitrator renounces his charge or the other party accepts the challenge, it shall be up to the arbitral tribunal to decide on this.
>
> If the challenge that is initiated in the terms of the preceding paragraph is not admitted, the party making the challenge may request the judge, within thirty days of the notification of the decision whereby the challenge is rejected, to rule on its admissibility, a decision that shall not be subject to appeal. While this petition is pending, the arbitral tribunal, including the arbitrator that has been challenged, may proceed with their arbitral activities and issue an award.
>
> **Article 11**
> **Challenge of Arbitrators**
>
> 1
> A challenge of an arbitrator, whether for an alleged lack of independence or otherwise, shall be made by the submission to the Secretariat of a written statement specifying the facts and circumstances on which the challenge is based.
>
> 2
>
> For a challenge to be admissible, it must be sent by a party either within 30 days from receipt by that party of the notification of the appointment or confirmation of the arbitrator, or within 30 days from the date when the party making the challenge was informed of the facts and circumstances on which the challenge is based if such date is subsequent to the receipt of such notification.
>
> 3
>
> The Court shall decide on the admissibility and, at the same time, if necessary, on the merits of a challenge after

the Secretariat has afforded an opportunity for the arbitrator concerned, the other party or parties and any other members of the Arbitral Tribunal to comment in writing within a suitable period of time. Such comments shall be communicated to the parties and to the arbitrators.

In the Code of Commerce, there exists no provision whatsoever on which the nullity of an arbitral award can be based by alleging the lack of impartiality of the arbitrators in the procedure, precisely because this ordinance establishes a distinct procedural moment in which objections of this nature can be advanced and that "as it happens" were not presented by PEP at the proper time, but which it is attempting to use now in order to avoid paying the penalty established in the arbitral award.

Now then, supposing without conceding the point that what PEP alleges as a ground for nullity is a violation of public policy deriving from a supposed partiality of the arbitral tribunal when it issued the ruling contained in the arbitral award (which it did not do and, therefore, the court cannot analyze it in order to make up for the deficiency in its complaint), in this scenario it is clear that what the plaintiff would be proposing is the review by Your Honor of the grounds and lines of reasoning on which the arbitral tribunal based itself in order to issue the arbitral award, which, as we have been insisting, far exceeds the task of review that the law entrusts to you, which, in the words of Francisco González de Cassio, cited by the plaintiff itself, consists of the following:

> The judge has competence solely to determine whether there exists one of the grounds for nullity or non-enforcement. **He may not analyze or reevaluate the substance of the arbitral award.** In other words, he may not conduct a review concerning the facts or the application of law that is the ground for the resolution contained in the arbitral award.[22]

On another side, even in the event that, in exceeding your function, Your Honor were to decide to enter into the analysis of the substance of the dispute, in order to determine whether the arbitral tribunal acted with partiality when it issued its ruling (which would make its sentence illegal), in order to go as far as to declare the nullity of the arbitral award that is the object of this motion, in any case, one would have to objectively demonstrate that the arbitrators moved away from their legal opinions concerning the case in order to issue a ruling in the opposite sense; at the same time one would have to demonstrate the absence of all logic or coherence in the lines of reasoning advanced by the arbitrators and that the sense of said arbitral award was issued with

---

[22] GONZALEZ DE COSSIO, Francisco. *Arbitraje, editorial* Porrúa, first edition, México, 2004, p. 406

the sole end of harming one of the parties while benefiting the other. Otherwise the partiality of the arbitral tribunal would be an unproven issue, because the arbitrators have the power to resolve a dispute in a definitive manner through the application and interpretation that they themselves make of the law applicable to the facts presented and proven by the parties in the procedure.

The burden of proof that the plaintiff has in order to demonstrate the partiality of the arbitrators at the time of issuing the arbitral award is extremely great, and one could arrive there solely through the coexistence of objective elements that would generate conviction about the reasons for which the sense of the arbitral award was adopted, such as bribes, gratuities or perks given by the winning party to the members of the tribunal. However, these acts have not taken place and, therefore, the plaintiff will never be able to prove them. While the existence of acts of corruption would suppose a clear violation of public policy, we insist that the arbitral award has been issued with full freedom by the arbitral tribunal and none of its members was affected by any cause that might have signified an obstacle or an incentive to rule in any given sense.

Additionally, the burden of proof that the plaintiff has not satisfied is complemented by the application of the principle of the presumption of the validity of an arbitral award, which has been conceptualized by national doctrine in the following terms:

> As for arbitral awards, the *presumptio in favorem validitatis sententiae*[r] applies to them, because they are presumed to be valid and enforceable. It is for this reason that a system of exception and discretion is established in the possible determination of their nullity. Given this presumption, the burden of proof for their nullity belongs to the party that is seeking to annul or to oppose the enforcement thereof.[23]

In the case that concerns us here, the plaintiff has not brought forward any objective element whatsoever that would detract from the application of this principle and would demonstrate partiality by the arbitral tribunal to its detriment. Much less has the plaintiff presented any element showing that said supposed partiality translated into the issuing of an arbitral award, the enforcement of which implies a violation of public policy, with this being understood as a series of fundamental principles of law and justice, the violation of which is gravely incompatible with the values or the Mexican economic or legal system.

In reality, PEP alleges the impartiality [*sic*][s] purely and simply because the sense of the ruling did not seem adequate to it. PEP lost the arbitration and is alleging any means within its reach in order to avoid paying to my client the amounts to which it is entitled. Despite this, the Code of

---

[23] *Ibidem*, p. 406.

---

[r] *Translator's note:* Latin expression meaning "presumption in favor of the validity of the ruling."
[s] *Translator's note:* The sense of the overall argument suggests that the word "partiality" was intended here.

Commerce and the interpretation of its provisions given by the doctrine allow us to conclude with crystal clarity that the plaintiff fails to demonstrate the ends of its action, in failing to present any element of conviction that would objectively demonstrate that the arbitral tribunal acted with partiality when it issued the ruling and that this conduct also translated into the issuance of an arbitral award that violated the fundamental principles of justice and law that govern the Mexican economic and legal system.

Consequently, this argument of the plaintiff is unfounded.

> 3. – The decision contained in the award concerning the financial expenses is not founded upon Equity, but on specific contractual and legal provisions.

PEP falsely and tendentiously asserts that the decision adopted with respect to the financial expenses is founded on equity, only because it did not confirm its own arguments.  This argument can easily be refuted by merely analyzing the content of pages 168 to 174 where the Arbitral Tribunal, just as has been explained in previous points, ruled on the basis of various legal and contractual provisions the amount and form of causation and the calculation of the financial expenses that have to be reimbursed to my client.

**G)     RESPONSE TO OTHER CONSIDERATIONS AND ARGUMENTS THAT ATTEMPT TO SUPPORT THE NULLITY OF THE DECISION CONCERNING TECHNICAL DISPUTE NUMBER 36.**

PEP alleges that the dispute was presented by COMMISA at a time when it was no longer contractually permitted and therefore could not be a matter of arbitration.

Nevertheless, the fact that COMMISA may have presented technical dispute number 36 after the work had been completed is not capable of causing the claim to cease to be a matter for arbitration.

As has been explained previously, my client maintains that any non-compliance with the second paragraph of the arbitration clause does not generate [the result] that the possible dispute may fall outside the scope of the arbitration clause.

Apart from this, my client considers that the plaintiff's claim is incapable of generating the nullity of the arbitral award by virtue of the fact that it is based on a mistaken reading and interpretation of the second paragraph of the arbitration clause.

According to what can be inferred from arbitration clause number 23.3 of the contract, the only requirement that is imposed for the processing of technical disputes is that these disputes should be presented prior to arbitration.  The clause of reference does not impose on the contractor the obligation that the technical dispute would have to be presented before the work has been concluded or the time of final delivery.

**The condition that is imposed by the clause under comment is that the technical dispute should be presented prior to arbitration.**

**Thus it is sufficient that my client had presented its dispute prior to submission to arbitration in order for it [i.e. the condition] to be considered fulfilled.**

This is, in reality, what happened, according to what can be inferred from the very facts of the plaintiff's petition for nullity, of the arbitral award, and also of the request for arbitration. From such documents one can infer as follows:

PEP accepted that Technical Dispute 36 would be presented at the completion and delivery of the work.

At the time it signed the Certificate of Delivery, PEP acknowledged and accepted, on the date of its signature, that there were certain pending technical disputes to be presented by PEP, among them Dispute 36, by virtue of which COMMISA made a claim for the payment of compensation from delays it suffered on account of bad weather.

Subsequently, PEP agreed to join a series of work session to attend to the disputes that were presented subsequent to the Certificate of Delivery, specifically, including Dispute 36.[24] PEP received, analyzed and resolved Dispute 36, presented by PEP [sic].

PEP's conduct proves, beyond any doubt, that the right interpretation of the Contract is that disputes such as the one identified with number 36 are fully acceptable within the arbitration clause, even when it may have been presented after the signing of the Certificate of Delivery and Reception.

In accordance with Mexican legal doctrine, this manifestation of PEP's intent is valid, even if it was not done in writing:

---

[24] Arbitral Award ¶235.

**Record No.** 172234
Location
Ninth Session
Instance: Three-Judge Circuit Courts
Source: *Semanario Judicial de la Federación* and its Gazette
XXV, June 2007
Page: 1048
Excerpt: XIX. 2o A.C. 46 C
Isolated excerpt
Case(s): Civil

**CONTRACTS. MAY BE MODIFIED EXPRESSLY OR TACITLY IN VIEW OF THE "AUTONOMY OF THE WILL," AS LONG AS IT DOES NOT AFFECT PUBLIC POLICY, MORALITY OR PROPER CUSTOMS, EVEN IF WRITTEN FORMALITY FOR THIS HAS BEEN AN AGREEMENT IN A SPECIFIC CLAUSE (LEGISLATION OF THE STATE OF TAMAULIPAS).** In the terms of articles 1255, 1256 and 1300 of the Civil Code for the State of Tamaulipas, a contract is an agreement of two or more persons to create, transfer, modify, preserve or extinguish obligations; therefore, the will of the parties is the supreme law that translates into contractual freedom, which usually exists in two aspects, the external and the internal, the latter being designated by the doctrine as "autonomy of the will," where the first is the power to decide whether or not the contract is to be concluded and, the second is the possibility of establishing the content of the agreement of wills; in other words, the rights and obligations of each one of the parties. Said freedom is not some unlimited right that is enjoyed by the contracting parties, because it is limited by public policy, morality or proper customs. This means that the parties, in the use of this maximum authority that rules in contracts, which is the will to choose, as long as they do not violate such principles, may expressly or tacitly create, transfer, modify, preserve or extinguish what was initially agreed upon, even if they have agreed in a specific clause that this could be done only if the agreement were made in writing, because while this also constitutes the will expressed by the parties in the contract, such a formality agreed upon cannot be deemed immutable, because it does not protect any right of public order nor is its modification or cancellation contrary to morality or law.

SECOND THREE-JUDGE COURT FOR ADMINISTRATIVE AND CIVIL CASES OF THE NINETEENTH CIRCUIT.
Direct "amparo" 126/2005. Inmobiliaria Ayusa, S. R.L. de C.V. June 28, 2005. Unanimous vote. Judge writing the opinion: Jorge Sebastián Martínez García. Clerk of the Court: Jesús Garza Villarreal.

**More abundantly, the Principle of Good Faith prevents PEP from insisting on clauses or agreements that PEP itself agreed were not applicable.**

Aritcle 1796 of the Federal Civil Code that PEP repeatedly invokes as a foundation for alleging that the Arbitral Tribunal should not have accepted Technical Dispute 36, obligates PEP and COMMISA to act in good faith in the fulfillment of the Contract. One of the consequences imposed by good faith on the contracting parties is that of not abusing the exercise of their rights.

110

**Record No.** 183878
Location
Ninth Session
Instance:  Three-Judge Circuit Courts
Source:  *Semanario Judicial de la Federación* and its Gazette
XVIII, July 2003
Page: 1061
Excerpt: 1. 8o C.251 C
Isolated excerpt
Case(s):  Civil

**BILATERAL CONTRACTS, GOOD FAITH IN THE FULFILLMENT OF.**  It is not enough any non-fulfillment of the obligations assumed by one of the contracting parties in order for that of the other party to be justified, but rather it is necessary that the former be of such importance that it leaves the interest of the one to whom the obligation is due, in view of the functional interdependence of the correlative mutual services; this is what is required by the principle of good faith in the fulfillment of a contract which is established by article 1796 of the Civil Code for the Federal District, because contracts as soon as they are perfected obligate not only to fulfillment of what was expressly agreed upon, but also to the consequences which, according to their nature, conform to good faith.  This same rule leads us to deem as inadmissible the claim that one of the parties is released from fulfillment, when the non-fulfillment of the other contracting party is not of importance, given that this would imply an abusive exercise of that right since it goes against the ends that the law had when acknowledging it – that of preserving the mutuality of the contract – and since it exceeds the limits imposed by good faith.

EIGHT THREE-JUDGE COURT FOR CIVIL CASES OF THE FIRST CIRCUIT.
Direct "amparo" 273/2003.  Sistema de Transporte Colectivo.  june 18, 2003.  Unanimous vote.  Judge writing the opinion:  Abraham S. Marcos Valdés.  Clerk of the Court: María Teresa Lobo Sáenz.

According to the principle of good faith, as interpreted and applied by the Mexican courts, PEP cannot now invoke an agreement or pact (that Technical Disputes could be presented only before the completion of the work), which PEP itself agreed was not applicable to the specific case of this claim.  The Mexican courts have determined that one party may not invoke in its own favor a clause that the party itself agreed, even tacitly, to leave inoperative.

**Record No.** 271663
Location
Sixth Session
Instance:  Three-Judge Circuit Courts
Source:  *Semanario Judicial de la Federación*
Fourth Part, XXIX
Page: 43
Isolated excerpt
Case(s):  Civil

**LEASING, WAIVERS THAT MAY NOT BE INCLUDED IN CONTRACTS OF.**
While it is true that what is provided in article 2432 of the Civil Code is not subject to waiver, as established by article 2433 of that same ordinance, this rule governs in order to prevent that waiver from being included in contracts and, in

the event that it is included, that it is given no value. But this does not imply that the holder of each action may not cease to exercise it. Therefore, if for five years, the contracting parties were in agreement not to give effectiveness to a given clause of the contract, this agreement makes it clear, by the very force of the facts, that no effectiveness of said stipulation was recognized by the leaseholder. Therefore, it does not seem in keeping with good faith that ought to prevail in contracts to come to invoke, after five years, a clause that has become inoperative by the consent of the parties who manifest, by the manner of fulfilling the other stipulations, their tacit intent on this particular matter."

In conclusion, PEP's way of acting makes it so that its petition for nullity ought to be declared inadmissible and, in addition, this is an issue of substance and interpretation of the Contract, so that Your Honor is also prevented from considering it.

**H)** RESPONSE TO OTHER CONSIDERATIONS AND ARGUMENTS THAT ATTEMPT TO SUPPORT THE NULLITY OF THE DECISION CONCERNING TECHNICAL DISPUTES NUMBERS 34 AND 35.

1. – The Court of Arbitration has authority to resolve issues of fact as it best deems, apart from any arguments of the parties and this does not involve any violation of the arbitration agreement with respect to the penalties related with the claims of disputes numbers 34 and 35.

According to the plaintiff, the arbitral tribunal violated the arbitration agreement by virtue of the fact that it resolved a dispute not submitted to its consideration. According to the plaintiff, the arbitral tribunal did not resolve an action for indemnity, but rather an action for irrecoverable expenses, which was not requested nor was it a matter for arbitration; it thereby violated article 19 of the Rules of Arbitration of the International Chamber of Commerce.

In the first place, it must be considered that the arbitral tribunal is bound only by the agreements established by the parties. Said agreements can be determined, either in the arbitration agreement, or in the mission statement or else in any other agreement during the arbitration procedure.

As can be inferred from the arbitration agreement (clause 23.3 of the contract), the parties agreed to bestow powers on the arbitral tribunal in accordance to the Rules of Arbitration of the International Chamber of Commerce.

Article 15 of the Rules of Arbitration of the International Chamber of Commerce is a reflection of this principle. Said article contains the following:

**Article 15**

**Rules Governing the Proceedings**

1
The proceedings before the Arbitral Tribunal shall be governed by these Rules and, where these Rules are silent, by any rules which the parties or, failing them, the Arbitral Tribunal may settle on, whether or not reference is thereby made to the rules of procedure of a national law to be applied to the arbitration.
2
In all cases, the Arbitral Tribunal shall act fairly and impartially and ensure that each party has a reasonable opportunity to present its case.

This also implies that the arbitral tribunal has powers to determine which law is the applicable one, as well as the applicable legal consequences in accordance with the parties' claims and the facts on which they base them.

In the specific case, according to what can be inferred from the plaintiff's petition, in which it cites the corresponding arbitration claim of my client, as well as my client's petition itself, which claimed the following with respect to the wait times:

"Commisa demands compensation of approximately $81 million U.S. dollars. Said sum is calculated in accordance with Contract EPC-28. In the event that, for some reason, the Arbitral Tribunal were to determine that the rates or tariffs for wait times or standby times that are established in Contract EPC-28 are not applicable for the calculation of the compensation corresponding to these delays. Commisa respectfully requests that an arbitral award be issued whereby the payment of an indemnity to be paid by PEP that will be sufficient to compensate Commisa for the harm and damage it suffered as a consequence of the delays previously suffered. For these purposes, Commisa estimates that said damages amount to approximately $81 million U.S. dollars ..."

Said claim by COMMISA did not go beyond the arbitration agreement nor did it imply any incentive for the arbitral tribunal to violate it. It is very clear that COMMISA's claim was an indemnification for having two vessels idle for causes imputable to PEP and it requested freedom for the arbitral tribunal to grant an indemnity as it best deemed appropriate.

In this sense, in the Mission Statement that was signed and accepted by PEP, the arbitral tribunal determined the following:

**"C) Points in dispute in relation to the claims and requests formulated by the plaintiff**

3. a) Were there delays imputable to the Defendant and suffered by the Plaintiff, which affected the start of the work by the two main vessels, the Castoro 10 and the Bar Protector?

b) Were there delays imputable to the Defendant, because on account PEP's delays, the Plaintiff had to carry out the work agreed upon in Contract EPC-28 in unfavorable weather conditions deriving from the change of season?

c) If the responses to questions 3 a) and/or 3 b) are in the affirmative, is the Plaintiff entitled to receive from the Defendant compensation and/or indemnity for damages or should such a claim be rejected in the event of considering any of the exceptions articulated by the Defendant? If the admissibility of the compensation and/or indemnity is decreed, what would be the amount thereof?

As can be inferred from the Mission Statement entrusted by the parties to the arbitral tribunal, the arbitral tribunal was charged with determining, obviously in accordance with the dispute presented and in accordance with the evidence offered by the parties, whether COMMISA was entitled to any indemnity for the wait times and how much this would amount to.

This was accepted by PEP, as can be inferred from the Mission Statement. This implies that PEP was in agreement that the arbitral tribunal should determine this in accordance with the dispute. This is consistent with what was agreed upon by the parties and in accordance with what is ordered by the Rules of Arbitration of the International Chamber of Commerce.

Thus, if PEP accepted the Mission Statement, it cannot be considered that the arbitral tribunal exceeded its powers or else that it violated the arbitration agreement.

As can be inferred from the arbitral award that is now challenged, the arbitral tribunal decided in accordance with the Mission Statement to condemn PEP to pay an indemnity for wait times, whether said indemnity was determined as damages or else as fees or any form whatsoever, this circumstance turns out to be irrelevant for the purposes of the nullity of the arbitral award, as argued by PEP, by virtue of the fact that, as can be seen from what is reported in the foregoing lines, the arbitral tribunal adhered to the Mission Statement agreed upon by both parties.

The parties empowered the arbitral tribunal to decide on the admissibility of the indemnity as well as on the amount thereof.

In this sense, PEP's assertion that it was left in a state of defenselessness is unfounded, by virtue of the fact that it knew and accepted the terms and conditions of the Mission Statement.

PEP became aware of COMMISA's claims in a timely manner.  Likewise, it had the opportunity to respond to the demand and it became aware, in a timely manner, of the terms of the Mission Statement; it had the opportunity to offer items of evidence and to prove its allegation with the case.  As can be inferred from the arbitral procedure, this circumstance was not unknown to PEP.

Thus it is not possible to validly assert that PEP was deprived of its opportunity for defense either on account of COMMISA's claims or on account of what was resolved by the arbitral tribunal with respect thereto.

**Moreover, also unfounded is PEP's argument that COMMISA claimed the same quantity for two distinct causes:  a) wait fees and b) damages and that such a circumstance was capable, by itself, of annulling the arbitral award.**

This argument set forth by the plaintiff as a cause for the nullity of the arbitral award has nothing to do with the causes for nullity provided in article 1457 of the Code of Commerce.  The circumstance that is alleged by the plaintiff is, in any case, a circumstance that is proper to the substance of the arbitration dispute.

As has been demonstrated, the parties gave authority to the arbitral tribunal to resolve the facts of the dispute by virtue both of the arbitration clause and the Mission Statement.

All the issues manifested by the arbitral tribunal relating to this are issues of substances, for which it was fully empowered to make a resolution.  Whether or not COMMISA's claim was inadmissible simply has to do with issues that in no way are outside the agreements of the parties and in no way are related with the grounds for nullity.

**In the same sense, we must reject PEP's argument whereby, according to clause 23.2, PEP is not responsible for legal or contractual damages not provided for in the contract and, for this reason, any claim based on them is not subject to arbitration.**

This issue also belonged exclusively to the arbitral tribunal, in this event, as an object of analysis of the substance of the dispute. As has been indicated, the parties granted powers to the arbitral tribunal for the interpretation of the Contract and the determination of its legal consequences. For this reason, it was up to the arbitral tribunal to analyze said issue as one proper to the dispute [and to] the arbitration procedure.

For no reason can it be considered that the study of said issue might be the grounds for the nullity of arbitral award. This is due to the fact that the proper or improper interpretation of the Contract from which the rights and obligations of the parties derive is not a ground for the nullity of the arbitral award. As has been indicated through the entire response to the petition, the grounds for nullity are limited and express and preclude Your Honor from entering into the study of the matter resolved in the arbitral award.

**The same consideration must be made with respect to the fair, reasonable and duly verified costs that had become due.**

The determination of the fair, reasonable and verified costs owed to COMMISA for this heading is contained in paragraphs 178 to 183 of the Arbitral Award.

In principle, the Arbitral Tribunal determined that, despite the fact that the Contract made reference to "fair, reasonable and verified costs," it did not have the powers of an amicable conciliator, but rather that the amount of the indemnity would have to be calculated by multiplying the number of days of wait time actually proven by the rate that COMMISA "actually had to pay to EMC by virtue of the Subcontract" for the lease of the vessels.

COMMISA argued that the amounts to which it was entitled ought to be calculated on the basis of the rate per day of delay agreed upon in the Subcontract concluded between COMMISA and EMC.

Nonetheless, and despite COMMISA's objection, the Arbitral Tribunal considered that COMMISA was not entitled to such amounts, despite having paid EMC by virtue of a certain Transaction Contract concluded on September 30, 2004 between COMMISA, EMC and their respective controlling companies (Haliburton Brown Root Limited ("HBR") and European Marine Investments Limited ("EMI").

Here it is important to reiterate that the Arbitral Tribunal determined that the evidence offered was sufficient to prove that COMMISA had actually paid amounts and that the payment made

under the Transaction Contract (which in reality consisted of a cancellation of debt) was sufficient to prove that said amounts were actually paid by COMMISA.

Indeed the Arbitral Tribunal use certain rates contained in a quotation that COMMISA had offered to PEP, and which were less than those actually paid by COMMISA. The Arbitral Tribunal based its decision on the supposition that COMMISA would have been able to obtain rates lower than those established in the Subcontract and that it was obligated to this as a part of its duty to mitigate the damages. To put it briefly, the Arbitral Tribunal condemned PEP to indemnify COMMISA for the delays caused by using a rate lower than what COMMISA actually paid, because COMMISA "was capable (or could have been capable)" of obtaining from EMC a discount on said rates.

> 2. – The evaluation of the items of evidence by the Court of Arbitration cannot be reviewed judicially. The evaluation of the items of evidence is a matter of the facts of the case.

As the jurisprudence of the Mexican courts has indicated, the determination of the facts on the basis of the evidence offered and examined is an issue of substance that belongs to the Arbitral Tribunal. And what has been resolved by the Arbitral Tribunal has the effects of *res judicata*, which can be reviewed by the judicial authority only when the arbitral award is contrary to public policy.

In this sense, it is necessary to reiterate that the determination of the facts in dispute made by the Arbitral Tribunal has the effects of *res judicata*, as the jurisprudence cited clearly indicates.

Except if, in the determination of the facts in dispute, the Arbitral Tribunal had violated the essential formalities of the procedure or had resolved a dispute outside the scope of the arbitration agreement, what has been resolved by the Arbitral Tribunal with respect to the facts in dispute is unassailable. The facts *per se* are not nor can they be contrary to public order and, therefore, there is no way, in Mexican law, in which the resolution of the facts in dispute can be annulled for this reason.

Therefore, it must also be considered that such grounds for nullity are purely unfounded.

3. – <u>The fact that COMMISA may have set forth technical disputes number 34 and 35 once the work was completed cannot cause the claim to cease to be a matter for the arbitration.</u>

As has been explained previously, my client maintains that any non-compliance with the second paragraph of the arbitration clause does not generate [the result] that the possible controversy falls outside the scope of the arbitration clause.

Despite this, my client considers that the plaintiff's claim is incapable of generating the nullity of the arbitral award by virtue of the fact that it is based on a mistaken reading and interpretation of the second paragraph of the arbitration clause.

As can be inferred from what is ordered by the arbitration clause, number 23.3 of the contract, the only requirement that it imposes for the processing of technical disputes is that they should be presented prior to arbitration.  The clause of reference does not impose the obligation on the contractor whereby the technical dispute must be presented before the work is concluded or at the time of final delivery.

The condition that is imposed by the clause under comment consists in that the technical dispute must be presented prior to arbitration.

Thus, it is sufficient that my client did present the dispute prior to its submission to arbitration in order for it [the clause] to be considered as fulfilled.

That is how it happened in reality, as can be inferred from the very facts of the plaintiff's petition for nullity, and from the arbitral award, and also from the demand for arbitration.  From said documents, the following can be inferred:

COMMISA prepared its proposal of unit prices in accordance with Annex C of the contract in order to attempt to recover the wait times.  In a meeting held on March 5, 1999, PEP asked my client (COMMISA) to submit two estimates for costs for delays in construction, an estimate in which COMMISA would assume the immediate movement of the vessels and an estimate in which COMMISA would assume that vessels would move to the work site by August 1999.  COMMISA carried said estimates.

During a meeting on March 18, 1999, my client asked PEP to give it a response to its cost estimates.

However, PEP never gave it a response. PEP also did not respond to the cost estimates that COMMISA provided to it.

As can be inferred from the foregoing, my client did carry out the initiation of the technical dispute procedures related to these claims. However, for causes imputable to PEP, it was unable to continue with the formulation of the claim.

Now then, as can be inferred from the foregoing, my client did fulfill the condition of carrying out the procedure for the technical dispute before the initiation of the arbitration. The time at which this was done exactly is irrelevant. The only condition imposed by the clause is that it has to be done prior to the arbitration, which was fulfilled.

Therefore, if my client fulfilled the condition of presenting the dispute before resorting to arbitration, then it must be considered that it did comply with the condition of the second paragraph of clause 23.3 of the contract.

    4.    <u>When this claim was resolved in the arbitral award, there was no violation of the arbitration procedure, because the Mission Statement was fulfilled completely, there was no violation of article 19 of the Rules of the International Chamber of Commerce, nor was PEP left in a state of defenselessness.</u>

Also unfounded is what is alleged by the plaintiff in the sense that the arbitral tribunal violated what is ordered by the Mission Statement, because the expenses related to the claims deriving from technical disputes 34 and 35 did not occur nor were they proven.

Such assertions are lacking in support by virtue of the fact that, as has already been explained, the issues of burden of proof, proof of facts and other issues that have to do with the substance of the dispute in the arbitration are not allegations that can validly annul the arbitral award.

As has been explained, PEP accepted the Mission Statement and, in said document, it was clearly established that one of the points to be resolved would be the indemnity for the wait times.

The Mission Statement that was signed and accepted by PEP, in which the arbitral tribunal determined the following:

    ***"C) Points in dispute in relation to the claims and requests formulated by the plaintiff***

119

*5. a) Were there delays imputable to the Defendant and suffered by the Plaintiff, which affected the start of the work by the two main vessels, the Castoro 10 and the Bar Protector?*

*b) Were there delays imputable to the Defendant, because on account PEP's delays, the Plaintiff had to carry out the work agreed upon in Contract EPC-28 in unfavorable weather conditions deriving from the change of season?*

*c) If the responses to questions 3 a) and/or 3 b) are in the affirmative, is the Plaintiff entitled to receive from the Defendant compensation and/or indemnity for damages or should such a claim be rejected in the event of considering any of the exceptions articulated by the Defendant? If the admissibility of the compensation and/or indemnity is decreed, what would be the amount thereof?"*

As can be inferred from the Mission Statement entrusted by the parties to the Arbitral Tribunal, the Arbitral Tribunal was charged with determining, obviously in accordance with the dispute presented, and in accordance to the evidence offered by the parties, whether COMMISA was entitled to any indemnity for the wait times and what the amount thereof would be.

This was accepted by PEP, as can be inferred from the Mission Statement. This implies that PEP agreed that the arbitral tribunal should determine this in accordance to the dispute. This is consistent with what was agreed upon by the parties and in accordance with what is ordered by the Rules of Arbitration of the International Chamber of Commerce.

Article 19 of the Rules of Arbitration of the International Chamber of Commerce textually orders the following:

> **"Article 19**
> **New Claims**
> After the Terms of Reference have been signed or approved by the Court, no party shall make new claims or counterclaims which fall outside the limits of the Terms of Reference unless it has been authorized to do so by the Arbitral Tribunal, which shall consider the nature of such new claims or counterclaims, the stage of the arbitration and other relevant circumstances."

In accordance with what was proven in the arbitration, it was fully accredited that the vessels had wait times in addition to what was agreed upon by the parties. It also was demonstrated that the wait times that COMMISA had to endure were due to PEP's failure to provide access to the site on time.

# EXHIBIT 2 (PART 4)

Now then, PEP's non-performance was proven without any room for doubt.  However, the plaintiff's argument is infantile in that it claims that the expense was not proven.  Apart from that, this is an issue of substance in the arbitration.  Obviously, one must pay attention to the nature of the non-performance and its consequences.  If COMMISA had its vessels idle for causes imputable to PEP, it is logical that it would be entitled to an indemnity.

PEP's argument is very superficial whereby COMMISA would have to have demonstrated the expense.  As has been said, the vessels were idle on the high sea and at PEP's disposal, waiting for PEP.  This obviously has a cost, simply the cost of not being able to use the vessel in another operation.  For this reason, when the arbitral tribunal ordered [PEP] to the pay for the indemnity, it did not violate the arbitration procedure for two reasons, one formal and one related to substance.

The formal reason is rooted in the fact that, in the Mission Statement, the question of the possibility of indemnifying my client simply for wait times was established.

The reason relating to substance is rooted in the fact that it has been proven that PEP failed to fulfill its obligations and forced my client to keep his vessels idle.

This does not imply, on any grounds, the violation of article 19 of the Rules of Arbitration of the International Chamber of Commerce.  What was determined by the arbitral tribunal did not involve the admission of a new demand or any new compensation claimed.  PEP was aware, from the beginning, of the scope of the demand and the scope of the dispute established in the Mission Statement.  There is no room for doubt that PEP had an opportunity for defense and the penalty that is being analyzed was not the occasion of a new demand.

For this reason, it must be considered that these arguments are also unfounded.

I) RESPONSE TO OTHER CONSIDERATIONS AND ARGUMENTS THAT ATTEMPT TO SUPPORT THE NULLITY OF THE DECISION CONCERNING TECHNICAL DISPUTE NUMBER 19.

PEP alleges the violation of the principle of due process because, when it resolved technical dispute number 19, the Arbitral Tribunal did not avail itself of expert testimony.

Now then, PEP's allegations in relation to technical dispute 19 are unfounded by virtue of the fact that these are issues of substance of the arbitration, which are not grounds for nullity in accordance with article 1457 of the Code of Commerce, in addition to the fact that the aforementioned principle of due process refers to a constitutional guarantee applicable only to authorities in relation to acts of harassment and not to arbitral awards.

Indeed, the violation of the **principle of due process**, by virtue of the fact that supposedly the arbitral tribunal resolved this dispute **without expert support,** as well as the fact that it ruled on **technical problems not provided for in the contract** are all problems of the facts of the case in the arbitral award which, under no circumstances, can be reviewed in the light of article 1457 of the Code of Commerce, because none of them is located in the hypothetical cases contemplated therein.

In this same sense, PEP's arguments set forth in paragraph 230 of its petition are clearly unfounded, in the sense that COMMISA's claims for thirty-one instances of obstructions **had already precluded** by virtue of the fact that they were not formalized by PEP as extraordinary jobs.

The fact that such claims had not been formalized by PEP as extraordinary jobs does not generate the impossibility of these claims being made.  This is so by virtue of the fact that PEP itself argued it in this claim and it has been set forth as a defense by my client throughout this petition; pursuant to article 1797 of the Federal Civil Code, it is not valid to leave the fulfillment of the obligations to one of the contracting parties.  **It would be absurd to make the admissibility of a claim dependent on the classification thereof that PEP would make as an extraordinary job.**  For this reason, it is not valid for PEP to now make the validity of the arbitral award dependent on this circumstance.

In this sense, PEP's position that it had to approve all the extraordinary jobs done by COMMISA and, if the arbitral tribunal ordered it [i.e., PEP] to pay for them without PEP's consent, [then] it results in the nullity of the arbitral award, is absurd.  As has been indicated, the fulfillment of the obligations cannot be left to the discretion one of the parties.  **In addition, this is proper to the dispute and the arbitration procedure that the arbitral tribunal is empowered to resolve.**  For this reason, it cannot be deemed that the order goes beyond the arbitration clause and this somehow violates public policy.

In addition, as has been explained, the issues related to pipes according to annex C of the contract did not require formalization as a technical dispute.  Therefore, said circumstance is irrelevant for a possible

preclusion of rights. **The same must be considered with respect to the argument related to annex B-2, which is based on the same principle.**

In the last instance, as has been maintained throughout this response to the petition, the issue of formalization of claims as technical disputes is not an issue that involves the violation of the arbitration agreement or else an excess of powers by the arbitrators that could bring about the nullity of the arbitral award. On the contrary, such issues are proper to the arbitration procedure. **To suppose the contrary would lead to the absurdity of accepting that any undue interpretation of the contract would involve the violation of the arbitration agreement.**

Finally, and in relation to PEP's argument that the decision on technical dispute number 19 refers to technical problems not contemplated in the Contract and, therefore, the decision on this goes beyond the terms of the arbitration agreement also is unfounded.

As has been indicated in the defense, in relation to the claims of technical disputes 34, 35, 36, 37 and 39, particularly 37 and 39, relating to the **crossings of pipes established on the sea bed**, it is obvious that such issues are regulated in technical annex C. Technical annex C is not included in clause 23.2 of the contract. **The obstructions must be considered as extraordinary jobs related to the pipes according to annex C of the Contract.**

Therefore, since what relates to pipes cannot be considered as a technical dispute of those referred to in said clause, COMMISA could not then be required to exhaust said procedure.

For all these reasons also, it must be considered that the nullity proposed by the plaintiff is unfounded.

J) VALIDITY OF THE ORDER TO PAY EXPENSES AND COSTS OF THE ARBITRATION

PEP practically challenges the order contained in the arbitral award to pay for the expenses and costs of the arbitration without invoking any ground for the nullity of the arbitral award with respect to said point and it basically focuses on challenging the considerations of substance made by the Arbitral Tribunal with respect to this point.

The deficiency in PEP's approach vitiates its argument and makes it unacceptable *per se*.

Apart from the foregoing, and supposing without conceding the point that this "challenge" by PEP were admissible, it is clear the order to PEP contained in point 5 of the decision of the Arbitral Tribunal in the matter of costs, which can be seen on pages 182 and 183 of the final arbitral award, which is the object of the present motion for nullity is valid in itself, because it was issued in compliance with what is provided by article 31 of the Rules of Arbitration of the International Chamber of Commerce, which regulates the procedure from which the arbitral award is derived, the nullity of which is petitioned by PEP, in the following sense:

"6. To order, in the matter of costs and expenses:

(i) Each party to assume one half of the fees and expenses of the arbitrators, one half of the administrative costs of the International Chamber of Commerce and their own defense expenses.

(ii) Order PEP to pay COMMISA $200,000 U.S. dollars for expenses incurred by it to defend itself from the objections of lack of jurisdiction of the Arbitral Tribunal, and lack of prerequisites for admissibility argued by the former."

Indeed, the Rules of Arbitration under comment confers on the Arbitral Tribunal a discretional faculty to set the costs of the arbitration that it deems reasonable, a situation that can be verified in the text of article 31, which is cited below for the sake of greater clarity.

**Article 31**
**Decision as to the Costs of the Arbitration**
1
The **costs of the arbitration** shall include the fees and expenses of the arbitrators and the ICC administrative expenses fixed by the Court, in accordance with the scale in force at the time of the commencement of the arbitral proceedings, as well as the fees and expenses of any experts appointed by the Arbitral Tribunal and the reasonable legal and other costs incurred by the parties for the arbitration.

2
The Court may fix the fees of the arbitrators at a figure higher or lower than that which would result from the application of the relevant scale should this be deemed necessary due to the exceptional circumstances of the case. **Decisions on costs other than those fixed by the Court may be taken by the Arbitral Tribunal at any time during the proceedings.**

3
The final Award shall fix the **costs of the arbitration** and decide **which of the parties shall bear them or in what proportion they shall be borne by the parties.**

(Emphasis added)

As can be inferred from the transcribed article from the ICC Rules of Arbitration, it is the arbitral tribunal which, through the agreement of the parties, is empowered to set the costs of the arbitration in the final arbitral award and to decide who must cover them and in what proportion.

Both the most authorized international doctrine with respect to the interpretation of the ICC Rules of Arbitration and the practice of arbitrators emphasize the discretion enjoyed by arbitrators to establish the proportion in which the costs of the arbitration are to be covered.

Thus, Yves Derains and Eric A. Schwartz[25] point out that *"according to article 31(3)* [of the Rules of Arbitration of the ICC]*, arbitrators have total discretion to assign the costs in the manner they deem appropriate."*[26]. This is also the view of W. Lawrence Craig, William W. Park and Jan Paulsson, three other voices broadly and internationally recognized in the matter of international commercial arbitration and, in particular, the interpretation and application of the ICC Rules of Arbitration.[27]

With respect to the consideration of the sense of the ruling on the benefits demanded and the procedural conduct of the parties, the jurisprudence on arbitration sheds light on the use of simple formulas for prorating the costs of the arbitration in an arbitral award issued in accordance with the ICC Rules of Arbitration[28], highlight the following lines of reasoning: **(i) the arbitral tribunal enjoys broad discretion** in accordance to the rules of the ICC**,** and (ii) constitutes a fair solution in that it distributes the benefit of the costs in the same proportion as the admissibility of the benefits claimed by the parties (useful principle in the case of reciprocal claims).[29]

Finally, in this paragraph, it is important to point out that it is a usual practice in commercial arbitration that, if one party wins all its claims, for the costs of the arbitration to be imposed on the defeated party, as well as any other reasonable expenses of representation of the winning party. This practice has the twofold function of reparation and deterrence.

---

[25] Both authors are former clerks of the International Court of Arbitration of the ICC.
[26] DERAINS, Yves and Eric A. SCHWARTS. The New Rules of Arbitration of the International Chamber of Commerce (Guide to International Commercial Arbitration), *Colección de Estudios Jurídicos*, edit Oxford University Press, Mexico City, 2001, p. 414 *(Spanish edition)*.
[27] CRAIG, W. Laurence, William W. PARK and Jan PAULLSON. *International Chamber of Commerce Arbitration,* 3rd edition, Ocean Publications, Inc. United States of America, 2000, pp. 394 and 395.
[28] Collection of ICC Arbitral Awards, 1986-1990, p. 52, case no. 3267 from the year 1984.
[29] GRAHAM TAPIA, Luis Enrique, *El arbitraje comercial,* Colección de Obras Monográficas, reprint of the 1st edition. Editorial Themis, Mexico City, 2007, p. 290.

The foregoing implies that the arbitral tribunal must take into account all the circumstances of the case in order to distribute the costs in a fair and equitable manner. One important criterion in this is the conduct of the parties in the procedure. Whenever a claim is frivolous or one party causes unjustifiable expenses or delays in the procedure by means of active conduct (dilatory tactics) or conduct by way of omission, generally the arbitral tribunal must take said circumstances into account in order to charge against it any expenses that this might have generated for the other party.[30]

In this order of ideas, as Your Honor can appreciate, the setting of costs that was made by the Arbitral Tribunal to penalize PEP was done in compliance with and on the basis of the power that is conferred on it by article 31 of the Rules of Arbitration of the International Chamber of Commerce transcribed above.

This was the reasoning used by the Arbitral Tribunal in order to issue the order to pay costs transcribed above.

In addition, as can be seen from paragraph 767, the Arbitral Tribunal also based its decision on the content of article 1455 of the Code of Commerce, which also follows the criterion of the reasonability of the costs, according to the specific case, as can be seen in the citation that follows:

> "**Article 1455**. – Except for what is provided by the following paragraph, **the costs of the arbitration shall be borne by the defeated party**. However, the Arbitral Tribunal may prorate the items of these costs between the parties, if it decides that the prorating is reasonable, taking into consideration the circumstances of the case.
>
> With respect to the cost of legal representation and assistance, **the Arbitral Tribunal shall decide**, taking into account the circumstances of the case, which party must pay said cost and may prorate it between the parties, **if it decides that this is reasonable**."

It is from a logical and systematic interpretation of the article transcribed that our legislation in the matter of international commercial arbitration is derived; it establishes, among others, the following rules in the matter of costs:

---

[30] GONZÁLEZ DE COSSÍO, Francisco, *Arbitraje*, op. cit. supra. Note 22, p. 306.

a.   It is the arbitral tribunal that shall set the costs of the arbitration in the final arbitral award.

b.   Both the fees of the arbitral tribunal and the cost of legal representation and assistance shall be determined by the arbitral tribunal in a reasonable amount, taking into account the amount of the dispute, the complexity of the topic, the time dedicated by the arbitrator and any other circumstances pertinent to the case.[31]

c.   The costs of the arbitration shall be borne by the defeated party. However, *the arbitral tribunal may prorate the items of these costs between the parties if it decides that prorating is reasonable, taking into account the circumstances of the case..*

In this context and following Prof. José Luis Siqueiros, a recognized Mexican jurist and an expert in commercial arbitration, in the absence of an agreement by the parties, the arbitral tribunal is expressly empowered by the Code of Commerce to establish the costs of the arbitration in the final arbitral award, providing that they are reasonable according to the circumstances of the case.  Even though the general rule is that the costs shall be borne by the defeated party, the arbitral tribunal is authorized to prorate[32] the items of the costs between the parties.[33]

In this, Dr. Luis Enrique Graham Tapia concurs, when he points out that *with "the reservation of what the parties may have agreed upon, the trend within arbitration is to trust the arbitral tribunal with a broad margin of appreciation, as far as the distribution of the costs between the parties. Thus the arbitrator may take into consideration i) the procedural conduct of the parties; ii) the ruling (for or against) with respect to the benefits claimed."*[34] [Emphasis added].

In this connection, with respect to the substance of the case, in the arbitral award, the Arbitral Tribunal resolved that each one of the parties should pay one half of the administrative expenses and assume their own defense expenses, given that both COMMISA and PEP had ended up as winners in a partial manner.

---

[31]  A somewhat unfortunate copy of the Rules of Arbitration of UNCITRAL empowers one of the parties to solicit a judge, at his entire discretion, to take part in the process of determining the costs of the arbitration, while the latter may make only the observations he deems appropriate with respect to the fees of the arbitrators, but it will be the arbitral tribunal itself, which, in the first instance, must set the amount that corresponds to its fees.

[32]  The verb "prorratear" ("prorate"), according to how it is used by article 1455 of the Code of Commerce, means, in accordance to the Real Academia de la Lengua, means to distribute an amount between two or more persons, according to the part that proportionally corresponds to each one.

[33]  SIQUEIROS, José Luis and Alexander C. HOAGLAND, International Handbook on Commercial Arbitration, Vol. III, International Council for Commercial Arbitration (ICCA), Kluwer, The Hague and London / New York, 1995.

[34]  GRAHAM TAPIA, Luis Enrique.  El arbitraje comercial, op. cit. supra, Note 29, p. 290.

127

In contrast, the Arbitral Tribunal determined that, given that COMMISA was the winner in each and every one of the objections raised by PEP with respect to the supposed lack of jurisdiction of the Arbitral Tribunal and the lack of requirements for admissibility, PEP had to bear the reasonable expenses included by COMMISA in the defense of these objections, which the Arbitral Tribunal set at $200,000 U.S. dollars (two hundred thousand dollars of the United States of America 00/100).

As can be seen, there is no issue of public policy, violation of norms of procedure or any other grounds for nullity that are applicable to this order to pay costs.

The argument advanced by PEP in the sense that it was not defeated with respect to the procedure exceptions of lack of jurisdiction that it filed in court in this motion for nullity turns out to be absolutely inadmissible and unacceptable, because it refers to an appreciation of the substance, issued by the Arbitral Tribunal, in the exercise of its powers that, for the purpose of distributing the costs of the arbitration, are conferred on it by article 31 of the Rules of Arbitration of the International Chamber of Commerce.

Definitively, it has nothing to do with the limited grounds for nullity that the Code of Commerce provides that the Arbitral Tribunal decided that it was reasonable for PEP to have to pay the amount to which it was condemned, since it had been defeated in a particular point of the dispute resolved in the final arbitral award.

**Neither in article 1457 nor in any other article of the Code of Commerce is there any authorization or grounds that empower the competent judge to review what has been resolved by the arbitral tribunal in the arbitral award concerning the setting and determination of the payment of the costs of an arbitration procedure.**

It is the arbitral tribunal that determines the issues of a case of arbitration.  Any judge who hears a petition for nullity (or recognition and enforcement) of an arbitral award is not empowered to examine said determinations or to modify them.[35]

As has been mentioned on various occasions in the present document, article 1457 establishes, in a limitative form and with a strict interpretation, the grounds on which the competent judge may annul an arbitral award.

In neither of the two fractions of said article 1457 (and of its various subparagraphs) is there established a possibility for the competent judge to be able to annul an arbitral award with respect to the setting and

---

[35] GONZÁLEZ DE COSSIO, Francisco, *Arbitraje,* op. cit. supra. Note 22, p. 300.

determination of the costs of a case of arbitration. Likewise, as has already been duly accredited in previous paragraphs, the examination of the various grounds for nullity in article 1457 also do not empower the judge, for any circumstance, to review or analyze the decisions on substance adopted by the arbitral tribunal in the arbitral award.

Even if there were an attempt to apply by analogy any one of the grounds for nullity contemplated in article 1457, it is necessary to reiterate that the arbitral tribunal, at every moment, acted within the authority and with the powers that are conferred on it by the arbitration clause and the Code of Commerce.

With respect to the costs of the arbitration, it has already been duly accredited that the arbitral tribunal adhered to the arbitration agreement and that said agreement is not in conflict with any provision of the Code of Commerce or with any other precept, which, by the agreement of the parties or by legal mandate, might be applicable to the arbitration.

Consequently, this order to pay costs must prevail and thus be declared by Your Honor, because, in this sense, it was determined in accordance with article 31 of the Rules of Arbitration of the International Chamber of Commerce.

## LAW

I deny the application of the legal precepts invoked by the plaintiff both in its adjective part and in its substantive part.

Likewise, by means of the present petition, I hereby file a complaint against PEP.

## COUNTERCLAIM

The foregoing is sought by virtue of the fact that my client took part as the plaintiff in arbitration procedure number 13716/CCO/JRF conducted before the International Court of Arbitration of the International Chamber of Commerce and in which a definitive and unappealable arbitral award was issued which condemned the defendant PEP to the payment of various considerations to my client.

By virtue of what has been set forth in the preceding paragraph, with due respect, I request that Your Honor:

1. – Recognize the validity of the final arbitral award dated the fifteen of January, two thousand and one, issued in arbitration procedure number 13716/CCO/JRF conducted before the International Court of Arbitration of the International Chamber of Commerce.

2. – Consequently order PEP to pay to my client the amounts determined in its favor in the aforesaid arbitral award, in accordance with the specifications of the arbitral award contained in the section designated as "XII. DECISION," which can be seen on pages 182 and 183 of the arbitral award under comment, which are cited textually below.

"…

3          … the sum of "S" Mexican pesos ["PME"] calculated in accordance with the following formula

$$S = (A + B) \times 0.995$$

in which

"S" is the sum in Mexican pesos that PEP must pay Commisa

"A" is equal to 10,928,728 Mexican pesos

"B" is the sum in Mexican pesos that results from the conversion of 75,075,635 dollars of the United States of America ("USD") into Mexican pesos at the sale rate of exchange that the Bank of Mexico has determined and published in the *Diario Oficial de la Federación* on the business day immediately prior to September 29, 2002.

"+" is the addition sign

"x" is the multiplication sign

"=" is the equal sign

0.995 reflects the 5 mils reduction that Commisa is obligated to make to the Department of the Comptroller and Administrative Development.

4.          … to pay to Commisa, for financial expenses deriving from Contract EPC-28, interest calculated on the sum "S," defined in the foregoing Decision; the financial expenses that shall be due from September 29, 2002 until the date of actual payment, at the rate at each moment established by the Federal Law on Income for cases of extension in the payment of tax liabilities; the computation shall be done by days and the payment of the financial expenses shall be made together with that of sum "S" defined in the foregoing Decision.

6.          To order, in terms of expenses and costs, to

(ii)          … to pay to Commisa 200,000 USD as expenses incurred by it in order to defend itself from the objections of lack of jurisdiction of the Arbitral Tribunal and lack of prerequisites for admissibility argued by the former [i.e. PEP]."

3. – PEP should be condemned to the payment of the amount determined by Your Honor for expenses and costs deriving from the present procedure.

A.    **_Summons_**.  For the purpose of having the semi-government company PEP summoned to the present counterclaim, I hereby request Your Honor that the same be **notified in person** of the present counterclaim in accordance with the binding jurisprudence that I cite below:

> **Record No.**  178,647
> Jurisprudence
> Case(s): Civil
> Ninth Session
> Instance:  First Chamber
> Source:  _Semanario Judicial de la Federación_ and its Gazette
> XXI, April 2005
> Excerpt: 1a/J 134/2004
> Isolated excerpt
> Page: 617
>
> **COUNTERCLAIM.  THE DECREE THAT ADMITS IT MUST BE NOTIFIED IN PERSON TO THE DEFENDANT OF THE COUNTERCLAIM (LAWS OF BAJA CALIFORNIA AND THE FEDERAL DISTRICT).**  The procedural codes of Baja California and the Federal District do not establish the form in which a counterclaim must be notified, but rather they limit themselves only to saying that the same shall be made available to the plaintiff so that he may respond to it.  The expression "to make available" does not refer to the form in which the counterclaim must be notified, but rather to the manner in which the parties may have access to the records and to the documents that have been added, so that they may know their content and be informed of them.  Therefore, since there is a legal gap with respect to the form in which the act that admits the counterclaim must be notified, one must attend to the nature of a countersuit, which implies the exercise of actions against the plaintiff in the main suit, for which reason it also constitutes a suit, which, as such, must receive the same treatment that is given to the main suit.  In this way, if both codes establish that once the suit is admitted, it must be made available to the defendant party and must notify the party so that he will respond to it, in the case of the counterclaim, it also must be notified.    This  implies  that  **the corresponding act admitting it [the counterclaim] must be notified in person**, with the copies of said counterclaim suit accompanying it, just as occurs when the notification of the main suit is made.  With the foregoing, what is sought is to comply with the guarantee of legal certainty that is established in article 14 of the Constitution in favor of the person who is summoned by a counterclaim, because even though the latter is already aware of the suit and the authority before whom it is being processed, he is unaware of the claims of its counterpart and the actions that are being taken against him in the counterclaim; for this reason, if the act that admits said counterclaim suit is not notified to him in person, his guarantee of defense would be limited, since he would be made unable to give a response to the actions of the counterclaim and in order to refute them through any items of evidence that he may deem pertinent for that purpose.
>
> Contradiction of excerpt 99/2004-PS.  Among those upheld by the Third Three-Judge

Court for Civil Case of the First Circuit and the Third Three-Judge Court of the Fifteen Circuit. November 17, 2004. Majority vote. Dissenting votes: José Ramón Cossio Díaz and Olga Sánchez Cordero de García Villegas. Judge writing the opinion: José Ramón Cossio Díaz. Clerk of the Court: Fernando A. Casasola Mendoza.

Excerpt of jurisprudence 134/2004. Approved by the First Chamber of this High Court in session on the first of December, two thousand and four.

The domicile for carrying out the notification is located at:

**Gerencia Jurídica de Exploración y Producción**

**Marina Nacional 329 Edificio A, Octavo Piso**

**Colonia Huasteca, Delegación Miguel Hidalgo**

**México, Distrito Federal, C.P. 11311**


**B.**    *Causes of the Action.*    In compliance with article 1461 of the Code of Commerce, an arbitral award shall be recognized as binding by Mexican Judges and, after a filing of a petition in writing by the interested party, it shall be enforced.

In order to grant the enforcement referred to, there is required solely and exclusively for the petitioner, in accordance with the second paragraph of article 1461 of the Code of Commerce, for a duly authenticated copy of the arbitral award to accompany it and the original of the arbitration agreement or a certified copy thereof, which served as the basis for the arbitration procedure and, for the respective arbitral award. On this particular point, it is pertinent to cite the following excerpt of jurisprudence.

Ninth Session
Instance:  EIGHTH THREE-JUDGE COURT FOR CIVIL CASES
OF THE FIRST CIRCUIT
Source:  *Semanario Judicial de la Federación* and its Gazette
Volume VIII, August 1998
Excerpt: I 8o C 159 C
Page: 877


**ARBITRAL AWARD ISSUED ON THE NATIONAL TERRITORY, FORMALITIES THAT MUST BE FOLLOWED BY THE APPROVAL PROCEDURE.** In accordance with article 1461 of the Code of Commerce, the procedure for the approval of an arbitral award must take on the formalities established in that article, as well as in article 360 of the Federal Code of Civil Procedure; the formalities are as follow:  1) Presentation of the corresponding request in writing before the Judge of first instance; 2) Original presentation of the authenticated arbitral award or a certified copy thereof; 3) Original presentation of the arbitration agreement or a certified copy thereof, and 4) Those established by article 360 of the adjunct federal code, which are:  a) Once the motion has been filed, the Judge shall order that it be made available to the parties, for three days.  b) Once this time has passed, if the parties have not offered evidence, or if the court has deemed them not necessary, a summons

must be issued for a hearing of allegations within the three days that follow, which shall be held with or without the presence of the parties.  c) In the event that evidence is offered, a time for producing evidence for ten days must be opened.  d) Once the hearing of allegations has been held, within the five days that follow, the corresponding resolution must be issued.

EIGHTH THREE-JUDGE COURT FOR CIVIL CASES OF THE FIRST CIRCUIT

"Amparo" in revision 65/97.  Lydia Marina de Álvarez et al.  March 31, 1997.  Unanimous vote.  Judge writing the opinion:  Guillermo Antonio Muñoz Jiménez.  Clerk of the Court: Ana Luisa Mendoza Vázquez.

According to what is required by the Code of Commerce and reiterated in the foregoing precedent, a certified copy of the arbitral award dated the fifteenth of March, two thousand and eight is attached to the present petition as **ANNEX TWO**, the recognition and enforcement of which is requested in this act.

As to the original of the arbitration agreement, it has already been presented by my opponent in the present procedure under number 4 of the Annex and, in addition, it was recognized as valid and binding upon PEP.

In this sense, in accordance to what is provided by article 210 of the Federal Code of Civil Procedure, which establishes that a document that a litigant presents in trial, is full proof against him, in the face of the offering of the arbitration agreement under comment, by my opponent and the recognition thereof, by my client, the requirement of the presentation of the original of said agreement has effectively been fulfilled.  The foregoing takes on even more support in the judicial ruling cited below:

**Record No.**  362651
Location
Fifth Session
Instance:  Third Chamber
Source:  *Semanario Judicial de la Federación*
XXXVI
Page: 2020
Isolated excerpt
Case(s):  Civil

**DOCUMENTS, PROBATIVE VALUE OF.  A document presented by one of the parties in a trial, is full proof against him, in all its parts, even if the co-litigant does not recognize it, in accordance with what is set forth in article 1298 of the Code of Commerce.**

Motion for reconsideration of an interlocutory ruling 165/26.  Straffon Tomás.  December 2, 1932.  Unanimous vote.  Absent:  Manuel Padilla.  The publication does not mention the name of the judge writing the opinion.

(Emphasis added)

133

The arbitral award referred to above was composed in the Spanish language, therefore it is not necessary to present a translation thereof.

In addition, it is important to emphasize that the Judicial Authority must refrain from entering into the study of the substance resolved by the arbitral award, the recognition and enforcement of which is being solicited. It is absolute and beyond debate; the final arbitral award, the enforcement of which is solicited, has the standing of *res judicata*, a situation that can be verified in the judicial rulings that follow:

**Record No.** 189345
Location
Ninth Session
Instance: Three-Judge Circuit Courts
Source: *Semanario Judicial de la Federación* and its Gazette
XIV, July 2001
Page: 1107
Excerpt: 1. 3o C.231 C
Isolated excerpt
Case(s): Civil

**ARBITRATOR. HIS RESOLUTIONS ARE ACTS OF AUTHORITY AND THEIR ENFORCEMENT CORRESPONDS TO THE JUDGE DESIGNATED BY THE PARTIES.** For the enforcement of an arbitral award, there must be an act of authority carried out by a jurisdictional body, which, without taking away its private nature, assumes its content, in such a way that, if the arbitral award is enforceable by virtue of the jurisdictional act, which is only the necessary complement in order to enforce what has been resolved by an arbitrator, because the arbitral award is a resolution issued by the arbitrator that settles the dispute that has arisen between the parties, with the status of *res judicata* and it constitutes a title that gives grounds for enforcement, before the competent judge who must lend the procedural means necessary in order for the content of what has been resolved in the arbitral award to be carried out. For this reason, *an arbitral award is a resolution that has the attributes of unassailability, immutability and enforceability*, except that the efficacy and specific realization of what has been condemned are always incumbent upon the competent judge designated by the parties or the judge of the place of the judgment. The arbitrator lacks the power to enforce, on his own, the arbitral award that he has issued, because he does not have the power or "imperium" (coercive authority), which is one of the attributes of jurisdiction and is inherent to the jurisdictional organs of the State. This implies that **the arbitrator lacks the force of the State to make the order effective, but the *arbitral award in itself is not bereft of the attributes of *res iudicata*, because the power to decide the controversy is a delegation made by the State, through juridical regulation, and it reserves to itself only the power of enforcing.** The Judge before who the enforcement of an arbitral award issued by an arbitrator is requested, in order to issue the order for payment, has the ability and the duty only to verify the existence of the arbitral award, as a resolution that has established a correct line of conduct, unassailable and immutable and which, therefore, must originate from a procedure in which the essential formalities of the procedure have been observed and it must not be contrary to a matter of public policy.

THIRD THREE-JUDGE COURT FOR CIVIL CASES OF THE FIRST CIRCUIT.

Direct "amparo" 1303/2001. Constructora Aboumrad Amodio Berho, S.A. de C.V., March 8, 2001. Unanimous vote. Judge writing the opinion: Neófilo López Ramos. Clerk of the Court: Lina Sharai González Juárez.

Note: By its final judgment dated October 26, 2001, the Second Chamber ruled the non-existence of a contradiction in ruling 14/2001-PL, in which the present criterion was a part.

**Record No.** 186,229
Isolated excerpt
Case(s):  Civil
Ninth Session
Instance:  Three-Judge Circuit Courts
Source:  *Semanario Judicial de la Federación* and its Gazette
XVI, August 2002
Excerpt:  XV. 1º. 50 C
Page: 1317

**ARBITRAL AWARD, ITS RATIFICATION BY ORDINARY JUDICIAL AUTHORITY AND THE ANALYSIS THEREFORE, IN AN "AMPARO" CASE, DOES NOT PERMIT THE STUDY OF ITS MEANING WITH RESPECT TO THE FACTS OF THE CASE.**  An arbitral award is the decision of a non-state body, thus convened by the parties to resolve a dispute, whether present or future, for the effects of the ordinary instance, it is left to the exclusive power of decision of the arbitral tribunal and it comes to be an extension of that intent, which, since it is an act of private persons, with respect to its sense, it is not subject to constitutional review; nonetheless, such a constitutional review can occur with respect to the resolution of ratification issued by a state judicial body, which, of course, shall limit itself to the result of the analysis of the proper composition of the arbitral tribunal, the proper procedure, the manifestation of the intent of the parties to submit to the arbitration, of the matter thereof and the other **suppositions contemplated in article 1462 of the Code of Commerce, suppositions, which, as noted, contemplate only issues of *form* and *not* of *fact*,** and, once the ratification has been given to the acts enforcement whereby the Judge assists in the enforcement of the arbitral award; therefore in the "amparo" proceeding, only these issues may be alleged and not those related to the facts of the case and the sense of the arbitral award.  The foregoing is confirmed with the decision sustained by the Third Court of the previous session of the Supreme Court of Justice of the Nation, in the isolated excerpt, published in the *Semanario Judicial de la Federación,* Fifth Session, Volume XXXVIII, page 801, under the heading "ARBITRATION," in which it considers that **arbitration is a convention that the law recognizes, which constitutes a waiver of the private individuals for the judicial authority to hear a dispute; therefore it has negative procedural importance, inasmuch as the parties entrust the decision of their conflicts to one or more private individuals, called arbitrators**; nonetheless, they are not officials of the State and they do not have proper or delegated jurisdiction, and their powers derive solely from the will of the parties, expressed, in accordance with the law and, while the arbitration decision cannot be revoked at the will of one of the interested parties, it is not executive in itself, because it can only be considered as a work of the legal logic that is accepted by the State; therefore it can be enforced only through an act carried out by a jurisdictional body, which, without taking away its private nature, assumes its content and it is then that it is put on the same level as a jurisdictional act.  Nevertheless, Judges are not authorized to revise arbitral awards in an integral manner, because, otherwise they would be able to nullify them, even for issues of fact; for this purpose it would be necessary for the parties to appear first before the Judge to present to him the debate, and the system generally adopted, if the violation contained in the arbitral award transgresses public policy, means that the Judge must not order its enforcement, but if it only is prejudicial to private interests, the Judge must order its enforcement; and once decreed judicially, its enforcement is raised to the

category of a jurisdictional act and it is then that the one disadvantaged may have recourse to the federal courts with a petition of "amparo," which must be processed in a procedure involving two instances, as is noted in jurisprudence number 32/93 of the Third Court of the previous session of the Supreme Court of Justice of the Nation, published in the Gazette of the *Semanario Judicial de la Federación,* volume 72, December 1993, page 41, under the heading: "ARBITRAL AWARD, AGREEMENTS OF RATIFICATION AND ENFORCEMENT OF. AGAINST IT A SUIT FOR INDIRECT "AMPARO" IS ADMISSIBLE, PURSUANT TO ARTICLE 114, SECTION III, OF THE LAW ON "AMPARO," BUT NOT THE DIRECT "AMPARO" TO WHICH ARTICLE 158 OF THE SAME LAW ALLUDES.

FIRST THREE-JUDGE COURT OF THE FIFTEENTH CIRCUIT.

"Amparo" in review 138/2002. Mecalux, México, S.A. de C.V., May 28, 2002. Unanimous ruling. Judge who wrote the decision: Pedro Fernando Reyes Colín. Clerk: Ángel Rodríguez Rico."

(Emphasis added)

## FACTS

**ONE.** – The plaintiff **COMMISA** presented its petition for arbitration against the defendant PEP on the eleventh of February, two thousand and five.

**TWO.** – The defendant PEP presented its response to said petition for arbitration and a counterclaim on the third of May, two thousand and five.

**THREE.** – The plaintiff COMMISA presented its reply to the counterclaim on the fifteenth of June, two thousand and five.

**FOUR.** – The Arbitral Tribunal was constituted on the second of June, two thousand and five, the co-arbitrators José W. Fernández and Darío Oscós Coria designated Juan Fernández-Armesto as the President of the Arbitral Tribunal. This designation was confirmed by the Secretary General of the International Court of Arbitration of the International Chamber of Commerce, on the tenth day of the same month and year.

**FIVE.** – The Arbitral Tribunal prepared a draft of the Mission Statement which was signed within the term established by the International Court of Arbitration of the International Chamber of Commerce, in its session from the twelfth of August to the thirty-first of October, two thousand and five.

On the twentieth of September, two thousand and five, the Arbitral Tribunal issued Procedural Order no. 1 which included the procedural calendar.

SIX. – The plaintiff **COMMISA** presented its written petition on the sixteenth of January, two thousand and six. The defendant PEP responded to said written petition through its written response to the petition and its counterclaim on the second of March, two thousand and six.

SEVEN. – On the fifth of April, two thousand and six, the plaintiff **COMMISA** presented its written reply and on the ninth of May, two thousand and six, the defendant PEP presented its rejoinder to the plaintiff's reply.

EIGHT. – The corresponding hearings were held from the fifth to the ninth of June, two thousand and six in the J. W. Marriott Hotel in Mexico City, Federal District.

NINE. – On the fifteenth of January, two thousand and eight, the arbitral award was issued by the Arbitral Tribunal comprised of Juan Fernández Armesto as the Presiding Arbitrator and José W. Fernández and Dario Oscós Coria as co-arbitrators, resolving as follows:

"1.    To declare that it is competent to resolve all the claims and petitions formulated by "Corporación Mexicana de Mantenimiento Integral, S. de R. L. de C.V. ["Commisa"] in its petition and by "PEMEX Exploración y Producción ["PEP"] in its counterclaim.

2.    To declare that there is no impediment to undertaking to hear the claims and petitions formulated by Commisa in its petition and by PEP in its counterclaim.

3.    To order PEP to pay Commisa, for remuneration and indemnification, due to the shelter of contract EPC-28, the sum of "S" Mexican pesos ["PME"] calculated in accordance with the following formula

$$S = (A + B) \times 0.995$$

in which

"S" is the sum in Mexican pesos that PEP must pay Commisa
"A" is equal to 10,928,728 Mexican pesos
"B" is the sum in Mexican pesos that results from the conversion of 75,075,635 dollars of the United States of America ("USD") into Mexican pesos at the sale rate of exchange that the Bank of Mexico has determined and published in the *Diario Oficial de la Federación* on the business day immediately prior to September 29, 2002.
"+" is the addition sign
"x" is the multiplication sign
"=" is the equal sign

138

0.995 reflects the 5 mils reduction that Commisa is obligated to make to the Department of the Comptroller and Administrative Development.

4.    To order PEP to pay to Commisa, for financial expenses deriving from Contract EPC-28, interest calculated on the sum "S," defined in the foregoing Decision, the financial expenses that shall be due from September 29, 2002 until the date of actual payment, at the rate at each moment established by the Federal Law on Income for cases of extension in the payment of tax liabilities; the computation shall be done by days and the payment of the financial expenses shall be made together with that of sum "S" defined in the foregoing Decision.

5.    To declare that the amounts to the payment of which PEP has been ordered by virtue of the present arbitral award do not include the Mexican Value Added Tax.

6.    To order, in the matter of expense and costs:

(iii) Each party to assume one half of the fees and expenses of the arbitrators, one half of the administrative expenses of the International Chamber of Commerce and their own defense expenses.

(iv) To order PEP to pay to Commisa 200,000 USD as expenses incurred by it in order to defend itself from the objections of lack of jurisdiction of the Arbitral Tribunal and lack of prerequisites for admissibility argued by the former [i.e. PEP]

7.    To reject all the other claims and petitions of the parties.

The decision of the Arbitral Tribunal is hereby adopted unanimously, with the exception that arbitrator D. Oscós Coria dissented from the opinion of the majority in relation to Technical Disputes 36 ("Bad weather that affected the work of Castoro 10 and Bar Protector"), 34 and 35 ("Wait times on account of delays in the start of the work of Castoro 10 and Bar Protector") and the calculation of interest and costs.  His opinion in these aspects shall be reflected in an individual vote."

## *CONSIDERATIONS OF LAW BY VIRTUE OF WHICH THE ACTION THAT IS BEING EXERCISED THROUGH THE PRESENT MOTION MUST BE CONSIDERED AS ADMISSIBLE AND FOUNDED*

1. – My client is entitled to claim the order issued in the arbitral award of arbitral procedure 13716/CCO/JRF by virtue of the fact that it took part as the plaintiff, which was recognized by the Arbitral Tribunal, from which it obtained a favorable arbitral award.

As can be inferred from what has been done in the arbitration procedure of reference, whose definitive arbitral award is on record as evidence and base document for the action in the case file in which the action is filed, dated the fifteen of January, two thousand and eight, the Arbitral Tribunal, comprised of José W. Fernández, Juan Fernández Armesto and Dario Oscós Coria ordered the plaintiff, as can be seen on pages 182 and 183 of the arbitral award of reference, to pay the following amounts:

3    … the sum of "S" Mexican pesos ["PME"] calculated in accordance with the following formula

$$S = (A + B) \times 0.995$$

in which

"S" is the sum in Mexican pesos that PEP must pay Commisa
"A" is equal to 10,928,728 Mexican pesos
"B" is the sum in Mexican pesos that results from the conversion of 75,075,635 dollars of the United States of America ("USD") into Mexican pesos at the sale rate of exchange that the Bank of Mexico has determined and published in the *Diario Oficial de la Federación* on the business day immediately prior to September 29, 2002.
"+" is the addition sign
"x" is the multiplication sign
"=" is the equal sign
0.995 reflects the 5 mils reduction that Commisa is obligated to make to the Department of the Comptroller and Administrative Development.

4.    … to pay to Commisa, for financial expenses deriving from Contract EPC-28, interest calculated on the sum "S," defined in the foregoing Decision, the financial expenses that shall be due from September 29, 2002 until the date of actual payment, at the rate at each moment established by the Federal Law on Income for cases of extension in the payment of tax liabilities; the computation shall be done by days and the payment of the financial expenses shall be made together with that of sum "S" defined in the foregoing Decision.

6.    To order, in terms of expenses and costs, to

(ii)    … to pay to Commisa 200,000 USD as expenses incurred by it in order to defend itself from the objections of lack of jurisdiction of the Arbitral Tribunal and lack of prerequisites for admissibility argued by the former [i.e. PEP]."

2. - The present counterclaim is admissible without the precedent necessity of previously demanding the payment from the defendant, because the summons relating to each individual action should take the place of a judicial demand for payment.

3. – The persons who functioned as arbitrators in the arbitration procedure were never impeded from hearing and resolving the dispute submitted to their competence.

By virtue of the foregoing, it must be added that the Arbitral Tribunal was adequately and correctly constituted, given that:

My client complied with what is provided in the arbitration clause and the Rules of Arbitration of the International Chamber of Commerce at the time of designating its arbitrator, just as PEP itself did.

Deriving from the foregoing and as it has already been duly mentioned, it is hereby clarified that my client carried out the appointment of the arbitrator cited on the basis of his reputation and prestige as an impartial and independent arbitrator and knowledgeable in both the field of arbitration and the legal-commercial field.

4. – The present petition for recognition and enforcement of the arbitral award is admissible, by virtue of the fact that the parties submitted voluntarily and expressly to the arbitration procedure.

5. – What was resolved by the Arbitral Tribunal does not deal with the declaration of a violation of an issue of administrative law, but rather with the non-performance of a contractual obligation.

The specific case has as its assumption the prior existence of an obligation agreed upon by the parties, and the consequence of the non-fulfillment thereof is the payment of an indemnity for the damage caused by PEP to my client, a legal situation that implies the admissibility of the arbitration procedure.

6. – None of the suppositions contemplated in article 1462, fraction II of the Code of Commerce are present in this case.

Indeed, as can be inferred from what is ordered by said article, the judge may deny the recognition of the arbitral award if the object of the dispute is not open to arbitration or else if the recognition or the enforcement of the arbitral award are contrary to public policy.

In this sense, never were there any violations that could be categorized as procedural, formal or material violations in the issuance of the arbitral award. Such issues are not capable of involving a violation of public policy.

The concept of public policy to which article 1462 of the Code of Commerce, cited above, refers has nothing to do with the formalities of arbitration procedure. On the contrary, what the law is referring to with this is that the arbitral award or its enforcement involves the violation of laws, which, on account of their importance, contain higher values of the legal system. In other words, the text of the law does not refer to procedural norms of the arbitration, but rather to substantive norms, which, on account of their importance, are considered to be raised to category of public policy.

In this context, the arbitral award is in fact reasoned in terms of Mexican law. It contains the citation of the precepts that the arbitrators considered applicable to the specific case and it likewise contains the reasons, circumstances and considerations of fact and law on the basis of which they determined the direction of the decision.

It must also be pointed out that, in accordance with article 25 of the Rules of Arbitration of the International Chamber of Commerce, the only obligation that the arbitrators have in relation to the content of the arbitral award is that it be based on reasons. However, said providing of reason may not and cannot be interpreted in the terms of the obligation of the Mexican state jurisdictional authorities, given that this stems from the principle of due process existing in constitutional law, while the obligation of basing the arbitral award on reasons stems from an agreement between the parties.

In this sense, the Rules of Arbitration of the International Chamber of Commerce do not define the terms and scope of what must be understood by an arbitral award based on reasons. Nevertheless the interpretation that has been given in arbitral practice, especially considering the versions that exist in other languages, article 25 cited (as, for example, in the English language "The Award shall state the reasons upon which it is based," a free translation of which would be "The Award shall establish the reasons upon which it is based"); this means that it is enough for the reasons for the decision to be expressed in the arbitral award in order for it to be valid.

7. – There were no violations of arbitral procedure. As can be inferred from what is provided by article 15 of the Rules of Arbitration of the International Chamber of Commerce, national procedural law is applicable only if the Rules are remiss and also if the Arbitral Tribunal considers it appropriate to make reference to it.

For its part, article 15, paragraph 2, of the Rules of Arbitration cited, has a provision concerning the opportunity for defense.  In this respect, this article determines that the Arbitral Tribunal must grant the parties sufficient opportunity to present their case.

For this reason, it must be understood that the arbitration procedure must comply with sufficient formalities in order to be able to constitute a means for the solution of disputes.  In other words, it must provide the possibility that, both the plaintiff and the defendant are able to present their cases in order to constitute litigation.

Likewise it is required that the parties be able to offer the items of evidence to support their claims, that they be permitted to make allegations, if this is the case, and that the Arbitral Tribunal issue an award that coherently deals with the points presented.

The alleged incoherent application of administrative norms and norms of a commercial and even civil nature that PEP alleges in a manner that is inconsistent and lacking in logical sequence, with respect to the manner in which the arbitration procedure was carried out, are not essential formalities of the procedure.  Nor is the form in which the Arbitral Tribunal decided to interpret the binding content of the contract, especially the arbitration agreement contained in clause 23.3 of the contract that is the basis for the action and the scope that said agreement might have with respect to the various disputes that might arise on the basis of the fulfillment of said contract.

Such elements are part and derive specifically from the jurisdiction over the facts of the case that the Arbitral Tribunal holds exclusively.  The manner of evaluating the evidence, as well as the considerations by virtue of which the Arbitral Tribunal makes its decisions has nothing to do with the essential formalities of the procedure.  Such issues cannot be subject to analysis by a state court.

The autonomy of the Arbitral Tribunal in the making of its decisions and the corresponding recognition by the state courts is precisely the *raison d'être* of commercial arbitration.  Said institution has as its purpose the existence and recognition of a means for the solution of disputes based on the contractual intent and whose limits must be minimal in order to fulfill its reason for being, which is the swiftness and economy that is proper to commercial law.

In this sense, the defendant's arguments that consist [in maintaining] that the arbitral award must not be recognized because it does not observe the supposed essential formalities of the procedure, which the defendant considers to be the fact of taking into account the public interest involved in the contract that is the basis for the action, the supposed lack of providing foundation and grounds in various administrative laws that are supposedly applicable to the contract that is the basis for the action, the evidentiary value given to the documents offered as evidence, and the analysis of the lines of reasoning with respect to the "arbitrability" of the dispute regarding the various technical disputes submitted to arbitration, are not arguments which, according to what has been explained and according to what is ordered in article 1462 of the Code of Commerce, are capable of bringing about the repudiation of the arbitral award.

8. – Likewise it is important to take into account what is provided by article 33 of the Rules of Arbitration of the International Chamber of Commerce, which establishes that, in the event any one of the parties neglects to object to some act that he considers a violation of his rights to an adequate defense, at the first opportunity he has to do so, it shall be understood that he has lost his right to object to said act. This rule was confirmed in section (vii) of point G) of the Mission Statement that is binding upon the parties, as follows:

> "If, during the course of the procedure, any one of the parties notes that his right to a fair and equitable process or the principles of equality, hearing and refutation are being violated, he must make this known to the Arbitral Tribunal as soon as he notes it, with the understanding that, if he does not do so at the first opportunity, he is renouncing subsequent allegation thereof."

PEP never made known to the Arbitral Tribunal any type of violation of this kind.  Consequently, Your Honor must consider that it has renounced its right to allege any type of argument in the sense that the right to guarantee of hearing or due process was violated.

In this sense, the ground provided by section b), fraction I, of article 1462 of the Code Commerce is absolutely ruled out, in order for the party condemned in the final arbitral award, the recognition and enforcement of which is being petitioned, to allege a violation to its rights to an adequate defense.

The fact of the loss of this right is made even more conclusive by what is established in paragraph 41 of the arbitral award under comment, which can be seen on page 11 thereof, in which it is acknowledged that PEP was asked *"whether at any time during the arbitration*

*procedure the principles of hearing, refutation and equality had been violated or whether it [had] suffered any type of procedural defenselessness"* and the latter [i.e. PEP] declared that it had not suffered any procedural defenselessness and that the arbitration procedure was carried out in accordance with the principles of due process.

### DOCUMENTS

In compliance with what is ordered by articles 1061 and 1378 of the Code of Commerce, I hereby proceed to make a report of the documents on which my client has based its petitions.

**1. – THE PUBLIC DOCUMENTS,** consisting of official public document number 58.042, dated the fourteenth of March, two thousand and eight, granted in the presence of Notary Public number 1 of the Federal District, Licenciado Roberto Nuñez y Bandera, in which there is a record of the power of attorney granted by COMMISA to Licenciado Marco Tulio Venegas Cruz and others.

This item of evidence accredits the legal capacity with which COMMISA appears in the present motion for nullity. It is appropriate for accrediting this fact by virtue of the fact that the power of attorney contained in the official public document of reference was granted before a notary public complying with the formalities required by the Federal Civil Code for this purpose.

The present item of evidence is related to each and every one of the acts of the present response and counterclaim, especially to the legal capacity with which the undersigned Mario Tulio Venegas Cruz appears in representation of COMMISA.

**2. – THE PRIVATE DOCUMENTS,** consisting of the certified copy dated the twenty-eighth of February, two thousand and eight, issued by Jason A. Fry, Secretary General of the International Court of Arbitration of the International Chamber of Commerce, with respect to the final arbitral award dated the fifteenth of January, two thousand and eight, issued in arbitration 13716/CCO/JRF conducted between COMMISA and PEP.

This item of evidence is presented to comply with what is provided by article 1061 of the Code of Commerce for the purpose that the final arbitral award be recognized and executed by Your honor.

This certified copy is appropriate to accredit this point by virtue of the fact that the certification that it contains was issued by the International Court of Arbitration of the International Chamber of Commerce,

which was precisely the institution administering the arbitration which gave rise to the arbitral award that is the object of the present procedure.

This item of evidence is related to each and every one of the facts of the present response and especially to those referred to in the counterclaim.

**3. – THE PRIVATE DOCUMENTS**, consisting in a certification dated the twenty-ninth of February, two thousand and eight, issued by Jason A. Fry, Secretary General of the International Court of Arbitration of the International Chamber of Commerce, in which the following is certified:

1) that, CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V. (formally called CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S.A. de C.V.) (Mexico) was the Plaintiff in an arbitration procedure against PEMEX-EXPLORACIÓN Y PRODUCCIÓN (Mexico) ("the Defendant") (reference number 13716/CCO/JRF);

2) that the Defendant in the arbitration was received by the Secretariat on February 14, 2005;

3) that, in accordance with the record of the express messaging company DHL, the Petition for Arbitration was received by the Defendant on February 22, 2005;

4) that the Response to the Petition for Arbitration was presented on May 3, 2005.

5) that, in accordance with the record of the express messaging company DHL, the Final Arbitral Award dated January 15, 2008 was received by the Defendant on February 11, 2008.

This item of evidence is offered to accredit the facts that are set forth in the certification in relation to various procedural events that were verified during the processing of arbitration procedure 13716/CCO/JRF.  This item of evidence is appropriate to accredit the points contained therein by virtue of the fact that it was issued by the Institution administering the arbitration that concluded in the arbitral award that is the object of the present procedure.

This item of evidence is related to each and every one of the facts in the present petition, especially to the fact that the essential formalities of the procedure contemplated in the Rules of Arbitration of the International Chamber of Commerce were observed.

**4. – THE PRIVATE DOCUMENTS**, consisting in a certified copy dated the twenty-eighth of February, two thousand and eight, written by Jason A. Fry, Secretary General of the International Court of Arbitration of the International Chamber of Commerce with respect to the Mission Statement or "Terms of Reference" signed by the arbitrators, the representatives of COMMISA and PEP.

The present is offered to accredit the express manifestation of intent and agreement that existed between the parties to the arbitration on the points on which the Arbitral Tribunal was to rule; in other words, the delineation of the dispute that the latter was supposed to resolve. This item of evidence accredits that the parties expressly submitted to the determination that was eventually made by the Arbitral Tribunal, consisting of the final arbitral award, which PEP has now challenged as null.

This item of evidence is appropriate to accredit the fact referred to in the previous paragraph by virtue of the fact that it faithfully corresponds to the original, which was in turn signed by the parties.

The present item of evidence is related to each and every one of the facts related in the present written petition, particularly the fact that the Arbitral Tribunal resolved, in the final arbitral award, the points that the parties expressly consented made up the disputes at issue in the arbitration.

**5. – THE PUBLIC DOCUMENTS**, consisting in the paper file dated the nineteenth of May, two thousand and eight, issued by Licenciado Miguel Soberón Mainero, Notary Public number 181, of the Federal District, with respect to the document consisting of Annex C of Contract number PEP-O-IT 136/98.

This item of evidence is offered to accredit that what is presented in the aforesaid Annex C was the material to which clause 23.2 of the Contract referred in an exclusive and limitative manner and in that sense, only with respect to the material dealt with in said Annex C could there have arisen any technical disputes at any given moment. In this sense, the technical disputes to which Annex C referred do not correspond to those for which the arbitral award issued an order.

This item of evidence is appropriate to accredit the fact under comment because it is the full proof of the contents of said Annex C and, in this sense, it will show beyond any doubt that the text of clause 23.2 of the Contract makes reference only to technical disputes that might arise by reason of what is provided in said Annex C.

This item of evidence is related to each and every one of the facts in the present written response and counterclaim, especially with respect to the fact that the condemnations issued in the arbitral award referred to technical disputes distinct from those that were the matter of clause 23.2 of the Contract.

**6. – THE PUBLIC DOCUMENTS**, consisting of the translation dated the nineteenth of May, two thousand and eight, made by Alberto de la Santa Cruz Manzano Alba, Expert Translator no. P.125-2004, with respect to two citations: the first of these consists of paragraph 9-32 of the book REDFERN, Alan, HUNTER, Martin; BLACKABY, Nigel; and PARTASIDES, C. *Law and Practice of International Commercial Arbitration*, Klewer Law International, 2004, p. 1-50; the second consists of one paragraph from page 180 of the book BROCHES, Aron, *Commentary on the UNCITRAL Model Law. Council for International Commercial Arbitration*, Kluwer Law International, vol. IV, 2004.

The present item of evidence is offered to accredit that COMMISA fulfilled what is provided by article 131 of the Federal Code of Civil Procedure in relation to the translations into Spanish that must be submitted with respect to documents that are presented in a foreign language. The same is appropriate to accredit each fulfillment, given that it was issued by a translator authorized to issue translations like this specific one.

This item of evidence is related to each and every one of the facts in the present written response and counterclaim, especially in relation to the doctrine on international arbitration with respect to the most accepted concept of "public policy," which is completely removed from the one deceitfully proposed by PEP.

**7. – THE PRIVATE DOCUMENTS**, consisting in the Public Works Contract with Unit Prices and Determined Time number PEP-O-IT-236/98 dated the fourth of September, nineteen hundred and ninety-eight concluded between COMMISA and PEP, which was the object of the arbitration that gave rise to the final arbitral award that is the object of the present procedure.

This item of evidence is offered on the basis of article 210 of the Federal Code of Civil Procedure and I make my own the same document offered by PEP in its initial written motion for nullity, as point 4, of the paragraph designated as "List of Documents that Accompany the Petition," which can be seen on page 292 thereof. This item of evidence accredits the existence of arbitration clause 23.3 and the foundation of all the claims that were the grounds for the arbitral award, which is the object of the present procedure and the recognition and enforcement of which is sought by COMMISA.

This item of evidence is related to each and every one of the facts in the present petition, especially to the contractual basis of the arbitral dispute, on the competence of the Arbitral Tribunal to rule with respect to the disputes arising in relation to said Contract and the arbitral award itself.

On the basis of what has been set forth and founded above,

I hereby respectfully ask **YOUR HONOR** to please:

**ONE.** – Consider me as having appeared in representation of **CORPORACIÓN MEXICANA DE MANTENIMIENTO INTEGRAL, S. DE R.L. DE C.V.,** filing the present motion for recognition and enforcement of the arbitral award, as well as exhibiting the documents that are attached to the present written petition.

**TWO.** – Order that PEMEX EXPLORACIÓN Y PRODUCCIÓN be summoned through notification in person.

**THREE.** – At the right moment in the procedure, to issue a ruling in which the recognition and enforcement of the arbitral award that is sought by my client will be declared admissible, and that PEMEX EXPLORACIÓN Y PRODUCCIÓN be ordered to pay the amounts to which it was condemned in the arbitral award of the fifteen of January, two thousand and five.

Duly affirmed under penalty of perjury

Mexico City, Federal District, on the nineteenth of May, two thousand and eight.

*{Signature}*

_____

***MARCO TULIO VENEGAS CRUZ***
in representation of
**CORPORACIÓN MEXICANA DE MANTENIMIENTO
INTEGRAL, S. DE R. L. DE C. V.**

149